# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLAKE OF CHICAGO CORP., *et al.*<br>f/k/a A.B. DICK COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 04-12002 (JLP)<br><br>Jointly Administered |
| MHR CAPITAL PARTNERS LP, MHR<br>INSTITUTIONAL PARTNERS LP, MHRM<br>LP, and MHR FUND MANAGEMENT LLC,<br><br>Appellants,<br><br>v.<br><br>BLAKE OF CHICAGO, CORP., *et al.*,<br>f/k/a A.B. DICK COMPANY, *et al.*, and<br>PRESSTEK, INC.,<br><br>Appellees. | Appeal No. 04-CV-1498 |

## OPENING BRIEF OF APPELLANTS MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC

Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
LANDIS RATH & COBB
919 Market Street
Suite 600
Wilmington, DE 19899

David S. Rosner
Michael M. Fay
Kim Conroy
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Counsel to Appellants MHR Capital Partners LP,
MHR Institutional Partners LP, MHRM LP and
MHR Fund Management LLC

Dated: March 11, 2005

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................................ 1

SUMMARY OF ARGUMENT ............................................................................ 4

STATEMENT OF FACTS ................................................................................. 4

    I.     Evidence Of Presstek's Bad Faith............................................................ 4

          A.    The Stock Purchase And Escrow Agreements............................................. 4

          B.    Presstek's Pretext For Terminating The SPA And
              Escrow Agreements ........................................................................ 6

              1.    Despite Presstek's Claims To The Contrary, Key Bank
                    Agreed To Continue Funding ABD ................................................. 6

              2.    Presstek Failed To Perform Its Obligations Under
                    The Escrow Agreement.................................................................. 9

          C.    Presstek Coerced ABD To Execute The APA............................................. 9

          D.    Presstek's Spurious Rationale For The APA ............................................ 11

          E.    Presstek Terminated A Valuable ABD Asset Immediately
              Prior To The Filing Of The APA And Announcement Of
              The Section 363 Auction ........................................................... 13

    II.    The Hearing ................................................................................. 14

    III.    Presstek's Improper Response ......................................................... 15

ARGUMENT ............................................................................................. 15

    I.     Record Evidence Demonstrates That The Order's Finding That
         Presstek Was A Good Faith Purchaser Is Clearly Erroneous .............................. 16

    II.    The Bankruptcy Court Failed To Make Any Specific Factual
         Findings Regarding Presstek's Good Faith.............................................. 18

CONCLUSION ........................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76
(3d Cir. 1999)............................................................................................................... 16

*Commissioner v. Duberstein*, 363 U.S. 278 (1960) ....................................................... 19

*Entin v. Bristol*, 368 F.2d 695 (2d Cir. 1966) .............................................................. 18

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416
(S.D.N.Y. 1999)........................................................................................................... 17

*Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*, 57 F.3d 1215
(3d Cir. 1995)............................................................................................................... 16

*Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284
(2d Cir. 1997)............................................................................................................... 17

*Haines v. Liggett Group, Inc.*, 975 F.2d 81 (3d Cir. 1992)............................................ 16

*High River Limited Partnership v. Trans World Airlines, Inc., (In re Trans World Airlines, Inc.)*, 2002 U.S. Dist. LEXIS 5951 (D. Del. 2002).................................... 20

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986)........................... *passim*

*In re Landmark Distributors, Inc.*, 189 B.R. 290 (Bankr. D.N.J. 1995)....................... 17

*In re Pisces Leasing Corp.*, 66 B.R. 671 (E.D.N.Y. 1986)............................................ 17

*In re Rock Indus. Mach. Corp.*, 572 F.2d 1195 (7th Cir. 1978).................................... 16

*Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci, Inc.)*, 126 F.3d 380
(2d Cir. 1997)......................................................................................................... 16, 17

*Morgan v. Wind Down Associates, LLC (In re Polaroid Corp.)*, 2004 U.S. Dist.
LEXIS 19822 (D. Del. Sept. 30, 2004)...................................................................... 19

*Rachmani Corp. v. 9 East 96th St. Apartment Corp.*, 211 A.D. 2d 262,
629 N.Y.S.2d 382 (1st Dep't 1995)............................................................................ 18

*Taylor v. Lake (In re Cada Investments, Inc.)*, 664 F.2d 1158 (9th Cir. 1981) ........... 16

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948).............................................. 16

*Young v. Hunter*, 6 N.Y. 203 (N.Y. 1852) ................................................................... 18

*Zim Israel Navigation Co. v. Indonesian Exps. Dev. Co.*, 1993 U.S. Dist.
    LEXIS 3513 (S.D.N.Y. Mar. 24, 1993) ..................................................................... 17

## Statutes and Rules

11 U.S.C. § 363(b) ................................................................................................. 1, 16

11 U.S.C. § 363(m) ................................................................................................ *passim*

Fed.R.Civ.P. 52(a) ............................................................................................ 4, 19, 21

## Other

BLACK'S LAW DICTIONARY, 127 (5th ed. 1979) ............................................................ 17

FARNSWORTH ON CONTRACTS § 8.16 (3d ed. 1999) ...................................................... 17

MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund
Management LLC (collectively, "MHR"), the largest unsecured creditor of Blake of Chicago
Corp., f/k/a A.B. Dick Co. ("ABD") and Paragon Corporate Holdings, Inc. ("Paragon," and
collectively with ABD, Multigraphics, LLC and Interactive Media Group, Inc., the "Debtors"),
by their undersigned counsel, hereby submit this opening brief in support of their appeal from the
findings of good faith in the November 3, 2004 order of the Bankruptcy Court: (a) authorizing
the sale of substantially all of the assets of ABD and its wholly-owned subsidiaries free and clear
of liens, claims and encumbrances; (b) authorizing assumption and assignment of certain
unexpired leases and executory contracts; and (c) granting related relief (the "Order" (Docket
No. 460; A569)).[1]

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This appeal arises out of the Debtors' motion (the "Sale Motion") – made in Bankruptcy
Case No. 04-12002 and pursuant to 11 U.S.C. § 363(b) and (m) – to sell substantially all of
ABD's assets to Presstek, Inc. ("Presstek"). MHR objected to, and now appeals from the Order
granting, the Debtors' request that Presstek be determined a "good faith purchaser" of ABD's
assets pursuant to Section 363(m).

Debtors filed their bankruptcy petitions on July 13, 2004. That same day, Debtors also
filed the Sale Motion, seeking approval of the terms of an Asset Purchase Agreement, dated
July 13, 2004 ("Asset Purchase Agreement" or "APA"), which provided that Presstek would pay
approximately $40 million to purchase the assets of ABD. However, the Sale Motion failed to
inform the bankruptcy court that less than one month prior to execution of the APA, Presstek had
agreed to the terms of a Stock Purchase Agreement, dated June 16, 2004 ("Stock Purchase

---

[1]     Submitted herewith is an Appendix, the pages of which are numbered "A[page number]."

Agreement" or "SPA"), whereby Presstek had committed to purchasing the common stock of ABD – and thus substantially all of ABD's assets *and* debts – for the higher price of $44.1 million. The Stock Purchase Agreement, which Presstek calculated as having a total cost of over $41 million more than the Asset Purchase Agreement, was terminated by Presstek on a pretext: *i.e.,* that ABD had been denied further bank financing when, in fact, such financing had been obtained.

Nonetheless, having abandoned the SPA, Presstek used the Debtors' desperate financial condition to coerce ABD into a much less advantageous deal (*i.e.*, the APA) that will likely provide no return whatsoever to unsecured creditors. In fact, Debtors have recently informed the bankruptcy court that they are only "marginally solvent," and MHR will soon be moving to convert this proceeding to Chapter 7.

MHR filed objections to the Sale Motion on August 9, 2004 (A32) and supplemental objections on October 29, 2004 (A110), arguing, among other things, that Presstek's refusal to abide by its obligations under the earlier SPA precluded a finding that Presstek was a good faith purchaser with respect to the APA under Section 363(m).

On November 2 and 3, 2004, an evidentiary hearing was held before the bankruptcy court on the Sale Motion (the "Hearing"). During the Hearing, neither the Debtors nor Presstek offered anything refuting MHR's evidence of Presstek's bad faith in rejecting the Stock Purchase Agreement. Nonetheless, on or about November 3, 2004, the bankruptcy court granted the Sale Motion and issued the Order, which approved the sale of ABD's assets to Presstek (A569). The Order also found that Presstek's acquisition affiliate ("Silver") was a good faith purchaser pursuant to Section 363(m), but set forth no specific facts in support of this finding and failed even to mention Presstek's rejection of the SPA.

MHR timely noticed its appeal from the Order on November 3, 2004 (A610) and timely filed its Designation of Record and Statement of Issues on November 15, 2004 (A613).

This appeal presents a paradigm case of bad faith by a Section 363(b) purchaser and substantial injury to unsecured creditors as a result thereof. Presstek's wrongfully terminated Stock Purchase Agreement would have prevented an ABD bankruptcy and satisfied all creditors' claims; the under-priced Asset Purchase Agreement compelled ABD to seek Chapter 11 protection, satisfied only ABD's secured creditor's claim and resulted in a likely administrative insolvency.

Accordingly, this case presents a compelling opportunity for the Court to send the much-needed message that a Section 363(m) good faith determination should not be, as it was here, a mere rubber-stamping of a debtor's unsubstantiated assertions. Most significantly, through its conclusory finding of good faith, the bankruptcy court not only allowed Presstek to purchase ABD's assets at an unreasonably low price, but it also extinguished the single greatest asset of the Debtors' estate: the Debtors' claim against Presstek for its unlawful termination of the Stock Purchase Agreement.[2]  Even the Debtors' own financial advisor agreed at the Hearing that the value of that SPA-based claim could be as high as $30 million. Accordingly, as demonstrated in more detail below, the Order should be:

> (a)  reversed in its entirety for Presstek's lack of good faith under 11 U.S.C. § 363(m) or, at the very least, to the extent that the Order approved that portion of the APA releasing the Debtors' claims against Presstek under the Stock Purchase Agreement; or

---

[2]    The Asset Purchase Agreement released all of the Debtors' claims against Presstek. (Docket No. 70, Exh. A, § 13.17)

(b)    reversed and remanded with directions that the bankruptcy court conduct a

hearing on, and consistent with Fed.R.Civ.P. 52(a) make specific factual findings

regarding, Presstek's good or bad faith in terminating the SPA.

## SUMMARY OF ARGUMENT

1.    The bankruptcy court's finding that Presstek was a good faith purchaser of ABD's

assets pursuant to 11 U.S.C. § 363(m), and otherwise engaged in good faith conduct with respect

to the APA, was clearly erroneous under the holding of *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143 (3d Cir. 1986) and related case law in that Presstek's unlawful termination of the Stock

Purchase Agreement – and coercive conduct in forcing the Debtors into the Asset Purchase

Agreement – was bad faith conduct.

2.    The bankruptcy court's failure to set forth specific findings of fact with respect to

Presstek's good or bad faith in purchasing ABD's assets violated the directives of *In re Abbotts

Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) and the express provisions of Fed.R.Civ.P.

52(a).

## STATEMENT OF FACTS

### I.    Evidence Of Presstek's Bad Faith

#### A.    The Stock Purchase And Escrow Agreements

Presstek first approached ABD regarding a potential acquisition in July of 2003.

(10/14/04 Deposition of Paragon Director Frank Zaffino ("Zaffino Dep."), A162, lines 14 to19;

July 1, 2003 Presstek email, A394)  Over the course of the next eleven months, Presstek made

various proposals to ABD, obtained financial information regarding ABD, conducted analyses of

ABD, and negotiated terms for a stock purchase (and at times an asset purchase) agreement with

respect to ABD.  (*See* A393-407, A433-436, A444-446; *see also* 10/20/04 Deposition Testimony

of Presstek CFO Moosa E. Moosa ("Moosa Dep."), A251, lines 6 to 22)

These negotiations concluded with a final SPA, which was executed by ABD and Paragon on June 16, 2004 and then placed into escrow. (SPA, A041-109) The terms of the SPA provided, among other things:

(a)     Presstek would pay $20.1 million in cash and $24 million in Presstek stock for the stock of ABD (SPA, § 2.2);

(b)     The SPA was being executed based on ABD's warranties as to the accuracy of its financial statements as of March 31, 2004 (*id.*, § 3.7);

(c)     A final set of ABD financial statements was to be prepared five days before closing, and should these final statements show a defined amount of financial deterioration, the purchase price would be adjusted (*id.*, § 2.3); and

(d)     Prior to closing, ABD's indebtedness to its secured lender, Key Corporate Capital, Inc. ("Key Bank"), would not exceed $24 million or $26 million with Presstek's permission (*id.*, § 9.12).

The parties also agreed that the SPA would close in 30 days. (10/22/04 Deposition of Presstek CEO Edward J. Marino ("Marino Dep.") at A317, line 19, to A318, line 21; Moosa Dep. at A241, lines 4 to 8)

Presstek did not sign the SPA on June 16, 2004, purportedly because it wanted to avoid a reportable event. (*See* A370-371) Instead, the parties agreed on the terms of an Escrow Agreement ("Escrow Agreement" or "Escrow"), whereby the SPA was to be escrowed for a short period, with Presstek as escrow agent. (Escrow, A421-425) Both Presstek's CFO, Moosa, and CEO, Marino, testified that the Escrow Agreement, if fulfilled, bound Presstek to the SPA's terms:

Q.     Did you believe that, as of June 16th, that Presstek was bound to the agreement?

A.    Oh, sure.

MR. SLATTERY:    Which agreement are you talking about?

MR. PHILLIPS:    The stock purchase agreement.

MR. SLATTERY:    Okay.

A:    Yes, assuming the escrow was fulfilled.

(Marino Dep. at A321, line 18, to A322, line 3; *see also* 10/25/04 Deposition Testimony of

Moosa E. Moosa ("Moosa Dep. 2"), at A266, lines 19 to 24)

By its terms, the Escrow Agreement provided that Presstek would sign and perform under

the SPA after:

(a)    Presstek directed its financial advisor to complete its financial diligence,
       obtained a fairness opinion and submitted the SPA to the Presstek Board
       for approval; and

(b)    Key Bank consented to the SPA and agreed to continue funding ABD
       through closing.  (Escrow Agreement, §§ 3(a)-(b))

Presstek was required to complete its obligations under the Escrow by June 25, 2004; Key

Bank's consent to the SPA and continued funding needed to be obtained by June 22, 2004.  (*Id.*)

Marino testified that as of June 16, 2004, the Presstek Board of Directors ("Presstek Board") had

already approved the SPA.  (10/25/04 Deposition of Edward J. Marino ("Marino Dep. 2") at

A326, lines 13 to 23)

**B.    Presstek's Pretext For Terminating
       The SPA And Escrow Agreements**

**1.    Despite Presstek's Claims To The Contrary,
        Key Bank Agreed To Continue Funding ABD**

On June 22, 2004, in an email from its counsel to ABD, Paragon and MHR

representatives, Presstek terminated the SPA and Escrow Agreement based on Key Bank's

purported failure to consent to further funding of ABD. (6/22/04 McDermott, Will & Emery email, A364-365) In fact, earlier in the day, Moosa of Presstek had sent a letter to Michael Lugli ("Lugli") of Key Bank indicating that Key Bank's purported refusal to approve the SPA and fund ABD through closing would terminate the SPA. (6/22/04 Moosa Letter to Lugli, A517-A518)

*Key Bank, however, had responded to Moosa's letter and had agreed both to approve the Stock Purchase Agreement and to fund ABD through the closing of that Agreement.*[3] (6/22/04 Lugli letter to Moosa, A373-374) In so consenting, Key Bank had only three conditions, all of which had already been agreed to by the parties:

(a)  that any Presstek due diligence be completed by June 28 (the Escrow required completion by June 25);

(b)  that Presstek consent to the increase of ABD's indebtedness to Key Bank to $26 million (the maximum allowed by the SPA was $26 million);[4] and

(c)  that the closing occur by July 16, 2004, 30 days after the escrowing of the SPA (the parties had already agreed to close in 30 days).

All parties agreed that Key Bank had consented to further funding. Lugli of Key Bank obviously believed he had consented to funding ABD through closing. (Lugli Dep. at A350, lines 3 to 9) ABD's CEO, Brian Longe ("Longe"), testified that Key Bank had continued

---

[3]    On Thursday, June 17, 2004, Marino, Moosa and James Scafide ("Scafide"), Presstek's General Counsel, met with Lugli of Key Bank in Cleveland, Ohio. (10/6/04 Deposition of Key Bank employee Michael Lugli ("Lugli Dep."), at A334, lines 3 to 19) At that meeting, Key Bank advised that it was unwilling to fund the SPA transaction through closing and suggested that Presstek provide the necessary funding. (Lugli Dep. at A337, line 3, to A339, line 20) However, subsequently, Robert Tomsich – a long time customer of Key Bank and the President and CEO of NESCO, Inc., the majority shareholder of Paragon – agreed to pledge cash collateral to Key Bank to secure a $2 million over-advance to ABD (Lugli Dep. at A331, lines 11 to 13; A339, line 21, to A340, line 10), and on the following Monday, June 22, 2004, Key Bank agreed to fund ABD through closing.

[4]    As of June 16, 2004, ABD's indebtedness to Key Bank was just over $22 million (A527); as of June 18, 2004, with new funding from Key Bank, it was just over $24 million (A521).

funding and Paragon Director Frank Zaffino ("Zaffino") testified that he believed Presstek's termination email was sent simply because Presstek had not seen Key Bank's consent letter. (Longe Dep. at A152, line 16, to A153, line 5; Zaffino Dep. at A201, lines 1 to 21)  In addition, Presstek CFO Moosa testified that Key Bank agreed to "one element" – *i.e.,* funding through closing – and Presstek consultant and present employee, Michael McCarthy ("McCarthy"), testified that Moosa told him that Key Bank had consented to funding.  (Moosa Dep. at A237, lines 4 to 18; 10/20/04 Deposition of Michael McCarthy ("McCarthy Dep.") at A360, line 17, to A361, line 3)  Even Presstek's CEO, Marino, admitted that Key Bank had consented to $2 million in additional funding.  (Marino Dep. at A274, lines 17 to 25)

Presstek, however, refused to accept this consent.  As Lugli of Key Bank testified, after receiving Key Bank's letter, Presstek representatives called Lugli and stated that despite Key Bank's consent to further funding, Presstek was taking the position that unless Key Bank signed the draft "Consent and Agreement" ("Consent") appended to the Escrow Agreement, Key Bank's consent was not sufficient.  (Lugli Dep. at A347, lines 5 to 18)  This position – which was a ludicrous form over substance argument – was an obvious pretext for abandoning the SPA. Indeed, Presstek's June 22 letter to Lugli of Key Bank never once mentioned a requirement that a specific form of "Consent" be executed.  (A517-518)

Nonetheless, even after receiving the unambiguous consent letter from Key Bank, Marino told his fellow Board members that Key Bank had "refuse[d] funding through closing." (6/29/04 Marino email, A430)  As Lugli testified:

> Q.    At some level, Mr. Lugli, did you view [the June 22nd Presstek] letter [claiming that Key Bank had not consented] as an attempt by Presstek to get out of a bad deal?
>
> A.    Absolutely.

(Lugli Dep. at A344, lines 11 to 14)

Interestingly, the June 22 email in which Presstek ultimately declared the Escrow Agreement terminated was sent by Presstek attorney James Goldsmith. (A364-365) That same attorney had, only days before on June 15, 2004, conceded that "[f]rom my perspective, obtaining [Key Bank's] 'consent' means they approve of the transaction contemplated by the Purchase Agreement . . . ." (6/15/04 Goldsmith email, A367) Under Goldsmith's June 15 interpretation of "consent," Key Bank's consent was clearly obtained on June 22.

### 2. Presstek Failed To Perform Its Obligations Under The Escrow Agreement

By its own admission, Presstek never really commenced – much less completed – the financial diligence contemplated by the Escrow Agreement.[5] (Moosa Dep. at A226, lines 4 to 7) Moreover, Presstek never sought the fairness opinion required by the Escrow, or held the Presstek Board meeting that might have still been necessary under that Agreement. (Moosa Dep. 2 at A269, lines 8 to 14; Marino Dep. 2 at A326, line 6, to A327, line 12) Apparently, with the pretext and outright misrepresentation that Key Bank was refusing to fund, Presstek believed it could walk away from its SPA obligations.

### C. Presstek Coerced ABD To Execute The APA

Presstek's pretextual termination of the SPA and Escrow Agreement placed ABD in a grave position. As Zaffino testified, ABD had "very little" negotiating power over the APA. (Zaffino Dep. at A194, lines 9 to 12) ABD director Jim Wert similarly noted that the Debtor "companies had no leverage in negotiations with PT [Presstek]." (A535, point 4)

---

[5]     Despite close to a year of due diligence, Moosa testified that as of June 16, 2004 – the date that the parties escrowed the SPA – there was still "extensive" due diligence to be completed. (Moosa Dep., at A224, lines 9 to 13) This testimony, of course, is not credible on its face. Pursuant to the terms of the June 16th Escrow Agreement, any final financial diligence had to be completed by June 25, 2004 – nine days later. (Escrow, § 3; Moosa Dep., at A224, line 14, to A225, line 2) Despite this tight schedule, Presstek conducted no due diligence on eight of those days – June 17, 18, 19, 20, 22, 23, 24 or 25. (Moosa Dep., at A226, line 4, to A229, line 6)

Presstek took full advantage of the situation. In a telephone call that likely took place even before Presstek "terminated" the Escrow and SPA,[6] Presstek representatives told ABD that a new price of $40 million was the most Presstek would pay. (Zaffino Dep. at A165, lines 3 to 13) By June 23, 2004 – *only one day after Presstek terminated the Escrow and SPA* – Presstek had prepared a term sheet setting forth an incredibly advantageous deal: a purchase of only ABD's assets for only $40 million. (A491-494) Paragon Director Zaffino offered this opinion:

> Q.    [L]et me ask you if you personally believed Moosa's statement that the deal was changing because the company was no longer what they thought the company was as opposed to simply the fact that they now had the leverage to do what they wanted to do? I'm asking you for your personal belief.

MR. PHILLIPS: Objection. Go ahead.

> A.    I think Moosa is a very shrewd negotiator, and I would not be surprised if, in fact, this was part of his methodology.

(Zaffino Dep. at A197, line 20, to A198, line 6)

Presstek's own internal calculations showed that the total cost of this new deal was over $41 million less than the SPA. (A427) As Presstek CEO Marino told the Presstek Board, the new deal:

- "yields a significant financial advantage to Presstek," and

- is structured so that "[m]any liabilities are 'left behind.'"

(6/26/04 and 6/29/04 Marino emails, A409; A430-431)

With no bargaining power, ABD accepted the deal and, as required by the express terms of the APA, filed for bankruptcy on July 13, 2004. Notably, ABD survived from June 16 to July 13 – only three days shy of the 30 day closing period for the SPA – requiring approximately $2

---

[6]    Zaffino received a "late night" call from Moosa who "suggested" that in order for the deal to go through, ABD would have to accept a reduced price of $40 million and agree to file for Chapter 11 bankruptcy protection, if ABD "had the stomach for it." (Zaffino Dep. at A164, line 19, to A165, line 8) Zaffino also testified that the call probably took place before June 22. (*Id.* at A187, line 25, to A188, line 19)

million in additional financing from Key Bank, the amount to which Key Bank had agreed in its June 22nd letter. (Lugli Dep. at A338, lines 3 to 13; A341, lines 3 to 15)

### D.    Presstek's Spurious Rationale For The APA

Although Presstek never created any written financial model justifying a $40 million price for the assets of ABD (Moosa Dep. at A254, line 22, to A255, line 9), or the one-day dramatic "reversal" causing ABD to lose half of its value,[7] Presstek contends that during a single meeting with ABD officials on June 21, 2004, it learned that ABD had "hidden" financial information from it, and that ABD was in worse financial condition than Presstek believed. (Marino Dep. at A297, line 7, to A298, line 15; A456) This meeting was originally scheduled to take place in May 2004, but was cancelled by Presstek. (Marino Dep. at A285, lines 7 to 18; A471-477)

Presstek's contention – which, even if true, could never support a $40 million reduction in Presstek's commitment – does not withstand scrutiny. First, as the Stock Purchase Agreement expressly provided, any material change in ABD's financial condition resulted in an adjustment to the SPA purchase price (SPA, § 2.3), and not a termination of that Agreement.

Second, as ABD officials testified, and as the documents produced make clear, Presstek was receiving information about ABD, and conducting due diligence of ABD, for at least eleven months prior to the execution of the Stock Purchase and Escrow Agreements on June 16, 2004. (A376-381, A394, A396-400, A402-407, A454; Marino Dep. at A301, line 13, to A302, line 13; Longe Dep. at A141, line 19, to A144, line 7; A147, line 18, to A148, line 9) Presstek CFO Moosa was responsible for coordinating due diligence and was assisted by a team of Presstek personnel, outside auditors and lawyers. (Moosa Dep. at A221, lines 3 to 22)

---

[7]    According to Moosa, the $40 million figure was the result of "an analysis of the business, as we saw it, on the 21st of June" and that the $40 million number was the result of a "mental calculation" that he performed after June 21. (Moosa Dep. at A244, line 15, to A245, line 19)

Paragon Director Zaffino testified that Presstek made repeated requests for ABD financial information, often requesting the same data more than once. (Zaffino Dep. at A168, line 16, to A169, line 2) Indeed, as of June 16, 2004, Presstek had copies of ABD's financial information through May 31, 2004. (Moosa Dep. at A251, lines 6 to 22) It is simply impossible that Presstek was not fully cognizant of the exact state of ABD's financial health.

When asked what "new" information Presstek learned on June 21, 2004, Presstek witnesses identified (a) a liquidity crisis at ABD resulting from an erosion of ABD's borrowing base, and/or (b) projected lower ABD revenues/profitability. (Moosa Dep. at A254, lines 2 to 7; Marino Dep. at A282, lines 2 to 24; A286, line 10, to A287, line 19) Of course, the liquidity crisis at ABD was well known and was the reason that the Escrow Agreement was conditioned on further funding from Key Bank. In fact, Presstek had received various communications prior to the June 16, 2004 execution of the Stock Purchase and Escrow Agreements which made it clear that Key Bank was concerned about its loan with ABD and that ABD was short on cash. (A479-481, A483-485, A487-488; *see also* 10/28/04 Deposition of James Wert at A532, line 10, to A533, line 16)

As for revenues, the hard data in Presstek's possession did not show a dire change in ABD. In fact, through May 2004, ABD had actual revenues that were averaging more than the annual revenue projections included in forecasts prepared by Presstek's financial advisor in April and May. (A440 (April), A451(May), A462 (post-June 21)) Nonetheless, in justifying the ridiculously low price of $40 million to its Board, Presstek officials predicted that from May 2004 to the end of the year, ABD would average less than $10 million in revenues a month. (A462) This forecast was unreasonably low, and – as Presstek CEO Marino conceded – not

12

borne out by real data for the months following May 2004. (Marino Dep. at A293, line 24, to A294, line 13; A296, lines 3 to 13)

**E.    Presstek Terminated A Valuable ABD Asset Immediately Prior To The Filing Of The APA And Announcement Of The Section 363 Auction**

In addition to breaching its obligations under the Stock Purchase and Escrow Agreements, on or about July 8, 2004, Presstek also acted to deprive ABD of a valuable asset – *i.e.,* its October 2003 joint development agreement ("JVA") with Presstek for certain metal printing plate-making technologies known by the tradenames "Vector" or "Freedom." (Moosa Dep. 2 at A260, line 18, to A261, line 12; Marino Dep. at A305, line 5, to A306, line 2; A466-467; A513) On July 8, Presstek terminated the JVA and pulled its component parts from the Vector and Freedom products. (A513)

The "Vector TX52" is a laser imaging device for metal plates as opposed to polyester plates; it is "a technological breakthrough" that uses both ABD's proprietary materials – handling technology and Presstek's proprietary laser technology. (Zaffino Dep. at A175, line 8, to A176, line 12) The Vector TX52 not only produces a "very good" image quality, it has the added benefit of being "environmentally clean." (*Id.* at A179, line 4, to A180, line 9) In addition, the fact that the Vector TX52 uses a metal plate as opposed to a polyester plate was of great significance for ABD, in that it opened up a whole new market for ABD whose customers primarily used electrostatic or film-based plates. (*Id.* at A180, lines 10 to 20)

As former ABD CEO Longe testified:

Q.    . . . In discussing this plate-making laser technology and the fact that PressTek pulled the engine or the laser for the technology, how does that impact A. B. Dick's ability to market that product?

A.    It severely impacts it because you have to go and find a new technology or a new partner to provide you with the engine that you need to make a plate. So now it is retrofittable to other technologies because we

13

> purposely designed the product to do that.  However, it does set back the development and does set back the company.

Q.    . . . And the joint marketing of this product would have been beneficial to both A. B. Dick and PressTek, correct?

A.    It has been beneficial to both.  It had a huge impact at the trade show.  One of the industry analysts called it the Holy Grail of printing, and it is a fine product and a perfect fit for the market, and it expands A. B. Dick's market to a global market which would allow it to rebuild its distribution channels . . . .

(Longe Dep. at A155, line 21, to A156, line 18)  Zaffino testified that the JVA with Presstek would be of interest to a potential purchaser of ABD.  (Zaffino Dep. at A181, lines 18 to 21)

Why then would Presstek cancel the agreement?  Presstek's CFO contended that it was because ABD could not make payments to Presstek (Moosa Dep. 2 at A261, line 17, to A262, line 11) – *i.e.,* the liquidity crisis that was well known to everyone and had existed for some time prior to July 2004.  Presstek's CEO offered a conflicting reason, *i.e.*, to protect Presstek's intellectual property (Marino Dep. at A305, line 20, to A310, line 24), although he could not explain how any bankruptcy of ABD could put such rights at risk.  Former ABD CEO Longe had a different opinion:  that Presstek was lowering the value of ABD in anticipation of the Section 363 auction.  (Longe Dep. at A156, line 21, to A157, line 9)

Longe's opinion is bolstered by the fact that Presstek, having purchased ABD's assets, intends to continue developing and marketing the Freedom and Vector products.  (Marino Dep. at A312, lines 2 to 8; *see also* McCarthy Dep. at A355, line 24, to A357, line 7)

## II.    **The Hearing**

During the Hearing, the Debtor called only two witnesses, Steven Gray and Glenn Pollack, neither of which provided any testimony regarding the conduct of Presstek with respect to its termination of the Stock Purchase Agreement.  (Docket Nos. 634, 635)  In fact, Gray, the Chief Reorganization Officer of the Debtors, had never even been provided with a copy of the

14

SPA. (A545, lines 15 to 17; A548, line 21, to A549, line 5) Pollack, a financial advisor to the Debtors, had read only a "small section" of the SPA, had no involvement in the negotiations of the SPA and had only become involved with the negotiations of the APA on June 29 or 30, 2004 – no less than six or seven days after Presstek first proposed its unreasonable terms. (A558, line 18, to A559, line 15; A366, lines 5 to 12)

Pollack, however, did testify that he agreed with MHR representative Hal Goldstein that the Debtors' claim against Presstek for Presstek's termination of the Stock Purchase Agreement "may be" worth as much as $30 million. (A561, line 21, to A562, line 24)

Presstek called no witnesses during the Hearing.

## III.    Presstek's Improper Response

On November 1, 2004 – the night before the Hearing – Presstek filed what it characterized as a "response" to MHR's objections ("Response") and a motion seeking leave to file that Response. (Docket No. 453) However, Presstek never asked the Bankruptcy Court to rule on its motion, the motion was never granted and the Response is not a proper part of the record before the bankruptcy court or this Court. Had Presstek sought a ruling on its motion, MHR would have objected to the Response in that it contains several inadmissible documents, including self-serving hearsay statements of Presstek's own employees.

Nonetheless, even if this Court were to consider the Response, it fails to refute MHR's fundamental showing here and below: that Presstek had no lawful basis for terminating the Stock Purchase Agreement.

## ARGUMENT

A finding of good faith under 11 U.S.C. § 363(m) is a mixed question of law and fact that "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings" and requires specific factual findings. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir.

1986) (citation omitted). *See also Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci, Inc.)*, 126 F.3d 380, 390 (2d Cir. 1997 (1997) ("The good faith purchaser determination is a mixed question of law and fact"). On appeal, this Court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to its legal conclusions. *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

A factual finding is clearly erroneous if it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data," *Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995), or where some evidence supports the finding, but the reviewing court is left with "the definite and firm conviction that a mistake has been made." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Here, the Order is defective and must be reversed for at least two reasons: (a) the Order's finding that Presstek is a good faith purchaser is flatly contradicted by the record evidence and is clearly erroneous; and (b) the Order is devoid of any of the necessary factual findings regarding the good faith of Presstek.

## I.    Record Evidence Demonstrates That The Order's Finding That Presstek Was A Good Faith Purchaser Is Clearly Erroneous

Under 11 U.S.C. § 363(m), bad faith in connection with a Section 363(b) sale includes conduct amounting to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders," *In re Abbotts Dairies, supra,* 788 F.2d at 147.(*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)), or conduct "'tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction,'" *Taylor v. Lake (In re Cada Investments, Inc.)*, 664 F.2d 1158, 1162 (9th Cir. 1981) (citation omitted; cited in *In re Abbotts*). Even where "the conduct in question

16

was alleged to have begun before the bankruptcy proceedings," the "relevant inquiry" is "whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *In re Paolo Gucci, Inc.*, *supra*, 126 F.3d at 391. Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Abbotts Dairies*, *supra*, 788 F.2d at 147 (citation omitted); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (citation omitted).

Here, Presstek's conduct in refusing to comply with the terms of the Stock Purchase and Escrow Agreements, and using financial coercion to obtain an unfairly advantageous deal through the terms of the Asset Purchase Agreement, clearly demonstrates a lack of integrity during the ABD sales process and falls squarely within the definition of "bad faith." *See, e.g., In re Landmark Distributors, Inc.*, 189 B.R. 290, 309 (Bankr. D.N.J. 1995) ("bad faith" generally implies or involves "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive") (*quoting* BLACK'S LAW DICTIONARY, 127 (5th ed. 1979)). Key Bank's failure to sign the Consent was not – as Presstek contended – a material breach of the Escrow Agreement because it did not go to the "root of the agreement" between the parties. *Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citation omitted). A material breach is one that goes to "the essence of the contract . . . [and] defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected.'" *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (quoting FARNSWORTH ON CONTRACTS § 8.16 (3d ed. 1999)). *See also Zim Israel Navigation Co. v. Indonesian Exps. Dev.*

*Co.*, 1993 U.S. Dist. LEXIS 3513, *6-7 (S.D.N.Y. Mar. 24, 1993) ("Whether a breach is 'total'

or material is an alternate formulation of the question of whether a breach 'goes to the essence'

of the contract") (citation omitted).

It is indisputable that Presstek lost nothing that it justifiably expected from Key Bank's

consent to further funding and that Key Bank's June 22 consent letter – which promised funding

to ABD up to the amount allowed under the terms of the Stock Purchase Agreement through the

agreed-upon 30 day closing period – was, in essence, what the parties wanted from Key Bank.[8]

The only reasonable interpretation of the record in this matter is that Presstek used Key Bank's

June 22nd letter as a pretext for abandoning the SPA and coercing the Debtors into the APA.

## II.    The Bankruptcy Court Failed To Make Any Specific Factual Findings Regarding Presstek's Good Faith

In *In re Abbotts Dairies,* the Third Circuit also held that "when a bankruptcy court

authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with

respect to the good faith of the purchaser." 788 F.2d at 149-150.  No such finding was made

here.

Indeed, the Order – which was drafted by counsel – is silent on Presstek's termination of

the Stock Purchase Agreement and the vast difference in value between the SPA and APA.

Instead, the Order states only in conclusory fashion that Silver (Presstek's acquisition affiliate) is

a "good faith purchaser." (A572, ¶ J)  Not a single fact is cited in support of this conclusion.

---

[8]    In addition, under the Escrow, Presstek's failure to complete financial diligence, prepare a fairness opinion and hold a Board meeting (that may or may not have been needed, given the Presstek Board's prior approval of the SPA) cannot possibly justify Presstek's rejection of the SPA.  Presstek had a duty to "put forth every reasonable endeavor" to complete its obligations under the Escrow Agreement, *Entin v. Bristol*, 368 F.2d 695, 701 (2d Cir. 1966), and having failed to do so, it cannot now use those obligations as a defense. *Young v. Hunter*, 6 N.Y. 203, 207 (N.Y. 1852) (it is  a "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself"); *Rachmani Corp. v. 9 East 96th St. Apartment Corp.*, 211 A.D.2d 262, 270, 629 N.Y.S.2d 382, 387 (1st Dep't 1995) ("[T]he failure of the condition may not be set up as a defense to the underlying obligation under the contract where the party charged with the duty to fulfill the condition has failed to make a good-faith effort to bring it about").  The Stock Purchase and Escrow Agreements are expressly governed by New York law.

The Order also states in conclusory fashion that "[t]he Asset Purchase Agreement was negotiated, proposed, and entered into by the Parent [Paragon] and the Sale Debtors [including ABD], on one hand, and Presstek and Silver, on the other hand, without collusion, in good faith, and from arm's-length bargaining positions." (A572, ¶ I) Record evidence that Presstek proposed the APA, that the Debtors had no leverage in bargaining with Presstek, and that Presstek wrongfully terminated the much more favorable SPA flatly contradicts these factually unsubstantiated statements.

The mere interjection of conclusory and factually unsubstantiated "good faith" statements in the Order clearly violates the directives of *In re Abbotts Dairies,* where, as here, the bankruptcy court did not consider the evidence of bad faith before it. In *Abbotts,* the Third Circuit reversed and remanded a Section 363 sale order because the bankruptcy court had failed to consider evidence presented by objectors which suggested that "the situation was ripe for collusion and interested dealing." 788 F.2d at 149.

In addition, Fed.R.Civ.P. 52(a) – which is made applicable to this contested matter by Rules of Bankruptcy Court 7052 and 9014 – is violated where, as here, a court fails to make specific findings of fact. *See Commissioner v. Duberstein,* 363 U.S. 278, 292 (1960) ("To be sure, conciseness is to be strived for, and prolixity avoided, in findings; but . . . there comes a point where findings become so sparse and conclusory as to give no revelation of what the District Court's concept of the determining facts and legal standard may be. Such conclusory, general findings do not constitute compliance with Rule 52's direction to 'find the facts specially and state separately . . . conclusions of law thereon'") (citations omitted). *See also Morgan v. Wind Down Associates, LLC (In re Polaroid Corp.),* 2004 U.S. Dist. LEXIS 19822, at * 5-6 (D. Del. Sept. 30, 2004) (Section 363 good faith determination upheld where, unlike here, based on

detailed factual findings that refuted appellant's objections); *High River Limited Partnership v. Trans World Airlines, Inc., (In re Trans World Airlines, Inc.)*, 2002 U.S. Dist. LEXIS 5951, at *5 (D. Del. 2002) (Section 363(m) good faith determination affirmed where, unlike here, bankruptcy court engaged in a "careful examination of the voluminous record" and made specific findings of, among other things, a lack of "fraud" and "improper conduct"). Under *In re Abbotts*, the Order should be reversed and remanded with directions that the bankruptcy court hold a hearing on, and make specific factual findings regarding, Presstek's misconduct in terminating the Stock Purchase Agreement.

## CONCLUSION

For the foregoing reasons, the Order granting Debtors' Sale Motion should be: (a) reversed in its entirety for Presstek's lack of good faith under 11 U.S.C. 363(m) or, at the very least, to the extent that the Order approved that portion of the APA releasing the Debtors' claims against Presstek under the Stock Purchase Agreement; or (b) reversed and remanded with directions that the bankruptcy court conduct a hearing on, and consistent with Fed.R.Civ.P. 52(a) make specific factual findings regarding, Presstek's good or bad faith in terminating the SPA.

Dated: March 11, 2005

Respectfully submitted,

_____
Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
LANDIS RATH & COBB
919 Market Street
Suite 600
Wilmington, DE 19899

-and-

David S. Rosner
Michael M. Fay
Kim Conroy
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700


Counsel To Appellants MHR Capital Partners LP,
MHR Institutional Partners LP, MHRM LP and
MHR Fund Management LLLC

LEXSEE 2002 U.S. DIST. LEXIS 5951

**IN RE: TRANS WORLD AIRLINES, INC., et al., Debtors. HIGH RIVER LIMITED PARTNERSHIP, KARABU CORP. and LOWESTFARE.com, LLC, Appellants, v. TRANS WORLD AIRLINES, INC., et al., Appellees.**

Chapter 11, Case No. 01-0056-PJW, Civil Action No. 01-226-SLR (Appeal Nos. 01-18, 01-27 and 01-28)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 5951*

**March 26, 2002, Decided**

**DISPOSITION:** Appeal was dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For TRANSWORLD AIRLINES, INC., AMBASSADOR FUEL CORPORATION, LAX HOLDING COMPANY, INC., MEGA ADVERTISING INC, NORTHWEST 112TH STREET CORPORATION, TWA AMBASSADOR CLUB, INC., TRANS WORLD COMPUTER SERVICES, INC., TRANSCONTINENTAL & WESTERN AIR, INC., TWA AVIATION INC., TWA GROUP INC., TWA STANDARDS & CONTROLS, INC., TWA STOCK HOLDING COMPANY, TWA-D.C. GATE COMPANY, INC., TWA-LAX GATE COMPANY, INC., TWA LOGAN GATE CO., INC., TWA-NY/NJ GATE COMPANY, INC., TWA-OMNIBUS GATE COMPANY, INC., TWA-SAN FRANCISCO GATE COMPANY, INC., TWA-HANGAR 12 HOLDING COMPANY, INC., OZARK GROUP INC., TWA NIPPON INC., TWA EMPLOYEE SERVICES, INC., TWA GETAWAY VACATIONS, INC., TRANSWORLD EXPRESS, INC., INTERNATIONAL AVIATION SECURITY INC., GETAWAY MANAGEMENT SERVICES, INC., GETAWAY GROUP (U.K.) INC., debtors: Laura Davis Jones, Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, DE.

For HIGH RIVER LIMITED PARTNERSHIP, KARABU CORP., LOWESTFARE.COM, appellants: Steven K. Kortanek, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For AMBASSADOR FUEL CORPORATION, LAX HOLDING COMPANY, INC., MEGA ADVERTISING INC, NORTHWEST 112TH STREET CORPORATION, TWA AMBASSADOR CLUB, INC., TRANS WORLD COMPUTER [*2] SERVICES, INC., TRANSCONTINENTAL & WESTERN AIR, INC., TWA AVIATION INC., TWA GROUP INC., TWA STANDARDS & CONTROLS, INC., TWA STOCK HOLDING COMPANY, TWA-D.C. GATE COMPANY, INC., TWA-LAX GATE COMPANY, INC., TWA LOGAN GATE CO., INC., TWA-NY/NJ GATE COMPANY, INC., TWA-OMNIBUS GATE COMPANY, INC., TWA-SAN FRANCISCO GATE COMPANY, INC., TWA-HANGAR 12 HOLDING COMPANY, INC., OZARK GROUP INC., TWA NIPPON INC., TWA EMPLOYEE SERVICES, INC., TWA GETAWAY VACATIONS, INC., TRANSWORLD EXPRESS, INC., INTERNATIONAL AVIATION SECURITY INC., GETAWAY MANAGEMENT SERVICES, INC., GETAWAY GROUP (U.K.) INC., TRANSWORLD AIRLINES, INC., appellees: Laura Davis Jones, Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM ORDER**

At Wilmington, this 26th day of March, 2002;

IT IS ORDERED that debtors' motion to dismiss as moot the appeals filed by the High River Entities challenging the bankruptcy court's authorization of the Key Employee Retention Plan, rejection of the Karabu Ticket Agreement, and March 12, 2001 Sale Order (D.I. 11) is granted for the reasons that follow:

1. This court has jurisdiction to hear an [*3] appeal from the bankruptcy court pursuant to *28 U.S.C. § 158*(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See *Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999)*. With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991)* (citing *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981))*.

2. **Appeal of the Sale Order**. To promote certainty and finality in bankruptcy sales, *11 U.S.C. § 363*(m) prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate property if an objecting party failed to obtain a stay of the [*4] sale. See *Cinicola v. Scharffenberger, 248 F.3d 110, 121 (3d Cir. 2001)*. The statute provides:

> The reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*11 U.S.C. § 363*(m). Thus, before an appeal of an order approving the sale of property to a good faith purchaser can be deemed moot, two conditions must be satisfied: (1) the underlying sale must not have been stayed pending appeal, and (2) reversing or modifying the authorization to sell would affect the validity of the sale. See *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 499 (3d Cir. 1998)*.

a. Appellants contend that the bankruptcy court erroneously determined that debtors' transaction with AMR Corporation ("American") was consummated in good faith and, therefore, their appeal of the Sale Order is not moot pursuant to § [*5] *363*(m). The court finds that the bankruptcy court correctly concluded that American's purchase of substantially all of debtors' assets was "at arm's length, negotiated in good faith and for fair value." (D.I. 10, Ex. 1 at P12) After careful examination of the voluminous record, the bankruptcy court determined that there was "no evidence of unlawful insider influence or improper conduct," nor was there "any evidence of fraud or collusion between American and [debtors], or American and other bidders." (Id.) The bankruptcy court based this finding on evidence of record that a Section 363 sale within sixty days of the bankruptcy petition was the only way for debtors to avoid a piecemeal liquidation of their assets n1 (debtors possessed inadequate capital to sustain a self-help plan), the only "strategic transaction" available to debtors was American's proposal, n2 and debtors bargained with American to obtain "meaningful concessions" over American's initial bid. (Id. at PP10, 16-18, 20-25, 59) This court concurs with the bankruptcy court's assessment and finds no evidence in the record to suggest any bad faith or collusion surrounding debtors' transaction with American. Thus, [*6] the High River Entities' appeal of the Sale Order is moot pursuant to § 363(m).

---

n1 In their emergency motion for a stay of the Sale Order pending appeal, appellants argued that the evidence "established that the timing of this bankruptcy filing and the expedited nature of the bidding process was orchestrated by American to preclude or 'chill' other bids." (Bankr. D.I. 1021 at 10) The bankruptcy court appropriately rejected this argument because of evidence supporting debtors' dire financial situation and the need to make Section 1110 payments to debtors' aircraft lessors by March 12, 2001. (D.I. 10, Ex. 1 at PP17-18)

n2 The bankruptcy court determined that the proposal offered by Carl Icahn's organization, TWA Acquisition Group, Inc., was "completely inadequate as an 'alternative transaction' proposal contemplated by the Bidding Procedures Order." (D.I. 10, Ex. 1 at P39) "It made no commitment to [debtors], it was not a binding agreement to propose a plan; it had no realistic or detailed plan for preserving [debtors] as a standalone entity; and it was submitted without the $ 50 million deposit." (Id.) Mr. Icahn's revised DIP proposals were also "not viable or meritorious alternative transactions" and "procedurally defective." (Id. at P49) "American complied with, and was the only

2002 U.S. Dist. LEXIS 5951, *

entity that complied with, the Bidding Procedures Order." (Id. at P46)

[*7]

3. **Appeals of the Key Employee Retention Plan and Rejection of the Karabu Ticket Agreement.** The court also finds that the appeals of the bankruptcy court's authorization of the Key Employee Retention Plan and rejection of the Karabu Ticket Agreement are equitably moot pursuant to *In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996)* (en banc) for the following reasons: n3

> n3 The court declines to apply § 363(m) as the vehicle for dismissing these appeals as moot, as suggested by debtors.

a. Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable. See *id. at 559.* The court should consider several prudential factors when evaluating equitable mootness, including: (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the success of the plan, [*8] (4) whether the relief requested would affect the rights of the parties not before the court, and (5) the public policy of affording finality to bankruptcy judgments. See *id. at 560.* These "factors are given varying weight, depending on the particular circumstances, but the foremost consideration is whether the reorganization plan has been substantially consummated." *In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000).*

b. **Substantial Consummation of the Plan.** Debtors' plan was substantially consummated on April 9, 2001, when sale of substantially all of debtors' assets to American was completed.

c. **Obtaining a Stay.** The failure to obtain a stay favors dismissal for equitable mootness. See *Continental, 91 F.3d at 562.* Here, appellants unsuccessfully moved for a stay pending appeal in the bankruptcy court, district court and Third Circuit.

d. **The Success of the Plan.** If the requested relief has an, "integral nexus" with the reorganization plan

such that it would cause the "reversal or unraveling" of the plan, dismissal for equitable mootness is favored. See *PWS Holding Corp., 228 F.3d at 236.* [*9] In this case, the rejection of the Karabu Ticket Agreement was a condition of the consummation of debtors' transaction with American. (D.I. 10, Ex. 2 at 6-7, 11-12) Although the benefit to debtors' management under the Key Employee Retention Plan was not contingent on the sale to American in particular, a management retention program would be a fundamental component of any plan of reorganization chosen by debtor. (Id., Ex. 1 at P19, Ex. 2 at 7-8) Granting appellants' requested relief would disrupt debtors' sale of substantially all of its assets to American.

e. **Parties Not Before the Court.** Because the Key Employee Retention Plan and rejection of the Karabu Ticket Agreement are intertwined with the sale of debtors' assets, a determination here will affect all third parties with an economic stake in the sale, including debtors' 20,000 employees, the St. Louis region, and consumers who have purchased TWA tickets that American has assumed. (D.I. 10, Ex. 1 at P74)

f. **Finality.** The ability of the parties to rely on the orders of the bankruptcy court weighs in favor of dismissing the appeal for equitable mootness. See *In re Zenith Elecs. Corp., 2002 U.S. Dist. LEXIS 2369, Nos. 99-746, 99-747, 00-399, 2002 WL 226242,* [*10] at *4 (D. Del. Feb. 11, 2002).

IT IS FURTHER ORDERED that appellants' motion to vacate the underlying bankruptcy orders (D.I. 13) is denied. The appeals are moot based on statutory and equitable grounds, and not pursuant to Article III, therefore, the Munsingwear doctrine does not apply. See generally *Cinicola, 248 F.3d 110* (distinguishing between constitutional mootness and statutory mootness in bankruptcy context). See also *In re Highway Truck Drivers & Helpers Local Union No. 107, 888 F.2d 293, 299 (3d Cir. 1989)* (vacating district court judgment pursuant to Munsingwear because matter was mooted by intervening judgment of state Supreme Court relieving debtor of liability to appealing creditors).

IT IS FURTHER ORDERED that appellants' motion to consolidate (D.I. 5) is denied as moot.

Sue L. Robinson

United States District Judge

LEXSEE 2004 U.S. DIST. LEXIS 19822

In re: POLAROID CORPORATION, et al., Debtors. STEPHEN J. MORGAN,
Appellant, v. WIND DOWN ASSOCIATES, LLC, as Plan Administrator of
Reorganized Polaroid, Appellee.

Civil Action No. 03-1168-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 19822*

September 30, 2004, Decided

**PRIOR HISTORY:** [*1] Chapter 11, Bankruptcy Case
No. 01-10864-PJW.

**DISPOSITION:** Motion To Dismiss Appeal was
granted. Request For Consolidation Under Case 02-1353
was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Stephen J. Morgan, Pro Se Appellant.

Brendan Linehan Shannon, Esquire, Joseph A.
Malfitano, Esquire and Maribeth L. Minella, Esquire of
YOUNG CONAWAY STARGATT & TAYLOR, LLP,
Wilmington, Delaware.

Of Counsel: Fred Hodara, Esquire and Nava Hazan,
Esquire of AKIN GUMP, STRAUSS, HAUER & FELD,
LLP, New York, New York. Counsel to the Plan
Administrator.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED
STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

   **MEMORANDUM OPINION**

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is a Motion To Dismiss
Appeal (D.I. 12) filed by Wind Down Associates, LLC
("Wind Down") as Plan Administrator of the
Reorganized Debtor, Polaroid Corporation and its
affiliates and a Request For Reconsideration In Case 02-
1353, Required Brief In Case 03-1168 And Request For
Consolidation Under Case 02-1353 (D.I. 37) filed by
Stephen J. Morgan. [*2] For the reasons discussed
below, the Court will grant Wind Down's Motion To
Dismiss. The Court will also deny the request for
consolidation filed by Stephen J. Morgan. n1

       n1 To avoid procedural confusion, the Court
    will take up Mr. Morgan's request for
    reconsideration in the context of Civil Action No.
    02-1353, where it is also pending.

**I. Background**

    This action is related to Plaintiff's appeal in Civil
Action No. 02-1353 (the "2002 Appeal"). In that action,
Mr. Morgan appealed the Bankruptcy Court's Order
Authorizing And Approving (1) Asset Purchase
Agreement, (2) Sale of Substantially All Of The Debtors'
Assets Free And Clear Of Liens, Claims and
Encumbrances To OEP Imaging Corporation, (3)
Assumption And Assignment To OEP Imaging
Corporation Of Certain Executory Contracts And
Unexpired Leases, And (4) Certain Related Relief (the
"Sale Order"). The Court dismissed Mr. Morgan's 2002
Appeal on grounds of statutory mootness.

    In the instant action (the "2003 Appeal"), Mr.
Morgan has appealed three orders [*3] entered by the

2004 U.S. Dist. LEXIS 19822, *

Bankruptcy Court: (1) Findings Of Fact, Conclusions Of Law & Order Confirming The Third Amended Joint Plan Of Reorganization (the "Plan") Of Primary PDC, Inc. (f/k/a Polaroid Corporation) And Its Debtor Subsidiaries And The Official Committee Of Unsecured Creditors (the "Confirmation Order"); (2) Order Denying Motion Of Stephen J. Morgan For Expansion Of Scope Of Independent Examiner And Appointment Of Equity Committee (the "Expansion Order") and (3) Order Denying Stephen J. Morgan's Notice And Request For Motion Regarding *Rule 3018* And Objecting To Plan Confirmation And Disallowance Of Claim (the "3018 Order"). Since the entry of these Orders by the Bankruptcy Court, Mr. Morgan's motion to stay the Confirmation Order was denied, and the Plan became effective on December 17, 2003. All allowed administrative and priority claims have been paid by Wind Down as Plan Administrator, and the first distribution to unsecured creditors has been made.

By its Motion, Wind Down contends that the 2003 Appeal should be dismissed for three reasons. Specifically, Wind Down contends that the 2003 Appeal is statutorily moot, equitably moot, and moot under the theory of res judicata as [*4] a result of the Court's decision in the 2002 Appeal.

In response, Mr. Morgan acknowledges that his 2003 Appeal raises the same issues raised by virtue of his 2002 Appeal. Specifically, Mr. Morgan raises concerns about the sale process and the validity of the Sale Order entered by the Bankruptcy Court. Mr. Morgan requests the Court to consolidate this appeal with the 2002 Appeal, and to reconsider the Court's ruling in the 2002 Appeal.

## II. DISCUSSION

After reviewing Wind Down's Motion To Dismiss in light of the claims raised by Mr. Morgan in the 2003 Appeal, the Court concludes that the 2003 Appeal should be dismissed on grounds of statutory and equitable mootness. Although Mr. Morgan appeals the Confirmation Order and other related orders, it is evident to the Court based on Mr. Morgan's representations that the crux of his appeal rests on his continued challenge to the validity of the Sale Order. Mr. Morgan challenges the Bankruptcy Court's finding that the sale was in good faith and contends that there was fraud in the sale, because among other reasons, "only a net of that $ 7.1 million cash was paid for the assets of over $ 900 million." (D.I. 37 at 5).

As the Court [*5] discussed in its previous decision with respect to Mr. Morgan's 2002 Appeal, his challenges to the validity of the Sale Order are statutorily

moot under *Section 363(m) of the Bankruptcy Code.* In pertinent part, *11 U.S.C. § 363(m)* provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*Cinicola v. Scharffenberger, 248 F.3d 110, 121-22 (3d Cir. 2001).* With respect to the "good faith purchaser" requirement, the Bankruptcy Court expressly found that OEP was a good faith purchaser based on the fact that the Debtors' assets had been effectively shopped before the petition was filed, a rigorous auction process was undertaken in which nothing was withheld from the market and all bidders had the opportunity to buy the business, and based on the rigorous [*6] efforts of the various constituencies, including the Committee of Unsecured Creditors, to maximize their returns. In making these findings, the Bankruptcy Court overruled the objections of Mr. Morgan and others that the Debtors undervalued their assets and that the Debtors' assets should have been valued higher. Based on the record in this case, the Court is persuaded that the Bankruptcy Court's findings were not clearly erroneous and were supported by the record. See e.g. *High River LP v. TWA, Inc. (In re TWA, Inc.), 2002 U.S. Dist. LEXIS 5951, 2002 WL 500569, *2 (D. Del. 2002)* (affirming bankruptcy court's finding that *§ 363(m)* purchaser acted in good faith where finding was based on careful examination of record); see also *In re PWS Holding Co., 228 F.3d 224, 242 (3d Cir. 2000)* (recognizing that fact determinations relating to good faith are reviewed for clear error).

The Court further concludes that the remaining requirements for the application of *Section 363(m)* are met in this case. As the Court concluded in Mr. Morgan's 2002 Appeal, the Bankruptcy Court's order authorizing the sale was not stayed pending appeal and vacating the Bankruptcy Court's order would undermine the validity [*7] of the sale. *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 499 (3d Cir. 1998).*

In the alternative, the Court also concludes that the 2003 Appeal is equitably moot. "Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable."

2004 U.S. Dist. LEXIS 19822, *

*In re Continental Airlines, 203 F.3d 203, 209 (3d Cir. 2000)*. In applying this doctrine to determine whether the Court should reach the merits of a bankruptcy appeal, the Court must consider: "(1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan, and (5) the public policy affording finality to bankruptcy judgments." *In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996)* (citations omitted).

In this case, the Court concludes that each of the five factors for equitable mootness weighs in favor of dismissal of the 2003 Appeal. The Plan has been [*8] substantially consummated, because the Debtors' assets have been transferred and the Debtor's successor has assumed management of the Debtor's business. In addition, distribution under the plan has commenced with all administrative and priority claims having been paid and distribution to the unsecured creditors having begun. The Court is also persuaded that granting Mr. Morgan the relief he seeks would impair the success of the Debtor's reorganization by essentially unraveling the Plan. This consequence would, in turn, harm the public interest by undermining a successful reorganization. *American Film Technologies, Inc. v. Taritero, 175 B.R. 847, 849 (Bankr. D. Del. 1994)* (recognizing that public interest in a bankruptcy case is promoting and assisting debtor in successful reorganization).

In sum, the Court concludes that the 2003 Appeal is statutorily and equitably moot, such that Mr. Morgan is not entitled to the relief he requested. Because this appeal will be dismissed, the Court finds its consolidation with Civil Action Number 02-1353-JJF unnecessary. To the extent that Mr. Morgan requests reconsideration of the Court's ruling in the 2002 Appeal, the Court will [*9] take up that request by separate Order in that case.

### III. CONCLUSION

For the reasons discussed, the Court will grant Wind Down's Motion To Dismiss Appeal and deny the Request For Consolidation Under 02-1353 filed by Mr. Morgan.

An appropriate Order will be entered.

### FINAL ORDER

At Wilmington, this 30th day of September 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The Motion To Dismiss Appeal (D.I. 12) filed by Wind Down Associates, LLC as Plan Administrator of the Reorganized Debtor, Polaroid Corporation is **GRANTED.**

2. The Request For Consolidation Under Case 02-1353 (D.I. 37) filed by Stephen J. Morgan is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

LEXSEE 2004 U.S. DIST. LEXIS 19822

**In re: POLAROID CORPORATION, et al., Debtors. STEPHEN J. MORGAN, Appellant, v. WIND DOWN ASSOCIATES, LLC, as Plan Administrator of Reorganized Polaroid, Appellee.**

**Civil Action No. 03-1168-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 19822*

**September 30, 2004, Decided**

**PRIOR HISTORY:** [*1] Chapter 11, Bankruptcy Case No. 01-10864-PJW.

**DISPOSITION:** Motion To Dismiss Appeal was granted. Request For Consolidation Under Case 02-1353 was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Stephen J. Morgan, Pro Se Appellant.

Brendan Linehan Shannon, Esquire, Joseph A. Malfitano, Esquire and Maribeth L. Minella, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.

Of Counsel: Fred Hodara, Esquire and Nava Hazan, Esquire of AKIN GUMP, STRAUSS, HAUER & FELD, LLP, New York, New York. Counsel to the Plan Administrator.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

  **MEMORANDUM OPINION**

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is a Motion To Dismiss Appeal (D.I. 12) filed by Wind Down Associates, LLC ("Wind Down") as Plan Administrator of the Reorganized Debtor, Polaroid Corporation and its affiliates and a Request For Reconsideration In Case 02-1353, Required Brief In Case 03-1168 And Request For Consolidation Under Case 02-1353 (D.I. 37) filed by Stephen J. Morgan. [*2] For the reasons discussed below, the Court will grant Wind Down's Motion To Dismiss. The Court will also deny the request for consolidation filed by Stephen J. Morgan. n1

> n1 To avoid procedural confusion, the Court will take up Mr. Morgan's request for reconsideration in the context of Civil Action No. 02-1353, where it is also pending.

**I. Background**

This action is related to Plaintiff's appeal in Civil Action No. 02-1353 (the "2002 Appeal"). In that action, Mr. Morgan appealed the Bankruptcy Court's Order Authorizing And Approving (1) Asset Purchase Agreement, (2) Sale of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims and Encumbrances To OEP Imaging Corporation, (3) Assumption And Assignment To OEP Imaging Corporation Of Certain Executory Contracts And Unexpired Leases, And (4) Certain Related Relief (the "Sale Order"). The Court dismissed Mr. Morgan's 2002 Appeal on grounds of statutory mootness.

In the instant action (the "2003 Appeal"), Mr. Morgan has appealed three orders [*3] entered by the

2004 U.S. Dist. LEXIS 19822, *

Bankruptcy Court: (1) Findings Of Fact, Conclusions Of Law & Order Confirming The Third Amended Joint Plan Of Reorganization (the "Plan") Of Primary PDC, Inc. (f/k/a Polaroid Corporation) And Its Debtor Subsidiaries And The Official Committee Of Unsecured Creditors (the "Confirmation Order"); (2) Order Denying Motion Of Stephen J. Morgan For Expansion Of Scope Of Independent Examiner And Appointment Of Equity Committee (the "Expansion Order") and (3) Order Denying Stephen J. Morgan's Notice And Request For Motion Regarding *Rule 3018* And Objecting To Plan Confirmation And Disallowance Of Claim (the "3018 Order"). Since the entry of these Orders by the Bankruptcy Court, Mr. Morgan's motion to stay the Confirmation Order was denied, and the Plan became effective on December 17, 2003. All allowed administrative and priority claims have been paid by Wind Down as Plan Administrator, and the first distribution to unsecured creditors has been made.

By its Motion, Wind Down contends that the 2003 Appeal should be dismissed for three reasons. Specifically, Wind Down contends that the 2003 Appeal is statutorily moot, equitably moot, and moot under the theory of res judicata as [*4] a result of the Court's decision in the 2002 Appeal.

In response, Mr. Morgan acknowledges that his 2003 Appeal raises the same issues raised by virtue of his 2002 Appeal. Specifically, Mr. Morgan raises concerns about the sale process and the validity of the Sale Order entered by the Bankruptcy Court. Mr. Morgan requests the Court to consolidate this appeal with the 2002 Appeal, and to reconsider the Court's ruling in the 2002 Appeal.

## II. DISCUSSION

After reviewing Wind Down's Motion To Dismiss in light of the claims raised by Mr. Morgan in the 2003 Appeal, the Court concludes that the 2003 Appeal should be dismissed on grounds of statutory and equitable mootness. Although Mr. Morgan appeals the Confirmation Order and other related orders, it is evident to the Court based on Mr. Morgan's representations that the crux of his appeal rests on his continued challenge to the validity of the Sale Order. Mr. Morgan challenges the Bankruptcy Court's finding that the sale was in good faith and contends that there was fraud in the sale, because among other reasons, "only a net of that $ 7.1 million cash was paid for the assets of over $ 900 million." (D.I. 37 at 5).

As the Court [*5] discussed in its previous decision with respect to Mr. Morgan's 2002 Appeal, his challenges to the validity of the Sale Order are statutorily

moot under *Section 363(m) of the Bankruptcy Code*. In pertinent part, *11 U.S.C. § 363(m)* provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*Cinicola v. Scharffenberger, 248 F.3d 110, 121-22 (3d Cir. 2001).* With respect to the "good faith purchaser" requirement, the Bankruptcy Court expressly found that OEP was a good faith purchaser based on the fact that the Debtors' assets had been effectively shopped before the petition was filed, a rigorous auction process was undertaken in which nothing was withheld from the market and all bidders had the opportunity to buy the business, and based on the rigorous [*6] efforts of the various constituencies, including the Committee of Unsecured Creditors, to maximize their returns. In making these findings, the Bankruptcy Court overruled the objections of Mr. Morgan and others that the Debtors undervalued their assets and that the Debtors' assets should have been valued higher. Based on the record in this case, the Court is persuaded that the Bankruptcy Court's findings were not clearly erroneous and were supported by the record. See e.g. *High River LP v. TWA, Inc. (In re TWA, Inc.), 2002 U.S. Dist. LEXIS 5951, 2002 WL 500569, *2 (D. Del. 2002)* (affirming bankruptcy court's finding that § 363(m) purchaser acted in good faith where finding was based on careful examination of record); see also *In re PWS Holding Co., 228 F.3d 224, 242 (3d Cir. 2000)* (recognizing that fact determinations relating to good faith are reviewed for clear error).

The Court further concludes that the remaining requirements for the application of *Section 363(m)* are met in this case. As the Court concluded in Mr. Morgan's 2002 Appeal, the Bankruptcy Court's order authorizing the sale was not stayed pending appeal and vacating the Bankruptcy Court's order would undermine the validity [*7] of the sale. *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 499 (3d Cir. 1998).*

In the alternative, the Court also concludes that the 2003 Appeal is equitably moot. "Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable."

*In re Continental Airlines, 203 F.3d 203, 209 (3d Cir. 2000).* In applying this doctrine to determine whether the Court should reach the merits of a bankruptcy appeal, the Court must consider: "(1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan, and (5) the public policy affording finality to bankruptcy judgments." *In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996)* (citations omitted).

In this case, the Court concludes that each of the five factors for equitable mootness weighs in favor of dismissal of the 2003 Appeal. The Plan has been [*8] substantially consummated, because the Debtors' assets have been transferred and the Debtor's successor has assumed management of the Debtor's business. In addition, distribution under the plan has commenced with all administrative and priority claims having been paid and distribution to the unsecured creditors having begun. The Court is also persuaded that granting Mr. Morgan the relief he seeks would impair the success of the Debtor's reorganization by essentially unraveling the Plan. This consequence would, in turn, harm the public interest by undermining a successful reorganization. *American Film Technologies, Inc. v. Taritero, 175 B.R. 847, 849 (Bankr. D. Del. 1994)* (recognizing that public interest in a bankruptcy case is promoting and assisting debtor in successful reorganization).

In sum, the Court concludes that the 2003 Appeal is statutorily and equitably moot, such that Mr. Morgan is not entitled to the relief he requested. Because this appeal will be dismissed, the Court finds its consolidation with Civil Action Number 02-1353-JJF unnecessary. To the extent that Mr. Morgan requests reconsideration of the Court's ruling in the 2002 Appeal, the Court will [*9] take up that request by separate Order in that case.

### III. CONCLUSION

For the reasons discussed, the Court will grant Wind Down's Motion To Dismiss Appeal and deny the Request For Consolidation Under 02-1353 filed by Mr. Morgan.

An appropriate Order will be entered.

### FINAL ORDER

At Wilmington, this 30th day of September 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The Motion To Dismiss Appeal (D.I. 12) filed by Wind Down Associates, LLC as Plan Administrator of the Reorganized Debtor, Polaroid Corporation is **GRANTED.**

2. The Request For Consolidation Under Case 02-1353 (D.I. 37) filed by Stephen J. Morgan is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

LEXSEE 1993 U.S. DIST. LEXIS 3513

**ZIM ISRAEL NAVIGATION CO., LTD, Plaintiff, v. INDONESIAN EXPORTS
DEVELOPMENT CORP., Defendant.**

**91 Civ. 3848 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1993 U.S. Dist. LEXIS 3513*

**March 24, 1993, Decided
March 24, 1993, Filed**

**LexisNexis(R) Headnotes**

**JUDGES:** [*1] HAIGHT, JR.

**OPINIONBY:** CHARLES S. HAIGHT, JR.

**OPINION:**

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the court on plaintiff's motion for
summary judgment.

### BACKGROUND

Plaintiff, Zim Israel Navigation Co. (hereinafter
"Zim"), is an ocean carrier. Zim entered into a service
contract with defendant, Indonesian Exports
Development Corp. (hereinafter "Indonesian"), to carry
from Indonesia to various ports in the United States a
minimum quantity of 75 cargo containers over an
approximately one year period. When the contract
expired, Indonesian had in fact shipped only 24
containers. Zim moves for summary judgment claiming
that Indonesian breached the service contract by not
shipping the minimum quantity of containers and
claiming damages for the shortfall pursuant to a
liquidated damages clause in the service contract.

Clause 8 of the contract, captioned "Penalty Clause,
provides that if Indonesian did not meet the minimum
number of containers (for reasons other than force
majeure), Indonesian would pay $ 500 for each container
not carried. Because the minimum number was 75

containers and Indonesian shipped only 24, Zim's claim
is for $ 25,500 (51 unshipped containers [*2] x $ 500).

In its defense, Indonesian claims, and Zim does not
dispute, that the last of the 24 containers carried by Zim
arrived at its point of destination over one month late.
Indonesian claims that oral representations made to Ken
Tan, the president of Indonesian, and printed timetables
published by Zim, indicated that the estimated shipping
times from Indonesia to the United States were 35 to 45
days. Indonesian further claims that Ken Tan relied on
these representations, that these representations were of
"paramount and utmost importance" to Tan's decision to
enter into the service contract, and that he would not
have done so if the time for delivery had been stated at
more than 45 days. See Schneiderman Aff. Opp. Summ.
J. paras. 6-7. Indonesian argues that the published
timetables and oral representations as to the time of
delivery became an integral part of the contract and thus
constituted a promise by Zim to at least "closely
approximate" the 35 to 45 day delivery estimate. See Tan
Aff. Opp. Summ. J. para. 4 ("it was my understanding
based upon these written as well as verbal
representations, that actual shipping times would closely
approximate the 35-45 day estimate.") [*3] Because
Zim delivered a shipment approximately one and half
months late, Indonesian argues that Zim thereby
significantly breached the contract, and Indonesian is
therefore relieved of its remaining obligations under the
service contract.

Pursuant to clause (6)(E) of the Service Contract the
terms of the contract of carriage included the provisions
of the Service Contract itself, the Carrier's Bill of Lading,
and the applicable Tariffs. That clause also indicated that

"if under the terms of the [Service Contract] any conditions are contrary to the conditions of the Carrier's Bill of Lading the latter shall prevail." Zim argues that no specific delivery times or dates were guaranteed and to support this claim, it points to a clause in the Bill of Lading that specifically states that "arrival times are not guaranteed by the Carrier." See Leonard Aff. exh. A.

For the reasons stated below, plaintiff's motion for summary judgment is granted.

DISCUSSION

Summary judgment is appropriate where there is "no genuine issue as to any material fact." *Fed. R. Civ. P. 56(c)*; see *Battery Steamship Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 (2d Cir. 1975).* [*4] Because summary judgment deprives the opponent to the motion of his day in court, factual ambiguities must be construed in the opponent's favor. See *United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Knight v. United States Fire Insurance, 804 F.2d 9, 11 (2d Cir. 1986),* cert. denied, *480 U.S. 932 (1987).* An opponent to a motion for summary judgment must show not only that there is a factual dispute, but that the fact disputed is material to an ultimate determination of the case based on substantive law. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).*

In an opposing brief citing no authority, Indonesian may be arguing that summary judgment is inappropriate because there is a dispute of fact over whether or not the service contract was integrated n1 and whether Zim breached the contract by delivering a shipment one and a half months late. But Indonesian has not shown why the resolution of these factual disputes is material to the determination of this case. Even if on a proper construction of the service contract, Zim breached the contract [*5] by its late delivery of one shipment, such a breach does not relieve Indonesian of its further obligations under the contract.

n1 New York law treats the question of whether a contract is integrated as a question of law. See *Battery Steamship Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 n.3 (2d Cir. 1975); Adler & Shaykin v. Wachner, 721 F. Supp. 472, 476 (S.D.N.Y. 1988).* In maritime law the question is treated as one of fact. See *Battery Steamship, 513 F.2d at 738-739.*

Under general contract law, a total breach of contract may discharge the non-breaching party's further performance under the contract. See *Jafari v. Wally Findlay Galleries, 741 F. Supp. 64, 68 (S.D.N.Y. 1990)* ("where a party materially breaches, he has failed to substantially perform the contract, and the other party is discharged from performing his obligation"); *Restatement (Second) of Contracts § 237* comment b (1979) [*6] (a party is relieved of continued performance under a contract if a "material failure" in performance goes uncured). Not every breach of contract, however, is total, or material, and therefore not all breaches of contract justify rescission by the non-breaching party. To justify rescission, the breach must be so significant that the purpose of the contract is defeated by the breach. See *United States Plywood Corp. v. Hudson Lumber Co., 113 F. Supp. 529, 534 (S.D.N.Y. 1953)* ("the rule is that a breach will not justify rescission unless it substantially defeats the object which the parties intended to accomplish"); 6 Corbin, Contracts § 1253 (1951) (a breach of contract does not discharge the non-breaching party's further obligations unless the effects of the breach are "so material to the interests of the other party" that a judicial remedy is not enough); 4 Corbin, Contracts § 946 (1951) (a total breach is the "non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end.") Whether a breach is "total" or material is an alternate formulation of the question of whether a breach [*7] "goes to the essence" of the contract. See 4 Corbin, Contracts § 946 n.5 (1951).

A similar test is used in maritime law to determine whether a party's conduct constitutes a "deviation" from the contract. A party to a maritime contract may be relieved of the obligations under the contract if he deviates from it, or breaches the contract in a way that goes to the essence of the contract. See T.J. Schoenbaum, Admiralty and Maritime Law § 9-31 (1975); see also *Sedco, Inc. v. S.S. Strathewe, 800 F.2d 27, 32 (2d Cir. 1986)* ("the doctrine of deviation is applicable only to 'the carrier's voluntary action in unjustifiably deviating' when the deviation has 'so changed the essence of the agreement as to affect its abrogation' " (quoting *Jones v. The Flying Clipper, 116 F. Supp. 386, 389 (S.D.N.Y. 1953)).* It is therefore instructive to consider cases applying the concept of deviation to determine the answer to the question at hand: whether the late delivery of a shipment constitutes a breach going to the essence of a maritime contract.

The misdelivery or nondelivery of goods under a maritime contract has not been considered [*8] a breach so fundamental to the contract as to constitute a deviation. See Sedco at 32 ("a failure to properly handle, stow, care, or deliver cargo, never has constituted deviation"); *Hellyer v. Nippon Yesen Kaisya, 130 F. Supp. 209, 211 (S.D.N.Y. 1955)* (the nondelivery of goods under a contract is not "such a fundamental breach as to vitiate the contract between the parties," but is "a risk within the contemplation of the [contracting]

1993 U.S. Dist. LEXIS 3513, *

parties" (citations omitted)); see also *B.M.A. Industries v. Nigerian Star Line, 786 F.2d 90, 91 (2d Cir. 1986)* (per curiam) (misdelivery of goods does not constitute a deviation). In Sedco, the Second Circuit dealt with the question of whether an unreasonable delay in the delivery of goods, for two years, constituted a deviation, or fundamental breach, of the contract of carriage. The court held that an unreasonable delay resulting from the carrier's negligence does not constitute a deviation, a doctrine which that court has carefully proscribed to include only those situations where a ship geographically deviates from its course or where cargo that is contracted to be carried [*9] below deck is stored above deck. See Sedco at 31-32. One of the reasons why the concept has not been extended is because of the harsh consequences it has on the carrier. See Sedco at 31; *B.M.A. Industries, 786 F.2d at 92;* Iligan Integrated Steel Mills, Inc. v. S.S. John 92; *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser, 507 F.2d 68, 70-73 (2d Cir. 1974).*

In the case at hand, Indonesian's contention that it was relieved of its unfulfilled obligation to ship 51 more containers under the Service Contract with Zim is without support in the law. Both vitiating a contract's terms and forgiving further performance under a contract yield harsh results to a carrier and both should therefore be allowed only for the most significant breaches. Under maritime law, the one and a half month delay in delivery does not constitute a fundamental breach of the service contract and will not vitiate the contract's terms. Specifically, the breach does not forgive continued performance by Indonesian.

Accordingly plaintiff's motion for summary judgment is granted. Settle order and judgment consistent with this [*10] opinion on five (5) days' notice within fourteen (14) days of the date of this opinion.

So ordered.

Dated: New York, New York
March 24, 1993

CHARLES S. HAIGHT, JR.

U.S.D.J.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLAKE OF CHICAGO CORP., *et al.*<br>f/k/a A.B. DICK COMPANY, *et al.,*<br><br>Debtors.<br><br>MHR CAPITAL PARTNERS LP, MHR<br>INSTITUTIONAL PARTNERS LP, MHRM<br>LP, and MHR FUND MANAGEMENT LLC,<br><br>Appellants,<br><br>v.<br><br>BLAKE OF CHICAGO, CORP., *et al.,*<br>f/k/a A.B. DICK COMPANY, *et al.,* and<br>PRESSTEK, INC.,<br><br>Appellees. | Chapter 11<br><br>Case No. 04-12002 (JLP)<br><br>Jointly Administered<br><br><br><br><br>Appeal No. 04-CV-1498 |

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2005, I electronically filed Opening Brief of Appellants MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund Management LLC with the Clerk of Court using CM/ECF and have caused a copy to be served upon the parties on the attached list in the manner indicated.

Richard S. Cobb (ID No. 3157)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, DE 19801
302-467-4400
cobb@lrclaw.com

Jeffrey Schlerf, Esq.
Christopher A. Ward, Esq.
GianClaudio Finizio, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
*By Electronic Notification*

Jeffrey Schwartz, Esq.
Benesch, Friedlander, Coplan &
Aronoff LLP
2300 BP Tower, 200 Public Square
Cleveland, OH 44114-2378
*By First Class Mail*

Frederick B. Rosner, Esq.
Jaspan Schlesinger Homman
1201 North Orange Street, Suite 1001
Wilmington, DE 19801
*By Electronic Notification*

Lawrence Slattery, Esq.
Garry Ravert, Esq.
McDermott Will & Emery
50 Rockefeller Plaza
New York, NY 10020
*By First Class Mail*

Francis A. Monaco, Jr., Esq.
Walsh Monzack and Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE 19801
*By Electronic Notification*

Robert C. Folland, Esq.
Alan R. Lepene, Esq.
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
*By First Class Mail*

David M. Klauder, Esq.
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
*By Electronic Notification*

Richard Mason, Esq.
Michael M. Schmahl, Esq.
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
*By First Class Mail*

Jami B. Nimeroff, Esq.
Buchanan Ingersoll Professional
Corporation
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
***By Electronic Notification***

Michael M. Fay
KAZOWITZ, BENSON, TORRES & FRIEDMAN, LLP
1633 Broadway
New York, NY 10019
***By First Class Mail***