# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLAKE OF CHICAGO CORP., *et al.*<br>f/k/a A.B. DICK COMPANY, *et al.*,<br><br>      Debtors. | Chapter 11<br><br>Case No. 04-12002 (JLP)<br><br>Jointly Administered |
| MHR CAPITAL PARTNERS LP, MHR<br>INSTITUTIONAL PARTNERS LP, MHRM<br>LP, and MHR FUND MANAGEMENT LLC,<br><br>      Appellant,<br><br>v.<br><br>BLAKE OF CHICAGO, CORP., *et al.*,<br>f/k/a A.B. DICK COMPANY, *et al.*, and<br>PRESSTEK, INC.,<br><br>      Appellees. | Appeal No. 04-CV-1498 |

## APPENDIX TO OPENING BRIEF OF APPELLANTS
## MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL
## PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC

Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
LANDIS RATH & COBB
919 Market Street, Suite 600
Wilmington, DE 19899

David S. Rosner
Michael M. Fay
Kim Conroy
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Counsel to Appellants MHR Capital Partners LP,
MHR Institutional Partners LP, MHRM LP and
MHR Fund Management LLC

Dated: March 11, 2005

A001

# TABLE OF CONTENTS

**Docket**                                                                    **Page**

22     Motion of Debtors For Entry of Order:  (A) Approving Bidding
       Procedures for the Sale of Substantially All Of The Assets Of A.B. Dick
       Company And Its Wholly Owned Subsidiaries; (B) Authorizing Payment
       of An Expense Reimbursement and Termination Fee; (C) Setting Sale
       Hearing Date; and (D) Approving Form of Notice ("Order"),
       dated July 13, 2004 ................................................................................ A003

33     Objections of MHR Capital Partners LP, MHR Institutional Partners
       LP, MHRM LP and MHR Fund Management LLC (collectively, "MHR")
       to the Motion for Order, dated August 9, 2004........................................... A032

436    Supplemental Objections of MHR to the Motion for Order,
       dated October 29, 2004 .............................................................................. A110

436    Declaration in Support of MHR's Supplemental Objections,
       dated October 29, 2004 .............................................................................. A130

634    Excerpts from Transcript of Hearing,
       dated November 2, 2004 ............................................................................. A538

635    Excerpts from Transcript of Hearing,
       dated November 3, 2004 ............................................................................. A551

460    Order Approving Sale Pursuant to Asset Purchase Agreement,
       dated November 3, 2004 ............................................................................. A569

467    Notice of Appeal, dated November 3, 2004 ............................................... A610

500    Designation of Record and Statement of Issues,
       dated November 15, 2004 ........................................................................... A613

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-----------------------------------------------------x
In re                                                :    Chapter 11
                                                     :
A.B.DICK COMPANY, *et al.*,                          :    Case No. 04-_____ (___)
                                                     :
                                   Debtors.          :    Jointly Administered
-----------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF ORDER: (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B.DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES; (B) AUTHORIZING PAYMENT OF AN EXPENSE REIMBURSEMENT AND TERMINATION FEE; (C) SETTING SALE HEARING DATE; AND (D) APPROVING FORM OF NOTICE

A.B.Dick Company ("A.B.Dick"), Paragon Corporate Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc., the debtors and debtors in possession in the above-captioned jointly administered[1] chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") this Court, pursuant to sections 105(a) and 363 of Title 11 (the "Bankruptcy Code") of the United States Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order (the "Bidding Procedures Order"): (A) approving bidding and other procedures respecting the sale of substantially all of the assets of A.B.Dick and its wholly owned subsidiaries (the "Sale"); (B) authorizing the Debtors to pay Silver Acquisitions Corp. ("Silver") an expense reimbursement and termination fee under certain terms and conditions set forth more particularly below; (C) scheduling a date for the hearing on approval of the proposed Sale (the "Sale Hearing"); and (D) approving the form of notice fixing the manner and extent of the Sale (the "Sale Hearing Notice"). A proposed order is attached hereto as Exhibit A. In support of this Motion, the Debtors respectfully represent as follows:

---

[1]    Contemporaneously herewith, the Debtors have filed a motion seeking joint administration of the Debtors' cases. This Motion presumes that joint administration will be authorized, and is therefore presented as a motion of A.B.Dick and its affiliated debtors in possession.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 provide the statutory bases for the relief sought herein.

## BACKGROUND

2.      On July 13, 2004 (the "Petition Date"), the Debtors each filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their property and assets as debtors in possession. No trustee, examiner or committee of creditors has yet been appointed in these chapter 11 cases.

### Description of the Debtors' Businesses

3.      In 1884, Albert Blake Dick, the founder of A.B.Dick, revolutionized document reproduction when he partnered with Thomas Edison to invent the world's first mimeograph. Throughout the 20th century, A.B.Dick continued to grow its printing equipment business by pioneering a series of technological advances, including the development of printers that could reproduce photographs without negatives in the 1960's. In March 2000, A.B.Dick took on its present corporate form and significantly increased its market share when it integrated with Multigraphics Inc., another printing company.

4.      A.B.Dick is presently a leading global supplier to the graphic arts and printing industry, manufacturing and marketing equipment and supplies for the global quick print and small commercial printing markets. Its business has three product lines: (a) pre-press, press and other related equipment; (b) supplies; and (c) after-market repair service and replacement parts. A.B.Dick manufactures its own products – sold under the A.B.Dick®, Multigraphics® and Itek Graphix® brand names – and distributes certain products manufactured by third parties. A.B.Dick sells its products and services through a network of branches and independent

2

distributors in the United States, its subsidiaries in Canada and the United Kingdom, and independent distributors in other countries. Its customers include commercial, in-house and convenience printers, publishing companies, educational institutions and graphic design firms.

5.    A.B.Dick and Interactive Media Group, Inc., corporations organized under the laws of the states of Delaware and Ohio respectively, are wholly owned, direct subsidiaries of Paragon, a privately held holding company incorporated under the laws of the state of Delaware and headquartered in Niles, Illinois. A.B.Dick is the sole member of Multigraphics LLC, a limited liability company organized under the laws of the state of Delaware, and the owner of A.B.Dick Company of Canada, Ltd. and A.B.Dick UK Limited (collectively, the "Foreign Subsidiaries"). Together with the Foreign Subsidiaries, the Debtors – who employ approximately 700 employees in their operations – collectively provide a full range of high quality prepress, press and post-press equipment, supplies and technical services to a broad national and international customer base.

### Events Leading to the Chapter 11 Filing

6.    In recent years, the Debtors began to experience weakened sales reflecting, in part, the impact of changing technologies in their industry that reduced demand for Debtors' products. This decline in sales was exacerbated by the effects of September 11, 2001 and the subsequent worldwide economic recession.

7.    In the months preceding the commencement of the Debtors' chapter 11 cases, Debtors' management evaluated the Debtors' financial situation and determined that the value of the Debtors' businesses would be maximized if certain of the Debtors' businesses were sold on a going concern basis. In late 2003, the Debtors entered into negotiations for a going concern sale of certain of their businesses with Presstek, Inc. ("Presstek"), another manufacturer of printing equipment. During the course of these negotiations, the Debtors ' financial condition continued to deteriorate such that immediately prior to the Petition Date the Debtors found themselves struggling to pay suppliers and meet payroll.

3

8.    Shortly before the Petition Date, Presstek, Silver Acquisitions Corp. ("Silver") and the Debtors entered into an Asset Purchase Agreement, pursuant to which the Debtors agreed, among other things, to the commencement of cases under chapter 11 of the Bankruptcy Code to effectuate a sale to Silver of substantially all of the assets of A.B.Dick and its wholly owned subsidiaries on a going concern basis, free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code.

## Summary of the Terms of the Proposed Sale

9.    The Debtors have determined that, in light of existing limitations on available funding for the Debtors' operations and the probable value that would be attained were the Debtors' assets to be liquidated on a piecemeal basis, that the best interests of the Debtors' creditors, customers and employees will be served by the expedient marketing and sale of the Assets to the purchaser making the highest and best offer pursuant to the Bidding Procedures described below.[2]

10.    As set forth in an Asset Purchase Agreement ("APA") by and among the Debtors, Presstek, Silver, and A.B.Dick Company of Canada, Ltd. (A.B.Dick's non-debtor Canadian subsidiary) (a copy of which is annexed as an exhibit to the Sale Motion), the Debtors propose to sell the Assets to Silver for $40 million (the "Purchase Price") pursuant to section 363(b) and (f) of the Bankruptcy Code, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including but not limited to any administrative expense or priority claim asserted in the Debtors' chapter 11 cases. In addition to selling the Assets, the Debtors also propose to assume and assign to Silver certain of their unexpired leases and executory contracts in accordance with section 365 of the Bankruptcy Code (collectively, the "Assigned Contracts and Leases," and individually, an "Assigned Contract" or an "Assigned Lease").

---

[2]    Contemporaneously herewith, the Debtors have filed a motion (the "Sale Motion") for entry of an order authorizing the sale of the Assets to the party submitting the highest and best offer in accordance with the sale procedures outlined herein free and clear of liens, claims and encumbrances pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

11.     Contemporaneously herewith or in the near future, the Debtors have filed or will file an application to retain Candlewood Partners LLC ("Candlewood") to act as their financial advisors for the purposes of marketing the Assets and soliciting potential bidders.

## RELIEF REQUESTED AND REASONS THEREFOR

### Approval of Bidding Procedures, Expense Reimbursement and Termination Fee

12.     By this motion, the Debtors seek entry of an order approving the following bidding and other procedures respecting the Sale, including the terms of the Termination Fee and the Expense Reimbursement (all defined below) (collectively, the "Bidding Procedures"):

a.     Eligibility of Bidders to Participate in Auction.  In order to be eligible to bid for the Assets or otherwise participate in the Auction (defined below), each bidder (other than Silver) must be determined by the Debtors, in their sole discretion, to be a "Qualifying Bidder" (defined below).  The Debtors shall have the right, in their sole discretion, to determine whether a bidder is a Qualifying Bidder (a bid being submitted by a bidder determined by the Debtors to be a Qualifying Bidder and to have otherwise satisfied the requirements of paragraph (b) below being a "Qualifying Bid").

b.     Qualification of Bidders.  To be considered for status as a Qualifying Bidder, a bidder must:

i.     Deliver to counsel for the Debtors, H. Jeffrey Schwartz, Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114, so as to be received by the Debtors' counsel before **5:00 p.m. (Eastern Time)** on _____, **2004** (the "Bid Deadline"), all of the following:

a)  A written competing offer to purchase the Assets that (i) states that the bidder offers to purchase the Assets upon the terms and conditions as substantially set forth in the APA or through a merger or alternative structure on such different or additional terms as appropriate and desirable, for such transaction structure (which terms and conditions shall be no less favorable to the Debtors than the terms and conditions contained in the APA); (ii) states that the bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the APA; (iii) states that the bidder is financially capable of consummating a transaction substantially similar to the transactions contemplated by the APA; (iv) states the bidder's

5

offer is irrevocable until the closing of the Sale of the Assets or upon breach of the APA by the Debtors; and (v) is likely to result in a value to the Debtors that is at least $42,100,000 (the "Initial Minimum Overbid Amount"); and

b) Evidence that the bidder has received debt and/or equity funding commitments sufficient in the aggregate to finance the purchase of the assets proposed to be acquired, which evidence may include, without limitation, evidence of sources of equity or debt financing for payment of the purchase price, copies of commitment letters, and the identity of contact persons at the financing institutions issuing such commitment letters; and

ii. Before the Bid Deadline, pay an earnest money deposit in the amount of 10% of the gross amount of the purchase price set forth in the bid (a "Qualified Bidder Deposit") by cashier's or certified check (made payable to the Debtors) or wire transfer of immediately available funds, which deposit shall be held by an escrow agent selected by the Debtors in accordance with the terms of an escrow agreement to be provided by the Debtors. A Qualified Bidder Deposit will be refunded only if the bid corresponding with the Qualified Bidder Deposit is not approved by the Court. The Debtors reserve the right to hold each Qualified Bidder Deposit until five days after the closing of the Sale of the Assets.

c. **Access to Debtors' Books and Records; Execution of Confidentiality Agreement**. All potential bidders shall be required to submit any requests for information with respect to the Debtors' businesses or Assets or requests for access to the Debtors' employees, management or officers and directors to discuss the Debtors' businesses or Assets directly to Candlewood, and in no event shall any bidders be granted any such access other than by means of access through Candlewood. From the date of the approval of the Bidding Procedures Order, (1) if the Debtors supply any information regarding the Debtors' business to a potential bidder not previously given to Silver, the Debtors shall further provide Silver with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or expression of interest by any other party for any of the Assets, or any other reorganization proposal, submitted prior to the Bid Deadline, the Debtors shall provide Silver with prompt notice of such proposal and a copy of such proposal within 48 hours of the Debtors' receipt thereof. Further, as a condition precedent to being provided access to the Debtors' books, records and executives, all bidders must (i) be determined by the Debtors to have satisfied the requirements of paragraph (b)(i)(b) above and (ii) execute a confidentiality agreement in form reasonably acceptable to the

6

Debtors. Bidders who satisfy the foregoing requirements will be given reasonable access to the Debtors' books, records and executives before the Auction.

d.    Terms of Auction. In the event that one or more Qualifying Bids are submitted in accordance with paragraph (b) above, the Debtors will conduct an auction sale of the Assets (the "Auction") on the following terms:

    i.    Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualifying Bidders at Auction. The Auction will be held at the offices of Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114 on _____, 2004 at 10:00 a.m. (prevailing Eastern Time) or such later date as the Debtors may determine. The Debtors may continue or adjourn the Auction from time to time without further notice in their sole discretion. For a Qualifying Bid to be considered, the corresponding Qualifying Bidder must appear in person at the Auction unless alternative arrangements are agreed upon in advance with the Debtors.

    ii.    Auction Bid Submission Procedures. If one or more Qualifying Bids are received by the Debtors, each such Qualifying Bidder and Silver shall have the right to improve their respective bids at the Auction. Bidding will commence with the announcement of the highest Qualifying Bid.

    iii.    Irrevocability of Bids; Rejection of Bids. All Qualifying Bids and successive bids at the Auction shall be irrevocable until the earlier of the closing of the Sale of the Assets or thirty days following the conclusion of the Auction. Formal rejection by the Debtors of a Qualifying Bid or any successive bid thereto will not be deemed to have occurred unless and until (a) the Debtors expressly reject such bid or (b) the Sale of the Assets to the bidder submitting the Prevailing Bid (defined below) is finally consummated.

    iv.    Selection of Prevailing Bid. At the conclusion of the Auction, the Debtors will determine and announce the highest and best bid submitted at the Auction (the "Prevailing Bid," and the entity submitting such Prevailing Bid being the "Prevailing Bidder"). Within one (1) day following the conclusion of the Auction, unless and to the extent otherwise agreed by the Debtors, the Prevailing Bidder shall complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other

things, the amount of the Prevailing Bid (a "Prevailing Bidder APA").

e.    <u>Terms of Termination Fee</u>.  In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors will be obliged to pay Silver $1,200,000 (the "Termination Fee") in accordance with the terms of the APA. The Debtors' obligation to pay the Termination Fee shall be given administrative expense priority pursuant to Bankruptcy Code section 507(a)(1).

f.    <u>Terms of Expense Reimbursement</u>.  In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Silver for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Presstek and Silver in connection with the transactions contemplated by the APA, up to a maximum of $500,000 (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

g.    <u>Inclusion of Termination Fee and Expense Reimbursement in Initial Minimum Overbid Amount</u>.  The Termination Fee and the Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

h.    <u>Sale Hearing</u>. The Sale Hearing will be held on _____, 2004 at ___ _.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Third Floor, Wilmington, Delaware. At the Sale Hearing, the Debtors will seek the entry of an order (the "Sale Order") approving and authorizing the proposed Sale to Silver or the Prevailing Bidder, if any.  The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

A010

i.     <u>Closing</u>. The closing of the Sale of the Assets will occur in accordance with the terms of the APA, the Prevailing Bidder APA, or the asset purchase agreement of the entity otherwise authorized by the Court to purchase the Assets, as applicable.

j.     <u>Failure of Prevailing Bidder to Consummate Purchase; Designation of Backup Bidder</u>. If for any reason the Prevailing Bidder fails to consummate its purchase of the Assets, the Debtors may deem the bidder of the second highest and best bid for the Assets (such bidder being the "Backup Bidder," with such bid being the "Backup Bid") to have submitted the Prevailing Bid. If the Debtors so designate a bidder as a Backup Bidder, such Backup Bidder shall be required to complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Backup Bid (a "Backup Bidder APA"). If the failure by the Prevailing Bidder to consummate the purchase is the result of such Prevailing Bidder's breach of, or default or failure to perform under, the Prevailing Bidder APA or the terms of these Bidding Procedures (such bidder being a "Defaulting Bidder"), such Defaulting Bidder's Qualified Bidder Deposit shall be forfeited to the Debtors, and the Debtors shall thereupon have the right to assert all rights and remedies available under applicable law.

k.     <u>Determination of Cure Amounts under Assigned Leases and Contracts</u>. The Debtors shall file and serve a schedule of the Assigned Leases and Contracts on all parties to such agreements as soon as is practicable, and in no event later than ten (10) days prior to the Sale Hearing, which schedule shall include the Debtors' calculation of the amount they believe must be paid to cure all defaults under each of the Assigned Leases and Contracts (collectively, the "Cure Amounts"). **ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO DISPUTES SUCH CALCULATION MUST (i) FILE WITH THE COURT A WRITTEN CLAIM ASSERTING A CURE CLAIM THAT IS DIFFERENT FROM THE RESPECTIVE CURE AMOUNT ON OR BEFORE ANY BAR DATE SET BY THE COURT FOR THE FILING OF SUCH CLAIMS; AND (ii) FILE WITH THE COURT AND SERVE UPON COUNSEL FOR THE DEBTORS, H. JEFFREY SCHWARTZ, ESQ., BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, 2300 BP TOWER, 200 PUBLIC SQUARE, CLEVELAND, OHIO 44114, AN OBJECTION TO ITS SCHEDULED CURE AMOUNT ON OR BEFORE THE DATE OF THE SALE HEARING. ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO FAILS TO COMPLY WITH THE FOREGOING REQUIREMENTS SHALL BE FOREVER BARRED FROM (i) OBJECTING TO THE CURE AMOUNT APPLICABLE**

9

TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT AND (ii) ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT. If an objection to a scheduled Cure Amount is filed in accordance with this paragraph, the Court will hear that objection at the Sale Hearing.

l.    Reservation of Rights; Deadline Extensions. The Debtors shall be deemed to have reserved their rights to: (i) cancel the Auction; (ii) extend the Bid Deadline; (iii) impose such other and additional terms and conditions or modify the terms and conditions hereof as the Debtors determine to be in their best interests and (iv) reject all Qualifying Bids if, in the Debtors' reasonable judgment, no Qualifying Bid is in the best interests of the Debtors' estates.

m.    Sale of Assets "As Is". All of the Assets shall be transferred "as is." THE DEBTORS SHALL BE DEEMED TO HAVE EXPRESSLY DISCLAIMED ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.

13.    In accordance with Bankruptcy Rule 2002(a)(2), the Debtors seek entry of an order authorizing the Debtors to distribute a copy of the form of Sale Hearing Notice attached hereto as Exhibit B to all creditors and parties in interest in these chapter 11 cases; the United States Trustee; counsel to any statutory committee(s) appointed in these cases; counsel to KeyBank National Association, as agent for the Debtors' prepetition lender and proposed post-petition lenders (the "Agent"); and all parties the Debtors and/or Candlewood have determined, in their sole discretion, demonstrate an interest in the Assets and financial capability sufficient to consummate the Sale.

## LAW AND ANALYSIS

14.    Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.[3] The implementation of competitive bidding procedures to facilitate

---

[3]    See In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y.), aff'd 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). See also In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (the debtor's duty with respect to sales is to obtain the highest

the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.[4] The Debtors submit that the foregoing Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable, are designed to maximize the value of the Assets and should, therefore, be approved by this Court.

15.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Approval of the Bidding Procedures will facilitate orderly marketing and bidding for the Assets and will thereby maximize the value of the Assets and recoveries to the Debtors' creditors. Accordingly, the Debtors respectfully submit that granting the requested relief is appropriate under the circumstances.

16.    Approval of the Termination Fee and the Expense Reimbursement is guided by the standards articulated by the Third Circuit Court of Appeals in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.).*[5] In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) control in sales prosecuted under Bankruptcy Code section 363 (*i.e.*, in order to be approved, bidding incentives must provide some benefit to the debtor's estate).[6] Under *O'Brien*, a break-up fee (described in the APA as a "Termination Fee") may be deemed to confer a benefit on the estate if (i) the break-up fee is necessary to promote more competitive

---

[4]    price or greatest overall   benefit for the estate); *In re Wilson Freight Co.*, 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (the debtor's paramount duty in connection with sale is to obtain the best price).

    *See In re Gould*, 977 F.2d 1038, 1041-42 (7th Cir. 1992) (requirements that sale be publicly advertised, that bidders supply a ten percent earnest money deposit, and that a purchaser pay the balance of the sale price at closing are routine competitive bidding procedures in bankruptcy sales). *See also In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (bankruptcy courts have plenary power to provide for competitive bidding); *In re Big Rivers Elec. Corp.*, 213 B.R. 962 (Bankr. W.D. Ky. 1997) (bankruptcy court has broad discretion with regard to ordering bidding procedure on sale of estate property other than in the ordinary course of the debtor's business).

[5]    181 F.3d 527 (3d Cir. 1999).

[6]    *Id.* at 533.

11

bidding or (ii) the availability of a break-up fee induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or "floor bid" on which other bidders can rely.[7]

17.     The use of bid protections, including break-up fees, has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[8]  Expense reimbursement provisions have similarly been favored.[9]

18.     Here, the Termination Fee and the Expense Reimbursement are the products of extended, good faith, arm's-length negotiations between the Debtors and Silver and are fair and reasonable in their respective amounts, particularly in view of Silver's due diligence efforts to date.  Further, the Termination Fee and the Expense Reimbursement are material inducements for, and conditions of, Silver's agreement to purchase the Assets.  Notably, the Termination Fee of $1,200,000 is approximately 3% of the $40 million Purchase Price, an amount well within the acceptable range of break-up fees typically authorized in similar asset sales.[10]

19.     Payment of the Termination Fee and the Expense Reimbursement will not diminish the estates.  The Debtors will not terminate the APA and incur the obligation to pay the Termination Fee or the Expense Reimbursement unless they accept, and the Court approves, a higher and better bid at the Auction in an amount that is at least $400,000 greater than the sum of the $40 million Purchase Price plus the Termination Fee and the maximum amount of the Expense Reimbursement (*i.e.*, at least the $42,100,000 Initial Minimum Overbid Amount), or the

---

[7]     *Id.* at 537.

[8]     See Cottle v. Storer Communications, 849 F.2d 570, 578-79 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't. Stores (In re Federated Dep't. Stores)*, 683 F.Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Indus., Inc. (In re Burlington Indus., Inc.)*, 663 F.Supp. 614, 624-25 (S.D.N.Y. 1987); *In re 995 Fifth Avenue Assoc., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

[9]     See, e.g., *In re Bethlehem Steel Crop.*, 2003 WL 21738964 (S.D.N.Y. 2003) (unreported) (authorizing reimbursement to labor union of restructuring due diligence costs).

[10]    See, e.g., *In re RSL Primecall, Inc.*, 2002 Bankr. Lexis 367, Case No. 01-11457 (unreported) (Bankr. S.D.N.Y. 2002) (approving $475,000 break-up fee which was approximately 1.6% of $15.5 million purchase price).

Debtors elect to pursue a stand-alone plan of reorganization. Accordingly, the Debtors accordingly request that the Court authorize payment of the Termination Fee and the Expense Reimbursement upon the conditions set forth above and in the APA.

20.     For all of the foregoing reasons, the Debtors, exercising their business judgment, believe that the Bidding Procedures, including the terms of the Termination Fee and the Expense Reimbursement are in the best interest of their estates and creditors and are necessary to preserve and maximize the value of the estates.

## NOTICE

21.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been given to: (a) the United States Trustee for this region; (b) the Debtors' thirty largest unsecured creditors; and (c) KeyBank National Association, agent for the proposed postpetition lenders and prepetition lender. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

22.     No prior request for the relief sought in this Motion has been made to this or to any other court.

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order substantially in the form of Exhibit A hereto: (a) approving the Bidding Procedures; (b) authorizing the Debtors to pay Silver the Termination Fee and the Expense Reimbursement under the terms and conditions set forth above; (c) scheduling a date for the Sale Hearing; and (d) approving the form of Bidding Procedures Notice annexed hereto as Exhibit B.

13

Dated: Cleveland, Ohio
      July 13, 2004

Respectfully submitted,


/s/ H. Jeffrey Schwartz
H. Jeffrey Schwartz  (OBR #0014307)
John A. Gleason  (OBR #0039150)
Michael D. Zaverton  (OBR #0038597)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
2300 BP Tower
200 Public Square
Cleveland, OH  44114-2378
(216) 363-4500
(216) 363-4588 (Facsimile)
jschwartz@bfca.com
jgleason@bfca.com
mzaverton@bfca.com

Proposed Attorneys for A.B.Dick Company, *et al.*,
Debtors and Debtors in Possession

           and


/s/ Frederick B. Rosner
Frederick B. Rosner, Esq.  (No. 3995)
JASPAN SCHLESINGER HOFFMAN LLP
1201 North Orange Street, Suite 1001
Wilmington, DE  19801
Telephone:  302-351-8000/8005
Facsimile:  302-351-8010
frosner@jshllp-de.com

Proposed Local Counsel for A.B.Dick Company,
*et al.*, Debtors and Debtors in Possession

14

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
-----------------------------------------------------x
```
In re                                    :    Chapter 11
                                         :
A.B.DICK COMPANY, *et al.*,              :    Case No. 04-_____  (___)
                                         :
                    Debtors.             :    Jointly Administered
```
-----------------------------------------------------x
```

**ORDER: (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE ASSETS OF A.B.DICK COMPANY AND ITS
WHOLLY OWNED SUBSIDIARIES; (B) AUTHORIZING PAYMENT OF AN
EXPENSE REIMBURSEMENT AND TERMINATION FEE; (C) SETTING SALE
HEARING DATE; AND (D) APPROVING FORM OF NOTICE**

Upon the Motion (the "Motion") of A.B.Dick Company ("A.B.Dick"), Paragon Corporate

Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc., the debtors

and debtors in possession in the above-captioned jointly administered chapter 11 cases

(collectively, the "Debtors") for entry of an order (the "Sale Procedures Order"), pursuant to

sections 105(a) and 363 of Title 11 (the "Bankruptcy Code") of the United States Code and

Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(A) approving bidding and other procedures respecting the sale of substantially all of the assets

of A.B.Dick and its wholly owned subsidiaries (the "Sale"); (B) authorizing the Debtors to pay

Silver Acquisitions Corp. ("Silver") an expense reimbursement and termination fee under certain

terms and conditions set forth more particularly below; (C) scheduling a date for the hearing on

approval of the proposed Sale (the "Sale Hearing"); and (D) approving the form of notice fixing

the manner and extent of the Sale (the "Sale Hearing Notice")[1], and having heard the statements

of counsel for the Debtor and the statements of other parties in interest who appeared, the Court

finds:

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Debtors' Chapter 11 cases and this Motion are proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Notice of the Motion was sufficient under applicable law and rules of the Court and appropriate under the circumstances.

3.      Approval of the Bidding Procedures as requested in the Motion is in the best interest of the Debtors' estates because, among other reasons, the Bidding Procedures will facilitate orderly marketing and bidding for the Assets and will thereby maximize the value of the Assets and recoveries to the Debtors' creditors.

4.      Counsel for the Debtors has represented that the Termination Fee and Expense Reimbursement are the products of extended good faith, arm's-length negotiations between the Debtors and Silver. Counsel for the Debtors has further represented that the Termination Fee and the Expense Reimbursement are fair and reasonable in their respective amounts. Accordingly, the Court finds that the Termination Fee and the Expense Reimbursement are in the best interests of the estates and may and should be approved.

5.      The form of Sale Hearing Notice annexed to the Motion as <u>Exhibit B</u> provides adequate and sufficient notice of the Sale Hearing and the Bidding Procedures and complies with Bankruptcy Rule 2002(a)(2) and other applicable law and Rules of the Court. Accordingly, the Debtors may and should be authorized to distribute the Sale Hearing Notice to all creditors and parties in interest in these chapter 11 cases, the United States Trustee, counsel to any statutory committee(s) appointed in these cases, counsel to the Agent, and all parties the Debtors and/or Candlewood have determined, in their discretion, demonstrate an interest in acquiring the Assets and evidence financial capability sufficient to consummate the Sale.

Accordingly, it is hereby **ORDERED THAT:**

1.    The Motion is granted;

2.    The following bidding and other procedures respecting the Sale, including the terms of the Termination Fee and the Expense Reimbursement (the "Bidding Procedures"), are hereby authorized and approved:

a.    Eligibility of Bidders to Participate in Auction. In order to be eligible to bid for the Assets or otherwise participate in the Auction (defined below), each bidder (other than Silver) must be determined by the Debtors, in their sole discretion, to be a "Qualifying Bidder" (defined below). The Debtors shall have the right, in their sole discretion, to determine whether a bidder is a Qualifying Bidder (a bid being submitted by a bidder determined by the Debtors to be a Qualifying Bidder and to have otherwise satisfied the requirements of paragraph (b) below being a "Qualifying Bid").

b.    Qualification of Bidders. To be considered for status as a Qualifying Bidder, a bidder must:

   i.    Deliver to counsel for the Debtors, H. Jeffrey Schwartz, Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114, so as to be received by the Debtors' counsel before **5:00 p.m. (Eastern Time) on _____, 2004** (the "Bid Deadline"), all of the following:

      a) A written competing offer to purchase the Assets that (i) states that the bidder offers to purchase the Assets upon the terms and conditions as substantially set forth in the APA or through a merger or alternative structure on such different or additional terms as appropriate and desirable, for such transaction structure (which terms and conditions shall be no less favorable to the Debtors than the terms and conditions contained in the APA); (ii) states that the bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the APA; (iii) states that the bidder is financially capable of consummating a transaction substantially similar to the transactions contemplated by the APA; (iv) states the bidder's offer is irrevocable until the closing of the Sale of the Assets or upon breach of the APA by the Debtors; and (v) is likely to result in a value to the Debtors that is at least $42,100,000 (the "Initial Minimum Overbid Amount"); and

3

b) Evidence that the bidder has received debt and/or equity funding commitments sufficient in the aggregate to finance the purchase of the assets proposed to be acquired, which evidence may include, without limitation, evidence of sources of equity or debt financing for payment of the purchase price, copies of commitment letters, and the identity of contact persons at the financing institutions issuing such commitment letters; and

ii.  Before the Bid Deadline, pay an earnest money deposit in the amount of 10% of the gross amount of the purchase price set forth in the bid (a "Qualified Bidder Deposit") by cashier's or certified check (made payable to the Debtors) or wire transfer of immediately available funds, which deposit shall be held by an escrow agent selected by the Debtors in accordance with the terms of an escrow agreement to be provided by the Debtors. A Qualified Bidder Deposit will be refunded only if the bid corresponding with the Qualified Bidder Deposit is not approved by the Court. The Debtors reserve the right to hold each Qualified Bidder Deposit until five days after the closing of the Sale of the Assets.

c.  Access to Debtors' Books and Records; Execution of Confidentiality Agreement. All potential bidders shall be required to submit any requests for information with respect to the Debtors' businesses or Assets or requests for access to the Debtors' employees, management or officers and directors to discuss the Debtors' businesses or Assets directly to Candlewood, and in no event shall any bidders be granted any such access other than by means of access through Candlewood. From the date of the approval of the Bidding Procedures Order, (1) if the Debtors supply any information regarding the Debtors' business to a potential bidder not previously given to Silver, the Debtors shall further provide Silver with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or expression of interest by any other party for any of the Assets, or any other reorganization proposal, submitted prior to the Bid Deadline, the Debtors shall provide Silver with prompt notice of such proposal and a copy of such proposal within 48 hours of the Debtors' receipt thereof. Further, as a condition precedent to being provided access to the Debtors' books, records and executives, all bidders must (i) be determined by the Debtors to have satisfied the requirements of paragraph (b)(i)(b) above and (ii) execute a confidentiality agreement in form reasonably acceptable to the Debtors. Bidders who satisfy the foregoing requirements will be given reasonable access to the Debtors' books, records and executives before the Auction.

d.  Terms of Auction. In the event that one or more Qualifying Bids are submitted in accordance with paragraph (b) above, the Debtors will

4

conduct an auction sale of the Assets (the "Auction") on the following terms:

    i.    <u>Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualifying Bidders at Auction</u>. The Auction will be held at the offices of Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114 on _____, 2004 at 10:00 a.m. (prevailing Eastern Time) or such later date as the Debtors may determine. The Debtors may continue or adjourn the Auction from time to time without further notice in their sole discretion. For a Qualifying Bid to be considered, the corresponding Qualifying Bidder must appear in person at the Auction unless alternative arrangements are agreed upon in advance with the Debtors.

    ii.    <u>Auction Bid Submission Procedures</u>. If one or more Qualifying Bids are received by the Debtors, each such Qualifying Bidder and Silver shall have the right to improve their respective bids at the Auction. Bidding will commence with the announcement of the highest Qualifying Bid.

    iii.    <u>Irrevocability of Bids; Rejection of Bids</u>. All Qualifying Bids and successive bids at the Auction shall be irrevocable until the earlier of the closing of the Sale of the Assets or thirty days following the conclusion of the Auction. Formal rejection by the Debtors of a Qualifying Bid or any successive bid thereto will not be deemed to have occurred unless and until (a) the Debtors expressly reject such bid or (b) the Sale of the Assets to the bidder submitting the Prevailing Bid (defined below) is finally consummated.

    iv.    <u>Selection of Prevailing Bid</u>. At the conclusion of the Auction, the Debtors will determine and announce the highest and best bid submitted at the Auction (the "Prevailing Bid," and the entity submitting such Prevailing Bid being the "Prevailing Bidder"). Within one (1) day following the conclusion of the Auction, unless and to the extent otherwise agreed by the Debtors, the Prevailing Bidder shall complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Prevailing Bid (a "Prevailing Bidder APA").

e.    <u>Terms of Termination Fee</u>. In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the

5

Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors will be obliged to pay Silver $1,200,000 (the "Termination Fee") in accordance with the terms of the APA. The Debtors' obligation to pay the Termination Fee shall be given administrative expense priority pursuant to Bankruptcy Code section 507(a)(1).

f.      Terms of Expense Reimbursement.    In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Silver for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Presstek and Silver in connection with the transactions contemplated by the APA, up to a maximum of $500,000 (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

g.      Inclusion of Termination Fee and Expense Reimbursement in Initial Minimum Overbid Amount.    The Termination Fee and the Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

h.      Sale Hearing.  The Sale Hearing will be held on _____, 2004 at ___ _.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Third Floor, Wilmington, Delaware. At the Sale Hearing, the Debtors will seek the entry of an order (the "Sale Order") approving and authorizing the proposed Sale to Silver or the Prevailing Bidder, if any.  The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

i.      Closing.  The closing of the Sale of the Assets will occur in accordance with the terms of the APA, the Prevailing Bidder APA, or the asset purchase agreement of the entity otherwise authorized by the Court to purchase the Assets, as applicable.

j.      Failure of Prevailing Bidder to Consummate Purchase; Designation of Backup Bidder.   If for any reason the Prevailing Bidder fails to consummate its purchase of the Assets, the Debtors may deem the bidder of the second highest and best bid for the Assets (such bidder being the "Backup Bidder," with such bid being the "Backup Bid") to have submitted the Prevailing Bid.  If the Debtors so designate a bidder as a

6

Backup Bidder, such Backup Bidder shall be required to complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Backup Bid (a "Backup Bidder APA"). If the failure by the Prevailing Bidder to consummate the purchase is the result of such Prevailing Bidder's breach of, or default or failure to perform under, the Prevailing Bidder APA or the terms of these Bidding Procedures (such bidder being a "Defaulting Bidder"), such Defaulting Bidder's Qualified Bidder Deposit shall be forfeited to the Debtors, and the Debtors shall thereupon have the right to assert all rights and remedies available under applicable law.

k.    Determination of Cure Amounts under Assigned Leases and Contracts. The Debtors shall file and serve a schedule of the Assigned Leases and Contracts on all parties to such agreements as soon as is practicable, and in no event later than ten (10) days prior to the Sale Hearing, which schedule shall include the Debtors' calculation of the amount they believe must be paid to cure all defaults under each of the Assigned Leases and Contracts (collectively, the "Cure Amounts"). ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO DISPUTES SUCH CALCULATION MUST (i) FILE WITH THE COURT A WRITTEN CLAIM ASSERTING A CURE CLAIM THAT IS DIFFERENT FROM THE RESPECTIVE CURE AMOUNT ON OR BEFORE ANY BAR DATE SET BY THE COURT FOR THE FILING OF SUCH CLAIMS; AND (ii) FILE WITH THE COURT AND SERVE UPON COUNSEL FOR THE DEBTORS, H. JEFFREY SCHWARTZ, ESQ., BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, 2300 BP TOWER, 200 PUBLIC SQUARE, CLEVELAND, OHIO 44114, AN OBJECTION TO ITS SCHEDULED CURE AMOUNT ON OR BEFORE THE DATE OF THE SALE HEARING. ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO FAILS TO COMPLY WITH THE FOREGOING REQUIREMENTS SHALL BE FOREVER BARRED FROM (i) OBJECTING TO THE CURE AMOUNT APPLICABLE TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT AND (ii) ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT. If an objection to a scheduled Cure Amount is filed in accordance with this paragraph, the Court will hear that objection at the Sale Hearing.

l.    Reservation of Rights; Deadline Extensions. The Debtors shall be deemed to have reserved their rights to: (i) cancel the Auction; (ii) extend the Bid Deadline; (iii) impose such other and additional terms and conditions or modify the terms and conditions hereof as the Debtors determine to be in their best interests and (iv) reject all Qualifying Bids if, in the Debtors' reasonable judgment, no Qualifying Bid is in the best interests of the Debtors' estates.

7

m.  <u>Sale of Assets "As Is"</u>.  All of the Assets shall be transferred "as is."  THE DEBTORS SHALL BE DEEMED TO HAVE EXPRESSLY DISCLAIMED ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.

3.  The form of Sale Hearing Notice annexed to the Motion as <u>Exhibit B</u> is hereby approved and the Debtors are authorized to distribute a copy of the Sale Hearing Notice to all creditors and parties in interest in these chapter 11 cases, the United States Trustee, counsel to any statutory committee(s) appointed in these cases, counsel to the Agent, and all parties the Debtors and/or Candlewood have determined, in their discretion, demonstrate financial capability sufficient to consummate the Sale.

Dated: Wilmington, Delaware
        _____, 2004


                              _____
                              UNITED STATES BANKRUPTCY JUDGE

A024

EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
--------------------------------------------------x
In re                           :     Chapter 11
                                :
A.B.DICK COMPANY, et al.,       :     Case No. 04-_____ (___)
                                :
            Debtors.            :     Jointly Administered
--------------------------------------------------x
```

**NOTICE OF: (A) ASSET SALE BIDDING PROCEDURES; AND (B) HEARING ON APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B.DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES**

PLEASE TAKE NOTICE that, upon the Motion (the "Motion") of A.B.Dick Company ("A.B.Dick"), Paragon Corporate Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc., the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), the Court has entered an Order: (A) approving bidding and other procedures respecting the sale of substantially all of the assets of A.B.Dick and its wholly owned subsidiaries (the "Sale"); (B) authorizing the Debtors to pay Silver Acquisitions Corp. ("Silver") an expense reimbursement and termination fee under certain terms and conditions set forth more particularly below; (C) scheduling a date for the hearing on approval of the proposed Sale (the "Sale Hearing"); and (D) approving the form of notice fixing the manner and extent of the Sale (the "Sale Hearing Notice"). (All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.);

PLEASE TAKE FURTHER NOTICE that, pursuant to the Sale Procedures Order, persons desiring to purchase the Assets must comply with the following bidding and other procedures respecting the Sale (the "Bidding Procedures"):

    a.    <u>Eligibility of Bidders to Participate in Auction</u>. In order to be eligible to bid for the Assets or otherwise participate in the Auction (defined below), each bidder (other than Silver) must be determined by the Debtors, in their sole discretion, to be a "Qualifying Bidder" (defined below). The Debtors shall have the right, in their sole discretion, to determine whether a bidder is a Qualifying Bidder (a bid being submitted by a bidder determined by the Debtors to be a Qualifying Bidder and to have otherwise satisfied the requirements of paragraph (b) below being a "Qualifying Bid").

    b.    <u>Qualification of Bidders</u>. To be considered for status as a Qualifying Bidder, a bidder must:

        i.    Deliver to counsel for the Debtors, H. Jeffrey Schwartz, Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114, so as to be received by the

A025

Debtors' counsel before **5:00 p.m. (Eastern Time) on ____,
2004** (the "Bid Deadline"), all of the following:

a) A written competing offer to purchase the Assets that (i) states
that the bidder offers to purchase the Assets upon the terms and
conditions as substantially set forth in the APA or through a
merger or alternative structure on such different or additional
terms as appropriate and desirable, for such transaction
structure (which terms and conditions shall be no less favorable
to the Debtors than the terms and conditions contained in the
APA); (ii) states that the bidder is prepared to enter into a
legally binding purchase and sale agreement for the acquisition
of the Assets on terms and conditions no less favorable to the
Debtors than the terms and conditions contained in the APA;
(iii) states that the bidder is financially capable of
consummating a transaction substantially similar to the
transactions contemplated by the APA; (iv) states the bidder's
offer is irrevocable until the closing of the Sale of the Assets or
upon breach of the APA by the Debtors; and (v) is likely to
result in a value to the Debtors that is at least $42,100,000 (the
"Initial Minimum Overbid Amount"); and

b) Evidence that the bidder has received debt and/or equity
funding commitments sufficient in the aggregate to finance the
purchase of the assets proposed to be acquired, which evidence
may include, without limitation, evidence of sources of equity
or debt financing for payment of the purchase price, copies of
commitment letters, and the identity of contact persons at the
financing institutions issuing such commitment letters; and

ii.    Before the Bid Deadline, pay an earnest money deposit in the
amount of 10% of the gross amount of the purchase price set forth
in the bid (a "Qualified Bidder Deposit") by cashier's or certified
check (made payable to the Debtors) or wire transfer of
immediately available funds, which deposit shall be held by an
escrow agent selected by the Debtors in accordance with the terms
of an escrow agreement to be provided by the Debtors. A
Qualified Bidder Deposit will be refunded only if the bid
corresponding with the Qualified Bidder Deposit is not approved
by the Court. The Debtors reserve the right to hold each Qualified
Bidder Deposit until five days after the closing of the Sale of the
Assets.

c.    <u>Access to Debtors' Books and Records; Execution of Confidentiality
Agreement</u>. All potential bidders shall be required to submit any requests
for information with respect to the Debtors' businesses or Assets or
requests for access to the Debtors' employees, management or officers and
directors to discuss the Debtors' businesses or Assets directly to

2

Candlewood, and in no event shall any bidders be granted any such access other than by means of access through Candlewood. From the date of the approval of the Bidding Procedures Order, (1) if the Debtors supply any information regarding the Debtors' business to a potential bidder not previously given to Silver, the Debtors shall further provide Silver with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or expression of interest by any other party for any of the Assets, or any other reorganization proposal, submitted prior to the Bid Deadline, the Debtors shall provide Silver with prompt notice of such proposal and a copy of such proposal within 48 hours of the Debtors' receipt thereof. Further, as a condition precedent to being provided access to the Debtors' books, records and executives, all bidders must (i) be determined by the Debtors to have satisfied the requirements of paragraph (b)(i)(b) above and (ii) execute a confidentiality agreement in form reasonably acceptable to the Debtors. Bidders who satisfy the foregoing requirements will be given reasonable access to the Debtors' books, records and executives before the Auction.

d.    Terms of Auction. In the event that one or more Qualifying Bids are submitted in accordance with paragraph (b) above, the Debtors will conduct an auction sale of the Assets (the "Auction") on the following terms:

i.    Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualifying Bidders at Auction. The Auction will be held at the offices of Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114 on _____, 2004 at 10:00 a.m. (prevailing Eastern Time) or such later date as the Debtors may determine. The Debtors may continue or adjourn the Auction from time to time without further notice in their sole discretion. For a Qualifying Bid to be considered, the corresponding Qualifying Bidder must appear in person at the Auction unless alternative arrangements are agreed upon in advance with the Debtors.

ii.    Auction Bid Submission Procedures. If one or more Qualifying Bids are received by the Debtors, each such Qualifying Bidder and Silver shall have the right to improve their respective bids at the Auction. Bidding will commence with the announcement of the highest Qualifying Bid.

iii.    Irrevocability of Bids; Rejection of Bids. All Qualifying Bids and successive bids at the Auction shall be irrevocable until the earlier of the closing of the Sale of the Assets or thirty days following the conclusion of the Auction. Formal rejection by the Debtors of a Qualifying Bid or any successive bid thereto will not be deemed to have occurred unless and until (a) the Debtors expressly reject such

3

bid or (b) the Sale of the Assets to the bidder submitting the Prevailing Bid (defined below) is finally consummated.

iv.   Selection of Prevailing Bid. At the conclusion of the Auction, the Debtors will determine and announce the highest and best bid submitted at the Auction (the "Prevailing Bid," and the entity submitting such Prevailing Bid being the "Prevailing Bidder"). Within one (1) day following the conclusion of the Auction, unless and to the extent otherwise agreed by the Debtors, the Prevailing Bidder shall complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Prevailing Bid (a "Prevailing Bidder APA").

e.   Terms of Termination Fee. In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors will be obliged to pay Silver $1,200,000 (the "Termination Fee") in accordance with the terms of the APA. The Debtors' obligation to pay the Termination Fee shall be given administrative expense priority pursuant to Bankruptcy Code section 507(a)(1).

f.   Terms of Expense Reimbursement. In the event that (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Silver or any of its affiliates to purchase all or any portion of the Debtors' businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Silver for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Presstek and Silver in connection with the transactions contemplated by the APA, up to a maximum of $500,000 (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

g.   Inclusion of Termination Fee and Expense Reimbursement in Initial Minimum Overbid Amount. The Termination Fee and the Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

h.  Sale Hearing. The Sale Hearing will be held on _____, 2004 at ___ _.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Third Floor, Wilmington, Delaware. At the Sale Hearing, the Debtors will seek the entry of an order (the "Sale Order") approving and authorizing the proposed Sale to Silver or the Prevailing Bidder, if any. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

i.  Closing. The closing of the Sale of the Assets will occur in accordance with the terms of the APA, the Prevailing Bidder APA, or the asset purchase agreement of the entity otherwise authorized by the Court to purchase the Assets, as applicable.

j.  Failure of Prevailing Bidder to Consummate Purchase; Designation of Backup Bidder. If for any reason the Prevailing Bidder fails to consummate its purchase of the Assets, the Debtors may deem the bidder of the second highest and best bid for the Assets (such bidder being the "Backup Bidder," with such bid being the "Backup Bid") to have submitted the Prevailing Bid. If the Debtors so designate a bidder as a Backup Bidder, such Backup Bidder shall be required to complete and execute an asset purchase agreement substantially in the form of the APA, and in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Backup Bid (a "Backup Bidder APA"). If the failure by the Prevailing Bidder to consummate the purchase is the result of such Prevailing Bidder's breach of, or default or failure to perform under, the Prevailing Bidder APA or the terms of these Bidding Procedures (such bidder being a "Defaulting Bidder"), such Defaulting Bidder's Qualified Bidder Deposit shall be forfeited to the Debtors, and the Debtors shall thereupon have the right to assert all rights and remedies available under applicable law.

k.  Determination of Cure Amounts under Assigned Leases and Contracts. The Debtors shall file and serve a schedule of the Assigned Leases and Contracts on all parties to such agreements as soon as is practicable, and in no event later than ten (10) days prior to the Sale Hearing, which schedule shall include the Debtors' calculation of the amount they believe must be paid to cure all defaults under each of the Assigned Leases and Contracts (collectively, the "Cure Amounts"). ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO DISPUTES SUCH CALCULATION MUST (i) FILE WITH THE COURT A WRITTEN CLAIM ASSERTING A CURE CLAIM THAT IS DIFFERENT FROM THE RESPECTIVE CURE AMOUNT ON OR BEFORE ANY BAR DATE SET BY THE COURT FOR THE FILING OF SUCH CLAIMS; AND (ii) FILE WITH THE COURT AND SERVE UPON COUNSEL FOR THE DEBTORS, BENESCH, FRIEDLANDER, COPLAN & ARONOFF,

5

LLP, 2300 BP TOWER, 200 PUBLIC SQUARE, CLEVELAND, OHIO 44114, ATTN: H. JEFFREY SCHWARTZ, ESQ., AN OBJECTION TO ITS SCHEDULED CURE AMOUNT ON OR BEFORE THE DATE OF THE SALE HEARING. ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO FAILS TO COMPLY WITH THE FOREGOING REQUIREMENTS SHALL BE FOREVER BARRED FROM (i) OBJECTING TO THE CURE AMOUNT APPLICABLE TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT AND (ii) ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT. If an objection to a scheduled Cure Amount is filed in accordance with this paragraph, the Court will hear that objection at the Sale Hearing.

l.    Reservation of Rights; Deadline Extensions. The Debtors shall be deemed to have reserved their rights to: (i) cancel the Auction; (ii) extend the Bid Deadline; (iii) impose such other and additional terms and conditions or modify the terms and conditions hereof as the Debtors determine to be in their best interests and (iv) reject all Qualifying Bids if, in the Debtors' reasonable judgment, no Qualifying Bid is in the best interests of the Debtors' estates.

m.    Sale of Assets "As Is". All of the Assets shall be transferred "as is." THE DEBTORS SHALL BE DEEMED TO HAVE EXPRESSLY DISCLAIMED ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.

PLEASE TAKE FURTHER NOTICE that the Debtors have filed a Motion for an Order authorizing the Debtors to sell substantially all of the assets of A.B.Dick and its wholly owned subsidiaries and assume and assign certain leases and executory contracts (the "Sale Motion"). ANY OBJECTIONS OR OTHER RESPONSES TO THE SALE MOTION MUST FILED WITH THE COURT AND SERVED ON (i) BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, 2300 BP TOWER, 200 PUBLIC SQUARE, CLEVELAND, OH 44114-2378, ATTN: H. JEFFREY SCHWARTZ, ESQ.; (ii) JASPAN, SCHLESINGER HOFFMAN LLP, 1201 NORTH ORANGE STREET, SUITE 1001, WILMINGTON, DE 19801, ATTN: FREDERICK B. ROSNER, ESQ.; (iii) THOMPSON HINE LLP, 127 PUBLIC SQUARE, 3900 KEY CENTER, CLEVELAND, OHIO 44114-1291, ATTN: ALAN R. LEPENE, ESQ. AND ROBERT C. FOLLAND, ESQ.,; (iv) MCDERMOTT WILL & EMERY LLP, 50 ROCKEFELLER PLAZA, NEW YORK, NEW YORK 10020, ATTN: STEPHEN B. SELBST, ESQ.; AND (V) THE OFFICE OF THE UNITED STATES

A030

TRUSTEE, _____, WILMINGTON, DELAWARE, NO LATER THAN
_____, 2004.

Dated: Cleveland, Ohio
            _____, 2004

                                    _____
                                    H. Jeffrey Schwartz  (OBR #0014307)
                                    John A. Gleason  (OBR #0039150)
                                    Michael D. Zaverton  (OBR #0038597)
                                    BENESCH, FRIEDLANDER,
                                      COPLAN & ARONOFF LLP
                                    2300 BP Tower
                                    200 Public Square
                                    Cleveland, OH  44114-2378
                                    (216) 363-4500
                                    (216) 363-4588 (Facsimile)
                                    jschwartz@bfca.com
                                    jgleason@bfca.com
                                    mzaverton@bfca.com

                                    Proposed Attorneys for A.B.Dick Company, *et al.*,
                                    Debtors and Debtors in Possession

                                                    and


                                    _____
                                    Frederick B. Rosner, Esq.  (No. 3995)
                                    JASPAN SCHLESINGER HOFFMAN LLP
                                    1201 North Orange Street, Suite 1001
                                    Wilmington, DE  19801
                                    Telephone:  302-351-8000/8005
                                    Facsimile:  302-351-8010
                                    frosner@jshllp-de.com

                                    Proposed Local Counsel for A.B.Dick Company,
                                    *et al.*, Debtors and Debtors in Possession

7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
----------------------------------------------------X
In re:                                          :      CASE NO. 04-12002
                                                :
A.B. DICK CO., et al.                           :      Chapter 11
                                                :
                         Debtors.               :      Hearing Date:  TBD
                                                :
----------------------------------------------------X      Related to Docket No. 70
```

**OBJECTIONS OF MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL
PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC  TO
THE MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY
ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED
SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND  ENCUMBRANCES;
(B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED
LEASE AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF**

MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund

Management LLC (collectively, "MHR"), the largest unsecured creditor of A.B. Dick Co.

("ABD") and Paragon Corporate Holdings, Inc. ("Paragon," and collectively with ABD,

Multigraphics, LLC and Interactive Media Group, Inc., the "Debtors"), by their undersigned

counsel, hereby object to the Debtors' motion, dated July 22, 2004, for entry of an order: (a)

authorizing the sale of substantially all of the assets of ABD and its wholly-owned subsidiaries

free and clear of liens, claims and encumbrances; (b) authorizing assumption and assignment of

certain unexpired leases and executory contracts; and (c) granting related relief (the "Motion").

### Preliminary Statement

1.      The Debtors have entered into an Asset Purchase Agreement ("APA") with

Presstek, Inc. ("Presstek"), and its acquisition affiliate, Silver Acquisition Corp. ("Silver")

(collectively, "Presstek"), whereby the Debtors would sell the assets of ABD – free and clear of

any liabilities, real or contingent – for $40 million in cash.  In the Motion, the Debtors seek

authorization for this sale under 11 U.S.C. § 363, as well as a determination that Presstek is a "good faith purchaser" under 11 U.S.C. § 363(b) and (m).

2.    However, the Debtors fail to inform this Court that only weeks before the Debtors' July 13, 2004 bankruptcy filing, Presstek had agreed to purchase the *stock* of ABD (and thus, all assets *and* liabilities ) for over $44 million. (*See* Stock Purchase Agreement, executed on or about June 16, 2004 ("SPA"), Exhibit A hereto.)  Further, whereas the SPA negotiations were conducted with the full participation of ABD's largest creditor, MHR, the APA negotiations were conducted secretly and concealed from MHR and other unsecured creditors.

3.    Moreover, since 2003, when Presstek first offered to acquire ABD, Presstek has asserted influence over the operations and management of ABD – influence that may have prevented the kind of labor reductions and cost cutting that could have saved ABD from its bankruptcy filing.

4.    Clearly, the fire sale of ABD's assets should not be authorized – and no finding of good faith should be made with respect to Presstek – until interested parties have had an opportunity to conduct discovery regarding the negotiation of the APA, Presstek's dealings with the Debtors and whether the financial condition of ABD has suffered because of Presstek's influence.

## FACTS

I.    **The Stock Purchase Agreement**

5.    Presstek first approached ABD regarding a potential acquisition in 2003.  In November 2003, Presstek proposed a transaction whereby it would purchase all the common stock of ABD for a much higher price.

2

6.    Presstek's offering price for ABD was thereafter renegotiated. The new price –
$44.1 million – is set forth in the SPA. (Exhibit A.) On June 16, 2004, Presstek, Paragon, ABD
and MHR executed the SPA and placed it in escrow.

7.    The SPA escrow agreement required that ABD's principal financial institution,
Key Bank National Association ("Key Bank"), continue funding of ABD's obligations through
the SPA closing. Inexplicably, Key Bank refused to fund through closing, even though it had
funded ABD and its payroll for months and was over secured. Citing terms of the escrow
agreement, on June 22, 2004, Presstek terminated the SPA.

## II.    The Asset Purchase Agreement

8.    Soon after the so-called termination of the SPA, Presstek, ABD and Paragon
began negotiating the APA. However, whereas MHR participated fully in the negotiations
leading to the execution of the SPA, MHR was shut out of the APA negotiations. Indeed, MHR
was forced to obtain a Delaware Superior Court injunction to enforce its right to seat a director
on ABD's board and obtain information regarding the APA.[1]

9.    The APA was executed by ABD, Paragon and Presstek on July 13, 2004 – less
than one month after the SPA's execution and on the same day that the Debtors filed their
bankruptcy petitions. Moreover, also on July 13, 2004, the Debtors:

(a)    sought approval of their debtor-in-possession (DIP) financing with Presstek and

Key Bank, which financing contained numerous terms favorable to both

financiers, including unreasonable attempts to limit the liability of Presstek and

Key Bank and a provision allowing Presstek to withdraw the DIP financing unless

---

[1]    The MHR representative remained on ABD's board for only a few days because, consistent with his
fiduciary duties, he was constrained to resign. (See Objections of MHR to the Interim Order Authorizing Certain of
the "Debtors-in-Possession" to Enter into Post-Petition Credit Agreement, etc., ¶¶ 11-15, filed July 14, 2004, Docket
No. 33.)

its unilateral and unreasonable terms for the ABD bidding process were followed;[2] and

(b)      commenced an action against MHR, seeking an order to convert the Debtor promissory notes held by three of the MHR entities to equity.[3]

10.      Clearly, the APA is part of a scheme to (a) win approval of a sweetheart deal for Presstek, (b) save Paragon and ABD equity holders from their very real exposure to Paragon and ABD creditors, and (c) eliminate the creditor standing of anyone who might dissent.

11.      Indeed, in less than a month, Presstek negotiated from a commitment to purchase the stock of ABD (*i.e.,* assets and liabilities) for $44.1 million to an agreement to purchase only ABD's assets – free of virtually all liabilities – for the lesser amount of $40 million, even though Presstek's original higher offer had already been negotiated down to $44.1 million. Now Presstek plans to buy the assets of ABD for $4.1 million less, *without assuming any liabilities* and avoiding over $6 million in trade debt.

12.      In sum, no sale of ABD's assets to Presstek should proceed before the facts and circumstances surrounding this abrupt change in the valuation of ABD are fully explored.

## III.    Presstek's Influence Over ABD

13.      In addition, MHR understands that Presstek has, in the past, exercised substantial influence over the management and operations of ABD. Clearly, whether Presstek's influence aggravated the financial difficulties of ABD should also be fully explored before any decision is made with respect to its status as a "good faith purchaser."

---

[2]      These terms include payment of $1.7 million to Presstek should another bidder succeed in acquiring ABD.
[3]      The Debtors have subsequently commenced a class action seeking to convert the Debtor promissory notes of other creditors to equity.

## ARGUMENT

I.  **The APA Negotiations Should Be**
    **Thoroughly Explored Before This Court**
    **Approves Any Sale Of ABD's Assets Under Its Terms**

14.    As the Debtors concede (Motion ¶¶16-17), a debtor's sale of property of the estate

under Section 363 must be supported by some "articulated business justification other than the

appeasement of major creditors." *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983). *See*

*also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward*

*Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use,

sale or lease of property of the estate under this section, courts require the debtor to show that a

sound business purpose justifies such actions") (citing *In re Lionel,* among other cases).

Accordingly, a bankruptcy court judge should "expressly find from the evidence presented

before him at the hearing a good business reason to grant such an application." *In re Lionel,*

*supra,* 722 F.2d at 1071.

15.    Further, the sale must be "in the best interest of the estate, *i.e.,* it is fair and

reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in

good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length'

transaction." *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)

(*citing,* among other cases, *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176-177 (D.

Del. 1991) and *Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335-336 (Bankr. D. Del. 1987)).

The level of required scrutiny increases where, like here, the proposed sale includes substantially

all of the debtor's assets. *See* 3 COLLIER ON BANKRUPTCY, ¶ 363.02[4], at 363-19 (2004)

("Because there is some danger that a section 363 sale might deprive parties of substantial rights

inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under

section 363 must be scrutinized closely by the court").

5

16.    No Section 363 authorization is possible here without a thorough exploration of the negotiations and events which occurred from the SPA's execution on June 16, 2004 to the APA's execution less than one month later. It is difficult to imagine what fundamental changes could have occurred in three and a half weeks which would justify such a decline in the value offered for ABD's assets. *See, e.g., In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.,* 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) ("It is particularly disturbing that the proposed sale price in the Purchase Agreement of July 20, 1987, is a twenty-five (25%) percent reduction from the $640,000.00 price offered on June 30, 1987, less than three weeks before, by the same purchaser"). At this point, the APA appears to be something other than an "arms length" transaction and nothing more than an impermissible effort to "appease major creditors" – *i.e.,* Presstek and Key Bank.

17.    Indeed, one consideration on a Section 363 motion is "the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property." *Dai-Ichi Kangyo Bank, supra,* 242 B.R. at 154 (*quoting In re Lionel,* 722 F.2d at 1071). Although MHR is aware of no existing appraisal of the assets of ABD, the $44.1 million offer in the SPA (with all liabilities included), certainly suggests that the "proceeds to be obtained from" the APA (with virtually no liabilities) are inadequate.

## II.    A "Good Faith Purchaser" Determination Cannot Be Made Without An Exploration Of Presstek's Role In The Business Affairs Of ABD And The APA Negotiations

18.    As the Debtors also concede (Motion ¶¶ 21-22), under Section 363(b) and (m), this Court cannot authorize the proposed sale of ABD's assets to Presstek without first finding that Presstek is a "good faith purchaser." In *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986), a case that, like here, involved the simultaneous filing of bankruptcy petitions and a motion for approval of a Section 363 asset sale, the Third Circuit Court of Appeals reversed the

6

lower court's authorization of that sale, holding that if the evidence submitted by the objectors demonstrated "collusion between the purchaser and . . . trustee [or in this case, the debtor-in-possession], or an attempt to take grossly unfair advantage of other bidders," the purchaser's good faith status, as a matter of law, would be "destroy[ed]." *Id.* at 150 (*quoting In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)). Accordingly, the Third Circuit stated:

> [T]he bankruptcy court should, upon remand of this matter from the district court, determine whether there was any impermissible collusion between ADC [the purchaser] and Abbotts [the debtor] that would negate ADC's status as a purchaser "in good faith."

*Id.* at 151.

19.    Here: (a) Presstek's and the Debtors' secret negotiation of the APA, (b) the disparity in value offered in the APA vis-a-vis the SPA, and (c) the possibility that Presstek's influence may have contributed to ABD's financial difficulties all raise the specter of collusion and/or other misconduct which preclude a good faith finding absent a full exploration of these issues.

20.    Equally significant is the fact that the APA contains terms that are unnecessarily favorable to Presstek and unfair to other potential bidders. For example, under Section 2.4, PressTek is released from virtually all liabilities occurring prior to the closing date of the APA. Additionally, considering the inadequacy of Presstek's present offer of $40 million, it is entirely unreasonable to require any other bidder to pay Presstek $1.7 million – or 4.25 percent of that price – simply to make an offer that actually reflects the value of ABD's assets. In their rush to protect themselves, the equity holders of ABD and Paragon have entered into a wholly inadequate agreement with Presstek and constructed a process that makes challenging that agreement exceedingly difficult.

7

## CONCLUSION

For the foregoing reasons, the Debtors' Motion should be denied, or alternatively, no decision should be made on that Motion until such time as MHR and all other interested parties have had an opportunity to obtain discovery regarding the termination of the SPA, the negotiations leading to execution of the APA and Presstek's influence on the operations of ABD.

Dated: August 9, 2004.                    Respectfully submitted,



                              Richard S. Cobb (I.D. No. 3157)
                              Jamie L. Edmonson (I.D. No. 4247)
                              LANDIS RATH & COBB LLP
                              919 Market Street
                              Suite 600
                              Wilmington, DE 19899
                              Telephone: (302) 467-4400
                              Facsimile: (302) 467-4450

                              -and-

                              David S. Rosner
                              Michael M. Fay
                              Ronna G. Jackson
                              KASOWITZ, BENSON, TORRES
                              & FRIEDMAN LLP
                              1633 Broadway
                              New York, New York 10019
                              (212) 506-1700


                              Counsel to MHR CAPITAL PARTNERS LP,
                              MHR INSTITUTIONAL PARTNERS LP,
                              MHRM LP AND MHR MANAGEMENT LLC

8

A039

# EXHIBIT A

Execution Copy

STOCK PURCHASE AGREEMENT

BY AND AMONG

PRESSTEK, INC.,

SILVER ACQUISITIONS CORP.,

PARAGON CORPORATE HOLDINGS, INC.

AND

A.B. DICK COMPANY

DATED AS OF JUNE ___, 2004

# TABLE OF CONTENTS

Page

1.  DEFINITIONS AND USAGE OF CERTAIN TERMS ........................................................ 1
    1.1   Definitions .......................................................................................................... 1
    1.2   Usage .................................................................................................................. 9

2.  PURCHASE AND SALE OF SHARES ............................................................................ 10
    2.1   Purchase and Sales of Shares ........................................................................... 10
    2.2   Consideration ..................................................................................................... 10
    2.3   Balance Sheet Adjustment to Purchase Price ................................................... 10
    2.4   Prohibition on Trading ...................................................................................... 12
    2.5   Intentionally Omitted ........................................................................................ 12
    2.6   Section 338(h)(10) Elections ............................................................................ 12
    2.7   Transfer Taxes ................................................................................................... 12
    2.8   Closing ............................................................................................................... 13

3.  REPRESENTATIONS AND WARRANTIES OF PARENT AND SILVER ................ 13
    3.1   Organization and Good Standing ...................................................................... 13
    3.2   Subsidiaries ....................................................................................................... 13
    3.3   Capitalization ..................................................................................................... 14
    3.4   Power, Authorization and Non-Contravention ................................................. 14
    3.5   No Violation of Charter Documents and Contracts; Compliance with
          Legal Authorizations; Governmental Authorizations ....................................... 15
    3.6   Documents and Disclosures .............................................................................. 16
    3.7   Silver Financial Statements .............................................................................. 17
    3.8   Intentionally Omitted ........................................................................................ 17
    3.9   Accounts Receivable ......................................................................................... 17
    3.10  Banking Relations ............................................................................................. 18
    3.11  Litigation ........................................................................................................... 18
    3.12  Taxes .................................................................................................................. 18
    3.13  Title to Properties .............................................................................................. 20
    3.14  Absence of Certain Changes or Events ............................................................. 21
    3.15  Intellectual Property .......................................................................................... 22
    3.16  Conformity of Products and Services ............................................................... 24
    3.17  Product and Service Warranties ........................................................................ 24
    3.18  List of Certain Employees; Suppliers and Customers ...................................... 24
    3.19  Intentionally Omitted ........................................................................................ 25
    3.20  Compliance with Laws ...................................................................................... 25
    3.21  Agreements and Commitments ......................................................................... 25
    3.22  Employees .......................................................................................................... 27
    3.23  Relationships with Affiliates ............................................................................ 29
    3.24  Environmental Matters ...................................................................................... 29
    3.25  [Intentionally Omitted] ..................................................................................... 30
    3.26  Board of Directors, Officers and Key Personnel .............................................. 30

A042

TABLE OF CONTENTS
(continued)

Page

|       | 3.27 | Insurance | 31 |
|       | 3.28 | Investment Banking and Brokerage Fees | 31 |
|       | 3.29 | Accuracy of Disclosure | 31 |
|       | 3.30 | No Other Representations | 31 |
| 4. | | REPRESENTATIONS AND WARRANTIES OF PLATINUM AND PURCHASER | 31 |
|       | 4.1 | Organization and Good Standing | 31 |
|       | 4.2 | Capitalization | 32 |
|       | 4.3 | Power, Authorization and Non-Contravention | 32 |
|       | 4.4 | No Violation of Charter Documents, Contracts or Laws | 33 |
|       | 4.5 | SEC Filings | 33 |
|       | 4.6 | Platinum Financial Statements | 34 |
|       | 4.7 | Financing | 34 |
|       | 4.8 | Accuracy of Disclosure | 34 |
|       | 4.9 | Litigation | 34 |
|       | 4.10 | Absence of Certain Changes or Events | 34 |
|       | 4.11 | Investment Banking and Brokerage Fees | 35 |
|       | 4.12 | No Other Representations | 35 |
| 5. | | PARENT AND SILVER COVENANTS | 35 |
|       | 5.1 | Advice of Changes | 35 |
|       | 5.2 | Conduct of Business | 36 |
|       | 5.3 | No Solicitation | 38 |
|       | 5.4 | Regulatory Approvals | 38 |
|       | 5.5 | Necessary Consents | 38 |
|       | 5.6 | Securities Laws | 38 |
|       | 5.7 | Litigation | 38 |
|       | 5.8 | Notification of Employee Problems | 39 |
|       | 5.9 | Satisfaction of Closing Conditions | 39 |
|       | 5.10 | Confidentiality | 39 |
|       | 5.11 | Access to Information | 39 |
|       | 5.12 | Mutual Releases | 40 |
| 6. | | COVENANTS OF PLATINUM AND PURCHASER | 40 |
|       | 6.1 | Advice of Changes | 40 |
|       | 6.2 | Conduct of Business | 40 |
|       | 6.3 | Regulatory Approvals | 41 |
|       | 6.4 | Litigation | 41 |
|       | 6.5 | Satisfaction of Conditions Precedent | 41 |
|       | 6.6 | Blue Sky Laws | 41 |
|       | 6.7 | NASDAQ Listing | 41 |

A043

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 6.8 | Confidentiality | 41 |
| 6.9 | Access to Information | 41 |
| 6.10 | Mutual Releases | 42 |
| 6.11 | Director and Officer Indemnification | 42 |
| **7.** | **ADDITIONAL COVENANTS** | **42** |
| 7.1 | Liability for Taxes | 42 |
| 7.2 | Tax Proceedings | 43 |
| 7.3 | Payment of Taxes | 44 |
| 7.4 | Tax Returns | 44 |
| 7.5 | Tax Allocation Arrangements | 44 |
| 7.6 | Cooperation and Exchange of Information | 45 |
| 7.7 | Conflict | 45 |
| 7.8 | [Intentionally Omitted] | 45 |
| 7.9 | Non-Competition, Non-Solicitation and Non-Disparagement | 45 |
| 7.10 | Further Assurances | 46 |
| 7.11 | Registration of Shares | 46 |
| 7.12 | Transfer of Shares | 46 |
| 7.13 | [Intentionally Omitted] | 46 |
| 7.14 | Filings | 46 |
| 7.15 | Joint Participation | 47 |
| 7.16 | Environmental Protection | 47 |
| 7.17 | Consents and Releases | 47 |
| 7.18 | Liability Insurance | 48 |
| **8.** | **CONDITIONS TO OBLIGATIONS OF PARENT** | **48** |
| 8.1 | Accuracy of Representations and Warranties | 48 |
| 8.2 | Covenants | 48 |
| 8.3 | Absence of Material Adverse Effect | 48 |
| 8.4 | Compliance with Law | 48 |
| 8.5 | Government Consents | 48 |
| 8.6 | Hart-Scott-Rodino Compliance | 48 |
| 8.7 | Absence of Litigation | 48 |
| 8.8 | Opinion of Platinum Counsel | 49 |
| 8.9 | Other Deliveries | 49 |
| 8.10 | Mutual Releases | 49 |
| 8.11 | Nasdaq | 49 |
| **9.** | **CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER** | **49** |
| 9.1 | Accuracy of Representations and Warranties | 49 |
| 9.2 | Covenants | 49 |
| 9.3 | Absence of Material Adverse Effect | 50 |

A044

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 9.4 | Compliance with Law | 50 |
| 9.5 | Government Consents | 50 |
| 9.6 | Third-Party Consents; Assignments; Other Documents | 50 |
| 9.7 | Mutual Releases and GEC Indemnity | 50 |
| 9.8 | Opinions of Counsel | 50 |
| 9.9 | Hart-Scott-Rodino Compliance | 50 |
| 9.10 | Closing Balance Sheet | 50 |
| 9.11 | Absence of Litigation | 50 |
| 9.12 | Limitation on Indebtedness | 50 |
| 9.13 | [Intentionally Omitted] | 51 |
| 9.14 | Other Indebtedness | 51 |
| 9.15 | Tax Indemnity | 51 |
| 9.16 | Other Deliveries | 51 |
| 9.17 | Financing | 52 |
| 9.18 | Financial Statements | 52 |
| 9.19 | Closing | 52 |

10. TERMINATION OF AGREEMENT ................................................ 52

| | | |
|---|---|---|
| 10.1 | Right to Terminate | 52 |
| 10.2 | Termination Procedures | 53 |
| 10.3 | Continuing Obligations | 53 |
| 10.4 | Effect of Termination | 53 |

11. NONSURVIVAL OF REPRESENTATIONS AND WARRANTIES ........................... 53

| | | |
|---|---|---|
| 11.1 | None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time | 53 |

12. MISCELLANEOUS ................................................ 53

| | | |
|---|---|---|
| 12.1 | Entire Agreement | 53 |
| 12.2 | Assignment; Binding Upon Successors and Assigns | 54 |
| 12.3 | Third Party Beneficiaries | 54 |
| 12.4 | No Joint Venture | 54 |
| 12.5 | Construction of Agreement | 54 |
| 12.6 | Severability | 54 |
| 12.7 | Section Headings | 54 |
| 12.8 | Exercise of Rights, Amendment, Extension and Waivers | 55 |
| 12.9 | Public Announcement | 55 |
| 12.10 | Fees and Expenses | 55 |
| 12.11 | Governing Law | 55 |
| 12.12 | Jurisdiction; Venue; Waiver of Jury Trial | 55 |
| 12.13 | Remedies | 56 |

A045

## TABLE OF CONTENTS
### (continued)

Page

12.14  Notices ......................................................................................................... 56
12.15  Time is of the Essence ................................................................................ 57
12.16  Counterparts................................................................................................ 57