Execution Copy

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this *"Agreement"*) is entered into as of June __, 2004, by and among Presstek, Inc., a Delaware corporation (*"Platinum"*), Silver Acquisitions Corp., a Delaware corporation and a wholly-owned subsidiary of Platinum (*"Purchaser"*), Paragon Corporate Holdings, Inc., a Delaware corporation (*"Parent"*), and A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent (*"Silver"*).

### RECITALS

WHEREAS, Parent owns of record and beneficially all of the issued and outstanding capital stock of Silver, consisting of 1,000 shares of Silver's common stock, $.01 par value per share (said shares being referred to herein as the *"Shares"*);

WHEREAS, Parent desires to sell all of the Shares to Purchaser, and Purchaser desires to acquire all of the Shares from Parent; and

WHEREAS, the Board of Directors of Silver, and the Noteholders (as defined herein) have consented to the sale of the Shares to Purchaser.

In consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, the parties agree as follows:

1.    **DEFINITIONS AND USAGE OF CERTAIN TERMS**

1.1    Definitions. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

*"Accounts Receivable"* means (i) all trade accounts receivable and other rights to payment from customers of Silver or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Silver or its Subsidiaries, and (ii) all other accounts or notes receivable of Silver or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

*"Adjustment Amount"* shall have the meaning set forth on Schedule 1 attached hereto.

*"Affiliate"* means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

*"Ancillary Agreements"* means any or all of the "Silver Ancillary Agreements", the "Platinum Ancillary Agreements" and any other agreements entered into by and between or among Silver, Platinum, Purchaser, Parent, MHR Capital Partners, LP, MHR Institutional Partners LP, MHRM LP, the Majority Holders and/or N.E.S. Investment Co. in connection with the transactions contemplated by this Agreement, including, without limitation, the Registration Rights Agreement, the Tax Indemnity Agreement and the Instructions, as the context requires.

*"Breach"* means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

*"Business"* means the manufacture, sale, distribution and service of offset presses, cameras and plate makers and related supplies for the graphic arts and printing industry as conducted by Silver and the Subsidiaries of Silver.

*"Business Day"* means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

*"CERCLA"* the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended.

*"Cleanup"* means any removal, containment, corrective action or other remediation or response actions carried out to address the requirements of any Environmental Law or Occupational Safety and Health Law, including measures to address any natural resource damages.

*"Closing Date"* means the date on which the Closing actually takes place.

*"Code"* means the Internal Revenue Code of 1986, as amended.

*"Confidential Information"* means any and all of the following information of Silver or its Subsidiaries, Parent, Purchaser or Platinum that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, or otherwise, or otherwise made available by observation, inspection or otherwise by either party (Purchaser and Platinum on the one hand or Silver and Parent collectively on the other hand) or its representatives (collectively, a *"Disclosing Party"*) to the other party or its representatives (collectively, a *"Receiving Party"*):

        (a)    all information that is a trade secret under applicable trade secret or other law;

        (b)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

        (c)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, Contracts, the names and backgrounds of key personnel, and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

        (d)    all notes, analyses, compilations, studies, summaries, and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, on any information included in the foregoing.

*"Contract"* means, with respect to any Person, any written or oral agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation,

2

promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"*Control*" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Effective Time*" means 12:01 a.m. on the Closing Date.

"*Encumbrance*" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"*Environment*" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"*Environmental, Health and Safety Liabilities*" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, which results or arises from a notice or claim made by a Governmental Authority or other Third Party or from application of any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

(a)      any environmental, health, or safety matter or condition (including on-site or off-site contamination, safety and health matters, release of Hazardous Material and regulation of chemical substances or products or waste material);

(b)      fine, penalty, judgment, award, settlement, legal or administrative proceeding, damage, loss, claim, demand or response, remedial, or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

(c)      financial responsibility under any Environmental Law or Occupational Safety and Health Law for Cleanup costs; or

(d)      any other compliance, corrective, or remedial measures required under any Environmental Law or Occupational Safety and Health Law.

The terms "*removal*," "*remedial*," and "*response action*" include the types of activities covered by the term "*disposal*" shall have the same definition assigned thereto by CERCLA; and the term "*remediation standard*" means a numerical standard that defines the concentrations of Hazardous Materials that are permitted to remain without liability in any environmental media after completion of all investigation, removal remediation and/or containment of a Release or Threat of Release.

"*Environmental Law*" means any applicable environmental or health and safety related Legal Requirement, including those requiring or relating to:

(a)      advising appropriate authorities, employees, and the public of intended or actual releases of Hazardous Materials, violations of discharge limits, or other prohibitions and the

3

commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

        (b)      preventing or reducing to acceptable levels, a Release, including any Release covered by a permit or license issued by a Governmental Authority;

        (c)      reducing the quantities, preventing the discharge, emission or release, or minimizing the hazardous characteristics of wastes that are generated and complying with waste disposal and recycling requirements;

        (d)      assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

        (e)      assuring that any Hazardous Materials are properly containerized, inventoried, used and stored;

        (f)      protecting resources, species, and ecological amenities;

        (g)      reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials and other potentially harmful substances;

        (h)      Cleanup of a Release, preventing the Threat of a Release or paying the costs preventing such Threats of Release; or

        (i)      making responsible parties pay private parties, or groups of them, for damages done to their health or property or the Environment, or permitting self appointed representatives of the public interest to recover for injuries done to public assets.

*"Equity Rights"* means all arrangements, calls, commitments, Contracts, options, rights to subscribe to, scrip, understandings, warrants, or other binding obligations of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, shares of the capital stock of a Person or by which a Person is or may be bound to issue additional shares of its capital stock or other Equity Rights.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

*"ERISA Affiliate"* means any entity which is a member of: (i) a "controlled group of corporations", as defined in Section 414(b) of the Code; (ii) a group of entities under "common control", as defined in Section 414(c) of the Code; or (iii) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Silver or any Subsidiary of Silver.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

*"Facilities"* means any real property, leasehold or other interest in real property currently owned or operated by any Person including the Tangible Personal Property currently being used or operated by Silver or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13. Notwithstanding the foregoing, for purposes of Sections 3.24, *"Facilities"* shall mean any real property, leasehold or other interest in real property currently or formerly owned or operated by Silver or its Subsidiaries, including the Real Property and Tangible Personal Property being used or operated by Silver or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13.

4

"*GAAP*" means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

"*Governmental Authority*" means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"*Governmental Authorization*" means any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"*Ground Lease*" means any long term lease of land in which most of the rights and benefits comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

"*Ground Lease Property*" means any land, improvements and appurtenances subject to a Ground Lease in favor of Silver or its Subsidiaries.

"*Hazardous Activity*" means the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, at, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on, at, or off the Facilities.

"*Hazardous Material*" means any hazardous or toxic substance, material, or waste, including petroleum and petroleum products, which is or becomes, prior to the Closing, regulated or defined as a "hazardous substance", "pollutant", "contaminant", "toxic chemical", "hazardous material", "toxic substance", "hazardous waste" or hazardous chemical" under: (i) CERCLA; (ii) Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§ 11001 et seq.; (iii) the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; (iv) the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; (v) the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651, et seq.; (vi) the Solid Waste Disposal Act as amended by the Resource Conservation & Recovery Act, 42 U.S.C. §§ 6901, et seq.; (vii) regulations promulgated under any of the above statutes; or (viii) any other applicable federal, state, or local statute, ordinance, rule or regulation that has a scope or purpose similar to those identified above.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"*Inventories*" means all inventories on hand at Closing of Silver or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by Silver or its Subsidiaries in the production of finished goods.

"*Key*" shall have the meaning specified in Section 2.3(b) hereof.

"*knowledge*" when used with respect to any entity, means the actual knowledge of the directors and executive officers of such entity after due inquiry, and when used with respect to Silver shall also mean the actual knowledge of the directors and officers of Parent and Silver after due inquiry and

BST99 1394460-27.069646.0011

when used with respect to Purchaser or Platinum, shall also mean the actual knowledge of the officers of Platinum or Purchaser after due inquiry. Due inquiry shall mean a reasonable good faith review of available business records and inquiry of responsible parties in a particular area with respect to which a person's "knowledge is in question. Due inquiry shall not include actual physical investigation of sites by the director or executive officer in question or inquiry of people outside the control of Parent, Silver, or the Subsidiaries of Silver, with the exception of agents, consultants or other independent contractors under assignments or relationships existing on or prior to the date of this Agreement.

"*Land*" means all parcels and tracts of land in which Silver or any of its Subsidiaries has an ownership interest.

"*Lease*" means any Real Property Lease or any lease or rental agreement, license, right to use or installment or conditional sale agreement to which Silver or any Subsidiary is a party and any other Silver Contract pertaining to the leasing or use of any Tangible Personal Property.

"*Legal Requirement*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

"*Liability*" with respect to any Person, means any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Majority Holders*" has the meaning specified in the Notes.

"*Material Adverse Effect*" when used in connection with an entity means any change, event, circumstance or effect that is or is reasonably likely to be materially adverse to the business, employees, assets, financial, condition, or results of operations of such entity taken as a whole with its Subsidiaries, provided, however, that no change or effect arising out of or in connection with or resulting from any of the following shall be deemed by itself or by themselves, either alone or in combination, to constitute or contribute to a Material Adverse Effect (i) a decrease in the public trading price of an entity's common stock; (ii) general economic conditions or changes generally affecting the industry in which such entity operates; or (iii) any action, omission, change, effect, circumstance or condition contemplated by this Agreement or attributable to the execution, performance or announcement of this Agreement or the transactions contemplated hereby.

"*Noteholders*" means the holders of the Notes.

"*Notes*" means Silver and Parent's promissory notes, dated August 14, 2001 in an aggregate principal amount of $25,000,000 issued by Silver pursuant to Silver's Offer to Exchange and Consent Solicitation Statement dated July 8, 2001, as amended and supplemented.

"*Occupational Safety and Health Law*" means any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act of 1970, as amended.

"*Order*" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

BST99 1394460-27.069646.0011

"*Permitted Encumbrance*" means the encumbrances identified on <u>Section 1 of the Silver Disclosure Schedule</u>, together with the following: (i) any liens of mechanics, suppliers, vendors, materialmen, laborers, employees, repairmen and other like liens arising in the ordinary course of Silver's business, securing obligations which are not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings if and to the extent that an adequate reserve shall have been made therefor on the Closing Balance Sheet; (ii) liens incurred or deposits to secure the performance of surety and appeal bonds, bids, leases, performance and return money bonds and similar obligations, in each case in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves as determined in accordance with GAAP have been made therefor on Silver's Closing Balance Sheet; (iii) purchase money liens incurred in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves as determined in accordance with GAAP have been made therefor on Silver's Closing Balance Sheet; and (iv) with respect to Real Property, privileges, easements, rights of way, licenses, covenants, zoning and other restrictions of record, which individually or in the aggregate, do not affect the current uses or marketability of such Real Property; and (v) any liens for taxes, assessments, levies, fees and other government or similar charges not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or which are otherwise set forth on the Silver Financial Statements.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"*Platinum Common Stock*" means the shares of common stock of Platinum, par value $.01 per share.

"*Platinum Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Platinum and Purchaser to Parent and Silver simultaneously with the execution and delivery of this Agreement.

"*Proceeding*" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"*Real Property*" means the Land and improvements and all appurtenances thereto and any Ground Lease Property.

"*Real Property Lease*" means any Ground Lease or Space Lease.

"*Record*" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping into the Environment.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Laws*" means the Securities Act, the Exchange Act, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of the SEC and any other Governmental Authority promulgated thereunder.

7

A053

"*SEC*" means the United States Securities and Exchange Commission.

"*Series B Notes*" means Parent's 9 5/8% Series B Senior Notes due 2008.

"*Silver Common Stock*" means the shares of common stock of Silver, par value $.01 per share.

"*Silver Contract*" means any Contract: (a) to which Silver or its Subsidiaries is a party; or (b) by which Silver or its Subsidiaries or any of their assets is bound or subject to any obligation.

"*Silver Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Parent and Silver to Platinum and Purchaser simultaneously with the execution and delivery of this Agreement.

"*Space Lease*" means any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

"*Silver Employee Plans*" means, collectively, (i) each "employee benefit plan", as defined in Section 3(3) of ERISA; and (ii) all other material written or formal plans, enforceable policies or practices or Contracts involving direct or indirect compensation or benefits (including any employment Contracts entered into between Silver or any Subsidiary of Silver and any employee of Silver or any Subsidiary of Silver) currently or previously maintained, contributed to or entered into by Silver or any Subsidiary of Silver under which Silver or any Subsidiary of Silver or any ERISA Affiliate of any of them has any present or future Liability but excluding any Silver Benefit Arrangements.

"*Subsidiary*" means, when used with reference to any Person, any corporation more than fifty percent (50%) of the outstanding voting securities of which, or any partnership, limited liability company, joint venture or other entity more than fifty percent (50%) of the total equity interest of which, is directly or indirectly owned or Controlled by such Person.

"*Tangible Personal Property*" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or Silver's or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

"*Tax*" or "*Taxes*" means (i) any and all federal, state, local and foreign Taxes, assessments and other governmental charges, duties, impositions and liabilities relating to Taxes, including Taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property Taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any liability for payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated consolidated, combined or unitary group (or similar concept under state or foreign law), and (iii) any liability for amounts of the type described in clauses (i) and (ii) as a result of any express or implied obligation to indemnify another person or as a result of any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for Taxes of a predecessor entity.

"*Third Party*" means a Person that is not a party to this Agreement or an Affiliate of a party to this Agreement.

BST99 1394460-27.069646.0011

A054

"*Threat of Release*" or "*threatened release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the Environment which may result from such Release.

    1.2   <u>Usage</u>.

    (a)   <u>Interpretation</u>. In this Agreement, unless a clear contrary intention appears:

    (i)   the singular number includes the plural number and <u>vice versa</u>;

    (ii)   references to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

    (iii)   reference to any gender includes each other gender;

    (iv)   reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

    (v)   reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

    (vi)   "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

    (vii)   "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

    (viii)   "or" is used in the inclusive sense of "and/or";

    (ix)   with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

    (x)   references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

    (xi)   the terms "Article", "Section", "Schedule" and "Exhibit" refer to the specified Article, Section, Schedule or Exhibit or this Agreement.

    (b)   <u>Accounting Terms and Determinations</u>. Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accounting determinations thereunder shall be made in accordance with GAAP.

BST99 1394460-27.069646.0011

(c)    Legal Representation of the Parties.  This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2.    PURCHASE AND SALE OF SHARES

2.1    Purchase and Sales of Shares.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Parent shall sell the Shares to the Purchaser, and deliver or cause to be delivered to Purchaser a certificate or certificates representing all of the Shares. Such stock certificate or certificates shall be duly endorsed in blank for transfer or shall be presented with stock powers duly executed in blank, with such signature guarantees and such other documents as may be reasonably required by Purchaser to effect a valid transfer of the Shares by Parent, free and clear of any and all Encumbrances to Purchaser.

2.2    Consideration.  The consideration for the Shares (the *"Purchase Price"*) will, subject to adjustment as set forth in Section 2.3, be (i) $24,000,000 in cash, (the *"Cash Payment"*), and (ii) such number of shares of Platinum Common Stock (as rounded up to the next highest whole share number, the *"Stock Payment"*) as is determined by dividing $20,100,000 by the average daily closing price per share of a share of Platinum Stock as reported on The Nasdaq Stock Market for each of the three (3) consecutive trading days ending (and including) the trading day that occurs two trading days prior to (and not including) the date of the Closing (the *"Closing Price"*).  The parties acknowledge and agree that (a) such number of shares of Platinum Common Stock as is determined by dividing $5,000,000 by the Closing Price (as rounded up to the next highest whole share number, the *"Holdback Amount"*) shall be deducted from the Stock Payment at Closing and held in trust by the Purchaser in accordance with Section 2.3(d); and (b) that the remainder of the Purchase Price shall be distributed in accordance with the joint written instructions (the *"Instructions"*) executed by Parent and the Majority Holders delivered to Purchaser (which Instructions with regard to the Stock Payment shall be reasonably acceptable to the Purchaser); provided, that, the amount of the Stock Payment to be distributed in accordance with the Instructions shall first be reduced by (i) $750,000 to be paid to the Majority Holders in reimbursement of their expenses (such amount to be paid at Closing, in cash to the extent available after making any cash distributions from the Cash Payment as required hereby, or otherwise deducted from the Stock Payment at the Closing) and (ii) the amount provided in writing to Platinum at least three (3) days prior to the Closing that represents transaction expenses of Silver and Parent (which amount shall not exceed $500,000, such amount to be paid as of the Closing to Parent and shall be deducted from the Stock Payment at the Closing), with the shares constituting the Stock Payment valued at the Closing Price for such purpose.  In the Instructions, the Majority Holders shall also consent to the transactions contemplated by this Agreement, waive the "ABD Sale Rights" (as defined in the Notes), agree not to pursue or entertain an Acquisition Proposal, and otherwise cooperate in consummating the transactions contemplated by this Agreement.  If, prior to the Closing, Platinum (X) recapitalizes either through a split-up of the outstanding shares of Platinum capital stock into a greater number, or through a combination of such outstanding shares into a lesser number, (Y) reorganizes, reclassifies or otherwise changes such outstanding shares into the same or a different number of shares of other classes or into securities of another company (other than through a split-up or combination of shares provided for in the previous clause), or (Z) declares a dividend outside the ordinary course of business on its outstanding shares, or, in each case, in any similar transaction, the calculation of the Stock Payment will be adjusted appropriately.

2.3    Balance Sheet Adjustment to Purchase Price

(a)    Closing Balance Sheet.  Not less than five (5) business days prior to Closing, Silver shall deliver to Purchaser an unaudited balance sheet of Silver (the *"Closing Balance Sheet"*) and

10

A056

a preliminary calculation of the Adjustment Amount as of the most recent month-end prior to the Closing Date (the *"Closing Adjustment Amount"*), together with a certificate signed by the chief financial officer of the Silver and an appropriate executive officer of Parent certifying (i) that the Closing Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that the Closing Balance Sheet fairly and accurately presents, in all material respects, the financial condition of Silver as of such date, and (iii) the Closing Adjustment Amount. The Closing Balance Sheet and the calculation of the Closing Adjustment Amount shall be prepared by the chief financial officer of Silver in good faith in consultation with Platinum and Platinum's representatives after Platinum and Platinum's representatives have had access to financial information and personnel relevant to the preparation of the Closing Balance Sheet and the calculation of the Closing Adjustment Amount.

(b)    Closing Date Adjustment. In the event that the Closing Adjustment Amount reflected on the Closing Balance Sheet is less than $4,830,000, then a dollar-for-dollar decrease shall be made to the Cash Payment of the Purchase Price at the Closing equal to the amount by which the Closing Adjustment Amount is less than $4,830,000; provided, however, that the Cash Payment payable at Closing shall not be reduced below the amount required to satisfy all obligations to Key Corporate Capital, Inc. ("*Key*") under the Credit and Security Agreement, dated as of April 1, 1998, as amended, between Key and Parent as permitted by the terms of this Agreement, with any remaining reduction to the Purchase Price which is not made through a reduction in the Cash Payment made through a reduction in shares of Platinum Common Stock constituting the Stock Payment, valued at the Closing Price (rounded up to the next highest whole share). No increase shall be made to the Purchase Price based upon the Closing Adjustment Amount or the Closing Balance Sheet.

(c)    Final Balance Sheet. Not later than ninety (90) days subsequent to Closing, Platinum shall deliver to Parent an unaudited balance sheet of Silver (the *"Final Balance Sheet"*) and a calculation of the Adjustment Amount as of the Closing Date (the *"Final Adjustment Amount"*), together with a certificate signed by the chief financial officer of Platinum or Purchaser certifying (i) that the Final Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that, to his knowledge, the Final Balance Sheet fairly and accurately presents the financial condition of Silver as of such date, and (iii) the Final Adjustment Amount.

(d)    Final Adjustment. In the event that the Final Adjustment Amount reflected on the Final Balance Sheet is less than or greater than $4,830,000, then a dollar-for-dollar decrease or increase, shall be made to the Purchase Price based upon the difference between $4,830,000 and the Final Adjustment Amount, after taking into account any prior adjustment to the Purchase Price pursuant to Section 2.3(b). Any decrease in the Purchase Price pursuant to this Section 2.3(d) shall be satisfied first from the Holdback Amount, and then from the recipients of the Stock Payment on a pro rata basis, based upon the respective portions of the Stock Payments allocable to such recipients as set forth in the Instructions. Such right to recover the decrease in the Purchase Price from the recipients of the Stock Payment will be evidenced by separate agreements with Platinum regarding such recovery. Any portion of the Holdback Amount which is not paid to Purchaser to satisfy a decrease in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in accordance with the Instructions, and any increase in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in cash in accordance with the Instructions.

(e)    Mechanism for Dispute. The Final Balance Sheet and the accompanying calculation of the Adjustment Amount shall be utilized for the purposes of Sections 2.3(c)-(d) above upon the failure of Parent to timely deliver the Balance Sheet Dispute Notice as set forth in this Section 2.3(e). Parent shall notify Platinum in writing of any challenge to the Final Balance Sheet (the *"Disputed*

11

*Balance Sheet*") or the accompanying calculation of the Adjustment Amount thirty (30) days subsequent to the delivery of the Final Balance Sheet (the "*Balance Sheet Dispute Notice*"). If the Balance Sheet Dispute Notice has been timely delivered, the parties shall use their good faith efforts to resolve promptly any disagreements between them concerning the Disputed Balance Sheet and the Final Adjustment Amount. In the event that, despite such good faith efforts, the parties are unable to resolve any such disagreements within three (3) days after the delivery of the Balance Sheet Dispute Notice, the parties shall together appoint an independent nationally recognized accounting firm (the "*Arbitrator*") to resolve any such disagreements. The parties shall present their positions to the Arbitrator, together with such other materials as the Arbitrator deems appropriate. The Arbitrator shall render its decision as to such disagreements within forty-five (45) days after its engagement and such written report shall be final, binding and conclusive upon the parties. The fees and disbursements of the Arbitrator shall be allocated to parties in the same proportion that the aggregate amount of such disputed items so submitted to the Arbitrator that is unsuccessfully disputed by Parent bears to the total amount of such disputed items and the balance shall be paid by Platinum. In connection with any dispute, the parties will cooperate with each other and the Arbitrator to resolve such dispute including providing any information reasonably requested. Any amounts payable hereunder which are paid in Platinum Common Stock shall be valued at the Closing Price.

2.4    Prohibition on Trading. Prior to the Closing, each of Platinum and Parent covenants that it will not, and it will cause its subsidiaries not to, engage in any trading in securities of Platinum (including any repurchase in the public market), including any hedging transactions or other stock market trading activities which could be reasonably expected to influence the bid and asked prices for shares of Platinum Common Stock.

2.5    Intentionally Omitted.

2.6    Section 338(h)(10) Elections. At Platinum's request, N.E.S. Investment Co. (as the common parent of the affiliated group that includes Silver (the "*Seller Group*")) shall within the time period prescribed by law for the filing thereof, join with Platinum in making a timely, irrevocable and effective election under Section 338(h)(10) of the Code and similar elections under applicable state income tax law (collectively, the "*Section 338(h)(10) Elections*") with respect to Platinum's purchase of the Shares. In connection with the Closing, Platinum and N.E.S. Investment Co. will execute Internal Revenue Service Forms 8023 and 8883 reflecting the Price Allocation. Platinum shall prepare Internal Revenue Service Forms 8023 and 8883 with respect to Platinum's purchase of the Shares, and such forms shall be duly executed by an authorized person for each of Platinum and Parent (and N.E.S. Investment Co.) in connection with the Closing. Platinum shall, within the time periods prescribed by law, prepare the state tax forms, if any, necessary for effectuating the Section 338(h)(10) Elections in the applicable states (the "*State Forms*") and any schedules (the "*Tax Schedules*") required to be attached to the Internal Revenue Service Forms 8023 or 8883 or the State Forms (collectively, the "*Forms*"), in each case in accordance with the Price Allocation. Parent shall provide any cooperation that Platinum shall reasonably require in preparing the Tax Schedules and State Forms and shall execute any State Forms presented to it by Platinum. Platinum shall duly and timely file the Forms (together with the applicable Tax Schedules) as prescribed by Treasury Regulation §1.338(h)(10)-1 (as in effect and as it may hereafter be amended) or the corresponding provisions of state income tax law. Platinum and Parent (and N.E.S. Investment Co.) shall prepare all relevant Tax Returns in a manner consistent with the Tax Schedules and in accordance with the allocation of purchase price to be agreed by such parties prior to the Effective Time (the "*Price Allocation*"). The intent of this Section 2.6 shall be to create the same obligations concerning the Forms as are contained in the Tax Indemnity Agreement.

2.7    Transfer Taxes. Unless otherwise specified in this Agreement, Parent, on the one hand, and the Purchaser, on the other hand, shall each be responsible for one half of all sales, transfer,

12

value added and similar Taxes and all recording and filing fees that may be imposed, assessed or payable by reason of the sale and transfer of the Shares pursuant to this Agreement, and Purchaser, on the one hand, and Parent, on the other, shall be entitled to any refund of such amounts received applicable thereto. Purchaser agrees, and agrees to cause Silver to take any commercially reasonable actions requested by the other that would reduce the amount of such taxes imposed with respect to the transactions contemplated by this Agreement.

2.8    Closing. The purchase and sale provided for in this Agreement (the "*Closing*") will take place at the offices of Purchaser's counsel, McDermott, Will & Emery, 28 State Street, Boston, Massachusetts 02109, at 10:00 a.m. (local time) on the date that is five (5) Business Days following the satisfaction of the Closing conditions set forth in Article 8 and Article 9 (other than, but subject to the satisfaction of, those conditions that by their nature are to be satisfied at the Closing), unless Purchaser and Silver agree otherwise; *provided, however*, that in no event shall the Closing occur any sooner than 10 trading days after the public announcement of the transactions contemplated by this Agreement. Subject to the provisions of Article 10, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.8 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to Article 10.

3.    REPRESENTATIONS AND WARRANTIES OF PARENT AND SILVER

Except as set forth in the Silver Disclosure Schedule delivered to Platinum herewith, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 3, Parent and Silver hereby jointly and severally represent and warrant to Platinum as follows:

3.1    Organization and Good Standing. Silver and each Subsidiary of Silver is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect on Silver. All jurisdictions in which Silver and each Subsidiary of Silver is duly qualified or registered to do business as a foreign corporation is listed on Section 3.1 of the Silver Disclosure Schedule. Seller has delivered or made available to Platinum a true and correct copy of its certificate of incorporation and bylaws and similar governing instruments of each of its Subsidiaries, each as amended to date (collectively, the "*Silver Charter Documents*"), and each such instrument is in full force and effect. Neither Silver nor any Subsidiary is in violation of any of the provisions of the Silver Charter Documents.

3.2    Subsidiaries. Each of Silver's Subsidiaries are listed on Section 3.2 of the Silver Disclosure Schedule, each of which is directly or indirectly wholly-owned by Silver. Except as set forth in Section 3.2 of the Silver Disclosure Schedule, Silver does not have any other Subsidiaries or any interest, direct or indirect, in any corporation, partnership, joint venture, limited liability company or other business entity. Neither Silver nor any Subsidiary of Silver has agreed or is obligated to make, or is bound by any Contract, letter of intent, option, insurance policy, or benefit plan as in effect as of the date hereof pursuant to which it is required to make any future investment in or capital contribution to any other Person. Except as set forth in Section 3.2 of the Silver Disclosure Schedule, neither Silver, nor any Subsidiary, has, at any time, been a general partner of any general partnership, limited partnership or other entity or manager or member of any limited liability company. Section 3.2 of the Silver Disclosure

13

A059

Schedule indicates the jurisdiction of organization of each entity listed therein and Silver's direct or indirect equity interest therein.

3.3    Capitalization.

(a)    Authorized/Outstanding Capital Stock. As of the date hereof, the authorized capital stock of Silver consists solely of 1,000,000 shares of Silver Common Stock. As of the date hereof, there are issued and outstanding 1,000 shares of Silver Common Stock, all of which are owned, beneficially and of record, by Parent. All issued and outstanding shares of Silver Common Stock have been duly authorized and validly issued and are fully paid and nonassessable are not subject to any right of rescission, are not subject to preemptive rights and have been offered, issued, sold and delivered by Silver in compliance with all registration or qualification requirements (or applicable exemptions therefrom) of applicable federal and state securities laws. Section 3.3(a) of the Silver Disclosure Schedule sets forth the authorized and issued and outstanding capital stock of each Subsidiary of Silver. There are no outstanding stockholder agreements, voting trusts, proxies or other Contracts to which Silver, any such Subsidiary of Silver or, to Silver's knowledge, to which any other Person is a party, relating to the voting of any shares of Silver or any such Subsidiary's capital stock.

(b)    Options/Warrants/Rights. There is no: (i) outstanding preemptive right, stock appreciation right, subscription, option, call, warrant or right (whether or not currently exercisable) to acquire from Parent or Silver or, to Silver's knowledge, from any other Person, any shares of Silver Common Stock or other securities of Silver or any Subsidiary of Silver; (ii) outstanding security, instrument or obligation issued by Silver or Affiliates of Silver, that is or may become convertible into or exchangeable for any shares of Silver Common Stock or other securities of Silver or any Subsidiary of Silver; (iii) stockholders' rights plan (or similar plan commonly referred to as a "poison pill") or Contract under which Silver or any successor of Silver is or may become obligated to sell or otherwise issue any shares of its capital stock or any securities of any Subsidiary of Silver; (iv) Contract to which Parent or Silver is a party relating to the voting or registration of or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to) any shares of Silver Common Stock or any securities of any Subsidiary of Silver; (v) liability for dividends accrued but unpaid; or (vi) condition or circumstance, to Silver's knowledge, that likely would directly or indirectly give rise to or provide a basis for the assertion of a claim by any Person to the effect that such Person is entitled to acquire or receive any shares of capital stock or other securities of Silver or any Subsidiary of Silver, including but not limited to promises to issue or grant securities of Silver or to recommend to Silver's board of directors to issue or grant securities of Silver or any Subsidiary of Silver.

(c)    Title to Shares. Parent has valid title to the Shares and the legal right and power, and all authorizations and approvals required by law, to enter into this Agreement, and to sell, transfer and deliver the Shares to Purchaser; (ii) Parent has not sold, assigned or otherwise transferred to any third party any of its right, title or interest in or to any of the Shares; and (iii) there exists no Encumbrance on or relating to any of the shares of Silver Common Stock. To Silver's knowledge: (x) no Person has claimed any interest in any additional shares of Silver Common Stock, or any options, warrants or other securities of Silver or any securities of any Subsidiary of Silver, except for the Shares owned by Parent; and (y) no third party has made, or has, any claim of entitlement to receive any shares of the capital stock of Silver or any securities of any Subsidiary of Silver, any warrants or other rights to acquire any capital stock of Silver or any other securities of Silver or any securities of any Subsidiary of Silver.

3.4    Power, Authorization and Non-Contravention.

(a)    Silver and each Subsidiary of Silver has the right, corporate power, legal capacity and authority to: (i) carry on its business as now conducted; (ii) own, operate and lease its properties in

14

A060

the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under all Silver Contracts, and (iv) enter into and perform its obligations under this Agreement and all agreements to which it is or will be a party that are required to be executed pursuant to or in connection with this Agreement (the "*Silver Ancillary Agreements*"); except in the case of clauses (i), (ii) and (iii) of this Section 3.4 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Silver, including by the Board of Directors of Silver. The written consent of Parent, as the sole stockholder of Silver, and the consents of the holders of a majority of the outstanding Notes that have been obtained, certified copies of which have previously been delivered to Purchaser, are sufficient for the approval of the transactions contemplated hereby by Silver's stockholders and no other approval of any holder of any securities of Silver is required in connection with the consummation of the transactions contemplated hereby.

(b)    No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by Silver or any Subsidiary of Silver in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (i) the consents set forth in Section 3.4(b) of the Silver Disclosure Schedule, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities (or related) laws and the Antitrust Filings and (iii) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Silver, Platinum or Purchaser or their respective businesses or assets or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c)    This Agreement and the Silver Ancillary Agreements are, or when executed and delivered by Silver and the other parties thereto will be, valid and binding obligations of Parent and Silver (to the extent a party thereto) enforceable against Parent and Silver (to the extent a party thereto) in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Silver Ancillary Agreements will not be effective until the earlier of the Effective Time and the date provided for therein.

3.5    No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations.

(a)    Neither the execution and delivery of this Agreement or any Silver Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of the Silver Charter Documents, as currently in effect, except as set forth in Section 3.5 of the Silver Disclosure Schedule, or any material Silver Contract, which termination, Breach, impairment or violation of any material Silver Contract, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Silver.

(b)    Except as set forth in Section 3.5(b) of the Silver Disclosure Schedule:

(i)    each of Silver and each Subsidiary of Silver is, and at all times since January 1, 2000 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of operation of its business or the ownership or use of any of Silver's assets;

15