(ii)     no event has occurred since January 1, 2000 or circumstance currently exists that (with or without notice or lapse of time) constitute or will result in a violation by Silver or any Subsidiary of Silver of, or a failure on the part of Silver or any Subsidiary of Silver to comply with, any Legal Requirement; and

(iii)     neither Silver nor any Subsidiary of Silver has received, at any time since January 1, 2000, any written notice or other communication, or to Silver's knowledge, any other notice or communication, from any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by Silver or any Subsidiary of Silver with, any Legal Requirement.

(c)     Section 3.5(c) of the Silver Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that are collectively necessary to permit Silver to lawfully conduct and operate its business in the manner it currently conducts and operates its business and to permit Silver to own and use its assets in the manner in which it currently owns and uses such assets. Each Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.5(c) of the Silver Disclosure Schedule:

(i)     each of Silver and each Subsidiary of Silver is, and at all times since January 1, 2000 has been, in full compliance with all of the material terms and requirements of each Governmental Authorization identified or required to be identified in Section 3.5(c) of the Silver Disclosure Schedule;

(ii)     no event has occurred since January 1, 2000 or circumstance currently exists that may (with or without notice or lapse of time) (A) constitute or will result directly or indirectly in a violation of or a failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule, or (B) will result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any material Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule;

(iii)     neither Silver nor any Subsidiary of Silver have received, at any time since January 1, 2000, any written notice or other communication, or to Silver's knowledge, any other notice or communication, from any Governmental Authority or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any material Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule; and

(iv)     all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule have been duly filed on a timely basis with the appropriate Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities.

3.6     Documents and Disclosures.

BST99 1394460-27.069646.0011

A062

(a)    Silver has made available to Platinum for examination true and complete copies of all documents and information listed in the Silver Disclosure Schedule or other exhibits called for by this Agreement, as well as (i) Silver's minute book containing all records of all proceedings, consents, actions and meetings of the stockholders, the Board of Directors and any committees of the Board of Directors of Silver; (ii) all Governmental Authorizations, permits, Orders and consents issued by any regulatory agency or other Governmental Authority with respect to Silver and/or the Business and (iii) all of the foregoing documents and information with respect to the Subsidiaries of Silver.

(b)    There has not been any violation of any of the provisions of the Silver Charter Documents, or of any resolution adopted by the stockholders or boards of directors, of Silver or any Subsidiary of Silver, and to Silver's knowledge, no event has occurred and is continuing, and no condition or circumstance exists, that likely would (with or without notice and/or lapse of time) constitute or result directly or indirectly in such a violation.

(c)    The books of account, stock records, minute books and other records of Silver and its Subsidiaries: (i) are in all material respects true and complete, (ii) have been maintained in accordance with reasonable business practices and (iii) accurately and fairly reflect in all material respects the transactions and dispositions of the assets of Silver and its Subsidiaries.

3.7    Silver Financial Statements. Included in Section 3.7 of the Silver Disclosure Schedule are Silver's internal management report containing its financial statements as of December 31, 2003 (the "*Internal Management Report*"), the consolidated financial statements of Silver (including, in each case, any related notes thereto) for the fiscal years ended December 31, 2001, 2002 and 2003 (the "*Silver Financial Statements*") and for the three-month periods ended March 31, 2004 and 2003 (the "*Interim Financials*") and each: (i) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto); (ii) fairly present in all material respects the consolidated financial position of Silver and the Subsidiaries of Silver as at the respective dates thereof and the consolidated results of Silver's operations and cash flows for the periods indicated, except that the unaudited interim financial statements may not contain footnotes and were or are subject to normal and recurring year end adjustments which are not material. Except as set forth on Section 3.7 of the Silver Disclosure Schedule, since December 31, 2003 (the "*Base Balance Sheet Date*"), neither Silver nor any Subsidiary of Silver has any liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for liabilities incurred since the Base Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Silver and the Subsidiaries of Silver taken as a whole and liabilities incurred in connection with this Agreement. There has been no change in Silver's accounting policies during the periods covered by the Silver Financial Statements, except as described in the notes to the Silver Financial Statements. Silver has no material debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected, reserved against or disclosed in the Silver Financial Statements or under Section 3.7 of the Silver Disclosure Schedule, except for those that may have been incurred after the Base Balance Sheet Date in the ordinary course of Silver's business, consistent with past practice and that in an aggregate do not exceed $50,000, and those that occur after the date of this Agreement will be in compliance with this Agreement or with the express written consent of Platinum.

3.8    Intentionally Omitted.

3.9    Accounts Receivable. The Accounts Receivable shown in the balance sheet contained in the Silver Financial Statements as of December 31, 2003 (the "*Base Balance Sheet*") arose in the ordinary course of business consistent with past practice. Allowances for doubtful accounts and

17

warranty returns are adequate and have been prepared in accordance with GAAP consistently applied and in accordance with the past practices of Silver and its Subsidiaries. The Accounts Receivable of Silver and its Subsidiaries arising after the Base Balance Sheet Date and prior to the Closing Date arose or will arise in the ordinary course of business consistent with past practice. To the knowledge of Silver, the Accounts Receivable represent bona fide accounts due from third parties in arms-length transactions, are not subject to any material claim of offset, recoupment, credit setoff or counter-claim and it has no knowledge of any specific facts or circumstances (whether asserted or unasserted) that could give rise to any such claim in any such case, except to the extent otherwise reflected in the allowances for doubtful accounts as provided for in the Base Balance Sheet or, with respect to Accounts Receivable arising after December 31, 2003 and prior to the Closing Date, as determined in the ordinary course of business consistent with the past practices of Silver and its Subsidiaries. No material amount of Accounts Receivable are contingent upon the performance by Silver or any of its Subsidiaries of any obligation or Contract other than normal warranty repair and replacement and other than products' progress bills in the ordinary course of business consistent with past practice. Other than Permitted Encumbrances, no Person has any Encumbrance on any of such Accounts Receivable and no agreement for deduction or discount has been made with respect to any of such receivables. Section 3.9 of the Silver Disclosure Schedule sets forth an aging of Accounts Receivable of Silver and its Subsidiaries in the aggregate and by customer, and indicates the amounts of allowances for doubtful accounts and warranty returns and the amounts of Accounts Receivable which are subject to asserted warranty claims. Section 3.9 of the Silver Disclosure Schedule sets forth such amounts of Accounts Receivable which are subject to asserted warranty claims known to Silver by customers and information regarding asserted warranty claims known to Silver made within the last year, including the type and amounts of such claims. Except as set forth on Section 3.9 of the Silver Disclosure Schedule, Silver has no Accounts Receivable from any person, firm or corporation which is affiliated with Silver or from any director, officer or employee or Affiliate of Silver, Parent or any Subsidiary of Silver.

3.10    Banking Relations. All of the arrangements which Silver and the Subsidiaries have with any banking institutions are described in Section 3.10 of the Silver Disclosure Schedule, indicating with respect to each such arrangement the type of arrangement maintained (such as checking account, borrowing arrangement, safe deposit box, etc.) and the Person or Persons authorized in respect thereof.

3.11    Litigation. There is no Proceeding pending against Silver or any of its Subsidiaries, nor, to Silver's knowledge, is any Proceeding threatened against Silver or any of its Subsidiaries before any Governmental Authority or arbitrator that, if determined adversely to Silver or any of its Subsidiaries, may reasonably be expected to have a Material Adverse Effect on Silver or the Business. As of the date hereof, Section 3.11 of the Silver Disclosure Schedule sets forth any filings required to be made by Silver within 120 days of the date hereof in connection with any Proceeding. There is no material unsatisfied adverse judgment, decree, injunction or ruling of a Governmental Authority or arbitrator outstanding against Silver or any of its Subsidiaries. There is no Proceeding pending as to which Silver has received notice of assertion against Silver, which in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

3.12    Taxes.

(a)    Parent, Silver and each Subsidiary of Silver have timely filed all material federal, state, local and foreign returns, reports, estimates, information statements or other documents or information required to be supplied to any "Tax" authority relating to "Taxes" required to be filed by or on behalf of Parent, Silver and each Subsidiary of Silver ("*Tax Returns*"). Such Tax Returns are true, correct and complete. Parent, Silver and each Subsidiary of Silver have paid all material Taxes required to be paid, has made all necessary estimated tax payments, and has no liability for Taxes in excess of the

18

amount so paid, except to the extent adequate reserves as determined in accordance with GAAP have been established in the Silver Financial Statements and the Closing Balance Sheet, or, with respect to Taxes that are not yet due on or prior to the date of this Agreement and which have become due thereafter, adequate reserves as determined in accordance with GAAP have been established by Parent or Silver prior to the Closing.

(b)     Parent, Silver and each Subsidiary of Silver have withheld and paid all material Taxes required by applicable law to be withheld and paid in connection with any amounts paid or owing to any employee, independent producer or contractor, creditor, stockholder, or other third party with respect to which such withholding would be required.

(c)     To the knowledge of Silver, no claim has ever been made by a Governmental Authority in a jurisdiction where Silver or any Subsidiary of Silver does not file Tax Returns that Silver or any Subsidiary of Silver is or may be subject to a material amount of taxation by that jurisdiction.

(d)     None of Parent, Silver nor any Subsidiary of Silver have been delinquent in the payment of any material Tax nor is there any material Tax deficiency outstanding, or to the knowledge of Parent, proposed or assessed against Parent, Silver or any Subsidiary of Silver, nor have Parent, Silver or any Subsidiary of Silver executed any currently effective waiver of any statute of limitations on or extending the period for the assessment or collection of any material Tax. Parent, Silver and each Subsidiary of Silver have disclosed on their respective federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Section 6662 of the Code.

(e)     No audit or other examination of any Tax Return of Parent, Silver or any Subsidiary of Silver by any Tax authority is presently in progress, nor have Parent, Silver or any Subsidiary of Silver been notified of any request for such an audit or other examination.

(f)     No adjustment relating to any Tax Returns filed by Parent, Silver or any Subsidiary of Silver has been proposed in writing formally or informally by any Tax authority to Parent, Silver or any Subsidiary of Silver or any representative thereof.

(g)     None of Parent, Silver nor any Subsidiary of Silver have any liability for unpaid Taxes which has not been accrued for or reserved on the Closing Balance Sheet in accordance with GAAP, whether asserted or unasserted, contingent or otherwise, other than any liability for unpaid Taxes that may have accrued since the Closing Balance Sheet Date in connection with the operation of the business of Parent, Silver or the Subsidiaries of Silver in the ordinary course.

(h)     There is no agreement, plan or arrangement to which any of Parent, Silver or any Subsidiary of Silver is a party, including this Agreement and the agreements entered into in connection with this Agreement, covering any employee or former employee of Parent, Silver or any Subsidiary of Silver, individually or collectively, would be reasonably likely to give rise to the payment of any amount that would not be deductible pursuant to Sections 280G, 404 or 162(m) of the Code. There is no contract, agreement, plan or arrangement to which the Parent, Silver or any Subsidiary of Silver is a party or by which it is bound to compensate any individual for excise Taxes paid pursuant to Section 4999 of the Code.

(i)     None of Parent, Silver nor any Subsidiary of Silver have filed any consent agreement under former Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as defined in Section 341(f)(4) of the Code) owned by Parent.

19

(j)    Except as set forth in Section 3.12(j) of the Silver Disclosure Schedule, none of Parent, Silver nor any Subsidiary of Silver are party to or has an obligation under any Tax-sharing, Tax indemnity or Tax allocation agreement or arrangement.

(k)    None of Parent, Silver or any Subsidiary of Silver have been required to include any adjustment in Taxable income for any Tax period (or portion thereof) ending after the Effective Time pursuant to Section 481 of the Code or any comparable provision under state or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Closing Date.

(l)    None of Silver's or any of its Subsidiaries' assets are Tax exempt use property within the meaning of Section 168(h) of the Code.

(m)    Neither Silver nor any Subsidiary of Silver (a) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a member of the Seller Group) from or (b) has any liability for the Taxes of any person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(n)    Neither Silver nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(o)    None of Parent, Silver or any Subsidiary of Silver have distributed stock of another Person, or had its stock distributed by another Person, in a transaction that was purported to be governed in whole or part by Section 355 of the Code within the last two years.

(p)    No Taxes will be due and no payments or liabilities of Silver or its Affiliates will be triggered as a result of the sale of the Shares or the consummation of the transactions contemplated by this Agreement.

3.13    Title to Properties.

(a)    Silver and each of its Subsidiaries have good and marketable title to all of their respective assets as shown on the Base Balance Sheet, or with respect to leased assets, valid leasehold interests in, or with respect to licensed assets, valid licenses to use, free and clear of all Encumbrances (other than Permitted Encumbrances). The machinery and equipment included in the assets as shown on the Base Balance Sheet are in all material respects in good condition and repair, normal wear and tear excepted, and all leases of real or personal property to which Silver or any Subsidiary of Silver is a party are fully effective and afford Silver or such Subsidiary peaceful and undisturbed possession of the subject matter of the lease. Neither Silver nor any Subsidiary of Silver is in violation of any zoning, building, or safety ordinance, regulation or requirement or other law or regulation applicable to the operation of owned or leased properties, and Silver has not received any notice of such violation with which it has not complied or had waived, in each case, which individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect on Silver.

(b)    Section 3.13(b) of the Silver Disclosure Schedule sets forth the addresses and uses of all Real Property that Silver, its predecessors, Affiliates or its Subsidiaries own, lease or sublease or have ever owned, leased or subleased since January 1, 2003. All leases of Real Property or Tangible Personal Property to which Silver or any Subsidiary of Silver is a party are effective and afford Silver quiet enjoyment of the subject matter of the lease. As a result of the transactions contemplated by this Agreement, subject to any encumbrance created by Purchaser or Platinum, Purchaser will obtain a valid ownership or leasehold interest in all Tangible Personal Property that Silver or its Subsidiaries currently

20

own or lease and all Real Property that Silver or its Subsidiaries currently own or lease, as of the date of this Agreement, in each case free and clear of all Encumbrances of any kind, except Permitted Encumbrances and: (i) mechanics', carriers', workers' and other similar liens arising in the ordinary course of business, and (ii) liens for current Taxes not yet due and payable.

3.14    Absence of Certain Changes or Events.  Since the Base Balance Sheet Date, Silver and its Subsidiaries have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Base Balance Sheet Date.

(a)    Except as set forth under Section 3.14 of the Silver Disclosure Schedule, or as expressly contemplated by this Agreement, since the Base Balance Sheet Date there has not been with respect to Silver or any Subsidiary of Silver:

(i)    any change, event, circumstance or effect, which by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect on Silver or its Subsidiaries' ability to conduct the Business as presently conducted, or that is reasonably likely to impede the performance by Silver of its obligations under this Agreement or any of the Silver Ancillary Agreements;

(ii)    any Encumbrance placed on any of the properties of Silver or any Subsidiary of Silver except Permitted Encumbrances;

(iii)    any liability incurred by Silver or any Subsidiary of Silver other than in the ordinary course of business or which obligations or liabilities do not exceed in the aggregate $50,000 through the date of this Agreement;

(iv)    any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any assets other than in the ordinary course of business and consistent with past practice or which do not exceed the aggregate $50,000 through the date of this Agreement;

(v)    any material damage, destruction or loss of any material property or asset, whether or not covered by insurance;

(vi)    any material labor dispute or material claim of unfair labor practices;

(vii)    any increase in the compensation payable or to become payable to any of Silver's or any of its Subsidiary's officers, employees or agents earning compensation at an anticipated annual rate in excess of $50,000, or any bonus payment or arrangement made to or with any of such officers, employees, consultants or agents; or any increase in the compensation payable or to become payable to any of Silver's or any of its Subsidiary's other officers, employees, consultants or agents (other than normal annual raises for non-officers in the ordinary course of business consistent with past practice) or any bonus payment or arrangement made to or with any of such officers, employees or agents other than normal bonuses or compensation increases granted prior to the date of this Agreement as disclosed under Section 3.14 of the Silver Disclosure Schedule;

(viii)    any material change with respect to the executive officers of Silver or any Subsidiary of Silver; or

21

A067

(ix)    any loss of one or more material customers of Silver or any Subsidiary of Silver, which, individually or in the aggregate, account for more than five percent (5%) of the consolidated revenues of Silver and its Subsidiaries as of the Base Balance Sheet Date.

(b)    Except as set forth under Section 3.14 of the Silver Disclosure Schedule, since the Base Balance Sheet Date neither Silver nor any Subsidiary of Silver has:

(i)    amended their certificates of incorporation, bylaws or any other organizational document;

(ii)    made any material payment or discharged any material Encumbrance or Liability;

(iii)    incurred any material obligation or liability to any of their employees, officers, directors, stockholders or Affiliates, or any loans or advances made to any of its employees, officers, directors, stockholders or Affiliates, except normal compensation and reasonable travel related expense allowances payable to employees, officers or directors;

(iv)    declared, set aside or paid any dividend on, or made any other distribution in respect of, their capital stock, or made any changes in any rights, preferences, privileges or restrictions of any of their outstanding capital stock;

(v)    effected or been a party to any transaction relating to a merger, consolidation, sale of all or substantially all of their assets, or similar transaction; or accepted or otherwise entered into any Acquisition Proposal (as defined in Section 5.3);

(vi)    executed, amended, relinquished, terminated or failed to renew any material Contract, including any lease, transaction or legally binding commitment other than in the ordinary course of their business (nor has there been any written or oral indication or assertion by the other party thereto of its desire to so amend, relinquish, terminate or not renew any such Contract, lease transaction or legally binding commitment);

(vii)    deferred the payment of any accounts payable outside the ordinary course of business or provided any discount, accommodation or other concession made outside the ordinary course of business in order to accelerate or induce the collection of any receivable;

(viii)    incurred indebtedness for borrowed money, entered into any capital lease or guaranteed any such indebtedness other than in the ordinary course of their business, and not in excess of $50,000 in the aggregate; or

(ix)    entered into any other material transaction or taken any other material action outside the ordinary course of their business.

3.15    Intellectual Property.

(a)    Definition. As used herein, the term "*Intellectual Property Rights*" shall mean all worldwide industrial and intellectual property rights, including patents, patent applications, patent rights, trademarks (registered and/or at common law), trademark applications, trade names, service marks, service mark applications, URLs, works of authorship, copyrights, copyright registrations and applications for registration, mask work rights, moral rights, franchises, licenses, inventories, know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and

22

A068

data collections, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records.

       (b)    Ownership of Intellectual Property. Silver and each Subsidiary of Silver own all right, title and interest in, or have licenses (sufficient for the conduct of its business as presently conducted) to all Intellectual Property Rights used in and reasonably necessary to the conduct of its business as presently conducted including the business of the development, design, maintenance, sale, licensing, installation and use of Silver's and its Subsidiaries' products and the sale of commercial services using such Intellectual Property Rights (with such Intellectual Property Rights being hereinafter collectively referred to as the "*Silver IP Rights*"). Except as set forth in Section 3.15(b) of the Silver Disclosure Schedule, Silver and its Subsidiaries have the exclusive, unrestricted, worldwide right to design, develop, use, reproduce, manufacture, sell, license and distribute all of their products and services (such products and services being set forth under Section 3.15(b) of the Silver Disclosure Schedule and hereinafter collectively referred to as the "*Silver Products and Services*") and the right to use all of their customer and supplier lists except where the failure to have such right would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver. Except as set forth under Section 3.15(b) of the Silver Disclosure Schedule, neither Silver nor any Subsidiary of Silver have granted any reseller, distributor, sales representative, original equipment manufacturer, value added reseller or other third party any right to reproduce, manufacture, sell, license or distribute any of its products or services in any market segment or geographic location and which right is continuing as of the date of this Agreement. Set forth under Section 3.15(b) of the Silver Disclosure Schedule is a true and complete list of all copyright, mask work and trademark registrations and applications and all patents and patent applications for Silver IP Rights owned or exclusively licensed by Silver or its Subsidiaries. Silver is not aware of any loss, cancellation, termination or expiration of any such registration or patent except as set forth on Section 3.15(b) of the Silver Disclosure Schedule. To the knowledge of Silver, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby does not constitute a material Breach of any instrument or agreement governing any Silver IP Right, will not cause forfeiture or termination or give rise to a right of forfeiture or termination of any Silver IP Right or materially impair the right of Silver to use, sell or license any Silver IP Right or portion thereof except where such breach, forfeiture, termination or impairment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or the Business.

       (c)    No Violation of Rights of Others. To the knowledge of Silver, the business of Silver and each Subsidiary of Silver and the design, development, use, manufacture, sale, license or provision of any Silver Product and Service does not, and the use, manufacture, sale, license or provision of any Silver Product or Service after the Effective Time will not, cause Silver or any Subsidiary of Silver to infringe or violate any of the Intellectual Property Rights of any other Person. To the knowledge of Silver, neither Silver nor any Subsidiary of Silver have received any written or oral claim or notice of infringement or potential infringement of the Intellectual Property Rights of any other Person. Neither Silver nor any Subsidiary of Silver are using any confidential information or trade secrets of third party, including, but not limited to, any past or present employees or their respective past employers. To the knowledge of Silver, there are no royalties, honoraria, fees or other payments payable by Silver or any Subsidiary of Silver to any Person by reason of the ownership, use, license, sale, or disposition of the Silver IP Rights (other than as set forth under Section 3.15(b) of the Silver Disclosure Schedule.

       (d)    Protection of Rights. Silver has taken all commercially reasonable and necessary steps designed to safeguard and maintain the secrecy and confidentiality of, and its proprietary rights in, all Silver IP Rights. To the knowledge of Silver, there is no material unauthorized use, infringement or misappropriation of any Silver IP Rights by any Third Party, including, to the knowledge of Silver, any Silver employee or Subsidiary of Silver employee.

23

3.16    Conformity of Products and Services. All Silver Products and Services delivered or provided by Silver or any Subsidiary of Silver to customers on or prior to the Closing Date conform in all material respects (to the extent required in Contracts with such customers) to applicable contractual commitments, express and implied warranties, product specifications and product documentation and to any representations provided to customers and neither Silver nor any Subsidiary of Silver have any material liability (and, to Silver's knowledge, there is no legitimate basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against Silver or any Subsidiary giving rise to any material liability relating to the foregoing Contracts) for replacement or repair thereof or other damages in connection therewith in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries.

3.17    Product and Service Warranties. Set forth on Section 3.17 of the Silver Disclosure Schedule are the standard written forms of product and service warranties and guarantees utilized by Silver or any Subsidiary of Silver as of the date of this Agreement with respect to the Silver Products and Services. Except as set forth on Section 3.17 of the Silver Disclosure Schedule, during a period of three (3) years prior to the Closing Date, neither Silver nor any Subsidiary of Silver have made any other written material warranties (which remain in effect) with regard to Silver Products and Services. There are not existing or threatened in writing, product liability, warranty or other similar claims against Silver or any Subsidiary of Silver alleging that any Silver Products and Services are defective or fail to meet any product or service warranty except for such claims (i) that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or (ii) resulting in any Liability which is not in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries and reflected on the Closing Balance Sheet. Except as set forth on Section 3.17 of the Silver Disclosure Schedule, there are (a) no inherent design defects or systemic or chronic problems in any Silver Products and Services that are known to Silver or any Subsidiary of Silver and (b) no liabilities that are known to Silver or any Subsidiary of Silver for warranty or other claims or returns with respect to any Silver Products and Services relating to any such defects or problems in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries and reflected on the Closing Balance Sheet. The product liability indemnities contained in that certain Stock Purchase Agreement dated as of December 19, 1996 between GEC Incorporated, as Seller, and Paragon Corporate Holdings, Inc., as Purchaser, have not been modified, amended or rescinded.

3.18    List of Certain Employees; Suppliers and Customers.

(a)    Section 3.18(a) of the Silver Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus and deferred compensation paid or payable, for each officer, employee, consultant and independent contractor of Silver and the Subsidiaries of Silver who individually received compensation in excess of $50,000 for the fiscal year ended December 31, 2003 or is anticipated to receive compensation in excess of $50,000 for the fiscal year ending December 31, 2004.

(b)    Section 3.18(b) of the Silver Disclosure Schedule sets forth a list of all suppliers, licensors and vendors of Silver or the Subsidiaries to whom, since January 1, 2003, Silver or the Subsidiaries of Silver made payments aggregating $50,000 or more, showing, with respect to each, the name, address and dollar value involved. No such supplier, licensor or vendor has canceled or otherwise terminated or materially reduced its business with Silver or its Subsidiaries or materially and adversely

24

BST99 1394460-27.069646.0011

A070

modified its relationship with Silver or its Subsidiaries nor, to the knowledge of Silver, does any supplier, licensor or vendor, have any plan or intention to do so.

(c)     Section 3.18(c) of the Silver Disclosure Schedule sets forth the name of each customer or distributor of Silver or its Subsidiaries who accounted for more than two percent (2%) of the revenues of Silver for the fiscal year(s) ending December 31, 2002 and December 31, 2003 (the "*Customers*") showing with respect to each, the name, address and dollar value involved. Except as set forth in Section 3.18(c) of the Silver Disclosure Schedule, between December 31, 2002 and the date of this Agreement, no Customer of Silver or its Subsidiaries has canceled or otherwise terminated its relationship with Silver or its Subsidiaries, or not renewed or accepted any maintenance agreements, or has decreased materially its purchases of Silver Products and Services. No Customer has, to the knowledge of the Silver, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with Silver or its Subsidiaries or to decrease materially or limit its purchase or distribution of Silver Products and Services.

3.19    Intentionally Omitted.

3.20    Compliance with Laws. Silver and each Subsidiary of Silver have complied, or prior to the Closing Date will have complied, and is or will be at the Closing Date in compliance, in all material respects, with all laws, ordinances, regulations and rules, and all Orders, writs, injunctions, awards, judgments and decrees, applicable to Silver or any of its Subsidiary, or to the assets, properties and business of Silver or any Subsidiary of Silver, except where the failure to comply with any such laws would not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect on Silver or the Business.

Silver and each of its Subsidiaries have received all material permits, approvals and Governmental Authorizations from, and has made all material filings with, third parties, including Governmental Authorities, that are necessary to the conduct of its business as presently conducted.

3.21    Agreements and Commitments. Except as set forth under Section 3.21 of the Silver Disclosure Schedule and delivered or made available by Silver to Platinum on or prior to the Closing Date, as of the date hereof, neither Silver nor any Subsidiary of Silver is a party or subject to any agreement, obligation or commitment that is material to Silver, its financial condition or business or which is described below, including the following:

(a)     any Contract providing for payments by or to Silver or any Subsidiary of Silver in an amount with respect to any single transaction, or series of related transactions, of (i) $50,000 or more in the ordinary course of business or (ii) $25,000 or more not in the ordinary course of business;

(b)     any Contract to which Silver or any Subsidiary of Silver is a party (i) with respect to Silver IP Rights licensed or transferred to any third party (other than standard agreements with customers arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel); and (ii) pursuant to which a third party has licensed or transferred any Intellectual Property Rights to Silver or any Subsidiary of Silver reasonably necessary for the conduct of its business as of the date hereof (except for commercially available, non-customized software sold at retail and not embedded in Silver Products and Services or sub-licensed to customers of Silver or its Subsidiaries);

(c)     any agreement by Silver or any Subsidiary of Silver to encumber, transfer or sell any material rights in or with respect to any material Silver IP Rights except non-exclusive software licenses;

(d)     any Contract providing for development of technology for Silver or any Subsidiary of Silver which technology (i) is used or incorporated in any Silver Products or Services currently distributed or performed by Silver or any Subsidiary of Silver or (ii) is anticipated to be used or incorporated in any planned products or services of Silver or a Subsidiary of Silver, or any Contract that requires Silver or any Subsidiary of Silver to perform specified development work for a third party.

(e)     any Contract currently in force for hosting, data center, transaction processing or other services related to the Silver's website;

(f)     any agreement for the sale or lease of real or personal property involving more than $50,000 per year;

(g)     any dealer, distributor, sales representative, original equipment manufacturer, value added remarketer or other agreement for the distribution of Silver's Products or Services (other than standard agreements arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel);

(h)     any franchise agreement;

(i)     any Contract granting most favored nation pricing and/or terms to any customer, licensee, purchaser, reseller, promoter or remarketer of any of Silver or its Subsidiaries' products or services;

(j)     any joint venture Contract or arrangement or any other agreement that involves a sharing of profits with other Persons or the payment of royalties to any other Person;

(k)     any instrument evidencing indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, except for trade indebtedness or any advance to any employee of Silver or any Subsidiary of Silver incurred or made in the ordinary course of business, and except as disclosed in the Silver Financial Statements;

(l)     any Contract containing covenants purporting to limit Silver's or any of its Subsidiaries' freedom to compete in any line of business in any geographic area or to sell products or services to a specific entity or within an identified territory or industry or requiring Silver to make payments to any third parties in connection with any such sales;

(m)     any Contract currently in force to provide source code to any third party for any product or technology;

(n)     any Contract for the employment of any officer, employee or consultant of Silver or any Subsidiary of Silver or any other type of Contract or understanding with any officer, employee or consultant of Silver or any Subsidiary of Silver that is not immediately terminable by Silver or the Subsidiary of Silver without cost or liability;

(o)     any Contract for consulting or similar services with a term of more than sixty (60) days and which is not terminable without penalty with notice of sixty (60) days or less; or

(p)     any other material Contract entered into outside the ordinary course of business.

All agreements, obligations and commitments listed in Section 3.21 of the Silver Disclosure Schedule, are valid and in full force and effect, and except as expressly noted, a true and

26

complete copy of each has been delivered or made available to Platinum. Except as noted on <u>Section 3.21 of the Silver Disclosure Schedule</u>, neither Silver nor, to the knowledge of Silver, any other party, is in material Breach of or default under any material term of any such agreement, obligation or commitment except where such breach or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or the Business. Neither Silver nor any Subsidiary of Silver has any liability for renegotiation of government Contracts or sub-Contracts which individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect on Silver or the Business.

     3.22   <u>Employees</u>.

     (a)   <u>General Compliance</u>. Silver and each of its Subsidiaries is in compliance in all material respects with all applicable laws and Contracts relating to employment, employment practices, wages, hours, and terms and conditions of employment, including, employee compensation matters, and has correctly classified employees as exempt employees and non-exempt employees under the Fair Labor Standards Act. Except as set forth under <u>Section 3.22(a) of the Silver Disclosure Schedule</u>, neither Silver nor any Subsidiary of Silver has employment or consulting Contracts currently in effect that are not terminable at will (other than agreements with the sole purpose of providing for the confidentiality of proprietary information or assignment of inventions). All independent contractors have been properly classified as independent contractors for the purposes of federal and applicable state Tax laws, laws applicable to employee benefits and other applicable laws. All employees of Silver or any Subsidiary of Silver located in the United States are legally permitted to be employed by Silver or such Subsidiary in the United States of America. Silver will have no liability to any employee or to any organization or any other entity as a result of the termination of any employee leasing arrangement.

     (b)   <u>Good Labor Relations</u>. Each of Silver and its Subsidiaries: (i) has never been and is not now subject to a union organizing effort; (ii) is not subject to any collective bargaining agreement with respect to any of its employees; (iii) is not subject to any other Contract with any trade or labor union, employees' association or similar organization; and (iv) has no current labor disputes and has had no material labor disputes or claims of unfair labor practices since January 1, 2000. Silver and its Subsidiaries have good labor relations, and have no knowledge of any facts indicating that its consummation of the transactions contemplated hereby will have a Material Adverse Effect on such labor relations. Between January 1, 2003 and the date of this Agreement, to Silver's knowledge, no executive officer of Silver or any of its Subsidiaries, or material number of other employees of Silver or any of its Subsidiaries, has given notice that such employee intends to terminate his or her employment with Silver or any such Subsidiary. As of the date of this Agreement, Silver has no knowledge that any key personnel or other employees intend to leave its or a Subsidiary's employment. There are no controversies pending or, to Silver's knowledge, threatened, between Silver or any of its Subsidiaries and any of their employees that would be reasonably likely to result in a Material Adverse Effect on Silver.

     (c)   <u>Employee Plans</u>. <u>Section 3.22(c) of the Silver Disclosure Schedule</u> identifies each Silver Employee Plan and copies of all other Silver Employee Plans (and, if applicable, related trust agreements) and all related documents, amendments and material written interpretations (including summary plan descriptions) thereto have been delivered or made available to Platinum or its counsel, together with, to the extent applicable, the two most recent annual reports (Form 5500, including, if applicable, Schedule B thereto) prepared in connection with any such Silver Employee Plan. No "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred with respect to any Silver Employee Plan which is covered by Title I of ERISA which would result in a material liability to Silver, excluding transactions effected pursuant to a statutory or administrative exemption. Nothing done or omitted to be done and no transaction or holding of any asset under or in connection with any Silver Employee Plan has or will make Silver, any Subsidiary of Silver or any Silver or Subsidiary officer or director subject to any material liability under Title I of ERISA or liability for any

27

material Tax or penalty pursuant to Sections 4972, 4975, 4976 or 4979 of the Code or Section 502 of ERISA. Except as set forth in Section 3.22(c) of the Silver Disclosure Schedule, no Silver Employee Plans will be subject to any surrender fees or service fees upon termination other than the normal and reasonable administrative fees associated with the termination of benefit plans. All contributions due from Silver or any Subsidiary of Silver with respect to any of the Silver Employee Plans have been made as required under such plans and, to the extent applicable, ERISA, other than contributions accrued in the ordinary course of business consistent with past practice, all of which have been paid or will be paid when and as required or, if not required to be made, have been accrued on the Silver Financial Statements. Silver and each of its Subsidiaries have performed in all material respects all obligations required to be performed by it under each Silver Employee Plan, and each Silver Employee Plan has been maintained substantially in compliance with its terms and with the requirements prescribed by any and all statutes, Orders, rules and regulations, including ERISA and the Code, which are applicable to such Silver Employee Plans. All individuals who, pursuant to the terms of any Silver Employee Plan, are entitled to participate in any Silver Employee Plan, currently are participating in such Silver Employee Plan or have been offered an opportunity to do so. Except as set forth under Section 3.22(c) of the Silver Disclosure Schedule, to Silver's knowledge, no employee of Silver or any of its Subsidiaries, and no person subject to any health plan of Silver or any of its Subsidiaries has made medical claims through such health plan during the 12 months preceding the date hereof for more than $50,000 in the aggregate for which Silver is responsible, or has any catastrophic illness.

(d)    Pension Plans. All Silver Employee Plans which individually or collectively would constitute an "employee pension benefit plan", as defined in Section 3(2) of ERISA (collectively, the "*Silver Pension Plans*"), are identified as such under Section 3.22(d) of the Silver Disclosure Schedule. Any Silver Pension Plan which is intended to be qualified under Section 401(a) of the Code (a "*Silver 401(a) Plan*") has received a favorable determination from the Internal Revenue Service with respect to its tax-qualified status. No Silver Pension Plan constitutes, or has since the enactment of ERISA constituted, a "multiemployer plan," as defined in Section 3(37) of ERISA. No Silver Pension Plans are subject to Title IV of ERISA. Silver has delivered to Platinum or its counsel a complete and correct copy of the most recent Internal Revenue Service determination letter with respect to each Silver 401(a) Plan, if any exists.

(e)    Benefit Arrangements. Section 3.22(e) of the Silver Disclosure Schedule lists each employment, severance (including all post-employment liabilities) or other similar Contract or policy and each Contract providing for insurance coverage (including any self-insured arrangements), workers' benefits, vacation benefits, severance benefits, disability benefits, death benefits, hospitalization benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits for employees, consultants or directors which: (i) is not a Silver Employee Plan; (ii) is entered into, maintained or contributed to by Silver or any Subsidiary of Silver; and (iii) covers any employee or former employee or independent contractor or consultant of Silver or any Subsidiary of Silver. Such Contracts and policies as are described in this Section 3.22(e) are herein referred to collectively as the "*Silver Benefit Arrangements*." Each Silver Benefit Arrangement has been maintained in substantial compliance with its terms and with the requirements prescribed by any and all statutes, Orders, rules and regulations which are applicable to such Silver Benefit Arrangement. Silver has delivered to Platinum or its counsel a complete and correct copy or description of each Silver Benefit Arrangement. All individuals who, pursuant to the terms of any Silver Benefit Arrangement, are entitled to participate in any such Silver Benefit Arrangement, are currently participating in such Silver Benefit Arrangement or have been offered an opportunity to do so and have declined.

(f)    Benefit Changes. Except as set forth in Section 3.22(f) of the Silver Disclosure Schedule since January 1, 2003, there has been no amendment to, written interpretation or announcement

28

(whether or not written) by Silver or any Subsidiary of Silver relating to, or change in employee participation or coverage under, any Silver Employee Plan or Silver Benefit Arrangement that would increase materially the expense of maintaining such Silver Employee Plan or Silver Benefit Arrangement in the future.

      (g)    COBRA Compliance. Silver and each of its Subsidiaries has complied in all material respects prior to the date hereof, with the continuation coverage requirements of Section 4980B of the Code and the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*"), Sections 601 through 608 of ERISA, the American Civil Disabilities Act of 1990, as amended, and the Family Medical Leave Act of 1993, as amended, and the regulations thereunder, and no material Tax payable on account of Section 4980B of the Code has been incurred with respect to any current or former employees (or their beneficiaries) of Silver or any Subsidiary of Silver.

      (h)    No Violation of Contracts. To the knowledge of Silver, no employee or consultant of Silver or any Subsidiary of Silver is in violation of any term of any employment Contract, patent disclosure agreement, non-competition agreement, or any other Contract, or any restrictive covenant relating to the right of any such employee to be employed by Silver or any Subsidiary of Silver, or to use Intellectual Property Rights of others.

      3.23    Relationships with Affiliates. Except as disclosed in Section 3.23 of the Silver Disclosure Schedule, neither Silver nor Parent nor any Affiliate of any of them has, or since January 1, 2000 has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to Silver's business. Neither Silver nor Parent nor any Affiliate of any of them owns, or since January 1, 2000 has owned, of record or as a beneficial owner, an equity interest in any other financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with Silver other than business dealings or transactions disclosed in Section 3.23 of the Silver Disclosure Schedule, each of which has been conducted in the ordinary course of business with Silver at substantially prevailing market prices and on substantially prevailing market terms, or (b) engaged in competition with Silver with respect to any line of the products or services of Silver (a "*Competing Business*") in any market presently served by Silver or its Subsidiaries, except for ownership of less than one percent of the outstanding capital stock of any Competing Business with securities listed on any national or regional securities exchange or that have been registered under Section 12(g) of the Exchange Act. Except as set forth in Section 3.23 of the Silver Disclosure Schedule, neither Silver nor Parent nor any Affiliate of any of them is a party to any Contract with, or has any claim or right against, Silver or any Subsidiary of Silver.

      3.24    Environmental Matters.

      (a)    As of the Closing, to the knowledge of Silver, except in compliance with Environmental Laws and Occupational Safety and Health Laws, or in a manner that could not reasonably be expected to subject Silver or any Subsidiary of Silver to material liability, no Hazardous Materials are present, at on or under any Facility currently owned, operated, or leased by Silver, any predecessor, any Subsidiary of Silver or any former subsidiary, or were present on, at or under any other Facility at the time it ceased to be owned, operated or leased by Silver, any predecessor, any Subsidiary of Silver or any former subsidiary. To the knowledge of Silver, neither Silver nor any Person for whose conduct it is or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to any Facility or any other property or assets (whether real, personal, or mixed) in which Silver has or had an interest except in full compliance with all applicable Environmental Laws.

29

A075

(b)    To the knowledge of Silver, and except as set forth on <u>Section 3.24 of the Silver Disclosure Schedule</u>, during the time that Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary of Silver has owned or leased a Facility:

(i)    there have been no disposals, Release or threatened release of Hazardous Materials on, at, from or under any Facility;

(ii)    no Hazardous Materials have been transported from any Facilities to any site or facility now listed or proposed for listing on the National Priorities List, at 40 C.F.R. Part 300, or any listing with a similar scope or purpose published by any state authority;

(iii)    there has been no litigation, proceeding or administrative action brought, threatened in writing against Parent, Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary, or any settlement reached by Parent, Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary with, any party or parties alleging the presence, disposal, Release or threatened release of any Hazardous Materials on, at, from or under any such Facility or that otherwise relates to Hazardous Activity; and

(iv)    there has been no written notification from a Governmental Authority or third party, nor is there any litigation, proceeding, or administrative action that has been brought or has been threatened in writing against Parent, Silver or any Subsidiary of Silver with respect to violation of an Environment Law or the existence of Environmental, Health and Safety Liabilities held by or with respect to any Facility.

(c)    Except as set forth on <u>Section 3.24 of the Silver Disclosure Schedule</u>, Silver has no knowledge of any presence, disposal, Release or threatened release of Hazardous Materials on, from or under, or, except in compliance with Environmental Laws and Occupational Safety and Health Laws, the conduct of any Hazardous Activity at, any Facility that may have occurred prior to Silver, a Subsidiary of Silver or former subsidiary having taken possession of any such Facility.

(d)    Silver has delivered to Purchaser true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Silver or any of its Subsidiaries pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Silver, or any Subsidiary of Silver or any other Person for whose conduct it is or may be held responsible, with Environmental Laws.

(e)    Each of (i) the Stock Purchase Agreement dated as of December 19, 1996 by and among GEC Incorporated ("GEC") and Parent, (ii) the Assumption Agreement dated as of January 17, 1997 by and among GEC, Silver and Parent or (iii) the Guaranty dated as of January 17, 1997 by and between Parent and General Electric Company plc have not been amended or terminated and continue in full force and effect in accordance with their terms (the "GEC Agreements").

3.25    [Intentionally Omitted]

3.26    <u>Board of Directors, Officers and Key Personnel</u>.  <u>Section 3.26 of the Silver Disclosure Schedule</u> accurately sets forth, as of the date of this Agreement: (a) the name and title of each of Silver's officers and its Subsidiaries' officers; (b) the name and title of supervisory, developmental or other key personnel of Silver and its Subsidiaries; and (c) the name, principal occupation and address of each member of Silver's board of directors and its Subsidiaries' boards of directors.

30

A076

3.27    Insurance. Silver and each Subsidiary of Silver maintains, and at all times since Parent and/or its Affiliates has owned Silver has maintained, fire and casualty, workers compensation, general liability, business interruption and product liability insurance (which current policies are listed under Section 3.27 of the Silver Disclosure Schedule) which it believes to be reasonably prudent for similarly sized and similarly situated businesses.  Section 3.27 of the Silver Disclosure Schedule sets forth all material claims made under Silver's insurance policies since January 1, 2001 and the premiums that apply with respect to such insurance policies as of the date of this Agreement.  As of the date hereof, the insurance policies set forth on Section 3.27 of the Silver Disclosure Schedule are in full force and effect and Silver is not in default with respect to any material provision contained in such insurance policies nor has Silver failed to give any notice of any claim under insurance policies in due and timely fashion, nor has any coverage for current claims been denied, except where such default or failure as of the date of this Agreement, individually or in the aggregate, could not reasonably be expected to result in a cost to Silver in excess of Ten Thousand Dollars ($10,000).

3.28    Investment Banking and Brokerage Fees. Except as set forth on Section 3.28 of the Silver Disclosure Schedule, Silver has not incurred or become liable for any broker's or finder's fees, banking fee or similar compensation relating to or in connection with the transactions contemplated hereby.  All fees reflected on Section 3.28 of the Silver Disclosure Schedule shall be paid by Parent or N.E.S. Investment Co. in accordance with Schedule 12.10.

3.29    Accuracy of Disclosure. This Agreement, its exhibits and schedules, and any of the certificates or documents to be delivered by Silver or Parent to Platinum or Purchaser under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

3.30    No Other Representations. Except as set forth in this Article 3 or otherwise in this Agreement or any Ancillary Agreement, neither Parent nor Silver makes, and no party shall be entitled to rely upon, any representation or warranty as to any fact or matter other than as expressly set forth herein or therein.

4.    REPRESENTATIONS AND WARRANTIES OF PLATINUM AND PURCHASER

Except as set forth in the Platinum Disclosure Schedule, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 4, each of Platinum and Purchaser, where applicable, hereby represents and warrants jointly and severally to Silver and Parent as follows:

4.1    Organization and Good Standing. Each of Platinum and Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Platinum. Platinum has delivered or made available to Silver a true and correct copy of its and Purchaser's certificate of incorporation and bylaws, each as amended to date (collectively, the "*Platinum Charter Documents*"), and each such instrument is in full force and effect. Platinum is not in violation of any of the provisions of the Platinum Charter Documents. Platinum has delivered or made available to Silver all proposed or considered amendments to the Platinum Charter Documents.

31

A077

    4.2   Capitalization.

    (a)   Authorized/Outstanding Capital Stock. The authorized capital stock of Platinum consisted solely of 75,000,000 shares of Platinum Common Stock and 1,000,000 shares of Platinum preferred stock. As of May 29, 2004, there were issued and outstanding 34,459,109 shares of Platinum Common Stock and no shares of Platinum preferred stock.

    (b)   The authorized capital stock of Purchaser consists of 1,000 shares of common stock, $0.01 par value per share, all of which, as of the date hereof, are issued and outstanding and are held by Platinum. All of the outstanding shares of Purchaser's common stock have been duly authorized and validly issued, and are fully paid and nonassessable. Purchaser was formed for the purpose of purchasing the Shares and has no material assets or liabilities except as necessary for such purpose.

    (c)   All of the issued and outstanding Platinum Common Stock are, and the shares of Platinum Common Stock to be issued to Silver, when issued in accordance with the provisions of this Agreement, will be duly and validly issued and fully paid and nonassessable. None of the shares of Platinum Common Stock to be issued to Silver will be issued in violation of any preemptive rights and, assuming the accuracy of certain representations made by Silver and Parent regarding Securities Laws, have been offered, issued, sold and delivered in compliance with all registration or qualification requirements (or applicable exemptions therefrom) of applicable Securities Laws and state securities or "Blue Sky" laws. Except as otherwise disclosed in the Platinum SEC documents filed as of the date hereof, there are no outstanding stockholder agreement, voting trusts, proxies or Contracts to which Platinum, Purchaser or, to Platinum's knowledge, to which any other Person is a party, relating to the voting of any shares of Platinum's capital stock.

    (d)   Options/Warrants/Rights. As of May 29, 2004, options to purchase 3,198,309 shares of Platinum Common Stock have been issued and are outstanding and there are no warrants to purchase shares of Platinum Common Stock which are issued or outstanding. Except as set forth in this Section 4.2, there is no: (i) outstanding shares of capital stock or other equity securities of Platinum; (ii) outstanding preemptive right, stock appreciation right, subscription, option, call, warrant or right (whether or not currently exercisable) to acquire from Platinum any shares of Platinum Common Stock or other securities of Platinum or any Subsidiary of Platinum; (iii) outstanding security, instrument or obligation issued by Platinum or any Subsidiary of Platinum, that is or may become convertible into or exchangeable for any shares of Platinum Common Stock or other securities of Platinum or any Subsidiary of Platinum; (iv) stockholders' rights plan (or similar plan commonly referred to as a "poison pill") under which Platinum or any successor of Platinum is or may become obligated to sell or otherwise issue any shares of its capital stock or any securities of any Subsidiary of Platinum; (v) Contract to which Platinum is a party relating to the voting or registration of or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to) any shares of Platinum Common Stock or any securities of any Subsidiary of Platinum; or (vi) liability for dividends accrued but unpaid.

    4.3   Power, Authorization and Non-Contravention.

    (a)   Each of Platinum and Purchaser has the corporate power, legal capacity and authority to (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under Contracts to which Platinum or any of its Subsidiaries is a party or bound; and (iv) enter into and perform its obligations under this Agreement, and all agreements to which Platinum or Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "*Platinum Ancillary Agreements*"); except in the case of clauses (i), (ii) and (iii) of this Section 4.3 where the failure to have

32

such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Platinum or Purchaser. The execution, delivery and performance of this Agreement and the Platinum Ancillary Agreements have been duly and validly approved and authorized by Platinum's Board of Directors and Purchaser's Board of Directors, as applicable. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Platinum and Purchaser. The written consent of Platinum, as the sole stockholder of Purchaser, a certified copy of which has previously been delivered to Silver, is sufficient for the approval, and no other approval of any holder of any securities of Platinum is required in connection with, the consummation of the transactions contemplated hereby.

(b)        No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person is required to be obtained or made by Platinum or Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the filing with the SEC of a Current Report on Form 8-K with respect to the purchase of the Shares in accordance with the Exchange Act, (ii) the filing with the NASDAQ Stock Market of a Notification Form for Listing of Additional Shares with respect to the shares of Platinum Common Stock issued to Silver, (iii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities (or related) laws, the Antitrust Filings and (iv) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Platinum or Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c)        This Agreement and the Platinum Ancillary Agreements are, or when executed by Platinum and Purchaser (as applicable) and the other parties thereto will be, valid and binding obligations of Platinum and Purchaser, to the extent a party thereto, enforceable against Platinum and Purchaser, to the extent a party thereto, in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Platinum Ancillary Agreements will not be effective until the earlier of the Effective Time or the date provided for therein.

4.4        No Violation of Charter Documents, Contracts or Laws. Neither the execution and delivery of this Agreement or any Platinum Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of the certificate of incorporation, bylaws or other charter documents of Platinum or Purchaser, as currently in effect; (b) any material Contract to which Platinum or any of its Subsidiaries is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, Order, statute, rule or regulation applicable to Platinum any Subsidiary of Platinum or any of their respective assets or properties.

4.5        SEC Filings. Platinum has filed all forms, reports and documents required to be filed by Platinum with the SEC since January 1, 2001. All such required forms, reports and documents are referred to herein as the "*Platinum SEC Documents*." As of their respective dates, the Platinum SEC Documents: (i) were prepared in accordance with the requirements of the Securities Laws and other laws applicable to such Platinum SEC Documents; and (ii) did not at the time they were filed (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent corrected prior to the date of this Agreement by a subsequently

33

filed Platinum SEC Document. Platinum is eligible to register securities for resale on Form S-3 under the Securities Act of 1933.

4.6     Platinum Financial Statements. Each of the consolidated financial statements (including, in each case, any related notes thereto) contained in the Platinum SEC Documents (the "*Platinum Financial Statements*") (i) complied in all material respects with the published rules and regulations of the SEC with respect thereto; (ii) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited interim financial statements, as may be permitted by the SEC on Form 10-Q, Form 8-K or any successor form under the Exchange Act); and (iii) fairly presented the consolidated financial position of Platinum and its subsidiaries as at the respective dates thereof and the consolidated results of Platinum's operations and cash flows for the periods indicated, except that the unaudited interim financial statements may not contain footnotes and were or are subject to normal and recurring year-end adjustments. The balance sheet of Platinum contained in the Platinum SEC Documents as of January 3, 2004 is hereinafter referred to as the "*Platinum Balance Sheet*", with January 3, 2004 hereinafter referred to as the "*Platinum Balance Sheet Date*". Except as disclosed in the Platinum Financial Statements, since the Platinum Balance Sheet Date neither Platinum nor any of its subsidiaries has any liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for liabilities incurred since the Platinum Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Platinum and its subsidiaries taken as a whole and liabilities incurred in connection with this Agreement. There has been no change in Platinum's accounting policies, except as described in the notes to the Platinum Financial Statements.

4.7     Financing. Platinum has a commitment letter, as attached to Section 4.7 of the Platinum Disclosure Schedule, for a credit facility (the "Credit Facility") which, if funded in accordance with its terms, together with available cash on hand, will provide sufficient funds to deliver the Purchase Price and all associated costs and expenses to Parent and to consummate the transactions contemplated by this Agreement.

4.8     Accuracy of Disclosure. This Agreement, its exhibits and schedules, and any of the certificates or documents to be delivered by Platinum or Purchaser to Silver or Parent under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

4.9     Litigation. Except as disclosed in the Platinum SEC Documents filed as of the date hereof or as set forth in Section 4.9 of the Platinum Disclosure Schedule, there is no Proceeding pending against Platinum or any Subsidiary of Platinum, nor, to Platinum's knowledge, is any Proceeding threatened against Platinum or any Subsidiary of Platinum before any Governmental Authority or arbitrator that, if determined adversely to Platinum or any Subsidiary of Platinum, may reasonably be expected to have a Material Adverse Effect on Platinum. There is no Proceeding pending as to which Platinum has received written notice of assertion against Platinum, which in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

4.10     Absence of Certain Changes or Events.

(a)     Since the Platinum Balance Sheet Date, Platinum and its Subsidiaries have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Platinum Balance Sheet Date. Except as set forth under Section 4.10 of the Platinum Disclosure Schedule or in the Platinum SEC Documents filed as of the date hereof, since the

34

A080

Platinum Balance Sheet Date there has not been with respect to Platinum or any Subsidiary of Platinum any change, event, circumstance or effect, which by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or can reasonably be expected to have a Material Adverse Effect on Platinum or on Platinum's or its Subsidiary's ability to conduct their respective businesses as presently conducted, or that is reasonably likely to impede the performance by Platinum or Purchaser of their obligations under this Agreement or any of the Platinum Ancillary Agreements

      (b)      Except as set forth under Section 4.10 of the Platinum Disclosure Schedule or in the Platinum SEC Documents filed as of the date hereof, since the Platinum Balance Sheet Date Platinum has not:

      (i)      amended its certificate of incorporation, bylaws or any other organizational document;

      (ii)      sold, issued, granted or authorized the issuance or grant of: (A) any shares of its capital stock of any class or other security; (B) any option, call, warrant, obligation, subscription, or other right to acquire any capital stock or any other security; or (C) any instrument convertible into or exchangeable for any capital stock or other security (in each case except for options and other equity awards granted in the ordinary course of business) with respect to any such event that would not require Stockholder approval;

      (iii)      declared, set aside or paid any dividend on, or made any other distribution in respect of, its capital stock, or made any changes in any rights, preferences, privileges or restrictions of any of its outstanding capital stock;

      (iv)      effected any split, stock dividend, combination or recapitalization of its capital stock or any direct or indirect redemption, purchase or other acquisition by Platinum of its capital stock; and

      (v)      taken any action that should be reasonably expected to materially delay, impair or alter the ability of Platinum to consummate the transactions contemplated hereunder.

      4.11      Investment Banking and Brokerage Fees. Except as set forth on Section 4.11 of the Platinum Disclosure Schedule, Purchaser has not incurred or become liable for any broker's or finder's fees, banking fee or similar compensation relating to or in connection with the transactions contemplated hereby.

      4.12      No Other Representations. Except as set forth in this Article 4 or otherwise in this Agreement or any Ancillary Agreement, neither Platinum nor Purchaser makes, and no party shall be entitled to rely upon, any representation or warranty as to any fact or matter other than as expressly set forth herein or therein.

## 5.      PARENT AND SILVER COVENANTS

      5.1      Advice of Changes. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Parent and/or Silver will promptly advise Platinum in writing of: (i) the discovery by Silver of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Parent, Silver or any Subsidiary of Silver contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or

circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Silver, Parent, or any Subsidiary of Silver contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Silver pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 9 impossible or unlikely; and (v) any Material Adverse Effect on Silver.

5.2    Conduct of Business.  During the period from the date of this Agreement until the earlier to occur of (a) the Closing or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Silver and each of its Subsidiaries shall, except to the extent that Platinum shall otherwise consent in writing (which consent shall not be unreasonably withheld or delayed), carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable laws and regulations, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts consistent with past practices and policies to (i) preserve intact its present business organization, (ii) keep available the services of its present officers (except as expressly contemplated by this Agreement), (iii) preserve its relationships with customers, suppliers, licensors, licensees, and others with which it has business dealings, (iv) maintain Silver's assets in good working condition and repair according to the standards it has maintained as of the date of this Agreement, subject only to ordinary wear and tear, and (v) keep in full force all insurance policies identified under Section 3.27 of the Silver Disclosure Schedule and obtain, renew or extend any insurance consistent with past practices for the Business and Silver's assets.  In addition, during that period, Silver will promptly notify Platinum of any material event involving the operation of the Business or Silver's assets consistent with the agreements contained herein.

In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, except as provided otherwise herein or as approved or recommended by Platinum in writing Silver and its Subsidiaries will not, and Parent will cause Silver and its Subsidiaries not to, without the prior written consent of Platinum, which consent shall not be unreasonably withheld or delayed:

(a)    sell, lease, license, encumber or otherwise dispose of any of the assets of Silver or any Subsidiary of Silver which individually or in the aggregate, are material to the Business or which have a book value in excess of $50,000, other than sales of products to customers and resellers on commercially reasonable terms effected in the ordinary course of business consistent with past practice;

(b)    incur any indebtedness for borrowed money, enter into any capital leases or guarantee any such indebtedness or capital leases of any other Person or enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing, which obligations, liabilities or indebtedness exceed $50,000 in the aggregate except indebtedness to Key under Silver's existing credit facilities up to a total aggregate amount of $24,000,000; in addition, Parent and Silver may borrow up to an additional $2,000,000 to fund working capital and operating deficits without obtaining the consent of any third party; provided, however, that Parent or Silver may borrow in excess of $2,000,000 only with the prior written consent of MHR;

(c)    except as required under agreements existing as of the date of this Agreement as set forth under Section 5.2(c) of the Silver Disclosure Schedule, grant or pay any bonus, royalty, severance or termination pay or increased salary or other compensation to any officer, director, employee,

36

consultant or agent of Silver or its Subsidiaries or enter into any new employment agreement or a consulting agreement which provides for payment of more than $50,000 annually with any such Person, or enter into any new agreement or plan of the type described in Sections 3.22(c) or 3.22(e);

        (d)      enter into, amend, modify or terminate any Contract, except in the ordinary course of business consistent with past practice and to the extent such action would not require disclosure under Section 3.21, or waive, release, compromise or assign any material rights or claims;

        (e)      issue or sell any shares of the capital stock of any class of any Subsidiary of Silver or any other of such Subsidiary's securities, or issue, grant or create any Equity Rights;

        (f)      acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, association or other business organization or division thereof; or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business or enter into any joint ventures, partnerships or limited liability companies, or enter into strategic relationships or alliances, which are material, individually or in the aggregate, to the Business;

        (g)      make or permit to be made any capital expenditures, or make or commit or commit or agree to make any payments that would be classified as expenses under GAAP in each case which exceed $50,000 in any one transaction or the terms of which transactions are not in the ordinary course of business consistent with past practice;

        (h)      materially change its business practices or policies with respect to the Silver Products and Services or its customers;

        (i)      materially revalue any of its assets or, except as required by GAAP, make any change in accounting methods, principles or practices, or agree to any material audit assessment by any tax authority or make any tax election;

        (j)      lend any amount to any Person, other than loans made to Subsidiaries of Silver that will be repaid in full prior to the Effective Time, in an amount not to exceed $50,000, and advances for reasonable travel related expenses which are incurred in the ordinary course of business consistent with past practice, not material in amount, which travel related expenses shall be documented by receipts for the claimed amounts in accordance with past practice;

        (k)      make any material payments outside the ordinary course of business consistent with past practice;

        (l)      distribute cash to any person outside the ordinary course of business, including, without limitation (i) declaring, setting aside, making or paying any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or (ii) any transaction related expenses, including attorneys' or other professional fees;

        (m)      distribute the $678,330.08 held in escrow, except in accordance with the terms of the Escrow Agreement dated January 18, 2000 by and among Multigraphics, Inc., Datacard Corporation and Harris Trust and Savings Bank, as the same may have been amended (the "Harris Escrow Agreement"), and such $678,330.08 shall remain in escrow pursuant to the Harris Escrow Agreement;

        (n)      take any action which would have a Material Adverse Effect on Silver; or

37

A083

(o)    agree to do, or permit a Subsidiary to do or agree to do, any of the things described in the preceding clauses 5.2(a) through (n).

5.3    No Solicitation.

(a)    From and after the date of this Agreement until the Effective Time or termination of this Agreement pursuant to Article 10, Parent will not, nor will it authorize or permit Silver and their Subsidiaries or any of their respective officers, directors, stockholders, affiliates or employees or any investment banker, attorney or other advisor or representative retained by any of them to, directly or indirectly take any action to solicit, initiate, seek or encourage or support any inquiry, proposal or offer from, furnish any information to, or participate in any negotiations with, any Person regarding any acquisition of Parent, Silver or any of its Subsidiaries, any merger or consolidation with or involving, or any acquisition of any material portion of the stock or assets of Parent, Silver or any of its Subsidiaries or any material license of any Intellectual Property Rights of Parent, Silver or the Subsidiaries (any of the foregoing being referred to in this Agreement as an *"Acquisition Proposal"*) or enter into an agreement concerning any Acquisition Proposal with any party other than Platinum and Purchaser.

(b)    Each of Parent and Silver as promptly as reasonably practicable: (i) shall advise Platinum in writing of any Acquisition Proposal or request which Parent or Silver reasonably believes could lead to an Acquisition Proposal, the material terms and conditions of such request, inquiry or Acquisition Proposal, and the identity of the Person or group making any such request, inquiry or Acquisition Proposal, and (ii), upon the request of Platinum, notify such Person or group of Parent's and Silver's obligations under this Agreement and their intention to abide by them. Each of Parent and Silver will keep Platinum informed as promptly as practicable in all material respects of amendments to any such request, inquiry or Acquisition Proposal.

5.4    Regulatory Approvals. Each of Parent and Silver will execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority, whether federal, state, local or foreign, which may be reasonably required, or which Platinum may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Each of Parent and Silver will use commercially reasonable efforts to obtain or assist Platinum in obtaining all such authorizations, approvals and consents.

5.5    Necessary Consents. Each of Parent and Silver will use all commercially reasonable efforts to obtain such written consents and take such other actions as may be necessary or appropriate for Parent or Silver, in addition to those set forth in Section 5.4 and Section 7.10, to allow the consummation of the transactions provided for herein and to facilitate and allow Platinum to carry on Silver's Business after the Closing Date including the obtaining of any consents required to assign the Silver Contracts to Purchaser.

5.6    Securities Laws. Each of Parent and Silver shall use commercially reasonable efforts to assist Platinum to the extent necessary to comply with the securities laws of all jurisdictions applicable in connection with the issuance of the Stock Payment; provided, however, each of Parent and Silver shall not for any purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction where it is not so qualified, or to subject itself to taxation in any such jurisdiction, or to execute a general consent to service of process unless it is already subject to service in such jurisdiction.

5.7    Litigation. Parent or Silver will notify Platinum in writing promptly after learning of any action, suit, proceeding or investigation by or before any court, board or governmental agency, initiated or threatened against Parent or Silver relating to the Business or for the purpose or with

38

A084

the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which, if adversely determined, could be reasonably expected to have a Material Adverse Effect on Silver, the Business or Silver's assets. If Parent or Silver becomes subject to a review by the Internal Revenue Service or any other taxing agency or authority for periods prior to the Closing Date, and such review has the potential to materially affect the liability of Platinum or any Subsidiary of Platinum for any taxes due with respect to a taxable period ending after the Closing Date, Parent or Silver (as the case may be) shall keep Platinum informed on a regular basis of the nature of such proceedings and shall consider in good faith any recommendations made by Platinum as to the conduct and settlement of such proceedings. In no event will Parent enter into, or permit Silver to enter into, any settlement or other stipulation with respect to any such review without the written consent of Platinum, which consent will not be unreasonably withheld.

       5.8     Notification of Employee Problems. Parent or Silver will promptly notify Platinum if any of Parent's or Silver's officers becomes aware that any of the key personnel listed under Section 3.26 of the Silver Disclosure Schedule intends to leave Silver's employ.

       5.9     Satisfaction of Closing Conditions. Silver and Parent will use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 9 or elsewhere in this Agreement on or before the Closing. Subject to the terms and conditions of this Agreement, Silver and Parent will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

       5.10    Confidentiality. Silver and Parent agree that Silver and Parent will, and will cause their respective officers, directors, agents and representatives, will hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data obtained from Purchaser or Platinum with respect to Purchaser or Platinum except for the purpose of evaluating, negotiating and completing the transactions contemplated hereby. Information generally known in Platinum's industry or which has been disclosed to Silver or Parent by Third Parties which have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of this Agreement. If the transactions contemplated by this Agreement are not consummated, Silver and Parent will return to Platinum (or certify that they have destroyed) all copies of such Confidential Information and proprietary data, including, but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Silver in connection with the transactions contemplated hereby.

       5.11    Access to Information. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable laws (including, but not limited to, antitrust laws), Parent and Silver will provide Platinum and its agents with reasonable access, during regular business hours, to the employees of Silver and its Subsidiaries and Parent and to the files, books, records and offices of Silver and the Subsidiaries, including, without limitation, any and all information relating to Silver's and its Subsidiaries' Taxes, commitments, Contracts, leases, licenses, real, personal and intangible property (including any Intellectual Property Rights), and financial condition. Silver will cause its accountants to cooperate with Platinum and its agents in making available all financial information reasonably requested, including, without limitation, the right to examine all working papers pertaining to all financial statements prepared or audited by such accountants.

39

5.12    Mutual Releases.  Contemporaneously with, and subject to the Closing, Parent shall execute a release of all claims it may have against Silver, Platinum, Purchaser, Key and the Majority Holders, pursuant to which each of such parties (with the exception of Key) will release all claims any of them shall have against the others, subject to the obligations set forth in this Agreement or any of the Ancillary Agreements (the "*Mutual Release*").  The form of Mutual Release is attached hereto as Exhibit A.

6.    COVENANTS OF PLATINUM AND PURCHASER

6.1    Advice of Changes.  During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Platinum and Purchaser will promptly advise Silver in writing of:  (i) the discovery by Platinum or Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Platinum or Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Platinum or Purchaser contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that the representations and warranties which are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Platinum or Purchaser pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 8 impossible or unlikely; and (v) any Material Adverse Effect on Platinum.

6.2    Conduct of Business.

(a)    During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Platinum and each of its Subsidiaries shall, except to the extent that Silver shall otherwise consent in writing, which consent shall not be unreasonably withheld or delayed, carry on its business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable laws and regulations, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts consistent with past practices and policies to preserve intact its present business organization.  In addition, during that period, Platinum will promptly notify Silver of any material event involving the operation of its businesses.

(b)    In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, neither Platinum nor Purchaser will, without the prior written consent of Silver, which consent shall not be unreasonably withheld or delayed:

(i)    amend its Certificate of Incorporation or Bylaws, in each case, in any manner adverse to the holders of Purchaser common stock;

(ii)    except (i) for this Agreement, (ii) pursuant to the terms of stock options outstanding as of the date hereof and (iii) pursuant to the terms thereof in existence on the date hereof or with respect to options to purchase not more than an aggregate of 45,000 shares of Platinum Common Stock, issue or sell any shares of the capital stock of Platinum or any other of its securities, or issue, grant or create any Equity Rights if any such issuance or sale would require the approval of Platinum's stockholders; and

40

(iii)    to do or agree to do, or permit a Subsidiary to do or agree to do, any of the things described in the preceding (a) and (b).

6.3    Regulatory Approvals. Platinum will execute and file, or join in the execution and filing of, any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority, federal, state, local or foreign, which may be reasonably required, or which Silver may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Platinum will use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

6.4    Litigation. Platinum will notify Silver in writing promptly after learning of any action, suit, investigation, litigation or proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which would be reasonably expected to have a Material Adverse Effect on Platinum.

6.5    Satisfaction of Conditions Precedent. Upon the terms and subject to the conditions of this Agreement, Platinum will use commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 8 on or before the Closing Date, including closing the Credit Facility. Upon the terms and subject to the conditions of this Agreement, Platinum will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated as promptly as practicable, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions provided for herein. Platinum will allow MHR Capital Partners, LP, Parent and their respective authorized representatives to discuss the status of the financing contemplated by the Credit Facility with the lenders thereunder or with substitute lenders.

6.6    Blue Sky Laws. Platinum shall take such steps as may be necessary to comply with all applicable Securities Laws as well as the securities laws of all states which are applicable in connection with the transactions contemplated by this Agreement.

6.7    NASDAQ Listing. Platinum agrees to take all necessary steps for listing on the NASDAQ National Market the shares of Platinum Common Stock issuable in connection with the transactions contemplated by this Agreement.

6.8    Confidentiality. Purchaser and Platinum agree that, unless and until the Closing has been consummated, Purchaser, Platinum and their officers, directors, agents and representatives, will hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data obtained from Silver or Parent with respect to Silver or Parent except for the purpose of evaluating, negotiating and completing the transactions contemplated hereby. Information generally known in Silver's industry or which has been disclosed to Purchaser or Platinum by Third Parties which have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of this Agreement. If the transactions contemplated by this Agreement are not consummated, Purchaser and Platinum will return to Silver (or certify that they have destroyed) all copies of such Confidential Information and proprietary data, including, but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Purchaser and Platinum in connection with the transactions contemplated hereby.

6.9    Access to Information. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with

41

the provisions of Article 10 hereof, subject to the terms and conditions hereof relating to the
confidentiality and use of confidential and proprietary information, and subject to compliance with
applicable laws (including, but not limited to antitrust laws), Purchaser and Platinum will provide the
Majority Holder and its agents with reasonable access, during regular business hours, to the executive
officers of Platinum.

      6.10    <u>Mutual Releases</u>.  Contemporaneously with, and subject to the Closing,
Platinum shall execute the Mutual Release, pursuant to which it shall release all claims it may have
against Parent, Key and the Majority Holders and N.E.S. Investment Co., and pursuant to which each of
such parties (with the exception of Key) will release all claims any of them shall have against the others,
subject to the obligations set forth in this Agreement or any of the Ancillary Agreements.

      6.11    <u>Director and Officer Indemnification</u>.

      (a)    Platinum agrees that subsequent to the Effective Time, it will, and it will cause
Silver and each Silver Subsidiary to, honor the indemnification and exculpation from liability provisions
set forth in the Silver Charter Documents and the equivalent governance documents of each Silver
Subsidiary as in effect on the date hereof; provided, however, that any such indemnification obligations of
Platinum and Silver shall be honored only to the extent N.E.S. Investment Co. shall have indemnified
Platinum, Silver and any Silver Subsidiary in full for such obligations and liabilities. To the extent Parent
shall have purchased any officers' and directors' insurance policy (the "D&O Insurance"), Platinum and
its Affiliates will not take any action to cause such D&O Insurance to be terminated prior to its stated
term.

      (b)    The provisions of this Section 6.11 are intended to be for the benefit of, and shall
be enforceable by, each D&O Indemnitee, his or her heirs and his or her representatives.

      (c)    In the event that Silver or any of its successors or assigns (i) consolidates with or
merges into any other Person and is not the continuing or surviving corporation or entity of such
consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and assets to
any Person, then, and in each such case, proper provision shall be made so that the successors and assigns
of Silver shall assume all of the obligations thereof set forth in this Section 6.11.

7.    ADDITIONAL COVENANTS

      7.1    <u>Liability for Taxes</u>.

      (a)    Parent shall be liable for and will pay (i) any Taxes caused by or resulting from
the sale of the Shares (including, without limitation, all Taxes arising from the Section 338(h)(10)
Elections), (ii) any Taxes imposed on or incurred by Silver arising out of the inclusion of Silver in the
Seller Group or any combined, consolidated, unitary or similar group (a "*Group*") prior to the Closing
Date, (iii) any federal, state or foreign income Taxes imposed on or incurred by Silver or any Subsidiary
of Silver (or any Group with respect to the taxable items of Silver or any Subsidiary of Silver) for any
taxable period ending on or before the Closing Date (or the portion, determined as described in paragraph
(c) of this Section 7.1, of any such Taxes for any taxable period beginning on or before and ending after
the Closing Date which is allocable to the portion of such period occurring on or before the Closing Date
(the "*Pre Closing Period*")) and (iv) any attorneys' fees or other costs incurred by Platinum or Silver in
connection with any payment from Parent under this paragraph (a) of Section 7.1; provided, that Parent
shall not be liable for any of the foregoing to the extent the amount has been included in the calculation of
the Final Adjustment Amount. N.E.S. Investment Co. and Parent have entered into an agreement with
Platinum in the form of Exhibit B pursuant to which they have, among other matters, agreed to indemnify

Platinum and its affiliates for certain Taxes in accordance with the terms and conditions of such agreement (the "Tax Indemnity Agreement).

(b)    Platinum shall be liable for, and shall pay any Taxes imposed on or incurred by or with respect to Silver for which Parent is not liable under paragraph (a) of this Section 7.1.

(c)    Whenever it is necessary for purposes of paragraph (a) or (b) of this Section 7.1 to determine the portion of any Taxes imposed on or incurred by Silver (or any Group) for a taxable period beginning on or before and ending after the Closing Date which is allocable to the Pre Closing Period, the determination shall be made, in the case of Taxes which are not measured by, or based upon, production or net income, on a per diem basis, except any consequences of the Section 338(h)(10) Elections shall be excluded, and, in the case of other Taxes, by assuming that the Pre Closing Period constitutes a separate taxable period of Silver and by taking into account the actual taxable events occurring during such period (except that exemptions, allowances and deductions for a taxable period beginning on or before and ending after the Closing Date that are calculated on an annual or periodic basis, such as the deduction for depreciation, shall be apportioned to the Pre Closing Period ratably on a per diem basis and any consequences of the Section 338(h)(10) Elections shall be excluded).

(d)    Parent and Platinum will, to the extent permitted by applicable law, elect with the relevant taxing authorities to close all taxable periods of Silver and each Subsidiary of Silver as of the close of business on the Closing Date.

(e)    Platinum agrees to pay to Parent any refund received after the Closing Date by Platinum or Silver, in respect of any Taxes for which Parent is liable under paragraph (a) of this Section 7.1, except to the extent such refund is shown as an asset on the Final Balance Sheet. Parent agrees to pay to Platinum any refund received by Parent in respect of any Taxes for which Platinum is liable under paragraph (b) of this Section 7.1. The parties shall cooperate in order to take all necessary steps to claim any such refund. Any such refund received by a party for the account of the other party shall be paid to such other party within thirty (30) days after such refund is received.

(f)    Parent and Platinum agree that any payment made with respect to Taxes pursuant to this Section 7.1 shall be treated by the parties on their Tax Returns as an adjustment to the Purchase Price for the Silver Common Stock.

(g)    Notwithstanding anything in this Agreement to the contrary, the amount of any payment under Section 7.1(a) or 7.1(b) shall be reduced by the amount of any Tax benefit actually realized by the party making the claim for such payment after giving effect to the obligations under this Section 7.1.

7.2    Tax Proceedings. In the event Platinum or Silver or any of their Affiliates receives notice (the "*Proceeding Notice*") of any examination, claim, adjustment or other proceeding with respect to the liability of Silver or any Subsidiary of Silver for Taxes for any period for which Parent is or may be liable under paragraph (a) of Section 7.1, Platinum shall notify Parent in writing thereof (the "*Platinum Notice*") no later than the earlier of (a) thirty (30) days after the receipt by Platinum, Silver or any of their Affiliates of the Proceeding Notice, or (b) ten (10) days prior to the deadline for responding to the Proceeding Notice. As to any such Taxes for which Parent is solely liable under paragraph (a) of Section 7.1, Parent shall be entitled at its expense to control or settle the contest of such examination, claim, adjustment or other proceeding, provided that (a) Parent notifies Platinum in writing that it desires to do so no later than the earlier of (i) thirty (30) days after receipt of the Platinum Notice, or (ii) ten (10) days prior to the deadline for responding to the Proceeding Notice; (b) Parent provides Platinum with adequate assurance that it will satisfy such Taxes in full; and (c) any resolution of the matter will result in

43