no liability or adverse Tax or other consequence to Platinum or its Affiliates. Subject to the preceding sentence, the parties shall cooperate with each other and with their respective Affiliates, and will consult with each other, in the negotiation and settlement of any proceeding described in this Section 7.2. Failure by Platinum to comply with its obligations under this Section 7.2 will not relieve Parent of any liability it may have to Platinum, except to the extent Parent is materially prejudiced thereby.

       7.3    Payment of Taxes. All Taxes with respect to Silver shall be paid by the party that is legally responsible therefor. Except as otherwise provided in Sections 7.1-7.3, any amount to which a party is entitled under Sections 7.1-7.3 shall be promptly paid to such party by the party obligated to make such payment following written notice to the party so obligated stating that the Taxes to which such amount relates are due and providing details supporting the calculation of such amount.

       7.4    Tax Returns.

       (a)    All Tax Returns which relate to any Taxes of Silver shall be prepared and filed by the party that is legally responsible therefor. All taxable items of Silver for the period beginning on January 1 of the calendar year in which the Closing occurs and extending through the Closing (and, to the extent required in the applicable regulations, through the close of business on the Closing Date, but in no event including items arising from transactions by Silver after the Closing) will be included in the consolidated federal income Tax Return of the Seller Group (as well as any state combined, unitary or similar income Tax Return) and will be reported on a basis consistent with previously filed Tax Returns. Platinum and its affiliates, including Silver, shall cooperate with Parent and shall make available all necessary records and timely take all action necessary to allow Parent and its affiliates to prepare and file the Tax Returns which they are responsible for preparing and filing under this Section 7.4.

       (b)    For any taxable period of Silver or any Subsidiary of Silver that includes (but does not end on) the Closing Date, Platinum will timely prepare and file the Tax Returns required to be filed and will pay all Taxes due with respect to such Tax Returns; provided that Parent will remit to Platinum not less than ten (10) calendar days prior to the due date of any such Tax Return, any amount owed by Parent pursuant to Section 7.1(a) with respect to the taxable periods covered by such Tax Return. All such Tax Returns will be prepared on a basis reasonably consistent with the past practice of Silver and its Subsidiaries, provided that such basis is not otherwise inconsistent with applicable law. Platinum will furnish such Tax Returns to Parent for its review and comment at least thirty (30) calendar days prior to the due date for filing such Tax Returns.

       (c)    For any taxable period of Silver and any Subsidiary of Silver that ends on or before the Closing Date for which a Tax Return is due after the Closing Date, Parent will timely prepare and file all Tax Returns required to be filed and will pay all Taxes due with respect to such Tax Returns. All such Tax Returns will be prepared on a basis reasonably consistent with the past practice of Silver and any Subsidiary of Silver, provided that such basis is not otherwise inconsistent with applicable law. Platinum will have the right to review and comment on any separate Silver or any Subsidiary of Silver Tax Returns prepared by Parent at least thirty (30) calendar days prior to the due date for filing such Tax Returns.

       7.5    Tax Allocation Arrangements. Effective as of the Closing, all liabilities and obligations between Silver or any Subsidiary of Silver, on one hand, and Parent and any Affiliates thereof, on the other hand, under any tax indemnity, sharing, allocation or similar agreement or arrangement in effect prior to the Closing shall be extinguished in full, and any liabilities or rights existing under any such agreement or arrangement shall cease to exist and shall no longer be enforceable. Parent and its Affiliates shall execute any documents necessary to effectuate the provisions of this Section 7.5.

44

7.6    <u>Cooperation and Exchange of Information.</u> Each party will provide, or cause to be provided, to the other party copies of all correspondence received from any taxing authority by such party or any of its Affiliates in connection with the liability of Silver or any Subsidiary of Silver for Taxes for any period for which such other party is or may be liable under paragraph (a) or (b) of Section 7.1. The parties will provide each other with such cooperation and information as they may reasonably request of each other in preparing or filing any Tax Return or claim for refund, in determining a liability or a right of refund or in conducting any audit or other proceeding in respect of Taxes imposed on the parties or their respective Affiliates. The parties and their Affiliates will preserve and retain all Tax Returns, schedules, work papers and all material records or other documents relating to any such Tax Returns, claims, audits or other proceedings until the expiration of the statutory period of limitations (including extensions) of taxable periods to which such documents relate and until the final determination of any payments which may be required with respect to such periods under this Agreement and shall make such documents available to the other party or any affiliate thereof, and their respective officers, employees and agents, upon reasonable notice and at reasonable times, it being understood that such representatives shall be entitled to make copies of any such books and records relating to Silver as they shall deem necessary. Any information obtained pursuant to this Section 7.6 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refunds or in conducting any audit or other proceeding. Each of Parent and Platinum shall pay the reasonable out-of-pocket expenses incurred by the other's Affiliates or representatives in providing the cooperation and information required by this Section 7.6 at its own expense.

7.7    <u>Conflict.</u> In the event of a conflict between the provisions of Sections 7.1-7.7 and any other provisions of this Agreement, the provisions of Sections 7.1-7.7 shall control.

7.8    [Intentionally Omitted]

7.9    <u>Non-Competition, Non-Solicitation and Non-Disparagement.</u>

(a)    <u>Non-Competition.</u> For a period of five (5) years after the Closing Date, Parent shall not, anywhere in the world, directly or indirectly invest in, own, manage, operate, finance, control, advise, or render services to, or guarantee the obligations of, any Person engaged in or planning to become engaged in the Business; <u>provided</u>, <u>however</u>, that Parent may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b)    <u>Non-Solicitation.</u> For a period of five (5) years after the Closing Date, Parent shall not, directly or indirectly:

(i)    solicit the business of any Person who is a customer of Silver or Platinum; or

(ii)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Silver on the Closing Date or within the year preceding the Closing Date to cease doing business with Silver or Platinum, to deal with any competitor of Silver or Platinum, or in any way interfere with its relationship with Silver or Platinum.

(c)    <u>Non-Disparagement.</u> After the Closing Date, the parties will not disparage the other parties or any of their respective shareholders, directors, officers, employees or agents.

BST99 1394460-27.069646.0011

(d)    Modification of Covenant. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 7.9(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration, or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 7.9 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 7.9 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Business and the Shares and to prevent any unfair advantage being conferred on Silver or Parent.

7.10    Further Assurances. Parent agrees that if, at any time after the Effective Time, Platinum considers or is advised that any further deeds, assignments or assurances are reasonably necessary or desirable to vest, perfect or confirm in Purchaser (as of the Closing) title to the Shares and the use by Platinum, Purchaser or Silver of Silver's assets (including as a result of any failure to obtain the consent of any third party), Parent shall, and shall cause its Affiliates to, execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement. Parent shall also use all reasonable efforts to secure the consent of Ernst & Young LLP to file the audited Silver Financial Statements as part of a filing with the SEC by Platinum. In addition, Parent will remit to Silver all checks or payments received by it subsequent to the Effective Time which constitute Silver assets.

7.11    Registration of Shares. Subject to execution of the Registration Rights Agreement substantially in the form attached hereto as Exhibit C (the "Registration Rights Agreement"), holders of Platinum Common Stock issued by Platinum in connection with the transaction contemplated by this Agreement who receive such shares in accordance with the terms of this Agreement shall have the benefit of the Registration Rights Agreement.

7.12    Transfer of Shares. Parent agrees that it shall not sell or otherwise transfer any of the shares of Platinum Common Stock issued by Platinum in the transaction contemplated by this Agreement without registration under the Securities Act, pursuant to Rule 144 (or any successor rule) under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act, provided that where such transfer is to be effected pursuant to an exemption from the registration requirements of the Securities Act, Parent shall provide Platinum with an opinion of counsel reasonably satisfactory to Platinum that no violation of the Securities Act will be involved in such transfer, and Parent fully understands and agrees that it must bear the total economic risk of its purchase for an indefinite period of time because, among other reasons, none of such shares have been registered under the Securities Act or under the securities laws of any applicable state or other jurisdiction and, therefor, cannot be resold, pledged, assigned or otherwise disposed of unless subsequently registered under the Securities Act and under the applicable securities laws of such states or jurisdictions or an exemption from such registration is available. Parent understands that Platinum is under no obligation to register its shares on Parent's behalf except as provided in the Registration Rights Agreements. Parent understands the lack of liquidity and restrictions on transfer of such shares.

7.13    [Intentionally Omitted]

7.14    Filings. The parties agree that, based upon the current facts known to them, no Antitrust Filings (as hereinafter defined) nor Other Filings (as hereinafter defined) are required. Notwithstanding the foregoing, in the event that Antitrust Filings (as hereinafter defined) or Other Filings (as hereinafter defined) are required, as promptly as practicable after the date of this Agreement, each of

46

Parent, N.E.S. Investment Co., Silver and Platinum will prepare and file (i) with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the transactions contemplated herein if required by the HSR Act, as well as comparable notification forms required by the merger notification or control laws and regulations of any other applicable jurisdiction (the "*Antitrust Filings*") and (ii) any other filings required to be filed by them under the Exchange Act, the Securities Act or any other Federal, state or foreign laws relating to the transactions contemplated by this Agreement (the "*Other Filings*"). Parent, Silver and Platinum each shall promptly supply the other with any information which may be required in order to effectuate any filings pursuant to this Section 7.14. Neither Platinum nor any of its Affiliates on the one hand, nor Parent nor any of its Affiliates on the other hand, shall be under any obligation to make proposals, execute or carry out agreements or submit to orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of such party or any of its Affiliates, or imposing or seeking to impose any limitation on the ability of Platinum or any of its Affiliates or subsidiaries on the one hand or Parent or any of its Affiliates or subsidiaries on the other hand, to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of the Shares to be acquired.

        7.15    Joint Participation. Each of Parent, Silver and Platinum will notify the other promptly upon the receipt of any comments from the government officials in connection with any filing made pursuant hereto and of any request by any government officials for amendments or supplements to the Antitrust Filings or for additional information and will supply the other with copies of all correspondence between such party or any of its representatives, on the one hand, any government officials, on the other hand, with respect to the Antitrust Filings. Each of Parent, Silver and Platinum will use commercially reasonable efforts to cause all documents that it is responsible for filing with regulatory authorities under this Section 7.15 to comply in all material respects with all applicable Legal Requirements and the rules and regulations promulgated thereunder. Whenever any event occurs which is required to be set forth in an amendment or supplement to the Antitrust Filings, Parent, Silver or Platinum, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the appropriate Governmental Authority such amendment or supplement.

        7.16    Environmental Protection. Each of Parent, Silver and Platinum agree to cooperate in gathering information prior to the Closing necessary to pursue the purchase of environmental insurance to cover some or all of the potential environmental liabilities related to one or more of the Silver facilities or other matters for which Silver or its Affiliates may have potential environmental liability ("Environmental Insurance"). Should Platinum purchase Environmental Insurance at any time during the thirty-six (36) month period following the date of the Closing, Platinum shall include as additional insured, and shall use commercially reasonable efforts to obtain a waiver of subrogation against, Platinum, the members of the Board of Directors of each of Silver and Parent and any designee of the Majority Holders who have previously served on either of such Board of Directors (the "*Insured*") provided that the coverage of the Insured would be subordinated to that of Platinum and other insured parties. Platinum shall have the right to direct the defense of Platinum and the Insured against any claim brought by any third party which is covered by the Environmental Insurance with counsel of its choice, so long as Platinum conducts the defense of such claim actively and diligently. In such event, the Insured may retain separate co-counsel at its sole cost and expense and participate in the defense of the such claim. Platinum will not consent to the entry of any judgment or enter into any settlement with respect to any claim against the Insured without the consent of the Insured if such settlement would impose any liability upon the Insured (which consent shall not be unreasonably withheld).

        7.17    Consents and Releases. Parent agrees to use commercially reasonable efforts to obtain or cause to be obtained general releases of all claims in favor of Platinum and its officers, directors,

47

agents and employees, and each Person, if any who Controls or may Control Platinum, as well as the Majority Holders, from the Noteholders and the holders of the Series B Notes.

       7.18    <u>Liability Insurance</u>. Parent agrees that if it shall purchase a directors' and officers' "tail" liability insurance policy which covers any present or former officers or directors of Silver and/or its Subsidiaries, then it shall also purchase entity coverage under such policy which extends coverage to Silver.

## 8.    CONDITIONS TO OBLIGATIONS OF PARENT

Parent's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Parent, but only in a writing signed on behalf of Parent by an authorized officer).

       8.1    <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties of Platinum and Purchaser set forth in Article 4 of this Agreement shall be true and correct on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date, except where any such failures to be true and correct would not in the aggregate have a Material Adverse Effect on Platinum.

       8.2    <u>Covenants</u>. Platinum and Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article 6 on or before the Closing Date.

       8.3    <u>Absence of Material Adverse Effect</u>. No Material Adverse Effect with respect to Platinum shall have occurred since the date of this Agreement and be continuing.

       8.4    <u>Compliance with Law</u>. There shall be no Order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

       8.5    <u>Government and Other Consents</u>. There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of the Shares by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including satisfaction of all requirements under applicable Securities Laws and state "Blue Sky" or securities laws, as well as the consent of Key to consummate the transactions contemplated by this Agreement.

       8.6    <u>Hart-Scott-Rodino Compliance</u>. Any applicable waiting periods under the HSR Act and the merger notification or control laws and regulations of any other applicable jurisdictions, shall have expired or early termination shall have been granted if notification under the HSR Act or other applicable merger notification or control laws are necessary.

       8.7    <u>Absence of Litigation</u>. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Platinum that has not been previously disclosed to Silver herein.

BST99 1394460-27.069646.0011

A094

8.8    Opinion of Platinum Counsel. Parent shall have received from McDermott, Will & Emery, counsel to Platinum, a customary opinion letter in a form mutually agreeable to Platinum and Parent.

8.9    Other Deliveries. Purchaser shall have delivered to Silver and Parent and/or their designee, as the case may be:

(a)    the Purchase Price, as such amount may be adjusted in accordance with Section 2.3, Section 2.4 and/or Section 2.5; provided that delivery of the Purchase Price shall include the treatment of the Holdback Amount in accordance with Section 2.2 and 2.3(d);

(b)    the Registration Rights Agreement in the form attached hereto as Exhibit C, duly executed by Purchaser and Platinum; and

(c)    a certificate executed by Purchaser and Platinum as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 8.1 and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 8.2;

(d)    a certificate of the Secretary of Purchaser certifying, as complete and accurate as of the Closing, copies of the Platinum Charter Documents, certifying all requisite resolutions or actions of Purchaser's board of directors approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Purchaser executing this Agreement and any other documents relating to the transactions contemplated by this Agreement;

8.10    Mutual Releases. Each of Platinum, Purchaser and the Majority Holders shall have executed and delivered to Parent the Mutual Release, which shall include a release of Parent, Silver and Silver's current and former officers and directors.

8.11    Nasdaq. Platinum shall have complied with Section 6.7 of this Agreement.

9.    CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER

The obligations of Platinum and Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Platinum, but only in a writing signed on behalf of Platinum by an authorized officer):

9.1    Accuracy of Representations and Warranties. Each of the representations and warranties of Parent and Silver set forth in Article 3 of this Agreement shall be true and correct on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that, to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of the date hereof and on and as of such particular date as if made on and as of such particular date, except where any such failures to be true and correct would not in the aggregate have a Material Adverse Effect on Parent, Silver or the Business.

9.2    Covenants. Parent and Silver shall have performed and complied in all material respects with all of its covenants contained in Article 5 on or before the Closing Date, and Platinum shall have received a certificate to such effect executed on behalf of Silver by the President, Chief Executive Officer or Chief Financial Officer of Silver.

49

A095

9.3     _Absence of Material Adverse Effect_. No Material Adverse Effect with respect to Silver shall have occurred since the date of this Agreement and be continuing.

9.4     _Compliance with Law_. There shall be no Order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.5     _Government Consents_. There shall have been obtained at or prior to the Closing Date such permits or authorizations and there shall have been taken such other action, as may be required to consummate the sale of the Shares by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including satisfaction of all requirements under applicable federal and state securities laws.

9.6     _Third-Party Consents; Assignments; Other Documents_. Platinum shall have received: (a) duly executed copies of all third-party consents, approvals, assignments, waivers, authorizations, permits or other certificates set forth on _Section 9.6 of the Silver Disclosure Schedule_; and (b) any other written consents, assignments, waivers, authorizations or other certificates where, in the case of this clause (b), the failure to have received the same would have a Material Adverse Effect on Silver, including any consents required to continue in effect any Contracts of Silver or any Subsidiary of Silver which are individually or in the aggregate material to Silver.

9.7     _Mutual Releases and GEC Indemnity_.

(a)     The Mutual Release shall have been executed and delivered by all of the parties contemplated as signatories thereto.

(b)     Parent and its Affiliates (other than Silver) shall have assigned to Platinum and its Affiliates all rights they have under the GEC Agreements.

9.8     _Opinions of Counsel_. Platinum shall have received from Squire, Sanders & Dempsey, counsel to Parent and Silver, a customary opinion letter dated as of the Closing Date in a form mutually agreeable to Platinum and Silver.

9.9     _Hart-Scott-Rodino Compliance_. Any applicable waiting periods under the HSR Act and the merger notification or control laws and regulations of any other applicable jurisdictions, if necessary, shall have expired or early termination shall have been granted.

9.10     _Closing Balance Sheet_. Silver shall have delivered to Platinum the Closing Balance Sheet in format and presentation similar to the Base Balance Sheet and if necessary the appropriate adjustment shall be made to the Cash Payment of the Purchase Price as set forth in Section 2.3(b).

9.11     _Absence of Litigation_. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Silver or the Business that has not been previously disclosed to Platinum herein.

9.12     _Limitation on Indebtedness_. The total aggregate amount of indebtedness owed to Key, shall not exceed $24,000,000, or $26,000,000 to the extent Platinum has consented thereto in accordance with Section 5.2(b).

50

9.13    [Intentionally Omitted]

9.14    Other Indebtedness. Parent and Silver shall have (i) satisfied all obligations to Key, the holders of the Series B Notes, any other holders of indebtedness for borrowed money and any creditors holding Encumbrances on the assets of Silver or any Subsidiary of Silver (except Permitted Encumbrances) or the Shares, or shall have provided general releases of Platinum, Silver and Purchaser from each of such parties, (ii) delivered pay-off letters and releases, in form and substance reasonably satisfactory to Platinum, of any Encumbrances on the assets of Silver or any Subsidiary of Silver (except Permitted Encumbrances) or the Shares, (iii) delivered the consents of the Majority Holders, which shall evidence the Majority Holders' consents to the transactions contemplated by this Agreement and the allocation of the Purchase Price as set forth in the Instructions and (iv) satisfied the obligations of the Noteholders as provided in the Notes.

9.15    Tax Indemnity. N.E.S. Investment Co. shall have delivered to Purchaser an executed copy of the Tax Indemnity Agreement.

9.16    Other Deliveries. Silver shall have delivered to Purchaser and Platinum the following:

(a)    for each leasehold interest in Real Property identified on Section 3.13(b) of the Silver Disclosure Schedule, a consent of the landlord with respect to the change of control of Silver, if required by the lease for such Real Property or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to Purchaser and its counsel and executed by Silver and/or its Subsidiaries and the landlord for such Real Property;

(b)    such other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Parent, Seller and/or its Subsidiaries;

(c)    fully executed instruments to effect changes to the signing and authorization authority with respect to the bank and other accounts set forth on Section 3.10 of the Silver Disclosure Schedule;

(d)    a certificate executed by Silver and Parent as to the accuracy of their representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 9.1 and as to their compliance with and performance of their covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 9.2;

(e)    a certificate of the Secretary of Parent certifying, as complete and accurate as of the Closing, copies of the Parent's charter documents, certifying all requisite resolutions or actions of Parent's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Parent executing this Agreement and any other document relating to the transactions contemplated by this Agreement;

(f)    a certificate of the Secretary of Silver certifying, as complete and accurate as of the Closing, copies of the Silver Charter Documents, certifying all requisite resolutions or actions of Silver's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Silver executing this Agreement and any other document relating to the transactions contemplated by this Agreement; and

51

(g)    resignations of all officers above the level of vice president (in their capacities as officers of Silver and its Subsidiaries) and directors of Silver and all Subsidiaries of Silver.

9.17    Financing.  Platinum and Purchaser shall have obtained and have the ability to draw upon a credit facility or other source of financing on commercially reasonable terms and in an amount of at least $50,000,000; provided, that, this condition shall be deemed satisfied if Platinum and Purchaser shall have obtained senior secured financing to replace Platinum's existing financing in the amount of $50,000,000 at a rate of interest not to exceed LIBOR plus 350 basis points per year and with a maturity date no earlier than the fifth (5th) anniversary of the Closing.

9.18    Financial Statements.  Silver shall have delivered a copy of its unaudited Interim Financials reviewed by Ernst & Young LLP and certified by its chief financial officer and an appropriate executive officer of Parent as being prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto). Silver also shall have delivered a draft of (i) such Silver financial statements and audit report which, if the transaction contemplated by this Agreement is consummated, shall contain no adverse opinion or disclaimer of opinion or qualification or modification as to uncertainty, accounting principal, or audit scope, in such form (audited or unaudited), as will be required in order for the registration of the resale of the Shares contemplated by the Registration Rights Agreement to be declared effective in accordance with the rules of the Securities and Exchange Commission (the "*Updated Financial Statements*") and (ii) the consent of Ernst & Young LLP to file the audited Updated Silver Financial Statements as part of a filing with the SEC by Platinum, assuming the consummation of such transaction.

9.19    Closing.  Silver shall have taken the actions described in Schedule 9.19.

10.    **TERMINATION OF AGREEMENT**

10.1    Right to Terminate.

(a)    This Agreement may be terminated and the purchase of the Shares abandoned at any time prior to the Effective Time:

(i)    by the mutual written consent of Parent, MHR Capital Partners, LP, and Platinum;

(ii)    by either Parent or Platinum, if such party (including its stockholders) is not in material Breach of any representation, warranty, covenant or agreement contained in this Agreement, and such other party is in material Breach of any representation, warranty, covenant or agreement contained in this Agreement, or if any representation of such other party will have become untrue, in either case to an extent that would cause the conditions set forth in Article 8 (for Silver) or Article 9 (for Platinum) not to be satisfied and such breaching party fails to cure such material Breach within 15 days of written notice of such material Breach from the non-Breaching party (except that no cure period will be provided for a Breach which by its nature cannot be cured);

(iii)    by either Parent or Platinum, if the Closing shall not have been consummated by one month subsequent to the execution of this Agreement for any reason; provided, however, that the right to terminate this Agreement under this Section 10(a)(iii) shall not be available to any party whose action or failure to act has been a principal cause of or resulted in the failure of the Closing to occur on or before such date and such action or failure to act constitutes a Breach of this Agreement;

52

(iv)    by either Parent or Platinum, if there is a final nonappealable Order of a federal or state court in effect preventing consummation of the transactions contemplated by this Agreement, or if any statute, rule, regulation or Order is enacted, promulgated or issued or deemed applicable to the purchase of the Shares by any Governmental Authority that would make consummation of the purchase of the Shares illegal; or

(v)    by either Parent or Platinum, if a Material Adverse Effect occurs with respect to the other party.

10.2    Termination Procedures. If either party wishes to terminate this Agreement pursuant to Section 10.1, such party shall deliver to the other party a written notice stating that such party is terminating this Agreement and setting forth a brief description of the basis of such termination. Termination of this Agreement will be effective upon the delivery of such notice.

10.3    Continuing Obligations. In the event of the termination of this Agreement as provided in Section 10.1, this Agreement shall be of no further force or effect, except (i) as set forth in this Section 10.3, 10.4 and Article 12, each of which shall survive the termination of this Agreement, and (ii) nothing herein shall relieve any party from liability for any fraud or intentional or willful Breach of this Agreement. No termination of this Agreement shall affect the obligations of the parties pursuant to this Agreement or any other Contract to maintain the confidentiality of information regarding the other party, all of which obligations shall survive termination of this Agreement in accordance with their terms.

10.4    Effect of Termination.

(a)    In the event of termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to this Article 10, no party hereto (or any of its directors or officers) shall have any liability or further obligation to any other party hereto, except (i) as provided in subsection (b) of this Section 10.4 and (ii) under the provisions of Sections hereof, which provisions shall survive such termination and abandonment, and except that, notwithstanding any other provision of this Agreement or any Ancillary Agreement, none of the parties hereto shall be relieved or released from any liabilities or further obligations arising from or in connection with any fraud or intentional or willful breach of its obligations under this Agreement or any Ancillary Agreement.

(b)    In the event of the termination of this Agreement by Platinum as a result of Silver or Parent considering or accepting an Acquisition Proposal in violation of Section 5.3, then the Silver shall pay to Platinum, by wire transfer of immediately available funds, One Million Dollars ($1,000,000). All amounts payable pursuant to this Section 10.4(b) shall be paid promptly, but in no event later than two Business Days following the date of such termination.

## 11.    NONSURVIVAL OF REPRESENTATIONS AND WARRANTIES

11.1    None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time. This Section 11.1 shall not limit any covenant or agreement of the parties contained in this Agreement or in any Ancillary Agreement which by its terms applies or contemplates performance in whole or in part after the Effective Time.

## 12.    MISCELLANEOUS

12.1    Entire Agreement. This Agreement, the Ancillary Agreements and the exhibits hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject

53

matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

12.2    Assignment; Binding Upon Successors and Assigns. Neither party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other party hereto; provided however, that Purchaser may assign its rights to acquire the Shares in whole or in part to an Affiliate. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.3    Third Party Beneficiaries. No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee or any party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement. Notwithstanding the foregoing: (i) in part because the Majority Holder has, in lieu of exercising the ABD Sale right (as defined in the Notes), consented to this Agreement and the transactions described herein, the Majority Holders are expressly made third party beneficiaries of Sections 5.12 and 12.10 of this Agreement and the Majority Holders and the other Note Holders are expressly made third party beneficiaries of Section 7.16 of this Agreement, provided that the Majority Holders shall have no liability or any duties as a third party beneficiary, except as set forth in this Agreement or in any Ancillary Agreement; (ii) all present and former officers and directors of Silver and any Silver Subsidiary who may be entitled to the benefits of the D&O Insurance (the "D&O Indemnitees") are expressly made beneficiaries of Section 6.11 hereof and (iii) recipients of the Stock Payment pursuant to this Agreement who execute the Registration Rights Agreement, together with their permitted assigns, are expressly made third party beneficiaries of Section 7.11 of this Agreement.

12.4    No Joint Venture. Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the parties hereto. No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party. No party will have the power to control the activities and operations of any other, and the parties' status is, and at all times, will continue to be, that of independent contractors with respect to each other. No party will have any power or authority to bind or commit any other. No party will hold itself out as having any authority or relationship in contravention of this Section.

12.5    Construction of Agreement. This Agreement has been negotiated by the respective parties hereto and their attorneys and have been reviewed by each party hereto. Accordingly, no ambiguity in the language hereof will be construed for or against either party.

12.6    Severability. If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

12.7    Section Headings. A reference to an Article, Section, Exhibit or Schedule will mean an Article or Section in, or an Exhibit or Schedule to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

BST99 1394460-27.069646.0011

12.8    <u>Exercise of Rights, Amendment, Extension and Waivers</u>. At any time prior to the Effective Time, Platinum, Purchaser, Parent and Silver may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant thereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein. Any term or provision of this Agreement may be amended. Any agreement to any amendment, extension, waiver or any other notice of any exercise of any right will be valid only if set forth in writing and signed by the party to be bound; provided, that any such action by Parent and/or Silver shall require a writing signed by the Majority Holders. The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions. This Agreement may be amended by the parties hereto and the Majority Holders at any time.

12.9    <u>Public Announcement</u>. No party hereto shall issue any press release or otherwise make any statements to any Third-Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any party, such party will consult with the other party regarding the content of such announcement and obtain such other party's reasonable approval of such press release. Notwithstanding the foregoing, either party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable laws, regulatory rules or any listing or trading agreement concerning its publicly traded securities.

12.10   <u>Fees and Expenses</u>. All filing fees relating to Antitrust Filings and Other Filings shall be paid equally by Parent and Platinum. Except as otherwise expressly provided herein, all other fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including the fees of a party's own accountants, attorneys, investment bankers and other professionals, shall be paid by the party incurring such expenses, whether or not the purchase and sale of the Shares is consummated; provided, however, that Parent shall be responsible for such fees and expenses of Silver and its Affiliates and Parent hereby agrees to indemnify Platinum, Purchaser and Silver for the fees and expenses set forth on <u>Schedule 12.10</u> in excess of the $500,000 set forth in Section 2.2. Notwithstanding the foregoing, in the event that the purchase and sale of the Shares contemplated by this Agreement is not consummated solely as a result of Platinum's failure to fulfill that closing condition requiring Platinum to obtain adequate financing as set forth in Section 9.17 hereof, then Platinum shall reimburse the Majority Holders for its documented, reasonable, out-of-pocket professional fees and expenses actually incurred and paid by them for services rendered to enable the purchase and sale of the Shares, such fees and expenses not to exceed $300,000. In the event that the purchase and sale of the Shares contemplated by this Agreement is consummated, Platinum agrees to pay MHR Fund Management LLC at the Closing a fee of $3,500,000, which shall be paid in shares of Platinum Common Stock valued at the Closing Price (rounded up to the next highest whole share number).

12.11   <u>Governing Law</u>. The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties of this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

12.12   <u>Jurisdiction; Venue; Waiver of Jury Trial</u>.

BST99 1394460-27.069646.0011

(a)    Each of the parties to this Agreement hereby agrees that the state and federal courts of the State of New York shall have jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein). To the extent permitted by law, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement. Each of the parties waives any claim that New York is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section 12.12 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)    Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each party hereto (i) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that the other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

12.13   Remedies. It is specifically understood and agreed that any Breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such Breach, and that, in addition to any other remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by law). Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy will not preclude the exercise of any other.

12.14   Notices. All notices, requests and other communications hereunder must be in writing, and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (registered or certified mail) to the parties at the following addresses or facsimile numbers:

| | |
|---|---|
| If to Platinum or Purchaser: | Presstek, Inc.<br>55 Executive Drive<br>Hudson, NH 03051-4903<br>Attention: James Scafide, Esq.<br>Phone: (603) 595-7000<br>Facsimile No.: (603) 594-8575 |
| with a copy to: | McDermott Will & Emery LLP<br>28 State Street<br>Boston, MA 02109<br>Attention: John J. Egan III, P.C.<br>Phone: (617) 535-4000<br>Facsimile No.: (617) 535-3800 |

56

|  |  |
|---|---|
| If to Parent or Silver<br>(prior to the Closing): | Paragon Corporate Holdings, Inc.<br>c/o Squire, Sanders & Dempsey L.L.P.<br>4900 Key Tower<br>127 Public Square<br>Cleveland, OH 44114<br>Attention: David A. Zagore, Esq.<br>Phone: (216) 479-8610<br>Facsimile No.: (216)-479-8780 |
| with a copy to: | Squire, Sanders & Dempsey L.L.P.<br>4900 Key Tower<br>127 Public Square<br>Cleveland, OH 44114<br>Attention: David A. Zagore, Esq.<br>Phone: (216) 479-8610<br>Facsimile No.: (216)-479-8780 |
| with a copy to: | MHR Fund Management LLC<br>40 West 57th Street<br>33rd Floor<br>New York, New York 10019<br>Attention: Hal Goldstein, Esq.<br>Phone:<br>Facsimile No.: (212)-262-9356 |
| with a copy to: | Clifford Chance US LLP<br>31 West 52nd Street<br>New York, New York 10019<br>Attention: Alan M. Christenfeld, Esq.<br>         Richard D. Pritz, Esq.<br>Phone: (212) 878-8220<br>Facsimile No.: (212)-878-8375 |

All such notices, requests and other communications will (i) if delivered personally to the address as provided in this Section 12.14, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section 12.14, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above to the address as provided in this Section 12.14, be deemed given upon receipt (in each case, regardless of whether such notice is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this Section 12.14). Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

12.15   Time is of the Essence. The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

12.16   Counterparts. This Agreement may be executed in counterparts, each of which will be an original as regards any party whose name appears thereon and all of which together will constitute one and the same instrument. This Agreement will become binding when one or more

57

A103

counterparts hereof, individually or taken together, bear the signatures of all parties reflected hereon as signatories.

[Signature Page Follows]

BST99 1394460-27.069646.0011

A104

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement as of the date first above written.

PRESSTEK, INC.


By:_____
    Name:
    Title:


SILVER ACQUISITIONS CORP.


By:_____
    Name:
    Title:


A.B. DICK COMPANY


By:_____
    Name:
    Title:


PARAGON CORPORATE HOLDINGS, INC.


By:_____
    Name:
    Title:

EXHIBITS AND SCHEDULES

<u>Exhibits</u>

Exhibit A       Mutual Release

Exhibit B       Tax Indemnity Agreement

Exhibit C       Registration Rights Agreement

<u>Schedules</u>

Schedule 1          Adjustment Amount

Schedule 9.19       Termination Matters

Schedule 12.10      Parent Expenses

Schedule 1

*"Adjustment Amount"* shall mean the dollar amount determined as set forth in this Schedule 1:

1.     The sum of Silver's Cash (excluding any cash held pursuant to the Harris Escrow Agreement), Accounts Receivable, Inventory, Prepaid Expenses and Other Current Assets (collectively, "Assets");

minus

2.     The sum of Silver's Accounts Payable, Accrued Liabilities, Customer Advances, Other Current Liabilities (collectively, "Liabilities").

The categories of Assets and Liabilities referenced in this Schedule 1 correspond to the categories set forth in the Internal Management Report contained in the Silver Financial Statements (the "Base Balance Sheet"), and the Assets and Liabilities shall be categorized in a manner consistent with the Internal Management Report and in accordance with GAAP. Notwithstanding the foregoing, all checks for which Silver is an obligor and which remain outstanding shall constitute Accounts Payable for purposes of the Adjustment Amount. To the extent the Liabilities include any accrued but unpaid costs for (i) the reduction in force by Silver of approximately 73 employees commenced on or about January, 2004, up to a maximum amount of $85,912.06 and/or (ii) severance payments resulting from the actions required by Section 9.19 of the Agreement up to a maximum of $700,000, such amounts shall be deducted from the Liabilities. For greater clarity, no amounts due to the holders of the Series B Notes shall be deducted from or added to the Adjustment Amount.

**SCHEDULE 9.19**

Prior to closing, Silver and Parent shall have terminated Brian Longe as CEO of Silver and Kenneth Newton as COO of Silver. In connection with such terminations, Silver shall have entered into separation agreements with such individuals, which shall include, without limitation, releases of Silver, Parent, Platinum, MHR and Purchaser.

## **SCHEDULE 12.10**

Parent Expenses

1.     Candlewood                                          $300,000

2.     Any Premium for Directors and Officers Insurance

3.     Fees and expenses in excess of                      $500,000

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------X
In re:                                    :        CASE NO. 04-12002
                                          :
A.B. DICK CO., *et al.*                   :        Chapter 11
                                          :
                    Debtors.              :        Hearing Date:
                                          :
------------------------------------------------X    Related to Docket No. 70

### SUPPLEMENTAL OBJECTIONS OF MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC TO THE MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund

Management LLC (collectively, "MHR"), the largest unsecured creditor of A.B. Dick Co.

("ABD") and Paragon Corporate Holdings, Inc. ("Paragon," and collectively with ABD,

Multigraphics, LLC and Interactive Media Group, Inc., the "Debtors"), by their undersigned

counsel, hereby submit these supplemental objections to the Debtors' motion, dated July 22,

2004, for entry of an order: (a) authorizing the sale of substantially all of the assets of ABD and

its wholly-owned subsidiaries free and clear of liens, claims and encumbrances; (b) authorizing

assumption and assignment of certain unexpired leases and executory contracts; and (c) granting

related relief (the "Motion").[1]

### PRELIMINARY STATEMENT

1.      The Debtors are apparently proceeding Monday with an auction of their assets,

having recklessly denied two alternative bidders – ComVest Investment Partners II, LLC and

Harbor Partners – the necessary time to conduct due diligence or negotiate a potentially better

---

[1]      Submitted herewith is the Declaration of Michael M. Fay ("Fay Decl."), sworn to on October 29, 2004.

deal with the Debtors. This decision is particularly egregious given that if ABD's assets are sold to Presstek, Inc. ("Presstek"), the unsecured creditors will receive nothing and will lose the biggest estate asset available to satisfy their claims: the Debtors' cause of action against Presstek under the June 16, 2004 Stock Purchase Agreement (the "Stock Purchase Agreement" or "SPA"). The Debtors agree that they have this cause of action, and agree that it is valuable, but appear to be choosing simply to squander it because Presstek has leveraged them into a corner.

2.     Since July 2004, the parties to this proceeding have conducted discovery regarding Presstek's bid to purchase the assets of ABD, and that discovery has revealed both unlawful conduct, as well as startling acts of bad faith, by Presstek. Most significantly, discovery has demonstrated that Presstek (which estimated the actual cost of the SPA at $89.1 million and its present Asset Purchase Agreement ("APA") at $45 million, for a $44.1 million savings) used pretext and financial coercion to force ABD into a much less advantageous deal.

3.     As a result, Presstek is attempting to purchase ABD's assets for only $40 million under the agreement before the Court. However, only weeks before it forced this agreement on the Debtors, Presstek had agreed in the SPA to purchase ABD's stock – thereby assuming all of ABD's liabilities as well – for $44.1 million, literally double what it is now paying. In short, Presstek is seeking to do that which all unscrupulous predators desire: (1) offer true value, (2) leverage your quarry into a corner, (3) cut your offer in half, (4) "lend" the quarry just enough money to set an aggressive deadline until financing terminates (here November 14), and (5) steal the company. Here, Presstek's brazenness adds a release to itself of the approximately $30 million claim against it owned by these estates.

4.     In addition, only days before ABD filed for bankruptcy – and the coerced terms of the APA were first made public – Presstek inexplicably cancelled a joint Presstek/ABD development contract, which contract was undeniably a valuable asset of ABD. Presstek's

2

conflicting excuses for canceling this contract – which range from ABD's failure to make

payments to a concern about Presstek's intellectual property rights – do not withstand scrutiny.

Instead, the apparent intention of Presstek was best articulated by ABD's former CEO:

> Q.   . . . Other than the insolvency of A. B. Dick, did anyone at PressTek ever
> explain to you any other reasons why PressTek would have an economic
> interest in pulling the consumables for this [joint development] product?
>
> A.   I have my opinions as to why.  No one expressed it.
>
> Q.   What is your opinion?
>
> A.   My opinion is it limits the price of the company in the auction.
>
> Q.   And when you say the auction, you are talking about the 363 sale?
>
> A.   Yes.

(10/7/04 Deposition of Brian Longe ("Longe Dep.") at 221:21-222:9, **Fay Decl. Exh. A.**)

5.    In the Motion, the Debtors seek authorization for the sale of ABD's assets to

Presstek under 11 U.S.C. § 363(b), as well as a determination that Presstek is a "good faith

purchaser" under 11 U.S.C. § 363(m).  The facts set forth below preclude any such authorization

for at least two reasons.  First, a sale to Presstek has no sound business justification, as required

by Section 363(b) of the Bankruptcy Code.  Any such sale would extinguish the only real asset

available to unsecured creditors – *i.e.*, the estate's $30 million cause of action against Presstek

for breach of the SPA.  In fact, in light of discovery, it is now clear that the bid procedures for

the sale of ABD's assets were misleading.  Those procedures required any qualified bid to

exceed $ 41.2 million, the sum of Presstek's $40 million offer and the APA's $1.2 million break

up fee.  However, the Debtors' action against Presstek is worth as much as $30 million, thus a

lower offer that preserves the claim against Presstek actually has greater value.  The need to

maximize assets of the Debtors' estates requires either (a) that Presstek's $40 million offer be

rejected and a new auction held with a refined definition of "qualified bid," or (b) if Presstek's

offer is approved, such approval exclude any release of Presstek for claims under the SPA.

6.      Second, the good faith requirement of Section 363(m) simply cannot be met here.

Presstek's conduct in breaching the SPA, coercing execution of the APA, using its position and

the information it acquired confidentially from the Debtors "to terminate" the valuable joint

development agreement, and then depriving the creditors of the Debtors' estates of tens of

millions of dollars cannot be viewed as a purchaser's "good faith" under any cognizable

interpretation of Section 363(m) of the Bankruptcy Code.

FACTS

## I.      The Stock Purchase And Escrow Agreements

7.      Presstek first approached ABD regarding a potential acquisition in July of 2003.

(10/14/04 Deposition of Frank Zaffino ("Zaffino Dep.") at 28:14-19, **Fay Decl. Exh. B**; July 1,

2003 Presstek email, **Fay Decl. Exh. O**.) Over the course of the next eleven months, Presstek

made various proposals to ABD, obtained financial information regarding ABD, conducted

analyses of ABD, and negotiated terms for a stock purchase, and at times an asset purchase

agreement, with respect to ABD. (*See* **Fay Decl. Exhs. O, P, Q, W, Y**; *see also* 10/20/04

Deposition Testimony of Moosa E. Moosa ("Moosa Dep.") at 127:6-22, **Fay Decl. Exh. C**.)

8.      These negotiations concluded with a final SPA, which was executed by ABD and

Paragon on June 16, 2004 and then placed into escrow. (SPA, **Fay Decl. Exh. S**.) The terms of

the SPA provided, among other things:

> (a)    Presstek would pay $20.1 million in cash and $24 million in Presstek
>        stock for the stock of ABD (SPA, § 2.2);
>
> (b)    The SPA was being executed based on ABD's warranties as to the
>        accuracy of its the financial statements as of March 31, 2004 (*id.*, § 3.7);

4

    (c)      A final set of ABD financial statements was to be prepared five days before closing, and should these final statements show a defined amount of financial deterioration, the purchase price would be adjusted (*id.*, § 2.3); and

    (d)      Prior to closing, ABD's indebtedness to its secured lender, Key Corporate Capital, Inc. ("Key Bank"), would not exceed $24 million or $26 million with Presstek's permission (*id.*, § 9.12).

The parties also agreed that the SPA would close in 30 days. (10/22/04 Deposition of Edward J. Marino ("Marino Dep.") at 134:19-135:21, **Fay Decl. Exh. E**; Moosa Dep. at 96:4-8.)

    9.    Presstek did not sign the SPA on June 16, 2004, purportedly because it wanted to avoid a reportable event. (*See* **Fay Decl. Exh. K.**) Instead, the parties agreed on the terms of an Escrow Agreement ("Escrow Agreement" or "Escrow"), whereby the SPA was to be escrowed for a short period, with Presstek as escrow agent. (Escrow Agreement, **Fay Decl. Exh. T.**) Both Presstek's CFO, Moosa, and CEO, Marino, testified that the Escrow Agreement, if fulfilled, bound Presstek to the SPA's terms. (10/25/04 Deposition Testimony of Moosa E. Moosa ("Moosa Dep. 2"), at 41:19-24, **Fay Decl. Exh. T**; Marino Dep. at 141:18-142:3.) By its terms, the Escrow Agreement provided that Presstek would sign and perform under the SPA after:

    (a)      Presstek directed its financial advisor to complete its financial diligence, obtained a fairness opinion and submitted the SPA to the Presstek Board for approval;[2] and

    (b)      Key Bank consented to the SPA and agreed to continue funding ABD through closing. (Escrow Agreement, §§ 3(a)-(b).)

---

[2]     Marino testified that as of June 16, 2004, the Presstek Board of Directors ("Presstek Board") had already approved the SPA, and thus it is unclear whether this condition was still necessary. (10/25/04 Deposition of Edward J. Marino ("Marino Dep. 2"), at 37:13-23; **Fay Decl. Exh. F.**)

Presstek was required to complete its obligations under the Escrow by June 25, 2004; Key

Bank's consent to the SPA and continued funding needed to be obtained by June 22, 2004. (*Id.*)

## II.    Presstek's Pretext For Terminating The SPA And Escrow Agreement

### A.    Despite Presstek's Claims To The Contrary, Key Bank Agreed To Continue Funding

10.    On June 22, 2004, in an email from its counsel to ABD, Paragon, and MHR

representatives, Presstek terminated the SPA and Escrow Agreement based on Key Bank's

purported failure to consent to further funding of ABD. (6/22/04 McDermott, Will & Emery

email, **Fay Decl. Exh. I.**) In fact, earlier in the day, Moosa of Presstek had sent a letter to

Michael Lugli ("Lugli") of Key Bank indicating that Key Bank's refusal to approve the SPA and

fund ABD through closing would terminate the SPA. (6/22/04 Moosa Letter to Lugli, **Fay Decl.

Exh. PP.**)

11.    *Key Bank, however, had responded to Moosa's letter and had agreed both to

approve the SPA and to fund ABD through the closing of that agreement.*[3] (6/22/04 Lugli letter

to Moosa, **Fay Decl. Exh. L.**) In so consenting, Key Bank had only three conditions, all of

which had already been agreed to by the parties:

(a)    that any Presstek due diligence be completed by June 28 (the Escrow

required completion by June 25);

---

[3]    On Thursday, June 17, 2004, Marino, Moosa and James Scafide ("Scafide"), Presstek's General Counsel,
met with Lugli of Key Bank in Cleveland, Ohio. (10/6/04 Deposition of Michael Lugli ("Lugli Dep."), at 36:3-19,
Fay Decl. Exh. G.) At that meeting, Key Bank advised that it was unwilling to fund the SPA transaction through
closing and suggested that Presstek provide the necessary funding. (Lugli Dep. at 39:3-41:20.) However,
subsequently, Robert Tomsich – a long time customer of Key Bank and the President and CEO of NESCO, Inc., the
majority shareholder of Paragon – agreed to pledge cash collateral to Key Bank to secure a $2 million over-advance
to ABD (Lugli Dep. at 23:11-13, 41:21-42:10), and on the following Monday, June 22, 2004, Key Bank agreed to
fund ABD through closing.

(b)     that Presstek consent to the increase of ABD's indebtedness to Key Bank

to $26 million (the maximum allowed by the SPA was $ 26 million);[4] and

(c)     that the closing occur by July 16, 2004, 30 days after the escrowing of the

SPA (the parties had already agreed to close in 30 days).

12.     The consensus was that Key Bank had consented to further funding.  Lugli of Key

Bank obviously believed he had consented to funding ABD through closing.  (Lugli Dep. at

55:3-9.)  ABD's CEO, Brian Longe ("Longe") testified that Key Bank had continued funding

and Paragon Director, Frank Zaffino ("Zaffino") testified that he believed Presstek's termination

email was sent simply because Presstek had not seen Key Bank's consent letter.  (Longe Dep. at

217:16-218:5; Zaffino Dep. at 230:1-21.)  In addition, Presstek CFO Moosa testified that Key

Bank agreed to "one element" – funding through closing – and Presstek consultant and present

employee, Michael McCarthy ("McCarthy"), testified that Moosa told him that Key Bank had

consented to funding.  (Moosa Dep. at 92:10-18; 10/20/04 Deposition of Michael McCarthy

("McCarthy Dep.") at 96:17-97:3, **Fay Decl. Exh. H**.)  Even Presstek's CEO, Marino, admitted

that Key Bank had consented to $2 million in additional funding.  (Marino Dep. at 24:17-26:9.)

13.     Presstek, however, refused to accept this consent.  As Lugli of Key Bank testified,

after receiving Key Bank's letter, Presstek representatives called Lugli and stated that despite

Key Bank's consent, Presstek was taking the position that unless Key Bank signed the draft

"Consent and Agreement" ("Consent") appended to the Escrow Agreement, Key Bank's consent

was not sufficient.  (Lugli Dep. at 49:5-18.)  This position – which was a ludicrous form over

substance argument – was an obvious pretext for abandoning the SPA.  Indeed, Moosa's June 22

---

[4]     As of June 16, 2004, ABD's indebtedness to Key Bank was just over $22 million; as of June 18, 2004, with
new funding from Key Bank, it was just over $24 million.  (**Fay Decl. Exh. QQ**, p. 2; **Exh. RR**, p. 2.)

letter to Lugli of Key Bank never once mentioned a requirement that a specific form of "Consent" be executed. **(Fay Decl. Exh. PP.)**

14.    Nonetheless, even after receiving the unambiguous consent letter from Key Bank, Marino told his fellow Board members that Key Bank had "refuse[d] funding through closing." (6/29/04 Marino email, **Fay Decl. Exh. V.**)  As Lugli testified:

> Q.    At some level, Mr. Lugli, did you view [the June 22 Moosa] letter [claiming that Key Bank had not consented] as an attempt by Presstek to get out of a bad deal?
>
> A.    Absolutely.

(Lugli Dep. at 46:11-14.)

15.    Interestingly, the June 22 email in which Presstek ultimately declared the Escrow Agreement terminated was sent by Presstek attorney James Goldsmith.  **(Fay Decl. Exh. I.)** That same attorney had, only days before on June 15, 2004, conceded that "[f]rom my perspective, obtaining the bank's [Key Bank's] 'consent' means they approve of the transaction contemplated by the Purchase Agreement . . . ."  (6/15/04 Goldsmith email, **Fay Decl. Exh. J.**) Under Goldsmith's June 15 interpretation of "consent," Key Bank's consent was clearly obtained on June 22.

**B.    Presstek Failed to Perform Its**
**Obligations Under The Escrow Agreement**

16.    By its own admission, Presstek never really commenced – much less completed – the financial diligence contemplated by the Escrow Agreement.[5]  (Moosa Dep. at 54:4-7.) Moreover, Presstek never sought the fairness opinion required by the Escrow, or held the

---

[5]    Despite close to a year of due diligence, Moosa testified that as of June 16, 2004 – the date that the parties escrowed the SPA – there was still "extensive" due diligence to be completed. (Moosa Dep. at 52:9-13.)  This, of course, is not credible on its face. Pursuant to the terms of the Escrow Agreement, any final financial diligence had to be completed by June 25, 2004 – nine days later.  (Escrow, § 3; Moosa Dep. at 52:14-53:2.)  Despite this tight schedule, Presstek conducted no due diligence on eight of those days – June 17, 18, 19, 20, 22, 23, 24 or 25.  (Moosa Dep. at 54:4-57:6.)  Because it needed no more diligence.

Presstek Board meeting that might have still been necessary under that Agreement. (Moosa Dep. 2 at 48:8-14; Marino Dep. 2 at 37:6-38:12.) Apparently, with the pretext and outright misrepresentation that Key Bank was refusing to fund, Presstek believed it could walk away from these obligations.

### III.    Presstek Coerces ABD To Execute The APA

17.    Presstek's pretextual termination of the SPA and Escrow Agreement placed ABD in a grave position. As Zaffino testified, ABD had "very little" negotiating power over the APA. (Zaffino Dep. at 218:9-12.) ABD director Jim Wert similarly noted that the Debtor "companies had no leverage in negotiations with PT [Presstek]." (**Fay Decl. Exh. TT.**)

18.    Presstek took full advantage of the situation. In a telephone call that likely took place even before Presstek "terminated" the Escrow and SPA,[6] Presstek representatives told ABD that a new price of $40 million was the most Presstek would pay. (Zaffino Dep. at 81:3-13.) By June 23, 2004 – *only one day after Presstek terminated the Escrow and SPA* – Presstek had prepared a term sheet setting forth an incredibly advantageous deal: a purchase of only ABD's assets for only $40 million. (**Fay Decl. Exh. KK.**) Zaffino offered this opinion:

> Q.    [L]et me ask you if you personally believed Moosa's statement that the deal was changing because the company was no longer what they thought the company was as opposed to simply the fact that they now had the leverage to do what they wanted to do? I'm asking you for your personal belief.
>
> MR. PHILLIPS: Objection. Go ahead.
>
> A.    I think Moosa is a very shrewd negotiator, and I would not be surprised if, in fact, this was part of his methodology.

(Zaffino Dep. at 225:20-226:6.)

---

[6]    Zaffino received a "late night" call from Moosa who "suggested" that in order for the deal to go through, ABD would have to accept a reduced price of $40 million and agree to file for Chapter 11 bankruptcy protection, if ABD "had the stomach for it." (Zaffino Dep. at 80:19-81:8.) Zaffino also testified that the call probably took place before June 22. (*Id.* at 210:25-211:19.)

19.     Presstek's own internal calculations showed that the total cost of this new deal was over $41 million less than the SPA. (**Fay Decl. Exh. U, p. 1.**) As Marino told the Presstek Board, the new deal:

- "yields a significant financial advantage to Presstek," and

- is structured so that "[m]any liabilities are 'left behind.'"

(6/26/04 and 6/29/04 Marino emails, **Fay Decl. Exhs. R, V.**)

20.     With no bargaining power, ABD accepted the deal and, as required by the express terms of the APA, filed for bankruptcy on July 13, 2004. Notably, ABD survived from June 16 to July 13 – only three days shy of the 30 day closing period for the SPA – requiring approximately $2 million in additional financing from Key Bank, to which Key Bank had earlier agreed. (Lugli Dep. at 40:3-13, 43:3-15.)

## IV.    Presstek's Spurious Rationale For The APA

21.     Although Presstek never created any written financial model justifying a $40 million price for the assets of ABD (Moosa Dep. at 134:22-135:9), or the one-day dramatic "reversal" causing ABD to lose half of its value,[7] Presstek contends that during a single meeting with ABD officials on June 21, 2004, it learned that ABD had "hidden" financial information from it, and that ABD was in worse financial condition than Presstek believed. (Marino Dep. at 82:7-83:15; **Fay Decl. Exh. BB**.) This meeting was originally scheduled to take place in May 2004, but was cancelled by Presstek. (Marino Dep. at 52:7-18; **Fay Decl. Exhs. FF, GG.**)

22.     Presstek's contention – which, even if true, could never support a $40 million reduction in Presstek's commitment – does not withstand scrutiny. First, as ABD officials testified, and as the documents produced make clear, Presstek was receiving information about

---

[7]     According to Moosa, the $40 million figure was the result of "an analysis of the business, as we saw it, on the 21st of June" and that the $40 million number was the result of a "mental calculation" that he performed after June 21. (Moosa Dep. at 103:15-104:19.)

ABD, and conducting due diligence of ABD, for at least ten months prior to the execution of the SPA and Escrow Agreement on June 16, 2004. (**Fay Decl. Exhs. M, N, AA;** Moosa Dep. at 37:1-38:13; Marino Dep. at 93:13-94:13; Longe Dep. at 102:19-105:7, 199:18-200:10.) Presstek CFO Moosa was responsible for coordinating due diligence and was assisted by a team of Presstek personnel, outside auditors and lawyers. (Moosa Dep. at 49:3-22.)

23.    Paragon Director Zaffino testified that Presstek made repeated requests for financial information, often requesting the same data more than once. (Zaffino Dep. at 84:16-85:2.) Indeed, as of June 16, 2004, Presstek had copies of ABD's financial information through the end of May 2004. (Moosa Dep. at 127:6-22.) It is simply impossible that Presstek was not fully cognizant of the exact state of ABD's financial health.

24.    When asked what "new" information Presstek learned on June 21, 2004, Presstek witnesses identified (a) a liquidity crisis at ABD resulting from an erosion of ABD's borrowing base, and/or (b) projected lower ABD revenues/profitability. (Moosa Dep. at 134:2-7; Marino Dep. at 42:2-24, 53:10-54:19.) Of course, the liquidity crisis at ABD was well known and was the reason that the Escrow Agreement was conditioned on further funding from Key Bank. In fact, Presstek had received various communications prior to the June 16, 2004 execution of the SPA and Escrow Agreement which made it clear that Key Bank was concerned about its loan with ABD and that ABD was short on cash. (**Fay Decl. Exhs. HH, II, JJ**; *see also* 10/28/04 Deposition of James Wert at 115-116, Fay Exh. SS.)

25.    As for revenues, the hard data in Presstek's possession did not show a dire change in ABD. In fact, through May 2004, ABD had actual revenues that were averaging more than the annual revenue projections included in forecasts prepared by Presstek's financial advisor in April and May. (**Fay Decl. Exh. X**, p. 2 (April); **Exh. Z**, p. 3 (May) **Exh. CC**, p. 3 (post-June 21).) Nonetheless, in justifying the ridiculously low price of $40 million to its Board, Presstek

11

officials predicted that from May 2004 to the end of the year, ABD would average less than $10 million in revenues a month. (**Fay Decl. Exh. CC,** p. 3.) This forecast was unreasonably low, and – as Marino conceded – not borne out by real data for the months following May 2004. (Marino Dep. at 70:24-71:13.)

26.    Clearly, Presstek knew the facts but chose unlawfully to terminate the Escrow and SPA to negotiate a vastly better deal for itself. Its conduct: (a) gives ABD, among others, a valuable cause of action for the lost value of the SPA, and (b) demonstrates that Presstek did not act in good faith and could never be adjudicated a good faith purchaser under 11 U.S.C. § 363(m).

## V.    Presstek Terminated A Valuable ABD Asset Immediately Prior To The Filing of The APA And Announcement Of The Section 363 Auction

27.    In addition to breaching its obligations under the SPA and Escrow Agreement, on or about July 8, 2004, Presstek also acted to deprive ABD of a valuable asset – *i.e.,* its October 2003 joint development agreement ("JVA") with Presstek for certain metal printing plate-making technologies known by the tradenames "Vector" or "Freedom." (Moosa Dep. 2 at 16:18-17:12; Marino Dep. at 104:5-105:2; **Fay Decl. Exhs. DD, NN.**) On July 8, Presstek terminated the JVA and pulled its component parts from the Vector and Freedom products. (*See, e.g.,* Moosa Dep. 2 at 16:18–19:9.)

28.    For example, the "Vector TX52" was a laser imaging device for metal plates as opposed to polyester plates; it was "a perfect union" of ABD's proprietary materials handling technology and Presstek's proprietary laser technology. (Zaffino Dep. at 91:8-92:12.) The Vector TX52 was regarded as a technological breakthrough for the printing industry because it is environmentally clean and has very good image quality. (*Id.* at 197:4-198:9.) In addition, the fact that the Vector TX52 used a metal plate as opposed to a polyester plate was of great

12

significance for ABD, in that it opened up a whole new market for ABD whose customers

primarily used electrostatic or film-based plates. (*Id.* at 198:10-20.)

29.    As former ABD CEO Longe testified:

Q.    . . . In discussing this plate-making laser technology and the fact that
PressTek pulled the engine or the laser for the technology, how does that
impact A. B. Dick's ability to market that product?

A.    It severely impacts it because you have to go and find a new technology or
a new partner to provide you with the engine that you need to make a
plate.    So now it is retrofittable to other technologies because we
purposely designed the product to do that.  However, it does set back the
development and does set back the company.

Q.    . . . And the joint marketing of this product would have been beneficial to
both A. B. Dick and PressTek, correct?

A.    It has been beneficial to both.  It had a huge impact at the trade show.  One
of the industry analysts called it the Holy Grail of printing, and it is a fine
product and a perfect fit for the market, and it expands A. B. Dick's
market to a global market which would allow it to rebuild its distribution
channels . . . .

(Longe Dep. at 220:21-221:20.) Zaffino testified that the JVA with Presstek would be of interest

to a potential purchaser of ABD.  (Zaffino Dep. at 199:18-21.)

30.    Why then would Presstek cancel the agreement?  Presstek's CFO contended that

it was because ABD could not make payments to Presstek (Moosa Dep. 2 at 17:17-18:11) – *i.e.,*

the liquidity crisis that was well known to everyone and had existed for some time prior to July

2004. Presstek's CEO offered a conflicting reason, that was to protect Presstek's intellectual

property (Marino Dep. at 104:20-109:24), although he could not explain how any bankruptcy of

ABD could put such rights at risk. Former ABD CEO Longe had a different opinion: that

Presstek was lowering the value of ABD in anticipation of the Section 363 auction.  (Longe Dep.

at 221:21-222:9.)

31.    Longe's opinion is bolstered by the fact that Presstek – if it succeeds in acquiring

the assets of ABD – intends to continue developing and marketing the Freedom and Vector

13

products, products Presstek has openly acknowledged are assets. (McCarthy Dep. at 41:24-43:7.)

32.    Presstek's avaricious actions violate business norms even if they had been conducted outside of this Court. However, notwithstanding whether any other entity seeks to buy ABD, this Court – a court of equity that must scrutinize the purchasers that come before it for clean hands and honest intentions and actions – simply cannot as a matter of law approve Presstek's conduct here much less grant it the demanded release. Further, that the unsecured creditors will receive nothing – *nothing* – from this sale compellingly requires denial.

**ARGUMENT**

I.    **ABD's Breach Of Contract Claim Against
      Presstek Is A Valuable Estate Asset And Should
      Not Be Released Through An 11 U.S.C. § 363 Sale**

33.    A debtor's sale of property of the estate under Section 363(b) must be supported by some "articulated business justification other than the appeasement of major creditors." *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983). *See also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions") (citing *In re Lionel,* among other cases). Further, the sale must be "in the best interest of the estate, *i.e.,* it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length' transaction." *In re Wilde Horse Enters., Inc.,* 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) (*citing,* among other cases, *In re Delaware & Hudson Ry. Co.,* 124 B.R.

14

169, 176-177 (D. Del. 1991) and *Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335-336 (Bankr. D. Del. 1987)).[8]

34.     No business justification exists here for approving the APA.  The APA will reward Presstek for its unscrupulous conduct and then release any claim of the Debtors against Presstek under the Escrow and SPA.  The unsecured creditors – who will receive nothing under the APA – are clearly better off if the Debtors preserve their claim against Presstek.

35.     Significantly, Presstek's anticipated defenses to a breach of contract claim under the Escrow and SPA are without merit.  First, Key Bank's failure to sign the Consent was not a material breach of the Escrow Agreement because it did not go to the "root of the agreement" between the parties.  *Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997).  Under New York law – which governed the SPA and Escrow Agreement – a material breach is one that goes to "the essence of the contract . . . [and] defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected.'" *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (quoting FARNSWORTH ON CONTRACTS § 8.16 (3d ed. 1999)); *Zim Israel Navigation Co. v. Indonesian Exps. Dev. Co.*, 1993 U.S. Dist. LEXIS 3513, *6-7 (S.D.N.Y. Mar. 24, 1993) ("[T]he question of whether a breach is 'total' or material is an alternate formulation of the question of whether a breach 'goes to the essence' of the contract").  It is indisputable that Presstek lost nothing that it justifiably expected from Key Bank's consent to further funding and that Key Bank's June 22 consent letter – which promised funding to ABD up to the amount

---

[8]     The level of required judicial scrutiny increases where, like here, the proposed Section 363 sale includes substantially all of the debtor's assets. *See* 3 COLLIER ON BANKRUPTCY, ¶ 363.02[4], at 363-19 (15th ed. 2004) ("Because there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court"). *See also In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (Section 363 sale rejected because, among other things, "[i]t is particularly disturbing that the proposed sale price in the Purchase Agreement of July 20, 1987, is a twenty-five (25%) percent reduction from the $640,000.00 price offered on June 30, 1987, less than three weeks before, by the same purchaser").

allowed under the terms of the SPA through the agreed-upon 30 day closing period – was, in

essence, what the parties wanted from Key Bank.

36.    The decision in *Frank Felix Assoc.*, *supra*, is instructive here. In that case, the

Second Circuit Court of Appeals held that the imperfect performance of the defendant under a

settlement agreement was not a material breach because – like Presstek here – the plaintiff was

seeking to use the defendant's minor deviations from the agreement to void their entire

arrangement. Although the defendant breached the settlement agreement by missing the

performance deadline, the Second Circuit reasoned that the appellee's breach should be viewed

"in the light of its substantial compliance with its other obligations under the accord." 111 F.3d

at 289. The court reasoned that materiality depends on all of the facts and circumstances,

including "the extent to which the injured party will be deprived of the benefits reasonably

expected, the extent to which the injured party can be adequately compensated for its loss, and

the good faith of the breaching party." *Id.* (*citing* RESTATEMENT (2d) OF CONTRACTS, § 241

1981).

37.    Further, Presstek's failure to complete financial diligence, prepare a fairness

opinion and hold a Board meeting (that may or may not have been needed, given the Board's

prior approval of the SPA) cannot possibly provide Presstek with any defense. Presstek had a

duty to "put forth every reasonable endeavor" to complete its obligations under the Escrow

Agreement, *Entin v. Bristol*, 368 F.2d 695, 701 (2d Cir. 1966), and having failed to do so, it

cannot now use those obligations as a defense. *Young v. Hunter*, 6 N.Y. 203, 207 (N.Y. 1952) (it

is a "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its

non-performance has been caused by himself"); *Rachmani Corp. v. 9 East 96th St. Apartment

Corp.*, 211 A.D. 2d 262, 270, 629 N.Y.S.2d 382, 387 (1st Dep't 1995), ("[T]he failure of the

condition may not be set up as a defense to the underlying obligation under the contract where

16

the party charged with the duty to fulfill the condition has failed to make a good-faith effort to bring it about"); *cf. Sidney Roberts v. H. Gin Realty Corp.*, 185 A.D. 2d 209, 210; 586 N.Y.S. 2d 264, 265 (1st Dep't 1992) ("[O]ne who frustrates the other party's fulfillment of a condition precedent by unilateral termination cannot avail himself of that condition precedent as a defense").

38.     The decision in *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.* ("*Apogee*"), 807 F. Supp. 1007 (S.D.N.Y. 1992) is instructive here.  In that case, defendant Apogee defended a breach of contract action by arguing that several condition precedents – including the required approval by the supervisory board of its parent company – had not occurred.  The court rejected these defenses:

> [A] party may not rely on another party's failure to perform a condition precedent to discharge that party's obligations under a contract where that party frustrated or prevented the occurrence of the condition. *Sunshine Steak, Salad & Seafood, Inc. v. W. I. M. Realty, Inc.*, 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (3d Dep't 1987); *Kooleraire Service & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971). The doctrine of prevention "excuses a condition precedent when a party wrongfully prevents that condition from occurring." *In re Gulf Oil*, 725 F. Supp. at 737 n.9. . . .

> APOGEE had an obligation to act in good faith and to act in a manner consistent with the fulfillment of the conditions precedent set forth in the January 9, 1990 contract. The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing implicit in every contract. *In re Gulf Oil*, 725 F. Supp. at 735-38; *Bass v. Sevits*, 78 A.D.2d 926, 433 N.Y.S.2d 245 (3d Dep't 1980). The implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate the occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence. *In re Roman Crest Fruit, Inc.*, 35 Bankr. 939 (Bankr. S.D.N.Y. 1983). . . .

> Applying the implied obligation of good faith and fair dealing and the prevention doctrine to this case, the court finds that all four of the conditions precedent in the January 9, 1990 contract were either satisfied or prevented from occurring by APOGEE's bad faith. . . .

* * *

17

A126

> The fourth condition precedent required approval of the contract by KLM's [APOGEE's parent company] Supervisory Board. This condition is excused by APOGEE's failure to seek this approval in good faith. . . .

*Id.* at 1022-1024.

39.    The Debtors' cause of action against Presstek is the only real asset available to unsecured creditors and should be preserved. Indeed, when the value of this claim is fully considered, the marketing of the auction of ABD's assets was misleading, requiring at least a $41.2 million offer to be a "qualified bid" where a lower offer would have provided the estate with greater value by maintaining the claim against Presstek. Accordingly, as alternatives to rejecting the Presstek offer, this Court could (a) require a new marketing period with a more accurate definition of qualified bid, or (b) allow Presstek to proceed with its purchase of ABD's assets, but only with the withdrawal of the proposed release of the Debtors' claims against Presstek under the APA.

## II.    Presstek's Conduct In Coercing ABD Into The APA Precludes A Finding Of Good Faith Under 11 U.S.C. § 363(m)

40.    Under 11 U.S.C. § 363(m), this Court cannot authorize the proposed sale of ABD's assets to Presstek without first finding that Presstek is a "good faith" purchaser. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 (3d Cir. 1986). Bad faith exists where a party's conduct in connection with the sale amounts to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* at 147 (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Even where "the conduct in question was alleged to have begun before the bankruptcy proceedings," the "relevant inquiry" is "whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci, Inc.)*, 126 F.3d 380, 390-391 (2d Cir. 1997). Due to

18

the absence of a bright-line test for good faith, the determination is based on the facts of each

case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re*

*Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quotation omitted).

41.     Here, Presstek's conduct in refusing to comply with the terms of the SPA and

Escrow Agreement, and using financial coercion to obtain an unfairly advantageous deal through

the terms of the APA, is clear bad faith.

**III.     As An Alternative To Denying The Motion,
          This Court Could Adjourn The Sale Hearing To
          Allow A Reasonable Period Of Time For
          Negotiations With The Two Additional Bidders**

42.     The alternative bids received by the Debtors for ABD's assets – from ComVest

Investment Partners II, LLC ("ComVest") (**Fay Decl. Exh. MM**) and Harbor Partners

("Harbor") (**Fay Decl. Exh. LL**) – should be fully explored before any deal is consummated

under the terms of the APA.  For example, in its initial offer, Harbor expressly preserves the

Debtors' claim against Presstek for breach of the SPA and Escrow Agreement.  (**Fay Decl. Exh.**

**LL.**)  If a deal could be negotiated that offers the same or greater value as the APA, and

maintains the Debtors' valuable breach of contract claim against Presstek – the Debtors must

explore that transaction  before the unsecured creditors are left with nothing.

43.     Accordingly, as an alternative to denying the Motion, this Court could adjourn the

November 2, 2004 hearing currently set for consideration of the Motion to allow the Debtors and

interested parties to determine whether a better deal can be negotiated.  This adjournment would

not prejudice the Debtors or their secured creditors and will benefit the unsecured creditors

significantly.

A128

## CONCLUSION

For the foregoing reasons, the Motion to approve a sale of ABD's assets to Presstek should be denied or, alternatively, consideration of the Motion should be adjourned for a reasonable period of time to allow for negotiations with other bidders for ABD's assets.

Dated: October 29, 2004

LANDIS RATH & COBB LLP

Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

David S. Rosner
Michael M. Fay
Ronna G. Jackson
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York  10019
(212) 506-1700

Counsel to MHR CAPITAL PARTNERS LP,
MHR INSTITUTIONAL PARTNERS LP,
MHRM LP AND MHR MANAGEMENT LLC

A129

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------X
In re:                                          :        CASE NO. 04-12002
                                                :
A.B. DICK CO., *et al.*                         :        Chapter 11
                                                :
                              Debtors.          :        Hearing Date:
                                                :
-------------------------------------------------------X        Related to Docket No. 70

DECLARATION IN SUPPORT OF SUPPLEMENTAL
OBJECTIONS OF MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL
PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC
TO THE MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY
ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED
SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES;
(B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED
LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

STATE OF NEW YORK       )
                        )  ss:
COUNTY OF NEW YORK  )

        Michael M. Fay, under the penalty of perjury, deposes and says:

        1.      I am a member of the firm of Kasowitz, Benson, Torres & Friedman LLP and an

attorney for MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR

Fund Management LLC (collectively, "MHR").  I submit this affidavit in support of MHR's

supplemental objections to the Debtors' motion, dated July 22, 2004, for entry of an order: (a)

authorizing the sale of substantially all of the assets of ABD and its wholly-owned subsidiaries

free and clear of liens, claims and encumbrances; (b) authorizing assumption and assignment of

certain unexpired leases and executory contracts; and (c) granting related relief.

        2.      Attached hereto are true and accurate copies of the following deposition

transcripts submitted in support of MHR's supplemental objections:

                A.      Pertinent pages of the Deposition Transcripts of Brian J.
                        Longe, sworn to on September 28 and October 7, 2004.

A130