B.      Pertinent pages of the Deposition Transcript of Frank D. Zaffino, sworn to on October 14, 2004.

C.      Pertinent pages of the Deposition Transcripts of Moosa E. Moosa, sworn to on October 20, 2004.

D.      Pertinent pages of the Deposition Transcripts of Moosa E. Moosa, sworn to on October 25, 2004.

E.      Pertinent pages of the Deposition Transcripts of Edward J. Marino, sworn to on October 22, 2004.

F.      Pertinent pages of the Deposition Transcripts of Edward J. Marino, sworn to on October 25, 2004.

G.      Pertinent pages of the Deposition Transcript of Michael V. Lugli, sworn to on October 6, 2004.

H.      Pertinent pages of the Deposition Transcripts of Michael McCarthy, sworn to on October 20, 2004.

SS.    Pertinent pages of the Deposition Transcripts of James W. Wert, sworn to on October 28, 2004.

3.      Attached hereto are true and accurate copies of the following documents produced by MHR and submitted in support of MHR's supplemental objections:

I.      Email from James H. Goldsmith re "Project Silver" dated June 22, 2004 – Bates Nos. MHR000001201 – MHR000001203.

J.      Email from James H. Goldsmith re "Re: Project Silver" dated June 15, 2004 – Bates Nos. MHR000002371 – MHR000002378.

K.      Email from James Scafide re "Re: Project Silver" dated June 15, 2004 – Bates Nos. MHR000002359 – MHR000002367.

4.      Attached hereto are true and accurate copies of the following documents produced by Presstek, Inc. and submitted in support of MHR's supplemental objections:

L.      Letter from Key Bank to Presstek dated June 22, 2004 – Bates Nos. P-00001– P-00002.

M.      Draft of Asset Purchase Agreement dated February 23, 2004 Bates Nos. p-00092-P-00093, P-0016-P00019.

N.      Draft of Stock Purchase Agreement dated April 27, 2004 – Bates Nos. P-02557 – P- 02563, P-02494 – P-02496.

O.      Email from Moosa E. Moosa re "Project Bright Silver" dated July 1, 2004 – Bates Nos. P-02800.

P.      Email from Edward J. Marino re "Some Basic Data on Project: Silver" dated July 10, 2003- Bates Nos. p-02801-P-02805.

Q.      Email from Edward J. Marino re "Silver Notes 23 Aug 03.doc" dated August 24, 2003 – Bates Nos. P-02841 - P-02846.

R.      Email from Edward J. Marino re "Silver Status-Very Confidential" dated June 26, 2004 – Bates Nos. P-34473.

S.      Pertinent pages of executed Stock Purchase Agreement dated on June 16, 2004– Bates Nos.- P-3802, P-03742, P-03751- P- 0373, P- 03758, 03790, 03793.

T.      Executed Escrow Agreement with signatures – Bates Nos. P-03851- P-03854, P-03722.

U.      Pertinent pages from Moosa E. Moosa's June forecast analysis – Bates Nos. P-03890- P-03891.

V.      Email from Edward J. Marino re "Materials for Tomorrow's Meeting" dated June 29, 2004 – Bates Nos. P-04238 – P-04239.

W.      Email from Edward J. Marino re "Confidential Prestek Proposal" dated November 7, 2003 – Bates Nos. P-05109-P-05112.

X.      Hill Street Forecast dated April 20, 2004 – Bates Nos. P-07121 – P-07138.

Y.      Email from Victor Mendoza re "Project Silver – Preliminary Due Diligence Request List" dated August 12, 2003 – Bates Nos. P-04546 – P-04548.

Z.      Hill Street Forecast dated May 25, 2004 – Bates Nos. P-08082 – P-08100.

AA.    Email from Greg Knipp re "Revenue/Margin/Sku Information" dated January 23, 2004 – Bates No. P-16179.

3

BB.   Email from Edward J. Marino re "Silver Deal Status" dated
      June 23, 2004 – Bates Nos. P-34410 – P-34411.

CC.   Hill Street Forecast dated June 30, 2004 – Bates Nos. P-
      35299 – P-35316.

DD.   Email from Jane Miller re "releases" dated July 8, 2004 –
      Bates Nos. P-36696 – P-36697.

5.    Attached hereto are true and accurate copies of the following documents produced

by Debtors and submitted in support of MHR's supplemental objections:

EE.   Letter from Presstek to Paragon, A.B. Dick and MHR dated
      April 12, 2004 – Bates Nos. ABD/P000281–
      ABD/P000282.

FF.   Memo from Frank Zaffino re "Due Diligence Specifics for
      the Week of 24 May" dated May 20, 2004 – Bates Nos.
      ABD/P000763– ABD/P000766.

GG.   Email from Michael McCarthy re "Today's update call"
      dated May 27, 2004 – Bates No. ABD/P001013.

HH.   Email from David Zagore re "Available" dated June 5,
      2004 – Bates Nos. ABD/P001886 - ABD/P001888.

II.   Email from David Zagore re "Key" dated June 8, 2004 –
      Bates Nos. ABD/P002109 - ABD/P002111.

JJ.   Email from David A. Zagore re "FW: Receivership
      Discussions" dated June 16, 2004 – Bates Nos.
      ABD/P003103– ABD/P003104.

KK.   Email from James Scafide re "Term Sheet" dated June 16,
      2004 – Bates Nos. ABD/P005088– ABD/P005092.

LL.   Fax of indication of interest from Harbor Partners dated
      October 27, 2004.

TT.   James W. Wert's notes on ABD Board Meeting, dated July
      8, 2004 – Bates Nos. ABD/P010321-ABD/P010323.

MM.   Fax of indication of interest from ComVest Investment
      Partners II, dated October 26, 2004.

NN.   Presstek Letter of Termination of Joint Development and
      Exclusive Supply and Distribution Agreement by Presstek
      dated July 8, 2004.

6.    Attached hereto are true and accurate copies of the following documents produced

by Key Bank Capital Corp., Inc. and submitted in support of MHR's supplemental objections:

OO.    Email from Michael V. Lugli re "Paragon" dated May 13,
2004 – Bates No. KEY01130.

PP.    Presstek Letter to Key Bank dated June 22, 2004 –Bates
Nos. KEY 01266 – KEY 01267.

QQ.    Letter from ABD to Key Bank dated June 23, 2004 – Bates
Nos. KEY01809 – KEY01813.

RR.    Letter from ABD to Key Bank dated June 17, 2004 – Bates
Nos. KEY01814 – KEY01818.

7.    Based on, among other things, the attached documents and the accompanying

supplemental objections, the Motion should be denied.

I declare under the penalty of perjury that the foregoing is true and correct.

s/ Michael M. Fay
Michael M. Fay

Dated October 29, 2004

5

# EXHIBIT A

1           C O P Y

2

          IN THE UNITED STATES DISTRICT COURT

3               DISTRICT OF DELAWARE

4

     In re A.B. DICK COMPANY, et al.)

5                                    )

                    Debtors,         )  04-12002(CGC)

6                                    )

     - - - - - - - - - - - - - - - - - - - - - - - - - )

7

8

9

10            DEPOSITION OF BRIAN LONGE

11               New York, New York

12           Tuesday, September 28, 2004

13

14

15

16

17

18

19

20   Reported by:

     Jeremy Frank, MPM

21   JOB NO. 165245

22

23

24

25

1                    Longe

2    we named it the Vector 52.  And it is a metal

3    plate maker, they give us a good price, we

4    launched it as an A.B. Dick product as a

5    stopgap.

6              We privately labeled the product,

7    they had a pricing that was already

8    established in the marketplace and launched as

9    an A.B. Dick product OEM'd with our name on

10   it.  And then we commenced product investment

11   to take our technology plate making and their

12   laser and create a new product with a lesser

13   price in the marketplace.  That product was

14   launched at Drupa in May of '04.

15        Q.    You said that you dusted off the

16   confidentiality agreement.

17              Did A.B. Dick enter into a

18   development agreement with Presstek?

19        A.    Yes we did, we reached a

20   development agreement.  They had some new

21   technology we helped incorporate into our

22   technology.  We created a product and over the

23   course of several months we worked on creating

24   an agreement to distribute the product that as

25   it was from Presstek and an agreement, a joint

Page 83

Longe

2   development agreement and acquired I believe

3   what is called Surefire Laser Technology.

4      Q.    And did you view that contract as

5   a valuable asset of A.B. Dick?

6      A.    Absolutely. We came out with a

7   product at Drupa that was priced at $59,000

8   which is significantly less than anything on

9   the marketplace for a metal place machine, and

10   was described in several ways as a fine

11   product at a fine price point.

12      Q.    So what is the status of the

13   agreement, joint development agreement with

14   Presstek today?

15      A.    I can't comment today because I

16   haven't worked at A.B. Dick since July 23 of

17   2004. But I believe on July 8th we received a

18   letter from Presstek's attorney executing a

19   clause that since A.B. Dick was insolvent they

20   canceled the contract.

21      Q.    What was the date?

22      A.    July 8th, I believe it was prior

23   to the bankruptcy.

24      Q.    Of 2004?

25      A.    2004.

1                          Longe

2        Q.    So a few days prior to the

3    bankruptcy and after they had completed due

4    diligence on the sale, they then called and

5    insolvency out and terminated the development

6    agreement?

7        A.    That's my understanding.  I got a

8    letter that stated that due to the insolvency

9    they were canceling the agreement.

10       Q.    And what do you think the impact

11   of canceling that agreement is on the value of

12   A.B. Dick?

13              MR. PHILLIPS:  Objection, calls

14          for speculation.

15       A.    I can't comment on valuation

16   because I'm, I don't know.  But I can tell you

17   that that product has worldwide implications

18   because it uses metal plates which have a

19   larger use outside of the United States and

20   the United Kingdom.  So it enabled A.B. Dick

21   to distribute to larger territories of the

22   country and this is an incredible addition to

23   the product line of A.B. Dick, a product that

24   was jointly involved.

25       Q.    Wouldn't that development

1                     Longe

2              MR. BRINK:  If you recall.

3         A.    I don't recall at this time, I

4    would have to review my board notes.

5         Q.    You testified earlier I believe

6    that you were constantly going to the board

7    and proposing initiatives and they were

8    constantly pushing you back.

9         A.    The board would meet quarterly, I

10   would propose the initiatives quarterly but I

11   would have weekly and/or daily conversations

12   depending on the time period with Frank

13   Zaffino who was chairman or John Fountain.

14   The dialogue was ongoing with those two

15   gentlemen.

16        Q.    In this time frame of July of

17   2003, what were you recommending to the

18   company, recommending to the board?

19        A.    The company had a severe liquidity

20   issue at that time, I believe we were making

21   our covenants to the bank and in the time

22   frame from the first meeting to this board of

23   directors meeting I turned over and made the

24   introduction of Ed Marino to Frank Zaffino to

25   talk about Presstek acquiring the

1                      Longe

2    organization.

3         Q.    Do you know whether that was

4    discussed at the July board meeting?

5         A.    We went to executive session, I

6    don't know whether it was discussed but in the

7    Cleveland airport while we were having dinner

8    waiting for our flights Frank asked me what I

9    thought of that.

10        Q.    You testified to that before?

11        A.    Correct.

12        Q.    Did Frank say it was discussed at

13   the board?

14        A.    I don't recall.

15        Q.    Do you recall anything else from

16   the conversation with Frank other than what

17   you have testified already?

18        A.    No.

19        Q.    What was your next involvement in

20   the proposed sale to Presstek?

21        A.    There was a lot of activity around

22   gathering data and documents with my staff and

23   myself during this time period relative to

24   refinancing and finding a new lending source

25   from what I was led to believe.  And so we

```
 1                        Longe
 2    prepared a lot of financial forecasts and
 3    gathered a lot of data and provided it to the
 4    Paragon board.
 5         Q.    Take me through that, I don't
 6    understand.
 7              We are talking about now summer
 8    and fall of '03, correct?
 9         A.    Correct.
10         Q.    During that time period what were
11    you asked to do by the Paragon board?
12         A.    I was asked to run the company but
13    we were getting a significant amount of
14    requests to provide data regarding the
15    company.
16         Q.    From whom were you getting the
17    requests to provide data?
18         A.    Frank Zaffino primarily.
19         Q.    And to whom were you, what kind of
20    data?
21         A.    Financial data, employee data,
22    general metrics about the organization.
23         Q.    Due diligence?
24         A.    Those things are asked for in due
25    diligence, I can't say whether that was due
```

1                       Longe

2    diligence.

3         Q.    But you run companies, you're the

4    head of Bell & Howell.

5              Did you get the sense somebody was

6    doing diligence on the company?

7         A.    Yes.

8         Q.    Did you ask Zaffino whether

9    somebody was doing diligence on the company?

10        A.    No.

11        Q.    Did he ever tell you why you were

12   collecting all of this data?

13        A.    Yes.

14        Q.    What did he tell you?

15        A.    Refinancing and restructuring of

16   the bank agreements, the lending agreements.

17        Q.    Did KeyBank call you and ask for

18   any of this information?

19        A.    I don't recall a lot of

20   information funneled through the CFO.

21        Q.    You testified a moment ago you

22   said, "I was led to believe" was the phrase

23   that you used, we were collecting information

24   for our bank.

25              What do you mean by led to

1                        Longe

2    believe?  Do you believe you were collecting

3    it for somebody else?

4         A.    Yes.

5         Q.    Who do you believe you were

6    collecting it for?

7         A.    Presstek.

8         Q.    Had the company signed a

9    confidentiality agreement at that time?

10        A.    **There was a confidentiality**

11   **agreement relative to the development**

12   **agreements, and I don't know about anything**

13   **else.**

14        Q.    So why do you think that Zaffino

15   or Fountain weren't telling you they were

16   giving this information to Presstek?

17        A.    **I don't know.**

18        Q.    Was that typical?

19        A.    **It was typical that I would**

20   **receive partial pieces of information.**

21        Q.    From the Paragon board?

22        A.    **From the chairman of the board.**

23        Q.    Besides Zaffino and Fountain, did

24   you ever interact, did you ever interact with

25   John Tomsich?

1                          Longe

2          A.    John Tomsich only at board

3    meetings.

4          Q.    So principally you interacted with

5    Zaffino?

6          A.    John Fountain or Frank Zaffino.

7          Q.    Right.

8          A.    Depending on the time frame.

9          Q.    Was anybody else besides Zaffino

10   or Fountain asking you or your CFO for

11   information during this time period?

12         A.    There was always requests for

13   information but most of it was the ordinary

14   course of business, I have to say no.

15         Q.    What I mean is information of a

16   due diligence nature?

17         A.    No, it was provided to Frank.

18   Greg Knipp could answer the flow, the CFO

19   could answer the flow of the information, as

20   to who it went to I looked at it as an

21   operational versus me actually getting

22   involved in it.

23         Q.    All right.

24               When was the potential sale to

25   Presstek first raised at the Paragon board

187

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re                           ) Chapter 11
                                )
A. B. DICK COMPANY, et al.      ) No. 04-12002 (CGC)
                                )
                    Debtors.    ) (Jointly Administered)


VOLUME II

The continued deposition of BRIAN J. LONGE
taken in the above-entitled cause before
Patricia M. Stone, a Notary Public within and for
the County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said state, at
Suite 3100, 115 South LaSalle Street, Chicago,
Illinois, on the 7th day of October, A.D., 2004, at
8:58 o'clock a.m.


Reported for Getty & Associates
By:  Patricia M. Stone, CSR, RPR
License No:  084-002880



getty & associates, ltd.
court reporting
2516 waukegan road #334 • glenview, illinois 60025 • telephone (312) 372-4666

199

1       Q.   Would it be fair to say that as CEO you felt

2   that you should have all information about the

3   company?

4       A.   That's correct.

5       Q.   And in your role as CEO of the company, you

6   felt that any documents that were created that

7   contained representations and warranties about the

8   company should be accurate, correct?

9       A.   Correct.

10      Q.   And yet you felt that you were frustrated in

11  those goals.  Is that correct?

12      A.   Frustrated is a good term especially since

13  individuals aren't naive that work for me or myself.

14  So we had a very good idea of what was going on, but

15  again my goal was to get this company on solid

16  ground.

17      Q.   And did you view -- well, strike that.

18              Was it your understanding that at one

19  point in either late 2003 or early 2004 PressTek

20  offered to purchase A. B. Dick for a little over

21  $60 million?

22      A.   Yes.  It was brought in to -- I believe in

23  the November time frame they came out and put a due

24  diligence -- excuse me, put a non-disclosure in front

getty & associates, ltd. • court reporting

1    of myself, Jeff Herden, and Greg Knipp and wanted to

2    tell us this company had received an offer, we were

3    going into due diligence, and we need you to be

4    involved.

5              All of us kind of thought it was funny,

6    and we just left and laughed about it after we signed

7    it because we all knew it.

8              Then we were brought into the equation

9    because due diligence started in December.

10        Q.    Okay.

11             MR. BRINK:   If I may interrupt for just one

12   minute, I won't repeat again here today but this is

13   probably a good time to reiterate the instructions

14   that I gave to Mr. Longe at the beginning of the

15   deposition in your offices last week including the

16   instructions regarding information that might be

17   confidential or trade secret to A. B. Dick as well as

18   information that might be subject to any

19   attorney-client privilege that A. B. Dick might

20   assert.

21             MR. FAY:    Right.   I understand that, and

22   it is not my intent to ask him for any such

23   information.

24             If I inadvertently do, please just jump

201

1    up and wrestle me down.  All right?

2         MR. BRINK:  Thank you, Mike.

3    BY MR. FAY:

4         Q.  Okay.  Would it be correct to say,

5    Mr. Longe, that the reason that you found this

6    non-disclosure funny in November of 2003 was that you

7    had known since August of 2003 because of Mr. Knipp's

8    e-mail that PressTek was looking at the company.  Is

9    that correct?

10        A.  Mr. Zaffino's e-mail; but prior to that, I

11   knew because I was the one that helped identify who

12   to talk to and who you needed to talk to to get the

13   business sold.

14        MR. FAY:  Okay.  Can we mark this as

15   Exhibit 5, Longe Exhibit 5?

16                        (WHEREUPON, Longe Deposition

17                        Exhibit No. 5 was marked for

18                        identification as of this date.)

19   BY MR. FAY:

20        Q.  Mr. Longe, is the document that we have

21   marked as Longe Exhibit 5, is this the e-mail to

22   which you were referring in your prior testimony?

23        A.  Yes.

24        Q.  And this e-mail is from Mr. Zaffino?

202

getty & associates, ltd. • court reporting

1    A.    Yes.  It is.

2    Q.    And in the upper left-hand corner, there is

3    an icon that says "PressTek additional information."

4    Is that correct?

5    A.    Correct.

6    Q.    And is it fair to say that you interpreted

7    that as indicating that the financial information

8    being requested was for PressTek and not Key Bank.

9    Is that correct?

10    A.    That's correct.

11    Q.    And that understanding was based not only on

12    this e-mail but your prior conversations with

13    Mr. Marino.  Is that correct?

14    A.    And Mr. Zaffino.  As I stated before, at the

15    July board meeting this was discussed.  After the

16    board meeting, I had dinner with Frank Zaffino and he

17    asked me whether there would be a good deal or not,

18    and I stated I will lose my job but it is the right

19    thing to do.

20    Q.    And again, Mr. Longe, I am sitting here and

21    looking at this, and it would seem -- well, did you

22    develop any sense of why representations would be

23    made regarding this request for financial information

24    that weren't accurate?

1    Purchase Agreement?

2        A.    Yes.    That was communicated to me that we

3    were in an over-advanced position because of

4    liquidity issues, and that was communicated to me

5    that Key Bank was not willing to fund the

6    over-advance to the close, and I think it was also

7    that nor was PressTek going to.

8        Q.    And who would have communicated that to

9    you?

10       A.    Frank Zaffino.

11       Q.    Okay.    Now, did anyone ever tell you that

12   Key Bank was, in fact, willing to continue funding

13   until closing?

14       A.    No.

15       Q.    Did anyone ever show you a letter from Key

16   Bank in which they said that they were willing to

17   increase the level of A. B. Dick's facility to

18   26 million pending a closing in July of 2004?

19       A.    I am not sure of the date of when that would

20   have been.    There was an over-advanced position

21   because my understanding was the extensions that were

22   coming from Key to July 15th were to get the

23   transaction done.

24               So I don't recall what I saw exactly or

getty & associates, ltd. • court reporting

217

1    not, but my understanding was that Key from a

2    February time frame until July gave us the extension

3    to get the transaction done.

4        Q.    Right.    And after June 16th, 2004, there

5    were additional over-advances from Key Bank.    That's

6    correct, isn't it?

7        A.    Yes.

8        Q.    Okay.    Then you may not remember this, but

9    does it sound right that there were two additional

10   over-advances after June 16th, 2004?

11            MR. PHILLIPS:    Objection as to form.

12   BY THE WITNESS:

13       A.    I don't recall exactly, but I would assume

14   it would be, yes.

15   BY MR. FAY:

16       Q.    Okay.    So you saw at least through the

17   over-advances a willingness of Key Bank to continue

18   funding, correct?

19       A.    Yes.

20       Q.    Okay.    And yet you were told that the reason

21   that the Stock Purchase Agreement could not proceed

22   to closing was because Key Bank was unwilling to

23   continue funding.    Is that also correct?

24       A.    They were unwilling to fund between the time

218

1    of the transaction to close, that's correct.

2        Q.    And wouldn't it be fair to say that the

3    conduct of Key Bank was inconsistent with that

4    comment?

5        A.    Yes.

6        Q.    Now, Mr. Longe, subsequent to June 16th,

7    2004, yet another agreement was negotiated between

8    A. B. Dick and PressTek which is referred to as the

9    Asset Purchase Agreement.

10                    Were you aware of that?

11        A.    When was the timing on this?  Was this prior

12    to the $44 million offer?

13        Q.    This was subsequent to that.  This is the

14    $40 million offer.

15        A.    I am not aware of that.  Is that the 363

16    stalking horse offer?

17        Q.    Yes.  It is.

18        A.    Yes.  I am aware of that.

19        Q.    Were you involved in the negotiation of that

20    agreement?

21        A.    No.

22        Q.    Would it be fair to say that you had no

23    involvement in that agreement?

24        A.    Yes.

getty & associates, ltd. • court reporting

1    Q.    And yet it was being negotiated at a time

2    that you were still at A. B. Dick?

3    A.    Yes.

4    Q.    Okay.

5    A.    It would be fair to say that I had no

6    involvement in the $44.1 million or the $65.1 million

7    when it comes to the negotiation of price.

8    Q.    Okay.  Did you feel that in negotiating the

9    $40 million Asset Purchase Agreement that you were

10   intentionally excluded from that process?

11   A.    Yes.

12   Q.    Okay.  Did you ever develop a sense of why

13   you would be intentionally excluded from that

14   process?

15   A.    At that point in time, there are reasons as

16   to why I believe I was excluded, yes.

17   Q.    Can you tell me those reasons?  Do you want

18   to talk to your lawyer?

19   A.    Yeah.  I need to talk to my lawyer.

20                  (WHEREUPON, a brief pause was had

21                  in the proceedings.)

22          THE WITNESS:  Okay.  I can answer now.

23          MR. FAY:  Go ahead.

24

getty & associates, ltd. • court reporting

1    BY THE WITNESS:

2        A.    I believe it was because of brewing disputes

3    over my compensation and my employment.

4    BY MR. FAY:

5        Q.    Were these disputes over compensation under

6    an existing agreement or were you renegotiating an

7    agreement?

8            MR. BRINK:    Mike, I am going to have to

9    object to this line of questioning.

10           MR. FAY:    That's fine.

11           MR. BRINK:    It is among other things outside

12   the scope of the Notice of Deposition.

13           MR. FAY:    That's fine.    That's fine.    We

14   will move on.

15   BY MR. FAY:

16       Q.    Would it be fair to say that at the time

17   that you left A. B. Dick on July 23rd, 2004, these

18   brewing disputes about compensation were still

19   ongoing?

20       A.    Yes.

21       Q.    Okay.    In discussing this plate-making laser

22   technology and the fact that PressTek pulled the

23   engine or the laser for the technology, how does

24   that impact A. B. Dick's ability to market that

getty & associates, ltd. • court reporting

221

getty & associates, ltd. • court reporting

1    product?

2        A.    It severely impacts it because you have to

3    go and find a new technology or a new partner to

4    provide you with the engine that you need to make a

5    plate.  So now it is retrofittable to other

6    technologies because we purposely designed the

7    product to do that.  However, it does set back the

8    development and does set back the company.

9        Q.    Okay.  And the joint marketing of this

10   product would have been beneficial to both A. B. Dick

11   and PressTek, correct?

12       A.    It has been beneficial to both.  It had a

13   huge impact at the trade show.  One of the industry

14   analysts called it the Holy Grail of printing, and it

15   is a fine product and a perfect fit for the market,

16   and it expands A. B. Dick's market to a global market

17   which would allow it to rebuild its distribution

18   channels to parts of the world that do not use the

19   polyester machines that A. B. Dick uses.  So it is a

20   fine product.

21       Q.    Okay.  Other than the insolvency of

22   A. B. Dick, did anyone at PressTek ever explain to

23   you any other reasons why PressTek would have an

24   economic interest in pulling the consumables for this

222

getty & associates, ltd. • court reporting

1    product?

2        A.    I have my opinions as to why.    No one

3    expressed it.

4        Q.    What is your opinion?

5        A.    My opinion is it limits the price of the

6    company in the auction.

7        Q.    And when you say the auction, you are

8    talking about the 363 sale?

9        A.    Yes.

10        Q.    Mr. Longe, do you know who Barbara Pellow

11    is?

12        A.    Yes.

13        Q.    Did you hire Barbara Pellow to consult for

14    A. B. Dick?

15        A.    I hired her, yes.

16        Q.    And what was the purpose of hiring her?

17        A.    The purpose of hiring her was to help with

18    our sales and marketing difficulties.    She was at the

19    time -- I don't know the exact title, but she was

20    head of the Print Department at the Rochester

21    Institute of Technology and was brought in by Frank

22    Zaffino for us to hire her in the 2002, 2003 time

23    frame.

24                Frank introduced us to her.    Frank

getty & associates, ltd. • court reporting

1    wanted us to hire her.  We resisted at first actually

2    several times because we felt it was a conflict of

3    interest because she consulted with other companies;

4    and with what we were doing, we as a management team

5    felt we were moving faster to secure our marketplace

6    than the rest of the company.

7              We knew the issues in the company.  We

8    were addressing them, but the Board either refused or

9    refused to accept or did not understand the

10   complexity because they never went through a complete

11   presentation on the marketing strategy with me.  They

12   never felt that they had time to understand the

13   strategic implications of what we were doing.

14             Originally we turned Barbara Pellow down

15   through Frank Zaffino from hiring her because of the

16   conflicts of interest.  When I polled my management

17   team, the persons that I polled they said it would be

18   a conflict of interest.

19       Q.   Was she also working for PressTek at the

20   time that Mr. Zaffino wanted to hire her?

21       A.   Not at the time.  She became a board member.

22       Q.   She became a board member of PressTek?

23       A.   Yes.

24       Q.   All right.  Was that after A. B. Dick

# EXHIBIT B

1

1          IN THE UNITED STATES BANKRUPTCY COURT

2                  DISTRICT OF DELAWARE

3

4      IN RE:

5      A.B. DICK COMPANY,
       et al.,                    CASE NO. 04-12002

6
                   Debtors.

7

8                      - - - -

9

10         Deposition of FRANK D. ZAFFINO, taken upon

11     examination before M. Sheila Noce, a Registered

12     Professional Reporter and Notary Public within

13     and for the State of Ohio, at the offices of

14     Benesch, Friedlander, Coplan & Aronoff, 2300 BP

15     Tower, Cleveland, Ohio, at 10:00 a.m. on

16     Thursday, October 14, 2004, pursuant to notice

17     and/or stipulations of counsel, on behalf of the

18     Creditors in this cause.

19                     - - - -

20                  MEHLER & HAGESTROM
                    Court Reporters

21
              CLEVELAND                 AKRON
22     1750 Midland Building     1015 Key Building
       Cleveland, Ohio 44115     Akron, Ohio 44308
23        216.621.4984              330.535.7300
          FAX 621.0050              FAX 535.0050
24        800.822.0650              800.562.7100

25

27

1  Q.  Right.

2  A.  But do I know of any relationship between Nesco

3      and KeyBank separate from or as an umbrella to

4      the Paragon relationship, is that your question?

5  Q.  Yeah.  Of any sort.  I'm trying to see if there

6      was any effect on the relationship between the

7      debtors and KeyBank by nondebtors and KeyBank, if

8      there was any effect on that relationship.

9  A.  If there was, I was not in a position to know

10     that.  I just don't know.

11  Q.  Okay.  Did you ever hear, and this is something

12     which we heard from Mr. Lugli at his deposition,

13     that -- and I'm not sure if it was Bob Tomsich or

14     one of his companies -- guaranteed or agreed to

15     guarantee a portion of any additional advances

16     that would be made to support the Stock Purchase

17     Agreement transaction in June of 2004?

18                  MR. PHILLIPS:  Objection.

19  Q.  He doesn't like the form.  I'm not trying to

20     change what was said before, it's whatever it

21     was.

22  A.  Well, I don't know why he objected.  That's why

23     he's here.

24  Q.  That's fine.

25  A.  Repeat that question for me, please.

28

1          MR. JOHNSON:  Sure.  Could you

2      read it back.

3              -   -   -   -

4          (Thereupon, the requested portion of

5          the record was read by the Notary.)

6              -   -   -   -

7  A.  I had heard that that was a consideration.  I do

8      not recall ever having the decision as to whether

9      Nesco or Mr. Tomsich or one of the holdings of

10     Nesco had actually provided that or those moneys

11     or not.  I really don't know if it came to

12     fruition.  I do know, I had heard that that was a

13     consideration.

14  Q.  Okay.  Are you aware that at some point PressTek

15     expressed an interest in buying A.B. Dick or some

16     portion of A.B. Dick?

17  A.  Yes.

18  Q.  Do you recall approximately when that happened?

19  A.  Approximately July 3rd of 2003.

20  Q.  How did you become aware of that?

21  A.  Ed Marino the president and CEO of PressTek had

22     approached Brian Longe and expressed an interest

23     in acquiring the company.  Brian Longe told me

24     that and suggested to Ed Marino that he should

25     contact me, and Ed Marino did.

1   Q.   Okay.  And what was your position at that time if

2        you remember?

3   A.   I think I was chairman of the board or either

4        president CEO, but I was an officer in Paragon.

5   Q.   But not of A.B. Dick at that time?

6   A.   No.

7   Q.   You were not on the Board of A.B. Dick?

8   A.   No.

9   Q.   And do you know why Longe told Marino to talk to

10       you?

11  A.   I think Longe saw me as a representative of the

12       Paragon Board of Directors, and I would be the

13       point of entry for that communication.

14  Q.   And you were working closely with Mr. Longe at

15       that point in time?

16  A.   Very closely, yes.

17  Q.   To try to straighten things out.

18            And what happened next, what did you do with

19       that information?

20  A.   I brought the information to the board of

21       directors.

22  Q.   When you say the board?

23  A.   Paragon Board of Directors, I'm sorry.

24  Q.   What was the proposition that Mr. Marino

25       suggested at that time?

80

1     they had agreed to fund or not?

2  A.  I did not.  I was not party to that conversation.

3  Q.  Were there any reports back to the board about

4      that?

5  A.  Not that I recall.

6  Q.  Okay.  So what happened to the Stock Purchase

7      Agreement, the June Stock Purchase Agreement?  It

8      died at that point?

9  A.  It died.

10  Q.  What happened after that?

11  A.  PressTek was considering financing this interim

12      through their bank, if I recall, and asked to

13      speak to some of the A.B. Dick managers to kind

14      of do their own mini due diligence as part of

15      that consideration.  So they flew into Chicago.

16      I was present.  They interviewed a number of A.B.

17      Dick's managers to discuss the state of the

18      business.

19  Q.  And what happened then?

20  A.  At the end of that meeting, Moosa and McCarthy

21      stepped out of the room and had a conversation.

22      Then they wanted to speak with me, and they said

23      something to the effect that this is not the

24      company that they thought they were looking at

25      when they started the negotiation, that it had.

81

1    deteriorated, and they had to go back and rethink

2    it.

3    Q.   Okay.  And what happened then?

4    A.   They called us late night and suggested that the

5    deal would have to be reduced to 40 million, and

6    quote, if we had the stomach for it, that we

7    would have to file for Chapter 11, 363

8    bankruptcy.

9    Q.   Okay.  When they said that if you had the stomach

10   for it, you would have to file for Chapter 11,

11   did that, was that a condition to their making a

12   deal with you?

13   A.   Yes.

14   Q.   Was there any explanation at the time of that

15   phone call that it would be an asset deal and not

16   a stock deal?

17   A.   Not that I recall.

18   Q.   Okay.  What happened after that?  How did you

19   respond on that phone call?

20   A.   Swallowed hard and said we have to go back to the

21   board.

22   Q.   Did you go back to the board?

23   A.   Yes.

24   Q.   What did the board do?

25   A.   A debate ensued at the board, and there was not

82

1   unanimous agreement.  Bob Tomsich did not want to

2   take this company into bankruptcy, and the board

3   overruled him, and the decision was made to go

4   into bankruptcy.

5   Q.  Okay.  Do you recall the reasons given by the

6       board for deciding to take the bankruptcy route

7       over Bob's objection?

8   A.  Yeah.  Bob's hope was that we would find a way to

9       finance, get enough money to turn this company

10      around.  We discussed it, we discussed orders,

11      the magnitude of how much it would take and what

12      was the end game, and we basically said to Bob

13      your proposal is too little too late, that we

14      have now reached a point where in the board's

15      opinion, this is the most responsible position to

16      take.

17  Q.  And was Bob then making a proposal to put more

18      money in?

19  A.  He had not made a proposal that he would

20      personally put more money in, but he didn't rule

21      that out.

22  Q.  Okay.  Did the board have any idea of a time

23      frame that was involved in Bob's proposal?

24  A.  No.  He had nothing specific.  Bob did not make a

25      proposal.  He was arguing a point as a director.

83

1   Q.  Okay.  So he didn't really have a plan for it

2       either?

3   A.  I don't know that.

4   Q.  Well, at the meeting he did not express a plan?

5   A.  Yes, that's correct.

6   Q.  Okay.  So the board decided that they would be

7       willing to put the company in bankruptcy.  Did

8       they also decide that they would be willing to

9       take the new deal at that time?

10   A.  Oh, that was the condition of doing it.

11   Q.  So at that meeting they actually decided to take

12       the $40 million offer and put the company through

13       bankruptcy?

14   A.  Correct.  With advice of counsel, obviously.

15   Q.  Oh, yeah.  And at that time did the board know

16       that this was to be an asset sale instead of a

17       stock sale?

18   A.  Yeah, they understood the deal.

19   Q.  So at some point in time, the fact that this was

20       an asset sale had come to your attention?

21   A.  Yes.

22   Q.  Was there a term sheet sent or documents,

23       something of that sort?

24   A.  Yes, I believe there were.

25   Q.  So they were referring to those documents?

84

1    A.   They understood the deal.

2    Q.   Okay.  And is the deal that the board approved on

3         that date basically the deal which came to pass?

4    A.   Yeah, as I remember.

5    Q.   In our previous discussions we talked many times

6         about whether PressTek was doing due diligence

7         and the answer was always no, not at that time.

8              When did they actually do due diligence, for

9         the original deal, the June deal?

10   A.   I'm going to fail your IQ test.  I don't remember

11        the dates.

12   Q.   Rough timing, that's all.

13   A.   I think it was in the spring.  We set up a data

14        room, and they flew in and interviewed people and

15        that sort of thing.

16   Q.   Okay.  Did they express any unhappiness with the

17        due diligence that they got?

18   A.   Regarding the quality of the information or the

19        volume of information?

20   Q.   Well, did they indicate that they needed more

21        than what was given to them?

22   A.   Not that I recall.  In fact, we were somewhat

23        frustrated because they kept asking for the same

24        things over and over and over again, and we were

25        wondering if they were ever reading them.

85

1    Q.   But you provided them everything they asked for?

2    A.   We sure did.

3    Q.   And by the time of the June all-nighter, PressTek

4         wasn't asking for any more due diligence,

5         correct?

6    A.   Not that I recall.

7    Q.   All right.  After the board meeting at which the

8         Paragon Board approved the Asset Purchase

9         Agreement in bankruptcy, what happened then?  Do

10        you recall when that board meeting was

11        approximately?

12   A.   I don't have the date.

13   Q.   Okay.  What happened then to go towards the end

14        of this deal?

15   A.   We proceeded with filing.

16   Q.   Okay.  At the time of that board meeting, had

17        anything been done to prepare the company for

18        bankruptcy specifically?

19   A.   I'm not sure I even understand that question.

20   Q.   Okay.  Had you hired bankruptcy counsel?

21   A.   Oh, sure.

22   Q.   Were they hired before that meeting?

23   A.   They were hired to advise us before we made -- as

24        part of the decision process.

25   Q.   But they had not actually done anything towards

86

1     the filing at that time?

2  A.  Not until we all agreed to do that.

3  Q.  Right.  So that after this meeting, the

4     bankruptcy filing was put together?

5  A.  The procedure began.  I think that's right.

6  Q.  Okay.  After you received the call from PressTek

7     in which they said the deal had to go to

8     40 million and that it would have to be a Chapter

9     11 filing, did Paragon have anymore negotiations

10    with KeyBank?

11           MR. FOLLAND:  I'm going to object

12       to that question.

13           Go ahead and answer if you know.

14           THE WITNESS:  I do or don't?

15           MR. PHILLIPS:  You can answer.

16           I'll join in the objection.  Form.

17  A.  I was not aware of any other negotiations with

18     KeyBank.

19  Q.  Okay.  You're not aware of any negotiations

20     between Paragon and KeyBank about the DIP loan

21     facility?

22           MR. FOLLAND:  I'll just raise the

23       same objection along this line.

24           Go ahead.

25  A.  There was interaction between Paragon, PressTek