87

```
 1          and KeyBank regarding DIP loan facilities, but it
 2          was a three-way interaction as I recall.
 3     Q.   Do you know who handled that on Paragon's behalf?
 4     A.   On Paragon's, I think John Fountain.
 5     Q.   Okay.  Were there any reports made to the board
 6          about those negotiations?
 7     A.   My recollection is that we were told the results,
 8          basically that it was $7 million and that
 9          PressTek was going to pick up the lion's share of
10          that and that KeyBank would pick up the balance.
11     Q.   Do you know whether Bob Tomish had any
12          negotiations with KeyBank about the DIP facility?
13     A.   You mean Tomsich?
14     Q.   Tomsich, I'm sorry.
15     A.   I'm not aware of that.
16     Q.   Was there any discussion by the Paragon Board
17          about the change from a Stock Purchase Agreement
18          in June to an Asset Purchase Agreement in July?
19     A.   The board was made aware.  I don't know what you
20          mean by discussion.
21     Q.   Was there any -- was there any discussion of
22          whether that affected the deal from Paragon's
23          point of view?
24     A.   It was a concern.
25     Q.   And what was the concern?
```

| | | |
|---|---|---|
| 1 | A. | The concern was that we had to define what the |
| 2 | | liabilities would be left behind, because as I |
| 3 | | said when we started this whole conversation, |
| 4 | | Paragon could not responsibly allow liabilities |
| 5 | | to be left behind, that Paragon was in no |
| 6 | | position to honor or to serve.  So we were, we |
| 7 | | had to understand the details of that change. |
| 8 | Q. | Is that one of the reasons for the bankruptcy was |
| 9 | | to eliminate the liability that would be left |
| 10 | | behind? |
| 11 | A. | Oh, it was not, no.  It was not that simple.  The |
| 12 | | last thing this board wanted to do for any reason |
| 13 | | was to go into bankruptcy. |
| 14 | Q. | Um-hum.  Did the new deal, the asset deal leave |
| 15 | | behind liabilities that the Stock Purchase |
| 16 | | Agreement would not have left behind? |
| 17 | A. | I don't know the details of that.  I don't recall |
| 18 | | any major shift in liabilities -- repeat that |
| 19 | | question for me. |
| 20 | Q. | Did the asset purchase deal leave behind |
| 21 | | liabilities that the Stock Purchase Agreement |
| 22 | | would not have left behind? |
| 23 | | MR. PHILLIPS:  I'm going to |
| 24 | | object.  It calls for a legal conclusion. |
| 25 | A. | I don't know the answer to that. |

1   Q.   Let's put it a different way.  Did the Paragon

2        Board discuss any liabilities that would be left

3        behind in the asset purchase deal that would not

4        have been left behind in the Stock Purchase

5        Agreement?

6   A.   If we did, I don't remember.

7   Q.   Okay.  Was there an A.B. Dick Board meeting on

8        whether A.B. Dick should accept this deal or not?

9   A.   I believe there was.

10  Q.   And the A.B. Dick Board at that time was Mr. Wert

11       and Mr. Goldstein?

12  A.   I believe that's true.

13  Q.   Do you know what the result of that meeting was?

14  A.   No.  I was obviously not party to that meeting,

15       and I have not read the minutes, so I don't know.

16  Q.   Okay.

17                  MR. PHILLIPS:   And I would note

18            that we have offered Mr. Wert for

19            deposition also with respect to ABD.

20  Q.   Other than the change in purchase price, is the

21       asset sale in bankruptcy better than the stock

22       sale from PressTek's point of view?

23  A.   I don't know.

24  Q.   Other than the change in price, is the asset sale

25       between -- better than the stock sale from

1       Paragon's point of view?

2   A.  It is not what we would have preferred.

3   Q.  And why is that?

4   A.  Because we have a responsibility to all of the

5       stakeholders of the company, and leaving

6       liabilities exposed can't help all of the

7       stakeholders of the company, the creditors, it

8       just can't.  I mean people are going to be left

9       exposed.  Employees have to get in line as

10      unsecured creditors possibly.

11          It is not a desirable position for us as a

12      board because our objective is to serve as many

13      of the stakeholders as we can, realizing that in

14      bankruptcy the first in line to be worried about

15      are the creditors.  So there is a shift  of

16      responsibility with a bankruptcy, but still, in

17      the whole picture it is not something that we

18      would consider desirable.

19  Q.  Did you personally feel you had any choice at

20      that meeting?

21  A.  No.

22  Q.  You think that was true of the other directors,

23      leaving Mr. Tomsich out?

24  A.  I believe.  I can't speak for them.  I can't get

25      in their minds, but they argued pretty strongly.

1       And by the way, understand, none of the members

2       of this board to my knowledge has ever been

3       involved in a bankruptcy, and this is as

4       distasteful as anything we have ever done.  So

5       this was not a decision taken lightly, but the

6       decision was finally pretty clear just from their

7       dialogue that we didn't have a choice.

8   Q.  Moving back to A.B. Dick operationally just for a

9       moment here, a little bit of clean up.  Are you

10      aware of a new product that was going on the

11      market that was the result of a joint venture

12      between PressTek and A.B. Dick that used

13      PressTek's laser technology and a plate machine

14      from A.B. Dick?

15  A.  Yes.  It wasn't a joint venture, it was a

16      co-development project.

17  Q.  Okay.  What was the nature of that co-development

18      project?

19  A.  The design teams from both companies worked

20      together to create a laser imaging device for

21      metal plates which used PressTek technology for

22      consumables which had the advantage of being

23      chemically cleaned.  They don't require

24      traditional silver halide technology.  Once the

25      image is on, they're just washed with water.

92

1    It is believed that this is potentially a

2    technological breakthrough for the printing

3    industry because it is environmentally clean.

4    A.B. Dick had developed a technology for

5    handling platers in the process of creating an

6    image, and so an agreement was reached where we

7    would use PressTek's black box laser technology

8    inside a digital plate maker, which would use

9    PressTek's material handling technology, and that

10   we would manufacture it in Rochester in

11   A.B. Dick's facilities and sell it jointly as a

12   product.

13   Q.   Okay.  When you say sell it jointly, sell it as

14        both an A.B. Dick product and a PressTek product?

15   A.   I believe that was the agreement.

16   Q.   Okay.  And there was an agreement that was

17        written on this?

18   A.   Yes, I think there was an agreement.

19   Q.   Okay.  And what happened to that product?

20   A.   The product was developed, prototypes were

21        created, first run production were manufactured.

22        PressTek however has suggested they want to

23        put the agreement on hold until they find out

24        what happens through this process, this sale

25        process.

93

1          We did show the product at Graph Expo this

2     week, but we showed it with the stipulation that

3     everyone knew that this was a PressTek

4     technology, that it had PressTek technology

5     imbedded in it, and that it was really pending

6     production, in other words, leaving a window open

7     where if for some reason we did not go forward,

8     we did not violate any potential contractual

9     agreement to a customer.

10          We didn't say this kid is on the market.  We

11     said here it is in it's current stage of

12     development and production, and we're very

13     excited about it, but it had a caveat.

14  Q.   Okay.  And I think you said this was a graphics

15     expo?

16  A.   Graph Expo.

17  Q.   I may have not the right word here, because I

18     pulled it out of a rough deposition transcript,

19     but was it also called at something called DRUPA?

20     Does that mean anything to you?

21  A.   I don't think so.  DRUPA is a big show in Europe,

22     a big graphics show, but the first time it was

23     shown to my understanding was this last week in

24     Chicago.  If it was shown in DRUPA -- I don't

25     think it was.  I don't think it was ready.

196

1        the date.

2    Q.   2004?

3    A.   I believe it was in 2004.

4    Q.   If I understood you correctly earlier, you said

5         that there were prototypes made and the product

6         was displayed at the graphic expo this past

7         month?

8    A.   The Graph Expo.

9    Q.   Prior to that was the product available anywhere

10        on the market?

11   A.   No.  And it wasn't available on the market at

12        Graph Expo either.

13   Q.   Who from PressTek was the primary contact with

14        respect to that agreement?

15   A.   I don't know.  I believe it was at the

16        engineering level.  I'm sure they had counsel and

17        advisers, I don't know, but I know that Moosa was

18        involved with it.

19   Q.   Do you know what his role was?

20   A.   No.

21   Q.   Now, did the agreement have a set number of

22        years, or was it an indefinite agreement?

23   A.   I don't believe there was any definitive time

24        frame on that agreement.

25   Q.   And what about with respect to termination.

197

1    A.   I didn't read it completely.

2    Q.   Who would be able to answer a question like that?

3    A.   Ken Newton.

4    Q.   Now, prior to this agreement, had A.B. Dick and

5         PressTek been involved in the production of any,

6         not joint products, but did A.B. Dick produce any

7         PressTek products?

8    A.   There was a relationship between the two

9         companies that went back quite a ways, but I

10        wasn't familiar with the details.  It was an OEM

11        agreement of some sort.

12   Q.   A what?

13   A.   OEM, original equipment manufacturing.

14   Q.   Do you believe that A.B. Dick manufactured things

15        for PressTek in the past?

16   A.   I don't know that for sure.

17   Q.   Now, in addition to the new joint product being

18        chemically clean, what were the other benefits of

19        this product?

20   A.   To whom?

21   Q.   Potential purchasers and also you, A.B. Dick?

22   A.   It's greatest selling point, of course, was that

23        it was environmentally clean, and it had, my

24        understanding is, very good quality, image

25        quality.  It was good for the companies because

198

1    it required proprietary media technology, which

2    was PressTek's, which was consistent with

3    PressTek's business model, which was a razor

4    blade.

5        They didn't have a lot of interest in

6    manufacturing the equipment as long as it drove

7    sale of these consumables. So it was relatively

8    easy to use, didn't have a lot of waste, chemical

9    waste and so on. It was environmentally sound.

10  Q.  What about the fact that it was a metal plate as

11      opposed to a polyester plate, was that

12      significant?

13  A.  That was significant. It opened up a whole new

14      market for A.B. Dick. A.B. Dick's market

15      primarily used electrostatic plate, which is a

16      film based plate. Europe and China use these

17      metal plates to a much greater degree, so

18      A.B. Dick was quite excited about it because it

19      would allow us to expand into those potential

20      markets.

21  Q.  Right. In one of the transcripts I read

22      preparing for this deposition, I heard or read

23      that the product was described by one exhibitor

24      as the Holy Grail of the printing industry.

25      Would you agree with that statement?

199

1              MR. PHILLIPS:  Objection.

2              Go ahead.

3    A.   I wouldn't make that statement about that

4         product.

5    Q.   Why is that?

6    A.   Well, it's a very complex industry, and there's a

7         whole array of products, and I mean there are

8         some extremely impressive products using very

9         exciting technologies.  This is among them, but

10        the Holy Grail is something else.

11   Q.   Just curious.  As they stand today, is the joint

12        development agreement, has that been terminated?

13        You earlier testified it was on hold.

14   A.   There is still dialogue going on among the

15        PressTek and the A.B. Dick technical people and

16        marketing people, but I don't believe the

17        potential outcome is clear at this point.

18   Q.   In your opinion would the development agreement

19        with PressTek be of interest to a potential

20        purchaser of A.B. Dick?

21   A.   Yes.

22   Q.   When this agreement was signed, do you know

23        whether A.B. Dick had intentions of developing

24        other products with PressTek or vice versa?

25   A.   I am not specifically aware of any following

200

1      products that might have been developed or might

2      be developed between the two companies.

3  Q.  When ABD/Paragon first received the PressTek

4      offer in November of 2003, speaking for yourself,

5      what was your reaction to the initial price?

6  A.  I thought it was a good price.

7  Q.  Why is that?

8  A.  It was a high multiple of EPITDA, it would have

9      satisfied all of the creditors, and I thought it

10     left the organization in good standing in terms

11     of Paragon, and it was a strategic fit.  So it

12     was good for A.B. Dick, and it was good for

13     PressTek.

14 Q.  Were you surprised at all by the price given that

15     the Harbour Group had offered considerably less,

16     less than a year ago?

17 A.  I wasn't surprised.

18 Q.  Why not?

19 A.  Marino had been pretty outspoken about how

20     excited he was to get this company, and it

21     obviously had strategic value to him in his mind.

22 Q.  What was that strategic value?

23 A.  Linking A.B. Dick's equipment capability,

24     distribution and name brand with PressTek's

25     strengths, which were consumable technology, and

204

1   Q.   Did you interpret the June 22nd letter to KeyBank

2        as PressTek's termination of the deal?

3   A.   I would not have considered that a final

4        declaration that the deal was dead.

5   Q.   And why is that?

6   A.   I believe these were two businessmen negotiating,

7        and I believe that PressTek was hoping that we

8        would intervene and convince KeyBank, but I don't

9        believe that any party wanted this deal to die.

10  Q.   Okay.  Do you remember conveying the substance of

11       this letter to anyone on the ABD or Paragon

12       Board?

13  A.   This letter would have been distributed

14       immediately to members of the Paragon Board.

15                  MS. KOWALCZYK:  Ted, do you recall

16       whether you marked KeyBank's response.

17                  MR. FOLLAND:  I don't think he

18       did.

19                  MS. KOWALCZYK:  Then I'll mark

20       this as, this will be Exhibit 25.

21                  -   -   -   -

22                  (Thereupon, Zaffino Exhibit 25 was

23       marked for purposes of identification.)

24                  -   -   -   -

25                  MS. KOWALCZYK:  This is the June

A183

205

22nd letter from KeyBank to PressTek, in particular Moosa Moosa.

A.  Okay.

Q.  Prior to receiving this letter, did you have an understanding or did you know that Key intended to fund the transaction through the closing?

A.  In the late-night phone conversation with parties including KeyBank, Pat Auletta, it had been suggested that KeyBank would be willing to fund that.  I do recall some debate as to how much and for what duration was a discussion.  Because Hal Goldstein wanted 60 days, and the question was 30 days and Auletta originally said 10 days, and there was some debate about that, but I do recall that in principle they said they would be willing to fund to some level.

Q.  On what date did this late-night conversation occur?

A.  I don't have the date, I'm sorry.

Q.  Do you recall if it was a day or two before this June 22nd letter?

A.  I believe it was.

Q.  And who was part of this conversation?

A.  I think John Fountain was on the phone, Auletta was on the phone, I don't remember if Lugli was

206

1    on the phone.

2    Q. Was anyone from PressTek's side on the phone?

3    A. I believe they were.

4    Q. Can you recall who that would have been?

5    A. I'm sure Moosa was on there. If anybody from

6    PressTek was on, Moosa was on.

7    Q. So it would be your recollection then that before

8    June 22nd, PressTek had knowledge that KeyBank

9    intended to fund the transaction to closing?

10   A. I think that's true.

11   Q. Okay. I would like you to refer back to Zaffino

12   Exhibit 20, which is the e-mail from Goldsmith

13   dated June 22nd, 2004. Do you remember this

14   document?

15   A. Only from the previous discussion.

16   Q. Okay.

17   A. Let me just get my bearings. Yes. Okay.

18   Q. Moments ago you testified that you did not

19   interpret PressTek's June 22nd letter indicating

20   that Key would not provide funding as a

21   termination of the deal, is that correct?

22   A. Right.

23   Q. Upon seeing this June 22nd e-mail, did your

24   opinion change?

             MR. PHILLIPS: Objection.

25

A185

209

1    what day?

2    A.   I don't have the date.

3    Q.   In your opinion, is this letter something that

4    would have justified an immediate phone call to

5    PressTek?

6    A.   Yes, and I imagine Fountain did that.

7    Q.   Now, when you saw the June 22nd e-mail from

8    Goldsmith, did you interpret that to be a

9    termination of the deal on PressTek's behalf?

10   A.   It was potentially that, but I believed that this

11   thing had to be cleared up before that

12   determination was finalized.

13   Q.   But you didn't take any steps to clear it up?

14   A.   I believe Fountain did, if I recall.

15   Q.   And who is, who was A.B. Dick's in-house counsel

16   at this time?

17   A.   Jeffery Herden.

18   Q.   He is also Paragon's in-house counsel?

19   A.   Yes.

20   Q.   Do you know whether he took any actions on behalf

21   of A.B. Dick or Paragon in response to this

22   letter or e-mail?

23   A.   I don't know.  Zagore probably would have.

24   Q.   Who was that?

25   A.   Zagore.

210

1   Q.   But you don't recall giving any attorney working

2        on behalf of A.B. Dick or Paragon any

3        instructions?

4   A.   That probably would have come from Fountain.

5   Q.   Did you agree with PressTek's conclusions in this

6        e-mail?

7   A.   No.

8   Q.   Why is that?

9   A.   Because as far as I was concerned, the bank had

10       agreed to fund.

11  Q.   So they had consented?

12  A.   I thought it was a timing issue.  This is all

13       happening --

14  Q.   So the letters crossed?

15  A.   Yes.

16  Q.   So in your opinion would you say that the bank

17       had consented to the transaction?

18  A.   That's what this letter says, yes.

19  Q.   Did you or anyone on the ABD side think that

20       PressTek was looking for a way out of the deal

21       when it sent this e-mail?

22  A.   No.

23  Q.   Why is that?

24  A.   Marino never gave me indication of that.

25  Q.   Mr. Zaffino, can you look at Exhibit 18, please.

211

1      This is the June 23rd, 2004 term sheet.  Earlier

2      I believe you testified that the subject of an

3      Asset Purchase Agreement may have been mentioned

4      to you in a phone call prior to June 23rd, is

5      that correct?

6   A.  Yes.

7   Q.  Would that have been this late-night phone call

8      that you spoke of earlier?

9   A.  Yes.

10  Q.  And this late-night phone call happened before

11     the November 22nd letter?

12  A.  November 22nd?

13  Q.  I mean June 22nd, thank you.

14  A.  I believe it did.

15  Q.  So when you received PressTek's June 22nd letter

16     and e-mail, you were aware of the fact that they

17     were interested in converting the Stock Purchase

18     Agreement to an Asset Purchase Agreement?

19  A.  Yes.

20  Q.  Now, at this time the Stock Purchase Agreement

21     had already been executed by all parties,

22     correct?

23  A.  Correct.

24  Q.  Were you also aware of the terms that PressTek

25     was proposing under the Asset Purchase Agreement?

212

1  A.  What terms specifically?

2  Q.  The terms of price, liabilities that would be

3      assumed or not assumed?

4  A.  The telephone conversation that I recall, they

5      talked about the price going down to 40 million

6      and they talked about the requirement to file for

7      Chapter 11.  I don't recall the details of

8      liabilities, that level of detail.

9  Q.  In what context did this conversation take place,

10     they initiated the phone call?

11 A.  Yes.

12 Q.  And at this point were they aware of the fact

13     that KeyBank had agreed to fund the transaction

14     through closing to your knowledge?

15 A.  I thought they were.

16 Q.  And didn't you find this suggestion a bit odd?

17 A.  Yes.

18 Q.  And what was your reaction?

19 A.  Frustration, I suppose.  I wasn't quite sure how

20     this had all come about when we got to this

21     point.

22 Q.  Did this type of information necessitate a call

23     to the board?

24 A.  Oh, yes.

25 Q.  And what happened, what did you do?

A189

214

1   to change the terms of the deal postexecution?

2   A.   With Fountain.

3   Q.   Can you tell me what that conversation was?

4   A.   Fountain was troubled, as I was, that it had to

5   be addressed.  It didn't hang together.

6   Q.   Now, when you say it had to be addressed, why is

7   that so if you had a signed agreement?

8   A.   Because obviously PressTek was attempting to exit

9   the agreement and redefine it.

10  Q.   Was that within the terms of the agreement that

11  they were going to do that?

12  A.   The terms of which agreement?

13  Q.   The SPA that was signed, the Stock Purchase

14  Agreement.  My question was, was it your

15  understanding that the Stock Purchase Agreement

16  that was executed on June 16th, 2004 permitted

17  PressTek to change the terms postexecution?

18  A.   No.  May I say I am not a lawyer, and I didn't

19  study all the details of that and commit them to

20  memory, with that qualification.

21  Q.   Thank you.  I appreciate that.

22       Now, following that late-night phone call,

23  there was a board meeting to discuss this new

24  proposal.

25  A.   There was a meeting.  I don't recall if it was

**A190**

215

1   physically we came together, but yes, we

2   discussed this.

3   Q.  And you testified earlier that Tomsich was the

4   only board member who was not in favor?

5   A.  Tomsich was not anxious to bring this company

6   into bankruptcy.

7   Q.  Did PressTek give an explanation for the

8   reduction in price?

9   A.  The only indication they gave was right after the

10  visit to the Chicago management team, and they

11  conducted their interviews when Moosa said to me

12  this isn't the company that I thought it was,

13  that was the only indication.

14  Q.  And when he said this is not the company I

15  thought it was, how did you interpret that, to

16  mean what?

17  A.  My interpretation was that it wasn't as

18  financially strong and that it was struggling

19  more than he thought it had been.

20  Q.  But at that point had ABD and Paragon provided

21  PressTek with the most up-to-date financials?

22  A.  Absolutely.

23  Q.  Were you aware of the fact that NES's attorney

24  had sent a letter to PressTek concerning the June

25  22nd letter?

216

1    A.    No.

2    Q.    You didn't have any knowledge concerning that?

3    A.    Can you refresh my memory what it said.

4                         MR. PHILLIPS:   It's asked and

5          answered.

6    A.    That's fine.

7                         MR. PHILLIPS:   I think I objected

8          when you asked that question, Ted.

9                         MS. KOWALCZYK:   I thought it

10         deserved a second shot.

11   Q.    Now, with respect to the June 23rd term sheet

12         that is Zaffino 18, you testified that there were

13         a number of iterations of that document.  Do you

14         recall saying that?

15   A.    Yeah, I suppose.

16   Q.    Did ABD or Paragon have any input into the

17         substance of that document?

18   A.    This particular document?

19   Q.    Well, let's say the June 23rd term sheet as it

20         evolved.

21   A.    No.

22   Q.    No?

23   A.    No.  This was a result of what PressTek wanted to

24         present to A.B. Dick.

25   Q.    Essentially on a take it or leave it basis?

A192

217

1   A.  I don't know that.

2   Q.  Well, when you received that term sheet, did you

3       or anyone on behalf of A.B. Dick or Paragon

4       object to any of the provisions?

5   A.  The main concern we had was the requirement to go

6       into bankruptcy.  That troubled us greatly.  The

7       other details were relatively, I won't say

8       significant, but they were relatively minor.

9       This bankruptcy thing was a traumatic thing for

10      this board to swallow.

11  Q.  Were there any negotiations concerning this June

12      23rd term sheet or the deal that followed from

13      it?

14  A.  I don't recall.  We would have worked with

15      counsel, and they would have worked with their

16      counsel and that sort of thing.

17  Q.  Do you recall negotiating, entering into

18      negotiations with respect to the Asset Purchase

19      Agreement that was presented post June --

20  A.  I recall discussing it with our attorneys, but I

21      don't recall specifically the iterations.

22  Q.  Not the type of back and forth that was going on

23      with the other agreements?

24  A.  Well, there wasn't much left.

25  Q.  Okay.  If the price on that term sheet was

218

1    30 million as opposed to 40 million, would ABD

2    have agreed to the bankruptcy?

3                   MR. PHILLIPS:  Objection.  Calls

4         for speculation.

5                   THE WITNESS:  That means I can

6         answer or not?

7                   MR. PHILLIPS:  I don't know how

8         you do.

9    Q.  Let me ask a different question then.  Did

10        A.B. Dick feel that it had any power to negotiate

11        the reduced price that was offered by PressTek?

12   A.  Very little.

13   Q.  Did it come to you as a surprise that PressTek

14        was using A.B. Dick's insolvency or lack of

15        liquidity as a reason for terminating the June

16        16th agreement?

17   A.  I can't be sure that was why.

18   Q.  Why do you think it was terminated?

19   A.  Well, all I know is that they said it wasn't the

20        company they thought it was, and there was

21        nothing in the financials that should have

22        surprised Moosa.  So it may have been the

23        interviews, but they could not be specific with

24        me as to why.

25                   Was I surprised that they changed their minds

219

1    on the deal?  Yes.

2    Q.  And do you know who they met with when they

3        interviewed people?

4    A.  Yes.

5    Q.  Who was that?

6    A.  They met Lynn Gehrke who was the VP of

7        purchasing.  They met with Larry Mascia who was

8        the VP of sales.  They met with Dave Van Derwiel

9        who was the VP of consumables.  Larry Mascia, did

10       I say Mascia, I'm sorry.  They met with James

11       Yerkes who was the VP of service.  Those are the

12       people that I recall.

13   Q.  Do you know a woman by the name of Barbara

14       Pellow?

15   A.  Yes.

16   Q.  Who is she?

17   A.  Barbara Pellow was a professor of imaging science

18       at Rochester Institute of Technology.  She's

19       currently vice-president of the Eastman Kodak

20       Company.

21   Q.  Did she work for A.B. Dick?

22   A.  As a consultant.

23   Q.  Does she also have an association with PressTek?

24   A.  She was asked to join their board, or she was on

25       their board.

224

1    A.   Yes.

2    Q.   When Hal resigned from the board on March 23rd,

3         2004 or thereabouts, why did he resign?

4    A.   He expressed a concern of having a conflict of

5         interest serving MHR and A.B. Dick.

6    Q.   That resignation was at the same time or in the

7         same context with the idea that Hal would go out

8         and propose a deal where there would be an

9         assumption of all of the liabilities in exchange

10        for a reduction of approximately $15 million?

11   A.   Right.

12   Q.   Is his involvement in that negotiation what he

13        felt was going to create the conflict of

14        interest?

15   A.   I don't know for sure.

16   Q.   Did he communicate directly with you as to why he

17        felt he should resign?  In other words, is this

18        something he told you, or is this something you

19        heard?

20   A.   It was something I heard.

21   Q.   You were asked about the reason for the reduction

22        in the offer between the June 16th deal and the

23        deal that we're all now looking at.  Other than

24        the fact that it happened, are you aware of an

25        explanation for the reason in the reduction for

225

1    the initial 60 plus million dollar offer to the

2    next one on the table, which was 45?

3  A.  I think there was a 50 in the interim there.

4  Q.  I'm sorry.  You're right.

5  A.  I can only tell you what I observed, and that was

6    that we had a $65 million, $65.1 million offer on

7    the table, and some conversations were going on

8    that I wasn't a part of, and I believe they

9    included Hal, and when they came back, it was 50.

10  Q.  So this is a period of time when you were not

11    directly involved in negotiation?

12  A.  That's right.

13  Q.  Did you ever ask Hal for an explanation as to why

14    the deal went from 60 plus to 50?

15  A.  I did not ask him that question.

16  Q.  Then in connection with the reduction from 45 to

17    40, which as we've heard there was this

18    intervening visit by Moosa to Chicago, correct?

19  A.  Correct.

20  Q.  Was the -- let me ask you if you personally

21    believed Moosa's statement that the deal was

22    changing because the company was no longer what

23    they thought the company was as opposed to simply

24    the fact that they now had the leverage to do

25    what they wanted to do?  I'm asking you for your

226

1    personal belief.

2                    MR. PHILLIPS:  Objection.

3                    Go ahead.

4    A.  I think Moosa is a very shrewd negotiator, and I

5        would not be surprised if, in fact, this was part

6        of his methodology.

7    Q.  If I could explore just a little further the idea

8        of taking legal action against PressTek when they

9        originally announced that the terms of the escrow

10        agreement hadn't been met.  Was there anyone on

11        the Paragon level that was advocating taking some

12        legal action?

13    A.  I don't recall that.  Things were moving very

14        quickly, and I don't recall whether someone made

15        that comment in the heat of the discussions or

16        not.  I just don't recall that.

17    Q.  Was taking legal action something that you had

18        your own questions and had questions in your own

19        mind about whether it was an option?

20    A.  I may have been too intensely focused on the

21        negotiation, but I was still hopeful that we were

22        going to work our way through this knot.

23    Q.  As a practical matter, could A.B. Dick have

24        survived long enough to prosecute a legal action?

25    A.  Probably not.

227

1  Q.  Is that something that was discussed at all at

2      the board level as a reason for not pursuing

3      legal action?

4  A.  It may have been, but it was a moot point.

5  Q.  By moot?

6  A.  There was no time.

7  Q.  So the Stark reality was that a legal option

8      wasn't viable simply because there wasn't the

9      time to go prosecute that kind of case?

10 A.  That's true.  This board did not have a

11     propensity to pursue that.  They certainly may

12     have considered it, but as I said, I for one was

13     focused on working with reasonable people to get

14     through this knot.

15 Q.  Now, I also want to talk a little bit about this

16     board level discussion about declaring bankruptcy

17     where Mr. Tomsich was opposed, correct?

18 A.  Yes.

19 Q.  Was there a formal vote taken on that at that

20     board meeting?

21 A.  It didn't come to a vote because Tomsich was

22     absolutely overruled.  I mean people were so

23     outspoken, Bob knew there was no need for a vote.

24 Q.  Isn't the reality of it, however, that

25     Mr. Tomsich has a controlling stock position and

229

1     bankruptcy.

2  Q.  Okay.

3  A.  And so I had no reason to be enlightened

4     regarding our responsibilities in bankruptcy.

5  Q.  And would that hold true into the -- would you

6     have had any awareness of that obligation as of

7     February of 2004?

8  A.  Somewhere around that time frame.

9  Q.  All right.  You indicated there might have been

10     other expressions of other inquiries, but none of

11     them were substantial enough to get on the radar

12     screen in the 2003/2004 time frame.  Do you

13     recall anybody other than Eastman Kodak?

14  A.  I do not.

15  Q.  Do you even recall that there were any?

16  A.  Yeah, a couple names.

17  Q.  All right.

18  A.  I heard it third hand, and it just didn't

19     register who they were because nothing was going

20     to come of it.

21  Q.  Who would those inquiries have gone to?

22  A.  I think Fountain.

23  Q.  So he would be the person most likely able to

24     answer that question?

25  A.  Yes.

230

1   Q.   When you were shown the series of documents about

2        whether or not KeyBank had consented or hadn't

3        consented or KeyBank's consent had been met or

4        hadn't been met, coupled with PressTek's letters

5        indicating they felt the condition hadn't been

6        met, you said you thought that it just might be a

7        timing issue.  And by that do you mean that you

8        thought that the letters might have crossed in

9        the mail or that the consent had been given

10       technically late or something else?

11  A.   It was a simple -- one explanation is that they

12       could have crossed in the mail.  I think the

13       deadline was the end of business at 5:00.

14  Q.   The escrow agreement reads close of business.

15  A.   Close of business.  And if I remember correctly,

16       the e-mail, just having looked at it tonight, the

17       time is 6 something.  I don't know the timing of

18       the letter.

19            So I'm assuming that KeyBank sent the letter,

20       and someone who sent the e-mail hadn't read it

21       yet.  What that means, I don't know.

22  Q.   Just a couple more.

23            There was a reference to a lawsuit to have

24       Hal put back on the board.  I take it that would

25       have been his request to come back on the board

A201

231

1     after he had been on and left, correct?

2  A.   Yes.

3  Q.   Was there a reason why there was resistance to

4     putting Hal back on the board?

5  A.   One issue was simply timing. I mean my

6     understanding was Hal requested to be put back on

7     the board, and within a day or two there was a

8     lawsuit. Everybody was very busy. Counsel was

9     very busy, so you know, I don't know. I don't

10    know what else to say about that.

11  Q.  Was one of the reasons that Brian Longe was kept

12    out of the loop on the transaction the fact that,

13    and by that I mean the negotiations with

14    PressTek, the reason that PressTek wanted him

15    gone?

16  A.  It was felt generally Brian would not add any

17    value to the negotiation.

18  Q.  I presume no one ever told Mr. Longe that

19    PressTek was not particularly enamored with him?

20  A.  No.

21            MR. CROUCH: I think that's all I

22    have. Just give me one minute.

23          That's all I have.

24           MS. KOWALCZYK: I have one other

25    quick question.

# EXHIBIT C

COPY

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          FOR THE DISTRICT OF DELAWARE

4

    In Re:                    ) Chapter 11

5                             ) Case Nos. 04-12002

    A.B. DICK COMPANY, et al., ) (CGC)

6                             ) Jointly

    ---------------------------) Administered

7

8

9

10

11          DEPOSITION OF MOOSA E. MOOSA

12              New York, New York

13          Wednesday, October 20, 2004

14

15

16

17

18

19

20

21

22

23

24  Reported by:

    TAMI H. TAKAHASHI, RPR

25  JOB NO. 166399A

1                              Moosa

2    summer of 2003, begin to look at some of the

3    financial data from A.B. Dick?

4         A.    No.

5         Q.    No.  When did you start doing that?

6         A.    In the fall of 2003.

7         Q.    Okay.  There were some initial

8    meetings and -- in the summer of 2003; is that

9    correct?

10        A.    I can't remember specifically, but it

11   was sometime during that time.

12        Q.    Okay.  Let's see if I can use a few

13   documents to help us here.

14             MR. FAY:  I'd like to have marked, as

15        Exhibit 1 to Mr. Moosa's deposition, a

16        document that's been produced to us by

17        Presstek.  It bears Bates stamp numbers 2800

18        through 2805.

19             (Moosa Exhibit 1, E-mail dated 7/1/03,

20        from Moosa to Marino, marked for

21        identification, as of this date.)

22             MR. FOLLAND:  Michael, could I make a

23        request, because, obviously, you haven't

24        been involved in some of the other

25        depositions, but there's been a continual

```
 1                    Moosa
 2    lack of having enough copies for all
 3    counsel, and it makes it very difficult.
 4         If you know what exhibits you're going
 5    to use, could you please have someone go
 6    make copies of them now, because it makes it
 7    very difficult to follow along.
 8         MR. FAY:  I've got -- how many did I
 9    have?  I had one for him, one for me.  I had
10    five.  Last deposition I was at, that was
11    more than enough.
12         MR. FOLLAND:  Okay.  Maybe then --
13         MR. FAY:  I think we're one short.
14         MR. SLATTERY:  You have three spares.
15         MR. FAY:  Right.
16         MR. PHILLIPS:  That's enough.
17         MR. SLATTERY:  You're really one
18    short.
19         MR. PHILLIPS:  That's okay if you have
20    one for the three of us.  As long as we have
21    one for the three of us.
22         MR. FAY:  All right.
23         MR. CROUCH:  I don't have one.
24         MR. PHILLIPS:  Right.  That's the
25    problem.
```

Page 12

1                    Moosa

2           (Discussion off the record.)

3       Q.    Mr. Moosa, have you had a chance to

4    look at what we've marked as Exhibit 1 to your

5    deposition?

6       A.    Yes.

7       Q.    Okay.  And this is, apparently, an

8    e-mail from you dated July 1st, 2003 to

9    Mr. Marino; is that correct?

10      A.    Yes.

11      Q.    And Mr. Marino is the CEO of Presstek;

12   is that correct?

13      A.    Yes.

14      Q.    Okay.  Project Bright Silver, was that

15   the name that you gave the project whereby you

16   were considering an acquisition of A.B. Dick?

17      A.    I did not give the name.

18      Q.    But was that the name that was used at

19   Presstek?

20      A.    Yes.

21      Q.    Okay.  So, it's your understanding

22   that this e-mail addresses the potential

23   acquisition of A.B. Dick?

24      A.    Can you repeat that question, please.

25      Q.    This e-mail discusses an initial

Page 13

1                         Moosa

2     assessment, correct?

3         A.    Yes.

4         Q.    Okay.  And that would have been an

5     initial assessment of A.B. Dick; is that a fair

6     statement?

7         A.    Yes.

8         Q.    Okay.  Do you recall why you wrote

9     this e-mail to Mr. Marino?

10        A.    We were looking -- we were trying to

11    do an initial assessment.

12        Q.    Okay.  And at what point did

13    Mr. Marino call you and ask you to do an initial

14    assessment; is that how it went?

15        A.    I don't recall.

16        Q.    You can't recall.  Right.

17              And you asked -- in this e-mail you

18    asked for several categories of information; is

19    that correct?

20        A.    Yes.

21        Q.    And in part one, for example, you have

22    historic overview of the company, operation

23    overview, correct?

24        A.    Yes.

25        Q.    Okay.  And in part 2, you have

1                          Moosa

2    consolidated income statement for the last three

3    years, product line income statement for the last

4    three years, correct?

5         A.    Yes.

6         Q.    And other forms of financial

7    information?

8         A.    Yes.

9         Q.    Did you receive that financial

10   information from A.B. Dick?

11        A.    At some point in time.

12        Q.    Right.  Do you recall how soon after

13   this e-mail you got that kind of information?

14        A.    No.

15        Q.    Okay.  But it would be fair to say

16   that you got it by the fall of 2003, correct?

17        A.    Yes.

18             MR. SLATTERY:  I would just note, for

19             the record, that Exhibit 1 appears to be

20             more than -- two different documents, one of

21             which is dated July 10th and the other is

22             July 1st.

23             MR. FAY:  Yes, actually you're right.

24        Q.    In fact, let's talk about that -- as

25   your counsel just pointed out, Mr. Moosa,

Page 15

                                Moosa

1

2    Exhibit 1 also has an e-mail from July 10th, nine

3    days later, that's directed from Mr. Marino to

4    you and a Mitchell Hara, correct?

5        A.    Yes.

6        Q.    And attached to that e-mail is what is

7    described as basic data on Project Silver; is

8    that correct?

9        A.    It appears so.

10       Q.    Right.  Do you know where this basic

11   data came from?

12       A.    I can't recall.

13       Q.    Okay.  Is it possible that, by

14   July 10th, 2003, A.B. Dick had provided Presstek

15   with some financial data?

16       A.    It's unlikely.

17       Q.    Why do you say it's unlikely?

18       A.    Because it took a significantly longer

19   period of time from when we requested information

20   and when we got the information.

21       Q.    You think this might have been put

22   together from publicly available information?

23       A.    Yes.

24            MR. FAY:  Let's mark this as Exhibit 2

25        to Mr. Moosa's deposition.

Page 16

1                          Moosa

2              (Moosa Exhibit 2, E-mail dated

3         7/15/03, from Marino to Zaffino, marked for

4         identification, as of this date.)

5              MR. FAY:  For the record, what we've

6         marked as Exhibit 2 is a document produced

7         to us by Presstek, Bates stamped 4505

8         through 4509.

9         Q.    Mr. Moosa, Exhibit 2 to your

10    deposition is an e-mail from Mr. Marino on which

11    you were cc'd, correct?

12        A.    Can I have a moment to review this,

13    please?

14        Q.    Sure.

15             MR. SLATTERY:  I'll just note again, I

16        don't know if it's -- they're all like this,

17        but it's more than one document.

18             MR. FAY:  Yes.  Just the first page of

19        this e-mail --

20             MR. SLATTERY:  I think the first

21        three.

22             MR. FAY:  Right.  First three is an

23        e-mail from July 15th.

24        Q.    Mr. Moosa, the first e-mail in what

25    we've marked as Exhibit 2 is a July 15th e-mail