Page 17

                              Moosa

1

2    from Mr. Marino to yourself, correct -- and

3    others?

4        A.    I was copied.

5        Q.    Right.  And it attaches a letter from

6    Mr. Marino to Frank Zaffino; is that correct?

7        A.    Yes.

8        Q.    Do you recall this letter being sent?

9        A.    I don't recall.

10        Q.    Did you review the letter before it

11    was sent?

12        A.    I'm not sure.

13        Q.    Okay.  The letter expresses Presstek's

14    interest in the acquisition of A.B. Dick,

15    correct?

16        A.    Yes, sir.

17        Q.    Okay.  And it states in the third

18    paragraph:  "At this stage, we believe that a

19    prospective purchase price of up to $60 million

20    for A.B. Dick as a debt-free enterprise is within

21    reason."

22              Do you see that?

23        A.    Yes.

24        Q.    Do you know where that $60 million

25    number came from?

Moosa

1

2      A.    It was a number that was requested

3  from Tomsich.

4      Q.    So, Mr. Tomsich had communicated to

5  Presstek his desire that A.B. Dick be acquired

6  for approximately $60 million?

7      A.    Yes.

8      Q.    Okay.

9            MR. SLATTERY:   It's T-O-M-S-I-C-H.

10      Q.    How was that number communicated to

11  Presstek?

12      A.    At the time Mr. Tomsich said that the

13  EBITDA was $6 million and, therefore, he would

14  like to get $60 million.

15      Q.    Okay.  And were you involved in the

16  determination that that price was within reason?

17      A.    There was no determination whether it

18  was within reason.  It just said up to

19  $60 million.

20      Q.    So, no analysis had been done at

21  Presstek, as of this date, as to the

22  reasonableness of the $60 million price?

23      A.    As I understand, yes.

24      Q.    Okay.  And you certainly hadn't done

25  such an analysis; is that correct?

Page 19

1                    Moosa

2      A.    That's correct.

3      Q.    The second e-mail attached to

4  Exhibit 2 is an e-mail from Mr. Zaffino to

5  Mr. Marino, correct?

6      A.    Yes.

7      Q.    All right.  And it discusses the fact

8  that Mr. Zaffino had forwarded Presstek's

9  performance report to Bob Tomsich and John

10  Fountain.  Do you see that?

11      A.    Yes.

12      Q.    Do you know what that's a reference

13  to?

14      A.    I can speculate.

15      Q.    Go ahead.

16      A.    Maybe quarterly earnings.

17      Q.    Okay.  Had Mr. Tomsich expressed an

18  interest in seeing financial information about

19  Presstek?

20      A.    Yes.

21      Q.    The last e-mail that's part of

22  Exhibit 2 is an e-mail from Mr. Marino dated

23  August 4th, 2003 to yourself and others, correct?

24      A.    Yes.

25      Q.    And it refers to a Project Silver

1                    Moosa

2    understanding of what Nesco was?

3        A.    I understood it to be the parent

4    company of Paragon.

5        Q.    Okay.  Were there discussions had with

6    the representatives of Paragon or A.B. Dick about

7    what that return on equity the shareholders of

8    Nesco wanted?

9        A.    No.

10       Q.    You never had any of those

11   discussions?

12       A.    I don't remember.

13       Q.    Okay.  Do you know where this

14   7.5 million came from?  Did anyone ever explain

15   it to you?

16       A.    No.

17       Q.    The second e-mail attached to

18   Exhibit 6 is an e-mail -- an October 31st, 2003

19   e-mail from Mr. Brim to yourself, to Mr. Marino

20   and others, correct?

21       A.    Yes.

22       Q.    Okay.  And it shows Multigraphics

23   liability cash flows, correct?

24       A.    Yes.

25       Q.    What is Multigraphics?

1                          Moosa

2       A.     My understanding is Multigraphics was

3    a company that A.B. Dick acquired.

4       Q.     Okay.  Do you know why Mr. Brim was

5    generating cash flows regarding Multigraphics on

6    or about October 31st, 2003?

7       A.     I don't believe Mr. Brim was

8    generating any cash flows.

9       Q.     Okay.

10       A.     I believe that this information is

11    from A.B. Dick.

12       Q.     Okay.  Was there anything in

13    particular about Multigraphics that you were

14    looking at, at this time?

15       A.     Yes.

16       Q.     And what was that?

17       A.     In the information that was forwarded

18    to us, it -- it looked like there was a large

19    amount of preacquisition obligation that did not

20    relate to the operations of the existing

21    company.  And we were probing into that.

22       Q.     What was the nature of those

23    obligations?

24       A.     A variety of obligations.  Some of

25    which comprised post retirement medical cost.

Page 38

1                              Moosa

2    Some were post retirement insurance costs.  There

3    were some environmental costs.  And I can't

4    remember what else.  There may have been some

5    insurance, retros.

6         Q.    Okay.  And you were probing those

7    issues during this time frame in October of 2003,

8    correct?

9         A.    Yes.

10        Q.    Would it be fair to say you looked at

11   those issues in more depth in the December,

12   January time frame?

13        A.    Some aspects of it.

14        Q.    Okay.  Those preacquisition costs

15   associated with Multigraphics, would it be fair

16   to say that those costs ultimately were a factor

17   in Presstek lowering its proposed acquisition

18   price from 65 million?

19        A.    It may have been.

20        Q.    Okay.  You don't know?

21        A.    I'm not sure, specifically.

22        Q.    Okay.  Ultimately, a stock purchase

23   agreement was put in escrow on or about June

24   16th, 2004 for the acquisition of A.B. Dick,

25   correct?

1                          Moosa

2        A.      (Witness nodded head.)

3                MR. SLATTERY:  Objection to form.

4        Q.      You have to say Yes.

5        A.      Yes.

6        Q.      Okay.  And the purchase price in that

7    stock purchase agreement was not 65.1 million,

8    correct?

9        A.      Yes.

10       Q.      Okay.  It was a lesser amount,

11   approximately 44.1 million, correct?

12       A.      Yes.

13       Q.      Okay.  Were you involved in the

14   negotiations from the 65.1 to the 44.1?

15       A.      Depends what you mean by "involved."

16       Q.      Were you actually there negotiating

17   with representatives of Paragon or A.B. Dick?

18               MR. SLATTERY:  Over the price?

19               MR. FAY:  Over the price.

20       A.      I supported the negotiations.

21       Q.      Okay.  So, you provided support to

22   Mr. Marino during those negotiations?

23       A.      Yes.

24       Q.      Would it be fair to say you did most

25   of the negotiating?

1                          Moosa

2    subsidiaries?

3         A.    There were a bunch of others, but I

4    can't recall.

5         Q.    Okay.  Did anyone at A.B. Dick say,

6    sorry.  We're just not going to give you that?

7         A.    Yes.

8         Q.    Who said that?

9         A.    I think, people like Frank Zaffino.

10        Q.    Do you recall what Mr. Zaffino refused

11   to give you?

12        A.    We wanted access to management.

13        Q.    Would that be Mr. Longe?

14        A.    No.  It would be the remainder of his

15   management team, excluding Mr. Longe and

16   Mr. Knipp.

17        Q.    And did you ever get to speak to

18   management, Mr. Knipp?

19        A.    We did talk to Mr. Knipp occasionally,

20   since then.

21        Q.    Okay.  But when was this request

22   made?  When did you ask for access to management

23   and Mr. Zaffino refused it?

24        A.    We've been consistently asking for

25   that access from the very early stages.

Page 48

1                        Moosa

2      Q.    Okay.  And was there repeated refusals

3  to provide access to management?

4      A.    I think refusal may have been a strong

5  word.  I think the inclination was not to involve

6  them at that point.

7      Q.    And why was that?  Did Mr. Zaffino

8  ever give you a reason for that?

9      A.    I can't remember.

10     Q.    Okay.  Anything else you remember

11  that -- where anyone at A.B. Dick refused to

12  provide you with something that you had

13  requested?

14     A.    I think there was a list of open items

15  which we didn't get information on, but I can't

16  recall at the moment.

17     Q.    Did you ever put all those open items

18  on one list, send it to somebody at A.B. Dick and

19  say, these are still outstanding issues, please

20  provide us with this information?

21     A.    I'm not sure exactly what we did.

22          MS. CONROY:  Hold on.

23          (Brief interruption.)

24          MR. FAY:  Can you read back his

25      answer.

1                           Moosa

2                    (Record read.)

3       Q.     When it came to due diligence, was

4    there any one person at Presstek who had

5    responsibility for overseeing that due diligence

6    with respect to A.B. Dick?

7       A.     I was responsible for coordinating it.

8       Q.     You did have responsibility?

9       A.     Yes.

10      Q.     Okay.  Were there any employees at

11   Presstek that you relied on, in particular, to

12   conduct that due diligence?

13      A.     We relied on the entire team.

14      Q.     Excuse me?

15      A.     We relied on the entire team.

16      Q.     Entire team.  And who were the members

17   of that team?

18      A.     The team internally would have

19   comprised Jim Scafide, Cathy Cavanna, Bill

20   Davison.  And we had consultants like Michael

21   McCarthy.  We had also external firms like KPMG,

22   McDermott Will & Emery, Mercer, Marsh.

23      Q.     Did you conduct site visits during

24   that the due diligence process?

25      A.     We were not allowed to do site visits.

Page 50

1                          Moosa

2        Q.    You were not allowed to do site

3   visits?

4        A.    Yes.

5        Q.    Did you ask to do them?

6        A.    Yes.

7        Q.    And who did you ask?

8        A.    Primarily, Frank Zaffino and

9   John Fountain.

10       Q.    And they refused?

11       A.    Yes.

12       Q.    Did they tell you why they refused?

13       A.    I can't recall what was the reason.

14       Q.    Did you find that a bit odd?

15             MR. PHILLIPS:  Objection.

16       A.    No.  I felt it may have been not the

17   right time.

18       Q.    Not the right time to actually do a

19   site visit?

20       A.    Yeah.

21       Q.    Why would a time be right or wrong on

22   a site visit?

23       A.    In my experience, there have been --

24   some sellers are more open to early site visit,

25   as opposed to later site visit.  Our view was we

Page 51

```
 1                        Moosa
 2    would get to the site visit at some point in
 3    time; so, it was not critical that it be done
 4    right away.
 5         Q.    Did you ever get to it?
 6         A.    I don't recall.
 7         Q.    On or about June 16th, 2004, when the
 8    stock purchase agreement was placed in escrow, do
 9    you remember there being any discussions at
10    Presstek, in or about that time, where someone
11    was saying, we can't do this because there's
12    still information we need from A.B. Dick?
13         A.    Can't do what?
14         Q.    We can't escrow this stock purchase
15    agreement.
16              MR. SLATTERY:  Can you read the
17         question back, please.
18              (Record read.)
19              MR. SLATTERY:  Objection.
20         A.    I'm not clear -- I'm not clear about
21    the question.  I'm not sure what you are asking
22    here.
23         Q.    Right about that time frame of June
24    16th, 2004, do you recall having discussions at
25    Presstek where someone was saying, we can't
```

Page 52

1                          Moosa

2     finalize the stock purchase agreement because

3     there's still information we need from A.B. Dick?

4                MR. SLATTERY:  Objection.

5          A.    Our agreement, or at least the

6     agreement allowed Presstek to do due diligence,

7     to the extent it deemed necessary.  And we were

8     going to do that while it was in escrow.

9          Q.    Okay.  On or about June 16th, 2004

10    when you escrowed the stock purchase agreement,

11    was it your opinion you still had due diligence

12    to conduct?

13         A.    Extensive more.

14         Q.    And that due diligence had to be

15    complete by the 25th of June, correct?

16         A.    I'm not sure what day it was.

17         Q.    Okay.  And if I tell you, if I

18    represent to you that the escrow agreement

19    required that the due diligence be completed by

20    the 25th, would you have any reason to disagree

21    with that?

22         A.    No.

23         Q.    Okay.  That extensive due diligence

24    you're referring to, was it your intent to finish

25    it in nine days?

Page 53

1                       Moosa

2        A.    The entire deal, yes.

3        Q.    In fact, you would have had to do it

4   in even less than nine days because you needed to

5   do it to make a presentation to your board,

6   correct?

7        A.    I'm not sure whether we needed to do a

8   presentation to the board and when the

9   presentation was going to be done to the board,

10  but, yes.

11       Q.    Okay.  By June of 2004 for how long

12  had you been looking for A.B. Dick?

13       A.    Less than a year.

14       Q.    Okay.  But it was more than 10 months,

15  correct?

16       A.    In varying degrees, yes.

17       Q.    And, yet, it's your testimony that by

18  June 16th, 2004 there was still extensive due

19  diligence that needed to be conducted?

20       A.    Yes.

21       Q.    And, yet, due diligence had been

22  conducted throughout those 10 months, correct?

23       A.    Some due diligence was done.

24       Q.    Okay.  And then with that extensive

25  due diligence, you were going to do it in nine

1                           Moosa

2    days?

3          A.    Yes.

4          Q.    When did you begin that due diligence?

5          A.    We never began to do due diligence --

6          Q.    Okay.

7          A.    -- as such.

8          Q.    So, the stock purchase agreement was

9    escrowed on the 16th of June 2004, correct?

10         A.    If you say so.

11         Q.    Okay.  The next day, on the 17th of

12   June, no due diligence was conducted?

13         A.    I can't -- what day was the 17th?

14         Q.    A Thursday.

15         A.    Um-hum, yes.

16         Q.    Okay.  And then Friday, June 18th, no

17   due diligence was conducted?

18         A.    Yes.

19         Q.    Okay.  And none was conducted over the

20   weekend?

21         A.    Yes.

22         Q.    Okay.  Was any due diligence conducted

23   on Monday, June 21st?

24         A.    We had planned to.

25         Q.    Okay.  You had planned to start on the

Page 55

```
 1                      Moosa
 2   21st?
 3        A.    We planned to --
 4              MR. SLATTERY:  Objection.
 5        A.    We planned to start due diligence as
 6   soon as the seller was available to provide us
 7   with the information.
 8        Q.    Okay.  All right.  So, you planned --
 9   but did you actually do any due diligence on the
10   21st?
11        A.    We -- we were given information for
12   the first time we had access to the management on
13   the 21st, which was a Monday, yes.
14        Q.    Okay.  So, you did see some
15   information, you had access to management on June
16   21st, 2004, correct?
17        A.    Yes.
18        Q.    Okay.  And that was in Cleveland,
19   right?
20        A.    No, that was in Chicago.
21        Q.    Okay.  Sorry.  In Chicago.  And you
22   went out to Chicago, correct?
23        A.    Yes.
24        Q.    You and Mr. Marino and Mr. Scafide
25   went out to Chicago; is that correct, on Monday,
```

Page 56

1                         Moosa

2    June 21st?

3        A.    No.

4        Q.    Okay.  What date did you go to

5    Chicago?

6        A.    On the 21st.

7        Q.    On the 21st?

8        A.    Yes.

9        Q.    And that was a Monday, correct?

10       A.    Yes.

11       Q.    Okay.  What about on the 22nd, did do

12   any due diligence on the 22nd?

13       A.    No.

14       Q.    Okay.  And then, no due diligence on

15   the 23rd, 24th or 25th, correct?

16       A.    Yes.

17       Q.    Other than you, Mr. Marino and

18   Mr. Scafide, did anyone else from the Presstek

19   team that you testified about earlier, did they

20   go out to Chicago on the 21st and conduct due

21   diligence?

22       A.    I did not testify that Mr. Scafide and

23   Mr. Marino went to Chicago on the 21st.

24       Q.    Okay.  Who went to Chicago on the

25   21st?

Page 57

1                        Moosa

2        A.     I went with Mike McCarthy.

3        Q.     Okay.  Okay.  Other than you and

4    Mr. McCarthy, did anyone else from your team

5    travel to Chicago on June 21st?

6        A.     No.

7        Q.     And did any of those other individuals

8    who were on that team, did any of them conduct

9    any other due diligence on the 21st of June,

10   2004?

11       A.     Not to the best of my knowledge,

12   because the seller was not ready and available.

13       Q.     But the seller was ready to meet with

14   you and Mr. McCarthy, correct?

15       A.     In a different context, yes.

16       Q.     And how was that context different?

17       A.     Between the 16th -- 17th and the 21st,

18   Key Bank asked us to bridge or advance moneys.

19   And we said, if you want us to do that, we have

20   to have access to information.  And so, our visit

21   was in that context.

22       Q.     Okay.  So, that meeting that you had

23   on the 21st in Chicago, that was not due

24   diligence, that was with respect to a potential

25   bridge loan from Presstek to A.B. Dick?

Page 58

1                    Moosa

2              MR. SLATTERY:  Objection to the form.

3         A.    I would characterize it as a diligence

4    for both.

5         Q.    Okay.  Who did you meet with in

6    Chicago on the 21st?

7         A.    People that were present from the

8    company was Greg Knipp, Larry Mascia, David

9    Vanderweil, Lynn Gerky, the person that runs the

10   service business, I can't recall his name.  And I

11   believe Frank Zaffino was there.

12        Q.    Okay.  And what was discussed?

13        A.    We wanted a status of the operating

14   results through May and a forecast for the next

15   three months in the next -- and for the remainder

16   of the year.

17        Q.    Had you previously asked for this

18   information?

19        A.    We had previously asked for the

20   information, yes.

21        Q.    Okay.  And when would that prior

22   request have been made?

23        A.    It would have been made sometime

24   between the end of May and that time frame.

25        Q.    Prior to the escrow of the stock

Page 59

Moosa

1                      Moosa

2    purchase agreement on June 16th, 2004 you were

3    provided with financial information about

4    A.B. Dick's performance in May, correct?

5         MR. SLATTERY:  Objection.

6    A.    Very limited information.

7         MR. FAY:  For the record, Exhibit 7 is

8    an e-mail dated June 14th, 2004.  It was

9    produced to us by Presstek, and it's Bates

10   stamped 31588 through 31603.

11        (Moosa Exhibit 7, E-mail dated

12   6/14/04, from Knipp to Moosa, marked for

13   identification, as of this date.)

14        MR. PHILLIPS:  Can I suggest we take a

15   break at this point?

16        MR. FAY:  Yes.

17        (Recess taken.)

18   Q.    Mr. Moosa, have you had a chance to

19   look at what we've marked as Exhibit 7 to your

20   deposition?

21   A.    Yes.

22   Q.    And this is a June 14th, 2004 e-mail

23   from Greg Knipp to yourself and Mr. Zaffino?

24   A.    Yes.

25   Q.    Do you remember receiving this e-mail?

Page 60

1                          Moosa

2        A.    Yes.

3        Q.    And the financial results that were

4    attached to it?

5        A.    Yes.

6        Q.    Did you review this report entitled

7    "A.B. Dick Company financial performance, May

8    2004"?

9        A.    I don't recall when I did, but it

10   looks like I looked at it.

11       Q.    Okay.  Did this financial report that

12   you received on the 14th of June, did it show

13   that A.B. Dick's performance in May was below

14   what they budgeted?

15       A.    It does show.

16       Q.    If we look at the page Bates stamped

17   31591, it shows that A.B. Dick fell short of its

18   budgeted total revenues, correct?

19       A.    Yes.

20       Q.    And it fell short of its budgeted net

21   operating income, correct?

22       A.    Yes.

23       Q.    And it fell significantly short of its

24   budgeted EBITDA?

25       A.    Yes.

```
 1                     Moosa
 2   with Key Bank continued funding after you
 3   received this letter?
 4       A.    I don't remember.
 5       Q.    Okay.  By the end of the day on the
 6   22nd, your counsel had declared the escrow
 7   agreement null and void, correct?
 8       A.    I'm not sure what our counsel
 9   declared.
10       Q.    Did you have any discussions with
11   representatives of A.B. Dick about the adequacy
12   of this letter that you received from Key Bank on
13   June 22nd, 2004 with respect to Key Bank's
14   willingness to continue funding?
15       A.    Probably.
16       Q.    And A.B. Dick took the position that
17   it was sufficient, correct?
18       A.    I don't remember.
19       Q.    You don't remember.
20             You don't remember anyone from
21   A.B. Dick telling you, this is sufficient, that
22   Key Bank is agreeing to continue funding?
23       A.    I don't remember.
24       Q.    Who at A.B. Dick would you have had
25   those discussions with?
```

1                    Moosa

2          MR. SLATTERY:  Objection.

3      A.    It would be their lawyers, or could be

4  John Fountain or Frank Zaffino.

5      Q.    Was the principal reason that Presstek

6  objected to this letter from Key Bank that it had

7  not signed the consent agreement as it was

8  appended to the stock purchase agreement?

9          MR. SLATTERY:  Objection to the form.

10     A.    Can you repeat that question, please.

11     Q.    In determining that this letter was

12  inadequate with respect to the issue of continued

13  funding from Key Bank, was the principal basis

14  for that determination that Key Bank had not

15  signed the consent agreement as it was appended

16  to the stock purchase agreement?

17         MR. SLATTERY:  Objection.

18     A.    I'm sorry.  I still don't understand

19  it.

20     Q.    In Presstek's mind, collective mind,

21  why was this letter from Key Bank not sufficient

22  consent?

23     A.    We had an agreement with the --

24  between the buyer and seller that certain

25  conditions would be met.  One of the conditions

Page 90

1                         Moosa

2    that needed to be met is the seller was required

3    to get the consent in the form that was

4    negotiated.

5              And it was -- MHR was largely desirous

6    of this kind of consent.

7              And it was condition -- one of the

8    conditions that needed to be satisfied by the

9    22nd of June and, in our opinion, this fell short

10   of that.

11       Q.    Okay.  But why?  Why did it fall

12   short?

13       A.    Because it did not meet the

14   requirements of that consent.  There were a whole

15   bunch of things that the bank had to either waive

16   or approve or consent to.  I don't know all the

17   details now.

18       Q.    Did you ever ask any representative of

19   MHR whether MHR would be willing to waive those

20   other conditions?

21       A.    We did not.  There was no time for it.

22       Q.    Okay.  You said that it was -- that

23   the consent agreement was largely drafted by

24   MHR.  Did it ever occur to you that, maybe, we

25   should call MHR on the phone and say, does -- is

1                          Moosa

2    this sufficient?  Can we go forward?

3              MR. SLATTERY:  Objection.

4        A.    There was -- the one aspect was,

5    obviously, the reluctance on the bank to

6    further -- to advance, to give further advances

7    to the company.  That, to us, seems strange,

8    seems odd.

9        Q.    Didn't this letter from Key Bank on

10   June 22nd indicate that it was willing to give

11   further advances?

12             MR. SLATTERY:  Objection.

13       A.    I think --

14             MR. SLATTERY:  The document speaks for

15       itself.

16       A.    I think you have to go back to the

17   chain of events that occurred three days

18   previously.

19       Q.    Why do you have to go back to that

20   chain of events?

21       A.    This has to be put in that context.

22       Q.    And how does that change your

23   interpretation of this letter to put in the

24   context of those three prior days?

25       A.    The bank had been unwilling to fund

Page 92

1                    Moosa

2    the advances and, in fact, asked us to fund the

3    advances.

4        Q.    Okay.  But on the 22nd, they were

5    indicating that they were willing to fund the

6    advances, correct?

7              MR. SLATTERY:  Objection.

8        A.    Just -- that's just one element of

9    what they were required to do.

10       Q.    Okay.  But that was the principal

11   reason for getting Key Bank's consent, correct,

12   that they would continue funding?

13       A.    One element.

14             MR. SLATTERY:  Objection.

15       Q.    What were the other elements?

16       A.    Other elements was they had to consent

17   to the contract and waive certain of their

18   rights.

19       Q.    Okay.  And did you ever go back to

20   Key Bank and say, look, there are certain rights

21   in this consent agreement that you have to waive,

22   can you give us that, can you at least write us

23   another letter and say we agree to waive these

24   rights?

25       A.    We asked them to sign the consent.

Page 93

1                          Moosa

2        Q.    Okay.

3        A.    And they said they could not.

4        Q.    Okay.

5        A.    They were unwilling to.

6        Q.    Okay.  So, as to the issue of waiving

7    rights, you didn't carve that out and say, okay,

8    but just as to this issue will you send us a

9    letter saying this?

10        A.    We did not --

11              MR. SLATTERY:   Objection.

12        A.    -- go on a specific item basis.

13              MR. FAY:   Okay.  Let's mark this as

14        Exhibit 12 to your deposition, Mr. Moosa.

15              For the record, this is a document

16        that was produced to us by Presstek.   It's

17        Bates stamped 33481 and 33482.   It's an

18        e-mail dated June 17th, 2004.

19              (Moosa Exhibit 12, E-mail dated

20        6/17/04, from Marino to Rappaport,

21        Ebenstein, Samataro, Waite, Marino, Dreyer,

22        Howard, Moffitt and Moosa, marked for

23        identification, as of this date.)

24        Q.    Mr. Moosa, have you had an opportunity

25    to look at what we've marked as Exhibit 12 to

Page 94

1                          Moosa

2    your deposition?

3        A.    Yes.

4        Q.    This is an e-mail from Mr. Marino

5    dated June 17th, 2004 to yourself and several

6    other people?

7        A.    Yes.

8        Q.    Okay.  This is the day after the stock

9    purchase agreement was escrowed, correct?

10       A.    I believe so.

11       Q.    Okay.  And in his e-mail, Mr. Marino

12   states, "There's one additional step in the

13   process that involves an interim plan for Silver

14   over the next 30 days."

15             Do you see that?

16       A.    Yes.

17       Q.    And do you understand that to be a

18   reference to the need to obtain Key Bank's

19   consent to fund A.B. Dick for the next 30 days?

20       A.    I'm not sure what Mr. Marino intended.

21       Q.    Okay.  When you read that, when you

22   received that e-mail, did you read it?

23       A.    Yes.

24       Q.    And when you read it, how did you

25   interpret that?

Page 95

1                          Moosa

2                    MR. SLATTERY:  Objection.

3          A.     I have no idea how I interpreted it at

4    that time.

5          Q.     Okay.  It says, "Moosa, Jim and I are

6    heading to Cleveland to discuss this with Paragon

7    and their bank."

8                 Do you see that?

9          A.     Yes.

10         Q.     Okay.  Would that suggest that what

11   Mr. Marino was referring to was continued funding

12   from Key Bank for A.B. Dick?

13         A.     That's not what I understood.

14         Q.     Okay.  What did you understand?

15         A.     What I understood was that the bank --

16   at least the seller requested us to meet with

17   their bank to make them feel comfortable that we

18   have the ability and desire to close the

19   transaction.

20         Q.     Okay.  And obtaining Key Bank's

21   consent was not part of that?

22                MR. SLATTERY:  Objection.

23         A.     It was not -- to us, it was things

24   that the lawyers had to deal with.  This was not

25   a deal matter.  We had already done a deal.  It

Page 96

```
1                          Moosa
2    was a matter of somebody to get the documentation
3    in place.
4         Q.    Okay.  And the 30 days, is that a
5    reference to the period from June 17th to when
6    the parties anticipated closing the stock
7    purchase agreement?
8         A.    Yes.
9              MR. SLATTERY:  Please take your time
10        on the answer and let him finish the
11        question.
12             THE WITNESS:  Sorry.
13             MR. FAY:  Could we take a quick
14        break?
15             MR. SLATTERY:  Sure.
16             (Recess taken.)
17             MR. FAY:  This is Exhibit 13.
18             (Moosa Exhibit 13, E-mail dated
19        6/22/04, from Scafide to Ligli, marked for
20        identification, as of this date.)
21             MR. FAY:  Let me mark, as Exhibit 13,
22        a document produced to us by Presstek, Bates
23        stamped 34395 through 34396.  And it's an
24        e-mail dated June 22nd, 2004.
25        Q.    Have you had an opportunity,
```

```
 1                    Moosa
 2   Mr. Moosa, to take a look at what we've marked as
 3   Exhibit 13 to your deposition?
 4        A.    Yes.
 5        Q.    Okay.  This is an e-mail from
 6   Mr. Scafide to Mike Lugli at Key Bank, correct?
 7        A.    Yes.
 8        Q.    And then it attaches an e-mail from
 9   Mr. James Goldsmith of McDermott Will to a number
10   of people, correct?
11        A.    Yes.
12        Q.    Okay.  And Mr. Goldsmith also sent
13   this e-mail to Mr. Lugli, correct, buried in
14   there somewhere?
15        A.    Yes, sir.
16        Q.    Okay.
17        A.    A couple of times.
18        Q.    Yes.
19        A.    Must be an important guy.
20        Q.    And this e-mail was sent at 6:46 on
21   Tuesday, June 22nd, Mr. Goldsmith's e-mail?
22        A.    Yes.
23        Q.    And do you recall receiving this
24   e-mail, Mr. Moosa?
25        A.    Yes.
```

Page 102

```
 1                       Moosa
 2        Q.    Yes.
 3        A.    When you say where it "comes from,"
 4   I'm not sure what you mean.
 5        Q.    Were there discussions at Presstek as
 6   to what the purchase price of substantially all
 7   the assets of A.B. Dick should be?
 8        A.    Definitely there was discussion.
 9   There was discussion with advisors.  There was
10   discussion amongst ourselves.  So --
11        Q.    Isn't it reasonable to assume that
12   those discussions must have included a longer
13   period of time than that between 6:46 p.m. on
14   June 22nd and the next day?
15              MR. SLATTERY:  Objection.
16        A.    Definitely not.
17        Q.    So, they all took place between 6:46
18   p.m. an June 26th and the next day?
19        A.    It could have been finalized at that
20   time.
21        Q.    Okay.
22        A.    There could be a whole set of
23   numbers.  And it doesn't take as long to figure
24   out a number.
25        Q.    So, you think this whole term sheet
```

Page 103

1                      Moosa

2    and the numbers in it was generated between

3    6:46 p.m. on the 22nd and the next day?

4        A.    I don't know.

5        Q.    Who would know?

6        A.    The person who drafted this.

7        Q.    Okay.  And that would be Mr. Scafide?

8              MR. SLATTERY:  Objection.

9        A.    I think so.

10       Q.    This was a substantially lower price

11   than that in the stock purchase agreement,

12   correct?

13             MR. SLATTERY:  Objection.

14       A.    Depends how you look at it, yes.

15       Q.    You did an analysis, didn't you, that

16   showed that this was in excess of $35 million

17   cheaper than the stock purchase agreement,

18   correct?

19       A.    We did an analysis of the business, as

20   we saw it, on the 21st of June.  And we then

21   determined that the price of $40 million was

22   appropriate for the business as it stood at that

23   point in time.  So, when you say "cheaper," I'm

24   not sure what you mean.

25       Q.    Than what you were agreeing to pay

1                          Moosa

2    under the stock purchase agreement.

3         A.    If you say it's a mathematical

4    calculation, that it was a lower number,

5    probably.

6         Q.    Okay.  In fact, you were asked to do

7    an analysis of that, weren't you, a side-by-side

8    analysis?

9         A.    Maybe.

10        Q.    Okay.  You said you did an analysis of

11   the company "as it stood" on June 21st, and

12   that's how you came to the $40 million number.

13   When did you do that?

14        A.    We did a mental calculation.

15        Q.    Okay.  You did it mentally.  When did

16   you do this mental calculation?

17        A.    We did it after we looked at the

18   results of the company, talked to management and

19   looked at the forecast.

20        Q.    Okay.  And when you say "mental," did

21   you just kind of run some numbers in your head?

22        A.    Yes.

23        Q.    And when did you do that?

24        A.    Sometime between the 21st and the day

25   after.  I can't remember specifically.

Page 122

1                          Moosa

2    discussions at Presstek about why Presstek was

3    justified in proposing a deal that cut in half

4    its obligation with respect to an acquisition of

5    A.B. Dick?

6              MR. SLATTERY:  Could you read that

7         back, please.

8              (Record read.)

9              MR. SLATTERY:  Objection to the form

10        of the question.

11        A.    That was not our approach.  Our

12   approach was to determine what the performance of

13   the company was at that point in time.  And to

14   determine the valuation based on those numbers.

15        Q.    Okay.  So, prior to June 16th, 2004,

16   Presstek was of the opinion that a stock purchase

17   agreement that had an estimated total cost of

18   89.1 million was a reasonable deal, correct?

19              MR. SLATTERY:  Objection.

20        A.    Could you repeat that question,

21   please.

22        Q.    Prior to June 16th, 2004, Presstek was

23   of the opinion that a stock purchase agreement

24   that had a total estimated cost of approximately

25   $89 million was a reasonable deal?

Page 123

```
 1                      Moosa
 2           MR. SLATTERY:  Same objection.
 3      A.     Based on our information that we had
 4  at that time.
 5      Q.     Okay.  And five days later, by June
 6  21st, 2004, Presstek had concluded that the only
 7  reasonable deal would be an asset purchase
 8  agreement with a total cost of $48 million?
 9           MR. SLATTERY:  Objection.
10      A.     Based on the new information that was
11  received.
12      Q.     So, that new information that you
13  obtained in that five-day period, it was your
14  opinion that it justified an over $40 million
15  reduction in the commitment of Presstek?
16           MR. SLATTERY:  Objection.
17      A.     That was my opinion, yes.
18      Q.     Okay.  And if I remember your
19  testimony, the information you got on the 21st,
20  there were new discussions with management and a
21  forecast, correct?
22      A.     Yes.
23      Q.     And those discussions and that
24  forecast justified a $40 million reduction in
25  Presstek's commitment?
```

Page 124

1                         Moosa

2      A.    Yes.

3      Q.    Do you have any analysis where you

4   show that in writing?

5      A.    Explain to me what kind of analysis

6   you are looking for.

7      Q.    Like a side-by-side comparison of what

8   you thought you had prior to June 16th, 2004,

9   what you learned on June 21st, 2004 and how that

10  adds up to $40 million.

11     A.    We had the -- we don't have a

12  side-by-side comparison, but we knew what the

13  budget was, what management had represented and

14  what they were expecting to do for the year.

15           And that number was a favorable 6 or

16  $10 million of EBITDA.  Based on the numbers

17  that -- based on the information that we got on

18  June 21st, it was clear that the company had

19  reached a pinnacle, reached a precipitous fall.

20  And that it had a huge problem, in a sense, that

21  its go-forward run rate was significantly lower

22  and its profitability was significantly different

23  from what was presented to us in the budget and

24  forecast -- budget.

25     Q.    When we looked --

Page 125

1                        Moosa

2              MR. SLATTERY:  Please allow him to

3        complete the answer.

4              MR. FAY:  I'm sorry.

5        Q.    When we looked --

6              MR. SLATTERY:  Did you complete your

7        answer?

8              THE WITNESS:  I think so.

9              MR. SLATTERY:  Sorry.

10       Q.    We looked at the May financials that

11   were sent to you by Mr. Knipp on June 14th,

12   2004.  Do you remember that?

13       A.    Sure.

14       Q.    And we looked at the EBITDA for the

15   month of May, budgeted and actual.  Do you

16   remember that?

17       A.    Yes.

18       Q.    And the actual was 77 and the budgeted

19   was in excess of 500, correct?

20       A.    Yes.

21       Q.    Those financials which Presstek had in

22   hand prior to June 16th, 2004 showed a

23   significant fall off in EBITDA from what had been

24   budgeted, correct?

25             MR. SLATTERY:  Objection.

1                        Moosa

2        A.    One month does not make a trend.  We

3   all see situations where, in one month, things go

4   out of kilter.  But it does not indicate -- on

5   its own cannot indicate a trend, either a

6   positive trend or negative trend.

7             You have to look at everything in

8   totality and you have to understand all the facts

9   that have led to that.

10            And we didn't have any of these.  In

11  fact, management had not given us the fact.  And

12  management did not follow it up with -- follow up

13  the May information with forecasts.  It did not

14  attach that.  It did not attach a lot of things

15  with that information.

16            It was very sketchy information that

17  was provided to us.

18       Q.    Okay.  It's your testimony that that

19  package that we looked at that you received in

20  May was sketchy information?

21       A.    It was not the total package.  And it

22  was not all the information.  It did not tell us

23  what the forecast was going to be going forward.

24       Q.    Okay.  Did you ask for the forecast

25  going forward?

1                              Moosa

2         A.     I'm not sure what we asked for.  But

3     if -- if the company had a change in forecast,

4     you would have expected them to include it in the

5     package.

6         Q.     Okay.  You had financial information

7     for A.B. Dick when you received that financial

8     information from May; you had financial

9     information for A.B. Dick for January, February,

10    March, April and May of 2004, correct?

11                    MR. SLATTERY:  Objection.

12        A.     I don't believe I had April.

13        Q.     Okay.  Did you ever ask for it?

14        A.     Yes.

15        Q.     So, they gave you May, but they didn't

16    give you April?

17        A.     I don't remember.  But I remember

18    having March information.

19        Q.     Okay.  So, you had January, February,

20    March and -- at the very least you had January,

21    February, March and May, correct?

22        A.     Yes.

23        Q.     All right.  Did you ever try to do a

24    forecast of what was going to happen based on

25    those results?