1              Moosa

2       A.    No, because I was not -- I did not

3   have access to management.  And without access to

4   management, it would be nothing more than an

5   arithmetical exercise.  But those results showed

6   a trend of falling below budgeted EBITDA,

7   correct.

8              MR. SLATTERY:  Objection.

9       A.    You could have it -- you could have an

10  early portion that is slightly below budget and

11  it could recover at another time.

12      Q.    But you had at least four months,

13  maybe five months of data.  If that shows a trend

14  falling below EBITDA, wouldn't that suggest that

15  your annual actual EBITDA is going to be a lot

16  lower than budgeted?

17      A.    No.  The trend was it was slightly

18  below budget or below the trend for last year,

19  but it was very small.

20      Q.    It wasn't small in May; was it?

21      A.    The month of May is a different matter

22  altogether.  You asked me a question of in March,

23  and I'm telling you that, even based on our

24  analysis here, the run rate was not significantly

25  different.

```
 1                    Moosa
 2    looking at, your actual revenue was
 3    $46.2 million.  Your budget was 47.5.  Not a big
 4    difference.  Nothing that -- I did not have
 5    access to management.  If I sat down with
 6    management, I could have explained that or they
 7    could have explained that to me.
 8              So, when I talk about a falloff in the
 9    business, I'm referring to the revenue base.
10       Q.    Okay.  But the May numbers showed that
11    the revenue base was falling, as well, correct?
12       A.    By a small amount.
13       Q.    Okay.  When you got these March
14    numbers and -- you got these May numbers showing
15    a falloff in revenues, did you request a meeting
16    with management so you could discuss why?
17       A.    Yes.
18       Q.    And what happened?
19       A.    They said that they will give us
20    access to management during the due diligence
21    period.
22       Q.    Okay.  Did you have any discussions
23    with Brian Longe about why there was a falloff in
24    revenues?
25       A.    I did not.
```

1                              Moosa

2        Q.      Okay.  And the falloff in revenues

3    that you learned about on June 21st, 2004, in

4    your mind, that justified a $40 million reduction

5    in Presstek's commitment to purchase A.B. Dick?

6                MR. SLATTERY:  Objection to form.

7        A.      Yes.

8        Q.      Okay.  And did you ever sit down and

9    actually calculate that, say, this is what we

10   thought it was, this is what it is, and there is

11   now a $40 million spread in value?

12       A.      Our approach, at the time we looked at

13   the business and negotiated the first

14   transaction, was to base it on the business as it

15   was at that point in time.

16               When we got more information after

17   June 21st, we then assessed the business at that

18   point in time and independently determined the

19   value of the business at that point in time.

20               Our job is not to reconcile the

21   difference.  It was of academic interest.

22       Q.      And is there a model that actually

23   shows -- did you prepare a model that actually

24   shows that the assets of A.B. Dick, after what

25   you learned on June 21st, 2004, were now worth

Page 135

1                          Moosa

2     $40 million?

3          A.     I did not.

4          Q.     Did anyone in your group prepare such

5     a model?

6          A.     I'm not sure.

7          Q.     Did you ask anybody to prepare such a

8     model?

9          A.     I'm not sure.  I don't think so.

10              MR. SLATTERY:  It's about 8 minutes

11          till 1:00 -- actually, I don't know.  My

12          watch says almost 1:00.  This BlackBerry

13          says 12:52.

14              MR. RAVERT:  I've got about two

15          minutes till 1:00.

16              MR. SLATTERY:  That's what I thought.

17              MR. FAY:  Let me finish up with this

18          line of questioning.

19              MR. SLATTERY:  Sure.

20          Q.     You've testified that you did an

21     assessment after June 21st, 2004 of the value of

22     the company as you then understood it, and that

23     was at least relevant to the $40 million purchase

24     price of the asset purchase agreement, correct?

25              MR. SLATTERY:  Objection.

1                      Moosa

2      A.    Can you repeat that, please.

3      Q.    You have testified that, after

4  June 21st, 2004, you did an assessment of the

5  value of the company, correct?

6      A.    Yes.

7      Q.    That company being A.B. Dick, okay.

8              But, as you sit here today, you don't

9  know that that existed in any kind of model or

10  any kind of written form, correct?

11      A.    A valuation model?

12      Q.    Yes.

13      A.    I don't think there's a valuation

14  model.

15      Q.    Okay.  So, how could you do an

16  assessment of a company like A.B. Dick, its

17  valuation, based on this information?  Was this a

18  mental calculation?

19              MR. SLATTERY:  Objection.

20      A.    A lot of it was mental.  Part of it

21  was, we knew where they were and we used typical

22  multiplication -- valuation multiples in

23  determining the value of the entity.

24      Q.    Okay.  But that's not -- as you sit

25  here today, you don't know that that's written

# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CASE NO. 04-12002 (CGC)


- - - - - - - - - - - - - - - - x


IN RE: A.B. DICK COMPANY, Debtor


- - - - - - - - - - - - - - - - x



CONTINUED DEPOSITION OF MOOSA E. MOOSA

McDermott, Will & Emery, LLP

28 State Street

Boston, Massachusetts

Monday, October 25, 2004



Reported by: Helana Eve Kline, CSR, RPR

Job No. 1684a


ORIGINAL

Page 15

```
 1        the projections for fiscal years 2005, '6, '7,

 2        and '8 are projections assuming an acquisition

 3        of A.B. Dick's assets by Presstek?

 4   A.   Yes.

 5   Q.   Had these projections been run prior to

 6        this set of financials being created in June

 7        of 2004?

 8   A.   No.

 9   Q.   Okay.

10             MR. SLATTERY:  What is 18?

11             MS. CONROY:  Our last exhibit was No. 18.

12   Q.   We're going to mark this as Exhibit 19 to

13        Mr. Moosa's deposition; for the record, it's a

14        July 8th e-mail produced to us by Presstek;

15        it's Bates 36696 and 36697.

16             (E-mail dated July 8, 2004 marked

17              as Deposition Exhibit No. 19

18              for Identification.)

19   Q.   Mr. Moosa, have you seen previously what we've

20        marked as Exhibit 19 to your deposition?

21   A.   Yes.

22   Q.   This is a July 8th, 2004, e-mail from Jane

23        Miller to you and Mr. Scafide, correct?

24   A.   Yes.
```

```
 1   Q.  It attaches two draft press releases, correct?

 2   A.  Yes.

 3   Q.  Were either of these press releases ever

 4       actually released?

 5   A.  I think a version of the first one was

 6       released.

 7   Q.  Okay.  How about the second one?

 8   A.  I don't believe it was.

 9   Q.  Okay.  Who is Ms. Jane Miller?

10   A.  Ms. Jane Miller works in our investor

11       relations department.

12   Q.  Did you ask her to draft these press releases?

13   A.  Somebody from the team did.

14   Q.  Okay.  The first press release is entitled:

15       "Presstek terminates agreement with A.B.

16       Dick," correct?

17   A.  Yes.

18   Q.  Okay.  And this is a reference to an

19       agreement between Presstek and A.B. Dick for

20       the development of certain new products,

21       correct?

22   A.  Yes.

23   Q.  And these products included the Vector and

24       Vector TX52 platesetters as well as the
```

Page 17

```
 1        chemistry free freedom plate, correct?

 2   A.   Yes.

 3   Q.   And that agreement with A.B. Dick was

 4        terminated on or about July 8th, 2004,

 5        correct?

 6             MR. SLATTERY:  Objection.

 7   Q.   If you know?

 8   A.   Can you repeat that, please?

 9   Q.   The agreement that's referenced in this

10        first press release was terminated by

11        Presstek, correct?

12   A.   Yes.

13   Q.   And this press release says that it was

14        terminated because of the insolvency of A.B.

15        Dick, correct?

16             MR. SLATTERY:  Objection.

17   Q.   Actually, strike that.  Was that the reason

18        why it was being terminated because of the

19        insolvency of A.B. Dick?

20   A.   A.B. Dick was unable to pay its receivables.

21   Q.   And this is why it was terminated?

22   A.   Because it was unable to pay its receivables.

23   Q.   What receivables?

24   A.   It owes us money.
```

Page 18

1   Q.   I see, okay.  So under the terms of the

2        agreement because A.B. Dick was unable to pay

3        you the money, pay Presstek the money; A.B.

4        Dick owed Presstek, that's why you terminated

5        this?

6   A.   I believe that in addition to that it was

7        unable to indicate when it was going to pay us.

8        I can't remember all of the facts; but there

9        was a bunch of facts that led us to that, one

10       of which is they were unable to pay their

11       receivables.

12  Q.   Okay.  Why did Presstek feel the need to

13       issue a press release about that?

14            MR. SLATTERY:  Objection.

15  A.   Presstek and A.B. Dick had an on-site product,

16       a product, in May of that year; and since we

17       did announce it to our shareholders we felt

18       that if there was a termination of a contract,

19       that particular contract, we have to update

20       the shareholders on.

21  Q.   Okay.  Now, after this agreement was

22       terminated Presstek continued to work with

23       A.B. Dick to develop these products, correct?

24  A.   No.

```
 1   Q.   There was no effort after the termination of

 2        this agreement to continue the development of

 3        the Vector and Freedom product?

 4             MR. SLATTERY:  Objection.

 5   A.   There was some effort by both companies

 6        independently but not jointly.

 7   Q.   Okay, so there was no joint effort after the

 8        termination of the agreement?

 9   A.   Not in my mind.

10             MR. FAY:  Can we take a quick break....

11             (Whereupon, a short recess convened.)

12        EXAMINATION BY MR. CROUCH:

13   Q.   Mr. Moosa, my name is Ron Crouch and I am

14        an attorney that represents the Official

15        Committee of Unsecured Creditors and I've

16        got some questions for you.

17             As I ask these questions, please

18        understand that unlike the other folks at

19        this table we don't -- we're strangers to the

20        negotiations in the transaction.  Some of my

21        questions might seem rather simplistic to you,

22        but we don't have anybody who's in privity

23        with these negotiations to explain some of

24        the things that might be obvious to you.
```

Page 20

```
 1              With respect to the June 16th

 2       agreement, when the June 16th agreement was

 3       placed in escrow, was everybody assembled in

 4       a room for that?

 5   A.  Can you repeat that question?

 6   Q.  Sure.  On June 16th when the agreement was

 7       placed in escrow which means, for example,

 8       that Presstek executed the escrow agreement,

 9       correct?

10              MR. SLATTERY:  Objection.

11   A.  Yes.

12   Q.  And, physically, do you recall who executed

13       the escrow agreement on behalf of Presstek?

14   A.  I'm not sure who it is, but everybody was all

15       over the room.

16   Q.  Okay.  So this wasn't conducted as a closing

17       would be with everybody in the same room

18       signing these documents?

19   A.  I don't believe so.

20   Q.  How did the concept of closing into escrow

21       come up in the first place?

22              MR. SLATTERY:  Objection to form.

23   A.  I believe that MHR was desirous of having a

24       deal with no outs before an announcement, and
```

Page 40

1    A.    Yes.

2    Q.    Does that refresh your recollection that you

3          authored and forwarded this letter shortly

4          after midnight the day after your meeting

5          with the A.B. Dick management team?

6    A.    I don't ever recall staying up that late;

7          it's not my time of the day so it's possible

8          that that fax machine didn't have the correct

9          time.

10   Q.    So you don't think -- you think it unlikely

11         that this actually got sent out in the wee

12         hours?

13   A.    I doubt it.

14   Q.    Did you have a discussion with Mr. Marino

15         before you sent out Moosa 10?

16   A.    Yes, we had a discussion with the entire

17         team including our advisors.

18   Q.    Were you of the view after your due

19         diligence on June 21st that the value of A.B.

20         Dick was less than you thought it had been?

21            MR. SLATTERY:   Objection.

22   A.    It was my quick assessment that the value was,

23         yes, less.

24   Q.    Do you have an understanding as to whether

Page 41

1      under the escrow agreement Presstek had the

2      opportunity if it determined based on due

3      diligence that the value of the company was

4      materially less than what you believed it to

5      be that that was a condition that would allow

6      Presstek to terminate the escrow agreement?

7   A.  It's my understanding that based on the

8      escrow agreement we were allowed to do due

9      diligence; and if, for any reason, it doesn't

10     matter, whether that -- if we felt that we

11     were not going to proceed any further, we

12     could have.

13  Q.  So it's your belief that under the escrow

14     agreement Presstek could decide for any

15     reason that it didn't want to close on the

16     deal?

17  A.  Well, if we didn't like something, something

18     that did not meet our expectation, yes.

19  Q.  Were you of the view that Presstek was bound

20     to close if the conditions of the escrow

21     agreement had been met?

22  A.  If the due diligence was satisfactory and the

23     other conditions were met, yes, we would be

24     bound.

Page 42

1    Q.    And when you say "if the due diligence was

2          satisfactory," was that satisfactory in

3          Presstek's sole discretion or satisfactory

4          based upon some reasonable or definable

5          standards?

6                MR. SLATTERY:  Objection.

7    A.    Based on Presstek's expectations.

8    Q.    Based on Presstek's reasonable expectation

9          or just Presstek's expectation?

10               MR. SLATTERY:  Objection.

11   A.    I would say reasonable expectation.

12   Q.    Well, in fact, on June 22nd Presstek through

13         its lawyers did terminate the escrow

14         agreement, correct?

15   A.    Yes.

16   Q.    *  Is there a reason that you're aware of

17         why the termination of that escrow agreement

18         didn't recite any of the adverse change in

19         financial condition that you had discovered

20         the previous day?

21               MR. SLATTERY:  Objection to the form;

22         and, also, I'll instruct the witness not to

23         answer with information that might have come

24         from your attorneys on the subject; and if

```
 1   A.   Definitely not.

 2   Q.   Now, pursuant to the escrow agreement the

 3        transaction also required approval of the

 4        Presstek board, correct?

 5             MR. SLATTERY:  I'll object; and, again,

 6        to the extent that the questions are

 7        implicating any advice or information or

 8        exchanges you had with counsel, please answer

 9        exclusive of that.

10   A.   Can you repeat that question, please?

11   Q.   Sure.  I'm sorry.  The escrow agreement had

12        as one of the conditions approval by the

13        Presstek board of the transaction, correct?

14             MR. SLATTERY:  Objection.

15             MR. FOLLAND:  Objection; I'll join in

16        that one.

17   A.   I believe that approval had not been

18        received yet.

19   Q.   I'm sorry, I didn't hear your answer.

20   A.   I believe that approval had not been received

21        yet.

22   Q.   Was there a board meeting, was there a

23        meeting of the Presstek board scheduled?

24   A.   For what?
```

1    Q.    After June 16th had there been a meeting of

2          the Presstek board scheduled?

3    A.    I can't remember the scheduling of the board.

4    Q.    Were there any meetings with the Presstek

5          board after June 16th that you're aware of

6          between June 16th and June 22nd?

7    A.    I'm not sure.

8    Q.    Had Presstek sought a fairness opinion after

9          June 16th?

10   A.    No, not after June 16th.

11   Q.    Were there any efforts underway after June

12         16th on the part of any third party to provide

13         a fairness opinion?

14   A.    No.

15   Q.    Just give me a moment, I might be about done.

16         Larry, can you find Moosa 14 and hand it

17         to him?

18         MR. SLATTERY:  My answer to that is no.

19   Q.    No, that's too bad.  You know what, Mr. Moosa,

20         we're going to skip that one after all of

21         that.  Just give me a moment.

22         Mr. Moosa, did you take any notes from

23         your meetings either -- well, I'll make it a

24         separate question: did you take any notes of

Page 49

```
 1        your meeting with Key Bank on June 17th?

 2   A.   I don't remember; but as a general rule, I'm

 3        not a good notetaker.

 4   Q.   Do you know if anybody present on behalf of

 5        Presstek took notes of the June 17th meeting

 6        with Key Bank?

 7   A.   It would be our corporate counsel.

 8   Q.   And how about meeting with -- on your meeting

 9        on June 21st with A.B. Dick's management team

10        did you take any notes of those meetings?

11   A.   I may have taken; but, again, I'm a very

12        poor notetaker.

13   Q.   I mean, in connection with the request for

14        production of documents and subpoenas that

15        have been issued, did you undertake to locate

16        any notes that you might have had from any

17        of those meetings?

18   A.   Sure.

19   Q.   I'm asking if you did.

20   A.   Yes, I did.

21   Q.   And, I take it, you didn't find any?

22   A.   I didn't find any.

23             MR. CROUCH:  Folks, Gary Ravert is

24        calling; does that mean he's not on the line?
```

# EXHIBIT E

COPY

Page 1

1

2      UNITED STATES BANKRUPTCY COURT

3        FOR THE DISTRICT OF DELAWARE

4

       In Re:                    ) Chapter 11

5                                ) Case Nos. 04-12002

       A.B. DICK COMPANY, et al.,  ) (CGC)

6                                ) Jointly

       ---------------------------) Administered

7

8

9

10

11        DEPOSITION OF EDWARD J. MARINO

12            New York, New York

13          Friday, October 22, 2004

14

15

16

17

18

19

20

21

22

23

24   Reported by:

     TAMI H. TAKAHASHI, RPR

25   JOB NO. 166402

1                           Marino

2          A.    Yes.   Well, Jesus, he's there now, you

3     know.

4          Q.    And when he came back -- I didn't want

5     to hear a foundation objection.

6                When he came back, did he bring back

7     any materials that had been provided to him by

8     A.B. Dick?

9          A.    My understanding is -- and I don't

10    recall whether this came from A.B. Dick or

11    whether it came from the bank, but Mr. Moosa

12    returned with a document that described how the

13    asset base of A.B. Dick had eroded and had fallen

14    below the threshold of the bank loan, which was,

15    of course, the trigger for the bank to say, this

16    business is out of whack.

17         Q.    Okay.   But Key Bank did agree, on the

18    22nd, to continue funding --

19                MR. SLATTERY:   Objection.

20         Q.    -- correct?

21         A.    Rephrase the question for me a little

22    bit because I'm not sure what you mean by that.

23         Q.    Key Bank -- despite the fact that the

24    borrowing base for Key Bank's facility of

25    A.B. Dick had eroded, Key Bank, on June 22, 2004,

1                          Marino

2    did agree to continue funding --

3                    MR. SLATTERY:   Objection.

4         Q.     -- A.B. Dick?

5                    MR. SLATTERY:   Objection.

6         A.     My recollection was that the bank did

7    not agree to sign the consent and agreement

8    required by the -- by the -- by the purchase

9    agreement.

10                  And that they sent us a letter that

11   indicated they would fund up to a certain dollar

12   amount, again, was my recollection.  But, again,

13   our judgment was that that would not have

14   returned the company to the state that we

15   understood it to be when we justified the

16   purchase in the beginning.

17        Q.     Okay.  Was it your understanding that

18   Key Bank was agreeing to fund the company an

19   additional $2 million?

20        A.     That's my recollection.

21        Q.     Okay.  And was it also your

22   understanding that Key Bank was agreeing to

23   increase its facility with A.B. Dick from

24   24 million to 26 million?

25        A.     Yes, I remember seeing that in a note.

1                        Marino

2          Q.     Okay.  So, was it also your

3    understanding that there's a provision in the

4    stock purchase agreement limiting the outstanding

5    indebtedness of A.B. Dick to Key Bank to

6    26 million?

7          A.     That's possible.

8          Q.     Okay.

9          A.     Maybe you can refer me to a page.  I'm

10   sure it's in there, Michael.

11         Q.     It's Section 9.12.

12                MR. SLATTERY:  Belated objection.  The

13         document speaks for itself.

14         Q.     Do you see that on page 50?

15         A.     Yes, thank you.

16         Q.     Okay.  Given that there was a

17   limitation in the stock purchase agreement on

18   indebtedness to Key Bank of 26 million, wasn't it

19   reasonable for Key Bank to at least, in the first

20   instance, offer to increase funding to

21   26 million?

22                MR. SLATTERY:  Objection to the form

23         of the question.

24                THE WITNESS:  Does it mean I answer

25         it?

```
 1                        Marino
 2              MR. SLATTERY:  You have to answer
 3         unless I tell you not to, however it may be
 4         phrased.
 5         A.    Again, my understanding is that, in
 6    order for this -- the release of the signatures
 7    under the escrow, Key Bank had to sign a consent
 8    and agreement, which had other provisions other
 9    than this in it, which they refused to do.
10         Q.    But I want to focus on this issue.
11    Given the fact that the stock purchase agreement
12    limited indebtedness to Key Bank from A.B. Dick
13    to 26 million, wasn't it at least, in the first
14    instance, reasonable for Key Bank to offer to
15    increase lending to A.B. Dick to 26 million?
16         A.    Again, you're taking your comments out
17    of context.
18         Q.    I just want an answer to my question.
19    You can say yes or no.
20              MR. SLATTERY:  I will object until the
21         witness has a chance to adequately peruse
22         this agreement, which, since you're asking
23         him about a provision that points to another
24         provision of the contract, I think it's only
25         fair to allow him to look at the --
```

1              Marino

2              MR. FAY:  Sure, go look.

3              MR. SLATTERY:  -- at the document.

4      Q.    Look.  5.2 if you want to look at it.

5      A.    5.2?  What am I looking at?

6      Q.    5.2(b).

7      A.    Okay.

8      Q.    Okay.  Once again, having now referred

9    to Section 9.12 of the stock purchase agreement

10   and having reviewed section 5.2(b), I would like

11   your response to the following question:  Was it

12   reasonable for Key Bank to offer to increase the

13   indebtedness of A.B. Dick under the facility to

14   26 million when the stock purchase agreement had

15   a limitation of 26 million on that indebtedness?

16             MR. SLATTERY:  Objection.

17     A.    Mike, you're asking me to answer for

18   Key Bank, and I can't do that.

19     Q.    I want to know what your opinion was.

20   Is that reasonable?

21     A.    My opinion is that Key Bank had a much

Page 36

1                          Marino

2        A.    I remember seeing the term sheet.  I

3    couldn't tell you whether it was the 23rd or not.

4              MR. FAY:  Let's mark this as Exhibit 3.



1                          Marino

2 · one that was included in that board package.

3        Q.    Okay.  The e-mail -- that board

4 package was sent to members of Presstek's board

5 on June 20, 2004, correct?

6        A.    Correct.

7        Q.    Okay.  And would it be correct to say

8 that the materials for Mr. Moosa that you sent

9 along with this e-mail, you don't know whether

10 they were generated on the 29th or an earlier

11 point in time?

12       A.    Well, more than likely, they were

13 generated very close to the 29th.  Because,

14 again, I don't recall Mr. Moosa developing that

15 model.  If he did, he didn't share it with me.

16       Q.    Okay.  In this term sheet that we have

17 marked as Exhibit 3 to your deposition, there is

18 a $40 million cash purchase price, correct?

19       A.    Correct.

20       Q.    Okay.  To the best of your

21 recollection, how did Presstek come up with that

22 $40 million number on June 23, 2004?

23       A.    Well --

24             MR. SLATTERY:  Objection.

25       A.    As I said to you, it's Mr. Moosa's job

1                          Marino
2    as a chief financial officer to make that kind of
3    determination.  And a lot of that judgment was
4    based on Mr. Moosa's understanding of the
5    condition of the business at that time.
6         Q.    I think you testified that Mr. Moosa,
7    in describing the condition of A.B. Dick after
8    his Chicago meeting on June 21, 2004, told you
9    that A.B. Dick had breached its lending
10   agreement, correct?
11        A.    Yes.
12        Q.    And told you that vendors had stopped
13   supplying product, correct?
14        A.    Correct.
15        Q.    Do you remember anything else that he
16   told you?
17        A.    I remember him saying that the
18   business had reached an inflection point in May
19   which wasn't apparent in the financial statements
20   we had seen at that time.
21             The primary reason for that was -- and
22   that they would show up in subsequent financial
23   results of the company.  The reason for that was
24   that it affected the asset base of the company
25   and not the income statement of the company.

1                    Marino

2    discussions with Mr. Moosa about financial

3    performance information from A.B. Dick for May of

4    2004 prior to the escrowing of the stock purchase

5    agreement?

6        A.    Yes, a lot.  But I don't recall

7    specifically talking about the May 31 financials.

8        Q.    Okay.  These financials, if we look

9    back to page 31598, include a consolidated

10   balance sheet for A.B. Dick, correct?

11       A.    Hang on a second.  Yes.

12       Q.    Did Mr. Moosa ever explain to you how

13   he had learned on June 21, 2004 added to his

14   understanding of the assets of A.B. Dick as of

15   May 2004 from whatever is in this document that

16   we've marked as Exhibit 4 to your deposition?

17           MR. SLATTERY:  Could you read back the

18       question.

19           MR. FAY:  Let me try again.

20       Q.    This, as we've established, Exhibit 4,

21   has data on assets of A.B. Dick, correct?

22       A.    Yes.

23       Q.    And data on assets of A.B. Dick as of

24   May 31, 2004, correct?

25       A.    Yes.

1                           Marino

2         Q.    Did Mr. Moosa, in relating to you the

3    substance of his meeting on June 21st, 2004,

4    explain what new information he had learned about

5    the assets of A.B. Dick?

6         A.    Yes.

7         Q.    What did he say?

8         A.    He had received information that was

9    provided by Key Bank that was an assessment of

10   the borrowing base, which is asset-driven, the

11   borrowing base of the company relative to the --

12   to the loan balance.

13        Q.    Okay.  So, this point about the asset

14   base is related -- if we go back to your

15   testimony about what Mr. Moosa told you he

16   learned on June 21st, one, was that he learned

17   that A.B. Dick was in breach of its lending

18   agreement, this point that you just made is

19   related to that, correct?

20              MR. SLATTERY:  Objection.

21        A.    Yeah, the point that I made about the

22   information that he obtained, right.

23        Q.    Yes.

24        A.    Yes, it's related to that.

25        Q.    But other than learning that the basis

Page 43

1                       Marino

2      for lending under the Key Bank facility had

3      eroded, did he learn anything else that was new

4      about the assets of A.B. Dick that's not

5      reflected in these financials of May 2004?

6                 MR. SLATTERY:  Objection.

7           A.    You're asking me a question I can't

8      answer because I'm just not that, you know,

9      familiar with the details.

10          Q.    Okay.  But did he explain to you --

11     did he, for example, say, well, we thought the

12     assets were that much, but now they're a lot

13     less?  Did he say anything like that?

14                MR. SLATTERY:  Objection.

15          A.    No.  What he indicated was that the

16     basis on which borrowing was established for the

17     company had fallen below the loan balance.  And

18     that that was a very critical point for the

19     company and for the banks.

20                And that was a lot of the reason

21     why -- which, again, information that was not

22     available to us prior to that -- a lot of the

23     reason why we got the reaction that we did from

24     the bank when asked -- when we asked them to sign

25     the consent and agreement.

1                          Marino

2    purchase price?

3              MR. SLATTERY:  Objection.

4         A.    Not in and of itself.

5         Q.    Okay.  What else justified that

6    number?

7         A.    Again, keep in mind, we had a much

8    clearer picture of the business after the visit

9    on the 21st, which was the first time the company

10   had free access -- Presstek had free access to

11   A.B. Dick's management team.

12        Q.    Let me just stop you there.  That's

13   not true, is it?  In May of 2004, Presstek had

14   set up interviews with A.B. Dick's management;

15   isn't that correct?

16        A.    As I said, free access to the

17   management.

18        Q.    Okay.  But you had set up interviews

19   with the management in May of 2004, correct?

20        A.    Yes.  We had discussions with the

21   management.

22        Q.    Okay.  And then you canceled those

23   interviews with management in May of 2004,

24   correct?

25        A.    Again, that's not an isolated

1                        Marino

2    instance.

3        Q.    Just -- my question is: Isn't that

4    correct, you did that?

5              MR. SLATTERY:  Objection.

6        A.    The --

7        Q.    Did Presstek, in May of 2004, set up

8    interviews with management of A.B. Dick and then

9    subsequently cancel those interviews?

10       A.    Interviews were set up in May of 2004

11   for the purpose of conducting further due

12   diligence with the management of A.B. Dick.

13       Q.    Okay.  And those interviews did not

14   occur in May of 2004, correct?

15       A.    Correct.

16       Q.    And that's because Presstek canceled,

17   correct?

18       A.    That's what I remember.

19       Q.    Okay.  We were talking about the

20   $40 million price, and I asked you if the fact

21   that, in your opinion, A.B. Dick needed more than

22   $2 million in financing until the closing of the

23   stock purchase agreement justified that price.

24   You testified "not in isolation," correct?

25       A.    Correct.

Page 53

1                        Marino

2       Q.    Okay.  And then I asked you what else

3    justified that price, correct?

4       A.    Correct.

5       Q.    Okay.  So, what else?  What else do we

6    have?

7       A.    I'm sorry.

8       Q.    What else do we have?

9       A.    Can you repeat the question, please.

10      Q.    Other than the fact that Presstek

11   believed A.B. Dick needed more financing, more

12   than $2 million in financing up to the closing of

13   the stock purchase agreement, what other factors

14   justified the $40 million price in the asset

15   purchase agreement?

16              MR. SLATTERY:   Objection.

17      A.    Again, you know, Mr. Moosa did the

18   analysis.  But let me respond to the question

19   about what other factors.

20              The liquidity position of the company,

21   cash position of the company, Mr. Moosa believed,

22   would impact the financial performance of the

23   company in the months to come.

24              So, it wasn't just the funding to the

25   close.  It was the impairment of the business

Page 54

1                              Marino

2    that had taken place as a result of the lack of

3    money that the company had to conduct its

4    business.

5         Q.    So, this was a liquidity issue, in

6    your mind?

7              MR. SLATTERY:  Objection.

8         A.    It was part of the problem, as I said.

9         Q.    What else was there other than a

10   liquidity issue?

11        A.    The business was going to -- because

12   of its inability to procure a product, could

13   potentially have caused its customer base to

14   erode.

15        Q.    And that, again, is related to the

16   liquidity issue, correct?

17        A.    It is.  But you would not see that in

18   any of the statements that we had received up to

19   that point, their longer term effects.

20        Q.    My question is:  Other than this

21   liquidity issue, were there any other issues that

22   you felt justified a $40 million asset purchase

23   price?

24              MR. SLATTERY:  Objection.

25        A.    Again, forgive me, but you're relating

Page 64

1                             Marino

2      the bottom of Exhibit 2, you discussed the third

3      page which you state is a very interesting one

4      showing the progression of the business over the

5      period from January of this year.

6                    Do you see that?

7          A.    I see the e-mail.  Do you mind if I

8      look at page 3?

9          Q.    Yes.  Go ahead.

10         A.    Okay.  Now, what was the question

11     again, Mike?

12         Q.    Okay.  The page 3 you're referring to

13     in this second bullet point at the bottom of

14     Exhibit 2 is the second page of Exhibit 5,

15     correct?

16         A.    It's page No. 3.

17         Q.    Right.  And one of the things you tell

18     the board about it is that it is an interesting

19     thing to note that the material deterioration of

20     the business began in May but was not -- but was

21     really not visible until June, right?

22         A.    That's what the e-mail says.

23         Q.    Okay.  Now, where on page 3 do you see

24     material deterioration of the business

25     beginning?  Can you point it to me?

Page 65

1                          Marino

2        A.    If you refer to the last line that

3    says EBITDA, and you see a swing from a minus

4    $16,000 to a $1-1/2 million, that looks pretty

5    material to me.  In my world, anyway.

6        Q.    I'm sorry.  I don't see where you're

7    referring.

8        A.    Page 3, Mike, at the very bottom,

9    EBITDA.

10       Q.    Okay.

11       A.    Do you see the -- that up through June

12   there was an accumulated negative EBITDA of

13   $16,000, but the month of June contained a

14   negative $1.5 million.

15       Q.    Okay.

16       A.    Do you see that?

17       Q.    Right.  I see that.  Okay.  Anything

18   else?

19       A.    I think that's enough.

20       Q.    Okay.  And this was based on data that

21   Mr. Moosa obtained on June 21, 2004?

22       A.    That's my understanding, yeah.

23       Q.    Okay.  So, it's impossible that

24   Mr. Moosa could have seen all the data on June

25   2004 when he was there, correct?

Page 66

1                            Marino

2          A.      June 21st you mean?

3                    MR. SLATTERY:  Objection.

4          Q.      Right.

5          A.      Well, again, I wasn't with Mr. Moosa.

6          Q.      Okay.

7          A.      But I relied on his judgment.

8          Q.      Okay.  But if this is based on data

9     that Mr. Moosa obtained on the 21st of June 2004

10    there has to be at least some projections in

11    this, correct?

12         A.      It's my recollection that these

13    projections came, in large part, from the company

14    management.

15         Q.      Okay.  But you would agree that it --

16    that the June 2004 numbers have to contain at

17    least some projection, correct?

18         A.      Well, they have to.  The month wasn't

19    complete yet.

20         Q.      Exactly.  Okay.  Now, Mr. Moosa over

21    in the -- oh, strike that.

22                  Do you know how the month of June

23    turned out?

24         A.      No.

25         Q.      Okay.  Have you ever gone back and

1                          Marino

2    looked at any data on that?

3         A.    No.

4         Q.    Have you looked at any data on how

5    A.B. Dick has performed at any time after you saw

6    this forecast?

7         A.    Yes.

8         Q.    Okay.  What have you looked at?

9         A.    The company has provided us monthly

10   statements.

11        Q.    And what do you see in those monthly

12   statements?

13        A.    Again, I -- I don't recall the exact

14   numbers, but the company is driving losses, both

15   at the EBIT line which you see above the EBITDA

16   line and at the EBITDA line, and they're cash

17   negative.

18        Q.    How has the company performed from --

19        A.    By the way, can I make one other

20   comment here?

21        Q.    Sure.

22        A.    It's also important to note that the

23   conditions of the business post-petition are very

24   different than the conditions of the business

25   pre-petition.  So, you have to be careful not to

Page 69

                                    Marino
1
2    think --
3        A.    I don't know whether he got that
4    directly from management.  But, as I said, I
5    believe that his projections or these projections
6    here were based on his discussions with
7    management.
8        Q.    Okay.  Let's look back at what we
9    marked as Exhibit 4, the May financials,
10   Mr. Marino.
11       A.    Got them.
12           MR. SLATTERY:  What's the next
13       exhibit?
14           MR. FAY:  No.  This -- we're just
15       looking back at Exhibit 4.
16           MR. SLATTERY:  Going back to
17       Exhibit 4.
18       Q.    I'm going to ask you to turn to page
19   31591 of that.  Once again, Exhibit 4,
20   Mr. Marino, is financial information about
21   A.B. Dick's May 2004 performance that were sent
22   to Mr. Moosa by Mr. Knipp on June 14, 2004,
23   correct?
24       A.    Yes.
25       Q.    Okay.  And on page 31591 of Exhibit 4,