1                    Marino

2    it shows an income statement for A.B. Dick for

3    the -- for both of the month of May and May 2004

4    year to date, correct?

5         A.    Yes.

6         Q.    And if we look at the top column on

7    31591, and the third row over, it shows actual

8    revenue as of May 2004 of 75,106,000, correct?

9              MR. SLATTERY:  Mike, can you point

10        that out again.  I got lost.  I'm found.

11             MR. FAY:  Okay.

12        Q.    Is that what it says, Mr. Marino?

13        A.    Yes.

14        Q.    Okay.  All right.  So, at least

15   according to this financial statement, as of the

16   end of May, A.B. Dick had generated actual

17   revenues of over 75 million, correct?

18        A.    According to the statement.

19        Q.    Right.  Now, let's look -- go back to

20   Mr. Moosa's --

21             MR. SLATTERY:  Can you read back the

22        question, the last question.

23             (Record read.)

24        Q.    Now, let's go back to Mr. Moosa's

25   forecast which is marked page 3 of Exhibit 5.

1          Marino

2    Mr. Moosa is -- has a column all the way over on

3    the right where he shows a projected net sales

4    for A.B. Dick for the year of 2004 of

5    $140 million, correct?

6         A.    That's what it shows.

7         Q.    Okay.  Which would mean that, between

8    May of 2004 and the end of the year, there would

9    only be an additional $65 million in revenues,

10   correct?

11              MR. SLATTERY:  Objection.

12        A.    Well, if -- if you do the math, that's

13   what it shows.

14        Q.    Okay.  Is it your understanding that,

15   when Mr. Moosa met with management on June 21st,

16   2004, they told him that there would only be an

17   additional $65 million in revenues at A.B. Dick

18   by the end of the year?

19        A.    I can't answer that.  I don't know

20   what they communicated to him.

21        Q.    And the actual performance of

22   A.B. Dick suggests that's incorrect, right?

23        A.    Say that again, please.

24              MR. SLATTERY:  Objection.

25        Q.    The performance of A.B. Dick -- well,

1              Marino

 2          MR. FAY:  It's a June 23rd, 2004

 3      e-mail.

 4          MR. SLATTERY:  Thank you.  Mike, where

 5      is the hidden language?

 6          MR. FAY:  It's in the last -- it's the

 7      second to last sentence.

 8          THE WITNESS:  You can save me from

 9      reading.

10          MR. FAY:  I thought you were reading

11      it.

12      Q.    Okay.  Mr. Marino, Exhibit 6 is an

13  e-mail that you sent to Presstek board members

14  and others on June 23, 2004, correct?

15      A.    Correct.

16      Q.    Okay.  And at the bottom of this

17  e-mail, after discussing various things about

18  A.B. Dick, you say, "We had the discipline and

19  knowledge to follow good process here and see the

20  real picture, the picture that was hidden to us

21  by the Seller"; is that correct?

22      A.    That's what it says.

23      Q.    And the seller would be A.B. Dick or

24  Paragon, right?

25      A.    Yes.

Page 72

1                        Marino
2    strike that.
3              If A.B. Dick were to generate revenues
4    of only 65 million between May 2004 and the end
5    of the year, that would average less than
6    $10 million in revenues a month, correct?
7              MR. SLATTERY:  Objection.
8         A.   Well, if you do the math.
9         Q.   Right.  Has A.B. Dick been averaging
10   less than $10 million in revenues a month?
11        A.   No.
12        Q.   It's been more than that, correct?
13        A.   Correct.
14        Q.   This model that we're looking at which
15   you forwarded to your board on June 20, 2004, to
16   your knowledge, has it been updated since that
17   date?
18        A.   No.
19        Q.   It hasn't or you don't know?
20        A.   I don't know.  Again, could -- Moosa
21   may be doing it on his own.  I don't know.
22        Q.   In your e-mail of June 20, 2004 which
23   we've marked as Exhibit 2, what did you mean when
24   you said in the second bullet down near the
25   bottom of the page that the material

Page 82

1                          Marino

2         Q.    And that was your position, then,

3    obviously, right?

4         A.    Yes.

5         Q.    Is that your position today?

6         A.    Yes.

7         Q.    Okay.  Have you ever shared that

8    position with anyone at A.B. Dick or Paragon that

9    your opinion of the financial condition of

10   A.B. Dick was hidden from you?

11        A.    I may have or I may not have.  I don't

12   recall.

13        Q.    Okay.  In the --

14        A.    By the way, can I make sure you're

15   clear on something?

16        Q.    Sure.

17        A.    The comment is the picture that was

18   hidden from us by the seller.

19        Q.    I see that.

20        A.    Good.  Just wanted to be sure.

21        Q.    And the picture, what does that refer

22   to?

23        A.    The overall look of the company.

24        Q.    Okay.  And when you say the overall

25   look, the financial condition of the company?

Page 83

1                          Marino

2       A.      Among other things, sure.

3       Q.      Okay.  In the paragraph above that,

4    you say, "Our position on this deal is that the

5    business is not as represented and we have clear

6    evidence of that fact."

7              Do you see that?

8       A.      Yes, I do.

9       Q.      And that clear evidence would be the

10   information that Mr. Moosa received from his

11   meeting on June 21, 2004?

12      A.      Mr. Moosa and Mr. McCarthy.

13      Q.      Okay.  Anything else?

14      A.      The only other thing I can think of

15   would be the information from the banks.

16      Q.      Did -- when you met with Key Bank, did

17   Key Bank give you any documents?  When you met

18   with Key Bank -- strike that.

19              When you met with Key Bank on June 17,

20   2004, did any of the representatives of Key Bank

21   give you any documents?

22      A.      I don't recall that they gave us

23   documents, but they indicated to us at that

24   time -- and I believe I mentioned this to you

25   earlier about this borrowing base issue.

1                           Marino

2         Q.    Other than that, do you remember any

3    other issue coming up in your meeting with

4    Key Bank about the financial condition of

5    A.B. Dick?

6         A.    I do remember the banks telling us

7    about their consultant, that they had -- again, I

8    don't know whether it was one or two or 10

9    people, but that they had engaged a consultant to

10   go in and look at the business.

11        Q.    Okay.  And prior to June 17, 2004,

12   Presstek wasn't aware of that fact?

13        A.    No.  As a matter of fact, again, so

14   that we're clear on this, I did not realize until

15   that time -- maybe Mr. Moosa did, but I did not

16   realize at that time the company was in what was

17   called a workout group, which is -- a troubled

18   company situation usually goes into a workout

19   group.

20        Q.    The company had been in that workout

21   group at Key Bank for many months, hadn't it,

22   Mr. Marino?

23        A.    I don't know.  We don't -- we didn't

24   have any communications with Key Bank.

25        Q.    Did you ever ask A.B. Dick whether its

1                          Marino

2        A.    No, I don't recall.  What I recall is

3    that we had every intention of proceeding with

4    this agreement and -- assuming the company was as

5    represented.

6        Q.    Okay.  My question is:  Do you recall,

7    prior to the trip on June 21, 2004, discussing

8    the possibility of purchasing just assets of

9    A.B. Dick?

10        A.    It could --

11              MR. SLATTERY:  Objection.

12        A.    It could have been.

13        Q.    If such a discussion had taken place,

14    who would have likely have been involved?

15              MR. SLATTERY:  Objection.

16        A.    Probably Mr. Moosa and myself.

17        Q.    Do you recall discussing a $40 million

18    purchase price for assets of A.B. Dick before

19    Mr. Moosa traveled to Chicago on June 21, 2004?

20        A.    No.

21        Q.    Do you recall discussing any purchase

22    price for the assets of A.B. Dick before

23    Mr. Moosa traveled to Chicago on June 21, 2004?

24        A.    What I remember was that I directed

25    Mr. Moosa to go out and find out what was going

1                          Marino

2    on with the company.  And until we did that --

3         Q.    So, you don't recall any discussions

4    about any purchase price for the assets of

5    A.B. Dick prior to Mr. Moosa's trip on June 21,

6    2004?

7              MR. SLATTERY:  Objection.

8         A.    Again, it may have -- those

9    discussions may have taken place.  I don't recall

10   any discussions, specific discussions, around

11   your $40 million comment.  We needed to find out

12   the condition of the business.

13        Q.    As of June 21, 2004, how long had

14   Presstek had been looking at A.B. Dick?

15        A.    A long time.

16        Q.    A long time.  It was almost a year,

17   right?

18        A.    I think it was -- July was our first

19   contact, of the prior year.

20        Q.    Okay.  And it's your position that,

21   after those 11 months, Presstek still didn't

22   understand the condition of A.B. Dick?

23              MR. SLATTERY:  Objection.

24        Q.    Prior to the meeting on June 21, 2004?

25              MR. SLATTERY:  Still objection.

Page 94

1                          Marino

2        A.    Presstek was given certain information

3    about the business, Mike.  Based on that

4    information, we had a certain picture of the

5    company.

6        Q.    Okay.  But Presstek also asked for

7    certain information about the business, correct?

8        A.    Yes, we did.

9        Q.    Okay.  So, over those 11 months,

10   Presstek didn't just sit there and receive things

11   from A.B. Dick, it also asked for things from

12   A.B. Dick, correct?

13       A.    Yes.

14       Q.    Okay.  And in that process of asking

15   for information from A.B. Dick, is it your

16   testimony that, as of June 18, 2004, Presstek

17   still didn't understand the financial condition

18   of A.B. Dick?

19            MR. SLATTERY:  Objection.

20       A.    We began to understand based on what

21   happened on the 17th.  Now, if you asked me on

22   the 16th --

23       Q.    On the 16th?

24       A.    Thank you.  The answer is no, we did

25   not have the real picture of the company.

1                        **Marino**

2          MR. FAY:  We may be getting close to

3      the end here.  I know you hate that.  So,

4      can I take a quick break just so I can have

5      a discussion with my colleague.

6          (Recess taken.)

7      Q.    Mr. Marino, during the 11 months from

8  July of 2003 to June of 2004, were you ever

9  contacted by anyone at A.B. Dick and asked

10 permission with respect to any cost cutting or

11 labor reductions at A.B. Dick?

12     **A.    I'm sorry.  Mike, give me the dates**

13 **again, please.**

14     Q.    From July 2003 to June 2004.

15     **A.    Yes.**

16     Q.    Okay.  Who contacted you?

17     **A.    Mr. Zaffino.**

18     Q.    Once, more?

19     **A.    I believe it was more than once.**

20     Q.    Any idea how many times?

21     **A.    It wasn't that frequent.**

22     Q.    Okay.  Less than 10?

23     **A.    Oh, yeah.**

24     Q.    Less than five?

25     **A.    Probably.**

1                        Marino

2        A.    The primary interest is not just to

3    obtain the -- because you don't acquire a

4    customer base.

5        Q.    Correct.

6        A.    Rather, we are interested in the

7    contact that A.B. Dick has and the franchise that

8    it has with that customer base.

9        Q.    Okay.

10        A.    Primarily through its sales, service

11    and its consumable businesses with that customer

12    base.

13        Q.    Okay.  Would it be fair to say that

14    Presstek believes that it could sell its own

15    products through that customer base after any

16    such acquisition?

17        A.    Presstek believes that we can, using

18    our technology, make products that fit very well

19    within the customer base just as we did with the

20    Vector Freedom product, which I'm still surprised

21    you haven't brought up yet.

22            MR. SLATTERY:  Please don't suggest

23        new areas of inquiry.  He's already exceeded

24        his 10 minutes.

25            MR. FAY:  You knew that was wrong when

Page 104

1              Marino

2      I said 10 minutes.

3              MR. SLATTERY:  You should be on this

4      side.

5      Q.    The Vector Freedom project, that was a

6  joint venture between Presstek and A.B. Dick on

7  that product line, correct?

8              MR. SLATTERY:  Objection.

9      A.    I would not certainly call it a joint

10  venture, but we had a joint business arrangement.

11     Q.    Okay.  And under that business

12  arrangement, Presstek was supplying a particular

13  part for this product, correct?

14     A.    Presstek was supplying three things.

15     Q.    Okay.

16     A.    The imaging system, the printing plate

17  and a lot of know-how around the interaction

18  between that imaging system and the printing

19  plate.

20     Q.    Okay.  Now, the agreement Presstek had

21  with A.B. Dick, that was terminated in early July

22  2004, correct?

23     A.    Yes, we terminated that agreement -- I

24  don't remember the exact date, but we terminated

25  that agreement based on the insolvency of the

Page 105

1                              Marino

2    company.

3        Q.    Okay.   Since terminating that

4    agreement, has Presstek been working with

5    A.B. Dick on those products?

6        A.    Yes.

7        Q.    Okay.   Why did you terminate it?

8        A.    We terminated the agreement, which was

9    part of the agreement, should A.B. Dick become

10   insolvent.

11           We terminated it because we were

12   concerned that our intellectual property could

13   fall into the hands of a competitor, which is why

14   you put those kinds of clauses in those kind of

15   agreements.

16       Q.    And how would that happen?

17            MR. SLATTERY:   Objection.

18       A.    It could happen when a company becomes

19   insolvent that another company could see this as

20   a way to enter the picture and help this company

21   out.  And, thereby, acquire certain assets, get

22   involved with them in doing business in a variety

23   of different ways.

24       Q.    So, it's your testimony that, after

25   that, the insolvency of A.B. Dick, it increased

1                    Marino

2    the risk that another company could obtain and

3    use your intellectual property?

4            MR. SLATTERY:  Objection.

5    A.    Yes.

6        Q.    Was that a decision you made or was it

7    a group decision?

8            MR. SLATTERY:  Objection.

9    A.    It was discussed extensively by

10   myself, Mr. Moosa and Mr. McCarthy, but

11   ultimately it was Mr. Moosa's decision.

12       Q.    Why did the three of you view --

13   strike that.

14           Why did any of you view insolvency as

15   being a factor in the protection of your

16   intellectual property rights?

17           MR. SLATTERY:  Objection.  Asked and

18       answered.

19   A.    Because a potential outcome from

20   insolvency is a bankruptcy.

21       Q.    Okay.  These are your intellectual

22   property rights?

23   A.    Pardon.

24       Q.    These are Presstek's intellectual

25   property rights that we're discussing, correct?

1                        Marino

2        **A.      Correct.**

3        Q.     Those intellectual property rights

4   would not be assets of any bankrupt estate,

5   correct?

6              MR. SLATTERY:  Objection.  I think

7        we're getting into sort of legal -- are you

8        asking him or advising him?

9              MR. FAY:  No, I'm asking --

10       Q.    Is that your understanding?

11       **A.    Would you repeat the question, please.**

12       Q.     The intellectual property rights of

13  Presstek would not be an asset of the bankruptcy

14  estate of A.B. Dick, right?

15             MR. SLATTERY:  By the way, I would

16       caution the witness not to answer anything

17       that reflects legal counsel that you

18       received from your attorneys.

19             And if you have any questions what

20       does and doesn't, then we would take a --

21       you and I would discuss it to see -- to the

22       extent you can answer without going into

23       legal advice, which I suppose would be hard

24       to do since he asked you a legal question.

25             THE WITNESS:  Don't worry, we have

1              Marino

2       enough lawyers here --

3              MR. SLATTERY:  I wouldn't take any

4       advice from any of them except for me.

5       A.    The answer to the question is that

6    Presstek guards its intellectual property very

7    carefully.  If you read any of our literature, we

8    position ourself as a technology company.  And we

9    use technology as a basis for competition.

10              The concern is not legal on my part.

11    The concern is that, from a business standpoint,

12    should a competitor of Presstek have access to

13    that technology, it could potentially be harmful

14    to Presstek.  I think you can understand that.

15       Q.    I certainly can understand, but I

16    guess I'm confused as to how a bankruptcy

17    proceeding would increase the likelihood of

18    access to that information.

19              MR. SLATTERY:  Objection.

20       Q.    I'm just wondering what your analysis

21    was to reach that conclusion.

22              MR. SLATTERY:  Objection.

23       A.    Again, you're going to -- this is

24    exactly the legal issue, which is why.

25       Q.    Did you consult lawyers about this

1                      Marino

2    issue?

3        A.    I consulted Mr. Moosa and

4    Mr. McCarthy.

5        Q.    Okay.  Are either of them a lawyer?

6        A.    No.

7        Q.    Okay.

8            MR. SLATTERY:  I would instruct you to

9            answer any question with -- keeping in mind

10           that, if Mr. Moosa or Mr. McCarthy or anyone

11           else you talked to about this was conveying

12           advice of counsel, that is also privileged.

13              The fact that Moosa tells it to you,

14           if he got it from his lawyers, it's legal

15           advice to the company.

16       A.    Right.  No.  I think the question was,

17    are Mr. Moosa and Mr. McCarthy attorneys.  And

18    the answer is no.

19       Q.    Okay.  In determining that -- that a

20    bankruptcy proceeding could increase the

21    likelihood of a competitor getting access to your

22    intellectual property rights, did any of the

23    three of you consult counsel?

24       A.    I did not consult counsel.

25       Q.    And do you remember any discussion

Page 113

```
 1                        Marino

 2        Q.    And if you successfully acquire

 3   A.B. Dick's assets, do you intend to

 4   commercialize the products that are being

 5   developed jointly with A.B. Dick in the future?

 6              MR. SLATTERY:  I'll object and also

 7         designate this as attorneys' eyes only.

 8              THE WITNESS:  I'm sorry.  What does

 9         that mean?

10              MR. SLATTERY:  That means only

11         attorneys --

12              MR. FAY:  You can't look at it,

13         Mr. Marino.

14              MR. SLATTERY:  You can look at your

15         own testimony, but no one else can, unless

16         they're an attorney, so that --

17              MR. FAY:  We have to kill them if they

18         did.

19              MR. SLATTERY:  So, anyone else who

20         might have interest in the lawsuit can't see

21         it.

22        A.    Jeez, this is really not good.  I have

23   to ask to have the question repeated.  I must

24   have had a senior moment here.  Go ahead, try

25   again.
```

Page 114

1                          **Marino**

2        Q.    If Presstek successfully acquires the

3    assets of A.B. Dick, is it the intention of

4    Presstek to commercialize the various products

5    that Presstek has been jointly developing with

6    A.B. Dick?

7              MR. SLATTERY:  Same objection.

8        **A.    Yes.**

9              MR. PHILLIPS:  Michael, are we going

10             to have time sufficient for both debtors and

11             the unsecured creditors here to ask some

12             questions?  I mean, that was 20 minutes ago

13             that we broke and I thought we were close to

14             being done.

15             MR. FAY:  Yeah, I thought it was,

16             too.  Well, I don't even want to say how

17             long it's going to be, but I will be done

18             quickly.

19             THE WITNESS:  I'll be gone at 5:00.

20       Q.    Mr. Marino, do you recall that, in

21   November of 2003, Presstek sent to the board of

22   directors of A.B. Dick a non-binding proposal for

23   the acquisition of A.B. Dick that included a

24   $65.1 million price?

25             MR. SLATTERY:  Objection.

Page 115

1                          Marino

2       A.    Yes.

3       Q.    Okay.  What did Presstek use, if

4   anything, to develop -- to come up with that

5   $65.1 million price?

6       A.    We used a financial model based on

7   what we perceived the condition of the business

8   to be.

9       Q.    And was that a financial model

10  generated by Mr. Moosa?

11      A.    Yes, Mr. Moosa generates all our

12  financial models.  He doesn't allow me to.

13            MR. SLATTERY:  Dabble.

14            MR. FAY:  I think that's all we have

15      for now.

16            (Marino Exhibit 8, Fax dated 11/18/03,

17      from Marino to Zaffino, marked for

18      identification, as of this date.)

19  EXAMINATION BY

20  MR. PHILLIPS:

21      Q.    Good afternoon, Mr. Marino.  You have

22  been handed by the court reporter what has been

23  marked as Marino Exhibit 8.  Do you recognize

24  this document?

25      A.    Yes.

Page 124

1                        Marino

2        Q.    If you turn to page 3, please.

3        A.    Sure.

4        Q.    It states, "The Company and Presstek

5   will seek to negotiate and execute the definitive

6   documents relating to the transaction by

7   December 31, 2003."

8        A.    Rather optimistic?  Wasn't it.

9        Q.    Do you know the date on which the

10  first draft of documents related to a proposed

11  transaction between Paragon and Presstek was

12  actually provided?

13             MR. SLATTERY:  Objection.

14       A.    You mean like a purchase and sale

15  agreement?

16       Q.    Yes.

17       A.    No.  I mean, I usually don't generate

18  those.

19       Q.    I mean, you would have seen copies,

20  would you have not?

21       A.    No.  There's a high likelihood I

22  wouldn't have seen the first draft of those

23  because, again, as long as they reflected the

24  basic business terms, they're rather lengthy

25  documents, as you know.

1                          Marino

2        Q.    Did you read the stock purchase

3    agreement that was executed on June 16th?

4        A.    Oh, yes.

5              MR. PHILLIPS:  Mark that.

6              (Marino Exhibit 10, E-mail dated

7         1/12/04, from Marino to Zaffino, marked for

8         identification, as of this date.)

9        Q.    You've been handed, sir, what has been

10   marked as Marino Exhibit 10 by the court

11   reporter.  Do you recognize this document, sir?

12       A.    Yes.

13       Q.    This is an electronic communication

14   that you sent to Mr. Zaffino on January 12, 2004,

15   correct?

16       A.    Yes.

17       Q.    And it transmits a new proposal from

18   Presstek to Paragon and A.B. Dick, correct?

19             MR. SLATTERY:  Objection.

20       A.    Yes, it says it right here in the

21   first sentence.

22       Q.    Okay.  And this proposal is for an

23   asset purchase with respect to the assets of

24   A.B. Dick rather than a stock purchase, correct?

25       A.    Yes.

Page 126

1                          Marino

2        Q.    If you turn to what is marked as ABD/P

3    010378, and it is paragraph 7, "The Company and

4    Presstek will seek to negotiate and execute the

5    definitive documents relating to the transaction

6    by February 7, 2004."

7              Were any documents generated prior to

8    February 7th of 2004, to your knowledge?

9        A.    Are you --

10       Q.    Relating to an agreement for the

11   purchase by Presstek of A.B. Dick assets?

12       A.    You just showed me one.

13       Q.    No.  An agreement, sir.  These aren't

14   agreements, are they?  They're non-binding

15   proposals, correct?

16       A.    I have to be careful what you mean by

17   agreement.

18       Q.    They're non-binding proposals,

19   correct?

20             MR. SLATTERY:  Objection.  Calls for a

21        legal conclusion.

22       A.    That's what it says here.

23       Q.    That's what they say?

24       A.    Yes.

25             MR. PHILLIPS:  I think we went through

1               Marino

2            But there were also discussions that

3   Mr. Rachesky had with me outside of the main

4   meeting where he indicated that the fees that

5   were being requested by Paragon he felt were

6   high.

7            And there were also discussions

8   regarding Delaware Asset Management and how that

9   situation would be handled, which caused

10  Mr. Rachesky to want to extend the close date so

11  that he could complete his discussions with

12  Delaware Asset Management, because he felt that

13  Delaware Asset Management should be on a pro rata

14  basis with other debtors and he needed to have

15  those discussions with Delaware Asset

16  Management.

17           So, there were a lot of those kind of

18  discussions.

19     Q.    And Mr. Rachesky wanted to extend the

20  close date from 30 days to 60 days; is that

21  correct?

22     A.    That's my recollection, yeah.  And

23  that's also, Mark, what changed in June, which we

24  thought was what permitted the bank to support

25  the agreement.

Page 135

1                          Marino

2      Q.    What do you mean, it changed in June?

3      A.    Well, the -- I believe it was the 16th

4   when I received a call from Mr. Fountain who

5   indicated that the bank would not support a

6   60-day close.  And I didn't ask why.

7                (Telephone interruption.)

8                THE WITNESS:  I'm sorry about that.

9                MR. PHILLIPS:  It's okay.

10     A.    And then I subsequently received a

11  call from Mr. Rachesky, who said that they were

12  willing to change the close -- the close date and

13  move it in to 30 days, at which time I asked

14  Mr. Rachesky, does that mean we're going to have

15  a deal?

16                Which he said yes.

17                I said, okay.  Well, then, let's go

18  get a deal done.

19                So, that was -- I'm sort of

20  paraphrasing, but that was sort of the sum and

21  substance of it.

22     Q.    You spoke previously about

23  Mr. Rachesky's comments about Paragon's fees.

24  Did you ever have a discussion with Mr. Rachesky

25  about the $3-1/2 million closing fee that was

Page 136

1                         Marino

2    provided for in the stock purchase agreement for

3    MHR?

4         A.    Yes.

5         Q.    And can you tell me what the substance

6    of that discussion was?

7         A.    Yes.  Since MHR was carrying the

8    negotiations at the time, they felt they were

9    entitled to a fee for the work they had put into

10   this.  And it was also my recollection, in the

11   purchase and sale agreement, there is reference

12   to legal fees, as well.

13        Q.    $750,000, correct?

14        A.    I don't remember the exact number, but

15   yes, it was a big number, yeah.

16        Q.    Okay.

17        A.    So, yeah, there were discussions about

18   that $3-1/2 million fee.

19        Q.    And these were with Mr. Rachesky?

20        A.    Yes.  I had -- Mark, generally, the

21   way the conduct of this was -- took place was

22   that Mr. Moosa, to a great extent, carried on the

23   majority of the negotiations.  And when we came

24   to an issue that required my participation, I

25   would participate.

1                         Marino

2    to 13.

3              Did you have any discussion with

4    Mr. Moosa about whether the adjustment provided

5    for in the stock purchase agreement would have

6    altered the purchase price, the ultimate purchase

7    price based upon what he had seen on June 21st?

8              MR. SLATTERY:  Objection.

9         A.   I'm sorry, Mark.  Would you say that

10   again, please.

11        Q.    Okay.  What's your understanding of

12   the purchase price adjustment, if you have one?

13        A.    My --

14        Q.    That was provided?

15        A.    My opinion?

16        Q.    No.  Your understanding of the

17   purchase price adjustment that's provided for in

18   this agreement at section 2.3 to the extent that

19   you have one.  I don't want you to read the

20   entire section here.  But do you have an

21   understanding of how that was to work?

22              MR. SLATTERY:  He's not asking you to

23         form an opinion now by your review.

24              MR. PHILLIPS:  Right.

25        A.    Yeah, the -- you had asked something

Page 141

1                        Marino

2    about the 21st.  This document wasn't relevant on

3    the 21st.  That's why I hesitated here.

4        Q.    Why wasn't it relevant on the 21st,

5    sir?

6        A.    Well, because, again, the bank had

7    not, at that point in time, agreed to the consent

8    and agreement.  So, this -- so, we hadn't

9    actually executed this document.  What we

10   executed was an escrow.

11       Q.    You hadn't executed the stock purchase

12   agreement, Presstek had not?

13       A.    We executed -- I believe we executed

14   an escrow agreement.

15       Q.    But you did not execute the stock

16   purchase agreement?

17       A.    I don't believe so.

18       Q.    Did you believe that, as of June 16th,

19   that Presstek was bound to the agreement?

20       A.    Oh, sure.

21            MR. SLATTERY:  Which agreement are you

22       talking about?

23            MR. PHILLIPS:  The stock purchase

24       agreement.

25            MR. SLATTERY:  Okay.

Page 142

1                        Marino

2      A.    Yes, assuming the escrow was

3  fulfilled.

4      Q.    You had an agreement with Paragon,

5  A.B. Dick and the other parties to the stock

6  purchase agreement as of -- as of June 16th?

7            MR. SLATTERY:  Objection.

8      Mischaracterizes the testimony.

9      A.    Assuming the escrow was fulfilled,

10 yes.

11     Q.    Okay.  Going back to my prior

12 question, what was your understanding or what is

13 your understanding, without going through the

14 document itself, as to how the balance sheet

15 adjustment provided for in the stock purchase

16 agreement was to have worked?

17            MR. SLATTERY:  Objection.

18     A.    My understanding is that the --

19 this -- that it was an adjustment mechanism, and

20 that that adjustment mechanism would allow for

21 certain fluctuations in working capital that were

22 normal course of business kind of things.

23            And that deterioration in the business

24 had already occurred to some extent.  And,

25 therefore, there was a number here which was

# EXHIBIT F

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CASE NO. 04-12002 (CGC)


- - - - - - - - - - - - - - - - x


IN RE: A.B. DICK COMPANY, Debtor


- - - - - - - - - - - - - - - - x



CONTINUED DEPOSITION OF EDWARD MARINO

McDermott, Will & Emery, LLP

28 State Street

Boston, Massachusetts

Monday, October 25, 2004



Reported by: Helana Eve Kline, CSR, RPR

Job No. 1684b



ORIGINAL

```
 1        Key Bank had expressed a reluctance to

 2        provide any additional funding outside of an

 3        appointment of a receiver or the involvement

 4        of a bankruptcy?

 5              MR. SLATTERY:  Objection.

 6   A.   As I indicated to you earlier on, the company

 7        had an ongoing set of issues around financing

 8        the business.  We understood that the bank

 9        was continuing to support the company.  We

10        did not know that the bank had a consultant

11        in there examining the operation of the

12        financial viability of the business so the

13        answer to the question was: we thought the

14        bank would continue with its funding that

15        they probably were certainly in discussions,

16        and we knew this from discussions that

17        Mr. Nip and Mr. Moosa related to me that

18        they were in constant discussion with the

19        bank about this; but we did not have any

20        indication that the bank would not fulfill

21        on its obligations to lend money to the

22        company; we'd be gone.

23   Q.   As of June 21st had there been any board

24        meetings scheduled to consider the proposed
```

Page 37

1        transaction?

2    A.  Well, there were a series of them because

3        the transaction continued to drag on but --

4        so subsequent to the 21st there were a number

5        of them.

6    Q.  Well, again, I'm referring to the escrow

7        agreement, do you recall if the escrow

8        agreement had a provision in it or as one

9        of the conditions that there would be

10       consideration of the transaction by the

11       Board of Directors of Presstek?

12   A.  I don't recall.

13   Q.  Do you know if as of June 21st there had

14       been a board meeting scheduled at Presstek

15       to specifically approve or not approve the

16       transaction?

17   A.  Well, the transaction had been approved by

18       Presstek's board.  When this new information

19       came to light, I indicated to the board that

20       we would take no action before we consulted

21       with them, again different than what we

22       would -- different in our original proposed

23       transaction.

24   Q.  And when did the Presstek board approve the

Page 38

1      transaction?

2   A.  I beg your pardon?

3   Q.  When is it that the Presstek board had

4       approved the transaction?

5   A.  When is it?

6   Q.  Yes.

7   A.  Again, forgive me, I would have to go back

8       and look at the dates.  I don't recall when

9       we actually went ahead with the formal

10      proposal on that.

11  Q.  Was it prior to or after June 16th?

12  A.  It would have been prior to.

13  Q.  And just so I'm clear, as I understand it,

14      upon learning this additional information

15      you advised the board that the management

16      would take no further action with respect to

17      the transaction as opposed to a direction

18      coming back from the board instructing

19      management not to take any further action?

20  A.  Ron, I'm sorry, you may be a little further

21      away from the speaker; could you just try

22      that one again?

23  Q.  Sure.  I'm just asking, from your last answer,

24      I take it, that what occurred is based on the

1        new information management advised the board

2        of Presstek that it would take no further

3        action as opposed to the other way around,

4        the board instructing management not to take

5        any further action?

6    A.  No, you're -- the date that I advised the

7        board of that was after the 21st when

8        Mr. Moosa made his trip; at least that's my

9        recollection. He did it; then, I did advise

10       the board. However, that based on the

11       request by Key Bank that we lend money to

12       the company, that's a different situation

13       now that I would not take any action without

14       seeking their advise on the loan for A.B.

15       Dick which, of course, is different than

16       the transaction as I said that was proposed.

17   Q.  Were there any board members who expressed

18       the view that given this new information

19       that they would not want to proceed with

20       the transaction under any circumstances?

21   A.  I'm sorry. Say that again, please?

22   Q.  Were there any members of the board who

23       expressed the view that based on this new

24       information they would not want to proceed

# EXHIBIT G

COURT

1-12002

1

taken as if

e, a

Notary

io, at the

wer,

nesday,

nd/or

the

N
uilding
o 44308
.7300
.0050
.7100

A329

22

1    Q.    Oh.

2                 MR. LEPENE:    The basis for my

3          objection to the form of the question,

4          actually.

5    Q.    So that's what they owed PressTek.

6    A.    That's what they owed.

7    Q.    All right.    Excuse me.    I got up at 4:30.

8          Did you get a similar kind of report on the

9          accounts receivable?

10   A.    Yes.

11   Q.    You did?

12   A.    Yes.

13   Q.    Let me show you another document, Mr. Lugli.

14                 MR. FAY:    Will you mark this as

15          Lugli 3.

16                 --    --    --

17                 (Thereupon, Lugli Exhibit 3 was

18          marked for purposes of identification.)

19                 --    --    --

20   Q.    Mr. Lugli, have you seen what we've marked as

21          Lugli 3 before, this document?

22   A.    Yes, I have.

23   Q.    It's entitled Asset Quality Report, correct?

24   A.    Correct.

25   Q.    Is this a report that is generated by your group,

A330

23

1    the Asset Recovery Group?

2  A.  This report was generated by my group.

3  Q.  Is this something that you commonly do with

4      facilities that are assigned to your group?

5  A.  All risk rated facilities in Key Corp of 15 or

6      worse have this report issued on a quarterly

7      basis.

8  Q.  Okay.  I just want to ask you some questions

9      about the page Bates stamped 545.

10 A.  Yes.

11 Q.  Would it be fair to say that Mr. Robert Tomsich

12     is a large customer of KeyBank?

13 A.  Yes, it would.

14 Q.  It says he has, is that $96 million marketable

15     securities relationship with the Key Trust

16     Department?  Do you understand what that means?

17 A.  I believe that he has a relationship with our

18     Trust Department that has at least $96 million in

19     marketable securities.

20 Q.  Would it be fair to say that in your dealings

21     with A.B. Dick, that fact influenced your

22     decisions?

23            MR. LEPENE:  Objection.

24            You can answer.

25 A.  I would certainly say we were cognizant of

24

1    Mr. Tomsich's relationship with the bank, but I

2    don't think it influenced our decisions.

3  Q.   Okay.  When you dealt with A. B. Dick, did you

4    often deal with Mr. Tomsich?

5  A.   Until 2004 I never dealt with Mr. Tomsich.

6  Q.   Okay.  When did you start dealing with

7    Mr. Tomsich?

8  A.   I would say towards the end of the first quarter,

9    beginning of the second quarter of 2004.

10 Q.   Okay.  Did something in your mind change that

11   resulted in his involvement?

12 A.   Yes.

13 Q.   And what was that?

14 A.   The company was rapidly running out of money, and

15   the sale to PressTek had continued to be delayed,

16   and there was concern as to whether or not the

17   company had sufficient resources to continue to

18   operate through a sale, and if the sale price

19   would hold given the deterioration that we were

20   seeing.

21 Q.   Okay.  So would it be a fair statement to say

22   that Mr. Tomsich became involved at the time when

23   payments of overadvances first came up?

24 A.   Prior.  I think he was always involved in the

25   credit.  My dealing with him directly was

A332