35

1     to anyone representing PressTek?

2    A.    No.

3    Q.    Okay. When was that? When was the first time

4    you talked to anyone representing PressTek?

5    A.    I want to say the beginning of -- I'll say the

6    beginning of the second quarter of 2004 when I

7    received permission in the name of the loan

8    officer from Citizens Bank who was going to

9    provide the ticket, to finance the purchase of

10    the acquisition. So I spoke to him briefly then.

11    Q.    So you spoke to someone from Citizens Bank,

12    correct?

13    A.    I spoke to Moosa, who gave me the name of the

14    loan officer at Citizens Bank as well as

15    permission to speak directly, to contact them.

16    Q.    Was that the first time you had ever talked to

17    Mr. Moosa?

18    A.    Yes.

19    Q.    Other than giving you the name of a

20    representative of Citizens Bank, was there any

21    other discussion?

22    A.    No, there was not.

23    Q.    Did you talk at all about the terms of the deal?

24    A.    No.

25    Q.    Okay. This meeting that occurred, did it occur

36

1    here in Cleveland?

2    A.    Yes, it did.

3    Q.    Okay.  So Mr. Marino, Mr. Moosa and Mr. Scaf ide

4    flew to Cleveland and met with you here, correct?

5    A.    Correct.

6    Q.    When did that meeting take place?  Did it take

7    place on the 18th, does that ring a bell?

8    A.    It occurred in June.  I would like to say it

9    occurred prior to the 18th.

10   Q.    Okay.  Did it occur after the Stock Purchase

11   Agreement was signed?

12   A.    My recollection was that it occurred on the day

13   after the Stock Purchase Agreement was signed.

14   Q.    Okay.  So if the Stock Purchase Agreement was

15   signed on the 16th, it would have occurred on the

16   17th, to your recollection?

17   A.    To my understanding, it was signed that night.

18   Q.    Okay.  And then it came out?

19   A.    It came out the very next morning or day.

20   Q.    Okay.  Prior to that meeting, and we'll just say

21   it occurred on the 17th with the understanding

22   that that may not be accurate.

23          Prior to that meeting on the 17th, had you

24   been involved in any of the negotiations of the

25   documents that would paper this acquisition?

A334

37

1    A.   No.   Never.

2    Q.   Had you received any of the documents that were

3       part of the Stock Purchase Agreement?

4    A.   I believe we did receive a draft of the

5       agreement, two drafts of the agreement.

6    Q.   Okay.   Did you review those drafts?

7    A.   Yes.

8    Q.   What did you review them for?

9    A.   Basically price, the amount of cash and due

10      diligence, contingencies.

11    Q.   Did you convey any thoughts or concerns about the

12      documentation to A.B. Dick?

13    A.   No.

14    Q.   Did you convey any thoughts to anyone?

15    A.   My -- we did convey the thought that we felt that

16      that was an extremely high price that was being

17      paid for this asset, and we were concerned that

18      that price might not hold.

19    Q.   Who did you convey that to?

20    A.   To A.B. Dick.   Well, to John Fountain.

21    Q.   To John Fountain.   Did you personally tell John

22      Fountain you thought the price was too high?

23    A.   We thought this was an aggressive price, and we

24      were concerned that there may be erosion.

25    Q.   When did you tell Mr. Fountain that?

A335

38

1 A. I believe we were fairly incredulous about the

2   price from the very beginning.

3 Q. But you never conveyed that thought to PressTek,

4   right?

5 A. No.

6 Q. That's understandable.  In response to that

7   thought, did Mr. Fountain have anything to say?

8 A. He said that they, I think John would have

9   indicated, did indicate that he too thought it

10   was a very aggressive price, but given that they

11   were in the business and they saw this for

12   strategic -- as a strategic acquisition to get

13   distribution, he could kind of see how they got

14   there especially when part of the purchase price

15   was in stock.

16 Q. Okay.  Was there anything else about the Stock

17   Purchase Agreement and the transactional

18   documents underlying that agreement that you

19   conveyed to A.B. Dick, any other concerns or

20   thoughts?

21 A. No.  We were again looking -- we saw this as a

22   way out.  We had confirmed, you know, we knew

23   that they were in the business, strategic, and we

24   had confirmed that their bank, they had bank

25   financing to take this deal out.  So we were

A336

39

1    cautiously optimistic; hopeful that this would
2    get done.
3    Q.    Okay.  When Mr. Marino, Mr. Moosa and Mr. Scafide
4          came to Cleveland, what did they say to you?
5    A.    They said we want to buy this asset, that we've
6          come out to let you meet us to let you know that
7          we're earnest about buying this asset, and we're
8          looking forward to closing.
9    Q.    Okay.  Is that all they said?
10   A.    They probably said a fair amount more, but if you
11         distilled it all, this is who we are, this is who
12         our company is, this is why we think this makes
13         sense, and we want to give you comfort that we're
14         going to go forward and get this deal done in the
15         next 30 days.
16   Q.    Okay.  Did they use the term 30 days?
17   A.    I believe it was 30 days, yes.  Whatever the date
18         of the contract.  There was a closing date
19         specified which I think was 30 days out.
20   Q.    Okay.  Did you have an understanding of why they
21         felt the need to come out to Cleveland and tell
22         you that?
23   A.    I think that that was to get us comfortable to
24         continue to fund overadvances.
25   Q.    Did that make you comfortable to continue to fund

A337

40

1    overadvances?

2 A.  No, it did not.

3 Q.  But you did fund an overadvance at or about that

4    time, correct?

5 A.  We, subsequent to the meeting; we did, and then

6    subsequent to that, we funded an overadvance, but

7    subsequent to the meeting we did fund an

8    overadvance.

9 Q.  And if memory serves, that was about

10   two-and-a-half million, correct?

11 A.  I think that brought our overadvance to

12   two-and-a-half million.  I think it was another

13   million dollars.

14 Q.  Okay.  You testified that your meeting with

15   Mr. Moosa and Marino and Scafide didn't make you

16   comfortable about overadvances, but yet you did

17   an additional overadvance of a million dollars,

18   correct?

19 A.  Correct.

20 Q.  Can you explain how that's consistent?

21 A.  Well, what our concern was, they were asking us

22   to fund out for 30 days to a company that was

23   deteriorating at a purchase price that we found

24   to be high, and our concern at that meeting was,

25   you know, why do you need 30 days given the

A338

41

1    length of negotiations that had gone on.  Why not
2    close this thing sooner than later.
3        There was really no reason.  Lawyers had been
4    involved from the very beginning, all parties,
5    all constituents were getting paid.  There was no
6    need for any kind of filing or anything like
7    that.
8        So our fear was that as time went on in the
9    30 days and we continued to overadvance in a
10    deteriorating company, we would find ourselves in
11    a worse position and somewhat over a barrel.
12        So our response to them when they came out
13    was we're not willing to undertake the risk to
14    close.  You tell us that you want to buy the
15    company, you're comfortable with the company,
16    then you should fund that through that 30-day
17    period, and we would be fine.  If there needed to
18    be an adjustment to purchase price, they should
19    talk with A.B. Dick/Paragon about that, but we
20    weren't prepared to fund at that point in time.
21    Q.   But there were at least two additional
22    overadvances paid out that day?
23    A.   Correct.  Well, that was the message we left them
24    with.  They said well, we're not a bank, we
25    weren't prepared to fund, we weren't thinking

A339

42

1    about funding, we would have to go back to

2    A.B. Dick to get our arms around just how much

3    money that's going to take and to do some

4    additional due diligence, we weren't prepared to

5    do that.  And they went off to do that additional

6    due diligence, and at some point prior to the

7    funding that you're talking about -- while they

8    were doing that due diligence, we made a decision

9    based on our agreement with Bob Tomsich that he

10    would guarantee the next funding.

11   Q.   Okay.

12   A.   So that was, that was how we got from here to

13    there, and we funded, and they sent us a letter

14    saying we understand -- we're not going to fund

15    this thing.  We understand from our conversations

16    you're not going to fund this, you don't consent,

17    you don't fall within the corners of the

18    document, you need to consent to the sale and

19    fund until this deal is over.  Which elicited a

20    letter from us indicating that we did consent,

21    and we were willing to fund within certain

22    parameters to the close.

23   Q.   Okay.  Let's follow up on some of that.  The last

24    two overadvances that were paid to A.B. Dick,

25    were they guaranteed by Mr. Tomsich?

A340

43

1                    the form of the question.

2              MR. LEPENE:  Again, I object to

3     the form of the question.

4     Q.   The last two overadvances that were lent to

5     A.B. Dick, were they guaranteed by Mr. Tomsich?

6     A.   In actuality, only $500,000 of the last two

7     overadvances were covered.  They weren't

8     guaranteed.  Collateral cash was pledged to the

9     bank to secure the overadvance.  So it wasn't a

10    guarantee by Mr. Tomsich, but it was cash

11    collateral was provided.

12    Q.   Okay.  For only $500,000 of those two over --

13    A.   Yes.

14    Q.   And what was the total of those two overadvances?

15    A.   I believe it was probably $2 million.

16    Q.   Okay.

17              MR. FAY:  I would like to mark

18    this as Lugli 5.  This is a document that

19    KeyBank has produced to us Bates stamped

20    Key 01266 and 01267.  It appears to be a

21    fax from PressTek.

22                 -  -  -

23         (Thereupon, Lugli Exhibit 5 was

24    marked for purposes of identification.)

25                 -  -  -

Q.   Mr. Lugli, have you seen this document that we've

A341

```
 1                                                       44
    marked as Lugli 5 before?
 2  A.   Yes, I have.
 3  Q.   Okay.  This is a fax to you from Mr. Moosa of
    PressTek, is that correct?
 4
 5  A.   Correct.
 6  Q.   Dated June 22, 2004?
 7  A.   Correct.
 8  Q.   In your prior testimony you mentioned that you
    received some communication from PressTek
 9
    regarding KeyBank's unwillingness to fund.  Is
10
    this the communication you received?
11
12  A.   This is the communication.
13  Q.   Okay.  When you received this, did you agree with
    what PressTek was saying here?
14
15  A.   We did not agree that we had not -- we did not
    agree that we had not -- we did not agree that we
16
    said we're not going to fund, that we still
17
    had -- under the agreement as presented to us,
18
    that we still had time to make that decision and,
19
    in fact, we were negotiating with A.B. Dick as to
20
    see if we could somehow bridge, you know, come to
21
    some arrangement to share the burden of the
22
    funding by either a guarantee of some money
23
    coming in, pledging additional collateral so that
24
    we could, so that we would feel comfortable to
25
```

A342

45

1    fund this thing through the close date.

2  Q.    When you say you were negotiating with A.B. Dick,

3    who were you negotiating with?

4  A.    We were primarily negotiating with John Fountain

5    and the board actually at that point in time,

6    actually Jim Wert had come onto the scene.

7  Q.    And as of the 22nd of June, 2004, those

8    negotiations were still ongoing?

9  A.    They were ongoing.

10 Q.    Okay.  Would it be fair to say that this letter

11    took you a bit at surprise?

12 A.    I thought it was somewhat presumptuous.  I would

13    have waited if I were they.  But I mean clearly

14    they had indicated prior to that based on their

15    due diligence that this was not the same company

16    that they had agreed to negotiate the purchase

17    under the Stock Purchase Agreement that had been

18    executed in June.

19 Q.    Okay.  So the Stock Purchase Agreement was

20    executed on the 16th of June, is that correct?

21    If I tell you that, do you have any reason to

22    disagree with that?

23 A.    I have no reason.  I'm just not sure.

24 Q.    Okay.  So is it your understanding that between

25    the time that the Stock Purchase Agreement was

46

1   executed and the time this letter was sent, that

2   PressTek had conducted additional due diligence

3   at A.B. Dick?

4  A.  Yes.

5  Q.  And it was their conclusion from that additional

6   due diligence that this was not the same company

7   they had agreed to purchase on the 16th of June?

8  A.  That is what we were told.

9  Q.  Who told you that?

10  A.  Moosa.

11  Q.  At some level, Mr. Lugli, did you view this

12   letter as an attempt by PressTek to get out of a

13   bad deal?

14  A.  Absolutely.

15        MR. LEPENE:  Can we take a short

16   break.

17        MR. FAY:  Sure.

18        - - - - -

19        (Thereupon, a recess was had.)

20        - - - - -

21  Q.  Mr. Lugli, in response to Exhibit Number 5 to

22   this deposition, the fax from Mr. Moosa to

23   yourself, did you send a letter to Mr. Moosa's

24   attention?

25  A.  Yes, I did.

47

1  MR. FAY: I would like to mark

2  this as Iugli 6. For the record this is a

3  document produced to us by KeyBank Bates

4  stamped 1456. It's a letter dated June

5  22nd, 2004 from PressTek.

6

7  (Thereupon, Iugli Exhibit 6 was

8  marked for purposes of identification.)

9  - - - -

10  Q.  Mr. Iugli, is this the letter, is this Exhibit 6

11  to your deposition, is this the letter that you

12  sent to Mr. Moosa on June 22nd, 2004?

13  A.  Yes, it is.

14  Q.  Is that your signature in the left hand corner,

15  the bottom left hand corner of the page?

16  A.  Yes, it is.

17  Q.  Once again I see some handwriting here over on

18  the side.  That's not your handwriting, correct?

19  A.  No, it is not.

20  Q.  Do you know whose handwriting that is?

21  A.  I do not.

22  Q.  Okay.  In this letter you expressed to Mr. Moosa

23  KeyBank's willingness to continue funding, is

24  that correct?

25  A.  That is correct, with some conditions, yes.

A345

48

1    Q.    Some conditions, and those conditions were that

2          you -- a limitation on due diligence, correct?

3    A.    Correct.

4    Q.    And at the time you wrote this letter it was your

5          understanding that PressTek had already conducted

6          due diligence?

7    A.    It was my understanding at the time of writing

8          this letter that PressTek had no due diligence

9          out.  The only remaining outs were reviewed by

10         their banks.

11   Q.    And you agreed to fund up to $26 million up until

12         closing, is that what the next condition is?

13   A.    Yes.

14   Q.    Finally, that there would be no impediment to a

15         closing on or about July 16th, is that correct?

16   A.    That's correct.

17   Q.    When you met with PressTek on or about June 17th,

18         did they represent to you that this acquisition

19         could be closed in approximately 30 days?

20   A.    Yes, they did.

21   Q.    Okay.  And when you wrote this letter, did you

22         feel that June 16th was a reasonable time frame

23         for closing the deal?

24             MR. LEPENE:  July.

25   Q.    Strike that.  When you wrote this letter, did you

A346

49

1    believe that July 16, 2004 was a reasonable time

2    frame in which to close this acquisition?

3    A.    I believe that was a time frame called for by the

4    agreement.

5    Q.    Did Mr. Moosa call you or otherwise communicate

6    with you about this letter that you sent to him

7    on June 22nd?

8    A.    I'm not sure if it was Mr. Moosa or Mr. Scafide,

9    but someone did communicate to me after that

10   letter.

11   Q.    Okay.  What did they say?

12   A.    Basically that there was a specific consent that

13   KeyBank had to sign and that was attached to the

14   Stock Purchase Agreement, and our failure to sign

15   that basically voided the deal; that we hadn't

16   sufficiently consented to the, to funding

17   pursuant to the agreement, to the Stock Purchase

18   Agreement.

19   Q.    Okay.  Prior to the meeting you had with

20   Mr. Moosa, Mr. Scafide and Mr. Marino on or about

21   June 17th, had anyone told you that there was a

22   specific consent agreement that KeyBank was

23   expected to sign?

24   A.    No.

25   Q.    Did Mr. Moosa, Mr. Marino or Mr. Scafide mention

50

1    that issue when they met with you in Cleveland on

2    the 17th?

3           MR. LEPENE: Of June?

4           MR. FAY: Of June.

5  A.   Not to my knowledge or recollection.

6  Q.   The call that you received from either

7    Mr. Scafide or Mr. Moosa in response to your

8    letter, when did that take place?

9  A.   I don't know if it was that business day. This

10   letter was sent out at the very end of the

11   business day. I'm not sure if I received a call

12   that day or the next.

13  Q.   Okay. I believe this was a Friday. So to the

14   best of your knowledge it would have either been

15   on this Friday or the following Monday?

16  A.   The next business day.

17  Q.   Okay. All right. Now, prior to that

18   communication that you had with either Mr. Moosa

19   or Mr. Scafide, had you ever been told that

20   KeyBank was expected to sign a specific document?

21  A.   I had not been told. When I looked through the

22   Stock Purchase Agreement, I did notice a consent

23   form which I forwarded to our attorneys to

24   review, and we were unwilling to sign that form.

25   We felt that this was sufficient and represented

54

1       produced to us by KeyBank Bates stamped
2       01264, 01265.  It appears to be an e-mail
3       dated June 22nd, 2004.
4                           -  -  -
5                           -  -  -
6            (Thereupon, Lugli Exhibit 8 was
7       marked for purposes of identification.)
8       Q.   Mr. Lugli, is the document we have marked as
9       Exhibit 8 to your deposition, is this the e-mail
10      that you received from Mr. Goldsmith that you
11      referred to in your prior testimony?
12      A.   I believe it is.
13      Q.   Okay.  Were you still at work on the 22nd when
14      you received this?
15      A.   I can't remember.
16      Q.   Okay.  So you don't remember whether you saw this
17      on that Friday or just picked it up on Monday?
18      A.   I'm pretty sure I saw it Friday, but I can't be
19      certain.
20      Q.   Okay.  Is it in response to this e-mail that you
21      wrote your letter of June 25th, 2004?
22      A.   Correct.
23      Q.   Would it be fair to say that you interpreted this
24      e-mail as PressTek stating that it would not go
25      forward with the acquisition because of KeyBank's

A349

55

```
 1   failure to consent to further funding?
 2   A.   That is correct.
 3   Q.   Would it also be fair to say that in Exhibit 7,
 4   your letter of June 25th, 2004, it was your
 5   intent in writing this letter to communicate to
 6   PressTek that KeyBank was indeed willing to
 7   continue funding?
 8   A.   That is correct.   Prior to the receipt of the
 9   e-mail.
10   Q.   And after receiving the e-mail, did that affect
11   KeyBank's willingness to continue funding?
12   A.   As indicated in the last paragraph of the letter,
13   you know, since they were saying that there was
14   no longer an agreement, our obligations as set
15   forth in the June 22nd correspondence with them,
16   we felt were void.
17   Q.   Okay.   Your letter of June 22nd set forth
18   KeyBank's willingness to continue funding if the
19   acquisition went forward, correct?
20   A.   That is correct.
21   Q.   After receiving Mr. Goldsmith's e-mail of June
22   22nd indicating that PressTek had no intent to go
23   forward, KeyBank felt that there was no
24   obligation to abide by those terms in your June
25   22nd letter, is that correct?
```

A350

56

1    A.    That is correct.

2    Q.    Mr. Lugli, in a production that's been made to us

3          by PressTek, we have received a term sheet for a

4          different deal, a deal that would be an Asset

5          Purchase Agreement dated June 23rd, 2004. Did

6          you ever see such a term sheet?

7                MR. LEPENE: You want to show the

8          witness a copy of it so he can answer that

9          question.

10               MR. FAY: Unfortunately, we're

11         missing a page of it.

12               MS. CONROY: I'll get it.

13               MR. FAY: Mark this as Exhibit

14         Number 9. It's PressTek 456 and what I

15         have is 458, 59 and 60. We're missing a

16         page, and I only have one.

17                    -    -    -

18               (Thereupon, Lugli Exhibit 9 was

19         marked for purposes of identification.)

20                    -    -    -

21   A.    I do not believe I saw this.

22   Q.    Okay. Mr. Lugli, I'm going to correct myself.

23         June 22nd, the date of your first letter was a

24         Tuesday, and June 25th was a Friday, okay?

25   A.    Okay.

A351

# EXHIBIT H

# ORIGINAL

1

2                     UNITED STATES BANKRUPTCY COURT

3                       FOR THE DISTRICT OF DELAWARE

4

  In Re:                          ) Chapter 11

5                                 ) Case Nos. 04-12002

  A.B. DICK COMPANY, et al.,      ) (CGC)

6                                 ) Jointly

  ----------------------------) Administered

7

8

9

10

11                 DEPOSITION OF MICHAEL McCARTHY

12                       New York, New York

13                   Wednesday, October 20, 2004

14

15

16

17

18

19

20

21

22

23

24    Reported by:

      TAMI H. TAKAHASHI, RPR

25    JOB NO. 166399B

Page 40

1                       McCarthy

2    Anything I have is more observation and hearsay.

3    I'm not potentially part of that program.

4         Q.    Can you tell me what you know about

5    the Vector TX52?

6         A.    I know it's a two-page CTP device that

7    utilizes our sure fire laser technology and runs

8    our Freedom Aurora plates.  Our proprietary, both

9    products.

10        Q.    And I believe you testified earlier

11   that it was, in fact, shown at one of the tech

12   shows, Graph Expo?

13        A.    I was told by Ken Newton that it was

14   shown as a development product at the Graph Expo

15   in October.

16        Q.    And are you aware of the market's

17   reaction to the product?

18        A.    I'm not.

19        Q.    Did you -- did Mr. Newton report back

20   whether it was favorably received unfavorably

21   received?

22        A.    We have not had a conversation.

23        Q.    So, you have no knowledge if there's

24   been any interest in the product from the

25   marketplace?

1                    McCarthy

2        A.    I've been told by A.B. Dick that

3    there's a lot of interest in the product over --

4    over months' period, not just out of Graph Expo.

5        Q.    Are you aware of any other trade shows

6    where this product was shown?

7        A.    I am not.

8        Q.    Do you know if that product is still

9    being manufactured by A.B. Dick?

10       A.    I do not.

11       Q.    Do you have any knowledge of

12   A.B. Dick's financial situation at the time that

13   the joint development agreement was executed?

14       A.    I do not.

15       Q.    Do you have any knowledge as to how

16   proceeds from the sale of the product were

17   distributed between A.B. Dick and Presstek?

18       A.    No.

19       Q.    Do you remember who you communicated

20   with at A.B. Dick who expressed the opinion that

21   the market -- or that the product was of interest

22   to people in the marketplace?

23       A.    Who -- repeat the question.

24       Q.    Who at A.B. Dick told you that there

25   was interest in the product?

Page 42

1                           McCarthy

2        A.    I heard it from their vice president

3    of sales, Larry Mascia; their chief operating

4    officer, Ken Newton.

5        Q.    Anyone else?

6        A.    Those are the two primaries.

7        Q.    Have you conveyed this information to

8    anyone else at Presstek?

9        A.    In a formal sense, no.

10        Q.    What do you mean by "formal sense"?

11        A.    I mean, did we sit down and talk

12    specifically about the Vector product?  I think

13    we know there's an interest in the product.

14        Q.    You know there's -- I'm sorry.  Could

15    you repeat that?

16        A.    We know there's an interest in the

17    product.  Our technology is in the product.

18    We're very aware of the product.

19              A.B. Dick is really manufacturing the

20    box that it goes in.  But the technology is

21    ours.  It makes it attractive in the market and

22    we manufacture the technology, so yes we know.

23        Q.    So, does Presstek consider this

24    product as an asset to its business?

25        A.    I don't know what the question is.

1                          McCarthy

2        Q.    Does Presstek consider the product

3    valuable?

4        A.    All of our technology is valuable to

5    us.  That's why we manufacture it.

6        Q.    So, that would be a yes?

7        A.    That would be a yes.

8        Q.    Mr. McCarthy, who was your immediate

9    supervisor?

10       A.    At Presstek?

11       Q.    Um-hum.

12       A.    Ed Marino.

13       Q.    And do you report only to him?

14       A.    Yes.

15       Q.    How about below you, who reports to

16   you?

17       A.    I recently picked up the vice

18   president of engineering as of yesterday -- I

19   believe Monday.

20       Q.    Meaning he reports to you or you have

21   become the vice president of engineering?

22       A.    No.  The director -- pardon me.  He's

23   the director of engineering and he reports to me.

24       Q.    Now, I understand that somewhere along

25   the way your position at Presstek changed from

1                        McCarthy

2    consultant to vice president?

3        A.    Yes, it did.

4        Q.    And you were the vice president of?

5        A.    Business integration.

6        Q.    And when did that occur?

7        A.    On July 27th of this year.

8        Q.    And was that a position that you and

9    the executives at Presstek had discussed when you

10   first came on board?

11       A.    Yes.

12       Q.    And what were those discussions?

13       A.    Discussions were, we were working on

14   an acquisition.  We expect there will be a

15   position at such time we get closer to

16   acquisition or such time we decide it's time to

17   bring you on.

18       Q.    And the acquisition they were

19   referring to was the acquisition of A.B. Dick?

20       A.    Yes.

21       Q.    Can you describe for me your job

22   duties as the vice president of integration?

23       A.    Essentially, my duties are to -- in

24   that role, is to do the integrations --

25   initially, provide the integration within

Page 95

1                         McCarthy

2    consent to the transaction?

3         A.    Yes.

4         Q.    Are you aware of a meeting that took

5    place the day after on June 17 in Cleveland

6    between representatives of Key Bank and Presstek?

7         A.    Yes.

8         Q.    And can you tell me who was at that

9    meeting from Presstek?

10        A.    I was not privy to that.  I do not

11   know.

12        Q.    What do you know about that meeting?

13        A.    It was a meeting where Moosa and Ed

14   met with the Paragon and bankers.  That's all I

15   knew.

16        Q.    And do you know the purpose of that

17   meeting?

18        A.    No, I do not.

19        Q.    Do you know at -- who initiated that

20   meeting?

21        A.    No.

22        Q.    Do you know the results of that

23   meeting?

24        A.    No.

25        Q.    So, you know they went to a meeting,

1                    McCarthy

2    but you don't know anything else?

3        A.    I don't know any specific results

4    because I wasn't at the meeting or part of the

5    process that was involved.  That was part of the

6    negotiation of the final deal.

7        Q.    So, neither Moosa nor Marino came back

8    and conveyed the results of that meeting to you?

9        A.    You know, I just don't remember

10   because the deal had been signed and -- during

11   that process, and I wasn't involved in that.

12       Q.    So, did your responsibilities change

13   after June 16th with respect to the SPA?

14            MR. SLATTERY:  Objection.

15       A.    I wasn't involved specifically with

16   it, no.

17       Q.    Do you know whether Key Bank was

18   willing to provide the necessary funding to

19   closing?

20       A.    Do I know?  Do I know if they

21   agreed -- you're asking me if they agreed to

22   provide funding to closing?

23       Q.    Yes.

24       A.    I believe I was told that.

25       Q.    Do you remember who told you that?

1                       McCarthy

2        A.    I believe it was -- I believe it was

3    Moosa.

4        Q.    And do you know when he conveyed that

5    information to you?

6        A.    I don't know exactly.

7        Q.    Do you recall if it was a day or two

8    within the signing of the agreement?

9        A.    I don't recall the specific days, no.

10            MS. KOWALCZYK:   I'd like to show you

11       an e-mail.   This will be McCarthy 3.

12            (McCarthy Exhibit 3, E-mail dated

13       6/18/04, from Marino to Marino, Rappaport,

14       Ebenstein, Samataro, Waite, Dreyer, Howard,

15       Moffitt and Moosa, marked for

16       identification, as of this date.)

17            MS. KOWALCZYK:   It's marked June 18,

18       2004.   It's from Ed Marino, and Mr. McCarthy

19       is cc'd on this.

20       A.    Yes.

21       Q.    The Bates number is P 03864.   There's

22   actually two E-mails on this page.   If you would

23   take a moment to read them both.

24            (Witness reading document.)

25       Q.    Do you recall receiving this e-mail?

1                   McCarthy

2            MR. SLATTERY:  Could you --

3            MS. KOWALCZYK:  You're still reading?

4            MR. SLATTERY:  Just -- I'm slow.

5            MS. KOWALCZYK:  Sure.  Are you ready?

6            MR. SLATTERY:  Yes.  Thank you.

7       Q.    I'd like to direct your attention to

8   the first e-mail there dated June 18, 2004 at

9   12:35 p.m.  You said you recall receiving this

10  e-mail?

11      A.    Yes.

12      Q.    Okay.  In the first paragraph,

13  Ed Marino writes, "We have been working closely

14  with Key Bank, who is very supportive us of in

15  our position."

16            Do you know what he meant by "our

17  position"?

18      A.    I have no idea.

19      Q.    Okay.  The next sentence he writes,

20  "We have 'bought some time', got agreement from

21  them to give us access to their information and

22  in the process are building a relationship for

23  the eventuality that this 'goes a different

24  way'."

25            What is your understanding of that

# EXHIBIT I

| | |
|---|---|
| **From:** | jgoldsmith@mwe.com |
| **Sent:** | Tuesday, June 22, 2004 6:46 PM |
| **To:** | chaffke@ssd.com; dzagore@ssd.com; fdzaffino@aol.com; hgoldstein@mhrfund.com; jfountain@worldnet.att.net; richard.pritz@cliffordchance.com; EPtaszek@bakerlaw.com; michael_v_lugli@keybank.com |
| **Cc:** | mmccarthy@presstek.com; mmoosa@presstek.com; jsteele@mwe.com; jegan@mwe.com; jscafide@presstek.com; emarino@presstek.com |
| **Subject:** | Project Silver |

As you are aware, we represent Presstek, Inc. with respect to that certain Escrow Agreement dated as of June 16, 2004 (the "Escrow Agreement") by and among Presstek, Inc. ("Platinum"), Paragon Corporate Holdings, Inc. ("Parent"), A.B. Dick Company, ("Silver"), Silver Acquisitions Corp. ("Purchaser"), N.E.S. Investment Co. ("Nes") and MHR Capital Partners LP, MHR Institutional Partners LP and MHRM LP (together with MHR Capital Partners LP and MHR Institutional Partners LP, "MHR"). All capitalized terms herein shall have the meanings ascribed thereto in the Escrow Agreement.

Section 4(c) of the Escrow Agreement provides that upon the failure of Key to execute the Consent and Agreement on or prior to the expiration of the Key Escrow Period, then the agreements, covenants and obligations of the Parties contained in the Principal Documents shall be null and void in their entirety. As you are aware, the Key Escrow Period expired at close of business today. Section 4(c) further states that upon such event, "Platinum shall, at the request of Nes, Parent and MHR, either (x) destroy all of the executed copies of the Principal Documents constituting the Escrow Deposit, and shall deliver a certificate to each of MHR, Nes and Parent attesting to such destruction of the execution copies of the Principal Documents or (y) return the Escrow Deposit to Parent and MHR, respectively."

Although our client has received related correspondence from Key, such correspondence does not satisfy the consent requirements set forth in the Consent and Agreement. Specifically, the Consent and Agreement which Key was required to execute pursuant to the terms of the Escrow Agreement (and which Key did not execute) calls for Key to (i) commit to continue to fund working capital and operating deficits of Silver by increasing its total aggregate lending commitment to Parent as necessary to ensure adequate funding for Silver through the closing of the Sale; (ii) to forbear from declaring any default under the Key Credit and Security Loan Agreement or exercise their rights and remedies under the Loan Agreement until the earlier of (A) the closing of the Sale or (B) the termination of the Purchase Agreement in accordance with its terms.

Accordingly, on behalf of Platinum, we request that you advise whether the signature pages bearing your signatures should be destroyed or returned to your attention.

James H. Goldsmith
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4416
(617) 535-3800 (fax)
jgoldsmith@mwe.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A364

Please visit http://www.mwe.com/ for more information about our Firm.

A365

# EXHIBIT J

From:       jgoldsmith@mwe.com
Sent:       Tuesday, June 15, 2004 9:21 PM
To:         Richard.Pritz@cliffordchance.com
Cc:         hgoldstein@mhrfund.com; jparis@mwe.com; jscafide@presstek.com
Subject:    Re: Project Silver


>From my perspective, obtaining the bank's "consent" means they approve
>of
the transaction contemplated by the Purchase Agreement and the Ancillary Documents.

What connection does this have with an "agreement to continue funding"? Are you asking if
the "consent" is tantamount to obtaining the bank's agreement to lend in excess of $24
mil?  Can you tell me what you are getting at?


James H. Goldsmith
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4416
(617) 535-3800 (fax)
jgoldsmith@mwe.com



                    Richard.Pritz@cliffor
                    dchance.com              To:       jgoldsmith@mwe.com,
jscafide@presstek.com
                                             cc:       jparis@mwe.com,
hgoldstein@mhrfund.com
                    06/15/2004 09:05 PM      Subject:  Re: Project Silver




Does "consent" include an agreement to continue funding?

Richard D. Pritz
Clifford Chance US LLP
+1 212-878-8220

-----Original Message-----
From: jgoldsmith@mwe.com <jgoldsmith@mwe.com>
To: Jim Scafide <jscafide@presstek.com>
CC: jparis@mwe.com <jparis@mwe.com>; Richard.Pritz@CliffordChance.com
<Richard.Pritz@CliffordChance.com>
Sent: Tue Jun 15 19:38:40 2004
Subject: Re: Project Silver


I think the best way to achieve this is to amend the Escrow Agreement to reflect that the
documents won't be released until the bank consents to the transaction.


James H. Goldsmith
McDermott Will & Emery LLP

                                    1

28 State Street
Boston, MA 02109-1775
(617) 535-4416
(617) 535-3800 (fax)
jgoldsmith@mwe.com


            "Jim Scafide"

                  <jscafide@presste        To:    <Richard.Pritz@CliffordChance.com>, <jgoldsmith@mwe.com>, <jparis@mwe.com>

                  k.com>                    cc:

                                            Subject:  Re: Project Silver

            06/15/2004 08:19

            PM


I have been informed by Moosa that your client has consented to signing the documents, provided that they are amended so that his consent would be contingent upon the bank approving the deal.

I am, therefore, asking Jim Goldsmith to make appropriate changes in the appropriate documents to reflect this concept. To that end, we would appreciate having a phone call with you to review your proposed changes of today so that we can appropruiately reflect them in the final documents.

Please call Jim Golldsmith (617-535-4416) at your earliest convenience.

Thanks,

Jim
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Richard.Pritz@CliffordChance.com <Richard.Pritz@CliffordChance.com>
To: Jim Scafide <jscafide@presstek.com>
Sent: Tue Jun 15 17:57:00 2004
Subject: RE: Project Silver

cell #?

Richard D. Pritz
Clifford Chance US LLP
+1 212-878-8220

A368

# EXHIBIT K

From:           Jim Scafide [jscafide@presstek.com]
Sent:           Tuesday, June 15, 2004 10:13 PM
To:             hgoldstein@mhrfund.com
Subject:        Re: Project Silver


Hal,

Understood and acknowledged. We are still facing a problem with disclosure. MWE is
advising me that if we sign the agreement, we will have a reportable event. Given that,
would you be amenable to our signing after we get consent from Key?

Jim
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Hal Goldstein <hgoldstein@mhrfund.com>
To: jgoldsmith@mwe.com <jgoldsmith@mwe.com>; Richard.Pritz@cliffordchance.com
<Richard.Pritz@cliffordchance.com>
CC: jparis@mwe.com <jparis@mwe.com>; Jim Scafide <jscafide@presstek.com>
Sent: Tue Jun 15 21:26:59 2004
Subject: RE: Project Silver

The agreement was that (a) the parties would sign documents and present them to the bank,
and (b) there would be a letter, or some similar document, that would provide that the
bank, or some other party, must consent to keep funding till the close (i.e., in excess of
$24m, if
necessary) or the deal expires w/in 3 - 5 days.  In this way PRST would avoid having to
announce the deal with the contingency.

As to eliminating the Series B notes language from Schedule 1, please someone explain why
PRST would not allow that.  I need this so that I can negotiate with Delaware.

Hal Goldstein
MHR Fund Management LLC
40 West 57th Street, 24th Floor
New York, NY 10019
Tel: (212) 262-0005
Fax: (212) 262-9356
email: hgoldstein@mhrfund.com

-----Original Message-----
From: jgoldsmith@mwe.com [mailto:jgoldsmith@mwe.com]
Sent: Tuesday, June 15, 2004 9:21 PM
To: Richard.Pritz@cliffordchance.com
Cc: hgoldstein@mhrfund.com; jparis@mwe.com; jscafide@presstek.com
Subject: Re: Project Silver


>From my perspective, obtaining the bank's "consent" means they approve
of
the transaction contemplated by the Purchase Agreement and the Ancillary Documents.

What connection does this have with an "agreement to continue funding"? Are you asking if
the "consent" is tantamount to obtaining the bank's agreement to lend in excess of $24
.mil?  Can you tell me what you are getting at?

James H. Goldsmith
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775

1

A370

```
(617) 535-4416
(617) 535-3800 (fax)
jgoldsmith@mwe.com
```

Richard.Pritz@cliffor

dchance.com                          To:
jgoldsmith@mwe.com, jscafide@presstek.com

                                     cc: jparis@mwe.com,
hgoldstein@mhrfund.com

        06/15/2004 09:05 PM          Subject:  Re: Project
Silver


Does "consent" include an agreement to continue funding?

Richard D. Pritz
Clifford Chance US LLP
+1 212-878-8220

-----Original Message-----
From: jgoldsmith@mwe.com <jgoldsmith@mwe.com>
To: Jim Scafide <jscafide@presstek.com>
CC: jparis@mwe.com <jparis@mwe.com>; Richard.Pritz@CliffordChance.com
<Richard.Pritz@CliffordChance.com>
Sent: Tue Jun 15 19:38:40 2004
Subject: Re: Project Silver


I think the best way to achieve this is to amend the Escrow Agreement to reflect that the
documents won't be released until the bank consents to the transaction.

James H. Goldsmith
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4416
(617) 535-3800 (fax)
jgoldsmith@mwe.com


               "Jim Scafide"

               <jscafide@presste       To:
<Richard.Pritz@CliffordChance.com>, <jgoldsmith@mwe.com>, <jparis@mwe.com>

                            2

# EXHIBIT L