06/22/04  17:09 FAX 216 689 8468        ASSET RECOVERY                        ☒001



# KeyBank

# Facsimile Cover Sheet

**To:** Moose E Moose
John Fountain

**Company:** Presstek
Paragon

**Phone:**

**Fax:** 603-595-2602
440-449-3111

**From:** Michael V. Lugli
**Company:** KeyBank National Association
**Phone:** (216) 689-0851
**Fax:** (216) 689-8465 or (216) 689-8468
**E-Mail:** Michael_V_Lugli@keybank.com

**Date:** 06/22/2004 4:29 PM

**Pages including this
cover page:**

**Re: Consent**

*M lugli@....*

Comments:

P- 00001
CONFIDENTIAL

This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy.

This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide services requested by Key.

A373



Key Corporate Capital Inc.
A KeyCorp Subsidiary
127 Public Square
Cleveland, OH 44114-1306

June 22, 2004

*Via Facsimile*

Presstek, Inc.
55 Executive Drive
Hudson, New Hampshire 03051
Attention:     Moosa E. Moosa
               Vice President--Finance and CFO

          Re:     *A.B. Dick Company*

Dear Moosa:

We are in receipt of your letter dated June 22, 2004 ("Presstek Letter") concerning A.B. Dick Company. Capitalized terms used but not otherwise defined herein shall have the meaning given thereto in the Presstek Letter.

Key Corporate Capital Inc. ("KCCI") hereby consents, on behalf of itself as Agent, LC Issuer and as the sole Bank under its Credit and Security Agreement with Paragon Corporate Holdings, Inc., to the Proposed Transaction pursuant to the terms that have been outlined to KCCI. Specifically, KCCI understands that (a) the limited open due diligence conditions will have been satisfied on or before June 28th 2004, (b) Platinum will consent to any increase in the outstandings under KCCI facility (up to $26,000,000) between now and the closing of the transaction, and (c) that there will be no other impediment to a closing on or about July 16, 2004.

We continue to look forward to hearing from you in an effort to work toward consummation of the Proposed Transaction.

Sincerely

KEY CORPORATE CAPITAL INC.

Name:  Michael Vl [signature]
Title:  SVP

cc: Paragon Corporate Holdings, Inc.

{CONSENT;1}

A374
CONFIDENTIAL

# EXHIBIT M

MWE DRAFT
FEBRUARY 23, 2004

ASSET PURCHASE AGREEMENT

BY AND AMONG

[PLATINUM], INC.,

SILVER ACQUISITION CORP.,

[PARENT] CORPORATE HOLDINGS, INC.

AND

[SILVER], INC.

DATED AS OF [FEBRUARYMARCH] __, 2004

Document comparison done by DeltaView on Tuesday, February 24, 2004 1:49:03 AM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://BSTDMS02/BST99/1394460/1 |
| Document 2 | iManageDeskSite://BSTDMS02/BST99/1394460/2 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |

| Inserted cell | |
|---|---|
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 767 |
| Deletions | 716 |
| Moved from | 53 |
| Moved to | 53 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1589 |

A377

CONFIDENTIAL

*[handwritten: Tran State:]*
*[handwritten: 2/25/04:]*

**CONFIDENTIAL**

*[handwritten: Finish]*

*[handwritten notation in margin: Wedensday 2/25/04]*

Working Capital Adjustment: Need more specificity on which line items included and excluded from the calculation. Given the deterioration in the numbers, the December 2003 financials will not serve as the baseline, so draft contemplates adjusting off the original $11M baseline. Moosa, however, noted the need to adjust for the write-down in the Multigraphics liability. ["Working capital" definition, §2.8] We would propose that any post-closing decrease in purchase price be made by reduction in the escrow. *[handwritten: Agreed ... Agree t]*

2. Specify Assets and Liabilities in Detail: Need more specificity on which assets to be excluded (e.g., equipment or other assets from Canada, Henrietta) and which liabilities to be assumed. [§2.1, 2.2, 2.4] In Monroe County, NY the combined transfer tax rate is 8.25%, with various exemptions available depending on type of assets and intended uses. Draft still provides for Seller to pay transfer taxes [§2.5]

3. Employee Benefit Obligations: Draft contemplates that employees offered employment will be offered compensation commensurate with Presstek terms and that they will be entitled to severance. [§6.8] Draft contemplates we will assume certain Multigraphics liabilities and Seller's current sales commission plan. [§2.4(a)(v)] Need more detail on which employees will be offered employment (Canada?) and which additional employment benefit plans will be assumed. Draft assumes a Transition Services Agreement for Henrietta as previously discussed – exact terms (e.g., Presstek buys inventory and raw materials, but not equipment (with option to buy); Seller continues to employ employees?) and handling of employee benefits to be determined. [§7.8]

4. Financing Out. [§4.7, 9.17]

*[handwritten in margin: 2/2/04]*

5. Seller Insurance: Moosa was interested in an assignment of certain Seller insurance. Draft contemplates that Presstek acquires insurance proceeds [§2.1(i)]. Should we pursue feasibility of assignment? *[handwritten: need detail]*

6. Environmental: Presstek assumes no liabilities. Seller provides environmental remediation plan and agrees to maintain reserves to fund. Draft removes concept of escrow to fund insurance retentions. We need response from Seller on proposal for insurance coverage. [§7.9]

7. Registration Rights: All shares (except escrow shares) registered within 90 days after Closing and effectiveness maintained until first anniversary. [§7.6]

**P- 00016**
**CONFIDENTIAL**

*[handwritten: • Absolutely liable to seller]*

*[handwritten: • Working Part to Silva not entire agreement]*

*[handwritten: • let me play 1,000 questions]*

*[handwritten: Tag — move legal bill along —]*

A378

*2/24/04*
*Duft of APA*

*God Hx/BS*
*is*

# TABLE OF CONTENTS

*(Legal pks png)*

Page

1.  DEFINITIONS AND USAGE OF CERTAIN TERMS ...................................................... 1
    1.1   Definitions ............................................................................................. 1
    1.2   Usage. ................................................................................................. ~~7~~8

2.  SALE AND TRANSFER OF ASSETS; CLOSING ....................................................... ~~8~~9
    2.1   Assets to be Sold ................................................................................. ~~8~~9
    2.2   Excluded Assets ................................................................................... ~~9~~ 10
    2.3   Consideration ...................................................................................... ~~10~~11
    2.4   Liabilities ............................................................................................ ~~10~~11
    2.5   Transfer Taxes .................................................................................... ~~12~~13
    2.6   Allocation ............................................................................................ ~~12~~13
    2.7   Closing ............................................................................................... ~~12~~13
    2.8   ~~Closing Obligations~~ ............................................................................ ~~12~~12.9 Adjustment t

3.  REPRESENTATIONS AND WARRANTIES OF PARENT AND SELLER ........................ ~~16~~15
    3.1   Organization and Good Standing ......................................................... ~~16~~15
    3.2   Subsidiaries and ~~Guarantees~~ ............................................... ~~16~~Guaranties 16
    3.3   Capitalization ...................................................................................... ~~17~~16
    3.4   Power, Authorization and Non-Contravention ...................................... ~~17~~16
    3.5   No Violation of Charter Documents and Contracts; Compliance with Legal
          Authorizations; Governmental Authorizations ...................................... ~~18~~17
    3.6   Documents and Disclosures ................................................................ ~~19~~18
    3.7   Seller Financial Statements ................................................................ ~~20~~19
    3.8   Internal Control Over Financial Reporting ............................................ ~~20~~19
    3.9   Accounts Receivable ........................................................................... ~~20~~19
    3.10  ~~Banking Relations~~ ............................................................................. ~~21~~
    3.10  Intentionally Omitted .......................................................................... 20
    3.11  Litigation ............................................................................................ ~~21~~20
    3.12  Taxes .................................................................................................. ~~21~~20
    3.13  Sufficiency of Assets; Title to Properties ............................................. ~~22~~21
    3.14  Absence of Certain Changes or Events ................................................ ~~23~~22
    3.15  Intellectual Property ............................................................................ ~~25~~23
    3.16  Conformity of Products and Services .................................................... ~~26~~25
    3.17  Product and Service Warranties ........................................................... ~~26~~25
    3.18  List of Certain Employees; Suppliers and Customers ............................ ~~27~~25
    3.19  Disabling Codes .................................................................................. ~~27~~26
    3.20  Compliance with Laws ......................................................................... ~~27~~26
    3.21  Agreements and Commitments ............................................................. ~~28~~26
    3.22  Employees ........................................................................................... ~~30~~28
    3.23  Relationships with Affiliates ................................................................. ~~32~~30
    3.24  Environmental Matters ......................................................................... ~~33~~31
    3.25  Certain Transactions and Agreements .................................................. ~~34~~32
    3.26  Board of Directors, Officers and Key Personnel .................................... ~~34~~32
    3.27  Insurance ............................................................................................ ~~35~~33

BST99 1396657-1.069646.0011

-i-

*• Legal vs Business*
*issues*

*• Esuk*
*• Purchase Price Adj*

A379
**CONFIDENTIAL**

## TABLE OF CONTENTS
### (continued)

Page

|  |  |  |  |
|---|---|---|---|
| 3.28 | Investment Banking and Brokerage Fees | | 3533 |
| 3.29 | Solvency | | 3533 |
| 3.30 | Accuracy of Disclosure | | 3533 |

| 4. | REPRESENTATIONS AND WARRANTIES OF PLATINUM AND PURCHASER | | 3534 |
|---|---|---|---|
| | 4.1 | Organization and Good Standing | 3634 |
| | 4.2 | Capitalization | 3634 |
| | 4.3 | Power, Authorization and Non-Contravention | 3635 |
| | 4.4 | No Violation of Charter Documents, Contracts or Laws | 3735 |
| | 4.5 | SEC Filings | 3736 |
| | 4.6 | Platinum Financial Statements | 3736 |
| | 4.7 | Financing | 36 |
| | 4.8 | Accuracy of Disclosure | 36 |
| | 4.9 | Litigation | 36 |
| | 4.10 | Absence of Certain Changes or Events | 37 |
| | 4.11 | Investment Banking and Brokerage Fees | 37 |

| 5. | SELLER COVENANTS | | 3837 |
|---|---|---|---|
| | 5.1 | ~~Access to Information~~ | 385.2 Advice of Cf |
| | 5.35.2 | Conduct of Business | 3837 |
| | 5.4 | ~~Filings~~ | 41 |
| | 5.5 | ~~Joint Participation~~ | 41 |
| | 5.65.3 | No Solicitation | 4139 |
| | 5.75.4 | Regulatory Approvals | 4239 |
| | 5.85.5 | Necessary Consents | 4240 |
| | 5.95.6 | Securities Laws | 4240 |
| | 5.105.7 | Litigation | 4240 |
| | 5.11 | ~~Certain Employee Benefits~~ | 42 |
| | 5.125.8 | Notification of Employee Problems | 4240 |
| | 5.13 | ~~Certain Agreements~~ | 42 |
| | 5.145.9 | Satisfaction of Closing Conditions | 4240 |
| | 5.155.10 | Confidentiality | 4340 |
| | 5.165.11 | Change of Name | 4341 |
| | 5.175.12 | Payment of Liabilities | 4341 |
| | 5.13 | Access to Information | 41 |

| 6. | ~~PLATINUM COVENANTS 43~~ OF PLATINUM AND PURCHASER | | 41 |
|---|---|---|---|
| | 6.1 | Advice of Changes | 4341 |
| | 6.2 | Regulatory Approvals | 4341 |
| | 6.3 | Litigation | 4442 |
| | 6.4 | ~~Certain Employee Benefits~~ | 446.5 Satisfaction o |
| | 6.66.5 | Blue Sky Laws | 4442 |
| | 6.76.6 | Nasdaq Listing | 4442 |
| | 6.86.7 | Confidentiality | 4442 |

-ii-

A380
**CONFIDENTIAL**

# TABLE OF CONTENTS
## (continued)

Page

6.8     Employees ................................................................................................ 42

7.     ADDITIONAL COVENANTS ................................................................... ~~11~~43

     7.1     Tax Matters; Assistance and Cooperation ............................... ~~11~~43
     7.2     Payment of all Taxes Resulting From Sale of Assets by Seller ................. 45~~13~~
     7.3     Payment of Other Retained Liabilities ....................................... 45~~13~~
     7.4     ~~Restrictions on Seller Dissolution and Distributions~~ ......................... ~~45~~5 Non-Compet
     ~~7.6~~7.5     Further Assurances ................................................................. 46~~11~~
     ~~7.7~~7.6     Registration of Shares ............................................................. 47~~14~~
     ~~7.8~~7.7     Transfer of Shares .................................................................. 47~~15~~
     ~~7.9~~7.8     Transition Services Agreement ................................................ 47~~15~~
     ~~7.10~~7.9     Seller Remediation and Insurance ............................................ 47~~15~~
     7.10     Filings ................................................................................... 46
     7.11     Joint Participation .................................................................... 46

8.     CONDITIONS TO OBLIGATIONS OF SELLER ......................................... 48~~46~~

     8.1     Accuracy of Representations and Warranties ......................... 48~~46~~
     8.2     Covenants ............................................................................... 48~~46~~
     8.3     Absence of Material Adverse Effect ........................................ 48~~46~~
     8.4     Compliance with Law .............................................................. 48~~47~~
     8.5     Government Consents .............................................................. 48~~47~~
     8.6     Hart-Scott-Rodino Compliance ............................................... 48~~47~~
     8.7     Absence of Litigation .............................................................. 49~~47~~
     8.8     ~~Purchaser Environmental Insurance~~ ........................................ ~~49~~
     8.9     ~~Transition Services Agreement~~ ............................................... ~~49~~
     8.8     Other Deliveries ..................................................................... 47

9.     CONDITIONS TO OBLIGATIONS OF PLATINUM ................................... 49~~47~~

     9.1     Accuracy of Representations and Warranties ......................... 49~~47~~
     9.2     Covenants ............................................................................... 49~~48~~
     9.3     Absence of Material Adverse Effect ........................................ 49~~48~~
     9.4     Compliance with Law .............................................................. 49~~48~~
     9.5     Government Consents .............................................................. 49~~48~~
     9.6     Third-Party Consents; Assignments; Other Documents ........... 49~~48~~
     9.7     Transition Services Agreement ................................................ 50~~48~~
     9.8     Opinion of Seller's Counsel .................................................... 50~~48~~
     9.9     Hart-Scott-Rodino Compliance ............................................... 50~~48~~
     9.10     Closing Balance Sheet ............................................................ 50~~48~~
     9.11     Absence of Litigation .............................................................. 50~~48~~
     9.12     Non-Competition Agreements ................................................. 50~~49~~
     9.13     Escrow Agreement .................................................................. 50~~49~~
     9.14     Other Indebtedness 49
     9.15     Environmental Matters ............................................................ 49

A381
CONFIDENTIAL

# EXHIBIT N

MWE DRAFT
APRIL ~~16~~.27, 2004

STOCK PURCHASE AGREEMENT

BY AND AMONG

[PLATINUM], INC.,

SILVER ACQUISITION CORP.,

[PARENT] CORPORATE HOLDINGS, INC.

AND

[SILVER], INC.

DATED AS OF APRIL ___, 2004

A383
CONFIDENTIAL

EXHIBITS AND SCHEDULES
[TO BE COMPLETED]

A384
CONFIDENTIAL

# TABLE OF CONTENTS

Page

1.  DEFINITIONS AND USAGE OF CERTAIN TERMS ................................. 1
    1.1  Definitions ....................................................................... 1
    1.2  Usage................................................................................. 9

2.  PURCHASE AND SALE OF SHARES................................................... 10
    2.1  Purchase and Sales of Shares .......................................... 10
    2.2  Consideration ................................................................... 10
    2.3  Balance Sheet Adjustment to Purchase Price ................. 10
    2.4  Prohibition on Trading.................................................... 12
    2.5  Intentionally Omitted ...................................................... 12
    2.6  Section 338(h)(10) Elections .......................................... 12
    2.7  Transfer Taxes ................................................................ 12
    2.8  Closing .................................................................... ~~13~~12

3.  REPRESENTATIONS AND WARRANTIES OF PARENT AND SILVER ............... 13
    3.1  Organization and Good Standing...................................... 13
    3.2  Subsidiaries ..................................................................... 13
    3.3  Capitalization ................................................................... 13
    3.4  Power, Authorization and Non-Contravention ................ 14
    3.5  No Violation of Charter Documents and Contracts; Compliance with
         Legal Authorizations; Governmental Authorizations...... 15
    3.6  Documents and Disclosures.............................................. 16
    3.7  Silver Financial Statements.............................................. 17
    3.8  Intentionally Omitted ...................................................... 17
    3.9  Accounts Receivable........................................................ 17
    3.10 Banking Relations............................................................ 18
    3.11 Litigation.......................................................................... 18
    3.12 Taxes................................................................................. 18
    3.13 Title to Properties............................................................ 20
    3.14 Absence of Certain Changes or Events............................ ~~21~~20
    3.15 Intellectual Property ........................................................ 22
    3.16 Conformity of Products and Services .............................. 23
    3.17 Product and Service Warranties....................................... ~~24~~23
    3.18 List of Certain Employees; Suppliers and Customers ..... 24
    3.19 Intentionally Omitted ...................................................... ~~25~~24
    3.20 Compliance with Laws .................................................... 25
    3.21 Agreements and Commitments......................................... 25
    3.22 Employees........................................................................ ~~27~~26
    3.23 Relationships with Affiliates............................................ 29
    3.24 Environmental Matters..................................................... 29
    3.25 [Intentionally Omitted] .................................................... 30
    3.26 Board of Directors, Officers and Key Personnel ............. 30

A385
CONFIDENTIAL

**TABLE OF CONTENTS**
(continued)

Page

3.27    Insurance ........................................................................ 30
3.28    Investment Banking and Brokerage Fees ...................... ~~31~~30
3.29    Accuracy of Disclosure ................................................. 31
3.30    No Other Representations ............................................. 31

4.    REPRESENTATIONS AND WARRANTIES OF PLATINUM AND
      PURCHASER ................................................................................ 31

4.1    Organization and Good Standing .................................. 31
4.2    Capitalization ................................................................. 31
4.3    Power, Authorization and Non-Contravention ............. 32
4.4    No Violation of Charter Documents, Contracts or Laws .... 33
4.5    SEC Filings ................................................................... 33
4.6    Platinum Financial Statements ..................................... 33
4.7    Financing ....................................................................... 34
4.8    Accuracy of Disclosure ................................................. 34
4.9    Litigation ....................................................................... 34
4.10   Absence of Certain Changes or Events ....................... 34
4.11   Investment Banking and Brokerage Fees ................... 35
4.12   No Other Representations ............................................. 35

5.    PARENT AND SILVER COVENANTS ........................................ 35

5.1    Advice of Changes ........................................................ 35
5.2    Conduct of Business ..................................................... ~~36~~35
5.3    No Solicitation ............................................................... 37
5.4    Regulatory Approvals .................................................... ~~38~~37
5.5    Necessary Consents ...................................................... 38
5.6    Securities Laws ............................................................. 38
5.7    Litigation ....................................................................... 38
5.8    Notification of Employee Problems .............................. 38
5.9    Satisfaction of Closing Conditions ............................... 38
5.10   Confidentiality ............................................................... ~~39~~38
5.11   Access to Information .................................................... 39
5.12   Parent Release ............................................................... 39

6.    COVENANTS OF PLATINUM AND PURCHASER ..................... 39

6.1    Advice of Changes ........................................................ 39
6.2    Conduct of Business ..................................................... 39
6.3    Regulatory Approvals .................................................... 40
6.4    Litigation ....................................................................... 40
6.5    Satisfaction of Conditions Precedent ........................... 40
6.6    Blue Sky Laws ............................................................... ~~41~~40
6.7    NASDAQ Listing ........................................................... 41

A386
**CONFIDENTIAL**

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 6.8 | Confidentiality | 41 |
| | 6.9 | Access to Information | 41 |
| 7. | | ADDITIONAL COVENANTS | 41 |
| | 7.1 | Liability for Taxes | 41 |
| | 7.2 | Tax Proceedings | 42 |
| | 7.3 | Payment of Taxes | 43 |
| | 7.4 | Tax Returns | 43 |
| | 7.5 | Tax Allocation Arrangements | 43 |
| | 7.6 | Cooperation and Exchange of Information | ~~11~~43 |
| | 7.7 | Conflict | 44 |
| | 7.8 | Assistance and Cooperation | 44 |
| | 7.9 | Non-Competition, Non-Solicitation and Non-Disparagement | 45 |
| | 7.10 | Further Assurances | 45 |
| | 7.11 | Registration of Shares | 46 |
| | 7.12 | Transfer of Shares | 46 |
| | 7.13 | Stakeholder Representative | 46 |
| | 7.14 | Filings | ~~17~~46 |
| | 7.15 | Joint Participation | 47 |
| | 7.16 | Environmental Protection | ~~18~~47 |
| | 7.17 | Consents and Releases | 47 |
| 8. | | CONDITIONS TO OBLIGATIONS OF PARENT | ~~18~~47 |
| | 8.1 | Accuracy of Representations and Warranties | 48 |
| | 8.2 | Covenants | 48 |
| | 8.3 | Absence of Material Adverse Effect | 48 |
| | 8.4 | Compliance with Law | 48 |
| | 8.5 | Government Consents | 48 |
| | 8.6 | Hart-Scott-Rodino Compliance | 48 |
| | 8.7 | ~~Escrow Agreement~~ | ~~18~~8.8 Absence of l |
| | ~~8.9~~8.8 | Opinion of Platinum Counsel | ~~49~~48 |
| | ~~8.10~~8.9 | | Other Deliveries ~~49~~48 |
| | ~~8.11~~ | ~~Other Indebtedness~~ | ~~49~~ |
| 9. | | CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER | 49 |
| | 9.1 | Accuracy of Representations and Warranties | 49 |
| | 9.2 | Covenants | ~~50~~49 |
| | 9.3 | Absence of Material Adverse Effect | ~~50~~49 |
| | 9.4 | Compliance with Law | ~~50~~49 |
| | 9.5 | Government Consents | ~~50~~49 |
| | 9.6 | Third-Party Consents; Assignments; Other Documents | ~~50~~49 |
| | 9.7 | Releases and GEC Indemnity | 50 |

A387

CONFIDENTIAL

TABLE OF CONTENTS
(continued)

Page

9.8     Opinions of Counsel .................................................................. 50
9.9     Hart-Scott-Rodino Compliance ................................................ 50
9.10    Closing Balance Sheet ............................................................... 50
9.11    Absence of Litigation................................................................ 51 50
9.12    [Intentionally Omitted] ............................................................. 51 50
9.13    Escrow Agreement..................................................................... 51
9.13    [Intentionally Omitted] .............................................................. 50
9.14    Other Indebtedness.................................................................... 51 50
9.15    [Intentionally Omitted] ............................................................. 51 50
9.16    Other Deliveries........................................................................ 51 50
9.17    Financing................................................................................... 52 51
9.18    Financial Statements ................................................................. 52 51
9.19    Closing ...................................................................................... 52

10.    TERMINATION OF AGREEMENT .......................................................... 52

10.1    Right to Terminate .................................................................... 52
10.2    Termination Procedures ............................................................ 53 52
10.3    Continuing Obligations ............................................................. 53 52
10.4    Effect of Termination ................................................................ 53

11.    SURVIVAL NONSURVIVAL OF REPRESENTATIONS, INDEMNIFICATION
       AND REMEDIES, CONTINUING COVENANTS AND WARRANTIES .................. 53

11.1    Survival of Representations ....................................................... 53
11.2    Agreement to Indemnify Platinum and Purchaser ..................... 54
11.3    Limitations on Liability of Parent; Exceptions ......................... 54
11.4    Agreement to Indemnify Parent................................................ 54
11.5    Limitations on Liability of Platinum and Purchaser; Exceptions ... 55
11.6    [Intentionally Omitted] ............................................................. 55
11.7    Survival of Claims .................................................................... 55
11.8    Escrow....................................................................................... 55
11.9    Third Party Claims ................................................................... 56
11.10   Procedure for Indemnification — Other Claims........................ 57
11.11   Mitigation.................................................................................. 57
11.12   Exclusive Remedy .................................................................... 57

12.    MISCELLANEOUS ................................................................................. 57 53

12.1    Entire Agreement...................................................................... 58 53
12.2    Assignment; Binding Upon Successors and Assigns.................. 58 53
12.3    No Third Party Beneficiaries .................................................... 58 53
12.4    No Joint Venture ....................................................................... 58 54
12.5    Construction of Agreement....................................................... 58 54
12.6    Severability ............................................................................... 58 54

A388
CONFIDENTIAL

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 12.7 | Section Headings | 58 54 |
| 12.8 | Exercise of Rights, Amendment, Extension and Waivers | 58 54 |
| 12.9 | Public Announcement | 59 54 |
| 12.10 | Fees and Expenses | 59 55 |
| 12.11 | Governing Law | 59 55 |
| 12.12 | Jurisdiction; Venue; Waiver of Jury Trial | 59 55 |
| 12.13 | Remedies | 60 55 |
| 12.14 | Notices | 60 56 |
| 12.15 | Time is of the Essence | 61 57 |
| 12.16 | Counterparts | 61 57 |

A389
CONFIDENTIAL

MWE Draft
4/~~16~~27/04

STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "*Agreement*") is entered into as of April __, 2004, by and among [Platinum], Inc., a Delaware corporation ("*Platinum*"), Silver Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Platinum ("*Purchaser*"), [Parent] Corporate Holdings, Inc., a Delaware corporation ("*Parent*"), and [Silver], Inc., a Delaware corporation and a wholly-owned subsidiary of Parent ("*Silver*").

RECITALS

WHEREAS, Parent owns of record and beneficially all of the issued and outstanding capital stock of Silver, consisting of 1,000 shares of Silver's common stock, **[number]** par value per share (said shares being referred to herein as the "*Shares*");

WHEREAS, Parent desires to sell all of the Shares to Purchaser, and Purchaser desires to acquire all of the Shares from Parent; and

WHEREAS, the Board of Directors of Silver, and the Noteholders (as defined herein) have consented to the sale of the Shares to Purchaser.

In consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, the parties agree as follows:

1.     **DEFINITIONS AND USAGE OF CERTAIN TERMS**

1.1     Definitions. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"*Accounts Receivable*" means (i) all trade accounts receivable and other rights to payment from customers of Silver or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Silver or its Subsidiaries, and (ii) all other accounts or notes receivable of Silver or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

"*Adjustment Amount*" shall have the meaning set forth on Schedule 1 attached hereto.

"*Affiliate*" means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"*Ancillary Agreements*" means ~~either of~~any or ~~both~~all of the "Silver Ancillary Agreements"~~and~~, the "Platinum Ancillary Agreements" and any other agreements entered into by and between or among Silver, Platinum, Purchaser, Parent, [MHR], the Stakeholder Representative, the Majority Holders and/or [the ultimate parent entity of Parent] in connection with the transactions contemplated by this Agreement, including, without limitation, the Registration Rights Agreement, the Tax Indemnity Agreement and the Instructions and the Tax Indemnity Agreement, as the context requires.

"*Breach*" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

A390
CONFIDENTIAL

"*Business*" means the manufacture, sale, distribution and service of offset presses, cameras and plate makers and related supplies for the graphic arts and printing industry as conducted by Silver and the Subsidiaries of Silver.

"*Business Day*" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"*CERCLA*" the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended.

"*Cleanup*" means any removal, containment, corrective action or other remediation or response actions carried out to address the requirements of any Environmental Law or Occupational Safety and Health Law, including measures to address any natural resource damages.

"*Closing Date*" means the date on which the Closing actually takes place.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Confidential Information*" means any and all of the following information of Silver or its Subsidiaries, Parent, Purchaser or Platinum that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, or otherwise, or otherwise made available by observation, inspection or otherwise by either party (Purchaser and Platinum on the one hand or Silver and Parent collectively on the other hand) or its representatives (collectively, a "*Disclosing Party*") to the other party or its representatives (collectively, a "*Receiving Party*"):

      (a)    all information that is a trade secret under applicable trade secret or other law;

      (b)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

      (c)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, Contracts, the names and backgrounds of key personnel, and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

      (d)    all notes, analyses, compilations, studies, summaries, and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, on any information included in the foregoing.

"*Contract*" means, with respect to any Person, any written or oral agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation,

A391
CONFIDENTIAL

promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"***Control***" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"***Effective Time***" means 12:01 a.m. on the Closing Date.

"***Encumbrance***" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"***Environment***" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"***Environmental, Health and Safety Liabilities***" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, which results or arises from a notice or claim made by a Governmental Authority or other Third Party or from application of any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

(a)     any environmental, health, or safety matter or condition (including on-site or off-site contamination, safety and health matters, release of Hazardous Material and regulation of chemical substances or products or waste material);

(b)     fine, penalty, judgment, award, settlement, legal or administrative proceeding, damage, loss, claim, demand or response, remedial, or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

(c)     financial responsibility under any Environmental Law or Occupational Safety and Health Law for Cleanup costs; or

(d)     any other compliance, corrective, or remedial measures required under any Environmental Law or Occupational Safety and Health Law.

The terms "***removal***," "***remedial***," and "***response action***" include the types of activities covered by the term "***disposal***" shall have the same definition assigned thereto by CERCLA; and the term "***remediation standard***" means a numerical standard that defines the concentrations of Hazardous Materials that are permitted to remain without liability in any environmental media after completion of all investigation, removal remediation and/or containment of a Release or Threat of Release.

"***Environmental Law***" means any applicable environmental or health and safety related Legal Requirement, including those requiring or relating to:

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of Hazardous Materials, violations of discharge limits, or other prohibitions and the

3

A392
CONFIDENTIAL

# EXHIBIT O

From:       Moosa E. Moosa
Sent:       Tuesday, July 1, 2003 10:44 AM
To:         Ed Marino
Subject:    Project Bright Silver

Ed:

Here is what we would need in the short term to make an initial assessment:

Part 1

This part would be in a form of an in-person interactive meeting maybe with a PowerPoint presentation. Will help us frame target.

1. Historical overview of Company
2. Operational overview of Company
3. Strategic overview of Company
4. Details of Key Management Team Members
5. Product Road Map - Current and Future
6. Revenue streams and trends
7. Competitive strengths and weaknesses
8. Organizational overview
9. Location overview
10. Opportunities and challenges

Part 2

This is info that could be emailed to us (preferably) or hard copied to us. We can then use the info to run a bunch of business models.

1. Consolidated Income Statement for the last 3 years
2. Product Line Income Statement for the last 3 years
3. Income Statement by location for the last 3 years
4. Functional Income Statement for the last 3 years
5. Balance Sheets for the last 3 years
6. Cash Flows for the last 3 years
7. 5 year Revenue trend
8. YTD performance
9. Budget for current fiscal year
10. Strategic Plan - Current

CONFIDENTIAL

DEPOSITION
EXHIBIT
Moosa 1
10-26-04  π

A394

# EXHIBIT P

From:       Ed Marino
Sent:       Thursday, July 10, 2003 7:51 AM
To:         Mitchell Hara; Moosa E. Moosa
Cc:         Bill Davison
Subject:    Some Basic Data on Project: Silver
Attach:     Silver notes 9 Jul 03.doc

<...>>

CONFIDENTIAL

Project: Silver
Briefing Information

General

- Turned down an offer at $49 million about a year ago- $35 m in cash and $14 m in equity.
- Debt Structure: $53.8 million
  - $30.8 m Bonds
  - $23 m loans to Key Bank
- MHR (Mark Richesky) holds $25 m zero coupon bonds convertible to 50% equity interest.
- Barb Pellow can be helpful
- Company has negative equity
- Company has 5 years of audited financials from E&Y
- June '03 P&L for the month showed Op Profit of $1.1 m, EBITDA of $1.3 m
- EBITDA mid-year of $ 3 to 4 million.
- Total of 24 dealers in US, only four are strong-see alliance dealers below
- 85% of business is direct

P&L for 2002 (in millions)

- Revenue      $201
- Gross Margin  $ 49
- Sls & Mktg    $ 23.4
- G&A           $ 19.4
- R&D           $ 2.8

- **Op Prof**      **$ 3.4**

Balance Sheet

- Assets
  - Cash    $ 3.3
  - A/R     $ 26
  - Inv.    $ 28

CONFIDENTIAL

A397

- o   Other           $ 9.3

  - o   PP&E           $ 5.1
  - o   Other          $ 4.5
- Liabilities
  - o                  $ 20.4
  - o   A/P            $ 23
  - o   Serv Rev       $ 14.5
  - o   Acc Comp       $ 4.2
  - o   Acc Other      $ 11.1

  - o   Curr debt      $ 7.1

  - o   Notes Payable  $ 25

  - o   Senior Notes   $ 5.8

  - o   L/T Debt       $ 4.5 (lease hold)

  - o   Retirement Obl $ 6.5 (carry-over from AMM acquisition)

- Equity              $ 3.2

- Retained Earnings   ($ 48.9)

- S/H Equity          ($ 50)


## Cash

- YE2002 cash balance       $ 3.3
- Free Cash Flow '03        $ 3.0
- Lease on discontinued Chicago factory expires in November- $75K per month


## Historical

- 2001 revenue was $235 million, with $55 m in Gross Margin

CONFIDENTIAL

- Dumped over $13 m in "garbage" revenue
- Had over $20 m in losses in 2000
- Eliminated over $17 m in OPEX

## Employees

- US                                                    810
  - Interactive media group on Ohio          14
  - Service                                          435
  - 'Sales                                            75
  - Telemarketing                              26
  - Marketing                                     6
  - Finance & Admin                            30
  - Rochester                                     100
    - Manufacturing                    59
    - Engineering                        17

- Canada                                                80
- UK                                                      95
- Other                                                  /15

- **Total**                                            **1,000**

## Facilities

- Main distribution facility in US is Chicago
  - "Spoke" operations- Portland, Or; Fresno; Dallas; Denver; Harrisburg
  - Alliance Dealer locations- Milw, Birmingham, Roanke, Portland Maine

- Sales staff work from home, there are 4 regional offices (small)
- Toured UK operation, well run

ONFIDENTIAL

<u>Synergies</u>

- Immediate

| Line of Business/ Activity | Synergy | Margin Enhancement | Market Share |
|---|---|---|---|
| OMDI Media | US, UK and possibly Euro Sales and Distribution | Yes | Yes |
| Service | CTP and DI Presses | Yes | |
| Aurora | Sales and distribution | Yes | Yes |
| Dimension Anthem | Sales, Service and distribution (integrate existing sales force) | Yes | Yes |
| Applause | Sales, Service and distribution (integrate existing sales force) | Yes | Yes |
| E Commerce | Order Administration and other back office admin. | Yes | |
| Equipment Manufacturing | Combine operations | Yes | |
| European Infrastructure | Bolt onto Silver's infrastructure | Yes | |
| Pre-press | Integrate operations | Yes | |

- Longer Term
  - o Low Cost Press channel
  - o In-Plant market

ΩNFIDENTIAL

# EXHIBIT Q

| From: | Ed Marino |
|---|---|
| Sent: | Sunday, August 24, 2003 10:03 AM |
| To: | Moosa E. Moosa; Bill Davison; John G. Brim (E-mail); James Scafide |
| Subject: | Second Installment of the Silver Project Analysis |
| Attach: | Silver Notes 23 Aug 03.doc |

All,

Here is the second installment analysis from the site visits.

<<...>>

The intent here is to be conservative about the savings/synergies. There were clearly more than I expected.

We will talk more about this in the coming week. Moosa, if you can get out to Chicago, it would be very worth while.

Ed

CONFIDENTIAL

P - 02841

A402

Silver Meeting Notes
22 August '03 Visit

<u>Activities</u>

1. Covered a lot of ground, including detailed tours of all Chicago-land facilities and departments. From here, their infrastructure, distribution and channel capabilities became clear.
2. Discussed numerous product line related issues, performance, and opportunities.
3. Examined business key statistics.
4. Reviewed their three-year strategic plan (they have a very complete one).

<u>Observations</u>

1. There is considerably more to this business than was apparent previously, and certainly not visible in the numbers. Brian and his management team have made significant improvements to this business to bring it closer to the 21st century.
   a. While many improvements have been made, they have not optimized the business. This is very good news in the sense that many of the underlying pieces for optimization are there, they just have not done it.
   b. They have a well-developed IT infrastructure that meets the needs of their business, and is scalable. They even have an automated promotional system used by their product managers for on-line promotions.
   c. Their distribution system is excellent and very efficient, including the e-Commerce elements.
2. IT and Infrastructure. Brian is very good at the IT and infrastructure areas. This is where a lot of improvement was visible.
   a. A lot has been cleaned up in the last 3 years, thanks to the combination of Brian and David Vanderweil- the VP of Consumables and IT.
   b. He has a good team (more of a B to B+), and they work very well together.

CONFIDENTIAL

3. Consumables. Consumables in the US are efficiently run with a bank of inbound and outbound telemarketers/customer service staff.

4. International. They handle the LAR and APR regions through dealers and a support staff in Chicago. The UK manages Europe. The sense I get is that they are not that strong internationally outside of the UK. The ROW is clearly an area of opportunity.

5. Distribution. The warehouse is well run. They also manufacture chemistries, blankets and paper plates in the warehouse.

6. Tech Center. They have a very nice (too nice) tech center close to the warehouse. It is both a demo center and training center. They do not need all the space they are in. Headquarters and the Tech Center should be combined. (Tomsich owns the headquarters building, and as you might guess, he takes full advantage of that.)

7. Admin and Finance. Seems really heavy with staff. This is not an area that Brian focuses on knows anything about, hence its inefficiency.

8. Service. Big area of opportunity. It is nowhere near optimized. They have made strides in improving the infrastructure but have not scaled the field operation appropriately. First impression- they are overstaffed by more than 50 people or more. There could be as much as 100 employees too many. (This action needs to be done in concert with product rationalization.)

9. Product Rationalization. The firs thing to go is the manufacture of duplicators. It makes no sense. The can be bought for less than what it costs to make them, and there is a lot of infrastructure to be taken out that supports manufacturing. There are probably a number of other areas of rationalization as well, but this is the most glaring.

10. Direct Sales Force. Works OK, but can afford to be upgraded (quality of rep). Did not meet the sales exec so difficult to gauge his competency.

11. Marketing. From what I could see, they have good tools for the field, but it is also clear that they are not sophisticated in this way, except for the on-line promotions tool noted above. Again, this area has not been optimized. (To be fair, this is not something I spent much time with.)

12. IMG. Kill it. It adds no value and only detracts from the their focus. The services they provide can be easily purchased outside.

CONFIDENTIAL                                          A404

Optimizations

There is a lot that can be done here. Early indications suggest the following.
I will attempt to quantify these shortly.

- Facilities (Savings undefined as of this time.)
    - At least one too many
    - It may actually be possible to put it all into one (co-located with the warehouse)
    - The reality is that the headquarters is in an area that is not easily accessible for anyone, and it costs a fortune.
- US Service Operations (Savings of approximately $3to $4m directly from ABD. Presstek's infusion of service business and the transfer of tech support could grow these synergies to double this number.)
    - Can easily be trimmed (whacked is more like it)
    - They have two dispatch centers, two tech support groups, and far too many field techs
    - The infrastructure is being improved and they have good long-term plans for further improvements using IT tools.
    - Presstek service needs can be fit into this unit including press service
    - They just put in place a telemarketing group for service contracts
- Admin and Finance (Savings of approximately $1m)
    - Similar comment, can easily be trimmed (and again, whacked is more like it)
    - The purchasing area is incredibly overstaffed, and burdened by too many products
- Product Rationalization (Savings counted in other areas)
    - A few surgical moves here could dramatically and positively effect Service, Purchasing and other admin and finance functions
    - Needs a lot of further study
- IT (Savings to Presstek, not counted)
    - Many elements appear superior to Presstek's
    - Cannot comment on their financial systems, I am referring to their operational and applications systems
- Distribution System (Savings of approximately $1.5m on DI consumables alone to Presstek, not counted)
    - Far superior to Presstek's in all respects

CONFIDENTIAL

- o They could sell and service all US DI customers far better and more cost-effectively than Pitman
  - o Their order admin is far superior to Presstek's
- Gross Margin Improvement. (Savings of approximately $2 to $3 million. In addition, the Aurora plate automatically drives a higher margin- not counted.)
  - o In spite of their large Purchasing group, they can't be buying well.
- Geographic Expansion (This represents a volume upside that is not easily determined at this time)
  - o They should be doing much better internationally as noted
  - o They need more discipline overall. There is a general "tightening of the operation" that is needed. Pricing is one of the areas of discipline

Near-term net savings conservatively should amount to $6 (low end) to $8 million directly from ABD, and not counting Presstek synergies. For planning purposes, a $5 million-near-term-improvement will result in an EBITDA at ABD conservatively of $10 million. This puts us in the right ballpark for a deal, excluding the Presstek synergies. Presstek synergies should amount to another $2 to $5 million pa.

(This takes into account a reduction of $1 million in the $6 million EBITDA figure submitted to us following the Cleveland visit, along with the add back of $1m to support the transition. Their second-half figures bear this out. Obviously, this is a first pass. More optimizations will be found as we go along, but the $5 million is very doable near-term. The synergies with Presstek should not be underestimated. They could easily approach $2 to $5 million in the areas of IT, tech support/ service, marketing, administration and product gross margin improvements. Moreover, Presstek's business performance would improve as well if we capitalized on the "best of breed" for in-place systems.)

CONFIDENTIAL

Product Lines

Margins are low in all of the lines of business. It is clear that overall they are not optimized on the purchase side or the pricing side. The below information is both sketchy and incomplete, but it serves to ballpark the situation with the lines of business.
- Lines of Business
  - o There are others, but these are the major lines

| LINE OF BUSINESS | PRODUCT CONTRIBUTION (US per annum) | GROSS MARGIN |
|---|---|---|
| Equipment<br>- DPM<br>- OEM Presses<br>- Duplicators<br>- Finishing/Other | Approximately $50m pa<br><br>- $20m<br>- $20 m<br>- $ 5m<br>- $ 5m | Blended Gross Margin of 29% excluding imputed service revenue<br>- 32%<br>- 30%<br>- 7%<br>- 30% |
| Service<br>- Contracts<br>- Time & Mat'l<br>- Parts | Approximately $55m pa<br>- $33m<br>- $ 9m<br>- $13m | - Do not have a good breakout of margins.<br>- Blended is 29%, including imputed revenue from equipment sales of $3m |
| Supplies<br>- Polyester Plates<br>- Other | Approximately $66m pa<br>- $44m<br>- $22m | - Blended rate of 34%<br>- Polyester plates are approx. 33%<br>- The big loser here is metal plates at 16% margin on $6m in sales (on a good day) |

CONFIDENTIAL

# EXHIBIT R

| | |
|---|---|
| **From:** | Ed Marino |
| **Sent:** | Saturday, June 26, 2004 4:39 PM |
| **To:** | Steve Rappaport; Dan Ebenstein; Debbie Samataro; Don Waite; Ed Marino; John Dreyer; Larry Howard; Mike Moffitt; Moosa E. Moosa |
| **Cc:** | Moosa E. Moosa; 'moosamoosa@earthlink.net'; Jim Scafide; Michael McCarthy; Debbie Samataro; John G. Brim (jbrim@hillstreetcap.com) |
| **Subject:** | Silver Status- Very Confidential |

---

Dear Fellow Board Members,

I was advised today that the Board of Paragon has tentatively accepted our offer surrounding a 363 sale, as I have outlined to certain of you in conversations. As you know, this deal now has considerably more financial advantage to Presstek if we can progress this along a 363 sale process expeditiously.

Our initial offer has the following elements
- A purchase price of approximately $40 million (yet to be negotiated), with a $10 million Debtor in Possession (DIP) financing provision
- This allows us to consider this transaction without liabilities such as environmental, pension tail benefits, and allows us also to select the employees and facilities we choose to take.
- Our team has looked at all of this carefully and we will be prepared to move on this by the middle of next week. This is a pivotal time since the next payroll for Silver is approximately July 3rd.

Here is what I would like to do:

- I would like to have a subset of the Board work with me on progressing this deal. Don, Larry, Steve and John, can you please be available to work with me on this transaction. In this regard, I intend to call each of you this weekend and discuss the path forward on this.
- I would like to formally convene a Board Meeting for the afternoon of Tuesday of this week, 29 June, at 4:00 PM (16:00 NYC time). The purpose of this meeting is to gain approval for our 363 proposal. We will distribute materials in advance of this meeting. Please submit to me your questions/concerns for discussion at this meeting on Tuesday.
- Finally, we have a conference call on Monday the 28th with the committee charged by the Paragon Board with managing this situation. Jim Wert is heading this deal and he is a very good person to work with. We have engaged a bankruptcy expert from MWE that we like very much for our side.

This can go very quickly and very smoothly, and yield a significant financial advantage to Presstek. We will continue with our cautious approach, but time is a major factor in this deal.

We have the necessary resources to proceed, and we will need your engagement to complete this transaction. Thank you in advance for your support on this. We will supply the logistics around the conference call on Monday morning.

Ed Marino
President and CEO
Presstek, Inc.
55 Executive Drive
Hudson, NH, 03051
Tel: 603-595-7000
Fax: 603-595-2602
email: emarino@presstek.com

**CONFIDENTIAL**

A409

# EXHIBIT S

STOCK PURCHASE AGREEMENT

BY AND AMONG

PRESSTEK, INC.,

SILVER ACQUISITIONS CORP.,

PARAGON CORPORATE HOLDINGS, INC.

AND

A.B. DICK COMPANY

DATED AS OF JUNE ___, 2004

CONFIDENTIAL

A411

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "*Agreement*") is entered into as of June ___, 2004, by and among Presstek, Inc., a Delaware corporation ("*Platinum*"), Silver Acquisitions Corp., a Delaware corporation and a wholly-owned subsidiary of Platinum ("*Purchaser*"), Paragon Corporate Holdings, Inc., a Delaware corporation ("*Parent*"), and A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent ("*Silver*").

### RECITALS

WHEREAS, Parent owns of record and beneficially all of the issued and outstanding capital stock of Silver, consisting of 1,000 shares of Silver's common stock, $.01 par value per share (said shares being referred to herein as the "*Shares*");

WHEREAS, Parent desires to sell all of the Shares to Purchaser, and Purchaser desires to acquire all of the Shares from Parent; and

WHEREAS, the Board of Directors of Silver, and the Noteholders (as defined herein) have consented to the sale of the Shares to Purchaser.

In consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, the parties agree as follows:

1.  **DEFINITIONS AND USAGE OF CERTAIN TERMS**

    1.1    Definitions. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

    "*Accounts Receivable*" means (i) all trade accounts receivable and other rights to payment from customers of Silver or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Silver or its Subsidiaries, and (ii) all other accounts or notes receivable of Silver or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

    "*Adjustment Amount*" shall have the meaning set forth on Schedule 1 attached hereto.

    "*Affiliate*" means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

    "*Ancillary Agreements*" means any or all of the "Silver Ancillary Agreements", the "Platinum Ancillary Agreements" and any other agreements entered into by and between or among Silver, Platinum, Purchaser, Parent, MHR Capital Partners, LP, MHR Institutional Partners LP, MHRM LP, the Majority Holders and/or N.E.S. Investment Co. in connection with the transactions contemplated by this Agreement, including, without limitation, the Registration Rights Agreement, the Tax Indemnity Agreement and the Instructions, as the context requires.

    "*Breach*" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

**CONFIDENTIAL**