(c)    Legal Representation of the Parties.  This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2.    PURCHASE AND SALE OF SHARES

2.1    Purchase and Sales of Shares.  Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Parent shall sell the Shares to the Purchaser, and deliver or cause to be delivered to Purchaser a certificate or certificates representing all of the Shares. Such stock certificate or certificates shall be duly endorsed in blank for transfer or shall be presented with stock powers duly executed in blank, with such signature guarantees and such other documents as may be reasonably required by Purchaser to effect a valid transfer of the Shares by Parent, free and clear of any and all Encumbrances to Purchaser.

2.2    Consideration.  The consideration for the Shares (the *"Purchase Price"*) will, subject to adjustment as set forth in Section 2.3, be (i) $24,000,000 in cash, (the *"Cash Payment"*), and (ii) such number of shares of Platinum Common Stock (as rounded up to the next highest whole share number, the *"Stock Payment"*) as is determined by dividing $20,100,000 by the average daily closing price per share of a share of Platinum Stock as reported on The Nasdaq Stock Market for each of the three (3) consecutive trading days ending (and including) the trading day that occurs two trading days prior to (and not including) the date of the Closing (the *"Closing Price"*).  The parties acknowledge and agree that (a) such number of shares of Platinum Common Stock as is determined by dividing $5,000,000 by the Closing Price (as rounded up to the next highest whole share number, the *"Holdback Amount"*) shall be deducted from the Stock Payment at Closing and held in trust by the Purchaser in accordance with Section 2.3(d); and (b) that the remainder of the Purchase Price shall be distributed in accordance with the joint written instructions (the *"Instructions"*) executed by Parent and the Majority Holders delivered to Purchaser (which Instructions with regard to the Stock Payment shall be reasonably acceptable to the Purchaser); provided, that, the amount of the Stock Payment to be distributed in accordance with the Instructions shall first be reduced by (i) $750,000 to be paid to the Majority Holders in reimbursement of their expenses (such amount to be paid at Closing, in cash to the extent available after making any cash distributions from the Cash Payment as required hereby, or otherwise deducted from the Stock Payment at the Closing) and (ii) the amount provided in writing to Platinum at least three (3) days prior to the Closing that represents transaction expenses of Silver and Parent (which amount shall not exceed $500,000, such amount to be paid as of the Closing to Parent and shall be deducted from the Stock Payment at the Closing), with the shares constituting the Stock Payment valued at the Closing Price for such purpose.  In the Instructions, the Majority Holders shall also consent to the transactions contemplated by this Agreement, waive the "ABD Sale Rights" (as defined in the Notes), agree not to pursue or entertain an Acquisition Proposal, and otherwise cooperate in consummating the transactions contemplated by this Agreement. If, prior to the Closing, Platinum (X) recapitalizes either through a split-up of the outstanding shares of Platinum capital stock into a greater number, or through a combination of such outstanding shares into a lesser number, (Y) reorganizes, reclassifies or otherwise changes such outstanding shares into the same or a different number of shares of other classes or into securities of another company (other than through a split-up or combination of shares provided for in the previous clause), or (Z) declares a dividend outside the ordinary course of business on its outstanding shares, or, in each case, in any similar transaction, the calculation of the Stock Payment will be adjusted appropriately.

2.3    Balance Sheet Adjustment to Purchase Price

(a)    Closing Balance Sheet.  Not less than five (5) business days prior to Closing, Silver shall deliver to Purchaser an unaudited balance sheet of Silver  (the *"Closing Balance Sheet"*) and

CONFIDENTIAL

2

A413

a preliminary calculation of the Adjustment Amount as of the most recent month-end prior to the Closing Date (the *"Closing Adjustment Amount"*), together with a certificate signed by the chief financial officer of the Silver and an appropriate executive officer of Parent certifying (i) that the Closing Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that the Closing Balance Sheet fairly and accurately presents, in all material respects, the financial condition of Silver as of such date, and (iii) the Closing Adjustment Amount. The Closing Balance Sheet and the calculation of the Closing Adjustment Amount shall be prepared by the chief financial officer of Silver in good faith in consultation with Platinum and Platinum's representatives after Platinum and Platinum's representatives have had access to financial information and personnel relevant to the preparation of the Closing Balance Sheet and the calculation of the Closing Adjustment Amount.

(b)    Closing Date Adjustment. In the event that the Closing Adjustment Amount reflected on the Closing Balance Sheet is less than $4,830,000, then a dollar-for-dollar decrease shall be made to the Cash Payment of the Purchase Price at the Closing equal to the amount by which the Closing Adjustment Amount is less than $4,830,000; provided, however, that the Cash Payment payable at Closing shall not be reduced below the amount required to satisfy all obligations to Key Corporate Capital, Inc. (*"Key"*) under the Credit and Security Agreement, dated as of April 1, 1998, as amended, between Key and Parent as permitted by the terms of this Agreement, with any remaining reduction in the Purchase Price which is not made through a reduction in the Cash Payment made through a reduction in shares of Platinum Common Stock constituting the Stock Payment, valued at the Closing Price (rounded up to the next highest whole share). No increase shall be made to the Purchase Price based upon the Closing Adjustment Amount or the Closing Balance Sheet.

(c)    Final Balance Sheet. Not later than ninety (90) days subsequent to Closing, Platinum shall deliver to Parent an unaudited balance sheet of Silver (the *"Final Balance Sheet"*) and a calculation of the Adjustment Amount as of the Closing Date (the *"Final Adjustment Amount"*), together with a certificate signed by the chief financial officer of Platinum or Purchaser certifying (i) that the Final Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that, to his knowledge, the Final Balance Sheet fairly and accurately presents the financial condition of Silver as of such date, and (iii) the Final Adjustment Amount.

(d)    Final Adjustment. In the event that the Final Adjustment Amount reflected on the Final Balance Sheet is less than or greater than $4,830,000, then a dollar-for-dollar decrease or increase, as appropriate, shall be made to the Purchase Price based upon the difference between $4,830,000 and the Final Adjustment Amount, after taking into account any prior adjustment to the Purchase Price pursuant to Section 2.3(b). Any decrease in the Purchase Price pursuant to this Section 2.3(d) shall be satisfied first from the Holdback Amount, and then from the recipients of the Stock Payment on a pro rata basis, based upon the respective portions of the Stock Payments allocable to such recipients as set forth in the Instructions. Such right to recover the decrease in the Purchase Price from the recipients of the Stock Payment will be evidenced by separate agreements with Platinum regarding such recovery. Any portion of the Holdback Amount which is not paid to Purchaser to satisfy a decrease in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in accordance with the Instructions, and any increase in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in cash in accordance with the Instructions.

(e)    Mechanism for Dispute. The Final Balance Sheet and the accompanying calculation of the Adjustment Amount shall be utilized for the purposes of Sections 2.3(c)-(d) above upon the failure of Parent to timely deliver the Balance Sheet Dispute Notice as set forth in this Section 2.3(e). Parent shall notify Platinum in writing of any challenge to the Final Balance Sheet (the *"Disputed*

CONFIDENTIAL

2

*Balance Sheet*") or the accompanying calculation of the Adjustment Amount thirty (30) days subsequent to the delivery of the Final Balance Sheet (the "*Balance Sheet Dispute Notice*"). If the Balance Sheet Dispute Notice has been timely delivered, the parties shall use their good faith efforts to resolve promptly any disagreements between them concerning the Disputed Balance Sheet and the Final Adjustment Amount. In the event that, despite such good faith efforts, the parties are unable to resolve any such disagreements within three (3) days after the delivery of the Balance Sheet Dispute Notice, the parties shall together appoint an independent nationally recognized accounting firm (the "*Arbitrator*") to resolve any such disagreements. The parties shall present their positions to the Arbitrator, together with such other materials as the Arbitrator deems appropriate. The Arbitrator shall render its decision as to such disagreements within forty-five (45) days after its engagement and such written report shall be final, binding and conclusive upon the parties. The fees and disbursements of the Arbitrator shall be allocated to parties in the same proportion that the aggregate amount of such disputed items so submitted to the Arbitrator that is unsuccessfully disputed by Parent bears to the total amount of such disputed items and the balance shall be paid by Platinum. In connection with any dispute, the parties will cooperate with each other and the Arbitrator to resolve such dispute including providing any information reasonably requested. Any amounts payable hereunder which are paid in Platinum Common Stock shall be valued at the Closing Price.

      2.4    <u>Prohibition on Trading</u>. Prior to the Closing, each of Platinum and Parent covenants that it will not, and it will cause its subsidiaries not to, engage in any trading in securities of Platinum (including any repurchase in the public market), including any hedging transactions or other stock market trading activities which could be reasonably expected to influence the bid and asked prices for shares of Platinum Common Stock.

      2.5    <u>Intentionally Omitted</u>.

      2.6    <u>Section 338(h)(10) Elections</u>. At Platinum's request, N.E.S. Investment Co. (as the common parent of the affiliated group that includes Silver (the "*Seller Group*")) shall within the time period prescribed by law for the filing thereof, join with Platinum in making a timely, irrevocable and effective election under Section 338(h)(10) of the Code and similar elections under applicable state income tax law (collectively, the "*Section 338(h)(10) Elections*") with respect to Platinum's purchase of the Shares. In connection with the Closing, Platinum and N.E.S. Investment Co. will execute Internal Revenue Service Forms 8023 and 8883 reflecting the Price Allocation. Platinum shall prepare Internal Revenue Service Forms 8023 and 8883 with respect to Platinum's purchase of the Shares, and such forms shall be duly executed by an authorized person for each of Platinum and Parent (and N.E.S. Investment Co.) in connection with the Closing. Platinum shall, within the time periods prescribed by law, prepare the state tax forms, if any, necessary for effectuating the Section 338(h)(10) Elections in the applicable states (the "*State Forms*") and any schedules (the "*Tax Schedules*") required to be attached to the Internal Revenue Service Forms 8023 or 8883 or the State Forms (collectively, the "*Forms*"), in each case in accordance with the Price Allocation. Parent shall provide any cooperation that Platinum shall reasonably require in preparing the Tax Schedules and State Forms and shall execute any State Forms presented to it by Platinum. Platinum shall duly and timely file the Forms (together with the applicable Tax Schedules) as prescribed by Treasury Regulation §1.338(h)(10)-1 (as in effect and as it may hereafter be amended) or the corresponding provisions of state income tax law. Platinum and Parent (and N.E.S. Investment Co.) shall prepare all relevant Tax Returns in a manner consistent with the Tax Schedules and in accordance with the allocation of purchase price to be agreed by such parties prior to the Effective Time (the "*Price Allocation*"). The intent of this Section 2.6 shall be to create the same obligations concerning the Forms as are contained in the Tax Indemnity Agreement.

      2.7    <u>Transfer Taxes</u>. Unless otherwise specified in this Agreement, Parent, on the one hand, and the Purchaser, on the other hand, shall each be responsible for one half of all sales, transfer,

2

CONFIDENTIAL

A415

(a)     Silver has made available to Platinum for examination true and complete copies of all documents and information listed in the Silver Disclosure Schedule or other exhibits called for by this Agreement, as well as (i) Silver's minute book containing all records of all proceedings, consents, actions and meetings of the stockholders, the Board of Directors and any committees of the Board of Directors of Silver; (ii) all Governmental Authorizations, permits, Orders and consents issued by any regulatory agency or other Governmental Authority with respect to Silver and/or the Business and (iii) all of the foregoing documents and information with respect to the Subsidiaries of Silver.

(b)     There has not been any violation of any of the provisions of the Silver Charter Documents, or of any resolution adopted by the stockholders or boards of directors, of Silver or any Subsidiary of Silver, and to Silver's knowledge, no event has occurred and is continuing, and no condition or circumstance exists, that likely would (with or without notice and/or lapse of time) constitute or result directly or indirectly in such a violation.

(c)     The books of account, stock records, minute books and other records of Silver and its Subsidiaries: (i) are in all material respects true and complete, (ii) have been maintained in accordance with reasonable business practices and (iii) accurately and fairly reflect in all material respects the transactions and dispositions of the assets of Silver and its Subsidiaries.

3.7     <u>Silver Financial Statements</u>. Included in <u>Section 3.7 of the Silver Disclosure Schedule</u> are Silver's internal management report containing its financial statements as of December 31, 2003 (the "*Internal Management Report*"), the consolidated financial statements of Silver (including, in each case, any related notes thereto) for the fiscal years ended December 31, 2001, 2002 and 2003 (the "*Silver Financial Statements*") and for the three-month periods ended March 31, 2004 and 2003 (the "*Interim Financials*") and each: (i) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto); (ii) fairly present in all material respects the consolidated financial position of Silver and the Subsidiaries of Silver as at the respective dates thereof and the consolidated results of Silver's operations and cash flows for the periods indicated, except that the unaudited interim financial statements may not contain footnotes and were or are subject to normal and recurring year end adjustments which are not material. Except as set forth on <u>Section 3.7 of the Silver Disclosure Schedule</u>, since December 31, 2003 (the "*Base Balance Sheet Date*"), neither Silver nor any Subsidiary of Silver has any liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for liabilities incurred since the Base Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Silver and the Subsidiaries of Silver taken as a whole and liabilities incurred in connection with this Agreement. There has been no change in Silver's accounting policies during the periods covered by the Silver Financial Statements, except as described in the notes to the Silver Financial Statements. Silver has no material debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected, reserved against or disclosed in the Silver Financial Statements or under <u>Section 3.7 of the Silver Disclosure Schedule</u>, except for those that may have been incurred after the Base Balance Sheet Date in the ordinary course of Silver's business, consistent with past practice and that in an aggregate do not exceed $50,000, and those that occur after the date of this Agreement will be in compliance with this Agreement or with the express written consent of Platinum.

3.8     <u>Intentionally Omitted</u>.

3.9     <u>Accounts Receivable</u>. The Accounts Receivable shown in the balance sheet contained in the Silver Financial Statements as of December 31, 2003 (the "*Base Balance Sheet*") arose in the ordinary course of business consistent with past practice. Allowances for doubtful accounts and

2

CONFIDENTIAL

8.8    Opinion of Platinum Counsel. Parent shall have received from McDermott, Will & Emery, counsel to Platinum, a customary opinion letter in a form mutually agreeable to Platinum and Parent.

8.9    Other Deliveries. Purchaser shall have delivered to Silver and Parent and/or their designee, as the case may be:

(a)    the Purchase Price, as such amount may be adjusted in accordance with Section 2.3, Section 2.4 and/or Section 2.5; provided that delivery of the Purchase Price shall include the treatment of the Holdback Amount in accordance with Section 2.2 and 2.3(d);

(b)    the Registration Rights Agreement in the form attached hereto as Exhibit C, duly executed by Purchaser and Platinum; and

(c)    a certificate executed by Purchaser and Platinum as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 8.1 and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 8.2;

(d)    a certificate of the Secretary of Purchaser certifying, as complete and accurate as of the Closing, copies of the Platinum Charter Documents, certifying all requisite resolutions or actions of Purchaser's board of directors approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Purchaser executing this Agreement and any other documents relating to the transactions contemplated by this Agreement;

8.10    Mutual Releases. Each of Platinum, Purchaser and the Majority Holders shall have executed and delivered to Parent the Mutual Release, which shall include a release of Parent, Silver and Silver's current and former officers and directors.

8.11    Nasdaq. Platinum shall have complied with Section 6.7 of this Agreement.

9.    CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER

The obligations of Platinum and Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Platinum, but only in a writing signed on behalf of Platinum by an authorized officer):

9.1    Accuracy of Representations and Warranties. Each of the representations and warranties of Parent and Silver set forth in Article 3 of this Agreement shall be true and correct on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that, to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of the date hereof and on and as of such particular date as if made on and as of such particular date, except where any such failures to be true and correct would not in the aggregate have a Material Adverse Effect on Parent, Silver or the Business.

9.2    Covenants. Parent and Silver shall have performed and complied in all material respects with all of its covenants contained in Article 5 on or before the Closing Date, and Platinum shall have received a certificate to such effect executed on behalf of Silver by the President, Chief Executive Officer or Chief Financial Officer of Silver.

CONFIDENTIAL

BST99 1394460-27.069646.0011

P - 03790

A417

9.3     Absence of Material Adverse Effect. No Material Adverse Effect with respect to Silver shall have occurred since the date of this Agreement and be continuing.

9.4     Compliance with Law. There shall be no Order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.5     Government Consents. There shall have been obtained at or prior to the Closing Date such permits or authorizations and there shall have been taken such other action, as may be required to consummate the sale of the Shares by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including satisfaction of all requirements under applicable federal and state securities laws.

9.6     Third-Party Consents; Assignments; Other Documents. Platinum shall have received: (a) duly executed copies of all third-party consents, approvals, assignments, waivers, authorizations, permits or other certificates set forth on Section 9.6 of the Silver Disclosure Schedule; and (b) any other written consents, assignments, waivers, authorizations or other certificates where, in the case of this clause (b), the failure to have received the same would have a Material Adverse Effect on Silver, including any consents required to continue in effect any Contracts of Silver or any Subsidiary of Silver which are individually or in the aggregate material to Silver.

9.7     Mutual Releases and GEC Indemnity.

(a)     The Mutual Release shall have been executed and delivered by all of the parties contemplated as signatories thereto.

(b)     Parent and its Affiliates (other than Silver) shall have assigned to Platinum and its Affiliates all rights they have under the GEC Agreements.

9.8     Opinions of Counsel. Platinum shall have received from Squire, Sanders & Dempsey, counsel to Parent and Silver, a customary opinion letter dated as of the Closing Date in a form mutually agreeable to Platinum and Silver.

9.9     Hart-Scott-Rodino Compliance. Any applicable waiting periods under the HSR Act and the merger notification or control laws and regulations of any other applicable jurisdictions, if necessary, shall have expired or early termination shall have been granted.

9.10    Closing Balance Sheet. Silver shall have delivered to Platinum the Closing Balance Sheet in format and presentation similar to the Base Balance Sheet and if necessary the appropriate adjustment shall be made to the Cash Payment of the Purchase Price as set forth in Section 2.3(b).

9.11    Absence of Litigation. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Silver or the Business that has not been previously disclosed to Platinum herein.

9.12    Limitation on Indebtedness. The total aggregate amount of indebtedness owed to Key, shall not exceed $24,000,000, or $26,000,000 to the extent Platinum has consented thereto in accordance with Section 5.2(b).

**CONFIDENTIAL**

2

9.13    [Intentionally Omitted]

9.14    Other Indebtedness.  Parent and Silver shall have (i) satisfied all obligations to Key, the holders of the Series B Notes, any other holders of indebtedness for borrowed money and any creditors holding Encumbrances on the assets of Silver or any Subsidiary of Silver (except Permitted Encumbrances) or the Shares, or shall have provided general releases of Platinum, Silver and Purchaser from each of such parties, (ii) delivered pay-off letters and releases, in form and substance reasonably satisfactory to Platinum, of any Encumbrances on the assets of Silver or any Subsidiary of Silver (except Permitted Encumbrances) or the Shares, (iii) delivered the consents of the Majority Holders, which shall evidence the Majority Holders' consents to the transactions contemplated by this Agreement and the allocation of the Purchase Price as set forth in the Instructions and (iv) satisfied the obligations of the Noteholders as provided in the Notes.

9.15    Tax Indemnity.  N.E.S. Investment Co. shall have delivered to Purchaser an executed copy of the Tax Indemnity Agreement.

9.16    Other Deliveries.  Silver shall have delivered to Purchaser and Platinum the following:

(a)    for each leasehold interest in Real Property identified on Section 3.13(b) of the Silver Disclosure Schedule, a consent of the landlord with respect to the change of control of Silver, if required by the lease for such Real Property or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to Purchaser and its counsel and executed by Silver and/or its Subsidiaries and the landlord for such Real Property;

(b)    such other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Parent, Seller and/or its Subsidiaries;

(c)    fully executed instruments to effect changes to the signing and authorization authority with respect to the bank and other accounts set forth on Section 3.10 of the Silver Disclosure Schedule;

(d)    a certificate executed by Silver and Parent as to the accuracy of their representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 9.1 and as to their compliance with and performance of their covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 9.2;

(e)    a certificate of the Secretary of Parent certifying, as complete and accurate as of the Closing, copies of the Parent's charter documents, certifying all requisite resolutions or actions of Parent's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Parent executing this Agreement and any other document relating to the transactions contemplated by this Agreement;

(f)    a certificate of the Secretary of Silver certifying, as complete and accurate as of the Closing, copies of the Silver Charter Documents, certifying all requisite resolutions or actions of Silver's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Silver executing this Agreement and any other document relating to the transactions contemplated by this Agreement; and

**CONFIDENTIAL**

2

A419

# EXHIBIT T

# ESCROW AGREEMENT

This Escrow Agreement, dated as of June ___, 2004 (the "Escrow Agreement"), is by and among Presstek, Inc., a Delaware corporation, ("Platinum"), Paragon Corporate Holdings, Inc., a Delaware corporation ("Parent"), A.B. Dick Company, a Delaware corporation and wholly-owned subsidiary of Parent ("Silver"), Silver Acquisitions Corp., a Delaware corporation and wholly owned subsidiary of Platinum ("Purchaser"), N.E.S. Investment Co., a Delaware corporation and the ultimate parent entity of Parent ("Nes") and MHR Capital Partners LP, MHR Institutional Partners LP and MHRM LP (together with MHR Capital Partners LP and MHR Institutional Partners LP, "MHR"). Each of the parties to this Escrow Agreement may be referred to herein as a "Party" or collectively as the "Parties." Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in that certain draft Stock Purchase Agreement by and among Silver, Purchaser, Platinum and Parent (the "Purchase Agreement") as of the date hereof.

WHEREAS, the Purchase Agreement calls for the Purchaser to purchase from Parent all of the issued and outstanding capital stock of Silver (the "Proposed Transaction");

WHEREAS, in addition to the Purchase Agreement, the Parties have negotiated and agreed upon the terms of certain Ancillary Documents, including, without limitation, that certain (i) Tax Matters, Indemnity and Antitrust Filing Agreement (the "Indemnity Agreement"), (ii) Registration Rights Agreement (the "Registration Rights Agreement"), (iii) Letter Agreement between Platinum and MHR (the "Side Letter"), (iv) Transaction Agreement between Parent and MHR (the Transaction Agreement"), (v) the Letter Agreement between Nes, Parent and MHR (the "NES Agreement") and (vi) a Mutual Release (the "Release");

WHEREAS, to the extent Parent, Silver, Nes and MHR are parties to each of the Purchase Agreement, the Instructions, the Indemnity Agreement, the Transaction Agreement, the NES Agreement, the Release and the Side Letter (collectively, the "Principal Documents"), such Parties have executed such documents;

WHEREAS, the Parties have agreed to have Platinum hold the Principal Documents in escrow for a period of up to ten (10) days from the date hereof (the "Escrow Period") to allow Platinum and Purchaser (i) a ten (10) day period (the "Platinum Escrow Period") to complete certain actions which are conditions precedent to their willingness to execute the Principal Documents and proceed with the Proposed Transaction and (ii) four (4) day period (the "Key Escrow Period") to obtain the consent of Key Corporate Capital, Inc. ("Key") to the Proposed Transaction; and

WHEREAS, the parties hereto have agreed that the escrow provided for hereunder shall in no event be released unless and until Key consents to the transaction on the terms and conditions contained herein; and

WHEREAS, the parties desire to set forth their understandings with regard to the escrow established hereunder.

CONFIDENTIAL

NOW, THEREFORE, in consideration of the premises and agreements of the parties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Appointment of Agent.** The Parties hereby appoint Platinum as their agent to hold in escrow, and to administer the disposition of, the Principal Documents in accordance with the terms of this Agreement, and Platinum hereby accepts such appointment.

2. **Establishment of Escrow.** Upon the execution of this Escrow Agreement, MHR and Parent shall deposit the executed Principal Documents, bearing original signatures, with Platinum, and Platinum shall promptly acknowledge to MHR and Parent receipt of the executed Principal Documents so deposited. The Principal Documents shall be herein referred to as the "Escrow Deposit."

3. **Procedures During Escrow.**

   (a) From the date hereof through the close of business on June 25, 2004, Platinum and Purchaser shall take the following steps in an effort to proceed towards execution of the Principal Documents:

      (i) Platinum shall take any and all reasonable actions it deems necessary or appropriate in anticipation of the Proposed Transaction;

      (ii) Platinum shall instruct its financial advisor to complete its financial diligence process, including without limitation, the execution and delivery of a fairness opinion to Platinum's Board of Directors;

      (iii) Platinum shall schedule and hold a meeting if its Board of Directors, the agenda for which shall include the consideration of the Proposed Transaction; and

   (b) From the date hereof through the close of business on June 22, 2004, Parent shall endeavor to obtain Key's consent and agreement to the Proposed Transaction, such consent and agreement to be evidenced by Key's execution of Exhibit A attached hereto.

4. **Release of the Escrow Deposit.**

   (a) On or prior to the expiration of the Platinum Escrow Period, if the parties complete the items set forth in Sections 3(a)(i), 3(a)(ii) and 3(a)(iii), Key has consented to the transaction in accordance with Section 4(b), and Platinum's Board of Directors has approved the Proposed Transaction, then Platinum shall promptly so inform MHR and Parent, and Platinum shall execute the Principal Documents to which it is a party (except for the Release) and shall deliver to MHR and Parent originally executed counterpart signature pages of all such documents. Upon the Closing, Platinum shall execute and deliver to MHR, Nes and Parent originally executed counterpart signature pages to the Release.

**CONFIDENTIAL**

(b)   On or prior to the expiration of the Key Escrow Period, if Key shall have consented to the transaction and executed the Consent and Agreement in accordance with Section 3(b) above, then, subject to the completion of 3(a) above, the parties hereby agree that the Escrow Deposit shall be released from any condition relating to obtaining Key's consent.

(c)   Upon the earlier of (i) the failure of the occurrence of the items set forth in Section 4(a) or 4(b) above, (ii) the expiration of the Platinum Escrow Period without Platinum's receipt of such Board approval or (iii) the expiration of the Key Escrow Period without receiving the consent and agreement of Key, Platinum shall, at the request of Nes, Parent and MHR, either (x) destroy all of the executed copies of the Principal Documents constituting the Escrow Deposit, and shall deliver a certificate to each of MHR, Nes and Parent attesting to such destruction of the execution copies of the Principal Documents or (y) return the Escrow Deposit to Parent and MHR, respectively. Upon the occurrence of either of the events set forth in 4(c)(i) or 4(c)(ii), then the agreements, covenants and obligations of the Parties contained in the Principal Documents shall be null and void in their entirety.

5.   **Responsibilities and Liability of Platinum as Escrow Agent**.

(a)   Duties Limited. Platinum undertakes to perform only such duties as are expressly set forth herein. Platinum's duties shall be determined only with reference to this Agreement and applicable laws and it shall have no implied duties.

(b)   Liability of Platinum as Escrow Agent. Except in cases of Platinum's bad faith, willful misconduct or gross negligence, Platinum shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith believed by Platinum to be genuine, (ii) in assuming that any person purporting to give Platinum any of the foregoing in accordance with the provisions hereof, or in connection with either this Agreement or Platinum's duties hereunder, has been duly authorized to do so, and (iii) in acting or failing to act in good faith on the advice of any counsel retained by Platinum. Platinum shall not be liable for any mistake of fact or law or any error of judgment, or for any act or omission, except as a result of its bad faith, willful misconduct or gross negligence.

6.   **Notices.** All notices under this Agreement shall be transmitted to the respective parties, shall be in writing and shall be considered to have been duly given or served when personally delivered to any individual party, or on the first (1st) business day after the date of deposit with an overnight courier for next day delivery, postage paid, or on the third (3rd) business day after deposit in the United States Mail, certified or registered, return receipt requested, postage prepaid, or on the date of telecopy, fax or similar telephonic transmission during normal business hours, as evidenced by mechanical confirmation of such telecopy, fax or telephonic transmission; addressed in all cases to the Parties in accordance with the Purchase Agreement. Any notice given hereunder may

be given on behalf of any Party to its counsel or other authorized representative. In all cases Platinum shall be entitled to rely on a copy or a fax transmission of any document with the same legal effect as it were the original of such document.

7.  **Modifications; Waiver.** This Escrow Agreement may not be altered or modified without the express prior written consent of the Parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.

8.  **Section Headings.** The section headings contained in this Escrow Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation hereof.

9.  **Governing Law.** This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

10. **Counterparts.** This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

[end of text]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

PRESSTEK, INC.

By: _Edward M_____
Name: _Edward J. Marino_____
Title: _President & CEO_____

A.B. DICK COMPANY

By: _____
Name: _____
Title: _____

SILVER ACQUISITIONS CORP.

By: _Edward M_____
Name: _Edward J. Marino_____
Title: _President_____

PARAGON CORPORATE HOLDINGS, INC.

By: _____
Name: _____
Title: _____

MHR CAPITAL PARTNERS LP

By: _____
Name: _____
Title: _____

*Signature Page to Escrow Agreement*

CONFIDENTIAL

# EXHIBIT U

# Transaction Structure

| ($MM) | Consideration | Previous Deal | Section 363 Deal |
|---|---|---|---|
| Purchase Price | Cash | $24.0 | $40.0 |
| Purchase Price | Stock | 23.6 | 0.0 |
| | | $47.6 | $40.0 |
| | | | |
| Enviromental | Cash | $13.5 | $0.0 |
| Restructuring | Cash | 15.0 | 5.0 |
| Working Capital Replenishment | Cash | 10.0 | 0.0 |
| Sub total | | $86.1 | $45.0 |
| | | | |
| Closing Costs | Cash | 3.0 | 3.0 |
| Total Consideration | | $89.1 | $48.0 |
| | | | |
| Cash Portion | | $65.5 | $48.0 |
| Stock Portion | | 23.6 | 0.0 |
| Total | | $89.1 | $48.0 |
| | | | |
| Asset Base | | | |
| PP&E | | $7.4 | $7.4 |
| Working Capital | | 4.8 | 20.8 |
| Hard Assets | | $12.2 | $28.2 |
| | | | |
| Intangibles | | 76.9 | 19.8 |
| Total | | $89.1 | $48.0 |

CONFIDENTIAL

ast

3

| Financials | June 2004 | Jun-Aug 2004 | Equipment | Service | Repair Parts | Supplies | IMG & Other | Adjusted Jan-Dec 2004E |
|---|---|---|---|---|---|---|---|---|
| 94 | $30,228 | $31,152 | | | | | | $21,676 |
| 98 | 39,288 | 39,992 | | | | | | 39,992 |
| 86 | 12,504 | 12,428 | | | ($1,243) | ($7,350) | | 11,185 |
| 62 | 73,584 | 73,500 | ($9,476) | $0 | | | ($111) | 66,150 |
| 80 | 1,044 | 1,108 | | | | | | 997 |
| 20 | $156,648 | $158,180 | ($9,476) | $0 | ($1,243) | ($7,350) | ($111) | $140,000 |
| 08) | (109,080) | (110,116) | 7,504 | 0 | 695 | 4,828 | 16 | ($97,073) |
| 12 | $47,568 | $48,064 | ($1,972) | $0 | ($548) | ($2,522) | ($94) | $42,927 |
| 3% | 30.4% | 30.4% | | | | | | 30.7% |
| 24) | ($6,504) | ($6,776) | | | $518 | $518 | | ($5,741) |
| 36) | (2,558) | (3,624) | | | | | | ($3,624) |
| 30) | ($9,072) | ($10,400) | | | $518 | $518 | | ($9,365) |
| 52 | $38,496 | $37,664 | ($1,972) | $0 | ($31) | ($2,005) | ($94) | $33,562 |
| % | 24.6% | 23.8% | | | | | | 24.0% |
| 36) | ($40,020) | ($40,020) | $0 | $0 | $0 | $0 | $0 | ($40,680) |
| % | 25.5% | 25.7% | | | | | | 29.1% |
| 32) | (2,388) | (2,388) | 0 | 0 | 0 | 0 | 0 | (2,396) |
| 30) | ($42,408) | ($42,408) | $0 | $0 | $0 | $0 | $0 | ($43,076) |
| % | 27.1% | 27.2% | | | | | | 30.8% |
| 8) | ($3,912) | ($5,412) | ($1,972) | $0 | ($31) | ($2,005) | ($94) | ($9,514) |
| % | (2.5%) | (3.4%) | | | | | | (6.6%) |
| 6) | ($1,524) | ($3,016) | ($1,972) | $0 | ($31) | ($2,005) | ($94) | ($7,11B) |
| % | -1.0% | -1.9% | | | | | | -5.1% |

# EXHIBIT V

| From: | Ed Marino |
|---|---|
| Sent: | Tuesday, June 29, 2004 8:27 PM |
| To: | Steve Rappaport; Dan Ebenstein; Debbie Samataro; Don Waite; Ed Marino; John Dreyer; Larry Howard; Mike Moffitt; Moosa E. Moosa |
| Cc: | Michael McCarthy; Jim Scafide; Debbie Samataro |
| Subject: | Materials for Tomorrow's Meeting |
| Attach: | Silver DIP TS NYK_912130_5.DOC; Silver Model Update_June 29_2004.ppt; Silver 363 Term Sheet Revision 2 (clean).DOC |

---

Dear Fellow Board Members,

I am attaching several documents to this email as material for tomorrow's Board Meeting. The purpose of the meeting is to review and approve the revised Silver transaction under a 363 Bankruptcy Sale.

Here is a brief summary:

- Presstek will submit a Term Sheet for Debtor in Process financing, for $5.5 million, with and additional $1.5 million provided by Key Bank. Presstek's first $4 million is secured by the stock of Silver UK, and the remaining $1.5 million is security wise equal with the Bank's $1.5 million. The term is through the end of September at the latest. The DIP Term Sheet is attached. Essentially, this is a friendly transaction with Key Bank.
- Presstek will submit a Purchase and Sale agreement (Term Sheet attached), for an asset purchase of "substantially all" of Silver's assets. We can choose those we want and those we do not, including employees. The Seller supports the P&S form Presstek. This is also a friendly transaction with the Seller. The Term Sheet here identifies up to $10 million in DIP funding, but as you know this is actually set for $5.5 million as noted above.
- The Seller will petition the courts for bankruptcy protection, and submit our Dip funding proposal and P&S for approval by the courts. There is no guarantee that the courts will accept our P&S. they may call for an auction process, which could extend the time to closure by up to about 90 days, and certainly does not guarantee that Presstek will be judged the winner in the auction. If the judge accepts our proposals, then we could close in 30 days.
- Presstek's banks are fully supportive of this deal.
- Many liabilities are "left behind" in this new construction. We have checked carefully with our attorneys to assure that there will not be any glue attached to these, or successor liabilities. Presstek may purchase insurance against this eventuality just in case.

We have completely retooled the business model to reflect the new situation for Silver. Attached is a presentation containing familiar charts with the key financial model information. Hill Street Capital helped in preparing this material, but the content was prepared by Moosa and Michael McCarthy. Here are a few of the highpoints:

- The first several pages, 2 through 5, are the operative pages in the model. Page 2 shows a before and after on the 360 degree purchase price and cash/stock mix. As you can see the consideration for the new transaction is about $40 million less than the previous transaction.
- The third page is a very interesting one, showing the progression of the business over the period from January of this year. The interesting thing to note is that the material deterioration of the business began in May, but was really not visible until June, as the financial figures show. Clearly, Key Bank had access to information not available to Presstek at the time which led them to refuse funding through closing. This is of course what triggered our awareness of the decline in the business.
- In our usual fashion, we have taken a conservative approach to the financial model, reducing the top line to $140 million. This creates a negative EBITDA of about $7 million without intervention. Presstek intends to take up to $14 million of costs out of the system, with the vast majority of that while the business is in Chapter 11. Thus, items such as restructuring costs and other liabilities are "washed" in the bankruptcy. (See page 3 of the model.)
- Page 4 then shows the business managed under Presstek, recovering to a 6 to 8% EBITDA margin for the years 2005 and beyond. Again, we have not taken the real market and margin synergies into account here.
- Page 5 then shows the first two years by quarters, so that you can see the progression of the business. We have only assumed a 4.5% growth in the outer years, as we did in our previous modeling. Again, we particularly believe this to be a conservative approach.
- If you then fast forward to page 11, you will see a very attractive consolidated EBITDA of close to $36 million in 2005.

We recognize that this is a lot of information in a very short period of time. We are prepared to step through the highpoints tomorrow. The format of the model should be familiar to you all and the term sheets can be described over the phone without a detailed reading.

CONFIDENTIAL                                                                                          A430

Thank you for your very supportive posture on this deal, considering the rapid turnaround of this transaction. We will be respectful of your time tomorrow and hold the meeting to one hour.

I look forward to our discussions.

Kindest Regards,
Ed

Ed Marino
President and CEO
Presstek, Inc.
55 Executive Drive
Hudson, NH, 03051
Tel: 603-595-7000
Fax: 603-595-2602
email: emarino@presstek.com

CONFIDENTIAL

# EXHIBIT W

| From: | Ed Marino |
|---|---|
| Sent: | Friday, November 7, 2003 1:45 PM |
| To: | Frank D. Zaffino (fzaffino@abdick.com) |
| Cc: | 'FDZaffino@aol.com'; Ed Marino |
| Subject: | Confidential Presstek Proposal |
| Attach: | Silver Offer Letter (with sig) 7 Nov 03.doc |

Dear Frank,

Attached is an electronic version of the proposal that was just fax'ed to you. We incorporated language into the proposal indicating the confidential nature of this proposal (see paragraph 9), and so there is not need at this time for you to execute another document.

We will look forward to your timely response.

Kindest Regards,
Ed

Ed Marino
President and CEO
Presstek, Inc.
55 Executive Drive
Hudson, NH, 03051
Tel: 603-595-7000
Fax: 603-595-2602
email: emarino@presstek.com

CONFIDENTIAL

A433



Edward J. Marino
President and CEO

Private & Confidential

November 7, 2003

The Boards of Directors
A.B. Dick Company
Paragon Corporate Holdings Inc.
7400 Caldwell Avenue
Niles, IL 60714-3806

Dear Directors:

Presstek, Inc. ("Presstek") is pleased to submit to you this non-binding proposal for the potential acquisition of A.B. Dick Company (the "Company") by Presstek. This proposal is based on the business, financial and other information we have received from Paragon Corporate Holdings ("Paragon") and Paragon's and the Company's management and financial advisors in recent months. The terms of our proposal are set out below.

1.    Purchase Price. Our preliminary proposal is for the acquisition by Presstek of 100% of the common stock and all other outstanding equity securities of the Company for consideration of $65.1 million by means of a statutory merger or other transaction structure acceptable to Presstek (the "Purchase Price"). In arriving at the Purchase Price, Presstek has assumed that the Company at the time of its acquisition by Presstek will have no liabilities, liens or adverse claims, other than normal course current liabilities and certain long-term liabilities known as the "Old Multigraphics Liabilities" stated by the Company to amount to approximately $6.6 million.

2.    Transaction Structure. At closing, Presstek will acquire all of the common stock and other outstanding equity securities of the Company, and the Company will have retained at that time ownership of all tangible and intangible assets of its business (excluding excess cash balances), as they have been described to us to date or as may otherwise be necessary to conduct the business as currently conducted. In connection with the transaction, Presstek would assume the Old Multigraphics Liabilities, as well as normal course current liabilities, including current accounts payable, accrued liabilities and customer advances.

3.    Consideration. The consideration comprising the Purchase Price will consist of (i) $46.5 million in cash and (ii) $18.6 million in Presstek common stock. Based on Presstek's existing cash position and credit facilities, we are highly confident of our ability to complete the transaction in a timely fashion. You have informed us that such consideration will be allocated among the Company's and Paragon's bank lenders, bondholders, stockholders and other

CONFIDENTIAL



claimants pursuant to an agreement to be reached among such parties. Evidence of satisfactory agreement as to allocation of the purchase price shall be a condition of closing.

4.    Due Diligence. A detailed business, accounting, and legal due diligence review of the Company will be required prior to our entering into final documentation. To undertake our due diligence, we will require access to documents that would ordinarily be assembled in a data room, as well as the opportunity to meet with the Company's management. The due diligence review would focus on, but not be limited to, the following:

(a) A customary legal and accounting review, including (i) litigation issues, (ii) change of control issues, (iii) tax issues, (iv) employment contracts and other human resources issues and (v) environmental and regulatory issues;

(b) Additional discussions with the Company's management on their perspectives for the business and on any issues that arise from our due diligence review;

(c) Review of customer and supplier relationships; and,

(d) Site visits to the Company's operating facilities.

We and our professional advisors are available to commence due diligence immediately upon your satisfaction with this proposal and execution of a customary exclusivity letter.

5.    Conditions. The completion of the transaction would be subject to conditions customary in these type of acquisitions, including (but not limited to): (i) the satisfactory completion by Presstek and its financial, accounting and legal advisors of their due diligence investigations, (ii) the negotiation and execution of the definitive documents related to the transaction by Presstek, the Company, Paragon and Paragon's ultimate parent ("Transaction Documents") in a form satisfactory to Presstek including representations, warranties, noncompetes, covenants, conditions and indemnities, (iii) the absence of any material adverse change in the business, assets, condition (financial or otherwise) or prospects of the Company, (iv) the conduct of the business of the Company in the ordinary course in all material respects at all times prior to closing, (v) the Company having adequate working capital at the closing to support its ongoing obligations, (vi) the arrangement by Presstek of debt financing sufficient to complete the transaction, and (vii) final board approval by both parties.

6.    Confidentiality. The Company and Presstek reaffirm that the Confidentiality Agreement executed by the parties remains in effect.

7.    Timing. The Company and Presstek will seek to negotiate and execute the definitive documents relating to the transaction by December 1, 2003.

8.    Expenses. Paragon shall bear all expenses and fees incurred by itself and the Company in connection with this transaction.

9.    Non-Binding Effect. This proposal is not intended to represent a binding offer, but it is merely a statement of intent that sets forth the general basis upon which we are willing to proceed. No binding obligations will arise until the Transaction Documents are negotiated, approved, executed and delivered by the parties. The proposal outlined in this letter and any subsequent negotiations are confidential and could be considered material information.

CONFIDENTIAL



Accordingly, neither the Company or Paragon nor any of their respective affiliates, employees or agents should disclose such information without the prior written consent of Presstek or use it for any purpose other than to consider, negotiate and consummate the transactions contemplated hereby.

We look forward to working with you to conclude a mutually beneficial transaction. Should you have any questions, please feel free to contact me at (603) 595-7000.

Very truly yours,

Edward J. Marino

CONFIDENTIAL

# EXHIBIT X

# Discussion Materials

## April 20, 2004

H.I. STREET CAPITAL, LLC
...mber, National Association
of Securities Dealers, Inc.

CONFIDENTIAL

# Principal Model Adjustments

## Summary

- We have made the following adjustments to the financial model:

  (a)   **Purchase Price and Capital Structure** – Adjusted capital structure to reflect latest agreement with MHR. $48.4MM purchase price (assumed to be $27.2MM in cash and $21.2MM in PRST common stock). Virtually all goes to Silver bank lender and noteholders;

  (b)   **Assumption of Environmental & Other Liabilities** – PRST will purchase Silver and will assume Silver's liabilities. Purchase price reduced by $13.450MM. Such reduction will be allocated by PRST to deemed values of $11.0MM and $2.450MM in environmental and other liabilities, respectively. We have assumed that PRST makes expenditures offsetting 50% of such amounts in 4Q04 and 50% in 4Q05; and,

  (c)   **Tax Treatment**– Assumed 338(h) (10) election by Seller results in no change of tax treatment by PRST from asset purchase model

- **Operational and cost of financing assumptions were not altered**

  —   Assumed fixed LT and ST costs of financing of 7.25% and 5.25%, respectively

CONFIDENTIAL

A439



HILL STREET CAPITAL LLC

# ABD – Annual Income Statement Forecast
## (Includes Head Count Reductions – "Boxes 1&3")

A.B. Dick - Consolidated Income Statement

| $ ('000s) | 2003 | Adjustments | Adj. 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Projections Fiscal Year | | |
| Net Sales | $193,229 | ($19,829) | $173,400 | $173,400 | $181,203 | $189,357 | $197,878 | $206,783 |
| % Growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Net Gross Margin | $46,301 | ($3,576) | $42,725 | $43,609 | $45,641 | $47,768 | $49,994 | $52,323 |
| % Margin | 24.0% | 18.0% | 24.6% | 25.1% | 25.2% | 25.2% | 25.3% | 25.3% |
| | | | | | | | | |
| R&D | ($1,995) | $194 | ($1,801) | ($1,818) | ($1,900) | ($1,986) | ($2,075) | ($2,169) |
| % Sales | 1.0% | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| SG&A | ($40,885) | $5,103 | ($35,782) | ($34,288) | ($34,829) | ($35,922) | ($37,044) | ($38,194) |
| % Sales | 12.2% | | 20.6% | 19.8% | 19.2% | 19.0% | 18.7% | 18.5% |
| Depreciation & Amortization | (2,854) | $0 | (2,854) | (6,233) | (8,159) | (8,959) | (5,617) | (3,292) |
| Total SG&A | ($45,734) | $5,297 | ($40,437) | ($42,340) | ($44,888) | ($46,868) | ($44,737) | ($43,655) |
| % Sales | 23.7% | | 23.3% | 24.4% | 24.8% | 24.8% | 22.6% | 21.1% |
| | | | | | | | | |
| Restructuring Benefits (Net Trans. Costs) | | | - | $2,950 | $9,500 | $9,500 | $9,500 | $9,500 |
| % Sales | | | 0.0% | 1.7% | 5.2% | 5.0% | 4.8% | 4.6% |
| EBIT | $567 | $1,721 | $2,288 | $4,219 | $10,253 | $10,400 | $14,757 | $18,168 |
| % Margin | 0.3% | | 1.3% | 2.4% | 5.7% | 5.5% | 7.5% | 8.8% |
| | | | | | | | | |
| Interest Expense | ($77) | | ($77) | ($2,715) | ($3,252) | ($2,864) | ($2,554) | ($2,261) |
| | | | | | | | | |
| Other Income/(Expense) | $133 | - | $133 | - | - | - | - | - |
| | | | | | | | | |
| Earnings before Taxes | $623 | $1,721 | $2,344 | $1,504 | $7,001 | $7,536 | $12,204 | $15,907 |
| | | | | | | | | |
| Income Taxes | ($12) | - | ($12) | ($752) | ($3,500) | ($3,768) | ($6,102) | ($7,954) |
| | | | | | | | | |
| Net Income | $611 | $1,721 | $2,332 | $752 | $3,500 | $3,768 | $6,102 | $7,954 |
| % Margin | 0.3% | | 1.3% | 0.4% | 1.9% | 2.0% | 3.1% | 3.8% |
| | | | | | | | | |
| EBITDA | $3,421 | $1,721 | $5,142 | $10,452 | $18,412 | $19,360 | $20,374 | $21,461 |
| % Margin | 1.8% | | 3.0% | 6.0% | 10.2% | 10.2% | 10.3% | 10.4% |

2

SSG
HILL STREET CAPITAL, LLC

CONFIDENTIAL

# ABD – Quarterly Income Statement Forecast
## (Includes Head Count Reductions — "Boxes 1&3")

A.B. Dick - Consolidated Income Statement

$ ('000s)

| | 1Q04 | 2Q04 | 3Q04 | 4Q04 | FY 2004 | 1Q05 | 2Q05 | 3Q05 | 4Q05 | FY 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $43,854 | $44,356 | $41,602 | $43,588 | $173,400 | $45,827 | $46,352 | $43,474 | $45,549 | $181,203 |
| % Q/Q Growth | | 1.1% | -6.2% | 4.8% | 0.0% | 5.1% | 1.1% | -6.2% | 4.8% | 4.5% |
| Net Gross Margin | $11,004 | $11,138 | $10,481 | $10,986 | $43,609 | $11,517 | $11,657 | $10,969 | $11,498 | $45,641 |
| % Margin | 25.1% | 25.1% | 25.2% | 25.2% | 25.1% | 25.1% | 25.1% | 25.2% | 25.2% | 25.2% |
| R&D | ($460) | ($465) | ($436) | ($457) | ($1,818) | ($481) | ($486) | ($456) | ($478) | ($1,900) |
| % Sales | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| SG&A | ($9,065) | ($8,637) | ($8,100) | ($8,487) | ($34,288) | ($8,808) | ($6,909) | ($8,356) | ($8,755) | ($34,829) |
| % Sales | 20.7% | 19.5% | 19.5% | 19.5% | 19.8% | 19.2% | 19.2% | 19.2% | 19.2% | 19.2% |
| Depreciation & Amortization | (714) | (1,840) | (1,840) | (1,840) | (6,233) | (2,040) | (2,040) | (2,040) | (2,040) | (8,159) |
| Total SG&A | ($10,238) | ($10,942) | ($10,376) | ($10,784) | ($42,340) | ($11,329) | ($11,435) | ($10,852) | ($11,272) | ($44,888) |
| % Sales | 23.3% | 24.7% | 24.9% | 24.7% | 24.4% | 24.7% | 24.7% | 25.0% | 24.7% | 24.8% |
| Restructuring Benefits (Net Trans. Costs) | $0 | ($1,200) | $1,775 | $2,375 | $2,950 | $2,375 | $2,375 | $2,375 | $2,375 | $9,500 |
| % Sales | 0.0% | -2.7% | 4.3% | 5.4% | 1.7% | 5.2% | 5.1% | 5.5% | 5.2% | 5.2% |
| EBIT | $766 | ($1,003) | $1,879 | $2,577 | $4,219 | $2,563 | $2,597 | $2,492 | $2,601 | $10,253 |
| % Margin | 1.7% | (2.3%) | 4.5% | 5.9% | 2.4% | 5.6% | 5.6% | 5.7% | 5.7% | 5.7% |
| Interest Expense | ($54) | ($904) | ($877) | ($880) | ($2,715) | ($849) | ($817) | ($786) | ($800) | ($3,252) |
| Earnings before Taxes | $712 | ($1,908) | $1,003 | $1,697 | $1,504 | $1,714 | $1,780 | $1,706 | $1,801 | $7,001 |
| Income Taxes | ($356) | $0 | $0 | ($396) | ($752) | ($857) | ($890) | ($853) | ($900) | ($3,500) |
| Net Income | $356 | ($1,908) | $1,003 | $1,301 | $752 | $857 | $890 | $853 | $900 | $3,500 |
| % Margin | 0.0% | (4.3%) | 2.4% | 3.0% | 0.4% | 1.9% | 1.9% | 2.0% | 2.0% | 1.9% |
| EBITDA | $1,479 | $837 | $3,719 | $4,417 | $10,452 | $4,603 | $4,637 | $4,532 | $4,641 | $18,412 |
| % Margin | 3.4% | 1.9% | 8.9% | 10.1% | 6.0% | 10.0% | 10.0% | 10.4% | 10.2% | 10.2% |

CONFIDENTIAL

3

# ABD – Revenue Forecast By Business Unit

ABD - Income Statement by Business Unit

| $ ('000s) | 2003E | Full-Year Adjustments | Adjusted 2003E | Projections Fiscal Year 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| **Equipment** | | | | | | | | |
| Sales | $51,316 | ($7,362) | $43,954 | $43,954 | $45,932 | $47,999 | $50,159 | $52,416 |
| % growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Std. Gross Profit | $11,141 | ($919) | $10,222 | $10,637 | $11,116 | $11,616 | $12,138 | $12,685 |
| % Margin | 21.7% | 12.5% | 23.3% | 24.2% | 24.2% | 24.2% | 24.2% | 24.2% |
| **Service** | | | | | | | | |
| Sales | $42,221 | ($8,000) | $34,221 | $34,221 | $35,761 | $37,370 | $39,052 | $40,809 |
| % growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Std. Gross Profit | $8,041 | ($984) | $7,057 | $7,081 | $7,399 | $7,732 | $8,080 | $8,444 |
| % Margin | 19.0% | 12.3% | 20.6% | 20.7% | 20.7% | 20.7% | 20.7% | 20.7% |
| **Repair Parts** | | | | | | | | |
| Sales | $13,386 | $0 | $13,386 | $13,386 | $13,988 | $14,618 | $15,276 | $15,963 |
| % growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Std. Gross Profit | $7,510 | $0 | $7,510 | $7,630 | $8,043 | $8,478 | $8,936 | $9,418 |
| % Margin | 56.1% | 0.0% | 56.1% | 57.0% | 57.5% | 58.0% | 58.5% | 59.0% |
| **Supplies** | | | | | | | | |
| Sales | $84,943 | ($3,104) | $81,839 | $81,839 | $85,522 | $89,370 | $93,392 | $97,595 |
| % growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Std. Gross Profit | $28,586 | ($447) | $28,139 | $28,701 | $29,992 | $31,342 | $32,753 | $34,226 |
| % Margin | 33.7% | 14.4% | 34.4% | 35.1% | 35.1% | 35.1% | 35.1% | 35.1% |
| *IMG & Other* | | | | | | | | |
| Gross Sales | $1,363 | ($1,363) | $0 | $0 | $0 | $0 | $0 | $0 |
| % growth | | | | | 0.0% | 0.0% | 0.0% | 0.0% |
| Std. Gross Profit | $1,226 | ($1,226) | $0 | $0 | $0 | $0 | $0 | $0 |
| % Margin | 89.9% | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total** | | | | | | | | |
| Sales | $193,229 | ($19,829) | $173,400 | $173,400 | $181,203 | $189,357 | $197,878 | $206,783 |
| % growth | | | | 0.0% | 4.5% | 4.5% | 4.5% | 4.5% |
| Std. Gross Profit | $56,504 | ($3,576) | $52,928 | $54,048 | $56,550 | $59,168 | $61,907 | $64,773 |
| % Margin | 29.2% | 18.0% | 30.5% | 31.2% | 31.2% | 31.2% | 31.3% | 31.3% |

4

CONFIDENTIAL

A442

HILL STREET CAPITAL, LLC

# EXHIBIT Y

| From: | Victor Mendoza |
|---|---|
| Sent: | Tuesday, August 12, 2003 12:30 PM |
| To: | Ed Marino; Moosa E. Moosa |
| Cc: | John Brim |
| Subject: | Project Silver-Preliminary Due Diligence Request List |
| Attach: | Preliminary Due Diligence Request List.doc |

Gentlemen:

At Mitch's request, please find attached a preliminary due diligence request list for your review.

Regards,

Victor Mendoza
Hill Street Capital LLC
126 East 56th Street
New York, New York 10022
Tel:  212-980-7100
Cell: 917-494-5768
Fax: 212-980-9550

A444

ONFIDENTIAL



HILL STREET CAPITAL LLC

## PROJECT SILVER
### Preliminary Due Diligence Request List

### Business Segment Information

1. Please provide detailed historical information by A.B. Dick line of business (equipment, consumables and service) for the past five years including:

   - Detailed income statements, including sales and margin breakdowns
   - Detailed breakdowns of capex and working capital
   - Detailed breakdown of SG&A (overhead), excluding corporate
   - List of major assets (including equipment) and associated liabilities, if any, including a summary description of all manufacturing and/or warehousing facilities and real property used to run the business
   - Number of senior managers and employees by segment

### Consolidated Financials

1. Please provide copies of Paragon's audited consolidated and consolidating financial statements (income statement, balance sheet and cash flow) for the past five years with corresponding notes

2. Do the summary financial statements provided in Friday's meeting represent A.B. Dick on a stand-alone basis?

   - What is the definition of Adjusted EBITDA?
   - Please provide more detail on the following assets/liabilities:

     i. Any corporate or other assets included, in addition to those on a business segment basis
     ii. Deferred service revenue
     iii. Accrued liabilities/other
     iv. Other long-term obligations
     v. Any other contingent liabilities

3. Please provide a detailed breakdown of corporate SG&A (overhead) and research and development expenses

4. Please provide a description of any aged accounts receivable, including a reserve for doubtful accounts and the company's standard terms

5. Please provide a description of any old or obsolete inventory as well as the period of obsolescence

6. Please provide a description of any existing reserves or anticipated writedowns

7. Please provide copies of any appraisal reports on fixed assets or owned properties

ONFIDENTIAL

8/12/2003

A445



8.  Please provide a description of any transferable net operating loss carryforwards

## Business Plan & Projections

1.  Please provide A.B. Dick's latest Business Plan outlining the Company's growth and strategy in more detail

2.  Please provide detailed financial projections, consolidated and by business segment, for the next five years including:

    - Income statements
    - Description of major assumptions
    - Description of any development programs underway and competitive and/or technological changes assumed, including any new products to be introduced
    - Planned research and development expenses
    - Planned capital expenditures
    - Planned depreciation and amortization schedule
    - Working capital requirements, including description of peak funding needs/periods
    - Changes in other assets and liabilities

## General Business Information

1.  Copy of most recent organization chart, consolidated and by business segment

2.  Summary description of A.B. Dick's marketing and sales organization, including coverage by major accounts

3.  List of the top 10 product lines, by sales, for the past five years

4.  List of the top 10 customers, by sales, for the past five years

5.  List of the top 10 suppliers, by purchases, for the past five years

6.  List and summary description of any major contracts on the sales and supply side

7.  List of any and all patents, trademarks, service marks, copyrights, etc. used in the business

8.  Description of major MIS systems used to run the business

9.  List and summary description of any employee benefit plans, including pension plans, covering current and former employees of A.B. Dick

ONFIDENTIAL

8/12/2003

# EXHIBIT Z

# Discussion Materials

May 25, 2004



HILL STREET CAPITAL LLC
Member, National Association
of Securities Dealers, Inc.

CONFIDENTIAL

The accompanying material was compiled on a confidential basis for use solely by the board of directors of Presstek, Inc. in evaluating a proposed transaction and not with a view to public disclosure or filing thereof under the United States Securities Act of 1933 or the United States Securities Exchange Act of 1934 (collectively, the "U.S. Securities Laws") or any dissemination thereof to the stockholders of the Company or any other purpose. This material was prepared for a specific use by specific persons and was not prepared to conform with any disclosure standards under the U.S. Securities Laws. Neither Hill Street Capital LLC ("HSC") nor any of its officers, managers, members, employees, affiliates, advisors, agents or representatives warrants or represents the accuracy or completeness of any of the material set forth herein.

It should be understood that any estimates, valuations and/or projections contained in the accompanying material were prepared or derived from information supplied by the Company and involve numerous and significant subjective determinations by the Company, which may or may not be correct. HSC has not assumed any responsibility for independent verification of any such estimates, valuations and/or projections. Accordingly, no representation or warranty can be or is made by HSC as to the accuracy of any such estimates, valuations and/or projections and nothing contained in the accompanying material is, or shall be relied upon as, a promise or representation as to the past or the future.



HILL STREET CAPITAL, LLC

A449

CONFIDENTIAL

# Principal Model Adjustments
## Summary

- We have made the following adjustments to the financial model:

  (a)  **Purchase Price and Capital Structure** – Adjusted capital structure to reflect final agreement. $47.6MM purchase price ($24.0MM in cash and $23.6MM in PRST common stock). Virtually all goes to Silver bank lender and noteholders;

  (b)  **Assumption of Environmental & Other Liabilities** – PRST will purchase Silver stock and will assume certain environmental and other liabilities with a deemed value of $13.450MM. We have assumed that PRST makes three quarterly expenditures offsetting this amount starting in 1Q05;

  (c)  **Tax Treatment** – Assumed 338(h) (10) election by Seller results in no change of tax treatment by PRST from asset purchase model;

  (d)  **Updated Financials** – Updated model to reflect Silver's and PRST's 1Q04 results; and,

  (e)  **Effective Date of Transaction** – Assumed that transaction closes at the beginning of 3Q04

- **Operational and cost of financing assumptions were not altered**

  — Assumed fixed LT and ST costs of financing of 7.25% and 5.25%, respectively



HILL STREET CAPITAL, LLC

CONFIDENTIAL

2

# ABD - Annual Income Statement Forecast
## (Includes Head Count Reductions — "Boxes 1&3")

A.B. Dick - Consolidated Income Statement

| $ (000s) | 2003 | Adjustments | Adj. 2003 | Projections Fiscal Year 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $193,229 | ($19,829) | $173,400 | $177,582 | $181,203 | $189,357 | $197,878 | $206,783 |
| % Growth | | | | 2.4% | 2.0% | 4.5% | 4.5% | 4.5% |
| Net Gross Margin | $46,301 | ($3,576) | $42,725 | $43,437 | $45,641 | $47,768 | $49,994 | $52,323 |
| % Margin | 24.0% | 18.0% | 24.6% | 24.5% | 25.2% | 25.2% | 25.3% | 25.3% |
| | | | | | | | | |
| R&D | ($1,995) | $194 | ($1,801) | ($1,862) | ($1,900) | ($1,986) | ($2,075) | ($2,169) |
| % Sales | 1.0% | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| SG&A | ($40,885) | $5,103 | ($35,782) | ($37,458) | ($34,829) | ($35,922) | ($37,044) | ($38,194) |
| % Sales | 12.2% | | 20.6% | 21.1% | 19.2% | 19.0% | 18.7% | 18.5% |
| Depreciation & Amortization | (2,854) | $0 | (2,854) | (4,788) | (7,944) | (8,744) | (6,652) | (3,594) |
| Total SG&A | ($45,734) | $5,297 | ($40,437) | ($44,108) | ($44,673) | ($46,652) | ($45,771) | ($43,957) |
| % Sales | 23.7% | | 23.3% | 24.8% | 24.7% | 24.6% | 23.1% | 21.3% |
| | | | | | | | | |
| Restructuring Benefits (Net Trans. Costs) | | | - | $575 | $9,500 | $9,500 | $9,500 | $9,500 |
| % Sales | | | 0.0% | 0.3% | 5.2% | 5.0% | 4.8% | 4.6% |
| EBIT | $567 | $1,721 | $2,288 | ($97) | $10,468 | $10,616 | $13,723 | $17,867 |
| % Margin | 0.3% | 1.3% | 1.3% | (0.1%) | 5.8% | 5.6% | 6.9% | 8.6% |
| | | | | | | | | |
| Interest Expense | ($77) | - | ($77) | ($1,855) | ($3,909) | ($3,714) | ($3,159) | ($2,587) |
| | | | | | | | | |
| Other Income/(Expense) | $133 | - | $133 | - | - | - | - | - |
| | | | | | | | | |
| Earnings before Taxes | $623 | $1,721 | $2,344 | ($1,951) | $6,559 | $6,902 | $10,564 | $15,279 |
| | | | | | | | | |
| Income Taxes | ($12) | - | ($12) | $695 | ($3,280) | ($3,451) | ($5,282) | ($7,640) |
| | | | | | | | | |
| Net Income | $611 | $1,721 | $2,332 | ($1,256) | $3,280 | $3,451 | $5,282 | $7,640 |
| % Margin | 0.3% | 1.3% | 1.3% | -0.7% | 1.8% | 1.8% | 2.7% | 3.7% |
| | | | | | | | | |
| EBITDA | $3,421 | $1,721 | $5,142 | $4,691 | $18,412 | $19,360 | $20,374 | $21,461 |
| % Margin | 1.8% | | 3.0% | 2.6% | 10.2% | 10.2% | 10.3% | 10.4% |

3



I.I.I. STREET CAPITAL, LLC

CONFIDENTIAL

# ABD - Quarterly Income Statement Forecast
## (Includes Head Count Reductions — "Boxes 1&3")

A.B. Dick - Consolidated Income Statement

| $ ('000s) | 1Q04A | 2Q04E | 3Q04E | 4Q04E | FY 2004E | 1Q05E | 2Q05E | 3Q05E | 4Q05E | FY 2005E |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $46,196 | $46,196 | $41,602 | $43,588 | $177,582 | $45,827 | $46,352 | $43,474 | $45,549 | $181,203 |
| % Q/Q Growth | 0.0% | 0.0% | -9.9% | 4.8% | 0.0% | 5.1% | 1.1% | -6.2% | 4.8% | 2.0% |
| Net Gross Margin | $10,985 | $10,985 | $10,481 | $10,986 | $43,437 | $11,517 | $11,657 | $10,969 | $11,498 | $45,641 |
| % Margin | 23.8% | 23.8% | 25.2% | 25.2% | 24.5% | 25.1% | 25.1% | 25.2% | 25.2% | 25.2% |
| | | | | | | | | | | |
| R&D | ($484) | ($484) | ($436) | ($457) | ($1,862) | ($481) | ($486) | ($456) | ($478) | ($1,900) |
| % Sales | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| SG&A | ($10,435) | ($10,435) | ($8,100) | ($8,487) | ($37,458) | ($8,808) | ($8,909) | ($8,356) | ($8,755) | ($34,829) |
| % Sales | 22.6% | 22.6% | 19.5% | 19.5% | 21.1% | 19.2% | 19.2% | 19.2% | 19.2% | 19.2% |
| Depreciation & Amortization | (608) | (608) | (1,786) | (1,786) | (4,788) | (1,986) | (1,986) | (1,986) | (1,986) | (7,944) |
| Total SG&A | ($11,528) | ($11,528) | ($10,323) | ($10,730) | ($44,108) | ($11,275) | ($11,381) | ($10,798) | ($11,219) | ($44,673) |
| % Sales | 25.0% | 25.0% | 24.8% | 24.6% | 24.8% | 24.6% | 24.6% | 24.8% | 24.6% | 24.7% |
| | | | | | | | | | | |
| Restructuring Benefits (Net Trans. Costs) | $0 | $0 | ($1,200) | $1,775 | $575 | $2,375 | $2,375 | $2,375 | $2,375 | $9,500 |
| % Sales | 0.0% | 0.0% | -2.9% | 4.1% | 0.3% | 5.2% | 5.1% | 5.5% | 5.2% | 5.2% |
| EBIT | ($543) | ($543) | ($1,042) | $2,031 | ($97) | $2,617 | $2,651 | $2,546 | $2,655 | $10,468 |
| % Margin | (1.2%) | (1.2%) | (2.5%) | 4.7% | (0.1%) | 5.7% | 5.7% | 5.9% | 5.8% | 5.8% |
| | | | | | | | | | | |
| Interest Expense | ($18) | ($18) | ($881) | ($937) | ($1,855) | ($938) | ($968) | ($1,000) | ($1,003) | ($3,909) |
| | | | | | | | | | | |
| Earnings before Taxes | ($561) | ($561) | ($1,923) | $1,093 | ($1,951) | $1,679 | $1,683 | $1,546 | $1,651 | $6,559 |
| | | | | | | | | | | |
| Income Taxes | $0 | $0 | $0 | $695 | $695 | ($840) | ($841) | ($773) | ($826) | ($3,280) |
| | | | | | | | | | | |
| Net Income | ($561) | ($561) | ($1,923) | $1,789 | ($1,256) | $840 | $841 | $773 | $826 | $3,280 |
| % Margin | (1.2%) | (1.2%) | (4.6%) | 4.1% | (0.7%) | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% |
| | | | | | | | | | | |
| EBITDA | $65 | $65 | $744 | $3,817 | $4,691 | $4,603 | $4,637 | $4,532 | $4,641 | $18,412 |
| % Margin | 0.1% | 0.1% | 1.8% | 8.8% | 2.6% | 10.0% | 10.0% | 10.4% | 10.2% | 10.2% |

4

ISI
H.I. STREET CAPITAL, LLC

CONFIDENTIAL