116

1    books to PressTek during that period in terms of any

2    and all information that Moosa Moosa wanted.  If he

3    wanted a schedule on weekly cash flows, he got it.

4        Q    Did AB Dick routinely prepare cash flow

5    forecasts in the first half of 2004?

6        A    Yes.

7        Q    Do you know if prior to June 16th of 2004

8    AB Dick had prepared any liquidity analysis?

9        A    I do.

10        Q    And did they?

11        A    Yes.  They were a part of regular board

12    packages.

13        Q    And were those board packages made

14    available to PressTek?

15        A    I have no direct knowledge, but I would

16    presume that they were.

17        Q    Are you aware that there was a data room

18    that was created towards the end of 2003 for

19    purposes of allowing PressTek's investigation of the

20    company's affairs?

21        A    I'm aware of the existence, but I've never

22    physically visited it.

23        Q    Do you know who would have been

24    principally responsible at AB Dick for assembling

25    the material that went into the data room?

# EXHIBIT TT

### JWW NOTES ON AB DICK BOARD MEETING
### JULY 8, 2004

Ha. Goldstein (HG) stated that he had reviewed all transaction docs (APA, DIP, etc.) with following comments:

    a  HG wants Presstek committed to purchase...docs leave too many outs.

    b.  PT overstepping bounds in DIP to protect its asset purchase.

    c.  ABD needs to preserve its rights to litigate...including against PT...to maximize value of bankruptcy estate.

    d.  Need to get more money from sale.

    e.  Need to avoid "chilling" the auction process.

2.  HG comments on DIP agreement:

    a.  Is $6 mm enough to get through closing?

        i.  Knipp analysis shows about $4.0 mm needed through 10/1/04...$6 mm is a 20% cushion...includes $2.1 mm of bankruptcy administration expenses:  $50 k SSD; $205 k BF; $155 k Candlewood; $35 k Jasper...; $150 k Creditors Committee advisors; and Herden $25 k monthly for total of $625 k monthly plus...

    b.  HG complained of coming into process late...reality is that he was lead negotiator on the stock deal that cratered a few weeks ago...all DIP docs have been circulated contemporaneously including to him...he has as much opportunity to comment as anyone else.

3.  HG raised issue of combining ABD and Paragon cash management.      REDACTED

    ..... Paragon is the borrower from Key Bank...ABD is the guarantor.  Paragon and ABD are co-makers on the MHR note if it is a note.

4.  JWW comment that companies had no leverage in negotiations with PT on the APA and DIP...nevertheless successfully changed some aspects of the APA.  Bank is funding one day at a time...may not honor checks at end of day.

5.  Directors hear from management that suppliers were recalling goods and selling COD only...rumors in marketplace harmful as well.

6.  Open Issues (with PT and Key reps):

    a.  Additional DIP $$:  committed to $7 mm now.

    b.  MAE : monthly revenues lowered somewhat in early months: $8.2 mm US July; $.75 mm Aug; $9.75 mm Sep 2004.

    c.  E&Y bill of $260 k still a hurdle...can't issue opinion if a creditor.

    d.  None of our law firms will issue legal opinions.

    e.  PT will not issue affirmative comment allowing ABD to sue PT after paying $40 mm for assets.

    f.  Working capital test at close is tight.

7.  Board unanimously approved 363 sale and filing subject to retention of ABD right to litigate...including Presstek...thought to be permitted in current APA.

JWW NOTES ON ABD BOARD MEETING 7/9/04

1.

REDACTED

2.

3. JWW stated that range of values was $22-25 mm liquidation value...$35 mm PT offer net of DIP....and some uncertain amount/probability of winning/settlement date which cannot be determined. Candlewood believed liquidation value might be more in the $10-20 mm because of old inventory. 363 sale only starts an auction process with a stalking horse...preserves enterprise value as going concern...jobs...etc. Only ABD prohibited from litigation if PT deal is high bid...other creditors can still act in their own best interests. JWW moves resolutions for 363 sale.

4. Goldstein unveils his conspiracy theory...that PT effectively ran ABD and was in cahoots with officers and directors. He asked if JWW had ever collaborated with PT on ABD management...answered "no"...asked MHR bankruptcy lawyer to leave the meeting telephonically if the meeting was turning into a deposition.

5. Goldstein suggested that the ABD Board owed a duty to the Paragon creditors too (guess who...MHR!).                REDACTED

6. JWW moved approval of 363 sale to PT as only viable option...pursuit of ABD litigation rights a deal breaker...left with forced liquidation...death spiral...and some uncertain prospect of successfully litigating the above issues.

7. Goldstein presents statement..."PT defrauded, misled and illegally manipulated ABD and dominated its operations..." HG stated that he could not make an informed decision and therefore resigned from Board.

ABD/P010322

A536

8. Paragon Special Comm (JWW) met and approved reducing ABD to one and quorum to one...ABD Board than re-met and voted for the various bankruptcy resolutions already proposed before HG speech



1

2            UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
3

4   IN RE:                        .    Chapter  11

5   A.B. Dick Company, Inc.,      .

6           Debtor(s).            .    Bankruptcy #04-12002 (JLP)
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
7

8                        Wilmington, DE
                        November 2, 2004
9                          2:00 p.m.

10                    TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE JOHN L. PETERSON
11              UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:

13  For the Debtor(s):          Frederick B. Rosner, Esq.
                                Jaspan Schlesinger Hoffman, LLP
14                              1201 North Orange Street-Ste. 1001
                                Wilmington, DE 19801
15
                                H. Jeffrey Schwartz, Esq.
16                              Benesch Friedlander Coplan
                                & Aronoff, LLP
17                              2300 BP Tower
                                200 Public Square
18                              Cleveland, OH 44114

19                              John F. Stock, Esq.
                                Benesch Friedlander Coplan
20                              & Aronoff, LLP
                                88 E. Broad St.-Ste. 900
21                              Columbus, OH 43215

22                              Mark A. Phillips, Esq.
                                Benesch Friedlander Coplan
23                              & Aronoff, LLP
                                2300 BP Tower
24                              200 Public Square
                                Cleveland, OH 44114
25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



2

```
 1   For The Official Committee:  James P. Ricciardi, Esq.
     of Unsecured Creditors       McGuire Woods, LLP
 2                                77 West Wacker Drive-Ste. 4100
                                  Chicago, IL 60601
 3
                                  James Joseph, Esq.
 4                                McGuire Woods, LLP
                                  Dominion Tower
 5                                625 Liberty Ave.-23rd Fl.
                                  Pittsburgh, PA 15222
 6
                                  Ronald W. Crouch, Esq.
 7                                McGuire Woods, LLP
                                  Dominion Tower
 8                                625 Liberty Ave.-23rd Fl.
                                  Pittsburgh, PA 15222
 9
                                  Jeffrey Schlerf, Esq.
10                                The Bayard Firm
                                  222 Delaware Ave.-Ste. 900
11                                Wilmington, DE 19801

12   For MHR Entities:            Megan N. Harper, Esq.
                                  Landis Rath & Cobb, LLP
13                                919 Market Street
                                  Wilmington, DE 19899
14
                                  David S. Rosner, Esq.
15                                Kasowitz Benson Torres
                                  & Friedman, LLP
16                                1633 Broadway
                                  New York, NY 10019
17
                                  Michael M. Fay, Esq.
18                                Kasowitz Benson Torres
                                  & Friedman, LLP
19                                1633 Broadway
                                  New York, NY 10019
20
     For Key Bank:                Margaret M. Manning, Esq.
21                                Buchanan Ingersoll, PC
                                  The Nemours Building
22                                1007 North Orange Street-Ste. 1110
                                  Wilmington, DE 19801
23

24

25
```

A539

3

|    |                    |                                                                                              |
|----|--------------------|----------------------------------------------------------------------------------------------|
| 1  |                    | Robert Folland, Esq.                                                                         |
|    |                    | Thompson Hine, LLP                                                                           |
| 2  |                    | 3900 Key Center                                                                             |
|    |                    | 127 Public Square                                                                           |
| 3  |                    | Cleveland, OH 44114                                                                          |
|    |                    |                                                                                              |
| 4  |                    | Alan R. Lepene, Esq.                                                                        |
|    |                    | Thompson Hine, LLP,                                                                          |
| 5  |                    | 3900 Key Center                                                                             |
|    |                    | 127 Public Square                                                                           |
| 6  |                    | Cleveland, OH 44114                                                                          |
| 7  | For Presstek, Inc.: | Stephen B. Selbst, Esq.                                                                     |
|    |                    | McDermott Will & Emery                                                                       |
| 8  |                    | 50 Rockefeller Plaza                                                                        |
|    |                    | New York, NY 10020                                                                          |
| 9  |                    |                                                                                              |
|    |                    | Gary O. Ravert, Esq.                                                                        |
| 10 |                    | McDermott Will & Emery                                                                       |
|    |                    | 50 Rockefeller Plaza                                                                        |
| 11 |                    | New York, NY 10020                                                                          |
| 12 |                    | Francis A. Monaco, Jr., Esq.                                                                |
|    |                    | Monzack & Monaco, PA                                                                         |
| 13 |                    | 400 Commerce Center                                                                         |
|    |                    | Twelfth & Orange Streets                                                                    |
| 14 |                    | Wilmington, DE 19899                                                                        |
| 15 | For Mitsubishi:    | Thomas G. Whalen, Jr., Esq.                                                                 |
|    |                    | Stevens & Lee, PC                                                                            |
| 16 |                    | 300 Delaware Ave.-Ste. 800                                                                   |
|    |                    | Wilmington, DE 19801                                                                        |
| 17 |                    |                                                                                              |
|    |                    | Robert Lapowsky, Esq.                                                                       |
| 18 |                    | Stevens & Lee, PC                                                                            |
|    |                    | 1818 Market Street-29th Fl.                                                                  |
| 19 |                    | Philadelphia, PA 19103                                                                      |
| 20 | For Data Card:     | Karen McKinley, Esq.                                                                        |
|    |                    | Richards Layton & Finger                                                                     |
| 21 |                    | One Rodney Square                                                                            |
|    |                    | Wilmington, DE 19899                                                                        |
| 22 |                    |                                                                                              |
|    | For Citicapital:   | John Weaver, Esq.                                                                           |
| 23 |                    | Farr Burke Gambacorta                                                                        |
|    |                    | & Wright, PC                                                                                 |
| 24 |                    | 211 Benigno Blvd.                                                                           |
|    |                    | Bellmawr, NJ 08099                                                                          |
| 25 |                    |                                                                                              |

A540

```
 1                                Sergio Scuteri, Esq.
                                  Farr Burke Gambacorta
 2                                & Wright, PC
                                  211 Benigno Blvd.
 3                                Bellmawr, NJ 08099

 4     For Brown Gibbons:         Jeffrey C. Wisler, Esq.
                                  Connolly Bove Lodge
 5                                & Hutz, LLP
                                  1007 N. Orange St.
 6                                Wilmington, DE 19899

 7     For Squire Sanders:        Philip Trainer, Jr., Esq.
                                  Ashby & Geddes
 8                                222 Delaware Ave.-17th Fl.
                                  Wilmington, DE 19899
 9
       For Comvest:              Victoria W. Counihan, Esq.
10                                Greenberg Traurig
                                  The Brandywine Bldg.
11                                1000 West Street-Ste. 1540
                                  Wilmington, DE 19801
12
                                  Allen G. Kadish, Esq.
13                                Greenberg Traurig
                                  Metlife Bldg.
14                                200 Park Ave.
                                  New York, NY 10166
15
       For N.E. S. Investment:    David Stratton, Esq.
16                                Pepper Hamilton, LLP
                                  Hercules Plaza
17                                1313 Market st.-Ste. 5100
                                  Wilmington, DE 19899
18
       For Individual 3rd Party:  Ray Lemisch, Esq.
19     Defendants                 Adelman Lavine Gold
                                  & Levin, PC
20                                1900 Two Penn Center
                                  Philadelphia, PA 19102
21
       For ESCO Graphics, Inc.:   Christopher D. Loizides, Esq.
22                                Loizides & Associates
                                  1225 King Street
23                                Wilmington, DE 19801

24

25
```

A541

5

| | | |
|---|---|---|
| 1 | For Acting U.S. Trustee: | David Klauder, Esq. |
| | (Roberta A. DeAngelis) | U.S. Trustee's Office |
| 2 | | 844 King Street-Ste. 2313 |
| | | Lock Box 35 |
| 3 | | Wilmington, DE 19801 |
| 4 | Audio Operator: | Brandon J. McCarthy |
| 5 | Transcribing Firm: | Writer's Cramp, Inc. |
| | | 6 Norton Rd. |
| 6 | | Monmouth Jct., NJ 08852 |
| | | 732-329-0191 |
| 7 | | |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A542

6

```
                              Index
                                                    Further
                   Direct Cross Redirect Recross Redirect
```

Witnesses For The
  Debtor:

  Mr. Gray
   (by Mr. Stock)          30                107
   (by Mr. D. Rosner)              54
   (by Mr. Crouch)                 97
   (by Mr. Selbst)                106

  Mr. Polleck
   (by Mr. Phillips)       110


EXHIBITS:                                    Marked   Received

  C-1      Waterfall analysis                 99

  MHR-A    Candlewood analysis                71
  MHR-B    Stock Purchase Agreement           87

  D-1      Paragon forecast, August 2004      33       35
  D-2      Paragon financial performance      38
  D-3      Bid Procedures Order               40
  D-4      D-I-P Order                        41
  D-5      Asset Purchase Agreement           44
  D-6      Letter of interest                 48
  D-7      Letter of interest                 50

A543

1  Debtors who need a D-I-P loan to continue to operate and
2  finance their bankruptcy, and the numbers show that.  We run
3  the risk of the Debtors being subjected to piecemeal
4  liquidation.  At that point you're working without a net.  This
5  $30 million claim against Presstek, there's no lawyer in this
6  room who's gonna stand up and sign a guarantee to Your Honor
7  that they can recover it and it's gonna be a $70 million
8  recovery, and if you lose the Debtors trying to chase that
9  claim you're working without a net, and that claim is a claim
10 that hasn't been quantified as to value, hasn't been quantified
11 as to the probability of recovery.  If you have an
12 administrative insolvency with the Estate with no money to
13 pursue the claim everybody loses.  So, we're not here, Your
14 Honor, to debate whether or not MHR's business judgment is
15 better than the Debtor's or Key Bank's or the Committee's.
16 That's not the test.  The test isn't do you have some different
17 business judgment or business judgment that you think is
18 better?  What we have is the judgment of management and its
19 professionals and of its Secured Lender, and of the Creditors
20 Committee that this is the best deal, and it's not just their
21 opinion.  It's the determination of the market.  That's where
22 we are, Your Honor.
23          THE COURT:  Call your first witness.
24          MR. STOCK:  Thank you.
25          MR. D. ROSNER:  Your Honor, are we gonna have an

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A544

Gray - Direct                              30

1   opportunity to make an opening --

2              THE COURT:  Why don't we do this.  Why don't we hear

3   the evidence then I'm going to give everybody a chance to speak

4   after I hear testimony so that I might have some questions

5   myself.

6              MR. D. ROSNER:  Okay, thank you, Your Honor.

7              THE COURT:  I'm not going to shut you off.

8              MR. STOCK:  Steven.

9                 STEVEN GRAY, Debtor's WITNESS, SWORN

10                       DIRECT EXAMINATION

11  BY MR. STOCK:

12  Q.  Mr. Gray, would you please identify yourself for the record

13  and give your business address?

14  A.  Steven S. Gray, 270 Congress Street, Boston, Massachusetts.

15  Q.  Mr. Gray, you are currently Chief Restructuring Officer for

16  the Debtors, correct?

17  A.  I am.

18  Q.  Okay.  And how long have you been operating in that

19  position?

20  A.  Since approximately July 27th, 2004.

21  Q.  Mr. Gray, would you describe for the Court your experience

22  in working with distressed companies.

23  A.  I have spent the last 30 years working exclusively with

24  distressed companies in and out of bankruptcies through various

25  crisis management restructuring roles.

A545

1  Q.   Okay.   Have you acted as a Chapter 11 Trustee?

2  A.   I have on numerous occasions.

3  Q.   Okay.   How about as a Chief Restructuring Officer?

4  A.   I have as well.

5  Q.   You have experience with 363 sales of assets in the

6  bankruptcy context?

7  A.   Yes.

8  Q.   And what --

9  A.   Numerous times.

10  Q.   What is that experience, generally?

11  A.   I have worked as a Trustee in selling assets in 363 sales,

12  as Chief Restructuring Officer, as Responsible Officer,

13  consultant to Debtors, Creditors, Secured parties, Buyers of

14  assets in 363 sales.   So just about all aspects.

15  Q.   Prior to becoming the Chief Restructuring Officer of

16  Presstek in this case had you had any prior relationship with

17  the Directors or Officer -- excuse me.   Prior to becoming Chief

18  Restructuring Officer with the Debtors in these cases, had you

19  had any prior relationship with the Directors or Officers of

20  the Debtors?

21  A.   No.

22  Q.   Thank you.   Would you describe for the Court your duties as

23  the Chief Restructuring Officer of the Debtors?

24  A.   I am responsible for the overall general management, the

25  day-to-day affairs of the Debtors, as well as the management of

A546

1    then.

2        (Recess)

3            THE COURT:  You may continue.

4            MR. D. ROSNER:  Thank you, Your Honor.

5    BY MR. D. ROSNER:

6    Q.  Mr. Gray, I believe you testified earlier, I don't want to

7    put words in your mouth, I believe you testified that all

8    material information was provided to potential bidders during

9    the bid solicitation process, is that correct?

10   A.  To the best of my knowledge.

11   Q.  What information was given to potential bidders about the

12   Debtor's claims against Presstek under the Stock Purchase

13   Agreement?

14   A.  I think you should ask Candlewood that question more

15   specifically, but the bidders had access to the Asset Purchase

16   Agreement, which is that my recollection was that there were

17   specific releases of those so-called Presstek claims in the

18   APA.

19   Q.  Right.  My question is, what information regarding the

20   claims against Presstek were provided to potential bidders?

21   A.  The potential claims?  I don't recall any of the people

22   that I talked to directly asking me what those claims were in

23   anything other than wanting to know why there were releases and

24   I would have responded that they were claims and had to do with

25   negotiations between the Debtor and Presstek prior to the Asset

1  Purchase Agreement.  But, very unspecific kinds of things.

2  That was my only first-hand knowledge.

3  Q.  And, who did you say that to?

4  A.  Oh, I don't know specifically, I mean, there were a number

5  of people who I talked to, a couple of dozen probably, and I

6  don't remember specifically who I might have said it to, maybe

7  more than one person.

8  Q.  Have you valued the Presstek claim -- I'm sorry, the claims

9  that the Debtors have against Presstek, under the SPA that are

10  to be released under the Asset Purchase Agreement?

11  A.  I have not.

12  Q.  Have you received the Stock Purchase Agreement?

13  A.  I have.  Oh, the Stock Purchase Agreement?

14  Q.  Yes.

15  A.  No.

16       MR. D. ROSNER:  Your Honor, may I approach the

17  witness with what I have marked as Exhibit-B?

18       THE COURT:  Yes.

19    (MHR's Exhibit-B previously marked for identification)

20  BY MR. D. ROSNER:

21  Q.  If you turn to the third date stamped page in you see the

22  top says, "Stock Purchase Agreement, Execution Copy."  Have you

23  ever seen this document before?

24  A.  I have not.

25  Q.  Do you know whether this document was in the data room?

Gray - Cross                                    88

1   A.  I do not know specifically.

2   Q.  Are you aware of any analysis that has been accomplished by

3   the Debtor, regarding the value of the Debtor's claims against

4   Presstek under the Stock Purchase Agreement?

5   A.  I have not been involved in any analysis of that, no.

6   Q.  Have you heard anybody at the Debtor's talk about what the

7   claim would be worth to the Estate if it were not being

8   released under the Asset Purchase Agreement?

9   A.  There was discussion with counsel but, I think that would

10  be --

11          MR. STOCK:  Objection, Your Honor.

12          THE COURT:  He said that he didn't.  He never valued

13  it.

14          MR. STOCK:  And I don't want opinions of counsel

15  being (inaudible).

16          THE COURT:  Go ahead.

17          MR. D. ROSNER:  Okay.

18  BY MR. D. ROSNER:

19  Q.  Once you learned that MHR had raised the issue of the value

20  of this claim being released, did you feel it incumbent as

21  Chief Restructuring Officer to do anything in order to evaluate

22  the claim?

23  A.  I did not.

24  Q.  You're aware that the Debtor was party to a Joint

25  Development Agreement with Presstek?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-329-0191*

A549

1    A.   I am.

2    Q.   What was that Joint Development Agreement about?

3    A.   I haven't read the agreement but I understand in a general

4    sense what it was.  It provided for the development of a

5    certain scale of digital pipe maker utilizing some of the

6    Debtor's technology and some of Presstek's technology, as well

7    as Presstek's plates, to create a product known as the Vector

8    TX product, that is in beta testing as of today.

9    Q.   What's your understanding about the Vector project?  Would

10   that be a good project for A.B. Dick to be involved with?

11   A.   Yes.

12   Q.   And why is that?

13   A.   Because it is a new product development that the Debtor

14   believes has some significant opportunity in the marketplace.

15   Q.   And, what happened with the Joint Development Agreement

16   that A.B. Dick had with Presstek?

17   A.   It was terminated, pre-petition is my understanding.

18   Q.   Did A.B. Dick terminate it?

19   A.   It did not.

20   Q.   So, Presstek terminated the Joint Development Agreement

21   with A.B. Dick?

22   A.   That's my understanding, yes.

23   Q.   Okay.  Do you know when Presstek terminated it?

24   A.   Not specifically.  It was prior to my involvement with this

25   matter.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A550



FILED
2004 DEC 13 AM 11 13
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              :        Chapter  11

A.B. Dick Company, Inc.,            :

          Debtor(s).                :        Bankruptcy #04-12002 (JLP)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
November 3, 2004
9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor(s):            Frederick B. Rosner, Esq.
                              Jaspan Schlesinger Hoffman, LLP
                              1201 North Orange Street-Ste. 1001
                              Wilmington, DE 19801

                              H. Jeffrey Schwartz, Esq.
                              Benesch Friedlander Coplan
                              & Aronoff, LLP
                              2300 BP Tower
                              200 Public Square
                              Cleveland, OH 44114

                              John F. Stock, Esq.
                              Benesch Friedlander Coplan
                              & Aronoff, LLP
                              88 E. Broad St.-Ste. 900
                              Columbus, OH 43215

                              John Gleason, Esq.
                              Benesch Friedlander Coplan
                              & Aronoff, LLP
                              88 E. Broad St.-Ste. 900
                              Columbus, OH 43215

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A551

2

```
 1                              Mark A. Phillips, Esq.
                                Benesch Friedlander Coplan
 2                              & Aronoff, LLP
                                2300 BP Tower
 3                              200 Public Square
                                Cleveland, OH 44114
 4
     For The Official Committee: James P. Ricciardi, Esq.
 5   of Unsecured Creditors      McGuire Woods, LLP
                                77 West Wacker Drive-Ste. 4100
 6                              Chicago, IL 60601

 7                              James Joseph, Esq.
                                McGuire Woods, LLP
 8                              Dominion Tower
                                625 Liberty Ave.-23rd Fl.
 9                              Pittsburgh, PA 15222

10                              Ronald W. Crouch, Esq.
                                McGuire Woods, LLP
11                              Dominion Tower
                                625 Liberty Ave.-23rd Fl.
12                              Pittsburgh, PA 15222

13                              Jeffrey Schlerf, Esq.
                                The Bayard Firm
14                              222 Delaware Ave.-Ste. 900
                                Wilmington, DE 19801
15
     For MHR Entities:          Megan N. Harper, Esq.
16                              Landis Rath & Cobb, LLP
                                919 Market Street
.17                             Wilmington, DE 19899

18                              David S. Rosner, Esq.
                                Kasowitz Benson Torres
19                              & Friedman, LLP
                                1633 Broadway
20                              New York, NY 10019

21                              Michael M. Fay, Esq.
                                Kasowitz Benson Torres
22                              & Friedman, LLP
                                1633 Broadway
23                              New York, NY 10019

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A552

3

| | | |
|---|---|---|
| 1 | For Key Bank: | Margaret M. Manning, Esq. |
| 2 | | Buchanan Ingersoll, PC<br>The Nemours Building<br>1007 North Orange Street-Ste. 1110 |
| 3 | | Wilmington, DE 19801 |
| 4 | | Robert Folland, Esq. |
| 5 | | Thompson Hine, LLP<br>3900 Key Center |
| 6 | | 127 Public Square<br>Cleveland, OH 44114 |
| 7 | For Presstek, Inc.: | Stephen B. Selbst, Esq. |
| 8 | | McDermott Will & Emery<br>50 Rockefeller Plaza |
| 9 | | New York, NY 10020 |
| 10 | | Gary O. Ravert, Esq.<br>McDermott Will & Emery |
| 11 | | 50 Rockefeller Plaza<br>New York, NY 10020 |
| 12 | | Lawrence J. Slattery, Esq. |
| 13 | | McDermott Will & Emery<br>50 Rockefeller Plaza<br>New York, NY 10020 |
| 14 | | Francis A. Monaco, Jr., Esq. |
| 15 | | Monzack & Monaco, PA<br>400 Commerce Center |
| 16 | | Twelfth & Orange Streets<br>Wilmington, DE 19899 |
| 17 | For Mitsubishi: | Thomas G. Whalen, Jr., Esq. |
| 18 | | Stevens & Lee, PC<br>300 Delaware Ave.-Ste. 800 |
| 19 | | Wilmington, DE 19801 |
| 20 | | Robert Lapowsky, Esq.<br>Stevens & Lee, PC |
| 21 | | 1818 Market Street-29th Fl.<br>Philadelphia, PA 19103 |
| 22 | For Data Card: | Karen McKinley, Esq. |
| 23 | | Richards Layton & Finger<br>One Rodney Square |
| 24 | | Wilmington, DE 19899 |
| 25 | | |

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A553

4



| | | |
|---|---|---|
| 1 | For Esko Graphics, Inc.: | Christopher D. Loizides, Esq. |
| 2 | | Loizides & Associates<br>1225 King Street<br>Wilmington, DE 19801 |
| 3 | | |
| | Audio Operator: | Brandon J. McCarthy |
| 4 | | |
| | Transcribing Firm: | Writer's Cramp, Inc. |
| 5 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| 6 | | 732-329-0191 |
| 7 | Proceedings recorded by electronic sound recording, transcript |
| | produced by transcription service. |

```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A554

5

```
 1                              Index
                                                      Further
 2                    Direct Cross Redirect Recross Redirect

 3    Witnesses For The
       Debtor:

 4
        Mr. Polleck
 5       (by Mr. Fay)                6
         (by Mr. Selbst)             34

 6

 7    EXHIBITS:                              Marked   Received

 8      MHR-C    Term Sheet                    17
        MHR-B    Purchase Agreement cost document  19
 9

10    Closing Statements:

11      Mr. Ricciardi                          37
        Mr. Selbst                             39
12      Mr. Joseph                             41
        Mr. Gleason                            45
13      Mr. D. Rosner                          48
        Mr. Firestone                          66
14      Mr. Polland                            67
        Mr. Loizides                           69
15      Mr. Stock                              75

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A555

1  THE CLERK:  All rise.  The United States Bankruptcy

2  Court for the District of Delaware is now in session.

3  THE COURT:  Please be seated.  Is the witness here?

4  You can take the stand please.  Now you may cross examine.

5  MR. FAY:  Thank you, Your Honor.

6  GLEN POLLECK, DEBTOR'S WITNESS, PREVIOUSLY SWORN

7  CROSS EXAMNATION

8  BY MR. FAY:

9  Q.  Good morning, Mr. Polleck.  My name is Michael Fay, I'm an

10  attorney for the MHR Entities.  I have a few questions for you.

11  Yesterday during your testimony you stated that you were

12  retained by the Debtors on June 30th, 2004, is that correct?

13  A.  I believe I said June 29th or June 30th.

14  Q.  Okay.  All right.  Had you been in the employ under any

15  retention with the Debtors prior to that date?

16  A.  My firm had.

17  Q.  Okay.  Had you been involved, though?

18  A.  Yes.

19  Q.  Okay.  And what had you done prior to that date?

20  A.  In, I believe, 2000, my former firm was retained to provide

21  financial advice with respect to the Debtors' proposed

22  restructuring plan.

23  Q.  Okay.  And what was that former firm?

24  A.  (Indiscern.).

25  Q.  Right.  And that retention was in or about September of

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Polleck - Cross                                    7

1  2003, correct?

2  A.  No.

3  Q.  All right.  When was it?

4  A.  I believe it was 2000, and my involvement terminated in

5  July of (indiscern.).  Candlewood was subsequently engaged.

6  Q.  Okay.  But you were not at Candlewood when it was

7  subsequently engaged, is that correct?

8  A.  No, I was.

9  Q.  You were, okay.  When was that engagement?

10  A.  That was, I believe, in September (indiscern.).

11  Q.  Okay.  And what was the purpose of that engagement?

12  A.  Presstek had made -- had provided an expression of interest

13  to (indiscern.) and the directors and officers of Paragon had

14  decided that they would like assistance in evaluating their

15  (indiscern.) at that time.

16  Q.  Okay.  And for how long did that retention last?

17  A.  My recollection is that our engagement was modified

18  sometime in November or December of 2003.  The modification

19  resulted in our agreeing to a reduced fee (indiscern.) Presstek

20  (indiscern.) released from an obligation (indiscern.).

21  Q.  Okay.  So from November of 2003 to June 29th or 30th of

22  2004 what, if anything, did you do for the Debtors?

23  A.  I received a call in May of 2000 where the Debtors asked if

24  we would agree to accept our fee in stocks, instead of cash

25  (indiscern.) I received a call in June, I believe, where the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A557

Polleck - Cross                                    8

1   Debtors asked if we would waive our fee (indiscern.).

2   Q.   Okay.   Other than those two calls, any other involvement

3   with the Debtors during that time frame, from November 2003, to

4   June 29th or 30th, 2004?

5   A.   Not that I recall.

6   Q.   Is it your understanding that prior to the negotiation and

7   execution of the Asset Purchase Agreement that's at issue in

8   this bankruptcy there was a Stock Purchase Agreement among the

9   parties?

10  A.   You're asking if I --

11  Q.   Do you understand that that's a fact?

12  A.   I understand that there was (indiscern.).

13  Q.   Okay.   Has anyone told you that that Stock Purchase

14  Agreement was escrowed on or about June 16th, 2004?

15  A.   I've heard that there was an escrow.

16  Q.   Okay.   Have you ever read the escrow?

17  A.   I have not.

18  Q.   Have you ever read the Stock Purchase Agreement?

19  A.   Only a small section.

20  Q.   What small section did you read?

21  A.   Relating to the adjustment (indiscern.).

22  Q.   The Stock Purchase Agreement had a provision that allowed

23  for adjustment in the purchase price if financial statements

24  were provided five days, I believe it was, before closing that

25  showed financial deterioration in the Debtors, correct?

A558

Polleck - Cross                                    9

1   A.  I'm not certain.  I didn't read the entire statement.  I

2   have no basis -- no one has ever showed me the entire agreement

3   (indiscern.) No one has ever showed me an escrow -- executed

4   Escrow Agreement.

5   Q.  Okay.  Why did you read that small section of the Stock

6   Purchase Agreement?

7   A.  Counsel asked me to.

8   Q.  What counsel?

9   A.  Debtors' counsel.

10  Q.  Okay.  Did you then provide any analysis of that small

11  section that you read?

12  A.  I did not.

13  Q.  Did you use that in any way to value any claims the Debtors

14  might have against Presstek under the Stock Purchase Agreement?

15  A.  I did not.

16  Q.  Have you done any valuation of the claims that the Debtors

17  might have under the Stock Purchase Agreement against Presstek?

18  A.  I have not.

19  Q.  I believe you testified yesterday that in your past you've

20  served as a bankruptcy Trustee, is that correct?

21  A.  I have.

22  Q.  Based on that experience, is it your opinion that some

23  valuation of the Debtors' claims under the Stock Purchase

24  Agreement should be done before those claims are released?

25  A.  It is.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A559

Polleck - Cross                                    10

1   Q.  And yet you haven't done that, correct?

2   A.  I relied on counsel.

3   Q.  But my question is, you have not done that valuation,

4   right?

5   A.  I'm not a lawyer.

6   Q.  Have you done a valuation of the claims that the Debtors

7   might have against Presstek under the Stock Purchase Agreement?

8   A.  Can you define valuation?  Do you mean the likelihood of

9   legal success?

10  Q.  The value of the claim.  Have you put a value on that

11  claim?

12  A.  No.

13  Q.  Do you know anyone that has?

14  A.  Yes.

15  Q.  Who?

16  A.  Counsel.

17  Q.  Has counsel provided you with that valuation?

18  A.  Provided advice to the Board.

19  Q.  What did counsel tell the Board?

20          MR. PHILLIPS:  Objection.  That is privileged

21  information, I believe.

22          THE COURT:  Well, what counsel?

23  A.  Debtors' counsel.

24          THE COURT:  Were you there?

25  A.  I was.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A560

Polleck - Cross                          11

1    MR. FAY:  Your Honor, I think if the Board relied on

2  this --

3    THE COURT:  Overruled.  You may answer.

4  A.  Counsel advised that the likelihood that the value claim

5  exceeding a million dollars was, I don't remember the exact

6  words, fairly (indiscern.).

7  BY MR. FAY:

8  Q.  Have you done any valuation -- other than counsel, did

9  anyone else provide an opinion about the value of the claim to

10  the Board?

11  A.  No.

12  Q.  Have you done an evaluation of the difference in the value

13  of a Stock Purchase Agreement versus the Asset Purchase

14  Agreement to the Estate?

15  A.  Could you repeat the question?

16  Q.  Have you done an evaluation of the difference in the value

17  that the Estates would have received, or the Debtors would have

18  received, from the Stock Purchase Agreement versus the value

19  that they're now receiving under the Asset Purchase Agreement?

20  A.  I have not done an evaluation.

21  Q.  Do you know who Hal Goldstein is?

22  A.  I do.

23  Q.  And you've had discussions with Hal Goldstein, correct?

24  A.  Yes.

25  Q.  Telephone discussions recently, correct?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A561

1    A.  Yes.

2    Q.  Hal Goldstein is a representative of the MHR Entities,

3    right?

4    A.  Yes.

5    Q.  And you told Hal Goldstein that you thought the claim under

6    the SPA could be worth as much as $30 million, correct?

7    A.  Hal told me that.

8    Q.  And what did you say in response?

9    A.  I said that the difference in the values may have well be

10   that.

11   Q.  Okay.  So you agreed --

12   A.  No.  I said the difference in the values of what one might

13   consider the value of the SPA, given what others have told me,

14   and what I believe the value of this (indiscern.).

15   Q.  May be $30 million, correct?

16   A.  Maybe.

17   Q.  Okay.  Did you tell counsel that the difference in the

18   value under the Stock Purchase Agreement versus the value under

19   the Asset Purchase Agreement may be $30 million?  Did you tell

20   counsel that?

21   A.  I think we had discussions regarding what the differences

22   of the values given certain assumptions.

23   Q.  Okay.  And did the number 30 million come up?

24   A.  Probably.

25   Q.  Okay.  In making its presentation, or their presentation to

A562

Polleck - Cross                                    13

1   the Board, did counsel mention that the difference in the value

2   between the Stock Purchase Agreement and the Asset Purchase

3   Agreement may be $30 million?

4   A.  I believe they did.

5   Q.  Did they then tell the Board how you go from $30 million to

6   $1 million?

7   A.  They provided a legal -- not a written opinion but a legal

8   consultation, however you describe it.

9   Q.  Okay.  What did they say?  How do we go from a claim that

10  may be worth $30 million to one where real time as counsel it's

11  unlikely to even be worth a million?

12  A.  My recollection is there was a discussion of the claims in

13  relation to whether or not there were obligations (indiscern.)

14  closing.

15  Q.  Okay.  Did counsel provide the Board with any legal

16  memoranda?

17  A.  Not to my recollection.

18  Q.  Did they cite any cases?

19  A.  I don't recall.

20  Q.  You don't recall if they did.  Did they make reference to

21  the fact that any claims under the escrow or the Stock Purchase

22  Agreement would be governed by New York law?

23  A.  I don't recall.

24  Q.  Did they hand out copies of any New York cases?

25  A.  I don't believe so.

A563

1  Q.   Okay.   Did they cite any legal principles or anything that

2  you recognize as a legal principle?

3  A.   I believe they did.

4  Q.   What did they say?

5  A.   I don't have a verbatim recollection of what they said.

6  Q.   Okay.  If you can remember.  Can you remember?

7  A.   Yes.  I believe they discussed the nature of the contract,

8  contract obligations, and whether or not -- and this is just my

9  recollection --

10  Q.   Sure.

11  A.   -- whether or not the execution of an Escrow Agreement

12  constituted an obligation to close (indiscern.).

13  Q.   Did they discussion the concept of a condition precedent?

14  A.   With respect to (indiscern.)?

15  Q.   Right.  To -- with respect to the escrow, did --

16  A.   There was a discussion of the -- of Key Bank (indiscern.).

17  Q.   Okay.  Did they discuss the concept of materiality?

18  A.   I believe there was some discussion about that.

19  Q.   Did they cite any case law or hand out any memoranda on

20  materiality, to your knowledge?

21  A.   I testified a moment ago, no.

22  Q.   Okay.  And did they discuss the concept of condition

23  precedent in the waiver of condition precedents?

24  A.   I don't recall the exact discussion (indiscern.).

25  Q.   Okay.  But $30 million did come up, correct?

1  A. I believe so.

2  Q. Okay.

3  A. That the claim was significantly larger (indiscern.).

4  Q. Okay. And what was -- do you remember the law firm, what

5  lawyers made this presentation?

6  A. Mr. Phillips.

7  Q. Mr. Phillips did. Did Mr. Phillips provide the Board with

8  any of the deposition transcripts of the depositions that he

9  took prior to this board meeting in this matter?

10  A. I don't know.

11  Q. Well, I'm just asking you. Did he do it at this meeting?

12  A. No.

13  Q. Okay. Did he cite any of the testimony that was obtained

14  through those depositions to the Board?

15  A. I believe he did.

16  Q. Do you remember who he cited?

17  A. I don't.

18  Q. Did he cite any of the testimony from Mr. Lugly of Key

19  Bank?

20  A. I don't recall (indiscern.).

21  Q. Did he tell the Board that on June 22nd, 2004, Key Bank had

22  sent a letter to Presstek consenting to further funding for the

23  Debtors?

24  A. There were a lot of conversations, and I'm trying to

25  remember (indiscern.). I clearly did hear it, but I can't

Polleck - Cross                                    16

1   recall if it was at the board meeting, but I did (indiscern.).

2   Q.  Okay.  Was a copy of that letter handed out to the Board

3   members?

4   A.  I don't believe so.

5   Q.  Based on your testimony, Mr. Polleck, it would be fair to

6   say that you were not involved in the negotiations of the Stock

7   Purchase Agreement, correct?

8   A.  Correct.

9   Q.  And any negotiations of the Asset Purchase Agreement that

10  occurred before June 29th or June 30th of 2004, you weren't

11  involved in those negotiations either, correct?

12  A.  Correct.

13  Q.  After June 29th or 30th of 2004, were there ever

14  negotiations about the purchase price under the Asset Purchase

15  Agreement?

16  A.  There were negotiations over the conditions (indiscern.)

17  impact on the purchase price.  There were not negotiations

18  (indiscern.).

19  Q.  Okay.  So at least during your involvement the Debtors

20  never went to Presstek and said, "40 million is not enough, we

21  want 41, or 42, or 43," correct?

22  A.  We would continually say we want 40.

23  Q.  And Presstek never backed down, right?

24  A.  Presstek did not back down.

25  Q.  Okay.  Do you know when --

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1  A.  No.  On some of the conditions we would have impacted the

2  price they did back down.

3  Q.  But they never backed down on the purchase price of 40

4  million, right?

5  A.  No.

6  Q.  Okay.  Do you know when Presstek first communicated that

7  price of 40 million to the Debtors?

8  A.  I've seen correspondence that indicates it was maybe a week

9  before I became involved.

10  Q.  Right.  On the 23rd of June, 2004, Presstek had drafted a

11  term sheet that showed the $40 million purchase price, correct?

12  A.  Do you have it?

13  Q.  Yes, I do.  Let's look at it.

14  A.  I don't.

15          MR. PHILLIPS:  Your Honor, may I approach the

16  witness?

17          THE COURT:  Yes.

18          MR. FAY:  Mark this as Exhibit-C, MHR Exhibit-C.

19          (MHR's Exhibit-C marked for identification)

20  BY MR. FAY:

21  Q.  And Mr. Polleck, I would refer you to the second page of

22  this exhibit, which reads, "June 23rd, 2004, Term Sheet,"

23  right?

24  A.  Yes.

25  Q.  And in this term sheet in paragraph 2, acquisition, there's

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A567

Polleck - Cross                                    18

1  a purchase price of $40 million cash, correct?

2  A.  Yes.

3  Q.  And the final APA, which was executed on or about July 13,

4  2004, had a final purchase price of $40 million cash, correct?

5  A.  Yes.

6  Q.  Okay.  Have you ever seen this term sheet before?

7  A.  Yes, although when I became involved there was already a

8  draft of the APA that we worked off of.

9  Q.  Okay.  Has anyone informed you upon what date Presstek

10  terminated the Escrow Agreement that you had heard about?

11  A.  I have an understanding that it was in the middle of June,

12  but I don't (indiscern.).

13  Q.  Has anyone ever told you that it was on June 22nd, 2004,

14  the day before that term sheet?

15  A.  I believe I heard that in a deposition.

16  Q.  Okay.  Do you have any reason to disagree with that fact?

17  A.  I have no reason to agree or disagree.

18  Q.  Okay.  During the course of your retention by the Debtors,

19  have you ever participated in a discussion where

20  representatives of the Debtor have referred to the fact that

21  one day after Presstek terminated the escrow or the Stock

22  Purchase Agreement, Presstek had drafted a term sheet for a $40

23  million Asset Purchase Agreement?

24  A.  I heard that in a deposition.

25  Q.  Other than the deposition, any other discussions?

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
----------------------------------------------x
In re                          :    Chapter 11
                               :
A.B. DICK COMPANY, et al.      :    Case No. 04–12002 (JLP)
                               :
              Debtors.         :    Jointly Administered
----------------------------------------------x
```

**ORDER, PURSUANT TO SECTIONS 105(a), 363(b) AND (f) AND 365(f)
OF THE BANKRUPTCY CODE AND RULES 2002(a)(2), (c)(1), (k) AND (m),
6004 AND 6006 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, APPROVING (1) THE SALE, PURSUANT TO THE ASSET PURCHASE
AGREEMENT DATED JULY 13, 2004, OF (a) SUBSTANTIALLY ALL OF THE
ASSETS OF THE A.B. DICK COMPANY AND THE A.B. DICK COMPANY OF
CANADA, LTD., AND (b) THE CAPITAL STOCK OF THE A.B. DICK U.K. LIMITED
TO SILVER ACQUISITIONS CORP., FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; AND (2) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO SILVER ACQUISITIONS CORP.**

Came on for hearing (the "Hearing") on the 2nd and 3rd days of November, 2004,

the *Motion for Order (A) Authorizing Sale of Substantially All of the Assets of A.B.Dick Company*

*and its Wholly Owned Subsidiaries Free and Clear of Liens, Claims and Encumbrances; (B)*

*Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contracts;*

*and (C) Granting Related Relief* (the "Motion")[1] filed on July 22, 2004 by A.B. Dick Company

("A.B.Dick"), Paragon Corporate Holdings, Inc., Multigraphics LLC, and Interactive Media

Group, Inc. (collectively, the "Debtors"), the debtors and debtors in possession in the above-

captioned jointly administered chapter 11 cases; the Court having reviewed the Motion and all

objections thereto and having heard the statements in support of the objections and in support of

the relief requested in the Motion at the Hearing; and upon the Motion and the record of the

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to
them in the Motion.

#10342.3

A569

Hearing and all other proceedings had before the Court; after due deliberation and good cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Proper, timely, adequate, and sufficient notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities in accordance with sections 102, 105(a), 363, and 365 of Title 11 (the "Bankruptcy Code") of the United States Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in compliance with the Bidding Procedures Order, including, but not limited to the following parties in interest: (i) the United States Trustee for the District of Delaware, (ii) the attorneys for KeyBank National Association as administrative agent under the DIP Credit Agreement, (iii) the attorneys for the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) the attorneys for the MHR Entities, (v) the attorneys for Presstek, Inc. ("Presstek") and Silver Acquisitions Corp. ("Silver"), (vi) all parties that have submitted written requests to the Debtors to purchase the Assets within two months prior to the date hereof, (vii) all parties that are known to assert a security interest, lien, or claim in the Assets, (viii) the Internal Revenue Service, (ix) parties to the Assumed Seller Contracts, (x) all applicable state and local taxing authorities and (xi) all creditors listed in the schedules filed by A.B.Dick. In addition, in compliance with the terms of the Bidding Procedures Order, notice of

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

A570

the Motion, the Bidding Procedures, and Sale was published in a printing industry trade journal and also published in the national edition of the WALL STREET JOURNAL on September 20, 2004.

C.    All objections to the relief requested in the Motion were either resolved prior to or at the Hearing or should be overruled.

D.    A prompt closing of the transactions contemplated by the Asset Purchase Agreement, dated July 13, 2004, among Paragon Corporate Holdings, Inc. ("Paragon" or "Parent"), A.B.Dick, A.B.Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of A.B.Dick ("Canada Sub"), and Interactive Media Group, Inc., a wholly owned subsidiary of Parent ("IMG" and together with A.B.Dick, the "Sale Debtors"), and Presstek and Silver, as guarantor and purchaser respectively as amended by the First and Second Amendments to such Asset Purchase Agreement and as further amended at the Auction and at the Hearing (as amended, the "Asset Purchase Agreement") is essential and is in the best interests of Sale Debtors and their estates. The terms of the Asset Purchase Agreement are the best terms that have been offered for sale of the Assets (as such term is defined in the Asset Purchase Agreement).

E.    Upon the execution, delivery, and closing of the Asset Purchase Agreement, the Assets to be sold and the interests to be assigned will have been acquired by Silver in good faith and as the result of arm's length negotiations.

F.    No consents or approvals are required for the Sale Debtors to consummate the sale of the Assets other than the consent and approval of this Court and those set forth in the Asset Purchase Agreement. Neither the execution of the Asset Purchase Agreement nor the consummation of the sale of the Assets in accordance with its terms will constitute a violation of

3

A571

any provision of any of Sale Debtors' organizational documents or any other instrument, law, regulation or ordinance by which the Sale Debtors are bound.

G.    The Sale Debtors are the legal and equitable owner of the Assets (other than the Assets owned by Canada Sub) and, upon entry of this Sale Order, the Sale Debtors will have full corporate power and authority to consummate the sale contemplated by the Asset Purchase Agreement. The Asset Purchase Agreement and the sale have been duly and validly authorized by all necessary corporate action required of each of the Parent and the Sale Debtors.

H.    This Order and the consummation of the transactions contemplated by the Asset Purchase Agreement are supported by good business reasons, and will serve the best interests of the Sale Debtors, their estates and their creditors by maximizing the values to be obtained from the Assets.

I.    The Asset Purchase Agreement was negotiated, proposed, and entered into by the Parent and the Sale Debtors, on one hand, and Presstek and Silver, on the other hand, without collusion, in good faith, and from arm's-length bargaining positions. Neither Presstek nor Silver is an "insider" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code. None of the Debtors, Presstek, or Silver have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

J.    Silver is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

K.    The consideration to be provided by Silver pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy

4

A572