# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| A.B.DICK CO., *et al.,* | : | Case No. 04-CV-1498 |
| | : | |
| Debtors. | : | |
| | : | |
| MHR CAPITAL PARTNERS LP, *et al.,* | : | |
| | : | On Appeal from the United States |
| Appellants, | : | Bankruptcy Court for the District of |
| | : | Delaware |
| v. | : | |
| | : | Bankr. Case No. 04-12002 (JLP) |
| A.B.DICK CO., *et al.,* | : | Chapter 11, Jointly Administered |
| | : | |
| Appellees. | : | |
| | *** | |

## <u>DEBTORS-APPELLEES' BRIEF</u>

Dated: Cleveland, Ohio
     April 8, 2005

H. Jeffrey Schwartz   (OBR #0014307)
Mark A. Phillips      (OBR #0047347)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
2300 BP Tower, 200 Public Square
Cleveland, Ohio 44114-2738
Telephone:  (216) 363-4500
Facsimile:   (216) 363-4588
jschwartz@bfca.com
mphillips@bfca.com

Frederick B. Rosner (No. 3995)
JASPAN SCHLESINGER HOFFMAN
913 Market Street, 12th Floor
Wilmington, Delaware  19801
Telephone:  (302) 351-8000
Facsimile:  (302) 351-8010
frosner@jshllp-de.com

Counsel for Debtors-Appellees A.B.Dick Company, *et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

I.    STATEMENT OF THE NATURE AND STAGE OF THE
      PROCEEDINGS ...........................................................................1

II.   SUMMARY OF ARGUMENT ..........................................................3

III.  STATEMENT OF FACTS ................................................................3

IV.   ARGUMENT ....................................................................................9

      A.    STANDARD OF REVIEW ....................................................9

      B.    THE ISSUES RAISED IN THIS APPEAL ARE MOOT ....................................10

      C.    THE BANKRUPTCY COURT'S FINDING THAT PRESSTEK
            (SILVER) WAS A GOOD FAITH PURCHASER IS NOT
            CLEARLY ERRONEOUS ...........................................................15

      D.    THE BANKRUPTCY COURT COMPLIED WITH THE
            REQUIREMENT THAT IT MAKE A FINDING THAT
            PRESSTEK (SILVER) WAS A GOOD FAITH PURCHASER ..........................19

V.    CONCLUSION ................................................................................22

CERTIFICATE OF SERVICE ................................................................23

UNREPORTED CASE:    *Operating Tel. Co. Subsidiaries of Verizon
      Communications, Inc. v. Net2000 Communications, Inc.* (*In re Net2000
      Communications, Inc.*), 43 Bankr.Ct.Dec. 217, 2004 WL 2346148 (D.Del.
      Oct. 5, 2004) ...............................................................................24

APPENDIX TABLE OF CONTENTS .......................................................27

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                   <u>Page</u>

*Anheuser-Busch, Inc. v. Miller* (*In re Stadium Managment Corp.*), 895 F.2d 845
(1st Cir. 1990) .................................................................................................12

*Cinicola v. Scharffenberger,* 248 F.3d 110 (3d Cir. 2001) ..............................................3, 9, 10, 11

*Crowder v. Given* (*In re Crowder*), 314 B.R. 445 (B.A.P. 10th Cir. 2004) .................................21

*Ewell v. Diebert,* 137 B.R. 963 (E.D.Cal. 1990), *aff'd,* 958 F.2d 276 (9th Cir.
1992) ............................................................................................................13

*In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986) .............................3, 16, 18, 19, 20

*In re Integrated Resources Inc.,* 135 B.R. 746 (Bankr. S.D.N.Y.), *aff'd,* 147 B.R.
650 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2nd Cir. 1993).................................17

*In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983) ........................................................17

*In re Lloyd,* 37 F.3d 271 (7th Cir. 1994)...................................................................13

*In re Perona Bros., Inc.* 186 B.R. 833 (D.N.J. 1995) ....................................................16

*In re Rock Indus. Mach. Corp.,* 572 F.2d 1195 (7th Cir. 1978)........................................16

*In re Tempo Technology Corp.,*  202 B.R. 363 (D.Del. 1996) ...................................10, 16, 19, 20

*In re Vlasek,* 325 F.3d 955 (7th Cir. 2003) ...............................................................12

*In re W.A. Mallory Co.,* 214 B.R. 834 (Bankr. E.D.Va. 1997)........................................16

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,*   141 F.3d 490 (3d Cir.
1998) .......................................................................................................3, 11, 12, 14

*L.R.S.C. Co. v. Rickel Home Centers, Inc.* (*In re Rickel Home Centers, Inc.*), 209
F.3d 291 (3d Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d
120 (2000)...............................................................................................11, 12

*Manges v. Seattle-First Nat'l Bank* (*In re Manges),* 29 F.3d 1034 (5th Cir. 1994),
*cert. denied,* 513 U.S. 1152, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995).........................11

*Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs.* (*In re Mark Bell
Furniture Warehouse, Inc.*), 992 F.2d 7 (1st Cir. 1993)...........................................13, 16

*Official Comm. of Senior Unsecured Creditors v. First RepublicBank Corp.,* 106 B.R. 938 (N.D.Tex. 1989) .................................................................14

*Official Comm. of Unsecured Creditors v. Trism, Inc.* (*In re Trism, Inc.*), 328 F.3d 1003 (8th Cir. 2003) .................................................................10, 11, 14

*Operating Tel. Co. Subsidiaries of Verizon Communications, Inc. v. Net2000 Communications, Inc.* (*In re Net2000 Communications, Inc.*), 43 Bankr.Ct.Dec. 217, 2004 WL 2346148 (D.Del. Oct. 5, 2004) .........................................20

*Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645 (3d Cir. 1997) .........................10, 14

*Sulmeyer v. Karbach Enters.* (*In re Exennium, Inc.*), 715 F.2d 1401 (9th Cir. 1983) .................................................................12

*255 Park Plaza Assocs. L.P. v. Connecticut Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. L.P.),* 100 F.3d 1214 (6th Cir. 1996) .........................11

*Weingarten Nostat, Inc. v. Service Merchandise Co.,* 396 F.3d 737 (6th Cir. 2005) .............10, 11

<u>Statutes</u>                                                                                          <u>Page</u>

11 U.S.C. § 363 .................................................................5

11 U.S.C. § 363(b)(1) .................................................................20

11 U.S.C. § 363(m) .................................................................*passim*

11 U.S.C. § 1129 .................................................................20

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Debtors-Appellees A.B. Dick Company ("A.B. Dick"), Paragon Corporate Holdings, Inc., Multigraphics LLC, and Interactive Media Group, Inc. ("IMG"), the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), commenced these chapter 11 cases by filing voluntary petitions for relief on July 13, 2004 ("the Petition Date"). D. 1.[1] On the Petition Date, Debtors also filed their *Motion for Entry of Order: (A) Approving Bidding Procedures for the Sale of Substantially All of the Assets of A.B. Dick Company and its Wholly Owned Subsidiaries; (B) Authorizing Payment of an Expense Reimbursement and Termination Fee; (C) Setting Sale Hearing Date; and (D) Approving Form of Notice* ("Sale Procedures Motion"). D. 22. On July 22, 2004, Debtors filed their *Motion for Entry of an Order: (A) Authorizing the Sale of Substantially All of the Assets of A.B.Dick Company and its Wholly Owned Subsidiaries, Free and Clear of all Liens, Claims and Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (C) Granting Related Relief* ("the Sale Motion"). D. 70; AA at 1.

The parties conducted extensive negotiations concerning the Sale Procedures Motion, and agreed to several significant modifications of Debtor's proposed order setting forth the sales procedure. These modifications included, *inter alia,* extending the marketing process and due dates for bids. D. 307 at 9-17; AA at 33-41. The Bankruptcy Court conducted an evidentiary hearing on the Sales Procedure Motion on August 23, 2004, D. 307; AA at 25, and on September 15, 2004, the Bankruptcy Court issued its *Amended Order: (A) Approving Bidding Procedures for the Sale of Substantially All of the Assets of A.B.Dick Company and Its Wholly Owned*

---

[1]    Unless otherwise noted, "D." refers to the docket number of documents filed with the Bankruptcy Court. "A" refers to the appendix submitted with Appellant's Brief. "AA" refers to the appendix submitted with this brief.

*Subsidiaries; (B) Authorizing Payment of an Expense Reimbursement and Termination Fee; (C)*

*Setting Sale Hearing Date; and (D) Approving Form of Notice* ("Sales Procedure Order.").  D.

301; AA at 16.[2]

The Bankruptcy Court conducted a hearing on the Sale Motion on November 2 & 3,

2004.  D. 634 & 635.  During the two-day hearing, Debtors presented testimony and other

evidence supporting the sale, while Appellants MHR  Capital Partners, LP, MHR Institutional

Partners LP, MHRM LP, and MHR Fund Management LLC (collectively, "MHR"), called no

witnesses.

On November 3, 2004, the Bankruptcy Court entered its *Order, Pursuant to Sections*

*105(a), 363(b) and (f) and 365(f) of the Bankruptcy Code and Rules 2002(a)(2), ((c)(1), (k), and*

*(m), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, Approving (1) the Sale,*

*Pursuant to the Asset Purchase Agreement Dated July 13, 2004, of (a) Substantially All of the*

*Assets of the A.B.Dick Company and the A.B. Dick Company of Canada, Ltd., and (b) the*

*Capital Stock of the A.B. Dick U.K Limited to Silver Acquisitions Corp, Free and Clear of Liens,*

*Claims, Encumbrances, and Interests; and (2) the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases to Silver Acquisitions Corp.* ("the Sale Order").  D.

460; A at 569.  In the Sale Order, the Bankruptcy Court, *inter alia,* overruled all objections to the

proposed sale and authorized the sale of substantially all of the assets of A.B. Dick to Silver

Acquisitions Corp. ("Silver").[3]  MHR  thereafter timely appealed from the Bankruptcy Court's

---

[2]  The Sales Procedure Order was not actually an "amended order" in the sense that it
amended an earlier Bankruptcy Court Order.  Rather, the Sales Procedure Order reflected some
minor changes to an earlier proposed order submitted to, but not entered by, the Bankruptcy
Court.  See D. 249 & 295.

[3]  Appellee Presstek, Inc. is the parent corporation of Silver.  Throughout this brief, the
terms "Presstek" and "Silver" are used interchangeably.

Sale Order. D. 467; A at 610. At no time did MHR seek a stay of the Sale Order, either from the Bankruptcy Court or from this Court, and the sale was fully consummated on November 5, 2004.

## II.    SUMMARY OF ARGUMENT

1.    MHR's failure to obtain, or to even seek, a stay of the Sale Order has rendered this case moot pursuant to 11 U.S.C. 363(m). Accordingly, the Court should dismiss MHR's appeal from the Sale Order. See *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 499 (3d Cir. 1998).

2.    To avoid a determination that it's appeal is moot, MHR asserts that Silver was not a "good faith purchaser." See *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986). Debtors maintain that the Bankruptcy Court's determination that Silver was a "good faith purchaser" is not clearly erroneous and must be affirmed. See *Cinicola v. Scharffenberger,* 248 F.3d 110, 115 n.1 (3d Cir. 2001).

3.    Finally, MHR has asserted that the Bankruptcy Court failed to make sufficient factual findings to support its determination that Silver was a "good faith purchaser." Contrary to MHR's assertion, the Sale Order contains sufficient findings of fact and fully complies with the Third Circuit's requirement that the Bankruptcy Court make a finding that Silver was a good faith purchaser. See *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d at 149-50.

## III.    STATEMENT OF FACTS

Prior to the Petition Date, the Debtors were faced with, among other issues, declining revenues and an inability to service their senior pre-petition loans from KeyBank National Association ("Key"). In the face of this worsening financial crisis, the Debtors explored various comprehensive restructuring possibilities, including a sale of the Assets or equity.

In the summer of 2003, the Debtors received an expression of interest from Presstek, Inc. ("Presstek"), the parent corporation of Silver, in acquiring the stock of A.B.Dick. The discussions between the parties culminated in mid-June 2004, with Presstek's offer to purchase A.B.Dick's stock for approximately $24 million in cash and Presstek stock valued at approximately $20.1 million (the "Stock Transaction"). The terms of the proposed Stock Transaction were contained in a "Stock Purchase Agreement" executed on June 16, 2004 ("SPA"), which agreement was immediately placed in escrow by the parties. The Escrow Agreement provided that Presstek would have until June 25, 2004 to complete financial due diligence and to obtain approval of the transaction. It also required Key to execute the Consent and Agreement (attached thereto) on or before June 22, 2004. Under the Consent and Agreement, Key would have obligated itself to continue funding A.B. Dick's working capital and operating deficits through the closing of the Stock Transaction and it would have agreed not to declare a default under its existing loan agreements. The Escrow Agreement further provided that in the event Key did not execute the Consent and Agreement, all agreements between the parties would become null and void. It is undisputed that Key failed to execute the Consent and Agreement, either prior to June 22, 2004, or at any time thereafter. Based on that failure, Presstek terminated the Stock Transaction.

Following the termination of the Stock Transaction, the Debtors and Presstek resumed discussions for an asset-based transaction under which Silver would acquire (a) substantially all of the assets of (i) A.B. Dick, (ii) A.B. Dick Company of Canada, Ltd. ("A.B. Dick Canada"), a wholly owned subsidiary of A.B. Dick, and (iii) IMG and (b) all of the capital stock of A.B. Dick UK Limited, a wholly owned subsidiary of A.B. Dick. This second round of negotiations, which was described as "spirited and not "one-sided," D. 634 at 111-12; AA at 69-70, culminated in the

Asset Purchase Agreement among Paragon, A.B. Dick, A.B. Dick Canada, Presstek and Silver dated July 13, 2004 (the "APA"), which was approved by the Bankruptcy Court in its Sale Order of November 3, 2004.  In the APA, Silver agreed to purchase the aforementioned assets for an aggregate purchase price of $40 million, free and clear of any interest, lien, claim, encumbrance or security interest of any other party.  The Debtors, in connection with the proposed sale transaction, agreed to commence these chapter 11 cases to effectuate a sale of the American assets of A.B. Dick and its wholly owned subsidiaries to Silver, or a competing bidder submitting a higher and better bid, free and clear of liens, claims and encumbrances, under section 363 of the Bankruptcy Code.  Key and Presstek agreed to provide a post-petition, debtor-in-possession loan facility (the "DIP Facility") to the Debtors to adequately finance the Debtors' post-petition operations pending approval of the Sale.

The Sale Procedures Order, D. 301; AA at 16, provided that Silver and the APA would serve as a "stalking horse" bid, and established, *inter alia*, threshold requirements for qualification of competing bids, including the requirements that (i) any competing bids be at least $1,200,000 greater than Silver's $40 million bid (the "Purchase Price") and (ii) only bids supported by a 5% cash deposit would be eligible to participate in the auction.

Starting in August 2004, Candlewood Partners L.L.C. ("Candlewood"), A.B Dick's financial advisors, began an extensive and intensive effort to identify and solicit expressions of interest from potential qualified buyers.  D. 307 at 148-52; AA at 42-46, Candlewood, *inter alia,* solicited more than two hundred carefully selected potential buyers for the Assets, including more than one hundred strategic buyers and ninety strategic financial buyers.  D. 634 at 119; AA at 77.  Of those potential buyers initially solicited with a "teaser" package (a summary memorandum describing the Debtors' businesses, among other things), approximately sixty

5

requested, and were sent, confidentiality agreements (a measure required by the Bid Procedures as a prerequisite to accessing the Debtors' confidential financial and other data). D. 634 at 119, 125; AA at 77, 83. Approximately fifty potential buyers returned executed confidentiality agreements and were granted access to the Debtors' "virtual" online data room to conduct due diligence evaluations of the Debtors' businesses and assets. D. 634 at 119; AA at 77.[4] In addition, Candlewood met with potential bidders. D. 634 at 121; AA at 79.

Under the bidding procedures approved by the Court, competing bids for the Assets were to be submitted by 5:00 p.m. on October 27, 2004. Despite the Debtors' marketing efforts, however, no formal bids meeting the requirements specified by the Bidding Procedures Order were received by the Debtors. The Debtors did receive two expressions of interest, one from ComVest Investment Partners II, LLC ("ComVest") and one from Harbor Partners ("Harbor"), both in the form of proposals for abandoning the proposed sale of assets and funding a plan of reorganization (collectively, "Plan Proposals"). D. 634 at 48-52; AA at 56-60, and Debtors Exs. 6 & 7; A at 496-511. Neither of the Plan Proposals, however, contained a firm, reliable commitment to provide greater value to the estates, and neither proposal complied with the bidder qualification requirements of the Bid Procedures. Among other disqualifiers, neither ComVest nor Harbor submitted a 5% cash deposit.

---

[4] Candlewood also solicited parties that would be interested in replacing the DIP Facility, but given the Debtors lack of profitability, none were willing to do so. D. 634 at 120; AA at 78. "None of them were willing or able to provide the D-I-P on the term[s] that existed with Presstek unless further conditions were met." D. 634 at 121; AA at 79.

At the hearing on the Sale Motion, Stephen Gray, the Debtors' Chief Restructuring Officer, D. 634 at 30; AA at 53,[5] testified that the Plan Proposals were "very contingent," D. 634 at 79; AA at 65, "lacked certainty . . . and presented substantial risks [to] the Estate . . . ." D. 634 at 49; AA at 57.[6]   For example, the ComVest proposal, Debtors' Ex. 6, A at 496-502, was contingent upon (1) open-ended due diligence, (2) the replacement of the DIP Facility, which was opposed by Key Bank, (3) the reinstatement of a "joint development agreement" between Debtors and Presstek, which Presstek opposed.  D. 634 at 49-50; AA at 57-58.[7]   Moreover, the proposal provided that the payment of a proposed note, which would have purportedly benefited creditors, was "to be paid out of a percentage of future profits," which was "a contingency that [Debtors'] couldn't define in current dollars because it's a question of what future profits might be."   D. 634 at 50; AA at 58.   Glenn Pollack, a member of Candlewood,[8] testified that the ComVest proposal was difficult to value "given its uncertainties," "lack of substance," and "lack of information."   D. 634 at 122-23; AA at 80-81.   "There were many, many, many, unknowns which would contribute to a level of uncertainty that would not allow us to provide a reliable and absolute range amount."   D. 634 at 123; AA at 81.

---

[5] Gray has served as the Debtors' Chief Restructuring Officer since July 27, 2004.  He has extensive experience in financial crisis management, has served as a Chapter 11 Trustee, and has presided over numerous asset sales.  D. 634 at 30-31; AA at 53-54.

[6] Gray testified that he had considered "an operational restructuring plan," but that such a plan would have required, *inter alia,* "significant staff lay offs."  D. 634 at 58; AA at 62.

[7] The joint development agreement had been terminated prior to the Petition Date.  D. 634 at 89; AA at 66.  Gray testified that having it "reinstated would require litigation which would be uncertain in its outcome."  D. 634 at 91; AA at 68.

[8] Like Gray, Pollack has served as a Chapter 11 Trustee and has participated in numerous sales in bankruptcy.  D. 634 at 111; AA at 69.

The Harbor proposal, Debtors' Ex. 7, A at 504-11, was a "nonstarter" because "it had an absolute financing contingency," *i.e.,* "[i]t was subject to Harbor Group securing financing, including the D-I-P financing, as a condition to go forward, and there [was] no assurance of that financing being forthcoming . . . ." D. 634 at 51; AA at 59. See also D. 634 at 77; AA at 57-58. Pollack testified that the Habor proposal "was functionally the same [as the ComVest proposal] in terms of its lack of particulars, lack of certainty, and lack of committed financing and therefore an inability to reach an appropriate value, reliable value." D. 634 at 124; AA at 82.

Notwithstanding the uncertainties of the Plan Proposals, Candlewood advised the Debtors' Board of Directors of the Plan Proposals and recommended that Debtors use these "expressions of interest" to negotiate enhancements in the APA with Presstek. D. 634 at 124-25; AA at 82-83. These negotiations over the APA modifications were, like the initial negotiations, "spirited," D. 634 at 113; AA at 71, and resulted in "further concessions and enhancements" to the APA. D. 634 at 113; AA at 71. For example, Presstek agreed to include all pre-paid inventory deposits in the calculation of working capital. D. 634 at 114; AA at 72. Absent its agreement to do so, the Debtors would have had to increase borrowing under the DIP Facility, thereby reducing the amount of funds available to pay unsecured creditors. D. 634 at 113-14; AA at 71-72. Presstek also agreed to accept responsibility for the cure amounts on certain executory contracts and leases assumed by the Debtors, full responsibility for unpaid employee medical claims up to the date of closing, and responsibility for one-half of sales commissions up to $250,000. D. 634 at 114-15; AA at 72-73. These negotiated modifications to the APA meant a difference to the estate of between $4 and $6 million. D. 634 at 116-18; AA at 74-76.

The Presstek proposal, as reflected in the amended APA, provided "a significant cash benefit to the Estate [which] assure[d] the [post-petition] solvency of the Estate . . . ." It also

8

provided for "the preservation of this business for its employees, and vendors, and the community that it serves . . . ." D. 634 at 52; AA at 60. Accordingly, the Debtors determined that, in light of existing limitations on available funding for the Debtors' operations and the probable value that would be attained were the Assets liquidated on a piecemeal basis, that the best interests of the Debtors' creditors, customers and employees would be served if the Sale was authorized. D. 634 at 127; AA at 85. Gray testified that the sale process was "completely open and fair." D. 634 at 44; AA at 55. Accordingly, Candlewood recommended, and the Debtors' Board of Directors voted, to accept the Presstek bid as in the best interests of the estate. D. 634 at 53, 127; AA at 61, 85.

As noted above, the Court approved the sale in its Sale Order of November 3, 2004, over the objections of, *inter alia,* MHR. D. 460; A at 569. The sale was fully consummated on November 5, 2004.

## IV.    ARGUMENT

### A.    STANDARD OF REVIEW.

"[T]he bankruptcy court's findings of fact [are reviewed] under a clearly erroneous standard, and its conclusions of law under a plenary standard." *Cinicola v. Scharffenberger,* 248 F.3d 110, 115 n.1 (3d Cir. 2001) (citations omitted).

> The question of whether [a party] purchased the Debtor's assets in good faith involves a legal concept, good faith, with a factual component. *i.e.,* a determination of a mixed question of law and fact. Where the Court is presented with such mixed questions, the appropriate standard must be applied to each legal or factual component. This Court must therefore exercise plenary review of the choice and application of the legal standard applied by the bankruptcy court.
>
> The lower court's factual findings are reviewed under a clearly erroneous standard. A factual finding is clearly erroneous if it is "completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary date."

*In re Tempo Technology Corp.,* 202 B.R. 363, 367 (D.Del. 1996) (citations omitted).

### B.    THE ISSUES RAISED IN THIS APPEAL ARE MOOT.

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, *unless such authorization and such sale or lease were stayed pending appeal.*

11 U.S.C. § 363(m) (emphasis added). "This language is referred to by the courts of appeals as a 'statutory' or 'bankruptcy' mootness provision." *Weingarten Nostat, Inc. v. Service Merchandise Co.,* 396 F.3d 737, 741 (6th Cir. 2005) (citations omitted). "[S]ection 363(m) fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645, 647-48 (3d Cir. 1997). See also *Weingarten Nonstt, Inc.,* 396 F.3d at 741. "The provision's blunt finality is harsh but its certainty attracts investors and helps effectuate debtor rehabilitation." *Cinicola,* 248 F.3d at 122 (citation omitted).

> By providing reliability and finality, section 363(m) enhances the value of the debtor's assets sold in bankruptcy. Section 363(m)'s finality also strikes a balance between the creditor's interest and the purchaser's interest by producing value for the estate and preventing modification or reversal of the bankruptcy court's authorization of the sale from affecting the validity of the sale. This finality rule "also reflects the inability of courts to supply a remedy once property has left the bankruptcy estate."

*Official Comm. of Unsecured Creditors v. Trism, Inc.* (*In re Trism, Inc.*), 328 F.3d 1003, 1006 (8th Cir. 2003) (citations omitted). See also *Weingarten Nostat, Inc.,* 396 F.3d at 741 ("'Bankruptcy' mootness is predicated on the particular need to encourage participation in bankruptcy asset sales and increase the value of the property of the estate by protecting good

10

faith purchasers from modification by an appeals court of the bargain struck with the debtor.")
(citation omitted).[9]

"[T]he failure or inability to obtain a stay pending appeal carries the risk that review
might be precluded on mootness grounds." *Manges v. Seattle-First Nat'l Bank (In re Manges),*
29 F.3d 1034, 1040 (5th Cir. 1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1105, 130 L.Ed.2d
1071 (1995). See also *255 Park Plaza Assocs. L.P. v. Connecticut Gen. Life Ins. Co. (In re 255
Park Plaza Assocs. L.P.),* 100 F.3d 1214, 1216-17 (6th Cir. 1996). "[T]here are two
prerequisites for section 363(m) 'statutory' mootness: (1) the underlying sale or lease was not
stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or
lease, would be affecting the validity of such a sale or lease." *Krebs Chrysler-Plymouth, Inc. v.
Valley Motors, Inc.,* 141 F.3d 490, 499 (3d Cir. 1998). See also *Trism, Inc.,* 328 F.3d at 1006-07.
See also *Cinicola,* 248 F.3d at 122; *L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home*

---

[9]The *Weingarten Nostat, Inc.* Court distinguished the concept of "constitutional"
mootness:

> While the primary goal of § 363(m) is to protect good faith purchasers, it
> also reflects the more general constitutional consideration that an appeal must be
> dismissed as moot when, by virtue of intervening events, the court of appeals
> cannot fashion effective relief. Though reflective of the general prohibition
> against advisory opinions undergirding the constitutional mootness doctrine,
> bankruptcy mootness under § 363(m) is broader. Even if the appeal is not moot
> as a constitutional matter because a court could provide a remedy, the policy
> favoring finality in bankruptcy sales reflected in § 363(m) requires that certain
> appeals nonetheless be treated as moot absent a stay.

*Weingarten Nostat, Inc.,* 396 F.3d at 741-42 (citations omitted).

*Centers, Inc.*), 209 F.3d 291, 298 (3d Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000). [10]

In this case, it is undisputed that MHR has never sought, and therefore never obtained, a stay of the Sale Order. Courts have been particularly reluctant to reverse a bankruptcy court's sale order where the appellant never sought to stay the order. In *Rickel Home Centers, Inc., supra,* the Third Circuit stated:

> Given the policies underlying section 363(m) and the series of cases that emphasize the importance of securing a stay, *we are perplexed by [appellant's] failure to even request a stay.* Although there was a suggestion from [appellant] at oral argument that the bond required for a stay would have been costly, it acknowledged it made no attempt to seek permission for a lower bond. Moreover, it failed to seek a stay limited to the Lawrence center lease, which might have substantially reduced the cost of a bond. *In short, [appellant] did nothing other than appeal and failed to take steps that might have minimized the dislocation a reversal of the assignment would cause the parties at this time.*

*Rickel Home Centers, Inc.,* 209 F.3d at 304-05 (emphasis added). See also *Anheuser-Busch, Inc. v. Miller* (*In re Stadium Managment Corp.*), 895 F.2d 845, 849 (1st Cir. 1990) ("Counsel failed, upon proper notice, to request a stay of the sale of the Stadium. That tactical decision sealed their fate when the sale went forward."); *Sulmeyer v. Karbach Enters.* (*In re Exennium, Inc.*), 715 F.2d 1401, 1404 (9th Cir. 1983) ("[A] failure to seek such a stay bars an appeal from the sale. If appeal is sought without a stay, the courts cannot grant relief because they cannot overturn the sale.") (citations omitted); *In re Vlasek,* 325 F.3d 955, 962 (7th Cir. 2003) ("Despite the fact that [Debtor-Appellant's] motion to dismiss his bankruptcy petition seeks the reversal of each and every order approving the sale of an estate asset, he at no time sought to stay or appeal any of those individual sale orders. * * * In short, we will not allow [Debtor-Appellant] to

---

[10] "Section 363(m) contains no exception for sales to creditors, or other parties to the bankruptcy proceedings, or to deep-pocketed financing companies . . . ." *Krebs Chrysler-Plymouth, Inc.,* 141 F.3d at 500.

perform what amounts to an end run around the appeal and stay requirements of § 363(m)."); *In re Lloyd,* 37 F.3d 271, 273 (7th Cir. 1994) (Appellant "did not request a stay pending appeal, and the sale of the land remaining after severance of the 'homestead' land took place as scheduled. As a result, her claim for the return of the land sold is moot."); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 9 (1st Cir. 1993) (appellant was foreclosed from arguing that "relative bidding" in sale of assets amounted to bad faith where it failed to preserve that argument in the bankruptcy court and failed to request a stay); *Ewell v. Diebert,* 137 B.R. 963, 967 (E.D.Cal. 1990) ("The critical event in this case was the entry of the order by the bankruptcy court authorizing the second sale to go forward.  Absent actions by the appellant to stop the judicial machinery at this point, the rights of the non-party purchasers have ripened into a property right that now cannot be voided. * * * Now there is no way that the legal effect of this sale can be undone. * * * A timely request for a stay pending appeal would have afforded a court the opportunity to adjudicate the conflicting interests of the appellant and the creditors of the estate."), *aff'd,* 958 F.2d 276 (9th Cir. 1992).

Moreover, it is clear that any order reversing the Sale Order cannot undo the results of the sale.  The sale was fully consummated on November 5, 2004.  MHR failed to request a stay of the sale, and accordingly all of the assets have been transferred to Silver, and Debtors understand that such assets have been fully incorporated into Silver's and Presstek's operations.  A reversal of the Bankruptcy Court's Sale Order simply will not, and cannot, undo the sale of the assets to Silver.

Apparently recognizing the fact that the sale cannot now be undone, MHR asks this Court to reverse the Sale Order "at the very least, to the extent that the Order approved that

13

portion of the APA releasing the Debtor's claims against Presstek under the Stock Purchase

Agreement . . . ."  Debtor's submit that such relief is not permitted.

In *Pittsburgh Food & Beverage, Inc.*, the Third Circuit ruled that a reviewing court could

not impose an "equitable remedy," which "though not nullifying the sale would affect its validity

. . . ."  *Pittsburgh Food & Beverage, Inc.*, 112 F.3d at 650.  And, in *Krebs Chrysler-Plymouth,*

*Inc., supra,* the Court concluded that, in an appeal challenging a bankruptcy court's sale order, a

proposed remedy that would require a reviewing court to alter part of the consideration for the

agreement would "affect the validity of the sale" and run afoul of § 363(m).  *Krebs Chrysler-*

*Plymouth, Inc.,* 141 F.3d at 499-500.  The Eight Circuit specifically applied this principle to

reject an appellant's attempt to void the release provision of an authorized sale:

> We conclude a challenge to a related provision of an order authorizing the
> sale of the debtor's assets affects the validity of the sale when the related
> provision is integral to the sale of the estate's assets. A provision is integral if the
> provision is so closely linked to the agreement governing the sale that modifying
> or reversing the provision would adversely alter the parties' bargained-for
> exchange.
>
> * * *
>
> CIT's release from avoidance liability is integral to the sale of Trism's
> assets to Bed Rock. Thus, section 363(m) moots the Committee's challenge to the
> bankruptcy court's order releasing CIT from avoidance liability.

*Trism, Inc.,* 328 F.3d at 1007-08.  See also *Official Comm. of Senior Unsecured Creditors v.*

*First RepublicBank Corp.,* 106 B.R. 938, 943 (N.D.Tex. 1989) ("This Court therefore concludes

that the 'corporate cleanup' and the compromise of claims which were included in the Purchase

Agreement and approved by the Bankruptcy Court as a part of the Purchase Agreement cannot,

on appeal, be separated from the sale of the Service Companies, especially in light of the fact

that Appellant failed to obtain a stay of the Bankruptcy Court's order pending appeal.").

Accordingly, a remedy that would require this Court to sever—and invalidate—the release

provision of the APA would "affect the validity of the sale."[11]  MHR's failure to seek or obtain a stay pending appeal has resulted in its challenge to the Sale Order, or any part thereof— becoming moot.  This Court should, therefore, dismiss this appeal.

### C.    THE BANKRUPTCY COURT'S FINDING THAT PRESSTEK (SILVER) WAS A GOOD FAITH PURCHASER IS NOT CLEARLY ERRONEOUS.

To avoid the  obvious conclusion that this appeal is moot, MHR argues that Presstek, *i.e.*, Silver, is not entitled to the protection of 363(m) because, contrary to the Bankruptcy Court's express finding, Presstek is not a "good faith purchaser."  Debtors maintain that ample evidence supports the Bankruptcy Court's finding of "good faith," and consequently, that such finding is

---

[11]MHR does not dispute that Key did not execute the Consent and Agreement as required under the Escrow Agreement.  Instead, MHR urges that there would be a valuable claim against Presstek absent the release, by quibbling with the firmness of that express requirement and arguing that it places "form over substance."  Appellants' Brief at 8.  In its notification of termination, however, Presstek made clear that it did not consider what MHR asserts is Key's "consent"—short of execution of the Consent and Agreement—to constitute sufficient performance:

> Although our client has received related correspondence from Key, such correspondence does not satisfy the consent requirements set forth in the Consent and Agreement.  Specifically, the Consent and Agreement which Key was required to execute pursuant to the terms of the Escrow Agreement (and which Key did not execute) calls for Key to (i) commit to continue to fund working capital and operating deficits of Silver by increasing its total aggregate lending commitment to Parent as necessary to ensure adequate funding for Silver through the closing of the Sale; (ii) to forbear from declaring any default under the Key Credit and Security Loan Agreement or exercise their rights and remedies under the Loan Agreement until the earlier of (A) the closing of the Sale or (B) the termination of the Purchase Agreement in accordance with its terms.

A at 364.  It is this issue—the effect of Key's refusal to execute the Consent and Agreement— that, in Debtors' view, made any claim against Presstek for breach of the SPA, speculative at best, and supports Debtors' agreement to include the provision in the APA as Presstek insisted.  Moreover, MHR's assertion that the claim was worth $30 million is belied by the absence of any competing bids for Debtors' assets which would have preserved that claim (and presumably resulted in a higher purchase price).

not clearly erroneous.   Accordingly, this Court should affirm the Bankruptcy Court's Sale Order.[12]

As noted by the Third Circuit Court of Appeals, "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147 (citations omitted).

> Neither the Bankruptcy Code nor the Bankruptcy Rules define "good faith."  In construing this phrase, courts have therefore borrowed from traditional equitable principles, holding that the concept of "good faith" speaks to the integrity of a party's conduct in the course of the bankruptcy sale proceedings.  A purchaser's good faith status at a bankruptcy sale would be destroyed by misconduct involving "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*In re Tempo Technology Corp.,* 202 B.R. at 367 (citations omitted).   "Good faith" implies negotiations at arms-length.  *In re W.A. Mallory Co.*, 214 B.R. 834, 837 (Bankr. E.D.Va. 1997). A "good faith purchaser" is "one who buys property in good faith and for value, without knowledge of adverse claims."  *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).  "'Good faith' purchaser status is precluded by *inter alia,* fraud, collusion with the trustee, and taking 'grossly unfair advantage' of other bidders."  *Mark Bell Furniture Warehouse, Inc.,* 992 F.2d at 8 (citations omitted).  See also *In re Perona Bros., Inc.* 186 B.R. 833, 839 (D.N.J. 1995).

---

[12]MHR does not assert that the Bankruptcy Court applied an incorrect legal standard of "good faith purchaser."

Here, the Debtors and Candlewood engaged in a substantial, thorough effort to market the Assets. More than 200 potential candidates to purchase the Assets were identified from various sources, including known strategic and financial buyers, and including all of the significant players in the industry. Candlewood sent each of these potential candidates an initial "teaser" introduction letter consisting of a short summary of the Debtors' businesses, and all potential buyers received direct follow-up telephone calls from Candlewood personnel. The Debtors also placed an advertisement for the sale of the Assets in the national edition of the Wall Street Journal and a major industry trade magazine. These extensive marketing efforts, designed specifically for the purpose of exposing the Assets to the marketplace and to solicit purchase offers from other parties, constituted *prima facie* proof that the sale of the Assets was made in good faith. The Debtors met their initial burden of demonstrating good faith, justifying the Bankruptcy Court in making such a finding under Bankruptcy Code section 363(m). Accordingly, the burden of proving Presstek's alleged bad faith (*i.e.*, fraud, collusion among bidders) shifted to the party opposing the sale, *i.e.,* MHR. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). MHR failed to provide *any evidence* to rebut this *prima facie* case.

MHR argues that Presstek was not entitled to a good faith finding because it backed out the proposed SPA, bargained hard, and, in light of A.B. Dick's deteriorating financial condition, negotiated at arms length the best terms it could for the acquisition of the assets.[13]    MHR

---

[13] MHR only indirectly challenges the purchase price of Debtors' assets by noting that the purchase price was, in its view, less than the amount that Presstek had offered to pay under the terminated SPA. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. *In re Integrated Resources Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd,* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993). The Debtors herein utilized a bidding process, with Silver as a stalking horse bidder, to provide other interested parties an opportunity to competitively bid for the Assets. Indeed, the Bankruptcy Court approved the bidding procedures, as modified, concluding that the process

identifies no actions by Presstek or Silver during the course of the sale proceedings that (a) were allegedly fraudulent, (b) constituted collusive conduct between Presstek and Silver and other Bidders or the Debtors, or (c) were an attempt to take grossly unfair advantage of other bidders. Indeed, the absence of competing bids offering more money for the assets than that offered by Silver, even after the extensive marketing efforts of Debtors and Candlewood, is an indication that Silver negotiated the APA at arms-length and in good faith.

Presstek's pre-petition actions, in engaging in "spirited negotiations" between sophisticated business people represented by competent counsel, did not render it ineligible for a good faith finding under section 363(m) of the Bankruptcy Code. Indeed, the record in this case is remarkably similar to a good faith purchase in another sale reviewed by this Court:

> The bankruptcy court found that TAC was a good faith purchaser within the meaning of section 363(m) under *Abbotts Dairies.* The bankruptcy court found the following: TAC, the purchaser, was composed of venture capital companies not affiliated with the Debtor's management or board of directors. In addition, the court found that TAC had originally explored the avenue of merely investing in the Debtor, but then abandoned that proposal. The Debtor then approached TAC with a proposal for TAC to buy the Debtor's assets. The court found that negotiations between the two entities were "spirited with some anger and continued for a period of time." The parties eventually agreed to a price of $3 million, payment terms including cash, preferred and common stock, and an assumption of some of the Debtor's liabilities.

                                  * * *

---

would produce the "highest and best" value for the assets. The ability for third parties to submit competitive bids, together with the Debtors' implementation of marketing efforts designed to generate additional interest and encourage the submission of higher bids, ensured that the best price was being obtained for the Assets. An auction process is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 149. The opportunity for competitive bidding, and the potential for enhancement of the purchase price, provide assurance that a debtor will receive the highest and best offer for its assets under the circumstances of a chapter 11. Moreover, in this case, the Debtors negotiated substantial enhancements in the consideration to be provided by Presstek pursuant to the APA that significantly increased the value of the transaction to the Debtors' estate.

The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser. Hamann's unrebutted testimony regarding the negotiation of the sale of the Debtor's assets demonstrated arm's length negotiations between the purchaser and the Debtor. There was no evidence of fraud, collusion, or interested dealing between the players . . . . In addition, it was uncontroverted that the purchase negotiations were fraught with debate, disagreement and at times seemed uncertain as to a positive outcome.

Moreover, there was no evidence that TAC colluded with the Debtor to attempt to take unfair advantage of other prospective bidders. Hamann's testimony demonstrated the Debtor's attempts to solicit interest from prospective purchasers other than TAC, albeit without success. Review of the initial emergency hearing in this matter also shows that the bankruptcy court considered that, combined with the Debtor's cash crunch, the lack of other companies engaged in this industry weighed heavily in justifying an expeditious sale of the Debtor's assets as a going concern. There was no evidence that any prospective purchasers regarded the auction terms as chilling their interest in bidding. Without a sizable pool of potential buyers, with only one buyer willing to negotiate terms of a purchase, and the Debtor's severe cash flow predicament, the bankruptcy court did not err when it approved the sale under 363(b)(1) of the Bankruptcy Code.

*In re Tempco Technology Corp.,* 369-70 (citations omitted). Like the record in *In re Tempco Technology Corp.,* the record herein is devoid of any evidence that Presstek did anything other than persistently assert its rights and engage in "spirited" negotiations. Accordingly, the Bankruptcy Court's "good faith" finding is not clearly erroneous, and this Court should affirm the Sale Order.

**D.     THE BANKRUPTCY COURT COMPLIED WITH THE REQUIREMENT THAT IT MAKE A FINDING THAT PRESSTEK (SILVER) WAS A GOOD FAITH PURCHASER.**

Finally, MHR asserts that the Bankruptcy Court's finding that Presstek, *i.e.,* Silver, was a "good faith purchaser" was somehow inadequate. Instead, it asserts, the lower court should have made additional, detailed findings supporting its "good faith" finding. MHR directs this Court's attention to no authority requiring such detailed findings, and indeed, such a requirement is not supported by the Third Circuit's decision in *In re Abbotts Dairies of Pa., Inc., supra.*

19

In *In re Abbotts Dairies of Pa., Inc.,* the Third Circuit explained its rationale for requiring an explicit finding of "good faith:"

> In short, we hold that when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser. Alternatively, such a finding might, in certain very limited circumstances, be made by the district court.
>
> We think that such a requirement represents a proper exercise of our supervisory authority over both the district and bankruptcy courts. First, the bankruptcy court, given its greater familiarity with the parties and proceedings, represents the forum best able to make such a determination in the first instance. Second, it encourages finality of the bankruptcy court's judgment's under section 363(b)(1), because *it places prospective appellants on notice of the need to obtain a stay pending appeal, or face dismissal for mootness pursuant to section 363(m),* should the district court affirm the bankruptcy court's finding of good faith. Finally, such a procedure ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan and make a finding that it "has been proposed in good faith and not by any means forbidden by law."

*In re Abbotts Dairies of Pa., Inc.,* 788 F.2d at 149-50 (emphasis added) (citations omitted). Indeed, this Court has not required such detailed findings provided that "[t]he entire bankruptcy record supports the bankruptcy court's finding that [the purchaser] was a good faith purchaser." *In re Tempco Tech. Corp.,* 202 B.R. at 370. See also *Operating Tel. Co. Subsidiaries of Verizon Communications, Inc. v. Net2000 Communications, Inc. (In re Net2000 Communications, Inc.),* 43 Bankr.Ct.Dec. 217, 2004 WL 2346148 at *2 (D.Del. Oct. 5, 2004) ("In its order, the Bankruptcy Court found that Cavalier was a good faith purchaser. There is nothing in the record to suggest that the bankruptcy court abused its discretion. Appellant cites *In re Abbotts Dairies,* 788 F.2d at 149, for the proposition that the debtor must show that the purchaser is acting in good faith. Appellant, however, misapprehends the holdings in that case. In that case the Third Circuit stated that the evidence was insufficient for the district court to find that the purchaser acted in good faith, and as the bankruptcy court had not made such a determination the case

should be remanded to the bankruptcy court.  In the instant case the Bankruptcy Court has determined that the purchaser acted in good faith and as such, *that line of reasoning is not applicable here*.") (footnote included in text) (emphasis added); *Crowder v. Given* (*In re Crowder*), 314 B.R. 445, 447 (B.A.P. 10th Cir. 2004) ("While the court failed to make detailed findings supporting its finding of good faith under § 363(m), the conclusion is amply supported by the record.").

As discussed above, the record in this case more than adequately supports the Bankruptcy Court's finding that Silver was a good faith purchaser of Debtors' assets.  Accordingly, this Court should decline MHR's invitation to remand this case for additional findings.

## V.    CONCLUSION

For the foregoing reasons, Debtors-Appellees respectfully urge this Court to dismiss this appeal, or in the alternative, to affirm the Bankruptcy Court's  Sale Order.

Dated: Cleveland, Ohio                                     Respectfully submitted,
           April 8, 2005


                                                           /s/ H. Jeffrey Schwartz
                                                           H. Jeffrey Schwartz  (OBR #0014307)
                                                           Mark A. Phillips (OBR #0047347)
                                                           BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
                                                           2300 BP Tower
                                                           200 Public Square
                                                           Cleveland, OH  44114-2378
                                                           (216) 363-4500
                                                           (216) 363-4588 (Facsimile)
                                                           jschwartz@bfca.com
                                                           jgleason@bfca.com

                                                                      and


                                                           /s/ Frederick B. Rosner
                                                           Frederick B. Rosner (No. 3995)
                                                           JASPAN SCHLESINGER HOFFMAN LLP
                                                           1201 North Orange Street, Suite 1001
                                                           Wilmington, DE  19801
                                                           Telephone:  302-351-8000/8005
                                                           Facsimile:  302-351-8010
                                                           frosner@jshllp-de.com

                                                           Counsel for Debtors-Appellees A.B.Dick Company,
                                                           *et al.*

22

Westlaw.

Slip Copy
2004 WL 2346148 (D.Del.), 43 Bankr.Ct.Dec. 217
(Cite as: 2004 WL 2346148 (D.Del.))

Page 1

United States District Court,
D. Delaware.
In re NET2000 COMMUNICATIONS INC., et al.,
Debtors.
OPERATING TELEPHONE COMPANY
SUBSIDIARIES OF VERIZON
COMMUNICATIONS, INC., et
al., Appellants,
v.
NET2000 COMMUNICATIONS, INC., Cavalier
East L.L.C. and Cavalier Telephone
L.L.C., Appellees.
OPERATING TELEPHONE COMPANY
SUBSIDIARIES OF VERIZON
COMMUNICATIONS, INC., et
al., Appellants,
v.
NET2000 COMMUNICATIONS, INC., and Cavalier
East, L.L.C. and Cavalier Telephone,
L.L.C., Appellants.
No. 01-11324 (MFW), Civ.A. 02-146-KAJ, Civ.A.
02-232-KAJ.

Oct. 5, 2004.
Bradford J. Sandler, Adelman, Lavine, Gold &
Levin, Wilmington, DE, for Debtor and Appellee.

Donald J. Detweiler, Saul Ewing LLP, Wilmington,
DE, for Appellants.

Kathleen M. Miller, Smith, Katzenstein, & Furlow,
Wilmington, DE, for Appellee.

Joseph McMahon, U.S. Trustee, Wilmington, DE,
pro se.

Richard G. Andrews, U.S. Attorney's Office,
Wilmington, DE, for Plaintiff.

*MEMORANDUM ORDER*

JORDAN, J.

*1 Presently before this court is an appeal by
Operating Telephone Company Subsidiaries of
Verizon Communications, Inc., et al., ("Verizon")
from the January, 10, 2002 order of the Bankruptcy
Court approving the purchase agreement between
NET2000 Communications, Inc., et al., ("Debtors")
and Cavalier East, L.L.C., ("Cavalier") (Docket Item
["D.I."] 10. P. A197; the "Order."). For the reasons

that follow, that Order is affirmed.

I. Background

On November 19, 2001, Debtors filed a motion with
the Bankruptcy Court to sell its assets to Cavalier.
(D.I. 10 at A1.) On December 27, 2002, the
interested parties appeared before the Bankruptcy
Court for consideration of the Debtors' motion to sell
its assets. (D.I. 1, Ex. A at 2.) At that time, counsel
for Verizon objected to the proposed sale on the
grounds that the sale could not be consummated
without the assumption of Verizon's agreements with
Debtor (the "Verizon agreements"). (*Id.* at 48-50.)
The Bankruptcy Court judge ruled that Verizon did
not have standing to object because the contracts
were not being assumed and consequently that issue
was not before the court. (*Id.* at 48- 50.)

On January 10, 2002 the Bankruptcy Court entered
an order: (A) Approving Purchase Agreement
Between the Debtors and Cavalier East, L.L.C.; (B)
Authorizing Sale of Assets Free and Clear of All
Liens, Claims and Encumbrances; (C) Authorizing
the Assumption and Assignment of Certain
Executory Contracts; and (D) Granting Related
Relief. (D.I. 10 at A197.)

In that order, the Bankruptcy Court held, "Debtors
shall not assume and assign any executory contract to
which the operation subsidiaries of Verizon
Communication, Inc .... are a counterparty...." (D.I.
10 at A207.)

On January 18, 2002, Verizon appealed under 28
U.S.C. Sec. 158(a).

II. Standard of Review

This court has jurisdiction over appeals from the
Bankruptcy Court pursuant to 28 U.S.C. § 158(a).
On appeal, this court applies a clearly erroneous
standard to the Bankruptcy Court's findings of fact
and a plenary standard to its legal conclusions. *See*
*Am. Flint Glass Workers Union v. Anchor Resolution*
*Corp.,* 197 F.3d 76, 80 (3d Cir.1999). When
reviewing mixed questions of law and fact, this court
will accept the Bankruptcy Court's finding of
"historical or narrative facts unless clearly erroneous,
but [will] exercise plenary review of the trial court's
choice and interpretation of legal precepts and its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2346148 (D.Del.), 43 Bankr.Ct.Dec. 217
(Cite as: 2004 WL 2346148 (D.Del.))

Page 2

application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (internal quotations omitted).

III. Discussion

In this appeal there are two main issues: (1) whether the Bankruptcy Court erred in holding that Verizon had no standing to object to the sale of the Debtors' assets, Cavalier was a "good faith" purchaser, and Debtors soundly exercised their business judgment, and, (2) whether under Sec 365(b)(1)(A) there was a *de facto* assumption of the Verizon agreements.

*2 With regard to the first issue on appeal, I find that section 363(m) moots any inquiry into the validity of the Debtor's asset sale. With respect to the second question, I find that there was no *de facto* assumption of Verizon's executory contract.

The question of whether the sale of the Debtors' assets was valid is moot. Section 363(m) of Title 11 of the United States Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (2004).

The United States Court of Appeals for the Third Circuit has held that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbots Dairies of Penn.,* 788 F.2d 143, 149-50 (3d Cir.1986). The Third Circuit went on to state that a finding of good faith is best performed by the bankruptcy court, as it is more familiar with the parties and such a finding "encourages finality of the bankruptcy court's judgments under section 363(b)(1)....". *Id.* at 150. In its order, the Bankruptcy Court, found that Cavalier was a good faith purchaser. (D.I. 10 at 3.) There is nothing in the record to suggest that the bankruptcy court abused its discretion. [FN1]

FN1. Appellant cites *In re Abbots Dairies,* 788 F.2d at 149, for the proposition that the debtor must show that the purchaser is

acting in good faith. (D.I. 9 at 37.) Appellant, however, misapprehends the holdings in that case. In that case the Third Circuit stated that the evidence was insufficient for the district court to find that the purchaser acted in good faith, and as the bankruptcy court had not made such a determination the case should be remanded to the bankruptcy court. 788 F.2d at 149-150. In the instant case the Bankruptcy Court has determined that the purchaser acted in good faith and as such, that line of reasoning is not applicable here.

If the purchaser is found to have acted in good faith, then this court must apply a two-prong test for mootness under § 363(m): (1) whether the order was stayed pending appeal, and (2) whether vacating the order would affect the validity of the sale. *Cinicola v. Scharffenberger,* 248 F.3d 110, 128 (3d Cir.2001)(citing *Krebs Chrysler-Plymouth v. Valley Motors, Inc.,* 141 F.3d 490, 499 (3d Cir.1998)). In this case, Verizon concedes that it failed to obtain a stay of the sale pending appeal. (D.I. 9 at 9.) Therefore, the only issue is whether vacating the Bankruptcy Court order to the sell the assets would affect the validity of the sale. The answer is it would.

The settlement has already been approved and, in accordance with the Bankruptcy Court's Order, Debtors' assets have been transferred to the purchasers free and clear of liens. Accordingly, modification or reversal of the Bankruptcy Court's Order would affect the validity of the sale and is impermissible under § 363(m). Consequently, the questions of whether the Bankruptcy Court erred in not allowing Appellant to object to the sale of the Debtors' assets and whether the Debtors soundly exercised their business judgment is moot.

The Debtors did not perform a *de facto* assumption and assignment of Verizon's agreements. Section 365(a) of Title 11 of the United States Code provides: "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365 does not address a *de facto* assumption. Additionally, Verizon has not offered, nor can I find, any case law to support Verizon's contention that the Debtors could have preformed a *de facto* assumption of the Verizon agreements.

IV. Conclusion

*3 Therefore, IT IS HEREBY ORDERED that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 3
2004 WL 2346148 (D.Del.), 43 Bankr.Ct.Dec. 217
(Cite as: 2004 WL 2346148 (D.Del.))

January 10, 2002 order of the Bankruptcy Court is
AFFIRMED.

 2004 WL 2346148 (D.Del.), 43 Bankr.Ct.Dec. 217

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>APPENDIX TABLE OF CONTENTS</u>

Bankruptcy
Court Docket
<u>Number</u>      <u>Description</u>      <u>Page</u>

D. 70      Motion for Entry of an Order:  (A) Authorizing the Sale of Substantially All of the Assets of A.B.Dick Company and its Wholly Owned Subsidiaries, Free and Clear of all Liens, Claims and Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (C) Granting Related Relief .......................................................AA 1

D. 301      Amended Order:  (A) Approving Bidding Procedures for the Sale of Substantially All of the Assets of A.B.Dick Company and Its Wholly Owned Subsidiaries; (B) Authorizing Payment of an Expense Reimbursement and Termination Fee; (C) Setting Sale Hearing Date; and (D) Approving Form of Notice.........................................AA 16

D. 307      Excerpts from Transcript of Hearing (August 23, 2004)................................AA 26

D. 634      Excerpts from Transcript of Hearing (November 2, 2004)............................AA 47