2

| | | |
|---|---|---|
| 1 | For The Official Committee: | Richard Mason, Esq. |
| | of Unsecured Creditors | McGuire Woods, LLP |
| 2 | | 77 West Wacker Drive-Ste. 4100 |
| | | Chicago, IL 60601 |
| 3 | | |
| | | James P. Ricciardi, Esq. |
| 4 | | McGuire Woods, LLP |
| | | 77 West Wacker Drive-Ste. 4100 |
| 5 | | Chicago, IL 60601 |
| 6 | | Shawn R. Fox, Esq. |
| | (Via telephone) | McGuire Woods, LLP |
| 7 | | 7th Fl. |
| | | 1345 Avenue of the Americas |
| 8 | | New York, NY 10105 |
| 9 | | Jeffrey Schlerf, Esq. |
| | | The Bayard Firm |
| 10 | | 222 Delaware Ave.-Ste. 900 |
| | | Wilmington, DE 19801 |
| 11 | | |
| | For MHR Capital Partners: | Eric M. Kay, Esq. |
| 12 | | Stroock Stroock & Lavan, LLP |
| | | 180 Maiden Lane |
| 13 | | New York, NY 10038 |
| 14 | | Anna Taruschio, Esq. |
| | | Stroock Stroock & Lavan, LLP |
| 15 | | 180 Maiden Lane |
| | | New York, NY 10038 |
| 16 | | |
| | | Megan N. Harper, Esq. |
| 17 | (Via telephone) | Landis Rath & Cobb, LLP |
| | | 919 Market Street |
| 18 | | Wilmington, DE 19899 |
| 19 | For Key Bank, NA: | Robert Folland, Esq. |
| | | Thompson Hine, LLP |
| 20 | | 3900 Key Center |
| | | 127 Public Square |
| 21 | | Cleveland, OH 44114 |
| 22 | | Alan R. Lepene, Esq. |
| | | Thompson Hine, LLP, |
| 23 | | 3900 Key Center |
| | | 127 Public Square |
| 24 | | Cleveland, OH 44114 |
| 25 | | |

3

```
 1                              Jami B. Nimeroff, Esq.
                                Buchanan Ingersoll, PC
 2    (Via telephone)           1835 Market Street-14th Fl.
                                Philadelphia, PA 19103
 3
                                David E. Wilks, Esq.
 4                              Buchanan Ingersoll, PC
      (Via telephone)           The Nemours Building
 5                              1007 North Orange Street-Ste. 1110
                                Wilmington, DE 19801
 6
      For Presstek, Inc.:       Stephen B. Selbst, Esq.
 7                              McDermott Will & Emery
                                50 Rockefeller Plaza
 8                              New York, NY 10020

 9                              Gary Ravert, Esq.
      (Via telephone)           McDermott Will & Emery
10                              50 Rockefeller Plaza
                                New York, NY 10020
11
                                Francis A. Monaco, Jr., Esq.
12                              Monzack & Monaco, PA
      (Via telephone)           400 Commerce Center
13                              Twelfth & Orange Streets
                                Wilmington, DE 19899
14
                                James Scafide, Esq.
15                              In-House Counsel
                                Presstek, Inc.
16                              55 Executive Drive
                                Hudson, NH 03051
17
      For Mitsubishi:           Thomas G. Whalen, Jr., Esq.
18                              Stevens & Lee, PC
      (Via telephone)           300 Delaware Ave.-Ste. 800
19                              Wilmington, DE 19801

20                              Robert Laposwky, Esq.
                                Stevens & Lee, PC
21    (Via telephone)           1818 Market Street-29th Fl.
                                Philadelphia, PA 19103
22
      For Acting U.S. Trustee:  David Klauder, Esq.
23    (Roberta A. DeAngelis)    U.S. Trustee's Office
                                844 King Street-Ste. 2313
24                              Lock Box 35
                                Wilmington, DE 19801
25
```

AA 27

4

```
 1                                    Joseph J. McMahon, Jr., Esq.
                                      U.S. Trustee's Office
 2                                    844 King Street-Ste. 2313
                                      Lock Box 35
 3                                    Wilmington, DE 19801

 4   Audio Operator:                  Brandon J. McCarthy

 5   Transcribing Firm:               Writer's Cramp, Inc.
                                      6 Norton Rd.
 6                                    Monmouth Jct., NJ 08852
                                      732-329-0191
 7
     Proceedings recorded by electronic sound recording, transcript
 8   produced by transcription service.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

AA 28

5

| | Index | | | | Further |
| | Direct | Cross | Redirect | Recross | Redirect |
|---|---|---|---|---|---|

Witnesses For
  Creditors' Committee:

Mr. Carlston
(by Mr. Mason)      219              235
(by Mr. Gleason)          229
(by Mr. Selbst)           233
(by Mr. Lepene)           234


Witnesses For The
  Debtor:

Mr. Knipp
(by Mr. Stock)       45              108
(by Mr. Mason)             83
(by Mr. Selbst)           106
(by Mr. Lepene)           107

Mr. Pollack
(by Mr. Gleason)    114              205
(by Mr. Mason)            166                   214

Mr. Pollack (cont'd)
(by Mr. Mason)            195
(by Mr. Selbst)           200
(by Mr. Lepene)           203


Voire Dire
Mr. Pollack
(by Mr. Gleason)    111


EXHIBITS:                                  Marked   Received

D-1    August 2004 Forecast                  *       211
D-2    Asset Purchase Agreement              *       211

C-A    April 27, 2004 Letter                 *       218
C-B    Stock Purchase Agreement              *       218

6

| | | | | |
|---|---|---|---|---|
| C-C | Document from Books & Records | * | 218 |
| C-D | Signature - Stock Purchase Agreement | * | 218 |

SUMMATION BY:

| | |
|---|---|
| Mr. Gleason | 244 |
| Mr. Selbst | 250 |
| Mr. Lepene | 257 |
| Mr. Ricciardi | 259 |
| Mr. Kay | 269 |

THE COURT:  Finding      272

*  Marked at previous hearing

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

AA 30

1    THE CLERK:  04-12002, AB Dick.

2    (Pause in proceedings)

3    THE COURT:  All right.  Good morning.

4    (Pause in proceedings)

5    THE COURT:  All right then, let's proceed.

6    MR. GLEASON:  Thank you, good morning, Your Honor.

7    John Gleason, Benesch, Friedland, Coplan & Aronoff on behalf of

8    the Debtors.  The first matter on the amended notice of agenda

9    for this morning is a motion that the Debtors have filed to

10   reject a certain unexpired -- or certain unexpired leases of

11   non-residential real property.  This matter is going to be,

12   pursuant to Your Honor, adjourned until the September 13th date

13   that we have.  And at that time we will ask -- assuming we are

14   out of that facility, ask for a retroactive rejection to August

15   31st so that we can avoid the September rent.

16   THE COURT:  All right.  Has the Landlord been involved

17   in those discussions?

18   MR. GLEASON:  We have advised the Landlord.  And I

19   understand that we are discussing that with them now.

20   THE COURT:  Is the Landlord aware of your request that

21   the matter be adjourned?  Is there anybody here on behalf of

22   the Landlord?

23   MR. ROSNER:  Your Honor, Fred Rosner, Jaspan

24   Schlesinger.  We served out that motion by Federal Express.

25   And we also served the agenda on the Landlord.  We're not

1  asking for any relief today.  This is just a status conference.

2  We're trying to vacate that premise by the end of the month.

3  If we're successful in that effort, we come back on the 13th,

4  report to the Court, and then ask that the Order authorizing

5  the rejection be retroactive to the date we vacated.  And again

6  the idea is to not incur charges going into September.

7       THE COURT:  I understand that.  All right, thank you.

8  The way counsel had presented it, it sounded as if it was being

9  continued on the understanding that the retroactive nature of

10 the rejection would be approved at that time.  And I'm not

11 making any substantive decision with regard to that at this

12 hearing today.

13      MR. GLEASON:  I understand, Your Honor.

14      MR. MASON:  Good morning, Judge Case.  For the record,

15 my name is Richard J. Mason.  I'm with McGuire Woods, and we

16 represent -- or we are proposed counsel to the Creditor's

17 Committee.

18      THE COURT:  We've never gotten an Order signed for

19 you, Mr. Mason?  Or is that still subject to dispute at this

20 point?

21      MR. MASON:  Judge, I don't believe it's subject to

22 dispute.  It's just that I think that we have presented the

23 only motion in this case that has not been termed an emergency

24 motion, and therefore, it has been scheduled for the middle of

25 September.  And so we are still proposed counsel, but subject

1  to that limitation.  The Committee has not been consulted on

2  this motion.  We may have some technical objections to it

3  concerning who is actually the tenant under this lease.  And

4  we're just gonna reserve our rights.  And we have no problems

5  with this being put over to September 13th.  We will attempt to

6  work out something with the Debtor.  If not, we may want to

7  file at least a limited objection on this motion.

8         MR. ROSNER:  Fred Rosner again.  We will notice that

9  the hearing is going to be continued to the 13th, and we'll

10 have a new objection deadline to give the Committee an

11 opportunity to weigh in.

12        THE COURT:  All right, thank you.  The matter will be

13 continued to September 13th on the terms and conditions stated

14 on the record.

15        MR. GLEASON:  Thank you, Your Honor.  The last two

16 matters on the agenda are the Debtor's motion for entry of a

17 final Order approving Debtor-In-Possession financing, and the

18 Debtor's motion for Order approving bidding procedures.  These

19 matters have been adjourned on several occasions.  And although

20 the parties have made progress with respect to an overall

21 agreement, there are still a few open issues.  As indicated by

22 Your Honor at the last hearing, we are prepared to introduce

23 evidence today to establish the need for the requested relief,

24 as well as the fact that the requested relief is fair,

25 reasonable, and adequate given the circumstances of these

1  cases.  I would first like to advise the Court of the

2  significant modifications the Debtors believe we have

3  successfully negotiated with respect to these matters.  Rather

4  than file a reply, Your Honor, the Debtors were successful in

5  negotiating with both Key and Presstek.  There were

6  negotiations -- I won't go into them -- with all of the other

7  parties.  Again pursuant to Your Honor's admonishment at the

8  last hearing, I think all parties were involved in the

9  discussions.  The Debtors with Presstek and Key we believe have

10  been successful in getting three major modifications that we

11  believe address the objecting parties' concerns, as well as the

12  overriding concerns held by the Debtors in these cases.

13      The Debtors were able first to negotiate an extended

14  marketing process with bids now being due October 27th, and a

15  sale hearing being held, subject to Your Honor's calendar, the

16  first week of November.  Second, we have firmed up the Asset

17  Purchase Agreement by revising the definition of "inventory"

18  for purposes of the working capital test.  Presstek and Key

19  have agreed to include up to $2.5 million of pre-paid inventory

20  in this definition, as long as that inventory is received by

21  November 30th.  That ties into the Mitsubishi agreement that we

22  spoke about at the last hearing, Your Honor.  The Debtors

23  believe this modification will enable them to comply with the

24  terms of the Asset Purchase Agreement.

25      Finally, we also negotiated a modification to the Debtor-

1  In-Possession financing package so that pre-paid inventory
2  constitutes inventory included in the borrowing base.  Again,
3  the Debtors are confident this will enable them to satisfy the
4  reasonable representations and warranties that are contained in
5  the Asset Purchase Agreement.  I should note also that the
6  parties have agreed to extend the term of the D-I-P, or the
7  maturity date of the D-I-P through November 15th, which we
8  believe is more than sufficient to get us through the marketing
9  process.  With -- this is a backdrop, Your Honor.  Again, the
10 Debtors believing that they have addressed the three major
11 issues that the Debtors also had concern with at the time these
12 documents were negotiated, but didn't have a whole lot of
13 leverage to deal with them.  The Debtors also made
14 modifications to the proposed bid procedures.  They have been
15 circulated.  And although --
16          THE COURT:  Let me just ask a question --
17          MR. GLEASON:  Sure.
18          THE COURT:  -- counsel.  I heard an indication on the
19 line that there may have been somebody who joined the
20 conference.  Is there anybody new on the telephone?  Is there
21 anybody on the telephone?
22          UNIDENTIFIED SPEAKER:  Yes.  Yes, Your Honor.
23          THE COURT:  Okay.  Well I heard the sound that we
24 often hear when it's time to -- to indicate that somebody had
25 joined.  Is there anybody who just joined the conference?  If

12

1  so, please speak up.  All right, well maybe we lost somebody

2  instead of joining somebody.  Okay, sorry, counsel, go ahead.

3          MR. GLEASON:  Thank you, Your Honor.  Although the

4  final document has not yet been agreed to by the Committee or

5  MHR, the Debtors have negotiated a revised Form of Order with

6  Presstek that we believe addresses the legitimate concerns

7  raised by various parties, that will enable the Debtors to

8  fully market their assets.  Should I continue or --

9          THE COURT:  Did we just have somebody join the

10  teleconference?  Is there anybody new on the telephone?  All

11  right, go ahead, Mr. Gleason.

12          MR. GLEASON:  Again, we believe we've addressed the

13  legitimate concerns raised by the various parties, which will

14  enable the Debtors to fully market their assets while at the

15  same time preserve the going concern value of the Debtors'

16  businesses.  I have a copy of a proposed Form of Order which we

17  have blacklined to the one that was submitted to the Court with

18  the motion, if I may approach.

19          THE COURT:  All right.  Well I think I have the

20  blackline of the D-I-P Order.

21          MR. GLEASON:  Right.  And I have a blackline of the

22  Bid Procedures Order.

23          THE COURT:  Okay.

24          MR. GLEASON:  May I approach?  I believe all the

25  parties have one.  If anybody needs an extra copy, I do have

AA 36

1   some, and I will leave them.  It's the one -- for the parties

2   in the Courtroom -- the one that we circulated this morning.

3   If I may, Your Honor, just go through the provisions and the

4   changes that have been made.  A lot of them are self-

5   explanatory, so I will just hit the substantive ones.  In

6   paragraph 4 of the revised bid procedures, Presstek has agreed

7   that they will guarantee the obligations of Silber pursuant to

8   the Asset Purchase Agreement.  That was one of the issues that

9   was raised by some of the parties.  In various paragraphs

10  throughout the bid procedures, the first place in paragraph 5,

11  the Debtors have agreed that with respect to many if not most

12  of the decisions concerning the bids and whether they're a

13  qualifying bid, and any other decisions that need to be made

14  with respect to the bid procedures, that they will do that

15  after consultation with the Committee, MHR, and Key Bank.  That

16  is kind of an overriding change throughout the document.

17      In paragraph 2(B)(i) it is -- the bid procedures have been

18  revised to show that the bids would be due October 27th.  We

19  then change the terms of the Asset Purchase Agreement that

20  other parties need to submit, so that it is not substantially

21  in the form of the Asset Purchase Agreement that was negotiated

22  pre-petition, but just that it is no less favorable than

23  negotiated pre-petition.  We have reduced the initial minimum

24  overbid amount by $200,000.  We have changed the deposit

25  amounts so that all bidders, including Silber and any of the

AA 37

1  bidders that submit a bid, their deposits are the same 5%.

2  Previously other bidders had to place a 10% deposit.  On page 5

3  of the blackline, Your Honor, in paragraph C, again this has

4  the provision that we will provide information, as well as all

5  of the bids, to the Committee, MHR, Key Bank, and other

6  qualifying bidders.  The one change I would indicate, after

7  discussions here this morning, the Debtors have agreed to take

8  out the words "upon request" in both places in that paragraph.

9  We had had that in there so that people would request, and then

10  we would be able to keep track.  But we have agreed that we

11  will just provide that information to all of those parties.

12      The next major modification again ties to the time frame

13  in paragraph D.  We will conduct the auction on October 29th.

14  I would indicate for the Court that as of now we do have it

15  being held at our offices in Cleveland.  We will in

16  consultation with the parties -- after we see where the bids

17  are coming from and the Court's calendar when we may be able to

18  have a sale hearing, that location may change.  And I think the

19  Order contemplates that.  Let's see.  Just going to -- the

20  other -- we had indicated a bidding increment increase of not

21  less than $200,000, which was one of the issues raised by some

22  of the parties.  With respect to paragraph E, which begins on

23  page 6 but then continues on page 7, Presstek has agreed that

24  their termination fee, as well as their expense reimbursement

25  fee, only lasts for a period of six months, so that if the

1  Debtors do not go forward with Presstek or Silber, and then

2  close a transaction either pursuant to another sale or pursuant

3  to a Plan of Reorganization let's say seven months down the

4  line, these bid protections would not be payable to Presstek.

5  The sale hearing date has been changed also, Your Honor,

6  although we have left that bracketed as, of course, subject to

7  Your Honor's calendar.

8      I think the -- well, two more substantive issues there.

9  One is that with respect to the cure amounts, the Debtors have

10  agreed that we -- Silber is requesting some additional

11  information.  We will provide that information as soon as

12  possible.  And Silber has agreed that within 15 days of that

13  time, they will provide us the list of executory contracts and

14  leases that they would like the Debtors to assume and assign.

15  We will submit that list prior to October 1st, which we believe

16  will give all parties enough time to look at the list and look

17  at the Debtors' cure amount.  And then that is an issue that

18  would be decided or would be before the Court at the sale

19  hearing.  We've also agreed to publish notice of the hearing at

20  least 45 days prior to the bid deadline in the Wall Street

21  Journal and a trade publication.  And finally, although not on

22  here, another issue that was raised this morning that the

23  Debtors will change, is that to the extent the Bid Procedures

24  Order conflicts with the terms of the Asset Purchase Agreement,

25  we will have a provision that the Bid Procedures Order governs.

1  So we believe the Debtors have made significant progress
2  with respect to the Bid Procedures Order. And we've addressed
3  the overriding concerns that the Debtors had. With respect to
4  the proposed final D-I-P Order, Your Honor, the Debtors and
5  other parties -- again, all parties have been involved in
6  discussions. We've had depositions, and there's been a lot of
7  work done within the last week. And in addition to the
8  business terms that I described earlier, the change in the
9  definition of collateral and inventory, which we believe will
10  enable the Debtors to satisfy the reps and warranties in the
11  Asset Purchase Agreement, there were various modifications made
12  to the D-I-P Order. And although I believe the Committee and
13  MHR may continue to take issue with certain provisions, the
14  Debtors believe these provisions are reasonable under the
15  circumstances, are consistent with applicable bankruptcy and
16  non-bankruptcy law, and are balanced by the limitations and
17  protections afforded the Debtors and other Parties-In-Interest.
18  Again, as has been the Debtors' main goal since the beginning,
19  before this case was filed, the Debtors' overriding concern is
20  to obtain reasonable post-petition financing in order to
21  maintain the going concern value of their business. As we
22  believe the evidence this morning or this afternoon will
23  demonstrate, we have accomplished this goal. With respect to
24  the individual items in the D-I-P Order, I would, if the Court
25  would like, turn the podium over to counsel for the Post-

AA 40

17

1  Petition Lenders to address those. And then as I indicated, we

2  are prepared to introduce testimony and other evidence to

3  support our motions.

4      THE COURT: All right. Are we're gonna counsel for

5  the -- and then we can hear from you kind of in an omnibus way,

6  Mr. Mason. How does that sound?

7      MR. MASON: Thank you, Judge.

8      MR. LEPENE: Good morning, Your Honor, Alan Lepene

9  with the law firm of Thompson Hine on behalf of Key Bank. Your

10  Honor, we have engaged in extensive discussions with the

11  objecting parties, and with counsel for Presstek, our co-D-I-P

12  Lender. And I believe we have reached an agreement in

13  principle with respect to all of the points that were in

14  contention. We have drafted a revised Order, but we have not

15  reached final agreement on the language, although I expect that

16  that will occur hopefully this morning or early this afternoon

17  so that we would be in a position to present an agreed Order to

18  the Court. I can review, and then would ask others to

19  supplement to the extent that I have left anything out or mis-

20  state anything, the basic points that were in issue as raised

21  by the objecting parties, and how those have been resolved.

22  And I will be brief with respect to that.

23      THE COURT: All right. Before we go into that, sorry

24  to keep interrupting. I want to ask the people on the

25  telephone, can you hear me? This is Judge Case.

1  value of the existing loans.

2  Q.  How long would it take a new DIP lender to complete due

3  diligence and commit funding?

4  A.  My view is no less than 3 weeks for a company this size

5  with the prime collateral being foreign assets or foreign

6  securities -- securities of foreign companies.

7  Q.  Given the modifications that we've discussed this

8  afternoon, do you believe the Debtors should continue

9  aggressively seeking a replacement Debtor-In-Possession

10 financing agreement?

11 A.  I do not.  Given the duration, the amount, the conditions

12 and the cost of the financing as modified, I find it, in my

13 opinion, adequate to allow the Debtors to reach the proposed

14 auction date without restricting -- unduly restricting their

15 business activities.  I also find it unlikely that the process

16 cost and distraction result of seeking alternate financing

17 would materially add to the going concern value of the

18 enterprise.

19 Q.  Let's turn now briefly to the marketing process in this

20 case.  Can you describe for the Court the professionals that

21 are working on this engagement on behalf of Candlewood?

22 A.  There are two of my partners and two associates.

23 Q.  And what steps has Candlewood taken to market the Debtor's

24 assets as of this date?

25 A.  We assembled a buyer's list through our own sources and

1  solicitation of names and ideas from the Debtor's management.

2  We sent a teaser, which is purely an introductory letter to, I

3  believe, 150 parties. We have contacted over 140 of those

4  parties personally by phone, haven't reach every one of them,

5  to encourage them to sign a CI and receive the Selling

6  Memorandum. The Selling Memorandum was started prior to the

7  commencement of the case, has been worked on continuously until

8  its completion about 4 or 5 days ago. It was substantially

9  complete awaiting the Debtor's analysis, at Candlewood's

10 request, of a break out of the results of the three main

11 business lines so that we would be able to use the Selling

12 Memorandum as a tool to identify opportunity to potential

13 buyers as opposed to just a reflection of exactly what the

14 Debtor has reported in its financial statements.

15 Q.  Does this -- explain that the three business lines --

16 A.  Sure, let me finish my answer.

17 Q.  Sure.

18 A.  We've also worked with the Debtor to establish an online

19 data room, which is effective now, which allows buyers who have

20 signed -- potential buyers who have signed a CA to view the

21 companies -- much of the companies diligence material without

22 leaving their offices. That encourages people to participate

23 in the process, it reduces the cost and gives more flexibility

24 to the prospective party. I'm sorry, your question was?

25 Q.  You had talked about the analysis of operations by the

1    lines.  Can you explain, one, why that wasn't available

2    previously and then what you hoped to show from that?

3    A.   Yes.  As Mr. Knipp has testified, the company records

4    revenue in three main categories; the sale of equipment, the

5    sale of supplies, and the provision of service and attendant

6    sale of service replacement parts.  Three major revenue sources

7    and three lines of businesses run by three separate operating

8    VPs, if you will.  The companies financial statements reflect

9    the sales of those three business lines, the standard margin of

10   those business lines, and from that point on, they tend to

11   lump, if you will, all of the costs associated with running all

12   of those businesses into a more general overhead and corporate

13   overhead line.  So they don't regularly report the -- and it is

14   a fact, to my knowledge, they don't ever report the operating

15   profitability by business line up through the EBITDA level.  As

16   Mr. Knipp has testified, that is a not -- that is not a simple

17   exercise and it requires the accounting staff to make certain

18   assumptions with respect to the division of those overhead

19   dollars.

20   Q.   When did they Debtors confirm that the no-shop provision in

21   the agreement was waived?

22   A.   I believe it was the end of the first week of August.

23   Q.   Why was that important to the Debtors?

24   A.   That -- the -- when that provision was waived, that

25   signaled the opportunity for Candlewood to begin marketing

1  these assets to the general public, if you will, and limited --

2  and ended the limitation honorability to talk to prospective

3  interested parties.

4  Q.  Had that no-shop not been waived previously, would the

5  Debtors and your office have been able to engage in any

6  marketing efforts with respect to these Debtors, as we sit here

7  today?

8  A.  I believe they would not have been.

9  Q.  Why is that?

10  A.  Because the no-shop required -- my understanding of the

11  arrangement was that the no-shop would not be lifted until the

12  Procedures Motion was put in force and that we wouldn't -- we

13  would not be allowed to market the assets, make any third party

14  contact, or hold any third party discussions until that was

15  lifted.

16  Q.  That was another concession that the Debtors were able to

17  obtain in these cases?

18  A.  That was.

19  Q.  If you could briefly describe for the Court the steps

20  Candlewood anticipates taking over the next few weeks to market

21  these assets?

22  A.  Yes.  We intend to contact and talk in person to every one

23  of the people on our prospective parties on our prospective

24  buyers list.  We have, I believe, 20 or 25 CAs that have gone

25  out so far.  We would expect a significant additional number of

1  CAs to be -- to go out and get executed.  That group of

2  prospective interested parties will get further attention from

3  us, regular follow-up calls inviting them to ask questions,

4  clarify things.  We will seek to understand what it is they're

5  looking at, what they're interested in.  We will seek to

6  discuss with them opportunities for them to participate in the

7  auction.  If it becomes apparent that there are parties who

8  want to buy one business line and some parties who want to buy

9  a different business line, we will attempt to negotiate with

10 the various parties to maximize the overall dollars available

11 for the estate in the sale of these assets.  And we will

12 continue talking with these interested parties until the

13 auction date.  We will also arrange for further diligence,

14 meetings with management, whatever else, reasonably -- is

15 reasonably requested.

16 Q.  All of these items you have mentioned, are they typical

17 activities that take place during this process in a 363 sale?

18 A.  I think in an appropriate one they are.

19 Q.  I want to turn briefly to the original schedule that was

20 contemplated under the bid procedures that were initially filed

21 with the Court.  What was that original schedule?

22 A.  My recollection is that the pre-petition schedule was that

23 the case would be commenced in early July.  The Procedures

24 Motion would go on very quickly.  There was an expectation that

25 it would be entered and certainly that the no-shop would be