

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          :        Chapter  11

A.B. Dick Company, Inc.,        :

        Debtor(s).              :        Bankruptcy #04-12002 (JLP)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
November 2, 2004
2:00 p.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor(s):          Frederick B. Rosner, Esq.
                            Jaspan Schlesinger Hoffman, LLP
                            1201 North Orange Street-Ste. 1001
                            Wilmington, DE 19801

                            H. Jeffrey Schwartz, Esq.
                            Benesch Friedlander Coplan
                            & Aronoff, LLP
                            2300 BP Tower
                            200 Public Square
                            Cleveland, OH 44114

                            John F. Stock, Esq.
                            Benesch Friedlander Coplan
                            & Aronoff, LLP
                            88 E. Broad St.-Ste. 900
                            Columbus, OH 43215

                            Mark A. Phillips, Esq.
                            Benesch Friedlander Coplan
                            & Aronoff, LLP
                            2300 BP Tower
                            200 Public Square
                            Cleveland, OH 44114

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
752-529-0191



AA 47



2

| | | |
|---|---|---|
| 1 | For The Official Committee: of Unsecured Creditors | James P. Ricciardi, Esq. McGuire Woods, LLP 77 West Wacker Drive-Ste. 4100 Chicago, IL 60601 |
| 2 | | |
| 3 | | James Joseph, Esq. McGuire Woods, LLP Dominion Tower 625 Liberty Ave.-23rd Fl. Pittsburgh, PA 15222 |
| 4 | | |
| 5 | | |
| 6 | | Ronald W. Crouch, Esq. McGuire Woods, LLP Dominion Tower 625 Liberty Ave.-23rd Fl. Pittsburgh, PA 15222 |
| 7 | | |
| 8 | | |
| 9 | | Jeffrey Schlerf, Esq. The Bayard Firm 222 Delaware Ave.-Ste. 900 Wilmington, DE 19801 |
| 10 | | |
| 11 | | |
| 12 | For MHR Entities: | Megan N. Harper, Esq. Landis Rath & Cobb, LLP 919 Market Street Wilmington, DE 19899 |
| 13 | | |
| 14 | | David S. Rosner, Esq. Kasowitz Benson Torres & Friedman, LLP 1633 Broadway New York, NY 10019 |
| 15 | | |
| 16 | | |
| 17 | | Michael M. Fay, Esq. Kasowitz Benson Torres & Friedman, LLP 1633 Broadway New York, NY 10019 |
| 18 | | |
| 19 | | |
| 20 | For Key Bank: | Margaret M. Manning, Esq. Buchanan Ingersoll, PC The Nemours Building 1007 North Orange Street-Ste. 1110 Wilmington, DE 19801 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

AA 48

3

| | |
|---|---|
| | Robert Folland, Esq.<br>Thompson Hine, LLP<br>3900 Key Center<br>127 Public Square<br>Cleveland, OH 44114 |
| | Alan R. Lepene, Esq.<br>Thompson Hine, LLP,<br>3900 Key Center<br>127 Public Square<br>Cleveland, OH 44114 |
| For Presstek, Inc.: | Stephen B. Selbst, Esq.<br>McDermott Will & Emery<br>50 Rockefeller Plaza<br>New York, NY 10020 |
| | Gary O. Ravert, Esq.<br>McDermott Will & Emery<br>50 Rockefeller Plaza<br>New York, NY 10020 |
| | Francis A. Monaco, Jr., Esq.<br>Monzack & Monaco, PA<br>400 Commerce Center<br>Twelfth & Orange Streets<br>Wilmington, DE 19899 |
| For Mitsubishi: | Thomas G. Whalen, Jr., Esq.<br>Stevens & Lee, PC<br>300 Delaware Ave.-Ste. 800<br>Wilmington, DE 19801 |
| | Robert Lapowsky, Esq.<br>Stevens & Lee, PC<br>1818 Market Street-29th Fl.<br>Philadelphia, PA 19103 |
| For Data Card: | Karen McKinley, Esq.<br>Richards Layton & Finger<br>One Rodney Square<br>Wilmington, DE 19899 |
| For Citicapital: | John Weaver, Esq.<br>Farr Burke Gambacorta<br>& Wright, PC<br>211 Benigno Blvd.<br>Bellmawr, NJ 08099 |

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

AA 49

4

```
 1                              Sergio Scuteri, Esq.
                                Farr Burke Gambacorta
 2                              & Wright, PC
                                211 Benigno Blvd.
 3                              Bellmawr, NJ 08099

 4    For Brown Gibbons:        Jeffrey C. Wisler, Esq.
                                Connolly Bove Lodge
 5                              & Hutz, LLP
                                1007 N. Orange St.
 6                              Wilmington, DE 19899

 7    For Squire Sanders:       Philip Trainer, Jr., Esq.
                                Ashby & Geddes
 8                              222 Delaware Ave.-17th Fl.
                                Wilmington, DE 19899

 9    For Comvest:              Victoria W. Counihan, Esq.
                                Greenberg Traurig
10                              The Brandywine Bldg.
                                1000 West Street-Ste. 1540
11                              Wilmington, DE 19801

12                              Allen G. Kadish, Esq.
                                Greenberg Traurig
13                              Metlife Bldg.
                                200 Park Ave.
14                              New York, NY 10166

15    For N.E. S. Investment:   David Stratton, Esq.
                                Pepper Hamilton, LLP
16                              Hercules Plaza
                                1313 Market st.-Ste. 5100
17                              Wilmington, DE 19899

18    For Individual 3rd Party: Ray Lemisch, Esq.
      Defendants                Adelman Lavine Gold
19                              & Levin, PC
                                1900 Two Penn Center
20                              Philadelphia, PA 19102

21    For ESCO Graphics, Inc.:  Christopher D. Loizides, Esq.
                                Loizides & Associates
22                              1225 King Street
                                Wilmington, DE 19801
23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

AA 50

5



```
 1   For Acting U.S. Trustee:      David Klauder, Esq.
     (Roberta A. DeAngelis)        U.S. Trustee's Office
 2                                 844 King Street-Ste. 2313
                                   Lock Box 35
 3                                 Wilmington, DE 19801

 4   Audio Operator:               Brandon J. McCarthy

 5   Transcribing Firm:            Writer's Cramp, Inc.
                                   6 Norton Rd.
 6                                 Monmouth Jct., NJ 08852
                                   732-329-0191
 7
     Proceedings recorded by electronic sound recording, transcript
 8   produced by transcription service.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

AA 51

6

## Index

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For The Debtor:

Mr. Gray
(by Mr. Stock)                 30              107
(by Mr. D. Rosner)                   54
(by Mr. Crouch)                      97
(by Mr. Selbst)                     106

Mr. Polleck
(by Mr. Phillips)              110

| | | Marked | Received |
|---|---|---|---|

EXHIBITS:

C-1      Waterfall analysis                        99

MHR-A    Candlewood analysis                       71
MHR-B    Stock Purchase Agreement                  87

D-1      Paragon forecast, August 2004             33      35
D-2      Paragon financial performance             38
D-3      Bid Procedures Order                      40
D-4      D-I-P Order                               41
D-5      Asset Purchase Agreement                  44
D-6      Letter of interest                        48
D-7      Letter of interest                        50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

AA 52

1  opportunity to make an opening --

2          THE COURT:  Why don't we do this.  Why don't we hear

3  the evidence then I'm going to give everybody a chance to speak

4  after I hear testimony so that I might have some questions

5  myself.

6          MR. D. ROSNER:  Okay, thank you, Your Honor.

7          THE COURT:  I'm not going to shut you off.

8          MR. STOCK:  Steven.

9              STEVEN GRAY, Debtor's WITNESS, SWORN

10                      DIRECT EXAMINATION

11  BY MR. STOCK:

12  Q.  Mr. Gray, would you please identify yourself for the record

13  and give your business address?

14  A.  Steven S. Gray, 270 Congress Street, Boston, Massachusetts.

15  Q.  Mr. Gray, you are currently Chief Restructuring Officer for

16  the Debtors, correct?

17  A.  I am.

18  Q.  Okay.  And how long have you been operating in that

19  position?

20  A.  Since approximately July 27th, 2004.

21  Q.  Mr. Gray, would you describe for the Court your experience

22  in working with distressed companies.

23  A.  I have spent the last 30 years working exclusively with

24  distressed companies in and out of bankruptcies through various

25  crisis management restructuring roles.

Gray - Direct                                           31

1   Q.  Okay.  Have you acted as a Chapter 11 Trustee?

2   A.  I have on numerous occasions.

3   Q.  Okay.  How about as a Chief Restructuring Officer?

4   A.  I have as well.

5   Q.  You have experience with 363 sales of assets in the

6   bankruptcy context?

7   A.  Yes.

8   Q.  And what --

9   A.  Numerous times.

10  Q.  What is that experience, generally?

11  A.  I have worked as a Trustee in selling assets in 363 sales,

12  as Chief Restructuring Officer, as Responsible Officer,

13  consultant to Debtors, Creditors, Secured parties, Buyers of

14  assets in 363 sales.  So just about all aspects.

15  Q.  Prior to becoming the Chief Restructuring Officer of

16  Presstek in this case had you had any prior relationship with

17  the Directors or Officer -- excuse me.  Prior to becoming Chief

18  Restructuring Officer with the Debtors in these cases, had you

19  had any prior relationship with the Directors or Officers of

20  the Debtors?

21  A.  No.

22  Q.  Thank you.  Would you describe for the Court your duties as

23  the Chief Restructuring Officer of the Debtors?

24  A.  I am responsible for the overall general management, the

25  day-to-day affairs of the Debtors, as well as the management of

AA 54

1        MR. D. ROSNER: The fairness of the sales proceeds?

2   Absolutely.

3        MR. STOCK: Sale process.

4        THE COURT: The objection's overruled. You can cross

5   examine him if you think the testimony is impeachable.

6   A.   The process was open, honest, the perspective bidders or

7   inquirers had access to all information on a timely basis, no

8   questions of any interested party were left unanswered. I

9   don't believe there was anything in the process that would

10  suggest it wasn't anything other than completely open and fair

11  BY MR. STOCK:

12  Q.   Okay. Now, I'd like to have you identify for the Court and

13  get into the record the Asset Purchase Agreement. We should be

14  up to, I believe, Exhibit-5.

15       (Pause in proceedings)

16  Q.   Mr. Gray, I've handed you what I've had marked as Debtor's

17  Exhibit-5. Would you please identify this for the record?

18       (Debtor's Exhibit-5 marked for identification)

19  A.   This is the Asset Purchase Agreement by and among Presstek,

20  Inc., Silver Acquisition Corp., Paragon Corporate Holdings,

21  Inc., A.B. Dick Company, Interactive Media Group, Inc., and

22  A.B. Dick Company of Canada, LTD, dated as of July 13th, 2004.

23  Q.   Is this the terms -- does this contain the terms of the

24  Presstek deal prior to the amendments that have been announced

25  in Court today?

AA 55

1  Q.  Now, during, or in response to the bid process that was

2  implemented, I've referenced letters of interest from Comvest

3  and from Harbor Partners.  Are you familiar with those?

4  A.  I am.

5  Q.  Okay.

6        MR. STOCK:  Let me find them if I can, Your Honor,

7  and submit them to the witness.

8      (Pause in proceedings)

9  BY MR. STOCK:

10  Q.  Is this now Exhibit-6?

11  A.  It's marked 5.

12  Q.  That is 5?

13  A.  Yes.

14  Q.  Okay.  So this new one is 6, thank you.

15      (Pause in proceedings)

16  Q.  Mr. Gray, I've handed you what I've marked as Debtor's

17  Exhibit-6.  Would you please identify it for the record?

18      (Debtor's Exhibit-6 marked for identification)

19  A.  This is a letter from our firm of Greenberg and Traurig to

20  the Debtors' counsel and Candlewood Partners, and it is a

21  self-described letter of -- as an indication of interest to

22  pursue a transaction as outlined in the letter.

23  Q.  Have you reviewed this document prior to today's hearing?

24  A.  I have.

25  Q.  Okay.  In what context?

AA 56

Gray - Direct                                    49

1  A.  In the context of understanding the results of the
2  marketing process, as well as understanding this indication of
3  interest as compared to the other offers that -- or the other
4  letter of interest that we received and the stalking horse bid.
5  Q.  Okay.  Did you engage in consultations with personnel of
6  the Debtor or the Debtors' professionals with respect to this
7  letter of interest?
8  A.  I did.
9  Q.  Okay.  Did you perform any assessment of the terms of this
10 letter of interest?
11 A.  I did in conjunction with Debtors' counsel and the Debtors'
12 financial advisors.
13 Q.  Okay.  I don't want you to reveal any -- the content of any
14 discussions you've had with Debtors' counsel, but excepting
15 those discussions out from this question, what assessments did
16 you reach regarding the terms and conditions of this letter of
17 interest?
18 A.  I viewed it as an interesting proposal, but lacked
19 certainty and presented the extent that we pursued this as
20 opposed to the Presstek bid presented substantial risks of the
21 Estate that made it difficult to define at this point.
22 Q.  Okay.  What risk did you identify?
23 A.  Well, the risk of the expiration of -- well, first of all,
24 this letter -- this indication of interest to the extent that
25 it went forward was contingent on due diligence.  It was

AA 57

1   contingent on a -- and that was an open-ended due diligence,

2   but there were specific -- it does propose to provide a

3   replacement D-I-P facility on the terms that currently exist,

4   which we have been informed by Key Bank it would oppose, and

5   the other major issue in it was the condition that it required

6   the reinstatement of the Presstek Joint Development Agreement

7   with the Debtor, which Presstek specifically told us that they

8   would not agree to. I should add the last piece is to the

9   stated proposed benefit to Creditors is a note to be paid out

10  of a percentage of future profits.  That was also an

11  uncertainty, or a contingency that we couldn't define in

12  current dollars because it's a question of what future profits

13  might be.

14  Q.  Mr. Gray, I've handed you what I've marked as Debtor's

15  Exhibit-7, is that correct, is that the number on there?  I

16  handed out all my copies.

17  A.  It is.

18  Q.  Thank you.  Would you please identify Debtor's Exhibit-7

19  for the record?

20      (Debtor's Exhibit-7 marked for identification)

21  A.  It's a letter from the law firm of Dicstein Shapiro &

22  Warren to Debtors' counsel and to myself expressing the

23  interest of Harbor Group, or Harbor Partners in pursuing a

24  transaction with the Debtor through the funding of a Plan of

25  Reorganization.

AA 58

1  Q.  Have you performed any assessment of this letter of

2  interest prior to today's hearing?

3  A.  I did.

4  Q.  Okay.  Would you please tell us what assessment you

5  performed?

6  A.  Well, it has a lot of contingencies in it too, due

7  diligence contingencies, it has a note on future profits, but

8  the biggest issue, and the nonstarter in this proposal was it

9  had an absolute financing contingency.

10  Q.  What do you mean by that?

11  A.  It was subject to Harbor Group securing financing,

12  including the D-I-P financing, as a condition to go forward,

13  and there's no assurance of that financing being forthcoming,

14  although there was a letter attached to it expressing interest

15  of someone who might provide D-I-P financing and exit

16  financing.

17  Q.  Now, as the Chief Restructuring Officer having reviewed the

18  Presstek bid now as improved by negotiation, the Comvest letter

19  of interest, their expression of interest, and the Harbor

20  Partners expression or letter of interest, did you form a

21  business judgment as to how the Debtor should proceed with

22  respect to those three items?

23  A.  Comvest, Harbor, and Presstek?

24  Q.  And Presstek.

25  A.  Yes.

1    Q.  And what --

2    A.  I did.

3    Q.  And what is that business judgment?

4    A.  In my judgment the, as I said, the Harbor proposal was a

5    nonstarter because of the financing contingencies.  The Comvest

6    proposal had its due diligence contingencies as well as these

7    other issues that I described.  As compared to those, the

8    Presstek proposal as improved and described previously in this

9    proceeding, provides a significant cash benefit to the Estate

10   assures the solvency of the Estate -- post-petition solvency of

11   the Estate, the preservation of this business for its

12   employees, and vendors, and the community that it serves, and

13   that that is in the best interest of this Estate, the Presstek

14   bid.

15   Q.  As the Chief Restructuring Reorganization Officer of the

16   Debtors have you had any deliberations or consultations with

17   the Boards of the Debtors regarding the Presstek bid and these

18   two expressions of interest?

19   A.  Yes, I have.

20   Q.  Okay.  What discussions have you had?

21   A.  The Board was made aware of all of these offers, of where

22   we stood last Friday, the original bid date, what myself and

23   the Debtors' other professionals view of these bids were.  We

24   thought we should proceed, and we -- the Debtors' professionals

25   were instructed to negotiation with the parties over the

AA 60

Gray - Direct                                    53

1   weekend in order to get to a place by yesterday afternoon where

2   there was a reconvened Board meeting and given the improvements

3   in the Presstek bid and still the lack of certainty in these

4   other offers both myself, Candlewood recommended to the Board

5   that we proceed with the Presstek transaction, and the Board

6   voted and approved that recommendation.

7           MR. D. ROSNER:  Your Honor, move to strike the latter

8   part of the answer in which the witness testifies as to what

9   the Board did and what the Board said, as opposed to what he

10  presented to the Board (inaudible).

11          THE COURT:  Were you present at the meeting?

12  A.  I was.

13          THE COURT:  Overruled.

14          MR. STOCK:  And -- I need to respond, Your Honor.  A

15  Board vote is a Board vote, it's an act, it's not a hear-say

16  statement.

17          MR. D. ROSNER:  Do you want to introduce the Board

18  minutes (inaudible) witness, we'd have no objection, Your

19  Honor, but in terms of what other people outside of the

20  Courtroom are saying I would call that hear-say.

21          THE COURT:  Well, all I heard is that the substance

22  of the answer was that the Board voted in favor of the offer of

23  Presstek, right?

24          MR. STOCK:  Right.

25          THE COURT:  They didn't vote no.

AA 61

1    that out into the future looking at what the cash requirements

2    were, what ability the Debtor had to operate, what its earnings

3    might be, those kind of things.

4    Q.  Instead of those kind of things, specifically, did you put

5    together an operating plan for this company?

6    A.  We did, yes.

7    Q.  Okay.  Did you produce that in the discovery in this case,

8    are you aware?

9    A.  I was not personally asked for any discovery.  I don't know

10   what discovery was provided.  It's certainly been available.

11   It's been in the data room and made available to all

12   perspective bidders, interested parties.  It's been no secret.

13   Q.  And what steps under the operating plan have been

14   undertaken by the Debtors?

15   A.  The largest component of the operational restructuring

16   would involve significant staff lay offs, some 140 or so

17   employees, 150 employees both here and in Canada.  Because we

18   are operating under post-petition Warren Act notice, which

19   expires today, we were advised by counsel that to the extent we

20   terminated any employees prior to today we'd still be obligated

21   to pay them through today.  So, the only steps we've taken was

22   prepared and everything is in place to begin those terminations

23   this week.  The other --

24   Q.  So you haven't terminated anybody?

25   A.  No, nothing -- not other than in the normal course, you

AA 62

1  Q. Now, looking back at MHR Exhibit-A, if you look under the

2  column for Comvest, go all the way down to the bottom.  It

3  says, "Potential Recovery to Unsecured Creditors."  Can you

4  please read the number that's under the comvest column?

5  A. $8 million.

6  Q. $8 million?

7  A. That's what it says, yes.  But that is a note, contingent

8  note.

9  Q. Okay.  Just try to restrict yourself to my questions.

10        THE COURT:  Let him explain.  Go ahead.

11  A. That is under the Comvest proposal, Your Honor, they were

12  offering the Unsecured Creditors a note for $8 million to be

13  paid in the amount of, out of 20 percent participation in

14  profits, a minimum of a million dollars within the first three

15  years, if I recall.

16  BY MR. D. ROSNER:

17  Q. And under the column for Harbor Group, where you see

18  "Potential Recovery to Unsecured Creditors," you see the number

19  there?

20  A. Yes.

21  Q. What number is that?

22  A. $7,501,000.

23  Q. Okay.  And now the enhanced Presstek deal, in your view,

24  yields $3½ million for Unsecured Creditors?

25  A. Your honor, can I explain the nature of that?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

AA 63

Gray - Cross                                78

THE COURT: You may.

1

2   A.  'Cause that is also a note to be paid out of, if I recall,

3   a 50% interest in free cash flow as defined.  Neither of those

4   were cash that would be available out of a transaction in the

5   short term.

6   BY MR. D. ROSNER:

7   Q.  Mr. Gray, have you analyzed the collectibility of those

8   notes?

9   A.  Those notes would be payable out of profit participation or

10  cash flow participation in the reorganized Debtor.

11  Q.  Right.

12  A.  It's not a note that is collectible from some third party.

13  Q.  Right, so have you analyzed the collectibility of the note

14  based upon the source of payments?

15  A.  The question is is what the ongoing profitability of the

16  Debtors would be --

17  Q.  I understand what the question is, I am asking you if you

18  have analyzed the collectibility of the notes?

19  A.  I have not, we have not projected out -- we have not done

20  long term projections of the Debtor's operations, but on a

21  nominal basis, you could maybe, I would feel comfortable with a

22  profit stream that would suggest that those notes might be paid

23  over four or five years.

24  Q.  Was there any term on the note that was shorter than four

25  or five years?

1  A.  These letters were not all that specific, but there was no

2  term on either of them.

3  Q.  Right, so, I thought one of them was actually a seven-year

4  note, which would likely mean it would be fully paid under your

5  estimation of four or five years. That would be the Comvest

6  one.

7  A.  I don't recall it being seven years but, we could look at

8  that piece of paper.

9  Q.  So, If that note were paid and the Harbor Group's note were

10 paid, those offers that you decided not to go forward with

11 would actually exceed the value of the Presstek compensation by

12 more that a hundred percent, as to the recovery to Unsecured

13 Creditors.

14         MR. STOCK:  Objection, Your Honor.

15         THE COURT:  Counsel, the problem is that he didn't

16 analyze the two offers from Comvent and Harbor on the basis of

17 what going to be paid to the Unsecured Creditors, it was the

18 basis that the -- his were so indefinite and didn't have any

19 binding affect that he didn't think that they were valid.  Is

20 that right?

21 A.  Yes, Your Honor they were both very contingent.

22 BY MR. D. ROSNER:

23 Q.  Okay.

24 A.  But, to answer your question I think you also have to

25 present value of those notes and so you don't get to --

AA 65

1   A.   I am.

2   Q.   What was that Joint Development Agreement about?

3   A.   I haven't read the agreement but I understand in a general

4   sense what it was.  It provided for the development of a

5   certain scale of digital pipe maker utilizing some of the

6   Debtor's technology and some of Presstek's technology, as well

7   as Presstek's plates, to create a product known as the Vector

8   TX product, that is in beta testing as of today.

9   Q.   What's your understanding about the Vector project?  Would

10  that be a good project for A.B. Dick to be involved with?

11  A.   Yes.

12  Q.   And why is that?

13  A.   Because it is a new product development that the Debtor

14  believes has some significant opportunity in the marketplace.

15  Q.   And, what happened with the Joint Development Agreement

16  that A.B. Dick had with Presstek?

17  A.   It was terminated, pre-petition is my understanding.

18  Q.   Did A.B. Dick terminate it?

19  A.   It did not.

20  Q.   So, Presstek terminated the Joint Development Agreement

21  with A.B. Dick?

22  A.   That's my understanding, yes.

23  Q.   Okay.  Do you know when Presstek terminated it?

24  A.   Not specifically.  It was prior to my involvement with this

25  matter.

Gray - Cross                              90

1   Q.  Would you be surprised to learn that it was within days of

2   the bankruptcy?

3   A.  It's my recollection that I heard it sometime in June, so

4   it's possible June, or July or something like that.

5   Q.  Do you know the basis upon which Presstek allegedly

6   terminated this agreement?

7   A.  Only through hearsay.

8   Q.  What is that hearsay?

9   A.  It was terminated on the grounds that A.B. Dick, the other

10  party to the agreement, was insolvent.  But I have not seen

11  anything specific in that regard.

12  Q.  Did you see the complaint that A.B. Dick filed that

13  indicated it has been insolvent since 2001?

14  A.  Not specifically, no.

15  Q.  You haven't seen anything dealing with the complaint for

16  recharacterization filed by A.B. Dick?

17  A.  No, I have not read that complaint.

18  Q.  Are you aware that A.B. Dick was insolvent at the time of

19  execution of the Joint Development agreement?

20  A.  I have never analyzed the solvency of A.B. Dick at the time

21  of the Joint Development Agreement.

22  Q.  Have you ever analyzed whether Presstek's termination of

23  the valuable Joint Development Agreement was lawful?

24  A.  I'm not a lawyer, I think that's a matter for lawyers to

25  analyze its lawfulness.

AA 67

Gray - Cross                                          91

1  Q.  Have you ever instructed your lawyers to investigate the

2  lawfulness of the Presstek termination of the valuable Joint

3  Development agreement on the basis of A.B. Dick's insolvency?

4  A.  I have not.

5  Q.  Do you know whether anybody has instructed A.B. Dick's

6  counsel to determine whether it's lawful?

7  A.  I do not.

8  Q.  Has a motion been filed to undo the termination, such that

9  A.B. Dick could maintain this valuable asset?

10 A.  Not that I am aware of.

11 Q.  But you are aware that Comvest said this is a very valuable

12 asset and they would want that agreement in place?

13 A.  Yes.

14 Q.  And other than asking Presstek for it voluntarily you

15 undertook no analysis as to whether this is still an asset of

16 this Estate, not withstanding the alleged termination?

17 A.  Only the analysis that I sugested before before and that is

18 that to the extent of it being reinstated would require

19 litigation which would be uncertain in its outcome.

20 Q.  This litigation is always uncertain, isn't it?

21 A.  It is indeed.

22 Q.  Including litigation by the company against Presstek on the

23 claims arising from the SPA?

24 A.  Indeed.

25 Q.  What efforts did you undertake to replace Key Bank and

AA 68

Polleck - Direct                                    111

1  Q.  And what role does Candlewood partners have in these cases?

2  A.  We are the financial advisor and investment banker for the

3  Debtors.

4  Q.  Okay.

5       MR. PHILLIPS:  Your Honor, due to the lateness of the

6  hour I would dispense with the usual background information and

7  the qualification of Mr. Polleck as an expert.  Mr. Polleck has

8  previously been designated as an expert by this court in --

9  with respect to financial advisory and investment banking

10  services in Bankruptcy, and I would refer the court to pages

11  121-124 of the transcript of the August 23 hearing before this

12  court.

13  BY MR. PHILLIPS:

14  Q.  Having said that Mr. Polleck, what has been your experience

15  in terms of section 363 sales in bankruptcy?

16  A.  I participated in more than 30 sales as both a financial

17  advisor to Debtors, Creditors, Buyers, I have been a Chapter 11

18  Trustee, I participated in (inaudible) as well.

19  Q.  Thank you.  Were you, sir, involved in the negotiation of

20  the Asset Purchase Agreement with Presstek that's been offered

21  as Exhibit-5, Debtor's Exhibit-5?

22  A.  I was.

23  Q.  Can you describe for the Court, what those -- characterize

24  those negotiations for the Court?

25  A.  I would characterize them as spirited, and both parties

AA 69

Polleck - Direct                                          112

1   taking very strong positions and working toward a negotiated

2   arrangement (inaudible).

3   Q.  In your judgment and experience, were these negotiations

4   one sided in any way, in terms of one party dictating to the

5   other the terms of the agreement?

6   A.  No, they were negotiated.

7   Q.  The -- and I don't want to go through Exhibit-5 with you

8   but do you recall the material economic terms of the agreement?

9   A.  Presstek, I do.

10  Q.  Okay, and could you please provide those for the Court?

11  A.  Presstek had agreed to pay $40 million in cash for the

12  assets of A.B. Dick, the assets of a small internet stock for

13  small internet (inaudible).  The agreement provided that

14  Presstek could designate certain executory contracts which the

15  Debtor would be required to assume, cure, and assign to them a

16  variety of other covanents (inaudible).

17  Q.  With respect to the specified executory contracts that you

18  just referred to, was there any estimation done of the cost of

19  curing those contracts?

20  A.  Not at the time of the negotiations.

21  Q.  Was any estimate done subsequently by Candlewood?

22  A.  Yes.

23  Q.  And what was the estimation?

24  A.  Based on the most recent information provided by Presstek,

25  either last Thursday or Wednesday, there was a range between

AA 70

1  five and seven million as to the maximum amount required.

2  Q.  All right.  And we've had testimony today regarding the

3  subsequent negotiations regarding the Asset Purchase Agreement.

4  Were you involved in those?

5  A.  I was.

6  Q.  And how would you characterize those negotiations?

7  A.  Spirited as well.

8  Q.  Can you describe the negotiation process with respect to

9  those modifications?

10  A.  The Debtor met with Presstek, the Debtor's professionals

11  met with Presstek last Friday, advised them of the Debtor's

12  interest in further negotiation, relief from certain

13  provisions, enhancement by Presstek of their outstanding bid,

14  there was an agreement to provide further information and meet

15  with Presstek in Boston on Sunday to negotiate, in an attempt

16  to negotiate further provisions to the Asset Purchase

17  Agreement.  There was -- that meeting was held and there were

18  further concessions and enhancements made, the negotiations

19  continued yesterday morning to -- and in fact continued up

20  until court today.

21  Q.  And you can you generally describe the results of those

22  negotiations in terms of the modifications to the agreement

23  from a financial standpoint with respect to the Debtors?

24  A.  There were four or five primary changes.  The first change

25  relates to the working capital contained in the APA.

AA 71

1   Originally, pre-paid inventory deposits were not to be included

2   in the calculation of working capital, which would have

3   resulted in the Debtors having to either complete the payment

4   in full of those goods, take title to it for those to be

5   included in working capital or to forgo the benefit of those

6   prepaid inventory deposits.  At a point earlier in the case the

7   Debtor had negotiated a (indiscern.) APA that provided for a

8   cap of $2½ million of pre-paid inventory deposits for inventory

9   to be received prior to November 30th to be included in the

10  calculation of working capital.  That would have left the

11  Debtor at this closing with an obligation of approximately a

12  million two or two-fifty to fund purchases of inventory that

13  would be on the water from Japan on their way here, which would

14  increase the D-I-P, therefore reduce the amount available for

15  Unsecured Creditors.  Presstek agreed to include all of the

16  pre-paid inventory deposits, including those -- about 2½

17  million, and including those for inventory which is to be

18  received after November 30th in the calculation of a working

19  capital.  We believe that is approximately $1.7 million.  The

20  next material modification would be in the contract

21  (indiscern.) payments.  As I testified a moment ago, the APA

22  provided that Presstek would be in a position to designate

23  certain contracts, the Debtors would be obligated to cure them,

24  assume and assign them to Presstek.  A schedule was provided

25  for review in the last couple of days which identified

AA 72

1  approximately $7 million cure amounts.  Not all of those cure

2  amounts were with respect to contracts that the Debtors

3  believed were executory.  However, Presstek believed and stated

4  that it was their belief that they were executory and desired

5  them to be cured, assumed, and assigned.  As a result of

6  negotiations, Presstek agreed that the Debtors would only be

7  required to provide the cures for operating capital and real

8  property leases which the Debtors believe are under $500

9  thousand with respect to any other contracts that Presstek

10  desired to (inaudible) assume and assign Presstek would take

11  responsibility for the cure amount.  The next significant item

12  is the medical claims.  Presstek has agreed to assume in full

13  the unpaid medical claims related to employees of the Debtor as

14  of the time of the sale (inaudible) accrued payroll by changing

15  the date of the closing, agreeing to close on the payroll date.

16  The Estate was relieved not only of the burden of operating at

17  potentially what could be a loss in the future, but of all

18  approved payrolls so that in our analysis a Friday closing

19  would yield almost a zero, through payroll.  This afternoon my

20  understanding is they agreed to -- Presstek agreed to assume

21  one half of the obligation for sales commissions, subject to a

22  limit of their obligation of $250 thousand.

23  Q.  So, what is the accumulative effect from a monetary

24  standpoint of these modifications to the Asset Purchase

25  Agreement in your opinion?

AA 73

Polleck - Direct                                        116

1   A.  There is a range of the value of the modifications.  If one
2   were to include all of the cures that might have been -- the
3   Debtor might have been obligated to the total benefits would
4   exceed $10 million.  Without those cures, or with some portion
5   of those cures, it's probably $4 to $6 million range.
6   Q.  And what impact does that have in terms of the waterfall
7   that was discussed in prior testimony with Mr. Gray?  I believe
8   a figure of 3.5 million was used.
9   A.  Right.  With respect to a so-called waterfall, the prior
10  evaluation had used a $2.3 million contract cure payment number
11  as an estimate.  That number was based on $1.9 million of
12  contracts that the Debtor believed were executory and an
13  incremental amount to provide a cushion.  The Board was advised
14  that there was potential for millions more in that cure amount.
15  Using just the $2.3 million number, there was from many
16  proceeds, before wind down costs and before the liquidation of
17  the Canadian real estate of minus $2.3 million.  After the
18  revisions there were proceeds remaining of $3.5 million.  I
19  would point out that this is an estimate not a contractual
20  document, and the point of this document was to provide the
21  basis for the Board to make a reasonably informed decision.
22  With respect to some of the other changes on this schedule from
23  the original Presstek schedule the professional case in access
24  of budget, that number was moved, as Mr. Gray testified, from
25  900 thousand to a million five.  The primary reason for moving

AA 74