1  it was to -- since the bills are not in and no one knows, there
2  was a desire on the part of the professionals to provide a
3  reasonable cushion for persons evaluating this schedule to come
4  to a reasonable conclusion that there would be proceeds
5  available to pay the wind down costs and make a distribution to
6  Creditors.  With respect to the post-petition trade credit,
7  that amount was reduced and is included in the detailed
8  accounts payable schedules with the amount related to the cures
9  that the Debtor had agreed to pay.  The KERP was calculated on
10 a more finite basis based on Presstek advising what employees
11 would remain with them or they would rehire actually.  The U.S.
12 severance was revised based on the revised testament of the
13 number of employees that would be terminated, accrued payroll,
14 as I mentioned, was revised based on the closing date, the
15 sales commissions were revised both based on Presstek's
16 assumption of part of the obligation as well as a refined
17 calculation with the CFO.  Going further down in the analysis
18 in the wind down --
19 Q.  I believe we're referring to Committee Exhibit-1 that was
20 presented before.
21 A.  Okay.  Going further down in the wind-down costs, there was
22 a change made in the general wind down from $350 thousand to $1
23 million to try and capture a portion of the expenses that might
24 be incurred if there was to be an (indiscern.) plan or some
25 other disposition of the Estate.  The original estimates were

AA 75

1   primarily used to reflect the wind down of corporate

2   activities.  So, all in all the difference on Exhibit-1 is

3   about 5.6 million.

4   Q.  Between what the transaction would have been if the APA had

5   not been modified and the modifications that have been

6   presented to the court today?

7   A.  Coupled with the changes in assets, correct.

8   Q.  Thank you.  Going back to the Asset Purchase Agreement

9   itself, as originally negotiated was that negotiated simply as

10  an agreement that would definitively be entered into between

11  Presstek and the Debtors?

12  A.  I'm not sure I understand.

13  Q.  Well, let me put it this way.  Was it contemplated that

14  there would be an auction with respect to the assets of the

15  Debtors?

16  A.  At the time the APA was entered into, there were

17  discussions and negotiations regarding the provision of Debtor-

18  In-Possession financing by Presstek to Key coupled with an

19  auction being held pursuant to the Chapter 11 filing, which the

20  Debtors (inaudible).

21  Q.  Okay.  So this -- I believe the terminology is a stalking

22  horse bid, have you been involved in stalking horse situations

23  before?

24  A.  Yes.

25  Q.  Can you describe what the benefit of having a stalking

AA 76

Polleck - Direct                                      119

1  horse bid is in an auction situation?

2  A.  Yes.  A stalking horse bid provides a bottom of the market

3  with respect to the assets in control.  In this case this

4  stalking horse bid provided Presstek would pay the Estate 40

5  million less the cure amounts, so long as certain tests were

6  met at the closing.  That established the market for these

7  assets and in fact was recognized as establishing the market

8  for these assets by parties that were contacted.

9  Q.  Speak of parties that you contacted, you're referring to

10  Candlewood?

11  A.  Yes.

12  Q.  What steps did Candlewood take to market this company?

13  A.  Candlewood contacted over 200 potencial purchasers and plan

14  sponsors.  Each of those parties was contacted through a teaser

15  (inaudible) introduction to the opportunity as well as a

16  personal phone call, follow up phone call, to a number of

17  (inaudible).  Of those 200 hundred, something over 200,

18  approximately 60 asked for and received Confidentiality

19  Agreements, of those approximately 50 executed those and were

20  provided access to the (inaudible).  In addition, Candlewood

21  provided, solicited and provided, solicited interest and

22  provided information to parties who would be interested in

23  replacing the existing D-I-P.

24  Q.  Okay.  In replacing the existing D-I-P, who did Candlewood

25  speak with regarding that possibility?

AA 77

1  A.  They talked with Congress.  This was early in the case, I
2  believe it was in July, they talked with Bank of America,
3  Congress, and a couple of other lenders, I don't have it in
4  front of me, but the lenders who are active in providing D-I-P
5  financing both domestically and (inaudible) the D-I-P that we
6  have today is primarily secured by the stock of those foreign
7  subsidiaries in Canada (inaudible).
8  Q.  What prompted you to make those inquires regarding the
9  possibility of replacing the Debtor-In-Possession financing?
10 A.  My firm was retained June 29th or 30th and was immediately
11 thrust into the negotiations for the Presstek D-I-P and the
12 Presstek APA and was unable to have the time to prepare
13 (inaudible) information and solicit an alternative D-I-P.  We
14 thought it would be prudent to undertake that evaluation in
15 case an opportunity arose to proceed (inaudible).
16 Q.  And what were the results of Candlewood's efforts in terms
17 of finding alternative D-I-P financing?
18 A.  The parties that we were in contact with were generally
19 unwilling to replace the Presstek facility without being able
20 to prime Key (inaudible) capital assets.  Some of them
21 indicated that had the business been more profitable they would
22 be willing to pick up the D-I-P as well as (inaudible) but
23 given the condition at the time, which was July, they were
24 unwilling to go forward, although some of them continued their
25 evaluation so that they would be in a position to support -- we

AA 78

1  asked them to and they agreed to continue their evaluation so

2  that they would be in a position to support any bidder who

3  would be need financing (inaudible).

4  Q.  And were -- did you put any of these potential financial

5  sources in touch with potential bidders?

6  A.  Either my colleges did, I did (inaudible) to the extent

7  that (inaudible).

8  Q.  You mentioned previously some of the activities that in

9  terms of taking this company to market that Candlewood engaged

10  in.  Did you have any specific meetings or discussions with any

11  potential bidders?

12  A.  Yes.

13  Q.  Could you describe any of those meetings --

14  A.  There were a variety of meetings held between myself and

15  other people in my office as well as company management and

16  with the CRO.  In particular we held meetings with what's been

17  known as the Harbor Group, (inaudible) both in person and

18  telephonically.  In fact, we solicited (indiscern.) and Harbor

19  Partners to provide an alternative D-I-P to allow us to go

20  forward.

21  Q.  And what was the response to those requests?

22  A.  None of them were willing or able to provide the D-I-P on

23  the term that existed with Presstek unless further conditions

24  were met.

25  Q.  How did the market respond to the $40 million stalking

AA 79

Polleck - Direct                                    122

1    horse bid by Presstek?

2    A.  In general, the responses that we received (indiscern.)

3    were centered around the fact that parties believed the

4    contract was paying a full value, that it was a strategic bid

5    for Presstek that offered (indiscern.) that it would not offer

6    to them.  The potential interested parties were foreign

7    companies proof included that they didn't want to make future

8    investments here for whatever reason or were unable to make

9    arrangements here at this time.  Other parties had told us that

10   they had better alternatives to invest their time and capital.

11   Q.  We have heard already today, and I won't go through the

12   process of getting to this point, but quickly, we've heard

13   today of two letters of interest that were received, one from

14   Comvest Investment Partners and the other from Harbor Partners.

15   Before getting to those, were any other letters of interest, or

16   bids, or expressions of interest received?

17   A.  No.

18   Q.  With respect to the letter of interest from Comvest, I

19   believe it is Debtor's Exhibit-6, Mr. Polleck, if you care to

20   refer to it, did Candlewood do an evaluation of this expression

21   of interest?

22   A.  We did.

23   Q.  And what was the result of that evaluation?

24   A.  The result was that this was simply an expression of

25   interest.  It would have been -- it was very difficult to value

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

AA 80

Polleck - Direct                                    123

1  it given its uncertainties, lack of description of the capitals
2  being employed by the sponsor, the lack of substance related to
3  the discussion of the notes, the lack of information with
4  respect to the sponsor's interest in taking management fees,
5  providing additional management.  There were many, many, many,
6  unknowns which would contribute to a level of uncertainty that
7  would not allow us to provide a reliable and absolute range
8  amount.
9  Q.  Upon receipt of this letter, which I believe is dated
10 October 26, 2004, did you or anyone else from Candlewood have
11 any discussions with representatives of Comvest?
12 A.  Yes.
13 Q.  And can you relate those discussions to us?
14 A.  We had ongoing discussions either directly or through
15 counsel over time, or through the companies CRO, and they
16 centered around the certainty of execution, the likelihood of a
17 transaction coming to fruition, and the other matters that I
18 testified to moments ago.
19 Q.  Were you able to obtain any greater certainty with respect
20 to this expression of interest through these discussions?
21 A.  Only with respect to the timing at which the level of
22 certainty of providing the D-I-P (inaudible).  Comvest advised
23 that if we were to hold off from the auction and these
24 proceedings by, I believe November 9th, they would tell us
25 whether or not they would be in a position to provide a D-I-P.

AA 81

1  Q. With respect to Harbor Partners' letter of interest, which

2  I believe is Exhibit-7, did Candlewood perform any sort of

3  evaluation of this expression of interest?

4  A. Only to the same extent as the Comvest analysis. This

5  expression of interest was functionally the same in terms of

6  its lack of particulars, lack of certainty, and lack of

7  committed financing and therefore an inability to reach an

8  appropriate value, reliable value.

9  Q. Did Candlewood advise the Board of Directors of Paragon and

10  A.B. Dick regarding its conclusions with respect to these two

11  expressions of interest?

12  A. We did.

13  Q. And, did Candlewood provide any recommendation at the end

14  of the day with respect to these expressions of interest to the

15  Board?

16  A. We did in conjunction with a recommendation that we attempt

17  to negotiate enhancements on the Presstek agreement.

18  Q. Was there ever any consideration given to developing a Plan

19  of Reorganization that would be internally generated by the

20  Debtors and financed by the Debtors?

21  A. We held discussions amongst the professionals and relied on

22  the structuring plan that the company had developed in

23  conjunction with TRJ and in evaluating that concluded that it

24  had some material weaknesses. Those weaknesses included it

25  relied on the Presstek Joint Development agreement in terms of

AA 82

1  the projected EBIDTA, number one.  Number two, the

2  restructuring plan would require a reasonable if not

3  significant course of new capital which the Debtor had no

4  ability to generate (inaudible).  So, the analysis was used,

5  the thoughts that came out of that, were used to try and induce

6  interested parties to provide the capital and to supportive a

7  Plan of Reorganization, which is the genesis of the two that

8  were recieved, and in particular, Candlewood made it clear to

9  those parties that the Creditors Committee and MHR had

10  expressed interest in maintaining their abilities to prosecute

11  any claims the estate might have against Presstek, so these

12  planned proposals, one at least, resulted in -- did not result

13  in a requirement that Presstek be given a release.

14  Q.  And I don't think I asked this question before.  When did

15  Candlewood begin marketing the assets of the company?

16  A.  Candlewood started working on the documents necessary to

17  achieve an auction in July.  My recollection is that the

18  teasers first went out on August 9th.

19  Q.  When you say the "teasers" what are you referring to?

20  A.  One page solicitation of interest went out on August 9th,

21  and phone calls were begun shortly thereafter.

22  Q.  So prior -- am I correct that that would be almost 2½

23  months prior to the bid date?

24  A.  Yes.

25  Q.  Sir, if you'd look at -- I believe it's MHR Exhibit-A.

*Writer's Cramp, Inc.*
Certified Court Transcribers
752-329-0191

AA 83

1    A.   Which one is that?

2    Q.   It is the single page comparison.

3    A.   Can I just asked what's the bottom number, the actual

4    bottom number?

5    Q.   No, not that document, sir.  It's the comparison of -- I

6    believe it was the comparison of the -- in fact it's two pages.

7    It's the comparison of Presstek and Comvest and Harbor Group,

8    correct?

9    A.   I have it.

10   Q.   Who prepared this document, sir?

11   A.   Myself and my colleagues.

12   Q.   The column with respect to Presstek, does that reflect the

13   modifications made to the Asset Purchase Agreement over the

14   past several days?

15   A.   It does not.

16   Q.   With respect to the Comvest and Harbor Group lines, are

17   there any assumptions made with respect to those proposals that

18   are not necessarily expressed here?

19   A.   Yes.

20   Q.   And what are those assumptions?

21   A.   That there is a 100% realization in the Comvest

22   participation and profits instrument without respect to any

23   time value of money and with respect to the Harbor Group

24   redeemable for stock that is redeemed, I believe that might be

25   the mid point, without any regards to the time value of money

AA 84

Polleck - Direct                           127

1  and that the preservation of the claim against Presstek did not

2  value but is signified only by a one dollar (inaudible).

3  Q.  And why is that the case?

4  A.  The time this was prepared I had no basis to make a

5  professional evaluation of that client.

6  Q.  Have you made a professional evaluation of the Presstek

7  proposal as reflected in the revised Asset Purchase Agreement?

8  A.  Yes.

9  Q.  And, have you come to any conclusions regarding that

10 proposal?

11 A.  Yes.

12 Q.  And what are those conclusions?

13 A.  That consummation of that transaction would be both in the

14 best interest of Creditors' and would exceed the liquidation of

15 the Estate's assets.

16 Q.  Has a liquidation analysis been preformed by Candlewood?

17 A.  It has.

18 Q.  And what was the result of that liquidation analysis?

19 A.  A range of values with a mid point of approximately $16

20 million, plus the value of any actions the Estate would

21 (inaudible).

22      MR. PHILLIPS:  I have no further questions at this

23 time.  Thank you, Mr. Polleck.

24      THE COURT:  I think we will adjourn until tomorrow

25 morning.  Some of the staff is paid on an hourly basis and they

AA 85