# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------------X
```

In re:

BLAKE OF CHICAGO CORP., *et al.,*

                  Debtors.

                 Chapter 11
                 Case Nos. 04-12002 (JLP)
                 (Jointly Administered)

```
-----------------------------------------------------------X
```

MHR CAPITAL PARTNERS LP, MHR
INSTITUTIONAL PARTNERS LP, MHRM
LP, AND MHR FUND MANAGEMENT LLC,

                 Appeal No. 04-CV-1498

                Appellants,

      v.

BLAKE OF CHICAGO CORP., *et al,*.
f/k/a A.B. DICK COMPANY, *et al.,* AND
PRESSTEK, INC.,

                Appellees.

```
-----------------------------------------------------------X
```

## SUPPLEMENTAL APPENDIX TO BRIEF ANSWERING THE APPEAL OF MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL PARTNERS LP, AND MHR MANAGEMENT LLC

        MONZACK AND MONACO, P.A.
        Francis A. Monaco, Jr. (No. 2078)
        Joseph J. Bodnar (No. 2512)
        400 Commerce Center
        Twelfth and Orange Streets
        P.O. Box 2031
        Wilmington, Delaware 19899
        (302) 656-8162

        McDERMOTT WILL & EMERY LLP
        50 Rockefeller Plaza
        New York, New York 10020
        (212) 547-5400

        *Of Counsel Attorneys for Presstek, Inc.*

        April 8, 2005

## TABLE OF CONTENTS

**Docket**                                                                                                                                          **Page**

453        Omnibus Response of Presstek, Inc. to Supplemental Objections of the
           Official Committee of Unsecured Creditors and the MHR Entities to the
           Motion for Order: (A) Authorizing Sale of Substantially All of the Assets of
           A.B. Dick Company and its Wholly Owned Subsidiaries, Free and Clear of
           Liens, Claims and Encumbrances; (B) Authorizing Assumption and
           Assignment of Certain Unexpired Leases and Executory Contracts; and (C)
           Granting Related Relief, dated November 1, 2004. ............................................ B001

451        Debtors' Hearing Memorandum in Support of Motion for Order:  (A)
           Authorizing Sale of Substantially All of the Assets of A.B. Dick Company
           and its Wholly Owned Subsidiaries, Free and Clear of Liens, Claims and
           Encumbrances; (B) Authorizing Assumption and Assignment of Certain
           Unexpired Leases and Executory Contracts; and (C) Granting Related Relief,
           dated November 1, 2004 .................................................................................... B212

460        Order, Pursuant to Sections 105(a), 363(b) and (f) and 365(f) of the
           Bankruptcy Code and Rules 2002(a)(2), (c)(1), (k) and (m), 6004 and 6006
           of the Federal Rules of Bankruptcy Procedure, Approving (1) the Sale,
           Pursuant to the Asset Purchase Agreement Dated July 13, 2004, of (a)
           Substantially All of the Assets of the A.B.  Dick Company and the A.B. Dick
           Company of Canada, Ltd., and (b) the Capital Stock of the A.B. Dick U.K.
           Limited to Silver Acquisitions Corp., Free and Clear of Liens, Claims,
           Encumbrances, and Interests; and (2) the Assumption and Assignment of
           Certain Executory Contracts and Unexpired Leases to Silver Acquisitions
           Corp., dated November 3, 2004 ........................................................................ B262

634        Transcript of Hearing, dated November 2, 2004.............................................. B303

635        Transcript of Hearing, dated November 3, 2004.............................................. B431

307        Excerpts from Hearing, dated August 23, 2004................................................ B530

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

----------------------------------------------------X
| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| A.B. DICK COMPANY., *et al.*, | ) **Case Nos. 04-12002 (JLP)** |
| | ) **(Jointly Administered)** |
| | ) Hearing Date: November 2, 2004 at 2:00 p.m. |
| **Debtors.** | ) |
| | ) |
----------------------------------------------------X  Re: Docket Nos. 434, 436 and 437

### OMNIBUS RESPONSE OF PRESSTEK, INC. TO SUPPLEMENTAL OBJECTIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE MHR ENTITIES TO THE MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

Presstek, Inc. ("Presstek"), by and through its undersigned counsel, hereby submits this response (the "Response") to the supplemental objections (the "Objections") of MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP, and MHR Fund Management LLC (collectively, "MHR") and the Official Committee of Unsecured Creditors (the "Committee") to the Debtors' motion (the "Motion"), dated July 22, 2004 for entry of an order: (a) authorizing the sale of substantially all of the assets of A.B. Dick Company ("ABD") and its wholly owned subsidiaries, free and clear of liens, claims and encumbrances; (b) authorizing assumption and assignment of certain unexpired leases and executory contracts; and (c) granting related relief, and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.    On August 23, 2004, this Court held an evidentiary hearing (the "August 23 Hearing"), at which it approved procedures for a §363 sale of the Debtors' business. The Court approved the bid of Presstek, Inc. as the "stalking horse," and set deadlines for the

38122

submission of competing bids, the auction, and the sale hearing. At the August 23 Hearing, the Committee and MHR sought to deny Presstek the status of a stalking horse, based in part on their claims that Presstek was allegedly acting in bad faith. This Court overruled those objections and approved the Debtors' bidding procedures and Presstek's status as a "stalking horse." On September 15, 2004, the court entered an order (the "Sales Procedure Order") with respect to the sale of the Debtors' business.

      2.    At the August 23 Hearing, the Court heard testimony from Gregory Knipp, the Debtors' chief financial officer, that the Debtors were on the verge of collapse:

- The Debtors' sales and cash flow had deteriorated sharply in the months prior to the petition date. Slattery Aff. Ex. 1, Aug. 23. Tr. at 63-65.

- The Debtors had virtually no availability under their pre-petition loan agreement with Key Bank, and were essentially out of cash. Slattery Aff. Ex. 1, Aug. 23 Tr. at 85.

- Key Bank had made $3.5 million in overadvances through June 2004, and was unwilling to fund further overadvances. Slattery Aff. Ex. 1, Aug. 23 Tr. at 171.

      3.    At the August 23 Hearing, Glenn Pollack, the Debtors' financial advisor, testified that given the Debtors' deteriorating business and financial condition, absent a prompt sale, the Debtors would be unable to continue in business and would be liquidated on a piece-meal basis. The uncontroverted testimony of these witnesses clearly establishes the Debtors' valid business purpose in selling their business at this time.

      4.    In approving the proposed bid procedures, Judge Case specifically agreed that these Debtors needed to be sold quickly:

> "[T]he evidence fully supports the notion that this was a company that was going down quickly, had run out of money, was surviving basically, on overadvances from Key Bank, and had to find a solution somewhere to stop the bleeding. That also supports the notion that putting the company into a sale mode as quickly as possible is a justified decision[.]

NYK 932861-3.069646.0011



Slattery Aff. Ex. 1, Aug. 23 Tr. at 171.

5.     In accordance with the Sales Procedure Order, the auction has now been held and the Debtors did not receive any "qualifying bids" within the meaning of the Sales Procedure Order entered by this Court on September 15, 2004. Although the Debtors received two highly conditional and contingent "indications of interest," both took the form of proposals to fund a plan of reorganization for the Debtors, which, under the best of circumstances, could not realistically be completed for at least three months.

6.     These Debtors do not have the luxury of time. Their DIP financing expires on November 15, 2004, and their pre-petition lender, Key Bank, has stated that it is unwilling to be primed by a new debtor-in-possession loan. The Debtors have continued to lose money in chapter 11 and their operations are projected to lose $4-6 million in cash between now and the end of January. The time to sell the Debtors' business is now; the alternative, as Mr. Pollack testified at the August 23 Hearing, is liquidation.

7.     But MHR and the Committee, in a virtual reprise of their August objections, have objected to the sale to Presstek. Although they raise a number of objections, their central claim, purportedly buttressed by a selective and self-serving version of events, is that Presstek is not a good faith buyer of the Debtors' business because Presstek allegedly improperly failed to close on a prior acquisition agreement. Their claims are flatly contradicted by the record in these cases, which demonstrates that Presstek did not act improperly. The prior agreement did not close because MHR itself interfered with and strung out the negotiations, and because Key Bank, the Debtors' pre-petition lender, would not give Presstek its required assurance that it would fund the Debtors' operation through closing. Contrary to the picture painted by MHR, it is clear that Presstek pushed for months to close a transaction with ABD, only to be frustrated by the never-ending bickering between ABD and MHR.

- 3 -

B003

8.     The basis of MHR's assertion that Presstek "breached" the SPA rests on the terms of two documents attached to the SPA: the Escrow Agreement and the Consent and Agreement annexed thereto. This claim is addressed in detail below. In summary, the Escrow Agreement – the only document executed by all parties – required Key, Debtors' lender, to sign the Consent and Agreement by June 22, 2004. There is no dispute that Key never executed the Consent and Agreement, which contained material conditions, including some that are not cited anywhere in MHR's papers. Section 4 (c) of the Escrow Agreement expressly states that in the event that Key did not execute the Consent and Agreement by June 22, 2004, the SPA and all related documents "shall be null and void in their entirety."

9.     Moreover, despite a purportedly detailed discussion of the record, MHR and the Committee studiously fail to provide a close analysis of the June Escrow Agreement. When that the terms of that agreement are reviewed against the actions of the parties, it is clear that Key Bank consciously determined not to provide the necessary assurances that it would fund the Debtors' operations through closing, and failed to provide assurances that it would not declare the loan to the Debtors in default or exercise remedies. Indeed, Key Bank's witness has admitted that Key Bank refused to sign the consent required by the Escrow Agreement.

10.     Moreover, the arguments by MHR and the Committee on what constitutes "good faith" for purposes of a §363 sale misreads Third Circuit law, which focuses on a party's conduct during the bankruptcy sale process. Knowing that they have no legitimate basis to stop the Presstek sale, they are improperly trying to turn the hearing on the Motion into a mini-trial on Presstek's prior attempt to acquire ABD.

11.     Because the objections of the Committee and MHR have no merit, they should be overruled and the sale of the Debtors' business to Presstek should be approved.

- 4 -

B004

## BACKGROUND

12.     On July 13, 2004 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue in possession of their respective properties and management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered.

13.     On July 23, 2004, the  United States Trustee appointed the Committee.

14.     On the Petition Date, the Debtors, Presstek, Silver Acquisition Corp. ("Silver"), Paragon Corporate Holdings, Inc., A.B. Dick Company, Interactive Media Group, Inc. and A.B. Dick of Canada, LTD. each entered in an asset purchase agreement (the "APA") whereby Silver, a wholly-owned subsidiary of Presstek, would purchase the assets of the Debtors in a section 363 sale in the course of the Debtors' chapter 11 cases.

15.     On July 22, 2004, the Debtors filed the Motion, seeking authority to sell their business to Presstek and Silver.

16.     On August 23, 2004, this Court held a hearing on bid procedures for an auction of the Debtors' assets, and on September 15, 2004, entered the Sales Procedures Order

## FACTS

### Presstek Approaches ABD

17.     Presstek, which is based in Hudson, New Hampshire, is a leading developer of digital laser imaging and chemistry-free plate technologies for the printing and graphic arts industries. Driving the printing industry's evolution to the digital age, Presstek developed the world's first direct imaging (DI) printing and chemistry-free plate technologies. The common stock of Presstek trades on the NASDAQ system under the symbol "PRST."

- 5 -

NYK 932861-3.069646.0011

18.     A.B. Dick is a privately held, worldwide supplier of equipment and supplies to the graphic arts and printing industry.

19.     In early July 2003, Ed Marino, Presstek's CEO, contacted ABD's CEO Frank Zaffino to discuss the possibility of Presstek acquiring ABD. The following month, Marino made a presentation to ABD's board, which then authorized Zaffino to engage in exploratory discussions with Presstek. On or about November 7th, after a series of discussions and the exchange basic financial information, Presstek sent a non-binding Expression of Interest outlining a proposed structure for a transaction. Slattery Aff. Ex. 2, P5110-12. In brief, Presstek would acquire the stock of ABD for a price of $65.1 million, consisting of $46.5 million in cash and $18.6 million in Presstek stock. Marino envisioned the negotiation and execution of final documentation by December 1, 2003. As is customary, any transaction was subject to a "detailed business, accounting and legal due diligence." *Id.*

20.     At the same time that ABD's board considered Presstek's proposal, Hal Goldstein, a board member and a representative of MHR recommended that ABD file for bankruptcy to enable it to reduce the $6.6 million of long-term liabilities. According to ABD's CEO, Goldstein regularly proposed a bankruptcy filing for ABD. Slattery Aff. Ex. 3, Zaffino 119:21-25; 120:1-3.

21.     ABD subsequently assembled a data room containing much of the information initially requested by Presstek. At that time, and for many months thereafter, ABD, through Zaffino, declined to grant Presstek's request to interview ABD's operational management (*i.e.*, officers who ran ABD's business divisions). Slattery Aff. Ex. 4, Moosa I at 47:5 to 48:6; Slattery Aff. Ex. 5, McCarthy I at 58:16 to 59:14. ABD did not consent to such

- 6 -

B006



interviews until May 2004. The interviews themselves did not take place until June 21, 2004.
Slattery Aff. Ex. 5, McCarthy I at 59:24-25.

**Environmental Issues**

22.    Early in the initial due diligence phase it became clear that ABD had a
substantial amount of potential environmental liabilities that impacted any transaction. In a
January 6, 2004 report to the Presstek board, Marino advised them that "the environmental issues
could bust this deal." Slattery Aff. Ex. 6, McCarthy E 1,P14711. Marino designated Michael
McCarthy to head the team charged with analyzing the environmental liabilities and
recommending to Marino method for dealing with them. Slattery Aff. Ex. 5, McCarthy I at
48:13-23; 88:13-25. The environmental review, continued into March 2004 (Slattery Aff. Ex. 5,
McCarthy I 88:13-25) and involved extensive discussions between Presstek, ABD, and MHR.
As McCarthy explained,

> The environmental issues were of great concern to us because of the successor
> liability components . . . we dug into it, used . . . consultants, did our homework, [and]
> we discovered there was a risk to us that had a financial as well as a risk cost to us.

23.    McCarthy subsequently recommended that Presstek secure successor
liability protection, indemnification, and liability insurance coverage for the environmental risks.
Slattery Aff. Ex. 5, McCarthy I 90: 13-25; McCarthy Page 91: 2-7.

**MHR Inserts Itself Into The Negotiations**

24.    Despite these difficulties, during the first quarter of 2004 numerous
draft documents circulated between the principal participants in the negotiations (Presstek, ABD,
and MHR) along with their lawyers and financial consultants. Due to the extensive
environmental issues, insurance carriers were involved as well. Slattery Aff. Ex. 3, Zaffino
41:18-25; 42:1-25; 43:1-17.

- 7 -

B007

25.    On March 4, 2004 Marino sent a message to Zaffino and John Fountain, a Paragon board member, proposing that the parties and their advisors meet to negotiate a final deal:

> Our objective is to finalize the agreement, including the language surrounding the environmental requirement. . . . *The team will leave the meeting with a final draft agreement, with the expectation of a final approval by Friday of next week.*

Slattery Aff. Ex. 7, Marino Ex. 11 ABD/P007453 (emphasis supplied).

26.    The meeting took place on March 9, 2004. As Zaffino explained, "Ed felt that if we could just sit down face to face we could hammer the many differences out and reach an agreement." Slattery Aff. Ex. 3, Zaffino at 51:4-22. Unfortunately, after a day-long session, MHR, Presstek and Paragon were not able to reach closure on the open issues. Id.

27.    Negotiations were further complicated by the fact that MHR had veto power over any proposed sale by virtue of its contractual rights as a noteholder that gave it the right to consent to any sale of ABD's business. Slattery Aff. Ex. 8, Marino I at 130:2-20. ABD/Paragon, for its part, knew that Presstek and MHR were dealing directly with one another; Paragon would at some point in time re-enter the negotiations when it believed it needed to do so to protect its interests. Slattery Aff. Ex. 9, Moosa II at 52:6-11.

28.    Early in the negotiations, MHR made it clear that part of the price for its consent would be payment of a fee to it for negotiating a deal. Slattery Aff. Ex. 8, Marino I 136-37

29.    According to Zaffino, it was not in Paragon's best interest to be involved at that point because

> There were too many variables with three parties trying to negotiate, and two of them talking on the side without us being party to it. It was just a very cumbersome way to conduct a negotiation, and so if they decided to

- 8 -

> do this in series, then let's do it in series, but it just wasn't practical to do
> it this way

Slattery Aff. Ex. 3, Zaffino 31: 18-24.

      30.    After the March 9, 2004 meeting, Goldstein began to negotiate with both

Presstek and the environmental insurance carriers. Zaffino at 52:8-14. Paragon was not

involved in deal negotiations for approximately the next month. Slattery Aff. Ex. 3, Zaffino 53:5

to 54:119

**ABD's Financial Condition in March 2004**

      31.    At the same time the parties were negotiating in Mach 2004, ABD's

business was facing increasingly significant problems. According to Michael Lugli of Key

Bank, rather than using borrowings under its loan facility to buy inventory, machinery and

equipment, ABD began borrowing to pay interest on the loan. As Lugli put it "to pay interest

they [ABD] basically were consuming themselves." Slattery Aff. Ex. 10, Lugli Page 123, Lines

9-25 Lugli Page 124, Lines 1-25. In a few months would result in a financial crisis.

      32.    Lugli explained that were it not for the prospect of Presstek acquiring

ABD "I don't think we would have let this go on as long as we did." Slattery Aff. Ex. 10, Lugli

Page 124, Lines 1-25. Key Bank also began to fear that the sale would not occur or that the sale

price would not hold given what Key Bank knew about ABD's deteriorating performance and

precarious financial situation. Slattery Aff. Ex. 10, Lugli Page 24, Lines 6-20 Indeed, Lugli

regularly had expressed his concern regarding the price collapsing to John Fountain, CEO of

ABD throughout the negotiating process.

**Breakdown of Negotiations in April 2004**

      33.    In April, after a month of negotiating with MHR, Presstek proposed that

the transaction be done as a stock deal, but at a reduced price. The price reduction resulted from

B009

Presstek's agreement to accept ABD's environmental liabilities. Slattery Aff. Ex. 11, McCarthy II at 11:2-16. By April 16th, Marino thought the parties were clearly heading toward consummation of the long-sought transaction. In a report to the Presstek board, he wrote that "[w]e now have agreement with MHR on the deal. . . . we have given MHR until the end of this coming week, 23 April, to obtain approval from [Paragon] on the deal." Slattery Aff. Ex. 12, P24382. Marino then sent a letter to Paragon, ABD, and MHR setting a timetable. Specifically, Marino conditioned Presstek's willingness to do the transaction negotiated with MHR on the following requirements:

- Presstek would extend its offer for only one week, to April 23;

- Documents would be executed and escrowed pending a two week period during which Presstek would conduct final due diligence;

- Receipt from ABD of final Disclosure Schedules; and

- A closing by May 31.

*Id.*

34.     April 23, 2004 passed without agreement from MHR and ABD. Instead, MHR sought (and received) further concessions, mostly related to working capital adjustments, which came at the cost of further delays. *See* Slattery Aff. Ex. 13, P25839. As part of its continuing attempt to move the long-stalled transaction expeditiously to a closing, Presstek conditioned its willingness to grant additional concessions and extend its previous deadline on there being no further changes and "a signed and announceable contract" by May 8th. Presstek also reiterated that it would require confirmatory due diligence. *Id.* On April 26, with negotiations still at an impasse, Marino sent a letter to MHR, Paragon, and ABD withdrawing Presstek's offer. Slattery Aff. Ex. 14, P26044.

NYK 932861-3.069646.0011

B010



35.    At this point, Presstek had become increasingly frustrated by MHR's repeated stalling and renegotiating.  As Presstek's CFO explained,

> during this process where we thought that we were close to a deal MHR kept changing the goal posts. . . ..  They wanted something else and they wanted more and more, and this kept on going until June and we had made up our minds that we had to stop this because either we have a deal or we don't have a deal.

Slattery Aff. Ex. 9, 61:19-24

36.    In particular, MHR kept demanding fees for itself and coverage for its legal expenses.  *Id.*  Indeed, by the time MHR executed the Stock Purchase Agreement, the document provided that MHR would receive millions in fees for itself, with an additional $750,000 for its lawyers.

**Internal Disagreements in the Seller's Camp**

37.    Discussions were held between Presstek and MHR immediately following Marino's letter of April 26th.  Negotiations resumed between Presstek and MHR.  Marino then sent another letter to MHR, Paragon, and ABD setting a deadline of May 7, 2004  for a final stock purchase agreement and May 31, 2004 for a closing.  Slattery Aff. Ex. 15, P26216.  The apparent progress toward a deal encouraged Marino.  On May 4, he reported to members of Presstek's board that the ABD transaction "is at a very advanced point, after much trial and tribulation.  We have agreement from the two major stakeholders around a deal. . . .Moosa and Michael McCarthy are charged with getting the ball across the goal line.  This is no time to let off the gas."  Slattery Aff. Ex. 16, P26979.

38.    Unfortunately, as had become par for the course, there was no final version of an SPA by May 7, 2004.  As Marino explained to the board, MHR and ABD were in a dispute as to the fees that would be paid to MHR.  He explained that "[w]hile it is not our issue, it is holding up the execution of documents."  Slattery Aff. Ex. 17, P27986.  Nonetheless,

- 11 -

B011

negotiations continued in May and appeared sufficiently promising that on May 19, 2004,

Presstek began to schedule final due diligence meetings for May 20 through June 1. Slattery Aff.

Ex. 18, P28108. The proposed schedule projected that by June 1 there would be a public

announcement that Presstek's board had approved the acquisition of ABD. Id.

      39.     Presstek's optimism did not last long. Although ABD's "two major

stakeholders" seemed to have reached a consensus, Presstek learned on May 21 that MHR had

not been able to reach agreement with a third stakeholder, Nesco. Slattery Aff. Ex. 19, P08078.

Given that yet another ABD constituent had surfaced to block a transaction, Presstek explained

that it would suspend due diligence until MHR, ABD, Paragon, and Nesco had once and for all

reached agreement among themselves. Presstek conditioned the resumption of its due diligence

on Nesco and MHR reaching a written agreement and presenting Presstek with a written

commitment to the terms of the most recent draft SPA. Id.

**May 2004 – ABD on the Brink**

      40.     While MHR, ABD, Paragon, and Nesco bickered among themselves for

the month of May, ABD's business began to deteriorate more sharply. In late May 2004, ABD

was virtually unable to borrow additional funds from Key Bank. As Lugli of Key Bank

explained, "the borrowing base is reported to us on a weekly basis and ABD was rapidly

reaching the point where it did not have sufficient availability under its borrowing base to meet

its obligations." Slattery Aff. Ex. 10, Lugli 12: 11 to13:2.

      41.     Because ABD was essentially out of cash it could not pay suppliers, 160

of whom had stopped supplying ABD with raw materials. As a consequence, ABD lacked

inventory and spare parts and could not fill the many backorders it had for product. Slattery Aff.

Ex. 3, Zaffino at 60:21-61:1. ABD simply could not afford the inventory to make the product.

**June 2004 – Final Negotiations**

42.    As negotiations dragged into June 2004, MHR added new demands. As documentation progressed, MHR demanded that Paragon and ABD provide "pre-funding" of all deal expenses along with an additional $1 million and that the money be held in escrow. Slattery Aff. Ex. 20, P30182. Millions of those fees and expenses were intended to go to MHR. On June 4th, counsel for ABD and Paragon rejected the request. Slattery Aff. Ex. 21, P30179. More significantly, MHR sought to extend the closing date, anticipated to be 30 days after execution of a stock purchase agreement, to 60 days after execution.

43.    On Monday, June 7, 2004, counsel for ABD urged MHR to execute the then-existing SPA and other transaction documents on which all the other parties had agreed. Slattery Aff. Ex. 22, P30497. Irritated by MHR's dilatory tactics, Marino sent a letter the following day explaining that Presstek's Board had set a deadline of June 16th for completion of all documentation for a transaction. If that did not occur, Marino advised, "Presstek's offer will be automatically withdrawn, and we will devote our time and resources to other ongoing and proposed projects." Slattery Aff. Ex. 23, P30752. It would take more than another week of negotiations and re-drafting before MHR was willing to commit to a transaction.

44.    At this point, ABD was near its maximum borrowings of $24 million on the Key facility. At MHR's suggestion, the parties addressed MHR's concern that there be a source of funding for the period from execution to closing. Slattery Aff. Ex. 24, P31996. On June 15th, Goldstein of MHR wrote that they required that the parties to sign documents and present them to Key and that Key, or some other party, would agree to fund ABD's operation beyond the $24 million loan limitation until the closing date. Slattery Aff. Ex. 25, P32008. It

- 13 -

B013

was at this time that MHR insisted that the Escrow Agreement contain provisions requiring Key to provide *inter alia*, funding until there was a closing under the stock purchase agreement.

45.    By the afternoon of June 16th, Key sent a message to ABD's counsel informing him that that "Key is currently willing to consider any additional funding only in conjunction with the appointment of a receiver. . . ." Slattery Aff. Ex. 26, P32420. The parties worked late into the evening to negotiate documentation related to funding and other open matters. Two documents are of particular significance here. The first is the Escrow Agreement designed to escrow the SPA executed by all parties other than Presstek. The purpose was to hold the documents in escrow pending, among other things, Presstek's completion of [financial] due diligence and ABD's obtaining Key Bank's execution of a Consent and Agreement to continue funding and waiving certain rights. The second document is the Consent and Agreement itself.

**June 17 – Meeting With Keybank**

46.    Prior to execution of final documents on June 16th, ABD had informed Presstek that the representatives of Key Bank wanted to meet them the next day in Cleveland. Presstek was told that Key Bank wanted to meet to, in effect, get comfortable with the buyer. Slattery Aff. Ex. 9, Moosa II at 32:1-12. It soon became apparent that Key Bank had a different goal. Key Bank's representative told Marino and others that Key Bank wanted Presstek to fund ABD's operations through the closing. Marino also learned that the ABD facility was assigned to Key Bank's workout group and that Key Bank had retained a consulting group to monitor ABD's performance. Slattery Aff. Ex. 8, Marino I at 85:23 to 86:8. Marino soon realized that Presstek did not have a clear picture ABD's financial condition before meeting with Key Bank. Slattery Aff. Ex. 8, Marino I at 94:13-25.

- 14 -

B014

47.     At his deposition, Lugli explained his reasoning for wanting Presstek to fund ABD's operations.

> "our concern was, they were asking us to fund out for 30 days to a company that was deteriorating at a purchase price that we found to be high . . . So our fear was that as time went on in the 30 days and we continued to overadvance in a deteriorating company, we would find ourselves in a worse position and somewhat over a barrel. . . . So our response to . . .[Presstek] was we're not willing to undertake the risk to close.

Slattery Aff. Ex. 10, Lugli 40:20 to 41:20.

### June 21 Meeting With ABD Operational Management

48.     Presstek had planned to commence final due diligence after the Key Bank meeting on June 17. Key Bank's statements at the meeting and its demand that Presstek fund through closing changed the landscape significantly. If Presstek were to consider funding ABD through closing, it would need immediate access to operational management. A meeting between Presstek and ABD's management was arranged for June 21 in Chicago. Slattery Aff. Ex. 4, Moosa I at 55:5-13.

49.     During the June 21 meeting Moosa and McCarthy received new information on the state of ABD's business from its operating management, essentially all of which was bad. The operating management – access to whom ABD had restricted earlier in the negotiations -- painted the picture of an insolvent company with no prospects for recovery. By the end of the meeting, Moosa told Zaffino that what management had just described was not the company Presstek thought it was buying and that Presstek would have to decide what it should do next. Slattery Aff. Ex. 3, Zaffino at 81:1-13.

50.     Moosa called Marino later on June 21 and described the dire situation at ABD. Specifically, he informed Marino that the forecasts he received that day put sales at a much lower level than had previously been indicated and that a number of negative factors were

- 15 -

B015

converging on the business. Slattery Aff. Ex. 4, Moosa I at 64:2-25. As Marino recounted, Moosa informed him that he saw materials describing how the asset base of ABD had eroded and had fallen below the threshold for the bank loan. Slattery Aff. Ex. 8, Marino I 23:9-25. He also explained, as Key Bank and others already knew, that suppliers had stopped shipping because ABD was in arrears and, as a result, ABD could not fill existing orders. Slattery Aff. Ex. 8, Marino I at 20:17 to 21:3. Moosa also estimated that to get the business to the level of performance Presstek thought it had would require up to $10 million. *Id.*

> 51. Finally, Moosa reported that
>
> the business had reached an inflection point in May which wasn't apparent in the financial statements we had seen at that time. . . . and that they would show up in subsequent financial results of the company. The reason for that was that it affected the asset base of the company and not the income statement of the company.

Slattery Aff. Ex. 8, Marino I at 39: 6-13.

**Key's Failure to Execute the Consent and Agreement**

52. The Escrow Agreement provided that Presstek would have until June 25, 2004 to complete financial due diligence and obtain board approval for the transaction. Slattery Aff. Ex. 27, Zaffino Ex. 17, ABD/P07910 at 3(a)(ii)-(iii). It also gave ABD until June 22, 2004 to have Key Bank execute a Consent and Agreement in the form attached as Exhibit A to the Escrow Agreement. *Id.* at 3(b). In the event that Key Bank did not execute the Consent and Agreement by June 22nd, the Escrow Agreement provided that all agreements between the parties would become null and void. *Id.* at 4(c).

53. The Consent and Agreement itself set out specific requirements for Key Bank. In particular, paragraph 3 required that

> a.     Key . . . *will continue to fund working capital and operating deficits of Silver by increasing its total aggregate lending commitment to*

- 16 -

B016

> Parent *as necessary to ensure adequate funding for Silver through the closing* of the Sale; and
>
> b    Key . . . shall forebear from
>
> (i)    declaring any default under the Loan Agreement until the earlier of (A) the closing of the Sale or (B) the termination of the Purchase Agreement in accordance with its terms.

*Id.* at p. 3 (emphasis supplied ).

54.    The funding requirement was originally was requested by MHR, which no doubt understood ABD's precarious financial condition far better than Presstek before June 17, 2004.

55.    There is no dispute that Key Bank did not execute the Consent and Agreement by June 22, 2004.  Indeed, there is no dispute that Key Bank never executed the document.  As Key Bank's officer in charge of the ABD loan testified, Key Bank in consultation with its legal counsel, specifically decided that it would not execute the Consent and Agreement.  Slattery Aff. Ex. 10, Lugli at 50:21-24.  Interestingly, although ABD had an obligation to endeavor to obtain Key Bank's execution of the Consent and Agreement (Escrow Agreement 3(b)) it appears to have made no effort whatever to do so.  Lugli testified that it was not until June 22nd (the deadline for Key Bank to execute the Consent) that he happened across the Consent and Agreement while reviewing the deal document previously sent to him.  Slattery Aff. Ex. 10, Lugli at 52:3-6.

56.    On the afternoon of June 22nd, Prestek's CFO sent a letter to Key Bank explaining that Presstek had concluded that Key Bank was not willing to fund ABD thorough the closing and not willing to consent to the sale of ABD.  Slattery Aff. Ex. 28, Moosa Ex 10 Key 01266-7.  After that letter was sent, Key Bank transmitted a letter as follows:

> 1.    Key . . hereby consents . . . to the proposed transaction pursuant to the terms outlined to [Key].

- 17 -

B017

2.    Specifically, [Key] understands that

(a)    the limited open due diligence conditions will have been satisfied on or before June 28th 2004,

(b)    [Presstek] will consent to any increase in the outstandings under the [Key] facility (up to $26,000,000) between now and the closing of the transaction, and

(c)    that there will be no other impediment to a closing on or about July 16, 2004.

Slattery Aff. Ex. 29, Moosa Ex. 11 (P00001-2)

57.    Several items are worth noting about Key Bank's June 22nd letter. First, and most importantly, it did not attach an executed Consent and Agreement as required under the Escrow Agreement. (As referenced above, Key Bank and its attorneys had already determined that Key Bank would not execute that document.) Second, the letter only imposes obligations on Presstek. It consisted of statements of what Key Bank believed Presstek was obligated to do. Third, the letter does not obligate Key to provide funding necessary to ensure adequate funding" through the closing, as required by the Consent and Agreement. Indeed, the precise terms of Key Bank's letter did not require Key Bank to provide *any* funding. Although it requires that Presstek consent to an increase under the ABD loan facility, it does not state that Key Bank would actually would provide any funding, and it does not state that Key will refrain from declaring the loan to be in default or exercise remedies, as required by the Consent and Agreement. Were ABD to claim the letter required Key Bank to advance funding, it would been unable to point to a single phrase in the letter to support its position.

58.    Later on the evening of June 22nd, counsel for Presstek sent a message to all participants in the negotiations, including Key Bank, informing them that all of the documentation for the planned sale of ABD were rendered null and void by operation of the Escrow Agreement's terms. Slattery Aff. Ex. 30, Moosa Ex. 13, P34395-6. In particular, Key

- 18 -

NYK 932861-3.069646.0011

B018

Bank's failure to execute the Consent and Agreement invoked provisions of paragraph 4(c) of the Escrow Agreement, which states that "Upon the occurrence of [Key Bank's failure to execute the Consent and Agreement by June 22nd] then the agreements, convents and obligations of the Parties contained in the Principal Documents shall be null and void in their entirety." Slattery Aff. Ex. 30, Moosa 13.

59.    In its opposition, MHR argues that because Moosa's June 22nd letter to Lugli only referenced Key Bank's failure to consent the transaction and to agree to fund through closing, Presstek somehow should be estopped from asserting other rights under the Escrow Agreement. The argument leads to a dead end. By its terms, paragraph 7 of the Escrow Agreement provides that it "may not be altered or modified without the express prior written consent of the Parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing and then only to the extent so specified." Slattery Aff. Ex. 27, Zaffino Ex. 17 ABD/P07910.

## RESPONSE TO OBJECTIONS OF THE CREDITORS COMMITTEE

60.    The Committee raises five objections to the proposed sale to Presstek. In addition, the Committee seeks an adjournment of the proposed sale hearing so that it can continue to pursue two unrealistic alternative proposals to the Presstek transaction, both of which, the Committee admits, were not "qualifying bids" under the terms of the Bid Procedures Order entered by this Court on September 15, 2004.    The Committee's arguments are that:

- Presstek has not acted in good faith, and is not entitled to finding of such good faith under section 363(m) of the Bankruptcy Code;

- That the proposed release of estate claims against Presstek is unreasonable and cannot be approved;

- The asset purchase agreement is "too conditional," and that even if the sale to Presstek is approved, Presstek may not proceed to a closing;

- 19 -

B019

•   · The Debtors failed to give proper notice of the sale and proposed assumption and assignment of contracts to the counterparties to those agreements, with the result that the Debtors may be saddled with an unknown amount of future cure costs; and

•   If the sale to Presstek is approved, the requested waiver of a stay of consummation of the transaction should be denied so that the Committee can pursue its appeal rights.

## Good Faith Finding Under 363(M)

61.     As discussed below, the Committee has misstated Third Circuit law on what constitutes good faith in connection with a sale under section 363 of the Bankruptcy Code. Moreover, as set forth in the "Facts" section of this Response, the extensive discovery taken prior to this hearing unambiguously demonstrates that Presstek did not act improperly at any time and is entitled to a good faith finding under section 363(m) in connection with its acquisition of the assets of ABD.

62.     The Committee's argument that Presstek allegedly acted in bad faith misreads applicable Third Circuit law.  The Committee focuses its argument on what it claims was Presstek's wrongful failure to complete the transaction contemplated by the Stock Purchase Agreement, arguing that those actions are evidence of Presstek's alleged lack of good faith.  As detailed above, Presstek's conduct prior to the petition date was entirely proper and does not substantiate the Committee's claim that it acted in bad faith as a matter of fact. But the Committee's argument also fails as a matter of law. In the controlling case, In re Abbott Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), the Third Circuit made it clear that good faith for a purchaser for purposes of section 363(m):

> speaks to the integrity of his conduct in the course of the sale proceedings. Typically the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

- 20 -

B020



788 F.2d at 147.

63.    None of the Committee's allegations as to Presstek's alleged bad faith go to actions that Presstek has taken in connection with the sale of AB Dick in the Debtors' chapter 11 proceedings.  As Glenn Pollack, the Debtors' financial advisor testified at the August 23 Hearing, the agreement between Presstek and the Debtors was negotiated at arms-length by parties with sophisticated and experienced counsel, none of the Debtors' equity holders will receive any consideration from the sale to Presstek, and none of the Debtors' executives have been promised employment by Presstek as an inducement for the Debtors to enter into the Asset Purchase Agreement.  Slattery Aff. Ex. 1, Glenn Pollack, Aug. 23 Tr. at 217.  Thus, there has been no fraud, no collusion, no attempt to take unfair advantage of other bidders, and no improper treatment by Presstek of the Debtors' insiders, and no bad faith by Presstek within the meaning of applicable law.

64.    In In re Tempo Tech, 202 B.R. 363 (D. Del. 1996), the court was presented with a case where the prospective buyer had engaged in prepetition negotiations with the seller and those negotiations had broken down as a result of the debtor's deteriorating performance.  Once the debtor filed for chapter 11 relief, the debtor and the buyer recommenced their negotiations, which led to an agreement for the sale of the debtor's business.  The bankruptcy court approved the §363 sale over the objection of the debtor's secured creditor, which argued that the failed pre-petition sale negotiations were evidence of the buyer's bad faith.

65.    In approving the sale, the bankruptcy court applied the rule of Abbot Dairies and found that the sale had been negotiated at arms-length, without evidence of fraud or collusion, and without the buyer providing any value or consideration to the debtor's insiders or equity holders.  The secured creditor appealed from the order approving the sale.  In affirming

- 21 -

B021

the sale, the District Court ruled that the bankruptcy court had correctly applied <u>Abbot Dairies</u>

and had correctly determined that the purchaser had acted in good faith:

> The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser. Hamann's unrebutted testimony regarding the negotiation of the sale of the Debtor's assets demonstrated arm's length negotiations between the purchaser and the Debtor. There was no evidence of fraud, collusion, or interested dealing between the players; Hamann was not promised any lucrative employment package for his part in the negotiations. In addition, it was uncontroverted that the purchase negotiations were fraught with debate, disagreement and at times seemed uncertain as to a positive outcome.
>
> Moreover, there was no evidence that TAC colluded with the Debtor to attempt to take unfair advantage of other prospective bidders. Hamann's testimony demonstrated the Debtor's attempts to solicit interest from prospective purchasers other than TAC, albeit without success. Review of the initial emergency hearing in this matter also shows that the bankruptcy court considered that, combined with the Debtor's cash crunch, the lack of other companies engaged in this industry weighed heavily in justifying an expeditious sale of the Debtor's assets as a going concern. There was no evidence that any prospective purchasers regarded the auction terms as chilling their interest in bidding.

202 B.R. at 370. The <u>Tempo Tech</u> court's analysis clearly emphasizes that the focus of a good

faith inquiry is the buyer's conduct during the bankruptcy sale process.

      66.     The Debtors' chapter 11 cases present a fact pattern that is analytically

indistinguishable from <u>Tempo Tech</u> and underline a related point. It is common for a debtor's

prepetition performance to worsen, often rapidly in the weeks before a chapter 11 filing. Thus, it

is not uncommon for pre-petition negotiations between a troubled seller and its prospective buyer

to proceed by fits and starts, and for the buyer's ultimate price to be lower than its initial offer as

it discovers additional facts about the seller's business. Such reductions in price, however, do

not come about because buyers are acting in bad faith; it's because the underlying businesses are

becoming less valuable. As was the case here, buyers often do not know how poorly the seller's

business is performing, because sellers are typically trying to put the best appearance on a

- 22 -

darkening situation. That is also a reason why, as here, buyers often insist on "due diligence" bring-downs when they buy troubled businesses; they need and are entitled to assurance that, immediately prior to closing, the business is still worth the purchase price they agreed to pay.

67.    If courts embrace a rule that says that a purchaser can be held to have acted in bad faith for abandoning pre-petition sale negotiations and then agreeing to purchase a debtor's assets in a §363 sale transaction, buyers will not take the risk that its prepetition actions will be used against them, and will wait the debtor has filed for relief before beginning those negotiations. It is not sensible policy to encourage buyers to adopt such postures. Most businesses are worth more outside of bankruptcy than after they file for chapter 11 relief. A policy that discourages negotiations until the debtor commences its chapter 11 proceeding will lead to more liquidations of businesses and worse recoveries by creditors of troubled debtors.

**The Release**

68.    The Committee's argument that the release of estate claims against Presstek is improper fails for two reasons. Although unacknowledged by the Committee, a decision to release claims is an exercise of the Debtors' business judgment. In re General Homes Corp., FGMC, Inc., 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991) (debtors' release of LBO related claims against the bank group under plan was within its reasonable judgment); In re Revco D.S., Inc., 118 B.R. 468, 476 (Bankr. N.D. Ohio 1990 (debtor's "decisions on whether or not to commence litigation rests [within its] business judgment[.]"). Where, as here, the release of claims is supported by valuable consideration in the form of the purchase price to be paid by Presstek, the Debtors' judgment cannot be undone merely because the Committee would prefer to retain such claims. Tellingly, the Committee's objection is silent on the issue of the controlling legal authority on this issue, doubtless because it is fatal to the Committee's position.

- 23 -

B023

69.     Moreover, the Committee's request that the Court delete the release wrongly suggests that it is the function of courts to refashion agreements between contracting parties.  The courts have wisely recognized that all agreements emerge from negotiations, and that in exchange for benefits in one area, parties may make concessions in others.  For that reason, courts have repeatedly held that is not their role to revise agreements that the parties have reached.  In re Midway Airlines, Inc., 180 B.R. 851, 915 (Bankr. N.D. Ill. 1995) ("court may not rewrite the parties agreement or impose obligations on the parties that they have not intended to impose upon themselves,") (citing LaScola v. US Sprint Communications, 946 F.2d 559, 564-65 (7th Cir.1991)); see also In re Yates Development, Inc., 256 F.3d 1285, 1290 (11th Cir. 2001) ("[i]t is never the role of a . . . court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain.").

**Conditionality of the APA**

70.     A similar argument is applicable to the Committee's continued assertion the APA is too conditional.  At the August 23 Hearing, Judge Case made that very point when he overruled the requests of the Committee and MHR to delete provisions of the APA to which they objected: "[A]s was made clear in my colloquy with MHR's counsel at the end of the hearing, this is not a hearing for me to rewrite this APA and to say, well, you really should remove this rep and warranty and remove that rep and warranty, and so on and so forth.  That's not appropriate[.]"  August 23 Tr. at 302 (ruling of Judge Case).  The Committee's argument about the alleged conditionality of the Asset Purchase Agreement is similarly misguided: as Judge Case and numerous other courts have recognized, it is not the role of courts to rewrite agreements for parties.  Midway Airlines, 180 B.R. 851, 915.

- 24 -

NYK 932861-3.069646.0011

B024

71.    The Committee's argument that the APA is too conditional fails for the same reason: it is not for courts to rewrite the agreement of the parties. The Committee argues that even if this Court approves the Asset Purchase Agreement, Presstek will exploit loopholes to avoid closing. In addition to being legally flawed, the Committee's argument is wrong as a matter of fact: Assuming that this Court approves the sale of the AB Dick business to Presstek, Presstek is prepared to close on the transaction no later than the end of this week. That fact alone is a complete rebuttal to the Committee's argument that Presstek is seeking to exploit a loophole to escape from the Asset Purchase Agreement.

**Notice of the Assumed Contracts**

72.    The Committee's objection about the adequacy of the notice given by the Debtors concerning the contracts to be assumed and assigned to Presstek is another red herring because, rather than being a frightening unknown, the actual costs of cure are a known and reasonable number. Presstek and the Debtors have come to an agreement on the contracts to be assumed and assigned, and the costs associated with curing any pre-petition defaults on those agreements. Moreover, all of the contract counterparties whose contracts would be subject to assumption and assignment received actual notice of this hearing.

**Waiver of Stay Pending Appeal**

73.    The Committee's argument for a denial of the waiver of the 10-day stay pursuant to Rules 6004(g) and 6006(d) is unsupported by fact or law, and is logically inconsistent with its argument that Presstek is looking for reasons not to close on the APA. The Committee apparently cannot make up its mind as to whether it is believes that Presstek *won't* complete the acquisition of AB Dick or whether it is worried that Presstek *will* complete the acquisition. As the Committee recognizes, however, a waiver Rules 6006(d) and 8005 is within

- 25 -

B025

this Court's authority to grant or deny, and in this case, the Debtors' continuing losses and the need to promptly resuscitate their operations supports granting a waiver in this case. Fed. R. Bankr. P. 8005; see also In Re Trans World Airlines, Inc., 2001 WL 1820325, *2 (Bankr.D. Del. 2001) (granting of a stay pending appeal is within the court's discretion); In re Polaroid Corp., 2004 WL 253477, *1 (D. Del. 2004).

74.     The Debtors' precarious financial position justifies a waiver of the 10-day stays set forth in Rules 6004 and 6006. In re Decora Industries, Inc., 2002 WL 32332749, *9 (D.Del. 2002) (holding that a waiver of the stay is justified where the sale motion has been pending for several months, and that an immediate closing is required to remedy [d]ebtors' precarious financial and business position). The record in this case is quite clear: the Debtors' operations have been losing money since at least 2003, they lost money in 2004 prior to seeking relief in this Court, they have continued to lose money in chapter 11, and their projections show that they will continue to lose money for the next 13 weeks. In addition, having fired Brian Longe, their former chief executive officer, the Debtors are now being managed by Stephen Gray, a crisis manager who is not a printing industry executive. In short, the Debtors' business continues to hang by a precious thread.

75.     From Presstek's perspective, the continuing losses at ABD erode its value every day. Equally importantly, Presstek wants to assume operational control as quickly as possible so as to install its own management team and repair ABD's frayed relationships with its customers, vendors and employees. From the Debtors' perspective, a prompt closing eliminates the uncertainty surrounding the disposition of their assets and will substantially reduce the enormous administrative expenses these cases are incurring. Thus a waiver of Rules 6004(g) and

- 26 -

6006(d) are justified by the exigencies of the circumstances. These same reasons dictate that the Committee's request for an adjournment of the sale hearing should also be denied.

76.    Finally, the Committee's suggestion that the Debtors be granted additional time to pursue alternatives to the Presstek sale should be rejected because the so-called alternatives are not realistic. The Debtors had three and a half months to solicit interest in their assets; as the Committee itself admits, the auction failed to develop even a single "qualifying bid." The two indications of interest that the Debtors received, from ComVest and Harbor Partners, both contemplated plans of reorganization of the Debtors, rather than sales of assets under section 363. Given the time needed to negotiate and draft a plan of reorganization and a disclosure statement, have the disclosure statement approved, solicit votes on the plan and seek confirmation, such a plan could not realistically be confirmed in less than three months. The Debtors' existing DIP financing expires on November 15, and Key Bank, the Debtors' prepetition lender, has stated that it supports the sale to Presstek and that it is unwilling to be primed by a new debtor-in-possession loan. Based on the Debtors' projections, the Debtors expect to have negative cash flow of $4-6 million between now and January, money that would have to be funded by any new debtor-in-possession loan. In addition, both plan proposals are expressly subject to due diligence and both are subject to a financing contingency. Key Bank, the Debtors' existing lender, has made it equally clear that it is unwilling to continue to lend to ABD. For these reasons, it is obvious that these so-called alternative proposals are not realistic. Pursuing these contingent and unfinanced alternatives to the Presstek bid only increases the likelihood that these cases lurch into administrative insolvency.

- 27 -

B027

## RESPONSE TO OBJECTIONS OF MHR

77.    MHR's objections principally take the form of a distorted and self-serving version of the events that led to the failure of the Stock Purchase Agreement to be consummated. As pointed out above, MHR's version is notable for its omission to point out several salient facts: MHR itself interfered with and strung out the negotiations between the Debtors and Presstek throughout much of the spring of 2004. Moreover, MHR is studiously silent about the fact that it negotiated for a huge fee in the millions of dollars and reimbursement of its legal fees and expenses in that transaction. MHR personally stood to benefit from the Stock Purchase Agreement to the detriment of the Debtors and their other creditors. But it is the fact that it will not collect that enormous and unjustified windfall that fuels MHR's titanic rage.

78.    What is striking is how thin MHR's legal objections to the Presstek transaction are: it makes three principal arguments, that Presstek acted in bad faith, that there is no sound business reason for the sale to Presstek, and that there is no basis for the Debtors to release their alleged litigation claim against Presstek.

79.    MHR's arguments about Presstek's alleged lack of good faith fail for the same reasons as the Committee's claims: they have no basis in fact or law. As set forth above, at no time did Presstek act in bad faith as a matter of fact. MHR repeatedly confuses "bad faith" with the exercise of contractual rights, most of which derive from contracts that MHR itself negotiated and executed. As addressed in detail above, the Escrow Agreement expressly provided that all agreements became "null and void" if Key did not execute the Consent and Agreement. Key undisputedly did not do so. The all agreements automatically terminated by operation of the terms of the Escrow Agreement. In addition, Presstek had the right to conduct due diligence before binding itself to the SPA. As recounted in detail, information learned after

- 28 -

June 16, 2004 demonstrated that Debtor absolutely not the company Presstek thought it was buying. Finally, it was not bad faith for Presstek to exercise its contractual right to terminate the Joint Development Agreement with based on A.B. Dick's insolvency.

80.     Similarly, MHR's argument about good faith in connection with a sale of assets under section 363 of the Bankruptcy Code is inconsistent with controlling Third Circuit authority, which focuses on a buyer's conduct during the bankruptcy court auction process. Abbott Dairies, 788 F.2d at 147; Tempo Tech, 202 B.R. at 370.

81.     MHR's assertion that there is no sound business purpose for the sale to Presstek is flatly inconsistent with the record in these cases. At the August 23 Hearing, this Court heard extensive and unrebutted testimony to the effect that, absent a prompt sale, the Debtors were unlikely to be able to continue to operate their business and were likely to be liquidated on a piece-meal basis. Through its counsel, MHR participated in the August 23 Hearing, and had the opportunity to cross-examine Messrs. Knipp and Pollack, who provided that testimony. For MHR now to take the position that the sale to Presstek is not supported by a sound business reason strains belief.

82.     True to form, MHR's argument that Presstek wrongfully terminated a Joint Development Agreement with Debtor fails to quote Presstek's termination letter and fails to even annex the Joint Development contract itself. Slattery Aff. Ex. 31, Joint Development Agreement. The contract specifically provides that "[e]ither Party may terminate this Agreement by giving a written notice of termination . . . [i]f the other Party becomes     insolvent. . ." On July 8, 2004 Presstek sent a termination letter to A.B. Dick expressly terminating the Joint Development Agreement. MHR does not contest the obvious fact that A.B. Dick certainly was insolvent when Presstek delivered its Notice of Termination.

- 29 -

NYK 932861-3.069646.0011

B029

## CONCLUSION

83.     In their zeal to attack Presstek, the objections of MHR and the Committee

ignore the economic reality of these chapter 11 cases: these Debtors are on their last legs and in

risk of imminent collapse.  Their DIP financing expires in two weeks and they have no time to

explore or pursue illusory plans of reorganization.  The record demonstrates that, contrary to the

baseless assertions of MHR and the Committee, Presstek has acted in good faith.  The Debtors

have established a sound business reason for their sale to Presstek; the alternative is a liquidation

that is likely to lead to administrative insolvency in these cases.  For all of these reasons, the sale

to Presstek should be approved.

    WHEREFORE, Presstek respectfully requests that the Court enter an order

approving the Motion and granting such other and further relief as may be just or proper.

Dated: November 1, 2004

                    MONZACK AND MONACO, P.A


                     _/s/ Francis A. Monaco, Jr.____
                    Francis A. Monaco, Jr. (#2078)
                    1201 Orange Street, Ste. 400
                    Wilmington, DE 19801
                    (302) 656-8162

                    McDERMOTT WILL & EMERY LLP
                    Stephen B. Selbst
                    Lawrence Slattery
                    Gary Ravert
                    50 Rockefeller Plaza
                    New York, New York 10020
                    (212) 547-5400

                    *Of Counsel*
                    *Attorneys for Presstek, Inc.*


                        - 30 -

B030

# EXHIBIT 1

Intentionally Blank



UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                          Chapter  11

A.B. Dick Company, Inc.,

         Debtor(s).                             Bankruptcy #04-12002 (CGC)

Wilmington, DE
August 23, 2004
9:30 a.m.

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor(s):          John A. Gleason, Esq.
                            Benesch Friedland Coplan
                            & Aronoff, LLP
                            2300 BP Tower
                            200 Public Square
                            Cleveland, OH 44114

                            John F. Stock, Esq.
                            Benesch Friedland Coplan
                            & Aronoff, LLP
                            88 E. Broad St.-Ste. 900
                            Columbus, OH 43215

                            H. Jeffrey Schwartz, Esq.
                            Benesch Friedland Coplan
                            & Aronoff, LLP
                            2300 BP Tower
                            200 Public Square
                            Cleveland, OH 44114

                            Frederick B. Rosner, Esq.
                            Jaspan Schlesinger Hoffman, LLP
                            1201 North Orange Street-Ste. 1001
                            Wilmington, DE 19801

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  represents our ending what we call net debt position as of

2  December '03.  And that was made up at the time there of

3  revolver borrowings of 22,459,000, and the cash balance that I

4  referred to before of 1,428,000.  And what you do, you see the

5  21,031,000 net number goes up to the top of the next column.

6  And --

7  Q.  Start with the --

8  A.  January of '04.

9  Q.  The revolver debt there.

10  A.  Right, the net cash position of the company with net debt

11  position.

12  Q.  Now with respect to actual December '03, the middle number

13  in the parenthesis, $22,459,000 --

14  A.  Right.  That's the same number from above.  The debt

15  number.

16  Q.  Okay.

17  A.  The borrowing number.  The number right below that, the

18  1,304,000 is the amount of letters of credit that Key Bank was

19  extending on our behalf.  So our total utilization with the

20  Bank at that time was 23,763,000.

21  Q.  That's in the liquidity analysis portion in the same column

22  below?

23  A.  That's correct.

24  Q.  Now we move up to -- let's start with Actual January '04

25  Cash Flow.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-329-0191*

1  A.  Okay.

2  Q.  Take us through those numbers.

3  A.  Okay.  What those basically show you is what are the

4  elements of cash flow on a month to month basis.  And what

5  we've done here basically is EBITDA, which is the EBITDA of the

6  domestic company only, and the Paragon Corporate -- do you want

7  me to take you through each line item, or --

8  Q.  Let's go through the line items for the first column.

9  We're not going to do it for all of them.

10 A.  Okay.

11 Q.  Just so we have a point of reference --

12 A.  Okay.

13 Q.  -- for this.

14 A.  The EBITDA number is, you know, our earnings for that month

15 on a domestic basis, which includes the A.B. Dick's sub

16 domestically as well as the Paragon Corporate Holdings

17 corporate entity.  And they lost $621,000.  That's a cash

18 outflow.  During the month, the company liquidated its

19 receivables.  It went down by 2,184,000.  That's a cash

20 generator of cash.  Inventories during that same period went up

21 by 580,000.  So that shows a negative 580.  And at the same

22 time, accounts payable went up as well.  And what sometimes

23 happens in a business when your inventories go up, your

24 payables go up commensurate with that because you get terms

25 when you buy the inventory.  The deferred service balance there

1   that you see, deferred service revenue, is 924,000 negative.

2   And that has to do with our service business where we're

3   getting less money from pre-paid service contracts.  It's the

4   issue of the 4.6 million in the prior year continuing on into

5   January of this year.

6   Q.  Okay.

7   A.  And then the other represents basically a pay down of

8   payroll at the end of the month.  We had a payroll close to the

9   end of the month, and that's what that represents.

10  Q.  All right.

11  A.  The -- also shows if you go down to the next -- and by the

12  way, that subtotal there of 87,000 is typically what you call

13  your cash flow from your operations.  And you get down below

14  that, and you go and you look --

15  Q.  The (87,000) {in parenthesis} means you're negative 87,000?

16  A.  Negative 87.  Virtually break even at that point.  But

17  basically what you did there, you liquidated your receivables

18  due to a lower sales volume probably.  You collected cash and

19  you didn't put receivables back with new billings.  The capital

20  expenditure line is just what it is.  It's payment for

21  property, plant and equipment, which we kept to a minimum

22  obviously because of the precarious cash situation we were in,

23  and liquidity position.  The capital lease obligation is paid

24  down on the leases that we have on our balance sheet.  And the

25  increase within our company subsidiaries, or decrease, that

Knipp - Cross                                              85

1   Q.  And approximately how much was it as of the time of the

2   filing of the bankruptcy?

3   A.  $23 million, 112.  Somewhere around there.

4   Q.  Okay.  And at the time of the filing of the bankruptcy,

5   approximately how much in accounts receivable did A.B. Dick

6   have that was subject to the bank security interest?

7   A.  I say $18 million, roughly.

8   Q.  Okay.

9   A.  Domestic receivables, that is.

10  Q.  And are those the only receivables that are subject to the

11  bank security interest?

12  A.  Yes.

13  Q.  And how about the inventory that is -- there was as of the

14  time of filing the bankruptcy, subject to --

15  A.  Net inventory -- inventory net or reserves -- I want to say

16  in the $11 to $12 million range.

17  Q.  And was there equipment at the time of the filing of

18  bankruptcy that the bank alleged a security interest in?

19  A.  Yes.

20  Q.  And what was the cost of that equipment?

21  A.  Well, the net book value's around $3.2 million.

22  Q.  And by the way, when we spoke about the (indiscern.) being

23  $12 million as of the time of the bankruptcy, was that at the

24  lower of cost or market?

25  A.  Yes it is.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

Pollack - Direct                                    126

1  Q.  And did the soon-to-be Debtor subsequently reach an

2  agreement with respect to post-petition financing?

3  A.  Yes.

4  Q.  Absent these agreements, do you have an opinion as to what

5  options the Debtors would have had in July 2004?

6  A.  Yes.

7  Q.  What is that opinion?

8  A.  Without those agreements and the support provided by those

9  agreements, it's my opinion that Key would not have funded the

10  next payroll.  And without a Debtor-In-Possession financing,

11  the next payroll would not have been funded, and the Debtor

12  would have had -- the Debtor had no other -- no other ready

13  alternatives that were workable in the timeframe available.

14  And I -- it's my opinion that the situation would have resulted

15  in a piece-meal liquidation of the Debtor's assets.

16  Q.  Based on your review of the Debtor's assets, do you have an

17  opinion as to whether a piece-meal liquidation would be a

18  higher and better value than a going concern sale?

19  A.  I have an initial view that it would be a lower value.  We

20  have not completed our formal liquidation analysis.

21       MR. GLEASON:  Your Honor, may I approach the witness?

22       (witness receives document)

23  BY MR. GLEASON:

24  Q.  Mr. Pollack, I handed you a document that we have marked as

25  Exhibit-1.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B038

# EXHIBIT 2

B039

Intentionally Blank



Edward J. Marino
President and CEO

<u>Private & Confidential</u>

November 7, 2003

The Boards of Directors
A.B. Dick Company
Paragon Corporate Holdings Inc.
7400 Caldwell Avenue
Niles, IL 60714-3806

Dear Directors:

Presstek, Inc. ("Presstek") is pleased to submit to you this non-binding proposal for the potential acquisition of A.B. Dick Company (the "Company") by Presstek. This proposal is based on the business, financial and other information we have received from Paragon Corporate Holdings ("Paragon") and Paragon's and the Company's management and financial advisors in recent months. The terms of our proposal are set out below.

1.    <u>Purchase Price</u>.  Our preliminary proposal is for the acquisition by Presstek of 100% of the common stock and all other outstanding equity securities of the Company for consideration of $65.1 million by means of a statutory merger or other transaction structure acceptable to Presstek (the "Purchase Price"). In arriving at the Purchase Price, Presstek has assumed that the Company at the time of its acquisition by Presstek will have no liabilities, liens or adverse claims, other than normal course current liabilities and certain long-term liabilities known as the "Old Multigraphics Liabilities" stated by the Company to amount to approximately $6.6 million.

2.    <u>Transaction Structure</u>.  At closing, Presstek will acquire all of the common stock and other outstanding equity securities of the Company, and the Company will have retained at that time ownership of all tangible and intangible assets of its business (excluding excess cash balances), as they have been described to us to date or as may otherwise be necessary to conduct the business as currently conducted.  In connection with the transaction, Presstek would assume the Old Multigraphics Liabilities, as well as normal course current liabilities, including current accounts payable, accrued liabilities and customer advances.

3.    <u>Consideration</u>.  The consideration comprising the Purchase Price will consist of (i) $46.5 million in cash and (ii) $18.6 million in Presstek common stock. Based on Presstek's existing cash position and credit facilities, we are highly confident of our ability to complete the transaction in a timely fashion. You have informed us that such consideration will be allocated among the Company's and Paragon's bank lenders, bondholders, stockholders and other

Presstek, Inc. · 55 Executive Drive · Hudson, NH  03051-04903 · Tel. (603) 594-8585 · Fax (603) 594-8575

P – 05110

CONFIDENTIAL

B041

# PRESSTEK

claimants pursuant to an agreement to be reached among such parties. Evidence of satisfactory agreement as to allocation of the purchase price shall be a condition of closing.

4.    Due Diligence.  A detailed business, accounting, and legal due diligence review of the Company will be required prior to our entering into final documentation. To undertake our due diligence, we will require access to documents that would ordinarily be assembled in a data room, as well as the opportunity to meet with the Company's management. The due diligence review would focus on, but not be limited to, the following:

   (a) A customary legal and accounting review, including (i) litigation issues, (ii) change of control issues, (iii) tax issues, (iv) employment contracts and other human resources issues and (v) environmental and regulatory issues;

   (b) Additional discussions with the Company's management on their perspectives for the business and on any issues that arise from our due diligence review;

   (c) Review of customer and supplier relationships; and,

   (d) Site visits to the Company's operating facilities.

We and our professional advisors are available to commence due diligence immediately upon your satisfaction with this proposal and execution of a customary exclusivity letter.

5.    Conditions.  The completion of the transaction would be subject to conditions customary in these type of acquisitions, including (but not limited to): (i) the satisfactory completion by Presstek and its financial, accounting and legal advisors of their due diligence investigations, (ii) the negotiation and execution of the definitive documents related to the transaction by Presstek, the Company, Paragon and Paragon's ultimate parent ("Transaction Documents") in a form satisfactory to Presstek including representations, warranties, noncompetes, covenants, conditions and indemnities, (iii) the absence of any material adverse change in the business, assets, condition (financial or otherwise) or prospects of the Company, (iv) the conduct of the business of the Company in the ordinary course in all material respects at all times prior to closing, (v) the Company having adequate working capital at the closing to support its ongoing obligations, (vi) the arrangement by Presstek of debt financing sufficient to complete the transaction, and (vii) final board approval by both parties.

6.    Confidentiality.  The Company and Presstek reaffirm that the Confidentiality Agreement executed by the parties remains in effect.

7.    Timing.  The Company and Presstek will seek to negotiate and execute the definitive documents relating to the transaction by December 1, 2003.

8.    Expenses.  Paragon shall bear all expenses and fees incurred by itself and the Company in connection with this transaction.

9.    Non-Binding Effect.  This proposal is not intended to represent a binding offer, but it is merely a statement of intent that sets forth the general basis upon which we are willing to proceed. No binding obligations will arise until the Transaction Documents are negotiated, approved, executed and delivered by the parties. The proposal outlined in this letter and any subsequent negotiations are confidential and could be considered material information.

---

Presstek, Inc. · 55 Executive Drive · Hudson, NH  03051-04903 · Tel. (603) 594-8585 · Fax (603) 594-8575

CONFIDENTIAL

P - 05111



Accordingly, neither the Company or Paragon nor any of their respective affiliates, employees or agents should disclose such information without the prior written consent of Presstek or use it for any purpose other than to consider, negotiate and consummate the transactions contemplated hereby.

We look forward to working with you to conclude a mutually beneficial transaction. Should you have any questions, please feel free to contact me at (603) 595-7000.

Very truly yours,

Edward J. Marino

Edward J. Marino

Presstek, Inc. · 55 Executive Drive - Hudson, NH  03051-04903 · Tel. (603) 594-8585 · Fax (603) 594-8575

CONFIDENTIAL

P - 05112

B043