# EXHIBIT 3

B044

Intentionally Blank



1

1    IN THE UNITED STATES BANKRUPTCY COURT

2        DISTRICT OF DELAWARE

3

4    IN RE:

5    A.B. DICK COMPANY,              CASE NO. 04-12002
     et al.,

6              Debtors.

7

8              - - - -

9

10        Deposition of FRANK D. ZAFFINO, taken upon

11   examination before M. Sheila Noce, a Registered

12   Professional Reporter and Notary Public within

13   and for the State of Ohio, at the offices of

14   Benesch, Friedlander, Coplan & Aronoff, 2300 BP

15   Tower, Cleveland, Ohio, at 10:00 a.m. on

16   Thursday, October 14, 2004, pursuant to notice

17   and/or stipulations of counsel, on behalf of the

18   Creditors in this cause.

19              - - - -

20        MEHLER & HAGESTROM
          Court Reporters

21
          CLEVELAND              AKRON
22   1750 Midland Building    1015 Key Building
     Cleveland, Ohio 44115   Akron, Ohio 44308
23      216.621.4984            330.535.7300
        FAX 621.0050            FAX 535.0050
24      800.822.0650            800.562.7100

25

41

1    the Paragon Board was aware, A.B. Dick's Board

2    knew.  So those two events notified the A.B. Dick

3    Board.

4   Q.  Now, what happened?  This was a potential stock

5       purchase in November of 2003, correct?

6   A.  Yes.

7   Q.  What happened from that point forward?

8   A.  You want to give me a time window.

9   Q.  Well, starting November 7th, you had this letter.

10  A.  Well, what happened --.

11  Q.  Let's start sequentially.

12          MR. PHILLIPS:  I think what he's

13       asking is do you want him to talk for the

14       next two hours or not.

15  Q.  No, just tell me what happened next with the

16      PressTek transaction after the November 7th

17      letter.

18  A.  Here's my recollection.  On November 7th we had

19      this letter from Ed Marino expressing interest.

20      We told him that the board would like to pursue

21      that.  There were several letters that made minor

22      adjustments to the offer, but it basically stayed

23      intact.

24          During the course of time, however, PressTek

25      changed the offer, and I think this was in late

42

1    2003.  They kept the price the same, but they

2    wanted to make it an asset deal, and their

3    argument was or their position was that to make

4    it an asset deal would favor them in terms of tax

5    implications.  Of course, we were concerned

6    because it would not favor the seller, but they

7    argued that it could be structured in such a way

8    as to be neutral to the seller in terms of taxes.

9        We engaged our tax expert, Nesco's tax

10    expert, a fellow by the name of Pat Brainard who

11    said it wasn't intuitively obvious to him that it

12    was going to be neutral.

13        Moosa and Marino wanted to visit Brainard and

14    try to show him the light, and as I recall, it

15    had something to do with the application of

16    nonoperating losses that came with the

17    acquisition of Multigraphics.

18        Our financial people said it's much more

19    complicated than that because the taxes are not

20    done at the ABD level or Paragon level, they're

21    at a higher level and so on and so forth.  But at

22    the end of the day, the offer was, I think it was

23    still 65.1 million, but it was an asset deal, a

24    change.

25        We entered the winter, the late Winter of

B048

43

1  2004, January, February, March, negotiating,

2  hammering out that now we had a draft, now we had

3  submitted a draft, detailed purchase offer for a

4  stock deal, and while Marino's letters were very

5  concise and encouraging, the detailed package was

6  a lawyer's dream, a businessman's nightmare.

7      It had all kinds of contradictions, and we

8  went through this iterative process through those

9  months by telephone with PressTek and their

10  attorneys and A.B. Dick and their attorneys, and

11  insurance carriers and financial people and Hal

12  Goldstein where they would send a document, our

13  people would red line it, send it back.  They

14  would send it back without all the changes, but

15  some of the changes and back and forth and so on.

16  So it became very tedious, very difficult through

17  those months, a great deal of time was spent.

18  Q.  Okay.  In the answer you just have given me, you

19      said something which may have been a misspeak,

20      and I just want to check it.  You started off by

21      saying that they had changed the deal to be an

22      asset deal, and then when you said they gave you

23      a detailed document, that that was for a stock

24      deal?

25  A.  No, an asset deal.  I did misspeak.  I apologize.

51

Q. Okay. So it was not actually triggered by the
   layoff either?

A. No, no, no.

Q. Okay. So you took us up on the negotiating
   process through roughly March of 2004 at this
   point, right? What was the stage of the
   negotiations at that point?

A. Complicated. We still had many issues on the
   table having to do with the details in that draft
   purchase and sale agreement.

Q. Okay. What happened next then? I guess this
   would be headed into April?

A. March, I think March 9th, Marino suggested that
   we all fly into Boston, we all being Paragon
   representatives, MHR representatives, because I
   think Hal was at that meeting, Ed Marino and his
   people. Ed felt that if we could just sit down
   face to face we could hammer the many differences
   out and reach an agreement.

       We all flew in, we had an all-day session.
   We were not able to reach closure on those
   issues. That was up to March 9th.

Q. During that session, were any of the issues
   resolved?

A. There may have been some. There were so many and

52

1    it was so detailed, but red lines all over the

2    place on the documents.  So there were probably

3    some, but the big issues still weren't there.  We

4    did not reach closure.  We could not reach

5    closure on that day.  We all left with a list of

6    action items to go back at it.

7  Q.  Okay.  And what happened next?

8  A.  It was about that time when Hal Goldstein tried

9    to take a very active role in the negotiations,

10    and I know that he started to engage with

11    PressTek without Paragon being present.  I know

12    he started to negotiate with the insurance

13    carrier, the environmental insurance carriers

14    without Paragon being present.

15  Q.  When you say without Paragon being present, was

16    Hal still on the board of A.B. Dick at this time?

17  A.  It was just around the time when he left.

18  Q.  Did you have an understanding at that time, when

19    I say you, I mean Paragon, that he was

20    negotiating without Paragon being present?

21  A.  No.  We were aware that there were conversations

22    going.  We never agreed that he could negotiate

23    on behalf of Paragon.

24  Q.  That's what I guess I was really aiming at.  This

25    was not done with Paragon's blessing?

53

A.  Absolutely not.

Q.  Did PressTek understand that?

A.  I think there was some confusion in PressTek's
mind.

Q.  Do you think there was confusion in Hal's mind?

A.  I don't know.

Q.  Okay.  So Hal was negotiating independently, is
that a fair characterization?

A.  Um-hum.

Q.  What was Paragon doing at this time?

A.  For a brief window in about that time frame,
there was almost an information blackout between
PressTek and Paragon, yeah, PressTek and Paragon.
        Everyone was studying the documents and so
on, but there was not a lot of dialogue between
Marino and me or the PressTek people, McCarthy,
Moosa and Paragon's people.

Q.  Okay.  And this is after the meeting on the 9th,
right?

A.  As I recall.

Q.  How long did that last approximately?

A.  It might have been a month, something like that.

Q.  And what happened then, did that come to an end?

A.  Yeah, it came to an end when we received another
offer, which dropped the price to 50 million but

54

brought it back to being a stock deal, if I
remember correctly.

Q. Okay. And do you know how that offer came about?

A. No.

Q. Was there any explanation by PressTek as to why
they changed it to a stock deal?

A. It was my understanding, the rationale was that
they would -- remember, there were two elements
of this negotiation, the price and liabilities.

Q. Yep.

A. It was my understanding that what their point
was, we'll bring it back to a stock deal, which
means that we'll assume more liabilities, but to
balance that, we'll lower the price. That was my
understanding of the rationale behind it.

Q. Was that satisfactory, that trade-off
satisfactory to, at least in concept, to Paragon?

A. We were troubled by it.

Q. When you say troubled, in what way?

A. The original conditions were north of $60 million
leaving no liabilities, and 50 was a far cry from
north of 60.

Q. Were there more liabilities in the company at
this time than there had been when the
negotiations started?

60

1  A.  Working capital.  We were still working at that,

2      hammering at that working capital that was

3      troubling to us.

4  Q.  So it was on a certain amount of debt?

5  A.  Below some arbitrary line that Moosa had drawn.

6  Q.  Was the company below that line at the time that

7      you received this offer, or do you know?

8  A.  It may have been.  These things ebbed and flowed,

9      because the business is cyclical.  So it might

10     have been, but it was still in our judgment a

11     tenuous calculation, one that required a lot of

12     question.

13  Q.  Is it fair to say that A.B. Dick was having

14     liquidity problems at this time anyway?

15  A.  Yes.

16  Q.  And that would impinge upon the amount of working

17     capital that they had, right?

18  A.  Yes.

19  Q.  They were quite thin on working capital?

20  A.  They were quite thin on liquidity, yes.

21  Q.  Was this a period of time, by this, we're talking

22     about Spring of 2004 when A.B. Dick had more

23     orders than it was capable of filling because it

24     was unable to buy the raw materials and parts

25     that it needed?

61

1    A.  That phenomenon had started to occur.

2    Q.  Okay.  Is that an indication of being short of

3        working capital?

4    A.  Yes.

5    Q.  So at this time in the spring, you have this

6        offer on the table, and let's go to the one at

7        $45 million now.  You still have the problems

8        with working capital, price and environmental

9        liability, correct?

10   A.  That is my recollection.

11   Q.  Okay.  And when this new deal came in, new offer

12       came in, was that something that Hal Goldstein

13       had negotiated on his own?

14   A.  I don't know.

15   Q.  Was there any discussion of that by the board?

16   A.  Yes.

17   Q.  Of Paragon?

18   A.  Yes.

19   Q.  What was the nature of that discussion?

20   A.  The board became aware, Paragon Board became

21       aware that Hal Goldstein and PressTek had been

22       negotiating.  Ed Marino wrote us a letter and

23       told us that.  I responded to Ed Marino telling

24       him unequivocally Hal Goldstein was not

25       authorized to negotiate on our behalf, and that

B055

66

1  Q.  Did you understand, and when I say you, I mean

2      Paragon, understand that when you sent that

3      letter, you had a deal?

4  A.  Yeah.

5  Q.  And did you understand at that point that you,

6      Paragon was going to execute the documents that

7      would reflect that deal?

8  A.  We signed the documents, and our signatures were

9      held in escrow.

10  Q.  Right.  And that was the 16th of June, right?

11  A.  Yeah.  Now, remember, everything was subject to

12      MHR's approval.

13  Q.  Right.  Well, what negotiations were you having

14      with MHR at this time?

15  A.  We weren't negotiating with MHR, we were simply

16      keeping them aware of where we were.

17  Q.  Okay.  And this is a time when Hal Goldstein was

18      not on A.B. Dick's Board, correct?

19  A.  I believe that's correct.  He had removed

20      himself.

21  Q.  Had MHR represented to you that they would accept

22      this deal?

23  A.  No.  I don't recall that.

24  Q.  Did MHR have to sign onto this deal?

25  A.  Yes.

81

1   deteriorated, and they had to go back and rethink

2   it.

3   Q.   Okay.  And what happened then?

4   A.   They called us late night and suggested that the

5        deal would have to be reduced to 40 million, and

6        quote, if we had the stomach for it, that we

7        would have to file for Chapter 11, 363

8        bankruptcy.

9   Q.   Okay.  When they said that if you had the stomach

10       for it, you would have to file for Chapter 11,

11       did that, was that a condition to their making a

12       deal with you?

13  A.   Yes.

14  Q.   Was there any explanation at the time of that

15       phone call that it would be an asset deal and not

16       a stock deal?

17  A.   Not that I recall.

18  Q.   Okay.  What happened after that?  How did you

19       respond on that phone call?

20  A.   Swallowed hard and said we have to go back to the

21       board.

22  Q.   Did you go back to the board?

23  A.   Yes.

24  Q.   What did the board do?

25  A.   A debate ensued at the board, and there was not

119

meeting or at a meeting, because you haven't
identified this particular meeting, that at 16
times, a topping bid is unlikely?

A. Yes.

Q. Is that something that was discussed by the board
of Paragon?

A. Specifically whether 16 X was going to be a tough
offer to top?

Q. Yeah.

A. There was some debate in the board. Many of us
thought that that was a very sound offer. You
might recall Mr. Tomsich as the majority
shareholder thought that 80 million would be a
good offer, looking at the potential of the
company. So we discussed it.

Q. It says here in Paragraph 3 "Goldstein asked if
PressTek could be pushed further, especially more
cash." Do you recall that?

A. Hal asked those kinds of questions a lot. So I
don't remember this particular timing.

Q. It says here, "Goldstein also asked if we've
considered a bankruptcy filing prior to the
PressTek sale to further reduce the $6.6 million
of long-term Multigraphics liabilities."

Do you recall a discussion of bankruptcy

B058

130

Q.   And the reduction in force is one of those

things?

A.   Yes.

Q.   It says here that would be in the best interest

of Paragon.  Would that also be -- would these

measures that were not taken also be in the best

interest of A.B. Dick?

A.   Yes.

Q.   The fifth whereas clause describes negotiations

between PressTek and one of A.B. Dick's

creditors, the note holder.  That's referring to

MHR, is that right?

A.   Yes.

Q.   And didn't you find it odd that one of your

creditors was holding discussions to sell the

company?

A.   Yes.

Q.   Did you have a view or did any of the directors

express a view that if MHR and PressTek agreed to

terms, that that would put undue pressure on

Paragon and A.B. Dick to accept those terms?

A.   No.

Q.   They never discussed anything like that?

A.   No.

Q.   So you didn't think that there was any downside

131

to the negotiations between PressTek and MHR from

Paragon's point of view?

A.  As long as it was understood that Hal or MHR was

not negotiating on behalf of Paragon.

Q.  Okay.  And then the sixth whereas clause says,

"Paragon's board of directors has determined it's

not in the best interest of Paragon to continue

spending significant time and resources in

negotiating a transaction with PressTek but will

evaluate and consider such reasonable proposals

that PressTek submits following it's discussions

with the note holder or otherwise."  Do you see

that?

A.  Yes.

Q.  Okay.  Why was it not in Paragon's best interest

to continue discussions with PressTek at this

point?

A.  There were too many variables with three parties

trying to negotiate, and two of them talking on

the side without us being party to it.  It was

just a very cumbersome way to conduct a

negotiation, and so if they decided to do this in

series, then let's do it in series, but it just

wasn't practical to do it this way.

Q.  Okay.  And I take it that PressTek and MHR did

B060

132

negotiate an agreement that was acceptable to
them?

A.   I do not know that.

Q.   But you subsequently got a new transaction, a new
proposal from PressTek?

A.   Correct.

Q.   Okay.  Did MHR express any unhappiness with that
proposal that came from PressTek?

A.   Not to me.

Q.   And did you ever hear the board discuss any
unhappiness by MHR to that proposal?

A.   Say that again.

Q.   Did you ever hear any discussion at the board
level of any unhappiness of MHR to the new
proposal that came from PressTek?

A.   At the Paragon Board level?

Q.   Yes.

A.   With the offer that came subsequent to this?

Q.   Yes.

A.   I believe this is the offer in which Hal
Goldstein stated that he wanted an extension of
30 to 60 days in the dealings so he could
approach Asset Delaware Management, the people
who owned bonds and tendered, to negotiate more
of the proceeds for MHR as a result of the sale.

B061

133

Q. And that was subsequently put into, ultimately put into the agreement, is that correct?

A. Thirty days was put in. He had asked for 30 to 60.

Q. Had the new agreement arrived, the one that arrived after this resolution, did it contain any terms that were more favorable to MHR than had previously been in the previous agreement?

A. I believe this one had a three-and-a-half million dollar fee for MHR in it.

Q. Was there any reaction to that at the Paragon Board when that arrived?

A. Yes.

Q. What was that reaction?

A. Concern, some puzzlement. Where did this come from.

Q. What was the concern?

A. The concern was there was so much money in the pot to be used for the sale of the company, and the proceeds have to be distributed to various shareholders and stakeholders and so on, and three-and-a-half million of it was funneled off as kind of an aside to the deal. That was a concern. Again, the board has a responsibility to look at all of the shareholders and

# EXHIBIT 4

B063

Intentionally Blank



Page 1

# COPY

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

In Re:                          ) Chapter 11
                                ) Case Nos. 04-12002
A.B. DICK COMPANY, et al.,      ) (CGC)
                                ) Jointly
------------------------------) Administered

DEPOSITION OF MOOSA E. MOOSA

New York, New York

Wednesday, October 20, 2004

Reported by:

TAMI H. TAKAHASHI, RPR

JOB NO. 166399A

Page 47

1                        Moosa

2    subsidiaries?

3        A.    There were a bunch of others, but I

4    can't recall.

5        Q.    Okay.  Did anyone at A.B. Dick say,

6    sorry.  We're just not going to give you that?

7        A.    Yes.

8        Q.    Who said that?

9        A.    I think, people like Frank Zaffino.

10       Q.    Do you recall what Mr. Zaffino refused

11   to give you?

12       A.    We wanted access to management.

13       Q.    Would that be Mr. Longe?

14       A.    No.  It would be the remainder of his

15   management team, excluding Mr. Longe and

16   Mr. Knipp.

17       Q.    And did you ever get to speak to

18   management, Mr. Knipp?

19       A.    We did talk to Mr. Knipp occasionally,

20   since then.

21       Q.    Okay.  But when was this request

22   made?  When did you ask for access to management

23   and Mr. Zaffino refused it?

24       A.    We've been consistently asking for

25   that access from the very early stages.

Page 55

1                        Moosa

2    21st?

3        A.    We planned to --

4            MR. SLATTERY:  Objection.

5        A.    We planned to start due diligence as

6    soon as the seller was available to provide us

7    with the information.

8        Q.    Okay.  All right.  So, you planned --

9    but did you actually do any due diligence on the

10   21st?

11       A.    We -- we were given information for

12   the first time we had access to the management on

13   the 21st, which was a Monday, yes.

14       Q.    Okay.  So, you did see some

15   information, you had access to management on June

16   21st, 2004, correct?

17       A.    Yes.

18       Q.    Okay.  And that was in Cleveland,

19   right?

20       A.    No, that was in Chicago.

21       Q.    Okay.  Sorry.  In Chicago.  And you

22   went out to Chicago, correct?

23       A.    Yes.

24       Q.    You and Mr. Marino and Mr. Scafide

25   went out to Chicago; is that correct, on Monday,

B067

1              Moosa

2       A.    Yes.

3       Q.    And what did you tell Mr. Marino?

4       A.    A couple of things.

5             One is, for the first time we were

6  privy to real forecasts for the next few months.

7  And it appeared that management was forecasting a

8  very lower -- much lower sales.

9             And that there were a number of

10 factors that were converging that was negative to

11 the business.

12      Q.    Prior to June 21st, 2004, had you

13 asked A.B. Dick for forecasts?

14      A.    We have asked for forecasts.

15      Q.    Had they provided forecasts to you?

16      A.    They provided budgets to us.

17      Q.    Okay.  Prior to the meeting on the

18 21st, that was the last time you had asked for

19 budgets?

20      A.    I'm not sure.

21      Q.    Okay.  Prior to that meeting on the

22 21st, were you in possession of budgets that ran

23 through the end of 2004?

24      A.    I believe so.

25      Q.    Prior to the escrowing of the stock

# EXHIBIT 5

Intentionally Blank



COPY                                    Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                    ) Chapter 11
                          ) Case Nos. 04-12002
A.B. DICK COMPANY, et al.,  ) (CGC)
                          ) Jointly
----------------------------) Administered

DEPOSITION OF MICHAEL McCARTHY

New York, New York

Wednesday, October 20, 2004

Reported by:

TAMI H. TAKAHASHI, RPR

JOB NO. 166399B

Page 48

1                      McCarthy

2        A.     I believe that's the time frame, but

3    I'm --

4        Q.     And what is the basis for your

5    knowledge?

6        A.     General discussions around -- we

7    started the conversations last summer.

8        Q.     Okay.  And, at that time, you had not

9    yet joined?

10       A.     No, I had not.

11       Q.     Okay.  Do you recall what stage the

12   negotiations were in when you joined Presstek?

13       A.     When I joined Presstek, the

14   expectation was we would probably have a closed

15   deal sometime in February.

16       Q.     That's February of 2004?

17       A.     I believe so.

18       Q.     And do you -- what were your specific

19   duties at that time?

20       A.     After the December diligence process,

21   I devoted my attention to working on the

22   environmental issues and the risk reduction of

23   those issues for negotiating the contract.

24       Q.     Now, you came on to Presstek in

25   mid-December, correct?

B072

1                    McCarthy

2       A.    No.

3       Q.    Why is that, do you know?

4       A.    He drifted in and out.  He would come

5    for an hour or two, have to go someplace else,

6    come back.

7       Q.    And do you have any understanding as

8    to why that was?

9       A.    No.

10      Q.    Do you know if Mr. Longe was well

11   liked by Presstek?

12             MR. SLATTERY:  Objection.

13      A.    I'm -- I'm not qualified to say if I

14   like or not like someone.  I didn't -- I just had

15   a business relationship with him.

16      Q.    So, in the process of conducting this

17   due diligence, did you and your team regularly

18   interact with A.B. Dick's management?

19      A.    No.

20      Q.    Did you find that to be unusual?

21      A.    Yes.

22      Q.    And what did you do to remedy that?

23      A.    We -- nothing.  We had an agreement

24   that we would speak at that level because they

25   didn't want to take it down to the next level of

1                    McCarthy

2  management.

3        Q.     Who -- who didn't want to take that

4  down?

5        A.     There was a decision made by the

6  A.B. Dick side conveyed by Frank Zaffino.

7        Q.     Can you explain that for me?

8        A.     The message was, you know, we don't

9  want to -- we do not want this to get out.  We

10  want to keep it quiet.  We do not want people to

11  think we're selling the company because it may

12  not work out, blah, blah, blah.  So, let's keep

13  it at a high level for information.

14        Q.     So, you were speaking with upper

15  management primarily?

16        A.     Um-hum.

17        Q.     And is that unusual?

18        A.     I think it is.

19        Q.     And why is that?

20        A.     I think it's unusual not having access

21  to the operational executives at least.

22        Q.     At some point in time, were you given

23  access to the operational executives?

24        A.     In Chicago on, I believe, June 21st

25  was my first access to the next level executives.

B074

1                    McCarthy

2    impressions to anyone at A.B. Dick?

3         A.    To Steven only.

4         Q.    To Steven?

5         A.    To Steven and to Ken Newton.

6         Q.    Can you think any other instances like

7    that?

8         A.    God, there probably were.  I can't

9    recall any specific times when I did that.

10        Q.    Aside from the due diligence aspect,

11   what other involvement did you have with the

12   potential acquisition of A.B. Dick?

13        A.    I took a leadership role in the

14   environmental evaluation --

15        Q.    Um-hum.

16        A.    -- that began in mid-December, end of

17   December.

18        Q.    And what were your responsibilities

19   there?

20        A.    To evaluate the environmental risk and

21   make a recommendation to Mr. Marino as to our

22   course forward on that.

23        Q.    And were you doing this at the same

24   time that you were handling due diligence?

25        A.    No.

1               McCarthy

2        Q.    Did you have any involvement in that?

3        A.    That was not my area of expertise, the

4   agreement terms, so I did not.

5        Q.    What about your recommendations with

6   respect to the environmental issues?

7        A.    Yes, that was my responsibility.

8        Q.    Was it your understanding that those

9   recommendations affected the structure of the

10  deal?

11       A.    Yes.

12       Q.    Can you explain that?

13       A.    The environmental issues were of great

14  concern to us because of the successor liability

15  components.

16              As we used -- as we dug into it, used

17  your consultants, did our homework, we discovered

18  there was a risk to us that had a financial as

19  well as a risk cost to us.

20       Q.    And about when did you reach these

21  conclusions?

22       A.    March.  March, April time frame.

23  Completed.

24       Q.    And what was your recommendation to

25  Presstek in terms of how best to deal with these

1                    McCarthy

2    issues?

3         A.    The recommendation was that we needed

4    to secure some successor liability protection,

5    indemnification, plus liability insurance

6    coverage that would cover our risk with the

7    environmental concerns.

8         Q.    Do you know if Presstek ever performed

9    an evaluation of A.B. Dick's business?

10        A.    I don't understand the context.

11        Q.    Did they retain an independent

12   consultant to evaluate A.B. Dick's business?

13        A.    I'm not aware.

14        Q.    Or to put a price on the business?

15        A.    We had an outside investment banker

16   firm, Hill Street Capital, that -- I believe that

17   was their role.

18        Q.    And do you know who Presstek worked

19   with from Hill Street Capital?

20        A.    John Brim.

21        Q.    Was there anyone else at that

22   organization?

23        A.    Victor Mendoza was another contact.

24        Q.    Do you recall the results of that

25   evaluation?

Intentionally Blank

# EXHIBIT 6

B079

Intentionally Blank

# EXHIBITS

Marked at the

Deposition of

## MICHAEL MCCARTHY

Taken on

## OCTOBER 20, 2004



## ESQUIRE™
### DEPOSITION SERVICES
#### A HOBART WEST COMPANY

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

216 EAST 45TH STREET, NEW YORK, NY 10017    212-687-8010

JOB: #166399B

| From: | Ed Marino |
|---|---|
| Sent: | Tuesday, January 6, 2004 5:18 AM |
| To: | Steve Rappaport; Barb Pellow; Dan Ebenstein; Debbie Samataro; Dick Williams; Don Waite; Ed Marino; John Dreyer; John Evans; Larry Howard; Mike Moffitt; Moosa E. Moosa |
| Cc: | Debbie Samataro |
| Subject: | Silver Update |

Dear Fellow Board Members,

Happy New Year and best wishes for a prosperous 2004. We are busy closing out 2003, preparing for a strong start to 2004 and working the Silver Project. We will provide you with a flash on the fourth quarter of 2003 as soon as we have a sufficient level of confidence to do so.

The note is really intended to give you a quick update on the Silver Project, and to suggest a brief optional teleconference for Monday of next week for a live update.

We have completed the majority of the due diligence, which kept many of the team busy over the holidays. The vast majority of the work concluded as expected with the exception of two significant items. Before we address the areas of concern, let me give you one positive outcome. We have managed to close the variance on tax to make an Asset Deal verses a Stock Deal neutral to the seller. Therefore, we intend to design the deal along the lines of an Asset Purchase. However, one of the issues we have uncovered is a potential deal breaker so let me move on to that.

The issues of concern we have uncovered in the process relate to two areas. One has to do with a termination of post retirement benefits to a class of workers from the Multigraphics acquisition. There is the potential for litigation arising from the action taken by ABD on this. We believe this to be manageable, but it clearly needs to be addressed.

The bigger issue is environmental. Our consultants have advised us of potential problems at a number of currently active and some inactive locations. Now, we have been very conservative in our approach here, so the dimensioning of this issue covers a wide financial range. Rather than get into the specifics of this, let me describe the approach we are taking to the problem. We have concluded that we cannot take the risk of assuming the liabilities of the majority of the sites. Therefore, we have made it clear to the owners that they have to not only retain these obligations, but also insure that Presstek be protected from any actions involving litigation or remediation of the sites in question. This is a tall order and will take some fancy footwork to conclude. We have a couple of options to discuss later today with the principles, but there is a real possibility that the environmental issues could bust this deal. We knew of the potential for issues in this area last week, but did not know the magnitude until yesterday.

Again, I know this is a very brief discussion of the issues, but I wanted to get you this information "real time" so that you can be fully appraised. There is always the possibility of another "unknown" entering the picture, but for now, we have narrowed things to these two major issues. I am available most of the week by phone to discuss this or any other issues. We will attempt to arrange for one of our informal discussions on Monday next (January 12th), and at that time we can delve into this more fully. By then we should also have a better grip on where things sit.

Take care,

Ed Marino
President and CEO
Presstek, Inc.
Executive Drive
Hudson, NH, 03051
603-595-7000
603-595-2602
Email: emarino@presstek.com

CONFIDENTIAL



P - 14711

# EXHIBIT 7

Intentionally Blank



# EXHIBITS

Marked at the

Deposition of

## EDWARD J. MARINO

Taken on

### OCTOBER 22, 2004



ESQUIRE™
DEPOSITION SERVICES
A HOBART WEST COMPANY

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

216 EAST 45TH STREET, NEW YORK, NY 10017    212-687-8010

JOB: #166402

INET

From:      Ed Marino [emarino@presstek.com]
Sent:      Thursday, March 04, 2004 6:28 PM
To:        John Fountain
Cc:        jegan@mwe.com; Michael McCarthy; DZegore@ssd.com; FDZaffino@aol.com; jbrim@allstreetcap.com; Moosa E. Moosa
Subject:   RE: Letter.pdf

Dear John,

Since this letter came from you, addressed to me, I will respond to you directly.

We are pleased to know that you seek to complete this transaction. I can assure you that we do as well.

Let me make it very clear that Presstek has not requested further environmental due diligence. This request, as we learned today was from your insurance broker as part of their commitment to successor liability coverage. We do insist on successor liability coverage, as our offer letter indicates (item 2 of my 12 January 2004 offer letter).

Therefore, we are prepared to meet in the Office of McDermott, Will & Emery on Tuesday of next week, in Boston, so that a final agreement can be prepared on the spot. From our side we will have: Michael McCarthy, Moosa, John Eagan, John Brim and legal support from MWE for agreement drafting. We would like to have Hal Goldstein from MBR at the meeting as well.

Our objective is to finalize the agreement, including the language surrounding the environmental requirement. In advance of the Tuesday meeting, we must agree on a timeframe for closure on the environmental policy and coverage.

The team will leave the meeting with a final draft of the agreement, with the expectation of a final approval by Friday of next week.

Thank you for your note and I look forward to a successful week.

Kindest Regards,
Ed


Ed Marino
President and CEO
Presstek, Inc.
55 Executive Drive
Hudson, NH, 03051
Tel: 603-595-7000
Fax: 603-595-2602
email: emarino@presstek.com

-----Original Message-----
From: John Fountain [mailto:jfountain@worldnet.att.net]
Sent: Thursday, March 04, 2004 5:03 PM
To: Ed Marino
Subject: Letter.pdf

1

DEPOSITION
EXHIBIT
Marino  11
10-27-04

ABD/P007453

# EXHIBIT 8