Intentionally Blank



COPY

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                          ) Chapter 11
                                ) Case Nos. 04-12002
A.B. DICK COMPANY, et al.,      ) (CGC)
                                ) Jointly
-----------------------------) Administered



DEPOSITION OF EDWARD J. MARINO

New York, New York

Friday, October 22, 2004



Reported by:

TAMI H. TAKAHASHI, RPR

JOB NO. 166402

Page 20

1                    Marino

2        Q.    And you don't know whether those

3  vendors would have started to supply product

4  again if they had received some payment, correct?

5        A.    Again, I had to rely on Mr. Moosa's

6  judgment.

7        Q.    But my question to you is:  You don't

8  know that, right?

9        A.    No, I hadn't had any discussions with

10  the vendors.

11        Q.    Okay.  And did Mr. Moosa ever tell you

12  what the vendors would require in order to start

13  supplying product again?

14        A.    It's possible that that was in his

15  analysis.

16        Q.    Okay.  But you don't recall, as you

17  sit here today?

18        A.    Mr. Moosa -- Mr. Moosa assessed the

19  situation and determined that the amount of

20  moneys needed to get the business back to a level

21  of performance that we thought it was at prior

22  was, I recall, somewhere in the neighborhood of

23  $10 million.  But -- and, again, he did indicate

24  that there were a number of vendors, as I said,

25  who had shut off payments -- excuse me --

1                           Marino

2    supplies to the company because they hadn't been

3    paid.

4         Q.    Okay.  But, again, my question was:

5    Did he tell you under what terms they would again

6    supply A.B. Dick?

7         A.    He may have.  I don't recall.

8         Q.    Okay.  And you say that Mr. Moosa did

9    an analysis where he calculated that the company

10   would need $10 million, correct?

11        A.    Well, that's my recollection.  This

12   is -- it's about the ballpark, yeah.

13        Q.    Would that have been the materials --

14   in the model that was generated after June 21st,

15   2004?

16        A.    No.

17        Q.    Okay.  This was in a different

18   document?

19             MR. SLATTERY:  Objection.

20        A.    I believe this was a verbal

21   discussion.  He -- again, Mr. Moosa may have

22   documented that, but I don't recall.

23        Q.    Okay.  So, you recall Mr. Moosa

24   telling you that the company was going to need

25   about 10 million to get back to where you thought

B091

1                    Marino

2      A.    Yes.  Well, Jesus, he's there now, you

3 know.

4      Q.    And when he came back -- I didn't want

5 to hear a foundation objection.

6            When he came back, did he bring back

7 any materials that had been provided to him by

8 A.B. Dick?

9      A.    My understanding is -- and I don't

10 recall whether this came from A.B. Dick or

11 whether it came from the bank, but Mr. Moosa

12 returned with a document that described how the

13 asset base of A.B. Dick had eroded and had fallen

14 below the threshold of the bank loan, which was,

15 of course, the trigger for the bank to say, this

16 business is out of whack.

17     Q.    Okay.  But Key Bank did agree, on the

18 22nd, to continue funding --

19            MR. SLATTERY:  Objection.

20     Q.    -- correct?

21     A.    Rephrase the question for me a little

22 bit because I'm not sure what you mean by that.

23     Q.    Key Bank -- despite the fact that the

24 borrowing base for Key Bank's facility of

25 A.B. Dick had eroded, Key Bank, on June 22, 2004,

1                    Marino

2    as a chief financial officer to make that kind of

3    determination.  And a lot of that judgment was

4    based on Mr. Moosa's understanding of the

5    condition of the business at that time.

6        Q.    I think you testified that Mr. Moosa,

7    in describing the condition of A.B. Dick after

8    his Chicago meeting on June 21, 2004, told you

9    that A.B. Dick had breached its lending

10   agreement, correct?

11       A.    Yes.

12       Q.    And told you that vendors had stopped

13   supplying product, correct?

14       A.    Correct.

15       Q.    Do you remember anything else that he

16   told you?

17       A.    I remember him saying that the

18   business had reached an inflection point in May

19   which wasn't apparent in the financial statements

20   we had seen at that time.

21            The primary reason for that was -- and

22   that they would show up in subsequent financial

23   results of the company.  The reason for that was

24   that it affected the asset base of the company

25   and not the income statement of the company.

1                    Marino

2    facility of Key Bank was in a workout group?

3         A.    I did not personally ever ask them

4    that.

5         Q.    Did Mr. Moosa or anyone else at

6    Presstek?

7         A.    He may have.

8              MR. SLATTERY:   Objection.

9         Q.    In fact, A.B. Dick had been in the

10   workout group at Key Bank since 2003; isn't that

11   correct?

12        A.    As I said to you, my understanding --

13   I learned then that they were part of the work --

14   that it was referred to the workout group.

15        Q.    Okay.  And weren't there

16   communications prior to June 16th, 2004 among the

17   parties to the stock purchase agreement that

18   referenced the fact that Key Bank had a

19   liquidation analyst involved?

20        A.    I don't recall that coming up.

21        Q.    So, if it did come up, you weren't

22   informed, right?

23        A.    I don't recall that coming up.

24        Q.    So, other than -- you mentioned the

25   workout group, you mentioned the borrowing base,

B094

1                    Marino

2    you mentioned the consultant.

3              Were there any other issues about your

4    meeting -- meeting with Key Bank that you can

5    recall?

6         A.    Well, yes.  I mean, Key Bank wanted us

7    to lend the money to fund the company through

8    closing.

9         Q.    Okay.  At least that was the case on

10   the 17th of June, right?

11        A.    That's correct.

12        Q.    Okay.  And on the 22nd of June, they

13   took a different position, right?

14             MR. SLATTERY:  Objection.

15        A.    Could you tell me what you're

16   referring to?

17        Q.    To the fact they sent you a letter

18   saying they would fund up to 26 million.

19             MR. SLATTERY:  Objection.

20        A.    They indicated they would fund up to

21   26 million, but they did not sign the consent and

22   agreement.

23             MR. FAY:  Let's mark this as

24        Exhibit 7.

25             (Marino Exhibit 7, E-mail dated

B095

Page 91

Marino

1

2     A.     Presstek was given certain information

3   about the business, Mike.  Based on that

4   information, we had a certain picture of the

5   company.

6          Q.     Okay.  But Presstek also asked for

7   certain information about the business, correct?

8          A.     Yes, we did.

9          Q.     Okay.  So, over those 11 months,

10  Presstek didn't just sit there and receive things

11  from A.B. Dick, it also asked for things from

12  A.B. Dick, correct?

13         A.     Yes.

14         Q.     Okay.  And in that process of asking

15  for information from A.B. Dick, is it your

16  testimony that, as of June 18, 2004, Presstek

17  still didn't understand the financial condition

18  of A.B. Dick?

19         MR. SLATTERY:    Objection.

20         A.     We began to understand based on what

21  happened on the 17th.  Now, if you asked me on

22  the 16th --

23         Q.     On the 16th?

24         A.     Thank you.  The answer is no, we did

25  not have the real picture of the company.

B096

1          Marino

2          MR. SLATTERY:  Objection to form.

3      A.    We were trying to get a deal done.

4  And it was our understanding that MHR had to

5  approve the transaction.

6      Q.    Did Mr. Goldstein become involved in

7  the negotiations?

8      A.    Yes.  As a matter of fact, at some

9  point, and it may have been following this

10  meeting, that Mr. Goldstein was requested by, I

11  suppose it was Paragon, to conduct the

12  negotiations.  It was sometime in and around

13  here.

14      Q.    Do you recall who told you that

15  Mr. Goldstein was requested by Paragon to conduct

16  the negotiations?

17      A.    Yes, it was Mr. Moosa who attended the

18  meeting.  I did not attend the meeting.  I

19  believe it was right in around that time frame.

20  I'm almost 100 percent sure.

21      Q.    Out of those negotiations came a new

22  proposal for a stock purchase agreement, correct,

23  you talked previously about it flipping?

24          MR. SLATTERY:  Objection to form.  Go

25      ahead.

```
1                    Marino

2    provided for in the stock purchase agreement for

3    MHR?

4         A.    Yes.

5         Q.    And can you tell me what the substance

6    of that discussion was?

7         A.    Yes.  Since MHR was carrying the

8    negotiations at the time, they felt they were

9    entitled to a fee for the work they had put into

10   this.  And it was also my recollection, in the

11   purchase and sale agreement, there is reference

12   to legal fees, as well.

13        Q.    $750,000, correct?

14        A.    I don't remember the exact number, but

15   yes, it was a big number, yeah.

16        Q.    Okay.

17        A.    So, yeah, there were discussions about

18   that $3-1/2 million fee.

19        Q.    And these were with Mr. Rachesky?

20        A.    Yes.  I had -- Mark, generally, the

21   way the conduct of this was -- took place was

22   that Mr. Moosa, to a great extent, carried on the

23   majority of the negotiations.  And when we came

24   to an issue that required my participation, I

25   would participate.
```

Marino

1

2          I don't recall how the ~~fee~~

3    fee came about.  But I certainly ~~had~~ a discussion

4    with Mr. Rachesky about it.

5          Q.    Was it something that Mr. Rachesky

6    requested?

7          A.    Well, that's again -- forgive me, I

8    can't recall how it came up.  I just can't recall

9    who said it first.

10         Q.    I appreciate that.

11         A.    You know what I'm saying?

12         Q.    I appreciate that.

13               Mr. Moosa, though, would have been

14    involved in those discussions, possibly?

15               MR. SLATTERY:  Objection to form.

16         A.    That's why my recollection is a little

17    vague, because we had a discussion one Friday in

18    Mr. Brim's office with Mr. Rachesky on the phone,

19    and I believe Mr. Moosa stepped out to go to

20    services on Friday afternoon, which he does.

21               And I think it was while Mr. Moosa was

22    out of the office that that discussion took

23    place.  And I believe that it was Mr. Brim,

24    myself, Mr. Eckstein and Mr. Rachesky and

25    probably Mr. Goldstein, because Mr. Goldstein

Intentionally Blank



# EXHIBIT 9

B101

Intentionally Blank

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CASE NO. 04-12002 (CGC)

- - - - - - - - - - - - - - x

IN RE: A.B. DICK COMPANY, Debtor

- - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF MOOSA E. MOOSA

McDermott, Will & Emery, LLP

28 State Street

Boston, Massachusetts

Monday, October 25, 2004

Reported by: Helana Eve Kline, CSR, RPR

Job No. 1684a

COPY

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

MR. FOLLAND:  Objection.

A.  I heard that.

Q.  How did the meeting with Key Bank on June 17th come about?

A.  My understanding was that Key Bank wanted to have a level of comfort with the senior executives of Presstek as to the process to closure, and they wanted to feel comfortable that this was in the process.

Q.  So the meeting on June 17th was initiated by Key Bank?

A.  Key Bank and/or Paragon.

Q.  Prior to going into the meeting with Key Bank were you of the belief or opinion that no additional funding would be necessary, no additional funding to A.B. Dick would be necessary, to reach closing?

A.  Can you repeat that question, please?

Q.  Sure.  On June 16th, when the agreements were signed, the amount of funding available from Key Bank to A.B. Dick and Paragon was 24 million dollars, correct?

A.  Uh-huh.

Q.  Were you of the opinion on June 16th that

1        Fountain.

2    Q.  And when did they tell you that, somewhere in

3        the February/March time frame?

4    A.  Yes.

5    Q.  What did they tell you?

6    A.  They told us something to the effect that

7        Paragon -- sorry, MHR would negotiate this

8        contract but on their behalf; and that at any

9        point in time, they could step in if they

10       chose to.

11   Q.  Did they tell you, did they tell this to you

12       directly?

13   A.  They said something to that effect in a

14       written communication.

15   Q.  In a written communication prior to April

16       12th?

17   A.  I believe so.

18   Q.  Was it an e-mail or a letter?

19   A.  I'm not sure whether it was an e-mail or

20       letter, but it could have been an e-mail.

21   Q.  And you can't tell me whether this was

22       Mr. Fountain or Mr. Zaffino?

23   A.  I think it was Mr. Zaffino, but I'm not sure.

24   Q.  And who did you understand was the

Page 61

1    the extent of reps and warranties.  We had

2    not seen any disclosure documents so we

3    could not find any in the agreement.   There

4    was no discussion on working capital, et

5    cetera, so there was a lot of open items;

6    but the essential pieces of the deal was

7    as stated here.

8    Q.   There were a lot of open items as to the

9         stock purchase agreement as of April 12th

10        from Presstek's point of view?

11   A.   There was not an agreement by MHR, yes.

12   Q.   But you anticipated that MHR and Paragon

13        would agree to this agreement, the stock

14        purchase agreement, that accompanied this

15        letter within four days?

16             MR. SLATTERY:   Objection.

17   A.   Yes.

18   Q.   Was that agreement reached?

19   A.   No.

20   Q.   And why not, sir?

21             MR. SLATTERY:   Objection.

22   A.   Cause during this process where we thought

23        that we were close to a deal MHR kept

24        changing the goal posts.   They were

B106

Page 62

1    changing too, which is natural; they were

2    trying to better the deal for themselves

3    and for all the parties; and so every time

4    we came closer to the finish line, it

5    seemed like the finish line had moved.

6    They wanted something else and they wanted

7    more and more, and this kept on going until

8    June and we had made up our minds that we

9    had to stop this because either we have a

10   deal or we don't have a deal.

11   Q.  Can you give me examples of, any examples,

12       of how MHR kept changing the goal posts?

13   A.  Working capital.

14   Q.  In what respect?

15   A.  We had a targeted working capital way back

16       in the November/December time frame and MHR

17       through the working capital kept changing

18       the target.  As a result, the effect of it

19       was to make the deal richer for themselves

20       and make the deal more expensive for ourselves.

21   Q.  Any other examples you can provide me?

22   A.  Things like fees that they wanted themselves.

23   Q.  Closing fees?

24   A.  Closing fees, things like indemnities that

B107

Intentionally Blank

# EXHIBIT 10

Intentionally Blank



1

1    IN THE UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF DELAWARE

3

4    IN RE:

5    A.B. DICK COMPANY,
     et al.,                    CASE NO. 04-12002

6              Debtors.

7

8                    - - - -

9

10

11        Deposition of MICHAEL V. LUGLI, taken as if

12   upon examination before M. Sheila Noce, a

13   Registered Professional Reporter and Notary

14   Public within and for the State of Ohio, at the

15   offices of Thompson Hine, 3900 Key Tower,

16   Cleveland, Ohio, at 10:00 a.m. on Wednesday,

17   October 6, 2004, pursuant to notice and/or

18   stipulations of counsel, on behalf of the

19   Creditors in this cause.

20                    - - - -

21            MEHLER & HAGESTROM
              Court Reporters

22
          CLEVELAND              AKRON
23   1750 Midland Building   1015 Key Building
     Cleveland, Ohio 44115   Akron, Ohio 44308
24      216.621.4984            330.535.7300
        FAX 621.0050            FAX 535.0050
25      800.822.0650            800.562.7100

24

1     Mr. Tomsich's relationship with the bank, but I

2     don't think it influenced our decisions.

3  Q.  Okay.  When you dealt with A.B. Dick, did you

4     often deal with Mr. Tomsich?

5  A.  Until 2004 I never dealt with Mr. Tomsich.

6  Q.  Okay.  When did you start dealing with

7     Mr. Tomsich?

8  A.  I would say towards the end of the first quarter,

9     beginning of the second quarter of 2004.

10  Q.  Okay.  Did something in your mind change that

11     resulted in his involvement?

12  A.  Yes.

13  Q.  And what was that?

14  A.  The company was rapidly running out of money, and

15     the sale to PressTek had continued to be delayed,

16     and there was concern as to whether or not the

17     company had sufficient resources to continue to

18     operate through a sale, and if the sale price

19     would hold given the deterioration that we were

20     seeing.

21  Q.  Okay.  So would it be a fair statement to say

22     that Mr. Tomsich became involved at the time when

23     payments of overadvances first came up?

24  A.  Prior.  I think he was always involved in the

25     credit.  My dealing with him directly was

B112

40

overadvances?

A.  No, it did not.

Q.  But you did fund an overadvance at or about that
    time, correct?

A.  We, subsequent to the meeting, we did, and then
    subsequent to that, we funded an overadvance, but
    subsequent to the meeting we did fund an
    overadvance.

Q.  And if memory serves, that was about
    two-and-a-half million, correct?

A.  I think that brought our overadvance to
    two-and-a-half million.  I think it was another
    million dollars.

Q.  Okay.  You testified that your meeting with
    Mr. Moosa and Marino and Scafide didn't make you
    comfortable about overadvances, but yet you did
    an additional overadvance of a million dollars,
    correct?

A.  Correct.

Q.  Can you explain how that's consistent?

A.  Well, what our concern was, they were asking us
    to fund out for 30 days to a company that was
    deteriorating at a purchase price that we found
    to be high, and our concern at that meeting was,
    you know, why do you need 30 days given the

B113

41

length of negotiations that had gone on.  Why not
close this thing sooner than later.

There was really no reason.  Lawyers had been
involved from the very beginning, all parties,
all constituents were getting paid.  There was no
need for any kind of filing or anything like
that.

So our fear was that as time went on in the
30 days and we continued to overadvance in a
deteriorating company, we would find ourselves in
a worse position and somewhat over a barrel.

So our response to them when they came out
was we're not willing to undertake the risk to
close.  You tell us that you want to buy the
company, you're comfortable with the company,
then you should fund that through that 30-day
period, and we would be fine.  If there needed to
be an adjustment to purchase price, they should
talk with A.B. Dick/Paragon about that, but we
weren't prepared to fund at that point in time.

Q.  But there were at least two additional
    overadvances paid out that day?

A.  Correct.  Well, that was the message we left them
    with.  They said well, we're not a bank, we
    weren't prepared to fund, we weren't thinking

B114

50

that issue when they met with you in Cleveland on the 17th?

MR. LEPENE:  Of June?

MR. FAY:  Of June.

A.  Not to my knowledge or recollection.

Q.  The call that you received from either Mr. Scafide or Mr. Moosa in response to your letter, when did that take place?

A.  I don't know if it was that business day.  This letter was sent out at the very end of the business day.  I'm not sure if I received a call that day or the next.

Q.  Okay.  I believe this was a Friday.  So to the best of your knowledge it would have either been on this Friday or the following Monday?

A.  The next business day.

Q.  Okay.  All right.  Now, prior to that communication that you had with either Mr. Moosa or Mr. Scafide, had you ever been told that KeyBank was expected to sign a specific document?

A.  I had not been told.  When I looked through the Stock Purchase Agreement, I did notice a consent form which I forwarded to our attorneys to review, and we were unwilling to sign that form. We felt that this was sufficient and represented

52

of this date, no later than July 16th, 2004, and

we didn't speak of the particulars of what that

consent was.  And it wasn't until, I believe, the

22nd when I was again reviewing the Stock

Purchase Agreement that I did see in the

agreement as an exhibit a consent, and I ran it

by our attorneys and said that this is attached,

my guess is they're looking for us to sign that,

what do you think.

          MR. LEPENE:  Well, any

      communication with your attorneys is

      privileged.

A.  Okay.

Q.  But in the end you didn't sign that?

A.  That is correct.

Q.  But you were willing to fund, and you were

    willing to fund through closing, is that correct?

A.  With these conditions, yes.

          MR. FAY:  I would like to mark

      this as Lugli Exhibit 7.

        -   -   -   -

          (Thereupon, Lugli Exhibit 7 was

    marked for purposes of identification.)

        -   -   -   -

          MR. FAY:  For the record, this is

123

that way, A.B. Dick was suffering from liquidity
problems, is that fair?

I think A.B. Dick had been running, was running
with tight liquidity for quite some time.  It was
running with, you know, two to three million
dollars of availability borrowing base,
availability in general on sales of quarter of a
billion dollars.

Q.  When you first became involved, when the A.B.
Dick account came into your department, did they
have a backlog on sales that they were unable to
fulfill because they were unable to produce the
product?

A.  My understanding, that was not a problem at the
time.

Q.  That became a problem later?

A.  That became a problem as they continued to
perform.  What basically happened because they
couldn't, their earnings weren't covering even
the interest expense to us, so to pay interest
they basically were consuming themselves.

They were using more and more borrowing base
instead of buying inventory and machinery and
equipment, which would be accretive.  That's what
began to happen in 2004, and that was the biggest

124

concern of the bank, you know, in March.

Based on their projections, they were looking like they weren't going to start to be able to cover interest, and when you can't cover interest, liquidity, which has always been tight, shrinks quickly.

Q. When A.B. Dick was unable to cover its interest payments, would you call that a liquidity crisis?

A. That was going to put them eventually into a liquidity crisis, absolutely.

Q. But you wouldn't think it was a liquidity crisis at that time?

A. They had a buyer, and they were going to close. So the question was okay, you're burning this much cash, you have this much availability.

Q. But absent the buyer?

A. Absent the buyer, this is a huge problem.

Q. Absent the buyer, this was a spiral that was probably only going to end in disaster, right?

A. Absent a buyer, we would not have -- I don't think we would have let this gone on as long as we did.

Because there is a point in time if you're not going to be able to sell this thing that you need to commence an orderly liquidation of your

B118

# EXHIBIT 11

Intentionally Blank

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CASE NO. 04-12002 (CGC)

- - - - - - - - - - - - - - - x

IN RE: A.B. DICK COMPANY, Debtor

- - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF MICHAEL MCCARTHY

McDermott, Will & Emery, LLP

28 State Street

Boston, Massachusetts

Monday, October 25, 2004

Reported by: Helana Eve Kline, CSR, RPR

Job No. 1684c

COPY

Page 11

1   A.  No.

2   Q.  Did it become a non-issue at any point?

3   A.  Yes.

4   Q.  How did that happen?

5   A.  My understanding is that we agreed with

6       the other party that we would adjust the

7       purchase price and we would accept the

8       liabilities and the insurance, the

9       subsequent insurance.

10  Q.  How was that information conveyed to you?

11  A.  We did an analysis of what it would cost us

12      to seek our own insurance, pollution, legal

13      liability, and liability insurance; and we

14      came up with a premium and a number for the

15      risk.

16  Q.  Do you recall what that number was?

17          MR. SLATTERY:  Wait.  Just in terms of

18      the environmental assessment to the extent

19      you were having discussions with counsel on

20      the environmental issues, those are privileged

21      discussions; and so I would ask you to, and

22      instruct you to, answer exclusive of the

23      discussions you had with counsel.

24          THE WITNESS:  Yes, understood.

# EXHIBIT 12



| | |
|---|---|
| **From:** | Ed Marino |
| **Sent:** | Friday, April 16, 2004 2:13 PM |
| **To:** | Steve Rappaport; Barb Pellow; Dan Ebenstein; Debbie Samataro; Dick Williams; Don Waite; Ed Marino; John Dreyer; Larry Howard; Mike Moffitt; Moosa E. Moosa |
| **Cc:** | Jim Scafide; Michael McCarthy |
| **Subject:** | Silver Update- Confidential |

Dear Fellow Board Members,

Moosa and I met with MHR yesterday and into the evening. We now have agreement with MHR on the deal. Our original intent was to go over more the legal points. In the course of working the legal points a few very positive new opportunities were introduced that strengthens the deal for all parties. These are now being cut into the agreements and they will be sent in final form to MHR tonight.

As a result of the changes, we have given MHR until the end of this coming week, 23 April, to obtain approval from Silver on the deal. A letter indicating that our deal expires at the close of business will be sent to MHR this afternoon. Their strategy is to present the full package to Silver as a fair and balanced package deal. I will explain more about their approach at our Board meeting on Thursday.

So, the NYC trip was successful, and we now one significant step left.

Again, we will discuss this further on Thursday. Please call if you have any questions or comments.

Best regards,
Ed

Ed Marino
President and CEO
Presstek, Inc.
55 Executive Drive
Hudson, NH, 03051
Tel: 603-595-7000
Fax: 603-595-2602
email: emarino@presstek.com

P - 24382



**CONFIDENTIAL**

B124

# EXHIBIT 13



| | |
|---|---|
| **From:** | Ed Marino |
| **Sent:** | Friday, April 23, 2004 1:46 PM |
| **To:** | Michael McCarthy; Jim Scafide |
| **Subject:** | FW: |
| **Attach:** | silver working capital analysis.xls; Silver summary of agreement.DOC |

Gentlemen,

I asm forwarding Platinum's best and final offer to MHR. As you will note, it also requires that no further negotiations be conducted with Nesco. Michael, that means we can still talk with them, but not negotiate.

I can answer any questions you may have, and will be on the cell phone over the weekend.

Ed

> ——Original Message——
> **From:** John Brim [mailto:jbrim@HILLSTREETCAP.com]
> **Sent:** Fri 4/23/2004 12:24 PM
> **To:** mrachesky@mhrfund.com; Hal Goldstein
> **Cc:** Moosa E. Moosa; Ed Marino
> **Subject:**
>
> Mark and Hal:
>
> Attached please find an analysis of the following:
>
> 1) On Sheet 1 is an analysis of Silver's working capital movements since last July. We have removed the "old Multi" liabilities for clarity, and this shows clearly that the true working capital has declined by $5.2 million. As you know, this money went mainly to reducing Paragon bank debt by $2.8 million and to interest payments of approximately $2 million on Paragon's debt. In addition, Platinum is absorbing a number of other liabilities that were initially to be assumed by the seller.
> 2) On Sheet 2 is Platinum's final offer. The offer is unchanged with respect to purchase price and liability adjustments. However, to get this deal done, Platinum will reduce the working capital adjustment from $5.2 million down to $4 million and will eliminate the $6 million escrow holdback in exchange for a $3 million price reduction. We also have assumed that you will be successful in obtaining a $1 million haircut from Delaware. As you will see, our analysis indicates a 73% recovery to MHR.
> 3) The final offer is conditioned upon the following: no other changes in the terms that we have worked out together as outlined in the second attachment above; no negotiations by us of these terms with Nesco; and a signed and announceable contract by May 8th. For its part, Platinum reiterates that its due diligence from here on is only confirmatory.
>
> We all want to do this deal. Let's now wrap it up.
>
> John Brim and Warren Eckstein (on behalf of Platinum)
>
>
> John G. Brim
> Hill Street Capital, LLC
> 126 East 56th Street
> New York, NY 10022
> 212-326-2626

P – 25839



CONFIDENTIAL

**B126**