# EXHIBIT 29

B165

Intentionally Blank

# EXHIBITS

Marked at the

Deposition of

## MOOSA E. MOOSA

Taken on

### OCTOBER 20, 2004



## ESQUIRE™
### DEPOSITION SERVICES
#### A HOBART WEST COMPANY

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

216 EAST 45TH STREET, NEW YORK, NY 10017    212-687-8010

JOB: #166399A

/04 17:09 FAX 216 689 8468     ASSET RECOVERY                     @001



# KeyBank

# Facsimile Cover Sheet

**To:** Moose E Moose
John Fountain

**Company:** Presstek
Paragon

**Phone:**
**Fax:** 603-595-2602
440-449-3111

**From:** Michael V. Lugli
**Company:** KeyBank National Association
**Phone:** (216) 689-0851
**Fax:** (216) 689-8465 or (216) 689-8468
**E-Mail:** Michael_V_Lugli@keybank.com

**Date:** 06/22/2004 4:29 PM
**Pages including this cover page:**

**Re: Consent**

**Comments:**

DEPOSITION
EXHIBIT
*Moses 11*
*10-28-04*

P- 00001
CONFIDENTIAL

This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy.

This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide services requested by Key.

6/22/04   17:10 FAX 216 689 8468          ASSET RECOVERY                        @002



**Key Corporate Capital Inc.**
A KeyCorp Subsidiary
127 Public Square
Cleveland, OH 44114-1306

June 22, 2004

*Via Facsimile*

Presstek, Inc.
55 Executive Drive
Hudson, New Hampshire 03051
Attention:    Moosa E. Moosa
              Vice President—Finance and CFO

     Re:    *A.B. Dick Company*

Dear Moosa:

We are in receipt of your letter dated June 22, 2004 ("Presstek Letter") concerning A.B. Dick Company. Capitalized terms used but not otherwise defined herein shall have the meaning given thereto in the Presstek Letter.

Key Corporate Capital Inc. ("KCCI") hereby consents, on behalf of itself as Agent, LC Issuer and as the sole Bank under its Credit and Security Agreement with Paragon Corporate Holdings, Inc., to the Proposed Transaction pursuant to the terms that have been outlined to KCCI. Specifically, KCCI understands that (a) the limited open due diligence conditions will have been satisfied on or before June 28th 2004, (b) Platinum will consent to any increase in the outstandings under KCCI facility (up to $26,000,000) between now and the closing of the transaction, and (c) that there will be no other impediment to a closing on or about July 16, 2004.

We continue to look forward to hearing from you in an effort to work toward consummation of the Proposed Transaction.

Sincerely,

KEY CORPORATE CAPITAL INC.

Name: Michael Vlist
Title: SVP

cc: Paragon Corporate Holdings, Inc.

P- 00002
CONFIDENTIAL

(CONSENT.1)

**B169**

Intentionally Blank

# EXHIBIT 30

B171

Intentionally Blank



# EXHIBITS

Marked at the

Deposition of

## MOOSA E. MOOSA

Taken on

### OCTOBER 20, 2004



# ESQUIRE™
DEPOSITION SERVICES
A HOBART WEST COMPANY

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

216 EAST 45TH STREET, NEW YORK, NY 10017     212-687-8010

JOB: #166399A

B173

Jim Scafide
Tuesday, June 22, 2004 7:24 PM
'mlugli@comcast.net'
Fw: Project Silver

m my BlackBerry Wireless Handheld

inal Message——

oldsmith@mwe.com <jgoldsmith@mwe.com>;
fke@ssd.com <chaffke@ssd.com>; dzagore@ssd.com <dzagore@ssd.com>; fitzaffino@aol.com <fitzaffino@aol.com>;
in@mhrfund.com <lgoldstein@mhrfund.com>; jfountain@worldnet.att.net <jfountain@worldnet.att.net>;
ritz@cliffordchance.com <richard.pritz@cliffordchance.com>; EPtaszek@bakerlaw.com <EPtaszek@bakerlaw.com>;
_v_lugli@keybank.com <michael_v_lugli@keybank.com>

hael McCarthy <mmccarthy@presstek.com>; Moosa E. Moosa <mmoosa@presstek.com>; jsteele@mwe.com
@mwe.com>; jegan@mwe.com <jegan@mwe.com>; Jim Scafide <jscafide@presstek.com>; Ed Marino
o@presstek.com>

e Jun 22 18:46:15 2004
Project Silver

are aware, we represent Presstek, Inc. with respect to that certain
Agreement dated as of June 16, 2004 (the "Escrow Agreement") by and
resstek, Inc. ("Platinum"), Paragon Corporate Holdings, Inc.
"), A.B. Dick Company, ("Silver"), Silver Acquisitions Corp.
aser"), N.E.S. Investment Co. ("Nes") and MHR Capital Partners LP,
itutional Partners LP and MHRM LP (together with MHR Capital
LP and MHR Institutional Partners LP, "MHR"). All capitalized
rein shall have the meanings ascribed thereto in the Escrow
nt.

4(c) of the Escrow Agreement provides that upon the failure of Key
e the Consent and Agreement on or prior to the expiration of the
ow Period, then the agreements, covenants and obligations of the
ntained in the Principal Documents shall be null and void in
rety. As you are aware, the Key Escrow Period expired at close
ss today. Section 4(c) further states that upon such event,
n shall, at the request of Nes, Parent and MHR, either (x) destroy
executed copies of the Principal Documents constituting the
eposit, and shall deliver a certificate to each of MHR, Nes and
esting to such destruction of the execution copies of the
Documents or (y) return the Escrow Deposit to Parent and MHR,
ly."

our client has received related correspondence from Key, such
dence does not satisfy the consent requirements set forth in the
d Agreement. Specifically, the Consent and Agreement which Key
ed to execute pursuant to the terms of the Escrow Agreement (and
y did not execute) calls for Key to (i) commit to continue to fund
apital and operating deficits of Silver by increasing its total

NFIDENTIAL

DEPOSITION
EXHIBIT
Moosa 13
10-20-04 tt

P - 34395

c lending commitment to Parent as necessary to ensure adequate
for Silver through the closing of the Sale; (ii) to forbear from
g any default under the Key Credit and Security Loan Agreement or
their rights and remedies under the Loan Agreement until the
f (A) the closing of the Sale or (B) the termination of the
e Agreement in accordance with its terms.

ordingly, on behalf of Platinum, we request that you advise
the signature pages bearing your signatures should be destroyed or
d to your attention.

L Goldsmith
nott Will & Emery LLP
e Street
, MA 02109-1775
5-4416
5-3800 (fax)
ith@mwe.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ssage is a PRIVATE communication. This message and all attachments
vate communication sent by a law firm and may be confidential or
d by privilege. If you are not the intended recipient, you are
notified that any disclosure, copying, distribution or use of the
tion contained in or attached to this message is strictly
d. Please notify the sender of the delivery error by replying to
sage, and then delete it from your system. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

visit http://www.mwe.com/ for more information about our Firm.

P - 34396

NFIDENTIAL

Intentionally Blank

# EXHIBIT 31

B177

Intentionally Blank



JOINT DEVELOPMENT AND EXCLUSIVE
SUPPLY AND DISTRIBUTION AGREEMENT

BY AND BETWEEN
The A.B.DICK COMPANY
AND
PRESSTE, INC.

- 1 -

JOINT DEVELOPMENT AND EXCLUSIVE
SUPPLY AND DISTRIBUTION AGREEMENT

I.   DEFINITIONS ............................................................................3
II.  CTP DEVICE ............................................................................5
     A.  CtP Device .........................................................................7
     B.  Imaging Devices .................................................................8
     C.  Royalty Payment .................................................................9
     D.  Trademark ........................................................................9
     E.  PRESSTEK OEM .................................................................9
III. PLATE PRODUCT ....................................................................10
     A.  Purchase and Sale / Territory ..............................................11
     B.  Trademark ........................................................................12
     C.  Prices and Terms of Payment ..............................................12
     D.  Terms of Delivery .............................................................13
     E.  Plate Product/Non-Proprietary Plate Product Specifications .......14
     F.  Plate Product/Non-Proprietary Plate Product Warranties ...........14
     G.  Plate Product/Non-Proprietary Plate Product Liability ..............14
IV.  TERM AND TERMINATION ......................................................16
V    CONFIDENTIALITY .................................................................16
VI   INTELLECTUAL PROPERTY AND INDEMNIFICATION ...............16
VII. GRANT OF LICENSE AND DISTRIBUTION RIGHTS ..................18
VIII. DISPUTES AND JURISDICTION ..............................................20
IX.  GOVERNING LAW ..................................................................20
X.   FORCE MAJEURE ...................................................................20
XI.  LIMITATION OF LIABILITY .....................................................20
XII. TRAINING AND MARKETING SUPPORT ..................................21
XIII. MISCELLANEOUS PROVISIONS .............................................21

-2-

B180

JOINT DEVELOPMENT AND EXCLUSIVE SUPPLY AND DISTRIBUTION
AGREEMENT

This Agreement is made and entered into as of the 16 day of October, 2003 (the "Effective Date"), by and between A.B.DICK Company, with its principal place of business at 7400 Caldwell Avenue, Niles, Illinois 60714 (hereinafter referred to as "A.B.DICK") and PRESSTEK, Inc, with its principal place of business at 55 Executive Drive Hudson, New Hampshire, NH 03051-04903 United States of America (hereinafter referred to as "PRESSTEK").

WITNESSETH:

WHEREAS A.B.DICK and PRESSTEK have been jointly collaborating on a plan for the design, manufacture and distribution of a 2-up CtP device that would be manufactured by A.B.DICK, that would incorporate PRESSTEK Imaging Technology (as that term is defined herein) and that would image certain PRESSTEK plates; and

WHEREAS A.B.DICK desires and is willing to purchase certain of the subsequently specified products from PRESSTEK for re-sale in accordance with the terms and conditions of this Agreement; and

WHEREAS PRESSTEK desires and is willing to sell and supply to A.B.DICK such products for re-sale to certain end-user customers,

NOW THEREFORE, the Parties agree as follows:

I.     DEFINITIONS

In this AGREEMENT the following terms have the following meaning except where the context otherwise requires:

A. "CtP Device" means a 2-up computer-to-plate imaging device to be manufactured by A.B.DICK in accordance with the terms of this Agreement and which incorporates PRESSTEK Imaging Technology and which images only Plate Products and meeting other specifications as further set out in ATTACHMENT A2.

B. "Minimum Purchase Amount" relates to the minimum number of Plate Products that A.B.DICK must order to maintain certain proprietary rights and benefits under this Agreement, as those rights are set out further in this Agreement and as those amounts are set out in ATTACHMENT A2.

C. "Imaging Device" means a certain PRESSTEK-designed product incorporating Imaging Technology and meeting the specifications described in ATTACHMENT B hereto including future modifications thereof that is to be supplied by PRESSTEK, or a third party approved by PRESSTEK, to A.B.DICK in accordance with the terms of this

-3-



Agreement, as well as the integration of the PRESSTEK-designed product into the CtP Device.

D. "Imaging Technology" means a certain PRESSTEK laser imaging technology designed to image Plate Products as such technology is currently offered by PRESSTEK and as further described in ATTACHMENT B hereto including future modifications thereof that is to be supplied by PRESSTEK for A.B.DICK in accordance with the terms of this Agreement.

E. "Intellectual Property Rights" or "IPR" shall mean all intellectual property rights, including without limitation, any rights in any invention, patent, discovery, improvement, know-how, utility model, trade-mark, copyright, industrial design or mask work, integrated circuit topography, trade secret and all rights of whatsoever nature in computer software and data, Confidential Information (as that term is defined in ATTACHMENT F), and all intangible rights or privileges of a nature similar to any of the foregoing, including in every case in any part of the world and whether or not registered, and shall include all rights in any applications and granted registrations for any of the foregoing.

F. "Joint Technology" means the technology mutually identified by the Parties as Joint Technology and conceived, created, developed or reduced to practice pursuant to this Agreement.

G. "Minimum Monthly Purchase Amount" means the Minimum Purchase Amount divided by twelve.

H. "Non-Proprietary Plate Product" means a version or versions of the PRESSTEK WOLF printing plate, which is based on US Patent Number 5,493,971 (the "971 Technology") as currently manufactured for and offered by PRESSTEK, being wider than 52 centimetres, and as further described in ATTACHMENT A1.B hereto, including future modifications thereof that is to be supplied by PRESSTEK for A.B.DICK and branded as an A.B.DICK product, in accordance with the terms of this Agreement.

I. "Plate Products" means a version or versions of the PRESSTEK WOLF printing plate, which is based on US Patent Number 5,493,971 (the "971 Technology") as currently manufactured for and offered by PRESSTEK and as further described in ATTACHMENT A1.A hereto including future modifications thereof that is to be supplied by PRESSTEK for A.B.DICK on an OEM basis, and branded as an A.B.DICK product, in accordance with the terms of this Agreement. Plate Products specified in ATTACHMENT A1.A may only be added, deleted or substituted upon written agreement of both Parties.

J. "Products" means, collectively, the Plate Product, the Non-Proprietary Plate Product, Imaging Device and Imaging Technology (as those terms are herein defined).

K. "Specifications" means the specifications of the Products as described in ATTACHMENT A1.A., A.1.B, B, B2

-4-

B182

L. "Territory" means the geographic region described as North America, including the United States of America and its territories, combined with the nations of Canada and Mexico, as well as the United Kingdom.

## II.    CtP DEVICE.

### A.    CtP Device.

The parties acknowledge that A.B.DICK and PRESSTEK have been jointly collaborating on their respective aspects of the design of a CtP Device. The CtP Device incorporates technology and intellectual property that is the property of PRESSTEK and A.B.DICK, respectively. PRESSTEK's efforts and contribution have been specifically limited to designing the Imaging Device and the Imaging Technology. A.B.DICK has been responsible for any and all other matters related to design of the CtP Device.

1.    PRESSTEK Obligations.   In accordance with the terms of this Agreement, PRESSTEK will design and supply Imaging Technology and will assist A.B.DICK in the engineering and design of incorporating the Imaging Technology into a CtP Device. PRESSTEK will bear any and all costs associated with its share of such engineering and design of incorporating the Imaging Technology into the CtP Devices, and PRESSTEK will bear any and all costs associated with engineering and designing the Imaging Devices and Plate Products.

2.    A.B.DICK Obligations.   A.B.DICK shall incorporate the Imaging Technology in the engineering and design of the CtP Device and A.B.DICK shall manufacture and sell and distribute the CtP Device to end-user customers in accordance with the terms of this Agreement. A.B.DICK will bear any and all costs associated with its share of such engineering and design of the CtP Devices and will bear any and all costs associated with the manufacture and sale or distribution of the CtP Devices.

3.    Manufacture.   A.B.DICK will manufacture and offer for commercial sale the CtP Devices. Manufacture of the CtP Devices will occur in two phases: Beta Testing and Production

(a)    *Beta Testing.* A.B.DICK will manufacture its first beta unit of the CtP Device and deliver such beta unit to the DRUPA exposition for purposes of demonstrating the function of the machine at DRUPA on or before May 1, 2004, (the "Beta Manufacture Date"). Upon completion of DRUPA, A.B.DICK will provide PRESSTEK with such beta unit (at A.B.DICK's cost) for purposes of testing and analysis. A.B.DICK will bear the cost of delivery of the beta unit to PRESSTEK, and PRESSTEK will be responsible for installation. PRESSTEK shall assess the operation of the beta unit of the CtP Device and shall make such suggestions and recommendations as are appropriate to improve the form, fit, function or reliability of the CtP Devices, and to grant its approval of the performance of the CtP Device on imaging the Plate Product, which approval shall not be unreasonably withheld. Should PRESSTEK, upon review of the performance of the CtP Device, refuse to give its approval for the release of the CtP Devices, PRESSTEK shall state its

- 5 -

B183

reasons in writing and forward such reasons to A.B.DICK, and should A.B.DICK deem PRESSTEK's refusal to be unreasonable, the parties agree to resolve the matter in an amicable and efficient manner by the CEOs of the respective companies.

(b)    *Production.* Upon approval of the CtP Device by PRESSTEK, PRESSTEK shall so notify A.B.DICK of its approval and A.B.DICK will begin marketing and distribution activities on or before June 30, 2004 (the "Market Release Date"), and A.B.DICK shall have the right, and will market, sell and otherwise distribute the CtP Device only in accordance with the terms of this Agreement.

4.    <u>PRESSTEK Dimension</u>. Beginning at GraphExpo 03 and continuing until June 1, 2004 (the "Interim Period"), as an interim measure, PRESSTEK will manufacture a modified version of its Dimension 200 Platesetter (the "A.B.DICK Dimension"). The A.B.DICK Dimension will be modified to image only the Plate Products.

(a)    *Demo Unit.* PRESSTEK has manufactured and delivered to A.B.DICK a demonstration unit of the A.B.DICK Dimension on or before the initial day of GraphExpo 03, in Chicago, Illinois at a price of $55,000, including delivery, installation, and service of the demonstration unit during GraphExpo 03. PRESSTEK warrants that the A.B.DICK Dimension demonstration unit will be free from material defects for a period of ninety (90) days from delivery to GraphExpo 03. A.B.DICK was responsible for all costs associated with de-installation and removal of the beta unit of the A.B.DICK Dimension from GraphExpo 03.

(b)    *Production.* During the Interim Period, Presstek will manufacture and sell to A.B.DICK such A.B.DICK Dimensions as A.B.DICK will order at a price to A.B.DICK of $55,000, such price is ex works, PRESSTEK's facility in Hudson, New Hampshire. A.B.DICK may designate certain A.B.DICK Dimensions as beta units.

(i)    <u>Order Lead Times/Payment</u>. PRESSTEK will deliver A.B.DICK Dimension, including beta units, upon a thirty (30) day lead-time from the date of orders. Payment for the A.B.DICK Dimensions will be due net 30 days from date of invoice.

(ii)    <u>Warranty</u>. PRESSTEK warrants that the parts of the A.B.DICK Dimensions, including beta units, will be free from material defects for a period of one hundred and eighty (180) days from delivery to A.B.DICK or ninety days (90) from installation, whichever is shorter.

(iii)    <u>Service</u>. A.B.DICK will be responsible for providing end-user service for the A.B.DICK Dimensions, including beta units. PRESSTEK and A.B.DICK will cooperate to immediately begin training of A.B.DICK-designated service personnel to meet A.B.DICK's installation and service obligations. PRESSTEK will provide one training session at no cost to A.B.DICK for up to six (6) such service personnel. A.B.DICK will bear all costs related to travel, meals and housing for such training.

- 6 -

B184

(c)     Distribution Rights.   During the Interim Period, A.B.DICK shall have the exclusive right to market, sell or otherwise distribute the A.B.DICK Dimension, including beta units, only within the Territory, and A.B.DICK shall have no right to market, sell or otherwise distribute the A.B.DICK Dimension (including beta unit(s)) outside of the Territory.

**B.  Imaging Devices**

1.  PRESSTEK will design Imaging Devices for use by A.B.DICK as component imaging systems of the CtP Devices.  PRESSTEK shall provide up to twenty (20) Imaging Devices (the "Initial Devices") to A.B DICK in accordance with the terms of this Agreement at a cost of $6,000. PRESSTEK will assist A.B.DICK in incorporating such Imaging Devices into the design of the CtP Device.   The twenty (20) Imaging Devices described in paragraph II B1 will not be subject to royalty payments described in Section II C1,2,3,4. PRESSTEK will provide as a loan to A.B.DICK the first Imaging Device (the "Prototype Device") no later than December 31, 2003.  A.B.DICK may use the Prototype Device only for its internal purposes (such as testing, evaluation, and design of the CtP Device).  On or before March 31, 2004, PRESSTEK will provide to A.B.DICK the first of the Initial Devices.  Upon delivery of the first of the Initial Devices, A.B.DICK will return the Prototype Device to Presstek.

2.  PRESSTEK warrants that the Imaging Devices shall be free from material defects and in workable condition upon delivery and for a period of three hundred and sixty five (365) days therefrom.

    In addition to the warranties set forth above, provided that PRESSTEK manufactures (or directs the manufacture of) Initial Devices, and provided that the Initial Devices are manufactured to PRESSTEK's design, PRESSTEK warrants that the Initial Devices sold to A.B.DICK by PRESSTEK hereunder shall be free from "serial defects."  A "serial defect" is defined as the same defect occurring in more than 7 Initial Devices.  In the event of a serial defect, PRESSTEK shall immediately correct such defect in its current production, and PRESSTEK will pay A.B.DICK all direct, reasonable costs associated with the repair or replacement of the Initial Devices or CtP devices which include the Initial Device with a serial defect.   PROVIDED, HOWEVER, that PRESSTEK's obligations to repair such "serial defects" and to pay A.B.DICK for all direct, reasonable costs associated with the repair or replacement of the Initial Devices or CtP devices which include the Initial Device with the serial defect arises upon A.B.DICK notifying PRESSTEK within ten (10) days that it becomes aware of the serial defect and such notice occurs within 18 months from the date that the Initial Device is shipped to A.B.DICK.

3.  PRESSTEK will own the Imaging Technology and all rights related thereto.  Except as specifically set out in the Licenses (as that term is defined herein), A.B.DICK will gain no rights of ownership, or other rights, related to the Imaging Technology.

4.  PRESSTEK will design the Imaging Device to provide appropriate imaging energy to the Plate Product to image in compliance with performance and quality specifications as are

-7-

B185

mutually agreed by the Parties. The Imaging Device will include the laser light source, the beam folding and collimating optics, aim the laser beam per specification in the Imaging Device, and the means to accept a TTL signal to modulate the laser beam to image the specified spot size on the plate in the system. The package will be enclosed to be laser safe, mountable to specifications into the system, sealed to prevent degradation per specification, provide electrical connections for internal components and provide means to attach an external chiller for cooling water. PRESSTEK will provide laser control and power specifications related to demands for imaging system reliability and life considerations.

A.B.DICK will collaborate with Presstek on the design of the Imaging Technology to ensure cost targets are met. A.B.DICK will create detail and assembly drawings for the Imaging Technology to allow change management and procurement through a third party. A.B.DICK will provide the design for external power supplies and controllers for any TEC and laser power needed, temperature control & logic, image pixel generation data and timing to include the laser modulation and the fast and slow scan spinner mirror mounting and controls.

5.  Payment for Imaging Devices will be due net 25days.

6.  PRESSTEK will either manufacture the Imaging Devices or assist A.B.DICK in identifying an alternative manufacturer of the Imaging Devices and, upon such identification, PRESSTEK will license or otherwise authorize the alternative manufacturer to manufacture the Imaging Devices for incorporation into the CtP Devices. PRESSTEK reserves the right of first refusal of supplying any and all component parts to the manufacture of the Imaging Devices regardless of the manufacturer, provided, however, that, in order to exercise this right, PRESSTEK must provide such component parts for similar price, quality, quantity, and performance variables as the most-favoured supplier.

C. Royalty Payment
1.  In consideration of the right and license granted to A.B.DICK for the Imaging Technolgoy and the Imaging Device pursuant to this Agreement, A.B.DICK shall pay PRESSTEK a royalty payment as set out in Attachment C1.

2.  Within 30 days after the end of each calendar quarter during the term of this Agreement (the "Due Date"), A.B.DICK shall provide to PRESSTEK a written report, certified by the Chief Financial Officer of A.B.DICK as to its correctness, showing separately by product, the number of CtP Devices sold during such calendar quarter pursuant to the terms of this Agreement. For the purposes of this paragraph, a CtP Device shall be deemed "sold" when it is shipped, at A.B.DICK's direction to an end customer. CtP Devices which are made or used by A.B.DICK for demonstration or other purposes at facilities owned or operated by A.B.DICK and are not intended for immediate sale shall be considered demonstration units and royalty will be due when unit is sold to an end customer. The royalty payable pursuant to II. C. shall be paid to PRESSTEK at the Due Date.

3.  All royalties due under this Agreement shall be paid in full by wire transfer to PRESSTEK in U.S. Dollars to an account designated by PRESSTEK for such purpose.

- 8 -





4. A.B.DICK shall keep full, clear, and accurate records of all CtP Devices made, used, leased, sold, or otherwise transferred pursuant to this Agreement. Such records shall be maintained in sufficient detail to enable PRESSTEK to determine the number of such CtP Devices made, used, leased, sold, or otherwise transferred and the royalties due and payable thereon under this Agreement. PRESSTEK shall have the right, at its own expense and with certified accountants of its choice, but not more than once during each calendar year of this Agreement and during normal business hours and so as not to unreasonably interfere with A.B.DICK's normal business operations, to examine and audit the records of A.B.DICK to verify compliance with the terms and conditions of this Agreement. If such audit reflects underpayments by A.B.DICK in excess of 10% for the audit period, the expense of such audit shall be borne by A.B.DICK.

5. If A.B.DICK (a) manufactures and/or sells a CtP device that does not use PRESSTEK's Imaging Technology for A.B.DICK's Chemistry-Free CtP product line; (b) manufactures, markets or sells non-PRESSTEK Chemistry-Free printing plates or chooses to provide other plate material not supplied by PRESSTEK for use on the CtP Device; (c) otherwise does not comply with Sections II.E then, in addition to any other rights retained by PRESSTEK, PRESSTEK may: (x) terminate any agreement to supply A.B.DICK PRESSTEK imaging Technology for the purpose of integration and manufacture of additional CtP Devices, or otherwise; (y) terminate the Licenses (as that term is herein defined) set out in VII.; and/or (z) PRESSTEK may terminate any or all of A.B.DICK's rights to distribute Plate Product that are set out in Section III, below.

6. Notwithstanding anything stated herein to the contrary, if PRESSTEK terminates A.B.DICK's distribution rights for any reason other than those set out in Section II. C. 5, above, then PRESSTEK will continue to supply Plate Product to A.B.DICK for those entities who are customers of A.B.DICK at the time of such termination, for reasonable prices determined by PRESSTEK.

**D. Trademark**
   The CtP Devices shall be marketed, sold, and distributed under A.B.DICK's own trademarks or trade-names, and shall include reference to PRESSTEK technology as mutually agreed by the parties.

**E. PRESSTEK OEM**
   A.B.DICK shall manufacture for PRESSTEK on an OEM basis such CtP Devices as PRESSTEK may order and that PRESSTEK may market, sell, or otherwise distribute outside the Territory (the "Presstek CtP Device"). The Presstek CtP Devices shall be marketed, sold, and distributed under PRESSTEK's own trademarks or trade-names, and shall include reference to A.B.DICK technology as mutually agreed by the parties

1. A.B.DICK will sell to PRESSTEK the Presstek CtP Device upon most favourable wholesale terms and conditions, with reasonable delivery terms.

2. Upon completion of the training of PRESSTEK personnel, as discussed in Item II. E. 6., below, PRESSTEK will be responsible for providing service to any Presstek CtP Device sold by PRESSTEK to an end-user purchaser; however, A.B.DICK will be available to PRESSTEK-designated field technicians for escalated service support at

-9-

reasonable costs. Prior to the completion of the training of PRESSTEK personnel, as discussed in Section II.E.6., below, A.B.DICK will provide service to the Presstek CtP Devices for reasonable costs and on reasonable terms.

3.    A.B.DICK warrants to PRESSTEK that the parts and materials of the Presstek CtP Device except the Imaging Technology in those instances where the Imaging Technology for such CtP Device is manufactured by PRESSTEK, shall be free from material defects for a period of either ninety (90) days from installation at the end-user customer location or one hundred eight (180) days from delivery to PRESSTEK, whichever is shorter.

4.    During the term of this Agreement, and for a period of five (5) years from the termination thereof, A.B.DICK will sell such parts as needed by PRESSTEK from time to time to service the Presstek CtP Devices no longer under the warranty described in Item II E. 3. upon reasonable terms and conditions.

5.    A.B.DICK will label the Presstek CtP Devices in a manner reasonably designed by PRESSTEK; however, the Presstek CtP Devices will include a reference to A.B.DICK in a manner mutually acceptable to both parties. PRESSTEK may change or modify the packaging or label of the Presstek CtP Device upon ninety (90) days written notice to A.B.DICK; provided ,however, that any reasonable costs incurred in changing or modifying such packaging or label shall be billed to PRESSTEK by A.B.DICK for reimbursement. PRESSTEK shall supply to A.B.DICK the information necessary for all such subsequent changes of labels and packaging.

6.    Within ninety days following the Market Release Date, A.B.DICK will provide one training session at no cost to PRESSTEK, up to six PRESSTEK-designated field technicians to enable the field technicians the ability to provide adequate service to the Presstek CtP Devices. PRESSTEK shall bear all costs related to travel, meals and housing for such field technicians. A.B.DICK will provide additional training for further PRESSTEK-designated field technicians upon reasonable terms and conditions.

7.    If PRESSTEK is approached by potential customers ("Leads") within the Territory, PRESSTEK will refrain from selling the Presstek CtP Device to any such Lead and will forthwith refer such Leads to A.B.DICK, who will share with PRESSTEK a finder's fee (in an amount to be determined) if the contact results in a sale or lease of a CtP Device.

## III. PLATE PRODUCT.

PRESSTEK shall manufacture, or have manufactured, Plate Products and Non-Proprietary Plate Products that PRESSTEK will supply to A.B.DICK on an OEM basis as follows:

- 10 -



B188

**A. Purchase and Sale / Territory**

1. PRESSTEK agrees to manufacture, sell and supply Plate Product and Non-Proprietary Plate Product to A.B.DICK, and A.B.DICK agrees to order and purchase such quantities of Plate Product and/or Non-Proprietary Plate Product as A.B.DICK may order from time to time under the terms and conditions of this Agreement.

    a. <u>Grant of Right: Proprietary Material.</u>

        i. Exclusive Right. PRESSTEK hereby grants to A.B.DICK the exclusive right to re-market, re-sell, or otherwise distribute Plate Products within the Territory, as set out in Section VII (the "Exclusive Right"). To maintain this Exclusive Right, however, A.B.DICK must purchase Plate Product sufficient to meet the Minimum Purchase Amount. Should A.B.DICK fail to purchase Plate Product in quantities sufficient to meet the Minimum Purchase Amount, PRESSTEK may terminate A.B.DICK's Exclusive Right.

        ii. Non-Exclusive Right. PRESSTEK hereby grants to A.B.DICK the non-exclusive right to re-market, re-sell, or otherwise distribute Plate Products outside of the Territory (the "Non-Exclusive Proprietary Right"). To maintain this Non-Exclusive Proprietary Right, however, A.B.DICK must purchase Plate Product sufficient to meet the Minimum Purchase Amount. Should A.B.DICK fail to purchase Plate Product in quantities sufficient to meet the Minimum Purchase Amount, PRESSTEK may terminate A.B.DICK's Non-Exclusive Proprietary Right

        iii. Grant of Right: Non-Proprietary Plate Product. PRESSTEK hereby grants to A.B.DICK the right to re-marketing, re-selling and otherwise distributing the Non-Proprietary Plate Product throughout the world, to the exclusion of no other party(the "Non-Proprietary Right").

    b. To maintain this Non-Proprietary Right, however, A.B.DICK must purchase Plate Product sufficient to meet the Minimum Purchase Amount. Should A.B.DICK fail to purchase Plate Product in quantities sufficient to meet the Minimum Purchase Amount, PRESSTEK may terminate any and all of A.B.DICK's rights to distribute the Non-Proprietary Plate Product.

    c. For purposes of clarity, A.B.DICK's distribution rights are set out in Attachment A3.

    d. Restriction. Notwithstanding anything stated herein to the contrary, A.B.DICK shall have no right to, and shall not, market, sell or otherwise distribute Plate Product or Non-Proprietary Plate Product to customers for use on PRESSTEK Dimension imaging systems.

2. PRESSTEK shall not market, sell or otherwise distribute the Plate Product or Non-Proprietary Plate Product marked with A.B.DICK's labels to any other customer other than A.B.DICK.

- 11 -



**B. Trademark**

1. The Plate Product and Non-Proprietary Plate Product shall be marketed, sold, and distributed under A.B.DICK's own trademarks or trade-names, and packaging shall include reference to PRESSTEK technology as mutually agreed by the parties.

2. PRESSTEK shall affix to the package of Plate Product and Non-Proprietary Plate Product such A.B.DICK labels as being designated by A.B.DICK in ATTACHMENT D. A.B.DICK may change or modify the packaging or label of the Plate Product and/or Non-Proprietary Plate Product upon ninety (90) days written notice to PRESSTEK; provided, however, that any reasonable costs incurred in changing or modifying such packaging or label shall be billed to A.B.DICK by PRESSTEK for reimbursement. A.B.DICK shall supply to PRESSTEK the information necessary for all such subsequent changes of labels and packaging. The same procedure shall apply to and shall be pursued accordingly regarding any future Plate Products that may be added or substituted upon written agreement by the Parties in ATTACHMENT A1.A.

3. A.B.DICK agrees to provide PRESSTEK at A.B.DICK's expense with all necessary artwork for labels and packaging for Plate Product and Non-Proprietary Plate Product. On the basis of such artwork PRESSTEK shall produce the respective labels and will acquire such boxes for packaging at PRESSTEK's expense.

**C. Prices and Terms of Payment**

1.     PRESSTEK shall sell to A.B.DICK the Plate Product and Non-Proprietary Plate Product at the following prices for the following volumes:

Proprietary Plate

| Volume | Less than 1,000,000 square feet/quarter for each of two consecutive quarters. | 1,000,000 or more square feet/quarter for each of two consecutive quarters. |
|---|---|---|
| Pricing | $0.76/square foot | $0.72/square foot. |

Non-proprietary Plate

| Thickness | Quantity/Box * | Price |
|---|---|---|
| 0.006"/0.008" | 100 plates/box | $0.76/square foot |
| 0.006"/0.008" | 50 plates/box | $0.84/square foot |
| 0.012" | 100 plates/box | $0.89/square foot |
| 0.012" | 50 plates/box | $0.97/square foot |
| 0.012" | 25 plates/box | $0.97/square foot |

* Note quantity per box is dependent on plate size -- the larger plates have fewer per box to keep weight at reasonable level due to handling requirements.

    For purposes of clarity, the number of square feet per quarter purchased by A.B.DICK that is indicated in the row entitled "Volume", above, is the combined total number of square feet of Plate Product and Non-Proprietary Plate Product.

2.     Pricing will be established as follows. Pricing for a current quarter will be established by reviewing the amount of Plate Product and Non-Proprietary Plate Product purchased by A.B.DICK from PRESSTEK for the two immediately previous quarters (the "Purchase Amount"). If the Purchase Amount for each of the two immediately previous quarters is greater than 1,000,000 (one million) square feet

- 12 -







(excluding returned goods), then the pricing for the current quarter will be $0.72 (seventy two cents) per square foot. If the Purchase Amount for each of the two immediately previous quarters is not greater than 1,000,000 (one million) square feet (excluding returned goods), then pricing for the current quarter will be $0.76 (seventy six cents) per square foot.

3. PRESSTEK will sell the Plate Product and Non-Proprietary Plate Product to A.B.DICK at a price not less favorable than PRESSTEK'S most-favored customer price for Plate Product within this market, based on similar application (i.e., 2-up CtP devices), terms, conditions, volumes and territory.

4. PRESSTEK will sell the Plate Product and Non-Proprietary Plate Product to A.B.DICK at prices relevant to prices of PRESSTEK plates sold within this market, based on similar application (i.e., 2-up CtP devices), terms, conditions, volumes and territory.

5. Through December 31 2006, PRESSTEK may increase these prices based only on increases in raw material and/or manufacturing costs.

6. All prices of Plate Product and Non-Proprietary Plate Product are point of manufacture.

7. Prices shall be payable without any deduction or further discount within sixty (60) days from the date of receipt of the invoice at A.B.DICK.

8. All payments under this Agreement shall be made in US Dollars by telegraphic transfer to the account of PRESSTEK as specified in the relevant invoice.

9. A.B.DICK will provide PRESSTEK every three (3) months with rolling twelve (12) calendar months forecasts for each Plate Product under this Agreement in a form similar to that which is enclosed as ATTACHMENT E; the first two (2) months of such initial forecast shall be binding. A.B.DICK shall during the effective period of this Agreement place with PRESSTEK their regular purchase orders for the shipment of Plate Product and Non-Proprietary Plate Product as specified in this Agreement.

10. Until April 1, 2004, Plate Product for one beta test prototype CtP Device will be provided by PRESSTEK in all thicknesses and sizes as defined in Attachment A.1A. at $0.72 per SQ.FT. Pricing beyond April 1, 2004 for all plates will be covered by Section III B 2.

**D. Terms of Delivery**
1. Shipment mode shall be at the discretion of A.B.DICK, always provided that any additional costs regarding special packaging, insurance, terms and conditions regarding freight and transportation and the like shall be borne by A.B.DICK. Loss or damage to Plate Product and/or Non-Proprietary Plate Product after delivery that is the result of faulty packaging or handling by PRESSTEK shall remain PRESSTEK's responsibility. PRESSTEK shall not be liable to A.B.DICK after delivery to carrier for transportation or for loss or damage in transit. Claims for shortage or damages caused in transit other than as a result of faulty packaging and handling by PRESSTEK shall be made against the carrier by A.B.DICK with a copy to PRESSTEK. Claims for shortage not attributable to the carrier must be made by A.B.DICK against PRESSTEK within sixty

- 13 -

B191

(60) days after receipt of the Plate Product and/or Non-Proprietary Plate Product, as far as such deficiency can be discovered by reasonable examination, otherwise without delay after detection at the specified destination.

### E. Plate Product/Non-Proprietary Plate Product Specifications

1. No material changes to the Specifications shall be made by either Party except by mutually agreed upon written amendments to ATTACHMENT A1.A or A.1.B.

2. If PRESSTEK develops or changes the nature of Plate Product or Non-Proprietary Plate Product PRESSTEK shall notify A.B.DICK one hundred and eighty (180) days in advance for changes in Plate Product specifications and provide test products for further evaluation.

### F. Plate Product/Non-Proprietary Plate Product Warranties

1. PRESSTEK warrants that all Plate Product and Non-Proprietary Plate Product delivered to A.B.DICK during the term of this Agreement are free from defects shall and meet the finished product performance and manufacturing specifications set forth in ATTACHMENT A1.A, or A.1.B, respectively. The warranty period is twelve (12) months from the date on which the Plate Products or Non-Proprietary Plate Product were delivered to A.B.DICK at the destination as stipulated in the purchase order.

2. In case of breach of warranty PRESSTEK shall replace, at no cost for A.B.DICK, the Plate Product and/or Non-Proprietary Plate Product or refund any payment made for the defective product. All return costs including transportation and applicable taxes shall be borne by PRESSTEK.

3. A.B.DICK shall notify PRESSTEK of any defect of the Plate Product or Non-Proprietary Plate Product within thirty (30) days from discovery of the defect in written form at the latest within twelve (12) months after receipt of the Plate Product.

### G. Plate Product/Non-Proprietary Plate Product Liability

1. PRESSTEK shall be liable for all claims of third parties asserted as a result of damage to property or bodily injury caused by a defect in the Plate Product and/or Non-Proprietary Plate Product and shall indemnify A.B.DICK against any such claims by third parties against A.B.DICK.

2. In case a claim for product liability is made against A.B.DICK, PRESSTEK shall co-operate with A.B.DICK in investigating appropriate actions in compliance with A.B.DICK's request and such co-operation shall be made without any expense to A.B.DICK.

### IV. TERM AND TERMINATION

A.    This Agreement shall be effective for successive three-year terms beginning on the Effective Date, unless sooner terminated in accordance with any provision of Section IV.C. or Section IV.D. The parties may extend or otherwise modify the terms of this Agreement, but only if such extension or modification is approved in writing by both parties.

- 14 -

B192

B.    The pricing and the Minimum Purchase Amounts by A.B.DICK of Plate Product and/or Non-Proprietary Plate Product shall be effective for the first three (3) years of the term of this Agreement.

C.    Six months prior to the expiration of the any three year term of this Agreement, the parties will in good faith commence negotiations of the pricing and new Minimum Purchase Amounts for the remaining term of the Agreement, or for such additional time as the parties may mutually agree. For purposes of this Section IV. C., the new pricing and Minimum Purchase Amounts will be established by considering the market conditions, cost of production, competitive conditions, and other relevant data.

1.    In the event that the parties are unable to resolve the new pricing or new Minimum Purchase Amounts as described in Section IV.C., above, by the end of the Term, then the Agreement shall terminate as if A.B.DICK failed to meet the Minimum Purchase Amounts as set out in Section VI. D.

D.    Either Party may terminate this Agreement by giving a written notice of termination to the other Party if:

1.    The other Party fails to perform or otherwise materially breaches a material obligation under this Agreement provided that such Party failing to perform or otherwise breaching shall have sixty (60) days from the date notice of intention to terminate is received to cure the failure or the material breach at which time this Agreement shall terminate if the failure or breach has not been cured, or

2.    Performance of any non-monetary obligation under this Agreement has been rendered impossible to the other Party for a period of three (3) consecutive months by reason of the occurrence of any of the events described in Section X A.(Force Majeure) or if any other event occurs which will be reasonably determined to permanently prevent performance of this Agreement, or

3.    If the other Party becomes insolvent or a petition in bankruptcy or for corporate reorganisation or for any similar relief is filed by or against the other Party, or a receiver is appointed with respect to any of the assets of the other Party, or a liquidation proceeding is commenced by or against the other Party, or

4.    If the other Party defaults in any of the provisions of this Agreement not covered in Section IV.D.1. and does not remedy the default within ninety (90) days after a written notice is given requesting to remedy the default.

E.    In the event this Agreement is terminated for any reason, then:

1.    Each Party shall promptly return to the other at the receiving Party's expense all property belonging to the other which is in such Party's possession as of the termination date (including, without limitation, materials and all labels and other packaging supplies bearing any of the other party's trademarks in that party's possession as of the termination date).

2.    PRESSTEK shall not be required to make any further shipment of Products to A.B.DICK and may cancel all A.B.DICK's unshipped orders for Products except with respect to: (a) all firm orders received by PRESSTEK prior to the notice of termination pursuant to Section III. E that are within the "Fixed Zone" as that term is

- 15 -

B193

defined in Attachment E, and (b) any Product sold by A.B.DICK pursuant to a valid and binding obligation the existence of which obligation has been made known to PRESSTEK within thirty (30) days after the notice of termination, as set out in Section II C.6. and Section IV.G.

3.    Neither Party shall be relieved of any unfulfilled obligations (including without limitation A.B.DICK's obligation to pay for Products shipped prior to the termination date) existing on the termination date.

F.    Any order placed by A.B.DICK and accepted by PRESSTEK after the termination or expiration of this Agreement is governed by the provisions of this Agreement. The placing, receipt or shipment of post-termination or post-expiration orders does NOT otherwise extend the term of this Agreement.

G.    Notwithstanding anything stated herein to the contrary, should A.B.DICK's rights to distribute Plate Product and/or Non-Proprietary Plate Product be terminated as a result of PRESSTEK's termination of this Agreement for reasons set out in Article III A, or Article XII B, upon notice of such termination, A.B.DICK shall provide PRESSTEK with a full and complete list of all persons or entities that comprise the list of end-user customers of the A.B.DICK Dimension and/or the CtP Device (the "Final Customers") and PRESSTEK will continue to sell to A.B.DICK such Plate Product or Non-Proprietary Plate Product sufficient for A.B.DICK to sell only to the Final Customers.

## V    CONFIDENTIALITY

A.    During the term of this Agreement, each Party shall maintain confidentiality of any technical or commercial information disclosed or otherwise revealed to it hereunder or coming to its attention in strict compliance with the Mutual Confidentiality Agreement between the Parties dated July 25, 2003 (ATTACHMENT F).

## VI INTELLECTUAL PROPERTY AND INDEMNIFICATION

A. PRESSTEK shall maintain any and all rights to any Intellectual Property Rights related to the Imaging Technology, Imaging Device, and Plate Product that were conceived, created, developed, or reduced to practice related to this Agreement.

B. A.B.DICK shall maintain any and all rights to any Intellectual Property Rights related to the CtP Device that were conceived, created, developed, or reduced to practice prior to, or independently of, any work performed by PRESSTEK. The parties will equally own any Joint Technology.

C. A.B.DICK shall not modify any aspect of the design of the Imaging Technology without the approval of PRESSTEK, which PRESSTEK will not withhold unreasonably.

D. Except as the Parties may otherwise agree in any Project schedule, the Parties agree that all Joint Technology shall belong jointly to both Parties and each Party shall have the semi-exclusive right to practice and exploit such Joint Technology anywhere in the world

- 16 -

without any restriction or accounting to the other Party, however, neither party will have the right to license or sublicense the Joint Technology without the expressed written consent of the other party.

E. Both Parties shall mutually agree upon the filing of applications and execution and delivery of any further documents that may be required in order to secure intellectual property rights, including but not limited to patent and copyright, in the Joint Technology.

F. While either Party may have the responsibility to file, prosecute and/or maintain patents, the filing, prosecuting or maintaining of such patents shall be at the sole discretion and judgment of that Party, and neither Party, nor their employees, agents or officers, shall have any responsibility or liability to the other party for any failure, mistake or error in the filing, prosecuting or maintaining of such patents.

G. Notwithstanding that PRESSTEK reserves its rights in the CtP Devices as set out above, A.B.DICK shall be responsible for any and all costs associated with providing warranty and other service and services to the CtP Devices and the customers of the CtP Devices, and A.B.DICK agrees, at its expense, to defend, indemnify and hold PRESSTEK, PRESSTEK Companies, and their respective authorized resellers, customers and officers, directors, employees and representatives ("Indemnities") harmless from any suit claim, demand, cause of action or proceeding asserted by a third party against any of the Indemnities alleging (i) that any CtP Device(s) violates any applicable safety or regulatory standard or has caused personal injury (including death) or damage to property or (ii) the infringement or misappropriation of such third party's intellectual property rights (a "Claim"), provided that A.B.DICK is notified of the Claim by PRESSTEK within a reasonable time after PRESSTEK learns of it, is given all reasonable assistance by PRESSTEK necessary for A.B.DICK to perform its obligations in respect of the Claim and is given the sole right to control the defense and settlement of the Claim. Furthermore, PRESSTEK will protect, defend and hold harmless A.B.DICK against any claim relating to the Imaging Technology provided the Imaging Technology has been implemented as designed and documented by PRESSTEK.

H. PRESSTEK shall defend, at its own expense, any suit or proceeding against A.B.DICK for the infringement of any patent or intellectual property rights of third parties because of the reasons of offering, putting on the market, using or stocking the Products. PRESSTEK shall pay all damages and costs (including attorney's fees) finally awarded against A.B.DICK because of infringement for the above-mentioned reasons.

I. PRESSTEK's obligations under Section VI.H., above are conditioned upon A.B.DICK giving PRESSTEK written notice of any suit or proceeding or any claim of infringement without undue delay. Upon PRESSTEK's request, A.B.DICK shall furnish to PRESSTEK a copy of each communication relating to the alleged infringement and give to PRESSTEK all authority (including the right to exclusive control of the defence and settlement of any such suit or proceeding), information and assistance at PRESSTEK's expense necessary to defend or settle such suit or proceeding. However, the aforementioned obligations of A.B.DICK shall only apply as long as PRESSTEK pursues the defence of such matter professionally and in due course. A.B.DICK reserves the right to defend its own interests

- 17 -

B195

accordance with the terms of this Agreement and to sell, market or otherwise distribute the CtP Device on an exclusive basis within the Territory (the "Exclusive License"). This Exclusive License expressly excludes the right to incorporate the Imaging Technology and/or the Imaging Device into any other plate imaging system that images plates printing plates that do not incorporate the '971 Technology and market, sell or otherwise distribute the CtP Device within the Territory. This Exclusive License does not permit A.B.DICK to disassemble, reverse engineer, analyse the design of, modify the design of, or otherwise use any portion of the Imaging Technology or the Imaging Device to assist in the development of an improved device, or an alternative device. This Exclusive License is expressly limited to incorporating the Imaging Technology and the Imaging Device into CtP Devices, and no other rights are granted hereunder. This Exclusive License does not extend or grant to A.B.DICK any rights to exclusively market, sell or otherwise distribute the CtP Device or the Imaging Technology outside the Territory. Nothing in this Exclusive License is intended or should be construed as to grant a right of ownership in the Imaging Technology and/or the Imaging Device, or to use any or all parts of the Imaging Technology or Imaging Device in any other manner than as specifically described in this Agreement.

3.     The Exclusive License and the Non-Exclusive License are collectively referred to as the "Licenses".

C.     **Distribution Rights**

1.     **Proprietary Rights.** Provided that A.B.DICK meets the Minimum Purchase Amount, A.B.DICK shall have the Proprietary Distribution Rights, as those rights are set out in Section II.A.1.a (i) and (ii). PRESSTEK shall not, nor shall PRESSTEK authorize any other party to, sell Plate Product within the Territory during the time that A.B.DICK has the exclusive right to distribute Plate Product.

2.     **Non-Proprietary Rights.**

       (a)     Provided that A.B.DICK meets the Minimum Purchase Amount, A.B.DICK shall have the nonexclusive right to distribute Non-Proprietary Plate Product of any width to end-user purchasers of CtP devices inside and outside of the Territory.

3.     Should A.B.DICK , fail to meet Minimum Purchase Amount, PRESSTEK shall immediately notify of A.B.DICK's failure of such and A.B.DICK, thereby granting A.B.DICK thirty (30) days notice of its impending breach of this Agreement, and offering A.B.DICK an opportunity to cure the breach. After such thirty(30)-day period, should A.B.DICK have failed to cure the impending breach, PRESSTEK may terminate any and all of A.B.DICK's distribution rights granted under this Section VII C in accordance with Section IV.

- 19 -

B197

## VIII. DISPUTES AND JURISDICTION

A.    Both Parties shall endeavour to settle possible points at issue or disputes relating to this Agreement in an amicable way. In case a controversy cannot be solved by the management dealing with the matter on an operational level, the dispute shall be transferred to the Chief Executive Officers/Managing Directors of both Parties who shall then try to find a mutual solution within thirty (30) days following their involvement.

B.    If the foregoing escalation procedure does not lead to a solution within 60 days after written notice by one Party to the other shall thereafter be settled by binding arbitration in New York, U.S.A., to be conducted in English pursuant to rules of arbitration of the American Arbitrators Association then in effect (except those rules pertaining to arbitrability) and judgment on the award rendered in such arbitration may be entered by any court having competent jurisdiction.

## IX. GOVERNING LAW

A.    This Agreement shall be governed by and interpreted in accordance with the laws of the State of New Hampshire, U.S.A.

## X. FORCE MAJEURE

A.    Neither Party hereto shall be liable to the other Party for failure to perform its obligations hereunder due to the occurrence of any event beyond the reasonable control of such Party and affecting its performance for any delay or failure to perform in accordance with the provisions of this Agreement caused by circumstances beyond its control including and without limitation acts of government, governmental orders or regulations, outbreaks of a state of emergency, acts of God, war, warlike conditions, civil commotion, riots, epidemics, natural disaster, strikes, lockouts other labour dispute or any other similar cause (hereinafter referred to as "Force Majeure").

## XI.    Limitation of Liability

EXCEPT FOR THE PARTIES' OBLIGATIONS OF INDEMNITY AS EXPRESSLY PROVIDED IN SECTION II. C. OF THIS AGREEMENT, (WHICH SHALL BE GOVERNED BY ITS TERMS), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY OTHER PERSON FOR ANY SPECIAL, PUNITIVE, INCIDENTAL, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR DAMAGES TO ANY PARTY'S BUSINESS REPUTATION OR GOODWILL, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN AN ACTION FOR CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE) OR ANY OTHER LEGAL OR EQUITABLE GROUNDS, WHETHER OR NOT THE FIRST PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY, AND IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EITHER PARTY FOR ALL CLAIMS OF ANY KIND ARISING IN CONNECTION WITH THIS AGREEMENT, THE PRODUCTS, OR ANY OTHER MATERIALS OR SERVICES FURNISHED HEREUNDER EXCEED THE PURCHASE PRICE OF PRODUCTS OUT OF WHICH SUCH CLAIM ARISES.

- 20 -

B198

## XII. TRAINING AND MARKETING SUPPORT

A. PRESSTEK will provide A.B.DICK upon A.B.DICK's request and at A.B.DICK's expense with necessary training, informative materials and assistance related to sales and service of the A.B.Dick Dimension.

B. A.B.DICK will provide PRESSTEK upon PRESSTEK's request and at PRESSTEK's expense with necessary training, informative materials and assistance related to sales and service of the Presstek CtP Device.

C. The parties agree to provide the other with all collateral text and images (sales, training and support material such as data sheets, handbooks, manuals, etc.) to enable the other party to produce appropriate own collateral material. Each party further grants the other party the permission to use and change the presentation, layout and the contents of the material for the purposes of the other party and to add any label, brand or trademark which the party deems appropriate.

## XIII. MISCELLANEIOUS PROVISIONS

A.    Notices

Any notice required or permitted to be given hereunder shall be in writing and shall be transmitted by facsimile (followed by confirmation), delivered by hand or sent by certified or registered mail and shall be deemed given when so delivered personally or if transmitted by facsimile one day after the date of such facsimile was properly transmitted or if mailed three (3) days after the date of mailing to the Parties at the addresses stated on the first page of this agreement (or to such Party and/or such other address as shall be specified by like notice from the Party to which notice or other communication shall be given; provided, however, that such notice of a change of address shall be effective only upon receipt thereof).

Any notices shall be given to the following:

If to A.B.Dick:

A.B.DICK Company
7400 Caldwell Avenue
Niles, IL  60714
Attn: Vice President - Procurement

Copy to:             Attn: General Counsel
                     (Same Address)

Copy to:             Attn: Vice President- Marketing
                     (Same Address)

If to Presstek: 

> **Comment:** Please provide appropriate titles for notices to Presstek.

Presstek, Inc.
55 Executive Drive

- 21 -

B199

Hudson, New Hampshire, NH 03051-04903

Copy to:    Attn: General Manager
               (Same Address)

Copy to:    Attn: Corporate Counsel
               (Same Address)

Copy to:    Attn: National Accounts Director
               (Same Address)

Either party may, by notice to the other, designate any other address in place of that shown above

**B.**    **Assignability**

This Agreement including all rights and obligations in whole or in part shall not be assigned by either Party to any third party without the prior written consent of the other Party, provided, however, that each party may assign this Agreement in connection with (a) the sale of all or substantially all of the capital stock or assets of such party, or (b) the acquisition by a third party of a party to this Agreement by merger, consolidation, reorganization or other business combination whereby more than fifty (50) percent of the voting securities of a party to this Agreement are sold or transferred to a third party (a "Business Combination"). Notwithstanding the foregoing, in the event of a Business Combination of A.B.DICK with a competitor of PRESSTEK, PRESSTEK shall have the right to terminate the Agreement without any further obligations except for those obligations set forth in Section IV.

**C.**    **Waivers**

The failure to exercise or enforce any right conferred upon any of the Parties hereto hereunder shall not be deemed to be a waiver of any such right.

**D.**    **Entire Agreement**

This Agreement contains the entire agreement between the Parties hereto with respect to the transactions with respect to the Products contemplated herein and - except as provided herein - supersedes all previous oral and written and all contemporaneous oral negotiations, commitments, writings and understanding between the Parties regarding and limited to the subject matter of this Agreement. Each Party agrees that it has not relied upon any representation warranty or provision not explicitly stated in this Agreement and that no oral statement has been made to either Party that in any way tends to waive any of the terms or conditions of this Agreement. This Agreement together with its ATTACHMENTs is intended by the Parties to be a final complete and exclusive statement of all terms and conditions of this Agreement. It may only be amended or changed by a written agreement signed by the representatives of both Parties.

- 22 -

E.    Severability

Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity, illegality or unenforceability without affecting in any way the remaining provisions hereof in such jurisdiction or rendering any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction. Any provision so severed will be deemed substituted by a valid provision accomplishing the Parties' intent to the closest effect possible.

F.    Exhibits

The following Exhibits are attached and incorporated by reference in this Agreement:

| | |
|---|---|
| ATTACHMENT A1A: | Plate Product Description and Specifications for Plate Product |
| ATTACHMENT A1B: | Non-Proprietary Plate Product Description and Specifications for Plate Product |
| ATTACHMENT A2: | Minimum Purchase Amounts |
| ATTACHMENT A3: | Table Description of A.B.DICK's plate distribution rights. |
| ATTACHMENT B: | Specifications for Imaging Device |
| ATTACHMENT B2: | Specifications for CtP Device |
| ATTACHMENT C1: | Royalty Schedule |
| ATTACHMENT D: | Specimen Product Label |
| ATTACHMENT E: | Rolling Forecast Schedule |
| ATTACHMENT F: | Mutual Confidentiality Agreement |

G.    Publicity.
1.    Except as may be required by regulatory agency, board or entity, neither party to this Agreement shall make any public or private announcements whatsoever to any third party regarding this Agreement without the written consent of the other party.

(The remainder of this page is intentionally left blank)

- 23 -

B201

IN WITNESS WHEREOF, the Parties hereto acting by and through their duly authorised
representatives have executed this Agreement.

**A.B.DICK**                                    **PRESSTEK**

Signed: _____        Signed: _____

Name: _____         Name: _____

Title: _____        Title: _____


Signed: _____        Signed: _____

Name: _____         Name: _____

Title: _____        Title: _____

Date: _____         Date: _____



- 24 -



ATTACHMENT A1A

_____, which is a version or versions of the PRESSTEK Wolf printing plate as currently manufactured and offered by PRESSTEK including future modifications thereof that is to be manufactured by PRESSTEK to the exclusive specifications of A.B.DICK on an OEM basis, and branded as a A.B.DICK product called "Freedom".

- Plate Specifications -

**Product Name: Freedom**

**Product Description:**

| | |
|---|---|
| Imaging Sensitivity: | 125-175 mj/cm2 |
| Processing Requirements | (Warm) water wash after imaging |
| Run Length (Nominal): | 25,000 impressions |
| Thickness | 0.006"/0.008" |
| Packaging | 100 pates per shipping carton, delivery to AB Dick in pallets of 2000 plates (20 boxes) per pallet. |
| Replacement | Equivalent or better if replaced by Presstek |
| Other | Straight cut Packing |
| Labeling | Designed by A.B.DICK and applied by Presstek |
| Amount | 100/box |
| Minimum order size unit | 20 boxes/pallet |
| Security | Plates will be manufactured to include A.B.Dick-specified barcode to be implemented through the mutual cooperation of Presstek and A.B.Dick.  A.B.Dick will bear all costs of implementing bar-coding technology onto CtP Device. |

- 25 -

B203



ATTACHMENT A1B

_____, which is a version or versions of the PRESSTEK Wolf printing plate as currently manufactured and offered by PRESSTEK including future modifications thereof that is to be manufactured by PRESSTEK to the exclusive specifications of A.B.DICK on an OEM basis, and branded as a A.B.DICK product called "".

- Plate Specifications -

**Product Name:** [Non-proprietary brand]

**Product Description:**

| | |
|---|---|
| Imaging Sensitivity: | 125–175 mj/cm2 |
| Processing Requirements | (Warm) water wash after imaging |
| Run Length (Nominal): | 25,000 impressions |
| Thickness | 0.006"/0.008"/0.012" |
| Packaging | 100, 50, or 25 pates per shipping carton (depending upon size), delivery to AB Dick in full pallet quantities of 2000 plates (20 boxes), 1000 plates or 500 plates (depending upon size)per pallet. |
| Replacement | Equivalent or better if replaced by Presstek |
| Other | Straight cut Packing |
| Labeling | Designed by A.B.DICK and applied by Presstek |
| Amount | 100/box; 50/box; 25/box depending upon size |
| Minimum order size unit | Full pallet quantities |

B204

ATTACHMENT A2

**Minimum Purchase Amounts**

<u>Minimum Purchase Amount</u>: at least six hundred and ninety thousand (690,000) square feet of Plate Product in 2004, at least two million, one hundred thousand (2,1000,000) square feet in 2005, and at least five million, eight hundred thousand (5,800,000) square feet in 2006.

- 27 -

B205

| Plate | Status Within Territory | Status Within Non-Territory (ROW) |
|---|---|---|
| Proprietary<br>Minimum Purchase Amount of 1, 4, and 10 MSF in 2004, 2005, 2006. | Exclusive | Non-Exclusive |
| Non-Proprietary (all sizes), linked to the Minimum Purchase Amount | Non-Exclusive | Non-Exclusive |
| | | |
| | | |

- 28 -

B206

ATTACHMENT B

## Imaging Device Specifications

**Product Name:**

**Product Description:**

| Output Power: | 8-10 Watts, external power to be provided |
|---|---|
| Output Wavelength: | 1064nm |
| Spatial mode: | TEM00 |
| Laser Crystal Thermal Management | TEC laser subplate w/ external power & control to be provided |
| Laser Pump Thermal Management | Chiller water, external chiller to be provided |
| Laser Thermal Management | TEC laser subplate w/ external power & control to be provided |
| Enclosure | Laser safe enclosure with internal safety shutter, optical output cover glass, external connections for AOM, TEC, Laser pump diode(s), shutter solenoid, and safety circuit. |

- 29 -

B207

ATTACHMENT B2
Product specifications.

- <u>CtP Device Specifications</u> -

**Product Name:**

**Product Description:**

[A.B. Dick to insert]



- 30 -



**ATTACHMENT C1**
**ROYALTY FEES**

| CUMULATIVE NUMBER OF UNITS | ROYALTY FEE PER UNIT |
|---|---|
| 1-500 | $600 |
| 501-1000 | $450 |
| 1001-+ | $300 |

- 31 -

B209

Plate                              Attachment D                              Label

- 32 -

B210

ATTACHMENT E

Forecasted month

**FIXED ZONE** – Months One and Two

      Forecast is binding; cannot be changed or cancelled

**FIRM ZONE** – Months Three and Four

      A.B.DICK must order at least 75% of the Firm Zone and can order up to 20% more than the Firm Zone, with Presstek approval.  The mix of the Firm Zone can be changed upon ordering depending on master roll availability.

**PLANNING ZONE** – Months Five through Twelve

      Forecasts are provided solely for Presstek's long-term planning purposes.  A.B.DICK. may change the forecast at A.B.Dick's discretion.

– 33 –

B211