## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re                               :      Chapter 11
                                    :
A. B. DICK COMPANY, et al.,         :      Case No. 04-12002 (JLP)
                                    :      (Jointly Administered)
                 Debtors.           :
-------------------------------------------------x      Hearing Date:  November 2, 2004 at 2:00 p.m.
```

**DEBTORS' HEARING MEMORANDUM IN SUPPORT OF MOTION FOR ORDER:
(A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF
A.B.DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES, FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF**

For their Hearing Memorandum in support of their *Motion for Entry of an Order: (A) Authorizing the Sale of Substantially All of the Assets of A.B.Dick Company and its Wholly Owned Subsidiaries, Free and Clear of all Liens, Claims and Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (C) Granting Related Relief* (the "Sale Motion"), A.B.Dick Company ("ABDick"), Paragon Corporate Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc. ("IMG"), the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), respectfully represent as follows:

### SUMMARY STATEMENT AND BACKGROUND FACTS

1.      The Debtors are seeking authority to (a) sell substantially all of the assets of A.B.Dick, its wholly-owned subsidiaries, and IMG (collectively, the "Assets") to a stalking horse bidder, Silver Acquisitions Corp. ("Silver"), or such other successful bidder selected at an auction to be held pursuant to certain bid procedures approved by the Court (the "Sale"), and (b) assume and assign certain unexpired leases and executory contracts in connection with the Sale. For the reasons that are set forth below and evidenced by the Declarations of Stephen Gray, the

#10316.1

Debtors' Chief Restructuring Officer,[1] and Glenn Pollack, a member of Candlewood Partners, LLC ("Candlewood"),[2] the Debtors' financial advisors in these cases, the Debtors submit that the Sale presents the best opportunity to preserve the going concern value of the Assets and maximize creditor recoveries.

2.      The Debtors commenced these chapter 11 cases by filing voluntary petitions for relief on July 13, 2004 (the "Petition Date"). Since the Petition Date, the Debtors have remained in possession of their property and continued operation of their businesses as debtors and debtors in possession pursuant to sections 1107 and 1108 of Title 11 (the "Bankruptcy Code") of the United States Code. On or about July 23, 2004, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in these jointly administered chapter 11 cases.

## History of Negotiations with Presstek and Silver

3.      Prepetition, the Debtors were faced with, among other issues, declining revenues and an inability to service their senior prepetition loans from KeyBank National Association ("Key"), successor in interest to and assignee of Key Corporate Capital, Inc. In the face of this worsening financial crisis, the Debtors explored various comprehensive restructuring possibilities, including a sale of the Assets or equity.

4.      In the summer of 2003, the Debtors received an expression of interest from Presstek, Inc. ("Presstek"), Silver's parent, in acquiring the stock of A.B.Dick. Subsequently, Presstek and the Debtors began negotiating the terms of such a transaction. These discussions culminated in mid-June 2004, with Presstek's offer to purchase A.B.Dick's stock for

---

[1]      The "Gray Declaration," annexed hereto as Exhibit A.

[2]      The "Pollack Declaration," annexed hereto as Exhibit B.

B213

approximately $24 million in cash and Presstek stock valued at approximately $20.1 million (the "Stock Transaction"). On June 22, 2004, however, Presstek terminated the Stock Transaction.

5.    Subsequently, the Debtors and Presstek resumed discussions for an asset based transaction under which Silver would acquire (a) substantially all of the assets of (i) A.B.Dick, (ii) ABDick Company of Canada, Ltd ("ABDick Canada"), a wholly owned subsidiary of ABDick, and (iii) IMG and (b) all of the capital stock of A.B. Dick UK Limited, a wholly owned subsidiary of ABDick. This second round of negotiations culminated in the Asset Purchase Agreement among Paragon, ABDick, ABDick Canada, Presstek and Silver dated July 13, 2004 (the "APA"), which is the basis of Silver's stalking horse bid. The Debtors, in connection with the proposed sale transaction, agreed to commence these chapter 11 cases to effectuate a sale of the American assets of A.B.Dick and its wholly owned subsidiaries to Silver, or a competing bidder submitting a higher and better bid, free and clear of liens, claims and encumbrances, under section 363 of the Bankruptcy Code. Key and Presstek agreed to provide a post-petition, debtor in possession loan facility (the "DIP Facility") to the Debtors to adequately finance the Debtors' postpetition operations pending approval of the Sale.

6.    The Debtors filed the Sale Motion on the Petition Date. Concurrent therewith, the Debtors filed a motion for approval of auction and bid solicitation procedures (the "Bid Procedures"). Following protracted negotiations with the Committee and other parties in interest and an evidentiary hearing before the Court, an order approving modified bidding procedures (the "Bid Procedures Order") was entered by the Court on September 15, 2004. The Bid Procedures Order established, *inter alia*, threshold requirements for qualification of competing bids, including the requirements that (i) any competing bids be at least $1,200,000

B214

greater than Silver's $40 million bid (the "Purchase Price") and (ii) only bids supported by a 5% cash deposit would be eligible to participate in the auction.

### Summary of Post-Petition Marketing Efforts

7.    Commencing in August 2004, Candlewood began an extensive and intensive effort to identify and solicit expressions of interest from potential qualified buyers. Candlewood solicited more than two hundred carefully selected potential buyers for the Assets, including more than one hundred strategic buyers and ninety strategic financial buyers. Of those potential buyers initially solicited with a "teaser" package (a summary memorandum describing the Debtors' businesses, among other things), eighty requested, and were sent, confidentiality agreements (a measure required by the Bid Procedures as a prerequisite to accessing the Debtors' confidential financial and other data). Sixty-four potential buyers returned executed confidentiality agreements and were granted access to the Debtors' "virtual" online data room to conduct due diligence evaluations of the Debtors' businesses and assets.

8.    In an additional marketing effort, the Debtors published notice of the proposed Sale and Bid Procedures in (a) the National Edition of the *Wall Street Journal*, (b) a printing industry trade journal and (c) an electronic newsletter serving the printing industry.

### Results of Competing Bid Solicitation Efforts

9.    Under the bidding procedures approved by the Court, competing bids for the Assets were to be submitted by 5:00 p.m. on October 27, 2004. Despite the Debtors' marketing efforts, however, no formal bids meeting the requirements specified by the Bidding Procedures Order were received by the Debtors.

10.    The Debtors did receive expressions of interest from ComVest Investment Partners II, LLC ("ComVest") and Harbor Partners ("Harbor"), both in the form of proposals

B215

for funding a plan of reorganization (together, the "Plan Proposals"). However, neither of the Plan Proposals contained a firm, reliable commitment to provide greater value to the estates, and neither proposal complied with the bidder qualification requirements of the Bid Procedures. Among other disqualifiers, neither ComVest nor Harbor Group submitted a 5% cash deposit.

11.    Specifically, both Plan Proposals proposed abandonment of the Sale in favor of a reorganization of the Debtors under a plan of reorganization. However, the Debtors, in consultation with Candlewood and counsel, have determined that neither of the Plan Proposals present a more favorable opportunity for the estates than the proposed Sale to Silver for a number of reasons. First and foremost, there is no guarantee that either of the Plan Proposals will result in a greater recovery for general unsecured creditors than will the Sale. Both Plan Proposals contain due diligence contingencies that give the proponents easy "outs" if they determine they do not like what they see. The APA, on the other hand, evidences Silver's firm commitment to maximize value for the Debtors' creditors and provide the estates with immediate and tangible liquidity. Thus, in accordance with the Bid Procedures, the Debtors should be authorized to reject the Plan Proposals as competing bids that do not suffice as higher and better offers than Silver's offer (as embodied in the APA).

## Summary of the Terms of the Proposed Sale

12.    The Debtors have determined that, in light of existing limitations on available funding for the Debtors' operations and the probable value that would be attained were the Assets to be liquidated on a piecemeal basis, that the best interests of the Debtors' creditors, customers and employees will be served if the Sale is authorized.

13.    Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors seek authority to sell the Assets to Silver pursuant to an Asset Purchase Agreement (the "APA," a

B216

copy of which is annexed to the Sale Motion, without attachments, as <u>Exhibit A</u>), for an aggregate Purchase Price of $40 million, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including but not limited to any administrative expense or priority claim asserted in the Debtors' chapter 11 cases. The Debtors also seek authority to assume and assign to Silver certain of their unexpired leases and executory contracts in accordance with section 365 of the Bankruptcy Code (collectively, the "Assigned Contracts and Leases," and, individually, an "Assigned Contract" or an "Assigned Lease").

14.    The APA also provides for the sale of substantial assets of A.B.Dick's Canadian subsidiary (the "Canadian Subsidiary"), as well as A.B.Dick's stock in its British subsidiary, A.B.Dick UK Limited (together, the "Foreign Subsidiaries"). The Foreign Subsidiaries are non-debtors. Thus, the Debtors do not seek any bankruptcy protections from the Court (*e.g.*, a sale free and clear of liens) with respect to the sale of the Foreign Subsidiaries' assets or stock.

## RESPONSES TO OBJECTIONS TO THE SALE

15.    A few parties have filed objections to the Sale, asserting that the Sale should not go forward for various reasons. For reasons set forth below, none of the objections set forth a colorable legal or equitable basis to deny approval of the Sale. The Debtors' post-petition financing will expire November 15, without such financing, the Debtors cannot sustain their operations. Thus, if the Sale does not close by mid-November as provided in the APA, the Debtors will very likely have no ability to fund their operations. They will be compelled to cease operations, terminate their employees and cease servicing their customers. As a consequence thereof, the going concern value of ABDick, its wholly owned subsidiaries, and IMG will be irreparably damaged and the Debtors will be forced to liquidate their assets on a

B217

piecemeal basis. Accordingly, in order to maximize value to all creditors and in the absence of higher and better bids for the Assets, the Court should authorize the Sale to Silver.

**a.    Response to the Objection of MHR**

16.    MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund Management LLC (collectively, "MHR") filed an objection (the "MHR Objection") to the Sale Motion shortly after it was filed. The primary thrust of the MHR Objection was twofold: (a) that the proposed transaction should not be authorized and no finding of good faith should be made with respect to Presstek until interested parties had been afforded an opportunity to conduct discovery regarding the negotiation of the APA, Presstek's dealings with the Debtors, and the extent to which the financial condition of ABDick had suffered as a consequence of Presstek's alleged influence over the operations and management of ABDick and (b) that the bid protections afforded Presstek under the APA and proposed bidding procedures were unnecessarily favorable to Presstek and unfair to other potential bidders. These specific objections have been rendered moot by the events that have occurred since the filing of the MHR Objection. Specifically, subsequent to the filing of the MHR Objection, MHR and other interested parties were afforded the opportunity to conduct extensive discovery regarding the negotiation of the APA, Presstek's dealings with the Debtors, and the impact, if any, of Presstek's alleged influence over A.B.Dick's operations and management. Further, the proposed bidding procedures and the bid protections afforded Presstek under the APA were modified by order of the Bankruptcy Court following protracted negotiations with Presstek and other interested parties and an evidentiary hearing held on August 23, 2004. Accordingly, the MHR Objection should be overruled as moot by the Court.

#10316.1                    7

B218

17.    MHR filed a Supplemental Objection (the "Supplemental Objection") to the Sale Motion on October 29, 2004.  The Supplemental Objection raises two arguments:  (a) there is no sound business justification for the Sale to Silver as the Sale – which includes a release of any claims the Debtors' may have against Presstek – eliminates a valuable asset by releasing Presstek from an allegedly valuable claim with respect to the Stock Transaction and (b) Presstek is not entitled to a good faith finding under section 363(m) of the Bankruptcy Code.

18.    The Supplemental Objection to the Sale is premised primarily on the fact that the purchase price for the Assets is substantially less than the consideration that was being offered in connection with the proposed prepetition Stock Transaction terminated by Presstek.  Here, however, the Assets were extensively marketed and no competing bids in excess of Silver's stalking horse bid were received for the Assets.  Accordingly, the market has determined that the consideration being offered by Presstek for the Assets is fair and reasonable.

19.    Contrary to MHR's assertion, sound business justifications do exist for authorizing the Sale to Silver.  Specifically, as noted above, the Debtors' postpetition financing arrangement terminates on November 15, 2004.  Further, on information and belief, neither Presstek nor Key will agree to an extension of the DIP Facility or the Debtors' use of their cash collateral to fund the Debtors' operations after November 15, 2004.  MHR offers no alternative source of funding the Debtors' operations following termination of the DIP Facility.  Absent the funding provided by the DIP Facility, the Debtors will lack sufficient cash to continue the operation of their businesses and will be compelled to cease business operations, stop servicing their customers and terminate their employees.  Such actions will irreparably impair the going concern value of ABDick, its wholly owned subsidiaries, and IMG and force the Debtors to liquidate the assets of these businesses on a piecemeal basis.  The proceeds from the Sale

exceeds the likely recovery to be generated by a piecemeal liquidation of the Assets. Preservation of "going concern" value, *i.e.*, maximizing the value of a debtor's assets for the benefit of creditors and preservation of the jobs of a large number of the Debtors' employees are sound business justifications for the Debtors' determination to proceed with the proposed Sale to Silver. Courts normally respect management's business judgment absent extraordinary circumstances that suggest the decision is uninformed, is made in bad faith, or otherwise represents an abuse of the discretion entrusted to management.[3] Here, the determination of Debtors' management to proceed with the Sale as opposed to reliance on a speculative recovery under an unproven claim or illusory reorganization offers is neither uninformed, made in bad faith, nor an abuse of the discretion afforded to Debtors' management.

20.    Similarly, MHR's contention that Presstek is not entitled to a "good faith" finding under section 363(m) of the Bankruptcy Code is without merit.[4] As noted by the Third Circuit Court of Appeals, "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee; or an attempt to take grossly unfair advantage of other bidders."[5] Other courts have also looked to the knowledge of the purchaser, holding that a

---

[3]    *See Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985) ("The issue presented for the first instance for judicial determination of the bankruptcy court is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only bad faith, or whim or caprice.").

[4]    As a matter of clarification, the APA identifies Silver, not Presstek, as the purchaser of the Assets.

[5]    *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986).

B220

good faith purchaser is "one who buys property in good faith and for value, without knowledge of adverse claims."[6] As noted by the *Rock Industries* Court,

> Traditionally, the requirement that a "good faith purchaser" take without notice of "adverse claims" has meant that the purchaser must have no actual knowledge of the defects in the title (to the assets bought), or knowledge of such facts and circumstances that would have put a man of ordinary circumspection upon inquiry." *Messirow v. Duggan*, 240 F.2d 751, 758 (8th Cir. 1957). This element of the traditional good faith purchaser test, of course, usually becomes an issue when an alleged good faith purchaser is seeking to extinguish adverse claims to title of which he had no actual or constructive notice at the time of sale.[7]

21.    Here, the Debtors and Candlewood engaged in a substantial, thorough effort to market the Assets. These extensive marketing efforts, designed specifically for the purpose of exposing the Assets to the marketplace and to solicit purchase offers from other parties, constitute *prima facie* proof that the sale of the Assets has been made in good faith. Thus, the Debtors have met their initial burden of demonstrating good faith for purposes of a finding under Bankruptcy Code section 363(m).

22.    Since the Debtors have met their burden of demonstrating a prima facie basis for authorization of the Sale and a determination of good faith under Bankruptcy Code section 363(m), the burden of proving Presstek's bad faith (*i.e.*, fraud, collusion among bidders) shifts to the MHR.[8] MHR, however, provides no evidence to rebut this *prima facie* case. With respect to the good faith purchaser issue, the Supplemental Objection focuses exclusively on the

---

[6]    *See, e.g., In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

[7]    *Id.*

[8]    *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) (once debtor meets initial burden of demonstrating justifications for non-ordinary course sale, objecting parties are required to produce some evidence in support of their objections); *Sapir v. Sartorius*, 230 B.R. 650 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1324 (once estate meets burden of demonstrating statutory requirements for authorization of section 363 sale, burden shifts to objector to prove basis for objection).

B221

prepetition conduct of Presstek. MHR argues, essentially, that Presstek is not entitled to a good faith finding because its management backed out of one proposed transaction and bargained hard and, in light of A.B.Dick's deteriorating financial condition, negotiated the best terms it could for the acquisition of the Assets. The absence of competing bids offering more money for the Assets than that offered by Silver indicates that the market believes the amount of the consideration being paid for the Assets is appropriate. As noted by above, the focus of a good faith inquiry is purchaser conduct during the course of the sale and the actual or constructive knowledge of the purchaser regarding adverse claims in the assets being acquired. The Supplemental Objection speaks to neither of these standards. MHR identifies no actions by Presstek or Silver during the course of the sale proceedings that is (a) allegedly fraudulent, (b) constitutes collusive conduct between Presstek and Silver and other Bidders or the Debtors, or (c) is an attempt to take grossly unfair advantage of other bidders. Neither does MHR identify any circumstances where Silver has actual knowledge or is on constructive notice of an adverse claim to such asset. Presstek's prepetition actions, in negotiations between sophisticated business people represented by competent counsel, does not bar a good faith finding under section 363(m) of the Bankruptcy Code. MHR's Objection should be overruled accordingly.

b.     **Response to Committee Objection**

23.     The Committee also filed an objection (the "Committee Objection") to the Sale on October 29, 2004. The Committee asserts four reason why approval of the Sale should be denied. First, the Committee inaccurately claims that the Debtors did not serve adequate notice of the list of executory contracts and unexpired leases to be assigned to Silver in the Sale (collectively, the "Assigned Contracts") or the corresponding proposed cure amounts (the "Cure Amounts"). Second, the Committee alleges that Silver should not be entitled to either a good

B222

faith finding under Bankruptcy Code section 363(m) or a release of claims against it because the Sale is not as good as the abandoned prepetition Stock Transaction. Third, the Committee claims that the various closing conditions in the APA make it too easy for Silver to back out of the Sale and force a foreclosure. Fourth, the Committee claims that the allocation of a portion of the Sale proceeds to the Canadian Subsidiary results in an impermissible "substantive consolidation" of the estates. As explained below, however, none of these spurious arguments have merit.

24.     With respect to executory contracts and unexpired leases to be assumed in connection with the Sale, the Debtors will demonstrate at the hearing that either due and proper notice of the cure claims amounts and the cure claims objection deadline was given to the non-Debtor parties to the Assigned Contracts or that such non-Debtor parties have consented to the assumption and assignment of their agreements to the purchaser in connection with the Sale. The Debtors further submit that they will demonstrate, at the hearing, an ability to ensure payment of all cure liabilities under the Assigned Contracts. Moreover, the Debtors submit that to the extent there is determined to be any defect in the notice given, the interests of the non-Debtor parties to the Assigned Contracts can be protected while continuing to authorize the Sale.

25.     The Committee's objection to a good faith finding under Bankruptcy Code section 363(m), predicated on essentially the same facts and arguments asserted in the Supplemental Objection filed by MHR, must also be overruled for the reasons set forth above.

26.     The Committee also argues that Presstek should be denied a release (the "Release") of any of the estates' claims against it. The Committee ignores the fact that the Release is a bargained-for component of the Sale in exchange for which Presstek is providing

B223

valuable consideration.  The Debtors are not seeking authority to release Presstek gratuitously.

To the contrary, the Release is being given in consideration of part of the $40 million Purchase

Price.  In other words, any claims the Debtors may have against Presstek are assets and property

of the estates that, pursuant to Bankruptcy Code section 363(b), the Debtors are seeking

authority to dispose of via the Release.  The Committee has not offered any evidence that the

Purchase Price is inadequate consideration for Sale of the Assets and, specifically, the release of

claims against Presstek.  This objection should be overruled accordingly.

      27.    The Committee claims that the various closing conditions in the APA make it too

easy for Silver to back out of the Sale and force a foreclosure under the DIP Facility.  Since the

filing of the Sale Motion the Debtors and Silver have negotiated an amendment to the APA, to

be presented to the Court at the hearing, reducing the amount of closing conditions to provide

increased certainty that the Sale will close, amends certain representations and warranties to

ensure that they are true and correct as of closing, and providing for the assumption of certain

additional liabilities of the Debtors.  Accordingly, the Committee's contention that the APA is

illusory will be rebutted at the hearing.

      28.    Finally, the Committee argues that the APA's allocation of a portion of the Sale

proceeds to the Canadian Subsidiary results in an impermissible "substantive consolidation" of

the estates with a non-debtor entity.  The Debtors do not seek, expressly or impliedly, any

consolidation of the estates with the non-debtor Canadian Subsidiary.  The fact that the APA

provides for an allocation of the Sale proceeds to the Canadian Subsidiary simply reflects the

fact that the assets of the Canadian Subsidiary have substantial value and cannot be given away

for free.  This objection should be overruled accordingly.

B224

c.    **Response to Objection of 811 Jefferson Road, LLC.**

29.    811 Jefferson Road, LLC ("Jefferson Road"), the landlord of the Debtors' leased real property in Henrietta, New York, has objected to the Sale on grounds that the subject lease (the "Henrietta Lease") cannot be assumed and assigned to Silver without "curing" alleged costs of future environmental remediation at the site.

30.    The Debtors do not seek to assume and assign this lease to Silver under Bankruptcy Code section 365, however. Instead, as set forth in the APA, the Debtors intend to sublease the Henrietta site to Silver for six months (for nominal $1 rent). Accordingly, to the extent Jefferson Road asserts an objection to the Sale based on a demand for "cure" under Bankruptcy Code section 365, such objection is inapplicable as a matter of law and should be overruled.

d.    **Response to Objections of State of Ohio and Datacard Corp.**

31.    Datacard Corp. ("Datacard") and the State of Ohio (the "State") have objected to the Sale, but only to the extent the Debtors seek to alter the terms of a prepetition escrow (the "Environmental Escrow") established under an Ohio EPA environmental remediation order respecting one of the Debtors' former facilities. The Debtors do not seek to alter or impair the Environmental Escrow via the Sale. Accordingly, the State's and Datacard's objections should be determined moot.

**RELIEF REQUESTED AND BASES THEREFOR**

A.    **The Sale Should Be Approved As All Applicable Statutory And Judicial Standards Have Been Satisfied And The Proposed Sale Is Fair And Reasonable And In The Best Interest Of The Debtors' Estates And Their Creditors.**

32.    Although section 363 of the Bankruptcy Code does not provide an express standard for determining whether a proposed non-ordinary course asset sale should be

B225

authorized, the Third Circuit has held that authorization of a sale of assets out of the ordinary course requires a demonstration of four elements: (i) that the sale reflects the debtor's sound business judgment; (ii) that notice of the sale is adequate; (iii) that the price is fair and reasonable; and (iv) that the sale is proposed in good faith.[9] For the reasons set forth below, which are evidenced by the Gray and Pollack Declarations, all of the foregoing criteria have been satisfied, and the Sale should be authorized accordingly.

1.    **Sound Business Justifications.**

33.    The Court's power to authorize a sale under section 363(b) of the Bankruptcy Code is discretionary, utilizing a flexible, case-by-case approach.[10] The key consideration is the Court's finding that a good business reason exists for the sale.[11]

34.    Importantly, under section 363 of the Bankruptcy Code, a court is not allowed to substitute its business judgment for that of the debtor.[12] Rather, the court is required to ascertain whether the debtor itself has articulated a valid business justification for the proposed transaction.[13] This is consistent with the "broad authority to operate the business of a debtor . . . [which] indicates congressional intent to limit court involvement in business decisions by a

---

[9]    *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc*, 788 F.2d 143 (3d Cir. 1986); *In re Martin*, 91 F.2d 395 (3d Cir. 1996). The "business judgment" standard has been applied consistently in this Court, as well as several other jurisdictions.  *See, e.g., Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); accord *Stephens Indus., Inc. v. McClung (In re McClung)*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D.Utah 1981).

[10]    *See In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984).

[11]    *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986).

[12]    *See, e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986).

[13]    *See, e.g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979).

---

B226

trustee . . . . [so that] a court may not interfere with a reasonable business decision made in good faith by a trustee."[14]

35.     Sound business justifications support this Court's approval of the proposed Sale. As set forth in the Gray Declaration, the Debtors have been unable to operate their businesses at a profit since the Petition Date, and cash flows have been [bordering on negative] during the course of these chapter 11 cases.  Moreover, the Debtors' post-petition loan facility (the "DIP Facility") is scheduled to expire on November 15, and, without that funding, the Debtors will not have sufficient working capital to sustain their operations, and would be forced to close their doors and terminate all of their  employees.  Thus, if the Sale is not authorized, there is a very substantial risk that the Debtors' going concern value would be destroyed.  Without that going concern value, general unsecured creditors would likely recover nothing, and the estates would face the sincere possibility of administrative insolvency.

36.     Finally, the Debtors believe that a going concern sale of their businesses and assets will generate greater value to their estates than will be received in a piecemeal liquidation.  Thus, inasmuch as maximization of asset value is a sound business purpose for a sale under Bankruptcy Code section 363(b), the Sale should be authorized.

**2.     Accurate and Reasonable Notice.**

37.     Consistent with Bid Procedures, notice of the proposed Sale was provided to the following parties: all creditors and parties in interest in these chapter 11 cases, the United States Trustee, counsel to the Committee, counsel to Key, counsel to Presstek, counsel to MHR, all parties requesting notice pursuant to Bankruptcy Rule 2002, and all parties the Debtors and/or Candlewood determined, in their reasonable discretion after consultation with the Committee,

---

[14]     *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

#10316.1                              16

MHR and Key, demonstrated an interest in acquiring the Assets and evidence financial capability sufficient to consummate the Sale. In addition, a form of notice of the Sale approved by the Court was published in national edition of the Wall Street Journal and a trade publication The form of notice itself, which described the assets to be sold, set forth the proposed Purchase Price, gave the date and time of the hearing, and set forth the deadline for filing objections, complied with the requirements of Bankruptcy Rule 6004 and was previously approved by the Court in the Bid Procedures Order. Accordingly, the record in these cases reflects that notice of the proposed Sale was adequate, accurate and reasonable.

3.   **Adequate Price.**

38.   Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.[15] In this instance, the Bid Procedures contemplated that following the Debtors' marketing efforts, the Assets would be submitted to an auction process to ensure that the best possible price is obtained. An auction is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith.[16] Moreover, the opportunity for competitive bidding provides assurance that the Debtors are receiving the highest and best offer for the Assets under the circumstances of their chapter 11 cases.

---

[15]   *In re Integrated Resources Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2nd Cir. 1993); *In re Atlanta Packaging Products, Inc.* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (debtor's duty with respect to sales is to obtain the highest price or greatest overall benefit for the estate); *In re Wilson Freight Co.,* 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (debtor's paramount duty in connection with a sale is to obtain the best price).

[16]   *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986). Moreover, the Sixth Circuit has indicated that a party would need to show fraud or collusion between the Purchaser, the other bidders and the debtor in order to demonstrate a lack of good faith. *Richards v. Swinebroad and Denton Auctioneers,* No. 84-5896, 1985 WL 13526, at *3 n.2 (6th Cir. July 3, 1985). The Debtors submit that any asset purchase agreement entered into as a result of the Bidding procedures will be an arms-length, negotiated transaction and thus entitled to the protections of section 363(m) of the Bankruptcy Code.

B228

39.     In this instance, the Debtors utilized a bidding process, with Silver as a stalking horse bidder, to provide other interested parties an opportunity to competitively bid for the Assets.  The ability for third parties to submit competitive bids, together with the Debtors' implementation of marketing efforts designed to generate additional interest and encourage the submission of higher bids (which, as described above, Candlewood undertook via solicitation of approximately 200 potential buyers), ensures that the best price is being obtained for the Assets. An auction process is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith.[17]  The opportunity for competitive bidding, and the potential for enhancement of the Purchase Price, provide assurance that the Debtors are receiving the highest and best offer for the Assets under the circumstances of their chapter 11 cases.

40.     Candlewood Partners began marketing the Assets to potential bidders on August 9, 2004.  More than 200 potential candidates to purchase the Assets were identified from various sources, including, known strategic and financial buyers.  This list included all of the significant players in the industry.

41.     On August 9, 2004, Candlewood sent each of these potential candidates an initial "teaser" introduction letter consisting of a short summary of the Debtors' businesses. Candlewood and the Debtors collaborated to identify and prioritize a group of certain potential buyers based on their perceived likelihood of purchasing the Assets.  The highest priority candidates, consisting of approximately 29 entities, included those potential candidates who were major competitors and/or suppliers of the Debtors.  Approximately 190 other potential buyers were also identified.  Shortly thereafter, all potential buyers received direct follow-up

---

[17]     *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

#10316.1                                    18

telephone calls from Candlewood personnel. In all, more than 200 potential candidates were contacted by telephone.

42.    In addition to these direct contact marketing methods, the Debtors also placed an advertisement for the sale of the Assets in the national edition of the Wall Street Journal and a major industry's trade magazine.

43.    As evidenced by the Pollack Declaration, the foregoing efforts were professionally planned and executed in a manner designed to identify appropriately qualified bidders and achieve the highest and best offer available.

44.    Despite these efforts, no competing qualified bids were submitted, with or without the required 5% bid deposit. As set forth above, the Debtors received Plan Proposals from ComVest and Harbor, but neither sufficed as either a qualified bid eligible to participate in the October 29 Auction or, more generally, a higher and better opportunity for the estates. Accordingly, the Debtors have taken all of the steps necessary to demonstrate that the Purchase Price is the highest and best price obtainable.

**4.    Good Faith.**

45.    "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser."[18] The purpose of such a finding is to facilitate the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith." Good faith, though not defined in the Bankruptcy Code, imports negotiations at arms-length and transactional fairness under the circumstances.[19] Thus, to

---

[18]    *In re Abbots Dairies, Inc.*, 788 F.2d at 149-50.

[19]    *In re W.A. Mallory Company, Inc.*, 214 B.R. 834 (Bankr. E.D.Va. 1997).

#10316.1                                      19

B230

establish good faith, courts focus on the marketing of the assets and whether the parties to the agreement negotiated at arms' length or engaged in fraud or collusion to take unfair advantage over other bidders.[20]

46.    As is described above and evidenced in the Pollack Declaration, the Debtors and Candlewood engaged in a substantial effort to market the Assets. These extensive marketing efforts, designed specifically for the purpose of exposing the Assets to the marketplace and to solicit purchase offers from other parties, constitute proof that the sale of the Assets has been made in good faith.

47.    The Debtors' other efforts to effectuate the sale of their assets provide further evidence of good faith. The Sale Motion was predicated on a stalking horse bid from Silver. The APA, which provided the essential framework for the sale of the Assets, was the result of arms-length, good faith negotiations between the parties. Additionally, both the marketing and bidding processes with respect to the Sale have been open and transparent. The Debtors consulted regularly and extensively with representatives of key creditor constituencies. Accordingly, if the Court approves the Sale as requested by the Sale Motion, it must, under the circumstances outlined above, make a determination that Silver is a good faith purchaser within the purview of section 363(m) of the Bankruptcy Code.

48.    The Debtors have demonstrated a sound business purpose for the Sale, adequate and reasonable notice of the proposed Sale to parties in interest in their chapter 11 cases, the receipt of fair and reasonable value for the Assets established by an adequately marketed opportunity for an auction sale thereof, and the good faith of the purchaser. Accordingly, all of

---

[20]    *Country Manor*, 172 B.R. at 221 (citing *Plabell Rubber Products*, 149 B.R. at 479 and *In re Coastal Industries, Inc.*, 63 B.R. 361, 369 (Bankr. N.D. Ohio 1986). See also, *Richards v. Swinebroad and Denton Auctioneers*, No. 84-5896, 1985 WL 13526, at *3 n.2 (6th Cir. July 3, 1985) (a party would need to show

B231

the factors for approval of the proposed Sale under sections 363(b) and 363(m) of the Bankruptcy Code are satisfied.

> **B.**     **The Requirements Of Section 363(f) Of The Bankruptcy Code Are Satisfied, Thus This Court Has The Authority To Order The Sale Free And Clear Of Liens, Claims, Encumbrances And Interests.**

49.     Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, encumbrances and interests.   Specifically, Bankruptcy Code section 363(f) provides that:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if:
>
> 1)     Applicable non-bankruptcy law permits a sale of such property free and clear of such interests;
>
> 2)     Such entity consents;
>
> 3)     Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> 4)     Such interest is in bona fide dispute; or
>
> 5)     Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[21]

Thus, in order for a debtor to be authorized to sell property free and clear of an entity's interest in such property, two requirements must be satisfied:  (1) the entity must have an "interest" in the property of the debtor; and (2) at least one of the five conditions set forth in § 363(f)(1)-(5) must be satisfied.[22]

---

fraud or collusion between the Purchaser, the other bidders and the debtor in order to demonstrate a lack of good faith).

[21]     11 U.S.C. § 363(f).

[22]     *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D. Va. 1995).

B232

50.     The purpose of Bankruptcy Code section 363(f) is to enable debtors to quickly liquidate their assets without adversely affecting the rights of its creditors and to provide purchasers with clear title to such property. To effectuate these competing goals, section 363(f) provides that so long as the sale of the debtor's property satisfies the requirements of section 363(f), such property is sold free and clear of any and all interests attaching to the property.[23] Although the term "interest" is not defined by the Code, courts have interpreted it broadly.[24] Further, the majority of courts have interpreted the term "interests," as used in § 363(f), to also include claims.[25] Thus, while creditors may thereafter satisfy their claims out of the proceeds of the sale, they cannot look to the property that was sold for satisfaction.[26]     However, such creditors are entitled to receive the same interest in the sale proceeds as they would have gotten in the property sold.[27] This scheme attempts to strike a balance between affording interest

---

[23]     "The well established rule that sales within a bankruptcy proceeding occur free and clear of any interest is founded upon the principle that good faith purchasers receive clean title to the property and that any claims against the property attach to the proceeds." *In re The Lady H Coal Co., Inc.*, 193 B.R. 233, 247 (Bankr. S.D. West Va. 1996). A significant chilling effect would occur on the sale of debtors' property if such was not transferred free and clear of existing liens and interests. *See In re New England Fish Co. v. Alaska Pacific Consortium*, 19 B.R. 323, 328029 (Bankr. W.D. Wash. 1982).

[24]     *See In re The Lady H Coal Co., Inc.*, 193 B.R. at 247; *see also In re Taylor*, 198 B.R. 142, 162 (Bankr. D. South Carolina 1996) (citing *In re Creative Restaurant Mgmt., Inc.*, 141 B.R. 534 (Bankr. W.D. Mo. 1992), *vacated as moot by* 150 B.R. 232 (Bankr. W.D. Mo. 1992) (stating that claims asserted by the National Labor Relations Board against a debtor for back pay and reinstatement were interests in estate property under § 363(f) and that an unsecured creditor has an interest in the debtor's property because it could obtain a judgment and execute on such property)).

[25]     *See Folger Adam Sec., Inc. v. DeMatteos/MacGregor, JV*, 209 F.3d 573 (3rd Cir. 2000)(any interest in property that can be reduced to money satisfaction attaches to proceeds of sale); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573 (4th Cir. 1996), *cert. denied*, 520 U.S. 1118 (1997)(debtors could sell assets free and clear of their obligations to benefits plans under Coal Act, regardless of whether asset purchasers were debtors' successors in interest within meaning of Coal Act where plan and fund had "claims" against debtors for future Coal Act premiums and right of plan and fund to collect premium payments from debtors constituted interest in assets); *WBQ Partnership*, 189 B.R. at 107. *But see, Fairchild Aircraft, Inc. v. Campbell* (*In re Fairchild Aircraft, Inc.*), 184 B.R. 910, 917-919 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998) (section 363(f) limited to *in rem* interests).

[26]     *See Forde v. Kee-Lox Mfg. Co., Inc.*, 437 F. Supp. 631 (W.D.N.Y. 1997), *aff'd*, 584 F.2d 4 (2d Cir. 1978).

[27]     *See* 2 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 363.07, at 363-33 (15th ed. 1992).

B233

holders a means to satisfy their interests, while fostering the sale of the debtor's property for the benefit of all creditors.[28]

51.    Here, at least one of the conditions of 363(f) are satisfied with respect to all of the property being sold in the proposed Sale.

        **1.    The Debtors' Senior Secured Creditors – Key and Presstek – Have Consented to the Sale Free and Clear of Their Liens, Claims, Encumbrances and Interests thereby Satisfying Bankruptcy Code Section 363(f)(2).**

52.    It is undisputed that the Assets are wholly encumbered by the liens of the Key and Presstek. Key and Presstek have consented to the Sale free and clear of their liens, claims, encumbrances and interests.[29] Thus, Bankruptcy Code section 363(f)(2) is satisfied.

        **2.    Secured Creditors Could be Compelled to Accept Cash Payments Having a Present Value Equal to the Value of Their Security Interest in a Cram Down Under Bankruptcy Code Section 1129(b)(2)(A), Thereby Satisfying the Requirements of 363(f)(5).**

53.    Section 363(f)(5) of the Bankruptcy Code provides that a debtor may sell property free and clear of any interest if the holder of such interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."[30] By its express terms, section 363(f)(5) permits a sale free and clear of interests if a debtor can demonstrate the existence of another legal mechanism by which a creditor's lien could be extinguished without

---

[28]    Courts discuss numerous benefits associated with the scheme provided by § 363(f) including fostering the sale of debtors' property, encouraging full value offers to the bankruptcy estate, preventing disruption to the bankruptcy distribution process and precluding the preferential treatment of certain creditors. *See In re The Lady H Coal Co.*, Inc., 193 B.R. at 247.

[29]    As of this time, a termination event exists with respect to the Settlement Agreement, which has resulted in the filing of Conditional Objections by certain Tank Financiers.

[30]    11 U.S.C. § 363(f)(5).

#10316.1                                           23

full satisfaction of its secured debt.[31]  Under section 1129(b)(2)(A) of the Bankruptcy Code, "a chapter 11 plan proponent can satisfy a secured claim, over the objection of the claimant, by cash payments having a present value equal to the value of the security interest."[32]  Therefore, in a "cram down" procedure, a debtor may sell assets of the estate free and clear, without the consent of the secured creditor, and such a "cram down" can be effectuated in a chapter 11 plan.

54.    Section 363(f)(5) requires only that a mechanism exist through which a debtor can extinguish a creditor's lien or interest without paying such interest in full.[33]  Furthermore, the phrase "could be compelled" requires only that the interest in question be subject to final satisfaction *on a hypothetical basis*, not that there be actual payment in satisfaction of the interest from the proceeds of the sale in question.[34]  In *In re Gulf States Steel, Inc. of Alabama,*[35] the court held that creditors opposing a sale motion could be compelled to accept a money satisfaction in a cram down plan of reorganization and that the claims of the senior secured creditor had priority to other claims, liens, or interest in the property to be sold.  Thus, the holders of such claims would be compelled as a matter of law to release those claims in a judicial or non-judicial foreclosure of the senior liens held by the senior secured creditor.  As such, the sale motion was granted.[36]

---

[31]    *In re Terrace Chalet Apartments Ltd.,* 159 B.R. 821, 829 (N.D. Ill. 1993) (debtor can sell property free of secured creditor's lien if debtor can demonstrate ability to cram down the secured creditor pursuant to section 1129(b)(2) of the Bankruptcy Code); *In re Grand Slam U.S.A., Inc.,* 178 B.R. 460 (E.D. Mich. 1995) (typical "legal proceeding" by which creditor may be compelled to accept less that full satisfaction of its interest is chapter 11 cram down.).

[32]    *Grand Slam,* 178 B.R. at 462 (citing *In re Healthco Int'l, Inc.,* 174 B.R. 174, 176 (Bankr. D. Mass. 1994)). *See also In re Terrace Chalet Apartments, Ltd.,* 159 B.R. 821 ("cram downs" are legal proceedings within the meaning of section 363(f)(5)); *In re WPRV-TV, Inc.,* 143 B.R. 315 (same).

[33]    *Grand Slam,* 178 B.R. at 463.

[34]    *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497 (N.D. Ala. 2002).

[35]    285 B.R. 497 (N.D. Ala. 2002).

[36]    *Id.* citing *In re Healthco Int'l, Inc.,* 174 B.R. at 176.

B235

55.    Here, Bankruptcy Code section 363(f)(5) is satisfied because all holders of liens, claims, encumbrances, and interest in or to the Assets could be compelled to accept a money satisfaction of all such liens. claims, encumbrances and interests.  The Sale should be approved accordingly.

### 3.    Applicable Non-Bankruptcy Law Permits the Sale Free and Clear of Claims Based on Successor Liability.

56.    Section 363(f)(1) of the Bankruptcy Code authorizes the sale of property free and clear of liens, claims, encumbrances and interests where such a sale is permitted under applicable non-bankruptcy law.  Generally, federal courts, including bankruptcy courts, follow well established state common law holding that when one corporation merely purchases for cash the assets of another corporation, the purchaser is generally not responsible for the liabilities of the seller.[37]

57.    There are four established exceptions to this non-liability rule.  A purchasing company will be liable for the obligations of its predecessor if:  (1) there is an express or implied agreement to assume the other company's debts; (2) the transaction was fraudulent; (3) there was a *de facto* consolidation or merger of the companies; or (4) the purchasing company was a mere continuation of the selling company. [38]  Where the established exceptions to the corporate law rule of no successor liability are not implicated, assets may be sold free and clear of claims based on theories of state law successor liability under section 363(f)(1) of the Bankruptcy Code.

---

[37]    *See, e.g., Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir. 1993).

[38]    *See, e.g., Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 340, 431 A.2d 811, 815 (1981); FLETCHER CYC. CORPS. § 7122 (Perm ed. & 1994 Supp.).

B236