# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

In re                         :      Chapter 11
                               :

A. B. DICK COMPANY, *et al.*,      :      Case No. 04-12002 (JLP)
                             :      (Jointly Administered)

              Debtors.      :

------------------------------------------------x

## DECLARATION OF STEPHEN S. GRAY IN SUPPORT OF DEBTORS' MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B.DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

STATE OF DELAWARE                  )
                                      ) ss:
NEW CASTLE COUNTY          )

Stephen S. Gray, being first duly sworn, deposes and says:

1.     I am the President of TRG, Inc. ("TRG"), which has offices located at 270 Congress Street, Boston, Massachusetts. This Declaration is submitted in support of the Motion (the "Sale Motion") filed by A.B.Dick Company ("A.B.Dick") and its affiliated debtors in possession in the captioned chapter 11 cases (the "Debtors") for the entry of an Order: (A) authorizing the sale of substantially all of the assets of A.B.Dick and its wholly owned subsidiaries, free and clear of all liens, claims and encumbrances (the "Sale"); (B) authorizing the Debtors to assume and assign to Silver certain executory contracts and unexpired leases; and (C) granting related relief.

2.     In July 2004, TRG was employed as the Debtors' crisis managers, and I was retained as Chief Restructuring Officer ("CRO") of the Debtors pursuant to an Order of the Court. In my capacity as CRO, I have been guiding the Debtors' reorganization efforts in these

chapter 11 cases and leading the Debtors' management team in the day-to-day management of the Debtors' businesses.

3.      As CRO, I have personal knowledge of the status of the Debtors' financial and business operations since the commencement of these chapter 11 cases in July 2004.  Moreover, I have regularly consulted with the Debtors' senior management and outside financial advisors in these cases, Candlewood Partners, LLC ("Candlewood"), with respect to the Debtors' post-petition financial planning.  Such planning has included, among other tasks, analyzing and projecting the Debtors' sources of revenue, operating expenses and ongoing working capital needs.

4.      I am generally familiar with the terms of a certain Asset Purchase Agreement between certain of the Debtors and Silver (the "APA") respecting the sale of substantially all of the Debtors assets to Silver in a proceeding under Bankruptcy Code section 363 (the "Sale").

5.      I am generally familiar with the terms of he Debtors' post-petition loan facility (the "DIP Facility"), which has been provided by KeyBank and Presstek, Inc. (together, the "DIP Lenders").

6.      The DIP Facility is the Debtors' sole source of working capital financing in these chapter 11 cases.  Without the DIP Facility, or debt financing on substantially comparable terms, the Debtors would not be able to continue operating their businesses.  Revenues from the Debtors' operations are insufficient by themselves to sustain the Debtors' ongoing payroll, purchases, manufacturing and other operating expenses as well as the costs of the Chapter 11 proceeding.  Thus, in the absence of the DIP Facility, or comparable financing, the Debtors would be forced to cease operations, terminate their employees and close their doors.

#10315.1                                        2

B260

7.      As of October 30, 2004, I am informed that the DIP Facility is scheduled to expire November 15, 2004, which is on or prior to the date that the Sale, if approved by the Court, is scheduled to close.  Based on my review of the Debtors' periodic internal financial reports and consultation with the Debtors' senior management and Candlewood, if the Sale does not close, and the DIP Facility expires, the Debtors will not have sufficient funding to sustain operations beyond November 15.  Further, upon consultation with the same parties, it does not appear that an orderly liquidation of the Debtors' assets following cessation of business would yield proceeds even close to the $40 million purchase price set forth in the APA and as adjusted. Accordingly, it appears that the Sale presents the best opportunity to maximize recoveries for the Debtors' creditors.

8.      I believe that the Debtors have faithfully executed and fulfilled its obligations under the Bid Procedures.

FURTHER, AFFIANT SAYETH NAUGHT.


/s/Stephen S. Gray
Stephen S. Gray


Sworn to and subscribed before me on this 1st day of November, 2004.


/s/Notary Public

B261

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
A.B. DICK COMPANY, *et al.*                    :        Case No. 04–12002 (JLP)
                                               :
                    Debtors.                   :        Jointly Administered
-------------------------------------------------------x

ORDER, PURSUANT TO SECTIONS 105(a), 363(b) AND (f) AND 365(f)
OF THE BANKRUPTCY CODE AND RULES 2002(a)(2), (c)(1), (k) AND (m),
6004 AND 6006 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, APPROVING (1) THE SALE, PURSUANT TO THE ASSET PURCHASE
AGREEMENT DATED JULY 13, 2004, OF (a) SUBSTANTIALLY ALL OF THE
ASSETS OF THE A.B. DICK COMPANY AND THE A.B. DICK COMPANY OF
CANADA, LTD., AND (b) THE CAPITAL STOCK OF THE A.B. DICK U.K. LIMITED
TO SILVER ACQUISITIONS CORP., FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; AND (2) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO SILVER ACQUISITIONS CORP.

Came on for hearing (the "Hearing") on the 2nd and 3rd days of November, 2004,

the *Motion for Order (A) Authorizing Sale of Substantially All of the Assets of A.B. Dick Company*

*and its Wholly Owned Subsidiaries Free and Clear of Liens, Claims and Encumbrances; (B)*

*Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contracts;*

*and (C) Granting Related Relief* (the "Motion")[1] filed on July 22, 2004 by A.B. Dick Company

("A.B.Dick"), Paragon Corporate Holdings, Inc., Multigraphics LLC, and Interactive Media

Group, Inc. (collectively, the "Debtors"), the debtors and debtors in possession in the above-

captioned jointly administered chapter 11 cases; the Court having reviewed the Motion and all

objections thereto and having heard the statements in support of the objections and in support of

the relief requested in the Motion at the Hearing; and upon the Motion and the record of the

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to
them in the Motion.

#10342.3

Hearing and all other proceedings had before the Court; after due deliberation and good cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Proper, timely, adequate, and sufficient notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities in accordance with sections 102, 105(a), 363, and 365 of Title 11 (the "Bankruptcy Code") of the United States Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in compliance with the Bidding Procedures Order, including, but not limited to the following parties in interest: (i) the United States Trustee for the District of Delaware, (ii) the attorneys for KeyBank National Association as administrative agent under the DIP Credit Agreement, (iii) the attorneys for the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) the attorneys for the MHR Entities, (v) the attorneys for Presstek, Inc. ("Presstek") and Silver Acquisitions Corp. ("Silver"), (vi) all parties that have submitted written requests to the Debtors to purchase the Assets within two months prior to the date hereof, (vii) all parties that are known to assert a security interest, lien, or claim in the Assets, (viii) the Internal Revenue Service, (ix) parties to the Assumed Seller Contracts, (x) all applicable state and local taxing authorities and (xi) all creditors listed in the schedules filed by A.B.Dick. In addition, in compliance with the terms of the Bidding Procedures Order, notice of

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

the Motion, the Bidding Procedures, and Sale was published in a printing industry trade journal and also published in the national edition of the WALL STREET JOURNAL on September 20, 2004.

C.    All objections to the relief requested in the Motion were either resolved prior to or at the Hearing or should be overruled.

D.    A prompt closing of the transactions contemplated by the Asset Purchase Agreement, dated July 13, 2004, among Paragon Corporate Holdings, Inc. ("Paragon" or "Parent"), A.B.Dick, A.B.Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of A.B.Dick ("Canada Sub"), and Interactive Media Group, Inc., a wholly owned subsidiary of Parent ("IMG" and together with A.B.Dick, the "Sale Debtors"), and Presstek and Silver, as guarantor and purchaser respectively as amended by the First and Second Amendments to such Asset Purchase Agreement and as further amended at the Auction and at the Hearing (as amended, the "Asset Purchase Agreement") is essential and is in the best interests of Sale Debtors and their estates.  The terms of the Asset Purchase Agreement are the best terms that have been offered for sale of the Assets (as such term is defined in the Asset Purchase Agreement).

E.    Upon the execution, delivery, and closing of the Asset Purchase Agreement, the Assets to be sold and the interests to be assigned will have been acquired by Silver in good faith and as the result of arm's length negotiations.

F.    No consents or approvals are required for the Sale Debtors to consummate the sale of the Assets other than the consent and approval of this Court and those set forth in the Asset Purchase Agreement.  Neither the execution of the Asset Purchase Agreement nor the consummation of the sale of the Assets in accordance with its terms will constitute a violation of

3

any provision of any of Sale Debtors' organizational documents or any other instrument, law, regulation or ordinance by which the Sale Debtors are bound.

G.      The Sale Debtors are the legal and equitable owner of the Assets (other than the Assets owned by Canada Sub) and, upon entry of this Sale Order, the Sale Debtors will have full corporate power and authority to consummate the sale contemplated by the Asset Purchase Agreement. The Asset Purchase Agreement and the sale have been duly and validly authorized by all necessary corporate action required of each of the Parent and the Sale Debtors.

H.      This Order and the consummation of the transactions contemplated by the Asset Purchase Agreement are supported by good business reasons, and will serve the best interests of the Sale Debtors, their estates and their creditors by maximizing the values to be obtained from the Assets.

I.      The Asset Purchase Agreement was negotiated, proposed, and entered into by the Parent and the Sale Debtors, on one hand, and Presstek and Silver, on the other hand, without collusion, in good faith, and from arm's-length bargaining positions. Neither Presstek nor Silver is an "insider" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code. None of the Debtors, Presstek, or Silver have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

J.      Silver is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

K.      The consideration to be provided by Silver pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy

4

Code and the Uniform Fraudulent Conveyance Act (7A part II, U.L.A. 2 (1999)) or the Uniform

Fraudulent Transfer Act (7A part II, U.L.A. 66 (1999)) or any similar laws of any state whose

law is applicable to the transactions contemplated by the Asset Purchase Agreement.

   L. The Asset Purchase Agreement was not entered into for the purpose of

hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the

United States, any state, territory, possession, or the District of Columbia.

   M. The consummation of the sale of the Assets pursuant to the Asset Purchase

Agreement will be a legal, valid, and effective sale of the Assets to Silver, and vests or will vest

Silver with all of the Sale Debtors' right, title, and interest in and to the Assets free and clear of

liens, claims, (including, but not limited to any and all "claims" as defined in section 101(5) of

the Bankruptcy Code), defenses to claims, including rights of setoff and recoupments, security

interests, pledges, hypothecations, encumbrances or other interests, and any and all rights and

claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute

or otherwise and whether arising before, on or after the date on which these chapter 11 cases

were commenced, whether known or unknown, including liens of any of the Debtors' creditors,

vendors, suppliers, employees, lessors or any other third party (collectively "Liens") in

accordance with section 363(f) of the Bankruptcy Code because one or more of the standards set

forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  All parties with Liens

against the Assets, if any, who did not object to the Motion and the relief requested therein, or

who withdrew their objections to the Motion, are deemed to have consented pursuant to section

363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against Silver,

Silver's affiliates or any agent of the foregoing to recover any claim which such person or entity

has solely against the Sale Debtors or any of their wholly owned subsidiaries.  Failure to sell the

5

B266

Assets free and clear of Liens would be substantially less benefit to, and would adversely affect, the Sale Debtors' bankruptcy estates.

N.    Brokers were not involved in consummating the Sale. Therefore, except as otherwise provided by prior Order of this Court, no agent, broker, person or firm acting or purporting to act on behalf of Parent, the Sale Debtors, Silver, or Presstek is or will be entitled to any commission, broker's fee or finder's fee from any of the parties to the Asset Purchase Agreement or any other person respecting the Sale.

O.    The Asset Purchase Agreement is a valid and binding contract between the Paragon, as parent, and A.B.Dick, Canada Sub and IMG, as sellers, and Presstek and Silver, as guarantor and purchaser, and is enforceable according to its terms.

P.    Unless an objection has been timely filed with the Bankruptcy Court, the amounts set forth on (i) Exhibits A – C to the SCHEDULES OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND RELATED CURE AMOUNTS OF THE DEBTORS AS OF SEPTEMBER 29, 2004 AND RESERVATION OF RIGHTS, dated October 1, 2004, and (ii) Exhibit D to the SUPPLEMENT TO SCHEDULES OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND RELATED CURE AMOUNTS OF THE DEBTORS AS OF SEPTEMBER 29, 2004 AND RESERVATION OF RIGHTS, dated October 6, 2004 (collectively, the "Schedule of Cure Amounts"), or if disputed, the amounts agreed to in writing by the objecting party and the Sale Debtors, are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code). There are no defaults under the Assumed Seller Contracts except as specified in the Schedule of Cure Amounts. Any anti-assignment provision

6

B267

of any of the Assumed Seller Contracts is unenforceable pursuant to section 365(e) and (f) of the Bankruptcy Code.

(i)     all Reseller Agreements, Domestic Distribution Agreements, International Distributor Agreements, Customer Service Agreements, including bundler agreements and agreements with governmental entities, and Material Confidentiality Agreements, each as set forth in the Schedule of Cure Amounts;

(ii)     all of the unexpired real estate leases listed in Exhibit B to the Schedule of Cure Amounts, except the real property leases on property located in Niles, IL, and, Rochester, NY;

(iii)     all of the unexpired capital leases listed in Exhibit C to the Schedule of Cure Amounts; and

(iv)     all of the unexpired leases listed in Exhibit D to the Schedule of Cure Amounts.

Q.     Representatives of the Sale Debtors and Presstek and Silver made the following representations with respect to the assumption and assignment of executory contracts on the record at the auction on November 1, 2004:

> MR. SCAFIDE: The second item is to remove from the estate the responsibility of curing all contracts with the exception of certain leases that have been provided by the company with a total liability not to exceed $500,000. That is to say that only $500,000 will remain with the estate on those obligations.
> . . .
>
> MR. POLLACK: The only clarifying comment is that the executory contracts are still being assumed with Presstek being responsible for the cures, other than the $500,000 Mr. Scafide mentioned.
>
> MR. SCAFIDE: There may be some contracts that are not assigned. But that won't affect the liability of the estate.

A copy of the Auction Transcript is attached hereto.

7

B268

R.     Presstek and Silver agreed, at the auction held on Monday November 1, 2004, and also stated on record at the Hearing, that the Sale Debtors' liability for cure obligations under the Sale Debtors (a) unexpired real estate leases (excluding Rochester, NY and Niles, IL.), (b) unexpired capital leases and (c) unexpired operating leases listed on the Schedule of Cure Amounts (collectively, the "Assumed Leases"), shall not exceed $500,000. Silver shall be liable for payment of all cure obligations with respect to the Assumed Leases in excess of $500,000.

S.     The Assumed Seller Contracts do not include any employment contracts.

T.     Adequate assurance of future performance has been demonstrated by or on behalf of Presstek and Silver with respect to the Assumed Seller Contracts.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is granted and approved in all respects as provided herein (other than with respect to matters already addressed by the Bidding Procedures Order) and all objections thereto, to the extent not withdrawn prior to or at the Hearing, are hereby overruled.

2.     Pursuant to sections 363 and 365 of the Bankruptcy Code, the sale, conveyance, and assignment of the Assets, including the Sale Debtors' assignment of the Assumed Seller Contracts, pursuant to the Asset Purchase Agreement (the "Sale") *as modified* is approved, and the Sale Debtors are authorized and directed to execute any and all documents, instruments and papers and to take all actions necessary and appropriate to effectuate, implement and consummate the transactions contemplated by the Asset Purchase Agreement in consideration of the purchase price specified therein, including assigning and transferring to Silver all of the Sale Debtors' right, title and interest (including common law rights) in and to all of the Sale Debtors' intangible property included among the Assets except as otherwise explicitly provided by the

8

Asset Purchase Agreement. Without limiting the foregoing, the Sale Debtors are authorized and directed to close and consummate the Asset Purchase Agreement and all other agreements and documents related to and contemplated thereby (collectively, the "Disposition Documents"), which agreements and documents hereby are authorized and approved in all respects.

3.     The transfers of the Assets by the Sale Debtors to Silver are legal, valid and effective transfers and shall vest Silver with all right, title and interest of the Sale Debtors in and to the Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all Liens. Any and all such Liens shall attach to the proceeds of the Sale, with the same priority, validity, force and effect as they now have against the Assets.

4.     The sale of the Sale Debtors' Assets pursuant to this Order and the Disposition Documents shall be binding upon Paragon, the Sale Debtors, Silver, all creditors, and shareholders of Paragon and the Sale Debtors, all of the parties to the Assumed Seller Contracts, all persons having or asserting a claim against, or an interest in Paragon, the Sale Debtors, or the Assets, and all parties to any actions or proceedings that directly or indirectly contest the power or authority of the Sale Debtors to sell, assign and convey the Assets or that seek to enjoin any such sale, assignment or conveyance.

5.     Any party having the right to consent to the assumption or assignment of the Assumed Seller Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code. The hearing on all Cure Claims objections filed with the Court, to the extent not resolved prior to or at the Hearing, are hereby continued to the December omnibus hearing date in these chapter 11 cases.

9

B270

6.    Notwithstanding any provisions of this Order to the contrary, the assumption and assignment of executory contracts shall be governed by the following statements of representatives of the Debtors and Presstek and Silver made on the record at the auction on November 1, 2004:

MR. SCAFIDE:  The second item is to remove from the estate the responsibility of curing all contracts with the exception of certain leases that have been provided by the company with a total liability not to exceed $500,000.  That is to say that only $500,000 will remain with the estate on those obligations.

. . .

MR. POLLACK:  The only clarifying comment is that the executory contracts are still being assumed with Presstek being responsible for the cures, other than the $500,000 Mr. Scafide mentioned.

MR. SCAFIDE:  There may be some contracts that are not assigned.  But that won't affect the liability of the estate.

7.    The Sale Debtors, Silver, and/or Presstek (in their sole and absolute discretion) may add or remove executory contracts or unexpired leases from the list of Assumed Seller Contracts up until Closing of the Sale.  In the event (a) one or more executory contracts or unexpired leases is added or removed after the entry of this Order, but before the Closing, (b) Silver and/or Presstek designate an executory contract or unexpired lease for assumption and assignment that was not listed on the Schedule of Cure Amounts or (c) a non-Debtor party to an Assumed Seller Contract did not receive adequate notice, the Sale Debtors shall file an amended Schedule of Cure Amounts and serve notice of added or removed executory contracts or unexpired leases on the non-Debtor parties to such executory contracts or unexpired leases.  The affected non-Debtor parties shall have 10 days from the date of service of such notice of amended Schedule of Cure Amounts to file and serve an objection to the assumption and assignment and/or cure obligation stated therein; failure by such non-Debtor party to object to

10

B271

such assumption and assignment shall be deemed a waiver of any and all objections thereto. Nothing shall require Silver and/or Presstek without its consent.

8.    The Sale Debtors' liability for cure obligations under the Assumed Leases shall not exceed $500,000. Silver shall be liable for payment of all cure obligations with respect to the Assumed Leases in excess of $500,000.

9.    Notwithstanding any other provision of this Order, neither the Private Label Sales Agreement  dated October 1, 2002 nor the Private Label Sales Agreement dated August, 2004 (the "Postpetition Agreement"), in each case between A.B.Dick and Mitsubishi Imaging (MPM), Inc. ("Mitsubishi") shall be deemed assumed or assumed and assigned to Silver pursuant to this Order. The Sale Debtors reserve their rights to seek assumption and assignment in the future. In addition, the sale approved hereby is not free and clear of (a) any of the rights of Mitsubishi under the Resale License created under and described and defined in the Postpetition Agreement or (b) any set-off or recoupment rights of Mitsubishi.

10.    Neither Presstek nor Silver has acquired any liabilities of the Sale Debtors other than the Assumed Liabilities, and all persons and/or entities are hereby permanently enjoined and restrained from asserting or prosecuting any claim against Presstek, Silver or their respective affiliates or agents, other than claims on account of Assumed Liabilities, to recover on any claim such person had, has or may have against the Sale Debtors, their estates or the Assets relating to the ownership, use and/or operation of the Assets prior to the effective date of the Sale.

11.    Except for obligations of the Sale Debtors to pay the cure amounts as set forth in the Schedule of Cure Amounts, or any amendments thereto, each non-Debtor party to an Assumed Seller Contract is hereby forever barred, estopped, and permanently enjoined from

11

asserting against the Sale Debtors, Presstek, and/or Silver any defaults or additional amounts existing as of the Closing whether disclosed or undisclosed, whether known or unknown, and such non-Debtor parties are also forever barred, estopped, and permanently enjoined from asserting against Presstek and/or Silver any counterclaim, defense, setoff, or any other claim or defense assertable against the Sale Debtors.

12.     To the extent permitted by law, except for Assumed Liabilities, none of Presstek, Silver or any of their respective affiliates shall be liable, either directly or indirectly, as successor, transferee or otherwise, for any liabilities of the Sale Debtors or any of their affiliates (whether under federal or state law or otherwise) as a result of the sale of the Assets.

13.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to Silver or any of its affiliates or designees as a result of Sale Debtors' assumption or assignment to Silver of the Assumed Seller Contracts, and the validity of such assumption or assignment shall not be affected by any dispute between the Sale Debtors or any of their affiliates and any counterparty to any Assumed Seller Contract, and the Assumed Seller Contracts, upon assignment to Silver, shall be deemed valid and binding and in full force and effect in accordance with their terms, and any anti-assignment provision of any of the Assumed Seller Contracts is unenforceable pursuant to section 365(e) and (f) of the Bankruptcy Code. There are no defaults under the Assumed Seller Contracts except as specified in the Schedule of Cure Amounts.

14.     The transactions contemplated by the Asset Purchase Agreement have been undertaken by Presstek and Silver and Paragon and the Sale Debtors at arm's-length and without collusion, and Presstek and Silver will acquire the Assets pursuant to the Asset Purchase Agreement and the Disposition Documents, in good faith within the meaning of section 363(m)

12

of the Bankruptcy Code, and Presstek and Silver are entitled to all of the protections in accordance therewith. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions contemplated by the Asset Purchase Agreement shall not affect the validity of the sale of the Assets, unless such authorization is duly stayed pending such appeal.

15.     The consideration provided by Silver for the Assets under the Asset Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

16.     The so-called "bulk-sale" laws in all applicable jurisdictions in the United States are waived or inapplicable as to the transactions contemplated by the Asset Purchase Agreement, and such transactions are hereby deemed to be under or in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code.

17.     The provisions of this Order are non-severable and mutually dependent.

18.     This Order and all provisions of the Disposition Documents shall be binding upon any successors and assigns of Paragon and the Sale Debtors, including without limitation, any trustee, receiver, or examiner in these chapter 11 cases or in any superseding proceedings under chapter 7 of the Bankruptcy Code.

19.     Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plan or any other order entered in these chapter 11 cases shall conflict with or derogate from the provisions of the Asset Purchase Agreement, to the extent modified by this Order, or the terms of this Order.

20.     The Asset Purchase Agreement, the Disposition Documents, or any other instruments delivered in connection with the consummation of the transactions contemplated by

13

B274

the Asset Purchase Agreement may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors or their estates.

21.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or the Disposition Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement or the Disposition Documents be authorized and approved in their entirety.

22.     To the extent of any inconsistency between the provisions of the Asset Purchase Agreement, any documents executed in connection therewith, and this Order, the provisions contained herein shall govern.

23.     This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6006(d), 7062 or otherwise.

24.     To the extent not withdrawn, or rendered moot by the provisions contained herein, all objections to the Motion, if any, are overruled.

25.     The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe and enforce the provisions of the Asset Purchase Agreement and the Order in all respects and, further, to hear and determine any and all disputes between the Paragon, the Sale Debtors and/or Presstek and Silver, as the case may be, and any non-seller party to, among other things, any Assumed Seller Contracts, concerning inter alia, the Sale Debtors' assignment thereof to Silver under the Asset Purchase Agreement of any Assets, and any claims against the Sale Debtors arising under any agreements relating to Excluded Liabilities and any dispute

14

between Silver and the Sale Debtors as to their respective obligations with respect to any asset or

liability of or claim against the Sale Debtors or otherwise arising hereunder.

Dated: November 3, 2004
       Wilmington, Delaware

                                    UNITED STATES BANKRUPTCY JUDGE

B276

# EXHIBIT "A"

B277

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                          )
                                )
A.B. DICK COMPANY, et al., )  Case No. 04-12002(CGC)
                                )
      Debtors.            )

Jaspan Schlesinger Hoffman LLP
913 Market Street – 12th Floor
Wilmington, Delaware

Monday, November 1, 2004
4:50 p.m.

-- TRANSCRIPT OF AUCTION PROCEEDINGS --

WILCOX & FETZER
1330 King Street – Wilmington, Delaware  19801
(302) 655-0477

2

1          MR. SCHWARTZ:  This auction proceeding is

2    commenced pursuant to amended order, A, approving bidding

3    procedures for the sale of substantially all of the

4    assets of ABD Company and its wholly-owned subsidiaries;

5    B, authorizing payment of an expense reimbursement and

6    termination fee; C, setting sale hearing date; and, D,

7    approving form of notice that was entered by the Court on

8    or about September 15th, 2004.

9          For the record, I am H. Jeffrey Schwartz

10   from Benesch, Friedlander, Coplan & Aronoff, counsel --

11         A VOICE:  Could you speak up?  It's hard to

12   hear you on the conference bridge.

13         MR. SCHWARTZ:  Okay.  I'll get closer to the

14   speaker.

15         A VOICE:  Thank you.

16         MR. SCHWARTZ:  H. Jeffrey Schwartz from

17   Benesch, Friedlander, Coplan & Aronoff, counsel to the

18   debtors-in-possession.

19         Also here from Benesch Friedlander are

20   Mark Phillips.  And participating telephonically from

21   Benesch Friedlander are Greg Gale and -- anyone else,

22   Greg?

23         MR. GALE:  John Gambaccini and

24   Michael Zaverton.

3

```
 1              MR. SCHWARTZ:  And also on behalf of the

 2   debtors-in-possession, we have the corporate secretary,

 3   Jeffrey Herden, H-E-R-D-E-N.

 4              We have from Candlewood Partners

 5   Glenn Pollack and Lynn, L-Y-N-N, Carpenter.

 6              We have the chief restructuring officer,

 7   Stephen Gray, from The Recovery Group and John Calabrese

 8   from The Recovery Group.

 9              And that's everybody on behalf of the

10   debtors --

11              A VOICE:  Hello?  You're still drifting in

12   and out.  I'm sorry.

13              MR. SCHWARTZ:  Okay.  That's everyone for

14   the debtors-in-possession.

15              For the creditors' committee, Jim you want

16   to identify yourself?

17              MR. RICCIARDI:  James Ricciardi of McGuire

18   Woods.

19              MR. SCHLERF:  Also, Jeffrey Schlerf from

20   The Bayard Firm.

21              MR. RICCIARDI:  Jeffrey Schlerf of

22   The Bayard Firm also with us.

23              MR. SCHWARTZ:  And for KeyBank?

24              MR. FOLLAND:  This is Robert Folland of
```

B280

4

1    Thompson Hine on behalf of secured creditor KeyBank, N.A.

2            MR. SCHWARTZ:  Okay.  And on behalf of

3    Presstek, we have present...

4            MR. MOOSA:  Moosa E. Moosa.

5            MR. SCHWARTZ:  And we have as well...

6            MR. SCAFIDE:  James Scafide, corporate

7    counsel.

8            MR. SCHWARTZ:  And we have participating

9    telephonically on behalf of Presstek two gentlemen from

10   the McDermott, Will & Emery firm.

11           Gentlemen, if you could, please, identify

12   yourselves for the record?

13           MR. EGAN:  John Egan.

14           MR. SLATTERY:  Lawrence Slattery.  And also

15   with me is Gary Ravert, R-A-V-E-R-T.

16           MR. GOLDSMITH:  And also Jim Goldsmith.

17           MR. SCHWARTZ:  That's it on behalf of the

18   McDermott Will attorneys participating telephonically?

19           A VOICE:  Yes.

20           MR. SCHWARTZ:  So we have also...

21           MS. KOWALCZYK:  Noelle Kowalczyk on behalf

22   of the MHR entities.

23           MR. SCHWARTZ:  Okay.  And anyone else on

24   behalf of MHR entities participating?

5

1          MS. KOWALCZYK:  No.

2          MR. SCHWARTZ:  Alan, do you want to identify

3    the Comvest parties?

4          MR. KADISH:  Alan Kadish, K-A-D-I-S-H,

5    Greenberg Traurig in New York.

6               On the line also is a principal of Comvest,

7    Carl Kleidman.

8               Carl, why don't you identify yourself by

9    voice?

10          MR. KLEIDMAN:  Hi, everyone.  It's

11    Carl Kleidman.  Last name is K-L-E-I-D-M-A-N.  And I'm

12    one of the partners at Comvest.

13          MR. SCHWARTZ:  Okay.  Is there anyone

14    present in the room or present telephonically who has not

15    identified him or herself?

16          MR. McCARTHY:  Yes.  Michael McCarthy,

17    Presstek.

18          MR. SCHWARTZ:  Thank you.

19               Okay.  At this time, the debtors understand

20    that Presstek has improved its bid.  So at this time, I

21    would ask a representative of Presstek to read into the

22    record with some specificity --

23          MS. KOWALCZYK:  Jeffrey, before we do that,

24    can I put a statement on the record?

B282

6

1          MR. SCHWARTZ:  Sure.

2          MS. KOWALCZYK:  Thank you.

3          This is Noelle Kowalczyk on behalf of

4  MHR Capital Partners, MHR Institutional Partners, MHRM LP

5  and MHR Fund Management.

6          I would like to state on the record that the

7  MHR entities oppose the board's decision to proceed with

8  the auction of ABD's assets today.  The MHR entities

9  believe that to do so will result in ABD's assets being

10  purchased by Presstek under the terms of the July 13th,

11  2004 asset purchase agreement.

12          As many of you know, the asset purchase

13  agreement intentionally releases and forever extinguishes

14  the only significant asset available for the satisfaction

15  of the unsecured creditors' claims; that is, the debtors'

16  breach of contract action against Presstek under the

17  terms of the June 16th, 2004 stock purchase and escrow

18  agreements.

19          In light of this fact, the MHR entities

20  believe that to proceed is in blatant violation of ABD's

21  and Paragon's fiduciary obligations to the creditors.

22          As you know, offers to purchase ABD's assets

23  have been received from two additional bidders:  Comvest

24  and Harbor.  Our analyses indicate that neither the