26

1  professionals involved to satisfy themselves that the trees
2  have been shaken to the extent possible under the
3  circumstances. We heard evidence today that about how the
4  company got into the bind that it's in, particularly with
5  regard to the liquidity crisis that led directly to the filing
6  of the bankruptcy. The -- it is clear to me that there was a
7  financial crisis in this company, that the company had no money
8  to deal with, and that it needed to file, and file quickly, and
9  then it needed also to move quickly to try to provide some
10 source of financing on an on-going basis, which it found from
11 Presstek." Page 299, Your Honor. "I think the record also is
12 clear that the financial circumstances of the Debtor
13 deteriorated from then until the time in the summer of '04 when
14 they literally didn't have enough money to make payroll, and
15 when Key said enough is enough, we're not advancing more than
16 500 thousand at this particular point, and that was enough,
17 really, to make the payroll. So I do think that the evidence
18 fully supports the notion that this was a company that was
19 going down quickly, had run out of money, was surviving
20 basically on overadvances from Key Bank, and had to find a
21 solution somewhere to stop the bleeding." Now on to page 302.
22 "Now, the primary focus of the Committee's and MHR's complaints
23 are that there are too many outs for Presstek and that it
24 really is an illusory agreement because if Presstek wants to
25 walk more likely than not it's going to find some technical

1  deviation from the terms of the APA, and that primarily focuses
2  on the representations and warranties somewhat on the
3  covenants, and so on. Frankly, I don't find that to be a very
4  convincing argument simply for the reasons that I indicated
5  before." Now on to 304, Your Honor. "But frankly, on the
6  macro level, I think it's more important to get the bid
7  procedures in place, get this deal going so that the
8  professionals can try to market the assets, and create an
9  environment where the market will cause changes to the APA, as
10 opposed to my imposing changes to the APA at this particular
11 point." And that's exactly what the market has done here, Your
12 Honor. The assets were shopped, we got a couple other letters
13 of interest, though not qualifying bids, and we're able to
14 negotiate a better deal so that the Committee, which vehemently
15 opposed the deal, now supports it. And then finally, Judge
16 Case concluded, "I think that the evidence suggests that there
17 is value of a substantial sort that has been brought to the
18 table. If we look at the difference, let's say, the Debtors
19 just noticed up a 363 sale or an auction and said whoever's
20 going to show up come and show up, we're going to try to sell
21 the assets. I think the fact that there is this deal
22 negotiated with Presstek is a materially better circumstance
23 than that and that the representations and warranties, although
24 extensive, I don't find to be so restrictive that it means
25 there is no value here. Presstek has spent a lot of money

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B329

1  getting to this particular point. They haven't gone away over
2  the course of the year. They have been willing to advance
3  money under a D-I-P loan, which they don't have to do, and that
4  -- all of that has some value that indicates that there's some
5  reality to this, more than what the objectors suggest." The
6  Presstek stalking horse deal provided value. They enabled the
7  Estates to get the highest and best value for the assets. That
8  is where the good faith lies in this transaction, Your Honor.
9  The D-I-P financing enabled us to get to the market. Now, MHR,
10 who at this point is the sole standing objector, says, "Your
11 Honor, there's a $30 million claim against Presstek under a
12 pre-petition Stock Purchase Agreement. That's the most
13 valuable asset of this Estate, and if you approve this sale and
14 give a release to Presstek that goes away." Well, first Your
15 Honor, we have to consider who MHR is. Certainly it doesn't
16 speak at this point for the Debtors, for Key Bank, for the
17 Creditors Committee, the Secureds and Unsecureds who are in
18 support of the approval of the sale as being in the best
19 interest of the Estate. MHR is an entity that holds notes that
20 have been challenged by the Debtors to be characterized as
21 equity, and that's still being liquidated -- or that is still
22 being litigated, Your Honor. But that claim is a pig in a
23 poke, if you will, Your Honor. It doesn't exist. It's not
24 cash-in-hand. And if the D-I-P loan expires on November 15 and
25 we don't have a deal, and we haven't sold the assets, we've got

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

29

1  Debtors who need a D-I-P loan to continue to operate and
2  finance their bankruptcy, and the numbers show that. We run
3  the risk of the Debtors being subjected to piecemeal
4  liquidation. At that point you're working without a net. This
5  $30 million claim against Presstek, there's no lawyer in this
6  room who's gonna stand up and sign a guarantee to Your Honor
7  that they can recover it and it's gonna be a $70 million
8  recovery, and if you lose the Debtors trying to chase that
9  claim you're working without a net, and that claim is a claim
10 that hasn't been quantified as to value, hasn't been quantified
11 as to the probability of recovery. If you have an
12 administrative insolvency with the Estate with no money to
13 pursue the claim everybody loses. So, we're not here, Your
14 Honor, to debate whether or not MHR's business judgment is
15 better than the Debtor's or Key Bank's or the Committee's.
16 That's not the test. The test isn't do you have some different
17 business judgment or business judgment that you think is
18 better? What we have is the judgment of management and its
19 professionals and of its Secured Lender, and of the Creditors
20 Committee that this is the best deal, and it's not just their
21 opinion. It's the determination of the market. That's where
22 we are, Your Honor.
23         THE COURT: Call your first witness.
24         MR. STOCK: Thank you.
25         MR. D. ROSNER: Your Honor, are we gonna have an

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

1  opportunity to make an opening --
2           THE COURT: Why don't we do this. Why don't we hear
3  the evidence then I'm going to give everybody a chance to speak
4  after I hear testimony so that I might have some questions
5  myself.
6           MR. D. ROSNER: Okay, thank you, Your Honor.
7           THE COURT: I'm not going to shut you off.
8           MR. STOCK: Steven.
9              STEVEN GRAY, Debtor's WITNESS, SWORN
10                       DIRECT EXAMINATION
11 BY MR. STOCK:
12 Q.  Mr. Gray, would you please identify yourself for the record
13 and give your business address?
14 A.  Steven S. Gray, 270 Congress Street, Boston, Massachusetts.
15 Q.  Mr. Gray, you are currently Chief Restructuring Officer for
16 the Debtors, correct?
17 A.  I am.
18 Q.  Okay.  And how long have you been operating in that
19 position?
20 A.  Since approximately July 27th, 2004.
21 Q.  Mr. Gray, would you describe for the Court your experience
22 in working with distressed companies.
23 A.  I have spent the last 30 years working exclusively with
24 distressed companies in and out of bankruptcies through various
25 crisis management restructuring roles.

Gray - Direct                                                                 31

1  Q. Okay. Have you acted as a Chapter 11 Trustee?
2  A. I have on numerous occasions.
3  Q. Okay. How about as a Chief Restructuring Officer?
4  A. I have as well.
5  Q. You have experience with 363 sales of assets in the
6  bankruptcy context?
7  A. Yes.
8  Q. And what --
9  A. Numerous times.
10 Q. What is that experience, generally?
11 A. I have worked as a Trustee in selling assets in 363 sales,
12 as Chief Restructuring Officer, as Responsible Officer,
13 consultant to Debtors, Creditors, Secured parties, Buyers of
14 assets in 363 sales. So just about all aspects.
15 Q. Prior to becoming the Chief Restructuring Officer of
16 Presstek in this case had you had any prior relationship with
17 the Directors or Officer -- excuse me. Prior to becoming Chief
18 Restructuring Officer with the Debtors in these cases, had you
19 had any prior relationship with the Directors or Officers of
20 the Debtors?
21 A. No.
22 Q. Thank you. Would you describe for the Court your duties as
23 the Chief Restructuring Officer of the Debtors?
24 A. I am responsible for the overall general management, the
25 day-to-day affairs of the Debtors, as well as the management of

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                                   32

1  the restructuring process, bankruptcy process.
2  Q. When you were first retained by the Debtors to act as the
3  Chief Restructuring Officer did you engage in any diligence to
4  familiarize yourself with the Debtors' operations and finances?
5  A. I did.
6  Q. And what diligence did you engage in?
7  A. Various meetings, discussions with Board of Directors,
8  management, other professionals in the case, analyses of its
9  financial history, strategic position, markets, products, the
10 like.
11 Q. Have you been involved at all in consulting with management
12 and professionals of the Debtors regarding projections of their
13 finances?
14 A. Yes, on a regular basis.
15 Q. What has your involvement been?
16 A. The -- we have -- first of all, I have overall
17 responsibility for signing off on all of the projections
18 prepared by the Debtors, but myself or John Calabrise, my
19 colleague, are involved directly in all of the assumptions that
20 go into those projections and analyses as well as -- along with
21 various line managers of the companies for their input.
22 Q. As a result of our activities working on behalf of the
23 company, have you become familiar with business operations in
24 the finance of the company?
25 A. I have.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                                33

1  Q. Okay.
2      MR. STOCK: Your Honor, I have an exhibit I would
3  like to give to the witness if I may approach.
4      THE COURT: You may.
5      (The witness receives exhibit)
6  BY MR. STOCK:
7  Q. Mr. Gray, I've handed you what I've marked as Exhibit-1,
8  this will be Debtor's Exhibit-1. Would you please identify
9  this for the record?
10     (Debtor's Exhibit-1 marked for identification)
11 A. This is a -- it's entitled "Paragon Corporate Holdings,
12 Inc., August 2004 forecast".
13 Q. Mr. Gray, would you please flip to page 5 of Exhibit-1?
14     THE COURT: It's not in evidence yet. Are you trying
15 to lay the foundation (indiscern.).
16     MR. STOCK: Yeah, I will --
17     THE COURT: All right.
18     MR. STOCK: -- get into that, Your Honor.
19     THE COURT: I don't want him testifying to the
20 substance until it's in evidence.
21     MR. STOCK: Okay, all right.
22 BY MR. STOCK:
23 Q. Steven, have you seen this document before?
24 A. I have.
25 Q. Okay. What does it consist of?

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

Gray - Direct                                                    34

1  A. It consists of various projections as well as actual
2  performance of the Debtor, prior actual performance of the
3  Debtor from December 2003 projected out through the end of the
4  October, 2004.
5  Q. Okay. Have these business records -- or is this document
6  from the business records of the Debtors?
7  A. Yes.
8  Q. And how has this document been used as part of the business
9  records of the Debtor?
10 A. Part of it is -- well, it largely is showing the trend of
11 the business, the financial trend of the business, principally
12 focused on cash flow issues from, you know, the beginning of
13 this fiscal year through the end of October 2004, as well as
14 projection of the Debtors' ability the meet certain covenants
15 and closing conditions as prescribed in the Presstek Asset
16 Purchase Agreement.
17 Q. Okay. And to what purposes is this business record of the
18 Debtors used in its business?
19 A. It's principally used to continue to forecast the Debtors'
20 cash requirements and where it would be through the Chapter 11
21 proceedings in its ability to operate within the D-I-P
22 facility, as well as to meet the covenants and closing
23 conditions in the Asset Purchase Agreement.
24 Q. Thank you.
25    MR. STOCK: Your Honor, may I now inquire into its

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                                                 35

1  contents?
2         THE COURT: Any objection to (indiscern.)?
3         MR. FAY: Yes, Your Honor. Our objection would be
4  that I believe I've seen this document before and I believe
5  this is just part of a larger document.
6         MR. STOCK: It is just part of a larger document.
7  It's part of financial records that were admitted at the sales
8  procedure hearing through the testimony of the CFO, Your Honor,
9  Mr. Knipp. There was some objection by the Committee's counsel
10 to the inclusion of pages other than the pages that were
11 referenced. In fact, Your Honor, I only intend to reference
12 the first page and the last page of this, but I certainly have
13 the full document available if counsel would like to review it.
14        MR. FAY: I would -- for completeness sake I'd like
15 to have the full document offered into the record.
16        THE COURT: Your objection's overruled. I'm going to
17 admit the exhibit.
18    (Debtor's Exhibit-1 admitted into evidence)
19 BY MR. STOCK:
20 Q. Mr. Gray, I'd like to turn your attention to the last page
21 of this document, the cash flow liquidity analysis, and there
22 are columns at the top, actual January '04, actual February
23 '04, actual March of '04, April, May, and June. Would you
24 explain to the Court what these columns and figures mean?
25 A. This is a cash flow, actual cash flow of the Debtor from

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B337

1  December 31st, 2003, on an actual basis through the end of June
2  2004, and projected forward through the end of October of 2004,
3  showing the Debtors' borrowing requirements, and comparing
4  those to its borrowing base under the Key Bank working capital
5  facility.
6  Q.  Let's take a look at actual January '04, that column.  If
7  you go down to the liquidity analysis it indicates facility
8  utilization, revolving loans $21 million 903 thousand.  What is
9  that?
10 A.  That's the actual draw against the line of credit provided
11 under the Key Bank working capital facility.
12 Q.  Okay.  There's also a million dollars under level --
13 letters of credit.  Is that also borrowing?
14 A.  That was not borrowing at that time, but that was a reserve
15 against availability under -- the formula availability for an
16 outstanding -- to cover the potential draw on an outstanding
17 letter of credit.
18 Q.  Okay.  And the total utilization, $23 million 207 thousand,
19 what does that represent?
20 A.  That would have been the sum of the actual draw on the line
21 as -- plus the reserve for the letter of credit --
22 Q.  Okay.
23 A.   -- that might -- could have been drawn at any time.
24 Q.  Okay.  Then there's a calculated borrowing base of $23
25 million 144 thousand.  What is that?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                        37

1  A. That's the formula availability under the borrowing base in
2  the Key Bank facility. It's a combination of advance rates
3  against various kinds of inventory and receivables adding up to
4  a total of 23,144. That's the maximum that the Debtor could
5  borrow at that point in time given its -- the composition of
6  its's receivables and inventory at that time.
7  Q. Okay. Then it says, "Potential available credit line."
8  And there is a $63 thousand in parentheses. What does that
9  mean?
10 A. That means that with all of the float funded the Debtor
11 would have been over-advanced under the Key Bank facility by
12 $63 thousand.
13 Q. Okay. And if we go to the column for actual February of
14 '04, what is the potential available credit line?
15 A. February '04, 23,086.
16 Q. No, the potential available credit line. You had an
17 overdraw of 63 thousand --
18 A. Oh, I'm sorry, that was the borrowing base. Yes, it was
19 overdrawn by $7 thousand.
20 Q. And March?
21 A. Over-advanced by $3 thousand.
22 Q. April?
23 A. Over-advanced by 313 thousand.
24 Q. May?
25 A. Over-advanced by 112 -- I mean, $1 million 212 thousand.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  Q. And June?
2  A. Over-advanced by 3 million and 98 thousand.
3  Q. Did Key Bank continue to over-advance after June?
4  A. I wasn't there at the time, but it's my understanding it
5  was about late in June where Key Bank said they would not
6  continue to support any further over-advances by the Debtors.
7  Q. Mr. Gray, I now want to direct the Court's attention to the
8  financial position of the Debtors now that they're in
9  bankruptcy, and I've got another exhibit to give to you. Let
10 me finish marking them.
11      (Pause in proceedings)
12 Q. Mr. Gray, I've handed you what I've marked as -- we'll call
13 that Debtor's Exhibit-2. Would you please identify this for
14 the record.
15      (Debtor's Exhibit-2 marked for identification)
16 A. This is entitled, "Paragon Corporate Holdings, Inc.
17 Financial Performance, September 2004."
18 Q. Is this a business record of the Debtors?
19 A. Yes, it is.
20 Q. And from what is it derived?
21 A. It's derived from the financial books and records of the
22 Debtor.
23 Q. Okay. I want to have you turn back to 1, 2, 3, 4, 5, 6,
24 the 7th page, under "Income Statements Trending."
25 A. Yes.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0197

Gray - Direct                                                                    39

1  Q. And let's go to the operating income line. What is this
2  page, "Monthly Income Statement Calendar Year 2004 Actual?"
3  A. This is a spread sheet showing the actual monthly P&L
4  performance of the consolidated Debtors at the Paragon level.
5  Q. Let's go to the operating loss -- excuse me, operating
6  income/loss line. What does that line mean? What is that?
7  A. It's the operating income of the Debtor on a monthly basis
8  from January -- for the months of January through September of
9  2004.
10 Q. And what does it show for the month of July?
11 A. A loss of a million 959 thousand.
12 Q. What does it show for the month of August?
13 A. Operating loss of a million 596 thousand.
14 Q. And what does it show for September?
15 A. An operating loss of 674 thousand.
16 Q. Are these figures true and accurate to the best of your
17 knowledge?
18 A. They are.
19 Q. Well, if the Debtors have been incurring these operating
20 losses, how have the Debtors been financing their operations
21 and the costs of these bankruptcy proceedings during these
22 months?
23 A. Through the -- a certain amount is funded by depreciation,
24 but the rest is funded by the D-I-P facility.
25 Q. And what is the D-I-P facility you're referring to?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                                        40

1  A. This is the post-petition financing Debtor-In-Possession
2  financing that was approved by this Court in the amount of --
3  maximum amount of $7 million as provided by the stalking horse
4  bidder.
5  Q. The stalking horse bidder being whom?
6  A. Presstek.
7  Q. Was anyone else involved in that D-I-P Financing Agreement?
8  A. Yes, Key Bank has a piece of, I think, the last million
9  and-a-half dollars of the D-I-P facility.
10       MR. STOCK: Your Honor, if I may approach, I would
11 like to hand Mr. Gray the amended D-I-P Order.
12      (The witness receives document)
13 BY MR. STOCK:
14 Q. Could you identify Exhibit-3 please?
15      (Debtor's Exhibit-3 marked for identification)
16 A. This is amended Order approving bidding procedure for the
17 sale of substantially all of the assets of A.B. Dick and its
18 wholly owned subsidiaries authorizing payment of an expense
19 reimbursement and termination fee, setting the sale hearing
20 date, and approving a Form of Notice, docket #22.
21 Q. Okay. This is the Order that was entered by the Court for
22 the D-I-P facility, is that correct?
23 A. To the best of my knowledge.
24 Q. How much has been borrowed by the Debtors under the D-I-P
25 facility?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

                                Gray - Direct                          41

1   A.   As of yesterday I believe it was about $4.8 million.
2   Q.   Okay.  And when does the D-I-P facility mature?
3   A.   November 15th, 2004.
4   Q.   Okay.  You've testified as to your involvement in the
5   operations of the Debtors and your familiarity with their
6   operations and financing.  Do you have a business judgment as
7   to what would happen to the Debtor's operations and its
8   financing if this D-I-P facility matures on November 15 and no
9   replacement is found for it?
10  A.   The Debtors would not be able operate, support its working
11  capital needs, and fund the costs of the Chapter 11
12  proceedings, and would run out of cash in short order.
13  Q.   I'm sorry, I handed you the wrong document.  I handed you
14  the Bidding Procedures Order.  Thank you for clarifying that.
15          MR. STOCK:  I apologize, Your Honor, I got lost in
16  the shuffle of documents.  Let me remark this.  This will be
17  Exhibit-4.  If I may reapproach, Your Honor.
18       (Debtor's Exhibit-4 marked for identification)
19          THE COURT:  Yes.
20       (The witness receives document)
21  BY MR. STOCK:
22  Q.   Let's straighten that out.  Exhibit-4, is Exhibit-4 the
23  D-I-P Order?
24  A.   It is.
25  Q.   Okay.  Exhibit-3 is the Order approving the amended bid

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Direct                                                                42

1  procedures, is that correct?
2  A.  It is.
3  Q.  Okay.  Thank you.  Let's go to the Bid Procedures Order.
4  It provided for -- did it provide for Presstek as a stalking
5  horse bidder pursuant to the Asset Purchase Agreement?
6  A.  It did.
7  Q.  Okay.
8  A.  Under the name of Silver Acquisition Corp.
9  Q.  Right.  And the bid date pursuant to the amended Order is
10 when?
11         MR. D. ROSNER:  Your Honor, we'll stipulate that the
12 Bid Order says exactly what it says and I don't think --
13         THE COURT:  All right.  I'll take (indiscern.) for
14 the Bid Order.
15 BY MR. STOCK:
16 Q.  Did you have any involvement in the marketing of the sale
17 of the assets of the Debtors with respect to the sales
18 procedure?
19 A.  Yes, in a role supporting the Debtor's -- Candlewood
20 Partners, the Debtor's financial advisors.
21 Q.  Okay.  And could you briefly describe for the Court, we're
22 going to have Mr. Glen Polleck testifying as to precise
23 activities carried on in the sales process, but with respect to
24 your involvement, what activities were engaged in and carried
25 out to implement the Sales Procedure Order?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Direct                                      43

1  A.  Myself, and members of my firm, as well as all of the
2  senior management of the Debtors provided -- supported the
3  marketing process through meeting with perspective Buyers,
4  providing -- developing various informations for -- information
5  and analyses, offer memorandum, and subsequent requests from
6  Buyers, answering questions, showing them the business, the
7  facilities, and the like.
8  Q.  Had you had experience prior to this case in dealing in
9  such bidding processes or procedures?
10 A.  Yes.
11 Q.  Okay.
12 A.  On numerous occasions.
13 Q.  Okay. Having been involved in the bidding processes and
14 procedures with respect to these Debtor's assets, do you have a
15 business judgment as the Chief Restructuring Officer as to the
16 fairness of the procedures?
17 A.  Yeah, the --
18        MR. D. ROSNER:  Your Honor, we object. I think this
19 is a fact witness. I believe he's now asking for an expert
20 opinion as to fairness of certain procedures. I don't believe
21 he submitted an expert report. I don't believe he's being
22 called as an expert.
23        THE COURT:  Has this been made an issue?
24        MR. STOCK:  Pardon?
25        THE COURT:  Is this an issue?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0797

Gray - Direct                                                44

1       MR. D. ROSNER:  The fairness of the sales proceeds?
2  Absolutely.
3       MR. STOCK:  Sale process.
4       THE COURT:  The objection's overruled.  You can cross
5  examine him if you think the testimony is impeachable.
6  A.  The process was open, honest, the perspective bidders or
7  inquirers had access to all information on a timely basis, no
8  questions of any interested party were left unanswered.  I
9  don't believe there was anything in the process that would
10 suggest it wasn't anything other than completely open and fair
11 BY MR. STOCK:
12 Q.  Okay.  Now, I'd like to have you identify for the Court and
13 get into the record the Asset Purchase Agreement.  We should be
14 up to, I believe, Exhibit-5.
15      (Pause in proceedings)
16 Q.  Mr. Gray, I've handed you what I've had marked as Debtor's
17 Exhibit-5.  Would you please identify this for the record?
18      (Debtor's Exhibit-5 marked for identification)
19 A.  This is the Asset Purchase Agreement by and among Presstek,
20 Inc., Silver Acquisition Corp., Paragon Corporate Holdings,
21 Inc., A.B. Dick Company, Interactive Media Group, Inc., and
22 A.B. Dick Company of Canada, LTD, dated as of July 13th, 2004.
23 Q.  Is this the terms -- does this contain the terms of the
24 Presstek deal prior to the amendments that have been announced
25 in Court today?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191