Gray - Direct                                          45

1    A.  Yes, to the best of my knowledge.

2           MR. D. ROSNER:  Objection, Your Honor.  Again, I

3    think that the agreement, whichever is the actual agreement,

4    provides for whatever it provides for.  I don't believe that we

5    need this witness to tell us what it says.  However, I will

6    note also for the record, I don't know if you're gonna be

7    introducing it, the one that at least you've just handed us has

8    hand-written markings throughout the document, and the one that

9    I believe was attached to the original motion did not.

10          MR. STOCK:  Your Honor, we will substitute at the end

11   of the proceeding a clean document.

12          THE COURT:  You're talking about the interlineations

13   on page 22 and so forth?

14          MR. STOCK:  Yes, Your Honor, they are.  Those are my

15   interlineations, Your Honor.

16          THE COURT:  Who's writing is that?

17          MR. STOCK:  Pardon?

18          THE COURT:  Who put that?

19          MR. STOCK:  That's my writing, Your Honor, from one

20   of my copies.

21          MR. D. ROSNER:  My guess is he didn't intend to waive

22   privilege on the document.

23          MR. STOCK:  I did not.

24          THE COURT:  I'll just strike it.

25          MR. D. ROSNER:  Fair enough Judge.

Gray - Direct                                              46

1    THE COURT: It's not part of the agreement?

2    MR. STOCK: It is not part of the agreement I will

3    represent to Your Honor. I was trying to get documents copied,

4    get them over here. We can substitute if they're willing to do

5    it, and we'll do so by stipulation a clean copy.

6    THE COURT: That's fine. We can leave it in and

7    we'll just ignore the hand-written materials.

8    MR. D. ROSNER: And that's fine, Your Honor. But my

9    earlier objection was to have this witness tell us what this

10   document says.

11   THE COURT: Well, I think he's just identifying the

12   document. I'm not going to let him testify what's in it.

13   That's going to speak for itself.

14   MR. D. ROSNER: Thank you, Your Honor.

15   MR. STOCK: Okay.

16   BY MR. STOCK:

17   Q. Mr. Gray, what is your understanding of the terms of the

18   original Presstek offer or bid?

19   A.    In the broadest sense it was the purchase of all of the

20   assets of the Debtors, all of the assets of the Debtors'

21   Canadian subsidiary, and the stock of -- oh, I'm sorry, all of

22   the assets of the Debtors' Canadian subsidiary except for the

23   Canadian subsidiary's real estate, and the stock of the

24   Debtors' U.K. subsidiary.

25   Q. What was the purchase price?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B348

Gray - Direct                                                    47

1    A.   $40 million.

2    Q.   Okay.  Were there any provisions regarding the assumption

3    and assignment and cure amounts for contracts?

4            MR. D. ROSNER:  Your Honor, I'll just renew the

5    objection.  I believe now we're actually going into the

6    substance of the document.

7            THE COURT:  What was the purpose of him testifying to

8    this document?

9            MR. STOCK:  Because, Your Honor, he is going to

10   testify as to his assessments of this bid and the letters of

11   interest and why in his business judgment he believes the

12   acceptance of the Presstek bid is in the best interest of the

13   Debtors.  He has to have some understanding as to what the

14   terms and conditions are as the basis or foundation for the

15   exercise of his business judgment.

16           THE COURT:  All right, the objection's overruled.

17   BY MR. STOCK:

18   Q.   And what is your understanding as to the terms and

19   conditions of the initial Presstek offer with respect to the

20   assumption, assignment, and curing of cure amounts for a signed

21   contract?

22   A.   The Buyer, Presstek, the right to designate any of the

23   Debtors' contracts, and to the extent that they were executory

24   contracts require the Debtors to assume, cure, and assign those

25   contracts to Presstek.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B349

Gray - Direct                                        48

1   Q.   Now, during, or in response to the bid process that was

2   implemented, I've referenced letters of interest from Comvest

3   and from Harbor Partners.  Are you familiar with those?

4   A.   I am.

5   Q.   Okay.

6          MR. STOCK:  Let me find them if I can, Your Honor,

7   and submit them to the witness.

8      (Pause in proceedings)

9   BY MR. STOCK:

10  Q.   Is this now Exhibit-6?

11  A.   It's marked 5.

12  Q.   That is 5?

13  A.   Yes.

14  Q.   Okay.  So this new one is 6, thank you.

15     (Pause in proceedings)

16  Q.   Mr. Gray, I've handed you what I've marked as Debtor's

17  Exhibit-6.  Would you please identify it for the record?

18     (Debtor's Exhibit-6 marked for identification)

19  A.   This is a letter from our firm of Greenberg and Traurig to

20  the Debtors' counsel and Candlewood Partners, and it is a

21  self-described letter of -- as an indication of interest to

22  pursue a transaction as outlined in the letter.

23  Q.   Have you reviewed this document prior to today's hearing?

24  A.   I have.

25  Q.   Okay.  In what context?

Gray - Direct                                    49

1  A.  In the context of understanding the results of the

2  marketing process, as well as understanding this indication of

3  interest as compared to the other offers that -- or the other

4  letter of interest that we received and the stalking horse bid.

5  Q.  Okay.  Did you engage in consultations with personnel of

6  the Debtor or the Debtors' professionals with respect to this

7  letter of interest?

8  A.  I did.

9  Q.  Okay.  Did you perform any assessment of the terms of this

10  letter of interest?

11  A.  I did in conjunction with Debtors' counsel and the Debtors'

12  financial advisors.

13  Q.  Okay.  I don't want you to reveal any -- the content of any

14  discussions you've had with Debtors' counsel, but excepting

15  those discussions out from this question, what assessments did

16  you reach regarding the terms and conditions of this letter of

17  interest?

18  A.  I viewed it as an interesting proposal, but lacked

19  certainty and presented the extent that we pursued this as

20  opposed to the Presstek bid presented substantial risks of the

21  Estate that made it difficult to define at this point.

22  Q.  Okay.  What risk did you identify?

23  A.  Well, the risk of the expiration of -- well, first of all,

24  this letter -- this indication of interest to the extent that

25  it went forward was contingent on due diligence.  It was

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B351

1   contingent on a -- and that was an open-ended due diligence,

2   but there were specific -- it does propose to provide a

3   replacement D-I-P facility on the terms that currently exist,

4   which we have been informed by Key Bank it would oppose, and

5   the other major issue in it was the condition that it required

6   the reinstatement of the Presstek Joint Development Agreement

7   with the Debtor, which Presstek specifically told us that they

8   would not agree to. I should add the last piece is to the

9   stated proposed benefit to Creditors is a note to be paid out

10  of a percentage of future profits.  That was also an

11  uncertainty, or a contingency that we couldn't define in

12  current dollars because it's a question of what future profits

13  might be.

14  Q.  Mr. Gray, I've handed you what I've marked as Debtor's

15  Exhibit-7, is that correct, is that the number on there?  I

16  handed out all my copies.

17  A.  It is.

18  Q.  Thank you.  Would you please identify Debtor's Exhibit-7

19  for the record?

20      (Debtor's Exhibit-7 marked for identification)

21  A.  It's a letter from the law firm of Dicstein Shapiro &

22  Warren to Debtors' counsel and to myself expressing the

23  interest of Harbor Group, or Harbor Partners in pursuing a

24  transaction with the Debtor through the funding of a Plan of

25  Reorganization.

1   Q.  Have you performed any assessment of this letter of

2   interest prior to today's hearing?

3   A.  I did.

4   Q.  Okay.  Would you please tell us what assessment you

5   performed?

6   A.  Well, it has a lot of contingencies in it too, due

7   diligence contingencies, it has a note on future profits, but

8   the biggest issue, and the nonstarter in this proposal was it

9   had an absolute financing contingency.

10  Q.  What do you mean by that?

11  A.  It was subject to Harbor Group securing financing,

12  including the D-I-P financing, as a condition to go forward,

13  and there's no assurance of that financing being forthcoming,

14  although there was a letter attached to it expressing interest

15  of someone who might provide D-I-P financing and exit

16  financing.

17  Q.  Now, as the Chief Restructuring Officer having reviewed the

18  Presstek bid now as improved by negotiation, the Comvest letter

19  of interest, their expression of interest, and the Harbor

20  Partners expression or letter of interest, did you form a

21  business judgment as to how the Debtor should proceed with

22  respect to those three items?

23  A.  Comvest, Harbor, and Presstek?

24  Q.  And Presstek.

25  A.  Yes.

Gray - Direct                                                    52

1  Q.  And what --

2  A.  I did.

3  Q.  And what is that business judgment?

4  A.  In my judgment the, as I said, the Harbor proposal was a

5  nonstarter because of the financing contingencies.  The Comvest

6  proposal had its due diligence contingencies as well as these

7  other issues that I described.  As compared to those, the

8  Presstek proposal as improved and described previously in this

9  proceeding, provides a significant cash benefit to the Estate

10  assures the solvency of the Estate -- post-petition solvency of

11  the Estate, the preservation of this business for its

12  employees, and vendors, and the community that it serves, and

13  that that is in the best interest of this Estate, the Presstek

14  bid.

15  Q.  As the Chief Restructuring Reorganization Officer of the

16  Debtors have you had any deliberations or consultations with

17  the Boards of the Debtors regarding the Presstek bid and these

18  two expressions of interest?

19  A.  Yes, I have.

20  Q.  Okay.  What discussions have you had?

21  A.  The Board was made aware of all of these offers, of where

22  we stood last Friday, the original bid date, what myself and

23  the Debtors' other professionals view of these bids were.  We

24  thought we should proceed, and we -- the Debtors' professionals

25  were instructed to negotiation with the parties over the

Gray - Direct          53

1  weekend in order to get to a place by yesterday afternoon where

2  there was a reconvened Board meeting and given the improvements

3  in the Presstek bid and still the lack of certainty in these

4  other offers both myself, Candlewood recommended to the Board

5  that we proceed with the Presstek transaction, and the Board

6  voted and approved that recommendation.

7          MR. D. ROSNER:  Your Honor, move to strike the latter

8  part of the answer in which the witness testifies as to what

9  the Board did and what the Board said, as opposed to what he

10  presented to the Board (inaudible).

11         THE COURT:  Were you present at the meeting?

12  A.  I was.

13         THE COURT:  Overruled.

14         MR. STOCK:  And -- I need to respond, Your Honor.  A

15  Board vote is a Board vote, it's an act, it's not a hear-say

16  statement.

17         MR. D. ROSNER:  Do you want to introduce the Board

18  minutes (inaudible) witness, we'd have no objection, Your

19  Honor, but in terms of what other people outside of the

20  Courtroom are saying I would call that hear-say.

21         THE COURT:  Well, all I heard is that the substance

22  of the answer was that the Board voted in favor of the offer of

23  Presstek, right?

24         MR. STOCK:  Right.

25         THE COURT:  They didn't vote no.

Gray - Cross                                54

1        MR. D. ROSNER:  We wouldn't be here today would we?

2        THE COURT:  No.  All right.  Do you have questions?

3        MR. STOCK:  May I have a moment, Your Honor --

4        THE COURT:  Yes.

5        MR. STOCK:  -- to confer with counsel.

6     (Pause in proceedings)

7        MR. STOCK:  Your Honor, I have no further questions

8    at this time.

9        THE COURT:  All right, Mr. Fay.

10                   CROSS EXAMINATION

11   BY MR. D. ROSNER:

12   Q.  Mr. Gray, you've been the Chief Restructuring Officer of

13   this company since July 27th, is that correct?

14   A.  Thereabouts, the last week in July, early in the last week

15   in July.

16   Q.  So about 3 and a half months by my calculation.  How many

17   hours a week do you spend doing that?

18   A.  My retention is limited to 4 days a week, full days a week,

19   as well·as the addition of 2 days a week by my colleague, Mr.

20   Calabrise.

21   Q.  Do you work four full days for the A.B. Dick companies?

22   A.  On average, yes.

23   Q.  And where do you do that?

24   A.  Mainly in Niles, Illinois, but in various other locations

25   as required, as well as whenever I'm available on a 24-hour-a-

B356

1    day basis whatever has to be done.

2    Q.  Are you acting on any other engagements right now other

3    than the A.B. Dick matter?

4    A.  I am responsible for certain other engagements, but they

5    are -- they take a very limited amount of my time.

6    Q.  About how much?

7    A.  Over this period of time, I'd have to review my time

8    records, but I would say no more than five or six full days,

9    guessing, but --

10   Q.  Over the 3-and-a-half months?

11   A.  Yes.  I mean, I had certain commitments to depositions,

12   trials, other things that I had to attend to, but I've not been

13   actively involved in an operating -- another operating case

14   over this period of time.

15   Q.  How does your firm charge these Estates, is it by the

16   month, or by the hour?

17   A.  A retention in this matter is hourly to a rate cap of, as I

18   recall, $22 thousand a week for my time and Mr. Calabrise's

19   time, and in addition to that any other time that my firm

20   approves, I mean, my firm is requested to provide approved by

21   the Board, and noticed to the U.S. Trustee, and the Creditors

22   Committee is in addition to that.

23   Q.  So, what's your run rate been on a monthly basis since

24   July?

25   A.  I would say about 100 thousand, maybe a 110.  It's a matter

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B357

Gray - Cross                                    56

1   of the fee applications we submitted.

2   Q.  That's per month just for your firm.  That doesn't take

3   into account Candlewood or any other professional.  Just your

4   firm's around 100 thousand a month?

5   A.  Correct.

6   Q.  Okay.  You signed a declaration prior to coming here today,

7   correct?

8   A.  The affidavit that I signed?  Or my --

9   Q.  Yeah, well it's called --

10  A.   -- retention declaration.

11          MR. D. ROSNER:  I think, Your Honor, you have a copy

12  of the declaration of Steven S. Gray.

13  BY MR. D. ROSNER:

14  Q.  I have it as a declaration.  I don't know if you signed an

15  affidavit or did you --

16  A.  I'm not sure what you're referring to.

17          THE COURT:  What was it attached to?

18          MR. D. ROSNER:  It was probably attached to the

19  Debtors' hearing memorandum.

20          THE COURT:  Go ahead, you can use it counsel.

21          UNIDENTIFIED SPEAKER:  Has it been signed?

22          MR. D. ROSNER:  Well, you know, it's one of those

23  interesting signatures.  It says slash S slash it's typed in --

24          THE COURT:  Go ahead and ask him if he prepared it

25  and then just go ahead with it.

Gray - Cross                           57

1        MR. D. ROSNER:  So do you mind if I show it to the

2    witness, Your Honor?

3            THE COURT:  Yes, sure.

4        MR. D. ROSNER:  Thank you.

5        (Pause in proceedings)

6    A.  Yes.

7    Q.  It says in paragraph 2 of your declaration that you have

8    been, and I quote, "Guiding the Debtors' reorganization

9    efforts."  What specifically have you done to guide the

10   Debtor's reorganization efforts, and by reorganization to be

11   clear, I'm separating that from selling its assets to Presstek?

12   A.  As an alternative to the Presstek transaction early on in

13   the proceedings I recommended to the Board that we look at a

14   strategy that would effectively be focused on an operational

15   restructuring of the Debtor such that to the extent that the

16   Presstek offer or no other viable asset sale offer was

17   forthcoming that the Debtor could continue to operate and

18   possibly reorganize, and we did that work, we did that work.

19   Q.  You made one presentation to the Board that said that you

20   should focus on an operational restructuring?

21   A.  No.

22   Q.  Did you do anything else?

23   A.  No, no.  The Board then asked us to pursue that, which we

24   did.  We worked with the management of the company, put

25   together an operational restructuring plan, and then projected

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1   that out into the future looking at what the cash requirements

2   were, what ability the Debtor had to operate, what its earnings

3   might be, those kind of things.

4   Q.  Instead of those kind of things, specifically, did you put

5   together an operating plan for this company?

6   A.  We did, yes.

7   Q.  Okay.  Did you produce that in the discovery in this case,

8   are you aware?

9   A.  I was not personally asked for any discovery.  I don't know

10  what discovery was provided.  It's certainly been available.

11  It's been in the data room and made available to all

12  perspective bidders, interested parties.  It's been no secret.

13  Q.  And what steps under the operating plan have been

14  undertaken by the Debtors?

15  A.  The largest component of the operational restructuring

16  would involve significant staff lay offs, some 140 or so

17  employees, 150 employees both here and in Canada.  Because we

18  are operating under post-petition Warren Act notice, which

19  expires today, we were advised by counsel that to the extent we

20  terminated any employees prior to today we'd still be obligated

21  to pay them through today.  So, the only steps we've taken was

22  prepared and everything is in place to begin those terminations

23  this week.  The other --

24  Q.  So you haven't terminated anybody?

25  A.  No, nothing -- not other than in the normal course, you

B360

1  know.

2  Q.  And if the sale gets approved today won't that be

3  Presstek's decision as to who will be terminated or who won't?

4  A.  Well, under the Asset Purchase Agreement the Debtor's

5  required to terminate all employees and then it's Presstek's

6  decision as to who they rehire.

7  Q.  Well, I don't understand.  You memorandum to the Court said

8  that absent approval of this Asset Purchase Agreement all

9  employees would be terminated, and then you testified before

10  that if this is not approved that it could lead to a

11  liquidation and then all employees would be terminated, but

12  under the Asset Purchase Agreement are all employees

13  terminated?

14  A.  Under the Asset Purchase Agreement, to the extent Presstek

15  goes forward with the transaction, yes, the Debtor terminates

16  all employees, and Presstek decides who they rehire.

17  Q.  So actually approval of the Asset Purchase Agreement today

18  isn't doing anything for the employees as a functional matter?

19  A.  No, but as a practical matter, the vast majority of the

20  employees will be rehired.

21  Q.  Do you work for Presstek?

22  A.  I do not.

23  Q.  Okay.  Are you in charge of hiring them at Presstek?

24  A.  No, but I have been -- I've been in conversations with

25  Presstek --

Gray - Cross                                      60

1  Q.  Why don't you just limit to what you can talk about about
2  what you know --
3  A.  Okay.  Presstek has --
4  Q.   -- not as opposed --
5          THE COURT:  Let him answer.
6          MR. STOCK:  Objection, Your Honor, he's arguing --
7          THE COURT:  Go ahead.
8  A.  Presstek has designated those employees that they will not
9  rehire.  They gave us that information over the last week or
10 so.  The -- as well as just as, again, as a practical matter to
11 the extent that they -- anyone would buy this company,
12 terminating all the employees would not be anything other than
13 liquidating the business, and anyone who's -- I would suggest
14 that is paying $40 million for the opportunity to liquidate
15 this business is on a fool's errand.
16 BY MR. D. ROSNER:
17 Q.  So in the operational restructuring that you presented
18 early on to the Board so far you've identified that you've
19 suggested a lay off of about 140 people, which you haven't
20 executed.  Is there any other piece of the operating -- is
21 there any piece of the operating restructuring that you
22 actually have accomplished?
23 A.  No.  The rest of the initiatives in that plan involve
24 closing facilities, entering into new lease facilities,
25 outsourcing manufacturing, the marketing of certain new

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Gray - Cross                                      61

1  products, and the like, none of which we were in a position to

2  do until we know where we're going and who we're going with,

3  and that would have been a matter of whether or not the Debtor

4  was continuing to operate in its own, or its assets were sold

5  today or in the near future.

6  Q.  So how is that the alternative to a sale if you can't --

7  you don't do anything until you determine whether you're sold?

8  Is that what alternative means to you?

9  A.  It's a matter of posturing the Debtor such that it would be

10  in a position to take some very aggressive actions that would

11  put it in a position such, you know, to continue to operate if

12  it had ongoing Debtor-In-Possession financing, and in fact, the

13  plan requires Debtor-In-Possession financing in an amount

14  greater than is currently in place today.

15  Q.  Okay.  So this operating restructuring plan that you

16  haven't executed anything on is basically gathering dust on the

17  shelf in case the sale to Presstek is not approved, and then

18  you would begin to execute it?

19  A.  I wouldn't agree with that, no.

20  Q.  Which part do you disagree with?

21  A.  It was gathering dust on the shelf.

22  Q.  Well, it's not in a vacuum.

23  A.  It was used extensively in the marketing of the company.

24  It was used -- it was reviewed, analyzed by all of the

25  perspective offerers.  I would suggest it was the foundation on

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Gray - Cross                                    62

1   which we received these other proposals, and it was the

2   alternative strategy to the extent that the Estate had to go in

3   that direction that we would take through ongoing financing,

4   and the -- we would have to dramatically change the way the

5   business operated, because as you can see from the prior

6   exhibits, this Debtor -- no company of this scale could

7   maintain those kind of operating losses it's had in the past.

8   Q.   We've got an operating restructuring plan presented early

9   on that has not been executed but has been shown to potential

10  bidders, and you surmise, actually supported Harbor's -- just

11  let me finish please if you don't mind -- supported Harbor's

12  offer as well as Comvest.  In addition to what you've just

13  testified to, what other steps have you taken to guide the

14  Debtors' reorganization efforts, if any?

15  A.   Continued support of the -- continuing the -- maintaining

16  the businesses on operating going concern, which is first and

17  foremost.   Secondly, to assure that we were able to meet the

18  covenants in the D-I-P financing and the Asset Purchase

19  Agreement, the closing conditions of the Asset Purchase

20  Agreement, as well as supporting -- working with Candlewood in

21  supporting them in the ongoing marketing of the assets through

22  either a 363 Sale or through a Plan -- recapitalization through

23  a Plan of Reorganization.

24  Q.   What's the current availability under the D-I-P financing

25  facility?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Gray - Cross                                    63

1   A.  I would have to check, but I suspect it's around a million
2   dollars or so.
3   Q.  Why haven't you drawn it?
4   A.  We haven't needed to draw it.
5   Q.  You haven't needed to draw it?
6   A.  We have not needed --
7   Q.  But the whole substance of our testimony before was that
8   you're hanging by the skin of your teeth.  Why haven't you not
9   drawn it to give yourself time in case this sale is not
10  approved today?
11  A.  Because that would just be buying assets.  Buying assets
12  that would be to the benefit of Presstek for which there is,
13  under the Purchase Agreement, Asset Purchase Agreement, no
14  mechanism to increase the purchase price for those additional
15  assets.
16  Q.  Is it your understanding that under the Purchase Agreement
17  Presstek purchases cash?
18  A.  They do not.
19  Q.  So if you took a million dollars down from your D-I-P
20  facility and you had it in your account as cash how would that
21  be increasing the assets being sold to Presstek?
22  A.  If we had it in cash we'd just have to pay it back.
23  Q.  Why would you not -- right now you've got $4.8 million
24  drawn under your facility, correct?
25  A.  Yes.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B365

Gray - Cross                                                    64

1   Q.  Why have you not drawn the full facility so that you could
2   support the company's operations going forward without this
3   horrible drop dead date of November 15th?
4   A.   The -- first of all, projections show that to the extent
5   that we continue to operate through November 15th we would
6   require the most of the D-I-P facility, or certainly all of the
7   D-I-P facility we could borrow under its availability, so
8   drawing it today or drawing it then, you know, over the next
9   couple of weeks is -- drawing it today is of no benefit.
10  Secondly, we don't have, to the extent that we drew the D-I-P
11  down that just means we've got an extra net cash and had to pay
12  it back.  There's no benefit to the Estate doing so.
13  Q.  You've got lots of Creditors that you have to pay back that
14  you're not bay paying back, right?
15  A.  We are paying all --
16  Q.  We're talking about liquidity here.
17  A.  Yes.  And we are operating the business in the normal
18  course, we're providing for all of its needs, and to the extent
19  that we needed that million dollars we would draw that million
20  dollars.
21  Q.  Mr. Gray, I mean, you do recognize you've walked into this
22  Court today and said to the Judge, "Please help me my D-I-P
23  expires on November 15th.  I'm out of money, I can't do
24  anything about it," and now you're telling -- you're at the
25  same time saying, well, you're running it orderly and you