Gray - Cross                                65

1  haven't drawn down the money 'cause you don't need it?
2  A.  I would disagree with --
3  Q.  Does that seem responsible to you?
4          MR. STOCK:  Your Honor --
5          THE COURT:  Wait a minute, let him answer the
6  question.
7  A.  I would disagree with your characterization, you know, I
8  mean --
9          THE COURT:  Irrespective of that characterization,
10 just answer the question.
11 A.  We came to this Court today to approve a sale that we
12 believe is in the best interest of the Estate.  We didn't come
13 to Court today to say that we needed liquidity today, but this
14 Estate will be out of liquidity by the middle of November or
15 shortly thereafter.
16 Q.  In paragraph 7 of your declaration you wrote something
17 that's just curious to me, and I don't know if it's just the
18 drafting.  It said, "I am informed" -- I'm quoting now from
19 paragraph 7 -- "I am informed that the D-I-P facility is
20 scheduled to expire November 15th, 2004."  Were you informed
21 about that or have you actually read the D-I-P Financing
22 Agreement?
23 A.  I have read that.  That was a poor choice of words.
24 Q.  Okay.  And what happens when the D-I-P facility expires,
25 actually?  What's your understanding of what happens?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
738-329-0191

Gray - Cross                                                                 66

1   A.  We have no access to ongoing financing. We would -- and
2   all of our projections indicate that we will be continuing to
3   incur -- require increased D-I-P support past November 15th,
4   which we would have no way to fund.
5   Q.  Are those projections now before the Court? I haven't seen
6   those projections. The ones that you showed were historicals,
7   I believe Exhibit -- what exhibit was it? Exhibit-3 or
8   Exhibit-4 was a September --
9           MR. D. ROSNER: I might be wrong. I'm just looking
10  it up, Your Honor. Your Honor, there hasn't been any
11  projections submitted as part of the record, as far as I'm
12  aware, so to the extent I would just strike the testimony
13  regarding what projections say --
14          THE COURT: I think that his opinion is that based
15  upon his analysis and as the financial advisor of the company
16  that as of November 15th when the termination of the Key loan
17  expires then they don't have sufficient cash to run it. It's
18  his opinion.
19  BY MR. D. ROSNER:
20  Q.  After November 15th what's your grace period before anybody
21  could exercise remedies under the D-I-P?
22  A.  I don't recall, but --
23  Q.  Twenty-five days.
24  A.   -- it's in the D-I-P documents.
25  Q.  Also in your declaration it says, "Further upon

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

Gray - Cross                                              67

consultation with the same parties it does not appear that an orderly liquidation of the Debtors' assets following cessation of business would yield proceeds even close to the $40 million purchase price set forth in the APA."
A. Yes.
Q. Do you agree with that statement?
A. I do.
Q. Do you believe that the alternative to approval of the sale to Presstek today would be an orderly liquidation of this company?
A. To the extent the Debtor could not continue to operate, I do.
Q. Asking what your opinion is as to what would happen, assuming the Judge today denies approval of the sale, will the company begin an orderly liquidation process tomorrow?
A. I don't think the company would begin an orderly liquidation process tomorrow, but we would certainly be in a mode of substantially trying -- prices and figuring out how we were gonna operate past November 15th without a new D-I-P facility and an expanded D-I-P facility.
Q. Would you call Harbor?
A. I probably would not. I shouldn't say that. I would, but they don't have financing commitments.
Q. How do you know they don't have financing commitments?
A. They've told me that.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1  Q. When did they tell you that?
2  A. As late as yesterday afternoon.
3  Q. Okay. And so do you know that they don't have financing
4  commitments tomorrow?
5  A. I do not know that they don't have financing commitments
6  tomorrow.
7  Q. Yeah, neither do I. How many professionals for the Debtor,
8  would you estimate, are sittin' in this room right now?
9  A. I don't know, I'd have to count them.
10 Q. Why don't you?
11 A. One, two, three, four, five, six, nine, I think.
12 Q. Nine professionals for the Debtor, all charging the Estate
13 on an administrative basis, correct?
14 A. Not all.
15         THE COURT: I haven't approved any of the fees yet.
16         MR. D. ROSNER: I said charging, not having been
17 paid.
18         THE COURT: They haven't got by me yet.
19         MR. D. ROSNER: Your Honor, but I do believe they are
20 charging on an administrative basis.
21 BY MR. D. ROSNER:
22 Q. Is that correct, Mr. Gray?
23 A. I believe there are two here that are not on an hourly
24 basis.
25 Q. Are they working for free?

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

Gray - Cross                                                    69

1  A. No, they're working on a success-fee basis, although they
2  have a monthly retainer. That's the Candlewood folks.
3  Q. Right. And by the way, would the approval of the Asset
4  Purchase Agreement be a success under the success fee that you
5  just identified?
6  A. I think you should ask Candlewood that, but I believe
7  that's the case.
8  Q. I will, I'm asking you though
9  A. Yes, I believe that's the case, yes.
10 Q. Okay. So, they're not working for free, they're on --
11 A. No, but they're not charging on an hourly basis was the
12 only (inaudible).
13 Q. Are they charging on an administrative basis?
14 A. They are charging on an administrative basis.
15 Q. Thank you. Now, how about for the Committee. How many
16 professionals from the Committee do you estimate are in the
17 room right now?
18 A. Could you all raise your hand? I see five.
19 Q. Similarly, those five plus the other nine, 14, I don't
20 believe you counted yourself, that would be 15 --
21 A. I think I did.
22 Q. You did, okay, 14. Also charging on an administrative
23 basis?
24         MR. D. ROSNER: I'm getting somewhere, Your Honor.
25 A. As far as I know.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

```
                            Gray - Cross                        70
 1              THE COURT: Well, maybe.
 2        (Laughter)
 3              THE COURT: Go ahead.
 4   BY MR. D. ROSNER:
 5   Q.  Are the professionals of this Estate over budget right now,
 6   the professional expenses over budget?
 7   A.  Yes.
 8   Q.  Are they significantly over budget in your estimation?
 9   A.  I don't know what you would call significant, but they are
10   over budget.
11   Q.  Well, what would you call significant?  $900 thousand over
12   budget?
13   A.  I don't think the professionals are $900 thousand over
14   budget at this point.
15   Q.  Let me show you a Candlewood document, okay.
16        (Pause in proceedings)
17              MR. D. ROSNER: Just one second, Your Honor, this
18   one, well -- Your Honor, I'm gonna show this to the witness.
19   It does have my circles on it.  Counsel's okay with that.
20              THE COURT: Why don't you just put a hypothetical to
21   him.  I think I know where you're going, but $900 thousand over
22   budget for the professionals do you think that's an incentive
23   for them to propose the sale.  Is that the point?
24              MR. D. ROSNER: I like that question.  I wasn't gonna
25   ask that one, but I do like that question.
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-389-0191

Gray - Cross                                                            71

1  A. I'm sorry, Your Honor, did you say it's an incentive to --
2        THE COURT: Now you ask a question.
3  BY MR. D. ROSNER:
4  Q. Wouldn't that be an incentive for the professionals to
5  favor a sale if they're $900 thousand over budget and the
6  Estate could be facing administrative insolvency?
7  A. I don't believe anyone that I've talked to in this matter,
8  and certainly I know for myself can speak that it's not an
9  incentive to approve the sale.
10 Q. Okay.
11       MR. D. ROSNER: Your Honor, I want to show this to
12 the witness because we're gonna be admitting this into evidence
13 as soon as we find a clean copy of it.
14       THE COURT: Just mark it as Exhibit-A or whatever,
15 you know. We'll admit it.
16       (MHR's Exhibit-A marked for identification)
17 BY MR. D. ROSNER:
18 Q. Mr. Gray, have you seen what's been marked as, I guess,
19 MHR's Exhibit-A before today?
20 A. I have.
21 Q. Can you describe it please?
22 A. It is an analysis of residual interest of the estate based
23 on three proposals that have been discussed here today.
24 Q. Who's analysis, is it?
25 A. This was prepared by Candlewood.

Writer's Cramp, Inc.
Certified Court Transcribers
752-329-0191

Gray - Cross                                                          72

1  Q. By Candlewood Partners and that's the financial advisor to
2  the Debtor? Correct?
3  A. Yes.
4  Q. So, this is the Debtor's document?
5  A. It is.
6  Q. Okay, if you look down the first line under the name
7  Presstek -- I'm sorry, can I get a look at that?
8          MR. ROSNER: I'm sorry, Your Honor, may I approach?
9          THE COURT: Yes.
10     (Pause in proceedings)
11         THE COURT: What exhibit letter did you give this?
12         MR. ROSNER: A. I know it's supposed to be
13 premarked. We didn't know who the witnesses were.
14         THE COURT: Go ahead.
15 BY MR. D. ROSNER:
16 Q. If you look down under the column of Presstek you see the
17 underlined category called administrative expenses. You see
18 that?
19 A. Yes.
20 Q. See the first line that says, "Professional fees over
21 budget?"
22 A. Yes.
23 Q. $900 thousand?
24 A. Yes.
25 Q. Is that accurate?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Gray - Cross                                                                 73

1  A. That was an estimate of when this was prepared of what
2  professional fees might end up over budget as the case went
3  forward, not what it was over budget at that particular point
4  in time. That's my recollection.
5  Q. What is the budget number?
6  A. I don't recall. I don't recall.
7  Q. Ballpark? Is it $9 million?
8  A. No. Within the original budget I think it was in the order
9  of $2½ to $3 million.
10 Q. $2½ to $3 million? So, let's take the high number, $3
11 million, so we're looking at an estimated over budget of 30%?
12 A. Yes.
13 Q. As Chief Restructuring Officer officer are you responsible
14 for performance under the budget?
15 A. Ultimately, yes.
16 Q. So, the professionals going 30% over budget on the high
17 number that's your responsibility?
18 A. I would not say that it was my responsibility. It was how
19 this case unfolded this budget that was put together prior to
20 the case. As commencement they assumed a rate of professional
21 fees based on normalized activity and because of significant
22 controversies and litigation the case that was unanticipated
23 the fees have run higher.
24 Q. What are the Unsecured Creditor's getting out of the
25 Presstek bid?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

B375

1  A.  We estimate as it sits today prior to this, at closing we
2  expect about $3.5 million.
3  Q.  Sorry, are you referring to a document now, when you
4  answered that question?
5  A.  It's, yes, my notes here.
6        MR. D. ROSNER:  Your Honor, can I ask for a copy of
7  the document that the witness is referring to during testimony?
8        THE COURT:  You can show him the document.
9  A.  Yeah, I think it's gonna be introduced shortly by
10 Candlewood, but I'll be happy to --
11       MR. D. ROSNER:  Then don't leave me in suspense, may
12 I have a copy?
13       THE COURT:  Use his copy.
14       MR. D. ROSNER:  Thank you, Your Honor.
15    (Pause in proceedings)
16 BY MR. D. ROSNER:
17 Q.  Mr. Gray, the document that you're looking at, unlike the
18 document I'm looking, at shows professional fees over budget of
19 $1.5 million.
20 A.  Yes.
21 Q.  Well, how come when you were just testifying about the 900,
22 you didn't correct me and say the actual number is 1.5 million?
23 See, I don't have that document so I didn't see that.  I was
24 still going on the 900 which is in the first column, but you
25 actually had the corrected number in the second column.  How

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0791

Gray - Cross                                              75

1   come you didn't mention that?
2   A.   'Cause you asked me about the $900 thousand and I said at
3   this point in time that's what we estimated the --
4   Q.   That's not what it is at this point and time.  At this time
5   it's 1.5 million.
6   A.   It's not 1.5 million either.  That is again an estimate
7   which we have increased just for the purposes of having some
8   cushion in the, what we're projecting to be, the benefit to the
9   estate from the Presstek transaction.
10  Q.   So, the numbers on that page are wrong?
11  A.   Which page?
12  Q.   The one that you just handed me that I didn't have before,
13  or just some of them are right and some of them are wrong?
14  A.   These are estimates there.  The numbers on the page you
15  gave me were prior to ongoing negotiations on the Presstek
16  transaction.
17  Q.   Yeah, the document that I gave you was given to us on
18  October 28.  Apparently you have made another document that you
19  didn't give to us that shows higher numbers.  When you were
20  just testifying about the 900 I asked you how over the admins
21  were and you said 900 was an estimate, but this says 1.5
22  million.  Which is it?  Is this document wrong?
23  A.   Which one?
24  Q.   This one, the one you had that I didn't have?
25  A.   It may well be, it is an estimate that, again, we increased

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

```
                        Gray - Cross                        76
```

1  as this evolved over the weekend, and negotiations continued
2  over the weekend to give us comfort that when we could say that
3  we feel that this $3.5 million benefit the estate at closing
4  that we are on firm ground.
5  Q. And you now have comfort by a document where the numbers
6  might be right and might be wrong that you're on firm ground as
7  to what the benefit is?
8         THE COURT: I don't think that's what he said,
9  counselor. Why don't we get on with something else?
10 BY MR. D. ROSNER:
11 Q. You say the Presstek deal yields you an additional --
12 yields the Unsecured Creditors $3.5 million, is that correct?
13 A. What I said was at closing we would expect, after the
14 payment of the costs as shown on that piece of paper, there
15 would be $3.5 million.
16 Q. Is that a guarantee by Presstek?
17 A. No, that's not a guarantee by Presstek.
18 Q. Is that the amount that somebody thinks might be left after
19 payment of administrative claims?
20 A. It's our best estimate of the amount that would be
21 available after the payment of those estimated claims and
22 expenses on that piece of paper.
23 Q. $3½ million?
24 A. You have the piece of paper. I don't. I think it's $3.5
25 million.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B378

Gray - Cross                                                77

1  Q.  Now, looking back at MHR Exhibit-A, if you look under the
2  column for Comvest, go all the way down to the bottom.  It
3  says, "Potential Recovery to Unsecured Creditors."  Can you
4  please read the number that's under the comvest column?
5  A.  $8 million.
6  Q.  $8 million?
7  A.  That's what it says, yes.  But that is a note, contingent
8  note.
9  Q.  Okay.  Just try to restrict yourself to my questions.
10            THE COURT:  Let him explain.  Go ahead.
11 A.  That is under the Comvest proposal, Your Honor, they were
12 offering the Unsecured Creditors a note for $8 million to be
13 paid in the amount of, out of 20 percent participation in
14 profits, a minimum of a million dollars within the first three
15 years, if I recall.
16 BY MR. D. ROSNER:
17 Q.  And under the column for Harbor Group, where you see
18 "Potential Recovery to Unsecured Creditors," you see the number
19 there?
20 A.  Yes.
21 Q.  What number is that?
22 A.  $7,501,000.
23 Q.  Okay.  And now the enhanced Presstek deal, in your view,
24 yields $3½ million for Unsecured Creditors?
25 A.  Your honor, can I explain the nature of that?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Cross 78

THE COURT: You may.

A. 'Cause that is also a note to be paid out of, if I recall, a 50% interest in free cash flow as defined. Neither of those were cash that would be available out of a transaction in the short term.

BY MR. D. ROSNER:

Q. Mr. Gray, have you analyzed the collectibility of those notes?

A. Those notes would be payable out of profit participation or cash flow participation in the reorganized Debtor.

Q. Right.

A. It's not a note that is collectible from some third party.

Q. Right, so have you analyzed the collectibility of the note based upon the source of payments?

A. The question is is what the ongoing profitability of the Debtors would be --

Q. I understand what the question is, I am asking you if you have analyzed the collectibility of the notes?

A. I have not, we have not projected out -- we have not done long term projections of the Debtor's operations, but on a nominal basis, you could maybe, I would feel comfortable with a profit stream that would suggest that those notes might be paid over four or five years.

Q. Was there any term on the note that was shorter than four or five years?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Cross                                                79

1   A.  These letters were not all that specific, but there was no
2   term on either of them.
3   Q.  Right, so, I thought one of them was actually a seven-year
4   note, which would likely mean it would be fully paid under your
5   estimation of four or five years. That would be the Comvest
6   one.
7   A.  I don't recall it being seven years but, we could look at
8   that piece of paper.
9   Q.  So, If that note were paid and the Harbor Group's note were
10  paid, those offers that you decided not to go forward with
11  would actually exceed the value of the Presstek compensation by
12  more that a hundred percent, as to the recovery to Unsecured
13  Creditors.
14          MR. STOCK:  Objection, Your Honor.
15          THE COURT:  Counsel, the problem is that he didn't
16  analyze the two offers from Comvent and Harbor on the basis of
17  what going to be paid to the Unsecured Creditors, it was the
18  basis that the -- his were so indefinite and didn't have any
19  binding affect that he didn't think that they were valid.  Is
20  that right?
21  A.  Yes, Your Honor they were both very contingent.
22  BY MR. D. ROSNER:
23  Q.  Okay.
24  A.  But, to answer your question I think you also have to
25  present value of those notes and so you don't get to --

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Gray - Cross                                                                 80

1  Q.  Well, wouldn't the interest component cover the present
2  value?
3  A.  I don't think they carried interest.
4  Q.  Well, how do you know?
5  A.  My recollection from reading --
6  Q.  You haven't seen a note right?  You haven't negotiated the
7  form of the note, have you?
8          MR. STOCK:  Objection, Your Honor this is argument.
9          THE COURT:  Okay.  Go ahead.
10 A.  No, as I said the (indiscern.) were not that specific in
11 those kinds of details.
12 BY MR. D. ROSNER:
13 Q.  Mr. Gray, are you aware that Comvest asked that this
14 hearing be adjourned, for a period of one week or up to no
15 later than November 14, so that it could actually firm up what
16 you described as the infirmities in its offer?
17 A.  I am.
18 Q.  Okay.  And what was your response to that request?
19 A.  That to the extent that we were able to accomplish what we
20 did accomplish with the Presstek proposal as it's been
21 described and been revised that the $3½ million estimated at
22 net of the administrative costs and closing expenses it was a
23 bird in the hand versus a proposal that still would have
24 significant contingencies even after that short period of a
25 time.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Gray - Cross                                                     81

```
 1  Q.  How could you possibly know the contingencies that the
 2  Comvest deal is gonna have in the future?  What if it's a fully
 3  hard full negotiated deal in seven days?
 4  A.  It had --
 5  Q.  Yielding a money good collectible note of $8 million.
 6  Wouldn't that offer be higher and better then Presstek?
 7          MR. STOCK:  Your Honor, may he answer the question?
 8          THE COURT:  I'm going to let him answer if he knows.
 9  A.  The proposal still required the consent of Key Bank for the
10  replacement of the D-I-P facility which Key Bank said
11  specifically they would not support.  Secondly, it required the
12  reinstatement of the Presstek Joint Development Agreement which
13  Presstek specifically said they would not do.  Both of those,
14  it wouls seem to me, would be things that could not be
15  determined within that period of time, would be the subject of
16  ongoing litigation that could extend this process out for a
17  significant period of time.
18  Q.  What if they removed those conditions this week?
19          THE COURT:  Well, now your speculating there.
20          MR. D. ROSNER:  That's exactly the point, Your Honor.
21  We're speculating because they requested a seven-day
22  adjournment so they could firm up their deal, and I've got a
23  witness here telling you that he couldn't accept your deal
24  because it was contingent, but wouldn't give him the time to
25  make it not contingent.
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

Gray - Cross                                                                82

1       THE COURT: That's what he's there for. That's the
2  decision he made.
3       MR. D. ROSNER: I'm sorry?
4       THE COURT: That's the decision they made.
5       MR. D. ROSNER: Right and now I am just trying to
6  investigate --
7       THE COURT: That's the decision the Board made.
8       MR. D. ROSNER: Well, we haven't heard from the
9  board, we have only heard from this witness.
10      THE COURT: I heard enough -- he said the Board
11 approved the Presstek deal.
12      MR. D. ROSNER: Yeah, I don't think there is anybody
13 from the board here today.
14      THE COURT: Any other questions?
15      MR. D. ROSNER: Yes, I do have more questions, Your
16 Honor, but what I think what I'm trying to investigate with the
17 witness is, what was the basis for that business decision not
18 to allow Comvest seven days to firm up its offer?
19 BY MR. D. ROSNER:
20 Q.  And what I am asking you is, why did you not agree?  You
21 said a bird in the hand.  Where was the bird going?
22      MR. STOCK: Objection, Your Honor, this question has
23 been answered.
24      MR. D. ROSNER: I don't believe it has been answered.
25 He said bird in the hand, I'm asking where the bird in the hand

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B384

Gray - Cross                                                        83

1 was going.
2          MR. STOCK: You asked him after that why he felt it
3 was contingent (indiscern.).
4          THE COURT: Do you know the answer?
5 A. It was our collective judgement, mine, Debtor's financial
6 advisors, counsel, that we would put this Estate in substantial
7 risk, by not going forward with the Presstek proposal and
8 embarking on a course that could seriously jeopardize the
9 solvency of this estate, post-petition, the solvency of this
10 Estate.
11 BY MR. D. ROSNER:
12 Q. And, so I ask you, what was the potential risk of seven
13 days?
14 A. Losing Presstek.
15 Q. On what basis could Presstek have walked away from the
16 Asset Purchase Agreement, if you know?
17          MR. D. ROSNER: The point, I am getting at, Your
18 Honor, they didn't have an ability to walk--
19          THE COURT: The problem that I think you got is that
20 the amended order approving the bidding procedures and the sale
21 of these assets specifically state that the auction was going
22 to be held on Friday, October 29, and that the Debtors may
23 continue or adjourn the auction from time to time without
24 further notice in their reasonable discretion after
25 consultation with the committee, MHR, and Key Bank, and he

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

1  testified that Key Bank just will not allow that to happen.
2  One of those four persons say that no, our post-petition
3  lending is over with, and that ends it. The auction went
4  forward --
5          MR. D. ROSNER: The auction did go forward, Your
6  Honor--
7          THE COURT: I don't know of any motion that was
8  presented to the Court that asked the Court to change this
9  condition.
10         MR. D. ROSNER: To change today's date?
11         THE COURT: To change the condition about the
12 continuance of the auction. It seems to me it was set out by
13 the Court that there was a bid date, that you had to post money
14 to make the bid and so forth, and all those conditions had to
15 be complied with, and you're bound by it, so is any other
16 Bidder.
17         MR. D. ROSNER: Yes, Your Honor, what I am referring
18 to is today's sale hearing and if you look at the bid
19 procedures that were entered by Judge Case at paragraph 7(g), I
20 believe it's 7(g), it provides that today's hearing may be
21 adjourned or rescheduled without notice other than by
22 announcement of the adjourned date at the sale hearing, and
23 Comvest had requested a seven-day adjournment, just so it could
24 fill the very blanks that the witness has testified caused him
25 not to accept the offer. We likewise asked the company to

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191