1  please adhere to that request and we believe at that point the

2  Committee also requested that the company adhered to Comvest's

3  request, so it could firm up its offer.  It's not an unusual

4  procedure when somebody is trying to maximize the value of

5  assets and their buyer is otherwise locked into a contract to

6  try and accommodate any reasonable requests by a potential

7  bidder in order to enhance the bid that was not done here, Your

8  Honor, and that's part of our case.

9       THE COURT:  Part of your case is that it has to be

10  reasonable and this gentleman says it isn't.

11       MR. D. ROSNER:  I mean, that's something for you to

12  decide whether seven days under these facts is reasonable when

13  the other party was offering more than twice what Presstek is

14  offering on a net basis to Unsecured Creditors.

15       MR. STOCK:  Objection.

16       THE COURT:  Well, I don't know how I could ever make

17  a finding that they offered twice, when they didn't really

18  offer anything.

19       MR. D. ROSNER:  I guess we hear where we're going.

20       THE COURT:  I am gonna take a ten minute recess.

21       MR. D. ROSNER:  Okay.

22       THE COURT:  How many more witnesses do you have?

23  One, all right.  How many witnesses do you have, Mr. Fay?

24       MR. FAY:  None.

25       THE COURT:  Okay.  We will take a ten minute recess

B387

Gray - Cross                                    86

1  then.

2      (Recess)

3          THE COURT:  You may continue.

4          MR. D. ROSNER:  Thank you, Your Honor.

5  BY MR. D. ROSNER:

6  Q.  Mr. Gray, I believe you testified earlier, I don't want to

7  put words in your mouth, I believe you testified that all

8  material information was provided to potential bidders during

9  the bid solicitation process, is that correct?

10  A.  To the best of my knowledge.

11  Q.  What information was given to potential bidders about the

12  Debtor's claims against Presstek under the Stock Purchase

13  Agreement?

14  A.  I think you should ask Candlewood that question more

15  specifically, but the bidders had access to the Asset Purchase

16  Agreement, which is that my recollection was that there were

17  specific releases of those so-called Presstek claims in the

18  APA.

19  Q.  Right.  My question is, what information regarding the

20  claims against Presstek were provided to potential bidders?

21  A.  The potential claims?  I don't recall any of the people

22  that I talked to directly asking me what those claims were in

23  anything other than wanting to know why there were releases and

24  I would have responded that they were claims and had to do with

25  negotiations between the Debtor and Presstek prior to the Asset

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-329-0191*

B388

1   Purchase Agreement.  But, very unspecific kinds of things.

2   That was my only first-hand knowledge.

3   Q.  And, who did you say that to?

4   A.  Oh, I don't know specifically, I mean, there were a number

5   of people who I talked to, a couple of dozen probably, and I

6   don't remember specifically who I might have said it to, maybe

7   more than one person.

8   Q.  Have you valued the Presstek claim -- I'm sorry, the claims

9   that the Debtors have against Presstek, under the SPA that are

10  to be released under the Asset Purchase Agreement?

11  A.  I have not.

12  Q.  Have you received the Stock Purchase Agreement?

13  A.  I have.  Oh, the Stock Purchase Agreement?

14  Q.  Yes.

15  A.  No.

16          MR. D. ROSNER:  Your Honor, may I approach the

17  witness with what I have marked as Exhibit-B?

18          THE COURT:  Yes.

19      (MHR's Exhibit-B previously marked for identification)

20  BY MR. D. ROSNER:

21  Q.  If you turn to the third date stamped page in you see the

22  top says, "Stock Purchase Agreement, Execution Copy."  Have you

23  ever seen this document before?

24  A.  I have not.

25  Q.  Do you know whether this document was in the data room?

Gray - Cross                                                88

1   A.  I do not know specifically.

2   Q.  Are you aware of any analysis that has been accomplished by

3   the Debtor, regarding the value of the Debtor's claims against

4   Presstek under the Stock Purchase Agreement?

5   A.  I have not been involved in any analysis of that, no.

6   Q.  Have you heard anybody at the Debtor's talk about what the

7   claim would be worth to the Estate if it were not being

8   released under the Asset Purchase Agreement?

9   A.  There was discussion with counsel but, I think that would

10  be --

11          MR. STOCK:  Objection, Your Honor.

12          THE COURT:  He said that he didn't.  He never valued

13  it.

14          MR. STOCK:  And I don't want opinions of counsel

15  being (inaudible).

16          THE COURT:  Go ahead.

17          MR. D. ROSNER:  Okay.

18  BY MR. D. ROSNER:

19  Q.  Once you learned that MHR had raised the issue of the value

20  of this claim being released, did you feel it incumbent as

21  Chief Restructuring Officer to do anything in order to evaluate

22  the claim?

23  A.  I did not.

24  Q.  You're aware that the Debtor was party to a Joint

25  Development Agreement with Presstek?

B390

1  A.  I am.

2  Q.  What was that Joint Development Agreement about?

3  A.  I haven't read the agreement but I understand in a general

4  sense what it was.  It provided for the development of a

5  certain scale of digital pipe maker utilizing some of the

6  Debtor's technology and some of Presstek's technology, as well

7  as Presstek's plates, to create a product known as the Vector

8  TX product, that is in beta testing as of today.

9  Q.  What's your understanding about the Vector project?  Would

10 that be a good project for A.B. Dick to be involved with?

11 A.  Yes.

12 Q.  And why is that?

13 A.  Because it is a new product development that the Debtor

14 believes has some significant opportunity in the marketplace.

15 Q.  And, what happened with the Joint Development Agreement

16 that A.B. Dick had with Presstek?

17 A.  It was terminated, pre-petition is my understanding.

18 Q.  Did A.B. Dick terminate it?

19 A.  It did not.

20 Q.  So, Presstek terminated the Joint Development Agreement

21 with A.B. Dick?

22 A.  That's my understanding, yes.

23 Q.  Okay.  Do you know when Presstek terminated it?

24 A.  Not specifically.  It was prior to my involvement with this

25 matter.

Gray - Cross                                           90

1   Q.   Would you be surprised to learn that it was within days of

2   the bankruptcy?

3   A.   It's my recollection that I heard it sometime in June, so

4   it's possible June, or July or something like that.

5   Q.   Do you know the basis upon which Presstek allegedly

6   terminated this agreement?

7   A.   Only through hearsay.

8   Q.   What is that hearsay?

9   A.   It was terminated on the grounds that A.B. Dick, the other

10  party to the agreement, was insolvent.  But I have not seen

11  anything specific in that regard.

12  Q.   Did you see the complaint that A.B. Dick filed that

13  indicated it has been insolvent since 2001?

14  A.   Not specifically, no.

15  Q.   You haven't seen anything dealing with the complaint for

16  recharacterization filed by A.B. Dick?

17  A.   No, I have not read that complaint.

18  Q.   Are you aware that A.B. Dick was insolvent at the time of

19  execution of the Joint Development agreement?

20  A.   I have never analyzed the solvency of A.B. Dick at the time

21  of the Joint Development Agreement.

22  Q.   Have you ever analyzed whether Presstek's termination of

23  the valuable Joint Development Agreement was lawful?

24  A.   I'm not a lawyer, I think that's a matter for lawyers to

25  analyze its lawfulness.

B392

Gray - Cross                                               91

1  Q.  Have you ever instructed your lawyers to investigate the

2  lawfulness of the Presstek termination of the valuable Joint

3  Development agreement on the basis of A.B. Dick's insolvency?

4  A.  I have not.

5  Q.  Do you know whether anybody has instructed A.B. Dick's

6  counsel to determine whether it's lawful?

7  A.  I do not.

8  Q.  Has a motion been filed to undo the termination, such that

9  A.B. Dick could maintain this valuable asset?

10 A.  Not that I am aware of.

11 Q.  But you are aware that Comvest said this is a very valuable

12 asset and they would want that agreement in place?

13 A.  Yes.

14 Q.  And other than asking Presstek for it voluntarily you

15 undertook no analysis as to whether this is still an asset of

16 this Estate, not withstanding the alleged termination?

17 A.  Only the analysis that I sugested before before and that is

18 that to the extent of it being reinstated would require

19 litigation which would be uncertain in its outcome.

20 Q.  This litigation is always uncertain, isn't it?

21 A.  It is indeed.

22 Q.  Including litigation by the company against Presstek on the

23 claims arising from the SPA?

24 A.  Indeed.

25 Q.  What efforts did you undertake to replace Key Bank and

B393

Gray - Cross                                      92

1  Presstek as the post-petition D-I-P financers of this company?

2  A.  None specifically as the Debtor on it's own but there were

3  parties including the ones that we have talked about here who

4  have explored the replacement of those facilities.

5  Q.  I'm sorry, but I didn't understand your answer.  Parties

6  about whom we've talked about here?

7  A.  Well, Comvest and Harbor.

8  Q.  I'm not talking about what Comvest didor Harbor did, what

9  did you do to replace the financing?

10  A.  I said I did not do anything with the Debtor on a stand-

11  alone basis, only in talking with lenders who were brought in

12  either by Comvest or Harbor, I think it was specifically by

13  Harbor, as potential replacement of the D-I-P in a pre-petition

14  facility.

15  Q.  So, since July 27th, when you were appointed as Chief

16  restructuring Officer with the November 15 termination date of

17  the D-I-P facility, you did not independently talk to a single

18  lender about extending that commitment, and extending post-

19  petition financing to the Debtor, is that correct?

20  A.  Only through third parties who were looking at a

21  transaction here.

22  Q.  When did you hear about Harbor looking for a transaction?

23  A.  Very early on, whenever very early in the marketing

24  process, whenever that was, probably early August.

25  Q.  Which lenders did Harbor bring you?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    A.  I don't know all the ones that they talked to.  The ones

2    that I talked to were GE Credit, Merill Lynch, Stairway

3    Capital, Congress Financial.  Those are the ones that I recall.

4    There may have been a couple of others.

5    Q.  But never as a stand alone for the Debtor?  Just through an

6    acquisition by Harbor?

7    A.  That's correct.

8    Q.  You familiar with the term "EBITDA?"

9    A.  I am.

10   Q.  Essentially, a company is operating cash.  Would you use

11   that as a loose definition for the next question or two?

12   A.  Well, it is the cash generated by the Debtor out of its

13   operations without any adjustment for working capital changes.

14   Q.  What's the Debtor's EBITDA for October?

15   A.  October, I don't know.  It's has not been closed.

16   Q.  What do you think it is?

17   A.  I suspect it will be something like September which, prior

18   to some reserve adjustments, was in the order of a couple

19   hundred thousand dollars.

20   Q.  Positive?

21   A.  Positive.

22   Q.  And prior to September, back in August and during the

23   summer, before that the EBITDA was negative, correct?

24   A.  It was.

25   Q.  And then now it's turning positive, is that correct?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Cross                                      94

1   A.  It is.

2   Q.  Is it trending positive?

3   A.  It's given at what you think the current rate of sales is

4   and that it's probably roughly ongoing at a couple hundred

5   thousand dollars.

6   Q.  So the company is now cash flow positive, would that give

7   an opportunity for the company to perhaps find or attract other

8   financing?

9   A.  No.  Not without additional capital.

10  Q.  But, you haven't actually tried it, have you?

11  A.  Tried it in which sense?

12  Q.  Tried to get new financing.

13  A.  No, I said that the company at a couple hundred thousand

14  dollars positive EBDA could not support $30 million of pre- and

15  post-petition financing, in my judgement, without additional

16  capital beyond that.

17  Q.  Well, it's $7 million, post-petition financing right now,

18  right?  The 23 million is pre-petition financing, correct?

19  A.  Correct.

20  Q.  Are you aware that the Unsecured Creditor's Committee has

21  filed a complaint within the last several days alleging that a

22  lot of that pre-petition lien does not actually extend to

23  collateral and therefore is unsecured?

24  A.  I am aware that there was such a pleading filed recently

25  but I have not reviewed it.

Gray - Cross                                    95

1  Q.  So, have you not evaluated how much of the pre-petition

2  financing is actually secured financing that would be subject

3  to either priming or another vehicle under 364?

4  A.  I have not.

5  Q.  But we do know for sure that if you don't get a sale done

6  today, that you're gonna run out of financing, correct?

7  A.  In my judgment if we don't get a sale done today, it puts

8  this estate in substantial jeopardy.

9  Q.  Right, and yet you have taken no steps to actually replace

10  the financing since July 27, since the day that you were

11  engaged?

12  A.  I have not taken any deliberate steps to secure new

13  financing, look at the asset base of this Debtor.  It is clear

14  that on its assets on its own it cannot support $30 million of

15  new financing, asset base and earnings history.

16  Q.  You're prepared to release all of the Debtor's claims

17  against Presstek, correct?

18  A.  I am prepared to recommend the sale to Presstek as opposed

19  to what could be a free fall with this Estate with speculation

20  as to what those claims may be worth.

21  Q.  Right, but you don't know or have any idea what those

22  claims are worth, correct?

23  A.  I have not analyzed those claims.

24  Q.  All right.  So for all you know they could be worth $100

25  million but that's okay to just give them away?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B397

Gray - Cross                                                96

1   A.  I have not analyzed those claims.

2   Q.  You testified before that you've been a Chapter 11 Trustee?

3   A.  I have.

4   Q.  And have you also been a Chapter 7 Trustee?

5   A.  I have.

6   Q.  In those capacities have you ever released claims without a

7   valuation of what the claims are worth?

8   A.  No.

9   Q.  And why not?

10  A.  Because I am fiduciary responsible to those Estates as

11  Chapter 11 Trustee, singularly, to make those decisions.

12  Q.  Any difference here?

13  A.  I believe there is.

14  Q.  You're not a fiduciary here?

15  A.  I am but I don't --

16  Q.  Are you a fiduciary to these Estates?

17  A.  -- I don't --

18          THE COURT:  Let him finish, let him finish the

19  answer.

20  A.  I don't act singularly in this matter, I report to a Board

21  of Directors who make ultimate decisions in this case.

22  BY MR. D. ROSNER:

23  Q.  So, If you didn't have a Board of Directors, you wouldn't

24  release the claim without a valuation, correct?

25  A.  I did not say that, no.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  Q.  So, then what's the point of saying your not acting

2  singular?  What's the point of the Board?

3  A.  The Board may have well evaluated those claims, they may

4  have had conversations with people I haven't been involved with

5  in those claims.  They were involved in this stock transaction,

6  which I was not involved with.  They have a much greater

7  history in this case than I do.

8  Q.  Okay, but you can't testify that the Board actually did

9  evaluate those claims, can you?

10 A.  I can only testify to what the Board did in my presence,

11 and in my presence they did not have any specific evaluations

12 of those claims.

13 Q.  Thank you.

14        MR. D. ROSNER:  I have nothing further, Your Honor.

15        THE COURT:  Any short redirect?  Or do you have any

16 questions?

17        MR. CROUCH:  Your Honor, Ronald Crouch from McGuire

18 Woods on behalf of the Official Committee of Unsecured

19 Creditors.

20        THE COURT:  Pardon me, go ahead.

21              CROSS EXAMINATION

22 BY MR. CROUCH:

23 Q.  Mr. Gray, I want to get the chronology down.  You

24 testified, I believe, that there were meetings over this

25 weekend, between Presstek and the Debtors, for Presstek to

Gray - Cross                                                    98

1  enhance its offer?

2  A.  They were.

3  Q.  And, following those enhancements, you participated in a

4  board meeting where you made a recommendation to the Board on

5  action to be taken?

6  A.  Yes.

7  Q.  And, when was that board meeting?

8  A.  Yesterday at four o'clock in the afternoon.

9  Q.  Was it before or after the auction?

10  A.  It was before the auction.

11  Q.  Now, as part of the -- your consideration in making a

12  recommendation to the Board you considered the fiduciary

13  obligation to all constituencies including the Unsecured

14  Creditors, correct?

15  A.  I did.

16  Q.  And in that regard you had calculated a waterfall which

17  would produce approximately a $3¾ million recovery to Unsecured

18  Creditors?

19  A.  Yes, it was a little less than that yesterday because there

20  were some other adjustments made this morning, but effectively

21  the same thing.

22  Q.  All right.  And one of those adjustments which we heard

23  about today was the willingness now of Presstek to assume the

24  post-petition sales commissions, correct?

25  A.  Yes.  That was today.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1  Q.  So, that would actually then increase the return to

2  Unsecured Creditors from approximately from 3½ million to 4

3  million?

4  A.  No, I believe that 50% of that reduction, the assumption of

5  sales commissions was in the $3½ million number.

6         MR. CROUCH:  I don't know if this has been marked

7  yet.  Has this been marked yet?  I don't think this has been

8  marked yet, Your Honor, so we have to mark another exhibit.

9         MR. D. ROSNER:  Your Honor, I think I meant to mark

10  that and forgot, so do you want to continue calling that MHR?

11  D I think we would be on,

12         THE COURT:  I don't know what it is, counsel, I

13  haven't seen it.

14         MR. CROUCH:  I guess we'll call it Committee-1, Your

15  Honor.

16         THE COURT:  That will be fine.

17  BY MR. CROUCH:

18  Q.  Mr. Gray, I have handed you what has been marked as

19  Committee-1, is that the waterfall analysis under the deal as

20  it existed prior to today?

21     (Committee's Exhibit-1 marked for identification)

22  A.  Yes, I don't know when this one existed, these have been

23  generated every couple of hours for a few weeks now.

24  Q.  In any event, that analysis shows the $3¾ million recovery

25  to the Unsecured Creditors, correct?

B401

Gray - Cross                                              100

1  A.  Yes.  All, including the sale of the Canadian real estate

2  and the projected corporate wind down expenses would be 3%, but

3  what I was referring to before was in a little different basis,

4  but we're talking about the same ballpark.

5  Q.  All right, but my point is -- would be with Committee-1

6  that $3½ million is prior to an assumption of $425 thousand in

7  commissions?

8  A.  Indeed, this one is.

9  Q.  So, if we were to add the commissions into that analysis we

10 would then have approximately a $4 million recovery to

11 Unsecured Creditors?

12 A.  Yes, after the assumptions about the wind down and the sale

13 of the Canadian real estate.

14 Q.  Now, as part of your recommendation to the Board, well,

15 first of all, as part of these weekend deliberations, and

16 leading into the auction yesterday, had Presstek made

17 representations regarding what executory contracts it was going

18 to assume?

19 A.  They had.

20 Q.  And specifically they made representations regarding

21 executory contracts they were going to assume with members of

22 the Unsecured Creditor's group, correct?  Let me be specific.

23 Did they make a representation as to whether or not they were

24 going to assume the Conica contract?

25 A.  Well, this is not quite that simple.  Presstek had

B402

Gray - Cross                    101

1  requested the assignment of contracts that we estimated cure

2  costs of about $2.3 million including those contracts that we,

3  the Debtor, believed were executory.  Beyond that, they

4  requested assignment of contracts that were -- that is counsel

5  did not believe or project executory that increase that number

6  close to $7 million.

7  A. Exactly, where Conica was at that point in those, I'm not

8  sure, I think it was in the non-executory category, but that

9  would have been a matter of some litigation to determine.

10  Q.  All right.  Well then along with Conica was Mitsubishi

11  discussed?  That would have part of one of those two groups?

12  A.  Mitsubishi was definitely in the what the Debtor believed

13  was non-executory.

14  Q.  And ESCO, would that have been amongst them?

15  A.  ESCO was certainly within the population, overall, yes.  I

16  don't recall where it sat.

17  Q.  All right, and in any event, was a value assigned to the

18  Estate of Presstek's willingness to take assignments to these

19  contracts?

20  A.  Yes.

21  Q.  And, what was the value that was assigned?

22  A.  In the minimum amount of about 1.9 million and the maximum

23  of about 7 million, or 6.7 million or so.  Depending on what

24  the ultimate outcome was the determination of which contracts

25  are totally executory.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

B403

Gray - Cross                                          102

1   Q.  And, Presstek's willingness or desire to take assignments

2   of these contracts also would influence directly the recovery

3   to not only individual Unsecured Creditors but to the Unsecured

4   Creditors as a group, correct?

5   A.  Yes.

6   Q.  In fact, it would substantially enhance the recovery to the

7   Unsecured Creditors group?

8   A.  The general Unsecured Creditors, yes.

9   Q.  And would it enhance it both because certain Creditors were

10  going to be made whole as a part of the assignment, correct?

11  A.  Yes.

12  Q.  And that in turn would then make the Creditors that were

13  seeking to obtain a recovery from the Unsecured Creditors' pool

14  smaller thereby increasing their recovery as well, correct?

15  A.  Yes, with the funds available to pay that second group

16  (inaudible).

17  Q.  Now, you've testified that one of the reasons that your

18  discounting or devaluing the Comvest and Harbor group offers is

19  simply their indefiniteness, there's too many contingencies

20  it's to indefinite for you to be able to take those -- assign a

21  significant value to those in order to recommend either holding

22  off these proceedings or pursuing either Comvest or Harbor

23  Group seriously?

24  A.  Correct.

25  Q.  Would you agree that if Presstek is unwilling to declare

B404

1  today what they want to do with these Unsecured Creditor

2  contracts, that there would be the same type of indefiniteness

3  to the Unsecured Creditors' group?

4  A.  It would certainly be within the range of the numbers that

5  I mentioned before.

6  Q.  But the reality is, for example, certain Unsecured

7  Creditors would be looking at the difference based upon whether

8  Presstek does or doesn't do that, certain members of the

9  Unsecured Creditors' group are looking at the difference

10 between 100% recovery and something significantly less than

11 50%.

12 A.  I don't -- from the Estate I don't know what Presstek's

13 plans are to deal with those contract Creditors on their own,

14 but certainly out of proceeds to the sale of the assets through

15 the estate, but I have no idea what Presstek is doing with

16 those Creditors on their own.

17 Q.  Well, that's precisely my point.  All I am really trying to

18 get at, and I don't want to belabor it, but isn't what Presstek

19 intends to do with those contracts with the Unsecured

20 Creditors, trade a huge amount of indefiniteness in terms of

21 whether or not the Unsecured Creditors should be supporting

22 this deal or not?

23 A.  Well, I can only look at the Unsecured Creditors as a

24 whole, and what we have available to Unsecured Creditors as a

25 whole, independent of whether they are assumed and assigned to

Gray - Cross                    104

1  the Estate or they're paid separately by Presstek outside the

2  Estate or any of that.  The -- what we know is in the Presstek

3  deal based on the obligation, the proceeds of the sale,

4  assumptions of certain obligations, not the contract,

5  obligations, but certain other obligations like sales

6  commissions and medical claims.  We know what is -- and the

7  payment of what we estimate to be the cost of delivering the

8  Canadian assets and the administrative expenses, wind down

9  expenses, what would be then available to the Estate for

10  distribution to general Unsecured Creditors.  But -- so that's

11  the only thing I can deal with in specific terms.

12  Q.  Let me just try to ask it simply.  Is what Presstek's

13  intentions are with the Unsecured Creditors' contracts make a

14  material difference in what an Unsecured Creditors' recovery is

15  going to be?

16  A.  Certainly makes a material difference to the so-called

17  contract Creditors.

18  Q.  And as well to the group as a whole?

19  A.  Well, yes, and it would then reduce -- to the extent that

20  their claims are paid separately it reduces the pool for

21  Unsecured Creditors, yes.

22  Q.  And when the Board voted on this deal, was it in the face

23  of the representations by Presstek that they wanted to obtain

24  an assignment of the majority of these contracts?

25  A.  No.  When the board voted on this deal, it was on the face

Gray - Cross                                    105

1    of their understanding that the estate was responsible to cure

2    only operating leases, capital leases, and real property leases

3    in the maximum amount of $500 thousand.

4    Q.  Well, I thought I understood you to say that the value to

5    the estate of Presstek's taking assignments of these contracts

6    that the value you placed on that was between $1.9 and $7

7    million?

8    A.  I said the cost --

9    Q.  Okay.

10   A.  -- to the Estate of Presstek requiring the Estate to assume

11   and assign those contracts.

12   Q.  Do you know if the -- I want you to just assume

13   hypothetically, if Presstek has now reneged and doesn't want to

14   assume any of these contracts or take assignments of any of

15   these contracts, do you know if the Board has reconvened to

16   consider whether or not it will still approve this transaction?

17   A.  I'm not sure I understand the question.

18   Q.  Have there been any other board meetings you're aware of

19   since the one where you recommended and the board approved this

20   transaction?

21   A.  No.

22          MR. CROUCH:  That's all I have, Your Honor.

23          THE COURT:  Any other questions by any other

24   attorneys?

25                     CROSS EXAMINATION

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B407

Gray - Cross                                                    106

BY MR. SELBST:

1  Q.  Mr. Gray, my name is Stephen Selbst, I represent Presstek.

2  I just have a few questions for you.  Mr. Gray, you were asked

3  a series of questions by Mr. Crouch.  Were you present at the

4  auction yesterday?

5  A.  I was.

6  Q.  Did you hear Presstek say yesterday that it would tell the

7  Debtors which contracts it would assume and assign by 5 o'clock

8  today?

9  A.  If I recall, what I specifically heard was that they only

10  required the Estate to assume and assign certain leases to the

11  maximum cure cost of $500 thousand.

12  Q.  Well, let me try a different way.  At the auction yesterday

13  did Presstek make any promises with respect to any contracts

14  other than those leases you just referred to that it would

15  assume?

16  A.  Not that I recall.

17  Q.  Okay, thank you.  And the other benefits you testified

18  about that Presstek provided, the assumption of the medical

19  costs, that is a direct benefit to the Estate, correct?

20  A.  That is a direct benefit to the Estate.

21  Q.  And Presstek's agreement to pay the additional $425

22  thousand in commissions that are owed to the sales force,

23  that's a direct benefit to the Estate, isn't it?

24  A.  That was a direct benefit to the Estate.

B408