1    MR. SELBST:  No further questions, Your Honor.

2    THE COURT:  Any other counsel?  Redirect?

3    MR. STOCK:  Very briefly, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. STOCK:

6    Q.  Mr. Gray, you were asked in cross examination by Mr.

7    Rosner, counsel for MHR, certain questions about, in essence,

8    what harm would there be in continuing an approval of the sale

9    to Presstek, continuing that from the closing of November 5, to

10   some date approximating November 12, November 14.  Do you

11   recall that line of questioning?

12   A.  Yes.

13   Q.  Okay.  With respect to the enhancements to the Presstek bid

14   that is set forth in the APA document, is there any requirement

15   to your understanding in the APA document that would require

16   Presstek to continue to offer those enhancements if a sale was

17   not approved today so that it could be closed by November 5?

18   MR. D. ROSNER:  Objection, Your Honor, leading.

19   THE COURT:  Overruled.

20   A.  It is my understanding that the so-called enhancements are

21   available subject to a closing by November 5.

22   BY MR. STOCK:

23   Q.  With respect to the Debtor's financial situation, if a

24   closing were continued past November 5 to say, November 14,

25   would it have any financial impact on the Debtors?

B409

1   A.  It would.

2   Q.  And what would that be?

3   A.  It would be additional negative cash flow in a substantial

4   amount.

5   Q.  Do you have an estimate as to the substantial amount?

6   A.  Well, if you went back to the original deal without the

7   enhancements, there's one of the enhancements is certainly an

8   early closing, and the waiver of, or the inclusion of all of

9   the Debtor's prepaid inventory deposits towards the working

10  capital covenant in the APA, it has a benefit to the Estate of

11  close to a million-and-a-half, $2 million.

12  Q.  So, would the million-and-a-half to $2 million be paid out

13  by the Debtor?

14  A.  Those would be burdens on the Estate that would increase

15  that amount by increasing the D-I-P loan upon certain inventory

16  purchases to get the prepaid inventory deposits in line.  It

17  also would create a accrued payroll liability.  The total

18  amount of those two alone without any negative operating cash

19  is about, you know, something short of one-and-a-half to 2

20  million bucks, dollars.

21  Q.  Thank you.  One final question.  Let's turn to Debtor's

22  Exhibit-2, the financial performance charts and analyses for

23  September of 2004.  Let's turn back one, two, three, four,

24  five, six, seven pages to the monthly income statement for

25  Paragon Corporate Holdings, Inc.  Do you have that?

Gray - Redirect                    109

1   A.  Yes.

2   Q.  I think the 7th page in.  And you were asked some questions

3   on cross examination by Mr. Rosner about EBITDA, and he talked

4   in positive with respect to positive figures.  Do you recall

5   that questioning?

6   A.  Yes.

7   Q.  Okay.  If you look at actual results for September at the

8   Paragon Corporate Holdings, Inc. level --

9   A.  Yes.

10  Q.  -- what was the EBITDA?

11  A.  $274 thousand.

12  Q.  Paragon?

13  A.  I'm sorry, I'm looking at the wrong page.

14  Q.  All right.  I need you to flip back one. Paragon Corporate

15  Holdings.  Let's start at the front of the document.

16  A.  Am I looking at -- this Exhibit-2?

17  Q.  Two, yes.  One, two, three, four, five, six, seven pages in

18  right after the income statements pending, cover sheet.  You

19  see the Paragon Holdings?

20  A.  Oh, okay, yes.

21  Q.  Paragon Corporate Holdings, Inc, monthly income statement?

22  A.  Minus 473 thousand.

23  Q.  Thank you.

24          MR SELBST:  No further questions.

25          THE COURT:  All right.  You're excused.  Call your

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  next witness.

2          MR. F. ROSNER:  Your Honor, Fred Rosner rejoining the

3  record.  The Debtor's next witness will be Glenn Polleck, who's

4  the financial advisor to the Debtor, he's with the Candlewood

5  Partners group.  Mr. Mark Phillips, from Benesch Friedlander,

6  will be adducing his testimony.  I just wanted to make a quick

7  motion to admit that Mr. Phillips pro hac vice. He's a member

8  in good standing of the bars of the State of Ohio, United

9  States District Court for Northern Ohio, United States District

10 Court for Eastern Michigan, the 6th Circuit Court of Appeals,

11 and the Federal Circuit Court of Appeals, and I asked that he

12 be allowed to participate, be heard in this case, and we will

13 follow up with a written submission.  Thank you.

14         THE COURT:  Permission is granted.

15         MR. PHILLIPS:  Thank you, Your Honor, the Debtors

16 would call Mr. Glenn Polleck.

17         GLEN POLLECK, DEBTOR'S WITNESS, SWORN

18                DIRECT EXAMINATION

19 BY MR. PHILLIPS:

20 Q.  Mr. Polleck, for the record, would you identify yourself

21 and give your business address?

22 A.  Glenn Polleck, 10½ East Washington Street, Chagrin Falls,

23 Ohio.

24 Q.  And who are you employed by, sir?

25 A.  Candlewood Partners.

Polleck - Direct                                     111

1  Q.  And what role does Candlewood partners have in these cases?

2  A.  We are the financial advisor and investment banker for the

3  Debtors.

4  Q.  Okay.

5       MR. PHILLIPS:  Your Honor, due to the lateness of the

6  hour I would dispense with the usual background information and

7  the qualification of Mr. Polleck as an expert.  Mr. Polleck has

8  previously been designated as an expert by this court in --

9  with respect to financial advisory and investment banking

10 services in Bankruptcy, and I would refer the court to pages

11 121-124 of the transcript of the August 23 hearing before this

12 court.

13 BY MR. PHILLIPS:

14 Q.  Having said that Mr. Polleck, what has been your experience

15 in terms of section 363 sales in bankruptcy?

16 A.  I participated in more than 30 sales as both a financial

17 advisor to Debtors, Creditors, Buyers, I have been a Chapter 11

18 Trustee, I participated in (inaudible) as well.

19 Q.  Thank you.  Were you, sir, involved in the negotiation of

20 the Asset Purchase Agreement with Presstek that's been offered

21 as Exhibit-5, Debtor's Exhibit-5?

22 A.  I was.

23 Q.  Can you describe for the Court, what those -- characterize

24 those negotiations for the Court?

25 A.  I would characterize them as spirited, and both parties

1  taking very strong positions and working toward a negotiated

2  arrangement (inaudible).

3  Q.  In your judgment and experience, were these negotiations

4  one sided in any way, in terms of one party dictating to the

5  other the terms of the agreement?

6  A.  No, they were negotiated.

7  Q.  The -- and I don't want to go through Exhibit-5 with you

8  but do you recall the material economic terms of the agreement?

9  A.  Presstek, I do.

10 Q.  Okay, and could you please provide those for the Court?

11 A.  Presstek had agreed to pay $40 million in cash for the

12 assets of A.B. Dick, the assets of a small internet stock for

13 small internet (inaudible).  The agreement provided that

14 Presstek could designate certain executory contracts which the

15 Debtor would be required to assume, cure, and assign to them a

16 variety of other covanents (inaudible).

17 Q.  With respect to the specified executory contracts that you

18 just referred to, was there any estimation done of the cost of

19 curing those contracts?

20 A.  Not at the time of the negotiations.

21 Q.  Was any estimate done subsequently by Candlewood?

22 A.  Yes.

23 Q.  And what was the estimation?

24 A.  Based on the most recent information provided by Presstek,

25 either last Thursday or Wednesday, there was a range between

Polleck - Direct                                113

1   five and seven million as to the maximum amount required.

2   Q.  All right.  And we've had testimony today regarding the

3   subsequent negotiations regarding the Asset Purchase Agreement.

4   Were you involved in those?

5   A.  I was.

6   Q.  And how would you characterize those negotiations?

7   A.  Spirited as well.

8   Q.  Can you describe the negotiation process with respect to

9   those modifications?

10  A.  The Debtor met with Presstek, the Debtor's professionals

11  met with Presstek last Friday, advised them of the Debtor's

12  interest in further negotiation, relief from certain

13  provisions, enhancement by Presstek of their outstanding bid,

14  there was an agreement to provide further information and meet

15  with Presstek in Boston on Sunday to negotiate, in an attempt

16  to negotiate further provisions to the Asset Purchase

17  Agreement.  There was -- that meeting was held and there were

18  further concessions and enhancements made, the negotiations

19  continued yesterday morning to -- and in fact continued up

20  until court today.

21  Q.  And you can you generally describe the results of those

22  negotiations in terms of the modifications to the agreement

23  from a financial standpoint with respect to the Debtors?

24  A.  There were four or five primary changes.  The first change

25  relates to the working capital contained in the APA.

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

732-329-0191

B415

1  Originally, pre-paid inventory deposits were not to be included

2  in the calculation of working capital, which would have

3  resulted in the Debtors having to either complete the payment

4  in full of those goods, take title to it for those to be

5  included in working capital or to forgo the benefit of those

6  prepaid inventory deposits.  At a point earlier in the case the

7  Debtor had negotiated a (indiscern.) APA that provided for a

8  cap of $2½ million of pre-paid inventory deposits for inventory

9  to be received prior to November 30th to be included in the

10  calculation of working capital.  That would have left the

11  Debtor at this closing with an obligation of approximately a

12  million two or two-fifty to fund purchases of inventory that

13  would be on the water from Japan on their way here, which would

14  increase the D-I-P, therefore reduce the amount available for

15  Unsecured Creditors.  Presstek agreed to include all of the

16  pre-paid inventory deposits, including those -- about 2½

17  million, and including those for inventory which is to be

18  received after November 30th in the calculation of a working

19  capital.  We believe that is approximately $1.7 million.  The

20  next material modification would be in the contract

21  (indiscern.) payments.  As I testified a moment ago, the APA

22  provided that Presstek would be in a position to designate

23  certain contracts, the Debtors would be obligated to cure them,

24  assume and assign them to Presstek.  A schedule was provided

25  for review in the last couple of days which identified

1  approximately $7 million cure amounts.  Not all of those cure
2  amounts were with respect to contracts that the Debtors
3  believed were executory.  However, Presstek believed and stated
4  that it was their belief that they were executory and desired
5  them to be cured, assumed, and assigned.  As a result of
6  negotiations, Presstek agreed that the Debtors would only be
7  required to provide the cures for operating capital and real
8  property leases which the Debtors believe are under $500
9  thousand with respect to any other contracts that Presstek
10 desired to (inaudible) assume and assign Presstek would take
11 responsibility for the cure amount.  The next significant item
12 is the medical claims.  Presstek has agreed to assume in full
13 the unpaid medical claims related to employees of the Debtor as
14 of the time of the sale (inaudible) accrued payroll by changing
15 the date of the closing, agreeing to close on the payroll date.
16 The Estate was relieved not only of the burden of operating at
17 potentially what could be a loss in the future, but of all
18 approved payrolls so that in our analysis a Friday closing
19 would yield almost a zero, through payroll.  This afternoon my
20 understanding is they agreed to -- Presstek agreed to assume
21 one half of the obligation for sales commissions, subject to a
22 limit of their obligation of $250 thousand.
23 Q.  So, what is the accumulative effect from a monetary
24 standpoint of these modifications to the Asset Purchase
25 Agreement in your opinion?

Polleck - Direct                          116

1   A.  There is a range of the value of the modifications.  If one

2   were to include all of the cures that might have been -- the

3   Debtor might have been obligated to the total benefits would

4   exceed $10 million.  Without those cures, or with some portion

5   of those cures, it's probably $4 to $6 million range.

6   Q.  And what impact does that have in terms of the waterfall

7   that was discussed in prior testimony with Mr. Gray?  I believe

8   a figure of 3.5 million was used.

9   A.  Right.  With respect to a so-called waterfall, the prior

10  evaluation had used a $2.3 million contract cure payment number

11  as an estimate.  That number was based on $1.9 million of

12  contracts that the Debtor believed were executory and an

13  incremental amount to provide a cushion.  The Board was advised

14  that there was potential for millions more in that cure amount.

15  Using just the $2.3 million number, there was from many

16  proceeds, before wind down costs and before the liquidation of

17  the Canadian real estate of minus $2.3 million.  After the

18  revisions there were proceeds remaining of $3.5 million.  I

19  would point out that this is an estimate not a contractual

20  document, and the point of this document was to provide the

21  basis for the Board to make a reasonably informed decision.

22  With respect to some of the other changes on this schedule from

23  the original Presstek schedule the professional case in access

24  of budget, that number was moved, as Mr. Gray testified, from

25  900 thousand to a million five.  The primary reason for moving

B418

1  it was to -- since the bills are not in and no one knows, there

2  was a desire on the part of the professionals to provide a

3  reasonable cushion for persons evaluating this schedule to come

4  to a reasonable conclusion that there would be proceeds

5  available to pay the wind down costs and make a distribution to

6  Creditors.  With respect to the post-petition trade credit,

7  that amount was reduced and is included in the detailed

8  accounts payable schedules with the amount related to the cures

9  that the Debtor had agreed to pay.  The KERP was calculated on

10  a more finite basis based on Presstek advising what employees

11  would remain with them or they would rehire actually.  The U.S.

12  severance was revised based on the revised testament of the

13  number of employees that would be terminated, accrued payroll,

14  as I mentioned, was revised based on the closing date, the

15  sales commissions were revised both based on Presstek's

16  assumption of part of the obligation as well as a refined

17  calculation with the CFO.  Going further down in the analysis

18  in the wind down --

19  Q.  I believe we're referring to Committee Exhibit-1 that was

20  presented before.

21  A.  Okay.  Going further down in the wind-down costs, there was

22  a change made in the general wind down from $350 thousand to $1

23  million to try and capture a portion of the expenses that might

24  be incurred if there was to be an (indiscern.) plan or some

25  other disposition of the Estate.  The original estimates were



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B419

Polleck - Direct                    118

1  primarily used to reflect the wind down of corporate

2  activities.  So, all in all the difference on Exhibit-1 is

3  about 5.6 million.

4  Q.  Between what the transaction would have been if the APA had

5  not been modified and the modifications that have been

6  presented to the court today?

7  A.  Coupled with the changes in assets, correct.

8  Q.  Thank you.  Going back to the Asset Purchase Agreement

9  itself, as originally negotiated was that negotiated simply as

10  an agreement that would definitively be entered into between

11  Presstek and the Debtors?

12  A.  I'm not sure I understand.

13  Q.  Well, let me put it this way.  Was it contemplated that

14  there would be an auction with respect to the assets of the

15  Debtors?

16  A.  At the time the APA was entered into, there were

17  discussions and negotiations regarding the provision of Debtor-

18  In-Possession financing by Presstek to Key coupled with an

19  auction being held pursuant to the Chapter 11 filing, which the

20  Debtors (inaudible).

21  Q.  Okay.  So this -- I believe the terminology is a stalking

22  horse bid, have you been involved in stalking horse situations

23  before?

24  A.  Yes.

25  Q.  Can you describe what the benefit of having a stalking

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B420

1  horse bid is in an auction situation?

2  A.   Yes.  A stalking horse bid provides a bottom of the market

3  with respect to the assets in control.  In this case this

4  stalking horse bid provided Presstek would pay the Estate 40

5  million less the cure amounts, so long as certain tests were

6  met at the closing.  That established the market for these

7  assets and in fact was recognized as establishing the market

8  for these assets by parties that were contacted.

9  Q.   Speak of parties that you contacted, you're referring to

10  Candlewood?

11  A.   Yes.

12  Q.   What steps did Candlewood take to market this company?

13  A.   Candlewood contacted over 200 potencial purchasers and plan

14  sponsors.  Each of those parties was contacted through a teaser

15  (inaudible) introduction to the opportunity as well as a

16  personal phone call, follow up phone call, to a number of

17  (inaudible).  Of those 200 hundred, something over 200,

18  approximately 60 asked for and received Confidentiality

19  Agreements, of those approximately 50 executed those and were

20  provided access to the (inaudible).  In addition, Candlewood

21  provided, solicited and provided, solicited interest and

22  provided information to parties who would be interested in

23  replacing the existing D-I-P.

24  Q.   Okay.  In replacing the existing D-I-P, who did Candlewood

25  speak with regarding that possibility?

Polleck - Direct                                    120

1   A.  They talked with Congress.  This was early in the case, I

2   believe it was in July, they talked with Bank of America,

3   Congress, and a couple of other lenders, I don't have it in

4   front of me, but the lenders who are active in providing D-I-P

5   financing both domestically and (inaudible) the D-I-P that we

6   have today is primarily secured by the stock of those foreign

7   subsidiaries in Canada (inaudible).

8   Q.  What prompted you to make those inquires regarding the

9   possibility of replacing the Debtor-In-Possession financing?

10  A.  My firm was retained June 29th or 30th and was immediately

11  thrust into the negotiations for the Presstek D-I-P and the

12  Presstek APA and was unable to have the time to prepare

13  (inaudible) information and solicit an alternative D-I-P.  We

14  thought it would be prudent to undertake that evaluation in

15  case an opportunity arose to proceed (inaudible).

16  Q.  And what were the results of Candlewood's efforts in terms

17  of finding alternative D-I-P financing?

18  A.  The parties that we were in contact with were generally

19  unwilling to replace the Presstek facility without being able

20  to prime Key (inaudible) capital assets.  Some of them

21  indicated that had the business been more profitable they would

22  be willing to pick up the D-I-P as well as (inaudible) but

23  given the condition at the time, which was July, they were

24  unwilling to go forward, although some of them continued their

25  evaluation so that they would be in a position to support -- we

1  asked them to and they agreed to continue their evaluation so

2  that they would be in a position to support any bidder who

3  would be need financing (inaudible).

4  Q.  And were -- did you put any of these potential financial

5  sources in touch with potential bidders?

6  A.  Either my colleges did, I did (inaudible) to the extent

7  that (inaudible).

8  Q.  You mentioned previously some of the activities that in

9  terms of taking this company to market that Candlewood engaged

10 in.  Did you have any specific meetings or discussions with any

11 potential bidders?

12 A.  Yes.

13 Q.  Could you describe any of those meetings --

14 A.  There were a variety of meetings held between myself and

15 other people in my office as well as company management and

16 with the CRO.  In particular we held meetings with what's been

17 known as the Harbor Group, (inaudible) both in person and

18 telephonically.  In fact, we solicited (indiscern.) and Harbor

19 Partners to provide an alternative D-I-P to allow us to go

20 forward.

21 Q.  And what was the response to those requests?

22 A.  None of them were willing or able to provide the D-I-P on

23 the term that existed with Presstek unless further conditions

24 were met.

25 Q.  How did the market respond to the $40 million stalking

1   horse bid by Presstek?

2   A.  In general, the responses that we received (indiscern.)

3   were centered around the fact that parties believed the

4   contract was paying a full value, that it was a strategic bid

5   for Presstek that offered (indiscern.) that it would not offer

6   to them.  The potential interested parties were foreign

7   companies proof included that they didn't want to make future

8   investments here for whatever reason or were unable to make

9   arrangements here at this time.  Other parties had told us that

10  they had better alternatives to invest their time and capital.

11  Q.  We have heard already today, and I won't go through the

12  process of getting to this point, but quickly, we've heard

13  today of two letters of interest that were received, one from

14  Comvest Investment Partners and the other from Harbor Partners.

15  Before getting to those, were any other letters of interest, or

16  bids, or expressions of interest received?

17  A.  No.

18  Q.  With respect to the letter of interest from Comvest, I

19  believe it is Debtor's Exhibit-6, Mr. Polleck, if you care to

20  refer to it, did Candlewood do an evaluation of this expression

21  of interest?

22  A.  We did.

23  Q.  And what was the result of that evaluation?

24  A.  The result was that this was simply an expression of

25  interest.  It would have been -- it was very difficult to value

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1  it given its uncertainties, lack of description of the capitals

2  being employed by the sponsor, the lack of substance related to

3  the discussion of the notes, the lack of information with

4  respect to the sponsor's interest in taking management fees,

5  providing additional management.  There were many, many, many,

6  unknowns which would contribute to a level of uncertainty that

7  would not allow us to provide a reliable and absolute range

8  amount.

9  Q.  Upon receipt of this letter, which I believe is dated

10 October 26, 2004, did you or anyone else from Candlewood have

11 any discussions with representatives of Comvest?

12 A.  Yes.

13 Q.  And can you relate those discussions to us?

14 A.  We had ongoing discussions either directly or through

15 counsel over time, or through the companies CRO, and they

16 centered around the certainty of execution, the likelihood of a

17 transaction coming to fruition, and the other matters that I

18 testified to moments ago.

19 Q.  Were you able to obtain any greater certainty with respect

20 to this expression of interest through these discussions?

21 A.  Only with respect to the timing at which the level of

22 certainty of providing the D-I-P (inaudible).  Comvest advised

23 that if we were to hold off from the auction and these

24 proceedings by, I believe November 9th, they would tell us

25 whether or not they would be in a position to provide a D-I-P.

Polleck - Direct                                    124

1   Q.  With respect to Harbor Partners' letter of interest, which

2   I believe is Exhibit-7, did Candlewood perform any sort of

3   evaluation of this expression of interest?

4   A.  Only to the same extent as the Comvest analysis.  This

5   expression of interest was functionally the same in terms of

6   its lack of particulars, lack of certainty, and lack of

7   committed financing and therefore an inability to reach an

8   appropriate value, reliable value.

9   Q.  Did Candlewood advise the Board of Directors of Paragon and

10  A.B. Dick regarding its conclusions with respect to these two

11  expressions of interest?

12  A.  We did.

13  Q.  And, did Candlewood provide any recommendation at the end

14  of the day with respect to these expressions of interest to the

15  Board?

16  A.  We did in conjunction with a recommendation that we attempt

17  to negotiate enhancements on the Presstek agreement.

18  Q.  Was there ever any consideration given to developing a Plan

19  of Reorganization that would be internally generated by the

20  Debtors and financed by the Debtors?

21  A.  We held discussions amongst the professionals and relied on

22  the structuring plan that the company had developed in

23  conjunction with TRJ and in evaluating that concluded that it

24  had some material weaknesses.  Those weaknesses included it

25  relied on the Presstek Joint Development agreement in terms of

B426

Polleck - Direct                        125

1    the projected EBIDTA, number one.  Number two, the

2    restructuring plan would require a reasonable if not

3    significant course of new capital which the Debtor had no

4    ability to generate (inaudible).  So, the analysis was used,

5    the thoughts that came out of that, were used to try and induce

6    interested parties to provide the capital and to supportive a

7    Plan of Reorganization, which is the genesis of the two that

8    were recieved, and in particular, Candlewood made it clear to

9    those parties that the Creditors Committee and MHR had

10   expressed interest in maintaining their abilities to prosecute

11   any claims the estate might have against Presstek, so these

12   planned proposals, one at least, resulted in -- did not result

13   in a requirement that Presstek be given a release.

14   Q.  And I don't think I asked this question before.  When did

15   Candlewood begin marketing the assets of the company?

16   A.  Candlewood started working on the documents necessary to

17   achieve an auction in July.  My recollection is that the

18   teasers first went out on August 9th.

19   Q.  When you say the "teasers" what are you referring to?

20   A.  One page solicitation of interest went out on August 9th,

21   and phone calls were begun shortly thereafter.

22   Q.  So prior -- am I correct that that would be almost 2½

23   months prior to the bid date?

24   A.  Yes.

25   Q.  Sir, if you'd look at -- I believe it's MHR Exhibit-A.

B427

Polleck - Direct                                126

1   A.  Which one is that?

2   Q.  It is the single page comparison.

3   A.  Can I just asked what's the bottom number, the actual

4   bottom number?

5   Q.  No, not that document, sir.  It's the comparison of -- I

6   believe it was the comparison of the -- in fact it's two pages.

7   It's the comparison of Presstek and Comvest and Harbor Group,

8   correct?

9   A.  I have it.

10  Q.  Who prepared this document, sir?

11  A.  Myself and my colleagues.

12  Q.  The column with respect to Presstek, does that reflect the

13  modifications made to the Asset Purchase Agreement over the

14  past several days?

15  A.  It does not.

16  Q.  With respect to the Comvest and Harbor Group lines, are

17  there any assumptions made with respect to those proposals that

18  are not necessarily expressed here?

19  A.  Yes.

20  Q.  And what are those assumptions?

21  A.  That there is a 100% realization in the Comvest

22  participation and profits instrument without respect to any

23  time value of money and with respect to the Harbor Group

24  redeemable for stock that is redeemed, I believe that might be

25  the mid point, without any regards to the time value of money

B428

Polleck - Direct                    127

1  and that the preservation of the claim against Presstek did not

2  value but is signified only by a one dollar (inaudible).

3  Q.  And why is that the case?

4  A.  The time this was prepared I had no basis to make a

5  professional evaluation of that client.

6  Q.  Have you made a professional evaluation of the Presstek

7  proposal as reflected in the revised Asset Purchase Agreement?

8  A.  Yes.

9  Q.  And, have you come to any conclusions regarding that

10  proposal?

11  A.  Yes.

12  Q.  And what are those conclusions?

13  A.  That consummation of that transaction would be both in the

14  best interest of Creditors' and would exceed the liquidation of

15  the Estate's assets.

16  Q.  Has a liquidation analysis been preformed by Candlewood?

17  A.  It has.

18  Q.  And what was the result of that liquidation analysis?

19  A.  A range of values with a mid point of approximately $16

20  million, plus the value of any actions the Estate would

21  (inaudible).

22      MR. PHILLIPS:  I have no further questions at this

23  time.  Thank you, Mr. Polleck.

24      THE COURT:  I think we will adjourn until tomorrow

25  morning.  Some of the staff is paid on an hourly basis and they

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

128

1  don't get professional fees, so lets start back at 8:30.  How

2  much more do you have?

3          MR. FAYE:  Thirty minutes to an hour.

4          THE COURT:  How much?

5          MR. FAY:  Thirty minutes to an hour.

6          THE COURT:  If you said 20 I'd let it go.

7      (Laughter)

8          THE COURT:  We'll come back here at 8:30 and

9  reconvene.

10         MR. FAYE:  Thank you, Your Honor.

11         THE COURT:  Court will be adjourned.

12     (Court is adjourned)

13

14                        CERTIFICATION
   I certify that the foregoing is a correct transcript from the
15 electronic sound recording of the proceedings in the above-
   entitled matter.
16

17 _____          _____
   Signature of Transcriber                 Date
18

19

20

21

22

23

24

25



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B430