FILED
2004 DEC 13 AM 11:13
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE: : Chapter 11

A.B. Dick Company, Inc., :

Debtor(s). : Bankruptcy #04-12002 (JLP)

Wilmington, DE
November 3, 2004
9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor(s):

Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman, LLP
1201 North Orange Street-Ste. 1001
Wilmington, DE 19801

H. Jeffrey Schwartz, Esq.
Benesch Friedlander Coplan
& Aronoff, LLP
2300 BP Tower
200 Public Square
Cleveland, OH 44114

John F. Stock, Esq.
Benesch Friedlander Coplan
& Aronoff, LLP
88 E. Broad St.-Ste. 900
Columbus, OH 43215

John Gleason, Esq.
Benesch Friedlander Coplan
& Aronoff, LLP
88 E. Broad St.-Ste. 900
Columbus, OH 43215

Mark A. Phillips, Esq.
Benesch Friedlander Coplan & Aronoff, LLP
2300 BP Tower
200 Public Square
Cleveland, OH 44114

For The Official Committee of Unsecured Creditors: James P. Ricciardi, Esq.
McGuire Woods, LLP
77 West Wacker Drive-Ste. 4100
Chicago, IL 60601

James Joseph, Esq.
McGuire Woods, LLP
Dominion Tower
625 Liberty Ave.-23rd Fl.
Pittsburgh, PA 15222

Ronald W. Crouch, Esq.
McGuire Woods, LLP
Dominion Tower
625 Liberty Ave.-23rd Fl.
Pittsburgh, PA 15222

Jeffrey Schlerf, Esq.
The Bayard Firm
222 Delaware Ave.-Ste. 900
Wilmington, DE 19801

For MHR Entities: Megan N. Harper, Esq.
Landis Rath & Cobb, LLP
919 Market Street
Wilmington, DE 19899

David S. Rosner, Esq.
Kasowitz Benson Torres & Friedman, LLP
1633 Broadway
New York, NY 10019

Michael M. Fay, Esq.
Kasowitz Benson Torres & Friedman, LLP
1633 Broadway
New York, NY 10019

For Key Bank:

Margaret M. Manning, Esq.
Buchanan Ingersoll, PC
The Nemours Building
1007 North Orange Street-Ste. 1110
Wilmington, DE 19801

Robert Folland, Esq.
Thompson Hine, LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114

For Presstek, Inc.:

Stephen B. Selbst, Esq.
McDermott Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Gary O. Ravert, Esq.
McDermott Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Lawrence J. Slattery, Esq.
McDermott Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Francis A. Monaco, Jr., Esq.
Monzack & Monaco, PA
400 Commerce Center
Twelfth & Orange Streets
Wilmington, DE 19899

For Mitsubishi:

Thomas G. Whalen, Jr., Esq.
Stevens & Lee, PC
300 Delaware Ave.-Ste. 800
Wilmington, DE 19801

Robert Lapowsky, Esq.
Stevens & Lee, PC
1818 Market Street-29th Fl.
Philadelphia, PA 19103

For Data Card:

Karen McKinley, Esq.
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

4

For Esko Graphics, Inc.: Christopher D. Loizides, Esq.
Loizides & Associates
1225 King Street
Wilmington, DE 19801

Audio Operator: Brandon J. McCarthy

Transcribing Firm: Writer's Cramp, Inc.
6 Norton Rd.
Monmouth Jct., NJ 08852
732-329-0191

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B434

Index

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| Witnesses For The Debtor: | | | | | |
| Mr. Polleck | | | | | |
| (by Mr. Fay) | 6 | | | | |
| (by Mr. Selbst) | 34 | | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| MHR-C | Term Sheet | 17 | |
| MHR-B | Purchase Agreement cost document | 19 | |

Closing Statements:

| | |
|---|---|
| Mr. Ricciardi | 37 |
| Mr. Selbst | 39 |
| Mr. Joseph | 41 |
| Mr. Gleason | 45 |
| Mr. D. Rosner | 48 |
| Mr. Firestone | 66 |
| Mr. Folland | 67 |
| Mr. Loizides | 69 |
| Mr. Stock | 75 |

THE CLERK: All rise. The United States Bankruptcy Court for the District of Delaware is now in session.

THE COURT: Please be seated. Is the witness here? You can take the stand please. Now you may cross examine.

MR. FAY: Thank you, Your Honor.

GLEN POLLECK, DEBTOR'S WITNESS, PREVIOUSLY SWORN

CROSS EXAMNATION

BY MR. FAY:

Q. Good morning, Mr. Polleck. My name is Michael Fay, I'm an attorney for the MHR Entities. I have a few questions for you. Yesterday during your testimony you stated that you were retained by the Debtors on June 30th, 2004, is that correct?

A. I believe I said June 29th or June 30th.

Q. Okay. All right. Had you been in the employ under any retention with the Debtors prior to that date?

A. My firm had.

Q. Okay. Had you been involved, though?

A. Yes.

Q. Okay. And what had you done prior to that date?

A. In, I believe, 2000, my former firm was retained to provide financial advice with respect to the Debtors' proposed restructuring plan.

Q. Okay. And what was that former firm?

A. (Indiscern.).

Q. Right. And that retention was in or about September of

2003, correct?

A. No.

Q. All right. When was it?

A. I believe it was 2000, and my involvement terminated in July of (indiscern.). Candlewood was subsequently engaged.

Q. Okay. But you were not at Candlewood when it was subsequently engaged, is that correct?

A. No, I was.

Q. You were, okay. When was that engagement?

A. That was, I believe, in September (indiscern.).

Q. Okay. And what was the purpose of that engagement?

A. Presstek had made -- had provided an expression of interest to (indiscern.) and the directors and officers of Paragon had decided that they would like assistance in evaluating their (indiscern.) at that time.

Q. Okay. And for how long did that retention last?

A. My recollection is that our engagement was modified sometime in November or December of 2003. The modification resulted in our agreeing to a reduced fee (indiscern.) Presstek (indiscern.) released from an obligation (indiscern.).

Q. Okay. So from November of 2003 to June 29th or 30th of 2004 what, if anything, did you do for the Debtors?

A. I received a call in May of 2000 where the Debtors asked if we would agree to accept our fee in stocks, instead of cash (indiscern.) I received a call in June, I believe, where the

Debtors asked if we would waive our fee (indiscern.).

Q. Okay. Other than those two calls, any other involvement with the Debtors during that time frame, from November 2003, to June 29th or 30th, 2004?

A. Not that I recall.

Q. Is it your understanding that prior to the negotiation and execution of the Asset Purchase Agreement that's at issue in this bankruptcy there was a Stock Purchase Agreement among the parties?

A. You're asking if I --

Q. Do you understand that that's a fact?

A. I understand that there was (indiscern.).

Q. Okay. Has anyone told you that that Stock Purchase Agreement was escrowed on or about June 16th, 2004?

A. I've heard that there was an escrow.

Q. Okay. Have you ever read the escrow?

A. I have not.

Q. Have you ever read the Stock Purchase Agreement?

A. Only a small section.

Q. What small section did you read?

A. Relating to the adjustment (indiscern.).

Q. The Stock Purchase Agreement had a provision that allowed for adjustment in the purchase price if financial statements were provided five days, I believe it was, before closing that showed financial deterioration in the Debtors, correct?

A. I'm not certain. I didn't read the entire statement. I have no basis -- no one has ever showed me the entire agreement (indiscern.) No one has ever showed me an escrow -- executed Escrow Agreement.

Q. Okay. Why did you read that small section of the Stock Purchase Agreement?

A. Counsel asked me to.

Q. What counsel?

A. Debtors' counsel.

Q. Okay. Did you then provide any analysis of that small section that you read?

A. I did not.

Q. Did you use that in any way to value any claims the Debtors might have against Presstek under the Stock Purchase Agreement?

A. I did not.

Q. Have you done any valuation of the claims that the Debtors might have under the Stock Purchase Agreement against Presstek?

A. I have not.

Q. I believe you testified yesterday that in your past you've served as a bankruptcy Trustee, is that correct?

A. I have.

Q. Based on that experience, is it your opinion that some valuation of the Debtors' claims under the Stock Purchase Agreement should be done before those claims are released?

A. It is.

Q. And yet you haven't done that, correct?
A. I relied on counsel.
Q. But my question is, you have not done that valuation, right?
A. I'm not a lawyer.
Q. Have you done a valuation of the claims that the Debtors might have against Presstek under the Stock Purchase Agreement?
A. Can you define valuation? Do you mean the likelihood of legal success?
Q. The value of the claim. Have you put a value on that claim?
A. No.
Q. Do you know anyone that has?
A. Yes.
Q. Who?
A. Counsel.
Q. Has counsel provided you with that valuation?
A. Provided advice to the Board.
Q. What did counsel tell the Board?

MR. PHILLIPS: Objection. That is privileged information, I believe.

THE COURT: Well, what counsel?

A. Debtors' counsel.

THE COURT: Were you there?

A. I was.

MR. FAY: Your Honor, I think if the Board relied on this --

THE COURT: Overruled. You may answer.

A. Counsel advised that the likelihood that the value claim exceeding a million dollars was, I don't remember the exact words, fairly (indiscern.).

BY MR. FAY:

Q. Have you done any valuation -- other than counsel, did anyone else provide an opinion about the value of the claim to the Board?

A. No.

Q. Have you done an evaluation of the difference in the value of a Stock Purchase Agreement versus the Asset Purchase Agreement to the Estate?

A. Could you repeat the question?

Q. Have you done an evaluation of the difference in the value that the Estates would have received, or the Debtors would have received, from the Stock Purchase Agreement versus the value that they're now receiving under the Asset Purchase Agreement?

A. I have not done an evaluation.

Q. Do you know who Hal Goldstein is?

A. I do.

Q. And you've had discussions with Hal Goldstein, correct?

A. Yes.

Q. Telephone discussions recently, correct?

A. Yes.

Q. Hal Goldstein is a representative of the MHR Entities, right?

A. Yes.

Q. And you told Hal Goldstein that you thought the claim under the SPA could be worth as much as $30 million, correct?

A. Hal told me that.

Q. And what did you say in response?

A. I said that the difference in the values may have well be that.

Q. Okay. So you agreed --

A. No. I said the difference in the values of what one might consider the value of the SPA, given what others have told me, and what I believe the value of this (indiscern.).

Q. May be $30 million, correct?

A. Maybe.

Q. Okay. Did you tell counsel that the difference in the value under the Stock Purchase Agreement versus the value under the Asset Purchase Agreement may be $30 million? Did you tell counsel that?

A. I think we had discussions regarding what the differences of the values given certain assumptions.

Q. Okay. And did the number 30 million come up?

A. Probably.

Q. Okay. In making its presentation, or their presentation to

the Board, did counsel mention that the difference in the value between the Stock Purchase Agreement and the Asset Purchase Agreement may be $30 million?
A. I believe they did.
Q. Did they then tell the Board how you go from $30 million to $1 million?
A. They provided a legal -- not a written opinion but a legal consultation, however you describe it.
Q. Okay. What did they say? How do we go from a claim that may be worth $30 million to one where real time as counsel it's unlikely to even be worth a million?
A. My recollection is there was a discussion of the claims in relation to whether or not there were obligations (indiscern.) closing.
Q. Okay. Did counsel provide the Board with any legal memoranda?
A. Not to my recollection.
Q. Did they cite any cases?
A. I don't recall.
Q. You don't recall if they did. Did they make reference to the fact that any claims under the escrow or the Stock Purchase Agreement would be governed by New York law?
A. I don't recall.
Q. Did they hand out copies of any New York cases?
A. I don't believe so.

Q. Okay. Did they cite any legal principles or anything that you recognize as a legal principle?

A. I believe they did.

Q. What did they say?

A. I don't have a verbatim recollection of what they said.

Q. Okay. If you can remember. Can you remember?

A. Yes. I believe they discussed the nature of the contract, contract obligations, and whether or not -- and this is just my recollection --

Q. Sure.

A. -- whether or not the execution of an Escrow Agreement constituted an obligation to close (indiscern.).

Q. Did they discussion the concept of a condition precedent?

A. With respect to (indiscern.)?

Q. Right. To -- with respect to the escrow, did --

A. There was a discussion of the -- of Key Bank (indiscern.).

Q. Okay. Did they discuss the concept of materiality?

A. I believe there was some discussion about that.

Q. Did they cite any case law or hand out any memoranda on materiality, to your knowledge?

A. I testified a moment ago, no.

Q. Okay. And did they discuss the concept of condition precedent in the waiver of condition precedents?

A. I don't recall the exact discussion (indiscern.).

Q. Okay. But $30 million did come up, correct?

A. I believe so.
Q. Okay.
A. That the claim was significantly larger (indiscern.).
Q. Okay. And what was -- do you remember the law firm, what lawyers made this presentation?
A. Mr. Phillips.
Q. Mr. Phillips did. Did Mr. Phillips provide the Board with any of the deposition transcripts of the depositions that he took prior to this board meeting in this matter?
A. I don't know.
Q. Well, I'm just asking you. Did he do it at this meeting?
A. No.
Q. Okay. Did he cite any of the testimony that was obtained through those depositions to the Board?
A. I believe he did.
Q. Do you remember who he cited?
A. I don't.
Q. Did he cite any of the testimony from Mr. Lugly of Key Bank?
A. I don't recall (indiscern.).
Q. Did he tell the Board that on June 22nd, 2004, Key Bank had sent a letter to Presstek consenting to further funding for the Debtors?
A. There were a lot of conversations, and I'm trying to remember (indiscern.). I clearly did hear it, but I can't

recall if it was at the board meeting, but I did (indiscern.).

Q. Okay. Was a copy of that letter handed out to the Board members?

A. I don't believe so.

Q. Based on your testimony, Mr. Polleck, it would be fair to say that you were not involved in the negotiations of the Stock Purchase Agreement, correct?

A. Correct.

Q. And any negotiations of the Asset Purchase Agreement that occurred before June 29th or June 30th of 2004, you weren't involved in those negotiations either, correct?

A. Correct.

Q. After June 29th or 30th of 2004, were there ever negotiations about the purchase price under the Asset Purchase Agreement?

A. There were negotiations over the conditions (indiscern.) impact on the purchase price. There were not negotiations (indiscern.).

Q. Okay. So at least during your involvement the Debtors never went to Presstek and said, "40 million is not enough, we want 41, or 42, or 43," correct?

A. We would continually say we want 40.

Q. And Presstek never backed down, right?

A. Presstek did not back down.

Q. Okay. Do you know when --

A. No. On some of the conditions we would have impacted the price they did back down.

Q. But they never backed down on the purchase price of 40 million, right?

A. No.

Q. Okay. Do you know when Presstek first communicated that price of 40 million to the Debtors?

A. I've seen correspondence that indicates it was maybe a week before I became involved.

Q. Right. On the 23rd of June, 2004, Presstek had drafted a term sheet that showed the $40 million purchase price, correct?

A. Do you have it?

Q. Yes, I do. Let's look at it.

A. I don't.

MR. PHILLIPS: Your Honor, may I approach the witness?

THE COURT: Yes.

MR. FAY: Mark this as Exhibit-C, MHR Exhibit-C.

(MHR's Exhibit-C marked for identification)

BY MR. FAY:

Q. And Mr. Polleck, I would refer you to the second page of this exhibit, which reads, "June 23rd, 2004, Term Sheet," right?

A. Yes.

Q. And in this term sheet in paragraph 2, acquisition, there's

a purchase price of $40 million cash, correct?

A. Yes.

Q. And the final APA, which was executed on or about July 13, 2004, had a final purchase price of $40 million cash, correct?

A. Yes.

Q. Okay. Have you ever seen this term sheet before?

A. Yes, although when I became involved there was already a draft of the APA that we worked off of.

Q. Okay. Has anyone informed you upon what date Presstek terminated the Escrow Agreement that you had heard about?

A. I have an understanding that it was in the middle of June, but I don't (indiscern.).

Q. Has anyone ever told you that it was on June 22nd, 2004, the day before that term sheet?

A. I believe I heard that in a deposition.

Q. Okay. Do you have any reason to disagree with that fact?

A. I have no reason to agree or disagree.

Q. Okay. During the course of your retention by the Debtors, have you ever participated in a discussion where representatives of the Debtor have referred to the fact that one day after Presstek terminated the escrow or the Stock Purchase Agreement, Presstek had drafted a term sheet for a $40 million Asset Purchase Agreement?

A. I heard that in a deposition.

Q. Other than the deposition, any other discussions?

A. A discussion of the deposition.

Q. Okay. But other than that?

A. I don't recall.

Q. Have you attended board meetings of the Debtors since your retention on June 29th or 30th, 2004?

A. Yes, I have.

Q. At any board meeting was that issue discussed, the fact that Presstek had drafted a term sheet for a $40 million Asset Purchase Agreement the day after it terminated the Stock Purchase Agreement?

A. I didn't attend the board meetings when these documents were presented so I don't know if that discussion was held. From the time I began (indiscern.) already been discussed (indiscern.).

Q. Okay. And you can't -- you would not be able to testify today as to any of the conduct of Presstek in June, or May, or April 2004, prior to your retention of June 29th or 30th, correct?

A. Not from (indiscern.).

Q. Let me show you another document, Mr. Polleck, and ask you if you've seen this.

MR. FAY: We've marked this as Exhibit-D.

(MHR's Exhibit-D marked for identification)

BY MR. FAY:

Q. It is your understanding, Mr. Polleck, that prior to the

hearing on today and yesterday there has been discovery in this contested matter?

A. Yes.

Q. And you've actually attended some of the depositions, correct?

A. Until I was asked to leave.

Q. Okay. And it's further your understanding the documents have been produced as part of that discovery process, correct?

A. Correct.

Q. Okay. And Presstek has produced documents, right?

A. I believe so, yes.

Q. Have you reviewed any of the documents that Presstek has produced?

A. Only at the depositions.

Q. Okay. The document I just handed you I'll represent to you is a document produced to us by Presstek during the discovery process. Have you ever reviewed this?

A. At the deposition.

Q. Okay. Did counsel ask you to review it or you just happened to look through it while you were there?

A. I received a copy (indiscern.).

Q. Okay. Was this at the deposition of Mr. Muso?

A. It was.

Q. Okay. If you recall from that deposition, we then had a discussion with Mr. Muso about the valuation of the Stock