Purchase Agreement versus the Asset Purchase Agreement, correct?

A. I believe so.

Q. Okay. And we discussed the fact that on this first page of Exhibit-D Presstek was calculating the cost of the Stock Purchase Agreement versus the cost of the Asset Purchase Agreement, correct?

A. Consideration, yes.

Q. Okay. And the Stock Purchase Agreement, the cost was 89.1 million, correct?

A. What this paper says.

Q. All right. And the Asset Purchase Agreement was 48 million, correct?

A. That is what this paper says.

Q. For over $41 million in savings, right?

A. Correct.

Q. Okay. During your retention --

A. I would note that there is a category, two categories in here, one called environmental, and one called (indiscern.) one called working capital (indiscern.). With respect to the Stock Purchase Agreement, those categories total approximately 38.5 million. Those, in my understanding, are estimates. I have no idea where they came from (indiscern.) Presstek will spend after its acquisition. If one looks under the section 363 deal there's a $5 million amount under restructuring, which again,

is an amount that they would expect to spend once the (indiscern.) company. Looking further above that, it says in the previous deal, in the section 363 deal, the purchase price -- the purchase price on the previous deal at 47.6 million, purchase price under the 363 deal is 40 million. There are, of course, differences because the 47 million includes the assumption of working capital obligations, and the 363 deal does not include the assumption of working capital obligations. However, the next three numbers as I described appear to me to be post-acquisition costs borne by Presstek not directly related to considerations of the Debtor.

Q. Right, but there is at least -- there's a component of consideration to the Debtors here, correct?

A. Well, to the extent that those liabilities are real, the restructuring is probably not a component to the Debtor. The working capital replenishment is not a component to the Debtor.

Q. Under the Asset Purchase Agreement I believe we heard yesterday that Unsecured Creditors will receive approximately $4 million, correct?

A. Correct.

Q. If Presstek had bought the stock of the Debtor, of A.B. Dick, the Creditors -- Presstek would be obligated to the Creditors for 100% of their debt, correct?

A. I agree. That's not reflected in that.

Q. Okay.

A. That's not what I see on this schedule.
Q. But that's a truism, right?
A. I believe that is correct, I haven't read the Stock Purchase Agreement, but you would assume that the acquisition of the stock would result in their becoming obligated for the working capital obligation, and the debt as well.
Q. And that's how you got the maybe $30 million figure that you and Mr. Goldstein discussed, correct?
A. That's how I would view it, but that is not what's on the paper.
Q. That's fine. These are the costs that Presstek viewed, correct?
A. I can't -- this is what Presstek appears to be Presstek's evaluation of the its (indiscern.) internal costs after owning it for some period of time.
Q. Right. And they're saying in this document that the cost, their estimates of cost, is $41 million, Correct?
A. Their estimates of these two columns are $41 million (indiscern.).
Q. Okay.
A. I don't believe -- it is not, in my opinion, an estimate of cost. This is what it takes for them to buy the company, restructure it into what they want it to be. This is not (indiscern.) cost (indiscern.). This includes converting it to the Presstek model, whatever that might be.

Q. Okay. But it stills shows a $41 million savings to Presstek under their estimate, correct?

A. Yes.

Q. Okay. Was that ever discussed during your retention by the Debtors? Did anyone pull out this document, sit around and say, "You know, in one day's time Presstek, by its own calculations, saved $41 million."

A. Yes.

Q. When did that happen?

A. At the deposition (indiscern.).

Q. Other than at the deposition, did those discussions occur during your retention by the Debtor?

A. There was from time to time general discuss that they saved a significant amount of money on a regular basis, but it was never -- this document was not produced and it was not (indiscern.).

Q. Okay. How much unsecured debt is there, Mr. Polleck? An estimate.

A. Could you -- well, there's $5 million, I believe (indiscern.), approximately $5 million from the old notes, there's the $25 or $28 million (indiscern.) notes. I believe there's between (indiscern.).

Q. And for all of that under the APA we have an estimate of about $4 million, correct?

A. It's actually a little greater than that based on whatever

(indiscern.).

Q. Okay. But it's in that range, right?

A. Four to eight.

Q. That's not what was testified to yesterday, correct?

A. Well, I said it's based on what cures, if any, Presstek would pay on its own for those contracts (indiscern.).

Q. Okay. But the document we looked at yesterday basically said 3½ and then I think the testimony was we're gonna add about another 400 to that, correct?

A. That was what would be as a result of proceeds into the Estate. I think -- wasn't their question different than that? What was your question?

Q. What are the proceeds coming into the Estate for the benefit of Unsecureds?

A. I think it was total proceeds, but into the Estate is about $4 million.

Q. Okay. And the unsecured debt that you just referred to, it's your understanding that if the Stock Purchase Agreement had closed Presstek would have taken responsibility for those debts, correct?

A. Yes.

Q. Yesterday you also testified that you conducted a liquidation analysis of the Debtors, is that right?

A. Yes.

Q. And I believe you said that the midpoint of your

calculation was 16 million?

A. Yes.

Q. In conducting that liquidation analysis did you add any value for the claims that the Debtors might have against Presstek under the Stock Purchase Agreement?

A. The liquidation of the assets the claim was valued at approximately the number I described.

Q. One million dollars.

A. Actually half.

Q. $500 thousand?

A. Yes.

Q. And that was based on the advice of counsel?

A. That was based on the only evaluation that we had available.

Q. Okay. And that was an evaluation by Mr. Phillips, is that correct?

A. Correct.

Q. Did anyone at the Debtors suggest that maybe a second opinion should be obtained?

A. Actually, we considered what it might have to be, what the value might have to be, given the liquidation of the assets (indiscern.).

Q. But my question was, during your discussions with representatives of the Debtors was it ever suggested that a second opinion about the value of this claim should be

obtained?

A. No, because we approached the issue by saying if we liquidate the assets (indiscern.) how much do the claims have to be worth to get to the equivalent dollar amount (indiscern.).

Q. And what was that?

A. It was (indiscern.).

Q. What was the high point of your range?

A. Twenty-one, I think.

Q. Twenty-one. So if you had a $21 million high point, and you had a $30 million claim, that'd be 51 million, right?

A. If you hit the high point, yes.

Q. Okay. In your discussions --

A. That would have to be the claim (indiscern.).

Q. Correct.

A. That would have after all legal costs, contingencies (indiscern.). You also have to consider the time value of money.

Q. Excuse me, I'm sorry, Mr. Polleck, what were you saying?

A. Go ahead.

Q. You were adding the thought that you would also have to factor in the time value of money on any recovery.

A. The costs of achieving (indiscern.) the time value of money related to when that recovery (indiscern.) of the Estate (indiscern.).

Q. Okay. If the Presstek deal is not approved today, wouldn't you try to sell the Debtors as a going concern?

A. If the Presstek deal is not approved today I think that our plan would be to find a way to replace the D-I-P, if possible (indiscern.) if not possible (indiscern.) there's nothing possible yet (indiscern.) find a way to close (indiscern.).

Q. Okay. And would you in an effort to close a transaction before the D-I-P expires would you approach Comvest or New England Partners?

A. Of course.

Q. What have you done since July -- I'm sorry. What have you done since June 29th or 30th, 2004, to replace the D-I-P on a stand alone basis?

A. I don't recall every institution I've talked to, but I've talked to CIT, Chase, (indiscern.) and (indiscern.).

Q. When did you do this?

A. I started in July. I began (indiscern.) for the lenders and private sources (indiscern.).

Q. Okay. Have you done anything in September or October?

A. Actually, we have continued to provide information to many of those lenders. As I testified yesterday, they were interested in pursuing their ability to finance whoever might show up (indiscern.) have been able to independently provide liquidity to (indiscern.) or been willing to (indiscern.).

Q. Okay. In the months of September and October did you

contact any other potential financiers of the Debtors' D-I-P on a stand alone basis?

A. There were some. The Committee provided some (indiscern.) provided information as well (indiscern.) as recently as yesterday.

Q. Did you contact anyone, though?

A. My firm did.

Q. Okay. Who at your firm would have done that?

A. Lynn.

Q. Okay. What's her full name?

A. Lynn Carpenter.

Q. Okay. But she did, you -- she might have contacted some additional lenders, but you didn't, correct?

A. I continued discussing it with the lenders (indiscern.).

Q. Okay. During your testimony yesterday you mentioned the restructuring plan that had been developed for the Debtors, correct?

A. I believe so.

Q. And you -- I believe you testified that one of the reasons you viewed it as unreasonable is that it was dependant on the Joint Development Agreement with Presstek?

A. I'm not sure I said unreasonable.

Q. Was the restructuring plan -- was that plan dependant on a continuation of that Joint Development Agreement?

A. It was.

Q. Okay. Isn't it the case though that the A.B. Dick technology that goes into those products, the Freedom and the Vector product, could be used for somebody else's technology?
A. My understanding is there's a 6 to 18 month development period, and the product that would result -- I'm not an engineer -- the product that would result (indiscern.) effective and efficient as the product (indiscern.) coming out (indiscern.).
Q. But it could be done. You could go and find a different vendor, correct?
A. You would get an alternative product. You would not get the same product.
Q. Okay. During your retention by the Debtors, are you aware of any effort to contact other vendors who might be able to supply the technology needed for the Vector and Freedom products?
A. I'm not certain what the CRO did in regard to (indiscern.). I know that they evaluated it because they discussed it with me.
Q. Okay. You also referred in your testimony to discussions you had with various parties that expressed an interest in acquiring the assets of A.B. Dick, right?
A. Correct.
Q. Okay.
A. Well, they were not all acquiring the assets.

Q. But they expressed some interest in the fact that an auction was being held, correct?

A. Correct.

Q. Okay. Did you tell any of those entities that there was a claim that might be worth as much as $30 million against Presstek?

A. I told everyone of the parties who was interested in being a proponent of a plan -- part of a plan (indiscern.) that there was an interest in the part (indiscern.) bidding in retaining whatever claim may be there and that those parties (indiscern.) valuable would have a plan for that claim (indiscern.). It was left with the (indiscern.).

Q. Did you give any of those parties who expressed an interest a value of the claim, or tell them the claim might be worth as much as $30 million?

A. I told them -- I gave no expression of value with regard to my opinion. I said there were others (indiscern.).

Q. Did you use the number it might be worth as much as $30 million?

A. I probably said they believe it might be worth as much as $30 million.

Q. Okay. Did you provide any of these interested parties with any opinions of the Debtors about the value of these claims?

A. I think -- my recollection is that I told all of the parties that it was my view that the ability to leave that

claim for the Creditors would be a tie breaker. That was the kind of discussion (indiscern.).

Q. Okay.

A. Since we didn't provide value, we never scheduled it as a value in our analysis, except for the $1 value, it was always the concept of, this is what the Creditors believe.

Q. Okay. So it was never the concept of this is what the Debtors believe, correct?

A. (Indiscern.).

Q. How is your firm being compensated in this matter, Mr. Polleck?

A. We have a monthly retainer and success fee.

Q. And what is the success fee?

A. My recollection is that it is 500 -- up to $42 million for a Presstek sale is $500 thousand (indiscern.) plus a formula that escalates the value (indiscern.) if there's a restructuring we receive $500 thousand plus the (indiscern.).

Q. If --

A. And if there's a third party -- I'm sorry.

Q. Go ahead.

A. If there's a third party we receive the same retainer, 50% (indiscern.) and I think it's 1½% of the purchase price of the (indiscern.).

Q. Okay. If this Presstek deal is approved today will your firm receive a success fee?

A. Yes.

Q. Okay.

A. Well, if the Judge allows it.

Q. Okay. If the Judge allows your success fee you'll receive a fee, correct?

A. Correct.

Q. Okay. To your knowledge, has any firm that is not receiving a success fee for the Presstek deal conducted a liquidation analysis of the Debtors?

A. Yes.

Q. And who's that?

A. Schuler Andrews.

Q. That's the financial advisor to Key Bank, correct?

A. Correct.

Q. Any financial advisor to the Debtors that has conducted a liquidation analysis that's not receiving a success fee?

A. Not to my knowledge.

Q. Have you provided the Board of Paragon or A.B. Dick with a fairness opinion about the Asset Purchase Agreement?

A. No.

Q. Do you intend to?

A. No.

Q. Have you been asked to?

A. No.

MR. FAY: That's all I have, Your Honor.

THE COURT: Thank you. Anyone else have any questions of this witness?

MR. SELBST: Your Honor, I do.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. SELBST:

Q. Good morning, Mr. Polleck. Mr. Polleck, on your cross examination by Mr. Fay you were asked a series of questions about the Stock Purchase Agreement. Do you recall those?

A. Yes.

Q. And he asked you on a number of occasions if Presstek had completed the acquisition under the Stock Purchase Agreement whether Presstek would have been responsible for the claims. Do you remember those questions?

A. Yes.

Q. But isn't it correct that if there'd been a stock purchase that it would have been A.B. Dick that would have been responsible for those claims?

A. Yes.

Q. Okay. Thank you. Now, you also testified in your direct yesterday a little bit about the alternative bids. Do you recall that testimony, or the alternative expressions of interest?

A. Yes.

Q. And I believe you also testified that in the negotiations

other the past weekend Presstek increased the value of its bid by approximately $1.6 million by taking on the tail medical expenses, do you recall that?
A. Yes.
Q. And you also testified that Presstek had agreed to assume the sales commissions, correct?
A. Half of the sales commissions (indiscern.).
Q. If I represent to you that Presstek's agreement, in fact, is to accept all of those commissions up to $425 thousand do you have any reason to disagree with that?
A. No. (Indiscern.).
Q. So, if there's going to be an alternative bid it would have to be not just bigger than the $40 million cash purchase price, it would have to be bigger than the $40 million cash purchase price increased by the tail medical, increased by the commissions, and increased by the break-up fee, isn't that correct?
A. Yes.
Q. For it to provide more value to the Estate?
A. Coupled with limitation on the cure, coupled with the changes to the working capital (indiscern.).
Q. And I believe you testified yesterday that the alternative expressions of interest both contemplated a Plan of Reorganization, isn't that correct?
A. Yes.

