1  other the past weekend Presstek increased the value of its bid

2  by approximately $1.6 million by taking on the tail medical

3  expenses, do you recall that?

4  A.  Yes.

5  Q.  And you also testified that Presstek had agreed to assume

6  the sales commissions, correct?

7  A.  Half of the sales commissions (indiscern.).

8  Q.  If I represent to you that Presstek's agreement, in fact,

9  is to accept all of those commissions up to $425 thousand do

10  you have any reason to disagree with that?

11  A.  No.  (Indiscern.).

12  Q.  So, if there's going to be an alternative bid it would have

13  to be not just bigger than the $40 million cash purchase price,

14  it would have to be bigger than the $40 million cash purchase

15  price increased by the tail medical, increased by the

16  commissions, and increased by the break-up fee, isn't that

17  correct?

18  A.  Yes.

19  Q.  For it to provide more value to the Estate?

20  A.  Coupled with limitation on the cure, coupled with the

21  changes to the working capital (indiscern.).

22  Q.  And I believe you testified yesterday that the alternative

23  expressions of interest both contemplated a Plan of

24  Reorganization, isn't that correct?

25  A.  Yes.



B465

1  Q.  And a plan would take two, three, maybe more months to

2  confirm, isn't that correct?

3  A.  At least three, I believe.

4  Q.  Okay.  And I believe there's been testimony from Mr. Gray

5  that during those three months the Debtors would lose $4 to $5

6  million, isn't that correct?

7  A.  Yes.

8  Q.  And that would have to be funded, correct?

9  A.  Yes.

10  Q.  And there'd be interest cost on the D-I-P, assuming you

11  could find a D-I-P?

12  A.  Correct.

13  Q.  So really even if you took the $50ish million of these

14  other bids and accepted them at face they're really not even

15  providing equivalent value to what's on the table today, are

16  they?

17  A.  Under that (indiscern.).

18  Q.  Okay, that's all.

19         MR. SELBST:   No further questions, Your Honor.

20         THE COURT:  Thank you.  Any redirect?

21         MR. RICCIARDI:  No, Your Honor.

22         THE COURT:  You're excused.  Any other witnesses on

23  behalf of the Debtor?

24         MR. RICCIARDI:  No more witnesses, Your Honor.

25         THE COURT:  Well, the objecting party for the -- about

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B466

1  the Committee (indiscern.).  No, the Committee.

2       MR. RICCIARDI:  Your Honor, we don't have any

3  witnesses.  I don't know if you want to hear some argument or

4  some statement now.

5       THE COURT:  As soon as I close the record.

6       MR. RICCIARDI:  Very well, thanks.

7       THE COURT:  MHR, your client have any witnesses?

8       MR. D. ROSNER:  No, sir.

9       THE COURT:  Any further evidence?

10      MR. D. ROSNER:  Not other than has been submitted.

11      THE COURT:  All right.  I'll deem the record closed.

12  You can make a closing statement if you wish.  Anyone for the

13  Debtor?

14      MR. STOCK:  Your Honor, I already had an opening

15  statement.  I --

16      THE COURT:  All right.

17      MR. STOCK:  -- would like to reserve a rebuttal

18  until --

19      THE COURT:  That would be fine.

20      MR. STOCK:  -- the other, the opponents.

21      THE COURT:  Committee?

22      MR. RICCIARDI:  Your Honor, James Ricciardi of McGuire

23  Woods on behalf of the Committee.  We came here to this hearing

24  yesterday prepared to support the sale and prepared to withdraw

25  our objection; however, there is a difficulty, perhaps it's a

38

1  misunderstanding, between Presstek and the Committee about

2  certain bid enhancements that were made at the auction.  And we

3  have been advised by Presstek's counsel this morning that they

4  will designate no contracts to be assumed, and I believe that

5  that is inconsistent with the description of the bid

6  enhancement that they made at the auction.  May I hand you a

7  transcript from the auction, Your Honor?

8        THE COURT:  Yes.  What page?

9        MR. RICCIARDI:  Page 9 to start, please, Your Honor.

10  Mr. Pollock, who you just heard testify, towards the bottom

11  third of the page in clarifying the bid enhancement of Presstek

12  with regard to executory contract says, "The only clarifying

13  comment is that the executory contracts are still to be assumed

14  and assigned with Presstek being responsible for the cures

15  other than the $500,000 Mr. Scaffidi mentioned."  Mr. Scaffidi,

16  who is a representative of Presstek at the auction, went on to

17  say, "There may be some contracts that are not signed but that

18  won't affect the liability of the Estate."  That is, in the

19  Committee's view, entirely inconsistent with the position

20  they're taking today that there will be no contracts.  In fact,

21  we thought that Mr. Scaffidi was saying that most of the

22  contracts would be assumed and we need a clarification from

23  Presstek before we can make a decision as to how we're going to

24  ask Your Honor to rule.  Also, Your Honor, with regard to

25  another item involving cures, on page 8, the first full

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

Closing Statement - Mr. Selbst                    39

1   paragraph on the page, the second item is to remove from the

2   estate the responsibility of curing all contracts with the

3   exception of certain leases that have been provided by the

4   company with a total liability not to exceed $500,000.  That is

5   to say that only $500,000 will remain with the Estate in those

6   obligations.

7          THE COURT:  Well, why don't you just propose that an

8   Order approving the sale and we'll include that in the Order

9   and if they don't like it and don't abide by it, it's all over

10  with.

11         MR. RICCIARDI:  Well, include -- we can certainly

12  include the cap of $500,000.  But that doesn't resolve the

13  issue, Your Honor.  Obviously, there are two ways of

14  distributing funds to Unsecured Creditors.  One is in terms of

15  a distribution from the Estate.  The other is in terms of cure

16  payments.  And we believe that they were committing to make

17  substantial cure payments as part of their bid enhancement.

18  And we can't understand how they can take the position that

19  they are not assuming any contracts right now.  So I would

20  welcome clarification from Presstek.

21         THE COURT:  All right.  Is the Purchaser here?

22         MR. SELBST:  Your Honor, there's -- we believe there

23  has been a misunderstanding between the Committee and Presstek.

24  We have provided the Debtors a list of the contracts to be

25  assumed.  We do not believe, and Mr. Scaffidi was present at

B469

1  the auction, that we made a blanket assumption of all cure

2  costs.  We told the Committee and it also appears in the

3  transcript, that we would designate by the close of business,

4  the list of the contracts that we would assume and we have

5  designated that.  That's not going to get the Committee as much

6  in cure costs as they hoped, but we did exactly what we said we

7  were going to do at the auction which was by five o'clock

8  yesterday we provided a list to the Debtors of the contracts to

9  be assumed.  But if you read the entire transcript it says

10 there may be some contracts that won't be assumed.  The --

11 Presstek was in the process of evaluating those contracts and

12 without question, Your Honor, the cost of cure were a material

13 consideration in deciding which to assume and which not to be

14 assumed.  But if you read the transcript in its entirety, it

15 says by five o'clock tomorrow, which means yesterday, we would

16 provide the Debtors with a list and that's what we did.

17        THE COURT:  What is the amount of money that -- what

18 is the amount involved in those contracts that you are not

19 assumed and are they executory?

20        MR. SELBST:  That we are not assuming?

21        THE COURT:  Yes.

22        MR. SELBST:  If you could give me one moment, Your

23 Honor.  Your Honor, the Debtors actually have a different view

24 than we do on this.  I can give you my own client's view but

25 Mr. Gleason advises me that the Debtors have a different view

Closing Statement - Mr. Joseph            41

1   as to what these cure costs are.  If you could give me a

2   moment, I can confer with my client.  You may want to hear from

3   Mr. Gleason while I have a moment.

4           THE COURT:  Are these contracts all executory?

5           MR. SELBST:  That is one of the subjects of

6   discussion.  The Debtor's view is that some of the contracts

7   which are at issue here are not executory and are not capable

8   of being assumed or assigned under any circumstances and

9   actually as to those contracts which the Debtors believe are

10  non executory, we're not proposing to assume any of those at

11  this point.

12          THE COURT:  Okay, how much -- what contracts are you

13  assuming?  Have you got the list there?

14          MR. SELBST:  Yeah, I have a list here.  It's --

15          THE COURT:  Has the Committee been provided that list?

16          MR. SELBST:  Yes, Your Honor.

17          MR. JOSEPH:  James Joseph of McGuire Woods, Your

18  Honor, yes, we have.

19          THE COURT:  And that list you don't agree with, is

20  that --

21          MR. JOSEPH:  The list that we've been given lists --

22  it includes only --

23          THE COURT:  Come on.  You've got come forward to get

24  on the record.

25          MR. JOSEPH:  Again, James Joseph of McGuire Woods for

B471

42

1   the Committee.  The list that we've been given, and that I've
2   discussed with Mr. Gleason and counsel for Presstek includes
3   only leases, real and personal property leases.  It is, for the
4   most part, the real and personal property lists -- excuse me,
5   leases listed on Exhibits, I believe it was, -B, -C, and -D of
6   the schedules that were filed with the Court.  At issue and the
7   way the Committee sees it, the real issue at the auction was
8   sort of two buckets:  executory contracts and leases.  And the
9   leases are on this schedule, are we believe based on the
10  statements at the auction, subject to a cure cap in terms of
11  the Estate's liability of $500,000.  What our concern is and
12  value that we perceive to be coming are a second bucket of non-
13  leases.  The contracts -- vendor contracts that were primarily
14  listed on Exhibit-A as well as other significant contracts on
15  Exhibit-A.  With respect to those cure costs, that was at the
16  auction, something the Committee believed to be, as Mr.
17  Ricciardi stated, another mechanism of providing substantial
18  value to certain members of the Unsecured Creditor
19  constituency.  And we viewed the comments of Mr. Scaffidi to
20  be, with respect that some contracts may not be assumed,
21  carrying with that and that being his clarification, that there
22  certainly would be some contracts, speaking again of the bucket
23  of contracts and not leases, that would be assumed.  And as we
24  stand here today, we have Presstek stating that other than
25  those leases that are listed, they will be taking no executory

B472

43

1    contracts.

2        (MHR's Exhibit-A previously marked for identification)

3        (MHR's Exhibit-B previously marked for identification)

4        (MHR's Exhibit-C previously marked for identification)

5        (MHR's Exhibit-D previously marked for identification)

6        MR. SELBST:  Your Honor, I -- the papers that I've

7    been handed by Debtor's counsel as the ones identified by my

8    client simply are inconsistent with that.  Yes, it involves the

9    real property leases, yes, it involves capital leases, yes, it

10   involves operating leases, but also includes all reseller

11   agreements, all domestic distributor agreements, all

12   international distributor agreements, all customer service

13   agreements, and some other confidentiality agreements.  But it

14   is clear that it is not simply the leases, Your Honor.

15       THE COURT:  Well, do you agree that only $500,000 of

16   the non-lease agreements would be left with the Estate

17   obligation?

18       MR. SELBST:  That's correct.  Because to the extent

19   that we are not -- well, I want to be very -- I want to be --

20       THE COURT:  And your company, then, as the Buyer will

21   assume everything over $500,000?

22       MR. SELBST:  No, no.  I --

23       THE COURT:  What did Mr. -- what did your

24   representative say then -- mean then, when he said that is to

25   say that only $500,000 will remain with the Estate and those

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B473

44

1  obligations?

2         MR. SELBST:  To the extent --

3         THE COURT:  What did he mean by that?

4         MR. SELBST:  He's here and you could ask him, Your

5  Honor, but I think what he meant -- what I think he meant was

6  to the extent that we assume the contracts, those liabilities

7  will be assumed, but if you read the entire transcript what it

8  says is there are some agreements that are not going to be

9  assumed.  At the time that he made that he was still in the

10 process of evaluating the agreements that would be assumed and

11 would not be assumed.

12        THE COURT:  Second item is to remove from the Estate

13 the responsibility of curing all contracts with the exception

14 of certain leases that have been provided by the company with a

15 total liability not to exceed 500,000.  That is to say that

16 only $500,000 will remain with the estate and those

17 obligations.  That's all the contract.

18        MR. SELBST:  As I said and, Your Honor, I'm happy to

19 call Mr. Scaffidi if you would like to reopen the record.  I

20 think what he intended to say was --

21        THE COURT:  Well, if there's not going to be any

22 agreement on this, there's not going to be any confirmation.

23        MR. SELBST:  I understand your position, Your Honor.

24        THE COURT:  So, you better give this --

25        MR. SELBST:  Understood, Your Honor.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B474

1         THE COURT:  I'm not going to write the agreement.

2         MR. SELBST:  Understood, Your Honor.

3         THE COURT:  The Debtor have anything else to say on

4  this issue?

5         MR. GLEASON:  Thank you, Your Honor.  John Gleason,

6  Benesch, Friedlander, Coplan and Aronoff on behalf of the

7  Debtors.  Let me give the Court some background on how we got

8  here.  Pursuant to paragraph 2(j) of the Bid Procedures Order,

9  the Debtors filed a schedule of leases and executory contracts

10 that they reserved the right to assume and assign along with

11 the calculation of the required cure amounts.  The Debtors

12 filed that schedule on October 1st.  Because of a computer

13 glitch of the PDF'ing, we supplemented that on October 6th and

14 the Trumble Group served out both of those schedules on that

15 date.  We received several objections to those cure amounts and

16 I can go through those later if necessary.  I believe we have

17 resolved all of those for the purposes of the sale hearing.  I

18 think it's important to note that the terms of the original

19 asset Purchase Agreement required the Debtors to pay all cure

20 amounts as a deduct of the purchase price.  The agreement set

21 forth on the schedules filed by the Debtors contemplated

22 approximately $2.24 million of cures.  It included -- I think

23 as there's been some discussion, certain vendor agreements,

24 real property leases, capital leases, operating leases, the

25 joint venture agreement with Presstek which the Debtors did

1    reserve the right to assume and assign, reseller agreements,

2    domestic distributor agreements, international distributor

3    agreements, customer service agreements, confidentiality

4    agreements and an agreement with a company called HP Indigo.

5    Those, again with the reservation of rights that was set forth

6    in the schedules, were the only contracts that the Debtors

7    believed were executory and subject to assumption and

8    assignment, cures totaling $2.24 million.  What happened after

9    that was that Presstek indicated that they believed certain

10    other Vendor agreements and that's really what we're talking

11    about, Your Honor, I think is the only thing that is in

12    dispute, that certain Vendor agreements which potentially

13    totaled an additional $5 million in cure amounts were executory

14    and subject to assumption and assignment by the Debtors.  More

15    importantly, subject to the Debtors having to pay those cure

16    amounts as a deduct to the purchase price.  So from the

17    Debtor's standpoint, prior to the modifications to the Asset

18    Purchase Agreement, it was agreed -- that were agreed to over

19    the weekend and yesterday, depending on how Your Honor ruled on

20    those disputed agreements, the Debtors faced a potential deduct

21    of $7 million to the purchase price.  What was agreed to was

22    that the maximum deduct to the purchase price was $500,000 on

23    the specific agreements that Presstek or Silver indicated that

24    they would like assumed and assigned.  And I do have, Your

25    Honor, for ease of reference, I think I've handed it out to

B476

47

1  most parties, I -- if I may approach?

2       THE COURT:  Yes.

3       MR. GLEASON:  This is just copies of the two schedules

4  that we filed and I have struck out the agreements that are

5  not, as of today, being assumed and assigned by the Debtors.

6  Those cure amounts total approximately $400,000.  I think it

7  should also be noted that the big agreements that are the

8  subject of the Committee -- or the Committee wanting assumed

9  and assigned or to the Committee's belief that Presstek was

10  going to assume the contracts, mainly include Mitsubishi, a

11  company called Esko-Graphics and Konica Minolta.  None of those

12  contracts, and I think the cures on those three agreements

13  total approximately $3 million, those agreements were not on

14  the Debtor's original schedules because the Debtors do not

15  believe those are executory.  And so, you know, where we are

16  today, we do have the agreements that the Debtors are prepared

17  to assume and assign to Silver and cure amounts of, we believe,

18  somewhat less than $500,000, although, I think as Mr. Selbst

19  indicated, the Debtor's liability would be capped at $500,000.

20       THE COURT:  Okay.

21       MR. GLEASON:  If you have any questions or -- I know

22  it's somewhat confusing but --

23       THE COURT:  Well, are you handing up an agreement that

24  is just about as indefinite as those that were submitted by

25  Harbor and that other bidder?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    MR. GLEASON:  The Debtors don't believe so, Your

2    Honor.

3          THE COURT:  How about the Committee?

4          MR. RICCIARDI:  Your Honor, when I alluded to page 9

5    of the transcript before, I left out one line in what I read

6    and that's at the bottom of the page, Mr. Scaffidi again,

7    "there may be some contracts that are not assigned but that

8    won't affect the liability of the Estate."  He was certainly

9    making every effort to have people present at the auction

10   believe that there was gonna to be insignificant or immaterial

11   rejection damages created from this transaction.  And that's

12   why he said there may be "some contracts that are not

13   assigned."  And I, as I said, again, I just -- the Committee is

14   going to have to consider the position it's going to take if

15   Presstek does not make some movement in this regard.

16         THE COURT:  Anyone else?

17         MR. D. ROSNER:  Do you want to hear from MHR, Your

18   Honor?

19         THE COURT:  Yes, you may go ahead.

20         MR. D. ROSNER:  MHR does not need to reconsider its

21   position.  We're still against approval of the sale for several

22   reasons, Your Honor, that I think bear mention at least on the

23   record.  We are the largest Creditor of this Estate.  We own

24   over $18.3 million in notes that were exchanged for other debt

25   obligations that we had with the company back in 2001 in an

B478

49

1  effort to create an interest-free environment for the Debtor to
2  be able to operate from 2001 going forward.  So we had debt
3  notes, we exchanged them for other debt notes but they were of
4  a kind that did not bear cash pay interest, so that we hoped to
5  approve the liquidity of the company so that it wouldn't end up
6  in an eventual bankruptcy.  It did, nevertheless, end up in an
7  eventual bankruptcy several years later and that's why we are
8  now the largest Creditor.  We have the largest stake in the
9  outcome of this auction in terms of what Unsecured Creditors
10  are going to get, if anything, from the sale.  We are -- Mr.
11  Ricciardi's largest -- the beneficiary, I'd say the largest
12  institution for which his fiduciaries act and the largest
13  institution with the most dollars at stake for whom the Debtors
14  act from the perspective of the Unsecured Creditors.  Certainly
15  not Key Bank; Key Bank has obviously been able to act for
16  itself.  On the facts, the record before Your Honor, the
17  documents that have been submitted, the record that was able to
18  be created in the brief time getting up to the sale hearing, we
19  submit that the Court cannot grant Presstek a legitimate, good
20  faith finding as required under Abbott's Dairies and, Your
21  Honor, under Abbott's Dairies, that good faith finding is
22  required, and I believe Your Honor adopted and applied Abbott's
23  Dairies in your own decision in Alpha Industries and Presstek
24  would have to be found to have acted in good faith and that
25  means without fraud, without evidence of collusion, without

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  taking unfair advantage of bidders, and with integrity and
2  honesty of purpose.  The Debtors, of course, have the burden of
3  proof on that.  They've offered nothing other than a financial
4  advisor, not a business person, saying that he saw spirited
5  discussions, even though the price was set seven days before he
6  got there and the price never changed.  And by the way, that
7  price, and we can't lose this fact, that price was set the day
8  after Presstek terminated this Stock Purchase Agreement.  For
9  11 months, they were taking due diligence negotiating a Stock
10  Purchase Agreement all up to June 22nd when Presstek sends out
11  a notice saying, "We terminate because Key Bank hasn't
12  consented."  Of course on the same day, Key Bank did consent to
13  continue funding so the actual reason they called the
14  termination, doesn't exist.  So you've got a document that was
15  only turned over to us in discovery.  We only learned about
16  this document just a few weeks ago, the actual Key Bank
17  consent.  So it's hard for me to believe Mr. Polleck when he
18  says that he told bidders about the existence of a claim.  We
19  didn't know how good the claim was until we got this document
20  in discovery just a few weeks ago.  We certainly know that he
21  didn't know it.  But in any event, one day after Presstek calls
22  a termination after 11 months of negotiation, they have a magic
23  term sheet that's ready to be handed out with a $40 million
24  purchase price that has not moved.  It's been 40 million and,
25  by the way, that 40 million is less than half of what was under

B480

51

1  the Stock Purchase Agreement. June 22nd, they're in contract

2  to close, at around a value to this company of about, I don't

3  know, $90 million. June 23rd, before Mr. Polleck shows up on

4  the scene again in order to take the APA, I think as he

5  testified which was already drafted at that point and kind of

6  bring it to the Court and do nothing much else other than that,

7  we're down to 40 million. There's been no evidence of good

8  faith that's been presented, no Presstek witness, no company

9  witness, no board member. We've heard about board meetings but

10  certainly nobody here to testify about. And, Your Honor, I

11  think you just saw, right here in Court, the third Presstek

12  retrade of the deal. We've discussed at length the second

13  Presstek retrade, but just on Monday, I think the auction

14  transcript is dated November 1st, on Monday, in order to block

15  out both Comvest and Harbor and recall, Your Honor, Comvest

16  admittedly came to the table and said, "Guys, we want to get

17  there but we need a little bit more time. We think we're going

18  to get there, but we're new to the game, we need a little bit

19  more time. We need a week." I spoke to Comvest. I personally

20  spoke to their attorney who said, "Can you just get us a little

21  bit of time so we can get there?" Presstek, apparently, said,

22  "No, we got to get this thing done on November 2nd because I

23  got to make sure that Comvest doesn't get in and Comvest

24  doesn't figure out this company and figure out that it can make

25  a better offer. So I'm going to dangle, once again, an offer

1  in front of the company, that I'm gonna assume all these

2  contracts, and I'm gonna pay all these liabilities, and I'm

3  gonna enhance the purchase price but then, once I know which

4  way the Court's going, and we're here and we're in Court, I'm

5  gonna then withdraw that claim and we're gonna be back to where

6  we were," which is what we just saw happen.  And I would tell

7  you, Your Honor, that's the third Presstek retrade.  On that

8  basis alone, I don't think Your Honor could find that there's

9  been good faith in the negotiation process.  I think it would

10 be just the opposite.  The SPA that Presstek signed paid in

11 full all Unsecured Creditors.  Mr. Charlie wouldn't be hired, I

12 wouldn't be here, there'd be no reason for us to be here unless

13 there was an eventual default and a problem in the future and

14 who knows if we'd be here in Delaware.  But that SPA was

15 breached and it was on a procured default, and it's important

16 for the Court, in our opinion, to take notice of the type of

17 default that was called.  It wasn't a default of deteriorating

18 financial condition 'cause you could hardly, even Presstek

19 couldn't say that.  They'd been watching this thing for 11

20 months.  They said that the bank didn't consent, but the bank

21 did consent.  And they knew it 'cause the bank gave them the

22 consent letter.  So they knew it but yet they called -- and

23 remember who the escrow agent was.  This wasn't like going to

24 J.P. Morgan Chase or CitiBank as an escrow agent and saying,

25 "Escrow must now be broken, the signature pages must be

B482

53

1  released because here the stated condition under this document

2  has been met."  Presstek was the escrow agent so Presstek told

3  itself, "Escrow hasn't been satisfied, we're not closing," and

4  then waited a few hours and delivered the real deal.  It's the

5  classic, I mean, you never -- we always talk about it,

6  bankruptcy practitioners talk about, "Be careful that you don't

7  get yourself into a one-bid auction, 'cause if you get into a

8  one-bid auction, what they're going to do is bring you up to

9  the final date and then they're gonna cut the bid in half."

10  Well, Presstek actually did that.  This is actually the first

11  time I've seen a company actually cut its bid literally in half

12  in a one-bid auction.  Unfortunately, the Debtor here didn't,

13  apparently, see that coming, neither its Chief Restructuring

14  Officer nor its financial advisor saw that coming because they

15  didn't create the alternative to Presstek.  In any other

16  matter, you create the alternative by making sure that you've

17  got a reasonable restructuring plan that can be done on a

18  stand-alone basis that you've exhausted every possibility to

19  get DIP financing in place.  Talk to the Cerberus of the world,

20  talk to MHR.  We actually were trying to come up with proposals

21  to throw financing in even though we're not obligated to and

22  got pushed back on it as opposed to being able to present

23  something.  So we did not have a restructuring plan alternative

24  and you left Presstek in a position of being a one-bid auction.

25  And in the one-bid auction, and, again, this is with the view

B483

54

```
1    if you know you're selling the Enron pipeline assets, you know,
2    if you know you're selling a valuable entity that people have
3    expressed interest in before, then you have a reasonable belief
4    that the market may be able to dictate the value of this
5    company.  But Mr. Polleck, who used to be right there -- Mr.
6    Polleck had tried to sell this company twice before.  I mean,
7    he was engaged when he was with Brown Gibbons in 2000, he was
8    re-engaged in '03, he knew that there were likely not going to
9    be a bunch of other bidders.  And so leaving it to just
10   Presstek was not a very good exercise of business judgment.
11   After Presstek breached the SPA and the Escrow Agreement, it
12   then not -- then says an APA where it requires a release of
13   that very valuable asset.  I'll talk a minute about what
14   apparently Mr. Phillips said to the Board, although, that was
15   apparently not substantiated with any legal analysis or any
16   factual analysis.  We've done our own legal and factual
17   analysis on the claim and, by the way, Your Honor, MHR is a
18   third-party beneficiary of the APA as to a certain amount, and
19   MHR will be pursuing its rights against Presstek for a breach
20   of the Stock Purchase Agreement under its rights as a third-
21   party beneficiary.  I don't believe and I don't want to say it
22   definitively so that it can be used against me, I don't believe
23   that we can sue for the full amount under the SPA but we are a
24   third-party beneficiary and we will be pursuing Presstek.
25            THE COURT:  Well, what if I-- in order of approving
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B484

55

```
1   the sale, what if I assign that claim to your client and let
2   you proceed against Presstek?
3         MR. D. ROSNER:  Then we would most likely withdraw our
4   objection to the sale.  And I can make a quick phone call and
5   get you that answer but I'm pretty sure --
6         THE COURT:  Well --
7         MR. D. ROSNER:  -- that would be the answer.
8         THE COURT:  -- there's not going to be time for a
9   phone call.  You take it or leave it.
10        MR. D. ROSNER:  We'll take it.
11        THE COURT:  Just like they're going to take it or
12  leave it.
13        MR. D. ROSNER:  We'll take it.
14        THE COURT:  Okay.
15        MR. D. ROSNER:  Okay.  In terms of the claim, the
16  claim that we're talking about now and the validity of the
17  claim and the materiality of the claim, and why one cannot, I
18  think the Chief Restructuring Officer testified that when he's
19  a Chapter 11 Trustee, he does not just abandon claims for no
20  consideration and here he recognizes that he neither evaluated
21  nor accepted a valuation of that claim. But I would look no
22  further, Your Honor, than the -- I don't know how many pages
23  this is -- this is what Presstek filed on midnight,
24  approximately midnight, maybe it was like ten o'clock --
25        THE COURT:  Yes.
```

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191