56

1        MR. D. ROSNER:  -- I'm not sure, right before the
2   hearing yesterday to explain all the reasons that it doesn't
3   think there is a good claim.  Now, you know, I'm not saying
4   that we should have a mini-trial on the claim right now, but
5   you've seen what we say, you see Presstek has not dismissed
6   this in a page but they've spent quite a bit of time trying to
7   explain what their defenses are to the claim.  That would tell
8   you right there, you know that you've got a tryable claim and
9   it's one that's being released without consideration as
10  procured by the actual purchaser here.  But now we can actually
11  add insult to injury to what Presstek actually did.  Presstek,
12  just days before the bankruptcy, five days I believe, to be
13  exact, before the bankruptcy was filed before this Court,
14  Presstek used its 11 months of due diligence to all of a sudden
15  {quote} "discover" that A.B. Dick was insolvent and if A.B.
16  Dick was insolvent it could then terminate, so-called terminate
17  the joint -- the valuable Joint Development Agreement that
18  we've heard for this Vector product and for a new valuable line
19  of products.  They could terminate it and keep it from other
20  bidders.  Now we know it's valuable.  Everyone's testified that
21  it's valuable.  We also know that Comvest in their bid said,
22  "That's a very important contract.  We need that."  Presstek
23  terminated it five days before the bankruptcy while they're in
24  contract to buy all of the assets on the basis that they've
25  just discovered that the company was insolvent.  The company's

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B486

57

1  been insolvent for three years, they pled that in their

2  complaint against us.  The company was insolvent when it

3  entered into the Joint Development Agreement.  The company was

4  insolvent the entire 11 months that Presstek was doing due

5  diligence, but five days before the bankruptcy when they knew

6  there would be other bidders that would be coming in to look at

7  this, Presstek terminated it and stripped the Debtor of this

8  asset.  Of course the Debtor hasn't really analyzed whether it

9  could -- whether that termination was valid.  Debtor hasn't

10  analyzed whether that --

11        MR. PHILLIPS:  Your Honor --

12        MR. D. ROSNER:  -- termination was actually --

13        MR. PHILLIPS:  -- we are going so far beyond the

14  record here --

15        THE COURT:  I -- that's true.

16        MR. PHILLIPS:  -- in terms of what Mr. Rosner is

17  offering here.  He is, in fact, and I would be happy to put Mr.

18  Rosner on the stand if he does want to testify as to all the

19  supposed bids that he's offering in this closing.

20        MR. D. ROSNER:  I think the facts are set forth in the

21  declaration in the exhibits that were attached to the

22  declaration.  Every fact that I'm talking about, the witnesses

23  testified that they didn't evaluate whether the Joint

24  Development Agreement, whether that termination was valid.  The

25  Chief Restructuring Officer -- I asked him about it, whether it

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B487

58

1   was valid, whether it had been looked into.  So I don't know

2   what fact you're talking about, but that's the fact that I was

3   just explaining.

4           THE COURT:  Go ahead.

5           MR. D. ROSNER:  Thank you, Your Honor.  Your Honor, we

6   believe that the contention that a Purchaser can insulate its

7   bad conduct by setting a scheme into motion, having that bad

8   conduct move right up until the date that it signs the Asset

9   Purchase Agreement and then having set the scheme in place, but

10  not necessarily doing anything more during the sale processes,

11  is a spurious type of allegation.  It really just gets rid of

12  the whole idea of who is a good faith Purchaser and who's not.

13  One cannot, Your Honor, possibly, in my opinion, strong arm an

14  insolvent company into a corner, exacerbate its leverage to

15  breach a Purchase agreement, fraudulently procure a default,

16  cuts its offer literally in half, demand a release from

17  liability, terminate the Debtor's most valuable contract to

18  restrict it from other bidders and then obtain this Court,

19  which is a Court of equity as we all know, this Court's

20  imprimatur as a good faith purchaser.  If that's the case, if

21  that can happen, there is no good faith requirement in this

22  Court, there is no Abbott's Dairies in this Court, if Presstek

23  can actually get a good faith finding.  Second, there really is

24  no real value being provided to the Unsecures.  Well, we've

25  just seen that even the little value that the unsecureds

B488

59

```
1   thought they were getting on our behalf, I would note, has been
2   retraded again today.  So even that -- even the 3½ million
3   doesn't sound like it's there.  But is the 3½ million actually
4   there?  The administrative expenses of this estate are already
5   somewhere -- projected to be somewhere between 900 to $1.5
6   million over budget.  What else is going on in this Estate
7   besides this sale?  The Debtors have sued MHR so there's a
8   lawsuit against us right now that's pending.  We've answered
9   and so that's one lawsuit that's out there.  The Debtors
10  apparently, I learned, they haven't had time to analyze the
11  termination under the Joint development agreement, but I
12  learned yesterday they filed a Motion to amend their complaint
13  against MHR to add a new count.  So that's kind of a second
14  lawsuit.  The Debtors have also sued the class -- sued in a
15  class action other note holders so that's now a third lawsuit.
16  The Unsecured Creditors have sued the Lenders.  So that's a
17  fourth lawsuit.  And we haven't gotten to a plan, we haven't
18  gotten to a disclosure statement, we haven't gotten to an
19  analysis of preferences and fraudulent conveyances.  My
20  experience, this is experiential, that $3½ million  is not
21  going to be there.  There's going to be possibly a residual
22  interest for unsecured Creditors in a litigation trust that
23  they want to fund or get to a contingency.  But that is very
24  scarce resources under this sale plan right now.  And remember,
25  all the employees are being terminated under the APA so this
```

B489

60

1  view of, "We must be a going concern, we must preserve jobs and
2  we must protect the unsecured Creditors," versus this
3  liquidation, this is a liquidation.  That's what's happening
4  and, frankly, if you didn't approve the sale, which you
5  shouldn't approve the sale, what they would do is they'd cobble
6  something together.  They'd go back to Comvest, they'd go back
7  to Harbor, they'd do something but it wouldn't be releasing
8  Presstek, it wouldn't be giving up every right this Estate has,
9  it'd be right sizing the leverage a little bit so that the
10  Unsecured Creditors could actually accomplish something in this
11  case other than sue MHR which is what the company's been doing.
12  Fair value.  The Debtors have said this is fair value because
13  the market has spoken.  We heard about the market speaking for
14  quite awhile, well, I would instruct counsel, I'm sure he
15  remembers, is that a market only speaks correctly when it's a
16  fully disclosed market.  That's what the SEC is for, that's
17  what registration statements are for and that's what in
18  bankruptcy typically disclosure statements are for, is to make
19  sure there's full disclosure so that a market can react.  Okay.
20  There's been no disclosure about the claim against Presstek.
21  People didn't know about the claim against Presstek.  People
22  didn't know the value of the claim against Presstek.  What the
23  purpose of the release in section 13.17 of the APA was.  That
24  wasn't available to the market.  People weren't bidding on that
25  basis.  Judge Case, you know, counsel pointed out what Judge

B490

1   Case -- some certain findings that Judge Case made on August

2   23rd.  He didn't know about the claim against Presstek that was

3   being released.  He didn't know that Key Bank had actually

4   consented.  He didn't know that the procured default that

5   Presstek had argued was actually false.  He didn't hear about

6   the terminated Joint Development agreement.  These things were

7   not available to the market, so I would tell you that the

8   market did not speak.  This is not just an inefficiency of a

9   market.  It's a nondisclosed market and, therefore, you cannot

10  find that there's been fair value 'cause there's been no fair

11  valuation of the claims that's been shared with bidders.  No

12  legal analysis, no factual analysis, no documents provided,

13  nothing.  We discovered it in discovery.  We called the

14  unsecured Creditors and said, "Pay attention.  This is real.

15  This looks good.  This looks right."  The Unsecured Creditors

16  then got involved and said, "You know what?  You're right.

17  This does look real, this does look good, let's go."  And then

18  they objected to the sale, too, and they were ready to sell out

19  for what they settled for yesterday which doesn't sound like

20  they got.  We're not, 'cause we value the claim, much higher

21  than that and we don't think Presstek is -- we don't think that

22  this is a fair sale of these assets.  Remember, there is an

23  alternative.  The chief restructuring officer testified that

24  the trend of the company now is turning to cash flow positive.

25  This is the trough but we're heading in -- it sounds like the

B491

62

1  company is trending out.  There's no question that -- remember
2  that Presstek is the D-I-P Lender here.  They didn't pick
3  November 15th by accident.  I mean, there's a design here.
4  This is the last step of the scheme, not the first step of the
5  scheme.  So this is all procured to leverage this Court into
6  making -- there being no decision other than being able to
7  sell.  That's the very thing that happened in Abbott's Dairies
8  that the Court said is ripe with possibilities of collusion,
9  when the company walks in with an Interim Agreement and says to
10  the Court, "We have no choice, Your Honor.  We're out of money,
11  the Interim Agreement says we have to do this and we have to do
12  it now."  The Judge, Bankruptcy Judge signed the Order.  Third
13  Circuit reversed it and said, "You can't do that.  You can't
14  just come in with no good faith and leverage a company and
15  leave the Bankruptcy Judge with no option."  There are options
16  here.  We've got a room full of professionals here that will
17  come up with the options.  How to replace the D-I-P financing,
18  how to extend the D-I-P financing.  Believe me, Key Bank's not
19  gonna be coming in here to be seeking foreclosure on these
20  assets tomorrow.  They're gonna work something out.  We don't
21  have to approve Presstek as the only possibility right now.
22  And release the claim.  No fair value, no good faith, no
23  benefit to the Estate, and I would say all of that adds up to
24  no legitimate business purpose for being here.  Thank you, Your
25  Honor.

B492

63

1    THE COURT:  This gentleman had -- I'll give him the

2  floor.

3    MR. LAPOWSKY:  Thank you, Your Honor, and I'll be very

4  brief.  Robert Lapowsky, Stevens and Lee, for Mitsubishi. Your

5  Honor, I just wanted to point out that we had filed a limited

6  objection to the sale that related to a resale license that we

7  obtained under a post-petition agreement that was entered into

8  between Mitsubishi and A.B. Dick.  And that resale license

9  gives us the ability, after the termination of that post-

10 petition agreement, to use A.B. Dick's intellectual property to

11 resell what I will call pipeline inventory, that is inventory

12 that A.B. Dick had ordered from Mitsubishi but not yet fully

13 paid for and as to which title was not transferred.  The resale

14 license gives Mitsubishi the right to resell that inventory to

15 third parties using A.B. Dick trademarks, A.B. Dick patented

16 technology.  That was part of the agreement that was approved

17 by Judge Case on August 16th and there is an Order entered with

18 the disagreement attached to it.  So we had filed an objection

19 saying, "If you're selling free and clear, including selling

20 the intellectual property of A.B. Dick free and clear of

21 interests, let's just make sure that the interest that we have

22 that's created by the resale agreement isn't wiped out, and

23 I've had -- I've discussed this issue with counsel to A.B.

24 Dick.  I think we have an agreement that that's not what is

25 intended and that the Order, assuming an Order is entered,

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

64

1  would include a savings provision to make clear that the resale

2  license is not affected by the free and clear nature of the

3  sale.  So on that point, all I'm asking is that to the extent

4  an Order is circulated for approval, that we be included on the

5  circulation list to the extent that the resale license is

6  protected.  We will have no other objection to the entry of the

7  Order.  If it's not included, then our objection stands and

8  there's been no adequate protection proposed for the

9  divestiture of our rights under the resale license so our

10  position would be absent a savings clause.  You can't approve

11  the sale free and clear of our interests under the Resale

12  Agreement.  The second thing that I wanted to mention just

13  briefly, Your Honor, is that there's been some discussion about

14  the Mitsubishi Supply Agreement.  Here it's important to

15  understand there are two Mitsubishi agreements.  There's a pre-

16  petition agreement, Supply Agreement, and the post-petition

17  agreement.  The resale license I just spoke about arises under

18  the post-petition agreement.  The agreement that you've heard

19  reference to is the pre-petition agreement, and that's the one

20  that has a cure amount due under it and Mr. Gleason got up to

21  say that it was the Debtor's position that the pre-petition

22  agreement was not an executory contract.  And I just wanted to

23  point out to Your Honor that that's different.  It's a

24  different position than what they've taken earlier in the case.

25  In fact, the post-petition agreement approved by Judge Case has

B494

65

1  a specific savings clause in it which preserves to A.B. Dick

2  the right to seek assumption or assumption and assignment of

3  the pre-petition agreement and the Order entered on August 16th

4  specifically references that reservation of rights and

5  continues it.  So I'm not here to say that it is or is not an

6  executory contract.  I'm only here to say that previously in

7  this case, A.B. Dick has taken the position with us and

8  required that it be incorporated in this post-petition

9  agreement, the position that the pre-petition agreement is

10 executory.  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. GLEASON:  Your Honor, may I address that point

13 real quick on behalf of the Debtors?  Very early on in this

14 case, Mitsubishi, the largest Unsecured Creditor, attempted to

15 force the Debtors to make a decision right away.  The Debtors

16 refused to do that.  We reserved our rights.  The Order that

17 was entered, specifically reserved the Debtor's rights.  No

18 determination was made.  And after the Debtors looked at it,

19 that is when we then filed our scheduled executory contracts.

20 So to stand up here and say that we're taking a different

21 position, I think, is inappropriate.  They had tried to force

22 us to do something very early in the case.  We reserved our

23 rights.  That's all we did.  And the other thing, we did have

24 an agreement with respect to the post-petition license which I

25 told Mr. Lapowsky yesterday we had an agreement with.  So I

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B495

Closing Statement - Mr. Firestone                    66

1    think that's also a nonissue.

2              THE COURT:  Counsel?

3              MR. FOLLAND:  Thank you, Your Honor.  I'm Bob

4    Folland --

5              MR. FIRESTONE:  Your Honor --

6              MR. FOLLAND:  -- on behalf of --

7              THE COURT:  Hold on.  Yes?  Who's speaking?

8              MR. FIRESTONE:  Your Honor, this is David Firestone.

9    At the appropriate point, I'd like to request the Court's

10   permission --

11             THE COURT:  All right.  I've got a couple --

12             MR. FIRESTONE:  -- (inaudible) very brief statement of

13   no more than one minute.

14             THE COURT:  Why don't you got right now with your one-

15   minute statement, is that all right?

16             MR. FIRESTONE:  Thank you.

17             THE COURT:  You can stay right there and listen.

18             MR. FIRESTONE:  First, Your Honor, I'm not, at this

19   point, trying to assert any legal right to either support or

20   oppose the proposed sale of Presstek.  Second, I don't know

21   whether approval or disapproval of that proposed sale would be

22   in the best interest of the 39 non-union retirees of which my

23   mother is one of the healthcare beneficiaries of their health

24   plan.  I do know I would be thrilled to hear Presstek tell this

25   Court that given the total dollar value of this sale, it would,

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B496

1   in good faith, continue the retiree health benefit plan for the

2   small number of people involved, and I would ask the Court to

3   use whatever discretionary authority it might have in the

4   approval process or otherwise to protect the health insurance

5   benefits that these retirees have relied on for many years.

6   There ought to be a way, Your Honor, to achieve an equitable

7   result for this small number of elderly people.  Thank you for

8   hearing me.

9         THE COURT:  Thank you.  Now counsel.

10        MR. FOLLAND:  Thank you, Your Honor.  Robert Folland

11  of Thompson Hine on behalf of Key Bank, Your Honor.  And I

12  would like to speak to provide some argument that also provides

13  some context from the bank's position for all of this.  First,

14  I want to make sure the record is that we are clear as to what

15  was put in the record today.  Notwithstanding what I've heard

16  from MHR a few minutes ago, I believe the offer is fairly clear

17  from Presstek with respect to $40 million cash, an additional

18  enhancement of value which was testified and put into the

19  record of at least $3½ million.  Now there may be additional

20  enhancement and I think there may be a disagreement at this

21  point between the Creditors' Committee and Presstek with

22  respect to cures that would be going outside of the Estate.

23  But there's no dispute that we're well in excess of $40

24  million.  The evidence that was put in here just a few minutes

25  ago with Mr. Polleck was clear as well in that his judgment

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B497

68

1   viewing the Presstek offer side by side with Harbor and with
2   Comvest, it was the best obtainable, even if we were to go
3   through a process with a plan of reorganization as untenable
4   and all the problems that exist with respect to that. And the
5   reason why there are problems, Your Honor, and the thing that
6   we have to be clear of in this case, is we are looking at a
7   Debtor that is in a very precarious position.
8           THE COURT: Are you pulling the plug on it on November
9   15th?
10          MR. FOLLAND: Yes, Your Honor. We are not providing -
11  - we are not the primary D-I-P Lender in this case. We were
12  prepared to pull the plug before the case was filed. It is
13  irresponsible for MHR to stand up and say we are in a room full
14  of professionals, we'll figure something out. We have been in
15  this bankruptcy case since July, Your Honor, and this has been
16  a very arduous process, Your Honor. But this case faces a very
17  real threat and a very likelihood of liquidation if the sale is
18  not approved. We've heard testimony as to what a liquidation
19  value is. We've heard the midpoint is $16 million. In that
20  case, the unsecured Creditors don't get anything. We've got an
21  insolvent Estate, administratively insolvent, and we've got a
22  secured Lender that's going to be receiving a substantial
23  haircut on what it's owed. Your Honor, this case does not
24  provide a forum where adequate protection can be provided.
25  We've -- notwithstanding what we just heard about this case



1  being cash positive, I believe the actual testimony was that

2  there was a significant burn rate. I believe that that's what

3  we heard yesterday. There would be no ability to provide

4  adequate protection. There would be no ability past the 15th

5  to use cash collateral. There will be no ability to prime Key

6  Bank. There will be no ability to provide alternate D-I-P

7  financing. We've heard the Debtor has looked for alternate D-

8  I-P financing. To date, they haven't found it. We heard Mr.

9  Polleck testify the litany of the financial institutions that

10 he's gone to and he's investigated. Nothing has come up. We

11 are at a very precarious time in this case. You know, there's

12 a lot of noise going on, there's a lot of allegations back and

13 forth, there's a lot of lawsuits. Let's not lose the sight of

14 what we're here to do today. We're here today to get the best

15 deal that's possible for the benefit of all Creditors.

16 Considering all the other constituencies, employees and the

17 like, that's obviously not my concern or not my primary

18 concern. I'll let the Debtor speak to that. But we have to be

19 focused on what the big picture is. We're here on a sale

20 hearing, and Key Bank believes that this is the last and best

21 opportunity for this company to produce results for the

22 Creditors and I believe the business judgment test has been

23 satisfied. Thank you, Your Honor.

24        THE COURT: Thank you.

25        MR. LOIZIDES: Good morning, Your Honor. Chris



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B499

1   Loizides for Esko-Graphics which is a Committee member.  Esko

2   had filed a limited protective objection to the sale.  If the

3   Court does not approve the sale, obviously our limited

4   objection is moot and perhaps, therefore, we could consider it

5   after the Court rules on the MHR objection.  I would also say

6   that we also support the -- as a Committee member, we also

7   support the Committee's position in this matter as well.  I'd

8   also mention that if the sale is approved, we have -- I have

9   worked out a stipulation with the Committee, with the Debtors

10  and with Presstek resolving our objection, and depending on

11  what the Court's ruling is with respect to the larger issues,

12  I'd like to present that later at the hearing at the

13  appropriate time.

14          THE COURT:  Anyone else?  Counsel for --

15          MR. SELBST:  Your Honor --

16          THE COURT:  -- Presstek?

17          MR. SELBST:  -- Stephen Selbst for Presstek.  Despite

18  the arguments that have been made by MHR, Your Honor, the

19  record is quite clear.  There's a ton of business purpose that

20  supports this transaction.  The Debtor's business was failing.

21  It was failing in 2003, it was failing pre-petition, and

22  unfortunately, it's continued to fail in 2004.  One month of

23  $300,000 of EBITDA does not make a successful business.  The

24  evidence was unrebutted.  These Debtors have lost money in

25  Chapter 11, they're going to continue to lose money between now

71

1  and whenever somebody else takes over their business or until

2  they liquidate.  That's what the testimony was.  The

3  allegations by MHR that my client improperly terminated the

4  stock Purchase Agreement weren't in the record.  Where I went

5  to law school, lawyers' allegations and papers aren't evidence.

6  There's no evidence about that.  We responded to those

7  allegations.  We disagreed.  I heard MHR's counsel say, not for

8  the first time, they're going to sue my client.  That's never

9  happy news for a client, but we understand that and we're

10 prepared to take that fight on as and when we get there.  But

11 that's not the issue for today.  The issue for today is not the

12 alleged wrongful termination.  You don't have a record on that.

13 Your issue today is whether to approve this asset Purchase

14 agreement.  And here the evidence is quite clear and, again,

15 despite the attempts to muddy the record, the evidence was

16 uncontrovert.  There was a full and fair auction and no other

17 bidder showed up.  Yeah, we had a couple of proposals, but both

18 Mr. Polleck and Mr. Gray said, they were too indefinite, they

19 both had financing contingencies, and you just heard Keith say

20 they're not staying in this credit, and they would take months

21 to consummate during which time the Debtors will continue to

22 lose money.  We've had an auction.  It's been a fair auction.

23 My client has stayed by this company for almost 16 months.

24 It's prepared to close on its agreement today.  And it thinks

25 that it made a fair offer.  There is absolutely nothing that

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B501

1    suggests bad faith in the conduct of this auction.

2            THE COURT: Well, is it going to --

3            MR. SELBST: Nothing.

4            THE COURT: -- is it going to close, if the Order

5    provides that you're going to cap out those cures of 500,000?

6            MR. SELBST: I have -- my client, Mr. Muso, who is the

7    Chief financial Officer, has been in contact with the CEO.

8            THE COURT: Because that's what the Order's going to

9    provide.

10           MR. SELBST: I understand that, Your Honor, and I had

11    not had an opportunity actually to confer with him about that.

12    I wanted to address the legal arguments first --

13           THE COURT: All right.

14           MR. SELBST: -- if I may. As I said, the argument

15    that it wasn't a fair auction because there was no information

16    about this alleged lawsuit, is a red herring. Creditors don't

17    buy lawsuits. The bid Procedure Order said, "Buy the business,

18    buy the business assets." If there isn't a stake claim here

19    and it's pursued, so be it. But by -- but Creditors don't buy

20    lawsuits. And that's why that argument is entirely specious.

21    We do have answers, Your Honor, about the escrow Agreement. It

22    is our contention, of course, that my client did nothing

23    whatsoever improper about the termination. But that's not

24    really the issue. The issue respectfully is whether there's a

25    business purpose here, and we believe the record of the

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B502

1  Debtor's continuing losses and the fact that there is no

2  realistic alternative here, fully supports the Debtor's

3  business judgment that a sale of their assets is the only

4  realistic answer here. Yeah, there is -- as I said, there were

5  these fly-by-night possibilities but they're not real, they're

6  not funded and they're not here today.  The time to settle

7  these assets is now.  And I want to respond to one other

8  comment that Mr. Rosner made, in one other line of argument.

9  He suggested that somehow Presstek magically engineered this

10 date for the closing date.  The fact of the matter's quite

11 different.  As he should know, MHR and the Committee objected

12 pretty vehemently to the original sale schedule. We were

13 looking for a faster sale schedule. We agreed back in August to

14 this date to accommodate the Creditors' concerns that there

15 wasn't going to be a fair auction.  Judge Case said, "You know

16 what?  I agree the Debtors need more time."  And we went along

17 with that.  But to somehow suggest we picked this date to

18 engineer it, is an errant attempt to rewrite history.  We

19 weren't thrilled by that, but we did it because we thought it

20 was the right thing for the Estate.  By the same token, there

21 comes a time when all the nonsense has to end.  The allegations

22 will get decided in some other Courtroom.  But the issue today

23 is to sell the assets, and we believe the Debtor has fully

24 satisfied its burden and we fully -- and we also believe that

25 the record fully satisfies the fact that Presstek acted in good

B503

74

```
1   faith, and I will be clear that unless there is a finding of
2   good faith, Presstek is not prepared.  We're not going to be --
3   we are not prepared to close absent of finding of good faith as
4   a purchaser.
5           THE COURT:  Now you want to close by November the 5th?
6           MR. SELBST:  We would like to, Your Honor.  We --
7           THE COURT:  Who picked that date?
8           MR. SELBST:  Pardon me?
9           THE COURT:  Who picked that date?
10          MR. SELBST:  In consultation with the Debtors we did,
11  Your Honor.  I mean, obviously it's within the Court's
12  discretion but here's the reason and we said it in our papers.
13  The business has lost money, is losing money, the
14  administrative expenses will be cut off when we close, and in
15  addition to that, and although Your Honor hasn't heard
16  testimony in great measure about it, as we said in our papers,
17  during the Debtor's long slide that began in 2003, they -- at
18  one point were -- had been stopped on shipments by 160 vendors.
19  They could not fill customer orders.  There were and are
20  employee morale issues and many, many of these A.B. Dick
21  employees, if Your Honor approves the sale, are gonna come to
22  work for Presstek.  There's a real business reason.  We want to
23  put our management team in there.  We want to repair the frayed
24  relationships with the vendors, with the customers, and with
25  the employees.  And those, Your Honor, I submit, are legitimate
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B504

1 reasons why we need an expedited closing.

2          THE COURT:  Okay.

3          MR. SELBST:  Thank you, Your Honor.

4          THE COURT:  Now let's hear from the Debtor.

5          MR. STOCK:  Your Honor, I will be succinct.  Where are

6 we now after all this testimony, all the argument, all the

7 pounding on the table?  We are where we were at the start, back

8 where the United States Supreme Court says we must be under

9 LaSalle:  market determines value.  The market determines the

10 value.  Presstek stands -- or, excuse me, MHR stands here by

11 itself saying, "Ignore the business judgment of the Debtors.

12 Ignore the business judgment of the Debtor's financial

13 advisors.  Ignore the business judgment of the Creditors

14 Committee.  Ignore the business judgment of the Committee's

15 financial advisors.  Ignore the business judgment of the senior

16 Secured Lender.  Ignore this Court's determination that the

17 sale process that it ordered will bring highest and best value.

18 We know best.  We know better than the Court in setting up a

19 sale procedure.  We know better than the Debtors.  We know

20 better than the senior secured Lender.  We know better than the

21 Creditors Committee."  Well, that's not the law.  The law is,

22 is there is a sound business judgment for the Debtors to do

23 this?  And in exercising their sound business judgment, they

24 must obtain highest and best value and the Court, in this case,

25 and the Court in every case now following the Supreme Court

B505

76

1   knows that the only way you do that is through the market.   And
2   we've done it through the market and this is the highest and
3   best value.   Everything else is merely opinion.   And in this
4   case, MHR's sole self-interested opinion.   With respect to good
5   faith, Your Honor, requires two things: arm's length
6   negotiation, integrity in the sale process.   You've heard ad
7   nauseam about the negotiations, you've heard ad nauseam about
8   the sale process.   I'm not going to repeat that.   But the Court
9   itself at the sales procedure hearing, again, identified the
10  value that this stalking horse process has brought to this
11  Estate.   Judge Case said, "I think the evidence suggests that
12  there is value of a substantial sort that has been brought to
13  the table."   If we look at the difference, let's say the
14  Debtors just noticed up a 363 sale or an action and said,
15  "Whoever's going to show up, come and show up.   We're going to
16  try to sell the assets."   I think the fact that there is this
17  deal negotiated with Presstek is a materially better
18  circumstance than that.   It has added value.   And that $40
19  million deal has been enhanced.   MHR says, without producing
20  any evidence to support its alleged business judgment, "We've
21  got this great claim out there.   It's a pig in the poke.   We're
22  not here presenting evidence as to its value.   We're not here
23  presenting -- we're not willing -- we're not proffering any
24  evidence as to the probability of success, but trust us.
25  Ignore the business judgment of all these other constituents.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B506

77

1   We've got no obligations to them.  We've got no duty to protect
2   them.  In fact, we're adversary to them.  But we stand up here
3   and, by God, Your Honor, forget all that.  Forget the market.
4   We know better.  We can't prove it to you.  We didn't bring any
5   witnesses, but we know better.  That's not the law.  The market
6   has spoken.  This is the best deal.  It is the highest and best
7   value and it should be authorized by the Court.  With respect
8   to another pig in the poke, well, let's just put this off
9   another week so that Comvest or someone else might come
10  strolling up,
11          THE COURT:  I'm not going to put it off.
12          MR. STOCK:  Thank you, Your Honor.  I won't need to
13  address that, then.  For the reasons that I've just discussed,
14  that you've heard from other counsel and based on the evidence,
15  we request that the Court authorize the sale.  The closing date
16  of November 5 is essential as you heard in the testimony.  The
17  Estates will incur additional millions of dollars of expense if
18  it has to go back to November 15 when the D-I-P expires and,
19  therefore, we ask that you authorize the sale free and clear of
20  liens and waive the ten-day stays.  Thank you, Your Honor.
21          THE COURT:  Let me ask this.  What does the sale
22  provide as to the continued obligation of the Buyer to these
23  retiree health -- retirees' health benefits?
24          MR. STOCK:  Can someone speak --
25          THE COURT:  Are you going to get cut off?

B507