1   Bank's pre-petition indebtedness was not paid in full under a

2   Plan of Reorganization.  What we have agreed to is that if a

3   Plan were to be filed, instead of pursuit of the 363 sale

4   process that -- outside of a Plan, that is before the Court, it

5   would in fact be a termination event, and the Debtors' rights

6   to continue to use cash based on Key Bank's agreement would

7   cease at that time.  However, at that point the Debtor would

8   have the right to seek authority to use cash.  We would have

9   the right to oppose that.  The issue would be one of adequate

10  protection, as if we were back to the first day of this case at

11  that point arguing over the use of cash collateral.

12          THE COURT:  So it would not trigger the need to --

13  under that circumstance, to pay -- or the requirement of paying

14  the debt in full.

15          MR. LEPENE:  That's correct.

16          THE COURT:  So that provision would be removed, and

17  basically the parties would be left with their remedies under

18  the cash collateral provisions of 363.

19          MR. LEPENE:  That is correct, Your Honor.  And

20  whatever other provisions might be available under the

21  Bankruptcy Code.

22          THE COURT:  Sure.  Whatever the parties rights are,

23  for them to seek the use of cash collateral, and you to require

24  that your interest be adequately protected.

25          MR. LEPENE:  The third point was that Key Bank in its

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

22

1 capacity as Pre-Petition Lender should not have consent rights
2 over any sale outside the ordinary course.  And we have agreed
3 that Key Bank in its capacity as Pre-Petition Lender would not
4 have any such consent rights with respect to sales.  Our
5 consent to sale procedures would be a requirement, and
6 qualified by our consent not being unreasonably withheld.  So
7 it would be limited to consent with respect to sale procedures
8 that would be adopted or put before the Court.
9      Point 4, the objecting parties raise an issue with respect
10 to the provision of the D-I-P Order providing for payments on
11 account of pre-petition indebtedness outside of and prior to a
12 Plan.  And, Your Honor, this relates to the provisions in the
13 Order upon closing of a sale that would provide for payment of
14 Key's pre-petition debt from the sale proceeds.  What we have
15 provided -- and this relates to another point, but I will
16 mention this now -- is we've set up a period for the Committee
17 to investigate Key Bank's security interest, the validity of
18 its claims and so forth.  We have now agreed to extend that to
19 November 1st, without any right of any further extension.  We
20 were seeking finality with respect to that.  If -- what we have
21 agreed to, and it's included in the Order -- if there is no
22 challenge to our security interest or our claims by the
23 November 1st date, then the Order would provide that we would
24 be paid consistent with our position of being, or holding a
25 first priority security interest in the assets that are being

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B551

23

1    sold.  If a challenge were to be filed by that particular date,

2    the funds would then be escrowed pending a ruling by the Court

3    on the challenge that had been raised as to whether we did in

4    fact have a first priority security interest, or whether there

5    was some issue with respect to the validity of our claim.  So I

6    believe that is how we have resolved that particular issue.

7        The next point, the objecting parties raised the issue

8    regarding the Order preventing the Committee from using funds

9    that are subject to a carve out for professional fees.  They

10   objected to an exclusion or a restriction on those funds being

11   used to pursue claims against Presstek as a prospective buyer

12   of assets, as opposed to its capacity as a lender -- a D-I-P

13   lender.  My understanding is, again based on our agreement,

14   that the objecting parties have agreed to withdraw that

15   particular objection.

16       The next point on the list, Your Honor, the objecting

17   parties raised an issue regarding the use of cash collateral on

18   a post-termination basis.  And this really relates to the point

19   that I addressed previously.  What happens if there is a

20   termination event?  And the Order does provide a number of

21   events of default which constitute termination events.  We have

22   agreed that we, the Lenders, would provide five days notice of

23   a termination event.  During that five day period, the Debtor

24   would have the right to use cash collateral.  Its right to use

25   cash collateral would expire at the end of that five day

1  period.  But the Debtor would have the right -- presumably

2  would seek to exercise that right if it felt it was

3  appropriate, to come before the Court to seek authority to use

4  cash collateral.  And again it would be the same issue.  We

5  would have the right to oppose.  The issue would be presumably

6  whether our interests are adequately protected.  We would be

7  back to square one at that particular point in time.

8      The next point deals with the 506(C) waiver which was

9  included in the proposed Order.  And in light of the agreement

10 that we have reached, and the concessions that we have made, my

11 understanding is that the objecting parties have agreed that

12 there would be included a 506(C) waiver, again as a quid pro

13 quo for the various concessions that have been made in terms of

14 the provisions of this particular Order.

15     The next point that was raised was what the objecting

16 parties believe was a lack of justification for an increase in

17 the Lender's super priority claims by the amount of carve out

18 funds that are paid to professionals.  We have agreed to leave

19 this provision in.  And there's really a very simple

20 explanation for that.  To the extent that there are

21 unencumbered funds available to pay professional fees, they are

22 to be used first before resort to the carve out.  However, if

23 at the time those fees are to be paid there are not

24 unencumbered funds available, we have agreed prior to our

25 receiving any distribution on our claim that we would cover the

1  unpaid professional fees that are subject to the carve out.

2  But that would result in a corresponding increase in our super

3  priority administrative expense claim in order to implement the

4  principle that the first source of payment for professional

5  fees are unencumbered assets.  And so on that basis the

6  provision that we have in the Order will remain.

7      The next point was raised by the objecting parties as to

8  whether this Order would bind a Chapter 7 Trustee.  We believe,

9  and my understanding that the objecting parties have agreed,

10  that it would be binding upon the Estate and any successor to

11  the Estate.  That is something that we require so that we have

12  some finality and assurance with respect to what has been

13  negotiated here.  It's my understanding that has been agreed

14  to.

15      And finally in terms of this list, there was an issue as

16  to what the maturity date of the D-I-P financing would be.  We

17  have agreed to extend to November the 15th to accommodate the

18  revised bid procedure and sale process timeline.  Those were

19  the points that MHR had raised.  There were some additional

20  points raised by the Committee.  I'm not sure that they

21  necessarily found their way into any specific paper that I can

22  point to right now, but let me just touch on those, and then

23  I'll turn the podium over to others to comment.  One of the

24  issues that was raised related to standing on the part of the

25  Committee or a Trustee to pursue claims, and a desire that we

B554

1  have a provision in this Order that recognizes the standing to

2  pursue claims on behalf of the Estate.  We have no problem with

3  that, and the Order will contain such a provision.  I've

4  indicated with respect to the investigation period -- that was

5  something the Committee had specifically raised -- that we have

6  agreed to extend that period to November 1st.  But that is

7  without any right to seek or obtain any further extension.

8       And then there is an issue with respect to the budget for

9  professional fees.  This relates primarily to the payment of

10  those fees prior to a termination event.  And there was some

11  concern expressed on the part of the Committee as to whether

12  all of the anticipated fees were included within the budget.

13  And if there was a shortfall, how would funds to allocated, and

14  so forth.  I don't know that we have a specific resolution.

15  We, on the part of the Lenders, believe it's primarily an issue

16  that affects the Debtor and its professionals, and the

17  Committee and its professionals, although there is the

18  provision that the Bank's professionals will be paid as we had

19  discussed before, pursuant to a provision of this Order.  But I

20  think what we have said is we will work together.  If we can

21  address the budget issue today with the Debtor and its

22  financial advisor, and reach some kind of appropriate

23  understanding with respect to that, that would be fine.  If we

24  cannot reach an agreement, I think we've agreed to defer that

25  and work towards a resolution.  Again I think to a large extent

1  it's a matter not so much for the Post-Petition Lenders as it

2  is for the Debtor and the Committee and their professionals.

3  One other point I should mention in --

4      THE COURT:  So restating that, it means what?

5      MR. LEPENE:  I wish I knew.  I think it's that further

6  works needs to be done, Your Honor, to first of all find out

7  whether all of the anticipated and estimated fees are in the

8  budget, and then agree on a mechanism to provide for payment to

9  the extent of available funds to cover those professional fees.

10 Again, this is all prior to a termination event.  The way the

11 carve out works, once there is a termination event, then there

12 is thereafter a finite dollar amount that is established to

13 cover fees.  But I think this is one that we need to have some

14 further work on.  I think the feeling of the various parties

15 though is that that should not hold up the entry of an Order

16 today if everything else falls into place, so that we can have

17 a final D-I-P Order.  It may then be subject to some further

18 supplementation as we further address this particular issue.

19     The last point that I would mention is we did agree,

20 relative to the provision that Mitsubishi had raised regarding

21 set-off rights, and that there was no effort being made by

22 virtue of priming liens that were created in this Order, to

23 prime Mitsubishi's set-off rights.  That was contained in the

24 bridge Order that we put on last week.  We will continue that.

25 And we have agreed that we would expand that to other vendors.

B556

28

1  who are similarly situated.  So it will be a generic provision

2  as opposed to just limited to Mitsubishi.  And, Your Honor,

3  that is based on my notes where we are in terms of the

4  agreement.  The Order that we have presented attempts -- is

5  blacklined.  But again, that is not something that the parties

6  have yet signed off on, so there may be further work with

7  respect to language to accomplish all of this.

8          MR. MASON:  Judge, I would defer to Mr. Selbst or

9  somebody from Presstek if they want to say anything in terms of

10  clarification so that we have the supporters of the motion

11  first, and then you could hear us.

12          MR. SELBST:  Thank you, Mr. Mason.  Good morning, Your

13  Honor, Stephen Selbst, McDermott, Will & Emery for Presstek.

14          THE COURT:  I think you need to speak up, Mr. Selbst,

15  because of our telephone connection.

16          MR. SELBST:  I'm sorry.  I will try to do so, Your

17  Honor.  Mr. Lepene's understanding and recitation of the Order

18  is correct.  I want to make two points.  And I simply want to

19  confirm that point number one that I had understand that was

20  acceptable to both MHR and the Committee was that no D-I-P

21  funds would be used to sue Presstek either in its capacity as a

22  lender or in its capacity as a proposed purchaser of the

23  assets.  Is that correct?

24          MR. MASON:  Yes.

25          MR. SELBST:  Okay.  And secondly, Your Honor, so that

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B557

1 there is no misunderstanding about this, Presstek's willingness

2 to continue as a D-I-P Lender is conditioned expressly in our

3 papers on a bid procedures Order being entered today.  We are

4 here as the stalking horse.  But if Your Honor does not enter

5 the bid procedures Order, we're not prepared to continue to

6 serve as a Lender.  Thank you.

7     THE COURT:  All right.  Is there anybody else who is a

8 proponent of the motion who wishes to be heard before we hear

9 from the Committee and MHR?  If not, go ahead, Mr. Mason, or

10 whoever is going to speak on behalf of the Committee.

11     MR. MASON:  Thank you, Judge.  Once again, Richard J.

12 Mason, McGuire Woods, proposed counsel for the Creditor's

13 Committee.  Judge, at the outset of this case these two motions

14 were presented to the Court.  And both of these motions, in the

15 opinion of the Committee, contain some over-reaching

16 provisions.  If you had granted the motions as originally

17 proposed, the Bank and Presstek would have tied up this Estate,

18 there would have been automatic -- lapses of the automatic stay

19 if we didn't operate on the schedule that was proposed, there

20 would have been other onerous provisions imposed on the Estate.

21 In addition, the sale would be coming up in the next few weeks,

22 and the concept of an auction would have been just a ruse.

23 Fortunately, we've been able to persuade the Debtor, Presstek,

24 and the Bank to back off on a number of these over-reaching

25 provisions.  And the Committee is satisfied with a number of

30

1   the changes.

2       Now to bring this thing into focus, what the Committee is

3   concerned about at this point is, number one, the

4   conditionality of the bid that is being submitted by Presstek.

5   The evidence is going to show that Presstek has many, many ways

6   of getting out of the contract.  And we believe that as a

7   result of the conditionality that the Court should not grant

8   bid protection to Presstek.  Number two, although we are

9   satisfied with the November 15th date being the outside date

10  for closing and being the time that the D-I-P loan comes due,

11  we are not entirely happy with the October 27 and 29th date,

12  and so that has become an issue of concern for us.

13      Now, Mr. Selbst made a comment just before he sat down to

14  the effect that in the event that Your Honor does not approve

15  the sale procedure Order in a form that is acceptable to Mr.

16  Selbst, then Presstek reserves the right to undermine the D-I-P

17  Order and to not make D-I-P loans.  We believe that Presstek

18  has no such right.  I would direct Your Honor's and the

19  parties' attention to Your Honor's July 15, 2004 interim Order.

20  That Order contains a provision in paragraph 39 that says in

21  the event that any inconsistency between the provisions of this

22  interim Order and the provisions of the post-petition financing

23  documents, the provisions of this interim Order shall control.

24  On page 26 of that Order, paragraph 19(R) and (S) read that the

25  financing is conditioned on failure by the Debtors to obtain an

**B559**

1   Order -- an Order -- approving sale procedure on or before

2   August 29, 2004; and (S), failure by the Debtors to obtain an

3   Order on or before September 30, 2004 that authorizes the

4   Debtors to sell substantially all of their assets.

5          We believe that these provisions indicate that if Your

6   Honor approves the sale procedure Order, under any terms, that

7   the D-I-P financing does have to go ahead.  We also believe

8   that in many other instances Presstek has also committed to

9   extend the D-I-P.  And we will present evidence and materials

10  as to those commitments to the extension of the D-I-P as

11  proposed earlier this morning.  Now, the way that we've divided

12  up the responsibilities among the Committee is that my

13  colleague, Mr. Ricciardi, will lead the objection to the sale

14  procedures Order, and Mr. Schlerf of The Bayard Firm will

15  address the D-I-P Order.  So at this point I don't believe that

16  Mr. Ricciardi has any further comments.  But I believe that Mr.

17  Schlerf may have a few further comments about the D-I-P.

18          MR. SCHLERF:  Hello again, Your Honor, Jeffrey Schlerf

19  for the Committee.  Your Honor, I just wanted to supplement

20  just to a small extent what Mr. Lepene -- his characterization

21  of our resolution.  With respect to adequate protection

22  payments, we are adding a proviso in the Order that there -- an

23  event such as the -- it turns out the Pre-Petition lender is

24  undersecured, or the Committee challenges its liens, then the

25  Committee has the right, or the Debtors have the right to

B560

32

1  revisit the issue of adequate protection.  That was the first

2  point I wanted to make.

3       Secondly, counsel described a situation where the

4  Committee challenges the Bank's liens.  And there would be an

5  escrow until that lawsuit was resolved.  I'd like the

6  opportunity to talk a bit more in detail with Mr. Lepene about

7  that, because there might be some reasons why, depending on the

8  scope of the lawsuit, that might not be right for the Bank to

9  have all of its debt escrowed.  There might be other reasons

10  why -- I think there needs to be some mechanics that are

11  discussed.  And I think we can probably resolve that between

12  now and when we present the Order.  I think this was an

13  oversight, Your Honor.  Just to make clear, though, that

14  avoidance actions will remain unencumbered.  Not only the D-I-P

15  Lender's liens, but also they won't be able to get recoveries

16  via their super priority claim -- pursuant to that claim.  If

17  they had a general unsecured claim, they would be able to get a

18  recovery that way, but not either through their lien or super

19  priority claim.

20       With respect to standing, Your Honor, we just want the

21  Order to make clear that whatever rights the Debtors have, the

22  Committee or a subsequent Trustee would have standing in the

23  shoes of the Debtor, as far as standing goes.  He agreed to

24  increase the carve out amounts.  I believe it's $100,000 for

25  the Debtors' professionals, and $75 for the Committee's

B561

33

1   professionals.

2          THE COURT:  You mean 75,000?

3          MR. SCHLERF:  Yes.  That would not be an improvement.

4   Also, we believe this is already the current version of the

5   Order, Your Honor, but with respect to the lifting of the

6   automatic stay in the event of a termination event, what we've

7   done is we've kind of bifurcated that in that if there is a

8   termination event with respect to the post-petition, that there

9   would be the five-day notice period with the opportunity to go

10  before Your Honor on the issue of whether there has actually

11  been in fact a termination event.  With respect to taking

12  action with respect to the pre-petition, Your Honor, that would

13  be something that there would be a longer period, a 20-day

14  period, with the opportunity for a full-blown hearing under

15  Section 362, Your Honor, as opposed to just limited to the idea

16  of whether there's been a termination event.

17          The last point, Your Honor, just to supplement a little

18  bit further about this discussion that we need to have

19  regarding the budgeting of professional fees, paragraph 14

20  discusses -- it's a long paragraph, but it has in there a

21  discussion about weekly escrows of individual professionals.

22  But the Committee has not actually been privy to what the

23  actual budgeted amounts are for the Committee in general.  And

24  to add to that a little bit, I believe since the budget for

25  professional fees is put together, the Committee has retained

B562

34

1    Jeffries as our financial advisor.  And so we want to make

2    sure, Your Honor, that professional fees are reasonable and

3    adequate vis-a-vis the Committee's people.  With that, Your

4    Honor, I think that -- we've put on the record what our

5    resolution is, subject to there being, I guess, two Debtor-In-

6    Possession Lenders.

7              MR. KAY:  Good morning, Your Honor, Eric Kay from

8    Stroock Stroock & Lavan for MHR.  Just want to -- I'm really

9    following up on what Mr. Mason said about the obligations of

10   Presstek to continue as D-I-P Lender in this case.  As you may

11   recall, Judge, the focus at the first day hearing was on the

12   two hats worn by Presstek.  Not only a D-I-P Lender, but also a

13   prospective purchaser.  And the concern expressed by MHR in its

14   objection to the interim D-I-P Order was the ability of

15   Presstek to lock up the sale to itself without a process,

16   without a reasonable process, based upon its -- the hat it's

17   worn as a D-I-P Lender.  And how Presstek was seeking to do

18   that was in the provisions of the proposed D-I-P Order.  And I

19   would focus on paragraph 19(R) of the proposed D-I-P Order

20   which provided that not only did the Court need to enter an

21   Order approving the sales procedures on or before August 27th,

22   but that Order had to provide a break-up fee to Presstek, it

23   had to provide an expense reimbursement to Presstek, it had to

24   provide the bidding increments, and it had to provide, you

25   know, other elements of what would normally be in a bidding

B563

1 procedures Order for a qualifying bid.  And as we expressed to

2 Your Honor, this caused us great concern because if Presstek

3 didn't get that Order, it would have the ability to pull the

4 financing and essentially lock up the assets without a real

5 process.

6     And the way that was resolved is we stripped out of the

7 Order all of those requirements.  All that is remaining in the

8 entered Interim Order is, as Mr. Mason suggested, that the

9 Court must enter an Order approving sale procedures by August

10 27th.  It doesn't say what that Order needs to provide.  And

11 that gave us comfort that Presstek, as long as the Order was

12 entered, would be there and would continue to provide the

13 financing, and hopefully would be there as a stalking horse

14 bidder.  Presstek is now informing us that no, if the Order is

15 not to our liking we could just walk and we could pull our

16 financing.  But I submit, Your Honor, that's simply not what

17 the Order says.  And I would note that at the first day hearing

18 Mr. Selbst indicated that they are prepared to abide by the

19 Court's determination as to what fair sale procedures are --

20 period, full stop.  So I submit, Your Honor, that after the

21 hearing on the bid procedures, if you enter an Order that

22 obviously the Court deems reasonable, that Presstek does not

23 have the ability to pull its financing, whether it has problems

24 with that Order or not.  It's committed to going forward on the

25 D-I-P.  And, you know, what it does with its bid, I don't know.

1   But it's at least committed to going forward with the D-I-P

2   financing.  That's all I have.  Obviously we'll have much more

3   in connection with the bid procedures.

4           THE COURT:  So let me see if I can crystalize for

5   myself where we are here.  With regard to the D-I-P Order

6   itself, which relates to two lenders, Key and Presstek, it

7   appears that perhaps subject to some tweaking there is

8   agreement among the Lenders, the Debtor, and the objectors,

9   including the United States Trustee, concerning how those

10  matters are going to be resolved.  With regard to the bid

11  procedures motion, some of the issues have in fact been

12  resolved, particularly the timing issues, it sounds like,

13  although there is some continuing concern by the Committee as

14  to the October dates.  There is also some proposed resolution

15  of incremental amounts and so on.  What the initial starting

16  overbid has to be.  But not all of those issues, particularly

17  the issues having to do with certain bid protections with

18  regard to Presstek have not been resolved in terms of the

19  amount of a break-up fee or the expense reimbursement, among

20  others.  So what we need to do today is to have a hearing on

21  the bid procedures motion, not so much on the D-I-P.  I mean

22  the D-I-P issues have been fundamentally resolved, except to

23  the extent that there seems to be a difference between the

24  parties.  That is to say Mr. Selbst saying there has to be a

25  bid procedure Order satisfactory to us in order for us to

37

1    consent to the continuation of the D-I-P, and the objectors

2    saying that's not true.  So that's an issue I need to address

3    and resolve.

4         MR. SELBST:  That's correct from our perspective, Your

5    Honor.

6         THE COURT:  I heard Mr. Selbst say that's correct from

7    his perspective.  And I take it that's correct too.

8         MR. KAY:  That is correct from MHR's perspective.

9         MR. MASON:  Judge, I -- the only comment that I would

10   have is I'm not quite sure --

11        THE COURT:  Make sure you're speaking towards the

12   microphone.

13        MR. MASON:  I'm -- excuse me.  I'm looking at Mr.

14   Ricciardi.  I don't believe that there is still an open issue

15   on incremental bidding.  Is that correct?

16        MR. RICCIARDI:  No, there is not an open issue.

17        MR. MASON:  Yes.  Your Honor, we agree with your

18   comments, except that I believe that the parties have reached

19   agreement on incremental bidding.  The two matters that the

20   Committee is concerned about in the sales procedure are the

21   conditionality of the offer, and whether or not there should be

22   bid protections given as a result of that conditionality, and

23   again the August -- I mean the October 27th or 29th dates.

24        THE COURT:  And by bid protections you fundamentally

25   mean a break-up fee.  Is that right?

B566

38

1    MR. MASON:   The break-up fee, and the expense

2 reimbursement.

3    THE COURT:   Expense reimbursement.

4    MR. MASON:   Yes.

5    THE COURT:   Those are the two aspects of bid

6 protection.   We've already done away with the no shop clause,

7 if I understand.

8    MR. MASON:   Yes, Your Honor.

9    THE COURT:   And other types of bid protections that

10 were in the initial thing are gone.   But there's still the

11 issue of the break-up fee, the reasonableness of that, and

12 whether or not it's appropriate given the fact that the

13 Committee believes that there are too many outs for Presstek

14 even to be entitled to a break-up fee.   In other words, your

15 position is if they're gonna get a break-up fee, they've got to

16 be more locked in than you believe they are.

17    MR. MASON:   Precisely, Judge, thank you.   And, Your

18 Honor, we are prepared to put on evidence.

19    MR. LAPOWSKY:   Judge, this is Robert Lapowsky.   Can I

20 be heard briefly on the D-I-P?

21    THE COURT:   Yes.   I'm sorry.   Start again, counsel,

22 and identify yourself.

23    MR. LAPOWSKY:   Robert Lapowsky for Mitsubishi, just

24 with a brief comment on the D-I-P Order.

25    THE COURT:   Okay.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B567

39

1    MR. LAPOWSKY:  Judge, the issue that we had raised in

2    our written objection sounds like it has been covered.  That is

3    the protection of set-off rights.  But when I was listening

4    earlier today I heard for the first time the resolution of the

5    issue of the counting of inventory that's been what they say

6    pre-paid.  And that's fine with Mitsubishi, provided that it's

7    understood, and if there's nothing in the Order that would

8    conflict with the notion that the title to that inventory --

9    because I think they are primarily talking about Mitsubishi

10   inventory -- remains with Mitsubishi until it's fully paid for.

11   So they can -- the Lenders certainly can do whatever they want

12   to do in terms of counting towards borrowing basis, or that

13   type of thing.  But I just wanted to make sure that it was

14   clear on the record that we would not be sort of backdooring

15   some type of title or accelerated passage of title for this

16   inventory that's going to be counted towards the borrowing

17   base.

18        MR. GLEASON:  Your Honor, I wish I was smart enough to

19   think about that.  No, it's pre-paid deposits, and --

20        THE COURT:  I think the issue here, if I understood

21   it, was how that pre-paid inventory was going to be accounted

22   for purposes of whether or not certain ratios that were

23   required to be achieved under the APA had or had not been

24   achieved, thereby providing an out to Presstek to go forward.

25        MR. GLEASON:  Right.  We are not looking to take title

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B568

40

1  to Mitsubishi's --

2          THE COURT:  So you're not trying to change whatever

3  rights the sellers of the inventory may have, but rather simply

4  have agreed on the treatment of the pre-paid inventory for

5  purposes of compliance with the reps and warranties of the APA.

6          MR. SELBST:  Your Honor, it's both the APA and the D-

7  I-P.  You know, in addition to be qualifying as inventory for

8  the working capital adjustment under the Asset Purchase

9  Agreement, it is also inventory for borrowing base purposes

10  under the D-I-P loan.

11          THE COURT:  Right.

12          MR. SELBST:  And, Your Honor, I do want to correct one

13  thing.  I believe my client had only agreed to two and not two

14  and a half million dollars on the pre-paid.

15          MR. LAPOWSKY:  Judge, it sounds like everyone is in

16  agreement.  And I would just ask that I be included on the

17  circulation list for the proposed Form of Order.

18          THE COURT:  All right.  Does that clarification by Mr.

19  Selbst as to the amount of the pre-paid inventory give

20  heartburn to anybody?  Is that contrary to anybody's

21  understanding of what the deal was?

22          MR. GLEASON:  No, that's fine.  That's sufficient,

23  Your Honor.

24          MR. LEPENE:  Your Honor, if I might, Alan Lepene on

25  behalf of Key Bank, just to raise one issue.  And it may fall

B569