1  in the category of tweaking, but I do rise to make this point.
2  With respect to this issue regarding escrow, once the Bank's
3  collateral has been sold and proceeds have been received, if a
4  challenge is raised, and we are awaiting a ruling from the
5  Court, the first time that I have heard any suggestion that the
6  full amount of our debt, what is owed to us, would not be
7  escrowed from the proceeds was when Mr. Schlerf stood up here
8  to raise that issue with you, and suggested that he wanted to
9  talk to me about it. We have been engaged in discussions all
10 week. This is the first time that I've heard that. And this
11 is a point that I think is more than just tweaking from the
12 Bank's standpoint.
13         THE COURT: I understand. And what we're gonna do is
14 take a short break here in a moment so you can in fact discuss
15 that. I must admit I didn't understand that. I mean I
16 understood what Mr. Schlerf was saying, but I didn't understand
17 what he was trying -- I didn't understand why he was saying it,
18 because if in fact what was done here was there was an
19 adversary proceeding lawsuit filed to challenge Key's liens or
20 its debt or recharacterize it or whatever it is you're gonna
21 try to do to it, until there's a determination of that lawsuit,
22 I didn't understand why just because of an allegation made in
23 the lawsuit the amount that would be escrowed should be smaller
24 than the full amount of the debt. And that's what --
25         MR. SCHLERF: Your Honor, Jeffrey Schlerf again.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

42

```
 1         THE COURT:  --I understood you saying.
 2         MR. SCHLERF:  I actually was thinking of an example
 3  that would favor Key, and that there would be less in the
 4  escrow and more in their hands.  But I want to think through
 5  whether there are other situations that might favor us.
 6         MR. LEPENE:  I withdraw my objection, Your Honor.
 7     (Laughter)
 8         MR. SCHLERF:  I'm not limiting it to that example,
 9  Your Honor.
10         THE COURT:  Funny how those things happen, you know.
11  Before -- I want to take a short break to allow the parties,
12  now that they've heard all of their things, to discuss how best
13  to proceed with the presentation of evidence.  Maybe that's
14  already happened.  But also to deal with those questions.  But
15  I also want to ask Mr. Selbst before we go on, what his
16  response is to the position of the Committee and MHR that there
17  is no linkage between the D-I-P and a satisfactory bid
18  procedures Order.
19         MR. SELBST:  Your Honor, right now the interim Order
20  that Mr. Mason referred to said that there had to be a sale
21  Order entered by September 30th.
22         THE COURT:  A sale.
23         MR. SELBST:  A sale Order, not a bid procedures Order.
24  Unless we have a bid procedures Order that is acceptable to my
25  client, our view is we're not prepared to waive that provision.
```

43

And we are certainly not prepared to serve as a Lender in perpetuity without the bid protections. I did tell Your Honor, and I stand by what I said, my client is prepared to be reasonable about the bid procedures Order. We're not here to nickel and dime. But if we're not the stalking horse, Your Honor, I don't think, respectfully, that even the Committee or anybody else, or even Your Honor, is able to compel us to be an involuntary lender.

THE COURT: Well, perhaps --

MR. SELBST: And I don't think that Order --

THE COURT: -- what you're saying is to be an involuntary lender on terms other than those terms as they currently exist.

MR. SELBST: That's correct.

THE COURT: And if I heard what you said correctly -- and correct me if I'm wrong -- perhaps it's better said to say that your consent to the modifications and the various concessions that are made in the proposal that was read on the record previously by counsel for Key is contingent upon a bid protection Order satisfactory to you --

MR. SELBST: Your Honor has said it -- that's correct.

THE COURT: -- as opposed to the lending Order as it currently exists.

MR. SELBST: Your Honor has said it much more nicely than I would have.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

44

1     THE COURT: Yeah, well I'm sure that's true.
2   (Laughter)
3     THE COURT: All right. I do want to take about a 10
4 minute break. I also need to advise the parties that I have a
5 commitment over the lunch hour starting at about 12:00 or 12:15
6 that shouldn't take too long, but -- so we'll have to take a
7 break at that point. But there is -- I had a trial scheduled
8 this afternoon that I was juggling, but it's now been vacated,
9 so we have the time available this afternoon to make sure that
10 an adequate record is made on these points.
11     MR. SELBST: Thank you.
12   (Recess)
13     THE COURT: Please be seated. All right. Are we
14 ready to proceed with the evidence?
15     MR. STOCK: We are, Your Honor.
16     THE COURT: Okay, well let's proceed.
17     MR. STOCK: Good morning, Your Honor, my name is John
18 Stock. I'm with the Columbus office of Benesch, Friedland.
19 I'm one of the lawyers for the Debtors, and I will be handling
20 the first witness. Our first witness is Gregory T. Knipp, K-N-
21 I-P-P, the CFO of A.B. Dick Company and Paragon Corporate
22 Holdings, Inc.
23     THE COURT: All right, Mr. Knipp, please come forward
24 here to the Courtroom Deputy and be sworn.
25     GREGORY T. KNIPP, DEBTORS' WITNESS, SWORN

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Direct  45

1  THE COURT: All right, Mr. Knipp, please take a seat
2  in the witness chair to my right, and speak up clearly into the
3  microphone as our proceedings are being recorded today. Okay,
4  Mr. Stock.
5      MR. STOCK: Thank you, Your Honor.
6           DIRECT EXAMINATION
7  BY MR. STOCK:
8  Q. Mr. Knipp, please state your full name, and business
9  address so we have it in the record.
10 A. My full name is Gregory T. Knipp, K-N-I-double P, at A.B.
11 Dick Company in Niles, Illinois, at 60 -- 7400 Caldwell Avenue.
12 60714 is the zip code.
13 Q. You are currently the Chief Financial Officer of A.B. Dick
14 Company, correct?
15 A. Yes, I am.
16 Q. And you are also CFO of Paragon Corporate Holdings, Inc.?
17 A. Yes, I am.
18 Q. How long have you held those positions?
19 A. Since January of 2000.
20 Q. In your position as CFO for both those corporations, are
21 you familiar with the finances of A.B. Dick and Paragon
22 Holdings during the period of time --
23 A. Yes, I am.
24 Q. -- since you've held -- are you familiar with the business
25 operations of those corporations while you have been CFO for

Knipp - Direct    46

1  them?
2  A. Yes, I am.
3  Q. Greg, I'd like to first give the Judge and others in the
4  Court some idea of your educational experience and your
5  employment history. Please tell us what your educational
6  background is.
7  A. Okay. I have a Bachelor of Science degree in accounting
8  from Bradley University. I have an MBA from the University of
9  Chicago, concentration in finance and international business.
10 And I'm a Certified Public Accountant.
11 Q. You currently have that certification of CPA?
12 A. Yes, I do.
13 Q. Would you describe for us, give us a general overview, if
14 you will, of your professional employment?
15 A. Sure. I graduated in 1977 from Bradley University, at
16 which time I went to work for the public accounting firm of
17 Pete, Marwick & Mitchell for four years until 1981. From 1981
18 to 1987 I was a financial analyst, as well as a treasury
19 manager. I got promoted to treasury manager for Masonite
20 Corporation. From 1987 I joined A.M. International, Inc., a
21 $1.2 billion revenue company that manufactured, distributed
22 printing equipment and supplies to the graphic arts industry.
23 During that time at A.M. International I hired in as a
24 directory of treasury operations. In 1994 I was promoted to
25 Assistant Treasurer. And in 1995 I was promoted to Treasurer.

Knipp - Direct                                                47

1   1997 I received a promotion to CFO of the company which had
2   downsized significantly over the years. A.M. International did
3   file for bankruptcy in 1993, and they divested several
4   divisions. And I became CFO with Multi Graphics division.
5   That division was ultimately sold to A.B. Dick Company in
6   January of 2000, at which time I was asked to stay on as CFO of
7   the A.B. Dick/Paragon companies.
8   Q. In your position as CFO for A.B. Dick and Paragon -- and
9   I'll just use those short names -- labels to describe them --
10  would you please give the Court an overview of your employment
11  responsibilities?
12  A. Okay. My employment responsibilities are the finances of
13  the company, ranging from financial reporting at which time --
14  when I first joined, it was FCC reporting -- treasury, which
15  includes banking relationships, insurance, taxes, employee
16  benefits, and general review of divestitures and acquisitions.
17  Q. All right. Now I'd like to shift to eliciting some
18  testimony regarding the business operations of A.B. Dick
19  Company. Let me first ask is Paragon Corporate Holdings, Inc.
20  a corporation that engages in business activity?
21  A. It's a holding company for A.B. Dick Company, which indeed
22  is in business activity.
23  Q. What are the primary business activities of A.B. Dick
24  Company?
25  A. A.B. Dick Company is a manufacturer and a distributor and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Knipp - Direct                                   48

1   service company to the graphic arts industry. They make small
2   printing presses and digital plate makers. They sell
3   consumables and provide service to the press rooms of small to
4   large printers throughout the country and the world.
5   Q. And then my understanding of it upon the primary business
6   activities is having three prongs. One, as you indicated,
7   manufacturing and selling printing equipment.
8   A. Right.
9   Q. That's one of the prongs, correct?
10  A. That's correct.
11  Q. Now with respect to that prong of the business, is that
12  business activity carried on under any formal division or
13  subsidiary corporate structure?
14  A. No. The way the companies work, it's a -- we call it the
15  three legged stool. It's an equipment business, which is
16  similar to a razor blade theory. The equipment business is the
17  razor. The consumables and service is the annuity tail you get
18  off by placing equipment out in the marketplace from which you
19  get the service business as well as the consumable business.
20  Q. With respect to the manufacturing and selling leg of the
21  stool, if you will, could you give us a description of -- I
22  guess I would call it the obsolescence position of A.B. Dick
23  generally with respect to that segment of the industry?
24          MR. MASON: Your Honor, I'm gonna object to this
25  question on the grounds that there's no foundation that this

Knipp - Direct                                                49

1   gentleman is in a position to start speculating as to the
2   obsolescence of a particular industry.
3           THE COURT: Overruled.
4   A.  Okay. A.B. Dick is going through a transformation like all
5   companies in the graphic arts business which was once a very
6   analog business where it involved film and cameras and things
7   of that nature. It's now become a digital world out there
8   where things are -- press copies and press production is
9   generated from the PC applications. A.B. Dick has a strong
10  portfolio of analog clients out there still. That business
11  will still stay around for a while. It becomes more of a trade
12  on the analog side. And there are a lot of tradesman out
13  there, if you will, that still use that type of equipment.
14  However, during the time over the last 20 years the shift has
15  been going from analog to digital. Analog is more expensive to
16  maintain, and it requires a lot of consumables to utilize the
17  press room. Digital is a lot less, and companies are making
18  that transformation. As such, A.B. Dick's business, in
19  particular its service business has experienced yearly declines
20  of 9, 10% which is in line with the industry average, where all
21  the companies out there, and printers, are going from an analog
22  based technology to a digital based technology.
23  BY MR. STOCK:
24  Q.  I want to move now our focus to the funding of A.B. Dick's
25  corporate operation.

Knipp - Direct                                                                50

1  A. Okay.
2  Q. In your tenure as CFO, what has been the primary source of
3  the funding of the operation?
4  A. Okay. Our primary sources are revolving credit agreement
5  with Key Bank, Corporate Finance out of Cleveland Ohio, and we
6  also had a small relative contingent of cash balances that we
7  received from the sale of a subsidiary back in the year 2000.
8  Paragon Corporate Holdings also owned a company called Curtis
9  Industries, which was in the automotive parts business. And
10 when they sold that business, they received proceeds that were
11 available to the company.
12 Q. Tell us how the funding facility with Key Bank was
13 structured, that is with respect to borrowing base.
14 A. Okay.
15 Q. How that was measured.
16 A. It's what they call an asset-based facility whereby the
17 borrowings are limited to a formula based on the value of your
18 receivables and your inventory. This is domestic only.
19 Basically they look at the perpetual balances of the
20 receivables, as well as the inventory. And they will lend at a
21 certain advance rate on those balances. In particular,
22 inventories that are around 60 cents on the dollar, receivables
23 that are not service contract related at 80 cents on the
24 dollar, and receivables that relate to extension of service
25 contracts at 50 cents on the dollar.

Knipp - Direct                                                      51

1  Q.  In your tenure as CFO of A.B. Dick, what has been the level
2  of borrowing from Key Bank with respect to A.B. Dick's
3  operation?
4  A.  In the 20,000,000 plus range.
5  Q.  Was this credit facility between A.B. Dick and Key Bank
6  memorialized in a written agreement?  Was there a written
7  credit agreement?
8  A.  Yes, yes, there is.
9  Q.  What was the tenure of the agreement or agreements between
10 A.B. Dick and Key Bank?
11 A.  The original agreement was to expire on April 15th, 2003.
12 Again, I came on board in January of 2000.  However, at that
13 time the company had not met its financial covenants.  It was
14 in violation.  And Key Bank continually waived those covenants.
15 And as a result, when it expired -- it was due to expire on
16 April of 2003 -- they extended it for one year roughly.
17 Q.  When the credit facility was extended in April of 2003 for
18 one year, had A.B. Dick had discussions with the Bank
19 concerning extending that credit facility for longer than one
20 year?
21 A.  I think we desired that, but given the situation of the
22 company and that we hadn't met our financial covenants -- also
23 at that time our liquidity became an issue.  And I think the
24 Bank -- I know the Bank was reluctant to go out any longer than
25 that.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

Knipp - Direct                                                                52

1  Q. Would the Bank agree to extend the facility more than one
2  year?
3  A. No, they would not.
4  Q. Let's talk about the uses to which the credit funds were
5  put.
6  A. Okay.
7  Q. What use was made of the money that was borrowed from Key
8  Bank?
9  A. To fund the operations of the company which -- day to day,
10 you know, expenses of the company, plus inventory requirements
11 and what they call working capital requirements.
12 Q. Was payroll a substantial expense for A.B. Dick during this
13 period?
14 A. Yes, it is, and it was. Today it averages about $2.6
15 million a month.
16 Q. Going back to calendar year 2003, how many employees did
17 A.B. Dick Company have?
18 A. At the beginning of the year they had about 850 employees
19 domestically, and about another 200 internationally, for near
20 1,000.
21 Q. All right. How about by the end of calendar year 2003?
22 A. Okay. They were down to about 800, 804, 805, somewhere in
23 there.
24 Q. How did the reduction in numbers come about?
25 A. I'm sorry, did I say 850 to start?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Direct                                                                53

1  Q.  Yes.
2  A.  Yeah, 850 down to 800, yes, that's correct.
3  Q.  Why was there a reduction in numbers?  How did that come
4  about?
5  A.  Okay.  What happened was -- is that the company in December
6  of 2003 had about a $5.8 million liquidity cushion.  Liquidity
7  cushion is defined as what your borrowing base is, minus your
8  utilizations under the facility, which included revolving loans
9  as well as letters of credit.  That number in and of itself was
10 about three or three and a half million dollars.  On top of
11 that, the company had cash balances of about two to two and a
12 half, for somewhere -- a total liquidity balance of about five
13 and a half million dollars.
14 Q.  What sort of annual revenues are we talking about?
15 A.  Okay.  The company is about 190,000,000 in revenues.  It
16 consists of about 55,000,000 on equipment, or 50,000,000 on
17 equipment, 55,000,000 on service and parts, and 85,000,000 on
18 consumable supplies.
19 Q.  With respect to the 5,000,000 or thereabouts cushion that
20 you refer to --
21 A.  Right.
22 Q.  -- as CFO did you consider that a large cushion, a small
23 cushion, what --
24 A.  No, we did not.  For a company that has that level of
25 revenues, having a $5,000,000 liquidity cushion is very thin.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B582

Knipp - Direct                                          54

1  And especially in our circumstance where our projected EBITDA
2  for that year, 2003, was supposed to be about $7,000,000. Of
3  that $7,000,000 though, we have an up front requirement for the
4  year of about two and a half million to cover interest expense.
5  We also have to pay off some what they call old liabilities
6  from the acquisition of Multi Graphics, which was acquired in
7  January of 2000, of about two to two and a half million a year.
8  So if you take those two items right by themselves, that's
9  $5,000,000 of the 7 that gets used for cash that gets consumed
10 out of the EBITDA balance. Then what happens is at least
11 $2,000,000 roughly to fund the rest of the operations. And
12 that means everything else has to go right in terms of the
13 revenue projections. And when you start missing your revenue
14 projections, the liquidity falls accordingly.
15 Q. So in essence are you telling us the $5,000,000 cushion
16 represents a margin of error for meeting budget?
17 A. Well, margin of error for just keeping above zero, keeping
18 a positive liquidity balance.
19 Q. With respect --
20 A. I can answer that. The margin of error -- or the budget
21 was projected to come in at about -- started the year at 5.8
22 and was supposed to end about 5.1. That was the 2003 budget in
23 terms of total liquidity. So --
24 Q. With respect to the borrowing base as it's defined in the
25 credit facility with Key Bank, did A.B. Dick do any sort of

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0197

1  budgeting so as to police its operations, if you will, with
2  respect to the budget --
3  A.  Yes, it did.
4  Q.  -- or the borrowing base?
5  A.  When it did its annual budget it would calculate to
6  determine what its earnings were going to be for the year, its
7  EBITDA, and roll it into what they call a liquidity forecast
8  month by month which projects out on a monthly basis what the
9  cushion would be.  Where it started at 5,000,000 and where it
10 would end by 5.1 million at the end of the year.  But that was
11 projected month to month based on the activities of the budget.
12 Q.  And why did A.B. Dick do that budgeting?
13 A.  It's required to for the Bank, for one thing.  Plus it
14 gives you a scorecard as to what you're supposed to be tracking
15 to on a day to day basis when you operate your business.
16 Q.  During calendar years 2003 and into 2004, would A.B. Dick
17 have been able to operate its business on an ongoing basis
18 without the Key Bank credit facility?
19 A.  No, it would not have.
20 Q.  Now, in late 2002 did A.B. Dick Company begin to experience
21 problems in meeting this budget?
22 A.  Yes, it did.  In year 2002 it missed its budget by about
23 $3,000,000 -- it's EBITDA budget.  And that left it with, like
24 I said before, about 5.5, $5.8 million of total liquidity.  In
25 2003 though it ran into further problems.  It missed its

1  service business revenues by about $4.8 million. It missed its
2  equipment -- and by the way, when you miss your service
3  business revenues, that's a direct fall through to the bottom
4  line of about 90%, because the fixed cost on that is your
5  installed base of service people that are out in the field.
6  And that is a fixed salary that you pay no matter what. So
7  when you miss the revenue side, that falls right through to the
8  bottom line. Equipment fell by about four and a half million,
9  and having a margin impact of about a million and a half
10 dollars. And supplies fell a million and a half, having a
11 margin impact of about a half a million. If you take those
12 three things together, that's about four and a half million
13 dollars of liquidity that left the company because it did not
14 meet its revenue targets.
15 Q. What is the significance of that, or was the significance
16 of that for A.B. Dick with respect to its credit facility at
17 Bank One -- or, excuse me, Key Bank?
18         THE COURT: Are we talking now about 2003 or --
19         MR. STOCK: We are talking end of calendar year 2003,
20 Your Honor.
21 A. Basically, as you can imagine, with the -- missing the
22 revenue targets like we did, we violated the bank covenants,
23 the financial covenants. The Bank did grant quarterly waivers
24 of those at the time. However, it did decrease the liquidity
25 quite a bit. When you start the year with $5.8 million of

Knipp - Direct                                                     57

1  liquidity and you end up, you know, utilizing 4.5 million just
2  on margin loss alone because of lower sales, our liquidity by
3  the end of 2003 was at about 1,400,000. And of that 1,400,00,
4  it was basically zero under the Key Bank facility, and about
5  1,400,000 of cash balances that were left with the company at
6  the time.
7  BY MR. STOCK:
8  Q. And when you say it was zero liquidity under the Key Bank
9  facility?
10 A. Yeah. That means at the time, December of 2003, our total
11 borrowing base minus the utilization, which is revolver debt
12 plus letters of credit, was at zero.
13 Q. So there was no -- are you telling us there was no more
14 credit that A.B. Dick was entitled to under the credit
15 facility?
16 A. That's correct -- under the current formulas of the
17 revolving credit agreement.
18 Q. And that's as of end of calendar year 2003. Is that
19 correct?
20 A. Right.
21 Q. Okay. Now you mention that the service leg of the
22 business, as we're calling that, was under budget by I think
23 you said $4.6 million?
24 A. Yes.
25 Q. Why was that?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Direct                                                    58

1  A. Basically it goes back to what I referred to before as the
2  old technology. There's these old analog -- they call systems
3  machines -- that had very expensive service contracts with
4  them. And those machines, they've been out in the field for 10
5  to 20 years. And there is a phenomenon in the way where all
6  these printers who own those machines are shutting them down
7  and replacing them with lower price technologies on the digital
8  side. So you're replacing an expensive contract with a less
9  expensive contract. So, therefore, you get the net decline
10 between the two.
11 Q. Did this shrinking of the business service leg at the end
12 of 2003 relate to one or a few large customers?
13 A. No, many customers. It was an industry-wide phenomenon.
14 Q. What actions did A.B. Dick take in response to being in a
15 situation at the end of calendar year 2003 where budget had
16 been missed and the lending facility from Key Bank had been
17 tapped out?
18 A. Well during 2003 -- and this wasn't just a miss that
19 happened at the end of the year. It happened throughout the
20 year. And the company reduced head count, reductions in force
21 by about 50 people in 2003, and also instituted a company-wide
22 reduction in its overhead spending, namely in its advertising,
23 its travel, and its outside professional fees for engineering
24 services in our Rochester, New York facility.
25 Q. All right. This brings us to the end of 2003. Let's talk

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Direct                                                  59

1  now about the beginning of calendar year 2004. Does the
2  financial position of A.B. Dick improve or does it get worse?
3  A. It gets worse. We entered that year, as I mentioned, with
4  about 1,400,000 in cash, zero availability under our credit
5  line. The budget for 2004 is about $6,000,000 of EBITDA. That
6  EBITDA number included -- to get there, we had to take out
7  three and a half million dollars of costs which were
8  anticipated in the budget, which is about 100 employees that
9  would go through a reduction in force. That budget also was
10 very much what they call back-end loaded in that it made most
11 of the $6,000,000 in the second half of the year. So it was
12 understood going into the calendar year 2004 that we would be
13 operating on a very tight basis with marginal liquidity, break
14 even liquidity. You get to -- and then what happened was is
15 that at that time the payables, the accounts payable levels of
16 the company were at about 45 to 50% past due. And that was up
17 from what we call our normal level within our company of 25 to
18 30%. Having said that, the vendors were not willing to extend
19 terms any longer, or extend us out in terms of dating the
20 payables to them. And they started demanding payment. And as
21 a consequence, the liquidity fell. And the sales fell out
22 because we couldn't acquire inventory to support sales,
23 especially in our equipment business. Through June 30th our
24 equipment business fell by about $8,000,000 to budget. And
25 that's about a $2,000,000 margin miss. So if you start the

Knipp - Direct                                              60

1   year with about 1,400,000 of liquidity, and you miss $2,000,000
2   in margin to extend your equipment business alone, that takes
3   you down to zero quickly. And that's where we ended up.
4   Q. Okay. You've done a nice job of giving us a general
5   overview. I now want to take the Court through some specific
6   concrete numbers so that we can make a record as to precisely
7   what was happening month by month in the first five or six
8   months of 2004.
9          MR. STOCK: Your Honor, I have an exhibit I'd like to
10  have the witness identify. May I approach?
11         THE COURT: All right. Do the other parties have a
12  copy of the exhibit?
13         MR. STOCK: They do.
14         MR. GLEASON: Your Honor, this has been produced to
15  the other parties previously. We are handing them a copy,
16  but --
17      (Pause in proceedings)
18  BY MR. STOCK:
19  Q. Mr. Knipp, I've handed you what has been marked as
20  Exhibit- 1. I guess we'll call it Debtor's Exhibit-1. Would
21  you please identify this for the record?
22      (Debtor's Exhibit-1 previously marked for identification)
23  A. Okay. This is what we call our August 2004 forecast that
24  we prepared about two weeks ago. And it's something we did as
25  part of the bankruptcy process. We wanted to take another look

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191