Knipp - Direct                                    61

1  at the business after we filed the D-I-P budget, and to go out
2  through the end of October. The original D-I-P budget only
3  went out to October 16th.
4  Q. What I'm interested in for our purposes here today, Greg,
5  is not projections, but actual financial figures. So let's
6  turn to the fifth page of this. One, two, three, four, five.
7  A. Okay.
8         MR. MASON: Judge, I think it would assist the parties
9  if Mr. Stock would represent that this is the same document
10 that was produced in Mr. Pollack's deposition.
11        MR. STOCK: It is.
12        MR. MASON: Okay.
13 BY MR. STOCK:
14 Q. Greg, we've gone to page five. Do you see that there?
15 A. Yes, I do.
16 Q. Paragon Corporate Holdings {comma}, Inc. Cash Flow
17 {slash}/Liquidity Analysis.
18 A. Yes.
19 Q. Now, there's an asterisk. And it indicates at the note
20 that the figures exclude foreign subsidiaries. So which
21 corporation -- A.B. Dick Company's operations would be included
22 in this?
23 A. Well basically what this schedule is, the top box is a roll
24 forward of our cash flow, month to month.
25 Q. Okay.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  A.   The bottom box shows -- I mean as it's labeled, liquidity.
2  And the way this works though is that the cash flow that's
3  shown up above represents the A.B. Dick domestic subsidiary as
4  well as the Paragon Corporate entity. The foreign subsidiaries
5  are shown through one line, which is a line as you see there
6  that says, "increase/decrease of intercompany subsidiaries."
7  The cash to and from them flow through that line on a net
8  basis.
9  Q.   Let's start with the cash flow analysis.
10 A.   Okay.
11        MR. MASON:  I'm sorry, we're having a little
12 difficulty following. I don't know if we're on the same page.
13        MR. STOCK:  Page five. The fifth page.
14        MR. MASON:  Okay, but not a numbered page?
15        MR. STOCK:  No. It's one, two --
16        MR. MASON:  I see.
17        MR. STOCK:  -- three, four, fifth page in.
18        MR. MASON:  Thank you very much.
19        MR. STOCK:  Paragon Corporate Holdings, Inc. Cash Flow
20 (slash)/Liquidity. Is that what you have?
21        MR. MASON:  Thank you.
22 BY MR. STOCK:
23 Q.   Greg, let's take the Court through the cash flow analysis.
24 Let's start with the column that says, "Actual December '03."
25 A.   Okay. The bottom number at the bottom of that first box

Knipp - Direct                                                        63

1   represents our ending what we call net debt position as of
2   December '03. And that was made up at the time there of
3   revolver borrowings of 22,459,000, and the cash balance that I
4   referred to before of 1,428,000. And what you do, you see the
5   21,031,000 net number goes up to the top of the next column.
6   And --
7   Q. Start with the --
8   A. January of '04.
9   Q. The revolver debt there.
10  A. Right, the net cash position of the company with net debt
11  position.
12  Q. Now with respect to actual December '03, the middle number
13  in the parenthesis, $22,459,000 --
14  A. Right. That's the same number from above. The debt
15  number.
16  Q. Okay.
17  A. The borrowing number. The number right below that, the
18  1,304,000 is the amount of letters of credit that Key Bank was
19  extending on our behalf. So our total utilization with the
20  Bank at that time was 23,763,000.
21  Q. That's in the liquidity analysis portion in the same column
22  below?
23  A. That's correct.
24  Q. Now we move up to -- let's start with Actual January '04
25  Cash Flow.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1  A.  Okay.

2  Q.  Take us through those numbers.

3  A.  Okay. What those basically show you is what are the

4  elements of cash flow on a month to month basis. And what

5  we've done here basically is EBITDA, which is the EBITDA of the

6  domestic company only, and the Paragon Corporate -- do you want

7  me to take you through each line item, or --

8  Q.  Let's go through the line items for the first column.

9  We're not going to do it for all of them.

10 A.  Okay.

11 Q.  Just so we have a point of reference --

12 A.  Okay.

13 Q.  -- for this.

14 A.  The EBITDA number is, you know, our earnings for that month

15 on a domestic basis, which includes the A.B. Dick's sub

16 domestically as well as the Paragon Corporate Holdings

17 corporate entity. And they lost $621,000. That's a cash

18 outflow. During the month, the company liquidated its

19 receivables. It went down by 2,184,000. That's a cash

20 generator of cash. Inventories during that same period went up

21 by 580,000. So that shows a negative 580. And at the same

22 time, accounts payable went up as well. And what sometimes

23 happens in a business when your inventories go up, your

24 payables go up commensurate with that because you get terms

25 when you buy the inventory. The deferred service balance there

Knipp - Direct                                                                 65

1  that you see, deferred service revenue, is 924,000 negative.
2  And that has to do with our service business where we're
3  getting less money from pre-paid service contracts. It's the
4  issue of the 4.6 million in the prior year continuing on into
5  January of this year.
6  Q. Okay.
7  A. And then the other represents basically a pay down of
8  payroll at the end of the month. We had a payroll close to the
9  end of the month, and that's what that represents.
10 Q. All right.
11 A. The -- also shows if you go down to the next -- and by the
12 way, that subtotal there of 87,000 is typically what you call
13 your cash flow from your operations. And you get down below
14 that, and you go and you look --
15 Q. The (87,000) {in parenthesis} means you're negative 87,000?
16 A. Negative 87. Virtually break even at that point. But
17 basically what you did there, you liquidated your receivables
18 due to a lower sales volume probably. You collected cash and
19 you didn't put receivables back with new billings. The capital
20 expenditure line is just what it is. It's payment for
21 property, plant and equipment, which we kept to a minimum
22 obviously because of the precarious cash situation we were in,
23 and liquidity position. The capital lease obligation is paid
24 down on the leases that we have on our balance sheet. And the
25 increase within our company subsidiaries, or decrease, that

Knipp - Direct                                                          66

1  number means -- the 473 means that we were able to get cash out
2  of our foreign subs to help keep the business running during
3  this time.  So if you add all those up you get a net cash flow
4  for the month of January of 115,000.  And if you take the
5  21,031,000 number at the top of the page of the January column,
6  add the 115 to it, you'll get the 20,916,000 which is the very
7  bottom number of the top box.  That's the mechanics of this
8  schedule.
9  Q.  I'm sorry, tell me that number again.
10 A.  Oh, it's the 21,031,000 which is the number at the top.
11 Q.  Right.
12 A.  That's the net debt number to start the month.
13 Q.  Okay.
14 A.  We add 115,000 in positive cash flow overall.
15 Q.  All right, on the total line.
16 A.  On the total line.
17 Q.  Okay.
18 A.  And then you come down to the ending net cash revolver per
19 balance sheet of 20,916,000 negative.
20 Q.  Okay.
21 A.  And the component is -- basically is that during that time
22 you can see the cash component of that 20,916,000 is 987 versus
23 1,400,000 to start the month.
24 Q.  Sure.
25 A.  So you we spent cash, and we also changed the revolver

Knipp - Direct                                                67

1  balances.
2  Q. Okay. Now let's follow --
3          THE COURT: Let me interrupt for a moment.
4          MR. STOCK: Yes.
5          THE COURT: Does the intercompany number represent
6  overall positive cash flow from those subsidiaries' operations?
7  Or is that just the amount of money you were able to extract
8  from your foreign subsidiaries?
9  A. It could be both.
10         THE COURT: So it doesn't necessarily mean the Debtor
11 operating at a positive cash flow of 473. That's just what you
12 were able to --
13 A. Yeah.
14         THE COURT: -- squeeze out of the rock.
15 A. Yes, Your Honor. Basically what happens here is I think --
16 I don't have it right in front of me -- but what they did
17 during the month, they probably made a couple hundred thousand
18 dollars. Of that 200,000 they transferred 473 out of earnings
19 and the other 200 out of their own cash reserves.
20 BY MR. STOCK:
21 Q. Let's go down to the liquidity analysis and see where that
22 left the corporation as a result of the cash flow set forth
23 above. Revolving loans. You start out with 21,903,000 in
24 January '04?
25 A. Well that's the ending January number. We started at the

Knipp - Direct                                                                 68

1  number to the left of that, which is the Actual December '03.
2  Q. Right, okay.
3  A. Total borrowings were 22,459,000 plus letters of credit of
4  1,304,000 to come up with 23,763,000.
5  Q. Okay.
6  A. So that's the ending December number --
7  Q. Right.
8  A. -- which is beginning January.
9  Q. Okay.
10 A. Then below that you see the borrowing base, which is the
11 calculation, the advanced formula based on receivables and
12 inventory that the company had. And if you take the difference
13 between those two, you can see there that we had a positive
14 16,000 which is basically you're out of money.
15 Q. You're over in the December of '03 column. Is that
16 correct?
17 A. Yes, I am.
18 Q. Okay.
19 A. Yeah.
20 Q. So you -- December of '03 column, if you look to the line
21 in the liquidity analysis, potential available credit line,
22 that is a reference to the credit available to A.B. Dick from
23 Key Bank under the credit facility?
24 A. That's correct.
25 Q. And that would be $16,000 is all that's left on that line?

Knipp - Direct                                                    69

1   A.   Yes, on a $200,000,000 revenue company.
2   Q.   Okay. Now how about at the end of January '04 liquidity
3   analysis? Where was A.B. Dick with respect to the borrowing
4   base and the extent --
5   A.   Okay.
6   Q.   -- of the credit line with Key Bank?
7   A.   The report there shows that we were under -- we're over-
8   advanced, if you will, by $63,000, which means our utilization
9   exceeded our borrowing base formula. However, there's a lag in
10  reporting this. At the time that we actually came upon the end
11  of January we probably had a couple hundred thousand dollars of
12  favorable liquidity that got chewed up once we closed the books
13  at the end of the month.
14  Q.   Okay. I don't want to go through each of the lines --
15  A.   Right.
16  Q.   I don't want to go through each of the lines --
17  A.   Right.
18  Q.   -- with respect to actual February, March, April, May and
19  June. Those figures are all on that exhibit, correct?
20  A.   Right, that's correct.
21  Q.   All right, why don't you just read for us the liquidity
22  position of Paragon Corporate Holdings with respect to the Key
23  Bank credit line for those months?
24  A.   Okay, January was a negative $63,000, February was a
25  negative $7,000, March was a negative $3,000, April was a

Knipp - Direct                                                70

1  negative $313,000, May was a negative $1. -- $1 million,
2  212,000 and June was a negative $3 million, 98,000.
3  Q.   As CFO of these corporations, what does that tell you?
4  A.   We're out of money.
5  BY THE COURT:
6  Q.   Well, you're more than out of money.
7  A.   Yes.
8  Q.   What -- was there a source of funding those -- that
9  negative liquidity?
10 A.   Basically, what happened here --
11 Q.   In other words, were there advances in excess of what the
12 formula allowed --
13 A.   Yes, there were.
14 Q.   -- from Key Bank?
15 A.   But we didn't know it -- the way this always happens is
16 that if you get a week or so to true everything up and at the
17 time, what happens is that you true up -- there's certain
18 reserves that get taken out of your gross inventory and your
19 gross receivable balances.  For instance, on the receivables,
20 they exclude receivables that are over 90 days old.  We don't
21 know what those are until two days after month end.  So what
22 this means here is that at the time, our over 90's may have
23 gone up -- over 90 day old receivables may have gone up at the
24 time we closed business on Friday, but we didn't know it until
25 after the fact.  And so, on -- with Heinset, we are over

Knipp - Direct                                                    71

1  advanced, but at the time, we didn't know we were until a few
2  days after month end.
3  BY MR. STOCK:
4  Q. All right, now you testified earlier that the credit
5  facility was extended in April of 2003 for a year, so that
6  means it's, by it's terms, to expire in April 2004, correct?
7  A. That's correct.
8  Q. During this period we're studying?
9  A. Right.
10 Q. All right. Did you have -- did you meet with Key Bank to
11 discuss with them extending the credit?
12 A. Yes, we did. I personally visited them in March of 2004,
13 based on the anticipated end date of April 15, 2004 under the
14 facility.
15 Q. You mentioned before (indiscern.) of the forecasting or
16 modeling --
17 A. Right.
18 Q. -- with respect to the credit facility. When you met with
19 Key Bank did you have a forecast or --
20 A. Yes, we did.
21 Q. -- model for purposes of your discussion?
22 A. That was the --
23        MR. MASON: Your Honor, I'm gonna object. Your Honor,
24 this is all very interesting information and I think it's
25 something that ought to be covered at some point, but as I

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Knipp - Direct                                                72

1  understand it, the issue before the Court is whether or not we
2  have a reasonable bid protection to Presstek. And all this
3  information, at this point, seems to be irrelevant to that
4  particular issue. So, if there's some transitional issues that
5  we've got to cover, some basic information, I don't mind going
6  through it. I think we've already covered the basic
7  information at this point. We're beyond the scope of what I
8  think the hearing is intended to cover.
9          THE COURT: Well, I'll overrule the objection. I
10 assume that counsel is laying the foundation for the issues
11 that need to be resolved and will not take more time than is
12 necessary to do that.
13         MR. STOCK: Yes, and I will simply take my cue from
14 the Court, Your Honor. It's my understanding that at the
15 initial exchange of papers on these motions, there was some
16 questioning as to the good faith of the Debtor. And I think as
17 well, though it's not my water to carry, of Presstek and the
18 terms of the initial deal. If we're now being told that that's
19 no longer an issue and that is all irrelevant, then I don't
20 need to make a record here as to the dire straits and the lack
21 of alternatives that A.B. Dick Company had when they attempted
22 to negotiate this deal in July.
23         THE COURT: I -- personally, I think that's relevant
24 and I'm interested in knowing about it. And I think we ought
25 to move along. We don't need to over build the record on that.

Knipp - Direct                                                           73

1   But we're up to a point here in April of '04 where the -- where
2   the Key Bank line was expiring by its own terms as I understand
3   it.
4           MR. STOCK:  Right.
5           THE COURT:  In April there was a substantial jump
6   negatively in the liquidity, and in May, June, July, that
7   becomes a torrent in the next few months there.
8           MR. MASON:  Yes.
9           MR. KNIPP:  That's correct.
10          THE COURT:  So, I mean, I'm interested in
11  understanding why that happened, how that happened.
12          MR. KNIPP:  Okay.
13          THE COURT:  What the background of that was and then
14  the -- then tie into whatever business decisions the Debtor was
15  making with regard to post, you know -- the timing of the
16  filing in the middle of all of this and then the negotiation of
17  the post-petition financing and understanding how that all
18  works together.
19          MR. STOCK:  And --
20          THE COURT:  Which I assumed is where you were going.
21          MR. STOCK:  I'm trying to get there as ardently as I'm
22  capable, Your Honor.  I'll try to move along.
23  BY MR. STOCK:
24  Q.  What did the forecast show --
25  A.  Okay.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Direct 74

1  Q.  -- that you were sharing with Key Bank at that time you
2  were attempting to renew the credit line in April of '04?
3  A.  Basically show that the liquidity would be negative in the
4  months of July and August.
5  Q.  Was the discussion with Key Bank -- was the basis upon
6  which you were discussing additional lending continuing normal
7  billing concern operations of A.B. Dick?
8  A.  Well, the issue at the time was is when we met Key Bank had
9  been monitoring the company's discussions with Presstek in
10 regard to the sale of the company to Presstek.  The
11 negotiations had gone on for quite a long time, this is my
12 understanding of it.  The -- I should point out that the
13 negotiations were, in fact, handled at the ownership level of
14 A. B. Dick Paragon, and I was brought in from the operations
15 side to talk about the operating side of the business.  But
16 they were concerned about the lack of progression in getting to
17 a final sale of the Presstek transaction.  And on that basis
18 alone, they at that point in time -- we met that day in March,
19 and they came back a few days later and said that they would
20 extend the bank agreement until the middle of July under the
21 assumption that the Presstek sale would be consummated by then.
22      THE COURT:  We're going to have to stop in a few
23 minutes.
24 A.  Yeah.
25      THE COURT:  So let me just ask you, if I could ask --

Knipp - Direct                                              75

1       MR. STOCK:  Absolutely, Your Honor.
2       THE COURT:  -- a couple of questions, at this point.
3  BY THE COURT:
4  Q.  When did the negotiations first start, if you know, with
5  regard to the sale of the business to Presstek?
6  A.  Okay, I heard, from -- that they started in the summer of
7  last year.
8  Q.  You were not personally involved?
9  A.  No, I did not get involved until December.  I was brought
10 under a confidentiality --
11 Q.  December of '03?
12 A.  '03, under a confidentiality agreement.
13 Q.  So, at the time that you became specifically, personally
14 involved --
15 A.  Right.
16 Q.  -- it was your understanding that it had been going on for
17 a period of months?
18 A.  Yes.
19 Q.  And then after that, do you have personal knowledge about
20 what happened with regard to those negotiations?
21 A.  Not directly, no.  I was not involved in the direct
22 negotiations.
23 Q.  And what was your role in connection with the initial
24 Presstek deal?
25 A.  I provided due diligence information in terms of the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B604