Knipp - Direct                                                                  76

1  operations of the company over the past 3 or 4 years.
2  Q. Did you understand the structure of the proposed deal, the
3  price to be paid, the manner in which it was to be done --
4  A. I had heard --
5  Q. -- and that sort of thing?
6  A. -- the number out at one point -- it's around $63 million
7  at one point, and that changed though. It -- from what I
8  understand it -- and I -- this could be maybe rumor -- is that
9  I heard it would start out as an asset purchase then it went to
10 a stock purchase.
11 Q. But you were not, in any event --
12 A. No.
13 Q. -- directly involved in that?
14 A. No.
15 Q. So you're not really the one with the knowledge of how all
16 of that happened to the extent --
17 A. Right.
18 Q. -- that's relevant?
19 A. Right.
20        MR. MASON: You did?
21 BY THE COURT:
22 Q. But at some point, we were involved in the discussions with
23 Key Bank about the extension of the loan beyond the maturity in
24 April?
25 A. Well, what happened there was that the meeting we had in

1  March -- attending that meeting with me were Frank Sefina, the
2  Chairman of Paragon Corporate Holdings, Inc. and John Fountain,
3  who is a Board Member for Paragon Corporate Holdings. I
4  attended with them to provide operational financial support to
5  the meeting.
6  Q. You were physically present at the meeting?
7  A. Yes, I was.
8  Q. And as a result of that meeting, you say there was an
9  extension until July?
10 A. 'Til about July 15th, I recall, yes.
11 Q. And that was in connection with the underlying assumption
12 that the business plan was to sell the business to Presstek --
13 A. Yes.
14 Q. -- and that the deal would put together one way or the
15 other by then?
16 A. Right.
17 Q. Okay.
18         MR. STOCK: Thank you, Your Honor.
19 BY MR. STOCK:
20 Q. Advances were made by Key Bank after --
21 A. Okay --
22 Q. -- the agreement to an extension is --
23 A. Yes, what happened was, as you can see on the schedule
24 here, we were negative 300,000 and the end of April, which was
25 a timing issue. However, we actually jumped up to 1.2 million

Knipp - Direct                                                              78

1   in May. And what Key Bank had agreed to do through amendments
2   to the agreement, they gave us two $1 million over advances in
3   the month of May, which means is that the formula for the
4   borrowing base wasn't sufficient and therefore, they just --
5   they extended beyond the terms of the original agreement.
6   Q.  Was there a million dollar over advance in June?
7   A.  Yes there was.
8   Q.  Approximately when was that?
9   A.  Around June -- the middle of June -- June 18th. Our
10  payroll was on June 18th, so I gotta believe it was right
11  around that time.
12  Q.  Payroll is 1.3 million twice a month?
13  A.  Yes it is.
14  Q.  Okay.
15  A.  Or every other Friday.
16  Q.  Every other Friday?
17  A.  Right.
18  Q.  How -- what were you to do or -- what was going to be the
19  source of funds for the next payroll to come due on July 2?
20  A.  Okay, on July 2nd, the day before pay day, I received a
21  call from our banker, Mike Lugley. He asked me how things were
22  for the payroll the next day. I said we needed about -- I
23  recall at the time -- around 900,000. Michael informed me that
24  the bank was only willing to extend a half a million dollars,
25  and that was the limit that they were gonna go on the over

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  advance. So, that would be cumulative three and a half million
2  dollars of over advance.
3  Q. So you were $400 short for payroll?
4  A. 400,000, which I had to delay freight payments, which are
5  due every Friday and -- that was a couple hundred thousand.
6  And I was able to extract some cash out of our foreign
7  subsidiary in Canada on a temporary basis. You know, one of
8  these things were you give it to me today, I'll give it back to
9  you next week to cover your payroll, Canada's payroll.
10 Q. The next $1.3 million payroll would be due 14 days later.
11 A. On June -- July 16th.
12 Q. What contingencies did you have at that point --
13 A. We had none.
14 Q. -- and what -- let me continue.
15 A. Oh, sorry.
16 Q. Once Key Bank told you they would not lend any money?
17 A. We had no contingencies, we had no sources of liquidity.
18       THE COURT: Is that a good place to stop for the mid-
19 day break?
20       MR. STOCK: Yes, Your Honor. I literally think I may
21 have two, three questions.
22       THE COURT: All right.
23       MR. STOCK: I'm done on my direct.
24       THE COURT: Let's go ahead. Do that.
25 BY MR. STOCK:

1  Q.  Well, had you, on behalf of A.B. Dick, attempted to obtain
2  financing for operations from a source other than Key prior to
3  this point?
4  A.  Yes, a year and a half before that, in the Fall of 2002,
5  the company, largely through the owners, NES Investment
6  Company, had contacted Foothill Capital as well as a company
7  called Surberus, who are -- they lend to financially distressed
8  companies, often referred to as lenders of last resort.  And
9  they declined to extend financing to us.
10 Q.  So in July 2004, once Key Bank told you they would not lend
11 anymore, were you aware of any other source --
12 A.  No, I was not.
13 Q.  -- to obtain funds for payroll?
14 A.  No.
15 BY THE COURT:
16 Q.  Do you know if there was an effort made again in July of
17 2004 to contact lenders such as Foothill or Surberus?
18 A.  I do not know.
19 BY MR. STOCK:
20 Q.  How was the financial position of A.B. Dick back in late
21 2002, early 2003 when Foothill and Surberus turned down A.B.
22 Dick compared to its financial situation in July 2004?
23 A.  Well, at that time we had, under the borrowing advance
24 formulas Key Bank, we had about $5 million liquidity; $3
25 million under the bank line and about $2 million in cash -- $2½

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

Knipp - Direct                                                            81

1  million dollars of cash.
2  Q.  That was when you were turned down?
3  A.  Yes.
4  Q.  Okay.  And how about July 2004, how was the financial
5  position from here?
6  A.  We were over advanced by $3½ million dollars.
7  Q.  Substantially worse financial position?
8  A.  Yes.
9  Q.  Okay.  What happened next, to your knowledge?
10 A.  That was on July 2nd.  We met our payroll, we just squeaked
11 by.  And within the next week and a half, we filed bankruptcy
12 on July 13.
13 Q.  Was there a press release upon the filing of the
14 bankruptcy?
15 A.  Yes, there was.
16 Q.  Okay.  Upon the filing of the bankruptcy and the press
17 release announcing the filing of the bankruptcy, have you as
18 CFO of A.B. Dick Company or Paragon Corporate Holdings, been
19 approached by anyone other than Presstek to buy the stock or
20 the assets of those corporations?
21 A.  I have not.
22         MR. STOCK:  No further questions, Your Honor.  Thank
23 you.
24         THE COURT:  All right, thank you.  We'll take a break
25 at this point.  As I say, the afternoon is clear.  I know that

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Direct                                                82

1  probably is not great for some people's plane reservations but
2  that's the way it goes. I will try to be back maybe by 1:15
3  and we'll stop -- start no later than 1:30 this afternoon and
4  then, as I say, we have the afternoon to proceed. Thank you.
5  We'll be adjourned.
6       (Court in recess)
7       THE COURT: Please be seated. Are you ready to
8  proceed with Mr. Knipp?
9       MR. MASON: Yes, Judge. Some of the parties have
10 asked me if we can get some idea of the Court's scheduling. I
11 know that it's difficult to predict because the Court doesn't
12 know how long this hearing is going to take place, nor do the
13 parties. But how long would you expect to go, Your Honor,
14 if --
15      THE COURT: Well, I expect to go as long as it takes
16 to get it done.
17      MR. MASON: Okay.
18      THE COURT: I don't know what that means but, really,
19 I don't think I have any time tomorrow. And I don't have any
20 time on Wednesday, and I'm leaving on Thursday morning. So
21 today is your day, and if that means we go until it's dark,
22 then we go until it's dark.
23      MR. MASON: Okay.
24      THE COURT: Okay?
25      MR. MASON: That's helpful, Your Honor.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Cross                                                                 83

1           CROSS EXAMINATION
2  BY MR. MASON:
3  Q. Good afternoon, Mr. Knipp. Mr. Knipp, in or about May of
4  2004, how much was the -- how much was the debt owed to the
5  bank?
6  A. I don't have that number off the top of my head. I can say
7  that the over advance was in the million-two range. I don't
8  have that exhibit with me, I didn't bring it back.
9  Q. Okay. I'm gonna give you --
10 A. Yeah.
11 Q. Is there something that would refresh your recollection?
12 A. Yeah.
13 Q. And that's the Exhibit-1 that you looked at a little bit
14 earlier?
15 A. Yes, yeah.
16 Q. I don't have the precise copy that you were given.
17 A. Okay.
18 Q. I'm giving you a copy that is --
19         THE COURT: What happened to the Exhibit?
20         MR. GLEASON: Where is it? I don't know.
21         THE COURT: We haven't admitted this Exhibit. Do you
22 want admit this Exhibit, Counsel?
23         MR. STOCK: Well, I would move after the end of the --
24 his testimony to admit it, yes. We stipulated, I believe, as
25 to -- was this authenticity or not?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191

Knipp - Cross                                                          84

1    THE COURT: Do we have an issue with regard to this?
2 Is there an objection to the admissibility of this evidence?
3    MR. MASON: Judge, we may have. The document has
4 many, many different pages in it, and I think at the end of
5 this cross examination I would have a better idea of whether
6 we're gonna have an objection --
7    THE COURT: Well where's the -- the exhibit that he
8 was referring to before? Let's make sure we're dealing with
9 the same thing as we had before.
10    (Counsel confer)
11    MR. MASON: Thank you, Judge. We have the deposition
12 version of the same document.
13    (Debtor's Exhibit-1 previously marked for identification)
14 BY MR. MASON:
15 Q. Mr. Knipp, do you now have Exhibit #1?
16 A. Yes, I do.
17 Q. And does that refresh your recollection as to what the debt
18 was to the bank as of May 1, 2004?
19 A. Yes it does.
20 Q. And what was that debt?
21 A. Including the letters of credit, $20 million, 934.
22 Q. How much was it for June 2004?
23 A. June was at $23 million, 148,000.
24 Q. And July?
25 A. $22 million, 953,000.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B613

Knipp - Cross                                                                85

1   Q. And approximately how much was it as of the time of the
2   filing of the bankruptcy?
3   A. $23 million, 112. Somewhere around there.
4   Q. Okay. And at the time of the filing of the bankruptcy,
5   approximately how much in accounts receivable did A.B. Dick
6   have that was subject to the bank security interest?
7   A. I say $18 million, roughly.
8   Q. Okay.
9   A. Domestic receivables, that is.
10  Q. And are those the only receivables that are subject to the
11  bank security interest?
12  A. Yes.
13  Q. And how about the inventory that is -- there was as of the
14  time of filing the bankruptcy, subject to --
15  A. Net inventory -- inventory net or reserves -- I want to say
16  in the $11 to $12 million range.
17  Q. And was there equipment at the time of the filing of
18  bankruptcy that the bank alleged a security interest in?
19  A. Yes.
20  Q. And what was the cost of that equipment?
21  A. Well, the net book value's around $3.2 million.
22  Q. And by the way, when we spoke about the (indiscern.) being
23  $12 million as of the time of the bankruptcy, was that at the
24  lower of cost or market?
25  A. Yes it is.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Cross                                                                86

1  Q. What other significant assets has the bank claimed security
2  interest in as of the time of the filing of bankruptcy?
3  A. Those are the major assets. I do know that -- that we have
4  stock in our foreign subsidiaries, and I'm not exactly sure
5  whether they had an interest in that stock or not, Canada and
6  the UK.
7  Q. And now, does the -- does A.B. Dick have intellectual
8  property rights?
9  A. Yes.
10 Q. Does it have patents?
11 A. Yes.
12 Q. And approximately how many patents does it have?
13 A. I can't answer that.
14 Q. Can you give us some estimate? Is it more than 25?
15 A. I don't want to speculate. I don't know.
16 Q. Are you aware of any new and innovative patents of A.B.
17 Dick?
18 A. No, I mean, we are working together with Presstek on a
19 joint development of a metal plate maker using Presstek's laser
20 imaging technology, but that is not our patent, that is their
21 patent.
22 Q. Was there an agreement between Presstek and A.B. Dick
23 concerning the development of that plate maker?
24 A. Yes there is.
25 Q. And have you seen that agreement?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Cross                                                                87

1   A.   Yes.
2   Q.   And what -- can you summarize the terms of it?
3   A.   I cannot.
4   Q.   When was that agreement entered into, approximately?
5   A.   I'm not exactly sure. I believe in the springtime. I have
6   not focused on that agreement though, I just know of it.
7   Q.   In the Spring of 2004?
8   A.   Yes. It could be earlier.
9   Q.   And are you familiar with any effort by Presstek to
10  terminate that agreement?
11  A.   No I'm not.
12       (Pause in proceedings)
13  Q.   Now, many of the products that are produced by A.B. Dick --
14  or, I'm sorry, strike that. Many of the products that are
15  produced for A.B. Dick by its suppliers, are subject to A.B.
16  Dick's patents, are they not?
17  A.   Yes. I wouldn't say many, I know of some.
18  Q.   All right, now you earlier testified that beginning around
19  2 -- December of 2003, you began to work on the due diligence
20  for a stock or asset sale?
21  A.   Early December, yes.
22  Q.   Okay, and that was Presstek?
23  A.   Yes.
24  Q.   I'm gonna show you what we've marked as Committee Exhibit-A
25  for identification of which appears to be a letter dated April

Knipp - Cross                                                88

1   27, 2004 and a draft Stock Purchase Agreement.
2       (Committee's Exhibit-A previously marked for
3   identification)
4       MR. MASON:  Your Honor, I have already previously told
5   the parties --
6       MR. SELBST:  I don't have copies of these, Mr. Mason.
7       MR. MASON:  I'm sorry, Mr. Selbst.  I believe that I
8   have a copy for you, but I don't have copies generally for
9   everybody.
10      THE COURT:  Is this what was attached to your
11  objection?
12      MR. MASON:  Yes, it was, Your Honor.  You do,
13  therefore, have a copy?
14      THE COURT:  I don't think I have a printed out copy so
15  I would need one if you have -- but, just for the benefit of
16  other parties, if you have that objection.
17      MR. SELBST:  I don't have an objection with it.
18      MR. MASON:  Uhm --
19      THE COURT:  How many copies do you have?
20      MR. MASON:  Your Honor, unfortunately -- I have one
21  for Mr. Selbst and there is one for the Court and -- I
22  apologize for --
23      THE COURT:  Have we marked one too?
24      MR. MASON:  Yes, and I've given it to the witness.
25  This would be Committee Exhibit-A.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Cross                                                                89

1    THE COURT: Yes, let's call this A. We'll have -- the
2    Debtors exhibits will be numerical, these will be alphabetic.
3        MR. MASON: Thank you, Your Honor.
4    BY MR. MASON:
5    Q. Now, first of all, have you ever seen this before?
6    A. No, I have not.
7    Q. You've never seen the cover letter?
8    A. No.
9    Q. And have you ever seen the Stock Purchase Agreement?
10   A. I received a draft of the stock purchase agreement sometime
11   around the first half of May. I had attended a meeting in New
12   York when they were doing negotiations with MHR's offices. And
13   based on that meeting, it was decided that I should get a copy
14   of that agreement.
15   Q. And does this appear to be a copy of the agreement which
16   you received?
17   A. The fact that it says "Stock Purchase Agreement" that's all
18   I can say, I mean --
19   Q. Well can you -- can you take a couple of --
20       MR. MASON: Let me advise the Court that Mr. Gleason
21   and I have agreed that this document is authentic, that it
22   is -- was in books and records, although Mr. Gleason has
23   reserved his right to object to the admission of this document
24   on the grounds of relevancy.
25       MR. GLEASON: I would state for the record, Your

1  Honor, it was in the Debtors books and records. That does not
2  mean that Mr. Knipp ever saw it.
3  BY MR. MASON:
4  Q. Mr. Mitt -- Mr. Knipp, does that appear to be the agreement
5  that you saw, the draft agreement, in or about May of 2004?
6  A. Well, that was 2 or 3 months ago and I mean, yeah, I mean,
7  it's a Stock Purchase Agreement. Whether it's the same
8  agreement, I can't tell you that.
9  Q. Okay. Mr. Knipp, you -- you earlier testified that you
10 were generally familiar with a Stock Purchase Agreement between
11 A.B. Dick and Presstek, is that right?
12 A. Generally familiar, I was aware of it.
13 Q. You were aware of it?
14 A. Yes.
15 Q. I'd like to turn your attention to page 10 of Exhibit-A,
16 and in particular, focus you on paragraph 2.2, which is titled
17 "Consideration".
18     (Witness examines document)
19 BY MR. MASON:
20 Q. Mr. Knipp, in the early portion of paragraph 2.2, there
21 appears to be a purchase price for the stock of A.B. Dick of
22 $22 million, 600,000 in cash and $18 million, 500,000 in
23 Presstek stock. Do you see that?
24 A. Yes, I do.
25 Q. Is that consistent with your understanding of the agreement

1  that was proposed to A.B. Dick by Presstek in April or May of
2  2004?
3  A.  I had heard of terms in that -- that level, yes.
4  Q.  And I'd like to also turn your attention to page 50 of this
5  agreement, and in particular, paragraph 9.14, titled "Other
6  Indebtedness".  And that paragraph seems to indicate that
7  Presstek would not be assuming either the Key Bank debt or the
8  obligations of A.B. Dick to certain note holders.  Is that your
9  understanding of the way the Stock Purchase Agreement we've
10 earlier discussed --
11 A.  I was never given a clarification as what -- how the debt
12 was gonna be dissolved.
13 Q.  Now, in April 2004, what was the debt of A.B. Dick other
14 than the debt owed to Key Bank and to the note holders?
15 A.  You mean A.B. Dick or Paragon?  'Cause A.B. Dick has no
16 debt other than the fact that it's got trade payables and some
17 accrued liabilities and the deferred service obligations.
18 Q.  Okay.  Well, what were the -- then let me ask you this --
19 what were -- what was the debt of A.B. Dick in April 2004?
20 A.  A.B. Dick on it's books would have had accounts payable,
21 would have had accrued liabilities, it would have had differed
22 service revenue, it would have had some capital lease
23 obligations and it would have had probably an inter-company
24 balance owing to Paragon.
25 Q.  I'm looking at the 15th page of Exhibit-1.

1	THE COURT: 1 or A? Oh, 1.
2	MR. MASON: This is 1.
3	MR. GLEASON: What's it say on the bottom right there?
4	MR. MASON: Ah, it doesn't say anything.
5	MR. GLEASON: In the little -- to the top --
6	MR. KNIPP: To the top -- "Reconsolidated" or "US"?
7	BY MR. MASON:
8	Q. Down in the right-hand corner it says, "2004 FCST
9	Board.xls/bsus --
10	A. Okay.
11	Q. Do you see that?
12	A. Yes.
13	Q. Okay, am I'm correct in reading this to mean, under
14	"Current Liabilities," that as of April 2004, the total current
15	liabilities of A.B. Dick were approximately $39 million?
16	A. It says here the current liabilities are $40 million, 500.
17	On May, you're saying?
18	Q. I'm sorry, I said in April.
19	A. Oh, April -- 30 million, 981, yes.
20	Q. Okay. And for May?
21	A. $40 million.
22	Q. $40 million, 504,000?
23	A. Right, right.
24	Q. And for June, $37 million, 899,000?
25	A. Correct.

Knipp - Cross                                                                 93

1   Q.  Is that correct?
2   A.  Yes.
3   Q.  And is this consistent with your recollection of how much
4   debt A.B. Dick had under current liabilities as of those days?
5   A.  Yes.
6        (Pause in proceedings)
7            MR. MASON:  Now Judge, again, a little commentary.  I
8   just received a copy of the signed Stock Purchase Agreement
9   from Mr. Gleason and I think we just have a little bit of a
10  communication gap.  I thought he was gonna give me a copy with
11  the signature on it.  So I only have a non-signed copy, which
12  is titled "Execution Copy" and I just received it.  And it's my
13  understanding that we have stipulated that this is also part of
14  books and records of A.B. Dick, and Mr. Gleason is reserving
15  his right to argue that this document is irrelevant.
16           MR. GLEASON:  Your Honor, let me make up what I'm --
17  kind of colloquy on this -- but this document was produced to
18  the Committee last week, was identified by the Committee's
19  general -- or the Debtor's general counsel.  The Committee was
20  advised at that time that the Debtors did not have a signed
21  copy of that document.  We would look for a signed copy and
22  provide it.  2 days ago, we advised the Committee that we did
23  not have a signed copy of the agreement, although we had signed
24  signature pages.  Because what happened, I believe -- Mr. Knipp
25  can testify to this -- he was sent signature pages, signed the

Knipp - Cross 94

1 signature pages and sent them back. Those pages were being
2 held pending consummation of the agreement if it ever was
3 consummated, which it was not. So, I guess to be clear, this
4 is a document that is in the books and records of the company.
5 We do not have a signed copy of that agreement. Mr. Mason does
6 have the signature pages for this document, as well as several
7 other documents that were (indiscern.).
8     MR. SELBST: John, identify signed by whom and not
9 signed by whom.
10     MR. GLEASON: Yes, it was the signature pages that we
11 provided, signed by Greg Knipp, on behalf of A.B. Dick. We do
12 understand that there's a signature page that was signed by
13 Paragon as well. It was not signed by Presstek or Silver.
14     MR. MASON: I just wanted to point out to the Court
15 that I only have one copy of this document, and I am sorry that
16 I don't have more copies. But in any event, I -- now, Mr.
17 Knipp --
18     THE COURT: Is this different from Committee Exhibit-
19 A?
20     MR. MASON: It is different in non-material respects,
21 Your Honor. There are some blanks in Committee Exhibit-A that
22 seem to be filled in Committee Exhibit-B.
23     THE COURT: Okay.
24 BY MR. MASON:
25 Q. All right, Mr. Knipp, I'm now gonna show you what we've

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  marked as Committee Exhibit-B and ask you if you are familiar
2  with that document?
3       (Committee's Exhibit-B previously marked for
4  identification)
5  A.  I did sign signature pages to a Stock Purchase Agreement
6  that I believed to be the execution copy, but I have not
7  actually seen any Stock Purchase Agreement other than that one
8  that was sent to me in early part of May.
9  Q.  I'm now gonna show you what we've marked as Committee
10 Exhibit-D, and the record should reflect that I've skipped over
11 C; we'll go back to C.
12      (Committee's Exhibit-D previously marked for
13 identification)
14         MR. MASON:  Your Honor -- then I have another copy for
15 anybody who wants to take a look at it.
16      (Pause in proceedings)
17         THE COURT:  That's his signature?
18         MR. MASON:  That's his signature.
19         THE COURT:  Okay.
20 BY MR. MASON:
21 Q.  First of all, Mr. Knipp, is that your signature on
22 Committee Exhibit-D?
23 A.  Yes, it appears to be.
24 Q.  And is this your understanding the -- of the document that
25 you signed agreeing on behalf of A.B. Dick to the Stock