Knipp - Cross                                                          96

1  Purchase Agreement, which we marked as Exhibit-B?
2  A.  Yes.
3  Q.  Thank you.
4      (Pause in proceedings)
5  Q.  And were you granted authority by A.B. Dick to sign that
6  signature page, Exhibit-D?
7  A.  Yes I am.  Yes I was.
8  Q.  I'm now gonna show you what we've marked as A.B. Dick --
9  I'm sorry, that's Committee Exhibit-C.
10     (Committee's Exhibit-C previously marked for
11 identification)
12 A.  Okay.
13         MR. MASON:  And Your Honor, I will represent to the
14 Court again that Mr. Gleason and I agreed that this is an
15 authentic document that was taken out of the books and records
16 of A.B. Dick.  And again, I believe that Mr. Gleason's only
17 possible objection to this is on the grounds of relevancy.
18         MR. GLEASON:  We do stipulate the authenticity, Your
19 Honor.
20         THE COURT:  I'm sorry, I didn't understand what you
21 said, Mr. Gleason.
22         MR. GLEASON:  We do stipulate to the authenticity of
23 the document.
24         THE COURT:  Okay, thank you.
25 BY MR. MASON:

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B625

Knipp - Cross                                                          97

1   Q. On the third page of Exhibit-C, there is a letter dated
2   June 22nd, 2004 signed by what appears to be a gentleman named
3   Musa Emusa. Do you see that?
4   A. Yes, I do.
5   Q. Have you ever seen this letter before?
6   A. I'm not sure. I saw a letter right around this time that
7   talked about -- I'm trying to read the whole letter through --
8   is this where Presstek has declined to go through with the
9   transaction?
10  Q. That was my question to you.
11  A. Yeah, I heard of that and I didn't read the letter very
12  closely, I just heard there was a letter, yeah.
13  Q. What was your understanding of Presstek's willingness to go
14  ahead with the Stock Purchase Agreement that we've marked as
15  Exhibit-B in or about June 2004?
16  A. It was my understanding that they decided not to go through
17  with the transaction based on circumstances that they learned
18  or -- at that point in time. I don't want to use the word
19  "learned," but whatever they -- for whatever reason.
20  Q. Did you attend a dinner of Presstek and A.B. Dick
21  executives in Chicago shortly after the filing of the
22  bankruptcy?
23  A. Yes I did.
24  Q. And was Presstek's president there?
25  A. Yes they were -- yes he was.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B626

Knipp - Cross 98

1  Q. And who is that?
2  A. Ed Marino.
3  Q. And was A.B. Dick's then president there?
4  A. Yes he was.
5  Q. And what is his name?
6  A. Brian Long.
7  Q. And where was that meeting?
8  A. A restaurant -- I don't recall the name of the restaurant,
9  it was -- there's several in that area near our offices in
10 Niles, Illinois.
11 Q. Okay.
12 A. It was actually in Rosemont, Illinois, that's where the
13 restaurant was at.
14 Q. All right, and who else was present?
15 A. Musa Emusa was there from Presstek; Michael McCarthy from
16 Presstek; and then the executive staff of A.B. Dick Company.
17 Q. How many executives from A.B. Dick were present?
18 A. Without giving a specific count, probably around 10, eight
19 to 10.
20 Q. And at that meeting, did you hear Presstek's president tell
21 Mr. Long, the President of --
22      MR. GLEASON: Objection, Your Honor, this is -- he's
23 trying to elicit hearsay. He's seeking a declaration by a
24 statement made by a Presstek executive who's clearly not in
25 this Courtroom.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Cross                                                           99

1       MR. MASON: Judge, I -- this would be a party
2   admission to be admission against interest. Presstek is here.
3   They're a party to this proceeding.
4       THE COURT: Overruled.
5   BY MR. MASON:
6   Q. At that meeting, did you hear Presstek's President tell Mr.
7   Brian Long, A.B. Dick's President --
8       THE COURT: Why don't you just ask him if he heard
9   anything from the one to the other, rather than ask --
10  A. What I heard was a general statement to that effect.
11      THE COURT: To what effect?
12  A. It wasn't directed directly at Mr. Long necessarily.
13      THE COURT: I just -- first I want to know whether or
14  not you heard some conversation as a foundational matter then
15  you can ask the follow-up question.
16  BY MR. MASON:
17  Q. Did you hear any conversation --
18  A. Yes, I did.
19  Q. -- among the parties? Did you hear Mr. Marino, the
20  President of Presstek, say anything to Mr. Long, the President
21  of A.B. Dick?
22  A. He -- he made a comment to that effect, what you just
23  indicated about the CFO -- CEO. But he didn't necessarily, as
24  I recall, look directly --
25      THE COURT: I don't understand --

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  A.  -- at Mr. Long.
2          THE COURT:  -- what you said.
3          MR. MASON:  Mr. Knipp, I --
4          THE COURT:  He hasn't -- he hadn't said anything yet.
5  A.  Oh, okay.
6          MR. MASON:  I think you were anticipating --
7  A.  Okay.
8          MR. MASON:  -- my question.
9  A.  All right.
10 BY MR. MASON:
11 Q.  Would you please describe to the Court as best you recall
12 what statement you heard being made by Mr. Marino to Mr. Long?
13 A.  Well -- what did you ask me before -- so I'm perfectly
14 clear on this?
15 Q.  Yes.  Did you hear Mr. Marino say anything to Mr. Long at
16 that meeting, yes or no?
17 A.  Not directly to Mr. Long.
18 Q.  Did you hear Mr. Marino say anything to the executives
19 assembled at that meeting?
20 A.  He said a lot of things.
21 Q.  Okay.  Did you hear him say anything about the longevity of
22 a CEO of a company?
23 A.  Yes, I did.
24 Q.  And what did he say, to the best of your recollection?
25 A.  The average longevity of a CEO is 4 years, or 4.2 years, or

1  something to that effect.
2  Q. Okay. And was Mr. Long there at that time this statement
3  was made?
4  A. Yes he was.
5  Q. And did Mr. Long later get fired by A.B. Dick?
6  A. He was terminated, yes.
7  Q. Okay. And how much after that meeting was he terminated?
8  A. It was around the end of July. That meeting was on July
9  14th, the dinner meeting was.
10 Q. Okay. So the dinner meeting was the day after the filing
11 of the bankruptcy. At the dinner meeting, Mr. Marino made that
12 statement and 2 weeks later, Mr. Long was discharged?
13 A. Yes.
14 Q. What does each -- you talked about the three-legged stool,
15 describing the operations of A.B. Dick. What does each of the
16 leg of the stool generate in revenue and EBITDA, E-B-I-T-D-A?
17 A. Okay, they are -- let me just think about if for a
18 second -- in 2003, equipment business generated about $50
19 million in revenue. And when you define EBITDA, it's a very
20 subjective number, but it was definitely negative on the
21 equipment side, okay? And the reason why I say it's -- it's
22 subjective is -- there's a lot of common costs that get shared
23 amongst the three business units. And it's up to the holder to
24 decide how they want to allocate those cost out. But needless
25 to say that the -- the equipment business lost -- could lose

Knipp - Cross                                                                 102

1  money anywhere from, you know, 5 to 13, 14 million, depending
2  on how you allocate the cost. The supplies business is about
3  $85 million and probably makes around 9 -- on that same basis -
4  - in the $9 million, $10 million range. And --
5  Q. That's 9 to 10 million positive?
6  A. Positive, yes.
7  Q. EBITDA?
8  A. Yes, and the service business, that's about a $55 million
9  business, companywide. And that probably generates at least 5
10 to 10 million itself.
11 Q. So, the supply division, if I could call it that, and the
12 service division, if I could call it that, generates EBITDA of
13 somewhere between 15 and $20 million a year?
14 A. Combined?
15 Q. Yes.
16 A. On a -- that allocation basis, yes, but again, that can
17 range probably 10 -- 5 million down to 10 to 20 million, I
18 guess, depending on how you look at it.
19 Q. Has the company management considered shutting down the
20 losing division and continuing to operate the more profitable
21 divisions?
22 A. No, not to my recollection, not in my discussions.
23 Q. Now --
24 A. I need to explain something there though --
25 Q. How --

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Cross                                                        103

1  A.  Okay.
2  Q.  Now, you earlier testified that somebody tried to find
3  Debtor-In-Podssession financing for A.B. Dick, is that correct?
4  A.  Yes.
5  Q.  And were you involved in that?
6  A.  Providing due diligence information. But the discussions
7  with the powers to be from the lending institutions were
8  handled through the ownership structure of Paragon.
9  Q.  And what -- how long did these discussions take place?
10 A.  Well, when I got involved, it was probably in the late fall
11 of the year 2000, and they terminated in the early winter of
12 2003.
13 Q.  I'm sorry, Mr. Knipp, I think that maybe we got our days a
14 little bit confused. Did you mean to say that you commenced
15 discussions in the year 2000?
16 A.  2002, I'm -- did I -- I meant to say 2002.
17 Q.  I'm asking you, and I'm just looking for clarification --
18 A.  Yeah.
19 Q.  I'm asking you -- you had earlier testified that it was
20 your understanding that A.B. Dick had approached two potential
21 sources of Debtor-In-Possession lending for this bankruptcy.
22 A.  Right.
23 Q.  And I'm asking you when that approach took place, as best
24 you know?
25 A.  The Fall of 2002.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Knipp - Cross                                                   104

1  Q. The Fall of 2002?
2  A. Yeah.
3  Q. And when did those discussions end?
4  A. I'm not exactly sure. I was asked for information from
5  time to time, but I believe they ended right -- January,
6  February of 2003.
7  Q. Okay.
8  A. About the same time that Key Bank, our current lender, gave
9  us an amendment to our existing agreement.
10 Q. Okay. So, since January or February of 2003, there has
11 been no effort by A.B. Dick, as best you know, to find the
12 Debtor-In-Possession financing lender --
13 A. I don't want to say, the best I know --
14 Q. -- other than by Presstek?
15 A. The -- as I mentioned before, the ownership structure
16 conducts inquiries on their own to find alternative sources of
17 financing. Whether they've done that or not, I can't tell you.
18 But I do know that they engage in those kind of discussions
19 from time to time.
20 Q. And so this company was -- the implication of your
21 statement is that the company was considering bankruptcy as
22 early as late 2002?
23 A. No, I can't say that, I don't know that at all.
24 Q. Well you said that you were participating in due diligence
25 for Debtor-In-Possession lending --

1  A. No, no, alternative financing to the Key Bank agreement,
2  the Key Bank Revolving Credit Agreement. Under no -- make it
3  clear, if I said before it was Debtor-In-Possession financing,
4  it was not, it was just financing.
5  Q. I see.
6  A. Regular --
7  Q. And so my question to you, and I don't mean to confuse you
8  --
9  A. Yeah.
10 Q. I want to make sure that the record is clear --
11 A. Yeah.
12 Q. Did you ever participate in an effort by doing due
13 diligence or otherwise to obtain Debtor-In-Possession
14 financing for this bankruptcy proceeding?
15 A. No, I did not.
16     (Pause in proceedings)
17         MR. MASON: Your Honor, if I could just have one
18 minute?
19     (Pause in proceedings)
20 BY MR. MASON:
21 Q. Currently, how much money is borrowed on the Debtor-In-
22 Possession, the line?
23 A. Right now, it's probably around zero.
24 Q. Was there ever any money borrowed from the Debtor-In-
25 Possession line?

Knipp - Cross    106

1  A.  I believe a week ago it was up towards a million dollars.
2  Q.  Okay, but it's down to zero at this point?
3  A.  Yeah, it fluctuates based on the timing of payrolls.
4  Q.  Mr. Knipp, thank you.
5      MR. MASON:  Judge, thank you.
6      THE COURT:  Do we have other cross examination?
7              CROSS EXAMINATION
8  BY MR. SELBST:
9  Q.  Good afternoon, Mr. Knipp.  My name is Stephen Selbst, I
10 represent Presstek.  Mr. Knipp, I want to direct your attention
11 back to the meeting where you testified to a few moments ago
12 between Presstek executives and A.B. Dick executives.  At that
13 meeting, did you ever hear anyone from Presstek tell anyone at
14 A.B. Dick to fire Mr. Long?
15 A.  No.
16 Q.  Did you ever hear it at any other time?
17 A.  No.
18 Q.  Did you ever hear about anyone at Presstek telling A.B.
19 Dick to fire Mr. Long?
20 A.  No.
21 Q.  Thank you.  Now, I also want to direct your attention to
22 the various forms of the Stock Purchase Agreement that were the
23 subject of your earlier testimony.  Did you ever see a signed
24 signature page from Presstek to that Agreement?
25 A.  No I did not.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B635

Knipp - Cross                                                                    107

1    MR. SELBST:  Nothing further.
2                        CROSS EXAMINATION
3    BY MR. LEPENE:
4    Q.  Mr. Knipp, I just have one or two questions.  You testified
5    in response to a question from Mr. Mason that at the time of
6    the filing, that bank debt was about 23 million, do you recall
7    that?
8    A.  Yes.
9    Q.  And you testified that the receivables at that time were
10   about 18 million, do you recall that?
11   A.  Yes.
12   Q.  And that's on a book basis, is that correct?
13   A.  That's -- 18 million is the gross number.  I'd say net or
14   reserves are probably closer to 16½ to 17.
15   Q.  Okay.  And inventory at that time, you testified, was 11 to
16   12 million?
17   A.  Yes.
18   Q.  Again, on a book basis?
19   A.  Yes.
20   Q.  Okay.  You don't have any idea, do you, if this company
21   were to cease operating and were to liquidate, what the
22   recoveries --
23   A.  No, I don't.
24   Q.  -- would be and it's receivables?  Let me finish the
25   question.

Knipp - Redirect                                         108

1  A. Okay.

2  Q. You don't have any idea what that would be, do you?

3  A. No.

4  Q. And the same with the inventory, if this company were to

5  cease to operate and were to be liquidated, you don't have any

6  idea of what the recovery on the inventory would be, do you?

7  A. No.

8  Q. Thank you.

9          MR. STOCK: Redirect, Your Honor.

10                  REDIRECT EXAMINATION

11 BY MR. STOCK:

12 Q. Greg, Mr. Mason asked you whether the company had

13 considered shutting down the less profitable division, I

14 believe was the term that he used.

15 A. Right.

16 Q. Was there any -- is there any formal division of functions

17 under A.B. Dick?

18 A. No.

19 Q. Okay.

20 A. Let me say this, though. There are different operating VPs

21 that run the equipment business, the service business and the

22 supplies business, but they're not formal legal divisions.

23 Q. And why has that not been considered?

24          MR. MASON: Your Honor, I'm gonna object to that

25 question. There's been no foundation. This gentleman has

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0197

Knipp - Redirect                                                                109

1   testified --
2           THE COURT: Sustained. If you lay foundation, or if
3   he knows why, then he can testify.
4   BY MR. STOCK:
5   Q. Do you know why?
6   A. Can you repeat the question please?
7   Q. Yes. Mr. Mason asked you whether or not the company has
8   considered shutting down a less profitable division.
9   A. Right.
10  Q. Remember that?
11  A. Yes.
12  Q. He apparently thought you may have knowledge regarding that
13  and I'm following up.
14  A. No.
15  Q. Do you have knowledge regarding that?
16  A. No I don't.
17  Q. Okay.
18          MR. STOCK: No further questions.
19          THE COURT: I have a couple of questions.
20  BY THE COURT:
21  Q. Mr. Knipp, from the time the case was filed, can you give
22  me a history of what's been drawn and re-paid on the DIP line?
23  A. I don't have those numbers exactly but I would anticipate
24  that probably a million to a million and a half has been drawn
25  on the DIP line and re-paid; it fluctuates up and down.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Knipp - Redirect                                                110

1  Q. That's re-paid from collection of receivables?
2  A. Yes it is.
3  Q. Right now it's at zero?
4  A. Yes.
5  Q. You would expect it to go -- do you expect the company to
6  be back into the line sometime soon?
7  A. Yes.
8  Q. Does that come on a bi-weekly basis, having to do with
9  inventory?
10 A. Well it has to do with the business plan as well. Yes,
11 we're -- our forecast shows that we're going to be buying more
12 inventory to fund Mitsubishi and other vendors to get product
13 in and --
14 Q. What do your forecasts show that you will actually meet on
15 the DIP line between now and November?
16 A. I want to say 5 to $6 million.
17 Q. On a revolving basis, up and down?
18 A. Yes, but tracking upwards.
19 Q. And what are the primary purposes for which that money will
20 be used?
21 A. To buy inventory and also to fund the operations of the
22 business. The business is expected to lose money in the next 3
23 months.
24 Q. And also to pay the costs of the bankruptcy case?
25 A. Those are included in that, yes.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Voir Dire                                         111

1  Q. And to pay the inventory?
2  A. Yes.
3  Q. Purchase inventory?
4  A. Yes.
5  Q. Okay, thank you.
6        THE COURT: Any questions from anybody based upon my
7  questions to the witness?
8        ALL: (No verbal response).
9        THE COURT: If not, you can step down, Sir.
10       MR. KNIPP: Do I leave these Exhibits here?
11       THE COURT: Please leave them there, yes. All right,
12 what's next?
13       MR. GLEASON: Your Honor, the Debtors would call Glenn
14 Pollack.
15       THE COURT: Mr. Pollack, come forward here to the
16 Courtroom Deputy to be sworn.
17       GLENN POLLACK, DEBTOR'S WITNESS, SWORN
18       THE COURT: Mr. Pollack, please take a seat to my
19 right in the witness chair and speak up clearly into the
20 microphone. Okay, Mr. Gleason.
21       MR. GLEASON: Thank you, Your Honor.
22                            VOIR DIRE
23 BY MR. GLEASON:
24 Q. Could you please state your name for the record?
25 A. Glenn Pollack.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B640

Pollock - Voir Dire                                              112

1  Q. Can you describe for the Court your educational background
2  after high school?
3  A. I received a degree in Accounting from Boston University
4  and I'm a Certified Public Account, currently inactive.
5  Q. Can you describe before the Court your work history after
6  high school?
7  A. My employment after college began with Touche, Ross as an
8  accountant in Boston in 1980. In 1983 I went to work as the
9  CFO of a troubled advertising agency. In 1984 I joined Sideman
10 & Associates, a workout firm in Cleveland, Ohio. That firm
11 merged into Price Waterhouse in 1988 or 1989. I remained with
12 Price Waterhouse in their workout consulting group. In 1990 I
13 became the CEO of one of the Price Waterhouse workout clients,
14 called A & W Foods. That business ran until October of '94.
15 Then I opened Pollack & Associates, a financial advisory firm.
16 That business was merged into a middle market investment bank
17 by the name of Brown, Gibbons & Lange in 1996. In 2001 I
18 formed Candlewood Partners with two other gentleman.
19 Q. Can you describe for the Court your experience with
20 distressed companies?
21 A. Since 1984, I have been at a variety of companies --
22 troubled companies -- CEO, Receiver, Chapter 11 Trustee,
23 Financial Advisor, Investment Banker, Consultant for a wide
24 variety of clients.
25 Q. Let's turn to the -- to your experience in bankruptcy

matters. You indicate a Chapter 11 Trustee, are there any other type of bankruptcy related as opposed to out of bankruptcy related matters?

A. I've been a Receiver, I have also acted as Financial Advisor and Investment Banker for a number of Chapter 11 Debtors.

Q. Can you describe for the Court generally what a Financial Advisor does on behalf of a Debtor in bankruptcy, both pre- and post-petition?

A. Yes. Depending upon the timeframe in the case in which you're hired, your activities might include helping management and the Board analyze their strategic options, helping to develop forecasts, help to develop financing alternatives, to the extent it's appropriate, begin the production of a selling memorandum, the assembly of a list of interested parties, negotiations with potential parties. There's a wide variety of activities.

Q. Those last items you mentioned, are they also related to what an Investment Banker does in bankruptcy or are they separate?

A. They are related to an Investment Banker; there's an interesting line.

Q. Have you ever been involved in a 363 sale process?

A. Yes.

Q. Can you give the Court an idea of how many of those sale

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

Pollack - Direct 114

1   processes you have been involved in?
2   A.   Over the last 20 years it's certainly been more than 30.
3   Q.   Have you been involved in Plans of Reorganization?
4   A.   Yes.
5   Q.   Approximately how many?
6   A.   Over the last 20 years, five to 10, 15.
7   Q.   Have you ever testified as an expert witness with respect
8   to bankruptcy transactions?
9   A.   Yes.
10  Q.   In what cases?
11  A.   I don't recall all of them, but Optical Datacom, General
12  Industries --
13  Q.   Where -- let's step back -- where was Optical Datacom?
14  A.   Delaware.  General Industries, Delaware.  Often my
15  testimony would be proffered.  It was last week in Manhattan,
16  in Ohio, in a variety -- I don't recall all of them, sorry.
17           MR. GLEASON:  Your Honor, at this time, I would like
18  to term Mr. Pollack as an expert witness with respect to
19  financial advisory and investment banking services in
20  bankruptcy.
21           THE COURT:  Any objection?
22           MR. MASON:  No objection, Your Honor.
23           THE COURT:  All right, he will be so designated.
24                      DIRECT EXAMINATION
25  BY MR. GLEASON:

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B643

Pollack - Direct                                                          115

1  Q.  Mr. Pollack, can you describe your understanding of the
2  general focus of a 363 sale?
3  A.  A 363 sale is typically used as a vehicle to maximize the
4  value -- the going concern value of an estate by providing for
5  -- providing an opportunity for a buyer to acquire assets
6  businesses without regard to the liabilities, and therefore, to
7  pay the largest price possible while the liabilities are dealt
8  with at a later time based on the value received in the sale.
9  Q.  Have you been involved in 363 sales where a stalking horse
10 has been used?
11 A.  Yes.
12 Q.  Can you describe for the Court your understanding of why a
13 stalking horse would be used in a 363 sale?
14 A.  A stalking horse is often used to establish a base -- for
15 two reasons.  One is to establish a baseline value that other
16 bidders can view as a target that they must over-achieve if
17 they wish to acquire the assets.  And two, it is often used as
18 a method to advise all the Parties-In-Interest that the
19 business will continue operating and it's a business that
20 should be supported and yes, it is in Chapter 11 today, but
21 here's a stalking horse that will provide for an ongoing
22 business and therefore allow it to maintain its going concern
23 value -- going concern value during the auction process.
24 Q.  Would you say there's a typical process used with respect
25 to 363 sales?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191