Pollack - Direct 116

1  A.   Yes.
2  Q.   Could you describe that process?
3  A.   The process depends a little bit on the level of activity,
4  pre and post, but it typically includes an investment banker or
5  some other party producing a list of potential interested
6  parties, distributing a teaser to those parties.  In our -- in
7  our shop, we use the teaser as an introduction then we call
8  every single party to invite them to sign a confidentially
9  agreement and receive a copy of the Selling Memorandum, which
10 we prepare with the company, which describes the business and
11 the opportunities.  After they have evaluated that, we
12 typically, for those who are interested, facilitate further
13 diligence, review of certain files, meet management, see the
14 company's operations, etc.  We participate and attempt to
15 forment negotiations towards a value greater than the stalking
16 horse, if there is one.  We facilitate those discussions and
17 try and bring as many parties as possible to an auction that
18 will create an environment to maximize the going concern value
19 of the estate, the assets they're selling.
20 Q.   Is there a typical timeframe involved in any 363 sale
21 process?
22 A.   I think they vary widely.
23 Q.   What considerations go into deciding what an appropriate
24 timeframe might be in a particular case?
25 A.   The size and complexity of the business.  The amount of

Pollack - Direct                                                    117

1  pre-filing marketing that has occurred. The company's ability
2  -- the Debtor's ability to sustain its operations. The terms
3  under which the stalking horse bid, if there is one, provide.
4  The nature of the potential interested parties. You know,
5  specifically, if all of the parties are foreign, then you might
6  expect to have a longer marketing process to accommodate their
7  needs. If all of the parties are going to be financial, you
8  could have a much shorter marketing period because those
9  parties are able to move quicker. There's a wide variety of --
10 Q. Is there any one consideration that's more important than
11 others?
12 A. I think the over-riding consideration would be the
13 maintenance of the going concern value of the Debtor.
14 Q. When you say maintenance of the going concern value, what
15 do you mean?
16 A. Most Debtors have -- have operations that lose money and
17 they have a limited amount of financing. And so there's a
18 limited amount of time that they can remain in operation,
19 maintain the -- we'll call it the run rate, the amount of
20 business they're doing and -- within the financing they have
21 available.
22 Q. In your experience, does a going concern sale of a business
23 as opposed to a piece-meal liquidation, generally result in
24 more value from estate?
25 A. It generally does.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Pollack - Direct                                              118

1   Q. Why is that?
2   A. Piece-meal liquidation typically results in the sale of
3   assets at or below their book value. And it's based on a party
4   who believes that they can either buy those assets and
5   liquidate them for a price greater than what they bought them,
6   or can buy those assets and re-start a business off those
7   assets. The typical sale as a going concern, the buying party
8   is paying at some level for good will, for the on-going
9   operations of the business.
10  Q. You had, I believe, were in the Courtroom when Mr. Knipp
11  was testifying and referenced the razor/razor blade situation?
12  A. Yes.
13  Q. Is that, in your experience, -- how does that play into
14  whether you have a going concern or a piece-meal liquidation?
15  A. The ability to continue servicing the -- the -- providing
16  the razor blades to the razor customers is critical in
17  maintaining the ongoing going concern value. If you were to
18  stop providing the service of the equipment in the field, some
19  other party would likely step into that void and that customer
20  would be gone from the Debtor forever, or for some period of
21  time, certainly.
22  Q. What if you were to stop selling the equipment that you
23  service? Is it the same?
24        MR. MASON: Your Honor, I'm gonna object. I'm trying
25  to figure out what relevancy that this line questioning has to

1  the question the whether or not Presstek is entitled to bid
2  protection, which I think is supposed to be the focus of this
3  hearing.
4         THE COURT: Overruled. I assume that counsel will
5  soon get to his point.
6         MR. GLEASON: Thank you, Your Honor.
7  A. Could you repeat the question?
8  BY MR. GLEASON:
9  Q. Yes. You, I believe, testified that if you get rid of the
10 service you will lose customers that are buying the equipment.
11 Is the same true if you get rid of the equipment, you may lose
12 the service?
13 A. In the razor blade/razor model, the assumption is once the
14 equipment or razor is out in the field, until its use expires
15 in the field, you'll be able to supply it with razor blades and
16 continue to service it. So, although your market would dwindle
17 as those businesses took the equipment out of service, you
18 would continue to have the ability to sell into that market.
19 Q. But then when the razor is gone, would you want to also
20 then sell another razor?
21 A. You would.
22 Q. Because then you can sell razor blades?
23 A. It's -- it's an annuity stream. You create a new annuity
24 stream -- the opportunity for a new annuity stream every time
25 you sell one of the pieces of equipment or razors.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Direct                                                                 120

1  Q. Mr. Pollack, let's turn to the Debtors in these cases.
2  When did you first learn of these Debtors?
3  A. I believe it was 1998 or 1999.
4  Q. How did you first learn of these Debtors?
5  A. Paragon hired my former firm to sell Curtis Industries on
6  its behalf.
7  Q. When did that engagement end?
8  A. My recollection is somewhere between '98 and late '99.
9  Q. Did you subsequently become involved with the Debtors
10 again?
11 A. Yes, I did.
12 Q. When was that?
13 A. Sometime between late '99 and 2000.
14 Q. And what were you asked to do at that time?
15 A. To advise them with respect to the negotiations with their
16 bondholders.
17 Q. And what happened with that engagement -- or during that
18 engagement?
19 A. We advised Paragon, with respect to its alternative and --
20 its alternatives and its negotiating strategies. We assisted
21 them in their negotiations with MHR as the primary bond holder.
22 And the company completed an exchange of those bonds with, I
23 believe, 97 or 98% of the bond holders sometime in August 2001.
24 Q. What was your next engagement or involvement with the
25 Debtors?

Pollack - Direct                                                                                   121

```
 1  A.  I don't recall the exact date, I believe it was in 2002,
 2  that the Paragon Board informally approached us and asked if we
 3  could introduce them to any lenders. We did, in fact, arrange
 4  a meeting with them and Surberus. We did not have a formal
 5  engagement letter or a formal relationship at that time.
 6  Subsequent to that --
 7  Q.  Let me just step for a second --
 8  A.  Yeah.
 9  Q.  Are you aware of anything that transpired from those
10  informal negotiations or the introductions that you made at
11  the request of the Debtors?
12  A.  I know there were meetings, there were discussions, I'm not
13  aware of any -- of any transaction arising out of those
14  meetings.
15  Q.  When were you next contacted, if at all, by the Debtors?
16  A.  My firm was contacted, I believe, in September of 2003.
17  Q.  And what, if anything, were you asked to do at that time?
18  A.  We were asked to advise the Debtor with respect to its
19  strategic alternatives directly as a result of their receiving
20  an expression of interest from Presstek earlier in the summer.
21  Q.  And what did your engagement consist of at that time?
22  A.  We helped the Debtor in moving its discussions along with
23  Presstek. We added -- we acted as an interface between the
24  Debtor and Presstek for a limited period of time. We helped
25  the Debtor begin to look at -- it wasn't the Debtor at that
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  time -- we helped the company to look at its operations on a
2  business line basis at that time. We acted as a financial
3  advisor, an investment banker, for a limited period of time.
4  Q. When did that engagement end?
5  A. In November of 2003 we were approached by the company and
6  asked if we would modify our engagement, to fix the success
7  fee, and terminate our activities.
8  Q. Do you know why you were asked to terminate your
9  activities?
10 A. My understanding --
11         MR. MASON: Your Honor, I'm gonna object on the
12 grounds that this gentleman would have to speculate as to why
13 somebody asked them to terminate his activities. There's been
14 no foundation.
15         THE COURT: Right, okay. Ask your foundation
16 question.
17         MR. GLEASON: I'll rephrase the question, Your Honor?
18         THE COURT: Yes.
19 BY MR. GLEASON:
20 Q. Do you know why Candlewood was asked to terminate its
21 activities?
22         MR. MASON: Again, same objection, Your Honor.
23         THE COURT: No, overruled. He's asking -- he's laying
24 the foundation.
25 A. Yes.

Pollack - Direct 123

1 BY MR. GLEASON:
2 Q. Why was Candlewood asked to terminate --
3     THE COURT: Well, you've got to ask how he knows.
4 BY MR. GLEASON:
5 Q. Okay, how do you know?
6 A. A Board member of Paragon called and advised us.
7 Q. Was it your understanding that the Debtors and MHR would be
8 commencing negotiations directly with Presstek at that time?
9 A. It was my understanding that the Debtors --
10 Q. Or the company at this time, I'm sorry.
11 A. That the company would be handling the negotiations from
12 that point out and that they would be involving MHR.
13 Q. When did you next hear from the Debtors -- or the company,
14 at this point?
15 A. In May of 2004, they called and asked if we would take our
16 revised fee in stock, Presstek stock.
17 Q. And what did you do?
18 A. We agreed that we would do that.
19 Q. What happened subsequently to that?
20 A. They called again.
21 Q. And what did -- and what were you advised at that time?
22 A. They asked if we would waive our fee.
23 Q. And what did you do?
24 A. We agreed to waive our fee in full and did so.
25 Q. So, did you receive any compensation at that point in time?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Direct                                                                 124

1  A.   At that point, when we waived our fee, they agreed to pay
2  the out-of-pocket expenses we had not yet billed them for.
3  Q.   Which was?
4  A.   $8,000.
5  Q.   And that's the $8,000 that Candlewood returned a few weeks
6  ago?
7  A.   It is.
8  Q.   At that time, was it your understanding that a transaction
9  was contemplated between the company and Presstek?
10 A.   At what time?
11 Q.   At the time you were asked to waive your fee?
12 A.   Yes.
13 Q.   Did that transaction ever close?
14 A.   Not to my knowledge.
15 Q.   Were you subsequently contacted by the company again?
16 A.   Yes.
17 Q.   When was that?
18 A.   Late June 2004.
19 Q.   And what were you asked to do at that time?
20 A.   Represent the Debtors, the soon-to-be Debtors, as financial
21 advisors and investment bankers.
22 Q.   What was the status of the debt -- of the companies
23 business at that time?
24 A.   They were barely able to make their upcoming payroll.  In
25 fact, they were not able to make their payroll without an

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Direct                                                                                   125

1  additional over advance from their secured lender. They were
2  in the midst of negotiating a 363 stalking horse arrangement
3  with Presstek and they were discussing DIP financing with
4  Presstek and Key Bank.
5  Q. Did you, on behalf of the company, become involved in those
6  negotiations?
7  A. Yes, I did.
8  Q. Let's turn to after you were retained to represent the
9  company. What steps did you take with respect to that
10 engagement?
11 A. We sent a member of our staff to the company to work with
12 Mr. Knipp to understand the company's current forecast and
13 projections. We had -- we reviewed documents, we had
14 conversations with counsel, we attended meetings with the
15 company's Board, both of the companies' Boards, as well as
16 negotiating sessions with Presstek and Key.
17 Q. Were there actual face-to-face negotiation -- negotiating
18 sessions between Presstek and Key at that time?
19 A. Between the soon-to-be Debtors and Presstek and Key?
20 Q. Yes.
21 A. Yes.
22 Q. Did the Debtor subsequently reach -- or the soon-to-be
23 Debtor -- subsequently reach an agreement with respect to a
24 stalking horse bid?
25 A. Yes.

Pollack - Direct                                              126

1  Q. And did the soon-to-be Debtor subsequently reach an
2  agreement with respect to post-petition financing?
3  A. Yes.
4  Q. Absent these agreements, do you have an opinion as to what
5  options the Debtors would have had in July 2004?
6  A. Yes.
7  Q. What is that opinion?
8  A. Without those agreements and the support provided by those
9  agreements, it's my opinion that Key would not have funded the
10 next payroll. And without a Debtor-In-Possession financing,
11 the next payroll would not have been funded, and the Debtor
12 would have had -- the Debtor had no other -- no other ready
13 alternatives that were workable in the timeframe available.
14 And I -- it's my opinion that the situation would have resulted
15 in a piece-meal liquidation of the Debtor's assets.
16 Q. Based on your review of the Debtor's assets, do you have an
17 opinion as to whether a piece-meal liquidation would be a
18 higher and better value than a going concern sale?
19 A. I have an initial view that it would be a lower value. We
20 have not completed our formal liquidation analysis.
21       MR. GLEASON: Your Honor, may I approach the witness?
22    (witness receives document)
23 BY MR. GLEASON:
24 Q. Mr. Pollack, I handed you a document that we have marked as
25 Exhibit-1.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                              127

1       THE COURT:  Two.
2  BY MR. GLEASON:
3  Q.  Two, I'm sorry, Exhibit-2.  Can you identify this document?
4       (Debtor's Exhibit-2 previously marked for identification)
5  A.  It's a copy of the executed Asset Purchase Agreement among
6  the Debtors, Presstek, et cetera.
7  Q.  Is this the agreement with some modifications that we've
8  talked about and they -- you had talked about that is before
9  the Court today with respect to bidding procedures?
10 A.  Yes, it is.
11 Q.  Can you briefly describe the overall terms of this
12 agreement?
13 A.  The buyer is acquiring all of the assets of A.B. Dick and
14 Paragon, the assets of its Canadian subsidiary, and the stock,
15 which are the -- which is an asset of A.B. Dick or Paragon, of
16 its UK subsidiary.  It's paying $40 million in cash -- the
17 buyer is paying $40 million in cash less a credit for the
18 amounts it is -- it has advanced as a DIP.  The Debtor is
19 responsible for cure costs of specified executory contracts.  I
20 think those are the general business terms.
21 Q.  Can you describe the negotiations that took place between
22 the Debtors and Presstek with respect to this agreement?
23 A.  Yes.
24 Q.  What took place?
25 A.  Once -- I can testify to the extent that we were involved,

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                          128

1  and I believe there was a first draft of the arrangement
2  prepared before our involvement. After that, there was
3  extensive discussion over -- and negotiation -- over the
4  covenants, the material adverse effects clause, the timing, the
5  financing, the related Debtor-In-Possession financing.
6  Extensive discussion and negotiation.
7  Q. Would you say that that negotiation became contentious at
8  times?
9  A. There were multiple calls that lasted past 3 in the
10 morning.
11 Q. At the time of these negotiations, were you aware of any
12 party that was interested in purchasing the Debtor's assets for
13 the consideration Presstek was offered?
14 A. No.
15 Q. Were the Debtors able to obtain improvements on what was
16 originally proposed in the agreement?
17 A. Yes.
18 Q. Can you maybe describe some of those?
19 A. Yes. In the material adverse effects section, the
20 Debtor --
21 Q. Step back for one second. Could you explain to the Court
22 what you mean by material adverse effect?
23 A. Yes. My understanding is that one of the conditions to
24 closing --
25 Q. Let's first talk in general -- in general Asset Purchase

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Direct                                               129

1  Agreements during 363 sales and other sales.
2  A.  Okay.  In general, a material adverse effect or a mac-out
3  clause is one that provides an opportunity for the buyer to
4  ensure that what they are buying is the same at the closing
5  date as at the contract date.  So in this case, this
6  arrangement was executed at some time early in July and the
7  sale will not be consummated until some significantly later
8  date.  And the buyer intends to buy the business in a fashion
9  that it is today.  So they want to make sure that there isn't a
10 degradation in the business, that the assets they're buying or
11 substantially similar assets, are there at the time of the
12 closing.  The seller --
13 Q.  Is that type of clause typical in transactions such as
14 this, given your experience?
15 A.  Yes.  The seller seeks to limit the subjectivity of a
16 material adverse effect clause so that it can understand the
17 conditions under which they buyer is obligated to close.
18 Q.  Were you able to negotiate the material adverse effects
19 provision at all in this agreement?
20 A.  Yes.
21 Q.  And can you explain for the Court whether the provision
22 that is in this agreement is narrower than in other agreements
23 you have experience with?
24 A.  Yes.
25 Q.  How is that?

Pollack - Direct                               130

1  A.  This -- the provision in this agreement is objective and
2  very specific and very limited.
3  Q.  Explain what you mean by that.
4  A.  It's a combination of two very specific tests. Numerical
5  tests with the numerical targets, there are no subjective
6  conditions with respect to the material adverse effect. It's
7  sales for certain periods and the level of assets at a test
8  date.
9  Q.  What would a broad material adverse effect clause be in
10 your experience?
11 A.  I have seen them as broad as there shall not be a material
12 adverse change, period. Which --
13 Q.  With no --
14 A.  No quantification, no objectivity, no definition. That
15 could mean, from my perspective, all kinds of things; an
16 increase in sales, a decrease in sales, a change in margin, a
17 change in the make-up of the inventory, a change in personnel,
18 loss of a particular customer, all kinds of things.
19 Q.  In your opinion, with respect to a seller who wants have
20 some assurance that a buyer will close, is the material adverse
21 effect clause in this agreement better than, for example, the
22 agreements -- the clauses you were just speaking of?
23 A.  My opinion is it's better.
24 Q.  Why is that?
25 A.  It's better because it's specific, it's quantifiable and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B659

Pollack - Direct                                                    131

1   there's no opportunity for extraneous issues to cause -- to be
2   the cause of a material adverse effect. You either make the
3   sales and it's not a condition, or you don't.
4   Q. I believe there's been some discussion in these cases about
5   -- as opposed to a termination event, why isn't this just a
6   adjustment at closing, a dollar adjustment at closing? In your
7   experience, have you seen it one way or the other?
8   A. I have seen it both ways.
9   Q. And is there any -- with respect to this agreement, were
10  the Debtors able to obtain an adjustment to the purchase price
11  as opposed to the termination option that is available if those
12  quantifiable results are not met?
13  A. No, the company -- the Debtor bargained hard for clauses
14  that would allow it to meet the tests in different ways. And
15  the buyer was steadfast in their need for this type of
16  requirement with respect to the -- you're just talking about
17  the working capital?
18  Q. Yes.
19  A. Yeah, with the working capital at closing, the buyer
20  advised that they would be willing to except inventory that the
21  Debtor just purchased to make up for any shortfall in working
22  capital.
23  Q. Based on your experience, do you believe that the material
24  adverse effect provision in this agreement sufficiently
25  convinced the seller, I mean the buyer, to purchase these

Pollack - Direct 132

1 assets?
2     MR. MASON: I'm gonna object to that question on the
3 grounds that it is so vague. I don't know what it means by
4 sufficiently convinced, but I'd like clarification on that
5 question.
6     MR. GLEASON: I'll come back to that.
7 BY MR. GLEASON:
8 Q. Mr. Pollack, based on your experience, are provisions that
9 provide a buyer an out if a business fails to meet various
10 financial targets typical in 363 sales?
11 A. Where there's a significant period of time between the
12 contract date and the closing date, yes.
13 Q. In these cases has anything happened post-petition that
14 would make it difficult for the Debtors to satisfy these
15 financial targets?
16 A. Make it more difficult?
17 Q. Yes.
18 A. The Mitsubishi requirement for pre-payment of orders
19 initially made it more difficult.
20 Q. Was this Mitsubishi requirement a change from the pre-
21 petition business relationship that the Debtors had had with
22 Mitsubishi?
23 A. Yes, my understanding is that they had an open line of
24 credit pre-petition and when orders were -- the line of credit
25 was not based on commitments, it was based on deliveries. And

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                              133

1  what I mean by that is when you enter into a purchase order,
2  you're entering into a commitment. When you receive the goods
3  at some later date, that's obviously a delivery. So the credit
4  line was -- my understanding is that the credit line was
5  limited or used only by delivery, so there was no requirement
6  to fund in any way, shape or manner or -- nor was there a
7  limitation pursuant to the credit line for orders placed. That
8  changed at the commencement of the case. And in fact, there
9  was a very specific requirement for pre-payment. At the time
10 orders were placed, these products were manufactured so it
11 wasn't an in-and-out type of arrangement. I believe the
12 reasonable expectation of the dates would be you order on day
13 one, it goes into manufacturing some time thereafter, it's
14 manufactured within 30 days or so. At the time manufacturing
15 is complete and it ships, you pay another third. So, a third
16 at the order, a third when it ships, if it ships by boat from
17 Japan, my understanding is it's 3 to 5 weeks to arrive at the
18 Chicago location of the Debtor, and then it's the final third
19 when it arrives.
20 Q. At the time the Asset Purchase Agreement was negotiated
21 pre-petition, were the Debtors aware that Mitsubishi would take
22 this position and change the way they had done business
23 previously?
24 A. The company had heard -- I don't know the exact dates. The
25 company had heard at some point that Mitsubishi had terminated

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                                    134

1  its line and was seeking an alternative.
2  Q.  What impact on the financial targets, or the material
3  adverse effect provisions in the Asset Purchase Agreement, did
4  that change by Mitsubishi have on the Debtors?
5  A.  There were two changes.  One was the Debtor-In-Possession
6  financing is regulated at some -- is regulated partially by the
7  amount of the over advance and when -- if the Debtor were to
8  expend funds for deposits which were not included in the
9  collateral base, the over advance would widen and we would have
10 a hard -- the Debtor would have a hard time keeping within the
11 collateral formula.  That's number one.  Number two, the Asset
12 Purchase Agreement provided for a working capital test at
13 closing.  The working capital test defined inventory and that
14 definition did not include inventory deposits.  And so had the
15 Debtor made deposits that would not have been -- deposits for
16 goods, which would not have been received by the closing date,
17 the buyer would have gotten the benefit of those deposits
18 without paying for them.  And more importantly, the Debtor
19 would not have been able to make the covenant -- its
20 projections indicated it would not have been able to make the
21 working capital covenant if those pre-payments were not
22 included.  And therefore, it would be unable to make those pre-
23 payments after a certain date, which would result in the
24 business not having inventory -- not having inventory from its
25 prime vendor available for sale after the first or second week

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B663

Pollack - Direct                                                              135

1  of October, which would have resulted in a decrease in its
2  appeal to other buyers.
3  Q.  The prime vendor being Mitsubishi?
4  A.  Mitsubishi, yeah.
5  Q.  Chair of the Creditors' Committee?
6  A.  Chair of the Creditors' Committee.
7  Q.  Have agreements been reached by the Debtors and the post-
8  petition lenders to address this -- these issues?
9  A.  Yeah, yes.
10 Q.  And what are those agreements?
11 A.  To my understanding, that the post-petition lenders have
12 agreed to allow up to 2.5 million --
13 Q.  Is it 2 or 2.5?  I think I misspoke earlier.
14 A.  It's $2.5 million -- my understanding is it's $2.5 million
15 for the Debtor-In-Possession collateral base.  So that -- up to
16 $2½ million would be included as collateral in the collateral
17 base and the appropriate availability formula would be applied
18 and that would be included.  My understanding is that Presstek
19 has also agreed to amend the definition of inventory to include
20 pre-paid inventory deposits up to $2 million at the closing
21 date.
22 Q.  How does this agreement benefit the Debtors?
23 A.  In three ways.  One is the use of cash for making these
24 pre-payments is now akin to buying inventory, at least for
25 purposes of calculating the collateral.  So making the deposits

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B664