Pollack - Direct                                                    136

1 will not adversely affect the Debtor's calculations anymore
2 than buying regular inventory. That's number one. Number two,
3 by allowing the definition of inventory on the APA, together
4 with the inclusion in the collateral base, it allows the Debtor
5 to order from Mitsubishi on an organized fashion and make sure
6 that there will be a stream of product available to meet the
7 tests -- the other sales tests in the APA, as well as provide
8 the foundation of an ongoing business to any other party who
9 might be interested in bidding.
10 Q.  Now there was some testimony earlier today about the Debtor
11 -- whether or not the Debtor has drawn down on the line
12 recently. I think the testimony was that as we sit here today
13 it may be a zero.
14 A.  Yes.
15 Q.  Can you explain why that is and whether that is going to
16 change in the immediate future?
17 A.  Well, I can address the immediate needs. Once the
18 amendments that we are talking about are approved and are
19 appropriate for the Debtor to rely on, it will immediately draw
20 down funds on the DIP to fund the next payment to Mitsubishi,
21 as well as the initial payment on the next set of orders to
22 Mitsubishi, as well as a variety of other vendors who are
23 requiring payment in advance.
24 Q.  And prior to reaching that agreement, were the Debtors --
25 did it make sense for the Debtors to draw down and send money

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                   137

1  to Mitsubishi?
2  A.  The Debtors -- prior to the agreement, the Debtors only
3  drew down and made a payment to Mitsubishi for inventory that
4  would be manufactured in August and early September and
5  available for delivery and sale in late September and the first
6  week of October.
7  Q.  Do you have an understanding of what is going to be drawn
8  down on the line in the next few days and sent to Mitsubishi?
9  A.  Approximately a million dollars.
10 Q.  I want to turn to a couple of other provisions in the Asset
11 Purchase Agreement.  Are you familiar with the financial
12 representations and warranties contained in the agreement?
13 A.  Generally.
14 Q.  Are these representations and warranties typical in
15 transactions such as this, in your experience?
16 A.  I have seen transactions where they're included and
17 transactions where they're excluded.
18 Q.  During the negotiations with the buyer, did the Debtors
19 attempt to modify the agreement with respect to those
20 representations and warranties?
21 A.  We did.
22 Q.  And were you successful in some manners and not others?
23 A.  We enjoyed some success.
24 Q.  Let's turn to the -- there's a liquidated damage provision.
25 Are you familiar with that type of provision?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B666

Pollack - Direct                                                                138

1  A. Yes.
2  Q. Is that a provision that is common or uncommon in
3  transactions such as this?
4  A. Relatively common.
5  Q. There is a release of the buyer in the agreement. In your
6  experience, it that something that is common or uncommon in
7  these types of transactions?
8  A. Relatively common.
9  Q. Why is that?
10 A. Buyers don't -- if you are buying the business and buying
11 the assets and paying the estate what the estate must consider
12 an appropriate amount of money, you don't want that -- those
13 dollars used then to prosecute you for some other activity.
14 Q. Does this agreement, meaning Exhibit-2, does it have a due
15 diligence contingency contained in it?
16 A. No, it doesn't.
17 Q. Does this agreement have a financing contingency contained
18 in it?
19 A. No, it does not.
20 Q. In your experience, do other transactions -- other 363
21 sales transactions, sometimes have those types of
22 contingencies?
23 A. They sometimes do.
24 Q. Given the modifications we have discussed, do you have an
25 opinion as to whether the Debtors will be able to satisfy the

Pollack - Direct                                                    139

1  representations and warranties in the agreement?
2  A. I do.
3  Q. What is that opinion?
4  A. I believe, based on discussions with management and a
5  review of the company's updated forecast, that they will in
6  fact be able to make the financial tests included in the APA,
7  achieve those tests.
8  Q. Now I want to turn briefly to the post-petition financing
9  agreement. Can you describe the general terms of the post-
10 petition financing the Debtors have negotiated with Key Bank
11 and Presstek?
12 A. Yes.
13         MR. MASON: Judge, I'm gonna object to this question
14 only in the name of time. If the Court would like to hear a
15 description of what's already been submitted to the Court in
16 writing, we can go through that exercise. But I think that
17 it's really kind of not a particularly good use of our time.
18         MR. GLEASON: Your Honor, if I could --
19         THE COURT: I could take --
20         MR. GLEASON: -- have a stipulation from Mr. Mason that
21 the Debtor's good faith in negotiating these documents is no
22 longer on the table, I would be happy to do that. But if he's
23 going to continue to say that the Debtors did not act in good
24 faith in this case, I have to put on the record what the
25 Debtors were able to negotiate, how they got there, and why we

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                    140

1  are where we are today.
2      MR. MASON: Judge, I don't know what I'm being asked
3  to stipulate to so I'm reluctant to stipulate --
4      THE COURT: All right then, why don't --
5      MR. MASON: I didn't even know good faith was an
6  issue here, but in any event, he --
7      THE COURT: I'll -- the objection will be overruled.
8      MR. MASON: Thank you.
9      THE COURT: Why don't you just go ahead.
10     MR. GLEASON: Thank you, I will try to be brief, Your
11 Honor.
12 BY MR. GLEASON:
13 Q. Can you briefly describe the terms of the post-petition
14 financing that has been agreed to in this case?
15 A. All right, there's approximately -- or I believe there's a
16 $7 million DIP line available to the Debtors. It's subject to
17 a budget, which has been provided to the lenders as well as the
18 Court, and it includes tests both as to disbursements as well
19 as the magnitude of the over advance at any point in time.
20 Q. In your experience, are you aware of cases where the
21 stalking horse bidder provides some or all of post-petition
22 financing?
23 A. I've not been involved in a case where that's been the
24 case, where that is --
25     THE COURT: I'm sorry, again, I didn't understand the

Pollack - Direct                                              141

1  question.
2  BY MR. GLEASON:
3  Q. Okay. In your experience, are you aware of cases where a
4  stalking horse bidder has provided post-petition financing?
5  A. I don't recall being in a case as an advisor where the
6  stalking horse bidder provided financing.
7  Q. Are you familiar with the TWA case?
8  A. No.
9  Q. Okay. Can you describe the negotiations that took place
10 with respect to the Debtor-In-Possession financing agreement?
11 A. Yes.
12 Q. What took place?
13 A. Generally, we -- the company asked Key if it would extend
14 DIP financing, they said no. We inquired would they allow us
15 to bring in new financing and prime them, they said no. We had
16 a discussion with them and Presstek. It became clear that they
17 would allow Presstek -- they wouldn't allow -- that it would
18 feasible to have Presstek provide a significant portion of the
19 financing using the collateral that Key did not have a lien on
20 as their collateral. I forgot the rest of the question.
21 Q. Just -- the negotiations that took place?
22 A. Yes.
23 Q. Were the Debtors able to obtain improvements on what was
24 originally proposed by the post-petition lenders?
25 A. Yes.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Direct                                                                     142

1  Q. Can you explain some of those improvements for the Court?
2  A. Yes. We spent quite a bit of time modifying the budget and
3  negotiating with the post-petition lenders for things such as
4  cumulative disbursements, allowing cross-category
5  disbursements, so that the Debtors weren't limited in how they
6  spent their dollars and had flexibility so long as they
7  maintained the overall disbursement number, the over advance
8  number, and stayed within the borrowing limit.
9  Q. Was the dollar amount of the DIP increased at one point?
10 A. It was increased and decreased.
11 Q. At one point it was $6 million, wasn't it?
12 A. Yes, it was and at one point there were discussions of 10.
13 Q. And it ended up?
14 A. Seven.
15 Q. Based on your experience, are the terms that are contained
16 in the DIP financing agreement reasonable given the facts and
17 circumstances in these cases?
18 A. Yes, they are.
19 Q. Mr. Pollack, I want to now briefly turn to the bid
20 procedures that were negotiated. Based on your experience, are
21 the bid procedures that were negotiated with Presstek
22 reasonable given the facts and circumstances in these cases?
23 A. Yes.
24 Q. Are you familiar with some of the modifications of --
25 strike that -- did the Debtors attempt to negotiate the bid

Pollack - Direct                                                                143

1  procedures pre-petition?
2  A. Yes.
3  Q. Were the Debtors able to get any concessions with respect
4  to the bid procedures?
5  A. Minor concessions.
6  Q. Based on your experience, is that typical in these cases?
7  A. Given the facts and circumstances here, yes.
8  Q. I think you were in the Courtroom earlier today when there
9  was some discussion about the modifications that Presstek has
10 agreed to make with respect to the bid procedures. Do you
11 remember that?
12 A. Yes.
13 Q. Based on those modifications, do you have an opinion as to
14 whether the bid procedures will enable the Debtors to
15 effectively market their assets and obtain the highest and best
16 value for the estates?
17 A. Yes.
18 Q. What is that opinion?
19 A. Given the changes, I believe the Debtors have a very real
20 and fair opportunity to hold an auction process that will
21 result in the highest and best value available today for these
22 assets.
23 Q. I want to turn briefly to the Debtor's financial advisor.
24 Are you familiar with Jeffries & Company?
25 A. That would be the Creditor's.

Pollack - Direct                                                                        144

1  THE COURT: You mean the Committee's?
2  BY MR. GLEASON:
3  Q. I mean the Committee's, sorry.
4  A. By reputation.
5  Q. When did you first meet with Jeffries & Company with
6  respect to this case?
7  A. I had lunch with Mr. Flax I believe on August 9th.
8  Q. When did Jeffries & Company first provide a due diligence
9  request to the Debtors?
10 A. I believe they delivered an e-mail with that request on
11 August 13th.
12 Q. And when did Jeffries first meet with the company?
13 A. I believe it was August 16th or 17th, it was the Monday
14 following the 13th.
15 Q. With respect to the modifications to the DIP, given the
16 modifications that you testified to today and you've heard
17 from Mr. Knipp's testimony, do have an opinion as to whether
18 the DIP is sufficient to enable the Debtors to preserve their
19 going concern value during the marketing process?
20 A. I do.
21 Q. And what is that opinion?
22 A. Assuming that the marketing process concludes by November
23 15th, I believe that the DIP is both sufficient in duration,
24 amount, and is reasonable in cost and will allow that process
25 to move forward.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                          145

1  Q. You said the marketing process, you mean the sale process?
2  A. Yes.
3  Q. The closing date?
4  A. The closing date.
5  Q. I'm gonna turn now to efforts to obtain other financing.
6  Are you aware whether the Debtors made any efforts to obtain
7  post-petition financing from parties other than Key and
8  Presstek before the cases were filed?
9  A. Yes.
10 Q. Did they?
11 A. They did not. To my knowledge, they did not.
12 Q. Do you know why?
13 A. Yes.
14 Q. Why is that?
15        MR. MASON: I'm gonna object on the grounds, again,
16 there's no foundation.
17        THE COURT: What are we --
18        MR. MASON: Again, he's being asked to speculate why.
19        THE COURT: Just let -- ask the foundational
20 questions.
21 BY MR. GLEASON:
22 Q. Mr. Pollack, are you aware as to why the Debtors did not
23 seek post-petition financing from lenders other than Key and
24 Presstek pre-petition?
25        MR. MASON: Same objection.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                                 146

1        THE COURT: Well, the question is are you aware?
2   A. Yes.
3        THE COURT: What is the basis of that awareness?
4   A. My discussions with the Board.
5        THE COURT: All right, why don't you follow up a bit
6   on that?
7   BY MR. GLEASON:
8   Q. What discussions did you have with the Board in your
9   capacity as financial advisor and with respect to seeking post-
10  petition financing from entities other than Key and Presstek?
11  A. Once we were engaged, we had discussions with respect to
12  the amount of time available to seek alternative financing
13  sources.
14  Q. Based on your experience, did these Debtors have sufficient
15  time to obtain alternative post-petition financing from parties
16  other than Key and Presstek?
17  A. Based on my experience and the facts and circumstances,
18  which include their inability to meet their payroll, which Mr.
19  Knipp testified to, and without an over advance and their
20  certain inability to meet their next payroll, it was my opinion
21  -- and it is my opinion that there was not sufficient time to
22  bring in an independent third party to provide DIP financing,
23  especially given the Key Bank position that they were not
24  willing to be primed, that it would have taken.
25  Q. Have the Debtors made any efforts to obtain replacement

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B675

Pollack - Direct                                                    147

1  financing on the post-petition basis?
2  A. Yes.
3  Q. What efforts have been made?
4  A. We've contacted a limited number of DIP lenders.
5  Q. Why have you contacted a limited number?
6         THE COURT: The question is -- you used the word "we?"
7  Is that something in which you have been directly involved?
8  A. Yes.
9         THE COURT: All right, why don't you lay a little
10 foundation about what he has done in connection with this?
11 BY MR. GLEASON:
12 Q. Mr. Pollack, what have you personally done with respect to
13 trying to obtain post-petition -- alternative post-petition
14 financing?
15 A. I have called specific lenders to inquire as to their
16 interest in pursuing that type of an arrangement.
17 Q. What is the status of these efforts?
18 A. Two lenders have advised that they are willing to consider
19 it and they have signed confidentiality agreements and have
20 begun their diligence. A third is to have a meeting with me
21 this week.
22 Q. Given your experience, are Debtors in the situation these
23 Debtors find themselves in generally able to obtain replacement
24 financing?
25 A. Not without substantial discounts from the stated principle

Pollack - Direct                                              148

1  value of the existing loans.
2  Q. How long would it take a new DIP lender to complete due
3  diligence and commit funding?
4  A. My view is no less than 3 weeks for a company this size
5  with the prime collateral being foreign assets or foreign
6  securities -- securities of foreign companies.
7  Q. Given the modifications that we've discussed this
8  afternoon, do you believe the Debtors should continue
9  aggressively seeking a replacement Debtor-In-Possession
10 financing agreement?
11 A. I do not. Given the duration, the amount, the conditions
12 and the cost of the financing as modified, I find it, in my
13 opinion, adequate to allow the Debtors to reach the proposed
14 auction date without restricting -- unduly restricting their
15 business activities. I also find it unlikely that the process
16 cost and distraction result of seeking alternate financing
17 would materially add to the going concern value of the
18 enterprise.
19 Q. Let's turn now briefly to the marketing process in this
20 case. Can you describe for the Court the professionals that
21 are working on this engagement on behalf of Candlewood?
22 A. There are two of my partners and two associates.
23 Q. And what steps has Candlewood taken to market the Debtor's
24 assets as of this date?
25 A. We assembled a buyer's list through our own sources and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Direct                                                              149

1   solicitation of names and ideas from the Debtor's management.
2   We sent a teaser, which is purely an introductory letter to, I
3   believe, 150 parties. We have contacted over 140 of those
4   parties personally by phone, haven't reach every one of them,
5   to encourage them to sign a CI and receive the Selling
6   Memorandum. The Selling Memorandum was started prior to the
7   commencement of the case, has been worked on continuously until
8   its completion about 4 or 5 days ago. It was substantially
9   complete awaiting the Debtor's analysis, at Candlewood's
10  request, of a break out of the results of the three main
11  business lines so that we would be able to use the Selling
12  Memorandum as a tool to identify opportunity to potential
13  buyers as opposed to just a reflection of exactly what the
14  Debtor has reported in its financial statements.
15  Q.   Does this -- explain that the three business lines --
16  A.   Sure, let me finish my answer.
17  Q.   Sure.
18  A.   We've also worked with the Debtor to establish an online
19  data room, which is effective now, which allows buyers who have
20  signed -- potential buyers who have signed a CA to view the
21  companies -- much of the companies diligence material without
22  leaving their offices. That encourages people to participate
23  in the process, it reduces the cost and gives more flexibility
24  to the prospective party. I'm sorry, your question was?
25  Q.   You had talked about the analysis of operations by the

1  lines. Can you explain, one, why that wasn't available
2  previously and then what you hoped to show from that?
3  A. Yes. As Mr. Knipp has testified, the company records
4  revenue in three main categories; the sale of equipment, the
5  sale of supplies, and the provision of service and attendant
6  sale of service replacement parts. Three major revenue sources
7  and three lines of businesses run by three separate operating
8  VPs, if you will. The companies financial statements reflect
9  the sales of those three business lines, the standard margin of
10 those business lines, and from that point on, they tend to
11 lump, if you will, all of the costs associated with running all
12 of those businesses into a more general overhead and corporate
13 overhead line. So they don't regularly report the -- and it is
14 a fact, to my knowledge, they don't ever report the operating
15 profitability by business line up through the EBITDA level. As
16 Mr. Knipp has testified, that is a not -- that is not a simple
17 exercise and it requires the accounting staff to make certain
18 assumptions with respect to the division of those overhead
19 dollars.
20 Q. When did they Debtors confirm that the no-shop provision in
21 the agreement was waived?
22 A. I believe it was the end of the first week of August.
23 Q. Why was that important to the Debtors?
24 A. That -- the -- when that provision was waived, that
25 signaled the opportunity for Candlewood to begin marketing