151

Pollack - Direct

1  these assets to the general public, if you will, and limited --

2  and ended the limitation honorability to talk to prospective

3  interested parties.

4  Q.  Had that no-shop not been waived previously, would the

5  Debtors and your office have been able to engage in any

6  marketing efforts with respect to these Debtors, as we sit here

7  today?

8  A.  I believe they would not have been.

9  Q.  Why is that?

10  A.  Because the no-shop required -- my understanding of the

11  arrangement was that the no-shop would not be lifted until the

12  Procedures Motion was put in force and that we wouldn't -- we

13  would not be allowed to market the assets, make any third party

14  contact, or hold any third party discussions until that was

15  lifted.

16  Q.  That was another concession that the Debtors were able to

17  obtain in these cases?

18  A.  That was.

19  Q.  If you could briefly describe for the Court the steps

20  Candlewood anticipates taking over the next few weeks to market

21  these assets?

22  A.  Yes.  We intend to contact and talk in person to every one

23  of the people on our prospective parties on our prospective

24  buyers list.  We have, I believe, 20 or 25 CAs that have gone

25  out so far.  We would expect a significant additional number of

Pollack - Direct

1   while they're waiting, become busy doing something else and
2   never come back.  You don't want to have an auction that is too
3   close to the end of a -- end of the year because parties will
4   then often times view it as a first quarter event instead of a
5   fourth quarter event with the belief that they would get pushed
6   off, et cetera, et cetera.
7   Q.  Let me ask you, is the present schedule, which contemplates
8   an auction of October 27th, fair, adequate and sufficient to
9   market the assets to achieve the maximum going concern value
10  given the facts and circumstances in these cases?
11  A.  I believe the auction is scheduled for the 29th.
12  Q.  You are correct.
13  A.  And I believe that it does present that opportunity.
14  Q.  Is that still your opinion even though there was no formal
15  or informal marketing process pre-petition in these cases?
16  A.  Yes, the October 29th date provides more than 9 weeks from
17  today.  We commenced contacting interested parties, I believe,
18  14 days ago.
19  Q.  After the no-shop was waived?
20  A.  Correct.  So, although August is a very slow period in the
21  {quote} {unquote} "deal business," it is a period of time where
22  -- that can be used and is being used to solicit interested
23  parties and have them negotiate and execute CAs so that the day
24  after Labor Day we are moving right along.
25  Q.  Do you have an opinion as to whether another week would be

Pollack - Direct                                          155

1  sufficiently more beneficial to the Debtor's estates such that

2  the auction should be pushed out further?

3  A.  No, I don't believe another week would be material at all.

4  Q.  I want to turn now to the post-petition performance of the

5  Debtors, and Mr. Knipp has covered some of this so hopefully it

6  will not take too long.  You talked -- you testified earlier

7  about the Mitsubishi transaction, do you recall that?

8  A.  Yes.

9  Q.  Have other vendors taken the steps that have or may have a

10 negative impact on the Debtors?

11 A.  Yes.

12 Q.  What steps have these vendors taken?

13 A.  Some vendors have required cash in advance, some have

14 required COD, there have been certain development agreements

15 that have been terminated.

16 Q.  Have you reviewed the Debtors' forecast to determine

17 whether the Debtors can continue operations without post-

18 petition financing?

19 A.  Without?

20 Q.  Post-petition financing.

21 A.  Yes.

22 Q.  Okay, and by the Debtor's forecast I'm referring to, I

23 believe Exhibit-1 that is in front of you?

24     (Debtor's Exhibit-1 previously marked for identification)

25 A.  Yes.

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

Pollack - Direct                                    156

1  Q.  Is that the document or some of the documents that you have

2  reviewed?

3  A.  Yes.

4  Q.  Have you reached a conclusion on the issue of whether the

5  Debtors can continue operating without post-petition financing?

6  A.  Yes.

7  Q.  And what is that conclusion?

8  A.  That the Debtor could not sustain operations at a level to

9  sustain its going concern value without post-petition

10 financing.

11 Q.  Do you have an understanding of whether or not the Debtors

12 can operate using cash collateral?

13 A.  Yes.

14 Q.  And what is that opinion?

15 A.  Once again, that without sufficient post-petition

16 financing, cash collateral alone would not be adequate to allow

17 the Debtor to maintain its operations.

18 Q.  Based on your experience in bankruptcy matters in general

19 and in 363 sales in particular, do have an opinion as to

20 whether the Debtor-In-Possession of financing in this case was

21 negotiated at arm's length and in good faith?

22 A.  Yes.

23 Q.  What is your opinion?

24 A.  That it was.

25 Q.  And based on your experience in bankruptcy matters in

1   general and 363 sales in particular, do you have an opinion as

2   to whether the bid protections were negotiated at arm's length

3   and in good faith?

4   A.   Yes.

5   Q.   What is that opinion?

6   A.   They were.

7   Q.   Mr. Pollack, I believe Mr. Knipp had testified about a

8   press release that was issued at the time the Debtors filed

9   their cases.  Do you recall that press release?

10  A.   Yes.

11  Q.   Since that time, have any parties contacted the Debtors or

12  yourself with an alternative bid or an expression of interest

13  to serve as a stalking horse bidder?

14  A.   No.

15  Q.   Mr. Pollack, given your experience, the facts and

16  circumstances in these cases and the revisions that have been

17  agreed to with respect to the Debtor-In-Possession of

18  financing, do have an opinion as to whether the proposed

19  Debtor-In-Possession financing is in the best interest of the

20  estates?

21  A.   Yes.

22  Q.   And what is that opinion?

23  A.   That it is in the best interest of the estate.

24  Q.   And Mr. Pollack, given your experience, the facts and

25  circumstances in these cases, and the revisions that have been

Pollack - Direct                                    158

1    agreed to with respect to the bid procedures, do you have an

2    opinion as to whether the proposed bid procedures are in the

3    best interest of the cases -- of these estates?

4    A.  I do.

5    Q.  And what is that opinion?

6    A.  That they are.

7    Q.  Mr. Pollack, based on your experience, if the Debtors' Bid

8    Procedures Motion is denied and Presstek chooses not to proceed

9    with the transaction, how would you advise the Debtors to

10   proceed?

11   A.  Not to proceed with the transaction or the financing?

12   Q.  The transaction and the financing at this point.

13   A.  Assuming that there would not be post-petition financing, I

14   see no alternative to a piece-meal liquid -- a wind down and a

15   piece-meal liquidation.  To the extent there was any time

16   available between the termination and the day the financing

17   terminated, I mean, we would certainly seek to find an

18   alternative, to the extent one was available.  It's an unlikely

19   situation.

20   Q.  Do you believe such action would be in the best interest of

21   the estates?

22   A.  No.

23        MR. GLEASON:  May I have a moment, Your Honor?

24      (Pause in proceedings)

25        MR. GLEASON:  That's all I have at this time, Your

Pollack - Direct                           159

1  Honor.

2       THE COURT:  Well, let me a question.  Are you going to

3  ask any specific questions?  Maybe I missed it, are you going

4  to ask any specific questions about the bid protections?

5       MR.  GLEASON:  I believe I did, but I will.

6       THE COURT:  Well, I --

7       MR. GLEASON:  Okay.

8       THE COURT:  It wasn't to my satisfaction.

9       MR. GLEASON: Okay, thank you, Your Honor.

10      THE COURT:  I mean, you asked him whether or not they

11 were reasonable, in good faith and so on and so forth.  I'd

12 like to understand from him his view of the two issues that are

13 really in play here; one of which is the so called

14 conditionality of the Presstek proposal and the other is

15 whether or not the break-up fee and expense reimbursement are

16 reasonable and necessary under the circumstances.

17      MR. MASON:  Judge, I would be delighted to cover all

18 of that on cross examination.

19      MR. GLEASON:  I'm just asking --

20      THE COURT:  I understand you -- and I assume that were

21 going to, but I thought it was maybe useful to make that part

22 of the case in chief, too.

23 BY MR. GLEASON:

24 Q.  Mr. Pollack, I believe you've talked about the (indiscern.)

25 of the representations and warranties and the covenants in the

B688

1    Asset Purchase Agreement.  Based on the modifications that have

2    been made, do you have an opinion as to whether the Asset

3    Purchase Agreement, which is has been marked as Exhibit-2, is

4    conditional?

5    A.  Could I ask you to rephrase that?

6    Q.  Sure.

7    A.  Conditional as --

8    Q.  I can do that.

9    A.  Okay.

10   Q.  I think -- I believe you testified that there are certain

11   requirements that the Debtors have to meet in order to force

12   Presstek to close, or that will keep -- that will require

13   Presstek to close the transaction, is that correct?

14   A.  Yes.

15   Q.  Given the Debtors' business as you -- strike that -- given

16   your understanding of the Debtors business and the

17   modifications that we've talked about today, do have an opinion

18   as to whether the Debtors will be able to satisfy the

19   requirements in the Asset Purchase Agreement such that Presstek

20   will be required to close the transaction?

21   A.  Yes.

22   Q.  And what is that opinion?

23   A.  My opinion is, with respect to the material adverse effects

24   requirements, I believe that the Debtors will be able to

25   satisfy those.  With respect to the non-financial conditions, .

Pollack - Direct                              161

1    I'm probably not the best person.

2    Q.  But as you sit here today, with respect to the financial

3    outs, the -- that the Committee is -- I'd better check

4    (indiscern.) -- do you believe those outs are realistic outs

5    for Presstek today?

6    A.  I view them as very narrow and outs only if there is a

7    material change in the Debtors' business, which is not

8    contemplated in its forecast, nor is it contemplated by its

9    recent run rate.  So I don't believe that they are walk-away

10   rights.

11   Q.  I think the Committee or maybe MHR has used the term an

12   option.  Do you view this Asset Purchase Agreement, which is

13   Exhibit-2, as an option?

14        MR. MASON:  Judge, I think we're getting involved in

15   very vague questioning, and I don't think we're really being

16   directed to Your Honor's concerns about this conditionality

17   issue.

18        THE COURT:  Overruled.  I'm looking at your objection

19   and perhaps I don't -- I apologize to counsel if it seems like

20   I am maybe involving myself too much in this and not letting

21   the counsel ask the questions, but since --

22        MR. GLEASON:  I'll take all the help I can get, Your

23   Honor.

24        THE COURT:  Since it's going to be a late day or

25   maybe a late day, I'd sort of like to get to the nub of the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B690

Pollack - Direct                                              162

1   thing and figure out what it's all about.  What the -- Mr.
2   Pollack, things may have changed.  I know they have changed
3   with regard to the inventory issue, for example.  But the
4   Committee's supplemental objection says that the Committee's
5   fear that Presstek would be able to abandon the sale at its
6   sole discretion has been realized because they currently have a
7   right to walk away.  They then cite some testimony from you in
8   your deposition saying that the Debtors can't meet these
9   conditions of 10.12 of the APA.  And that's primarily related
10  to this question of the inventory.  So I guess my specific
11  question is, are the modifications that were made and the
12  concessions made by Presstek with regard to the inventory, both
13  as far as the DIP financing and the APA are concerned,
14  sufficient to remedy the concerns that you expressed at the
15  time of your deposition about the ability of the Debtor to meet
16  them, and therefore, the ability of Presstek to walk away.
17  A.  Your Honor, if I could give a rather long answer.  The
18  testimony I gave in my deposition was fuller than what's
19  included there.  And in my testimony, I believe I said that
20  with the modifications that we are pursuing it is my opinion
21  that they would make it.  And we did pursue those
22  modifications, we did achieve those modifications, and it is
23  still my opinion that given those modifications, our current
24  circumstances and the companies current projections, we will
25  make those tests, which is exactly what I said at my

1  deposition.

2  BY MR. GLEASON:

3  Q.  Mr. Pollack, briefly turn to the bid protections, I believe

4  we talked in general about them.  Are you familiar with a

5  break-up fee?

6  A.  Yes.

7  Q.  Can you explain your understanding of the break-up fee?

8  A.  What it is?  What it's for?

9  Q.  Yes.

10 A.  A break-up fee is to -- is typically used to induce a party

11 to provide an offer in a transaction like this and to

12 compensate them for their time, effort and expenditure of

13 dollars if they are not ultimately the successful bidder.  I

14 mean, a break-up fee is there to maintain the base -- to induce

15 parties to be bidders -- stalking horse bidders, to maintain

16 the base level of the going concern value of what you're

17 selling.

18 Q.  Based on your experience, are break-up fees reasonable and

19 necessary in 363 sales transactions?

20 A.  Where there are stalking horse bids, I believe the answer

21 is yes.

22 Q.  Is there a range of -- well, let me strike that.  How are

23 break-up fees generally calculated?

24 A.  They're typically calculated as a percentage of the

25 consideration.  And there's two components, excuse me --

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

**B692**

Pollack - Direct                                                        164

1   sometimes combined, sometimes separate.  Those components are

2   the pure break-up fee and the attendant expense reimbursement.

3   Q.  In your experience, is there a range of percentage with

4   respect to -- let's first start with break-up fee, separate and

5   apart from expense reimbursement?

6   A.  There is.

7   Q.  What is that range?

8   A.  2 to 3%.

9   Q.  2 to 3%??

10  A.  Uhm-hum.

11  Q.  What about expense reimbursement?

12  A.  It is my experience that that is usually included in the 2

13  to 3%.  And typically, in many of the cases that we've -- that

14  I've been involved with, it's been 3% including the expense

15  reimbursement.

16  Q.  In this case, what is -- is there -- what is the percentage

17  of the break-up fee, including the expense reimbursement?

18  A.  I believe it's 4¼.

19  Q.  What is the --

20  A.  I believe it is 4¼.

21  Q.  What is the percentage with just the break-up fee?

22  A.  3%.

23  Q.  And how is the -- in this agreement, how is the expense

24  reimbursement calculated?

25  A.  Up to $500,000 based on actual expenses.

1  Q.  Did the Debtors attempt to negotiate different terms for

2  bid protections, including the break-up fee and expense

3  reimbursement?

4  A.  We did.

5  Q.  Did the Debtor have any success in doing that?

6  A.  We had them reduced to where they are.  We negotiated to

7  have them reduced further and were not able to do so.

8          MR. GLEASON:  Your Honor, I believe I've addressed --

9  or the witness has addressed the Court's specific issues if --

10          THE COURT:  Okay.

11          MR. GLEASON:  And if not, then I'm sure Mr. Mason will

12  ask.

13          THE COURT:  All right.  Are we ready for cross

14  examination?  Anybody want to take a break or should we plow

15  ahead?

16          MR. MASON:  Your choice --

17          THE COURT:  Let's plow ahead.

18          MR. MASON:  -- Judge.

19          THE COURT:  Let's plow ahead and see how we do.

20          MR. POLLACK:  Can I have some water?

21          MR. MASON:  Good afternoon, Mr. Pollack.

22          THE COURT:  Somebody has to be in charge of the

23  hydration committee here.

24          MR. POLLACK:  Witness hydration.

25          MR. GLEASON:  I'm the one that made him talk so much,

Pollack - Cross                                    166

1  so I'll get him some water.

2          MR. POLLACK:  Thank you.

3                  CROSS EXAMINATION

4  BY MR. MASON:

5  A.  Now, Mr. Pollack, when you came on board in mid-June,

6  circumstances for A.B. Dick were pretty desperate, weren't

7  they?

8  A.  It was the end of June.

9  Q.  I'm sorry, the end of June.

10  A.  Could you define "desperate?"

11  Q.  They appeared fairly desperate to you, didn't they?

12  A.  The company was running out of cash.  It had an inability

13  to meet its payroll without an over advance and had no clear

14  path to its next payroll.

15  Q.  And it had no cash available, but ability under its line of

16  credit with Key Bank, is that right?

17  A.  That's correct.  That's my understanding.

18  Q.  And it had -- it wasn't negotiating with anybody to sell

19  it's business over the (indiscern.), is that correct?

20  A.  When I got involved, that's correct.

21  Q.  And there wasn't anybody else that you knew of who had been

22  negotiating to possibly purchase Presstek -- or possibly

23  purchase A.B. Dick's business within the last few months prior

24  to your retention, is that correct?

25  A.  There were no -- to my knowledge, there were no other

Pollack - Cross                                                167

1   parties, third parties, making inquiries.

2   Q.  Okay.  And it was your judgment that there really wasn't

3   any time to get a Debtor-In-Possession line?

4   A.  An alternative Debtor-In-Possession line.

5   Q.  So you did the best you could?

6   A.  Given the facts and circumstances.

7   Q.  And you had a tough negotiation, didn't you?

8   A.  It was a fairly rigorous negotiation.

9   Q.  And even though your experience showed you that a typical

10  break-up fee was 2 to 3%, you went ahead and agreed, or the

11  company went ahead and agreed to 4¼%, didn't it?

12  A.  3% break-up fee and 4¼% expense reimbursement.

13  Q.  Okay, but in your experience the expense reimbursement is

14  typically within a 2 to 3%, is it not?  That was you testimony.

15  A.  It is.  And the basis for going ahead was that the

16  overwhelming conclusion was that that point, which we were not

17  able to get the buyer to concede, was dwarfed by the overall

18  value created in the preservation of the going concern value

19  that was supported by the two related agreements, the DIP and

20  the APA.

21  Q.  Your -- Mr. Pollack, I would just ask you to answer the

22  questions that I've asked you and then --

23  A.  Sure.

24  Q.  -- your -- or the counsel for A.B. Dick or other counsel

25  can ask you to elaborate on redirect, okay?  Now Mr. Pollack,

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1  when the original Asset Purchase Agreement was signed, there

2  was a no-shop provision, you testified about that, is that

3  correct?

4  A.   Could be specific?  This Asset Purchase Agreement?

5  Q.   Yes.

6  A.   The one marked Exhibit-2?

7  Q.   Yes.

8  A.   Yes, that's my understanding.

9  Q.   All right.  And you interpreted that to mean that you

10  couldn't go out looking for other buyers until that no-shop

11  provision was eliminated?

12  A.   I was advised by counsel that we could not contact other

13  buyers nor respond to inquiries.

14  Q.   Okay.  And it was your understanding that the way that that

15  was originally drafted, the no-shop provision remained in

16  effect until there was a Sale Procedures Order, isn't that

17  correct?

18  A.   It is.

19  Q.   And the Sale Procedures Order could have not been entered

20  by this Court until as late as August 27th, 2004, isn't that

21  correct?

22  A.   It could have been entered later.

23  Q.   Well, but the Agreement provides, does it not, that the

24  Sale Procedures Order as a condition to the enforceability of

25  the contract had to be entered by August 27th?

1    A.   Yes.

2    Q.   And the Asset Protection Agreement also provided that the

3    Sale Order approving the sale had to be entered no later than

4    September 30th, 2004, is that correct?

5    A.   The Asset Purchase Agreement --

6    Q.   Yes.

7    A.   -- provided that, yes.

8    Q.   So at the time of the filing of the bankruptcy, it was

9    conceivable that the Debtor was going to pay approximately

10   4.25% to Presstek as a break-up fee for the opportunity to

11   market this business from August 27th to approximately

12   September 30th, 2004?  Is that what the Asset -- the Asset

13   Purchase Agreement had originally provided for?

14   A.   Could you state a question that -- I'm not sure what I'm

15   being asked.

16   Q.   So when the Asset Purchase Agreement was signed --

17            THE COURT:  Mr. Mason, I'm going to ask you to stay

18   behind the lectern --

19            MR. MASON:  Sorry.

20            THE COURT:  -- for two reasons.  Number one, we

21   have -- no, three reasons.  Number one, it's the way we do

22   things here.  Number two, we have a digital recording we're

23   making and it goes in and out if you stray from the microphone.

24   And number three, we have a large number of people on the

25   telephone who are listening to your questions that way.  So I

1  ask all counsel to plant your feet and speak into the

2  microphone.  Thank you.

3           MR. MASON:  Thank you, Judge.

4  BY MR. MASON:

5  Q.  Mr. Pollack, when the Asset Purchase Agreement was

6  originally signed and presented to the Court, isn't it true

7  that A.B. Dick was prepared to pay approximately 4.25% of the

8  purchase price for the opportunity to possibly market the

9  business only from August 27th, 2004, the deadline for the Sale

10 Procedures Order, to sometime before September 30th, 2004, the

11 deadline for the Sale Approval Order?

12 A.  Those were the two deadlines.

13 Q.  Thank you.  Now, if Presstek walks away and defaults under

14 the Asset Protection Agreement, all the estate can recover from

15 Presstek is $2 million, is that right?

16 A.  The Asset Purchase Agreement?

17 Q.  Yes.

18 A.  I believe that is the liquidated damages for walking away.

19 Q.  Okay.

20          THE COURT:  And you need to speak up, too, Mr.

21 Pollack.

22          MR. POLLACK:  Sure.

23 BY MR. MASON:

24 Q.  And has that $2 million been given to A.B. Dick yet?

25 A.  My understanding is it's to be delivered upon the entry of

1  a procedures order.

2  Q. So you don't have it yet?

3  A. I would never have it, and I don't believe the company has

4  it either.

5  Q. Okay. Now, you don't profess to know the value of A.B.

6  Dick's assets that would be sold under the Asset Protection

7  Agreement, do you?

8          THE COURT: Asset Purchase Agreement.

9          MR. MASON: I'm sorry, Asset Purchase Agreement.

10         THE COURT: Do you have a sideline in Cayman Islands

11 work or something?

12     (Laughter)

13         THE COURT: Mr. -- excuse me, I --

14         MR. MASON: I have something else on my mind.

15         THE COURT: I thought at 4 o'clock in the afternoon it

16 was time to lighten things up a little bit. Okay, go ahead Mr.

17 Mason, I'm sorry.

18         MR. MASON: Thank you.

19         THE COURT: I think the record needs to be clear that

20 you're talking about the Asset Purchase Agreement.

21 BY MR. MASON:

22 Q. Mr. Pollack, can we call the Asset Purchase Agreement the

23 APA?

24 A. We can.

25 Q. Okay. And will you understand what I'm talking about?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B700

1  A.  I will.

2  Q.  That's the agreement between Presstek and A.B. Dick that's

3  now before the Court?

4  A.  Yes.

5  Q.  All right.  Now, you don't profess, do you, to know the

6  value of the assets to be sold to Presstek under the APA, do

7  you?

8  A.  Do I know -- can you be clearer about that question -- what

9  --

10  Q.  Do you --

11  A.  I don't understand the question.

12  Q.  Do you claim to know the value of the assets that are to be

13  sold to Presstek or its affiliate under the APA?

14  A.  I know the purchase price which I believe sets the bottom

15  for the value of those assets.

16  Q.  But I'm asking you whether you know the value or profess to

17  know the value of those assets?

18  A.  I know the accounting value of the assets.  I know the sale

19  value of the assets given the APA.  I'm not sure how I could

20  know the ultimate value until the end of the auction when such

21  value is realized.

22  Q.  All right, but you haven't conducted a fair market value

23  analysis of the assets to be sold under the APA, have you?

24  A.  Correct.

25  Q.  Now, in investigating A.B. Dick's affairs, you did learn,

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B701