Pollack - Cross										173

1  didn't you, that Presstek had made an offer to purchase A.B.'s
2  stock as recently as maybe the late spring or early summer of
3  2004? Isn't that correct?
4  A. I knew there were ongoing negotiations, yes.
5  Q. Did you not investigate whether there was, in fact, an
6  offer made by Presstek?
7  A. Could you define an offer?
8  Q. A written offer to purchase the assets.
9  A. I investigated and understood that there were ongoing
10 negotiations between the parties which resulted in a document
11 that was never executed. By all parties. But I was not
12 focused on that pre-petition activity so I was focused on what
13 I was retained to do.
14 Q. You didn't think that considering that transaction was
15 important for you to determine what the value of these assets
16 was?
17 A. I knew what prior offers were from other parties.
18 Q. I'm asking you whether you knew -- do you know as you sit
19 here now how much Presstek had offered to purchase the assets
20 of A.B. Dick in the spring and summer of 2004?
21 A. I heard testimony that there was discussions of -- I
22 believe it was 40 million in the combination of stock and cash
23 plus the assumption of certain liabilities.
24 Q. But this is the first time you ever heard any discussion on
25 this?

Pollack - Cross                                                      174

1   A.   No, I have heard discussion.
2   Q.   All right.  Now, before the bankruptcy case was filed, you
3   contemplated that you would have approximately 90 days to
4   complete the sale from the beginning of your retention to the
5   time of the sale?
6   A.   I think it was about 75 to 80 days, yes.
7   Q.   You told us in your deposition 90 days, didn't you?
8   A.   I don't recall.
9   Q.   Is it possible you said 90 days?
10  A.   It certainly is.
11  Q.   And at the time of the filing of the Chapter 11, you
12  thought you would have the sales book available within a couple
13  of weeks, didn't you?
14  A.   I did.
15  Q.   Okay.  And the sales book, the memorandum -- this is the
16  book that you turn over to potential purchasers of the assets
17  who have signed some kind of confidentiality agreement, is that
18  right?
19  A.   It is.
20  Q.   Have you finished that sales book yet?
21  A.   Yes.
22  Q.   And when did you first finish it?
23  A.   Last week.
24  Q.   All right, and is it in final form now?
25  A.   It is.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Cross                                                       175

1  Q.  On what day last week did you finish it?
2  A.  I don't recall.
3  Q.  Have you sent a copy to the Committee?
4  A.  I believe Jeffrey's received a copy. I believe the
5  Committee received a copy, and I believe that you all have
6  access to the online data room. And my understanding is that
7  it's posted there.
8  Q.  It's in final format?
9  A.  It may be modified later. It's in a form we are confident
10 today to release to parties. So it has been released.
11 Q.  Has it been released to anybody yet?
12 A.  Yes.
13 Q.  When was it first released?
14 A.  Last week.
15 Q.  You testified at your deposition, didn't you, that in your
16 opinion in order to maximize the value of assets, the sale
17 should be scheduled sometime between September 30th and
18 November 29th, wasn't that your testimony?
19 A.  I believe my testimony was 6 to 10 weeks from today.
20 Q.  Didn't you say in your deposition that you thought that the
21 optimal time was sometime after September 30th and sometime
22 before November 29th?
23 A.  I believe I did.
24 Q.  You contacted a number of foreign purchasers, haven't you?
25 A.  Yes we have.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Cross                                                     176

1  Q.  And some of them have shown an interest in possibly making
2  a bid for A.B. Dick, haven't they?
3  A.  They've shown an interest. I wouldn't go so far as to
4  making a bid.
5  Q.  Now, isn't it possible, based on your experience, that a
6  foreign buyer may need more time to conduct due diligence
7  before making an offer to buy a U.S. based business?
8  A.  It's my experience that foreign buyers have more difficult
9  travel schedules and have a -- often times have a different
10 corporate approval process.
11 Q.  And how many different locations does A.B. Dick have?
12 A.  Two primary.
13 Q.  And where are they?
14 A.  Rochester and Niles.
15 Q.  What other locations does it have?
16 A.  There's a list in the book. I'd be happy --
17 Q.  Approximately how many different locations?
18 A.  I think there are some sales offices, one or two, and
19 there's a distribution center, which I consider part of
20 Niles -- near Niles.
21 Q.  So there are two locations in or about Niles?
22 A.  I'm happy to look at the book, allowed to refresh my
23 memory, and give you a specific answer.
24 Q.  So you don't recall at this point?
25 A.  I do not.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Cross                                                         177

Q. And Rochester is in Rochester, New York?

A. It is.

Q. Did you recommend to A.B. Dick management that they give Presstek the bid protection it gained in the APA?

A. I discussed my opinion with the Board.

Q. I'm asking you whether you recommended that they accept the bid protection that was offered by Presstek in the APA.

A. I recommended that to the Board, given the facts and circumstances, as I've already testified to today.

Q. Okay. And the Board -- is that the Board of A.B. Dick?

A. Both Boards.

Q. Who is on the Board of A.B. Dick?

A. James Wert.

Q. Is there anybody else?

A. Not to my knowledge.

Q. Okay. Would you agree that it would not make sense to provide bid protection to a purchaser who does not have a legally enforceable obligation to purchase assets?

        THE COURT: I'm sorry, Counsel, will you restate the question.

BY MR. MASON:

Q. Would you agree, Mr. Pollack, that it would not make sense to provide bid protection to a purchaser who does not have a legally enforceable obligation to purchase assets?

A. The -- that would depend on the facts and circumstances

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Cross                                                              178

1   required -- related to the enforceability.  If it's absolutely
2   unenforceable in an expression of interest or an offer I would
3   wholeheartedly agree.
4   Q.   Are you familiar with paragraph 10 of the APA?
5   A.   I have read it.
6   Q.   Do you have a copy there?
7   A.   I do.
8   Q.   If I could turn your attention to it.  That's on page 46 of
9   the APA.
10  A.   Yes.
11  Q.   Do you see there are 13 different conditions --
12  A.   Yes.
13  Q.   -- 13 different numbered paragraphs?
14  A.   Yes.
15  Q.   All right, now just directing your attention to paragraph
16  10.1 on page 46, do you see there that the obligations of the
17  purchaser are dependant upon the accuracy of representations
18  and warranties?  Do you see that?
19  A.   I see the paragraph.
20  Q.   But you understand that if any one of those representations
21  or warranties proves to be untrue in any material respect, the
22  purchaser has the right to cancel the contract without any
23  liabilities to the estate?  Is that your understanding?
24  A.   That would be my understanding.
25  Q.   Now, 10.1 refers us back to paragraph 3.  Do you see that?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Pollack - Cross                                                             179

1  Paragraph 3 starts on page 16.
2  A. Yes.
3  Q. See that? And it goes to page 33; 17 pages. Do you see
4  that?
5  A. I do.
6  Q. Do you see the 28 paragraphs of representations and
7  warranties on those 17 pages?
8  A. I do.
9  Q. In all your years in as a bankruptcy professional have you
10 ever seen a Section 363 Asset Sale that had so many
11 representations and warranties?
12 A. I have seen them, especially when there are assets not
13 inside of the estate that are being sold as well.
14 Q. Now, between the time of your engagement with A.B. Dick and
15 today, what effort have you made to determine of these 17 pages
16 of representations and warranties are true and will remain true
17 up to the time of closing?
18 A. I have focused my attention on the financial conditions
19 contained in the APA. And I have, I think, been fairly
20 specific in my testimony today about the efforts to negotiate
21 and the success in negotiating the modifications to both the
22 APA and the DIP agreement with respect to the financial
23 conditions.
24 Q. And the financial conditions are not contained in paragraph
25 3 of the APA, are they?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Cross                                                  181

1  instance, at 13.14(A) sub 2. "To the sellers knowledge, except
2  as set forth in section 3.14 of the seller disclosure schedule,
3  since the base balance sheet date, there has not been with
4  respect to seller or any subsidiary of seller (little 2) any
5  encumbrance placed on any of the properties of seller or any
6  subsidiary except permitted encumbrances." See that?
7  A. I do.
8  Q. Now, isn't the sale supposed to be free and clear of all
9  liens and encumbrances?
10 A. It is.
11 Q. Can you imagine how Presstek would be injured if it turned
12 out that there was some undisclosed lien?
13         MR. GLEASON: Your Honor, I think that calls for
14 speculation.
15 A. I'm not a lawyer.
16         THE COURT: Overruled.
17 A. I'm not a lawyer. I can't speak to what liens might
18 interfere that the Court has or doesn't have jurisdiction over,
19 what liens might be in foreign assets they're being sold that
20 are not party to this proceeding. I can't speculate on that.
21 Is it not -- one question though, is it not subject to a
22 materiality clause?
23         MR. MASON: Your Honor, I move to strike the witnesses
24 testimony on the grounds that there was no question.
25         THE COURT: Granted.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Cross                                                                 186

1  than that which it can use to borrow money, buy inventory, and
2  include in its inventory and meet the calculation.
3  Q. So it's your view -- well, let's take a look at the section
4  titled Combined U.S. and Canada under Working Capital Closing
5  Covenants.
6  A. Yes.
7  Q. Do you see that?
8  A. I do.
9  Q. That's the second to last at the bottom in bold title,
10 Combined U.S. and Canada?
11 A. I see it.
12 Q. And that shows, does it not, that in August and September
13 A.B. Dick is not going to make the working capital closing
14 covenants, does it not?
15 A. It does -- well, no, it shows that under this analysis that
16 the forecast from operations would require the Debtor to borrow
17 $436,000 more on its line, buy inventory, and include that
18 inventory in its calculation to meet the test. That's what it
19 shows to me.
20 Q. All right, and how about in September?
21 A. I'm sorry, that was September. I apologize. That was --
22 September 30th is the last date out here. And if you look
23 where you pointed me to, Combined U.S. and Canada, you look at
24 the covenant line, it's a test of $22.7 million. It shows here
25 that we would be -- that the Debtors would be $436,000 short,

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Pollack - Cross                                                                                   182

1  BY MR. MASON:
2  Q.  Now, Mr. Pollack, turning your attention back to paragraph
3  10, page 46 at 10.2, do you see how there the enforceability of
4  the agreement against Presstek is subject to certain covenants
5  described in 10.2?
6  A.  It says, "Seller shall have performed and complied in all
7  material respects with all the covenants contained in Article 5
8  on or before the closing date, and Platinum shall have received
9  a certificate to such effect executed on behalf of seller by
10 the President, Chief Executive Officer, or Chief Financial
11 Officer of seller."
12 Q.  So it's your understanding that Presstek's obligations
13 under the APA are conditioned upon the performance of these
14 covenants in paragraph 5?
15 A.  In all material respects.
16 Q.  And -- now let's go back to paragraph 5, beginning on page
17 34, going on 5 pages to paragraph 38.  Do you see those 12
18 covenants?
19 A.  Uhm-hum.  Yes.
20 Q.  Now, between the time that you wee retained and today, what
21 efforts have you made to make certain that those covenants will
22 be complied with continuously from the time of the -- from
23 today up to the time of closing?
24 A.  With respect to 5.2, conduct of business, I have spent
25 quite a bit of time assisting the Debtors in negotiating with

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B711

Pollack - Cross                                                                183

1  its vendor base and with its lenders to allow it to conduct its
2  business in a fashion that would allow it to meet this. And I
3  believe, given the concessions made today, have achieved a
4  basis for the Debtor to go forward and do that.
5  Q.  Okay, so that covers one of the, I believe, 12 paragraphs.
6  Mr. Pollack, as you sit here today, what assurance can you give
7  the Committee, MHR and the other Creditors of this estate and
8  the Court that these covenants contained in paragraph 5 of the
9  APA will be met and kept up to the time of the closing?
10 A.  I can give no assurance.
11 Q.  Thank you. Now, I'd like to send you back to paragraph 10
12 of the APA and have you focus on paragraph 10.12, one of the
13 other conditions on which you earlier testified about. And I
14 think we have generally referred to 10.12 as the working
15 capital condition. See that on page 47?
16 A.  I do.
17 Q.  Now, I believe it was your testimony on direct examination
18 that with the $2 million concession given by Presstek that it
19 was your view that this condition will be met and will not
20 prevent the enforcement of the APA?
21 A.  I think my testimony was with the $2 million concession and
22 the $2½ million concession in the APA, based on the company's
23 forecast, it would be able to -- and its current operations, it
24 would be able to meet that test.
25 Q.  You said the $2½ million in the APA, did you mean the $2½

Pollack - Cross                                                                 184

1 million --
2 A. I'm sorry.
3 Q. -- concession in the Debtor-In-Possession --
4 A. I did, I'm sorry.
5 Q. -- lending arrangement.
6 A. 2 million in the APA, 2½ million in the DIP.
7 Q. Now, I'd like to turn you back to A.B. Dick Exhibit-1 --
8 A. Yes.
9 Q. -- which is titled (indiscern.) corporate holdings in
10 August 2004 forecast.
11 A. Yes.
12     (Debtor's Exhibit-1 previously marked for identification)
13 Q. You've made reference to that. Did you assist in the
14 preparation of this?
15 A. No. In the revisions -- in the revised documents, no.
16 Q. But I'm asking you whether you assisted in the preparation
17 of this Exhibit --
18 A. No.
19 Q. -- the projections and --
20 A. The original ones, not these.
21 Q. Okay. And is it your understanding that these, that is
22 A.B. Dick Exhibit Number 1, is based in part on the earlier
23 version of this that you worked on?
24 A. Yes.
25 Q. I'd like you to go to the fourth page. Do you see that,

Pollack - Cross                                                      185

1  it's sort of an up-and-down page?
2  A. Yes.
3  Q. And it's titled Asset Purchase Agreement Covenant Review?
4  A. Yes.
5  Q. Do you see that?
6  A. Yes.
7  Q. Did you work on this?
8  A. No.
9  Q. Do you have any reason to believe this is inaccurate?
10 A. No, but I would like to explain the meaning of it as I see
11 it.
12 Q. Okay.
13 A. This page analyzes the Debtor's projections as they are.
14 And to analyze -- in my view, to analyze whether or not the
15 Debtor will be able to meet the tests, one has to look at both
16 the result of this analysis and the available credit under the
17 DIP at the same timeframe. And so the reason I say that is
18 that the Debtor has the right to buy inventory so long as it
19 has available funds and use that inventory to include it in
20 this calculation so that it can make this calculation. So if
21 you were to look at the, for instance, the September
22 calculation, you'll see the working capital closing covenant.
23 And you look under covenant, cushion and deficit and you'll see
24 it's short $317,000. You can then look on one of the other
25 pages and you will see that the Debtor has availability greater

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Pollack - Cross                                                        187

1   and if you turn one page back on the third page, there is no
2   line for September 30th, but if you look at the week ending
3   October 2nd and you go all the way down to the bottom, there's
4   as forecast of $973,000 of funds available to borrow. And so
5   it could borrow the $460,000, buy inventory, include the
6   inventory in the test and meet the test, and still have some
7   small amount of room on its line. It never has a large amount
8   of room.
9   Q.  And where in the budget that's approved under the Debtor-
10  In-Possession arrangement does the company have the right to
11  spend that money?
12  A.  It's allowed to -- under the DIP budget it's allowed on a
13  cumulative basis to make the total of all these -- the total
14  disbursements included in the DIP budget.
15  Q.  But can you show me where either in Exhibit-1 or in any
16  other document that the Debtor has the power to --
17  A.  Buy inventory?
18  Q.  -- make those expenditures?
19  A.  To buy inventory?
20  Q.  Yes.
21  A.  Sure, in the -- on the third page -- do you have the
22  original forecast?
23  Q.  Yes.
24  A.  Okay, I believe it doesn't go -- it only goes through some
25  date in September, I think. Or maybe October 15th. But you'll

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B715

Pollack - Cross                                              188

1  see there's a line under operating disbursements for inventory.
2  The Debtor can buy inventory there, and actually the Debtor can
3  use -- my understanding of the DIP arrangement is the Debtor
4  can use its full allocation of disbursements on a cumulative
5  basis at any time for reasonable business purposes. And buying
6  inventory is a -- you know, my understanding would be a
7  reasonable business purpose.
8  Q. So it's your understanding that the budget permits the
9  Debtor to borrow all the way -- borrow it's entire line of
10 credit if it sees fit in a particular month?
11 A. No. My understanding of the DIP arrangement is that the
12 borrowings are limited to $7 million coupled with specific over
13 advance allowances. And in this case, on the week ending
14 October 2nd, the adjusted over advance allowance provides room
15 of $973,000. So there's $973,000 that the Debtor is allowed to
16 spend. And that's you know -- buying inventory would be an
17 acceptable -- and in fact, it could buy the inventory today,
18 $463,000, have the inventory there on September 30th and meet
19 the covenant. It's a timing activity as to when the inventory
20 is purchased. Furthermore, if the inventory that's pre-paid
21 comes in earlier, then there's even more room on the DIP line
22 because inventory advances are only -- only provide 60% -- the
23 ratio to actual dollars spent to collateral available to borrow
24 on is 60%. And at October 2nd, there is $1.8 million of pre-
25 paid inventory. So actually it's -- that material likely will