Pollack - Cross                                        189

1  not be here.  But if it were here, approximately $750,000 in

2  additional funds would be available to the Debtors.  But

3  because of the requirement, primarily Mitsubishi, it's limited.

4       MR. MASON:  Your Honor, if I could just have one

5  minute please.

6       (Pause in proceedings)

7  BY MR. MASON:

8  Q.  All right, Mr. Pollack now again directing you attention to

9  the fourth page of Exhibit-1, A.B. Dick Exhibit-1.  Do you see

10 the emboldened title U.K.?

11 A.  I do.

12 Q.  And do you see that there's a negative percentage along the

13 side the percent cushion/deficit --

14 A.  I do.

15 Q.  -- for U.K.?

16 A.  I do.

17 Q.  I have no further questions about that.  Now taking --

18 drawing your attention back to paragraph 10 of the APA.

19     (Witness locates document)

20 Q.  And directing your attention to paragraph 10.3 on page 46,

21 do you see that?

22 A.  I do.

23 Q.  There's a condition related to the absence of a material

24 adverse effect, do you see that?

25 A.  I do.

B717

1  Q.  All right.  And material adverse effect is described on

2  page 70 of the APA, isn't it?

3  A.  It is.

4  Q.  And the material adverse effect focuses primarily on the

5  timing of shipments, does it not?

6  A.  (No verbal response).

7  Q.  The timing and the amount of shipments on a monthly basis?

8  A.  Sales.

9  Q.  I'm sorry, sales.

10  A.  Yes.

11  Q.  Now, suppose a shipment of approximately $2 million of

12  product scheduled for August 31st were to slip by a day and not

13  be sent until September, and everything else was the same as

14  projected, would the Debtors miss this test?

15  A.  Could you repeat that question?

16  Q.  Suppose a shipment of $2 million of product scheduled for

17  August 31st were to slip by a day and were not shipped until

18  the next month, isn't it true that the Debtor would miss this

19  particular test, this material adverse effect test?

20  A.  No, it depends on the amount of sales that had occurred in

21  the month up until that point.

22  Q.  And how do you define sales?

23  A.  Sales are the recording of revenue.

24  Q.  So if you write up a sale in a month but you don't ship it

25  for a couple of months, it's still included in the sales on the

1  material adverse effect is your understanding (indiscern.)?

2  A.  That wasn't what I said.  What I said was it depends on the

3  volume of -- the question I heard was if $2 million scheduled

4  to be sold on the last day of the month went to the next day of

5  the month, would they miss the test.  My response is that

6  depends on the volume of revenue the company had experienced

7  prior to the last day of the month.

8  Q.  If as a result of the timing of a shipment you did not meet

9  the shipping or sales revenue under the material adverse effect

10  clause, is that a conceivable means for Presstek to back out of

11  the agreement?

12  A.  My understanding is if we don't -- if the Debtors do not

13  achieve these revenue targets, Presstek is not obligated to

14  close.

15  Q.  And that's regardless of whether you exceed the sales

16  revenues, say in September, but fall short of them in August?

17  A.  That's correct.

18  Q.  Even though on a combined basis, the average sales revenues

19  would be greater than or equal to the levels required by

20  material adverse effect?

21  A.  Correct.

22  Q.  Thank you.  Now, there was some testimony about the razor

23  and the razor blade.  You've been involved in this business

24  since the middle of June, is that what you said?

25  A.  No.

Pollack - Cross                    192

1   Q.   Okay.   How long -- how many weeks have you actually worked

2   for this business?

3   A.   I was first involved with these businesses personally in

4   either 1999 or 2000.   The year 2000.   The engagement with

5   respect to the current bankruptcy commenced on June 29th, 2004.

6   Q.   All right, is it your testimony that it's impossible to

7   split up the divisions or the functions of this business

8   because of the so-called razor and razor blade effect, as you

9   described in your direct testimony?

10  A.   No, I don't believe I said that.

11  Q.   So it's conceivable that this business could be broken up

12  into different parts, some of which are profitable and some of

13  which are not?

14  A.   That's my view.

15  Q.   And when you worked up the offering memorandum, you

16  actually came to the conclusion that two out of the three

17  divisions have a positive EBITDA, E-B-I-T-D-A, of approximately

18  $14 million a year?

19  A.   That's not true.

20  Q.   Okay.   How much did they have for the last year?

21  A.   Well, I didn't come up with anything.

22  Q.   Okay.

23  A.   We asked the company to prepare an analysis of the business

24  lines and what their operating results would be.   The company

25  made certain assumptions and delivered that to us and we have

1   included that in the Selling Memorandum because we believe it's

2   important -- very important information for prospective buyers

3   to understand.

4   Q.  And what was the company's projection as to the EBITDA for

5   the two profitable divisions?

6   A.  I would need the book to refresh my memory.

7   Q.  Do you have a book here in the Courtroom?

8   A.  I have a draft.  I might have a copy, yes.

9   Q.  I wonder if you could take it and see if it refreshes your

10  recollections of the answer.

11          THE COURT:  It's all right.

12  A.  Yeah, we could that.

13          MR. MASON:  Thank you, Your Honor.

14      (Witness reviews document)

15          MR. MASON:  Your Honor, perhaps this would be a good

16  time to take a short break.

17  A.  I found it.

18          THE COURT:  Well, we are going to take a break soon

19  here.

20          MR. MASON:  I would like a chance to look at it as

21  well.

22          THE COURT:  All right, how much more do you have here,

23  Counsel?

24          MR. MASON:  I would say about 3 or 4 minutes, Judge.

25          THE COURT:  And then we're going to have some -- do we

Pollack - Cross                                    194

1    have anybody else who wants to cross examine?

2             MR. SELBST:  I will want to discuss the (indiscern.),

3    Your Honor.

4             THE COURT:  And how much time do you thing you're

5    going to take?

6             MR. SELBST:  My question will be very short.

7             THE COURT:  Then will we have any redirect?

8             MR. GLEASON:  Just about 5 minutes at most.

9             MR. LEPENE:  Your Honor, I will have just a couple of

10   questions.

11            THE COURT:  And then what about further witnesses.

12            MR. GLEASON:  From the Debtor's standpoint, that is

13   all of our witnesses, Your Honor.  And we'd just move for the

14   admission of our exhibits.

15            THE COURT:  What about from the other parties?

16            MR. MASON:  Judge, we have one witness.

17            THE COURT:  All right, is that all we have then is we

18   have the remainder of this witness and then one more witness?

19   Okay, we'll take a 10 minute break until 10 minutes to 5.

20   Everybody stretch their legs and let Mr. Mason look at that.

21   Let everybody focus of the goal line.

22        (Court in recess)

23            THE COURT:  Be seated.  All right, Mr. Mason, are we

24   ready here?

25            MR. MASON:  Yes I am, Judge.  Judge, the witness is

1  going to use a confidential memorandum to refresh his

2  recollection, and I think you've already heard testimony that

3  this memorandum's only (indiscern.) the parties who've signed

4  the confidentiality agreement, so in order to maintain the

5  confidentiality of this I don't intend to mark this document as

6  an exhibit or anything like that.  But it will be used to

7  refresh the recollection.

                    CROSS EXAMINATION - (CONT'D)

9  BY MR. MASON:

10  Q.  Mr. Pollack, does that memorandum refresh your recollection

11  so that you can answer my question about what the proposed or

12  EBITDA or forecasted EBITDA for 2004 is for the three parts of

13  the A.B. Dick business?

14  A.  It does.

15  Q.  Okay.  And what are those three parts?

16  A.  Supplies business for 2004 is projected at 4.6 million,

17  service and parts is projected at 7.8 million, and the

18  equipment business is projected to have a loss of 13.3 million.

19  Q.  So if we look at sales and -- sale of supplies and service,

20  the so-called EBITDA would be just under $12½ million annually?

21  A.  Approximately, yes.

22  Q.  And isn't it true that purchasers of businesses ordinarily

23  fashion their offers based on some multiple of EBITDA?

24  A.  Very often.

25  Q.  And as I understand it, in addition to the EBITDA

1  opportunities, the opportunities to acquire the EBITDA and

2  acquire the A.B. Dick business (indiscern.) inventory,

3  intellectual property rights, equipment and other tangible

4  assets, is that correct?

5  A.  If they bought all of the assets.

6  Q.  Just one more brief line of questioning, Mr. Pollack.  In

7  negotiating bid protections, wouldn't you agree that the

8  reasonableness of a break-up fee is dependant upon how high the

9  price is in the proposed contract?

10 A.  Could you repeat that?

11 Q.  Yeah.  In fashioning or in negotiating or agreeing to a

12 break-up fee, wouldn't you say that the amount of the offer

13 that would be rewarded with the break-up fee should be to some

14 extent dependant upon the amount of the offer?

15      THE COURT:  You mean the amount of the break-up fee

16 should be dependant upon the amount of the offer?

17      MR. MASON:  Exactly.  Thank you, Judge.

18 A.  Since they're typically and often expressed and negotiated

19 as a percentage of the purchase price, I would say yes.

20 BY MR. MASON:

21 Q.  But if the offer that came from the stalking horse was far

22 below what you believe to be the fair market value of the

23 assets, would you be inclined to give a greater break-up fee or

24 a lesser break-up fee?  All other things being equal.

25 A.  I would think that I wouldn't give anything, but you would

1  negotiate for a break-up fee that would be consistent with the

2  market, which is 2 to 3% expressed -- which is an amount

3  expressed as 2 to 3% of the purchase price without judgment as

4  to whether it's small or large.

5  Q.  So your testimony is that you would give a break-up fee for

6  any kind of an offer, but you'd only give it as a percentage of

7  the amount of the offer?

8  A.  No.  You asked me what I would negotiate for, at least

9  that's what I understood the question to be.  Maybe you should

10 ask it again.

11 Q.  My question is, is the reasonableness of the break-up fee,

12 the amount of the break-up fee, dependant upon the

13 reasonableness of the amount of the offer for the purchase

14 price -- for the purchased assets?

15 A.  It would be my opinion that if a Debtor is willing to

16 accept a stalking horse bid, the Debtor then believes that that

17 stalking horse bid provides some level of value to the estate.

18 Either it's a high bid, better than they could do elsewhere,

19 it's a bid significant enough to sustain the going concern

20 value, or that stalking horse bid provides some value to the

21 estate.  Given that the typical break-up fee is expressed as a

22 percentage of the bid price, I think that the break-up fee that

23 results is -- after the application of the percentages to the

24 price being paid is a reasonable way of developing an

25 appropriate amount.

1  Q.  So you think a break-up fee should be reward -- should be

2  awarded if it's reasonable?

3  A.  Correct.

4  Q.  Okay.  Now, do you think that the reasonableness of the

5  amount of the break-up fee should be dependant on the length of

6  time that the offer from a stalking horse remains open?

7  A.  Remains open after an auction?

8  Q.  No, remains open from the time of the execution of the

9  Asset Purchase Agreement to the time of closing.

10 A.  I think it's all relative to the specific facts and

11 circumstances.  I've been involved in transactions with break-

12 up fees that have had short gestation periods and some with

13 very long.

14 Q.  Well, for instance, all other things being equal, if the

15 offer was only open for 2 days, would you be inclined to pay a

16 greater or a lesser break-up fee than if the offer remained

17 open for 3 months?

18 A.  I think that the percentage that you would apply might

19 increase if it was 3 months over 2 days, as extreme examples.

20 Q.  All right.  And would you agree that the reasonableness of

21 the amount of the break-up fee should be dependant upon the

22 conditionality of a stalking horse bid?

23 A.  I think if you accept a stalking horse bid, you should

24 accept it -- in my experience, if you're going to negotiate

25 one, you should negotiate one which you believe you can close.

Pollack - Cross                               199

1   Therefore, the application of the range that we discussed

2   before to the purchase price is an appropriate way of

3   developing that as well.

4   Q.  All right, so what you're saying is you'd pay the same

5   break-up fee regardless of the degree of conditionality of the

6   break-up -- of the stalking horse bid?

7   A.  If -- it's my opinion -- you're asking me my opinion?

8   Q.  Yes.

9   A.  My opinion is if you negotiate a stalking horse bid, it

10  should be one that you expect you can close based on your

11  negotiations and where you are.  To negotiate one you don't

12  believe you can close does not seem to me to be fruitful.

13  Q.  Mr. Pollack, do you think that the amount of the break-up

14  fee should be dependant upon the extent of the liability of the

15  stalking horse under its stalking horse bid?

16  A.  I think all of the elements you're identifying contribute

17  to the analysis of whether or not a break-up fee should be

18  included in a stalking -- in the arrangements related to a

19  stalking horse bid.  So all of the considerations you've

20  identified are ones that one should consider, take into

21  account.  And it still comes down to a range of 2 to 3% of the

22  consideration being an appropriate range, in my experience.

23          MR. MASON:  Judge, I have no further questions.

24          THE COURT:  Okay.  Mr. Selbst.

25                  CROSS EXAMINATION

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B727

1  BY MR. SELBST:

2  Q.  Good afternoon, Mr. Pollack.

3  A.  Good afternoon.

4  Q.  In the negotiation, to the extent that you were involved

5  with Presstek in the Debtors and in management, did Presstek

6  offer at any time any consideration to any member -- to any of

7  the old equity holders in these companies or to any employees,

8  senior management, for example?

9  A.  Not to my knowledge.

10  Q.  And you've testified that you have extensive experience in

11  negotiating 363 sales and in other transactions.  In your

12  experience, were the Debtors represented by experienced

13  counsel?

14  A.  Yes.

15  Q.  In your experience, were these negotiations over the terms

16  of the APA and over the bidding procedures, were they the

17  result of arm's length negotiations?

18  A.  Yes.

19  Q.  Now, we've heard a lot of testimony, partly from you,

20  partly from Mr. Knipp, about concessions that were made by

21  Presstek and by Key Bank to resolve some of the various

22  objections that were raised to the bidding procedures and to

23  the DIP.  And you have testified and Mr. Knipp has testified

24  about the changes in the DIP and the changes in the APA and the

25  changes to the bid procedures.  In exchange for all of these

1  various and sundry concessions, did Presstek ask or receive

2  anything in exchange or in consideration?

3  A.  No, not to my knowledge.

4  Q.  Now, Mr. Mason just spend a fair amount of time talking

5  with you about the conditionality of the book, as he referred

6  to as the agreement.  And I believe you testified that in your

7  experience, the (indiscern.) and the warranties were within

8  normal range of what is negotiated between a buyer and a

9  seller, is that correct?

10  A.  Yes.

11  Q.  I want to talk a little bit about the break-up fee again.

12  Is it your understanding that Presstek gets the break-up fee if

13  it terminates the agreement because various conditions are not

14  satisfied?

15  A.  No.

16  Q.  What are the conditions under which Presstek gets the

17  break-up fee, Mr. Pollack?

18  A.  My understanding is if the Debtor proposes a plan whose

19  value exceeds their offer within 6 months, Presstek is entitled

20  to receive their break-up fee.  If the auction is held and

21  Presstek is not the winning bidder and the company closes, the

22  estate closes with some other bidder, they are entitled to the

23  break-up fee, and if no auction is held and the assets are sold

24  to some other party within 6 months, they're entitled to the

25  break-up fee.

Pollack - Cross                                202

1  Q.  I want to make sure I got that right.  So if Presstek

2  simply says G company didn't make the sales targets, you didn't

3  make the working capital targets, Presstek doesn't get the

4  break-up fee, does it?

5  A.  That's my understanding.

6  Q.  Now, you've testified the Presstek has been involved in

7  negotiations with the company since December of '03, is that

8  correct?

9  A.  Mr. Knipp did.

10  Q.  I thought you said you also had knowledge of that.

11  A.  Actually, my understanding was they sent a letter of

12  interest in the summer of 2003.

13  Q.  Okay.  Are you aware that Presstek has disclosed publicly

14  that it has spent more than $1.2 million to date on this

15  acquisition?

16  A.  Yes.

17  Q.  Do you know what the source of that disclosure is?

18  A.  Their financial statements.

19  Q.  And where were those financial statements published?

20  A.  They're part of their SEC filings.

21  Q.  Thank you.  And are you aware the Presstek held an analysts

22  call on July 13th about the transaction?

23  A.  I had heard that.

24  Q.  Based on your involvement in negotiations, do you consider

25  Presstek to be a committed buyer?

Pollack - Cross                                    203

1   A.   Yes.

2   Q.   And based on your involvement in these negotiations, in

3   your overall experience of the cases, similar cases, do you

4   consider that Presstek did the stalking horse bid to provide

5   value to this estate?

6   A.   Yes.

7   Q.   Do you consider Presstek (indiscern.) stalking horse bid?

8   A.   Yes.

9   Q.   Taken as a whole, do you think the bidding procedures,

10  including the break-up fees and the expense reimbursements that

11  have been negotiated in this case, are fair?

12  A.   The ones that are on the table today?

13  Q.   Yes.

14  A.   Taken as a whole, I do.

15          MR. SELBST:   I have no further questions, Your Honor.

16          THE COURT:   All right, anybody else?   Okay, yes sir.

17          MR. LEPENE:   Thank you, Your Honor.

18                    CROSS EXAMINATION

19  BY MR. LEPENE:

20  Q.   Mr. Pollack, you testified on direct examination that you

21  were of the view that the Debtor-In-Possession financing being

22  provided would be sufficient to maintain the going concern

23  value if the sale process was concluded on November 15th.

24  A.   As amended, yes.

25  Q.   By November 15th?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B731