1  A.  Yeah, if the financing arrangements as amended --

2  Q.  Right.

3  A.  -- yes.

4  Q.  Why, in your view, is it essential that the sale process be

5  concluded by November 15 given the facts and circumstances

6  (indiscern.).

7  A.  I believe Mr. Knipp testified that the company is losing

8  money each month and that's my understanding as well.  It's

9  projected to lose money.  The considerations in a process like

10  this have to include what happens during the marketing period,

11  the pendency of the sale to the employees, vendors and

12  customers.  To the extent the sale becomes an amorphous

13  timeless or extended time period with an uncertain outcome,

14  employees tend to migrate to other positions to ensure their

15  own livelihood.  Customers, to a large degree, consider and

16  sometimes act on their own needs to ensure that their equipment

17  or whatever else will be serviced and maintained and will

18  not -- on a regular basis by reliable vendor so as not to

19  impact their own business.  Buyers as I said before, get tired;

20  after a period of time they want finality as well.  They don't

21  want to wait another week for three more prospective parties.

22  Q.  Are these the factors that cause you to conclude that this

23  company is in a very precarious financial condition at this

24  point?

25  A.  These, coupled with its limited financial ability to

Pollack - Redirect                                    205

1   sustain its operations.

2          MR. LEPENE:  That's all I have, Your Honor, thank you.

3          MR. GLEASON:  Just a few redirect, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MR. GLEASON:

6   Q.  Mr. Pollack, I want to address a few issues raised by Mr.

7   Mason.  During your exam, Mr. Mason asked a series of questions

8   with respect to the August 27th and September 30th dates

9   contained in the Asset Purchase Agreement.  Do you recall that?

10  A.  Yes.

11  Q.  Now, the bid procedures order could have been entered much

12  earlier than August 27th, isn't that true?

13  A.  Yes.

14         MR. MASON:  Your Honor, I'm going to object.

15         THE COURT:  Overruled.  Let's just get through it.

16  BY MR. GLEASON:

17  Q.  Do you know when the Debtors filed their Bid Procedures

18  Motion?

19  A.  I believe it was within a couple of days of the

20  commencement of the case.

21  Q.  would it surprise you if it was filed the day of the case?

22  A.  No.  That's when I thought, I wasn't certain.

23  Q.  Is it your understanding that the Debtors anticipated the

24  bid procedures would be entered long before August 27th?

25  A.  Yes.  In all of our discussions we had an expectation that

1    those procedures would be entered into relatively quickly

2    allowing for the -- a more fuller time period to market the

3    assets.  And in fact, August 27th, my recollection was

4    discussed as a very outside date to make sure that there was

5    plenty of opportunity to allow for mishaps.  And in -- the

6    eventuality of mishaps resulted in an early negotiation of the

7    no-shop, which resulted in the very same opportunity.

8    Q.  That was my next -- when the Debtors learned that that

9    would not happen by -- not happen as soon as the Debtors

10   originally thought, they negotiated a (indiscern.) no-shot?

11   A.  Correct.

12   Q.  Next, Mr. Mason made that statement the estate was willing

13   to pay Presstek 4.25% so it could market the assets for that

14   period, from August 27th to September 30th.  Do you recall

15   that?

16   A.  Yes.

17   Q.  The Debtors aren't paying for the right to market their

18   assets, are they?

19   A.  No.

20   Q.  Rather, isn't a break-up fee intended to compensate a

21   bidder for its time, expense, and effort in developing an Asset

22   Purchase Agreement, setting a base line by which other bids can

23   be judged?

24   A.  Yes.

25   Q.  Is that what's happened in this case?

Pollack - Redirect                                    207

1    A.  Yes.

2    Q.  Now Mr. Mason asked various questions about the

3    representations and the warranties in the Asset Purchase

4    Agreement.  Do you recall that?

5    A.  Yes.

6    Q.  And I believe you testified earlier that the

7    representations and warranties are common in transactions such

8    as this.

9    A.  Yes.

10   Q.  And in fact, without going through all of the

11   representations and warranties, many of these have a

12   materiality provision attached, do they not?

13   A.  Yes.

14   Q.  And many others are simply confirming the documents

15   provided by the sellers are accurate.

16        MR. MASON:  Judge, I have to object.  This is the most

17   leading direct testimony that I have ever encountered.  I mean,

18   I think -- I understand we want to get through with this, but I

19   believe that the witness should be testifying and Mr. Gleason

20   shouldn't be testifying.

21        MR. GLEASON:  No problem, Your Honor.

22        THE COURT:  Sustained.

23   BY MR. GLEASON:

24   Q.  Mr. Pollack, do you understand -- do you have an

25   understanding of whether some of the representations and

1  warranties relate to lists provided by the Debtors?  Maybe to

2  move through this, let's turn to section 3.18 on page 26.

3  A.  3 -- on what page?

4  Q.  Page 26.

5  A.  Yes.

6  Q.  What is that representation require the Debtors to do?

7  A.  3.18?

8  Q.  Yes.

9  A.  Provide lists of employees, suppliers and customers.

10  Q.  That is totally within the seller's control?

11  A.  It is.  It's a list of the seller's customers, suppliers

12  and employees.

13  Q.  I don't want to spend any more time with that.  You're

14  under -- you're -- again, your belief is that the

15  representations and warranties contained in this Asset Purchase

16  Agreement are standard for these types of transactions?

17  A.  Yes.

18  Q.  With respect to these representations and warranties, Mr.

19  Mason asked what you were going to do to ensure that they were

20  met.  Do you recall that?

21  A.  Yes.

22  Q.  That is not your obligation, is it?

23  A.  No.

24  Q.  Is it your understanding, however, that the representations

25  and warranties were accurate at the time the Asset Purchase

1   Agreement was executed?

2   A.  That's my understanding.

3   Q.  Do you have any reason to believe that the representations

4   and warranties won't be accurate at the time of closing?

5   A.  I do not.

6   Q.  Mr. Mason also talked about the material adverse effect

7   clause.  Does this clause enable the Debtors to manage their

8   business?

9   A.  The clause sets targets that the Debtor can clearly manage

10  to.  I don't believe it facilitates the management of the

11  Debtor, but it does provide specific targets that the Debtor

12  can manage its operations to.  In other words, to successfully

13  meet.

14  Q.  And is that different from other material adverse effect or

15  MAT clauses that you've seen in other agreements?

16  A.  Yes.

17  Q.  Mr. Pollack, in your opinion, does the fact that Presstek

18  is providing Debtor-In-Possession financing, does that fact

19  make it more or less likely that Presstek will close this

20  transaction?

21  A.  To me, that fact represents Presstek's interest in

22  requiring the assets is real and a substantial interest.

23  Q.  And did Presstek (indiscern.) because of alleged violations

24  of the however many pages of representations and warranties --

25  does Presstek get their break-up fee?

B737

1  A.  I don't believe so.

2  Q.  Finally, as you sit here today, do the Debtors believe that

3  they can meet the revenue targets and other requirements

4  contained in the Asset Purchase Agreement and close this

5  transaction?

6  A.  Given the modifications achieved today, they do.

7  Q.  Finally, Mr. Mason talked a lot about the fair market value

8  of the assets.  Mr. Pollack, what is the definition of fair

9  market value?

10  A.  I believe it's what a willing buyer is prepared to pay a

11  willing seller.

12  Q.  As we sit here today, does anyone know what the fair market

13  value of these assets are?

14  A.  I don't believe so.

15  Q.  In your opinion, what is the best way for these Debtors to

16  determine either the fair market value -- which we're in

17  bankruptcy process, we may not be able to satisfy that

18  definition -- but at a minimum, the best value the Debtors can

19  reasonably expect to receive based on the facts and

20  circumstances of these cases?

21  A.  The execution of an appropriate auction process.

22  Q.  And do you believe we have negotiated an effective auction

23  process in these cases?

24  A.  I do, given all the modifications, all the changes that

25  have been represented today.

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

1    MR. GLEASON:  Thank you, I have nothing further, Your

2    Honor.  (Indiscern.) other than I need to move the admission of

3    our exhibits which are Debtor's Exhibit-1, which is the August

4    forecast which has been identified by Mr. Knipp.  Should I hand

5    them up individually, Your Honor, or do you want me to go

6    through all of them.

7          THE COURT:  Let's go through all of them.

8          MR. GLEASON:  Okay.  Exhibit-2, which is the Asset

9    Purchase Agreement which was also identified by both Mr. Knipp

10   and Mr. Pollack.  And those are the only two at this point,

11   Your Honor.

12         THE COURT:  Any objection?

13         MR. MASON:  No objection, Your Honor.

14         THE COURT:  All right. It's ordered admitting 1 and 2.

15    (Debtor's Exhibit-1 admitted into evidence)

16    (Debtor's Exhibit-2 admitted into evidence)

17         THE COURT:  I have a couple of questions for the

18   witness before he steps down.

19   BY THE COURT:

20   Q.  Mr. Pollack, tell me again what you think the opening bid

21   is.

22   A.  The first overbid?

23   Q.  No, what their opening bid is.

24   A.  $40 million.

25   Q.  All right.  And what is the amount necessary for an initial

1  overbid to be higher and better under the newly renegotiated

2  terms?

3  A.  A bid on the exact same terms on the exact same documents?

4  Q.  Apples and apples.

5  A.  41-9.

6  Q.  So it's a million-nine is the hurdle amount?

7  A.  I believe so, yes.

8  Q.  And at a million-nine, that provides more value to the

9  estate -- excuse me, 41-nine, that provides more value to the

10 estate, even taking into account the payment of the break-up

11 fee?

12 A.  Yes.

13 Q.  And the break-up fee is calculated on what number -- let's

14 just use those numbers.  Let's say what happens is Presstek

15 opens 40 million.  Buyer X comes in and says 41-nine, and

16 Presstek passes.  What -- how would you calculate the break-up

17 fee and expense reimbursement?

18 A.  I would calculate it as a percentage of the total

19 consideration.  You would take 1.2 million plus whater they

20 demonstrate, and I would assume it would be all 500,000.

21 That's 1.7 million divided by --

22 Q.  That's in consideration of what their last bid was, not of

23 what the new bid was, correct?

24 A.  Correct.  That's how it's been calculated.  There --

25 Q.  So it's 1.2 million plus the documented expenses up to

1  500,000?

2  A.  Right.

3  Q.  So that would be in this case $1.7 million?

4  A.  Correct.

5  Q.  The 200,000 provides then the incremental amount that makes

6  this is a higher and better bid.

7  A.  Correct.

8  Q.  When was the original no-shop provision to expire?

9  A.  Upon the entry of a Sales Procedures Motion.

10  Q.  Well, let's say the Sales Procedures Motion had been

11  entered as part of the first day orders, would the no-shop have

12  gone into effect at that point?

13  A.  It would have gone away at that point.  It would have -- it

14  terminated with the entry of an order, so it would have -- the

15  marketing process -- the Debtors and we as their agent would

16  have been allowed to have discussions with third parties on the

17  entry of that order.

18  Q.  So the delay and the entry of the bid procedures order also

19  then delayed, shortened, the marketing time until there was a

20  waiver of the no-shop by Presstek?

21  A.  Correct.

22  Q.  Now you indicated in questions from Mr. Selbst that you

23  were aware that Presstek had made public disclosures regarding

24  how much money had actually been spent?

25  A.  Yes.

1   Q.  Do you know from those public disclosures whether there was

2   any allocation made between the first deal and the second deal?

3   A.  I do not know.

4   Q.  Okay, I don't have any other questions.

5        THE COURT:  Anybody have any follow-up questions based

6   upon those?

7        MR. MASON:  If I may, Your Honor.

8                        RECROSS EXAMINATION

9   BY MR. MASON:

10  Q.  Mr. Pollack, the Motion for the sale procedures order was

11  not presented to the Court on the first day of this case or

12  when the first day orders were presented, were they?

13  A.  My testimony was I didn't recall and I think Counsel

14  refreshed my memory and said it was.

15       MR. MASON:  Your Honor, the record -- if they

16  stipulate on this --

17       MR. GLEASON:  It's the filing issue.  They were filed

18  on the first day, we did not make them a first day order.  It

19  was contemplated, though, that we would have a hearing in --

20  later in July, prior to August and have them -- have the bid

21  procedures entered, unfortunately we weren't able to do that.

22       THE COURT:  I'm sure this is a knowable fact.  When I

23  mentioned first day, I was not suggesting that they were

24  presented on the first day.  I was just trying to understand

25  the operation of the agreement.

Pollack - Recross                                215

1          MR. MASON:   The record --

2          THE COURT:   What I don't remember is the first hearing

3   at which they were potentially presented, but it was then

4   adjourned.

5          MR. MASON:   That's correct, Judge, and I think we can

6   stipulate that the first time it was presented was in August,

7   approximately 2 weeks ago, and that the --

8          THE COURT:   Is that the first time they were on the

9   calendar, on the agenda?

10         MR. GLEASON:   I think that was the first time they

11  were on the agenda, Your Honor, but I believe a lot happened

12  and we did not anticipate the fights we received with the

13  interim DIP.   And there was a lot of negotiations with that and

14  dates were pushed at that point.   So again, our intention was

15  to have the bid procedures entered before -- in late July, but

16  given what has happened, we were not able to do that.

17         MR. MASON:   Judge, I don't know what the intention

18  was, but I will tell you, and I'm quite emphatic about this,

19  that we have -- the Committee has never requested a

20  (indiscern.).

21         THE COURT:   All right.   We don't need -- I'm opening a

22  can of worms that does not need to be addressed.

23         MR. MASON:   The record will be clear on that.

24         THE COURT:   All right.   I think the facts are that the

25  Bid Procedure Motion was filed at the beginning of the case.

1 It was then calendared.  It's been continued.  It's been

2 adjourned from time to time.  As I understand it, the no-shop

3 would have gone away with the entry of the order, but the

4 modifications to the order that have been presented today have

5 only been negotiated within the last 48 hours basically.  Or

6 whatever it is.  The final agreement on these changes --

7        MR. GLEASON:  The final agreement, although the no-

8 shop was done a while ago, Your Honor.

9        THE COURT:  I understand that.  But with regard to the

10 other issues we've talked about which are the overbid, for

11 example, and the October 27, October 29 and November 30th

12 dates, all of those things were just presented to me for the

13 first time today.

14        MR. GLEASON:  Those were presented.  I would say that

15 some of -- like the minimum overbid issue, some of the other --

16 I won't say minor issues -- but issues other than the

17 timeframe, those were actually in a draft of a bid procedures

18 order that was circulated to parties back at the August 12th

19 hearing, or before the August 12th hearing so --

20        THE COURT:  You would agree with me that in terms of

21 the final resting place for those concessions, other than the

22 ones where they have not been agreed to, was when they were

23 presented today.

24        MR. MASON:  That's correct, Judge.  Mr. Ricciardi

25 tells me that the statement that I just made in Court is

B744

1  inaccurate.  Apparently while I was out of town there was an

2  agreement that was -- there was an agreement by the Committee

3  to continue the Motion on the sale procedures order from August

4  5th to August 12th.  So I was not aware of that because I was

5  on vacation.  So I do want to correct --

6          THE COURT:  All right, well let's -- anybody else have

7  anything for Mr. Pollack, or are we going to let him off the

8  hot seat?  All right, let's let him of the hot seat and let's

9  call the next, which I understand to be the final witness.

10          MR. MASON:  Your Honor, as long as we're admitting

11  evidence, I do not believe it would appropriate for me to move

12  the admission of the Committee Exhibit-A, Committee Exhibit-B,

13  Committee Exhibit-C, and Committee Exhibit-D.  Committee

14  Exhibit-A, as you may recall, is the package containing the

15  letter from the president of Presstek to A.B. Dick Company's

16  Board of Directors and others containing a 427 (indiscern.) of

17  a Stock Purchase Agreement.  Exhibit-B, which we only have one

18  copy of and I'm happy to give it to the Court, is the so-called

19  execution copy of the Stock Purchase Agreement, which was in

20  the Debtors books and records.  I'm skipping over C and going

21  to D.  D is the signature page signed by Mr. Knipp, again, also

22  in the Debtor Books and Records containing the signature that

23  was identified by Mr. Knipp himself.  And then C contained a

24  memo and letter from (indiscern.) Vice President of Presstek in

25  which he makes comments on Presstek's unwillingness to sign the

B745

1   Stock Purchase Agreement.  I would move the admission of those

2   documents.  As I understand it, the Debtor perhaps wanted a

3   word on the relevance of those documents.

4          MR. GLEASON:  Thank you, Your Honor, John Gleason on

5   behalf of the Debtors.  I can't see the relevance of these

6   documents, but at the same time I -- I guess it would really go

7   the weight that the Court should afford these documents.  And I

8   would just state for the record that these are documents that

9   relate to an agreement that was never executed and is not

10  before the Court and would ask then that the Court, although we

11  don't have an objection to their admission, that the Court give

12  them the weight that they are due.

13         MR. MASON:  Judge, I think I heard Mr. Gleason say he

14  doesn't have any objection to their admission.

15         THE COURT:  Well, to the extent he has an objection,

16  it's a relevancy objection, which is overruled, and it's

17  ordered admitting the four documents.

18         MR. MASON:  Thank you.

19     (Committee's Exhibit-A admitted into evidence)

20     (Committee's Exhibit-B admitted into evidence)

21     (Committee's Exhibit-C admitted into evidence)

22     (Committee's Exhibit-D admitted into evidence)

23         THE COURT:  Let's proceed.

24     MR. MASON:  Mr. Carlston.

25         THE COURT:  Mr. Carlston, come forward here to the

Carlston - Direct                                    219

1  Courtroom Deputy please to be sworn.

2      DANE CARLSTON, CREDITOR COMMITTEE'S WITNESS, SWORN

3      THE COURT:  Please take a seat on the witness chair.

4  Speak up clearly into the microphone.

5                    DIRECT EXAMINATION

6  BY MR. MASON:

7  Q.  Mr. Carlston, would you please state your name and your

8  business address?

9  A.  Dane Carlston.  My business address is on 520 Madison

10 Avenue in New York.

11 Q.  What's your current occupation?

12 A.  I'm a managing director and co-head of the restructuring

13 and recapitalization group at Jeffries.

14 Q.  And could you please describe Jeffries as an organization?

15 A.  Jeffries employs approximately 1500 people.  A New York

16 Stock Exchange company engaged in the business of investment

17 banking advisory services, and sales and trading operations.

18 We raise capital for companies.  The group that I co-manage

19 focuses on advising distressed companies and restructurings and

20 recapitalizations.

21 Q.  Approximately how much people are in your group?

22 A.  Approximately 25.

23 Q.  What is your educational background since high school?

24 A.  I received a Bachelor of Arts from the University of Utah

25 and an MBA from UCLA with a concentration in finance.

B747

1  Q.  And when did you graduate with your degree, with your MBA?

2  A.  In 1992.

3  Q.  And could you briefly describe for the Court your work

4  history since school?

5  A.  For the last 13 years I've been employed with two firms.

6  My first -- the first firm that I joined was Channin & Company.

7  Channin & Company is a firm that is engaged in restructuring

8  advisory services to both Debtors and Creditors.  I left

9  Channin and Company in 1998 and joined Jeffries & Company where

10  I'm engaged in the same types of activities in addition to

11  capital raising.

12  Q.  Approximately how many sales of distressed businesses have

13  you worked on over your career?

14  A.  The group that I oversee has executed approximately $5

15  billion of distressed M&A transactions.  I personally have been

16  involved in about $2 billion of M&A transactions in the last 4

17  years.

18  Q.  And how many transactions approximately?

19  A.  In the last 4 years that's probably 10 transactions.

20  Q.  And prior to the last 4 years, if you were to take a look

21  at your entire career, could you estimate approximately how

22  many distressed business sales you've been involved in?

23  A.  Probably double that amount.

24  Q.  Would you identify some of the specific bankruptcy sales

25  you have worked on in the past 5 years, identifying the

Carlston - Direct                    221

1  business and your role in it?

2  A.  Sure.  OSI Group was filed in Saint Louis.  I testified in

3  connection with that matter and was qualified as an expert

4  there.  Destiny International was filed in Delaware.  I

5  testified there.  Budget Group filed in Delaware.  We

6  represented the Unsecured Creditor's Committee.  Diamond Brands

7  filed in Delaware.  We advised the company.  Darby Cycle filed

8  in Delaware.  We advised the Creditor's Committee.  Silver

9  Cinemas filed in Delaware.  We advised the company.  Espire

10 filed in Delaware.  We advised the Creditors Committee.  Those

11 are what come to mind immediately.

12 Q.  Did the Budget Group assignment involve a Section 363 sale

13 or a sale in the Bankruptcy Court?

14 A.  They did.

15 Q.  And how about Diamond Group?

16 A.  Diamond Brand was ultimately consummated through a plan of

17 reorganization.

18 Q.  And how about Darby Cycle?

19 A.  Through a 363 sale and a plan of reorganization.

20 Q.  Silver Cinemas?

21 A.  Through a 363 sale.

22 Q.  And how about this -- I think it was Espire?

23 A.  Through is 363 sale.

24 Q.  So is it safe to say that you are familiar with the process

25 of selling distressed businesses in bankruptcy proceedings?

B749

1  A.   I am.

2  Q.   Typically, and I don't want to belabor, get into a lot of

3  detail on this, but could you just tell me what the process is,

4  what phases the sale procedure goes through, briefly?

5  A.   Sure.   The whole M&A process is really engaged to yield

6  highest and best value and maximized value for all Creditors,

7  and it's a process that usually commences with, particularly in

8  the case of a distressed company, helping the market to

9  understand the nuances of what went wrong with the company.

10 Oftentimes it involves a lot more intensive due diligence to

11 understand that company as a result of the distress, and so the

12 first -- the initial stage with one where the investment banker

13 does their own due diligence on the company, prepares the

14 company for a sale, and we usually engage in a 30-day marketing

15 process where buyers are identified, Confidentiality Agreements

16 are sent out, a teaser is sent out, an offering memorandum is

17 sent out to those who execute Confidentiality Agreements, all

18 with the purpose of moving it into the next phase where

19 potential acquirers are invited in to do due diligence on the

20 company, and the last stage is one where the intent is to move

21 interested parties to a contractual phase so that they can

22 close on the asset.

23 Q.   Are you familiar with the concept of bid protection?

24 A.   I am.

25 Q.   And would you describe what you believe to be bid

B750

1  protection?

2  A.  Bid protection is designed to award a stalking-horse bidder

3  with appropriate protections to induce them to enter into a

4  contractual agreement with the seller first.

5  Q.  And what forms can bid protection take?

6  A.  A break-up fee, minimum overbid protections, oftentimes the

7  buyer has the ability to construct an Asset Purchase Agreement.

8  Q.  What's the significance of constructing an Asset Purchase

9  Agreement?

10  A.  Ultimately that's the template that is relied upon and used

11  by other parties when they're looking at the asset.

12  Q.  In your experience in the sale of a distressed business

13  with a stalking-horse bidder, what is a typical range of

14  break-up fees?

15  A.  I think the average range if you were to take a number of

16  cases that have been filed around the country is somewhere in

17  the neighborhood of 2.4 to 2.5%.

18  Q.  And when you say 2.4 to 2.5% would that include expense

19  reimbursement?

20  A.  It would.

21  Q.  Did you hear Mr. Pollack testify that in his opinion the

22  typical range is 2 to 3%?

23  A.  I did.

24  Q.  Okay.  And you think the average is about 2.4 to 2.5%?

25  A.  Oddly, it makes sense.  It falls right in the middle of his

Carlston - Direct                                          224

1  range.

2  Q.  Now, in your experience -- I'm sorry, I withdraw the

3  question.  When you represent the seller or Creditors Committee

4  of a distressed business in bankruptcy what factors do you

5  consider in determining the appropriateness of the break-up

6  fee?

7  A.  Certainly one of the issues is finality of the bidding

8  structure, knowing that they will have the wherewithal to close

9  on a transaction, and contractually they'll be obligated to do

10 so.  The extent to which they have valued the business.  Is it

11 a bid that's fully valued?  Is it a bid that represents a

12 marginal bid that's on the cusp of value, things like that.

13 Q.  What affect, if any, does the length of time the Purchase

14 Agreement from the stalking-horse bidder remains open -- what

15 affect might that have on the break-up fee?

16 A.  Well, I think -- the break-up fee is really an insurance

17 policy to protect the buyer from getting outbid by another

18 purchaser.  The longer is sale process remains open the

19 potential for that likelihood increases.

20 Q.  How did you first become familiar with the A.B. Dick

21 bankruptcy?

22 A.  It may have been through an industry rag that we read, but

23 my first concrete recollection is a phone call from one of the

24 Creditors asking us to interview with the Committee.

25 Q.  And do you remember approximately when that took place?