Carlston - Direct                                           224

1  range.
2  Q.  Now, in your experience -- I'm sorry, I withdraw the
3  question.  When you represent the seller or Creditors Committee
4  of a distressed business in bankruptcy what factors do you
5  consider in determining the appropriateness of the break-up
6  fee?
7  A.  Certainly one of the issues is finality of the bidding
8  structure, knowing that they will have the wherewithal to close
9  on a transaction, and contractually they'll be obligated to do
10 so.  The extent to which they have valued the business.  Is it
11 a bid that's fully valued?  Is it a bid that represents a
12 marginal bid that's on the cusp of value, things like that.
13 Q.  What affect, if any, does the length of time the Purchase
14 Agreement from the stalking-horse bidder remains open -- what
15 affect might that have on the break-up fee?
16 A.  Well, I think -- the break-up fee is really an insurance
17 policy to protect the buyer from getting outbid by another
18 purchaser.  The longer is sale process remains open the
19 potential for that likelihood increases.
20 Q.  How did you first become familiar with the A.B. Dick
21 bankruptcy?
22 A.  It may have been through an industry rag that we read, but
23 my first concrete recollection is a phone call from one of the
24 Creditors asking us to interview with the Committee.
25 Q.  And do you remember approximately when that took place?

Carlston - Direct                                                      225

A. It would have been shortly after the Committee organized, and as I recall that was around the third week of July.

Q. And were you ultimately retained by the Committee?

A. We were.

Q. Have you reached agreement with the Committee as to the terms of your compensation and the scope of our employment?

A. We have.

Q. And would you please describe, briefly, what the basic economic terms of your proposed retention are and what the scope of your responsibilities are?

A. Sure. In a nutshell, it's a monthly retainer of $100 thousand and a transaction fee based on value generated, and the way it's structured is that we would get no transaction fee if the bid that's on the table with Presstek simply closed. We would have to create an alternative bidder or a bid of higher value. And the scope of our responsibilities is outlined in our engagement letter, but in summary, it is to familiarize ourselves with the business and to the extent that there is a sale process that is pursued we are to assist in that process and provide support to the company's adviser in making sure that the asset is marketed fairly.

Q. Does your organization have connections with potential purchasers in the printing industry?

A. We have a group that covers financial sponsors and strategic acquires, and it's our custom to circulate the

Carlston - Direct                              226

1  opportunity within Jeffries to that group so that they can
2  identify the list of potential acquires, and we would then
3  forward those names to the company.
4  Q. And is it your understanding that you would also provide
5  advice to the Committee as to the advisability of various
6  offers as they come in?
7  A. We would.
8  Q. Do you understand that you cannot be compensated or obtain
9  expense reimbursement for your work unless the Court ultimately
10 approves your retention?
11 A. I understand that thoroughly.
12 Q. Are you familiar with the Asset Purchase Agreement between
13 and among Presstek and its affiliates and A.B. Dick and its
14 affiliates dated as of July 13th, 2004?
15 A. I have reviewed it, yes.
16 Q. Are you familiar with the bid protections for Presstek and
17 its affiliates in that agreement?
18 A. I am.
19 Q. And what are the basic bid protections?
20 A. The bid protections as outlined by Mr. Pollack are the
21 break-up fee of $1.2 million, $500 thousand of reimbursed
22 expenses, a minimum overbid of $200 thousand, and a series of
23 dates by which the Debtor has to comply.
24 Q. Are you familiar with the purchaser's conditions to closing
25 that are set forth in paragraph 10 in the -- I'll call it the

Carlston - Direct 227

1  APA, the Asset Purchase Agreement that we just referred to?
2  A. Yes.
3  Q. And based on your experience of working on sales of
4  distressed businesses, how would you describe the degree of
5  conditionality, or as you put it finality, of the APA?
6  A. Well, one of reasons, in my experience, that acquires and
7  sometimes insist that companies get acquired through a 363 is
8  because the Bankruptcy Court has the power and authority to
9  expunge certain liabilities and provide protections to a buyer,
10 and so the degree to which the reps and warranties are outlined
11 in section 10 leaves open the possibility that the acquire
12 could potentially opt out of the contract if all those
13 conditions are not met. Conditions like, for example, as all
14 of us who've worked with distressed companies before, we know
15 that sometimes employees leave because of the situation in
16 which the company is in, and there are conditions in the reps
17 and warranties that provide for an out in the event that
18 employees -- certain employees leave, or if an employee has
19 advised a superior and that superior has not in turn advised
20 the purchaser of those events, then that is in the reps and
21 warranties a condition under which the acquirer could exercise
22 an out.
23 Q. On a scale of say, 1-to-10, with 10 being the most
24 conditional type of (inaudible) and 1 being the least
25 conditional, how would you evaluate the APA?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  A.  You know, I've been watching the Olympics for the last week
2  and I'm still not that good at judging precisely with a score.
3  It seems like the conditions here outlined are substantial and
4  excessive and leave room for -- leave room that ideally the
5  Debtor or nobody should want, for the potential acquire to opt
6  out of the agreement, if all these conditions are not met.
7  Q.  Since Jeffries was first contacted by the Committee in this
8  case, generally, what have you done to understand the nature of
9  the proposed sale on the APA in the prepare for today's
10 testimony?
11 A.  We met with the company and their financial adviser one
12 week after getting retained for an introductory meeting.  We
13 had a follow on meeting a week after that.  We've reviewed
14 materials that were sent to us in conjunction with the due
15 diligence list that we sent out, and we've been conducting
16 on-going reviews of that material.
17 Q.  Based on your knowledge, skill, experience, training, and
18 education, and the preparation you have done in advance of your
19 testimony here today, do you have an opinion as to whether the
20 awarding of the proposed break-up fee and expense reimbursement
21 under the APA is necessary to preserve or enhance the value of
22 the A.B. Dick Estate?
23 A.  I think break-up fees are appropriate where there is
24 finality.  I think break-up fees have to be earned, and they're
25 earned by proposing finality to the extent that there are

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Carlston - Cross                                              229

1   conditions that the company may or may not meet, I don't think
2   it's appropriate to award a break-up fee.
3           MR. MASON: If I could have one minute, Judge. That
4   concludes the direct of Mr. Carlston, Your Honor.
5           THE COURT: All right. Do we have cross examination?
6           MR. GLEASON: Yes, just briefly, Your Honor.
7                           CROSS EXAMINATION
8   BY MR. GLEASON:
9   Q.  Good afternoon, Mr. Carlston.
10  A.  Good afternoon.
11  Q.  We met last week. How are you today?
12  A.  I'm well.
13  Q.  Would you agree that whether a sale process is appropriate
14  in a given case is dependent upon the facts and circumstances
15  of that particular case?
16  A.  I would.
17  Q.  Isn't it true that the availability of funding for the
18  continued operations is an important consideration in
19  determining whether a sale process is appropriate in a given
20  case?
21  A.  Yes.
22  Q.  I was -- getting ahead of myself. Mr. Carlston, has
23  Jeffries filed a Retention Motion in this case?
24  A.  If we haven't I think it's due shortly.
25  Q.  And isn't it true that Jeffries was retained by the

Carlston - Cross                                                    230

1  Committee on August 2nd?
2  A.  It's true.
3  Q.  Are you aware that the Committee was formed on July 23rd?
4  A.  I'm aware of that.
5  Q.  I believe you've described for the Court the terms of
6  Jeffries' compensation.  As I understand it then Jeffries only
7  receives retainers if the stalking-horse bid is approved?
8  A.  If the stalking -- if the sale closes as is we only get our
9  retainers, because presumably we didn't do much to make it
10 close.
11 Q.  Those retainers are a minimum of $300 thousand though,
12 aren't they?
13 A.  That's correct.
14 Q.  Mr. Carlston, did you review the objection filed by the
15 Committee with respect to Candlewood's fee application?
16 A.  I did not.
17 Q.  Are you aware that the Committee outlined Jeffries'
18 compensation terms in that objection?
19 A.  I didn't review the motion.
20 Q.  So I take it you're not aware there was absolutely no
21 mention of a monthly retainer being payable to Jeffries in that
22 objection?
23 A.  I didn't review it.
24 Q.  I believe you testified earlier today that when you get
25 involved in a process you start by doing due diligence, and

1  then a 30-day marketing period, is that correct?
2  A. Generally, yes.
3  Q. Does the extent of due diligence that is required, is that
4  different in different cases?
5  A. Absolutely.
6  Q. So if, in fact, there was a great deal of due diligence
7  with respect to a company pre-petition, and the company had
8  organized due diligence rooms, prepared documents, gathered
9  things together in a certain location, would that reduce the
10 amount of time you might need to do due diligence
11 post-petition?
12 A. Depending on the state of the information gathered and
13 what's been put together for potential acquires to look at,
14 yes.
15 Q. With respect to the representations and warranties, is it
16 your understanding, or isn't it true that if Presstek or Silver
17 terminates the Asset Purchase Agreement because of an alleged
18 violation of the representations and warranties they will not
19 receive the break-up fee?
20 A. That's correct.
21 Q. Mr. Carlston, are you familiar with -- strike that. Mr.
22 Carlston, I believe you testified that you were the financial
23 adviser in -- to the Committee and budget?
24 A. Yes.
25 Q. Do you recall whether or not there were covenants,

Carlston - Cross                                                      232

1  representations, and warranties contained in the Asset Purchase
2  Agreement with respect to budget?
3  A. There were.
4  Q. So, representations and warranties are not uncommon in 363
5  sale transactions, are they?
6  A. And they reminded us of that every time we met with them,
7  and subsequently tried to lower the purchase price by $30
8  million as a result of how broad those reps and warranties
9  were.
10 Q. Let's go back to the question that was representations and
11 warranties were contained in that agreement?
12 A. They were.
13        MR. GLEASON: May I have a moment, Your Honor?
14    (Pause in proceedings)
15 BY MR. GLEASON:
16 Q. In the budget case, Mr. Carlston, isn't it also true that
17 there was a material adverse change clause in that agreement?
18 A. I think there was.
19 Q. Are you aware of bankruptcy cases where the stalking-horse
20 bidder provided D-I-P financing?
21 A. It's usually an option of last resort, and I can't think of
22 one off the top of my head where it's happened, but I know it's
23 happened before.
24 Q. Okay. You've been involved in this industry for 12, 13
25 years?

Carlston - Cross                                                    233

1   A.  Yeah.
2   Q.  Are you familiar with the case of IN RE: TWA Airlines?
3   A.  I am.
4   Q.  Are you aware that the stalking-horse bidder provided D-I-P
5   financing in that case?
6   A.  To everybody's disappointment, I think.
7   Q.  Are you familiar with the IN RE: Drefers case?
8   A.  No, I'm not.
9   Q.  How about IN RE: PC Landing Corp., which was a Delaware
10  case?
11  A.  No.
12          MR. GLEASON: Nothing further, Your Honor.
13          THE COURT: Any other cross examination?
14                    CROSS EXAMINATION
15  BY MR. SELBST:
16  Q.  Good afternoon, Mr. Carlston, my name is Stephen Selbst.  I
17  represent Presstek.
18  A.  Nice to meet you.
19  Q.  Nice to meet you, sir.  I have one question for you.  You
20  testified just a moment ago that you were of the opinion that
21  if the employees left the employ of the company it was a basis
22  for Presstek to terminate the agreement.  Did I understand that
23  testimony correctly?
24  A.  I believe it has to be at a certain level.
25  Q.  Could you identify for me which provision of the agreement

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B761

1  that's contained in?
2  A.  Sure, if you'd like to give me the Asset Purchase
3  Agreement.
4          MR. SELBST:  May I approach, Your Honor?
5          THE COURT:  Please.
6  A.  Unless you want to stipulate that it's there.
7          MR. SELBST:  I'll withdraw the question.
8                       CROSS EXAMINATION
9  BY MR. LEPENE:
10 Q.  Mr. Carlston, I really just have a couple of questions, and
11 it goes to the terms of your retention, and if you could help
12 me with this 'cause I really must confess I'm not conversant
13 precisely with what the terms are, if the motion to approve bid
14 procedures is denied and Presstek isn't given a break-up fee
15 and they walk away from this transaction right now and someone
16 else were to come in and offered to pay $40 million and that
17 transaction is consummated, what is your fee arrangement under
18 those circumstances?
19 A.  You know, I've never read it that way, and I'd have to
20 review it to be totally honest to see if fees aren't -- the
21 intent of it was to provide a transaction fee for value added,
22 and the view was that if this transaction simply closed we
23 haven't done anything more than shepherd it across the finish
24 line.
25 Q.  Well, that's actually my question, I was previously reading

Carlston - Redirect 235

1  --
2  A. And we intend to file with the Bankruptcy Court and give
3  everybody including you and the Trustee and the Judge the
4  opportunity to object to it.
5  Q. I was reading the document that was produced at your
6  deposition last week, and it seems to me that it suggests that
7  if a party other than Presstek purchases the assets, let's say
8  for $40 million, that you do earn a fee of 0.75%, based on the
9  transaction, isn't that the case?
10 A. That may well be the case. I'd have to read it. I think
11 the paragraph is pretty lengthy.
12 Q. Okay. And that would be on top of the retention payments,
13 monthly payments?
14 A. That's correct.
15 Q. Okay. So that, in fact, if the motion is denied and
16 Presstek were to walk away you'd actually be better off, or you
17 would earn more than if this transaction goes forward and
18 Presstek buys it for you.
19 A. I guess that assumes that we were also able to generate
20 another buyer.
21       MR. LEPENE: That's all I have, thank you, Your
22 Honor.
23       MR. MASON: If I just may ask one question on
24 redirect?
25            REDIRECT EXAMINATION

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Carlston - Redirect                                                     236

BY MR. MASON:

Q. Mr. Carlston, if the Court were to decline the request to give bid protection to Presstek, and Presstek didn't participate at all in the bidding process, is it your understanding that if another bidder were to show up you would earn some percentage on the purchase price?

A. I believe so, yes.

Q. Okay. But if Presstek merely ceases to be the stalking horse and nevertheless participates in an open auction and becomes the successful bidder (inaudible) $40 million, is it your understanding that you would get a percentage of the first $40 million that would be paid by Presstek?

A. I don't think we would.

          MR. MASON: Thank you, Your Honor.

BY THE COURT:

Q. Mr. Carlston, is your compensation tied in any way to your generating a buyer, or if the buyer is generated instead by Candlewood would you still get a success fee?

A. We would weigh the scope of our activities as not related to directly marketing the asset. We recognize that that responsibility lies strictly with the Debtor. So, it's more of a percentage of value generated for the Estate.

Q. Is it a percentage in excess of what the stalking horse is, or does it start on dollar one?

A. No, there's a hurdle rate, and I don't mean to have any big

Carlston - Redirect                                               237

1  mystery. This Court will receive a retention application, I
2  assume, in the next week, but there is a hurdle rate over which
3  we would earn a fee.
4  Q. So if -- let's say that the final successful bid was $45
5  million and it started at $40 million would your fee be
6  calculated on the increase from 40-to-45, or would it start at
7  0-to-45?
8  A. I believe it would be calculated on the increment, and
9  again, I'd have to read the -- I'd have to reread it, but the
10 notion is very much an incentive to create value over and above
11 the minimum hurdle.
12 Q. Now, you testified that an average break-up fee is
13 somewhere in the vicinity of 2.4, 2.5%. Do you have an opinion
14 as to whether any break-up fee is justified in this case?
15 A. As the Asset Purchase Agreement is currently constructed I
16 think it does not provide enough finality, and as such I don't
17 think the bidder has earned a break-up fee.
18 Q. And that's your opinion and conclusion taking into account
19 the modifications that have been made in terms of the financial
20 covenants, particularly with regard to the pre-paid inventory?
21 A. You know, and it's unfortunate that we hadn't had the
22 opportunity to have more collaborative conversation, but I
23 learned of that literally during Mr. Pollack's examination at
24 4:30. So, I guess I'd have to be comfortable that the Debtor's
25 projections in fact allow for them to comfortably make those

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-389-0191*

Carlston - Redirect                                                           238

1  capital requirements that are imbedded in the letter.
2  Q. Let's -- so let's put aside then the financial covenants
3  for a moment and say that you became comfortable with the
4  notion that there was not an impossible hurdle here that the
5  Debtor had to meet because these of changes with regard to the
6  pre-paid inventory, and that was taken off the table, are the
7  non-financial covenants, in your opinion, still sufficiently
8  onerous that you think there's not adequate finality with
9  regard to the document?
10 A. Well -- and it's not just finality with respect to the
11 financial representations. The break-up fee is really
12 considered part of an overall package that takes into account
13 the amount of time, for example, that's being allotted for the
14 asset to be shopped. So, in light of the improvements that
15 have been made to the agreement, and there have been
16 improvements, ideally I think I'd like to see the reps and
17 warranties trimmed down to a level that recognizes the power of
18 the Bankruptcy Court in providing an asset free and clear to a
19 purchaser. And I'd also like to see, particularly given the
20 complexity of this business, it's got two operating segments
21 that generate $19 million of EBIDTA last year and projected $13
22 million of EBIDTA this year, and it's got one big money-losing
23 segment, and I guess I'd like to see some type of effort
24 undertaken to do a break-up analysis. Is this business worth
25 more in parts than it is altogether, and instead what's

Carlston - Redirect                                                        239

1   happened is the Debtor is engaged with one party for the last
2   year and it's not broken out that information to the market as
3   a whole in a way that other strategic parties or financial
4   parties can look at the asset, and I think you have to ask if
5   under the new agreement 60 days is enough to convey what the
6   story is behind those assets. So, I'm troubled by the length
7   of time that's been accorded here.
8   Q. And so the length of time is troubling not so much because
9   it's 60 days but because you think it doesn't give adequate
10  time to look at the business in a different way, breaking out
11  the loss-making portion from the two profitable portions?
12  A. Well, but 60 days is part of that problem, because if it
13  were -- and I don't think -- and I'm not talking about a year
14  to shut the company, I think if you're to have any hope of
15  getting a competitive bidding process you're going to need some
16  period of time for buyers and management, frankly, and there's
17  been a lot of movement at the management level, management is
18  going to have to be very hands-on conducting in-person meetings
19  on site, and I think 60 days -- at the end of 30 days, or at
20  the end of certainly 40 days a potential buyer very much has to
21  be in contract mode. Diligence has to be done, and that's all
22  influenced by the amount of time that management has to spend
23  in helping these buyers look at the assets. So, I'm troubled
24  by the 60-day provision, I think 90 days would be better, I
25  recognize that we've got a financing that matures under the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B767

Carlston - Redirect                                                    240

1  latest proposal in October so it creates an issue.
2  Q. Well, to go back to my initial question then, what aspects
3  of this particular deal, from a finality standpoint, are the
4  most important for you in concluding that you don't think a
5  break-up fee has been earned?
6  A. Well, from finality only, time aside, I think it's the reps
7  and warranties, assuming that the capital requirements have, in
8  fact, been resolved with this latest accommodation, and
9  presumably that's no longer an issue. But again, given that I
10 just heard about this I'd have to be comfortable that, in fact,
11 that accommodation resolves the capital requirement.
12 Q. Do you understand that the bid procedures that are under
13 consideration here would somehow preclude a buyer from offering
14 to purchase only the profitable segments of the business and
15 leaving the others on the table? Leaving the equipment side on
16 the table and just buying the services and consumables?
17 A. Well, the Asset Purchase Agreement on the table certainly
18 contemplates buying all the assets. I'm not -- if the bidding
19 procedures are, in fact, designed to make sure that all the
20 assets are sold and don't allow for the separate marketing of
21 the profitable assets I think it's an issue.
22 Q. Well, let's assume that it does, that it does allow the
23 separate marketing. Does that allay some of those concerns on
24 your part?
25 A. That it does allow the separate assets to be marketed?

Carlston - Redirect                                    241

1  Q. In other words, somebody could come in and say, I don't
2  want to pick up this loss-making aspect of the business, I'm
3  going to leave that on the table for the Debtor to go ahead and
4  liquidate, however they can liquidate the hard assets of that.
5  What I really want to buy are the two softer assets, the
6  service contracts --
7  A. Right.
8  Q. -- and the consumable part of the business, and my price
9  for that is greater than what Presstek's price is for the whole
10 ball of wax?
11 A. Which would allow all of us to determine the highest and
12 best offer.
13 Q. Then if that were to be the fact, if that's the way it
14 worked, would that move towards allaying that concern on your
15 part?
16 A. With respect to that concern, yes, but I think we're still
17 left with an Asset Purchase Agreement that every single buyer
18 is going to use as a template for looking at this asset, and
19 the reps and warranties that are outlined in that agreement are
20 extensive, and there would be no incentive for any other buyer
21 to do anything other than meet that minimum threshold offered
22 by the reps and warranties.
23 Q. Well, as I understand one of the concessions that's been
24 made is that the APA portion in the bid procedures says that --
25 instead of saying a substantially similar agreement it now says

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Carlston - Redirect                                                          242

1  a no less favorable agreement, isn't that correct?
2          MR. GLEASON: That is correct, Your Honor.
3  BY THE COURT:
4  Q. Does that make any difference to you on that part?
5  A. What troubles me, Your Honor, is -- and this happens all
6  the time in distressed companies, people leave, they get tired
7  of the process, this company's been barely meeting payroll now
8  for some time. We've heard what happens if an officer decides
9  to leave, and what happens if that's a -- and it is in the reps
10 and warranties, that is a condition that precipitates an out,
11 or what happens if in confidence an employee has come up to the
12 CRO and said, I'm thinking about leaving. That is a condition
13 in this Asset Purchase Agreement that would precipitate an out.
14 There are broad-reaching reps and warranties in here that are
15 troubling, and reps and warranties --
16 Q. Now -- I understand. Now, let's say that happens. Let's
17 just assume that that plays out, and Presstek obviously has the
18 option not the requirement that it terminate, it could waive
19 that particular default, or failure to meet the representation
20 and warranty, but let's say that it decides, you know, Mary
21 Smith, who is the chief whatever, is a critical party and
22 without Mary we're not going forward. Then I think everybody
23 has made it clear under those circumstances there's no break-up
24 fee payable to Presstek. What happens is, basically, the
25 Debtor is back at square one in terms of marketing the asset,

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Carlston - Redirect                                           243

1  correct?
2  A. They are.
3  Q. So, I guess I'm trying to understand your view of the
4  relationship between the break-up fee and the departure of Mary
5  Smith, given the fact that the departure of Mary Smith does not
6  trigger the payment of a break-up fee.
7  A. Because if Mary Smith is integral and we've awarded a
8  break-up fee to the buyer, then their feet should be held to
9  the fire. They should not be allowed to walk. If they're
10 asking for $1.7 million and they're providing the financing,
11 and let's face it, anybody who provides financing, if they're
12 also a buyer, has an edge. If you're a party looking in from
13 the outside at a situation where the buyer is both a lender and
14 a stalking-horse bidder you're going to think twice about
15 spending time and energy and money in pursuing that asset. If
16 they're going to earn a break-up fee it, in fact, has to be
17 earned, and it should not be their option to walk if Mary Smith
18 leaves. Their feet should be held to the fire.
19 Q. All right.
20         THE COURT: Anybody have any questions of the witness
21 in light of the questions that I've asked.
22         MR. MASON: No, Your Honor.
23         MR. GLEASON: No, Your Honor.
24         THE COURT: All right, thank you, sir, you may step
25 down.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-929-0191