A. Thank you.

THE COURT: Mr. Mason, what else do we have?

MR. MASON: Your Honor, we have no further witnesses, and I think we're prepared for final argument on this if that's how you would want to handle it.

THE COURT: All right, I think that's how we ought to handle it. I think the Debtor goes first.

MR. MASON: Your Honor, I will say that Mr. Ricciardi is going to appear on behalf of the Committee.

THE COURT: All right, thank you. Are the proponents ready? I guess I should say the Debtor, the proponents of the motion, which is the Debtor, should go first.

MR. GLEASON: I will be, Your Honor, as soon as I can find my notes. Thank you, Your Honor, I will be brief, Your Honor. I think the important thing as Your Honor indicated last time was the issues here, let's hear the evidence, and so I think everybody knows the issue. I think Your Honor is well aware of the situation and I'm not gonna waste a whole lot of time. We'd first like to thank you for your time and patience with respect to this. As indicated in my opening remarks, we believe the evidence is demonstrated by the facts in this case. The Debtor's business has been slowly deteriorating. In June of this year the Debtor's pre-petition lender advised the Debtors that it would no longer continue to fund the Debtor's operations. Third, the Debtors face the real possibility that

they would be unable to make payroll in early July. Given the Debtor's various businesses, including their large service segment, a loss of employees would have devastated the going concern value of these businesses. Finally, the Debtors were unable to obtain alternative financing and are unable to continue operations utilizing cash collateral. Against this backdrop the Debtors and their professionals engaged in arm's length negotiations with Key Bank and Presstek with respect to post-petition finance --

THE COURT: Let me ask you about the question of alternative financing. The only evidence we really heard dealt with efforts with Foothill and Servius back in '02, if I remember correctly.

MR. GLEASON: Yes. But I think we also heard, Your Honor, that at that point those entities did not want to go forward and as Mr. Knipp testified, the Debtor's businesses continued to deteriorate so that they were much worse before the Debtors filed this bankruptcy petition, and they were at the time Foothill and Servius declined. And I think as Mr. Pollack testified, he did not believe it made -- it was really -- the Debtors did not have the time pre-petition to get any alternative financing, and he also testified that on a post-petition basis he does not believe, given the facts and circumstances in this case, that seeking alternative financing at this time is appropriate.

THE COURT: Although apparently some effort has been made with regard to that.

MR. GLEASON: Yes, we did make an effort to see if there was anything out there, not knowing what would happen with the other aspects of this case. As I indicated, Your Honor, we engaged in negotiations with Key Bank and Presstek with respect to a post-petition financing package and the stalking-horse Asset Purchase Agreement. Were these agreements perfect? No, they were not. But were they reasonable agreements that would enable the Debtors to maintain the going concern value of the businesses while enabling the Debtors to fully and fairly market their assets and obtain the highest and best value? We believe, Your Honor, the evidence has clearly demonstrated they were at the time and now they're even better. As with similar cases, parties continue to negotiate post-petition --

THE COURT: Let's focus on a couple of issues --

MR. GLEASON: Sure.

THE COURT: -- so that we can kind of cut to the chase here. The evidence is, from both experts, in effect, that this break-up fee is outside the norm, and that at the 2½% or 2-to-3% level that the expenses would normally be included. So, we're looking at 4¼ rather than 2½, or 4¼ rather than 2, and I guess my question is, what's the justification under O'Brien, which is the standard that I have to apply, that has

been made here in this record to approve a break-up fee of that amount?

MR. GLEASON: Your Honor, and I will defer a lot of that to Mr. Selbst, but from the Debtor's standpoint, and as Mr. Pollack testified, there were negotiations, we did get it reduced. I think from a justification of O'Brien --

THE COURT: But the good-faith negotiations in saying this is the best we can get is not an O'Brien factor.

MR. GLEASON: Correct. I think an O'Brien factor is though, as Mr. Carlston testified, one of the things that you do when you start a process like this is due diligence, and I think break-up fees go to compensate a bidder from doing a lot of these things, getting the Debtors in a position that they can market their assets. That was done in this case, although arguably it was done pre-petition by Presstek, but the Debtors did put together, and the testify was a lot of due diligence done getting these Debtors in a position to go to the --

THE COURT: I'm going to ask Mr. Selbst the question that seems to me is squarely -- not at this point, I'm going to let him finish --

MR. SELBST: I'm sorry.

THE COURT: -- that seems to me is squarely presented by the evidence, including the evidence that he adduced from the witness, which is, they spent a million six, they do the math, they need to get a 4.25% break-up fee in order to recover

the costs that they have sunk into the deal. That that is -- that strikes me as what the basis of this is. Now, there's no direct evidence on that, but I think that's a reasonable inference. And so the question then becomes, if that's a reasonable inference, does that pass muster under O'Brien? Because particularly where there were two deals, and you know, what we haven't heard, and there is no evidence in the record, and I'm not going to even ask Mr. Selbst because he can't testify, nobody has put a -- any of the SEC filings into evidence showing, you know, how that was broken up. How much of that had to do with the Stock Purchase Agreement, how much of that had to do with this, is that a reasonable amount, should it be? But that's the conclusion, that's what I'm hearing that is really kind of motivating this.

MR. GLEASON: And I understand, and I will say though, from the Debtor's standpoint, Presstek's bid is providing value to these Estates. I would agree it maybe a different bid and there were prior deals that didn't get consummated, but as we sat here pre-petition, as we sit here today, the Presstek bid is providing value to the Debtor's Estates, it has set a floor for other bidders to hopefully come and make bids and we can get in the marketing process and hopefully an action process. So, we do believe the bid has brought value. I understand --

THE COURT: I understand that, but the question --

even if I were to agree with that the question is how much value? I mean, should it be measured by how many dollars Presstek has sunk into the deal, which is really what they're asking me to measure it by. It's not measured by any evidence that this would be a typical amount of break-up fee under the circumstances. It's not measured by that. There's nobody who's testified, neither expert on either side has testified about that. But rather, the only hint that we have here is that this is a way for them to recover their sunk cost. I don't blame them for that. My question is whether or not under O'Brien that passes muster in the 3rd Circuit.

MR. GLEASON: And I will let Mr. Selbst address that. We do believe, as Mr. Pollack testified, that a percentage based on the purchase price is appropriate, and that percentage is up to Your Honor. With respect to the other, I guess, big issue of the finality, we believe the Asset Purchase Agreement does have finality. It does contain reps and warranties, but these agreements contain reps and warranties. The Debtors believe that they can get to closing, they believe they can get Presstek to close, and for all of those reasons, Your Honor, we would ask the bid procedures be approved as we've modified them --

THE COURT: What about the Mary Smith issue, the one I just raised? We'll just call it the Mary Smith issue. You know, Mary runs out of patience. She's got a better offer from

somebody else. She decides to leave. Her leaving is a breach under the reps and warranty, what do you think about that? Mr. Carlston's position is, they shouldn't be able to walk on something like that if they're going to get a break-up fee, no matter how much money they've sunk into the deal.

MR. GLEASON: I have two responses to that. One, if they walk they don't get a break-up fee. More importantly, I would disagree with Mr. Carlston that everybody's gonna use the exact APA. What we have here is a situation where other bidders can look at this, and this will be the negotiations that go on in the discussions with bidders, of look, we're going to be deciding which is the highest and best bid, and if your bid doesn't have this provision, that provision, you know, it may be, even at a lesser dollar amount, it may be a better, higher and better bid. And so, I think that's how you deal with the Mary Smith situation, although, I also believe, Your Honor, in any transaction there is an element of good faith, and I believe every contract requires good faith and fair dealing, and to look at one provision in an agreement that says, if an executive officer resigns I have a right to terminate, I think it's reasonable that a buyer has a right to terminate if somebody that they believe is absolutely critical to the business resigns. I also believe that a reasonable buyer will exercise good faith and will not walk from a deal that they have invested a lot of time and money into just

because one person leaves. So, I don't think you can look at an agreement and go and say you have to close every potential out. That's just not the way things are done, and it's not how agreements in -- outside of 363 sales are done or even inside of 363 sales are done. So, one, I just -- I think we deal with Mary Smith by we let other bidders know they can submit a different Asset Purchase Agreement that may be a higher and better bid, but I also don't think we should lose the forest for the trees and just assume that Presstek's gonna walk just because somebody quits. I think we're getting a little too technical there. So, again, Your Honor, we would ask that the bid procedures be approved as modified so that we can go forward with the marketing of this business. We would also ask that they be approved in such a way that we can also insure the Debtors of the continued post-petition financing that we need to continue operations and get to a closing. Thank you.

THE COURT: Okay. Let me here from other proponents before I hear from Jeffries.

MR. SELBST: I'll try to be brief, Your Honor, mindful of the hour and with my own thanks to Your Honor's time and patience, thank you.

THE COURT: Well, somebody told me 9 o'clock earlier, so I figure we're doing great at this point.

(Laughter)

MR. SELBST: Well, I'm hoping you're wrong

(inaudible). Your Honor, as Mr. Gleason has suggested, my client believes it made a fair initial offer to buy these assets. It wasn't making a strangling hold on these Debtors. It believed that the initial marketing periods were fair and they've been negotiated at arm's length. You heard the testimony that they were negotiated at arm's length between experienced counsel (inaudible). We ask for what is in our view customary terms in the APA, and you heard Mr. Pollack say that the very conditions Presstek had asked for are customary. I understand the Creditors Committee doesn't like them, but they are not atypical, and that's what the evidence from Mr. Pollack was. And Your Honor asked at the last hearing, you want to hear about the business justifications for why conditions are in here, and I'm gonna explain them, I'm gonna link up the dots between the testimony you heard. You heard Mr. Knipp and Mr. Pollack both say, and it really wasn't contradicted by any evidence from the Creditors Committee, that this company is in distress. It is in distress. The purpose, and I said this in my responsive papers, Your Honor, for reps and warranties and closing conditions are to make sure the asset is in the same condition on the closing date that it was on the contract date, and to the extent that the marketing period goes on longer and you've heard about this the greater the risk is that the business deteriorates. There is a business justification for it. This is a business that's in

distress and it should be uncontradicted by the evidence. We wanted a reasonably prompt sale, and frankly, we wanted to proffer a sale than the Creditors Committee wanted, so we agreed to make modifications and Your Honor has heard at some length today about all the modifications we've agreed to. That wasn't our first preference but we understood that the Creditors Committee had raised concerns and we were prepared to stand up for this. The idea that we are in this to walk away from the agreement simply isn't borne out by the record. You heard again uncontradicted evidence we've been chasing this company for a year, for a year. And during that year the company has not gotten better, it has gotten worse, and yes, the amount that we've been prepared to pay has gone down. Every time we turn over another rock, respectfully, we found that the company's financial and operational condition was worse. But we think that we had made a fair baseline bid. Now, it may turn out that other people come in and overbid us, and guess what? We're gonna be there in that auction. We are gonna be there in that auction. We may not win, but we're gonna be there because we believe in this business. I don't think the evidence suggests, given the concession, the amount of time, the public amount of money that we've invested in this acquisition that there's any basis to suggest that we're trying to walk. You heard the testimony from Mr. Pollack, all the various concessions, he didn't ask for a thing. He simply

said, okay, let's try to move this along, let's try to do the right thing for this process. And what do we ask? We've asked for what we believe to be reasonable bidding protections. Your Honor asked under O'Brien what's the standard. The standard is, what are we investing to make this process? Now, let me tell you about it from my client's perspective, Your Honor. My client did not intend to be a 363 buyer. Back in December of '03 there was no contemplation the company would ever have to seek relief, but its view is, it's an acquisition of a business, and all that money it spent, and it's been more since the date of the SEC filing, that's all been in preparation of this bid. You can say, you know, did we break it up between the stock and the asset purchase? It's the same acquisition. And respectfully, Your Honor, the answer to your question is, it's all (inaudible). And I understand that the evidence -- you know, we did, although I didn't -- we showed Your Honor some other cases where the break-up fees were 3 and in some cases in excess of 3%. I understand we didn't put evidence in. I told Your Honor the first day we would be bound by your determination what a fair break-up fee is. I think the fair break-up fee is what we asked for here, and the expense reimbursement, and I understand the Creditors Committee doesn't like it, but you also heard from Mr. Pollack's testimony this is a real bid. What about Mary Smith? There are two answers. The first answer -- there are three answers, actually. The

first answer is, we don't get the break-up fee. We only get the break-up fee if we do the function we were supposed to do, start a bidding war that delivered higher value. We get outbid, or the company determines to do (indiscern.). If the Mary Smith thing happens, if the Mary Smith thing happens we don't get -- now, with respect to Mary Smith, it's pretty unlikely, and I'm prepared to argue the evidence, it's pretty unlikely we're gonna use Mary Smith as an example, but I'm not prepared, and respectfully don't think my client should be prepared to, to consider every single possibility and simply drop the reps and warranties. They're there for a purpose, and I said the purpose is make sure the asset's in the same condition on the closing date that it is on the starting date. I think Your Honor has heard pretty strong testimony that this business needs a prompt sale, and maybe Mr. Carlston is right, maybe the business ought to be disaggregated, and maybe our bid should be broken out, but as Your Honor has (inaudible) the Debtors are free to do that. And all of these horrible conditions that they are some unhappy about in the agreement, in fact, somebody could bid without those conditions, and maybe those bids will be higher and better, as I said in my responsive papers. And I've been there, Your Honor. I've been in situations where I represented clients who've made bids and the Debtor comes back and says, you know, your bid's 40 but the other guy's 39 he's got no conditions. You've got to take out

your conditions to stay in it. It might happen here, but I don't think we should be required to do that now because I think we've made, and Your Honor's heard, testimony there is a reasonable and customary (inaudible). I think the evidence shows we made a real and serious bid. Is this the highest bid that's gonna come out? Only time will tell, but I think with the concessions my client has made we've afforded the Debtors a real and fair opportunity to market these assets. I think in that respect we are, in fact, the legitimate stalking horse, and I think for those reasons we're entitled to the break-up fees and expense reimbursement we've asked for, and I would respectfully ask the Court to consider those procedures.

THE COURT: Thank you.

MR. SELBST: You have any questions, Your Honor?

THE COURT: No, thank you.

MR. SELBST: Thank you.

THE COURT: Let me just -- before I hear from anybody else, Mr. Gleason you agree that the bid procedures, as they currently exist, do allow the disaggregation and a bidder to come in and say, I only want to take this and I don't want to take that. Presumably the Debtor might have to -- the valuation of that may be a little tough because somebody would have to make some kind of a judgment on what the liquidation value is of the part left behind, and that, you know, it could be anywhere from a negative number to a positive number. So,

it would become a difficult issue from a valuation, but that doesn't stop anybody from doing it.

MR. GLEASON: No, that is correct, Your Honor.

THE COURT: So, if they came and they said, you know, we'll pay $45 million for the two profitable lines and we want to leave behind the equipment, then that's a bid that consistent with the bidding procedures.

MR. GLEASON: Yes, in consultation with everybody in this room.

THE COURT: And presumably you would talk to the Committee --

MR. GLEASON: Yes.

THE COURT: -- and the Committee's advisers, and you would talk to, you know, the other interested parties, and a decision would be reached or not reached, I mean, you know, you may have a different point of view about that. That would then become and issue for the sale hearing to determine who was really better -- higher and better under those circumstances.

MR. SELBST: That's absolutely my understanding about it.

THE COURT: Okay, all right, thank you.

MR. LEPENE: Your Honor, on behalf of Key Bank, we also are supportive of the granting of the motion. I think from our perspective the evidence today was very telling in terms of the testimony regarding the precarious and fragile

condition of the company. It really goes to the Mary Smith issue to a certain extent. There are employee issues here, there are customer issues, there are supplier issues. There is negative cash flow and Mr. Pollack testified with respect to that. Mr. Knipp testified with respect to that. And the testimony was that the D-I-P financing is sufficient to maintain going-concern value if the sale process is concluded by November 15th, no later than that date. So, where we come from, Your Honor, obviously we don't have any specific economic interest in whether Presstek gets a break-up fee. What we believe is extremely important, not only for us but for all of the other constituencies in this case, the Creditors, the employees, and obviously ourselves, that we proceed with the sale process. We believe, and we've satisfied ourselves in terms of listening to the evidence, having had discussions prior to this hearing, that Presstek is sufficiently committed to this transaction in view of the costs that they have incurred, and that certainly we heard testimony with respect to that. But I think perhaps even more importantly, their role as a Debtor-In-Possession lender. Without their participation in terms of that financing arrangement as the testimony has demonstrated, we would be in a piecemeal liquidation at this point. So, we think that the record and the evidence demonstrates a sufficient commitment on their part to proceed and go forward that would justify the provisions that have been

negotiated with respect to the break-up fee, but again, from our standpoint, the most important thing, given the fragile nature of this business, is that we get on with a sale process and that we proceed along the lines that the Debtor has suggested in the papers that have been filed, and therefore we do support the granting of the motion. Thank you, Your Honor.

THE COURT: Thank you.

MR. RICCIARDI: Your Honor, James Ricciardi, McGuire Woods on behalf of the Committee. I hope this is one of those days where the guy that gets to go last wins, but you know, let's see. First, Your Honor --

THE COURT: Depends on how long he takes.

(Laughter)

MR. RICCIARDI: As an initial matter, Committee has to take issue with Presstek's position that it's not compelled to lend through November 15th to accommodate the new auction schedule that it proposed in its written response to our objections to the D-I-P and to the bid proceedings. In fact, Your Honor anticipated this tactic of Presstek at the first-day hearing when the following colloquy took place, at page 35; The Court, "Now, there may be precedent for that but it certainly invites much closer scrutiny than it does if you have an independent financial institution that is in it for the money, and something, any term that may appear to have the effect of limiting the marketability of the assets because of your

client's position as both the stalking horse and the D-I-P lender I'm going to look at very closely." "Your Honor" -- Mr. Selbst, "We are perfectly prepared to abide by the Court's determination as to what fair sale procedures are." Period. Full stop. "My client understands." The Court, "Although you have an event of default if all of these terms that you put in here are not, in fact, met." Mr. Selbst, "And I'm here to represent to the Court if the Court sees fit to modify those terms we will live by such terms as are modified by this Court's order when the Court approves the bidding procedures. I am not going to -- my client is not going to blow up the D-I-P if those bidding procedures are modified, either consensually or by order of this Court." So, we think Presstek is estopped from taking the position that they don't have to lend through November 15th, and as I said, Your Honor, they've also indicated that they would accept November 15th and October 29th in their two pleadings that they filed in response to our objections. So we --

THE COURT: Remind me what the difference is between October 27th and October 29th.

MR. RICCIARDI: I believe October 27th is the date the bids are due, and October 29th is the auction date.

THE COURT: Okay.

MR. RICCIARDI: So, I will turn now, Your Honor, to the proposed break-up fee --

THE COURT: And then we have a hearing after that with a closing no later than the 15th, is that the idea?

MR. RICCIARDI: A closing no later than the 15th. I assume that the Debtors would be prepared to ask the Court to waive the requirements of the rule that say that you can't close an asset sale in less than 10 days.

THE COURT: You know, this is somewhat off the topic, and I don't mean to interrupt your argument, but you should understand that I may not have this case at that point. This case may be in the hands of another Judge. Presumably that Judge would be sensitive and I'd be happy to talk to that Judge about it to the timing necessary in order to get the sale confirmation hearing scheduled at the particular time. But next month is my last resident month in Wilmington. There are certain matters that I may hear -- continue to hear here, but I haven't made that final decision yet, and I haven't talked to Judge Walrath about which ones ought to be done, and I don't know what arrangements have been made for the next visiting Judge yet. So, I think you're talking the royal "we" when you say the Court will work on it's schedule here rather than necessarily me, and I just want to make sure everybody understands that that's a distinct possibility in this case.

MR. RICCIARDI: Well, I certainly understand that, Your Honor, thank you.

THE COURT: Okay.

MR. RICCIARDI: Turning to the proposed break-up fee and expense reimbursement, according to certain testimony of the Debtor's financial adviser about the numerous reps, warranties, and business-related closing conditions of the Presstek APA, indeed it appears to be the Debtor's current projection that not withstanding Presstek and Key Bank's concession regarding pre-paid inventory, the Debtors will not be able to meet the UK Limited net assets closing condition section of 10.12. If Your Honor would want to look at A.B. Dick Exhibit-1, Mr. Pollack was asked about this, and he had nothing to say except that A.B. Dick 1 regarding UK Limited closing conditions indicated that it was not met, that there was a deficit versus the closing condition, and I don't believe, Your Honor, that that's impacted in any way by the prepaid inventory concession, and it's just this kind of thing, there are so many of these little closing conditions, so many of these reps and warranties. Let's take, for example, the one about no encumbrances other than asset --

THE COURT: Let's not leave that last one, but what I understood Mr. Pollack's testimony to be was that you could not look at what is essentially the page 4 or 5 of Exhibit-1 by itself. That the so-called Asset Purchase Agreement covenant review -- is that what you were looking at?

MR. RICCIARDI: Yes.

THE COURT: And are you looking at the last portion

of it there?

MR. RICCIARDI: I am, the last line -- the last few lines under UK.

THE COURT: Right. That he said that shows what the deficit would be, but then what you have to look at is the availability under the line and the ability to buy inventory and that would bring that deficit into compliance. And then if you look at that at the same time that with regard to these various items that although there's not a lot of excess money, I think everybody would agree to that, that there is sufficient projected availability to be able to cure that problem.

MR. RICCIARDI: I think, Your Honor, that there are two different tests, respectfully. If you turn to 10.12 in the Asset Purchase Agreement, the first test requires that the sum of accounts receivable and inventory less the preferred revenue of seller and Canada Sub shall be at least $22,700,000 on a cumulative basis, and that line is represented as a covenant about a third of the way up the page from the bottom of $22,700,000, and it is those negative numbers that Mr. Pollack, I believe, testified would be compositive numbers if pre-paid inventory were allowed to be counted in the calculation as it is here up to a maximum of $2 million, and if the Debtors could spend available cash to buy additional inventory. But that is a separate test from the limited test which talks about $5.4 million in net assets, and as I understand it, I don't even