believe that the Debtors are allowed to use funds from the D-I-P loan for propping up the UK subsidiary.

THE COURT: Well, where is the covenant on the 5.4 million in?

MR. RICCIARDI: It's right there on page -- in 10.12 on page 48 of the Asset Purchase Agreement.

(Pause in proceedings)

THE COURT: Okay, so, your position is that -- now, this is as of closing, isn't that right?

MR. RICCIARDI: It is, it is a projection, Your Honor, yes.

THE COURT: But I mean the test here is that --

MR. RICCIARDI: The test is as of the closing.

THE COURT: At the effective time, which means closing basically, right.

MR. RICCIARDI: Yes.

THE COURT: Well, we don't really have anything here that tells us about that, do we?

MR. RICCIARDI: No, you're right, we don't, but --

THE COURT: We don't have October and November. What we have are July, August, and September that would show in July a deficit of $9 thousand, in August a deficit of $53 thousand, and in September a deficit of $14 thousand.

MR. RICCIARDI: Yes, that's correct, Your Honor, and I don't see any materiality qualifier here on this 10.12. So,

I think a deficit of $1 thousand would breach the covenant. That's the kind of thing that lurks in this Asset Purchase Agreement, Your Honor. I don't want to belabor the point, but I just want to go back to one rep and warranty that was discussed earlier when Mr. Pollack was on the stand, and it concerns unscheduled encumbrances, and as Your Honor well knows if there's an unscheduled encumbrance that comes to the attention of parties, that calls for additional notice to that lien holder. It doesn't, and shouldn't give the buyer a right to walk away. The buyer's gonna get a 363 Sale Order free and clear of liens. In addition to these problematic --

THE COURT: Well, let me ask you this question from a practical standpoint. The evidence here is that Presstek has sunk a million six or million four, whatever the number was, something like that, into this deal. At least they have disclosed in the public record I think it was a million six in costs. They will, at that point, if the projections from Mr. Knipp are correct, and also Mr. Pollack I think, the end of the D-I-P for some additional amount for which they're obviously secured as to those assets, but they're not secured -- they don't get to wrap in that $1.6 million as part of the D-I-P advance. So, they're not secured as to that. So, there may not be precisely in their materiality item, but what you're suggesting to me is that I should not approve these bid protections because, for the lack of a thousand dollars on the

UK subsidiary in terms of its net assets, that they'd walk from the million six without any possibility of recovering it.

MR. RICCIARDI: Well, no, Your Honor, I'm not asking you to believe that at all because that wouldn't make common sense. What I am asking you to believe, though, is that if they believe that there's a reasonable chance that that UK Limited test will not be able to be met as of the closing date then they have a free ride. They can just wait, they can wait through the process, they can hope somebody outbids them so that they get their break-up fee, and maybe they're -- you know, maybe they've had a problem in their business. Maybe they've had a labor strike and a plant was shut down for two months and they are no longer sure that they can integrate this business. So, if they have a reason to walk for a thousand dollars, they'll walk for a thousand dollars if they don't want to do the deal.

THE COURT: Yes, but if they walk for a thousand dollars before the time comes then they lose the million six.

MR. RICCIARDI: But as Your Honor --

THE COURT: If they walk for the thousand dollars and hope that somebody outbids them at the later time then if that bid is approved then necessarily it's better for the Estate than the deal they originally put on the table, because otherwise it wouldn't be approved. And so even if they got paid their break-up fee, whatever it turns out to be, they --

the Estate would be better off by definition, correct?

MR. RICCIARDI: Well, in that circumstance the Estate would be better off, but there's another circumstance in which they can use the thousand dollars to maybe negotiate a $5 million price reduction because nobody else showed up. So, you know, there are plenty of things that they can do with these little worms that exist in this Asset Purchase Agreement. There are plenty of uses that they can put into, and they're entitled to have all the protections they want. We're not trying to reform the agreement. We're just saying that under the O'Brien standard, which the Court admonished us all to consider, they haven't demonstrated the necessity of paying 4.25% in break-up and expense reimbursements to preserve or enhance the value of the Estate. In fact, we think that they haven't demonstrated the necessity on paying anything, and arguably Mr. Selbst's statements to the Court indicate that it's not even necessary to award the break-up fees because he said, you know, we're gonna be there at that auction. We believe in this business. We've been chasing this company for a year. So, how under O'Brien can we award a break-up fee to Presstek? Presstek's gonna be there one way or the other, and that's really the reason why we don't think it's permissible under O'Brien to award the break-up fee. I just want to be brief. Two other comments. There are two other conditions in this agreement that we really, really find troubling. The

first is in section 1010, and it's not a business condition, it's a legal condition, and this is the condition which permits Presstek to refuse to close if the Sale Order is appealed, even if there is a good faith filing -- a good faith finding made by the Court. It is not common, in my experience, Your Honor, to see buyers with a commitment that Mr. Selbst has indicated Presstek has insist on that kind of condition. In fact, it's rare, and I don't know what Your Honor's own experience is, but in my experience it's rare.

MR. SELBST: Your Honor, is Mr. Ricciardi testifying now? This isn't evidence.

MR. RICCIARDI: I think I'm entitled to refer to other argument of counsel, Your Honor.

THE COURT: What's the other one?

MR. RICCIARDI: The other one is the successor liability clause in the Sale Order. The definition of Sale Order, which they require in order to be committed to close. It's on page 8 and it says, "Determining that the purchaser is not a successor to seller or otherwise liable for any of the retaining liabilities or excluded assets, and permanently enjoining each and every holder of any of the retained liabilities or excluded assets from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, cause of action, or encumbrance against purchaser or the purchased assets related thereto." If the Court is comfortable that on

these facts where they're going to buy the name A.B. Dick, and they're going to continue the business of A.B. Dick after the acquisition if the Court could sign an order with such a provision in it then that wouldn't be troublesome to the Committee. But we are mindful of the case in the 1st Circuit, I think it's Sergeant -- that says -- there's a case from the 1st Circuit, Sergeant Arms, where it says, Your Honor, that that type of a provision is not appropriate. I'm sorry, it's Savage Industries Incorporated, and it's 43 F 3d 714, 1st Circuit, 1994. So, that's an additional concern we have is that another one of these worms, as I described them, in the Asset Purchase Agreement. So I guess on the basis of the not only conditionality but what we view as optionality of the agreement and on the basis of their not having met the burden on either the amount or the need for the break-up fee we would ask that the Court deny the break-up fee and the expense reimbursement.

THE COURT: Okay.

MR. RICCIARDI: Thank you, Your Honor.

MR. KAY: I'll be very brief. Eric Kay for MHR. We echo, obviously, the statements of the Committee. We just don't think that Presstek has met the O'Brien heavy burden of providing value to the Estate. The evidence suggested that that 3% is in the high range of break-up fees. What they're seeking here is 33% more than 3%, the high range of break-up

fees. As the Committee suggests, and we agree, we don't think they're entitled to anything, but they're certainly not entitled to this exorbitant break-up fee. Just one clarification. I think the parties had agreed to it but it's not reflected in the Bid Procedures Order. To the extent that the Court were to award a break-up fee, I think it needs to be made clear that they're not entitled to it if they're in default of the agreement at the time. The Order does not so provide, and I just want to make clear that they only get their break-up fee if they're not otherwise in default of the agreement. Lastly, on the option out, which is, you know, I have big concerns that obviously the Creditors are the ones who are gonna benefit from a sale that takes place here, and that's why we're trying to make certain that we have a firm deal. We negotiated over the weekend trying to firm up this deal, and Mr. Selbst indicated that Presstek is committed to this deal. They're not walking away from this deal. They will be at the auction. As a result of that, we tried to put some qualifier on the reps and warranties, put some baskets on, you have to show damages to the assets of X. If Mary Smith is not there but there's no harm to the assets they should not be entitled to walk. We couldn't bridge that gap. We were trying to make suggestions to bridge the gap, and you know, it couldn't be done. That's the way I've seen it done in other cases where this issue comes up. As the Debtors -- as Mr. Pollack

testified, the Debtors did try to strip down the reps and warranties to firm up the bid. They were not successful. I can appreciate that. Debtors don't have a lot of leverage when they're negotiating stalking-horse agreements. But I think, you know, it's in the Creditor's best interest that this process begins, it begins as soon as possible, and it begins with a firm bid. And I just don't think we're there, and without that committed bid --

THE COURT: Well, so what is it -- so what's in front of me today is whether to give them the bid protection.

MR. KAY: Right.

THE COURT: I'm not here to rewrite the APA.

MR. KAY: No, you're not here to rewrite the agreement, and that's why we're not raising any of those issues. Those possibly could be sale issues, but they're not issues for today, such as the release and the other problems with the APA as we see it. But what we're saying is that since this isn't a firm commitment, they're not contributing value to the Estate, and since they're not contributing value to the Estate they haven't met their heavy burden under O'Brien for any break-up fee, let alone the exorbitant break-up fee they're seeking.

THE COURT: Okay.

MR. KAY: That's all I have, Your Honor.

THE COURT: Anybody else?

MR. GLEASON: Can I make one response to that, Your Honor?

THE COURT: Sure.

MR. GLEASON: With respect to the value of the Estate, we just mentioned to the Court that but for Presstek we wouldn't be here. This case would be in piecemeal liquidation. And I want to follow that up with, we've come to Phoenix three times in August, and I love Phoenix in August, but if there's any chance we could come to Phoenix in November that would be fine.

THE COURT: You particularly like it when the air goes off at 6 o'clock?

(Laughter)

THE COURT: I assume the rest of you may have noticed that also.

ALL: Yes.

THE COURT: All right. That used to be a technique I would use if I was doing judicial settlement conferences. I'd make sure it'd run -- you know, I'd do it in July and August and make sure it ran until 8 or 9 o'clock at night, and then you know at that point a deal would be done, there was no question about it, because all they wanted was to get out. On that note, I'm going to take 10 minutes. I want to look at the APA in light of everybody's comments, look through it one more time carefully and then I'll come back and rule on the record.

UNIDENTIFIED SPEAKER: Your Honor, can we take our jackets off?

THE COURT: Yes, that's all right.

MR. MASON: Judge, I think you have all the exhibits other than our exhibit, I think it's C, that's the execution copy of the --

THE COURT: I have the execution copy.

MR. MASON: You do have it, okay.

(Recess)

THE COURT: Please be seated. All right. This morning and this afternoon we've had a hearing in connection with the final approval of a D-I-P agreement among the Debtor and Presstek and Key Bank, and also the approval of certain bidding procedures for the protection -- for the sale of the assets of this company. The parties announced at the beginning of the hearing with regard to the D-I-P financing that numerous of the matters in dispute had been resolved and recited those on the record. Frankly, I was pleased to hear that because I did think, and I think I may have telegraph from some period of time that a number of the provisions in the D-I-P agreement I found to be excessive and would not have been prepared to approve. The agreement -- the modifications that were made, I think, however, substantially leveled the playing field and provide the Debtor with financing that is necessary for its operations while at the same time providing reasonable

protections to the D-I-P lenders. So, with regard to the D-I-P, and I understand also that -- well, I understand all parties were in agreement with regard to those and that there were really no open issues with regard to the D-I-P as among the objecting parties, the lenders, and the Debtor, and I will approve those amendments and will sign a D-I-P Order under Certification of Counsel that all counsel have reviewed and agree with the way the matter has been drafted. With regard to the other open issue, which is the question of bid protections, well, the whole overall question of bid procedures, there was a substantial number of modifications made also to that, the most significant of which, in my view, are the lengthening of the time that the assets will be marketed and the extension until October 27th of the bid due date, October 29th is the auction date, and November 15th is the closing. Again, I think that this company was operated on a very -- this procedure was very compacted, and I do think that that significantly improves the possibility of having an increased return to the Debtor, or in the absence of any other viable bids by any other entity, at least, I think, it provides an adequate period of time for the professionals involved to satisfy themselves that the trees have been shaken to the extent possible under the circumstances. We heard evidence today that -- about how the company got into the bind that it's in, particularly with regard to the liquidity crisis that led directly to the filing

of the bankruptcy. The -- it is clear to me that there was a financial crisis in this company, that the company had no money to deal with, and that it needed to file, and file quickly, and then it needed also to move quickly to try to provide some source of financing on an on-going basis, which it found from Presstek. The record is thin on the question of whether or not financing on terms other than the terms provided here is, in fact, not available. The evidence that was provided on that is that in 2002 the Debtor went to two lenders, Foothill and Servius, who are well-known players in the world of financing distressed companies, who declined to -- to provide financing. The details of all of that were a little bit sketchy from the record. We didn't know, for example, whether or not -- all we know is that they declined. We don't know whether, for example, if the matter had been put into a Chapter 11 so that they had the protections that you would get under 364, would they have considered lending under those circumstances. But in any event, we know that there was some effort made. I think the record also is clear that the financial circumstances of the Debtor deteriorated from then until the time in the summer of '04 when they literally didn't have enough money to make payroll, and when Key said, enough is enough and we're not advancing more than $500 thousand at this particular point, and that was enough really to make the payroll. So, I do think that the evidence fully supports the notion that this was a

company that was going down quickly, had run out of money, was surviving, basically, on overadvances from Key Bank, and had to find a solution somewhere to stop the bleeding. That also supports the notion that putting the company into a sale mode as quickly as possible is a justified decision and that there probably isn't enough time to have the luxury of more fully developing, for example, the question of putting together a due diligence package on what the company looks like if it was disaggregated, and so on. I am satisfied that the bid procedures that have been put in place do allow that kind of disaggregation, and in fact, I'm confident that the professionals involved will, from the financial advisory investment banking standpoint, will do what they can do see if there is a way of selling just those lines of business, as opposed to the equipment line, which obviously at this point is a losing proposition. At the same time we heard testimony, and I accept it, that they are related in the sense that the equipment line may be a losing proposition but it's what provides the engine for the service and for the consumables. So, if you don't have new equipment that business gradually falls off. So, in a sense it's a loss leader, the question is whether or not it's a loss leader that you can afford because the burn rate on the equipment side is very substantial. So, I did find the evidence useful and helpful with regard to the company's financial history, where it got to where it was and

how it was in need of both the D-I-P financing, which will be approved, and of the bidding protections. Now, there is one issue that was put on the table by Mr. Selbst, which is that unless there's an agreement -- unless the bid protections are satisfactory to us we have the right, basically, to walk on the D-I-P, or to insist upon the terms of the D-I-P as they presently exist, making the certainly not unreasonable argument that nobody can force us to be an involuntary lender. On the other hand, I think it has been clear since the first day of this case that the bid procedures were subject to Court approval, and that Presstek had said it would live with the order of the Court on the bid procedures, and would not, in fact, use that as a lever to pull its D-I-P financing, and I was concerned about that from the very beginning. You all may have been in TWA but I wasn't, so this is something I have not seen before, frankly, where the stalking horse and the D-I-P financier are the same party, and I do think it raises a number of issues and changes the dynamic that typically exists in Chapter 11 cases. So, my view is that, frankly, there is no linkage between the D-I-P financing and the approval of the bid procedures, given the position that has been taken from the beginning by Presstek. In the absence of those statements on the record, statements today on the record by Mr. Selbst when I think he very candidly says that he will live with what the Court has to say I think does delink those two circumstances.

And there has been a substantial number of concessions made by Presstek. The -- as was made clear in my colloquy with MHR's counsel at the end of the hearing, this is not a hearing for me to rewrite this APA and to say, well, you really should remove this rep and warranty and remove that rep and warranty, and so on and so forth. That's not appropriate, that's not in front of me. It's raised in the context of whether or not given the APA as it stands is a break-up fee appropriate, and if so in what amount, is the negotiated amount of 3% plus the $500 thousand in expense reimbursements appropriate? So, this is not something I can look at on a micro level and say, we're going to fix this, this, this, and this and then it's okay. I've got to look at it on the macro level and say, in total as a business proposition and as a legal proposition is there a break-up fee justified when the stalking horse has the rights and obligations that are set forth in this particular APA? Now, the primary focus of the Committee's and MHR's complaints are that there are too many outs for Presstek, and that it really is an illusory agreement because if Presstek wants to walk more likely than not it's going to find some technical deviation from the terms of the APA, and that primarily focuses on the representation and warranties, somewhat on the covenants, and so on. There are really two different kinds, there's the financial covenants, where the Debtor's financial advisor had previously testified that in the absence of

modifications to the -- particularly the inventory calculations that they would not be able to make those -- reach those financial covenants. With the modifications that have been agreed to his opinion now is, in fact, they -- it is more likely than not, or it's quite likely the Debtor will meet those. Now, it was pointed out during argument that there was this issue with regard to the UK net assets, and that they are projected not to be sufficient. The reality is they're not really projected up to the point that's relevant, which is November, the closing date, on the documents that we've seen. The numbers are very close to what is required on the projections that are there, but they are below, and it was pointed out by Mr. Ricciardi that there is a -- there is no materiality provision written in there. Frankly, I don't find that to be a very convincing argument simply for the reasons that I indicated before. It is -- looking at this from a macro standpoint, if the UK net assets are 4, 5, 6, 10, $15 million -- $15 thousand short of what the rep and warranty is, I find it difficult to believe that that would give -- that Presstek would walk. Whether it would give Presstek leverage, of course, is another question, as was suggested maybe that would give them the right to come back and, you know, renegotiate the deal. But frankly, on the macro level I think it's more important to get the bid procedures in place, get this deal going so that the professionals can try to market the assets

and create an environment where the market will cause changes to the APA, as opposed to my imposing changes to the APA at this particular point. I think it's, as I said, I'm not going to do that, but rather say that the APA is so loose that no break-up fee is justified. The argument of the objectors is that because of the nature of this APA there's been no real value and it's not a necessary expense under the O'Brien test to pay any break-up fee here. I don't think that that's what the evidence suggests. I think that the evidence suggests that there is value of a substantial sort that has been brought to the table. If we look at the difference, let's say the Debtors just noticed up a 363 sale or an auction and said whoever's going to show up come and show up. We're going to try to sell the assets. I think the fact that there is this deal negotiated with Presstek is a materially better circumstance than that, and that the representations and warranties, although extensive, I don't find to be so restrictive that it means that there is no value here that should -- that would support some amount of a break-up fee being given to Presstek. I do think the amount that was negotiated is not justified, however. I think it's too high. I don't think it ought to be determined by what Presstek actually has in the deal, and although that's simply an inference on my part, when you do the math it seems to me that there's some basis for that conclusion. At the same time, I do think that there is a basis

that has been made that there is value that has been brought to the Estate such that a break-up fee is appropriate. That value is that they have, in fact, created a market. This is not a circumstance where, as you sometimes see, where there are many parties vying to be the stalking-horse bidder. The more typical circumstance where a break-up fee is not appropriate is where the other buyer shows up and says, I'll match that bid, I'll bid $40 million and I don't need a break-up fee. So, at that point it's hard to say that there's any value being added because the assets are sufficiently valuable and sufficiently attractive that there is pre-stalking horse competition, or there's competition to be the stalking horse. In which case I think there is no break-up fee that is suggested or allowed. That's not the circumstance here. Nobody else has been beating down the door to buy the assets of this particular company, and whatever the deficiencies of this APA are, it does exist, it is there. Presstek has spent a lot of money getting to this particular point. They haven't gone away over the course of the year. They have been willing to advance money under a D-I-P loan, which they don't have to do, and that -- all of that has some value that indicates that there's some reality to this, more than what the objectors suggest. So, my conclusion, having looked at this, is that a break-up fee is, in fact, justified, but not at the level that Presstek has negotiated. I don't think that is within the realm of reasonableness. I

don't think it's supported by the O'Brien factors, and I don't think it's supported by any of the testimony here. All the testimony from the experts is to the contrary. So, I'll find that a break-up fee inclusive of expenses of 2½% will be allowed, and the bid procedures will be modified accordingly, and the -- that will have an impact upon the overbids and so on, too, in terms of what's necessary for the next bidder. I picked that number because it's a consensus among the experts of what would be within the range of a normal break-up fee, and that's my experience also. I've seen break-up fees in that amount, plus expense reimbursements or maybe a break-up fee of 2% plus an expense reimbursement. I think it's better to just have a flat 2½% and approve it on that basis, because I am convinced that that amount of value has been brought to the table. I think with that I'm not sure there's much else I need to decide unless you all tell me I'm leaving something out. Other than learning how to turn the air on after hours.

(Laughter)

MR. GLEASON: Your Honor, can we submit a Bid Procedures Order with a Certificate of Counsel as well as Certification of Counsel?

THE COURT: Right. I think what ought to be done here is now there ought to be a Bid Procedures Order drafted up, it shouldn't -- I don't think it's going to require much change.

MR. GLEASON: No.

THE COURT: Those items that you've already had -- that's already been black lined once, and then just change that and that would be the Bid Procedure Order that should be submitted.

MR. RICCIARDI: Your Honor, one question. With the break-up fee of 2½% including expenses, that would be a total of a million, so that would mean that the bid procedures would be modified so that the minimum overbid would be 41.2 million. Do I understand --

THE COURT: Yes, it would be 1 million plus 200 thousand.

MR. RICCIARDI: Thank you.

THE COURT: That's what I was suggesting here that that's --

MR. GLEASON: Yes.

THE COURT: -- the other part of this I think that would have to be changed so you know what the next minimum overbid would be.

MR. GLEASON: Lastly, Your Honor, sale hearing. I know that may not be in your Court, but how should we handle that? Should we -- we do have a space in this, and we do have a notice that would go out as well.

THE COURT: Well, I don't know if we can set a sale hearing now. Does that create real heartburn for you? I'm

going to call Judge Walrath tomorrow and talk to her about what we're going to do and how these cases ought to be -- how this case ought to be handled, and I was hopeful that by now there would be -- and maybe there is, maybe I just don't know whether or not there's been another Judge identified to come in as of October, and as I say, I've agreed to stay on through the end of December, but not on a traveling to Wilmington basis, because that has become -- that will be difficult for me for the next three months.

MR. MASON: Judge, if you were so inclined to retain this case, but for it to be heard in Phoenix on behalf of the Committee, the Committee would prefer to keep the case before you. I don't know if the other parties, you know, would like to weigh in on that issue, and I don't know if that will influence the Court at all.

THE COURT: Yes, I don't -- frankly, I'd rather not know. I don't want to put counsel in the position of having to sort of stand up and waive the flag and say that's great or not, because I don't think that's really a fair position to put counsel in front of.

MR. GLEASON: No, we're fine, Your Honor. We would much rather -- you have history with the case and --

THE COURT: That's much like my saying, you know, I played golf with Mr. Mason last week, you really don't care about that do you?

(Laughter)

MR. GLEASON: What I hear maybe is Your Honor doesn't want to say he doesn't want this case.

THE COURT: No, and for me really, you know, I understand when I went to Delaware I undertook the obligation to hear cases, and on the one hand if there is -- if in fact there is a new Judge who is coming in, effective in October, then I think it makes sense to transfer that to the new Judge, just like a bunch of cases were transferred to me and I got hit with a bunch of stuff the first day I was there last year, and that new Judge will get up to speed very quickly and will understand what's going on. On the other hand, if there's not a new Judge coming in October and the result is then we don't know what we're going to do with it and the case either has to be transferred to one of the other visiting Judges who may be staying a couple months longer than me, or to Judge Walrath or Judge Walsh, who as you may know have quite a bit on their plate, too, then that will have an impact upon it, which is why I want to talk to Judge Walrath, who is chief Judge, and figure out what to do.

MR. MASON: Well, Judge, just the vast majority of the professionals are not from Delaware and so almost all of us have to get on a plane for every Court hearing anyhow.

THE COURT: I understand that. Part of the problem, of course, is that those who are, with the exception of Mr.

Rosner who is here, those who are from Delaware who participate this now find it to be almost 11 o'clock at night back in Wilmington, and I've had a number of these hearings where it gets very late on the east coast, but I guess you all are used to that. That's why they pay you the big bucks, right? You all don't sleep anyway.

(Laughter)

THE COURT: I will, as I said, I'll talk to Judge Walrath about it. I was going to wait until I go in September but I don't think there's enough time. I think I ought to talk to her about it and see what to do with this case after that.

MR. GLEASON: What we can do for the bid procedures is we can maybe just put a date to be determined by the Court. I think we have a little bit of time before we have to get our Sale Notice in, then we do need to kind of move a little promptly.

THE COURT: All right. Does anybody have any -- I'm not inviting any reargument, I just wanted to know if there's anybody who has any questions, if there's anything unclear about the ruling today?

MR. MASON: The only question I have, Judge, is a logistical one and that is that we know you're going on vacation on Thursday and so I would imagine that we would have to get to the Chambers these orders in conformance with your --

THE COURT: What I normally do with orders when I

hear -- when I'm not in Delaware is the orders get sent to me, either I get forwarded e-mails that you all send to them, or I get an e-mail with the docket numbers and I can log on to the Delaware ECF system. I review the orders on-line and then I advise the Courtroom Deputy in Delaware that she can use my signature stamp, stamp the order and have it docketed, and that's the way I normally handle it because that's a lot better, I think, than sending them out here, signing them, FedExing them back and then it takes too much time. I can tell you I will -- you know, I'll be aware when I'm on vacation, I'm not going to the Antarctic, of what's going on and I can review matters electronically while I'm gone, too. It might have an impact upon what I think about certain things, but that's -- that's a joke, I'm sorry. Okay?

MR. GLEASON: I'll -- I mean, I'll get orders circulated tomorrow and we'll get it to them as soon as we can.

THE COURT: It seems to me that there's not really that much to do --

MR. GLEASON: No.

THE COURT: -- because you've already circulated the black lines that have all of the other issues in them.

MR. MASON: Judge, in the unlikely event that we were to have a disagreement over precise language, is there any little window of opportunity for us to at least have a telephone conference with you?

THE COURT: I'm sure if you contact my office we'll figure out if there is such a time. I have a trial starts at 9 o'clock tomorrow then I've got calendar -- 1:20, 2:30, 3:30 tomorrow. I have -- I don't know if any of you are involved in the Northwestern case, which is a Delaware case, that's going to confirmation hearing at 9 o'clock on Wednesday and maybe we'll last at least until this time on Wednesday night. So, that's what my calendar is the next two days.

MR. FOLLAND: Just for clarification in scheduling, Your Honor, I understand based on the Interim Order that D-I-P use is going to expire at the conclusion of this hearing. I would suggest that the hearing be kept open until an order be submitted to you which I understand there's going to be comments coming from the Committee and I would hope to get it to you say -- submitted to the Court I should say, on Thursday morning. Would that be acceptable, Your Honor?

THE COURT: That's fine. I think the record should reflect that the existing Interim Order will be extended until such time as the Final Order is submitted.

MR. GLEASON: Thank you, Your Honor.

THE COURT: That sounds like that's contingent. All right, thank you.

ALL: Thank you, Your Honor.

(Court adjourned)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

[signature] 9-7-04

Signature of Transcriber Date