## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------X
In re:                                                      )
                                                            )       **Chapter 11**
**BLAKE OF CHICAGO CORP.**, *et al.,*                       )       **Case Nos. 04-12002 (JLP)**
                                                            )       **(Jointly Administered)**
          **Debtors.**                )
------------------------------------------------------------X
**MHR CAPITAL PARTNERS LP, MHR**                            )
**INSTITUTIONAL PARTNERS LP, MHR**                          )
**LP, AND MHR FUND MANAGEMENT LLC,**                        )
                                                            )       **Appeal No. 04-CV-1498**
        **Appellants,**                    )
                                                            )
        **v.**                            )
                                                            )
**BLAKE OF CHICAGO CORP.**, *et al,.*                       )
**f/k/a A.B. Dick COMPANY,** *et al.,* **and**              )
**PRESSTEK, INC.**                                          )
                                                            )
        **Appellees**                     )
------------------------------------------------------------X

## <u>ANSWERING BRIEF OF APPELLEE PRESSTEK, INC.</u>

MONZACK AND MONACO, P.A
Francis A. Monaco, Jr.
400 Commerce Center
Twelfth and Orange Streets
P.O. Box 2031
Wilmington, Delaware 19899

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst
Lawrence J. Slattery
Gary O. Ravert
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

*Of Counsel*
*Attorneys for Presstek, Inc.*

Dated:  April 8, 2005

TABLE OF CONTENTS

Page

COUNTER-STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING......... 1

SUMMARY OF ARGUMENT ............................................................................................. 2

STATEMENT OF FACTS ................................................................................................. 3

    Negotiations Between Presstek and ABD Prior to Filing of the Bankruptcy
        Petition ................................................................................................................. 3
    The Escrow Agreement and the Consent and Agreement ............................................ 4
    The Bankruptcy Proceeding and the Auction ................................................................. 6

STANDARD OF REVIEW ON APPEAL ......................................................................... 7

ARGUMENT

    I.     THE RECORD BELOW AMPLY SUPPORTS THE BANKRUPTCY
           COURT'S FINDING THAT PRESSTEK WAS A GOOD FAITH
           PURCHASER ................................................................................................... 8

           A.  THE BANKRUPTCY COURT'S FINDINGS ............................................. 8

           B.  RECORD SUPPORT FOR THE COURT'S FINDINGS............................. 9

           C.  MHR FAILED TO SUBMIT ANY EVIDENCE OF FRAUD OR
               COLLUSION AFFECTING THE SALE PROCESS.................................. 12

           D.  MHR PRESENTS NO FACTS JUSTIFYING "REVERSAL"
               OF THE RELEASE CONTAINED IN THE SALE ORDER ......................15

    II.    THE BANKRUPTCY COURT MORE THAN FULFILLED ITS
           OBLIGATIONS UNDER FRCP 52(a).............................................................. 16

    III.   PRESSTEK'S OMNIBUS RESPONSE BELOW IS PROPERLY
           PART OF THE RECORD ................................................................................ 17

CONCLUSION.................................................................................................................. 18

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) .......................8

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76
   (3d Cir. 1999) ..................................................................................................8

*Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*, 57 F.3d 1215
   (3d Cir. 1995) ..................................................................................................9

*Gilbert v. Sterrett*, 509 F.2d 1389 (5th Cir.1975) ............................................16

*Greylock Glen Corp. v. Community Sav. Bank*, 656 F.2d 1 (1st Cir. 1981) ....................8

*Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784
   (6th Cir.1984) ..................................................................................................16

*Haines v. Liggett Group, Inc.*, 975 F.2d 81 (3d Cir. 1992) ................................9

*Hjelle v. Mid-State Consultants, Inc.*, 394 F.3d 873 (10th Cir. 2005) .............................16

*In re Kaiser Group Intern., Inc.*, 307 B.R. 449 (D. Del 2004) ..................................8

*LaScola v. US Sprint Communications*, 946 F.2d 559 (7th Cir.1991) .............................15

*Licensing by Paolo, Inc. v. Sinatra* (*In re Paolo Gucci, Inc.*), 126 F.3d 380
   (2d Cir. 1999) ..................................................................................................16

*In re Paolo Gucci, Inc.*, 126 F.3d 380 ...........................................................17

*Mellon Bank, N.A. v. Metropolitan Communications, Inc.*, 945 F.2d 635
   (3d Cir, 1991) ..................................................................................................9

*In re Midway Airlines, Inc.*, 180 B.R. 851 (Bankr. N.D. Ill. 1995) ................................18

*In re Polaroid Corporation, et al.*, 2004 WL 253479 ....................................................24

*Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060 (1st Cir.1995) .......................16

*In re Tempo Tech*, 202 B.R. 363 (D. Del. 1996) .............................................14

*U.S. v. Acosta*, 363 F.3d 1141, 1151 (11 Cir. 2004) ........................................16

*United States Gypsum Co.*, 333 U.S. 364 (1948) .............................................9

*Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98 (3d Cir. 1981) ...................9

*In re Yates Development, Inc.*, 256 F.3d 1285 (11th Cir. 2001) .......................................19

*Zack v. C.I.R.*,  291 F.3d 407, 412 (6th Cir. 2002)  ........................................................16

**FEDERAL STATUTES**

11 U.S.C. 363  ................................................................................................................24

Fed. R. Civ. P. 52................................................................................................................17

Appellee Presstek, Inc. ("Presstek"), respectfully submits this Answering Brief in Opposition to the Appeal of MHR Capital Partners LP, MHR Institutional Partners LP, and MHR Management LLC (collectively "MHR") from the order of the United States Bankruptcy Court for the District of Delaware, dated November 3, 2004, (a) authorizing the sale of substantially all of the assets of Appellee A.B. Dick Company  and its wholly owned subsidiaries ("ABD" or the "Debtors"), free and clear of liens, claims and encumbrances; (b) authorizing assumption and assignment of certain unexpired leases and executory contracts; and (c) granting related relief.  (The actual purchaser was a subsidiary of Presstek.  For convenience in this Brief, Presstek will be refer to both Presstek and its acquisition subsidiary.)

## COUNTER-STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is an appeal from a Bankruptcy Court's approval of a Section 363 sale over the objection of Appellant MHR.  The sale closed more than five months ago.  MHR did not seek a stay of the sale pending this appeal.  This appeal is MHR's third attempt to have a court rule that Presstek was not a good faith purchaser.

ABD filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 13, 2004.  On July 22, 2004, the Debtors filed their motion, seeking authority to sell their business to Presstek pursuant to the terms of an asset purchase agreement (the "APA") subject to an auction resulting in higher and better offers (the "Sale Motion").  Debtors also sought approval of bidding procedures (the "Bidding Procedures Motion").  MHR objected to both the Bidding Procedures Motion and the Sale Motion, in part based on its contention that Presstek was not a good faith purchaser based on its conduct in pre-filing negotiations with ABD.  At a hearing on August 23, 2004, the Bankruptcy Court (Judge Case presiding), held a hearing on the motions and rejected MHR's contentions.

After an extended period of soliciting bids, ABD held an auction of the Assets on November 1, 2004. Only one qualifying bid was received – Presstek's. On November 2nd and 3rd, 2004, the Bankruptcy Court (Judge Peterson presiding) conducted a hearing to determine whether to approve the sale to Presstek (the "Sale Hearing"). After two-day evidentiary hearing at which MHR opposed approval of the sale but presented no witnesses and offered no evidence in support of its claim that Presstek was not a good faith purchaser, the Bankruptcy Court entered the Sale Order, which contains multiple and explicit findings of good faith and arms' length negotiations. (B269, Sale Order ¶ 2). In approving the sale Judge Peterson, like Judge Case before him, rejected MHR's claim that Presstek was not a good faith purchaser

On November 4, 2004, MHR filed its Notice of Appeal of the Sale Order, but did not seek a stay of the sale on appeal. The Sale closed on November 5, 2004.

## SUMMARY OF ARGUMENT

1.      The Bankruptcy Court's finding that Presstek was a good faith purchaser is fully supported by the evidentiary record from the Sale Hearing. The lower court's ruling was wholly correct, especially in light of MHR's failure to present any witnesses or other evidence demonstrating that Presstek acted in bad faith in the Sale process.

2.      The Bankruptcy Court's findings fully comport with the requirements of FRCP 52(a), particularly in light of the overwhelming evidentiary support for the findings in the record.

## STATEMENT OF FACTS

Presstek's appendix on this appeal contains a detailed chronology of the pre-filing negotiations between Presstek and ABD, along with a description of MHR's role in delaying and disrupting those negotiations in an effort to extract financial benefits for itself. (B005-B019). The following is a brief summary events before ABD's bankruptcy filing, followed by a chronology of relevant post-filing events leading up to the Bankruptcy Court's approval of the Section 363 asset sale to Presstek.

### Negotiations Between Presstek and ABD Prior to Filing of the Bankruptcy Petition

In July 2003 the Chief Executive Officers of Presstek and ABD discussed a possible acquisition of ABD by Presstek. In November 2003, Presstek sent a non-binding expression of interest outlining a proposed acquisition of ABD for a combination of cash and Presstek stock. (B041-B043). As ABD's board of directors considered the proposal, MHR's representative on the board, Hal Goldstein, recommended that ABD file for bankruptcy, a recommendation he had regularly made to his fellow directors. (B058-B059).

By January 2004 due diligence had revealed unanticipated environmental issues that stalled any possible transaction. (B082). Months passed before the issues were resolved. (B047, B049). In March 2004 Presstek's CEO met with representatives of ABD, Paragon (ABD's parent), and MHR. They were unable to resolve the open issues. (B050).

As an ABD noteholder, MHR had contractual rights block a sale of ABD. (B097). MHR made it clear that part of the price for its consent would be payment of a fee to it for "negotiating" a deal. (B098-B099). As a result of its veto power, Mr. Goldstein of MHR began to negotiate directly with Presstek in March 2004. (B051). After a month of negotiating

with MHR, Presstek believed it had a deal to buy ABD.  Presstek's CEO set a deadline of April

23 for MHR to obtain approval for the deal.  (B0124).  That deadline passed without agreement

from MHR, ABD, or its parent.

       While MHR and ABD's other stakeholders bickered among themselves, ABD's

business was deteriorating rapidly.  The company was approaching the point where it did not

have sufficient availability under its credit facility to finance its obligations.  (B112, B117).  Low

on cash, ABD could not pay suppliers, 160 of whom had stopped supplying ABD with raw

materials.  As a consequence, ABD lacked inventory and spare parts and could not fill the many

backorders it had for its products.  (B054-B055).

       As negotiations dragged into June 2004, MHR added new demands, including an

escrow of millions of dollars in expenses and fees to be paid to MHR and its attorneys.  (B140,

B142).  At that point, ABD was near its maximum borrowings of $24 million on its line of credit

with Key Bank, its main prepetition lender.  On June 15th, MHR required that Key Bank, or

some other party, agree to fund ABD's operations until the closing of a transaction with Presstek.

(B150).  Key responded that it would consider any additional funding "only in conjunction with

the appointment of a receiver. . . ."  (B152).

**The Escrow Agreement and the Consent and Agreement**

       The parties then negotiated two documents of significance to this appeal.  The

first was an Escrow Agreement designed to escrow the Stock Purchase Agreement ("SPA")

executed by all parties other than Presstek, pending (a) completion of financial due diligence by

Presstek, and (b) ABD's obtaining Key Bank's execution of the "Consent and Agreement"

document to continue funding and waiving certain rights (the "Consent").  The second important

document is the Consent itself.

The Escrow Agreement provided that Presstek would have until June 25, 2004 to complete financial due diligence and obtain board approval for the transaction. (B156). It also gave ABD until June 22, 2004 to have Key Bank execute the Consent in the form attached as Exhibit A to the Escrow Agreement. *Id*. at 3(b). In the event that Key Bank did not execute the Consent by June 22nd, the Escrow Agreement provided that all agreements between the parties would become null and void. *Id*. at 4(c).

The Escrow Agreement also provided that consummation of the SPA was contingent on Presstek's completion of financial due diligence. (B157 at ¶3(a)(iii)). Within days of execution of the Escrow Agreement, Presstek's representatives met with Key Bank personnel. At the meeting Key Bank stated that it wanted Presstek to fund ABD's operations through the closing. Presstek asked for immediate access to ABD's operational management. A meeting occurred on June 21, 2004. (B067). At the meeting, Presstek learned that ABD was in far worse condition than Presstek had thought. The operating management painted the picture of an insolvent company with no prospects for recovery. (B057). Forecasts presented that day put sales at a much lower level than had previously been indicated, and revealed a number of negative factors were converging on the business. (B068).

As noted earlier, the Escrow Agreement provided that if Key Bank did not execute the Consent by June 22, 2004 then all agreements between the parties would become null and void. (B157 at ¶ 4(c)). There is no dispute that Key Bank *never* executed the Consent. As Key Bank's officer in charge of the ABD loan testified, Key Bank, in consultation with its legal counsel, specifically decided that it would *not* execute the Consent. (B115). Interestingly, although ABD had an obligation to endeavor to obtain Key Bank's execution of the Consent and Agreement (Escrow Agreement 3(b)) it appears to have made no effort whatsoever to do so. In

fact, Key Bank's representative testified that it was not until June 22nd (the deadline for Key Bank to execute the Consent) that he happened across the Consent while reviewing the deal document previously sent to him.  (B116).  Also on that day, Presstek's counsel informed that by operation of the Escrow Agreement, the lack of a Consent executed by Key Bank rendered all agreements between the parties null and void.  (B163, B174-B175).

Subsequently, Presstek and ABD commenced negotiation of an asset purchase agreement (the "APA") pursuant to which substantially all of ABD's assets would be sold to Presstek in a Section 363 sale approved by a bankruptcy court.

**The Bankruptcy Proceeding and the Auction**

On July 13, 2004, ABD and related entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  That same day Presstek and ABD and related entities executed the APA.  On July 22, 2004, ABD filed a motion seeking authority to sell their business to Presstek pursuant to the terms of the APA, or to any bidder presenting a higher and better offer as a result of a planned auction.  On August 9, 2004, MHR objected to the Bidding Procedures Motion the Sale Motion.

On August 23, 2004, the Court held a hearing on ABD's motion to approve bidding procedures at which time it overruled MHR's objections.  (B801-810).  On September 15, 2004, the Court entered the order approving the bidding procedures (the "Bidding Procedures Order"), setting an auction date.  ABD's investment banker proceeded to contact over 200 prospective bidders during the auction process.  (B421).  Despite this effort, no potential bidder submitted a bid that conformed to the court-approved Bid Procedures.  On November 1, 2004, the Debtors held the auction, with Presstek as the only qualifying bidder.  Despite its status as sole bidder, Presstek agreed to increase the consideration to be paid for ABD's assets.

On November 2nd and 3rd, 2004, the Court conducted a hearing on the Sale Motion and, rejecting MHR's objections, approved an asset sale to Presstek (the "Sale").  On November 3, 2004, the Bankruptcy Court entered an order pursuant to, *inter alia*, sections 363(b), (f), and (m) authorizing the sale of substantially all of ABD's assets to Presstek (the "Sale Order").  On November 4, 2004, MHR filed its Notice of Appeal of the Sale Order.  It did not seek a stay of the Sale Order.  The following day Presstek and ABD closed on the asset sale.

## STANDARD OF REVIEW ON APPEAL

This Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *In re Kaiser Group Intern., Inc.*, 307 B.R. 449, 453 -454 (D. Del. 2004) (citing *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999)); Fed.R.Bankr.P. 8013.  The question of whether a purchaser is a good faith purchaser "requires the determination of an ultimate fact[.]" *In re Abbotts Dairies of Pennsylvania, Inc.* 788 F.2d 143, *147 (3d Cir. 1986) (*citing Greylock Glen Corp. v. Community Sav. Bank*, 656 F.2d 1, 3 (1st Cir. 1981).  With mixed questions of law and fact, the District Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir.1981)).

A factual finding is clearly erroneous if it is "complete devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data," *Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d cir. 1995), or where some evidence supports the finding but the reviewing

court is left with "the definite and firm conviction that a mistake has been made." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992) (quoting *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Here, the record before the Bankruptcy Court amply supported the good faith finding in the Sale Order.

## ARGUMENT[1]

## I.    THE RECORD BELOW AMPLY SUPPORTS THE BANKRUPTCY COURT'S FINDING THAT PRESSTEK WAS A GOOD FAITH PURCHASER

### A.    The Bankruptcy Court's Findings

After a two-day evidentiary hearing the Bankruptcy Court entered the Sale Order approving the Sale of the Assets to Presstek pursuant to the terms of the APA. (B269). The Sale Order contains multiple and explicit findings of good faith and arms' length negotiations. Specifically, the Bankruptcy Court found that

1.    the sale assets "will have been acquired by [Presstek] *in good faith and as a result of arm's length negotiations*." (B264) (emphasis added)

2.    the APA was negotiated, proposed, and entered into "*without collusion, in good faith, and from arm's length* bargaining positions." (B265.) (emphasis added)

3.    Presstek was a "good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby." (B265)

4.    the transactions contemplated by the APA "*have been undertaken . . . at arm's-length and without collusion*, and Presstek will acquire the Assets . . . *in good faith within the meaning of section 363(m) of the Bankruptcy Code*." (B273-B274) (emphasis added)

Finally, the Sale order specifically found that "the reversal or modification on appeal of the authorization provided herein to consummate the transactions contemplated by the

---

[1]    This appeal is moot because MHR is seeking relief that would affect the validity of the Sale Order, but MHR did not obtain a stay of that Order pending this appeal. Presstek has filed a Motion to Dismiss the Appeal as Moot contemporaneously with this Brief.

Asset Purchase Agreement shall not affect the validity of the sale of the Assets, unless such authorization is duly stayed pending such appeal." (B274).

**B.**          **Record Support For The Court's Findings**

The record below resoundingly supports the Bankruptcy Court's findings of good faith, arms' length negotiations, and necessity of the Sale. Indeed, all of the evidence presented at the Sale Hearing demonstrated good faith in the Sale process. For example, Glenn Pollack, ABD's financial advisor, gave testimony that specifically contradicts MHR's unsupported theory that ABD was coerced into executing the APA. (MHR Br. at 2.) As Mr. Pollack testified, the APA was the product of arms' length negotiations:

> Q. Can you describe . . . those negotiations for the Court?
>
> A. I would characterize them as spirited, and both parties taking very strong positions and working toward a negotiated arrangement (inaudible).
>
> Q. All right. And we've had testimony today regarding the subsequent negotiations regarding the Asset Purchase Agreement. were you involved in those?
> A. I was.
>
> Q. And how would you characterize those negotiations?
>
> A. Spirited as well[.]

(B413-B415).

After negotiating the APA, the Debtors solicited potential bidders in an attempt to top Presstek's bid. As Stephen Gray, ABD's Chief Restructuring Officer, testified:

> The process was open, honest, the perspective bidders or inquirers had access to all information on a timely basis, no questions of any interested party were left unanswered. I don't believe there was anything in the process that would suggest it wasn't anything other than completely open and fair[.]

(B346).

Despite an open and honest auction, no other qualifying bids were received. It was not for lack of trying. As ABD's investment banker, Glenn Pollack of Candlewood Partners testified, his company contacted more than 200 potential purchasers, approximately 50 of whom executed the Confidentiality Agreements necessary to receive financial information. (B421). At the end of this process, no potential bidders were willing to make a commitment to top Presstek's offer.

> Q. How did the market respond to the $40 million stalking horse bid by Presstek?
>
> A. In general, the responses that we received . . . were centered around the fact that parties believed the [APA] was paying a full value, that it was a strategic bid for Presstek . . . Other parties had told us that they had better alternatives to invest their time and capital.

(B423-B424).

After canvassing the market, all that ABD received were two highly conditional, and largely illusory, "expressions of interest" from Comvest Investment Partners and Harbor Partners. Neither complied with the court ordered Bidding Procedures. Both were highly contingent and, in effect, committed Comvest and Harbor to nothing. As Stephen Gray, ABD's Chief Restructuring Officer, testified, Comvest and Harbor Partners expressions of interest were too contingent to be considered. As to Harbor, Mr. Gray explained that

> A. . . . it has a lot of contingencies in it too, due diligence contingencies, it has a note on future profits, but the biggest issue, and *the nonstarter in this proposal was it had an absolute financing contingency*.
>
> Q. What do you mean by that?
>
> A. It was subject to Harbor Group securing financing, including the D-I-P financing, as a condition to go forward, and there's no assurance of that financing being forthcoming, although there was a letter attached to it

expressing interest of someone who might provide D-I-P financing and
exit financing.

(B353).

Similarly, the Comvest expression of interest was riddled with

contingencies.  (B353).  As a result, Mr. Gray testified, it was the collective judgment of

himself, ABD's financial advisors, and counsel, that "we would put this Estate in

substantial risk by not going forward with the Presstek proposal and embarking on a

course that could seriously jeopardize . . . the solvency of the Estate."  (B385)

In explaining why MHR's opposition to the Sale was meritless, the

Bankruptcy Court summed up the problem with the Comvest and Harbor Partners

expressions of interest.  Responding to a request to postpone the Sale see if Comvest

would make a real offer, because Comvest "was offering more than twice what Presstek

is offering," the Bankruptcy Court explained the questionable validity of the Comvest's

and Harbor Partners' expressions of interest.

THE COURT: Well, I don't know how I could ever make a finding that
they offered twice, *when they didn't really offer anything.*

(B387).

In sum, the record is replete with testimony of the fairness and openness of the

auction process, and the failure of anyone but Presstek to commit to buy ABD's assets.

Importantly, the record is devoid of evidence of fraud or collusion in the Sale process.  MHR's

argument that Presstek was not a good faith purchaser was properly rejected by the Bankruptcy

Court.

C.        **MHR Failed to Submit Any Evidence of Fraud or Collusion Affecting the Sale Process**

MHR sets out the proper standard for a finding of bad faith in a section 363 sale process: "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders. . . or conduct tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction." (MHR Br. at 16.) At the Sale Hearing, however, MHR made no attempt to present *any* evidence that would satisfy that standard and support such a finding. As detailed above, ABD, in contrast, presented evidence proving that the sale process was fair, open, and wholly free of anything remotely akin to fraud or collusion. MHR presents literally nothing to justify the relief it requests in this appeal.

In *Abbotts Dairies*, the Third Circuit stated that for purposes of Section 363, the "misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' *Abbotts Dairies*, 788 F.2d at 147. None of MHR's allegations as to Presstek's alleged bad faith relate at all to the sale process.

The decision in *In re Tempo Tech*, 202 B.R. 363 (D. Del. 1996) is instructive on this point. There, the court was presented with a case where the prospective buyer had engaged in pre-petition negotiations with the seller and those negotiations had broken down as a result of the debtor's deteriorating performance. Once the debtor filed for chapter 11 relief, the debtor and the buyer recommenced their negotiations, which led to an agreement for a Section 363 sale of the debtor's assets. The bankruptcy court approved the 363 sale over the objection of the debtor's secured creditor, who argued that the failed pre-petition sale negotiations were evidence of the buyer's bad faith. *In re Tempo Tech*, 202 B.R. at 365.

- 12 -

In approving the sale, the bankruptcy court applied the rule of *Abbotts Dairies* and found that the sale had been negotiated at arms-length, without evidence of fraud or collusion, and without the buyer providing any value or consideration to the debtor's insiders or equity holders.  The secured creditor appealed.  The District Court affirmed the bankruptcy court's ruling.  In holding that the lower court had correctly applied *Abbotts Dairies* in determining that the purchaser had acted in good faith, the district court presented the following analysis, which applies equally to the present matter.

> The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser.  [The Debtor's President's] unrebutted testimony regarding the negotiation of the sale of the Debtor's assets demonstrated arm's length negotiations between the purchaser and the Debtor. There was no evidence of fraud, collusion, or interested dealing between the players; [the Debtor's President] was not promised any lucrative employment package for his part in the negotiations. . . .

> Moreover, there was no evidence that TAC [the Section 363 Purchaser] colluded with the Debtor to attempt to take unfair advantage of other prospective bidders. . . . testimony demonstrated the Debtor's attempts to solicit interest from prospective purchasers other than TAC, albeit without success. . . . There was no evidence that any prospective purchasers regarded the auction terms as chilling their interest in bidding.

202 B.R. at 370.

The same result should inure here.

MHR's position also finds no support in *Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci, Inc.)*, 126 F.3d 380 (2d Cir. 1997), which it cites for the proposition that conduct prior to the bankruptcy is proceedings is relevant to the inquiry into bad faith.  First, the bankruptcy court, the district court, and the circuit court all found that there was no bad faith conduct, before or during the sale process.  Second, the challenged pre-petition conduct was alleged to have had a detrimental effect on other bidders.  *In re Paola Gucci, Inc.*, 126 F.3d 380, 391.

In affirming the lower courts' determinations that the purchaser acted in good faith, the Second Circuit applied the familiar standard for a bad faith finding: "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Paolo Gucci, Inc.*, 126 F.3d at 390. The Second Circuit concluded that the argument of the appellant, an aggrieved party adversely affected by the sale order, was "less of a claim of fraud, collusion or unfair advantage in the bidding process and more of an attack on [the purchaser's] general business practices." *Id*. The "appropriate scope of inquiry regarding a purchaser's good faith *is not nearly so broad.*" *Id.*

The Second Circuit went on to explain that a good faith finding is based on "the purchaser's conduct in the course of the bankruptcy proceedings . . . and prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale." *Id*. Contrary to MHR's reading of *Paolo Gucci*, the Second Circuit specifically held that "[a]lthough the conduct in question was alleged to have begun before the bankruptcy proceedings were initiated, *the relevant inquiry still remained whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders.*" *Id*. MHR does not point to evidence that Presstek controlled the sale price or took unfair advantage of prospective bidders.

Here, the Debtors and Presstek entered into the APA subject to higher and better offers. After a lengthy and fair sale process the Sale did not generate a single qualifying bidder other than Presstek. Despite being the only bidder, Presstek raised the value of its bid by several million dollars at the insistence of the Debtors. (B415-B418). Notably, at that point in time, Presstek was bidding only against itself. Such conduct is distantly removed from the fraud or collusion necessary to support a finding of bad faith.

- 14 -

**D.**          **MHR Presents no Facts Justifying "Reversal" of the Release Contained in the Sale Order**

MHR also challenges the Sale Order's grant of a release by the Debtors' estate of any potential claims against Presstek.

As stated on the record at the Sale Hearing, the release was an indispensable component of the transaction. Without the release, Presstek would not have consummated the asset purchase. The significance of the release to Presstek was acknowledged at the Sale Hearing, and the Sale was explicitly conditioned on the approval of the release. As stated by Presstek's attorney at the Sale Hearing, "it is absolutely part of the bargained for consideration that we have a release from the Estate, and *without it Presstek is not prepared to proceed*. (B512).

MHR's off-handed request that this Court "reverse" the Sale Order to the extent of deleting the release is fanciful. As set forth above and in greater detail in the Motion to Dismiss this appeal as moot, filed contemporaneously with this Brief, MHR's request that this Court delete the release would fundamentally undermine the Sale Order. The Sale can not be undone now. Presstek has paid $40 million for the assets, almost all of which ABD has already spent. If MHR were serious about the relief it requests, it would have sought a stay pending appeal instead of asking this Court to reverse a Sale Order for a transaction that closed more than five months ago.

Courts have wisely recognized that all agreements emerge from negotiations, and that in exchange for benefits in one area, parties may make concessions in others. For that reason, courts have repeatedly held that is not their role to revise agreements that the parties have reached. *In re Midway Airlines, Inc.*, 180 B.R. 851, 915 (Bankr. N.D. Ill. 1995) ("court may not rewrite the parties agreement or impose obligations on the parties that they have not intended to

impose upon themselves,") (citing *LaScola v. US Sprint Communications*, 946 F.2d 559, 564-65 (7th Cir.1991)); see also *In re Yates Development, Inc.*, 256 F.3d 1285, 1290 (11th Cir. 2001) ("[i]t is never the role of a . . . court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain.").

## II.    THE BANKRUPTCY COURT MORE THAN FULFILLED ITS OBLIGATIONS UNDER FRCP 52(a)

MHR wrongly asserts that the Bankruptcy Court "failed to make any specific findings regarding Presstek's good faith." (MHR Br. at 18.) As set forth in detail at I.A. above, the Bankruptcy Court made many specific findings as to Presstek's good faith. Indeed, the Sale Order contains several findings of good faith and arms' length negotiations in the Sale process. *Supra*, I.A. The Sale Order more that satisfies FRCP 52(a), which requires findings of facts, not findings of facts that please MHR.

As many courts have explained, in "evaluating whether the requirements of Rule 52(a) have been satisfied, we do not insist that trial courts make factual findings directly addressing each issue that a litigant raises." *Zack v. C.I.R.*, 291 F.3d 407, 412 (6th Cir. 2002); *see also Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 792 (6th Cir.1984) ("It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial.").

Instead, "findings should be construed liberally and found to be in consonance with the judgment, *so long as that judgment is supported by evidence in the record*[.]" *U.S. v. Acosta*, 363 F.3d 1141, 1151 (11 Cir. 2004)); (citing *Gilbert v. Sterrett*, 509 F.2d 1389, 1393 (5th Cir.1975) (citation and quotation marks omitted) (emphasis supplied)); "Findings are sufficient if they indicate the factual basis for the court's general conclusion as to ultimate facts and are broad enough to cover all material issues." *Id.  Hjelle v. Mid-State Consultants, Inc.*, 394 F.3d 873,

880 (10th Cir. 2005) (internal quotes omitted).  Even "anemic factual findings are not fatal to the

decision so long as a complete understanding of the issues may be had from the record on

appeal." *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1079 (1st Cir.1995).  Based

on the ample record before the Bankruptcy Court, the good faith finding satisfies the

requirements of Fed.R.Civ.P. 52.

        For the sake of brevity, Presstek will not reprise the litany of good faith findings

by the Bankruptcy Court and the catalogue of record facts supporting those findings.  The Court

is respectfully referred to I. A. and B. above.  Ironically, in an appeal in which MHR would have

this Court reject the Bankruptcy Court's findings as clearly erroneous, MHR points to no record

evidence of fraud or collusion necessary to support it's appeal.  Indeed, given that MHR asks this

Court to *reverse* findings of the lower court, MHR should be citing overwhelming record support

for its position.  MHR cites none.  The reason is simple: MHR submitted no such evidence to the

Bankruptcy Court at the Sale Hearing.  It literally made no attempt to prove fraud or collusion in

the sale process.  Its strident rhetoric notwithstanding, MHR, not the Bankruptcy Court, is

responsible for its failure to prove its case.

## III.    PRESSTEK'S OMNIBUS RESPONSE BELOW IS PROPERLY PART OF THE RECORD.

        In its opening brief, MHR asserts that the omnibus response (the "Response")

filed by Presstek on November 1, 2004 is not a proper part of the record.  However, the

Response was properly filed prior to the hearing.  Neither MHR nor any other party moved to

strike the Response.  In fact, far from objecting to the Response, MHR's counsel specifically

referred the Bankruptcy Court to Presstek's Response in his closing argument, stating that to

support his point "I would look no further, Your Honor, than . . . what Presstek filed on

midnight, approximately midnight, maybe it was like ten o'clock." (B485).  Having relied on

Presstek's filing for support at the Sale Hearing, MHR should not be heard to argue that the

filing is not properly part of the record on appeal.

## CONCLUSION

MHR's appeal should be denied in its entirety.

Dated: April 8, 2005

MONZACK AND MONACO, P.A

___/s/ Kevin J. Mangan_____
Francis A. Monaco, Jr. (Bar No. 2078)
Kevin J. Mangan (Bar No. 3810)
1201 Orange Street, Ste. 400
Wilmington, Delaware 19801
kmangan@monlaw.com
(302) 656--8162

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst
Lawrence J. Slattery
Gary Ravert
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

*Of Counsel*
*Attorneys for Presstek, Inc.*