### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLAKE OF CHICAGO CORP., *et al.*<br>f/k/a A.B. DICK COMPANY, *et al.*,<br><br>               Debtors. | Chapter 11<br><br>Case No. 04-12002 (JLP)<br><br>Jointly Administered |
| MHR CAPITAL PARTNERS LP, MHR<br>INSTITUTIONAL PARTNERS LP, MHRM<br>LP, and MHR FUND MANAGEMENT LLC,<br><br>               Appellants,<br><br>     v.<br><br>BLAKE OF CHICAGO, CORP., *et al.*,<br>f/k/a A.B. DICK COMPANY, *et al.,* and<br>PRESSTEK, INC.,<br><br>               Appellees. | Appeal No. 04-CV-1498 |

---

### REPLY BRIEF OF APPELLANTS MHR CAPITAL PARTNERS LP, MHR INSTITUTIONAL PARTNERS LP, MHRM LP AND MHR FUND MANAGEMENT LLC ("MHR") AND MHR'S ANSWERING BRIEF TO PRESSTEK, INC.'S MOTION TO DISMISS

Dated:  April 25, 2005

Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
LANDIS RATH & COBB
919 Market Street
Suite 600
Wilmington, DE  19899

David S. Rosner
Michael M. Fay
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York  10019
(212) 506-1700
Counsel to Appellants MHR Capital Partners LP,
MHR Institutional Partners LP, MHRM LP and
MHR Fund Management LLC

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 3

I.   The Record Below Cannot Support A Finding That Presstek Was
     A Good Faith Purchaser Under Section 363(m) ......................................... 3

     A.   The Section 363(b) Sale Process – As Mischaracterized
          By Presstek and Debtors – Cannot Establish Good Faith ...................... 3

     B.   Presstek And Debtors Fail To Refute MHR's Showing That
          Presstek Wrongfully Terminated The SPA ............................................. 5

II.  The Order's Conclusory Language, Coupled With Testimony Of
     Incompetent Witnesses, Do Not Add Up To Factual Findings
     Of Presstek's Good Faith ............................................................................ 7

     A.   The Testimony Of The Hearings' Two Witnesses
          Did Not Create A Record Of Good Faith ............................................... 7

     B.   The "Entire Bankruptcy Record" Does Not Support The
          Order's Conclusory Findings Of Good Faith .......................................... 8

III. MHR's Appeal Is Not Moot, And *Abbotts Dairies* Confirms
     That The Bankruptcy Court Has Broad Authority To Consider
     Remedies On Remand .................................................................................. 9

IV.  Presstek's "Response" Submission Is Not Part Of The Record Here .............. 11

CONCLUSION ..................................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**

*Commissioner v. Duberstein*, 363 U.S. 278 (1960) ........................................................ 8

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416
(S.D.N.Y. 1999) ........................................................................................................ 6

*Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 1997 U.S. App. LEXIS 19795 (2d Cir. Apr. 10,
1997) ........................................................................................................................ 6

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) ........................................... *passim*

*Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci)*, 126 F.3d 380 (2d Cir. 1997)................. 4

*In re Tempo Tech. Corp.,*, 202 B.R. 363 (D. Del. 1996) .......................................... *passim*

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490
(3d Cir. 1998)........................................................................................................... 11

*Official Comm. Of Senior Unsecured Creditors v. First RepublicBank Corp.*,
106 B.R. 938 (N.D. Tex 1989) ................................................................................. 11

*Official Comm. Of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.)*,
328 F.3d 1003 (8th Cir. 2003) ................................................................................. 11

*Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645 (3d Cir. 1997) ................. 11

*Taylor v. Lake (In re Cada Investments, Inc.)*, 664 F.2d 1158 (9th Cir. 1981) .............................. 4

*United States v. Acosta,* 363 F.3d 1141 (11th Cir. 2004) ............................................... 9

**Statutes**

11 U.S.C. § 363(b) ........................................................................................... *passim*

11 U.S.C. §363(m)........................................................................................... *passim*

**Rules**

Fed.R.Civ.P. 52(a) ........................................................................................ 1, 3, 8, 9

**Other**

BLACK'S LAW DICTIONARY (5th ab. ed. 1983) ............................................................... 4

Farnsworth on Contracts (3d ed. 1999)........................................................................... 6

MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund Management LLC (collectively, "MHR"), the largest unsecured creditor of Blake of Chicago Corp., f/k/a A.B. Dick Co. ("ABD") and Paragon Corporate Holdings, Inc. ("Paragon," and collectively with ABD, Multigraphics, LLC and Interactive Media Group, Inc., the "Debtors"), by their undersigned counsel, hereby submit this (a) reply brief in further support of their appeal from the findings of good faith in the November 3, 2004 order of the Bankruptcy Court ("Order") (Bankr. D. I. 460), and (b) answering brief to Presstek, Inc's motion to dismiss this appeal as moot.[1]

## PRELIMINARY STATEMENT

In its opening brief, MHR demonstrated that: (a) the record before the bankruptcy court below affirmatively demonstrated that Presstek was not a "good faith purchaser" of ABD's assets pursuant to 11 U.S.C. § 363(m); and (b) the bankruptcy court's findings of good faith were conclusory and insufficient to meet the requirements of Fed.R.Civ.P. 52(a) and *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986). In response,[2] Debtors and Presstek contend that "good faith" is established by the terms of the Asset Purchase Agreement – which they claim was the best deal Debtors could get for ABD's assets – and that the Order's conclusory statements regarding good faith are somehow sufficient under Rule 52(a) and *Abbotts Dairies*. Debtors and Presstek are wrong on both counts.

First, Debtors and Presstek seek to confine the definition of "bad faith" to something so narrow that a broad spectrum of misconduct would nonetheless be sanctioned under Section 363(m). By equating "good faith" with, and only with, "best deal," Debtors and Presstek would

---

[1]    MHR submitted an opening brief ("MHR Br.") on March 11, 2005 (D. I. 12). The defined terms used herein are the same as those in the MHR Br.

[2]    Debtors and Presstek have filed opposition briefs ("Debtors Br." and "Presstek Br.") dated April 8, 2005 (D. Is. 14, 25). Presstek has also filed a motion to dismiss ("Presstek MTD") MHR's appeal as moot (Docket Nos. 16-18).

compel a bankruptcy court to approve a Section 363(b) sale even where, as here, the purchaser

engaged in conduct that deprived the debtor of significant and valuable assets before that sale. In

short, under Debtors' and Presstek's theory, a Section 363(b) purchaser could rob a store, but

still be a "good faith" purchaser if it then paid the best price obtainable for what was left of that

store.

Of course, the law does not support is self-serving contention. Indeed, the Third Circuit

has made it clear that a Section 363(m) "good faith" finding focuses broadly on the "integrity of

[an actor's] conduct during the sale proceedings." *In re Abbotts Dairies, supra,* 788 F.2d at 147

(citation omitted). Here, the evidence is overwhelming that Presstek's conduct – in wrongfully

terminating the Stock Purchase Agreement, coercing Debtors into the APA and then terminating

the Presstek/ABD joint venture agreement ("JVA") – lacked the required integrity and ultimately

was of great harm to the creditors of this estate. In fact, in arguing for their convenient (albeit

erroneous) definition of "good faith," both Debtors and Presstek fail to mention that the APA –

what they claim is the "best deal" – has left the estate only "marginally solvent."

Further, Debtors' and Presstek's contention that the Order's conclusory "good faith"

language is sufficient here would gut the holding of *Abbotts Dairies* and establish the most

meaningless and superficial of Section 363(m) thresholds: *i.e.,* mere words in an order – even

those added by attorneys – could establish good faith even where, as here, the record is devoid of

any competent testimony or other evidence demonstrating good faith. Although Debtors and

Presstek labor to find evidence of Presstek's good faith in the record, they are compelled to rely

solely on abbreviated testimony by two interested witnesses *who concededly had no personal*

*knowledge regarding the negotiation or termination of the SPA and the genesis of the much*

*cheaper APA.* In the end, it is undeniable that the bankruptcy court failed even to consider the

Stock Purchase Agreement and Presstek's conduct in wrongfully terminating that Agreement –
an omission that, under *Abbotts Dairies,* should be corrected on remand.

Under *Abbotts Dairies,* this appeal is not moot and remedies are available upon remand.
Accordingly, as demonstrated in MHR's opening brief, and in more detail below, the Order
should be:

(a)     reversed in its entirety for Presstek's lack of good faith under 11 U.S.C. § 363(m)
        or, at the very least, to the extent that the Order approved that portion of the APA
        releasing the Debtors' claims against Presstek under the Stock Purchase
        Agreement; or

(b)     reversed and remanded with directions that the bankruptcy court conduct a
        hearing on, and consistent with Rule 52(a) make specific factual findings
        regarding, Presstek's good or bad faith in terminating the SPA.

## ARGUMENT

**I.      The Record Below Cannot Support A Finding That
          Presstek Was A Good Faith Purchaser Under Section 363(m)**

### A.      The Section 363(b) Sale Process – As Mischaracterized
            By Presstek and Debtors – Cannot Establish Good Faith

Debtors and Presstek argue that the solicitation process prior to the Section 363(b) sale of
ABD's assets proves that the APA was the best deal obtainable and establishes that Presstek
supposedly took no action to "control the sale price" and thus acted in good faith. (Debtors Br.
at 15-19, Presstek Br. at 12-14) Of course, unrefuted evidence demonstrates otherwise: that
Presstek did work to control, and in fact successfully controlled, the Section 363(b) sale price by
depriving ABD of two of its most valuable assets – the SPA and JVA – before any solicitation
process began.

As noted, the good faith determination under Section 363(m) involves the "integrity of [an actor's] conduct in the course of the sale proceedings," *In re Abbotts Dairies, supra,* 788 F.2d at 147 (citation omitted), and condemns conduct that is "'tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction,'" *Taylor v. Lake (In re Cada Investments, Inc.),* 664 F.2d 1158, 1162 (9th Cir. 1981) (quotation omitted) or "intended to control the sale price." *Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci),* 126 F.3d 380, 391 (2d Cir. 1997). Although in *Abbotts Dairies,* the Third Circuit referred to "fraud" and "collusion" or unfairness to other bidders in the solicitation and sale process, nothing in that decision limits "bad faith" to the narrow definition proffered by Debtors and Presstek. (*See, e.g.,* Presstek Br. at 12 (arguing that "fraud" or "collusion" in sale process is only ground for bad faith)) In fact, the accepted understanding of "bad faith" is quite broad:

> Bad faith. The opposite of "good faith," generally implying actual or constructive fraud *or* a design to mislead or deceive another, *or a neglect and refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.*

BLACK'S LAW DICTIONARY, 72 (5th abr. ed. 1983) (emphasis added). *See also In re Tempo Tech. Corp.,* 202 B.R. 363, 367 (D. Del. 1996) ("Neither the Bankruptcy Code nor the Bankruptcy Rules define 'good faith.' In construing this phrase, courts have therefore borrowed from traditional equitable principles, holding that the concept of 'good faith' speaks to the integrity of a party's conduct in the course of the bankruptcy sale proceedings") (citation omitted) (cited in Presstek Br. at 12-13, Debtors Br. at 16, 18-19).

Presstek's misconduct with respect to the SPA and JVA was a successful effort to "control the sale price" and clearly falls with the accepted definition of "bad faith." Indeed, Section 363(b) would be ripe for abuse if the only and exclusive determination of fair sale price,

4

and good faith, was the solicitation process itself. Depriving a debtor of assets – and then paying

the "best price" for what is left of that debtor – is not good faith conduct.

### B. Presstek And Debtors Fail To Refute MHR's Showing That Presstek Wrongfully Terminated The SPA

Both Debtors and Presstek[3] briefly discuss the SPA in their opposition briefs, although

they ignore the substantial deposition and documentary evidence submitted by MHR to the

bankruptcy court (and to this Court in the appendix accompanying MHR's opening brief).

Further, neither Debtors nor Presstek disputes the core facts demonstrating Presstek's unlawful

termination of the SPA:

(a)     The SPA was escrowed on June 16, 2004;

(b)     Presstek terminated the SPA on June 22, 2004, allegedly because Key Bank did

        not sign the Consent, the critical term of which was an agreement by Key Bank to

        continue funding ABD; and

(c)     Despite not signing the Consent, Key Bank affirmatively agreed to continue – and

        did continue – funding ABD.

(*See* MHR Br. at 5-7, 10-11)

The Debtors and Presstek then completely ignore the fundamental legal question – *i.e.,*

whether Key Bank's failure to sign the Consent was a material breach of the Stock Purchase and

Escrow Agreements. In fact, neither Presstek nor Debtors makes any attempt to demonstrate that

---

[3]     Unable to deny the material facts raised by MHR, Presstek contends – by mischaracterizing documents attached to its "Response" (which are not even part of the record, *see* MHR Br. at 15) – that MHR, as a contracting party in the SPA negotiations, "bicker[ed]" or was responsible for "negotiations dragg[ing]" (Presstek Br. at 4). Such contentions are not only erroneous, they are entirely irrelevant to the interpretation of the final escrowed Stock Purchase Agreement.

Presstek also claims that prior to its June 22, 2004 termination of the SPA, it determined that ABD was in worse financial condition than Presstek had previously assumed. (Presstek Br. at 5) However, Presstek fails to address MHR's showing that this worsening financial condition was no ground for termination: the SPA, as escrowed, contained specific provisions for lowering the SPA purchase price should ABD's financial condition deteriorate. (*See* MHR Br. at 11)

Key Bank's failure to sign the Consent was a material breach, and they fail to respond in any way to the case law cited by MHR establishing that this failure was not a material breach. (*See* MHR Br. at 17-18)

Under controlling New York law, a breach, in order to be material, "must 'go to the root of the agreement between the parties,'" *Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 1997 U.S. App. LEXIS 19795, *14 (2d Cir. Apr. 10, 1997) (citation omitted), and "defeat[] the object of the parties in making the contract" or "'deprive[] the injured party of the benefit that it justifiably expected.'" *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (quoting FARNSWORTH ON CONTRACTS § 8.16 (3d ed. 1999)). Here, Debtors and Presstek do not – because they cannot – argue that Key Bank's June 22, 2004 letter (A373-374) agreeing to fund ABD through the SPA closing to the amount allowed by the terms of the SPA was somehow not the "benefit that [they] justifiably expected." (*See also* MHR Br. at 11-12)

Undeterred, Debtors and Presstek discuss this Court's decision in *In re Tempo Tech. Corp.*, *supra*, and argue that the Section 363 purchasers in *Tempo Tech.* – CIBC Wood Gundy Ventures and Clairvest Group, Inc. (collectively, "CIBC") -- engaged in pre-sale conduct similar to that of Presstek and were nonetheless declared good faith purchasers. (Debtors Br. at 17-19, Presstek Br. at 12-13) Debtors and Presstek misread this case.

In *Tempo Tech.*, CIBC had, several months prior to the debtor's solicitation process and subsequent asset sale to CIBC, "explored the avenue of merely investing in the Debtor" but then decided to "abandon[] that proposal." 202 B.R. at 369. There is absolutely no suggestion in *Tempo Tech.* that CIBC's conduct in "abandon[ing]" its investment proposal was unlawful or in bad faith, or that CIBC had been in any way obligated to invest in the debtor. In fact, in *Tempo Tech.*, this Court described CIBC's earlier investment proposal as "offers for investment" and

stated that these offers were withdrawn "because the Debtor failed to meet certain operational objectives that CIBC had imposed as prerequisites." *Id.* at 368.

Here, the record evidence establishes that Presstek – unlike CIBC in *Tempo Tech.* – was, prior to ABD's solicitation process and Section 363(b) asset sale, *obligated* to purchase the assets of ABD under the terms of the Stock Purchase and Escrow Agreements. The record also establishes that in an act of clear bad faith, Presstek then used a false pretext – *i.e.,* Key Bank's supposed refusal to fund ABD – to abandon that contractual obligation. The bankruptcy court below failed even to consider this evidence.

## II. The Order's Conclusory Language, Coupled With Testimony Of Incompetent Witnesses, Do Not Add Up To Factual Findings Of Presstek's Good Faith

Debtors and Presstek also fail to refute MHR's showing that the bankruptcy court gave no consideration to Presstek's wrongful termination of the SPA, and made only conclusory findings of good faith in an Order that was drafted by Debtors' and Presstek's counsel. Instead, Debtors and Presstek twist the testimony of the Hearing's two witnesses in an effort to manufacturer "good faith" evidence and/or argue that specific factual findings were not necessary here. (Debtors Br. at 19-21, Presstek Br. at 16-17) Once again, they are wrong.

### A. The Testimony Of The Hearings' Two Witnesses Did Not Create A Record Of Good Faith

First, Debtors and Presstek argue that the two witnesses who testified at the Hearing – Steven Gray and Glenn Pollack – provided testimony that negotiations over the APA were "spirited" and that the solicitation process for ABD's assets was "open" and "honest." (Debtors Br. at 5-9, 17; Presstek Br. at 9, 17) However, as MHR has previously demonstrated (MHR Br. at 14-15), such testimony is of no relevance here, because neither Gray nor Pollack had any first hand knowledge of the SPA, Presstek's termination of the SPA or the genesis of the APA.

(MHR Br. at 14-15) Indeed, Pollack – the witness who said the APA negotiations were "spirited" – did not become involved in those negotiations until approximately a week after Presstek wrongfully terminated the SPA and coerced ABD into the APA. (*Id.* at 15)

Further, Gray's testimony of an "open" and "honest" solicitation process ignores – and in no way contradicts the bad faith of – Presstek's pre-sale termination of the SPA and JVA. As noted above, offering to sell unlawfully deflated or wasted assets to the market – and then declaring the inevitably deflated price the best obtainable – cannot possibly be "good faith" conduct under the provisions of Section 363(m).

### B.    The "Entire Bankruptcy Record" Does Not Support The Order's Conclusory Findings Of Good Faith

Debtors and Presstek also erroneously contend that the bankruptcy court's conclusory findings[4] are sufficient because either the "entire bankruptcy record" supports the bankruptcy court (Debtors Br. at 20), or Rule 52(a) does not actually require what it says it requires (Presstek Mem. at 16-17).

First, as demonstrated in MHR's opening brief, the "entire bankruptcy record" – which includes the facts surrounding the SPA and Presstek's wrongful termination of the SPA and JVA – clearly does not support a finding of good faith here. (MHR Br. at 4-18)

Second, Rule 52(a) affirmatively states that "the court shall find the facts specially and state separately its conclusions of law thereon . . .;" the United States Supreme Court has affirmatively stated that "conclusory, general findings do not constitute compliance with Rule 52's direction," *Commissioner v. Duberstein*, 363 U.S. 278, 292 (1960); and the Third Circuit has affirmatively stated that, *in this very context*, the bankruptcy court must make an express

---

[4]    Although Debtors rely on *In re Tempo Tech. Corp.* for the contention that the bankruptcy court's conclusory "good faith" findings were sufficient, the bankruptcy court in *Tempo Tech.* clearly made actual and specific findings of fact – including findings regarding CIBC's earlier investment proposals – upon which this Court relied. *See In re Tempo Tech. Corp.*, 202 B.R. at 369-370.

finding with respect to the good faith of a Section 363(b) purchaser. *In re Abbotts Dairies,* 788 F.2d at 149-150. Accordingly, the Order – which contains only conclusory and general "good faith" findings – violates the directives of Rule 52(a).

In arguing otherwise, Presstek cites *United States v. Acosta,* 363 F.3d 1141, 1151 (11th Cir. 2004) (Presstek Mem. at 16), for the proposition that under Rule 52(a), "[f]indings are sufficient if they indicate the factual basis for the court's general conclusion as to ultimate facts and are broad enough to cover all material issues." The Order, however, fails this test: it does not provide any findings "sufficient" to "indicate the factual basis for the court's general conclusions" as to the material fact of Presstek's good faith. For example, when the Order states that Presstek was a "good faith purchaser" (A572, ¶ J) or "[t]he Asset Purchase Agreement was negotiated, proposed, and entered into by the Parent [Paragon] and the Sale Debtors [including ABD], on one hand, and Presstek and Silver, on the other hand, without collusion, in good faith, and from arm's-length bargaining positions" (A572, ¶ I), it raises an obvious and completely unanswered question: "why"? What facts led the bankruptcy court to reach these conclusions? What record evidence did the Court consider? The Order provides no answers, because there are no answers, and thereby fails to meet the requirements of *Acosta, Abbotts Dairies* and Rule 52(a).

### III.  MHR's Appeal Is Not Moot, And *Abbotts Dairies* Confirms That The Bankruptcy Court Has Broad Authority To Consider Remedies On Remand

Debtors and, through its motion to dismiss, Presstek also contend that MHR's appeal is moot and, even if not, no remedies will be available to the bankruptcy court on remand. (Debtors Br. at 10-15, Presstek MTD at 1-5) Of course, the Third Circuit's decision in *Abbotts Dairies* holds otherwise.

9

*Abbotts Dairies* confirms that an appeal challenging the good faith of a Section 363(b) purchaser is not moot even without a stay (788 F.2d at 147-150) – a holding that is not contradicted by any of the "mootness" authority cited by Debtors or Presstek. As this Court stated in *In re Tempo Tech. Corp.*:

> In cases where the purchaser's good faith was contested on appeal, courts have held that "as indicated in § 363(m), a stay is not required to challenge a sale on the grounds that an entity did not purchase in good faith . . ."
>
>       *          *          *          *
>
> Similarly, in Abbotts Dairies, the Third Circuit Court of Appeals was confronted with a bankruptcy appeal in which the parties appealed a section 363(b)(1) order approving the sale of the debtor's assets. The appellants, as did their counterparts in the instant case, failed to obtain a stay pending appeal as outlined in section 363(m). Notwithstanding this failure to obtain a stay, the Abbotts Dairies appellants also asserted that a stay was not necessary because there was purportedly nothing in the record to support a finding that the purchaser acted in good faith. The court agreed . . . . Thus, where the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as moot under section 363(m).

202 B.R. at 366-367 (citations omitted).

*Abbotts Dairies* also confirms that whether a remedy exists on remand, and what that remedy might be, is left to the discretion of the bankruptcy court. Indeed, in *Abbotts Dairies*, the debtor and the Section 363 purchaser made a similar "no remedy" argument, contending that on remand, the bankruptcy court would not be able to unwind the sale at issue. The Third Circuit disagreed:

> . . . ADC and Abbotts assert that even if the present appeals are not moot by virtue of section 363(m), they are moot under Article III, because the relief sought by NFO and Cumberland – that is, the undoing of the sale – can no longer be effectively granted by this court.
>
>       *          *          *          *
>
> The short answer to this claim is that neither ADC nor Abbotts has "borne [the] burden of showing that the outcome of this appeal could not affect the legal

interests of the parties." They did not introduce any evidence in either the district or bankruptcy court to substantiate the claim that the property purchased from Abbotts has been irreversibly commingled with that of ADC. We believe, therefore, that this question is more properly decided on remand.

With respect to NFO, however, we are generally confident that the present appeal is *not* moot. Unlike Cumberland, NFO can be made whole *without* undoing the sale. We need not belabor the fact that a bankruptcy court is, after all, a court of equity, which "in the exercise of its equitable jurisdiction . . . has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate[.]" As a result, a bankruptcy court has broad remedial powers with which to fashion relief for parties such as NFO. For example, in the present case a profitable analogy might be made to section 363(n) of the Code, which provides, *inter alia*, that the trustee may recover from a party engaged in collusive bidding any excess of value over the purchase price plus attorneys' fees and costs, and, where appropriate, punitive damages. Similarly, the court might consider whether Abbotts, as a debtor-in-possession, violated its fiduciary duties to its creditors, thus subjecting it or its principals to liability.

*In re Abbotts Dairies, supra,* 788 F.2d at 150-151 (footnote, citations and quotations omitted).

Here, Debtors and Presstek also have failed to produce any evidence that ABD's assets have been "irreversibly commingled" with Presstek. Further, as *Abbotts Dairies* suggests, other remedies may be available to MHR including a process through which the bankruptcy court "consider[s]" whether Presstek "violated its [contractual] duties" and is therefore subject to "principals of liability." [5] In any event, whether any remedy is available to MHR – and what that remedy might be – is an issue for the bankruptcy court on remand.

---

[5]     Debtors and Presstek cite *Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645 (3d Cir. 1997); *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490 (3d Cir. 1998); *Official Comm. Of Unsecured Creditor v. Trism, Inc. (In re Trism, Inc.),* 328 F.3d 1003 (8th Cir. 2003); and *Official Comm. Of Senior Unsecured Creditors v. First RepublicBank Corp.,* 106 B.R. 938 (N.D. Tex 1989), for the supposed proposition that any adjudication of Presstek's liability for terminating the SPA – *i.e.,* the difference in value between the SPA and APA – impermissibly attacks the validity of the release in the Order. (*See, e.g.,* Debtors Br. at 14) However, these cases are inapposite here because *none of them involved proper challenges to the good faith of the Section 363 purchaser.* In *Abbotts Dairies,* the Third Circuit confirmed that when, as here, "good faith" is not shown, the validity of the sale order can be challenged on appeal, without a stay. 788 F.2d at 149-150.

**IV.    Presstek's "Response" Submission Is Not Part Of The Record Here**

Presstek argues that that its November 1, 2004 "Response" to MHR's objections (D. I. 453) should be considered part of the record on this appeal even through Presstek never asked the Bankruptcy Court to rule on its motion for leave to file that Response and, accordingly, the motion was never granted. Presstek's reasoning? That MHR mentioned Presstek's filing in oral argument! (Presstek Br. at 17-18)

This argument is ridiculous. Under Presstek's reasoning, all motions – and all proffered evidence, however objectionable -- would be deemed granted or admitted if opposing counsel simply mentioned such motion or evidence in addressing the Court. Presstek chose not to proceed with its motion for leave, and it must now live with the ramifications of that decision.

**(THIS PORTION OF THE PAGE INTENTIONALLY LEFT BLANK)**

## CONCLUSION

For the foregoing reasons, and the those set forth in MHR's opening brief, the Order granting Debtors' Sale Motion should be: (a) reversed in its entirety for Presstek's lack of good faith under 11 U.S.C. § 363(m) or, at the very least, to the extent that the Order approved that portion of the APA releasing the Debtors' claims against Presstek under the Stock Purchase Agreement; or (b) reversed and remanded with directions that the bankruptcy court conduct a hearing on, and consistent with Fed.R.Civ.P. 52(a) make specific factual findings regarding, Presstek's good or bad faith in terminating the SPA. Furthermore, Presstek's motion to dismiss should be denied.

Dated:  April 25, 2005

Respectfully submitted,

Richard S. Cobb (No. 3157)
Megan N. Harper (No. 4103)
LANDIS RATH & COBB
919 Market Street
Suite 600
Wilmington, DE  19899

-and-

David S. Rosner
Michael M. Fay
 KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York  10019
(212) 506-1700

Counsel To Appellants MHR Capital Partners LP,
MHR Institutional Partners LP, MHRM LP and
MHR Fund Management LLLC

13

LEXSEE 1997 U.S. APP. LEXIS 19795

**FRANK FELIX ASSOCIATES, LTD., Plaintiff-Appellant, v. AUSTIN DRUGS, INC., Defendant-Appellee.**

**Docket No. 96-7604**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*1997 U.S. App. LEXIS 19795*

**December 12, 1996, Argued**
**April 10, 1997, Decided**

**SUBSEQUENT HISTORY:** [*1] As Corrected.

**PRIOR HISTORY:** Appeal from a judgment entered in the United States District Court for the Eastern District of New York (Thomas C. Platt, Judge), awarding Plaintiff $ 10,250 for breach of a settlement agreement but refusing to allow Plaintiff to reinstate its pre-settlement claims.

Original Opinion Previously Reported at: *1997 U.S. App. LEXIS 6647.*

**DISPOSITION:** Judgment affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** Stephen R. Sugrue, New York, NY (Herriot, Coti & Sugrue, New York, NY, of counsel), for Plaintiff-Appellant.

James H. Allyn, New York, NY (Allyn & Fortuna, New York, NY, of counsel), for Defendant-Appellee.

**JUDGES:** Before: CARDAMONE and PARKER, Circuit Judges, and WEXLER, Judge. *

 * The Honorable Leonard D. Wexler, of the United States District Court for the Eastern District of New York, sitting by designation.

**OPINIONBY:** PARKER

**OPINION:** PARKER, Circuit Judge:

Frank Felix Associates ("Felix") appeals from the judgment of the United States District Court for the Eastern District of New York (Thomas C. Platt, Judge) awarding Felix damages of $ 10,250 for breach of a settlement agreement. Felix contends that upon breach of the settlement agreement by Austin Drugs, Inc. ("Austin"), [*2] Felix was entitled under *New York General Obligations Law § 15-501(3)* (McKinney 1989) to assert its pre-settlement claims. Finding no error, we affirm.

I. BACKGROUND

In the mid-1980s, Felix entered into an oral agreement with Interstate Cigar Company ("ICC"), the predecessor of Austin, to install computer systems on ICC's property. Unfortunately for Felix, ICC went bankrupt. In May of 1991, several investors, some of whom were formerly associated with ICC, bought Austin in the ICC bankruptcy proceedings. Austin was a subsidiary of ICC at the time of the purchase. Subsequent to the purchase of Austin, Austin had Felix install computer systems in Austin stores like those Felix previously installed in stores owned by ICC.

On May 20, 1992, one year after the bankruptcy proceedings, Felix sent Austin a memorandum claiming that Austin owed Felix $ 70,000 in arrearages under the ICC account incurred prior to the bankruptcy sale and $ 75,000 in arrearages incurred by Austin after May of 1991. After Felix learned that Austin planned to replace the computer system, Felix sent another memorandum to Austin on June 22, 1992, claiming an outstanding balance of over $ 462,000. Then the parties [*3] entered into settlement discussions.

Felix and Austin thereafter executed a written settlement agreement, wherein Austin agreed to pay Felix $ 50,000 as the amount owed for Austin's past use of the computer system, and agreed to return a tape drive and a high-speed printer. The settlement agreement provided that Austin had to meet these obligations by October 1, 1992, or Felix would renew its prior claims. Austin made the $ 50,000 payment and returned the printer promptly. However, it did not return the tape drive. When Austin failed to return the tape drive, Felix sent a renewed demand letter on October 22, 1992, claiming an outstanding balance of $ 412,000.

Austin requested that Felix send someone to remove the tape drive on or about the time Austin received Felix's October 22 letter. Austin indicated that it needed Felix's technical assistance to remove the device. However, Felix agreed to remove the tape drive only if Austin promised to pay Felix $ 250. Austin refused to pay Felix, but made clear that Felix could come by and pick up the device. Felix never attempted to retrieve it. Months later, after Consumer Value Stores ("CVS") bought out Austin, CVS scrapped the tape drive [*4] when it installed a new computer system in the former Austin stores.

Felix then brought this suit, asserting all of its pre-settlement demands. Claiming that the settlement agreement was no longer binding due to Austin's breach, Felix sought in excess of $ 800,000. After a bench trial, the district court concluded that Austin breached the settlement agreement but that the breach was not material. The court awarded Felix $ 10,000 in damages for Austin's use of the computer system one month beyond the date when it was supposed to return the tape drive under the settlement agreement, concluding that the tape drive allowed Austin to use the rest of the proprietary software provided in the pre-settlement leasing agreement between Felix and Austin. The court also awarded $ 250 in damages for the cost Felix would have incurred in retrieving the device. The court did not award any damages for Austin's use of the tape drive beyond the date when Austin asked Felix to remove the system. The court also did not award damages for the destruction of the tape drive, reasoning that the tape drive would not have been destroyed had Felix removed it from Austin's property when given the opportunity. [*5]

## II. DISCUSSION

We agree with the district court that Austin plainly breached the settlement agreement by not returning the tape drive on or before October 1. We also agree that, in light of Austin's payment to Felix of $ 50,000 under the settlement agreement, Austin's return of the high-speed printer, and Austin's request that Felix remove the tape

drive at the end of October, Austin's failure to return the tape drive on October 1 was not a material breach. Assuming, as appears appropriate, that the settlement agreement was an executory accord, we hold that New York law requires that an executory accord be materially breached before a party may sue based on its pre-settlement claims. Accordingly, Felix was not entitled to assert its pre-settlement claims.

## A. Whether a Material Breach of the Accord Is Required

Assuming, as Felix argues, that the settlement agreement was an executory accord, under New York law an aggrieved party may elect to sue on the original obligation that is the subject of the accord in cases where the accord has not been performed. See *Ellenbogen & Goldstein, P.C. v. Brandes*, 226 A.D.2d 237, 641 N.Y.S.2d 28, 29 (1st Dep't 1996) (citing *Denburg v. Parker Chapin* [*6] *Flattau & Klimpl*, 82 N.Y.2d 375, 383, 604 N.Y.S.2d 900, 905, 624 N.E.2d 995, 1000 (1993)); *Plant City Steel Corp. v. National Machinery Exch., Inc.*, 23 N.Y.2d 472, 478, 297 N.Y.S.2d 559, 562, 245 N.E.2d 213, 215 (1969). n1 Under *New York General Obligations Law § 15-501(3)*, "if an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the claim, cause of action, contract, [or] obligation . . . which is the subject of the accord, or to assert his right under the accord."

> N1 We assume that the agreement was an executory accord as opposed to a substitute agreement. Whereas an executory accord extinguishes a claimant's prior claims upon performance of the accord, a substitute agreement extinguishes a claimant's prior claims upon execution of the agreement. See *Denburg, 82 N.Y.2d at 383, 604 N.Y.S.2d at 906, 624 N.E.2d at 1000.* Whether an agreement is an executory accord or substitute agreement is, of course, a question of the parties' intent. *Denburg, 82 N.Y.2d at 384, 604 N.Y.S.2d at 906, 624 N.E.2d at 1001.*

[*7]

New York law requires, as appellant stresses, that an executory accord be performed "according to its terms" if the obligee wishes to avoid the creditor's original claims. Id.; see also *Albee Truck Inc. v. Halpin Fire Equip. Inc.*, 206 A.D.2d 789, 791, 615 N.Y.S.2d 118, 120 (3d Dep't 1994) (citing *Denburg, 82 N.Y.2d at 383, 604 N.Y.S.2d at 905, 624 N.E.2d at 1000); American Bank & Trust Co. v. Koplik*, 87 A.D.2d 351, 354, 451 N.Y.S.2d 426, 428 (1st Dep't 1982); *Loblaw v. Wylie*, 50 A.D.2d 4, 8, 375

*N.Y.S.2d 706, 709-10* (4th Dep't 1975). However, the New York Court of Appeals has not addressed whether a non-material failure to perform an executory accord fully will allow a plaintiff to reinstate his prior claims, as neither *Denburg* nor *Plant City Steel* were confronted with the issue. While New York cases suggest that nothing less than full performance of an executory accord will bar suit on a creditor's original claims, each has involved substantial and material nonperformance by the obligee under the accord. See, e.g., *Albee Truck Inc., 206 A.D.2d at 789, 615 N.Y.S.2d at 119* ("the agreement was not implemented"); *Koplik, 87 A.D.2d at 352-53, 451* [*8] *N.Y.S.2d at 427* (defendant agreed to pay $ 50,000 but only paid $ 7,000); *Loblaw, 50 A.D.2d at 6-8, 375 N.Y.S.2d at 708-09* (defendant did not attempt to satisfy $ 125,000 accord and allegedly transferred assets to defeat creditors).

Because no New York court has specifically addressed whether the breach of an executory accord must be material before a party to the accord can elect to sue on its original claims, it falls to this Court to predict how the New York Court of Appeals would interpret New York law on this point. See *In re Joint Eastern & Southern Dist. New York Asbestos Lit., 897 F.2d 626, 636 (2d Cir. 1990); Calvin Klein Ltd. v. Trylon Trucking Corp., 892 F.2d 191, 195 (2d Cir. 1989)*. In this endeavor, we must consider "all the resources the highest court could use, including decisions reached in other jurisdictions." *Francis v. INA Life Ins. Co., 809 F.2d 183, 185 (2d Cir. 1987)* (citations omitted).

Although *New York General Obligations Law § 15-501(3)* provides that an executory accord must be "performed according to its terms," not every breach, however insubstantial, will allow a plaintiff to disregard an executory accord and sue on its original claims. [*9] Such an interpretation could lead to absurd and inequitable results where, despite a debtor's substantial performance in reliance on an executory accord, the most trivial breach could revive a creditor's original claims. The creditor could obtain payment of a contested debt and, due to a minor breach of the accord, receive the windfall entitlement to reassert its pre-settlement claims. We do not believe New York courts would adopt such a view, especially in light of the difference in the treatment of executory accords under New York's General Obligations law and the treatment of executory accords under prior New York common law. Under modern New York law, executory accords, if in writing, are enforceable contracts. Therefore, based on ordinary contract principles, a non-material breach does not justify non-performance by the other party.

Under New York common law, an executory accord was not an enforceable contract. Only full performance constituted satisfaction of the accord and extinguished the pre-existing debt. *Denburg, 82 N.Y.2d at 384, 604 N.Y.S.2d at 906, 624 N.E.2d at 1001*. In 1937, the New York legislature made executory accords binding contracts, provided that the promise [*10] is in writing and signed by the parties to be bound. Id.; General Obligations Law § 15-501(2). Accordingly, it seems appropriate to apply general contract principles to enforceable executory accords under modern New York law, keeping in mind the special purpose of the executory accord, which grants a limited window of opportunity within which an obligee can render performance to a creditor to escape a creditor's prior claims. This appears consistent with the ruling of the New York Court of Appeals, which determined that before a prior obligation may be sued upon, the accord must be "breached or repudiated." See *Plant City Steel, 23 N.Y.2d at 478, 297 N.Y.S.2d at 562, 245 N.E.2d at 215*.

In our interpretation of New York law, we are aided by decisions in other jurisdictions. State high courts and federal appellate courts interpreting state laws have uniformly determined that before a party to an executory accord can elect to sue on its original claims, the executory accord must be materially breached. See, e.g., *Zenith Drilling Corp. v. Internorth, Inc., 869 F.2d 560, 563 (10th Cir. 1989)* (interpreting Oklahoma law, noting that defendant breached executory accord and [*11] that "the only question is whether that breach was material"); *Coffeyville State Bank v. Lembeck, 227 Kan. 857, 610 P.2d 616, 618-19 (Kan. 1980)* (debtor's material breach of executory accord revives discharged agreement); *Warner v. Rossignol, 513 F.2d 678, 683 (1st Cir. 1975)* (interpreting Maine law, the court characterized a settlement agreement as an "accord executory" and held that "if defendant did not repudiate or commit a material breach of the settlement agreement, . . .

defendant is entitled to specific performance of the compromise"). This Court cited *Warner* with approval in holding that a settlement agreement was enforceable absent special circumstances, including a material breach of the agreement. See *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975, 687 F.2d 626, 629 (2d Cir. 1982); see also Clark v. Elza, 286 Md. 208, 406 A.2d 922, 927 (Md. 1979)*. "An executory accord is simply a type of bilateral contract. As long as the basic requirements to form a contract are present, there is no reason to treat a settlement agreement differently than other contracts which are binding." Id. at 928. Lower state and federal courts have reached the same conclusion. [*12] n2 Based on this authority, at least one federal district court within this Circuit has held that New York law would require an executory accord to be materially breached before pre-settlement claims may be reinstated. See *Conan Properties, Inc. v. Mattel, Inc.,* No.

84- *Civ.-5799 (JSM), 1990 WL 209366, *3-4* (S.D.N.Y. Dec. 4, 1990).

> n2 See, e.g., *Kapco Mfg. Co. v. C & O Enterp., Inc., 605 F. Supp. 253, 256 (N.D. Ill. 1985)* (applying Illinois law, holding that a "material breach" is necessary to reinstate plaintiff's claims under the First Circuit's reasoning in Warner); *Caldwell v. Armstrong, 642 P.2d 47, 49 (Colo. App. 1981)* (holding that "once it is established that there is a valid accord and satisfaction, it is governed by the same rules as applied to other contracts," including the doctrine of substantial performance); *Browning v. Holloway, 620 S.W.2d 611, 617 n.6 (Tex. Ct. App. 1981)* ("the inquiry should be whether there was a breach, and, if so, whether the breach was material so as to give plaintiffs the election to rescind"); *Tuskegee Alumni Housing Fed., Inc. v. National Homes Constr. Corp., 450 F. Supp. 714, 720 (S.D. Ohio 1978)* ("This Court has decided that the better reasoning is that substantial performance of an [executory] accord is sufficient to satisfy it.") (Ohio law), aff'd mem., *624 F.2d 1101 (6th Cir. 1980).*

[*13]

Our conclusion is also consistent with the view taken in the Restatement (Second) of Contracts, which states that "whether a breach by the obligor discharges the obligee's duty under the accord is governed by the rules [relating to performance and non-performance of contracts]." *Restatement (Second) of Contracts § 281* cmt. b (1981). These rules include the requirement that for an obligor's duties to be discharged on account of failed performance, the obligee's failure to perform must be material. Id. § 241; see also 6 A. Corbin, Corbin on Contracts § 1275, pp. 111-13 (1962) (To "make[] the creditor's prior claim again enforceable. . . . the debtor's breach must be a material breach, going to the essence, and discharging the creditor from his contractual duty."); E. Allan Farnsworth, Contracts § § 4.24 n.9, 8.18 (1990) (applying rules relating to the material breach of contracts to accords).

We believe, based on this authority, that New York courts would require that any breach of an executory accord be material before a party may sue upon the original obligation. We therefore turn to the question of whether Austin materially breached the executory accord.

B.   [*14]   Whether Austin Materially Breached the Executory Accord

Whether Austin materially breached the executory accord is a question of law. Therefore, while we defer to the district court's findings regarding the relevant facts, we review its conclusion that Austin did not commit a material breach de novo. See *Petereit v. S.B. Thomas, 63 F.3d 1169, 1176 (2d Cir. 1995).*

Under New York law, for a breach of a contract to be material, it must "go to the root of the agreement between the parties." See *Septembertide Pub., B.V. v. Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989)* (citing *Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980)).* A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract. See *Babylon Assocs. v. County of Suffolk, 101 A.D.2d 207, 215, 475 N.Y.S.2d 869, 874 (2d Dep't 1984)* (citing *Callanan v. Powers, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)).*

In determining if Austin's breach defeated the object of the executory accord, we must consider the special purpose of the contract. As we previously noted, an [*15] executory accord grants an obligor a limited window of opportunity within which to satisfy a creditor's demands before the creditor may again assert its original claims. Accordingly, close adherence to the terms of the accord is important, especially to the time-frame within which substitute performance must be rendered to the creditor. See *Restatement (Second) of Contracts § 241(a)* (materiality depends, in part, on "the extent to which the injured party will be deprived of the benefit which he reasonably expected"); id. § 242(c) (in determining whether material breach relieves non-breaching party's obligation to perform, "the extent to which the agreement provides for performance without delay" should be considered).

Austin clearly did not meet its obligation to comply with the executory accord's deadline for full performance. Not until twenty days after it was supposed to have returned Felix's tape drive did Austin invite Felix to remove the device. In fact, Austin never returned it and the device was eventually scrapped. We do not believe these facts establish that Austin's breach was material, however. Austin's breach must be viewed in light of its substantial compliance [*16] with its other obligations under the accord. See id. § 241 (materiality depends on all of the facts and circumstances, including, inter alia, the extent to which the injured party will be deprived of the benefits reasonably expected, the extent to which the injured party can be adequately compensated for its loss, and the good faith of the breaching party). Austin substantially complied with the terms of the executory accord by promptly paying Felix the agreed-upon $ 50,000 and returning Felix's high-speed printer.

Moreover, any harm to Felix caused by Austin failing to return the tape drive promptly could be fully compensated in monetary damages without undermining the basis of the executory accord, given Austin's substantial performance of its other obligations under the accord. Accordingly, the mere fact that the district court found damages for Austin's delay in the amount of $ 10,000 does not render the breach material. See id. § 241(b) and cmt. c (materiality of breach depends in part on the extent to which the injured party can be compensated for its loss).

The fact that Austin never returned the tape-drive and that it was eventually scrapped when CVS took over Austin's [*17] stores does not warrant a different conclusion. On October 20 Austin invited Felix to remove it. This was a reasonable invitation, given the fact that removal required the technical expertise that Felix had. Felix never did so, essentially abandoning the tape drive. Given these circumstances, we believe the district court justifiably attributed little weight to Felix's claim that the tape drive was very valuable. We also believe the district court correctly concluded, based on its view of the evidence, that Felix easily could have retrieved the device if it had wanted to. Accordingly, we conclude that the twenty-day delay between the time Austin was supposed to return the tape drive and the time it invited Felix to remove the device from Austin's stores was not a material breach of the executory accord. Felix was not entitled to sue on its original claims.

III. CONCLUSION

We affirm the judgment of the district court.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLAKE OF CHICAGO CORP., *et al.*<br>f/k/a A.B. DICK COMPANY, *et al.,*<br><br>Debtors.<br><br>---<br><br>MHR CAPITAL PARTNERS LP, MHR<br>INSTITUTIONAL PARTNERS LP, MHRM<br>LP, and MHR FUND MANAGEMENT LLC,<br><br>Appellants,<br><br>v.<br><br>BLAKE OF CHICAGO, CORP., *et al.,*<br>f/k/a A.B. DICK COMPANY, *et al.,* and<br>PRESSTEK, INC.,<br><br>Appellees. | Chapter 11<br><br>Case No. 04-12002 (JLP)<br><br>Jointly Administered<br><br><br><br><br>Appeal No. 04-CV-1498 |

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2005, I electronically filed the Reply Brief of Appellants MHR Capital Partners LP, MHR Institutional Partners LP, MHRM LP and MHR Fund Management LLC ("MHR") and MHR's Answering Brief to Presstek, Inc.'s Motion to Dismiss with the Clerk of Court using CM/ECF and have caused a copy to be served upon the parties on the attached list in the manner indicated.

Megan N. Harper (ID No. 4103)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, DE  19801
302-467-4400
harper@lrclaw.com

Jeffrey Schlerf, Esq.
Christopher A. Ward, Esq.
GianClaudio Finizio, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
*By Electronic Notification*

Jeffrey Schwartz, Esq.
Benesch, Friedlander, Coplan &
Aronoff LLP
2300 BP Tower, 200 Public Square
Cleveland, OH 44114-2378
*By First Class Mail*

Frederick B. Rosner, Esq.
Jaspan Schlesinger Homman
1201 North Orange Street, Suite 1001
Wilmington, DE 19801
*By Electronic Notification*

Lawrence Slattery, Esq.
Garry Ravert, Esq.
McDermott Will & Emery
50 Rockefeller Plaza
New York, NY 10020
*By First Class Mail*

Francis A. Monaco, Jr., Esq.
Walsh Monzack and Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE 19801
*By Electronic Notification*

Robert C. Folland, Esq.
Alan R. Lepene, Esq.
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
*By First Class Mail*

David M. Klauder, Esq.
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
*By Electronic Notification*

Richard Mason, Esq.
Michael M. Schmahl, Esq.
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
*By First Class Mail*

Jami B. Nimeroff, Esq.
Buchanan Ingersoll Professional
Corporation
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
***By Electronic Notification***