# EXHIBIT B

1

1         IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

      IN RE:                        : Chapter 11
4                                   :
      BLAKE OF CHICAGO, CORP., et al.,  : Case No 04-12002-JLP
5     f/k/a A.B. DICK COMPANY, et al.,   :
                                    :
6              Debtors.            : Jointly Administered
      --------------------------------
7     MHR CAPITAL PARTNERS LP, MHR   :
      INSTITUTIONAL PARTNERS LP, MHRM  :
8     LP, and MHR FUND MANAGEMENT LLC,  :
                                    :
9          Appellant,              : CIVIL ACTION
                                    :
10            v                     :
                                    :
11    BLAKE OF CHICAGO, CORP., et al.,  :
      f/k/a A.B. DICK COMPANY, et al.,   :
12    and PRESSTEK, INC.,           :
                                    :
13          Defendants.            : NO. 04-1498 (KAJ)

14

15                        - - -

16              Wilmington, Delaware
            Wednesday, May 25, 2005 at 9:00 a.m.
17                   ORAL ARGUMENT

18                        - - -

      BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
19
                          - - -
20    APPEARANCES:

21

            JASPAN SCHLESINGER HOFFMAN
22          BY:  FREDERICK B. ROSNER, ESQ.

23                 and

24

25
                              Brian P. Gaffigan
                              Registered Merit Reporter

```
 1
     APPEARANCES  (Continued)
 2

 3              BENESCH FRIEDLANDER COPLAN & ARONOFF, LLP
                BY:  H. JEFFERY SCHWARTZ, ESQ., and
 4                   MARK PHILLIPS, ESQ.
                     (Cleveland, Ohio)
 5
                          Counsel for Blake of Chicago Corp., et
 6                        al. f/k/a A.B. Dick Company, et al.

 7
                MONZACK and MONACO, P.A.
 8              BY:  FRANCIS A. MONACO, JR., ESQ.

 9                   and

10              McDERMOTT WILL & EMERY
                BY:  LAWRENCE SLATTERY, ESQ.
11                   (New York, New York)

12                        Counsel for Presstek, Inc.

13
                LANDIS RATH & COBB LLP
14              BY:  MEGAN N. HARPER, ESQ.

15                   and

16              KASOWITZ BENSON TORRES & FRIEDMAN, LLP
                BY:  MICHAEL M. FAY, ESQ.
17                   (New York, New York)

18                        Counsel to Third Party Plaintiffs MHR
                          Capital Partners, LP, MHR
19                        Institutional Partners, LP, MHRM LP
                          and MHRM Fund Management LLC
20

21
                BUCHANAN INGERSOLL, PC
22              BY:  JAMI B. NIMEROFF, ESQ.

23                        Counsel for Key Bank

24

25
```

1                              - oOo -

2                        P R O C E E D I N G S

3              (Oral argument began at 9:00 a.m.)

4              THE COURT:  Good morning.  Please be seated.

5     Why don't we start with introductions?

6              MR. MONACO:  Good morning, Your Honor.  My name

7     is Frank Monaco.  I represent one of the appellees, Presstek

8     and related entities.

9              Your Honor, I'd like to take a minute to

10    introduce and move the admission pro hac vice of my

11    co-counsel Larry Slattery.  He is a member of good standing

12    of the bar of New York.  He is a member of the firm

13    McDermott Will & Emery.  He'll be making the presentation

14    to the Court today.

15             THE COURT:  All right.  Mr. Slattery.

16             Who do I have from the -- actually, why don't I

17    find out who else is in the courtroom.

18             MR. ROSNER:  Good morning, Your Honor.  My name

19    is Fred Rosner with Jaspan Schlesinger Hoffman here in

20    Wilmington, Delaware.  I'm appearing here today on behalf of

21    the debtors.  I'd like to move the admission pro hac vice of

22    my co-counsel, Mr. Mark Phillips and Mr. Jeffrey Schwartz of

23    the firm Bennett Friedlander Coplan & Aronoff from Ohio.

24    They're both members of good standing of the courts of Ohio.

25             I believe Mr. Phillips will be making the

1    presentation today.  We have an order already entered into

2    the court admitting him pro hac vice.

3              THE COURT:  All right.  Thank you.

4              Welcome, gentlemen.

5              Go ahead, ma'am.

6              MS. HARPER:  Good morning, Your Honor.  Megan

7    Harper of Landis Rath & Cobb.  With me here today is Michael

8    Fay of Kasowitz Benson Torres & Friedman.  Mr. Fay's motion

9    for pro hac vice has been approved and he will be presenting

10   on behalf of the appellants.

11             THE COURT:  All right.  Thank you.

12             MR. NIMEROFF:  Good morning, Your Honor.  My

13   name is Jami Nimeroff.  I'm with the law firm of Buchanan

14   Ingersoll appearing on behalf of Key Bank, one of the

15   appellees in this matter.

16             THE COURT:  All right.  Well, I have two

17   competing motions here.  And I'm going to hear you on both

18   of them, and I guess I'll hear about the motion to dismiss

19   as moot first.  What I would like to do is, Mr. Fay, are you

20   going to be handling the argument?

21             MR. FAY:  Yes, I will.

22             THE COURT:  Why don't I ask to you come to the

23   podium first.  I have some questions I want to ask you

24   specifically; all right?

25             MR. FAY:  All right.  Thank you, Your Honor.

1          THE COURT:  Of course, you know what your

2    opponents have said.  I want you to answer specifically the

3    assertions that they make that because MHR failed to seek a

4    stay and because the Bankruptcy Court expressly held that

5    Presstek was a good faith purchaser that you're out of luck.

6    You are done.

7          And I'm assuming that as a factual matter,

8    everyone agrees MHR didn't seek a stay; right?

9          MR. FAY:  Yes, Your Honor.  There is no dispute

10   as to that.

11         THE COURT:  Can you tell me why?

12         MR. FAY:  Well, it's the whole In Re:  Abbotts

13   Dairies, Your Honor, which is that the mootness of the

14   appeal under 363(m) requires a real finding of good faith.

15         THE COURT:  Okay.  I'm sorry.  I didn't ask my

16   question right, I guess.  Can you tell me why MHR didn't

17   seek a stay?  Do you know as a factual matter why they

18   thought, "oh, you know what?  Let's not do it?"

19         MR. FAY:  Because the singular issue we saw here

20   as controlling this appeal and as being the defect in the

21   findings and the sale order was the issue of good faith

22   because the problem was there was significant evidence

23   that Presstek had taken actions to control the sale price,

24   actions that led up to an auction that was not selling the

25   same debtor that existed in June of 2004.  That's an issue

1    that goes directly to the findings in In Re:   Abbotts

2    Dairies about the integrity of the purchaser, the integrity

3    of the actor in the sales process.   Those are issues that do

4    not require that the sale not go forward.

5              What the Third Circuit said is that the District

6    Court, on appeal, will now look at the issue of good faith

7    and if it determines that there is at least some dispute or

8    there wasn't sufficient findings as to good faith or if it

9    determines there really wasn't good faith that the case gets

10   remanded to the Bankruptcy Court for remedies.   It's there

11   we address the issue of whether at this point what remedies

12   are available.

13             THE COURT:   Let me ask you this then.   Do I

14   understand you to be saying that MHR made a purposeful

15   decision not to seek a stay and let a sale go through to let

16   all the reliance that develops around a completed sale to

17   occur because it said we're going to make this good faith

18   argument on appeal and because there is a Third Circuit case

19   that gives us an out there, we won't seek a stay?   Did I

20   understand that right?

21             MR. FAY:   Right.   It's not even just the Third

22   Circuit case.   The actual statute itself says that the

23   protections of 363(m) only apply to good faith purchases.

24             THE COURT:   Could MHR have sought a stay on the

25   basis of lack of good faith pending appeal and said, hey,

1    let's get a stay.  We really think this is a serious issue.

2    We want the District Court to look at this and we don't want

3    any reliance arguments to be thrown at the District Court.

4    Let's get a stay.  Would that have been within the bounds of

5    the law?

6         MR. FAY:  I'm sure it would have been, Your

7    Honor.  But when you think about the relief we're seeking

8    here, it doesn't really demand a stay as it would in other

9    situations.  The real problem here is that there is real

10   evidence of unlawful conduct by Presstek that resulted

11   in less than full value going to the estate and the real

12   issue is that one of the provisions of the asset purchase

13   agreement, which has nothing to do with the validity of the

14   sale, the release of Presstek on those claims is presently

15   being enforced.

16        THE COURT:  Well, with all due respect, Mr. Fay,

17   that is a real issue but it's not the real issue.  Another

18   real issue is the policy behind 363(m), the finality, the

19   reliance issues, all of which night have been obviated had

20   your client thought it worth its while to get a stay.  Then

21   I wouldn't have these people at this table here thrown

22   throwing at me reliance-finality, reliance-finality.  So to

23   say the real issue is good faith seems to me to pretty

24   blithely skip over the decision.  You are telling me your

25   client ignored the purpose of a stay, let a sale go through

1    and have it brought to me months later and say unwind it

2    because it's all about good faith, judge. And that is, you

3    would not agree that finality and reliance are a real issue?

4    To you, the only issue is the good faith thing?

5              MR. FAY: Yes, Your Honor. That is what the

6    Third Circuit has said in In Re: Abbotts Dairies. They

7    made an oral motion for a stay. The Court invited them to

8    come in with a written motion for a stay. They didn't do

9    it. And what the Third Circuit said, that on this issue it

10   doesn't matter. And it was remanded to the District Court.

11             THE COURT: I read your cases. I read the case.

12             All right. Let's talk specifically about good

13   faith. Give me your position as to why the findings by the

14   Bankruptcy Court are so superficial, so untethered to the

15   record as to be worthy of no credence.

16             MR. FAY: Because, Your Honor, they're just

17   simply conclusory statements of the evidence that was

18   submitted of bad faith deals with the termination of the

19   stock purchase agreement, which was a valuable asset of A.B.

20   Dick before it went into bankruptcy. The termination was on

21   a pretext. The termination of the joint venture agreement,

22   also a valuable asset of A.B. Dick. Neither one of those

23   two factual scenarios are even mentioned in the order and

24   the hearing transcript contained nothing that the Bankruptcy

25   Court even considered that evidence.

1              We have cited case law, controlling case law

2    from New York -- this agreement was governed by New York

3    law -- that the formalistic differences between the consent

4    -- excuse me, Your Honor -- that Key Bank gave on funding

5    and what was actually in the form of consent are not --

6              THE COURT:  Are you okay?  Do you want to take a

7    break, get a drink?

8              MR. FAY:  I'm fine.  I'm fine.

9              -- they're not material.  The reality was that

10   on the 22nd of June, 2004, everything was in place for the

11   stock purchase agreement to go forward.  If that stock

12   purchase agreement had gone forward, the unsecured creditors

13   of this estate would have real value.  There wouldn't even

14   be unsecured creditors.

15             Instead, we have an estate with less than $1

16   million of cash.  This deal got nothing for the estate.

17   There was a deal in place only three-and-a-half weeks

18   earlier and we say that there was no legal grounds to

19   walk away from it.  We did discovery on it.  The debtors

20   participated in that discovery and yet no consideration was

21   given to that issue and to say, well, that is because good

22   faith doesn't entail that kind of conduct cannot possibly be

23   true.

24             THE COURT:  Okay.  Now, stop there.

25             Who is speaking to this issue from the other

1   side?

2       MR. SLATTERY:  The way Mr. Phillips and I had

3   proposed dividing it up, I would address mootness because I

4   represent Presstek and that was our motion.

5       THE COURT:  All right.  Then Mr. Slattery, I'll

6   just have you stand right there and ask you a question or

7   two.

8       Mr. Fay, I want you to reiterate.  I think I

9   heard you mention two things that are indicia of bad faith,

10  I guess I would say, and which were, according to the

11  appellants, absolutely unaddressed.  Did I understand you

12  right?

13      MR. FAY:  That's correct.

14      THE COURT:  You cited nothing in the record,

15  completely blown past by the Bankruptcy Court.  What is your

16  response to that, Mr. Slattery?

17      MR. SLATTERY:  The Bankruptcy Court in the sale

18  order on the record made numerous findings of good faith.

19      THE COURT:  Well, I don't want us to be talking

20  past each other.  I want you to speak exactly to that point.

21  I don't want to you say the judge made findings of good

22  faith.  I want you to speak to the point that the judge

23  didn't speak at all about these.

24      Go ahead and state them again.  What are the

25  indicia of bad faith, Mr. Fay?

1          MR. FAY:  That on June 22nd, 2004, the debtors

2     in this case had in hand an enforceable stock purchase

3     agreement and agreed-upon funding from Key Bank as was

4     required and that, nonetheless, Presstek walked away from

5     that deal, a deal that was worth, by some estimates, $30

6     million more than the one that was ultimately approved.

7          The second is that prior to July 30th, 2004,

8     when the debtor went into bankruptcy, it also had a valuable

9     joint venture address for Presstek which Presstek terminated

10    prior to that date and prior to the sale process.

11         THE COURT:  Okay.  Then the assertion is made

12    that as to those two things, the Court not only paid less

13    than scant attention but do I understand your opponent right

14    he is saying that the Court paid no attention to it?  That

15    is what I want to you address as a factual matter, taking me

16    to the record.  Do you understand?

17         MR. SLATTERY:  The Court did not, as far as I

18    recall, specifically say here are the reasons that I reject

19    everything you just said.  He did reject it and the law and

20    certainly the law is that -- and we've cited this in our

21    briefs -- is that the good faith standard in a 363 deal

22    relates to good faith in the conduct of the sale.

23         There is a couple of points here and I'll have

24    to go a little bit into contradicting or disagreeing with

25    what Mr. Fay said about the record.  But the first thing,

1  legal point is that it has to do with bad faith in the

2  conduct of the 363 sale process.  Their claim does not

3  allege misconduct in the sale by the vendee, 363 sale

4  process.  What they're saying is before there was a 363

5  sale, before there was a bankruptcy filing, they say that

6  Presstek breached -- essentially breached a contract to

7  buy the stock.

8       THE COURT:  That was a little stronger than

9  that.  Mr. Fay, you correct me if I'm wrong.  I take their

10  papers to be saying Presstek effectively drove them into

11  bankruptcy.  It wrecked their business prospects to such a

12  degree that it sent them into bankruptcy.  Did I read too

13  much into what you said?

14       MR. FAY:  No, Your Honor.  I think that is a

15  fair reading of what we were saying.

16       MR. SLATTERY:  That is contradicted by the

17  record in the case because the banker from Key Bank who was

18  financing A.B. Dick, the debtor, testified that they would

19  have put them into bankruptcy much sooner if it weren't for

20  the prospect of Presstek buying the company.

21       THE COURT:  So let me understand this.  Go

22  back to your legal point, and then I want you to answer the

23  specific factual standpoint I had you stand up for.  Okay?

24       Assume for the sake of argument a scenario of

25  the sort that Mr. Fay has described where a purchaser in

1   fact sends a party into bankruptcy by bad faith dealing with

2   it and then goes in and buys it as clean as a whistle in the

3   sale process.  You are telling me that as a legal matter,

4   that is not a basis for finding that the buyer is tainted

5   and therefore not a good faith purchaser.  Have I understood

6   you right?

7              MR. SLATTERY:  Yes.  In the Third Circuit, there

8   is no precedent for that.

9              THE COURT:  And you don't have to justify.  I'm

10  just asking have I understood you right?  And I think I

11  have.

12             MR. SLATTERY:  Yes, and the only way it happens

13  the presale conduct could be relevant is if it was somehow

14  something that interfered with other bidders in post-filing

15  matters.  There is one case that although it rejected the

16  claim, at least didn't entirely throw out that proposition

17  but it had to do with presale conduct that was directly

18  designed to effect the bidding process and mislead other

19  bidders and squeeze them out.

20             It has nothing to do with what happened here.

21  Here, there was a bidding process for months.  There was

22  hundreds of companies solicited to bid and nobody else came

23  forward and put in a qualified bid.  Please keep in mind no

24  one else was interested in buying this company.  If it

25  hadn't been sold to Presstek, everything would have fallen

1   apart and they would have had less money and the company

2   presumably would have had to have been liquidated because

3   there was no other buyer and the company wouldn't continue.

4               THE COURT:   Now, speak to me about the two

5   points I wanted you to talk about.   I'm going to give you

6   your chance at the podium.   Don't worry.   I'm just looking

7   now for a response to the specific factual assertion that

8   the judge, to paraphrase Mr. Fay, there is nothing in the

9   record to show that the judge gave any consideration at all

10  to these two points which MHR relies on so heavily to

11  demonstrate that.

12              MR. SLATTERY:   The judge asked questions of

13  them.   They didn't put on any witnesses.   And so the

14  question, if the question is did the judge, in his order,

15  specifically say "I reject their argument about these

16  issues," he didn't say that.   He just rejected them,

17  as well he should have because, amongst other things,

18  the fundamental premise of their argument they provided

19  no evidence for, as I'm sure you will hear more on the

20  motion on the appeal.

21              So it was an absolute failure of proof on them.

22  Because the whole premise was that Presstek was bound to do

23  something when in fact the condition precedent for Presstek

24  being bound to go forward with the sale was that the bank

25  signed a very specific consent and agreement form and what

1    they'll tell you in their papers is the bank sent a letter

2    that basically qualified for that.  The fact of the matter

3    is the agreement that they're saying we breached expired on

4    its -- was never entered into by Presstek.  Their agreement

5    to do that was explicitly conditioned on getting a specific

6    form signed and it was never signed and there is no question

7    about that.  And if you looked in the record to find that

8    specific form, you would not find it.

9              THE COURT:  All right.  I'm going to give you

10   your crack at the podium in a few minutes.  Be ready to

11   answer two things which I'm going to give Mr. Fay a chance

12   to talk about now.

13             One is how does the decision in In Re:  Abbotts

14   Dairies square with your assertion that under Third Circuit

15   law, presale behavior is entirely irrelevant?  Okay?

16   Because obviously your opponent is hanging his hat, if not

17   entirely, pretty close to entirely my reading In Re:

18   Abbotts Dairies the way he wants.

19             And the second thing to be addressed is what I

20   have been questioning Mr. Fay about and will continue to for

21   the next couple of minutes, whether or not the judges, the

22   bankruptcy judge's rulings are "wholly conclusory."  What

23   can you show me about those rulings?  What can you tell me,

24   showing me the record, that indicates or demonstrates that

25   the Bankruptcy Court did its job, which is what I hear your

 1    opponent saying it didn't.  All right?

 2              Now, Mr. Fay, since you are up first, I want

 3    you to answer the question about, let's continue with this

 4    question about conclusory findings.  When you say there is

 5    nothing in the record, you know, you folks gave me several

 6    volumes.  I'll freely confess I haven't read all of them

 7    but I want you to talk to me about what was going on there?

 8    Was the bankruptcy judge just sleeping during all that?  Is

 9    there any conclusion at all to be drawn from the fact that

10    evidently there were lengthy proceedings over which this

11    judge presided at which you tried to make your pitch and

12    were twice rejected; right?  I mean you brought it up twice

13    and twice got shot down.  Is there nothing to be concluded

14    about the Bankruptcy Court's efforts to get at the truth

15    from the fact that you had two bites at this apple already

16    and a lengthy hearing?

17              MR. FAY:  I'm not sure you could say we got shot

18    down twice.  We got shot down once at the final hearing on

19    this.  We filed two sets of objections but those two sets of

20    objections were not considered until final hearing.

21              THE COURT:  Well, maybe your opponents briefing

22    took me off the mark but I understood that you had objected

23    to the sale procedure.

24              MR. FAY:  Correct.

25              THE COURT:  And that was rejected.  And you

1  objected to the sale procedure in part on this good faith/no

2  good faith, Presstek doesn't have good faith argument;

3  right?

4           MR. FAY:  My understanding is that the sale

5  procedures were ultimately agreed upon by the parties.

6  There was an actual --

7           THE COURT:  Really.  Because --

8           MR. FAY:  -- a resolution reached on those

9  procedures.

10          THE COURT:  The assertion is made by your

11  opponent that you made that objection to the sale procedure

12  and the Bankruptcy Court denied it.  Not that it was an

13  agreement but that the Bankruptcy Court said "MHR, you

14  lose."  And then after the auction, you again made the

15  objection --

16          MR. FAY:  Right.

17          THE COURT:  -- that Presstek is not a good faith

18  purchaser and again the Bankruptcy Court said you lose.

19          MR. FAY:  Right, but it's two different

20  concepts.  Right?  One is what will the procedures be for

21  the sale process.

22          THE COURT:  Well, I understand that.  But wasn't

23  the nub of your objection in both instances, even though it

24  was at different stages that, "hey, Presstek can't be in

25  this game because they're dirty, they're not good faith

1    purchasers?"

2              MR. FAY:  That's correct.  That is was part of

3    it.  Yes, you're right, Your Honor.

4              THE COURT:  So talk to me then, when you say

5    "wholly conclusory," I want you to work with me and tell me

6    what it is that the Bankruptcy Court didn't do or failed to

7    do in hearing you twice on the issue of Presstek being a

8    malefactor and rejecting you twice.

9              MR. FAY:  Okay.  Well, on the first time it was

10   before we conducted any discovery; all right?

11             The second time when we're at the sale hearing,

12   discovery had taken place, we took that discovery.  We took

13   the thing that we discovered.  We took the evidence that Key

14   Bank actually had consented to funding and we put all that

15   before the Court.  We argued to the Court, "look at this.

16   This is real value.  This is value that the estate was

17   deprived of."  We also put before the Court the testimony

18   of Presstek principals about the termination of the joint

19   venture agreement.  So at the sale hearing the judge had

20   real evidence before him on these issues, evidence that had

21   been gleaned from discovery that he had allowed.

22             There is nothing -- the only comment that the

23   bankruptcy judge made about this concept during the hearing

24   was to at one point, toward the end of the hearing, offer

25   the claim to MHR in exchange for MHR's unsecured claim in

1   the bankruptcy.  So the judge tried to do a trade.  He said,

2   "look, you drop your claim, I'll give you this claim."  And

3   then he retracted it.  That is the only comment he makes

4   about this claim during the entire hearing.

5            And then we get an order that was drafted by

6   counsel that has these buzz words about good faith.  The

7   judge offered us the claim.  He must not have thought it

8   was completely frivolous to offer it to us.  And I wasn't in

9   there when it happened but I believe my partner indicated we

10  would have taken it.  And then it was retracted, the offer

11  was retracted.

12           To just put in, you know, In Re:  Abbotts

13  Dairies, first of all, In Re:  Abbotts Dairies addresses

14  diminution in value prior to the sale process so the concept

15  that that is not within the definition of bad or good faith

16  is just not true.  It also says --

17           THE COURT:  All right.  Well, then you tell me

18  why it's just not true.  I mean you will be most helpful

19  to me if you take me to the specific language in the case.

20  They're saying it has nothing to do with it.  You are

21  telling me "oh, no, it does."  If you have the case, show

22  me.  Show me.

23           MR. FAY:  If you look at -- it's on page 148 in

24  the decision.  The Court points out that some of the

25  objections were that the Abbotts, the debtor's value had

1    been greatly diminished by an interim agreement, okay?

2                THE COURT:  148 where?

3                MR. FAY:  Right at the bottom of 148, Your

4    Honor.

5                Then if you look just on the same page, right

6    below footnote six, in the paragraph that starts, generally

7    speaking, an auction may be sufficient to establish one has

8    paid value for the assets after bankruptcy.  In the present

9    case, on the other hand, we reject the assertion that the

10   auction conducted for Abbotts assets necessarily establishes

11   that ABC paid value if Abbotts and ABC colluded in its

12   motion to approve the interim agreement in attempt to chill

13   the bidding for the assets involved.  It would follow that

14   no auction took place in the Bankruptcy Court.  Thus, the

15   bidding could not, by definition, serve as the final arbiter

16   of the value of Abbotts' assets.

17               THE COURT:  All right.  Where are you on that?

18               MR. FAY:  It's the whole paragraph that starts

19   out with "generally speaking" on 149, Your Honor.

20               THE COURT:  It's on 149?

21               MR. FAY:  Right.  Yes.

22               I'm sorry.  It's on the next page.

23               So here we have a situation where there was an

24   interim agreement and the allegation was that that interim

25   agreement affected the value of the debtor so what was

1    actually being auctioned was less -- it either was of less

2    value or it looked to be of less value that than it should

3    have been.  That is exactly the same kind of thing we are

4    arguing here.

5            THE COURT:  Well, there, didn't the Third

6    Circuit say there really wasn't an auction?  Here, there was

7    an auction.

8            MR. FAY:  Well, there was an auction here, too.

9    I think what the Third Circuit is saying is that when you

10   have so diminished the assets, you can't say that the sort

11   of economic concept of an auction works if you have taken an

12   asset, diminished it through some kind of wrongful conduct

13   and then say, oh, we got the best price.  I mean the

14   definition of good faith is far broader than that.  And in

15   the In Re:  Abbotts Dairies, all the Third Circuit says is

16   that typically it says good faith goes to the integrity of

17   the actor's conduct.  Typically, that will be fraud and

18   collusion, but it doesn't say exclusively.  That is all it

19   says on that issue.

20           THE COURT:  And here, your assertion is that the

21   bad faith is bad faith in business conduct prior to the sale

22   that diminished the value and, therefore, deprived MHR or, I

23   should say, the company the opportunity to have a legitimate

24   auction.  Have I understood you right?

25           MR. FAY:  Well, what it did was it so diminished

1  -- if you were going to auction this company, it should have

2  been auctioned with these assets.   Right.

3          THE COURT:   Now, talk to me for a moment about

4  -- and obviously we merged over into your appeal itself.

5  Talk to me for a moment about what is the relief you would

6  have me grant?   In your ideal world, what would happen?

7  What are the words I would speak?

8          MR. FAY:   One of two things, Your Honor.   You

9  either look at the evidence and say I don't find good faith

10  here, send it back to see what the Bankruptcy Court can do

11  as far as relief.   As In Re:   Abbotts Dairies recognizes,

12  even on the issue of good faith, if it goes back to the --

13  there was certainly some limitations on the Bankruptcy

14  Court's ability to grant any relief.   There is no evidence

15  here that this sale can't be untangled.   But even if it --

16  let's assume it can.   Let's just assume the representations

17  on that.

18          THE COURT:   Yes, let's do.

19          MR. FAY:   The Bankruptcy Court can look to other

20  forms of relief.   That is the ideal.   Send it back to the

21  Bankruptcy Court.   Let's see what we can do here.   Again,

22  this is an estate that is almost insolvent.   This is the

23  only change the unsecured creditors have to find any real

24  value, okay?

25          Second, at the very least, send this back and

1    let's have a true airing of these issues.  Let's have a

2    hearing where we specifically address the conduct of

3    Presstek in walking away from the stock purchase agreement,

4    in terminating the joint venture agreement and findings on

5    whether or not that really amounted to benefit them.

6              THE COURT:  Well, haven't you said that you

7    aired those before and the problem is the Bankruptcy Court

8    didn't pay attention to them?

9              MR. FAY:  Right.

10             THE COURT:  So wouldn't you get to the same

11   place you are saying you ought to be able to go to if the

12   matter was remanded to the Bankruptcy Court with the

13   requirement that the Court review the record already extant?

14             MR. FAY:  Right.  Correct.

15             THE COURT:  All right.  Okay.  I'm going to give

16   the podium to your opponent here for a bit, Mr. Fay.

17             MR. SLATTERY:  Thank you, Your Honor.

18             THE COURT:  Okay.  Now, I don't know if there

19   is anything in anything Mr. Fay said in response to my

20   questions that lead you to say anything before you get to

21   the questions that I asked you, but please remember I want

22   to you answer those specific questions.

23             MR. SLATTERY:  For the sake of moving things

24   along, I'll try to be very brief and not give a speech to

25   you.  But Abbotts Dairies, Your Honor, was a situation in

1    which the Bankruptcy Court did not make any finding of good

2    faith.  Abbotts Dairies is a Third Circuit case after which

3    after a bankruptcy 363 sale, the Third Circuit was asked to

4    put in findings of good faith.  So the difference in Abbotts

5    Dairies, there was no finding of good faith, period, by the

6    Bankruptcy Court.

7              THE COURT:  Well, you know, I think we get

8    past that pretty quickly by saying you need to address Mr.

9    Fay's argument that I can't allow form to be elevated over

10   substance.  The argument your opponent is making is the

11   bankruptcy judge signed an order you put in front of him

12   that uttered the words "good faith" but that doesn't

13   constitute a true finding of fact.  It's simply, you know,

14   you don't speak the magic words and that substitutes for a

15   true investigation of the record, a true examination of the

16   issue.

17             That is what I want you to talk to me about.

18   That is why I said get me into the record.  It's because to

19   meet your opponent's argument, you have to do more than say

20   he signed an order that said "good faith" in it.  You need

21   to plead that argument.  You need to show me well, wait, he

22   was looking at this.  He understood what was going on.  He

23   was paying attention.  I mean, it's in there.  So that's

24   what you need to talk to me about.

25             MR. SLATTERY:  First, I would say if they want

1   Your Honor to reject the findings, expressed findings and

2   repeated findings of the Bankruptcy Court that there was

3   good faith, they should cite precedent for that and they do

4   not.  Abbotts Dairies does not.  In Abbotts Dairies, the

5   court did not make a finding of good faith.  So there is

6   absolutely zero precedent for what they're asking you to do

7   in that sense in the context of a 363 on bankruptcy.

8                Now, whether or not the judge was --

9                THE COURT:  Now, stop, because I'll just go on

10  record with you right now saying I think you read Abbotts

11  Dairies too narrowly, bluntly.  I think that because if your

12  argument to me is -- and I'm sure it's not, but if I took

13  you to the logical limits, what you are telling me is it

14  doesn't make any difference whether the bankruptcy judge

15  has actually got his head on the desk, sleeps through the

16  entire hearing, wakes up only long enough to sign an order

17  that the opposing counsel shoves in front of him and says

18  the words "good faith," that that is done because that is a

19  "finding" of good faith and therefore Abbotts is --  see,

20  that is the argument they're in effect making to me that

21  it's wholly conclusory and the judge failed to do his job.

22                So it's not helping me, in the process of

23  dealing with their argument, for you to say, "well, Abbotts

24  Dairies is different because there was no finding of good

25  faith and here there is" when the assertion from the other

1   side is that is a sham, defining good faith is a.

2   Sham.   It's a lawyer construct.   That the judge did nothing

3   to investigate.   That is the point you need to answer.

4              MR. SLATTERY:   Okay.   The answer to that is

5   extensive testimony was presented by representatives of the

6   debtor.   And I don't mean to step on Mr. Phillips who is

7   going to address these issues more fully, but the debtors

8   Chief Restructuring Officer and their Financial Officer

9   testified, MHR put on no witnesses.   They testified to the

10  sale process.   They testified to the fact that hundreds of

11  people were solicited, that it was narrowed down to some who

12  expressed they wanted to think about it further.   That it

13  finally narrowed down to two entities, neither of which

14  filed a competing bid.

15              There is no evidence presented by anyone that

16  somehow Presstek was colluding with the debtor to affect the

17  bidding process, which is what Abbotts Dairies said.   That

18  the requirement of the purchaser to act in good faith speaks

19  to the integrity of his conduct in the course of the sale

20  proceedings.   Misconduct that would destroy the purchaser's

21  good faith status would be fraud, collusion between the

22  purchaser and other bidders or the trustee.   That's the

23  standard for what you are looking at in this process.

24              THE COURT:   Okay.   Show me that again what you

25  are reading from.

1          MR. SLATTERY:  That's Abbotts Dairies.

2          THE COURT:  What page?

3          MR. SLATTERY:  It's letter A.  I have a printout

4    so it's hard for me to find it.

5          MR. PHILLIPS:  147, Your Honor.

6          THE COURT:  All right.

7          MR. SLATTERY:  That is the actual standard in

8    the Third Circuit when you are looking at this.  So there

9    was extensive testimony on the sale process.  And the fact

10   that no other bidder showed up, MHR didn't present any

11   evidence by somebody coming in and saying, gee, you know, I

12   would have put in a huge bid if it weren't for what Presstek

13   did supposedly did before the bankruptcy filing.  There is

14   no connection between any of that.  They put on no evidence

15   period in that regard.  The only thing they talked about was

16   this supposed breach of the stock purchase agreement which

17   was never, by the way, never binding on Presstek.

18          So that is the record that was made.  The rest

19   of it was MHR calling all the witnesses liars.  They didn't

20   put on any testimony, and there is no question, no factual

21   question no, defense they can make to the validity of the

22   bidding procedures and the validity of the bidding process.

23   They didn't even try to make that.  The only thing they

24   talked about was their belief, their claim that Presstek

25   breached the stock purchase agreement.

1          And I do want to make this point again, Your

2    Honor.  The entire claim rested on saying that Presstek

3    wrongfully terminated by using a bogus excuse that Key Bank

4    did not sign what was called a consent and agreement.  They

5    never put that into evidence.  Theres is no question Key

6    Bank never signed it and MHR did not put the document into

7    evidence.

8          THE COURT:  And whose burden was that?

9          MR. SLATTERY:  It was theirs.  They're

10    challenging it.  They're the ones who were -- they spent a

11    lot -- they spent two hours trashing everybody else but the

12    fundamental foundation of their entire claim, the consent

13    agreement, as far as I can tell was never put in the record.

14    If you look at your briefs, Your Honor, you won't find a

15    reference to it in the record from MHR.

16          THE COURT:  Okay.  Mr. Slattery, hold it right

17    there.

18          Mr. Fay, the assertion is that you had your shot

19    in the Bankruptcy Court and you had a fundamental failure of

20    proof on a point that you had the burden of proof on.

21          MR. FAY:  Yes, and that document wasn't it.

22    What our point of proof was, our point of proof was that Key

23    Bank did consent.  And we put in the evidence showing that

24    consent.  If his defense was, yes, but he didn't sign this

25    document, that was his fundamental burden of proof to put

1    that in.

2          We put in evidence including testimony from an

3    official at Key Bank and a letter that Key Bank wrote that

4    they did indeed consent to further funding.  If he want to

5    contradict that consent and claimed it wasn't in sufficient

6    form, that is his burden.

7          MR. SLATTERY:  The escrow agreement by its terms

8    specifically states, this escrow -- what happened was they

9    had the documents, what everybody hoped would be final

10   form.  Presstek would not sign because they said we want a

11   representation from Key Bank that they will continue to

12   fund, they will commit to fund working capital while the

13   sale process was pending in an amount necessary to get them

14   through the sale process.  And it had other requirements.

15   It required them -- it's not in the record so I shouldn't

16   be testifying to it but let's suppose there is an agreement

17   that said you have to agree to fund through the proceeds

18   closing and you have to waive any defaults or anything else

19   like that through the closing.

20          They didn't sign it.  The escrow agreement which

21   is in the record, which is at Appendix A 421 is the start of

22   the escrow agreement that says that "the escrow provided

23   hereunder," and under the escrow, the escrow was the holding

24   of the executed documents that would be released from escrow

25   when the conditions were met.  "The escrow provided for

1    hereunder shall in no event be released until Key consents

2    to the transaction on the terms and conditions herein."

3              And it further says, the next page, in paragraph

4    3b:  "From the date through close of business on June 22,

5    2004, Parent shall endeavor" -- Parent being the debtors --

6    "shall endeavor to obtain Key's consent and agreement to the

7    Proposed Transaction, such consent and agreement to be

8    evidenced by Key's execution of Exhibit A attached hereto."

9              That is the escrow agreement.  Is it in the

10   papers that they put in front of Your Honor or before the

11   Bankruptcy Court?  No.

12             Therefore, when they say, well, Key Bank sent

13   this letter and it was really the same thing they have, the

14   Court could never have accepted such an argument because

15   there was no basis of comparison.  They're saying this

16   letter is the functional equivalent of the consent and

17   agreement but the consent and agreement was not in evidence.

18   No one could make that determination and it's an absolute

19   failure of proof.  And not only was it an absolute failure

20   of proof but it was a conscious failure of proof.

21             THE COURT:  All right.  Speak, if you would,

22   please -- and if I'm taking you over into Mr. Phillips'

23   piece of the argument, you guys decide where one of you

24   wants to stand up and the other one to sit down because I

25   understand these things are pretty tightly interrelated --

1    to the record itself and what it does show.  In other words,

2    the argument is made that, like I said, Mr. Fay is up here

3    saying the guy just -- you handed him a pen, you handed him

4    a piece of paper, he signed everything that was put in front

5    of him.  That is essentially the assertion I am getting in

6    front of me.  It's lawyer's language, it's not judicial

7    findings as to good faith.

8            Use your record.  Argue to me from your record

9    about why I should say, hey, this is the real deal.  Here is

10   a judge who had a big long hearing, paid attention, made

11   some findings.  They stick.

12           MR. SLATTERY:  Well, I will turn that over to my

13   colleague and superior, Mr. Phillips.

14           THE COURT:  All right.  Thanks, Mr. Slattery.

15           MR. PHILLIPS:  Good morning, Your Honor.  Mark

16   Phillips on behalf of the debtors.

17           Before I go into those issues, I would just like

18   to comment on two of the points that have been discussed so

19   far this morning.

20           Number one, with respect to the mootness issue,

21   I would simply point out that Abbotts Dairies was very

22   clear.  The Court was very clear about what the purpose of

23   obtaining a stay is and what the purpose of the good faith

24   finding by the Bankruptcy Court is.  It says, at page 150 of

25   the opinion.  "Such a finding encourages" -- and this begins

1    the quote, "encourages finality of the Bankruptcy Court's

2    judgments under Section 363(b)(1) because it places

3    prospective appellants on notice of the need to obtain a

4    stay pending appeal or face dismissal for mootness pursuant

5    to Section 363(m), should the District Court affirm the

6    Bankruptcy Court's finding of good faith."

7         Your Honor, what Abbotts Dairies says is that

8    you don't even get to question good faith.  If an explicit

9    finding, as happened in this case, is made regarding the

10   good faith purchaser and you don't seek a stay, you don't

11   get to pursue that appeal.  That is what Abbotts Dairies

12   says.  And this Court has previously applied that standard.

13        Second, Your Honor, this notion that somehow it

14   was the failure to go forward with the stock purchase

15   agreement that resulted in this debtor, these debtors

16   insolvencies.  I would refer the Court to the testimony of

17   Gregory Nip (phonetic) at the August 23rd hearing on the

18   sales procedures motion.  That is at B 0275 of the record

19   here.  And beginning at page 57, in which Mr. Nip describes

20   how the debtor was insolvent months, months before the

21   events that Mr. Faye and MHR now complain of and the

22   financial situation that the debtor found itself in.  It

23   wasn't any action of Presstek that drove these debtors into

24   bankruptcy, Your Honor.  Rather, they were confronted with

25   the necessity of pursuing bankruptcy when they were unable

1   to complete the sale process because of their own financial

2   situation.  And I believe Mr. Nip's testimony in that regard

3   is rather clear.

4          With respect to the record, your Honor, which

5   supports the Court's findings of good faith, the record is

6   not only evidentiary in nature, it is the entire process

7   here, all of the events that occurred over the four months

8   from the filing in July to the actual sale on November 5th.

9          First, let's begin even before the filing of the

10  bankruptcy with the negotiation of the asset purchase

11  agreement which became the stalking horse bid during the

12  auction process.  Mr. Pollack, the investment advisor for

13  the debtors, testified at the August 23rd hearing -- and

14  this is beginning at page 127 of that transcript, testified

15  that the terms of the asset purchase agreement were the

16  subject of extensive discussion and negotiation and he lists

17  there the items that were actually negotiated by the parties

18  in which the debtors were able to obtain more favorable

19  terms:  the covenants, the representations and warranties,

20  the material adverse change clause, the timing and financing

21  terms, and concludes at page 200 with the statement, yes,

22  this was definitely an arm's-length negotiation.

23         And those same comments are supported by the

24  record on, at the hearing on September 2nd -- excuse me.

25  November 2nd at pages 111 and 112 of the transcript.  Again,

1    Mr. Pollack repeats:  "I would characterize the negotiations

2    as spirited, both parties taking very strong positions and

3    working toward a negotiated contract."

4            THE COURT:  Mr. Phillips, let me interrupt you

5    long enough to say this.  Take it just for argument's sake

6    for a moment that no one is going to go at the sale process

7    itself.  That the focus is on MHR's assertion that precise

8    behavior ought to be something that is looked at.

9            Is there anything in the record on that point,

10   Mr. Slattery was referring to some discussion on that, that

11   indicates that that surfaced, was discussed at a point

12   before the Bankruptcy Court?

13           MR. PHILLIPS:  Mr. Slattery is absolutely

14   correct in one respect with respect to that issue, but I

15   would even go beyond what Mr. Slattery was saying about the

16   evidentiary record on this.  There is no question that there

17   was argument by counsel at the November 2nd, November 3rd

18   hearing on the sales order by MHR's counsel regarding these

19   issues.  However, no evidence was presented of any sort.

20   Not only did MHR never present any witnesses, they didn't

21   even submit into evidence, Your Honor, the deposition

22   transcripts which they assert are now part of the record.

23   They attached portions of deposition transcripts to their

24   motion papers but never offered them into evidence, never,

25   never presented any evidence of any sort regarding this

1   issue beyond attaching excerpts to their objection, and

2   never presented it from an evidentiary standpoint.

3          There was consideration by the Court.  As Mr.

4   Fay points out, at one point the Court even says, breaks

5   into the closing argument of Mr. Fay's colleague Mr. Rosner

6   and says, "well, what if I gave you the claim?"  And Mr.

7   Rosner stopped for a moment, said, "well, I'd have to make a

8   telephone call, Your Honor."  And he said, "well, I'm not

9   going to give you that option.  Do you want the claim or

10  not?"  And Mr. Rosner says "yes, we want the claim.  We'll

11  take the claim and we'll drop our objection."  And then the

12  issue was pointed out to the Court and the Court had to go

13  back off of that because of the fact that in fact under the

14  sales order and under the asset purchase agreement, those

15  claims would be released, and that in fact that would

16  represent a material change in the terms of the asset

17  purchase agreement.  And the Court recognized that and said

18  "I can't do that at this point."  Everything else supports

19  going forward with the asset purchase agreement.

20          The fact is, Your Honor, that there is nothing

21  here in terms of an indication of a lack of good faith in

22  the sales process.  All of the testimony, all of the

23  evidence before the Court supports the notion that in fact

24  this was a good faith process.  And I understand the Court's

25  concern here.

1          THE COURT:  Nothing about my questions should

2  prompt any anybody to say I have a concern.  I'm just asking

3  questions.

4          MR. PHILLIPS:  The Court's concern in what I was

5  suggesting was the notion that everybody else would accept

6  that the sales process -- there is no question that the

7  sales process was one in which there was an integrity in the

8  bidding process and there was marketing and that in fact

9  there was no indicia of collusion or bad faith or fraud in

10  connection with the actual sales process in the bankruptcy.

11  I believe that is what the Court said.

12          But that is exactly the point.  We had a bid

13  here, a stalking horse bid of $40 million for this company,

14  during the four and-a-half months after that asset purchase

15  agreement was entered into, and that stalking horse bid was

16  obtained, the debtors were able to negotiate enhancements to

17  that bid.  And I think the most, the best indicia of good

18  faith here, Your Honor, is in fact the transcript of the

19  November 1st auction which is attached to the sales order

20  itself, in which absent any competing qualifying bid, the

21  debtors actually negotiated with Presstek between $4-and-$6

22  million in enhancements to that bid with no other bid out

23  there.

24          And I would suggest to you, Your Honor, that in

25  fact if any claim exited and there is substantial doubt that

1    any claim could have ever been brought against Presstek for

2    breach of the stock purchase agreement, that in fact the

3    debtors were able to obtain the settlement value of those

4    claims right at that point.  There is no other explanation,

5    Your Honor, for the fact that here is this bidder with no

6    competing bid out there.  And it's offering $4-to-$6 million

7    more on its bid at that point in time and in fact the debtor

8    was able to realize those savings that were negotiated.  I

9    think that that is the best indication of good faith that

10   the Court could rely upon here.  There is multiple examples

11   in the record of this, Your Honor.  And I could go through

12   them more.

13              With respect to the claim here of MHR, your

14   Honor, there is nothing in the record from which the Court

15   could have -- even if accepting that somehow legally this

16   was a cognizable argument regarding good faith, that there

17   is nothing in the record from which the Court could have

18   found bad faith because it was counsel's arguments, it was

19   not evidence that was put before the Court, either at the

20   August 23rd hearing on the sales procedure motion or at the

21   November 2nd and 3rd hearings on the sales order.

22              THE COURT:  Well, what do you say to the

23   assertion they put a witness on the stand and they put a

24   letter in from a Key Bank official that said we're in, we're

25   funding?  When you say there is nothing, that they say there

1    is something, tell me why what they say is nothing.

2              MR. PHILLIPS:  What they're saying is something

3    is what they attached to their objection.  They attached

4    excerpts of deposition transcripts along with exhibits that

5    were presented at those depositions.  They did not ever

6    submit those deposition transcripts into evidence at the

7    sales hearing.  They never presented a witness.  The only

8    witnesses that were presented at the hearing on November 2nd

9    and 3rd were Mr. Steven Gray, the Chief Restructuring

10    Officer of the debtors, and Mr. Pollack, the investment

11    advisor.  Those are the only witnesses that were presented,

12    and in fact neither of them had any knowledge, any direct

13.   knowledge of what occurred with respect to the stock

14    purchase agreement on or before June 22nd.  All of the other

15    testimony was offered through excerpts from deposition

16    transcripts that were never submitted into evidence at the

17    hearing.

18              THE COURT:  All right.  Mr. Fay, I'll give you

19    the last word.

20              MR. FAY:  Okay.  Your Honor, our offering of

21    evidence was clearly in the record.  There was no objections

22    to it.  It was treated as if it was in the record at the

23    hearing when counsel was arguing and obviously the judge

24    heard us.  He offered us this claim.  He knew what we were

25    referring to.  He knew the evidence that we were referring

1    to here.  There was no objection to this evidence, no motion

2    to strike, nothing.

3         The concept that we haven't put in sufficient

4    evidence to find that there was a real concept here is

5    simply not true.  You know, if you look at the fact section

6    of our brief, we walked the Court through what happened.

7         Presstek sends a letter to Key Bank:  "You

8    haven't consented."  Key Bank sends a letter back, "yes, we

9    have."  Presstek sends an e-mail, "yes, but you didn't sign

10   the consent and here is the reasons why in the consent.

11   Here is what we didn't get from the consent that we say

12   means you didn't really consent."  That is our burden.  We

13   showed it.  They wanted to put in the consent agreement

14   itself to show that there was some other term that they

15   were relying upon they could do it but there was sufficient

16   evidence to have a prima facie burden of proof that, yes,

17   indeed there was a material consent here and that any

18   quibbling of around the side of it was immaterial and,

19   therefore, under New York law was no basis to walk away from

20   this deal.

21        And, what did counsel just admit?  In their

22   briefs, they rely over and over again on the testimony of

23   this Mr. Pollack about the good faith process, the good

24   faith of the negotiations.  Mr. Pollack admitted during

25   the hearing he had nothing to do with the stock purchase

1   agreement and didn't even get involved with the asset

2   purchase agreement until one week afterwards.  They are

3   relying on everything that happened after the bad conduct.

4   That can't possibly be the case.

5          THE COURT:  Well, stop.  When you say that that

6   can't possibly be the case, go ahead and pull out your

7   favorite case again and let's talk about page 147 of In Re:

8   Abbotts Dairies.  Speak to the legal assertion of your

9   opposing counsel that the standard to be applied is it

10  "speaks to the integrity of conduct in the course of the

11  sale proceedings period."  Typically, the misconduct that

12  would destroy purchaser's good faith status of a judicial

13  involved fraud, collusion between the purchaser and other

14  bidders or the trustee in an attempt to take grossly unfair

15  advantage of other bidders.  "Integrity in the course of the

16  sale procedures," that is what they're relying heavily upon.

17         MR. FAY:  That is correct.  And we would submit

18  that the course of the sale proceedings for this company

19  extended far beyond its bankruptcy.  This company was being

20  sold to Presstek as of June 16th, 2004; right?  It then

21  transpired that it went into bankruptcy and was sold in a

22  different way, but this is the sale process.  This company

23  had been on the block for a long time.  The auction was just

24  the end of what had been a long process of trying to sell

25  this company.

1          To read this provision as narrowly as they do
2    would read out of In Re:  Abbotts Dairies the very concerns
3    that the Third Circuit had; right?  The Third Circuit talks
4    about an interim agreement that may have diminished the
5    value of the company.  Well, if it's only the sales process,
6    you could have argued there this interim agreement doesn't
7    have anything to do with the sales process.

8          It's a far too narrow a definition of good
9    faith.  And there is nothing in In Re:  Abbotts Dairies
10   that suggests that you have to narrow it that way.  And I
11   think in the In Re:  Paolo Gucci, Inc. by the Second Circuit
12   says anything that would affect the sale price, anything
13   that tries to control the sale price.  This is conduct that
14   affected the sale price.  As of the 16th of June, this
15   company had a deal that was double in value.

16          THE COURT:  Okay.  I got your position.

17          Is there something you are burning to say, Mr.
18   Slattery?  It looks like it.

19          MR. SLATTERY:  No.

20          THE COURT:  No.  You are okay?  All right.

21          MR. FAY:  Thank you, Your Honor.

22          THE COURT:  Well, I would like to go back and
23   write this up for you in a nice opinion but the reality is
24   I'm scheduled to be in trial four weeks and this thing has
25   been hanging around long enough.  So I'm going to give you a

1    ruling now from the bench.  I'll memorialize it in an order

2    and I'm granting the motion to dismiss the appeal as moot

3    for the following reasons.

4              And I recognize that in effect, I mean these

5    things are so tightly interwoven it's hard to separate it

6    out, but my reasoning is as follows:  I have a significant

7    question about the appellants effort to read In Re:  Abbotts

8    Dairies of Pennsylvania Inc. so broadly as to say that any

9    kind of presale conduct that could be viewed as affecting

10   the value of the asset which is ultimately auctioned is

11   conduct which has to be taken into account in determining

12   whether there has been good faith in the sale process.

13             I think that is too broad a reading of that

14   case.  That In Re:  Abbotts Dairies speaks to good faith in

15   the sale process that is occurring under the judicial eye of

16   the Bankruptcy Court.  That is not to say that you couldn't

17   have something happen prior to that judicial watchfulness

18   that would affect the sale because obviously In Re:  Abbotts

19   Dairies says that can't happen but that speaks expressly to

20   a corrupting of the process by collusion and fraud in the

21   way the auction process is developed and there is nothing

22   remotely like that in this case.

23             On the contrary, the only evidence in the record

24   indicates that this was a fully, fair, open auction process.

25   And not even MHR disagrees with that.  The only argument MHR

1   makes is that the behavior of Presstek prior to the

2   bankruptcy was such as to make the value of the asset less

3   once they were in bankruptcy and, therefore, they couldn't

4   be good faith purchasers for value under the Code.

5           Now, maybe you will be right and maybe the Third

6   Circuit will turn it around.  And that is all right with me.

7   I have no ego investment in that but I think you stretched

8   that decision further than it can go, at least without

9   further clarification by the Third Circuit on that point.

10          And since there was no stay, something which

11  frankly I don't understand because In Re:  Abbotts Dairies

12  does speak to the importance of a stay expressly and the

13  argument here for counsel from MHR is they knowingly

14  declined to go into that because they were going to rely on

15  In Re:  Abbotts Dairies, well, that seems inconsistent to me

16  because the decision itself talks about the significance of

17  a stay.  It's hard for me to square those two positions, the

18  reality of the factual record and the argument that is made

19  here about why no stay was sought.

20          I also note the Bankruptcy Court twice heard MHR

21  on this very point and twice rejected it on this very point.

22  And by this very point, I mean that Presstek has somehow

23  got such unclean hands, it could never be a good faith

24  purchaser.  So to say that the Bankruptcy Court didn't

25  make a finding in good faith I don't think squares with

1   the record in that regard.  The argument was twice made and

2   twice rejected.

3           The assertion that was wholly conclusory and

4   that the Bankruptcy Court was just asleep at the switch I

5   think is not borne out by the extensive record that was

6   created by the questioning that occurred during the argument

7   that was made to the Court which has been brought out here

8   and discussed.  You know, it's interesting to hear the

9   different spins that the two sides put on it, but it's

10  clear, as Mr. Fay said on behalf of MHR, that the judge knew

11  what MHR's evidence was.  As you said, he knew what you were

12  referring to, it was in record.  He did indeed.  He was

13  paying attention.  And that tells me that this wasn't some

14  circumstance where the judge didn't know what was going on.

15  The judge knew what was going on, heard you, rejected the

16  argument, made a finding that there was good faith

17  sufficient to permit this sale to occur.

18          And so under 363(m), I believe I am bound to say

19  that the underlying sale or lease was not stayed pending

20  appeal and there wasn't anything to indicate that something

21  was going on that would affect the validity of the sale.

22  That there's no bad faith that would prevent that sale

23  process from having the full force and effect of law.  I

24  think were I to hold otherwise, I would dramatically

25  undermine the policy of finality and certainty which that

1    statutory section is supposed to provide people and it would

2    apply in the face of the Third Circuit precedent like

3    Cinicola v Scharffenberger which emphasizes the importance

4    of that policy.

5         So for those reasons, I'm granting the motion to

6    dismiss the appeal as moot.  I'll give you basically a one

7    sentence order that memorializes this by saying "for the

8    reasons stated in open court ..."  You will have your

9    opportunity at that point then to take this up and maybe you

10   will get some further law from the Third Circuit about just

11   how far the notion of good faith in the course of the sale

12   extends and, who knows, maybe we'll be back here.

13        All right.  Thanks for your time this morning.

14   We're in recess.

15              (Proceedings end at 10:12 a.m.)

16

17

18

19

20

21

22

23

24

25